# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

_____

MARY BASILE LOGAN, individually and on behalf   |
of those similarly situated, *Pro-Se*;   |
  |
        Plaintiff,   |
  |
MERRITT GARLAND, in his official capacity   |
Attorney General, Department of Justice; et al.   |
  | **CIVIL DOCKET: 3:24-CV-00040**
        Defendants.   |         **ZNQ-TJB**
  |

_____

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTION TO DISMISS**

**AND OPPOSITION TO *PRO HAC VICE* ADMISSION OF COUNSEL**

Dated March 11, 2024

Mary Basile Logan
Plaintiff, *Pro-Se*
Post Office Box 5237
Clinton, New Jersey 08809
Telephone:  908-200-7294
FAX:  888-237-2671
Email:  Trino@trinops.com

Plaintiff, Mary Basile Logan, individually and on behalf of those similarly situated, does hereby reply to Defendant, the DEMOCRATIC NATIONAL COMMITTEE's ("DNC") Consolidated Motion to Dismiss ("Motion") and Statement in lieu of Brief in support of *pro hac vice* admission of counsel; Shawn G. Crowley, and Maximillian Feldman.  Plaintiff opposes the Motion and *pro hac vice* admission of counsel, and herein provides the Honorable Court support to same, as follows:

## **PRELIMINARY STATEMENT**

Defendant opens the Memorandum of Law in support of the Consolidated Motion to Dismiss with a history of Plaintiff's pursuit which is irrevocably contradicted by two facts; 1)the vehemence with which the Defendant has sought to distance itself from the facts, and 2)a simultaneous pleading entered, seeking the Honorable Court's consent in allowing attorneys Shawn Crowley, and Maximillian Feldman of Kaplan Hecker and Fink, LLC to appear and participate *pro hac vice*. Plaintiff states that if, as Defendant claims, the complaint were "devoid of any factual matter sufficient to state a plausible claim for relief" against the DNC, the necessity of *pro hac vice* counsel would be moot.

Plaintiff seeks to reiterate for the benefit of the Honorable Court, while Plaintiff sought counsel, interviewing no less than seven attorneys, two of the candidates stated, "are you familiar with John Eastman?"  By making this statement, Plaintiff understood the reference to disbarment procedures sought at the bequest of former Governor, Christine Todd Whitman.  Having a limited knowledge of Federal Civil Procedure, Plaintiff was and remains fervently obligated to the facts, to that end, this pleading, and those forward will be presented in similar manner.  Respecting the Court, Plaintiff will research and stay within the confines of Fed. Civ. Rules of Court, opining of facts and absent conjecture.

Plaintiff seeks to present to the Honorable Court for consideration as the Defendant's application three emergent points of evidence which corroborate her claims and distinct analysis:

1. On March 5, 2024, Defendant, Andrew Cuomo was called before Congress regarding his Administration's handling of the COVID-19 pandemic, specific to the nursing home related deaths as well other implications.  As it concerns Defendant, Andrew Cuomo, as well those claims presented within the DNC Motion before the Honorable Court for consideration, Plaintiff provides the NYTimes article of March 3, 2024, which informs of emergent facts corroborating Plaintiff's claims concerning the COVID-19 mismanagement and resulting nursing home deaths which will be exacted in the forthcoming amended complaint.   (https://www.nytimes.com/2024/03/05/nyregion/cuomo-covid-nursing-homes-subpoena.html)

2. On March 7, 2024, Defendant, George Norcross, came under federal investigation as to his actions involving Camden real estate in New Jersey, among other matters.  As it concerns Defendant, George Norcross, as well those claims presented within the DNC Motion before the Honorable Court for consideration, Plaintiff includes reporting from the aforementioned federal investigation which inform of emergent facts corroborating Plaintiff's claims which will be exacted in the forthcoming amended complaint. (https://www.msn.com/en-us/news/politics/george-norcross-probe-prosecutors-have-broadened-their-investigation....)

3. On March 1, 2024, the Federal Appeals court panel ruled regarding Larry Brock, sentenced for the January 6, 2021 obstruction of Congressional proceedings, citing the legal enhancement for interfering with the administration of justice.  As it concerns Defendant, Elizabeth "Liz" Cheney as well those claims presented within the DNC Motion before the

Honorable Court for consideration, Plaintiff provides excerpt from the ruling

aforementioned which inform of emergent facts corroborating Plaintiff's claims which will

be exacted in the forthcoming amended complaint.

Brock challenges both the district court's interpretation of Section 1512(c)(2)'s elements
and the sufficiency of the evidence to support that conviction. He also challenges the
district court's application of the three-level sentencing enhancement for interfering with
the "administration of justice." Because the law and the record in this case foreclose
Brock's legal and sufficiency challenges, we affirm Brock's Section 1512(c)(2) conviction.
As for Brock's sentence, we hold that the "administration of justice" enhancement does not
apply to interference with the legislative process of certifying electoral votes. For that
reason, we vacate Brock's sentence for his Section 1512(c)(2) conviction and remand to
the district court for resentencing.[1]

4.  Plaintiff states, the DNC was and remains a central figure to the Plaintiff's action as well

those of the emergent facts concerning her claims as stated herein which will be further

evidenced in the forthcoming amended complaint.

## PROCEDURAL BACKGROUND

As to the Defendant's claim of standing ¶A, p.4, Fed. R. Civ. P. 12(b)(1); failure to state a

claim ¶B, p.6, Fed. R. Civ. P. 8(a)(2), 12(b)(6) and ¶C, p.7 futility determination would be unfair to

the *pro se* litigant, having entered a Motion to Leave to File Amended Complaint addressing the

foregoing defense perspectives raised.

The Rule 12(b)(6) test has been revised in recent years, this includes *Conley v. Gibson*, 355

U.S. 41 (1957), in this case, the Supreme Court stated that the interplay between Rule 8 ("pleading")

and Rule 12(b)(6) as follows:  "[T]he accepted rule [is] that a complaint should not be dismissed for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove a set of facts to

support her claim which would entitle her to relief." 355 U.S. at 45-46.  In *Bell Atlantic Corporation*

---

[1] Cheney, Kyle.  Some Jan 6 Sentences were Improperly Lengthened, Appeals Court Rules.  March 1, 2024.  Accessed March 8, 2024, https://www.politico.com/news/2024/03/01/some-jan-6-sentences-were-improperly-enhanced-appeals-court-rules-00144403

*v. Twombly*, 55 U.S. 544 (2007), the Court noted questions raised regarding the "no set of facts" test and clarified that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *id.* at 563.  It continued, "*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.*  In *Ashcroft v. Iqbal,* 566 U.S. 662 (2009), the Court further elaborated on the test, including this statement: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Id.* at 1949  (citation omitted).  The court considering a motion to dismiss pursuant to Rule 12(b)(6) must take all the factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Iqbal,* 556 U.S. at 678; *see Loreley Fin. (Jersey) No. 3 v. Wells Fargo Sec.,* 797 F.3d 160, 169 (2d. Cir. 2015).  Where a complaint is inadequate, leave to amend the complaint is common, Plaintiff restates the intent to take such action, evidence by application to the Court.  see, *e.g., Butt v. United Brotherhood of Carpenters & Joiners of America, No. 09-4285,* 2010 WL 2080034 (E.D. Pa. May 19, 2010).

As to the Defendant's claim represented in ¶D, p.8, Fed. R. Civ. P. 41(d), Plaintiff asserts the specificity of "virtually the same" as cited from *Centennial Plaza Prop, LLC v. Trane U.S. Inc.*, No. 22 Civ. 1262, 2022 WL 17582548, at *5 (D. N.J. Dec. 12, 2022); *Marias v. Bank of Am., N.A.*, No. 14 Civ. 4986, 2016 WL 4064780, at *5 (D.N.J. July 1, 2015); has not been fully disclosed given the forthcoming amended complaint.  Given the Plaintiff's Motion to Leave was filed on February 26, 2024, Defendant would have had full knowledge advancing submission of the subject Memorandum of Law in Support of the DNC's Consolidated Motion to Dismiss.

## FACTUAL BACKGROUND

5.  In March, 2022, the DNC was found culpable for their participation in the Russian dossier, weaponized against President Donald J. Trump following the 2016 Presidential election, the DNC paid a fine of $105,000 attached as EXHIBIT 1,  the DNC admitted their guilt.

6.  Plaintiff presents three interlocking case studies, supported by sourced findings that serve to connect three seemingly disconnected events to one larger criminal enterprise, perfected over time through the benefit of intrinsic permeation within governmental bodies, in the United States and more broadly.  Plaintiff attached EXHIBIT 2, "The BCCI Affair – Executive Summary" providing insight and background for the Honorable Court.

7.  Due to the knowing covert actions of the parties involved, Plaintiff attaches EXHIBIT 3, providing a mapping of the BCCI corruption structures.  There are three orbiting components within the continuum of the BCCI structure, presently active:

    a.  Fictitious businesses – an untold number, although Plaintiff retains an appreciative repository, including 501c3 organizations, the volume of those which exist are not yet known but would be sought in discovery.

    b.  Banking entities –criminal acts being perpetrated in the movement and laundering of funds, worldwide, resulting in domestic and international banking as well as monetary institutional corruption.  The list provided below is in no manner a complete directory.

        i.   Republic National Bank.

        ii.  UBS.

        iii. HSBC.

        iv.  Bank of America.

        v.   Deutsche Bank.

            vi.     Barclays.

      c.   Medium of movement:

            i.     Drug trafficking.

            ii.    Weaponry, including nuclear trafficking.

            iii.   Human trafficking and sex trafficking.

            iv.   Organized crime and gang structures.

            v.    Real estate, land development and preservation, including construction.

            vi.   Solar and alternative energy development, including mining (in all forms and mediums).

8. The three case studies, outlined below as (I – RUSSIAN COLLUSION; II – PREVEZON; III – FINDINGS/CLAIMS). The case studies conclude with a contrast/comparison against the historic record. The records of the case studies are in various form of investigative completeness by federal entities, all records analyzed were open source accessed.

9. Plaintiff states that the DNC sought to compromise the dually elected Chief Executive as well every facet of his Administration under the auspices of manufactured lies and innuendo having no merit or basis in truth under the schema of "Russian collusion". Ultimately, as facts in evidence came to light, the DNC was proven to be one of the primary actors in the schema, co-conspirators included codefendant, Hillary R. Clinton, and Perkins Coie for Fusion GPS, among other parties, see attached EXHIBIT 4. The "Russian election interference" schema served a two-fold purpose; 1)impose on future elections to change the structure of voting, allowing for broad manipulation or its implication to enable predictive modeling of election outcomes,

and 2)retain secrecy of the undercurrent activities being conducted covertly with the DNC as a central actor.  Plaintiff asserts that both goals were achieved in the 2020 election.

I.   **RUSSIAN COLLUSION:**  Plaintiff refers to EXHIBIT 5, House Resolution 1011, dated March 29, 2022, "Public Statement on the Hunter Biden Emails."  EXHIBIT 6, Interim Joint Staff Report, dated May 10, 2023 (Committee of the Judiciary, Select Subcommittee on the Weaponization of the Federal Government, and Permanent Select Committee on Intelligence), "The Hunter Biden Statement: How Senior Intelligence Community Officials and the Biden Campaign Worked to Mislead American Voters." (May, 2023).

    a.   <u>House Resolution 1011 (March 29, 2022).</u>

        (a)  Plaintiff  analyzed those matters of and associated with the October 19, 2020 letter penned by members of the intelligence community and subject of a New York Post article stating, "51 intelligence agents interfered with an election."[2]

        (b)  The parties affiliated with the authored letter of October 19, 2020, are inclusive members of the intelligence community, each holding security clearance in accordance with statute at the time of the letter being authored.

        (c)  The authored letter includes the signatory, Jeremy Nash, the managing director of Beacon Global Strategies.  Plaintiff analyzed affiliation with tax-exempt organizations which Nash is affiliated, analysis of the Spy Museum followed.  Nash serves on the Board with Grant Verstandig.

---

[2] Devine, Miranda.  Its Been Two Years Since 51 Intelligence Agents Interfered With An Election – They Still Won't Apologize."  October 19, 2022.  Accessed March 1, 2023  https://nypost.com/2022/10/19/its-been-two-years-since-51-intelligence

(d) Grant Verstandig serves as a senior advisor to the National Security Agency on advanced analytics, technology, and AI.  Verstandig is affiliated with Red Cell Partners, Zephyr AI, DEFCON AI, and Andesite, founder, and Chairman of Rally Health, and previously with Optum a group within UnitedHealth. Verstandig is co-founder of TARA Mind, serving with Marcus Capone, a former member of Seal Team 6.  Verstandig is also the co-founder of the venture backed CRISPR gene editing company, Tavros, as well as SpyCraft Entertainment with indirect affiliation to Netflix.

(e) Verstandig pursues a variety of philanthropic interests including those associated with the National Cancer Institute, one common associate is Gabrielle's Angel Foundation.  Denise Rich serves as the Board President and co-founder of Gabrielle's Angel Foundation.  Denise Rich, the widow of Marc Rich who shares direct association with the DNC as well the co-defendants, William J. Clinton and Hillary R. Clinton.[3]

b. <u>Committee of the Judiciary, Select Subcommittee on the Weaponization of the Federal Government, and Permanent Select Committee on Intelligence (May 10, 2023).</u>

A. Plaintiff states that the report clearly evidences the DNC's continuity of involvement in the abhorrent actions to circumvent the People's decision-making apparatus concerning the 2020 election, going so far as to weaponize law enforcement at all levels of government to their ends, irrevocably shattering public trust and increasing the likelihood of voter

---

[3] Orth, Maureen.  The Face of Scandal. (Vanity Fair).August 14, 2008.  Accessed March 1, 2024
https://www.vanityfair.com/news/2001/06/rich/200106

disenfranchisement; all the while concealing the truth of their as yet

undisclosed actions.

B.  Referring to letter of October 20, 2020 from Ms. Tyson to the Chairman of

Homeland Security and Government Affairs, attached as EXHIBIT 7, ¶2,

p.29. "…The FBI is the primary investigative agency responsible for the

integrity and security of the 2020 election, and as such, we are focused on an

array of threats, including the threat of malign foreign influence

operations…the FBI can neither confirm nor deny the existence of any

ongoing investigation or persons or entities under investigation, including to

Members of Congress."

C.  Plaintiff analyzed those matters of and related to Matt Taibbi's report, entitled

"Russiagate and the Most Pernicious Campaign on Censorship Since the

1950's".[4]

D.  Plaintiff then analyzed Hamilton 68; 2.0, the latter launching on September 4,

2019 as well as all associated matters concerning the Taibbi reporting.  The

following affiliations were omitted from previous reporting and central to

Plaintiff's claims herein.

    a.  The Hamilton dashboard had, in fact, reverse engineered the accounts

        which were tracked on the organization's platform, the tracking

        provided for 644 accounts, 36 of which were Russian based.  The

        overwhelming majority of the accounts belonging to private citizens

---

[4] Sheerpost.com.  The Christ Hedges Report: Matt Taibbi on Russiagate and the Most Pernicious Campaign on Censorship Since the 1950's.  February 11, 2023.  Accessed February 15, 2024, https://scheerpost.com/2023/02/11/the-chris-hedges-report-matt-taibbi-on-russiagate-and-the-most-pernicious-campaign-of-censorship-since-the-1950s/

from the United States, Canada, the U.K. and others.  The Russian

accounts belonged to Russia Today ("RT"), the Ministry of Foreign

Affairs, the Russian Embassy Accounts, and Sputnik accounts.

b.  Clint Watts serves on the Board of the Hamilton organization, the

Alliance for Securing Democracy.  Plaintiff refers Clint Watts keynote

speech of the Secretaries of State Conference in January, 2020,

transcript as enumerated in the original Complaint, *See* ECF 1.

c.  Plaintiff attached as EXHIBIT 9, letter of October 19, 2020 addressed

to Mark Zuckerberg, Chairman of Facebook; Jack Dorsey, CEO of

Twitter; and Susan Wojcicki of YouTube from Xavier Becerra, as

Attorney General, California.  The letter expressly eviscerates the

Attorney General's protections under the Tenth Amendment by

directing actions throughout the United States.  The letter corroborates

the claims setforth in Plaintiff's letter concerning the Center for Tech

and Civic Life, as enumerated in the original Complaint, *See* ECF 1.

d.  Alliance for Securing Democracy ("ASD") is also associated with the

U.S. Climate Alliance which retains records on every registered

electric vehicle purchased; sharing private citizen records of the motor

vehicle registrant information with a subsidiary entity, Atlas Public

Policy, an NGO.  The states which have motor-voter are participants of

the foregoing record sharing, absent disclosure or consent.

f.  Plaintiff analyzed the German Marshall Fund (501c3).  The tax-

exempt organization shows 2022 fiscal records of affiliate assets

among sibling-entities named:  1700 18th Street, LLC (Washington,

D.C.), a business registered to the German Marshall Fund, receiving

$16,625,086  defined as real estate.  The Transatlantic Foundation

(Brussels), a business registered to the German Marshall Fund,

receiving $2,294,278 defined to promote greater cooperation and

understanding between the U.S./Europe.  In and among the grants,

Schedule F of the Form 990 is "Central America and the Caribbean –

Antigua, Barbuda, Aruba and Bahamas: $24,102,061 designated

"investments."

g.   In January, 2016, Defendant Loretta Lynch directed the actions of the

U.S. Attorney's office in Manhattan to issue special immigration

parole permission, allowing Ms. Veselnitskaya entry into the United

States.

h.   On June 13, 2017, the Senate Intelligence Committee hosted then-

Attorney General Jeff Sessions to testify, the transcript attached as

EXHIBIT 9.  Plaintiff calls to ¶3.p13,

…28 CFR 45.2. Unless authorized, no employee shall participate in a
criminal investigation or prosecution if he had a personal or political
relationship with any person involved in a conduct of an investigation
that goes on to say for political campaign…if you have a close
identification with an elected official or candidate arising from service
as a principal adviser, you should not participate in an investigation of
that campaign. Many have suggested that my recusal is because I felt I
was a subject of the investigation myself, I may have done something
wrong.  This is the reason I recused myself:  I felt I was required to
under the rules of the Department of Justice and as a leader of the
Department of Justice, I should comply with the rules
obviously…¶3.p26…And when I said that to the president, deputy
Rosenstein's letter dealt with a number of things.  When Mr. Comey
declined the Clinton prosecution, that was a really a usurpation of the

authority of the federal prosecutors in the Department of Justice.  It was a stunning development.  The FBI is the investigative team.  They don't decide the prosecution policies.  That was a thunderous thing.

Plaintiff states that the lens of truth shifts the posture and purpose as to statecraft that has been exacted by those elected and appointed in the People's stead; the origins of BCCI, its ethos, contradicts Allegiance to the Constitution.  The DNC has irrevocably broken its trust and Charter with the American People established in its bylaws, regardless of their intent at the outset of their journey to this point.  Justice demands to be heard and exacted under the Rule of Law as much in the interest of these United States as to the world given to the expanse of their egregious activities.

    i.   January 8, 2019, U.S. prosecutors indicted Natalie Veselnitsyaka, a Russian attorney who represented Prevezon, on claims involving forfeiture and civil money laundering penalties.

II.  **PREVEZON**:  Plaintiff analyzed the matter associated with the *United States* v. *Prevezon Holdings, Ltd., et al.*, 13 Civ. 6326 (2015) indictment as well the Magnitsky Act (2012) and the periphery associated parties, as below.

10. Plaintiff provides below the undercurrent facts in evidence concerning the Russian collusion claims, unequivocally implicating the DNC in a broader scheme of fraud, corruption, and treason.

    vii.   Denis Katsyv (Ukrainian) – son of Pyotr Dmitriyevich Katsyv, former Minister of Transport, Moscow, Russia (2000-2012); head of

main department for Moscow, Russia (2012-2013), and VP, Russian Railways (2014-2019).

viii.    Katsyv is associated with Alexander Litvak, together own Martash Investment Ltd., a British Virgin Islands company with bank accounts UBS (Switzerland), and Bank Hapoalim (Israel)  In 2005, Martash was under investigation in Israel for money laundering, case resolved through settlement of $35m.

ix.    Katsyv owns Prevezon Holdings Ltd., Cyprus.  (2008) Prevezon Holdings received funds via UBS from two Moldovan companies Municon Impex and Elenast, through Alpha Bank to a hosted account at Krainiy Sever (Russian bank) - $52m.  A transfer of $850,000 was confirmed to Prevezon Holdings.  Thereafter, 4-Properties were purchased in NYC under the name Prevezon Cyprus which had shared interests with Prevezon Berlin GmbH (Germany).

x.    In 2005, Katsyv laundered millions of dollars through four organizations (Follet, Hanway and Bastet, and the Israeli Bank Hapoalim).

xi.    In 2008, Prevezon and its business partner, Africa Israel Investments ("AFI"), owned by Lev Leviev (Israeli diamond dealer), conducted several joint ventures in the United States and Europe through Deutsche Bank.

xii.    SARC is affiliated with a Russian citizen named Sergei Tikhomirov who holds a bank account in Lithuania, bank account reflects the fund transfer from Reaton, Ltd.

xiii.   In 2013, William Browder claimed that Prevezon had stolen $1.9m through his company, Hermitage Capital Management, the funds used to purchase the NYC properties, as above.  Preet Bharama, former US. Attorney, Southern District of New York, seized the 4-properties, 2-commercial properties and froze the assets of 11-firms, including Prevezon Ltd.

xiv.    William Browder, owner of Hermitage Capital Management, a Chicago Illinois native, educated at Stanford Business School who worked for Salomon Brothers as a proprietary trader of Russian securities.[5]  Browder's grandfather, Earl Browder was a leader in the U.S. Communist Party from 1932 – 1945.  Browder's father, Felix Browder worked with Jeffrey Epstein at Boston Consulting Group before joining Salomon Brothers in 1994.  Browder has an extensive history in lobbying with a specific leaning towards his fiscal interests.

xv.     Browder is a British financier, CEO and co-founder of Hermitage Capital Management, the investment advisor to the Hermitage Fund, a foreign registered portfolio investor based in the Channel Islands

---

[5] Crowney, Paul.  William Browder had cause to feel smug.  His Hermitage Fund had racked up a 228 percent return, making it the best performing fund of any type anywhere in the world in 1997.  Accessed December 10, 2022, https://www.institutionalinvestor.com/article/2btgidyngwpw34c2tyqkg/corner-office/seeing-red

(Guernsey) with offices in the Cayman Islands, London, and Moscow, founded in partnership with Republic National Bank, providing $25 million in seed capital.  Browder's former partner, Edmond Safra, a Lebanese-Brazilian banker of Syrian descent, died in 1999, founded Republic National Bank.   Under the Hermitage Fund, Browder is a prolific shareholder rights activist who directed his actions towards Gazprom, Surgutneftegaz, Unified Energy Systems, and Sidanco.  In November, 2005, he was refused entry to Russia citing him a national security threat and deported to the U.K, in June, 2007, the Hermitage Capital and Firestone Duncan (Browder's law firm), were raided by the Russian Interior Ministry.

    xvi.    Denis Katsyv, represented by attorney Veselnikskaya, met with Fusion GPS founder Glenn R. Simpson and Louis Freeh, who subsequently opened an investigation into Browder and Donald Trump, Jr. at the bequest of Katsyv.

III.  **FINDINGS/CLAIMS:**  Following a strict contrast/comparison model weighing the BCCI history against the emergent facts correlating the subject parties, Plaintiff states the following, inclusive of claims of harm:

    a.   Lending/Banking Institutions:

        i.   Republic National Bank ("RNB") was the principal banking institution of BCCI, according to the Senate Investigative report, with the help of the Central Intelligence Agency, BCCI purchased RNB, undisclosed to federal regulators.  RNB was founded by the partner and co-founder of

Hermitage Capital Management.  Bill Browder, the owner of Hermitage worked for Salomon Brothers which share direct association with BCCI as well as Marc Rich through Philipp Brothers.

ii.   Prevezon Holdings Ltd. is a boutique international real estate investment firm, following the exact model of BCCI, Plaintiff asserts that the DNC knowingly participated in the perpetuation of the BCCI scheme model following its demise in 1992.  The foregoing facts are further substantiated by those actions of the DNC and codefendants, as below:

1.   DNC is seeking application of *pro hac vice* counsel who were directly involved in the MeToo movement in New York City at the time of Harvey Weinstein's arrest.  Harvey Weinstein shared association with the DNC by donor capacity and attended events held at his Connecticut property.

2.   DNC had full knowledge that both Deutsche Bank and Barclays Bank had direct involvement with Jeffrey Epstein. The subject lending institutions shared direct involvement with BCCI.

iii.  Plaintiff asserts that Loretta Lynch colluded with Paul Manafort and Defendant, Robert Mueller to fortify predetermined schema outcomes, either the parties colluded with Russia for which the DNC was a participant, or the perpetuation of the BCCI schema is true and factual. In either circumstance, the DNC knowingly and irrefutably colluded in

and among other parties to set up Donald Trump Jr. among other Trump Administration officials.  Plaintiff asserts that the inclusive actions taken were an attempt to conceal their covert, subversive actions in motion as dual tracking events.  The foregoing set in motion a sequence of events by knowing covert hands imposing on Article II, Executive Branch authority as well those Rights enumerated to the People, inclusive of the Plaintiff.

iv.  Citing the tracking of data on the Hamilton platform, Plaintiff claims a gross violation of the First Amendment, Right to Free Speech.  As the data is gathered without benefit of disclosure or warrant, Plaintiff further claims a gross violation of the Fourth Amendment.

v.  The affiliation of the parties associated with the Hamilton 2.0 platform is suggestive of a closed circle, forming intelligence control and is in keeping with the BCCI model of mapping.

vi.  The association in and among the extraneous parties has a highly suggestive statistical probability.  Following the strict apprenticeship modeling of BCCI, the direct connection of parties in and among the DNC, acting as a hub, presents a structured organization, complete with the BCCI mapping of businesses, non-profits or NGO's, banking interface, and governmental parties inclusive of those elected and appointed.  Moreover, the findings irrefutably corroborate Plaintiff's initial pleadings and content thereto.

vii.   Based on the statement of Attorney General Jeff Sessions, citing 28 CFR 45.2, the DNC and the inclusive codefendants are guilty of violating the statute and, specifically Defendant James Comey, the Department of Justice, etc.  Each of the inclusive parties investigated either the 2016 and/or 2020 Presidential elections without regard to the statute.

viii.   In 2022, the Prevezon associate, Sergei Tikhomirov, was tied to a financial crimes' investigation in Cyprus involving 23-companies associated with a mining organization that moved $1.9 billion between 2007 – 2015, involving Swedbank, "some associated with U.S. Treasury financial crimes bureau,", as attached EXHIBIT 10.  The degree of association between Tikhomirov, Prevezon (already settled matter) reinforces Plaintiff's claims that the schema is active and being perpetuated in domestic and international affairs.

ix.   The communications drafted by the intelligence community, Ms. Tyson, and Xavier Becerra's were all authored on the same day, statistically significant and suggestive of a coordinated effort.

x.   The inclusive findings irrefutably identify connectivity between central figures, acting in tandem while appearing as separate from the central hub of the DNC, these include Preetinder "Preet" Bharara, former U.S. Attorney for the Southern District of New York, the CIA, the FBI, the NSA, factions within the Military Industrial Complex as well those

serving the people in elected capacity, at every level, and the administrative apparatus so attached as staff.

## PLAINTIFF'S STATEMENT OPPOSING PRO HAC VICE ADMISSION OF COUNSEL

Plaintiff speaks specifically to the history associated with the attorneys presented by the DNC for admission. The DNC's choice of the specific counselors at law is highly suggestive given the firms litigant history as to the former President, Donald John Trump and his family as to the matter before this Court. Plaintiff notes that nearly all and inclusive cases brought against the presumptive GOP nominee for President, Donald John Trump, in one manner or another, involves the firm and, in fact, the attorneys who appear on Defendant's admission application before the Honorable Court.

Plaintiff as an advocate of the People, requests that the Court deny the Defendant's application that the parties to this action may be free of undue influence and/or bias apart from the facts that will be presented, disclosed in discovery, and the like. The application attorneys, in the Plaintiff's opinion, are seeking another bite at the apple by way of the DNC. Plaintiff calls to the history of actions in New York, relevant as to the bar admission of the applicant attorneys in their admission application.

In the recent history of New York, facts provide that the former Attorney General and Governor were both subject to allegations of sexual misconduct, in both cases, the charges were deemed by law enforcement as not meeting the legal threshold to withstand court test and the charges were dropped. Evidently it was not in the interest of codefendant Kathy Hochul to champion the victim's rights in those alleged voluminous cases and within days of the resignations, the Governor and Attorney General assumed the unexpired terms of those having resigned. In the case of E. Jean Carroll, the political expedience was vastly more urgent citing the named defendant. In that case, the Governor took immediate action to execute the Adult Survivors Law of 2022, the legal instrument by which the *pro hac vice* attorneys, filed their midnight pleading. Plaintiff states, by all accounts of

historic record, the *pro hac vice* attorneys, front-face of the me-too movement in collaboration with then-Governor Cuomo, are merely seeking another venue to advance their personal agenda as much their practice while, in this case, such posturing is an apparent contradiction as the trafficking victims' interests are represented by the Plaintiff. The irony involves the Motion of the DNC vis-a-`-vis the E. Jean Carroll matter, but for the Executive action that the Governor took the case would not have met legal threshold, the Defendant having no physical evidence to her claim.

   In this case, the Plaintiff retains substantial evidence in the interest of the victims, despite this fact, the DNC and its co-conspirators would seek its silence; simultaneously the DNC has the audacity to make application before this Honorable Court to introduce an atmospheric byproduct of another case by way of its lead counselors at law. In the Plaintiff's opinion, these actions do not constitute lawfare, but they do manifest the actions of warfare or weaponization of the Law, a contortion by another name. The inclusive parties' actions were in the Plaintiff's opinion abhorrent to the Constitution, up to and including the dark money that funded the case, i.e. Reid Hoffman, the Kahle Austin Foundation, the John S. and James L. Knight Foundation, and the Neighborhood Legal Services, Inc., etc., many of these organizations share affiliation with the New York Attorney General, also a codefendant in this matter. The choice of the DNC in *pro hac vice* counsel, is in fact, one degree removed from the very same corrupt actions that were sown and fertilized by the Defendants, Plaintiff states that the harvest is ripe and has every good intention to clear the field. Plaintiff believes that just as with the actions of the DNC and co-Defendants herein, time will disclose the truth as regards the E. Jean Carrol v. Donald J. Trump matter. In the wake of that truth, Plaintiff would seek no affiliation with the Plaintiff's counsel in that action.

## CERTIFICATION OF SERVICE

Plaintiff, Mary Basile Logan, hereby certifies that on this 11th day of March, 2024, I electronically filed the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss the Complaint with the Clerk's office of the U.S. District Court for the District of New Jersey using the Electronic Case Filing ("ECF"), to be served upon the Defendant, the Democratic National Committee, same being notice of electronic filing to the following:

**Nicole G. McDonough, Esq.**
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, New Jersey 07012
Email: nmcdonough@sillscummis.com

**Kaplan Hecker & Fink LLP**
Shawn G. Crowley, pro hac vice pending
Maximillian Feldman, pro hac vice pending
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Email: scrowley@kaplanhecker.com
        mfeldman@kaplanhecker.com

Dated March 8, 2024

Respectfully submitted,

/s/Mary B. Logan
Mary Basile Logan
Plaintiff (*Pro Se*)

cc:    All Counsel of Record (***Via ECF)***

Case 3:24-cv-00040-JMC-TJB Document 46 Filed 03/11/24 Page 23 of 231 PageID: 757



# POLITICO



POLITICS

## Federal campaign watchdog fines DNC, Clinton campaign over dossier spending disclosure

The conciliation agreements found "probable cause to believe" that both the campaign and national party "misreport[ed] the purpose of certain disbursements."



Former Secretary of State Hillary Clinton speaks during the 2022 New York State Democratic Convention on Feb. 17, 2022, in New York City. | Michael M. Santiago/Getty Images

By **ZACH MONTELLARO**
03/30/2022 08:31 PM EDT
Updated: 03/31/2022 12:29 PM EDT

   

The Federal Election Commission has agreed to a fine of over $100,000 against the Democratic National Committee and Hillary Clinton's 2016 campaign over an investigation into alleged misreporting of spending related to the now-infamous Steele dossier.

The FEC fined both organizations after a pair of now years-old complaints — one from the Campaign Legal Center and another from the conservative Coolidge Reagan Foundation — alleged that the party and campaign reported payments to the powerhouse Democratic law firm Perkins Coie as legal expenses, when in actuality some of the money was earmarked for "paying Fusion GPS through Perkins Coie to conduct opposition research on Donald Trump," as the Campaign Legal Center's original complaint read.

The DNC and the Clinton campaign collectively agreed to pay $113,000 in fines, according to separate conciliation agreements the agency made with both parties. The DNC will pay $105,000 and the Clinton campaign $8,000.

The FEC conciliation agreements were made public Wednesday after the Coolidge Reagan Foundation first shared a response letter from the agency with the Washington Examiner. POLITICO independently obtained a second, and similar, letter the agency sent to the CLC.

The Steele dossier, which was first made public when BuzzFeed News published it in January 2017, contained a variety of accurate, inaccurate, unproven and sometimes salacious allegations about ties between Russia and Donald Trump, as well as others in his orbit.

The conciliation agreements found "probable cause to believe" that both the campaign and national party "misreport[ed] the purpose of certain disbursements" when they said certain payments to Perkins Coie were for legal fees.

The pair of agreements were signed for the Democratic groups on Feb. 16 by Graham Wilson, an attorney who was formerly at Perkins Coie and is now at the Elias Law Group.

---

🔊 Want more POLITICO? Download our mobile app to save stories, get notifications and more. In **iOS** or **Android**.

---

In the agreements, the DNC and Clinton campaign contend that they believed they properly disclosed the spending. The agreements read that the party and campaign do "not concede, but will not further contest the Commission's finding," in order to settle the matters and not incur more legal costs.

Daniel Wessel, a DNC spokesperson, said in a statement that "we settled aging and silly complaints from the 2016 election about 'purpose descriptions' in our

EXHIBIT 1

FEC report," while a spokesperson for Clinton's office did not respond to a request for comment.

The agency's full factual and legal analysis is not yet publicly available. The FEC has roughly 30 days to make it so, and an agency spokesperson declined to comment beyond noting that time frame for closed complaints. The agency routinely does not comment on specific allegations or enforcement measures.

The civil penalty appears to relate to highly technical rules about how campaign spending through an intermediary should be reported, and not to delve into issues around the legality (or veracity) of the dossier. In a letter addressing one of the complaints, the commission said it dismissed allegations against Marc Elias — who was then an attorney at Perkins Coie and is now the namesake of his own firm — and the law firm itself, Fusion GPS and Christopher Steele himself, and other allegations against the DNC over impermissible contributions from foreign nationals.

Trump, in a statement, boasted about the decision and touted a lawsuit he brought in federal court in Florida last week against Clinton, allies and others he accused of trying to "take down and illegally destroy your favorite President, me."

*Josh Gerstein contributed to this report.*

---

*CORRECTION: An earlier version of this article misstated lawyer Graham Wilson's law firm.*

**FILED UNDER:** RUSSIA, HILLARY CLINTON, DNC, FEC, DONALD TRUMP, DONALD TRUMP 2024,

**MOST READ**



**1 CALIFORNIA**

**Katie Porter pulled a Trump move after losing. Democrats are livid.**



**2 EXCLUSIVE**

**Intel agencies eye brief for Trump, amid fears he could spill secrets**



**3 STATE OF THE UNION 2024**

**Biden chooses a hammer over an olive branch**

< >

EXHIBIT 1

# The BCCI Affair

**A Report to the Committee on Foreign Relations
United States Senate
by
Senator John Kerry and Senator Hank Brown
December 1992
102d Congress 2d Session Senate Print 102-140**

# Contents

EXECUTIVE SUMMARY

INTRODUCTION AND SUMMARY OF INVESTIGATION

THE ORIGIN AND EARLY YEARS OF BCCI

BCCI'S CRIMINALITY

BCCI'S RELATIONSHIP WITH FOREIGN GOVERNMENTS  CENTRAL BANKS, AND INTERNATIONAL ORGANIZATIONS

BCCI IN THE UNITED STATES: PART I

BCCI IN THE UNITED STATES: PART II

BCCI AND LAW ENFORCEMENT: PART I

BCCI AND LAW ENFORCEMENT: PART II

BCCI AND ITS ACCOUNTANTS

BCCI, THE CIA AND FOREIGN INTELLIGENCE

THE REGULATORS

CLARK CLIFFORD AND ROBERT ALTMAN

ABU DHABI: BCCI'S FOUNDING AND MAJORITY SHAREHOLDERS

MOHAMMED HAMMOUD: BCCI'S FLEXIBLE FRONT-MAN

BCCI AND GEORGIA POLITICIANS

BCCI'S LAWYERS AND LOBBYISTS

HILL AND KNOWLTON AND BCCI'S PR CAMPAIGN

ED ROGERS AND KAMAL ADHAM

BCCI AND KISSINGER ASSOCIATES

LEGISLATIVE RECOMMENDATIONS

APPENDICES

# EXECUTIVE SUMMARY

## 1. BCCI CONSTITUTED INTERNATIONAL FINANCIAL CRIME ON A MASSIVE AND GLOBAL SCALE.

BCCI's unique criminal structure -- an elaborate corporate spider-web with BCCI's founder, Agha Hasan Abedi and his assistant, Swaleh Naqvi, in the middle -- was an essential

EXHIBIT 2

component of its spectacular growth, and a guarantee of its eventual collapse. The structure was conceived by Abedi and managed by Naqvi for the specific purpose of evading regulation or control by governments. It functioned to frustrate the full understanding of BCCI's operations by anyone.

Unlike any ordinary bank, BCCI was from its earliest days made up of multiplying layers of entities, related to one another through an impenetrable series of holding companies, affiliates, subsidiaries, banks-within-banks, insider dealings and nominee relationships. By fracturing corporate structure, record keeping, regulatory review, and audits, the complex BCCI family of entities created by Abedi was able to evade ordinary legal restrictions on the movement of capital and goods as a matter of daily practice and routine. In creating BCCI as a vehicle fundamentally free of government control, Abedi developed in BCCI an ideal mechanism for facilitating illicit activity by others, including such activity by officials of many of the governments whose laws BCCI was breaking.

BCCI's criminality included fraud by BCCI and BCCI customers involving billions of dollars; money laundering in Europe, Africa, Asia, and the Americas; BCCI's bribery of officials in most of those locations; support of terrorism, arms trafficking, and the sale of nuclear technologies; management of prostitution; the commission and facilitation of income tax evasion, smuggling, and illegal immigration; illicit purchases of banks and real estate; and a panoply of financial crimes limited only by the imagination of its officers and customers.

Among BCCI's principal mechanisms for committing crimes were its use of shell corporations and bank confidentiality and secrecy havens; layering of its corporate structure; its use of front-men and nominees, guarantees and buy-back arrangements; back-to-back financial documentation among BCCI controlled entities, kick-backs and bribes, the intimidation of witnesses, and the retention of well-placed insiders to discourage governmental action.

## 2. BCCI SYSTEMATICALLY BRIBED WORLD LEADERS AND POLITICAL FIGURES THROUGHOUT THE WORLD.

BCCI's systematically relied on relationships with, and as necessary, payments to, prominent political figures in most of the 73 countries in which BCCI operated. BCCI records and testimony from former BCCI officials together document BCCI's systematic securing of Central Bank deposits of Third World countries; its provision of favors to political figures; and its reliance on those figures to provide BCCI itself with favors in times of need.

These relationships were systematically turned to BCCI's use to generate cash needed to prop up its books. BCCI would obtain an important figure's agreement to give BCCI deposits from a country's Central Bank, exclusive handling of a country's use of U.S. commodity credits, preferential treatment on the processing of money coming in and out of the country where monetary controls were in place, the right to own a bank, secretly if necessary, in countries where foreign banks were not legal, or other questionable means of securing assets or profits. In return, BCCI would pay bribes to the figure, or otherwise give him other things he wanted in a simple quid-pro-quo.

The result was that BCCI had relationships that ranged from the questionable, to the improper, to the fully corrupt with officials from countries all over the world, including Argentina,

EXHIBIT 2

Bangladesh, Botswana, Brazil, Cameroon, China, Colombia, the Congo, Ghana, Guatemala, the Ivory Coast, India, Jamaica, Kuwait, Lebanon, Mauritius, Morocco, Nigeria, Pakistan, Panama, Peru, Saudi Arabia, Senegal, Sri Lanka, Sudan, Suriname, Tunisia, the United Arab Emirates, the United States, Zambia, and Zimbabwe.

### 3. BCCI DEVELOPED A STRATEGY TO INFILTRATE THE U.S. BANKING SYSTEM, WHICH IT SUCCESSFULLY IMPLEMENTED, DESPITE REGULATORY BARRIERS THAT WERE DESIGNED TO KEEP IT OUT.

In 1977, BCCI developed a plan to infiltrate the U.S. market through secretly purchasing U.S. banks while opening branch offices of BCCI throughout the U.S., and eventually merging the institutions. BCCI had significant difficulties implementing this strategy due to regulatory barriers in the United States designed to insure accountability. Despite these barriers, which delayed BCCI's entry, BCCI was ultimately successful in acquiring four banks, operating in seven states and the District of Colombia, with no jurisdiction successfully preventing BCCI from infiltrating it.

The techniques used by BCCI in the United States had been previously perfected by BCCI, and were used in BCCI's acquisitions of banks in a number of Third World countries and in Europe. These included purchasing banks through nominees, and arranging to have its activities shielded by prestigious lawyers, accountants, and public relations firms on the one hand, and politically-well connected agents on the other. These techniques were essential to BCCI's success in the United States, because without them, BCCI would have been stopped by regulators from gaining an interest in any U.S. bank. As it was, regulatory suspicion towards BCCI required the bank to deceive regulators in collusion with nominees including the heads of state of several foreign emirates, key political and intelligence figures from the Middle East, and entities controlled by the most important bank and banker in the Middle East.

Equally important to BCCI's successful secret acquisitions of U.S. banks in the face of regulatory suspicion was its aggressive use of a series of prominent Americans, beginning with Bert Lance, and continuing with former Defense Secretary Clark Clifford, former U.S. Senator Stuart Symington, well-connected former federal bank regulators, and former and current local, state and federal legislators. Wittingly or not, these individuals provided essential assistance to BCCI through lending their names and their reputations to BCCI at critical moments. Thus, it was not merely BCCI's deceptions that permitted it to infiltrate the United States and its banking system. Also essential were BCCI's use of political influence peddling and the revolving door in Washington.

### 4. THE JUSTICE DEPARTMENT MISHANDLED ITS INVESTIGATION AND PROSECUTION OF BCCI, AND ITS RELATIONSHIPS WITH OTHER GOVERNMENT AGENCIES CONCERNING BCCI.

Federal prosecutors in Tampa handling the 1988 drug money laundering indictment of BCCI failed to recognize the importance of information they received concerning BCCI's other crimes, including its apparent secret ownership of First American. As a result, they failed adequately to investigate these allegations themselves, or to refer this portion of the case to the FBI and other agencies at the Justice Department who could have properly investigated the additional information.

EXHIBIT 2

The Justice Department, along with the U.S. Customs Service and Treasury Departments, failed to provide adequate support and assistance to investigators and prosecutors working on the case against BCCI in 1988 and 1989, contributing to conditions that ultimately caused the chief undercover agent who handled the sting against BCCI to quit Customs entirely.

The January 1990 plea agreement between BCCI and the U.S. Attorney in Tampa kept BCCI alive, and had the effect of discouraging BCCI's officials from telling the U.S. what they knew about BCCI's larger criminality, including its ownership of First American and other U.S. banks.

The Justice Department essentially stopped investigating BCCI following the plea agreement, until press accounts, Federal Reserve action, and the New York District Attorney's investigation in New York forced them into action in mid-1991.

Justice Department personnel in Washington lobbied state regulators to keep BCCI open after the January 1990 plea agreement, following lobbying of them by former Justice Department personnel now representing BCCI.

Relations between main Justice in Washington and the U.S. Attorney for Miami, Dexter Lehtinen, broke down on BCCI-related prosecutions, and key actions on BCCI-related cases in Miami were, as a result, delayed for months during 1991.

Justice Department personnel in Washington, Miami, and Tampa actively obstructed and impeded Congressional attempts to investigate BCCI in 1990, and this practice continued to some extent until William P. Barr became Attorney General in late October, 1991.

Justice Department personnel in Washington, Miami and Tampa obstructed and impeded attempts by New York District Attorney Robert Morgenthau to obtain critical information concerning BCCI in 1989, 1990, and 1991, and in one case, a federal prosecutor lied to Morgenthau's office concerning the existence of such material. Important failures of cooperation continued to take place until William P. Barr became Attorney General in late October, 1991.

Cooperation by the Justice Department with the Federal Reserve was very limited until after BCCI's global closure on July 5, 1991.

Some public statements by the Justice Department concerning its handling of matters pertaining to BCCI were more cleverly crafted than true.

## 5. NEW YORK DISTRICT ATTORNEY MORGENTHAU NOT ONLY BROKE THE CASE ON BCCI, BUT INDIRECTLY BROUGHT ABOUT BCCI'S GLOBAL CLOSURE.

Acting on information provided him by the Subcommittee, New York District Attorney Robert Morgenthau began an investigation in 1989 of BCCI which materially contributed to the chain of events that resulted in BCCI's closure.

Questions asked by the District Attorney intensified the review of BCCI's activities by its auditors, Price Waterhouse, in England, and gave life to a moribund Federal Reserve investigation of BCCI's secret ownership of First American.

EXHIBIT 2

The District Attorney's criminal investigation was critical to stopping an intended reorganization of BCCI worked out through an agreement among the Bank of England, the government of Abu Dhabi, BCCI's auditors, Price Waterhouse, and BCCI itself, in which the nature and extent of BCCI's criminality would be suppressed, while Abu Dhabi would commit its financial resources to keep the bank going during a restructuring. By the late spring of 1991, the key obstacle to a successful restructuring of BCCI bankrolled up Abu Dhabi was the possibility that the District Attorney of New York would indict. Such an indictment would have inevitably caused a swift and thoroughly justified international run on BCCI by depositors all over the world. Instead, it was a substantial factor in the decision of the Bank of England to take the information it had received from Price Waterhouse and rely on it to close BCCI.

## 6. BCCI'S ACCOUNTANTS FAILED TO PROTECT BCCI'S INNOCENT DEPOSITORS AND CREDITORS FROM THE CONSEQUENCES OF POOR PRACTICES AT THE BANK OF WHICH THE AUDITORS WERE AWARE FOR YEARS.

BCCI's decision to divide its operations between two auditors, neither of whom had the right to audit all BCCI operations, was a significant mechanism by which BCCI was able to hide its frauds during its early years. For more than a decade, neither of BCCI's auditors objected to this practice.

BCCI provided loans and financial benefits to some of its auditors, whose acceptance of these benefits creates an appearance of impropriety, based on the possibility that such benefits could in theory affect the independent judgment of the auditors involved. These benefits included loans to two Price Waterhouse partnerships in the Caribbean. In addition, there are serious questions concerning the acceptance of payments and possibly housing from BCCI or its affiliates by Price Waterhouse partners in the Grand Caymans, and possible acceptance of sexual favors provided by BCCI officials to certain persons affiliated with the firm.

Regardless of BCCI's attempts to hide its frauds from its outside auditors, there were numerous warning bells visible to the auditors from the early years of the bank's activities, and BCCI's auditors could have and should have done more to respond to them.

By the end of 1987, given Price Waterhouse (UK)'s knowledge about the inadequacies of BCCI's records, it had ample reason to recognize that there could be no adequate basis for certifying that it had examined BCCI's books and records and that its picture of those records were indeed a "true and fair view" of BCCI's financial state of affairs.

The certifications by BCCI's auditors that its picture of BCCI's books were "true and fair" from December 31, 1987 forward, had the consequence of assisting BCCI in misleading depositors, regulators, investigators, and other financial institutions as to BCCI's true financial condition.

Prior to 1990, Price Waterhouse (UK) knew of gross irregularities in BCCI's handling of loans to CCAH/First American and was told of violations of U.S. banking laws by BCCI and its borrowers in connection with CCAH/First American, and failed to advise the partners of its U.S. affiliate or any U.S. regulator.

EXHIBIT 2

There is no evidence that Price Waterhouse (UK) has to this day notified Price Waterhouse (US) of the extent of the problems it found at BCCI, or of BCCI's secret ownership of CCAH/First American. Given the lack of information provided Price Waterhouse (US) by its United Kingdom affiliate, the U.S. firm performed its auditing of BCCI's U.S. branches in a manner that was professional and diligent, albeit unilluminating concerning BCCI's true activities in the United States.

Price Waterhouse's certification of BCCI's books and records in April, 1990 was explicitly conditioned by Price Waterhouse (UK) on the proposition that Abu Dhabi would bail BCCI out of its financial losses, and that the Bank of England, Abu Dhabi and BCCI would work with the auditors to restructure the bank and avoid its collapse. Price Waterhouse would not have made the certification but for the assurances it received from the Bank of England that its continued certification of BCCI's books was appropriate, and indeed, necessary for the bank's survival.

The April 1990 agreement among Price Waterhouse (UK), Abu Dhabi, BCCI, and the Bank of England described above, resulted in Price Waterhouse (UK) certifying the financial picture presented in its audit of BCCI as "true and fair," with a single footnote material to the huge losses still to be dealt with, failed adequately to describe their serious nature. As a consequence, the certification was materially misleading to anyone who relied on it ignorant of the facts then mutually known to BCCI, Abu Dhabi, Price Waterhouse and the Bank of England.

The decision by Abu Dhabi, Price Waterhouse (UK), BCCI and the Bank of England to reorganize BCCI over the duration of 1990 and 1991, rather than to advise the public of what they knew, caused substantial injury to innocent depositors and customers of BCCI who continued to do business with an institution which each of the above parties knew had engaged in fraud.

From at least April, 1990 through November, 1990, the Government of Abu Dhabi had knowledge of BCCI's criminality and frauds which it apparently withheld from BCCI's outside auditors, contributing to the delay in the ultimate closure of the bank, and causing further injury to the bank's innocent depositors and customers.

## 7. THE CIA DEVELOPED IMPORTANT INFORMATION ON BCCI, AND INADVERTENTLY FAILED TO PROVIDE IT TO THOSE WHO COULD USE IT.

### THE CIA AND FORMER CIA OFFICIALS HAD A FAR WIDER RANGE OF CONTACTS AND LINKS TO BCCI AND BCCI SHAREHOLDERS, OFFICERS, AND CUSTOMERS, THAN HAS BEEN ACKNOWLEDGED BY THE CIA.

By early 1985, the CIA knew more about BCCI's goals and intentions concerning the U.S. banking system than anyone else in government, and provided that information to the U.S. Treasury and the Office of the Comptroller of the Currency, neither of whom had the responsibility for regulating the First American Bank that BCCI had taken over. The CIA failed to provide the critical information it had gathered to the correct users of the information -- the Federal Reserve and the Justice Department.

After the CIA knew that BCCI was as an institution a fundamentally corrupt criminal enterprise, it continued to use both BCCI and First American, BCCI's secretly held U.S. subsidiary, for CIA operations.

While the reporting concerning BCCI by the CIA was in some respects impressive -- especially in its assembling of the essentials of BCCI's criminality, its secret purchase of First American by 1985, and its extensive involvement in money laundering -- there were also remarkable gaps in the CIA's reported knowledge about BCCI.

Former CIA officials, including former CIA director Richard Helms and the late William Casey; former and current foreign intelligence officials, including Kamal Adham and Abdul Raouf Khalil; and principal foreign agents of the U.S., such as Adnan Khashoggi and Manucher Ghorbanifar, float in and out of BCCI at critical times in its history, and participate simultaneously in the making of key episodes in U.S. foreign policy, ranging from the Camp David peace talks to the arming of Iran as part of the Iran/Contra affair. Yet the CIA has continued to maintain that it has no information regarding any involvement of these people, raising questions about the quality of intelligence the CIA is receiving generally, or its candor with the Subcommittee. The CIA's professions of total ignorance about their respective roles in BCCI are out of character with the Agency's early knowledge of many critical aspects of the bank's operations, structure, personnel, and history.

The errors made by the CIA in connection with its handling of BCCI were complicated by its handling of this Congressional investigation. Initial information that was provided by the CIA was untrue; later information that was provided was incomplete; and the Agency resisted providing a "full" account about its knowledge of BCCI until almost a year after the initial requests for the information. These experiences suggest caution in concluding that the information provided to date is full and complete. The relationships among former CIA personnel and BCCI front men and nominees, including Kamal Adham, Abdul Khalil, and Mohammed Irvani, requires further investigation.

## 8. THE FLAWED DECISIONS MADE BY REGULATORS IN THE US WHICH ALLOWED BCCI TO SECRETLY ACQUIRE US BANKS WERE CAUSED IN PART BY GAPS IN THE REGULATORY PROCESS AND IN PART BY BCCI'S USE OF WELL-CONNECTED LAWYERS TO HELP THEM THROUGH THE PROCESS.

When the Federal Reserve approved the take over of Financial General Bankshares by CCAH in 1981, it had substantial circumstantial evidence before it to suggest that BCCI was behind the bank's purchase. The Federal Reserve chose not to act on that evidence because of the specific representations that were made to it by CCAH's shareholders and lawyers, that BCCI was neither financing nor directing the take over. These representations were untrue and the Federal Reserve would not have approved the CCAH application but for the false statements made to it.

In approving the CCAH application, the Federal Reserve relied upon representations from the Central Intelligence Agency, State Department, and other U.S. agencies that they had no objections to or concerns about the Middle Eastern shareholders who were purporting to purchase shares in the bank. The Federal Reserve also relied upon the reputation for integrity of BCCI's lawyers, especially that of former Secretary of Defense Clark Clifford and former

EXHIBIT 2

Federal Reserve counsel Baldwin Tuttle. Assurances provided the Federal Reserve by the CIA and State Department, and by both attorneys, had a material impact on the Federal Reserve's willingness to approve the CCAH application despite its concerns about BCCI's possible involvement.

In 1981, the Office of the Comptroller of the Currency had additional information, from reports concerning BCCI's role in the Bank of America and the National Bank of Georgia, concerning BCCI's possible use of nominee arrangements and alter egos to purchase banks on its behalf in the United States, which it failed to pass on to the Federal Reserve. This failure was inadvertent, not intentional.

In approving the CCAH application, the Federal Reserve permitted BCCI and its attorneys to carve out a seeming loophole in the commitment that BCCI not be involved in financing or controlling CCAH's activities. This loophole permitted BCCI to act as an investment advisor and information conduit to CCAH's shareholders. The Federal Reserve's decision to accept this arrangement allowed BCCI and its attorneys and agents to use these permitted activities as a cover for the true nature of BCCI's ownership of CCAH and the First American Banks.

After approving the CCAH application in 1981, the Federal Reserve received few indicators about BCCI's possible improper involvement in CCAH/First American. However, at several critical junctures, especially the purchase by First American of the National Bank of Georgia from Ghaith Pharaon in 1986, there were obvious warnings signs that could have been investigated and which were not, until late 1990.

As a foreign bank whose branches were chartered by state banking authorities, BCCI largely escaped the Federal Reserve's scrutiny regarding its criminal activities in the United States unrelated to its interest in CCAH/First American. This gap in regulatory oversight has since been closed by the passage of the Foreign Bank Supervision Enhancement Act of 1991.

The U.S. Treasury Department failed to provide the Federal Reserve with information it received concerning BCCI's ownership of First American in 1985 and 1986 from the CIA. However, IRS agents did provide important information to the Federal Reserve on this issue in early 1989, which the Federal Reserve failed adequately to investigate at the time.

The FDIC approved Ghaith Pharaon's purchase of the Independence Bank in 1985 knowing him to be a shareholder of BCCI and knowing that he was placing a senior BCCI officer in charge of the bank, and failed to confer with the Federal Reserve or the OCC regarding their previous experiences with Pharaon and BCCI.

Once the Federal Reserve commenced a formal investigation of BCCI and First American on January 3, 1991, its investigation of BCCI and First American was aggressive and diligent. Its decisions to force BCCI out of the United States and to divest itself of First American were prompt. The charges it brought against the parties involved with BCCI in violating federal banking standards were fully justified by the record. Its investigations have over the past year contributed substantially to public understanding to date of what took place.

Even after the Federal Reserve understood the nature and scope of BCCI's frauds, it did not seek to have BCCI closed globally. This position was in some measure the consequence of the Federal Reserve's need to secure the cooperation of BCCI's majority shareholders, the

EXHIBIT 2

government and royal family of Abu Dhabi, in providing some $190 million to prop up First American Bank and prevent an embarrassing collapse. However, Federal Reserve investigators did actively work in the spring of 1991 to have BCCI's top management removed.

In investigating BCCI, the Federal Reserve's efforts were hampered by examples of lack of cooperation by foreign governments, including most significantly the Serious Fraud Office in the United Kingdom and, since the closure of BCCI on July 5, 1991, the government of Abu Dhabi.

U.S. regulatory handling of the U.S. banks secretly owned by BCCI was hampered by lack of coordination among the regulators, which included the Federal Reserve, the FDIC, and the OCC, highlighting the need for further integration of these separate banking regulatory agencies on supervision and enforcement.

## 9. THE BANK OF ENGLAND'S REGULATION OF BCCI WAS WHOLLY INADEQUATE TO PROTECT BCCI'S DEPOSITORS AND CREDITORS, AND THE BANK OF ENGLAND WITHHELD INFORMATION ABOUT BCCI'S FRAUDS FROM PUBLIC KNOWLEDGE FOR FIFTEEN MONTHS BEFORE CLOSING THE BANK.

The Bank of England had deep concerns about BCCI from the late 1970s on, and undertook several steps to slow BCCI's expansion in the United Kingdom.

In 1988 and 1989, the Bank of England learned of BCCI's involvement in the financing of terrorism and in drug money laundering, and undertook additional, but limited supervision of BCCI in response to receiving this information.

In the spring of 1990, Price Waterhouse advised the Bank of England that there were substantial loan losses at BCCI, numerous poor banking practices, and evidence of fraud, which together had created a massive hole in BCCI's books. The Bank of England's response to the information was not to close BCCI down, but to find ways to prop up BCCI and prevent its collapse. This meant, among other things, keeping secret the very serious nature of BCCI's problems from its creditors and one million depositors.

In April, 1990, the Bank of England reached an agreement with BCCI, Abu Dhabi, and Price Waterhouse to keep BCCI from collapsing. Under the agreement, Abu Dhabi agreed to guarantee BCCI's losses and Price Waterhouse agreed to certify BCCI's books. As a consequence, innocent depositors and creditors who did business with BCCI following that date were deceived into believing that BCCI's financial problems were not as serious as each of these parties already knew them to be.

From April, 1990, the Bank of England relied on British bank secrecy and confidentiality laws to reduce the risk of BCCI's collapse if word of its improprieties leaked out. As a consequence, innocent depositors and creditors who did business with BCCI following that date were denied vital information, in the possession of the regulators, auditors, officers, and shareholders of BCCI, that could have protected them against their losses.

EXHIBIT 2

In order to prevent risk to its restructuring plan for BCCI and a possible run on BCCI, the Bank of England withheld important information from the Federal Reserve in the spring of 1990 about the size and scope of BCCI's lending on CCAH/First American shares, despite the Federal Reserve's requests for such information. This action by the Bank of England delayed the opening of a full investigation by the Federal Reserve for approximately eight months.

Despite its knowledge of some of BCCI's past frauds, and its own understanding that consolidation into a single entity is essential for regulating a bank, in late 1990 and early 1991 the Bank of England tentatively agreed with BCCI and its Abu Dhabi owners to permit BCCI to restructure as three "separate" institutions, based in London, Abu Dhabi and Hong Kong. This tentative decision demonstrated extraordinarily poor judgment on the part of the Bank of England. This decision was reversed abruptly when the Bank of England suddenly decided to close BCCI instead in late June, 1991.

The decision by the Bank of England in April 1990 to permit BCCI to move its headquarters, officers, and records out of British jurisdiction to Abu Dhabi has had profound negative consequences for investigations of BCCI around the world. As a result of this decision, essential records and witnesses regarding what took place were removed from the control of the British government, and placed under the control of the government of Abu Dhabi, which has to date withheld them from criminal investigators in the U.S. and U.K. This decision constituted a costly, and likely irretrievable, error on the part of the Bank of England.

## 10. CLARK CLIFFORD AND ROBERT ALTMAN PARTICIPATED IN IMPROPRIETIES WITH BCCI IN THE UNITED STATES.

Regardless of whether Clifford and Altman were deceived by BCCI in some respects, both men participated in some BCCI's deceptions in the United States.

Beginning in late 1977, Clifford and Altman assisted BCCI in purchasing a U.S. bank, Financial General Bankshares, with the participation of nominees, and understood BCCI's central involvement in directing and controlling the transaction.

In the years that followed, they made business decisions regarding acquisitions for First American that were motivated by BCCI's goals, rather than by the business needs of First American itself; and represented as their own to regulators decisions that had been made by Abedi and BCCI on fundamental matters concerning First American, including the purchase by First American of the National Bank of Georgia and First American's decision to purchase branches in New York City.

Clifford and Altman concealed their own financing of shares of First American by BCCI from First American's other directors and from U.S. regulators, withheld critical information that they possessed from regulators in an effort to keep the truth about BCCI's ownership of First American secret, and deceived regulators and the Congress concerning their own knowledge of and personal involvement in BCCI's illegalities in the United States.

## 11. ABU DHABI'S INVOLVEMENT IN BCCI'S AFFAIRS WAS FAR MORE CENTRAL THAN IT HAS ACKNOWLEDGED, INVOLVING IN SOME CASES NOMINEE RELATIONS AND NO-RISK TRANSACTIONS THAT ABU DHABI IS

EXHIBIT 2

## TODAY COVERING-UP THROUGH HIDING WITNESSES AND DOCUMENTS FROM U.S. INVESTIGATORS.

Members of Abu Dhabi's ruling family appear to have contributed no more than $500,000 to BCCI's capitalization prior to April 1990, despite being the record owner of almost one-quarter of the bank's total shares. An unknown but substantial percentage of the shares acquired by Abu Dhabi overall in BCCI appear to have been acquired on a risk-free basis -- either with guaranteed rates of return, buy-back arrangements, or both.

The interest held in BCCI by the Abu Dhabi ruling family, like the interests held by the rulers of the three other gulf sheikdoms in the United Arab Emirates who owned shares of BCCI, materially aided and abetted Abedi and BCCI in projecting the illusion that BCCI was backed by, and capitalized by, Abu Dhabi's wealth. Investments made in BCCI by the Abu Dhabi Investment Authority appear to have been genuine, although possibly guaranteed by BCCI with buy-back or other no-risk arrangements.

Shares in Financial General Bankshares held by members of the Abu Dhabi royal family in late 1977 and early 1978 appear to have been nominee arrangements, adopted by Abu Dhabi as a convenience to BCCI and Abedi, under arrangements in which Abu Dhabi was to be without risk, and BCCI was to guarantee the purchase through a commitment to buy-back the stock at an agreed upon price.

Abu Dhabi's representative to BCCI's board of directors, Ghanim al Mazrui, received unorthodox financial benefits from BCCI in no-risk stock deals which may have compromised his ability to exercise independent judgment concerning BCCI's actions; confirmed at least one fraudulent transaction involving Abu Dhabi; and engaged in other improprieties pertaining to BCCI; but remains today in place at the apex of Abu Dhabi's committee designated to respond to BCCI's collapse.

In April, 1990, Abu Dhabi was told in detail about BCCI's fraud by top BCCI officials, and failed to advise BCCI's external auditors of what it had learned. Between April, 1990 and November, 1990, Abu Dhabi and BCCI together kept some information concerning BCCI's frauds hidden from the auditors.

From April, 1990 through July 5, 1991, Abu Dhabi tried to save BCCI through a massive restructuring. As part of the restructuring process, Abu Dhabi agreed to take responsibility for BCCI's losses, Price Waterhouse agreed to certify BCCI's books for another year, and Abu Dhabi, Price Waterhouse, the Bank of England, and BCCI agreed to keep all information concerning BCCI's frauds and other problems secret from BCCI's one million depositors, as well as from U.S. regulators and law enforcement, to prevent a run on the bank.

After the Federal Reserve was advised by the New York District Attorney of possible nominee arrangements involving BCCI and First American, Abu Dhabi, in an apparent effort to gain the Federal Reserve's acquiescence in BCCI's proposed restructuring, provided limited cooperation to the Federal Reserve, including access to selected documents. The cooperation did not extend to permitting the Federal Reserve open access to all BCCI documents, or substantive communication with key BCCI officials held in Abu Dhabi, such as BCCI's former president, Swaleh Naqvi. That access ended with the closure of BCCI July 5, 1991.

EXHIBIT 2

From November, 1990 through the present, Abu Dhabi has failed to provide documents and witnesses to U.S. law enforcement authorities and to the Congress, despite repeated commitments to do so. Instead, it has actively prevented U.S. investigators from having access to vital information necessary to investigate BCCI's global wrongdoing.

The proposed agreement between Abu Dhabi and BCCI's liquidators to settle their claims against one another contains provisions which could have the consequence of permitting Abu Dhabi to cover up any wrongdoing it may have had in connection with BCCI.

There is some evidence that the Sheikh Zayed may have had a political agenda in agreeing to the involvement of members of the Abu Dhabi royal family and its investment authority in purchasing shares of Financial General Bankshares, then of CCAH/First American. This evidence is offset, in part, by testimony that Abu Dhabi share purchases in the U.S. bank were done at Abedi's request and did not represent an actual investment by Abu Dhabi until much later.

## 12. BCCI MADE EXTENSIVE USE OF THE REVOLVING DOOR AND POLITICAL INFLUENCE PEDDLING IN THE UNITED STATES TO ACCOMPLISH ITS GOALS.

BCCI's political connections in Washington had a material impact on its ability to accomplish its goals in the United States. In hiring lawyers, lobbyists and public relations firms in the United States to help it deal with its problems vis a vis the government, BCCI pursued a strategy that it had practiced successfully around the world: the hiring of former government officials.

BCCI's and its shareholders' cadre of professional help in Washington D.C. included, at various times, a former Secretary of Defense (Clark Clifford), former Senators and Congressmen (John Culver, Mike Barnes), former federal prosecutors (Larry Wechsler, Raymond Banoun, and Larry Barcella, a former State Department Official (William Rogers), a former White House aide (Ed Rogers), a current Presidential campaign deputy director (James Lake), and former Federal Reserve Attorneys (Baldwin Tuttle, Jerry Hawke, and Michael Bradfield). In addition, BCCI solicited the help of Henry Kissinger, who chose not to do business with BCCI but made a referral of BCCI to his own lawyers.

At several key points in BCCI's activities in the U.S., the political influence and personal contacts of those it hired had an impact in helping BCCI accomplish its goals, including in connection with the 1981 CCAH acquisition of FGB and the handling and aftermath of BCCI's plea agreement in Tampa in 1990.

The political connections of BCCI's U.S. lawyers and lobbyists were critical to impeding Congressional and law enforcement investigations from 1988 through 1991, through a variety of techniques that included impugning the motives and integrity of investigators and journalists, withholding subpoenaed documents, and lobbying on capital hill to protect BCCI's reputation and discourage efforts to close the bank down in the United States.

## 13. BCCI'S PUBLIC RELATIONS FIRM SMEARED PEOPLE WHO WERE TELLING THE TRUTH AS PART OF ITS WORK FOR BCCI.

When Hill and Knowlton accepted BCCI's account in October, 1988, its partners knew of BCCI's reputation as a "sleazy" bank, but took the account anyway. In 1988 and 1989, Hill and Knowlton assisted BCCI with an aggressive public relations campaign designed to demonstrate that BCCI was not a criminal enterprise, and to put the best face possible on the Tampa drug money laundering indictments. In so doing, it disseminated materials unjustifiably and unfairly discrediting persons and publications who were telling the truth about BCCI's criminality.

Important information provided by Hill and Knowlton to Capitol Hill and provided by First American to regulators concerning the relationship between BCCI and First American in April, 1990 was false. The misleading material represented the position of BCCI, First American, Clifford and Altman concerning the relationship, and was contrary to the truth known by BCCI, Clifford and Altman.

Hill and Knowlton's representation of BCCI was within the norms and standards of the public relations industry, but raises larger questions as to the relationship of those norms and standards to the public interest.

## 14. BCCI ACTIVELY SOLICITED THE FRIENDSHIPS OF MAJOR U.S. POLITICAL FIGURES, AND MADE PAYMENTS TO THESE POLITICAL FIGURES, WHICH IN SOME CASES MAY HAVE BEEN IMPROPER.

Beginning with Bert Lance in 1977, whose debts BCCI paid off with a $3.5 million loan, BCCI, BCCI nominees, and top officials of BCCI systematically developed friendships and relationships with important U.S political figures. While those which are publicly known include former president Jimmy Carter, Jesse Jackson, and Andrew Young, the Subcommittee has received information suggesting that BCCI's network extended to other U.S. political figures. The payments made by BCCI to Andrew Young while he was a public official were at best unusual, and by all appearances, improper.

## 15. BCCI'S COMMODITIES AFFILIATE, CAPCOM, ENGAGED IN BILLIONS OF DOLLARS OF LARGELY ANONYMOUS TRADING IN THE US WHICH INCLUDED A VERY SUBSTANTIAL LEVEL OF MONEY LAUNDERING, WHILE CAPCOM SIMULTANEOUSLY DEVELOPED SIGNIFICANT TIES TO IMPORTANT U.S. TELECOMMUNICATIONS INDUSTRY EXECUTIVES AND FOREIGN INTELLIGENCE FIGURES.

BCCI's commodities affiliate, Capcom, based in Chicago, London and Cairo, was principally staffed by former BCCI bankers, capitalized by BCCI and BCCI customers, and owned by BCCI, BCCI shareholders, and front-men. Capcom employed many of the same practices as BCCI, especially the use of nominees and front companies to disguise ownership and the movement of money. Four U.S. citizens -- none of whom had any experience or expertise in the commodities markets -- played important and varied roles as Capcom front men in the United States.

While investigation information concerning Capcom is incomplete, its activities appear to have included misappropriation of BCCI assets; the laundering of billions of dollars from the

EXHIBIT 2

Middle East to the US and other parts of the world; and the siphoning of assets from BCCI to create a safe haven for them outside of the official BCCI empire.

Capcom's majority shareholders, Kamal Adham and A.R. Khalil, were both former senior Saudi government officials and successively acted as Saudi Arabia's principal liaisons to the Central Intelligence Agency during the 1970's and 1980's.

Its U.S. front men included Robert Magness, the CEO of the largest U.S. cable telecommunications company, TCI; a vice-President of TCI, Larry Romrell; and two other Americans, Kerry Fox and Robert Powell, with long-standing business interests in the Middle East. Magness, Romrell and Fox received loans from BCCI for real estate ventures in the U.S., and Magness and Romrell discussed numerous business ventures between BCCI and TCI, some of which involved the possible purchase of U.S. telecommunications stock and substantial lending by BCCI.

Commodities regulators with the responsibility for investigating Capcom showed little interest in conducting a thorough investigation of its activities, and in 1989 allowed Capcom to avoid such an investigation through agreeing to cease doing business in the United States.

The Subcommittee could not determine whether BCCI, Capcom, or their shareholders or agents actually acquired equity interests in the U.S. cable industry and believes further investigation of matters pertaining to Capcom is essential.

## 16. INVESTIGATIONS OF BCCI TO DATE REMAIN INCOMPLETE, AND MANY LEADS CANNOT BE FOLLOWED UP, AS THE RESULT OF DOCUMENTS BEING WITHHELD FROM US INVESTIGATORS BY THE BRITISH GOVERNMENT, AND DOCUMENTS AND WITNESSES BEING WITHHELD FROM US INVESTIGATORS BY THE GOVERNMENT OF ABU DHABI.

Many of the specific criminal transactions engaged in by BCCI's customers remain hidden from investigation as the result of bank secrecy laws in many jurisdictions, British national security laws, and the holding of key witnesses and documents by the Government of Abu Dhabi. Documents pertaining to BCCI's use to finance terrorism, to assist the builders of a Pakistani nuclear bomb, to finance Iranian arms deals, and related matters have been sealed in the United Kingdom by British intelligence and remain unavailable to U.S. investigators. Many other basic matters pertaining to BCCI's criminality, including any list that may exist of BCCI's political payoffs and bribes, remain sequestered in Abu Dhabi and unavailable to U.S. investigators.

Many investigative leads remain to be explored, but cannot be answered with devoting substantial additional sources that to date no agency of government has been in a position to provide.

Unanswered questions include, but are not limited to, the relationship between BCCI and the Banco Nazionale del Lavoro; the alleged relationship between the late CIA director William Casey and BCCI; the extent of BCCI's involvement in Pakistan's nuclear program; BCCI's manipulation of commodities and securities markets in Europe and Canada; BCCI's activities in India, including its relationship with the business empire of the Hinduja family; BCCI's relationships with convicted Iraqi arms dealer Sarkis Sarkenalian, Syrian drug trafficker,

terrorist, and arms trafficker Monzer Al-Kassar, and other major arms dealers; the use of BCCI by central figures in the alleged "October Surprise," BCCI's activities with the Central Bank of Syria and with the Foreign Trade Mission of the Soviet Union in London; its involvement with foreign intelligence agencies; the financial dealingst of BCCI directors with Charles Keating and several Keating affiliates and front-companies, including the possibility that BCCI related entities may have laundered funds for Keating to move them outside the United States; BCCI's financing of commodities and other business dealings of international criminal financier Marc Rich; the nature, extent and meaning of the ownership of other major U.S. financial institutions by Middle Eastern political figures; the nature, extent, and meaning of real estate and financial investments in the United States by major shareholders of BCCI; the sale of BCCI affiliate Banque de Commerce et Placement in Geneva, to the Cukorova Group of Turkey, which owned an entity involved in the BNL Iraqi arms sales, among others.

The withholding of documents and witnesses from U.S. investigators by the Government of Abu Dhabi threatens vital U.S. foreign policy, anti-narcotics and money laundering, and law enforcement interests, and should not be tolerated.

## SUMMARY OF LEGISLATIVE RECOMMENDATIONS

**1. THE SUBCOMMITTEE RECOMMENDS THAT THE UNITED STATES DEVELOP A MORE AGGRESSIVE AND COORDINATED APPROACH TO INTERNATIONAL FINANCIAL CRIME, AND TO MOVE FURTHER AGAINST FOREIGN PRIVACY AND CONFIDENTIAL LAWS THAT PROTECT CRIMINALS.**

**2. THE SUBCOMMITTEE RECOMMENDS THAT THE JUSTICE DEPARTMENT RECONSIDER THE POLICIES AND PRACTICES THAT LED TO ITS INEFFECTIVENESS IN INVESTIGATING AND PROSECUTING BCCI, AND IMPAIRED ITS ABILITY TO COOPERATE WITH OTHER INVESTIGATIONS OF BCCI BEING CONDUCTED BY THE FEDERAL RESERVE, NEW YORK DISTRICT ATTORNEY, AND THE SENATE.**

**3. THE SUBCOMMITTEE RECOMMENDS THAT THE CENTRAL INTELLIGENCE AGENCY AND STATE DEPARTMENT UPGRADE THE TRACKING OF FOREIGN FINANCIAL INSTITUTIONS AND ACTIVITIES, AND THE DISSEMINATION OF INFORMATION CONCERNING SUCH INSTITUTIONS.**

**4. THE SUBCOMMITTEE RECOMMENDS THAT THE CONGRESS CONSIDER WHETHER ADDITIONAL OVERSIGHT MECHANISMS ARE NECESSARY TO ENSURE THE CIA'S ACCOUNTABILITY ON THE PROVISION OF INFORMATION.**

**5. THE SUBCOMMITTEE RECOMMENDS THAT FEDERAL AGENCIES IMPOSE NEW REQUIREMENTS ON FOREIGN AUDITORS TO PROTECT U.S. INTERESTS IN ANY CASE IN WHICH ANY SUCH AGENCY IS RELYING ON AN AUDIT CERTIFIED BY A FOREIGN AUDITOR. AT MINIMUM, THIS SHOULD REQUIRE FOREIGN AUDITORS WHOSE CERTIFICATIONS ARE USED BY INSTITUTIONS DOING BUSINESS IN THE U.S. AGREE TO SUBMIT THEMSELVES TO U.S. LAWS.**

EXHIBIT 2

6. THE SUBCOMMITTEE RECOMMENDS THAT THE PRESIDENT AND THE SECRETARY OF STATE ADVISE THE GOVERNMENT OF ABU DHABI THAT ITS WITHHOLDING OF DOCUMENTS AND WITNESSES PERTAINING TO BCCI FROM U.S. FEDERAL LAW ENFORCEMENT INVESTIGATORS, THE FEDERAL RESERVE, THE NEW YORK DISTRICT ATTORNEY AND THE CONGRESS THREATENS VITAL U.S. INTERESTS AND WILL NOT BE TOLERATED.

7. FURTHER ATTENTION NEEDS TO BE GIVEN TO THE PROBLEM OF THE REVOLVING DOOR IN WASHINGTON, AND THE IMPACT ON THE REGULATORY PROCESS AND ON LAW ENFORCEMENT OF POLITICAL INFLUENCE IN WASHINGTON. THE SUBCOMMITTEE RECOMMENDS THE CONSIDERATION OF LEGISLATING A FEDERAL STATUTORY CODE OF CONDUCT FOR ATTORNEYS WHO PRACTICE BEFORE FEDERAL AGENCIES.

8. THE SELF-REGULATION OF THE U.S COMMODITIES MARKETS BY THE COMMODITIES FUTURES TRADING COMMISSION, THE CHICAGO BOARD OF TRADE, AND THE CHICAGO MERCANTILE EXCHANGE IS INADEQUATE TO PROTECT THOSE MARKETS AGAINST MONEY LAUNDERING INVOLVING TRADES

FROM ABROAD. THE SUBCOMMITTEE RECOMMENDS THAT THE EXCHANGES MAKE MONEY LAUNDERING ILLEGAL, AND DEMAND THAT THIS REQUIREMENT BE ACCEPTED BY FOREIGN COMMODITIES EXCHANGES WITH WHOM THEY DO BUSINESS, AS A CONDITION OF ACCESS TO US EXCHANGES.

9. THE SUBCOMMITTEE RECOMMENDS THAT FURTHER STEPS BE TAKEN TO INSURE ADEQUATE ACCOUNTABILITY OF FOREIGN FINANCIAL INSTITUTIONS DOING BUSINESS IN THE UNITED STATES, INCLUDING REQUIRING FOREIGN BANKS FORM SEPARATELY CAPITALIZED HOLDING COMPANIES IN THE UNITED STATES AS A CONDITION OF LICENSE AND THE CONSIDERATION BY THE FEDERAL RESERVE OF ESTABLISHMENT A MINIMUM STANDARD FOR CONSOLIDATED REGULATION THAT EXCLUDES BANK REGULATORY HAVENS.

10. THE SUBCOMMITTEE RECOMMENDS THAT FOREIGN INVESTORS WHO PURCHASE SUBSTANTIAL SHARES OF U.S. BUSINESSES BE REQUIRED TO APPEAR PERSONALLY IN THE UNITED STATES AS INSURANCE THAT THE FOREIGN INVESTOR IS NOT ACTING AS A NOMINEE FOR SOMEONE ELSE.

11. TURF WARS CONTINUE TO SEVERELY DAMAGE THE ABILITY OF LAW-ENFORCEMENT AGENCIES IN THE UNITED STATES TO DO THEIR JOB. THE SUBCOMMITTEE RECOMMENDS THE ESTABLISHMENT OF A COMMITTEE OF LAW ENFORCEMENT OFFICIALS WHOSE JOB IT IS TO CONDUCT OVERSIGHT OF, PREVENT, AND RESPOND TO FAILURES OF COOPERATION IN LAW ENFORCEMENT.

EXHIBIT 2

T H E   C O M M I T T E E S

EXHIBIT 3

C O N T E N T S

Committees - The Concept

Branch Management and Dynamics Committee

Branch Budget & Marketing Committee

Appendix

_____

Note : This manual also serves as a guide for :

     1)  Management Committee

             and

       Dynamics Committee

     2)  Budget & Marketing Committee

    at the level of

       Regional Office

       Head Offices of single country
       Subsidiaries and Affiliates

During February 1988, the Committee Structures were rationalised.

Budget and Marketing Committee

Marketing Committee was redesignated as Budget and Marketing Committee with responsibility for both Capability and Business budgets.

Management and Dynamics Committee

These two Committees under new arrangement were combined into one Committee which will hold meeting once a month.

Any separate reference in this booklet to Management Committee and Dynamics Committee now stands for the Management & Dynamics Committee.  The Budget & Marketing Committee takes care of all budget, marketing, business related affairs.

EXHIBIT 3

# C O M M I T T E E S

**The Concept**

"Meaning of Committee in our idiom is Joint Personality.  Joint Personality is joint flow of the streams of energy psyche of various individuals"

(Quotation from the President - 14.11.84)

Real Management concept is based on evolution of "joint personality" of the management.  Branch Committees which signify the process of "joint personality"  aim to achieve harmony of individual feelings and efforts towards the accomplishment of dominant Group goals.  Each of the management functions is an exercise of interfusion, interrelationships and interdependence. People exchange information, views and suggestions for the purpose of achievement of common objectives through direct personal communication, interaction and interfusion.  The identity of views and feelings thus achieved then tends to bring agreement on both methods and actions.  In the process of inter-action each participant influences the other and in turn they are collectively influenced by other persons and elements in the total situation.

Joint participation  helps to bring on various issues a wider range of experience, a greater variety of perception, a more thorough probing of facts and expertise on various aspects of the subject matter.

The "joint personality" of the Branch Committees have a vitality which transcends that of individual members.  Stimulation results from interchange and fusion of ideas. Participation in decision making helps people feel more enthusiastic and responsible in accepting and executing it.

The process of Branch Committees  enables members to perceive commonality of goals.  It is the anticipated satisfaction of sharing the results - it is a supportive relationship in which each feels the genuine common interest in terms of needs, values, aspirations, goals and expectations. It fosters greater creativity and innovativeness.  It is a team process in every step of  planning - assessing needs, formulating goals, designing

EXHIBIT 3

2.

lines of action, carrying out activities and evaluating results.  It is also a collaborative process both in policy making and policy execution. There is an open flow of communication - easy access, which is multi directional - up, down and sideways.  Feelings are expressed and valued. Every aspect of deliberation takes into account interaction and interface with the total environment.

The essence of the success of the committees is humility and mutual respect of one anothers' feelings by participants and a desire to integrate.  The utility of the system is the continuous interaction of people.  Each committee is a self regulating system of its own.  The process aids the growth of the Bank through increased exposure of its people to a range of concepts and ideas.

In their highest form, committees are continuously active and in session, though not always in formal session.  They meet in action, rather than for making decisions to be acted upon by others.

It is worth remembering that structure is created for establishing relationships between the individuals with the purpose of putting to use their energy for maximum productivity, and not to hamper individual initiative and evolution.

Under the present structure, the following Committees exist at branch level:

    I.  Management and Dynamics Committee
    II. Marketing Committee

The purpose and objectives of these Committees and their basic structure are briefly described hereafter.

For the sake of making the process of interfusion and deliberations at the meetings of these Committees more meaningful and purpose oriented, a set of specimen agenda and minutes relevant to each of them are provided in the Appendix.  This may help branches in developing their own framework for specific agenda and the minutes for the meetings.

EXHIBIT 3

3.

I.  BRANCH MANAGEMENT AND DYNAMICS COMMITTEE

(Management Committee and Dynamics Committee
which existed separately have now been merged
at Branch level and renamed as Management and
Dynamics Committee).

The two subjects of 'Management' and 'Dynamics' should be discussed
alternately in the monthly meetings of this Committee.  The subject of
'Budget', however, should be discussed at a "special" meeting of the
Committee  which should be held in the first week of each month.

The scope of the Committee is very wide and within the two subjects of
'Management' and 'Dynamics' it encompasses the practice of Real
Management.  While discussing operational issues of the Branch and
experiencing management concepts in dwelling on issues related to
attainment of the organisational objectives  it provides stimulus for
the growth of individuals.  The main purpose of the Committee is to
influence, enable, encourage and assist Branch Management to use the
Committee as a vehicle for Real Management at the Branch.

The subject of 'Real Management' is intensely dealt with in BCC through
a continuous flow of management conferences and Group publications.
Most of the BCC Managers and Officers are reasonably conversant with
BCC management philosophy and style.  From time to time new
developments will take place in the process of management and BCC
Managers and Officers are expected to remain abreast with such
developments and changes.

It is one of the corner stones of BCC management philosphy that largest
number of people should be encouraged to participate in the management
process and develop management skills.

EXHIBIT 3

4.

The primary objectives of the Committee are to:

- Initiate and induct the largest number of staff in the process of Management.

- Ensure the involvement of a maximum number of members in the overall development and operational affairs of the Branch.

- Enable the members of the Committee to realise and practise the law of interdependence, interrelationship, interfusion and evolution, through the proceedings of the Committee: The cosmic laws on which Real Management is based.

- Enable the members of the Committee to forge a joint personality in accordance with the concept of Real Management.

- Arouse the interest of the staff who constitute the Committee in affairs of the Bank, other than just their own specific assignment, i.e. to create their interest in Management, Marketing and the growth and progress of the Institution, as a whole.

- Assist individual members in the growth of their personality through enlarging their area of interest and the operation of the Committee.

The subject of **'Budget'**.

The Budget has become the basis for attaining clarity in future business strategies and results and it now assumes a major function and role of the Committee. It is now the centre piece for shaping and promoting Branch - its productivity, results and organisation. The essence of budget is in the goals, their achievement and on top of and beyond anything else identification of each individual member of the Committee with the Budget and its realisation becoming part of their being.

EXHIBIT 3

5.

Real Budget conveys a disciplined and organised effort to provide a measure of quality, quantity, ability and possibility as related to the time. Time frame is not one year, or a quarter or a month, but every moment of it which should crystalise into results. The process signifies a 'living budget', thinking of budget everyday and every second of it doing something which contributes to the process of attainment of objectives. Each member of the Committee is expected to live it. As against 'blind budget' which is a passive process, in a 'living budget' light of reality comes from the brilliance of insight, it is to be seen in the eyes of ones Soul.

The formation of budget is based on realism which relates to the possibilities and the height of desire, aspiration and hope. The Committee is continuously involved in the process of follow-up by becoming the dynamics and soul of budget and owns responsibility for achievement of quarterly goals. The Budget itself becomes the instrument and the scale for both managing the Budget and also measuring results by the Committee.

To assist and complement Branch Management and Dynamics Committee in its effort to achieve the budget, a simple form ('Budget - its Achievement') has been introduced to reflect the monthly progress in relation to the targets. This form has to be completed after the conclusion of each month and discussed in a "special" meeting of the Committee which should be held in the first week of each month. The Agenda of this "special" meeting should exclusively be the subject of Budget and the quality and vitality of efforts for its achievement.

The subject of **'Management'**.

While meeting on the subject of 'Management' the committee should particularly focus on the operational aspects of the Branch.

This is signified in terms of related tasks and objectives for an efficient and effective functioning of the Branch and its objectives.

EXHIBIT 3

6.

Management issues concern both the present and the future, both the short term and long term.  Management is concerned with decisions for action which aim at results both in the present and the future.  The subject also concerns administration - administering and managing to improve what already exists and is already known.  This may also require skills to redirect resources from areas of low or diminishing results to areas of high or increasing results.

The Committee is an organ of leadership, direction and decision for enhancing management performance.  In discharge of its responsibilities on the management issues, the Committee is concerned with:

1.  Specificiation of objectives - what our business is, what it should be and what it will  be.  This should be translatable in the action commitments.

2.  Providing operational direction on various issues, such as:

   . Management and quality control of loans and advances and other risk assets

   . Follow up of audit/inspection reports

   . Quality of service and general standards of efficiency

   . Effectiveness of systems and procedures

   . Manpower management

   . Image building and standing in the market place.

3.  Work assignments, requirements concerning work tools (mechanisation and automation) and other facilities.

EXHIBIT 3

7.

The subject of **'Dynamics'**.

"Real management is not done by instructing people to do things as we want, or manage as one person to another. The primary function of the management is to create a dynamics in the energy system of the branch, regional office or any other organisational unit and provide a purpose and a direction to this dynamics".

(Quotation from the President)

The word dynamics presupposes a flow, a movement of power and energy. By this definition, every individual, a unit of energy, has a dynamics of its own.

Dynamics is created by the interplay of the dynamics of various individuals, amongst themselves, and with the dynamics of their environment.

Dynamics is created in the process of inter-action and interfusion - in the flow of energy, flow of feelings.  In this flow, management injects the purpose and provides a direction to the flow.

The requirement is that the individuals should not act and relate as closed or fixed units of energy but as dynamic units, thus contributing to the creation of bigger dynamics.

In any organisation the process of dynamics can be analysed as under:

- Human unit of energy:  Inter-action and interfusion of various elements with their myriad qualities and vitality within the dynamics that a human being is.

- Area of operation or assignment:  Inter-action and interfusion between the individual human unit of dynamics and other human units

EXHIBIT 3

8.

of dynamics comprising his area of operation or assignment.

- Between one area of operation or assignment and another area of operation and assignment: Inter-action and interfusion between the various human units of dynamics in two or more areas of operation or assignments.

- Between each area of operation and the total organisation: Inter-action between the dynamics of each area of operation and the total dynamics of the organisation (between part and part, part and totality).

- Between the total dynamics of the organisation or the dynamics of a particular unit of the organisation and the dynamics of its environment (market place): Inter-action and interfusion between the dynamics of the organisation and the dynamics of the market place (external environment).

The health and vitality of dynamics is determined by its quality and thrust, which must be greater than the resistance to continue the movement and the momentum towards achievement of organisational purpose. Resistance comes from internal sources as well as external sources. Real Management is counter-acting such resistances and to channel the individual energies for enhancing productivity and achievement of organisational objectives by bringing to bear upon them the power of dynamics and not by putting pressure on them by external means.

The primary responsibility of the Committee would be to ensure that the qualities of the individuals or the groups of individuals are nurtured to such a degree that the flow of their energy produces greater thrust in both strength and quality to achieve the purpose and the goals of the organisational unit.

The Committee is responsible for the orientation of the individuals with the environment and the culture of the organisation, with a view

EXHIBIT 3

9.

to providing motivation for everyone to participate in the process of achievement and success.

The essential ingredient of orientation is having an awareness of human potential and existence of possibilities.

Orientation means permeation of the environment of the organisation and its market place in its changing patterns into the individuals and their total integration with the organisation.

The Committee focuses on developing and promoting a sense of possibilities in the individuals and operating units.

While discussing the subject of 'Dynamics', the Committee expects to:

- Create a dynamics in the branch, injecting a purpose in it and providing a direction to it.

- Ensure vitality and quality of the dynamics of the energy system which a branch or a unit of the organisation is.

- Achieve a high degree of orientation of the individuals with the culture, values and purpose of the organisation as well as with the environment of the market place by:

    . identifying and removing the reasons of the individual disorientation;

    . creating an environment conducive for the release of individual energy and its direction into positive and productive channels.

- Identify units of energy which are under-utilised or unutilised or ineffective and helping their activation and regeneration.

- Create a high degree of communication between individuals and

EXHIBIT 3

10.

various units of the organisation.

- Develop sustained intentionality and commitment for achievement of organisation and units' goals and objectives.

- Encourage process of change and evolution both for self-development of individual and the growth of the organisation units' operation and results.

**Structure**

| | | |
|---|---|---|
| Chairman | – | Ex-officio Branch Manager |
| Secretary | – | To be apppointed from among the members on a rotating basis. |
| Members | – | 3 to 8, according to the size of the Branch drawn from the staff showing high managerial potential and capable of contributing effectively by active participation in the business of the Committee, selected in consultation with the respective Regional General Manager/Head of Subsidiary/Affiliate. These members could be rotated on a six monthly basis to provide wider participation in the process. |
| Quorum | – | 3 members. |
| Decisions | – | By consensus. |

EXHIBIT 3

11.

| | | |
|---|---|---|
| Frequency of Meetings | – | On the subject of 'budget', a "special" meeting should be held in the first week of <u>each month</u>. The agenda of this "special" meeting should exclusively be the subject of 'budget' and the quality and vitality of efforts for its achievement. |

The subjects of 'management' and 'dynamics' would be separately discussed at <u>alternate monthly</u> meetings. Thus,

. in one month, the Committee will discuss the subject of 'management' matters pertaining to administration, operation, advances, excellence in service and other affairs of the branch, and

. in the other month, the Committee will discuss the process of 'dynamics'

| | | |
|---|---|---|
| Minutes | – | Minutes of every meeting must be recorded and copies sent to: |

. Respective Regional General Manager/ Head of Subsidiary/Affiliate, and

. CSO Executive at the Support Centre.

[The minutes of "special" Budget meeting should accompany the 'Budget - its Achievement' form and be sent latest by seventh of each month].

EXHIBIT 3

12.

## II. BRANCH MARKETING COMMITTEE

Branch Marketing Committees are an integral part of the 'marketing culture' of the organisation.  They play a significant role in the actualisation of energy of each member of the organisation in tangible results and are the provider of medium for pursuing organised marketing efforts, capturing the sense of possibilities, and accelerating the achievement of the goals and objectives.  The process not only involves continuous affirmation of the spirit of marketing, but also signifies a programme of constant building and verification of clear vision, intensity of desire and involvement of largest number of BCC family members in attaining the marketing goals.

In the spirit of 'joint personality', Marketing Committees provide the means for all the units of energy of the organisation to function together in a  spirit which goes far beyond the nominal growth attained by disoriented and diffused individual efforts.  It is only by adopting a spirit of wholehearted commitment of a shared goal that the challenge is met by bringing about a forceful marketing movement in which largest number of members participate intensively and extensively. Branch Marketing Rpmmittees aim to apply the best quality of energy and resources for the maximisation of results.

Marketing is reaching out and relating to the market place.  Today it refers to the global market place which has penetrated and permeated the boundaries of local market place of each branch and therefore the endeavour on the part of each branch has in a more extensive sense to be for marketing the global products from within the geographical boundaries.  Hence, the Branch will perform 'Internal Marketing' (IMP) in Internal Market Place for its own books and 'External Marketing' (EMP) in the geographic location of the Branch for generation of business for other centres of the Group.

EXHIBIT 3

13.

To draw focus on overall growth and various segments of market opportunities, challenges have been thrown to the organisation through various campaigns and programmes. The current programmes and priorities are as follows:

Programmes:

. Sales Force Programme/Client Contact and Relationship Programme

. E.M.P. - Correspondent Banking, Non Resident Accounts (NRA)/ External and Expatriate Accounts (EA)

Priorities:

- Mass mobilisation of low cost local currency deposits.

- Mobilisation of U.S. Dollar and other convertible currencies deposits at as low a cost as possible.

- Sale of Travellers Cheques.

- Concentrated marketing for the accounts and business of:

    . Financial Institutions
    . Domestic Corporations (both Private and Public)
    . International and Multinational Corporations
    . Embassies and Diplomatic Missions (cross selling through BCC network)
    . High networth individuals and affluent professionals
    . Correspondent Banks
    . Central Banks
    . International Agencies (Development Banks, etc.)

EXHIBIT 3

14.

- Bulk Business  (imports, exports and trade related banking services).


The primary objectives of the Marketing Committee are as follows:

- To help every individual member of the organisation adjust his or her priorities and place Marketing at the  top, over and above whatever their assignments are, by devoting at least a part of their daily time on Marketing.

- To interfuse the spirit and skills of Marketing in all individual members by involving as many people as possible, with their spirit, psyche, feelings and instincts in the process of Marketing.

  The Marketing Committees should bring about such a positive shift of emphasis and change in the spirit of the members as would transform the whole organisation into a massive Marketing movement.

- To evaluate quality of mix of deposits.

- To identify and expand market place and customer base.  In BCC the market place is the vision of marketing person.  Create marketing vision in the largest number of BCC family members.

- To strive to have a respectable share of  the market in  deposit and business.

- While continuing to explore traditional marketing channels, place special emphasis on priority areas.

- Realise, harness and utilise the power of BCC network through interfusion, cooperation and coordination with other units.

EXHIBIT 3

15.

The process of Marketing Committees helps in matching the Bank's capabilities with the opportunities in the changing environment. The opportunity provided by the mechanism of the Marketing Committees helps in the process of good strategic thinking, stimulating creativity and development of plans to turn ideas into results. The Marketing Committee leads the way in achieving the objectives of Marketing through:

- Organised and systematic penetration into the market place
- Increasing our market share significantly
- Competing with grace and dignity but persistently, forcefully and agressively
- Always trying to be creative, innovative and imaginative
- Never ignoring quality
- Marketing manners and methods such as would enhance BCC image and reputation
- Increasing coordination, cooperation, interfusion and exchange of information with all other units of BCC globally and with the Central Marketing Division.

**Structure**

Chairman        –        Ex officio Branch Manager.

Secretary       –        To be appointed from among the members on a rotating basis.

Members         –        3 to 10, according to the size of the Branch, drawn from the staff who have the flair and enthusiasm for Marketing, selected in consultation with the respective Regional General Manager/Head of Subsidiary/Affiliate. These members could be rotated on a six monthly basis to ensure wider participation in the process.

EXHIBIT 3

16.

| | | |
|---|---|---|
| Quorum | - | 3 members. |
| Decisions | - | By consensus |
| Frequency of Meetings | - | At least once in a month. |
| Minutes | - | Minutes of every meeting must be recorded and copies sent to: |

. Respective Regional General Manager/
Head of Subsidiary/Affiliate, and

. Member concerned of Joint Committee
for Deposit and Profit in CSO.

EXHIBIT 3

17.

A P P E N D I X

A.    Management and Dynamics Committee

The subject of 'Management & Dynamics'

i.   Agenda (a framework for developing

specific Agenda)

ii. Minutes (specimen)

B.    Budget and Marketing Committee

i.   Agenda (a framework for developing

specific Agenda)

ii. Minutes (specimen)

C.    Budget—Its Achievement Form

EXHIBIT 3

BRANCH MANAGEMENT AND DYNAMICS COMMITTEE
A G E N D A - I

The subject of 'Management'

---

A framework for developing a specific Agenda
covering issues related to banking and
operational management functions.

---

I. **Management of assets, operational procedures and security:**

1. Management of advances.
2. Fund management and liquidity.
3. Working systems and procedures.
4. Follow-up and rectification of audit report deficiencies.
5. Communication and reporting relationships with Regional and Central offices.
6. Effectiveness of record-keeping procedures.
7. Requirements and effectiveness of computers and other aids.
8. Delegation of authority.
9. Branch security, insurance and precaution against loss, etc.
10. Etc.

II. **Review of client service quality and working environment:**

1. Customers service and quality of service staff.
2. Customers complaints.
3. Effectiveness and efficiency of mail disposal.
4. Working environment and premises.
5. Etc.

III. **Staff Management:**

1. Assessment of staff strength and manpower projection.
2. Branch organisational structure, and job allocation.
3. Key issues of staff administration, personnel records and implementation of terms of service.
4. Training - job rotation, on-the-job training and nominations for in-house training facilities.
5. Performance appraisal and progression planning.
6. Succession planning for key jobs.
7. Issues related to counselling, group discipline and collective behaviour.
8. Etc.

EXHIBIT 3

BRANCH MANAGEMENT AND DYNAMICS COMMITTEE
A G E N D A ⁻ II

The subject of 'Dynamics'

---

The Agenda of the Meeting aims to capture
and comprehend the Totality in its most
dynamic state with a view to channel the
individual and collective energies for
productivity and achievement of
organisational objectives.

Since each item listed is an extensive
subject in itself, Branch has to adopt
one or more than one specific subject
for the Agenda of each meeting, in a
manner that ample coverage is provided
to a wide range of subjects given
hereunder, including other purposeful
areas in BCC context, over a period of
time.

---

Subjects, such as:

**Exploration of self -**

Exploration of the individual and common energy psyche and dynamics
which leads us to remain in rythm and tune with the Totality.

Pillars of BCC:

. Humility
. Love
. Hope
. Faith
. Courage
. Compassion

Spirit  - its vitality and its quality.

Desire  - its health and its quality. The release and flow of desire.

**Major Purpose -**

. Submission to God
. Service to humanity
. Giving
. Success

**Clarity of Purpose and clean instincts -**

Quality and the elements which we should manage for results:

. Purpose
. People
. Planning
. Priority

EXHIBIT 3

. Possibilities
. Products
. Profit - moral and material

**Flow and Flux of Energy -**

Energy System:

. The principles of:-

- interaction
- interfusion
- interdependence
- interrelationships

. Joint personality

**Management of Context and Contents of the Context -**

. Managing the Context.

. Changing the Context.

. Creating new Context.

. Management of Contents (related to purpose, people and environment).

**Sense and Vision of Possibilities and ability to produce and realise goals -**

. The 'Art of Possible' - vitality, quality and thrust behind it.

. Personal commitment and one's sense of possibilities.

. Building up management capability equal to opportunities and possiblities.

**Orientation - Changing and Renewal of each Member -**

Their feelings energised by conviction, commitment, sincerity, trust, joy, concern, faith, sensitivity.

**Vitality and quality of operation -**

**Real Management -**

. The principle of evolution

. The Laws of Nature and Creation:

- The Concept of Totality and Parts or the Totality Principle
- The Phenomena of Change or the Flow Principle

EXHIBIT 3                                                    ii.

- The Relationship of the State of Existence and State of No Existence
- The Truth about the Unity of Moral and Material

**Autonomy -**

. Control
. Accountability

Etc.

iii.

EXHIBIT 3

BUDGET & MARKETING COMMITTEE

A G E N D A

---

A framework for developing
specific Agenda covering
areas relating to
Budget & Marketing

---

1.    Review of Deposits : Deposit Profile

.   Mix of deposits - composition of low cost deposits
.   Trend
.   New accounts introduced
.   Etc.

2.    Progress and performance in relation to priority areas
      of business :

.   HNWI and professionals
.   Financial institutions
.   Domestic corporations
.   International and multinational corporations
.   Embassies, airlines and international agencies
.   Bulk business
.   Etc.

3.    Other business : Foreign Trade, T/Cs, FX etc.

4.    Review of Marketing contribution to profit :

.   Trend- overall profit, interest income and fee
    earning business
.   Potential for enhancing income and economising
    on expenditure
.   Etc.

5.    Profitability & Balance Sheet

6.    Market Share*

7.    Summary of decisions as to plans and strategies

8.    Other Matters, such as :

.   BCC marketing culture
.   Response and action on communications received
    from Regional Office, CSO, etc.
.   Etc.

                              * To be a quarterly feature of
                                the Agenda.

EXHIBIT 3

**BUDGET – ITS ACHIEVEMENTS FOR THE MONTH OF** 1988

BRANCH:            MANAGER:

COUNTRY:            EXCHANGE RATE: US$1=    (  /  /1988)      (31/12/1987)

### HUMAN RESOURCES

| Period | Total Number | International Officers | Local Officers | Clerical | Non-Clerical |
|---|---|---|---|---|---|
| 1987: December 31 | | | | | |
| 1988: Previous Month | | | | | |
| Reporting Month | | | | | |

Amounts in equivalent US$000s

### DEPOSIT PROFILE

| Deposit Mix | 1987 Dec.31 | Mix % | 1988 Achievement Up to Previous Month | Mix % | Up to Reporting Month | Mix % | 1988 Budget Quarterly (Up to March/June/Sept) | Mix % | End Year | Mix % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Deposits** | | | | | | | | | | |
| Current | | | | | | | | | | |
| Call | | | | | | | | | | |
| Savings | | | | | | | | | | |
| Term | | | | | | | | | | |
| Others | | | | | | | | | | |
| **Total No. of A/Cs** | | | | | | | | | | |
| Current | | | | | | | | | | |
| Call | | | | | | | | | | |
| Savings | | | | | | | | | | |
| Term | | | | | | | | | | |
| Others | | | | | | | | | | |

**Total deposits placed by other BCC units US$**

Amounts in equivalent US$000s

### EMP

| Description | 1987 | 1988 Achievement Reporting Month | Up to Reporting Month | 1988 Budget Quarterly up to March/June/Sept | End Year |
|---|---|---|---|---|---|
| **\*E.A. Deposits** | | | | | |
| i of Individuals: Amount | | | | | |
| No. of Accounts | | | | | |
| ii of others: Amount | | | | | |
| No. of Accounts | | | | | |
| **\*NRA Deposits of** | | | | | |
| **Individuals** | | | | | |
| Amount | | | | | |
| No. of Accounts | | | | | |
| **CBRB** | | | | | |
| TC sale through Banks | | | | | |

*Deposits recorded by other branches. Apportion to concerned branch indicated period.

| Description | 1987 | 1988 Achievement Reporting Month | Up to Reporting Month | 1988 Budget Quarterly up to March/June/Sept | End Year |
|---|---|---|---|---|---|
| **Total Exports** | | | | | |
| **Total Imports** | | | | | |
| **Total LG's Issued** | | | | | |
| **Total BCC TC Sales** | | | | | |
| **Purchase of:** | | | | | |
| i TCs | | | | | |
| ii Foreign Currency Notes | | | | | |
| **Credit Cards** | | | | | |
| i No. of Cards Issued | | | | | |
| \*ii No. of merchants | | | | | |
| \*iii Merchant volume | | | | | |

*Where applicable

### PROFITABILITY

| PROFIT | 1987 | 1988 Achievement Reporting Month | Up to Reporting Month | 1988 Budget Quarterly up to March/June/Sept | End Year |
|---|---|---|---|---|---|
| In Local currency | | | | | |
| Equivalent US$ | | | | | |

**INCOME**
Amounts in local currency:

| | | | | | |
|---|---|---|---|---|---|
| Interest Income | | | | | |
| Average Monthly Rate of Interest | | | | | |
| Interest Paid | | | | | |
| Average Monthly Rate of Interest | | | | | |
| Net Interest Income | | | | | |
| Commission | | | | | |
| Profit on Exchange (Net) | | | | | |
| Other Income | | | | | |
| TOTAL | | | | | |

**OPERATING EXPENDITURE**
Amounts in local currency:

| | | | | | |
|---|---|---|---|---|---|
| **Personnel Costs** | | | | | |
| **Occupancy Costs – Branch** | | | | | |
| **Other Operating Expenses** | | | | | |
| † | | | | | |
| TOTAL | | | | | |

EXHIBIT 8

amounts in equivalent US$000s

**BALANCE SHEET**

| Description | 1987 | 1988 Achievement | | 1988 Budget | |
| | | Reporting Month | Up to Reporting Month | Quarterly up to March/June/Sept | End Year |
|---|---|---|---|---|---|
| **Liabilities:** | | | | | |
| Capital/Capital Fund | | | | | |
| Total Deposits | | | | | |
| Due to Banks/NBFI/Affi. | | | | | |
| Others | | | | | |
| **Total Liabilities** | | | | | |
| **Assets:** | | | | | |
| Total Advances | | | | | |
| Due to Banks/NBFI/Affi. | | | | | |
| Fixed Assets/Others | | | | | |
| **Total Assets:** | | | | | |
| Advances/Deposit Ratio | | | | | |

**INTEREST RATES**

Bank Rate: Max_____ Min_____   Inter-Bank Rates: Max____ ___ Min_____   Interest Rate on Advances: Max ____ Min_____

Interest Rates on Deposits:   Term: Max _____ Min _____   Savings:_____ Current:_____

**COMMENTS ON BUDGET VARIANCES**
Brief comments on significant variations from the Budget

**PERFORMER OF THE MONTH:**
Please detail specific achievements and justification of selection



# BUDGET – ITS ACHIEVEMENT

Reflection of your feelings – Reflection of your capability
**Enhancement and enlargement of capability is our major goal**

Manager's name and signature

EXHIBIT 3

ET – ITC ACHIEVEMENTS FOR THE QUARTER ENDED _____ 1988
To be reviewed every quarter in a special meeting at the Branch

Case 3:24-cv-00040-ZNQ-TJB    Document 43    Filed 03/11/24    Page 69 of 231 PageID: 805

**BRANCH:** _____   **MANAGER:** _____

**COUNTRY:** _____   **EXCHANGE RATE:** US$1= _____ ( / /1988)   (31/12/1987)

## HUMAN RESOURCES

| Period | Total Number | International Officers | Local Officers | Clerical | Non-Clerical |
|---|---|---|---|---|---|
| 1987: December 31 | | | | | |
| 1988: Previous Month | | | | | |
| Reporting Month | | | | | |

Amounts in equivalent US$000s

### DEPOSIT PROFILE

| Deposit Mix | 1987 Dec 31 | Mix % | 1988 Achievement | | 1988 Budget | | |
|---|---|---|---|---|---|---|---|
| | | | Up to Reporting Quarter | Mix % | Up to Reporting Quarter | Mix % | • Quarterly Budget "Achieved"/"NOT Achieved" |
| **Total Deposits** | | | | | | | |
| Current | | | | | | | |
| Call | | | | | | | |
| Savings | | | | | | | |
| Term | | | | | | | |
| Others | | | | | | | |
| **Total No. of A/Cs** | | | | | | | |
| Current | | | | | | | |
| Call | | | | | | | |
| Savings | | | | | | | |
| Term | | | | | | | |
| Others | | | | | | | |

Total deposits placed by other BCC units US$ _____

Amounts in equivalent US$000s

### EMP

| Description | 1987 | 1988 Achievement | 1988 Budget | |
|---|---|---|---|---|
| | | Up to Reporting Quarter | Up to Reporting Quarter | • Quarterly Budget "Achieved"/"NOT Achieved" |
| **\*E.A. Deposits** | | | | |
| **i of Individuals: Amount** | | | | |
| No. of Accounts | | | | |
| **ii of others: Amount** | | | | |
| No. of Accounts | | | | |
| **\*NRA Deposits of** | | | | |
| **Individuals** | | | | |
| Amount | | | | |
| No. of Accounts | | | | |
| **CBRB** | | | | |
| **TC sale through Banks** | | | | |

*Deposits generated for other locations. Applicable to countries where regulations permit.   *State in this Column in full 'Achieved' or 'NOT Achieved' as the case may be

---

Amounts in equivalent US$000s

| Description | 1987 | 1988 Achievement | 1988 Budget | |
|---|---|---|---|---|
| | | Up to Reporting Quarter | Up to Reporting Quarter | • Quarterly Budget "Achieved"/"NOT Achieved" |
| **Total Exports** | | | | |
| **Total Imports** | | | | |
| **Total LG's Issued** | | | | |
| **Total BCC TC Sales** | | | | |
| **Purchase of:** | | | | |
| i  TCs | | | | |
| ii  Foreign Currency Notes | | | | |
| **Credit Cards** | | | | |
| *i  No. of Cards Issued | | | | |
| *ii  No. of merchants | | | | |
| *- iii  Merchant volume | | | | |

*Where applicable

### PROFITABILITY

| PROFIT | 1987 | 1988 Achievement | 1988 Budget | |
|---|---|---|---|---|
| | | Up to Reporting Quarter | Up to Reporting Quarter | • Quarterly Budget "Achieved"/"NOT Achieved" |
| In Local currency | | | | |
| Equivalent US$ | | | | |

### INCOME
Amounts in local currency:

| | | | |
|---|---|---|---|
| Interest Income | | | |
| Average Quarterly Rate of Interest | | | |
| Interest Paid | | | |
| Average Quarterly Rate of Interest | | | |
| Net Interest Income | | | |
| Commission | | | |
| Profit on Exchange (Net) | | | |
| Other Income | | | |
| TOTAL | | | |

### OPERATING EXPENDITURE
Amounts in local currency:

| | | | |
|---|---|---|---|
| **Personnel Costs** | | | |
| **Occupancy Costs – Branch** | | | |
| **Other Operating Expenses** | | | |
| ** | | | |
| TOTAL | | | |

EXHIBIT Q

**List here three major heads of other operating expenses with amounts.   *State in this Column in full 'Achieved' or 'NOT Achieved' as the case may be

Amounts in equivalent US$000s

| Description | 1987 | 1988 Achievement Up to Reporting Quarter | 1988 Budget Up to Reporting Quarter | • Quarterly Budget 'Achieved'NOT Achieved' |
|---|---|---|---|---|
| **Liabilities:** | | | | |
| Capital/Capital Fund | | | | |
| Total Deposits | | | | |
| Due to Banks/NBFI/Affi. | | | | |
| Others | | | | |
| Total Liabilities | | | | |
| **Assets:** | | | | |
| Total Advances | | | | |
| Due from Banks/NBFI/Affi. | | | | |
| Fixed Assets/Others | | | | |
| Total Assets | | | | |
| Advances/Deposit Ratio | | | | |

## INTEREST RATES

Bank Rate: Max _____ Min _____   Inter-Bank Rates: Max _____ Min _____   Interest Rate on Advances: Max _____ Min _____

Interest Rates on Deposits:   Term: Max ____ Min _____   Savings: _____   Current: _____



Amount in equivalent US$000's

| Description | 1986/87 Country figures | 1987 – Dec 31 Our Share Amount | 1987 – Dec 31 Our Share % of Market | 1988 – Our Share Previous Quarter Amount | 1988 – Our Share Previous Quarter % of Market | 1988 – Our Share Reporting Quarter Amount | 1988 – Our Share Reporting Quarter % of Market |
|---|---|---|---|---|---|---|---|
| Profit | | | | | | | |
| Deposits | | | | | | | |
| Exports | | | | | | | |
| Imports | | | | | | | |
| T/Cs | | | | | | | |

**MARKET SHARE*** *To be completed by Country Managers only

**COMMENTS ON BUDGET VARIANCES** Enumerate variations in all cases where Quarterly Budget Not Achieved. Use separate sheet of paper if space insufficient.



## BUDGET – ITS ACHIEVEMENT

Reflection of your feelings – Reflection of your capability
Enhancement and enlargement of capability is our major goal

**PERFORMER OF THE MONTH/QUARTER** Please detail specific achievements and justification of selection

EXHIBIT 3

## CAPABILITY   BUDGET

EXHIBIT 3

A NEW DIMENSION OF ANNUAL BUDGET

In the evolutionary process of Budgeting it was realised that the reality of Budget depends on two major factors:

— That it must be a *LIVING BUDGET*

— That it is complemented by a *'CAPABILITY BUDGET'* as distinct from the *'Business Budget'.*

LIVING BUDGET

This has been explained in detail from time to time.

By living budget we mean:

— that the budget should emerge both through an organised and scientific process of research and information on available opportunities in the Internal Market Place *(IMP)* and External Market Place *(EMP)*

   *and*

   instinctive and intuitive evaluation of available and achievable possibilities in the market place.

— that once the Budget is so made, it should live in our instinct, our consciousness and our being so that all we do and perform should be in the context of the Budget and for the realisation of Budget targets.

'CAPABILITY BUDGET'

There is yet another vital factor and a new dimension in making and achieving the Budget, which had not been highlighted and emphasised so far.

This factor adds a new dimension to 1988 Budget. The factor is what we have decided to call: 'Capability Budget'

WHY A 'CAPABILITY BUDGET'

The simple truth is that irrespective of what facts and figures a budget is made up of, it cannot produce results other than what the capability of the people (i.e. human resources) of the branch, country, region, subsidiary or affiliate concerned is.

The budget, therefore, should be matched by the capability of people concerned. At the same time, if the budget is bigger than the capability of the people, it will require that their capability be enhanced and enlarged to match the budget.

It was, therefore, considered appropriate that *'Capability Budget'* should be the precursor of *'Business Budget'.*

In 1988 Budget, there would be two parallel and simultaneous processes:

      A. *'CAPABILITY BUDGET'*

      B. *'BUSINESS BUDGET'*

Both processes are inevitably interlinked.

This section deals with the making of *'Capability Budget'.*

EXHIBIT 3

## WHAT IS CAPABILITY

Capability of an individual or group of individuals comprises of numerous elements. We are, however, at present focusing only on such elements that are relevant and fundamental to the budget process.

Every individual's capability, besides his human qualities on which BCC lays such great emphasis, needs in the present context the following elements:

| | |
|---|---|
| Source | : The degree and quality that each person has to become. |
| | – the source and origin of objectives, goals and targets |
| | – the source and origin of finding and providing means for the achievement of such objectives, goals and targets |
| | – the source of the capability to achieve the objectives, goals and targets |
| | – a source and origin just as the sun is the source and origin of light and heat |
| Organised Being | : The degree and quality of each person as an organised being. |
| | It is only if his being is organised that he would organise things and people around him. |
| Marketing and Selling | : The desire and will for marketing. Quality of marketing and selling ability, including ability to encash his efforts. |
| | Ability to identify products, clients and opportunities – organise new efforts, approach, new style and creative ways and means to encash contacts and opportunities. |
| Relationships | : Ability to relate with and respond to others – members of committees, colleagues and staff within his own unit and in other units at various organisational levels. |
| | Ability to inter-act with them and through interaction generate creativity. |
| Commitment | : Quality and degree of commitment to the organisation, goals and objectives, success and achievements. |
| | – Commitment means: |
| | – the desire and will – its intensity and quality to achieve the goals and objectives |
| | – the desire and will to change and to become a new being |
| | – the desire and will to enhance and enlarge his capacity. |

## WHOSE CAPABILITY SHOULD BE MEASURED, BUDGETED, MANAGED AND ENHANCED

Although it is important for all the members of BCC organisation, but in the first phase, for 1988 Budget, it is proposed to measure, budget, manage and enhance the capability of;

– All Branch Managers (including Country Managers)
– All members of Branch Management, Dynamics and Marketing Committees
– All Heads of Regions, Subsidiaries, Affiliates
– All members of Management, Dynamics and Marketing Committees of Regions, Subsidiaries, Affiliates
– All Heads of CSO Divisions/Support Centres and Members of Divisional Management Committees.

## WHO SHOULD MEASURE AND BUDGET THE CAPABILITY

– Self assessment will be made by each individual member of Management, Dynamics and Marketing Committees at Branches, Regional Offices, Head Offices of Subsidiaries and Affiliates and CSO Divisions, on the basis of enclosed 'Capability Budget' form.
– At branches Managers will moderate in consultation with officers concerned the self assessment of the members of Branch Committees and then make out a summary statement on the Capability Budget form of all members. The summary is to be sent to Regional/Head Office along with the Business Budget form, including his own self assessment.
– Support Centres and Heads of Regions, Subsidiaries and Affiliates will moderate in consultation with officers concerned the 'Capability Budget' of Branch Managers, Members of Branch Committees and Regional Office/Head Office Committees.
– 'Capability Budgets' of the following will be submitted to the President for review:
  – Heads of CSO Divisions/Support Centres, Region, Subsidiaries and Affiliates.
  – Members of the Management, Dynamics and Marketing Committee of the Regions, Subsidiaries and Affiliates.
  – Members of the Management Committees of CSO Divisions/Support Centres.

EXHIBIT 3

## HOW SHOULD THE CAPABILITY BE MEASURED AND BUDGETED

Capability, which comprises of a large number of qualities is an intangible substance. It is power plus quality. It can be felt and experienced. It is the quality and nature of a being. Sometimes, and only partly, it can be measured by tangible results or manifest behaviour. But mostly it is measured by a judgemental assessment, which should be as objective as possible. A being can only be measured by a being.

There is no perfect method to express the measurement of capability in numerical terms.

We have, therefore, devised a measurement of judgemental assessment expressed by points for each element of capability on the following scale:

| | |
|---|---|
| Very High | 10 points |
| High | 8 points |
| Satisfactory | 5 points |
| Moderate | 4 points |
| Low | 2 points |
| None | 0 points |

## FORMAT OF MEASUREMENT AND BUDGETING OF CAPABILITY

The Capability Budget format is designed

— to include individual names whose capability is being measured and budgeted

— to contain a separate column for each element of capability, subdivided in two parts: In the first part of the column should be stated the present level of capability. In the second part should be stated the budget – the target level to which the capability is to be enhanced and enlarged during the year 1988.

## PURPOSE OF THE EXERCISE OF 'CAPABILITY BUDGET'

When you have made the first assessment of present capability and made *'Business Budget'* you should then match the same with the available capability and budget it to match the *'Business Budget'.*

If you judge that the available capability is greater than the *'Business Budget',* then the *'Business Budget'* targets should be increased to match the capability.

On the other hand, if you find that the present level of capability is less than the *'Business Budget'* targets, you should then budget realistically the need for enhancement and enlargement of the present level of available capability.

If you find that you are short of capability quantitatively to match the budget, you should specifically request for new additional capability giving details of the requirements.

## SUBMISSION OF 'CAPABILITY BUDGET'

Simultaneously with the *'Business Budget',* you should complete *'Capability Budget'* in the prescribed form.

Other procedures for submission of *'Capability Budget'* will be the same as for *'Business Budget',* which are incorporated in the section relating to *'Business Budget'.*

The *'Capability Budget'* will be submitted together with the *'Business Budget'.*

## EMPHASIS

We would once again like to emphasise that *'Capability Budget'* is precursor of Business Budget and the size and quality of all our future budgets will largely depend on the quality of the budgeting process of the *'Capability Budget'.* Performance and achievement of *'Business Budget'* is directly related to and dependent on *'Capability Budget'.* In fact achievement of *'Business Budget'* is a result of the available capability, its present level and its planned enhancement.

Not only that capability should be pre-assessed and budgeted to match the *'Business Budget'* but throughout the year, equal emphasis should be laid on the enlargement and enhancement of capability to the budgeted level. The process of management and achievement of the two budgets will go hand in hand.

The Support Centres have been requested to work jointly with the Heads of the Regions, Subsidiaries and Affiliates in the measurement, budgeting and management of capability and enhancement and enlargement of individual's capability would be one of their primary functions.

It is important to note that the main purpose of the measurement of capability is to manage it, which means enhancing and enlarging the capability of each individual, which is the power and quality of his being in essence.

EXHIBIT 3

## CAPABILITY BUDGET 1988

COUNTRY_____

UNIT/BRANCH_____

| NAME | SOURCE | | ORGANISED BEING | | MARKETING & SELLING | | RELATIONSHIPS | | COMMITMENT | | OVERALL TOTAL OUT OF 50 | | DESIGNATION/ FUNCTION/ ASSIGNMENT |
|------|---------|--------|-----------------|--------|---------------------|--------|---------------|--------|------------|--------|---------|--------|--------|
| Members of all Dynamics, Management and Marketing Committees (in the Branches, Regions, Head Offices and CSO Divisions) | Present | Budget | Present | Budget | Present | Budget | Present | Budget | Present | Budget | Present | Budget | |
| | | | | | | | | | | | | | |

EXHIBIT 3   _____            _____

*MEASUREMENT: VERY HIGH – 10 points,   HIGH – 8 points,   SATISFACTORY – 6 points,   MODERATE – 4 points,   LOW – 2 points,   NONE – 0 points*



## CAPABILITY AND ASSIGNMENT
### HEART OF THE MATTER

Examine and identify within your being with **honesty** the need of your being, or the commitment of your being (without confusion and vagueness) to experience the meaning of your assignment and goals on the one hand AND the meaning of **all that you require** to do to justify your assignment and to achieve the goals.

Does your being 'experience' that your capability and the capability of all the people who are working jointly with you in your assignment, is the critical factor and the heart of the matter or not?

Your 'being' has to answer this. Once you answer this, then we should understand the capability budget. Only then will you be able to 'understand' what is your commitment, what is your need and (therefore) what are your priorities.

The need of your being is the mother of all that has been said above.

Assignment has certain goals within the goals, objectives and purpose of the organisation. You are the source of those goals. And your assignment is **all that is required to be done** to achieve those goals. As soon as you address this **(all that is required)** you will have the meaning of this assignment.

As soon as you understand the meaning, the meaning of your need, you will be exasperated at how much has to be done in an organised way. **And** this shall have to be done by **people** and their capability.

If we decide that **capability is at the heart** then the meaning of capability and capability budget will become clear. And also, the **how** to enhance or match the capability with the possibilities will become clear and become the highest priority.

This **HOW** will be a world of meaning of itself.

The difference in assignments is not material. Success in the assignment is material and important.

It has become our habit or second nature to do and deal with what comes to us and we are never in a position to do what we should plan to do (the **how** of goals). We don't even think of that; this is a critical problem. At least we should focus on this.

When I talk of capability, it is not just the source of creativity and productivity. We are also the source of security, preservation, (quality of operations) and image of the organisation.

### HIGHEST PRIORITY
— Improvement of Capability (i.e. sum total of all abilities, technical, managerial, human leadership, entrepreneurship etc).
— Improvement of the quality of relationships and the interaction between people.
— Focus on goals, and all that is required to achieve them (most important: THE HOW) in an organised way.
— Focus on capability and enhancing/matching the capability to match the possibilities.
— Understanding and experiencing the meaning of your assignment in the context of the above and setting your priorities to reflect this experiencing.

EXHIBIT 3

(CSO Meeting — 5.12.87).



## RATING AND ENHANCEMENT OF CAPABILITY

Some rate their capability higher than it is.
How does one rate his capability?
If he rates it by results and performance, the standards may not be high.
If he rates it in comparison with others, then it is a poor yardstick – he may be comparing with low capability people.
**Is it possible for them to measure/relate their capability as against the possibility.**

Best thing would have been to measure their capability per se – How to do this?

One measurement is measurement on the scale of ego – but it is a blind measurement – subjective measurement.

Vast majority of people are victim of measuring their capability on the scale of ego.

Ego is blind, black, opaque and has no value judgement. People are very cruel to themselves and unjust and unfair to themselves; if they measure their capability on this scale.

Question still remains: how to measure your capability which is capability per se, because that is a truth, reality and objective. How to become objective about yourself?

Objective measurement is possible when the object (capability) can see the object (capability). How can the object see the object –
**It can only experience itself.**

Unless your being experiences your being, you cannot measure yourself, and hence your capability.

Process of experiencing your being begins by becoming able to see the being by your feeling – I do not know what my being is – but for sure I have a being.

When I say that for sure there is a being – I have a being – starting from that I do not know what it is – but my realisation that for sure I am a being and my total faith that I am a being encourages and leads me to experience my being.

It is this total assurance to myself, of my being, the being that makes me experience my being.

But I have always believed that this being and the Cosmic Being are also the same substance, the same material, the same quality – one is a drop of energy and the other is an ocean of energy – and my ability i.e. the ability of the drop is to merge with the ocean.

I am the drop constantly merging and becoming one with other drops and the totality of drops – the ocean. And I do not live, **I do not work without this drop merging with other drops – merging with totality (the ocean).**

This is the essence of management.

Drops are always merging in my case –
drops and drops – drops with ocean.

EXHIBIT 3

Contd

## RATING AND ENHANCEMENT OF CAPABILITY

When I merge with you there is no problem – when the drops merge you get such a blissful happiness – it is so beautiful.

When the drops become one – there is no difference that remains. The blissful experience/pleasure comes in the process of merger. This blissful happiness, the process of merger – this is the process what world is, what creativity is. That is what is called living.

Quality of this process of merger is the quality of life and quality of management – in their respective contexts.

You can't attain perfection but it depends on the degree and quality of your experience of your being and being of others.

Suppose you are superb on the measurement of your capability – so make others superior by merging with them.

### Totality and Focus

– Everything is to be seen in the context of totality.

– Focus – a sharp, intense and concentrated attention. (Example of convex lens – rays of sun can burn).
Concentrate sharply enough to make the object of focus a point. Same concentration can be focused on totality by enlarging the "being".

That is the relationship of "being" and totality.

God has given you the power, quality and capability to focus on Him, or to focus on totality in the manner said above. It is not becoming bigger than God. God Himself has given you this power because He wants Himself to be loved or wants you to reciprocate His love for you. How could it be otherwise. After all you are His creation – creation must relate to the Creator (the Totality).

### MEANING OF DIMENSION

Literal meaning:
Dimension is the quantitative and qualitative size.
Can you put any limit to qualitative size?
Dimension of your being is the qualitative and quantitative size of your being.

### WHAT IS CAPABILITY BUDGET

It is Budgeting of your being – experiencing your goals and objectives the origin of which would be your need to experience and express your real "being". Develop and identify within your being the need to be a quality person, quality manager, quality banker, quality entrepreneur, quality leader.

(Far East Region Meeting – 7.12.87).

EXHIBIT 3



VIDEO   LIVE   SHOWS   ELECTION 2024   538   ⬚   🔍   🔔   LOG IN   |

Stream on hulu

YOUR VOICE ✷ YOUR VOTE 2024   Election Dashboard   State Results ⌄   Primary Schedule ⌄   Entrance/Exit Polls ⌄

# Fusion GPS founders 'horrified' Steele Dossier was published but say 'if you...tell fake stuff about us, we're going to fire back'

The two founders say there have been conspiracy theories made about them.

By Kathryn McQuade
November 26, 2019, 4:01 AM

f  𝕏  ✉  🔗



6:27

President Donald Trump hosts a roundtable discussion on the MS-13 gang with law...
Tom Brenner/The New York Times via Redux

Show More

The "Steele dossier" at the heart of the investigation into President Donald Trump's ties to Russia was never supposed to be seen by the public, according to those who commissioned it, who told ABC News they were "horrified" when it was published in full.

"This is just not what we do," said Glenn Simpson, co-founder of Fusion GPS, while reflecting on the publication of the memos that made up the dossier.

Simpson and Fusion GPS co-founder Peter Fritsch commissioned Christopher Steele to investigate Trump during his 2016 presidential campaign. His memos — compiled into the dossier — were supposed to be used internally to guide further investigation, and were shared selectively to spur more digging.

When the set of documents, with their raw findings, was published in full by BuzzFeed News shortly after the election, it sent shockwaves across Washington, D.C.

---

(MORE: Former spy who compiled controversial dossier breaks silence to criticize Trump)→

---



A file photo shows President Donald Trump greeting Rudy Giuliani at the clubhouse at Tr...          **Show more** ⌄

The Washington Post via Getty Images, FILE

"We were horrified when it was published because it's not the kind of thing that we do," Simpson said. "As Peter puts it, ironically, we're best known for something that we absolutely never do."

Simpson and Fritsch joined "The Investigation" podcast co-host and ABC News senior executive producer Chris Vlasto and guest co-host and senior investigative reporter Matthew Mosk to discuss their new book "Crime in Progress: Inside the Steele Dossier, the Fusion G.P.S. Investigation of Donald Trump."

The book's authors describe how they have become the focus of many of the Trump administration's favorite conspiracy theories, including one perpetuated by Trump's personal lawyer, Rudy Giuliani.

"[Giuliani] publicly accused us of setting up the notorious Trump Tower meeting between the Trump campaign and the Russians," Simpson said.

But that was only one of the false narratives about the two men, Simpson said.

---

(MORE: The Russia probe: A timeline from Moscow to Mueller)→

---



President Donald Trump speaks with members of the media in the Oval Office of the Whi...          **Show more** ⌄

Patrick Semansky/AP

"The more recent one is the idea that we doctored up the 'dodgy dossier' in conjunction with the Ukrainian intelligence services in 2016, and that I was spending time there doing that. And that we also framed Paul Manafort around the same time," said Simpson.

"These are some extravagant conspiracy theories that have zero factual basis," Simpson added. "The message we're delivering now is, if you guys lie about us, if you go out and you tell fake stuff about us, we're going to fire back. We're going to talk, too. We're going to make public statements and we're going to call you out for lying."

Fritsch and Simpson told "The Investigation" that the dossier began as an assignment from Republicans to look into Donald Trump's business history and career, and that it had nothing to do with Russia. However, after several months of investigations, the numerous connections between Donald Trump and Russia started coming to light.

"The term we coined during this period was, 'It's not clear that Donald Trump invested in Russia, but it's definitely clear that Russia invested in him,'" said Simpson. "[The Mueller Report found] over 140 contacts between the Trump campaign and the Russians, extensive secret meetings, secret dealings — some business dealings. Donald Trump was trying to do a business deal in Russia in the middle of the campaign."

## Related Topics

Russia Investigation



IV

117TH CONGRESS
2D SESSION

# H. RES. 1011

Recognizing the erroneous and misleading allegations in the October 19, 2020, "Public Statement on the Hunter Biden Emails" signed by 51 former intelligence officials.

––––––––––––––––––

## IN THE HOUSE OF REPRESENTATIVES

MARCH 29, 2022

Mr. GAETZ (for himself, Mr. MASSIE, Mrs. GREENE of Georgia, Mr. GOSAR, Mr. BIGGS, Mr. BISHOP of North Carolina, and Mr. GOHMERT) submitted the following resolution; which was referred to the Committee on Oversight and Reform

––––––––––––––––––

# RESOLUTION

Recognizing the erroneous and misleading allegations in the October 19, 2020, "Public Statement on the Hunter Biden Emails" signed by 51 former intelligence officials.

Whereas, on October 14, 2020, the New York Post exclusively reported on a ". . . massive trove of data recovered from a laptop computer" belonging to Hunter Biden;

Whereas, on October 19, 2020, 51 current and former intelligence officials signed and released a "Public Statement on the Hunter Biden Emails", which announced that the emails uncovered on Hunter Biden's laptop ". . . [have] all the classic earmarks of a Russian information operation";

★

2

Whereas the signatories include Jim Clapper, Mike Hayden, Leon Panetta, John Brennan, Thomas Finger, Rick Ledgett, John McLaughlin, Michael Morell, Mike Vickers, Doug Wise, Nick Rasmussen, Russ Travers, Andy Liepman, John Moseman, Larry Pfeiffer, Jeremy Bash, Rodney Snyder, Glenn Gerstell, David B. Buckley, Nada Bakos, Patty Brandmaier, James B. Bruce, David Cariens, Janice Cariens, Paul Kolbe, Peter Corsell, Brett Davis, Roger Zane George, Steven L. Hall, Kent Harrington, Don Hepburn, Timothy D. Kilbourn, Ron Marks, Jonna Hiestand Mendez, Emile Nakhleh, Gerald A. O'Shea, David Priess, Pam Purcilly, Marc Polymeropoulos, Chris Savos, Nick Shapiro, John Sipher, Stephen Slick, Cynthia Strand, Greg Tarbell, David Terry, Greg Treverton, John Tullius, David A. Vanell, Winston Wiley, and Kristin Wood;

Whereas the verification of doubts surrounding a developing story published by the New York Post story was not proven at the writing of the "Public Statement of Hunter Biden Emails";

Whereas the distribution of this letter occurred 15 days before the 2020 Presidential election;

Whereas using authorized access as a platform to discredit legitimate reporting has falsely informed the public prior to the outcome of the 2020 Presidential election;

Whereas, on October 19, 2020, Director of National Intelligence, John Ratcliffe, appeared on a televised interview with Fox Business, where he declared that "Hunter Biden's laptop is not part of some Russian disinformation campaign, and I think it's clear that the American people know that";

3

Whereas Twitter locked the New York Post's account for seven days following the October 2020 report;

Whereas, on April 8, 2021, the Daily Mail reported that "103,000 text messages, 154,000 emails, more than 2,000 photos and dozens of videos" from Hunter Biden's laptop were authenticated by forensic experts;

Whereas, on March 17, 2022, the New York Times published an article tacitly referring to these same legitimate emails found on Hunter Biden's laptop, which are being used in a grand jury probe into his finances;

Whereas, on March 22, 2022, 4 of the 51 signatories have issued sustained support of their letter, since the New York Times March 17th article, which passively verified the data discovered on Hunter Biden's "Russian Disinformation" laptop; and

Whereas this resolution shall be known as the "Spook Who Cried Wolf Resolution": Now, therefore, be it

1   *Resolved,* That it is the sense of the House of Rep-
2   resentatives that the 51 signatories of the letter who pub-
3   licly and falsely decried Hunter Biden's laptop to be Rus-
4   sian disinformation should be barred from holding any
5   level of security clearances indefinitely.

○



**THE HUNTER BIDEN STATEMENT: HOW SENIOR INTELLIGENCE COMMUNITY OFFICIALS AND THE BIDEN CAMPAIGN WORKED TO MISLEAD AMERICAN VOTERS**

Interim Joint Staff Report of the

Committee on the Judiciary,
Select Subcommittee on the Weaponization
of the Federal Government, and
Permanent Select Committee on Intelligence

U.S. House of Representatives



May 10, 2023

EXHIBIT 6

---

## Executive Summary

---

"Let me tell you, you take on the intelligence community, they have
six ways from Sunday to getting back at you."
– Senator Chuck Schumer (D-NY), January 3, 2017.[1]

In the heated days shortly before the 2020 presidential election, a news story appeared in the *New York Post* detailing how Hunter Biden used the position and influence of his father, now-President Joe Biden, for personal gain with President Biden's awareness.[2] This article, based on materials obtained from an abandoned laptop once owned by Hunter Biden, called into question statements made by President Biden denying awareness of the international business dealings of his son, Hunter.[3] Five days after the *Post* story, 51 former intelligence community officials, using their official titles and citing their national security credentials, released a public statement suggesting the story "ha[d] all the classic earmarks" of Russian disinformation.[4] Three days after that, Vice President Biden used this public statement in a nationally televised presidential debate to rebut President Trump's criticisms, asserting "there are 50 former national intelligence folks who said that what this, he's accusing me of is a Russian plan."[5]

Much has been written about how social media companies and news outlets improperly censored or ignored allegations on the flimsy basis that it was "hacked" materials;[6] and "can't be verified";[7] or, in the inspired words of National Public Radio, a "waste of time" and a "pure distraction."[8] These censorship decisions were wrong then, but they look even more egregious

[1] Rachel Maddow, *Schumer: Trump 'being really dumb' on intel*, MSNBC (Jan. 3, 2017).

[2] Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad*, N.Y. POST (Oct. 14, 2020); *see also* Emma-Jo Morris & Gabrielle Fonrouge, *Hunter Biden emails show leveraging connections with his father to boost Burisma pay*, N.Y. POST (Oct. 14, 2020).

[3] The Hill (@thehill), Twitter (Sept. 21, 2019, 3:04 PM) (Joe Biden claiming, "I've never spoken to my son about his overseas business dealings."), https://twitter.com/thehill/status/1175486006348460032; Press Briefing, Jen Psaki, White House Press Secretary, in Washington, D.C. (Apr. 5, 2022) (explaining how President Biden stands by his statement that he never spoke to Hunter Biden about his overseas business dealings). *See also* Miranda Devine, *Hunter Biden's biz partner called Joe Biden 'the Big Guy' in panicked message after Post's laptop story*, N.Y. POST (July 27, 2022) ("In an email to Hunter, Jim and other partners on May 13, 2017, Gilliar outlined an equity breakdown in which 10% of the lucrative CEFC joint venture would be held by Hunter 'for the big guy.' That email, which was previously revealed by The Post, was found on the laptop Hunter abandoned at a Delaware repair shop in April 2019. Another former associate of the first son, US Navy veteran Tony Bobulinski, publicly declared in October 2020 that 'big guy' was a reference to President Biden — and alleged that Biden was aware of, and involved in, the planned CEFC deal.").

[4] Jim Clapper et al., *Public Statement on the Hunter Biden Emails* (Oct. 19, 2020). *See also* Natasha Bertrand, *Hunter Biden story is Russian disinfo, dozens of former intel officials say*, POLITICO (Oct. 19, 2020).

[5] COMM. ON PRESIDENTIAL DEBATES, Presidential Debate at Belmont University in Nashville, Tennessee, October 22, 2020, Participants: Former Vice President Joe Biden (D) and President Donald Trump (R), https://www.debates.org/voter-education/debate-transcripts/october-22-2020-debate-transcript/.

[6] *See, e.g.*, Katie Paul, *Twitter, Facebook restrict users' dissemination of New York Post story on Biden*, REUTERS (Oct. 15, 2020); Kari Paul, *Facebook and Twitter restrict controversial New York Post story on Joe Biden*, THE GUARDIAN (Oct. 14, 2020).

[7] Zachary Evans, *60 Minutes Anchor Insists Hunter Biden Emails 'Can't Be Verified' When Pressed by Trump*, NAT'L REV. (Oct. 22, 2020).

[8] *See, e.g.*, Brian Flood, *NPR issues major correction after falsely claiming Hunter Biden laptop story was 'discredited' by intelligence*, FOX NEWS (Apr. 2, 2021); Joe Concha, *Media's pre-election burial of Hunter Biden story proves dereliction of duty*, THE HILL (Dec. 11, 2020).

1

EXHIBIT 6

with the passage of time. The contents of Hunter Biden's laptop have since been authenticated and the *Post*'s reporting has been verified by several other news outlets.[9]

What has not been examined, until now, is how 51 former federal employees with intelligence and national security credentials came together to insert themselves into the thick of the presidential campaign. Beginning in April 2022—and renewed earlier this year when Republicans resumed control of the House of Representatives—the Committee on the Judiciary and the Permanent Select Committee on Intelligence have been conducting oversight into the origins of this statement.[10] The Committees wrote to all 51 former officials requesting relevant documents and testimony. Consistent with the obligation to keep the House apprised of investigative activities,[11] this interim report summarizes the key information learned to date.

- **The public statement by 51 former intelligence officials was a political operation to help elect Vice President Biden in the 2020 presidential election.** Contemporaneous emails show the organizers' intent in drafting and releasing the statement: "[W]e think Trump will attack Biden on the issue at this week's debate and we want to offer perspectives on this from Russia watchers and other seasoned experts,"[12] and "we want to give the [Vice President] a talking point to use in response."[13]

- **The Biden campaign took active measures to discredit the allegations about Hunter Biden by exploiting the national security credentials of former intelligence officials.** On October 17, 2020, Biden campaign advisor—now Secretary of State—Antony Blinken contacted former Central Intelligence Agency (CIA) Acting Director Michael Morell to discuss the *Post*'s reporting. Morell told Blinken that he was not familiar with the reporting and Blinken later emailed Morell a *USA Today* article alleging the FBI was investigating whether it was Russian disinformation.[14] At the bottom of the email was the signature block of Andrew Bates, then-director of rapid response for the Biden campaign.[15] Following this outreach from the Biden campaign, Morell began the process of drafting the statement—something Morell testified would not have happened but for Blinken's communication. In addition, following the October 22 presidential debate— during which Vice President Biden used the public statement to rebut President Trump's criticisms—Biden campaign chairman Steve Ricchetti called Morell to thank him for the statement.

---

[9] *See, e.g.*, Katie Benner et al., *Hunter Biden Paid Tax Bill, but Broad Federal Investigation Continues*, N.Y. TIMES (Mar. 16, 2022); Craig Timberg et al., *Here's how The Post analyzed Hunter Biden's laptop*, WASHINGTON POST (Mar. 30, 2022).

[10] *See* Letter from Rep. Jim Jordan, Ranking Member et al., H. Comm. on the Judiciary, to Ms. Nada Bakos, c/o Central Intelligence Agency (Apr. 6, 2022).

[11] *See, e.g.*, H. Res. 12, 118th Cong. (2023).

[12] Email from Kristin Wood to Unnamed Intelligence Officials (Oct. 19, 2020, 7:27 AM) (on file with the Committees).

[13] Email from Michael Morell to Unnamed Intelligence Officials (Oct. 18, 2020, 4:48 PM) (on file with the Committees).

[14] Email from Tony Blinken to Michael Morell (Oct. 17, 2020, 10:53 PM) (on file with the Committees).

[15] *Id.*

EXHIBIT 6

- **Blinken's outreach to Morell was the impetus for the public statement.** Morell testified that he had no intention of drafting the statement until Blinken reached out to him. Morell, who at the time was reportedly under consideration to be appointed CIA Director in the Biden Administration if Biden won the election,[16] conceived the statement and concluded it would have greater credibility if it was supported by a significant number of signatories.[17] Thereafter, Morell contacted several former intelligence officials to help write the statement, solicit cosigners, and help with media outreach.

- **The Biden campaign coordinated dissemination of the statement to members of the media.** Morell tasked Nick Shapiro, his former Deputy Chief of Staff and Senior Advisor at the CIA, with placing the statement in major publications. Specifically, Morell apprised Shapiro that, "[b]etween us, the campaign would like" a specific reporter with the *Washington Post* to run the statement first.[18] Shapiro crafted an email for three separate media outlets and sent the content of the email to the Biden campaign's Director of Rapid Response, Andrew Bates, stating "This is what I gave them."[19] After peddling the statement to the *Washington Post* and the *Associated Press* with apparently no result, Shapiro found a willing partner in *Politico*. *Politico* published a story about the statement under the headline: "Hunter Biden story is Russian disinfo, dozens of former intel officials say."[20]

- **The Committees have evidence that an employee affiliated with the CIA may have assisted in obtaining signatories for the statement.** One signer of the statement, former CIA analyst David Cariens, disclosed to the Committees that a CIA employee affiliated with the agency's Prepublication Classification Review Board ("PCRB") informed him of the existence of the statement and asked if he would sign it.[21] The Committees have requested additional material from the CIA, which has ignored the request to date.

The Committees' oversight continues. Notably, the Biden Administration has declined to cooperate with this oversight to date. On March 21, 2023, the Committees wrote to the CIA, requesting documents in the CIA's possession relating to the statement and interactions between the CIA and the signatories of the statement.[22] The Committees requested that the CIA furnish these documents by April 4, 2023.[23] The CIA has so far failed to comply to this oversight request. On April 20, 2023, the Committees wrote to Secretary of State Antony Blinken requesting information in his possession about his role in the origins of the statement.[24] On May

---

[16] Erin Banco, *Biden Weighs Mike Morell as His CIA Chief. A Key Dem Senator Says Don't Bother*, THE DAILY BEAST (Dec. 2, 2020). *See also* Transcribed Interview of Mr. Michael Morell at 91 [hereinafter "Morell Interview"].

[17] *See* Email from Michael Morell to Kristin Wood (Oct. 18, 2020, 8:01 PM) (on file with the Committees). Morell Interview at 44.

[18] Email from Michael Morell to Nick Shapiro (Oct. 19, 2020, 8:21 PM) (on file with the Committees).

[19] Email from Nick Shapiro to Andrew Bates (Oct. 19, 2020, 11:22 PM) (on file with the Committees).

[20] Bertrand, *supra* note 4.

[21] Email from David Cariens to Committee staff (March 5, 2023, 3:02 PM) (on file with the Committees).

[22] Letter from Chairman Jim Jordan, H. Comm. on the Judiciary, and Chairman Michael R. Turner, Permanent Select Committee on Intelligence, to Hon. William J. Burns, Dir., Cent. Intel. Agency (Mar. 21, 2023).

[23] *Id.*

[24] Letter from Chairman Jim Jordan, H. Comm. on the Judiciary, and Chairman Michael R. Turner, Permanent Select Committee on Intelligence, to Hon. Antony Blinken, Sec., Dep't of State (Apr. 20, 2023).

EXHIBIT 6

4, 2023, via counsel, Secretary Blinken responded.[25] Although he denied asking Morell to write the statement, Secretary Blinken did not dispute that his communication was the impetus for the statement.[26] Secretary Blinken provided none of the documents that Committee requested. The Committees will continue to pursue additional information about the actions and events described in this report.

Americans deserve to have confidence that their government, particularly its premier intelligence agency, is free from politicization. The infusion of bare-knuckle partisan politics into America's intelligence agencies is cause for grave concern. Former federal employees have a right to engage in the political process—a fundamental right that the Committees do not dispute. Here, however, the signers of the Hunter Biden laptop statement relied on their national security credentials and used their official titles to lend heft to their statement and to insinuate access to secretive information unavailable to other Americans. And these signers did so in coordination with a political campaign for the explicit purpose of giving a candidate for office a "talking point" to dismiss legitimate criticism of his family's business practices.

Consistent with the Committees' obligations to keep the House of Representatives informed of its oversight, this interim report presents what the Committees have learned to date about the origins of the public statement signed by 51 former intelligence officials that falsely discredited public allegations about the Biden family. Although more work remains, this report presents the Committees' findings to date.

---

[25] Letter from Jonathan C. Su, counsel for Secretary Antony Blinken, to Chairman Jim Jordan, H. Comm. on the Judiciary, and Chairman Michael R. Turner, Permanent Select Committee on Intelligence (May 4, 2023).
[26] *Id.*

EXHIBIT 6

---

## Table of Contents

Executive Summary ........................................................................................................... 1

Table of Contents ............................................................................................................. 5

I.   The Biden campaign used the national security credentials of 51 former intelligence community employees to falsely discredit allegations of Biden family influence-peddling. 6

   A.   Biden campaign advisor Antony Blinken's outreach to former CIA Acting Director Michael Morell was the impetus for the public statement, which was intended to give the Biden campaign a "talking point" with which to respond to the Hunter Biden allegations. ...................................................................................................... 6

   B.   Morell recruited Polymeropoulos to draft the public statement. ....................................... 12

   C.   Morell, Polymeropoulos, and former CIA officer Kristin Wood solicited other former intelligence officials and employees to sign the public statement. ................................... 17

   D.   Some former intelligence officials objected to the first draft of the public statement for being too political, one sought to "strengthen the verbiage," and others refused to sign it altogether. ........................................................................................................... 20

   E.   On October 19, 2020, Morell sent the CIA the finalized public statement for review, calling it a "rush job," and quickly secured its approval. ................................................. 23

   F.   Contrary to the signers' assessment, the intelligence community publicly stated that the Hunter Biden laptop was not part of a Russian disinformation campaign. ...................... 27

II.   The Committees have evidence that the CIA may have promoted the statement to other intelligence community officials. .......................................................................................... 32

III. The Biden campaign coordinated with the organizers to promote the public statement with the media. ................................................................................................................. 36

   A.   Morell and Shapiro worked with the Biden campaign to release the statement to the media. ................................................................................................................. 36

   B.   *Politico* ultimately published a story about the statement, falsely calling the Hunter Biden laptop and emails Russian disinformation. ......................................................... 44

   C.   The *Politico* article and public statement helped to support the continued suppression of the allegations uncovered from emails on Hunter Biden's laptop. ................................... 51

IV. The statement had its intended effect of giving Vice President Biden a "talking point" to use in the presidential debate. .......................................................................................... 53

   A.   Then-Vice President Biden relied on the public statement in the presidential debate to falsely assert that Hunter Biden allegations were a Russian "plan." .............................. 53

   B.   The statement's signatories celebrated after the debate. ................................................. 54

   C.   The Biden campaign called Morell and thanked him for his service to the campaign. ..... 58

V.   Some signatories expressed outrage about Congressional oversight into the origins of the statement. ........................................................................................................... 60

Conclusion ...................................................................................................................... 62

EXHIBIT 6

**I.      The Biden campaign used the national security credentials of 51 former intelligence community employees to falsely discredit allegations of Biden family influence-peddling.**

On October 14, 2020, the *New York Post* published a report detailing how Hunter Biden used the position and influence of his father for personal gain with the apparent awareness of President Biden.[27] This article raised doubts about President Biden's earlier denial of ever speaking to his son about his international business dealings.[28] The *Post* reported on an email in which a Ukrainian businessman urged Hunter Biden to "use [his] influence to convey a message / signal, etc. to stop what we consider to be politically motivated actions."[29] In another email, the same businessman thanked Hunter Biden for arranging a meeting with his father, calling it "an honor and pleasure."[30] The *Post* reported that these emails came from a laptop belonging to Hunter Biden that he had abandoned in a Delaware computer shop.[31]

The Biden campaign knew it had a serious political liability with these allegations. This is because then-Vice President Biden's son had monetized his relationship with his father to secure lucrative, shady opportunities overseas.[32] In the days leading up to the 2020 election, Hunter Biden's laptop and the email trove it contained provided evidence of this arrangement.[33] To prevent President Trump from effectively raising these allegations in the final presidential debate, the Biden campaign sought to discredit the allegations by employing the national security credentials of compliant former intelligence community members.

**A.   Biden campaign advisor Antony Blinken's outreach to former CIA Acting Director Michael Morell was the impetus for the public statement, which was intended to give the Biden campaign a "talking point" with which to respond to the Hunter Biden allegations.**

On October 17, 2020, senior Biden campaign advisor and now Secretary of State Antony Blinken called Michael Morell, the former CIA Acting Director, and asked him if he had seen the *New York Post* story on the Hunter Biden laptop and emails and whether Morell believed the Russians were involved in disseminating those emails.[34] Morell claimed that he had not read the story, but at that point he began researching it.[35] Morell testified:

---

[27] Morris & Fonrouge, *Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad*, *supra* note 2.

[28] *See, e.g.*, Nick Givas, *Joe Biden again denies speaking to son about Ukrainian business dealings*, Fox News, Oct. 10, 2019.

[29] Morris & Fonrouge, *Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad*, *supra* note 2.

[30] *Id.*

[31] *Id.*

[32] *See, e.g.*, Matt Viser et al., *Inside Hunter Biden's multimillion-dollar deals with a Chinese energy company*, WASHINGTON POST (Mar. 30, 2022) ("But the new documents . . . illustrate  the ways in which his family profited from relationships built over Joe Biden's decades in public service.").

[33] Morris & Fonrouge, *Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad*, *supra* note 2.

[34] Morell Interview at 18.

[35] Statement of Michael Morell, dated March 28, 2023, at 2 [hereinafter "Morell Statement"]; Morell Interview at 18–20.

EXHIBIT 6

Q.      In an email to Nick Shapiro, you said that you would, quote, explain tomorrow on the phone how this came to be, meaning this public statement. . . . Can you tell us what you said to Mr. Shapiro during that call? . . .

A.      Sure.  I told him that I had received a call from Tony Blinken, then a senior official on the Biden campaign, asking me if I had seen *The New York Post* story. . . . I believe he summarized it for me, and he asked me if I thought the Russians may have been involved in any way in the emergence of these emails.

Q.      So that was—now—

A.      I should also say I don't know whether he called me or whether he sent me an email.

Q.      Okay.

A.      Just to be clear.

Q.      In the production the committee received, we did not get an email from him—

A.      Correct.

Q.      —initiating that call except—but for a *USA Today* article that he forwarded—

A.      Yes. [36]

At 10:53 p.m., after his initial call with Morell, Blinken forwarded to Morell a *USA Today* article, titled "A tabloid got a trove of data on Hunter Biden from Rudy Giuliani. Now, the FBI is probing a possible disinformation campaign."[37] Notably, at the bottom of Blinken's email was the signature block of Andrew Bates, then-Director of Rapid Response for the Biden campaign.[38] As the Biden campaign's Director of Rapid Response, Bates "was charged with

---

[36] Morell Interview at 20.

[37] Email from Tony Blinken to Michael Morell (Oct. 17, 2020, 10:53 PM) (on file with the Committees); Morell Statement at 2; Morell Interview at 18–20; *see also* Caren Bohan et al., *A tabloid got a trove of data on Hunter Biden from Rudy Giuliani. Now, the FBI is probing a possible disinformation campaign.*, USA TODAY (Oct. 17, 2020).

[38] Morell Statement at 2; *see* Email from Tony Blinken to Michael Morell (Oct. 17, 2020, 10:53 PM) (on file with the Committees).

EXHIBIT 6

defending" then-Vice President Biden "and his team against attacks on the campaign trail, while also employing an aggressive offensive strategy against President Trump and his team."[39]




Morell confirmed during this transcribed interview that he received two communications from Blinken on October 17, 2020. Morell speculated that the first communication occurred before 2:16 p.m. that day, based on the timestamp in a text message that Morell sent to Marc Polymeropoulos, a former CIA Acting Chief of Operations for Europe and Eurasia. The second communication was via email at 10:53 p.m. Morell testified:

> Q.     There were two separate communications. There was the first call or email, and then there was the subsequent email with the *USA Today* article?
>
> A.     Yes, sir.  Yes, sir.

---

[39] Brooke Singman, *Meet the Rapid Response director: Top Biden aide on how the 2020 campaign was unlike any other*, Fox News (Nov. 23, 2020).

Q.     What was the time of the email?

A.     So I don't know for sure, Congressman, but I believe he called to ask the question first and then followed up with the email.

Q.     Close together?

A.     I think—you know, given the timestamps [in the text message] on here, I feel that, you know, when I say—Congressman, I say: Just wondering if you guys, if you think the Russians played in the Hunter Biden thing.  That was at 2:16 p.m. on the 17th.  He sends me the *USA Today* article later that night.

Q.     Right.

A.     Right.  I think he called me or sent me an email prior 2:16 p.m.  So there's some gap there I think between the first contact and the second.

Q.     Okay.  That's what I assumed.  When you got the *USA Today* article—and I believe it was at 10:53 that evening—[that] was that the first time you had seen [the] *USA [Today]* article.

A.     So I referenced the FBI investigation in the early afternoon of the 17th in my conversation with Marc Polymeropoulos.  I don't remember whether I saw it.  The first thing I did when Mr. Blinken called me is I did some research.  I had not read *The New York Post* article.  I went and read it.  I did some internet searches.  I did a little bit of research here before I reached out to Marc.  It's possible I found it then.  It's also possible that, when Mr. Blinken called me, he mentioned it to me.  I just don't remember.

Q.     In that timeframe, then, you would have got the call from Mr. Blinken prior to 2:16.

A.     I believe so, sir.

Q.     Excuse me, Mr. Morell, as part of the research that you did in between the contact with Mr. Blinken and the contact with Marc [Polymeropoulos], did you contact any individuals as a part of that research?

> A.     I did not.
>
> Q.     So the full sum of that research involved your internet searches?
>
> A.     Yes.[40]

Morell testified that the statement was a direct result of his interactions with the Biden campaign, explaining that the call from Blinken triggered his interest in preparing the statement. He explained:

> Q.     But, prior to his call, you—you did not have any intent to write this statement?
>
> A.     I did not.
>
> Q.     Okay.  So his call triggered—
>
> A.     It did, yes.
>
> Q.     —that intent in you?
>
> A.     Yes.  Absolutely.[41]

Although Morell denied in his transcribed interview that the Biden campaign specifically asked that he prepare a statement,[42] Polymeropoulos, who helped to prepare the initial draft of the statement, told the Committees that Morell "did mention to me that someone in the kind of Biden world had asked about doing this."[43] When asked to elaborate, Polymeropoulos testified: "Morell said that to me, that someone from kind of the Biden world had asked for this. And he did not tell me who it was or any of the other kind of details of it."[44]

Morell testified repeatedly that his purpose for organizing, drafting, and disseminating the statement was to help Vice President Biden become president. He testified:

> Q.     What was the intent of the statement?
>
> A.     There were two intents. One intent was to share our concern with the American people that the Russians were playing on this issue; and, two, it was [to] help Vice President Biden.[45]

***

---

[40] Morell Interview at 19-20.
[41] *Id.* at 21-22.
[42] *Id.*
[43] Transcribed Interview of Mr. Marc Polymeropoulos at 17 [hereinafter "Polymeropoulos Interview"].
[44] *Id.* at 21.
[45] Morell Interview at 11.

10

EXHIBIT 6

Q.     So is it fair to say that the text of the letter makes it clear that the focus is actually on Russian interference, not on the political candidates?

A.     It's correct. I would just repeat what I said earlier just to be, you know, totally clear, that there were two intentions here, right?  One was to make clear to the American people that the Russians were interfering in the election, and the other was to help Vice President Biden in the debate.[46]

*** 

Q.     You wanted to help the Vice President why?

A.     Because I wanted him to win the election.

Q.     You wanted him to win; that's why?

A.     Yes, sir. [47]

An October 19, 2020, email exchange between Morell and former CIA Director John Brennan made abundantly clear that Morell's intentions were to "give the [Biden] campaign, particularly during the debate on Thursday, a talking point to push back on [President] Trump on this issue."[48]

---

[46] *Id.* at 78.
[47] *Id.* at 102.
[48] Email from Michael Morell to John Brennan (Oct. 19, 2020, 9:29 AM) (on file with the Committees). *See also* Jim Clapper et al., *supra* note 4.

EXHIBIT 6



Lastly, an October 18 email from Morell to former CIA senior intelligence officer Kristin Wood shows that the statement was meant to help the Biden campaign. Morell wrote that he had "control of the document. The more former intelligence officers the better. Campaign will be thrilled."[49]



## B.  Morell recruited Polymeropoulos to draft the public statement.

Upon concluding his communication with Blinken and performing internet searches, Morell then enlisted Polymeropoulos to begin preparing the statement. Morell recruited Polymeropoulos because, in Morell's wording, he was a former "acting chief of operations for the part of the world that covers Russia," "had a very good understanding of what the Russians did in [the] 2016 [election]," and is an expert "in Russian disinformation."[50]

In a text message exchange, Morell asked Polymeropoulos if he thought "the Russians

---

[49] Email from Michael Morell to Kristin Wood (Oct. 18, 2020, 8:01 PM) (on file with the Committees).
[50] Morell Interview at 56-57.

12

EXHIBIT 6

played in the Hunter Biden email thing," opining that it "[k]inda feels that way to me."[51] Polymeropoulos responded, "It does to me too."[52] Morell then expressed some doubt about the "strange" way in which the emails were placed "into the public domain," with Polymeropoulos responding: "They," presumably referring to the Russians, "will always look for a dissem[ination] mechanism third party. Yes this is odd . . . a blind computer guy."[53] After Polymeropoulos agreed to work with Morell on the draft, Morell asked Polymeropoulos to "send me a list of what you see as the hallmarks" of Russian involvement in the story.[54]

---

[51] Text message exchange between Michael Morell to Marc Polymeropoulos (Oct. 17, 2020, 2:16 PM) (on file with the Committees).

[52] *Id.*

[53] *Id.*

[54] *Id. See also* Email from Marc Polymeropoulos to Michael Morell (Oct. 17, 2020, 8:01 PM) (on file with the Committees).

13

EXHIBIT 6



Text message between Michael Morell and Marc Polymeropoulos (Oct. 17, 2020)[55]

---

[55] Text message graphics in this report were generated by the Committee from screen shots produced by Marc Polymeropoulos. The graphics were created to assist in reading the messages.

EXHIBIT 6

Morell explained that Polymeropoulos wrote the first draft of the statement. Morell testified:

> Q.    Okay. What was your role in the creation of the statement?
>
> A.    I organized it.
>
> Q.    So you drafted that?
>
> A.    I did not do the first draft.
>
> Q.    Okay.
>
> A.    Marc Polymeropoulos did the first draft. Then I redrafted it. Yeah, I'm the organizer, and I played a major role in drafting it.[56]

Polymeropoulos similarly testified:

> Q.    And what role did Mike Morell play in the creation of the statement?
>
> A.    . . . I think Mike Morell on the—I think it was on the 17th—had wrote me a text asking me if I thought there was any—kind of any Russian involvement in this.  I said that I thought that there was, based on my professional background.  He asked if I would be willing to write something with him on this.  And that's how this began.[57]

Polymeropoulos explained that he and Morell initially discussed preparing an op-ed, which eventually morphed into a statement. He testified:

> Q.    Did you say you had a conversation with Mr. Morell?
>
> A.    About?
>
> Q.    About this letter.  Or was it only over text message?
>
> A.    So I think from what I recall, two—a couple things happened.  First, he wrote me the text.  I then—I believe he asked, and I looked at my records and I just don't have the exact date, but shortly after that he asked me to come over to his house.

---

[56] Morell Interview at 11.
[57] Polymeropoulos Interview at 10.

EXHIBIT 6

Q.      Okay.

A.      And we discussed this there.

I don't recall how it morphed from what I thought was an op-ed into a letter.  He did mention to me that someone in the kind of Biden world had asked about doing this.

Q.      But he didn't–

A.      He did not tell me who it was, and I did not ask.

Q.      So you prepared the backgrounder that's exhibit 4.[58]

A.      Right.

Q.      Was that before or after you went to Morell's house?

A.      I believe it was after, but I actually don't recall.  I see that text was on the 17th, and I think I sent the backgrounder on the 17th as well.  But I actually don't recall if this was before or after.

Q.      And as you understand it, Mr. Morell took your backgrounder and turned it into the letter?

A.      That's right.

Q.      And do you know if any other person helped him do that?

A.      I don't know.

Q.      Or whether he did it himself?

A.      I don't know.[59]

Morell kept Polymeropoulos in the dark about his interactions with Blinken and the Biden campaign. Polymeropoulos was not aware of these facts until the Committees informed him during his transcribed interview. He testified:

Q.      Are you aware that now Secretary of State Antony Blinken

---

[58] The "backgrounder" refers to a document Polymeropoulos created that contains the purported reasons why he believed the Hunter Biden laptop and emails were part of a Russian information operation to interfere in the 2020 presidential election. *See* Email from Marc Polymeropoulos to Michael Morell (Oct. 17, 2020, 8:01 PM) (on file with the Committees).

[59] *Id.* at 17-18.

called Mr. Morell some time on or about October 17th, 2020, to inquire as to whether Mr. Morell believed Russia might have been involved in the Hunter Biden email story in some way?

A.    That's the first I heard of that. I was not aware of that at all.

Q.    Were you aware that Secretary Blinken also sent an article to Mr. Morell from *USA Today* titled "A tabloid got a trove of data on Hunter Biden from Rudy Giuliani. Now, the FBI is probing a possible disinformation campaign"?

A.    No.[60]

### C. Morell, Polymeropoulos, and former CIA officer Kristin Wood solicited other former intelligence officials and employees to sign the public statement.

As Morell testified, a goal of writing a statement was to "help Vice President Biden" win the election.[61] To achieve this goal, Morell wanted to affix as many signatures from former intelligence officials and employees as he could. For Morell, "The more former intelligence officers the better."[62]



Morell seemed to believe that the statement would have a great effect with more signatories. Morell admitted this fact to Nick Shapiro, his former Deputy Chief of Staff and Senior Advisor at the CIA, who was tasked with pushing the public statement to the media, writing: "The real power is the number of former, working-level IC officers who want the American people to know."[63]

---

[60] *Id.* at 16.
[61] *See* Morell Interview at 11, 78, 102.
[62] Email from Michael Morell to Kirstin Wood (Oct. 18, 2020, 8:01 PM) (on file with the Committees).
[63] Email from Michael Morell to Nick Shapiro (Oct. 19, 2020, 8:21 PM) (on file with the Committees).

EXHIBIT 6

| From: | Michael M▮▮▮▮▮▮▮▮▮▮▮▮▮ |
|---|---|
| Sent: | 10/19/2020 8:21:10 PM |
| To: | Nick Shapiro ▮▮▮▮▮▮▮▮▮ |
| Subject: | The Letter |

Will send to you shortly.

Some thoughts when dealing with reporters:

1. Between us, the campaign would like Shane Harris to go first. Please share with the campaign when you share with Shane. But, by all means, get it to other reporters as well.

2. On the record from you: What is this? A large group of former career intelligence officers, many specializing in Russia, joined by a group of former IC leaders, all saying that the Russians were somehow involved here. The IC leaders who have signed here are diverse in that they worked for the past four Presidents, including Trump. The real power here is the number of former, working-level IC officers who want the American people to know.

3. OTR: Make sure reporters know that we are not making a call on whether the materials are true or not, just that Moscow played a role in getting the information out. I'm afraid people might miss this point and say that we are saying that this is all disinformation.

4. If asked: On background from you: Why Michael? In talking to people, outside of government, who he worked with and who know Russia, he was struck by the fact that all of them thought Russia is involved here. Michael thought people should know that.

5. Also on background from you: We did not speculate on how the Russians played in this particular case because there are so many different possibilities.

Morell testified:

> So, breaking into two pieces here, the first piece is that three of us took responsibility for sending it out to officials to try to get signatories. Myself, Marc Polymeropoulos, and a woman named Kristin Wood. Kristin worked for me at the [Central Intelligence] Agency. She worked directly for me at the Agency as my aide. We were very close friends. I asked her to do that. She agreed. And then, in terms of getting it to the media, that was entirely Nick Shapiro's responsibility here. So he took that responsibility on.[64]

On October 18, Morell sent an email to several former intelligence personnel, writing about helping to give Vice President Biden "a talking point to use in" the final presidential debate.[65] Specifically, Morell wrote, "because we think Trump will attack Biden on the issue at this week's debate and we want to give the VP a talking point to use in response," Morell pleaded, "[w]e would be honored if each of you would be willing to join us in signing the

---

[64] Morell Interview at 15-16.
[65] Email from Michael Morell to Unnamed Intelligence Officials (Oct. 18, 2020, 4:48 PM) (on file with the Committees).

letter."[66]

---

### Request to Sign On to Statement

From:  Michael M███████████████████)

To:    ████████████████

Cc:    ████████████████████

Bcc:   ████████████████

Date:  Sunday, October 18, 2020 at 04:48 PM EDT

---

To all (everyone is on the bcc line to protect folks privacy):

Marc and I drafted the attached because we believe the Russians were involved in some way in the Hunter Biden email issue and because we think Trump will attack Biden on the issue at this week's debate and we want to give the VP a talking point to use in response.

We would be honored if each of you would be willing to join us in signing the letter.

If you do agree to sign, please let me know how you would like your affiliation to read.  For those CIA officers on the bcc line, I would like to find a way to highlight your Russia work, if appropriate.  For example, Marc's citation will read:

Marc P...
Former Senior CIA Operations Officer
Former Acting Chief of Operations for Europe and Eurasia

If you want to agree to sign but make that "conditional" on seeing who else is willing to sign, I'm happy to send you the final list, probably tomorrow, before obtaining your final approval.

I will clear the statement with the Publication Review Board at CIA tomorrow.

Let us know.  Thanks.

Michael and Marc

📄 Hunter Biden Statement.docx
   17.5kB

---

The next day, Wood sent an email to several former intelligence personnel within her network, using language from Morell's email the previous day.[67]

---

[66] *Id.*
[67] Email from Kristin Wood to Unnamed Intelligence Officials (Oct. 19, 2020, 10:27 AM) (on file with the Committees).

19

EXHIBIT 6



Like Morell, Wood wrote that the group intended for the public statement to help then-Vice President Biden's candidacy, specifically in regards to the upcoming debate: "[W]e think Trump will attack Biden on the issue at this week's debate and we want to offer perspectives on this from Russia watchers and other seasoned experts."[68]

**D. Some former intelligence officials objected to the first draft of the public statement for being too political, one sought to "strengthen the verbiage," and others refused to sign it altogether.**

The initial statement was so nakedly partisan that some of the former intelligence officials refused to sign it until portions of it were removed. In the initial draft, Morell and Polymeropoulos included two paragraphs about Vice President Biden's relationship with

---

[68] *Id.*

20

EXHIBIT 6

Ukraine, which were later omitted from the final version of the public statement:

> For those who argue that it is important for the truth to come out – even if it comes at the cost of foreign interference – let us share our understanding of the what [*sic*] transpired between Vice President Biden and the Ukrainians. It is not what Biden's opponents want Americans to think.
>
> When the Vice President took a private and public stand against the then Prosecutor General of Ukraine Victor Shokin, he did so as a matter of Obama Administration policy, because Shokin was corrupt, because he was not investigating corruption in Ukraine, and because the Obama Administration wanted a prosecutor who would. This included any corruption at Burisma. Shokin was not investigating Burisma. Biden was not protecting Burisma. Indeed, by arguing that Ukraine needed an aggressive prosecutor, Biden was arguing for just the opposite. The Russians want you to think otherwise.[69]

Some of the signatories objected to these paragraphs as "too political," as shown in an email exchange between Morell and Nick Rasmussen, former Director of the National Counterterrorism Center. Morell explained to Rasmussen that "some folks thought [the two paragraphs] too political. Just Russia and intel now. Better."[70]



> On Oct 19, 2020, at 8:41 AM, Michael M < Michael Morell > wrote:
>
> Nick,
>
> Attached is the current version letter with signatories so far. FYI: The last two paras are gone, as some folks thought them too political. Just Russia and intel now. Better.
>
> I fully expect to add Leon Panetta, Sue Gordon, Mike Rogers (DIRNSA), John McLaughlin, Lisa Monaco, and David Kris.
>
> Hoping to add Dan Coats, Mike Rogers (HPSCI), and Tom Bossert as well
>
> Michael
>
> On Mon, Oct 19, 2020 at 8:27 AM Nicholas Rasmussen <

In addition to the edits removing reference to Ukraine, other emails show that former Director of National Intelligence James Clapper offered editorial advice to "strengthen the verbiage."[71] On October 18, after reviewing the draft statement, Clapper emailed Morell that he

---

[69] Email from Michael Morell to Unnamed Intelligence Officials (Oct. 19, 2020, 1:38:31 AM) (on file with the Committees).

[70] Email from Michael Morell to Nick Rasmussen (Oct. 19, 2020, 8:41 AM) (on file with the Committees).

[71] Email from James Clapper to Michael Morell (Oct. 18, 2020, 6:10 PM) (on file with the Committees).

EXHIBIT 6

would "gladly sign on," having "said as much [about the Hunter Biden laptop and emails] on CNN Friday evening."[72] He also offered an editorial suggestion to a key phrase in the statement:

> I have one editorial suggestion for the letter: I think it would strengthen the verbiage if you say this has all the classic earmarks of a Soviet/Russian information operation rather than the "feel" of a Russian operation.[73]



On Sun, Oct 18, 2020 at 6:10 PM James Clapper <███████████████> wrote:

Michael:

I'll gladly sign on; I said as much on CNN Friday evening.

I have one editorial suggestion for the letter: I think it would strengthen the verbiage if you say this has all the classic earmarks of a Soviet/Russian information operation rather than the "feel" of a Russian operation.

Jim

Morell responded that Clapper's "editorial suggestion has been made. It was a good one."[74]

From: Michael M <█Michael Morell██>
Sent: Sunday, October 18, 2020 7:47 PM
To: James Clapper <█████████████>
Subject: Re: Request to Sign On to Statement

Jim,

Thanks.

And, your editorial suggestion has been made. It was a good one.

Michael

Other former national security officials were approached and declined to sign the statement.[75] By his own account, Morell solicited the signatures of 36 former intelligence officials,[76] 26 of whom did not sign. Ultimately, the following individuals agreed to add their name to the statement:

|  |  |
|---|---|
| Jim Clapper; | John Brennan; |
| Mike Hayden; | Thomas Finger; |
| Leon Panetta; | Rick Ledgett; |

---

[72] *Id.*
[73] *Id.*
[74] Email from Michael Morell to James Clapper (Oct. 18, 2020, 7:47 PM) (on file with the Committees).
[75] Morell Interview at 14.
[76] *See* Morell Statement at 3 n.9.

EXHIBIT 6

| | |
|---|---|
| John McLaughlin; | Kent Harrington; |
| Michael Morell; | Don Hepburn; |
| Mike Vickers; | Timothy D. Kilbourn; |
| Doug Wise; | Ron Marks; |
| Nick Rasmussen; | Jonna Hiestand Mendez; |
| Russ Travers; | Emile Nakhleh; |
| Andy Liepman; | Gerald A. O'Shea; |
| John Moseman; | David Priess; |
| Larry Pfeiffer; | Pam Purcilly; |
| Jeremy Bash; | Marc Polymeropoulos; |
| Rodney Snyder; | Chris Savos; |
| Glenn Gerstell; | Nick Shapiro; |
| David B. Buckley; | John Sipher; |
| Nada Bakos; | Stephen Slick; |
| Patty Brandmaier; | Cynthia Strand; |
| James B. Bruce; | Greg Tarbell; |
| David Cariens; | David Terry; |
| Janice Cariens; | Greg Treverton; |
| Paul Kolbe; | John Tullius; |
| Peter Corsell; | David A. Vanell; |
| Brett Davis; | Winston Wiley; and |
| Roger Zane George; | Kristin Wood.[77] |
| Steven L. Hall; | |

### E. On October 19, 2020, Morell sent the CIA the finalized public statement for review, calling it a "rush job," and quickly secured its approval.

On October 19, 2020, at 6:34 a.m., Morell sent the final version of the statement to the CIA's Prepublication Classification Review Board (PCRB) for review.[78] According to Morell, the PCRB consists of CIA officers—"not contractors"—and their sole function is to determine whether former and current CIA personnel are disclosing classified information in any materials they may release publicly.[79] This is because "[a]ll CIA officers, as a condition of employment, sign the standard CIA secrecy agreement when entering on duty . . . [and this] **lifelong** obligation which exists to help avoid the damage to national security" requires they submit any materials they intend to publicize to the PCRB for approval.[80]

Morell directed the PCRB that "[t]his is a rush job, as it need to get out as soon as possible."[81] Morell wanted the public statement released before the October 22, 2020, presidential debate. Specifically, he testified:

---

[77] Jim Clapper et al., *supra* note 4; Bertrand, *supra* note 4.
[78] Email from Michael Morell to PCRB staff (Oct. 19, 2020, 6:34 AM) (on file with the Committees).
[79] Morell Interview at 29.
[80] CIA, PREPUBLICATION CLASSIFICATION REVIEW BOARD, https://www.cia.gov/about/organization/prepublication-classification-review-board/ (emphasis in original).
[81] Email from Michael Morell to PCRB Staff (Oct. 19, 2020, 6:34 AM).

23

EXHIBIT 6

Q.     And, in this, you described . . . it as a rush job to the officials
       at the CIA. Why? Were you trying to get it out?

A.     We were trying to get it out before the debate, yes.

Q.     Before the debate?

A.     Yes, ma'am.[82]

The PCRB responded on October 19, 2020, at 7:11 a.m., that it received the submission.[83]



Morell testified the statement was "approved . . . as written."[84] Although the timing of the
PCRB's approval is uncertain, it appears to have come before 5:51 p.m. In response to a text
message at that time from Polymeropoulos, who "[d]idn't see" a response from PCRB, Morell

---

[82] Morell Interview at 28. COMM. ON PRESIDENTIAL DEBATES, *supra* note 5.
[83] Email from JAMESAG2 to Michael Morell (Oct. 19, 2020, 07:11 AM) (on file with the Committees) ("Michael,
[y]our submission has been received and the tracking number is 999145/t21667. Regards, PCRB Staff.");
[84] Morell Interview at 28.

texted that the PCRB "cleared" the statement.[85] Notably, none of the former intelligence officials who signed the letter and produced documents to the Committees, including Morell, have produced the PCRB's email approving the statement.



Text message between Michael Morell and Marc Polymeropoulos (Oct. 19, 2020)

---

[85] Text message from Marc Polymeropoulos to Michael Morell (Oct. 19, 2020, 5:51 PM) (on file with the Committees).



Text message between Michael Morell and Marc Polymeropoulos (Oct. 19, 2020)

Morell testified:

> Q.   And was the email the only communication you had with the CIA?
>
> A.   Yes.
>
> Q.   You did not speak to any of the officials on the phone?

A.      I did not.  I did not.[86]

**F.  Contrary to the signers' assessment, the intelligence community publicly stated that the Hunter Biden laptop was not part of a Russian disinformation campaign.**

On October 19, while Morell and others worked procuring more signatories for the statement, Director of National Intelligence John Ratcliffe—who, unlike the statement's signatories, was in government as the top intelligence official in the United States and privy to all classified information—stated publicly that "Hunter Biden's laptop is not part of some Russian disinformation campaign."[87] He further stated: "Let me be clear: The intelligence community doesn't believe that because there is no intelligence that supports that."[88] Director Ratcliffe issued this statement in response to Congressman Adam Schiff's claim that Hunter Biden's laptop and emails came "from the Kremlin. That's been clear for well over a year now that they've been pushing this false narrative about the vice president and his son.[89]



**Hunter Biden emails not part of a 'Russian disinformation campaign': John Ratcliffe**
Director of National Intelligence John Ratcliffe on Hunter Biden's laptop and emails.

---

[86] Morell Interview at 28. Morell has not produced the email from the PRCB approving the public statement. In his statement to the Committees, Morell stated that his document production is incomplete because, since 2015, he began "to regularly delete all communications in his personal email account." Morell Statement at 1.

[87] Mark Moore, *DNI John Ratcliffe says info on Hunter Biden laptop isn't Russian disinformation*, N.Y. POST (Oct. 19, 2020).

[88] *Id.*

[89] Olivia Beavers & Joe Concha, *Ratcliffe, Schiff battle over Biden emails, politicized intelligence*, THE HILL (Oct. 19, 2020).

Rather than give the then-Director of National Intelligence's statement credence or at least a modicum of deference, Morell rejected it wholesale. He testified:

> Q.      So did the statement put out by the Director of National Intelligence that day or earlier that morning, did that have any influence on your decision with the letter, specifically, what Mr. Ratcliffe said?
>
> A.      No.
>
> Q.      Even though he said . . . the emails were not part of some Russian disinformation operation.
>
> A.      It did not because, as a former intelligence officer with much more experience than Mr. Ratcliffe, I don't know how he could have came to that conclusion. How could he know . . . it wasn't part of Russian disinformation?
>
> ***
>
> Q.      So you were obviously aware of Mr. Ratcliffe's statement that morning before you sent the letter out?
>
> A.      Yes.
>
> Q.      And, as you sit here today, do you believe the Russians were involved in the Hunter Biden laptop matter?
>
> A.      I don't know.  I mean, I still have suspicions, Congressman.
>
> Q.      Would you organize such a letter today knowing what you know now?
>
> A.      I would have to write it differently because we now know the emails are authentic, right?  So you couldn't say anymore we don't know whether it's information or disinformation. But I still have suspicions about a Russian role in these emails getting to *The New York Post*.[90]

The Federal Bureau of Investigation (FBI) ratified Director Ratcliffe's statement. In a letter to Senator Ron Johnson, then-Chairman of the Senate Committee on Homeland Security and Governmental Affairs, the FBI stated, "we have nothing to add at this time to the October 19th public statement by the Director of National Intelligence about the available actionable intelligence" on Hunter Biden's laptop and emails.[91]

---

[90] Morell Interview at 37, 39.
[91] Even Perez, *FBI says it has 'nothing to add' to Ratcliffe's claim on Russian disinformation*, CNN (Oct. 21, 2020).



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

October 20, 2020

The Honorable Ron Johnson
Chairman
Committee on Homeland Security and
    Governmental Affairs
United States Senate
Washington, D.C.  20510

Dear Chairman Johnson:

    This responds to your letter, dated October 17, 2020, to the Federal Bureau of Investigation (FBI) regarding the authenticity of certain information provided to your Committee, including whether such information is linked to a foreign adversary's influence operation or is otherwise fraudulent.  You also ask several questions about a laptop computer reportedly produced pursuant to a grand jury subpoena.

    As you may know, the Office of the Director of National Intelligence has advised the American public that, in advance of the 2020 election, a number of nation-states plan to use covert and overt influence measures in an attempt to sway voter preferences and perspectives, sow discord in the United States, and undermine the confidence of Americans in our democratic process.  The FBI is the primary investigative agency responsible for the integrity and security of the 2020 election, and as such, we are focused on an array of threats, including the threat of malign foreign influence operations.  Regarding the subject of your letter, we have nothing to add at this time to the October 19th public statement by the Director of National Intelligence about the available actionable intelligence.  If actionable intelligence is developed, the FBI in consultation with the Intelligence Community will evaluate the need to provide defensive briefings to you and the Committee pursuant to the established notification framework.

    Finally, as the FBI advised the Committee in its letter, dated October 5, 2020, consistent with longstanding Department of Justice (Department) policy and practice, the FBI can neither confirm nor deny the existence of any ongoing investigation or persons or entities under investigation, including to Members of Congress.  As the Inspector General firmly reminded the Department and the FBI in recent years, this policy is designed to preserve the integrity of all Justice Department investigations and the Department's ability to effectively administer justice without political or other undue outside influences.  Therefore, the FBI cannot provide any additional information in response to the enumerated questions in your letter.

    Thank you for your support of the FBI, its mission, and its people.

Sincerely,

Jill C. Tyson
Assistant Director
Office of Congressional Affairs

Letter from FBI to Senator Ron Johnson (Oct. 20, 2020)

Even after learning of Ratcliffe's statement that the laptop and emails were not Russian disinformation, Morell and Polymeropoulos were not dissuaded. In one text exchange on October 19, Polymeropoulos remarked to Morell: "Did u see Ratcliffe[?] Omg[.]"[92]



Text message between Michael Morell and Marc Polymeropoulos (Oct. 19, 2020)

---

[92] Text message from Marc Polymeropoulos to Michael Morell (Oct. 19, 2020, 5:51 PM) (on file with the Committees). Polymeropoulos produced these text messages to the Committees with redactions, including what follows "OMG."



Text message between Michael Morell and Marc Polymeropoulos (Oct. 19, 2020)

## II.      The Committees have evidence that the CIA may have promoted the statement to other intelligence community officials.

According to a written statement provided to the Committees by former CIA official David Cariens, the CIA—or at least an employee of the CIA—may have helped in the effort to solicit signatures for the statement. Cariens explained that he spoke with the PCRB in October 2020 regarding the review of his memoir and during that call the CIA employee "asked" him if he would sign the statement.[93] As Cariens explained:

> When the person in charge of reviewing the book called to say it was approved with no changes, I was told about the draft letter. The person asked me if I would be willing to sign. . . . After hearing the letter's contents, and the qualifiers in it such as, "We want to emphasize that we do not know if the emails provided to the *New York Post* by President Trump's personal attorney, Rudy Giuliani, are genuine or not and that we do not have evidence of Russian involvement . . ." I agreed to sign.[94]

From: David Cariens
Sent: Sunday, March 5, 2023 3:02 PM
To: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
Subject: Re: FW: Letter for Mr. David Cariens

▇▇▇▇▇▇▇--Thank you for acknowledging my response. My wife and I are happy to help in any way possible.

To put our position in proper perspective, my wife retired from the CIA in 1995 and has not had security clearances after that time. I retired in 1997 and continued to do contract work for the CIA and other members of the Intelligence Community. I teach intelligence and crime analysis. My contract work for the CIA ended in 2017 and I no longer had security clearances after that.

The answer to the two questions posed in the April 6, 2022 letter are:

1. I am the author of nine books, including two text books on intelligence and crime analysis. All my work is passed through the CIA's Publications Review Board (PRB) for approval. My last book, a memoir, entitled*Escaping Madness*, was before the PRB in October, 2020. When the person in charge of reviewing the book called to say it was approved with no changes, I was told about the draft letter. The person asked me if I would be willing to sign. (I do not recall the person's name or the exact date of the phone call.) After hearing the letter's contents, and the qualifiers in it such as, "We want to emphasize that we do not know if the emails provided to the *New York Post* by President Trump's personal attorney, Rudy Giuliani, are genuine or not and that we do not have evidence of Russian involvement ...," I agreed to sign. I had been following the Hunter Biden laptop issue, and as a former director of CIA University's course in deception analysis (with a heavy emphasis on all forms of Soviet/KGB deception), I felt there was enough circumstantial evidence to raise the suspicion that Russian intelligence was involved. I shared these views with my wife, also a former CIA officer, and she agreed to sign as well.

2. We have no documents because all of the above was done in a phone call. Neither my wife nor I have discussed the letter with any of the other signatories or any member of the U.S. policy or intelligence communities.

If you have any other questions, please do not hesitate to contact us. Regards, David and Janice Cariens

www.davecariens.com

---

[93] Email from David Cariens to Committee staff (March 5, 2023, 3:02 PM) (on file with the Committees).
[94] *Id.*

Cariens's statement did not provide the precise timing of his communication with the PCRB. However, the Committees received an email exchange, produced by Kristin Wood, in which Cariens wrote, "Yes, I want to sign," on October 19, at 10:35 a.m.—eight minutes after Wood sent the mass distribution email soliciting signatures.[95] PCRB was in possession of the statement since 6:34 a.m. on October 19, when Morell emailed it to the unit for approval.[96] PCRB acknowledged receipt of the statement, at 7:11 a.m. that same day.[97]



1 message

**Kristin W** ▉▉▉▉▉▉▉▉▉▉                                   Mon, Oct 19, 2020 at 10:36 AM
To: Michael Gmail New ▉▉▉▉▉▉▉▉▉

Begin forwarded message:

**From:** David Cariens ▉▉▉▉▉▉▉▉▉▉
**Date:** October 19, 2020 at 10:35:50 AM EDT
**To:** Kristin W ▉▉▉▉▉▉
**Subject: Re:  Quick turnaround: Intelligence officers signing statement on Russian election interference**

Yes, I want to sign. As for signing, just do: David Cariens, former CIA Intelligence Analyst
                                                    Over 50 years working in the U.S. Intelligence Community

On Mon, Oct 19, 2020 at 10:27 AM Kristin W ▉▉▉▉▉▉▉▉▉▉▉ wrote:
  To all (everyone bcc'ed to protect privacy),

  >> Michael Morell and Marc Polymeropoulos drafted the attached because we believe the Russians were involved in some way in the Hunter Biden email issue and because we think Trump will attack Biden on the issue at this week's debate and we want to offer perspectives on this from Russia watchers and other seasoned experts. (Apologies if you've already received this...we are trying to cast a wide net).

  >> We would be honored if each of you would be willing to join us in signing the letter.

Cariens's revelation is potentially shocking. As he recounted, a CIA employee informed him about the statement, the CIA employee read the text of the statement to him, and the CIA employee asked Cariens if he would like to join.

Indeed, even Morell testified that such an action by a CIA employee would be "inappropriate." Morell explained:

A.      I did not coordinate with the CIA.  I would have—had I known [Carien's allegation], I would have reacted very negatively to this. This might—you know, had I known at the time this might have been in the letter, then I certainly would have reported this to then

---

[95] Email from David Cariens to Kristin Wood (Oct. 19, 2020, 10:35:50 AM) (on file with the Committees).
[96] Email from Michael Morell to PCRB staff (Oct. 19, 2020, 6:34 AM) (on file with the Committees).
[97] Email from JAMESAG2 to Michael Morell (Oct. 19, 2020, 07:11 AM) (on file with the Committees).

the Director of the Agency.

Q.     And why would you have done this?

A.     Because this is inappropriate.

Q.     And why is it inappropriate?

A.     It's inappropriate for a currently serving staff officer or contractor to be involved in the political process.

Q.     Do you know the people who were engaged in this review for the CIA?

A.     I do not.

Q.     You don't know any of the people who work in that process.

A.     I do not, sir.[98]

Similarly, Polymeropoulos testified that such an action from the CIA would be "incredibly unprofessional":

Q.     Does what Mr. Cariens described there, that interaction with the PCRB, sound like a quid pro quo to you?[99]

A.     I can't comment on this.  This is—to me, this is something that the PCRB in my experience would never engage in something like that. They are just straightforward back and forth in terms of approval. The idea they would have a comment on any other thing that they were working on, that to me is not even close to what I've experienced with them.

Q.     Does that concern you?

A.     If it's true, it would concern me, for sure.  But I just—I have a hard time believing that occurred.   If it did, that's incredibly unprofessional.[100]

Likewise, upon being confronted with Cariens's statement, Shapiro testified:

No.  I mean, I have no idea what happened here, to be very—this is

---

[98] Morell Interview at 30-31.
[99] *Quid pro quo*, Merriam Webster's Collegiate Dictionary, (11th ed. 2020) ("something given or received for something else.").
[100] Polymeropoulos Interview at 24.

the first I'm hearing of this.

But my guess—and lawyers would probably tell me not to guess or defend the PRB, but what I could've seen happen is someone in the PRB being inappropriate and asking, hey, are you signing this thing? Which, PRB shouldn't be sharing, like, materials they get from one former with other formers.  Like, that shouldn't be.

Because, as a former, if you send something—I've never sent something, but I know people who have—you're doing that because you're supposed to, but you're also hoping it stays within confidence.  Like, usually, if you're going to send something to the PRB, you're sending it elsewhere, and you don't want the PRB spreading that.

So my guess for this was that it was someone who acted inappropriately and was just stupidly outing it and asking these folks if they were going to sign it.

I can't imagine the PRB trying to get someone to sign it by offering to clear something else.  That would be really bad.[101]

Given the gravity of this allegation, the Committees sent a letter to CIA Director William J. Burns, on March 21, 2023, requesting documents about the CIA's review of the statement and its interactions with former CIA employees, such as Cariens, about the statement.[102] The Committees requested that the CIA furnish these documents by April 4, 2023.[103] To date, the CIA has failed to respond to this request. The Committees have also sought to follow up with Cariens for additional information.

---

[101] Transcribed Interview of Mr. Nick Shapiro at 26 [hereinafter "Shapiro Interview"].
[102] Letter from Chairman Jim Jordan, H. Comm. on the Judiciary, and Chairman Michael R. Turner, Permanent Select Committee on Intelligence, to Hon. William J. Burns, Dir., Cent. Intel. Agency (Mar. 21, 2013).
[103] *Id.*

### III.    The Biden campaign coordinated with the organizers to promote the public statement with the media.

The Committees' oversight has also revealed that the Biden campaign worked with Morell and the other organizers of the statement to promote the statement publicly. Specifically, in coordination with the Biden campaign, Morell enlisted Shapiro, a long-time "national security and strategic communications" aide, to coordinate dissemination efforts with the media.[104]

#### A.    Morell and Shapiro worked with the Biden campaign to release the statement to the media.

According to testimony provided to the Committees, Morell worked with Shapiro to disseminate it publicly. Morell testified that, "in terms of getting [the statement] to the media, that was entirely Nick Shapiro's responsibility here. So he took that responsibility on."[105] Email correspondence between Morell and Shapiro, Shapiro and journalists, and Shapiro and the Biden campaign reveal the extent of this effort.

On October 19, as Morell continued to recruit former intelligence officials to affix their names to the statement, he emailed Shapiro that he "[s]hould have something to give to the media through you tomorrow afternoon."[106] Morell promised Shapiro that he would "explain on the phone tomorrow how this came to be."[107]

---

[104] *See* 10th Avenue Consulting, https://www.10thavenueconsulting.com/ (last visited May 4, 2023) ("Founder and CEO, Nick Shapiro has more than 15 years of crisis management, national security and strategic communications experience in the White House, at the CIA and in the private sector. Previously, Shapiro was the CIA's Deputy Chief of Staff and Senior Advisor to the Director. Shapiro also served in the White House as a Senior Counterterrorism and Homeland Security Aide on the National Security Council, and he was a National Security Spokesperson for President Obama.").

[105] Morell Interview at 16.

[106] Email from Michael Morell to Nick Shapiro (Oct. 19, 2020, 6:36:42 AM) (on file with the Committees). In emails that Mr. Shapiro produced to the Committees, the timestamps are inconsistent the with times and, in one instance, the date, in which events unfolded. When the Committees inquired about these discrepancies, Mr. Shapiro's counsel provided the following response: "[I]t appears that such timestamp inaccuracies are a common issue faced by individuals, like Mr. Shapiro, who use the Gmail email server. The primary cause for these discrepancies appears to be the result of inaccurate time zone settings in the Gmail application, the web browser, and/or the computer settings itself. Unless the user manually corrects the time zone settings in Gmail, the computer's setting, and/or their web browser, the emails will continue to reflect an inaccurate time zone – regardless of where the user may have sent the email. Although we cannot rule out other technical issues, various online publications suggests that this is the most common reason for these discrepancies." Email from Timothy Sini, counsel for Nick Shapiro, to Committee staff (May 3, 2023, 10:00 PM) (on file with the Committees). Mr. Shapiro's counsel affirmed that, despite the timestamp discrepancies, Mr. Shapiro "emailed the *Washington Post*, the *AP*, and *Politico*, prior to the publication being run in the *Politico*. He emailed [Andrew] Bates at some point after contacting at least one of these media companies and prior to *Politico* running the story." Email from Timothy Sini, counsel for Nick Shapiro, to Committee staff (May 5, 2023, 11:53 AM) (on file with the Committees).

[107] Email from Michael Morell to Nick Shapiro (Oct. 19, 2020, 6:36:42 AM) (on file with the Committees).

From:        Michael Gmail New ████████████
Sent:        10/19/2020 6:36:42 AM
To:          Nick Shapiro ████████
Subject:     Re: Request to Sign Statement

Great and great. I will explain tomorrow on the phone how this came to be.

I've sent the draft to David Kris and Lisa Monaco but have not yet heard back. They should sign.

I'm looking for two things — pairs of senior who served in the same position from different administrations (Hayden and Panetta, Jeh Johnson and Mike Chertoff, Lisa and Ken Wainstein, Clapper and Coats, etc) and then a slew of former IC and national security who worked Russia.

Should have something to give to the media through you tomorrow afternoon. Let's talk when you get a chance in the morning.


Sent from my iPad


On Oct 18, 2020, at 11:55 PM, Nick Shapiro ████████████████████ wrote:


happy to sign and will also send around to folks if you want me to

Nick Shapiro
Former CIA Deputy Chief of Staff and Senior Advisor to the Director

---

Later on October 19, Morell sent Shapiro "some thoughts when dealing with reporters."[108] Specifically, Morell informed Shapiro that, "[b]etween us," the Biden campaign preferred that a certain reporter with the *Washington Post* run the statement first.[109] Morell asked Shapiro to "share with the campaign when you share with" the reporter.[110] Morell also sent Shapiro a lengthy script of information to share on various levels of sourcing—on the record, off the record, and on background.[111]

---

[108] Email from Michael Morel to Nick Shapiro (Oct. 19, 2020, 8:21:10 PM) (on file with the Committees).
[109] *Id.*
[110] *Id.*
[111] *Id.*

From: Michael M████████
Sent: 10/19/2020 8:21:10 PM
To: Nick Shapiro ████████
Subject: The Letter

Will send to you shortly.

Some thoughts when dealing with reporters:

1. Between us, the campaign would like ████████ to go first. Please share with the campaign when you share with ████. But, by all means, get it to other reporters as well.

2. On the record from you: What is this? A large group of former career intelligence officers, many specializing in Russia, joined by a group of former IC leaders, all saying that the Russians were somehow involved here. The IC leaders who have signed here are diverse in that they worked for the past four Presidents, including Trump. The real power here is the number of former, working-level IC officers who want the American people to know.

3. OTR: Make sure reporters know that we are not making a call on whether the materials are true or not, just that Moscow played a role in getting the information out. I'm afraid people might miss this point and say that we are saying that this is all disinformation.

4. If asked: On background from you: Why Michael? In talking to people, outside of government, who he worked with and who know Russia, he was struck by the fact that all of them thought Russia is involved here. Michael thought people should know that.

5. Also on background from you: We did not speculate on how the Russians played in this particular case because there are so many different possibilities.

In the background information that Morell gave Shapiro to tell reporters, Morell claimed the genesis of the public statement came from feedback from other Russia experts: "In talking to people, outside of government, who [Morell] worked with and who know Russia, [Morell] was struck by the fact that all of them thought Russia is involved here. [Morell] thought people should know that."[112] This assertion is disingenuous for several reasons.

First, Morell admitted in testimony to the Committees that he spearheaded the effort to publish the public statement for overtly political reasons—to help Vice President Biden in the debates and ultimately win the election.[113] Second, other than soliciting thoughts from and collaborating with Polymeropoulos,[114] Morell testified he did not speak to anyone about potential Russian involvement with Hunter Biden's laptop, but rather researched the issue himself following his conversation with Blinken. He explained:

> A.      The first thing I did when Mr. Blinken called me is I did some research. I had not read *The New York Post* article. I went and read it. I did some internet searches. I did a little

---

[112] *Id.*
[113] *See* Morell Interview at 11, 78, 102.
[114] *See* text message exchange between Michael Morell to Marc Polymeropoulos (Oct. 17, 2020, 2:16 PM) (on file with the Committees).

> bit of research here before I reached out to [Polymeropoulos].
>
>         \*\*\*
>
> Q.    [A]s part of the research that you did in between the contact with Mr. Blinken and the contact with [Polymeropoulos], did you contact any individuals as a part of your research?
>
> A.    I did not.[115]

Finally, Morell's claim is undercut by his disclosure that a majority of the people who he asked to sign the statement declined to do so.[116] Although the precise reasons they declined are not yet known, these facts cast doubt on Morell's intended perception that a groundswell of Russia experts organically concluded that the Hunter Biden laptop was a Russian intelligence operation.

Shapiro emailed the *Washington Post* reporter the statement, along with scripted on-the-record comments and background information.[117] It is important to note that Shapiro kept one of the most important elements of this story off the record—namely, "We are not making a call on whether the materials are true or not, just that Moscow played a role in getting the information out."[118]

---

[115] Morell Interview at 20

[116] *See* Morell Statement at 3 n.9. Bertrand, *supra* note 4. Morell solicited the signatures of 36 former intelligence officials, and 26 of those individuals did not sign the public statement.

[117] Email from Nick Shapiro to *Washington Post* reporter (Oct. 19, 2020, 9:25 PM) (on file with the Committees).

[118] *Id.*

From: Nick Shapiro ███████████████████████
Sent: 10/19/2020 9:25:33 PM
To: ███████████████████████
Subject: The Letter
Attachments: Former IC Officers Public Statement.docx

Ok - here you go.

Giving this to you exclusively first if you guys want to run with it. Then will give to others once you post.

You can also use this **on the record** from me (Nick Shapiro, Former CIA Deputy Chief of Staff and Senior Advisor to the Director) describing what this is:

"A large group of former career intelligence officers, many specializing in Russia, joined by a group of former intelligence community leaders, are all saying that they believe the Russians were somehow involved here. The IC leaders who have signed this letter worked for the past four Presidents, including Trump. The real power here however is the number of former, working-level IC officers who want the American people to know that once again the Russians are interfering."

**Off The Record**: We are not making a call on whether the materials are true or not, just that we believe Moscow played a role in getting the information out.

**On Background**: We did not speculate on how exactly the Russians played in this particular case because there are so many different possibilities.

     Appearing not to receive a favorable response from their preferred *Washington Post* journalist, Shapiro sent the public statement and an identical email to an *Associated Press* reporter about two hours later.[119]

---

[119] Email from Nick Shapiro to *Associated Press* reporter (Oct. 19, 2020, 11:15 PM) (on file with the Committees).

From: Nick Shapiro █████████
Sent: 10/19/2020 11:15:06 PM
To: ████████████
Subject: The Letter
Attachments: Former IC Officers Public Statement.docx

Ok - here you go.

Giving this to you exclusively first if you guys want to run with it. Then will give to others once you post.

You can also use this **on the record** from me (Nick Shapiro, Former CIA Deputy Chief of Staff and Senior Advisor to the Director) describing what this is:

"A large group of former career intelligence officers, many specializing in Russia, joined by a group of former intelligence community leaders, are all saying that they believe the Russians were somehow involved here. The IC leaders who have signed this letter worked for the past four Presidents, including Trump. The real power here however is the number of former, working-level IC officers who want the American people to know that once again the Russians are interfering."

**Off The Record**: We are not making a call on whether the materials are true or not, just that we believe Moscow played a role in getting the information out.

**On Background**: We did not speculate on how exactly the Russians played in this particular case because there are so many different possibilities.

Shapiro made sure to update the Biden campaign—specifically, Andrew Bates, Director of Rapid Response—after reaching out to the *Washington Post* and the *Associated* Press, stating, "This is what I gave them."[120]

---

[120] Email from Nick Shapiro to Andrew Bates (Oct. 19, 2020, 11:22 PM) (on file with the Committees).

| | |
|---|---|
| **From:** | Nick Shapiro ████████████████ |
| **Sent:** | 10/19/2020 11:22:24 PM |
| **To:** | Andrew Bates ████████ |
| **Subject:** | Fwd: The Letter |
| **Attachments:** | Former IC Officers Public Statement.docx |

This is what I gave them -

Ok - here you go.

Giving this to you exclusively first if you guys want to run with it. Then will give to others once you post.

You can also use this **on the record** from me (Nick Shapiro, Former CIA Deputy Chief of Staff and Senior Advisor to the Director) describing what this is:

"A large group of former career intelligence officers, many specializing in Russia, joined by a group of former intelligence community leaders, are all saying that they believe the Russians were somehow involved here. The IC leaders who have signed this letter worked for the past four Presidents, including Trump. The real power here however is the number of former, working-level IC officers who want the American people to know that once again the Russians are interfering."

**Off The Record**: We are not making a call on whether the materials are true or not, just that we believe Moscow played a role in getting the information out.

**On Background**: We did not speculate on how exactly the Russians played in this particular case because there are so many different possibilities.

      After apparently not receiving a favorable response from the *Associated Press* reporter, Shapiro later sent the email with the public statement to *Politico* about an hour later.[121] *Politico*, of course, eventually published the story.

---

[121] Email from Nick Shapiro to Natasha Bertrand (Oct. 20, 2020, 12:27 AM) (on file with the Committees).

| From: | Nick Shapiro█████████████████████ |
|---|---|
| Sent: | 10/20/2020 12:27:59 AM |
| To: | Natasha Bertrand██████████████████ |
| Subject: | The Letter |
| Attachments: | Former IC Officers Public Statement.docx |

Ok - here you go.

Giving this to you exclusively first. Then will give to others once you post your story.

You can also use this **on the record** from me (Nick Shapiro, Former CIA Deputy Chief of Staff and Senior Advisor to the Director) describing what this is:

"A large group of former career intelligence officers, many specializing in Russia, joined by a group of former intelligence community leaders, are all saying that they believe the Russians were somehow involved here. The IC leaders who have signed this letter worked for the past four Presidents, including Trump. The real power here however is the number of former, working-level IC officers who want the American people to know that once again the Russians are interfering."

**Off The Record**: We are not making a call on whether the materials are true or not, just that we believe Moscow played a role in getting the information out.

**On Background**: We did not speculate on how exactly the Russians played in this particular case because there are so many different possibilities.

       In his transcribed interview, Shapiro testified about the process of soliciting the statement to the media. He testified:

> Q.    And we understand from your productions that there were three journalists that you sent the statement to: ██████████ of *The Washington Post*, ██████████ of the *Associated Press*, and Natasha Bertrand of *Politico*?
>
> A.    Yep.
>
> Q.    Why those three?
>
> A.    █████ because I was asked to go to █████ first. And then the *AP* is a really good outlet you want stories in. And then *Politico* – I don't know why I went to *Politico* after that.

***

> Q.    We know that Natasha Bertrand is the one that ultimately ran with the article. Why did ██████████ and ██████████ decline to do so?
>
> A.    I don't remember. I know we – I'm sure we spoke. But you'd have to ask them. Reporters decline things all the time.

Q.      Okay.  But they did get back to you, I assume, over the phone?

A.      Yeah.

Q.      Because we didn't have any of those records and –

A.      Yeah.  I looked back at the emails, and it's clear that I spoke to them before I emailed them, which is normal.  When I'm talking to a reporter, I'll call them and say, "Hey, you know, I've got this idea. What do you want to do?"  And then, considering it was a letter, I'm sure I said, "I'll follow up and send it to you," which is what I did with each of them.

And then, for each of them, we got back on the phone.  And *Washington Post* and *AP* said no.  And *Politico*   I think I probably just reiterated these points to Natasha.[122]

## B. *Politico* ultimately published a story about the statement, falsely calling the Hunter Biden laptop and emails Russian disinformation.

On October 19, 2020, at 10:30 p.m., *Politico* published the public statement it received from Shapiro, with an accompanying article titled: "Hunter Biden story is Russian disinfo, dozens of former intel officials say."[123]

---

[122] Shapiro interview at 20-22.
[123] Bertrand, *supra* note 4.



**NATIONAL SECURITY**

# Hunter Biden story is Russian disinfo, dozens of former intel officials say

More than 50 former intelligence officials signed a letter casting doubt on the provenance of a New York Post story on the former vice president's son.

More than 50 former senior intelligence officials have signed on to a letter outlining their belief that the recent disclosure of emails allegedly belonging to Hunter Biden, pictured here, "has all the classic earmarks of a Russian information operation." | Handout/DNCC via Getty Images

By NATASHA BERTRAND
10/19/2020 10:30 PM EDT

   

Supporters of the Biden campaign immediately promoted the article, including Jen Psaki, who would later become the White House Press Secretary under President Biden.[124]

---

[124] Jen Psaki (@jrpsaki), Twitter (Oct. 19, 2020, 10:45 PM), https://twitter.com/jrpsaki/status/1318382779659411458.



Despite *Politico*'s conclusory headline, Morell, Polymeropoulos, and Shapiro all testified that their statement was not intended to make a conclusive determination about whether the Hunter Biden allegations were disinformation. Morell testified that "the statement clearly says that we're not saying this is disinformation."[125] Polymeropoulos testified that, at the presidential debate, "Vice President Biden" had "mischaracterize[ed]" the statement by calling "it disinformation, which is not what the letter said."[126] And Shapiro testified:

> Q    How do you feel now that you know that the contents on the laptop were not Russian disinformation?
>
> A    Meaning that they were real?

---

[125] Morell Interview at 26.
[126] Polymeropoulos Interview at 28.

Q       Yes.

A       I'm sure glad that we put that in the letter, saying that we don't know
        if this is real or not.[127]

Notwithstanding these recent protestations, there is no evidence that the statement's
signers attempted to correct *Politico*'s misleading headline. Indeed, Morell "knew" the media
would not run the letter's caveats. He testified:

> Q.      Do you regret that those caveats [in the statement] that you seem to
>         be relying on heavily today weren't really part of the public
>         discourse and the political discourse around this letter?
>
> A.      I knew they wouldn't be.  I knew they wouldn't be, as much as we
>         tried, right?  As you guys know better than anybody, right, politics
>         is hyperbole and particularly debates.  There's a lot of hyperbole
>         around, a lot of people taking things and taking them a little bit
>         further, right?  You know that better than I do.  So I wasn't surprised
>         at all that – you know, when President Biden – when Vice President
>         Biden talked about this at the debate that he didn't say, "Hey, I have
>         to put some caveats on this."  That's not what happens at debates.
>
> ***
>
> Q.      So you knew when you put this product out with caveats that its
>         utilization politically likely wouldn't include those caveats?
>
> A.      I guessed that politicians would not use the caveats.  I was hoping
>         that fact-checkers and I was hoping the media – disappointed in that
>         regard – would pay more attention to them.
>
> Q.      But you testified earlier that you were accelerating – you were
>         requesting an acceleration of the review of this material so it could
>         be used in a debate, right?
>
> A.      Yes, sir.[128]

Indeed, contemporaneous documents show that some of the signatories adopted
*Politico*'s framing that the laptop was Russian disinformation. One of the intelligence officials
who signed onto the statement, Thomas Fingar, the former Deputy Director of National
Intelligence for Analysis and Chair of the National Intelligence Council, wrote to colleagues at
Stanford University that the statement "conveys our judgment that the Hunter Biden emails story

---

[127] Shapiro Interview at 28.
[128] Morell Interview at 88-89.

published by the NY Post and seemingly endorsed by Trump's Director of National Intelligence is actually Russian disinformation."[129]



> **From:**      Thomas Fingar ▮▮▮▮▮▮▮▮▮▮
> **Sent:**      Tuesday, October 20, 2020 10:28 AM
> **To:**        Noa Ronkin; Ari Chasnoff
> **Subject:**   Letter on Russian disinformation
>
> Here is the link to a *Politico* story on the letter signed by 50 former senior intelligence officials, including me. The letter conveys our judgment that the Hunter Biden emails story published by the NY Post and seemingly endorsed by Trump's Director of National Intelligence is actually Russian disinformation. The letter itself and names of those who signed can be accessed by clicking on the first link in the story.
>
> https://www.politico.com/news/2020/10/19/hunter-biden-story-russian-disinfo-430276
>
> Tom

Fingar, in sharing the *Politico* story with Stanford's public affairs team, appeared intent on having the university promote the story among its networks.[130] But Fingar's Stanford colleagues did not seem willing. One Stanford employee immediately grasped the statement was nothing more than a political document.[131] Indeed, she used the word "political" four times in her terse response to Fingar explaining that Stanford cannot endorse these sorts of "political opinions."[132]

---

[129] Email from Thomas Fingar to Noa Ronkin and Ari Chasnoff (Oct. 20, 2020, 10:28 AM) (on file with the Committees).

[130] STANFORD-FREEMAN SPOGLI INSTITUTE FOR INTERNATIONAL STUDIES, All FSI People / Staff, https://fsi.stanford.edu/people/noa-ronkin-0; https://fsi.stanford.edu/people/ari-chasnoff (last visited May 4, 2023).

[131] Email from Noa Ronkin to Thomas Fingar (Oct. 20, 2020, 1:00 PM) (on file with the Committees).

[132] *Id.*

| From: | Noa Ronkin █████████████████ |
|---|---|
| Sent: | Tuesday, October 20, 2020 1:00 PM |
| To: | Thomas Fingar |
| Cc: | Ari Chasnoff |
| Subject: | Re: Letter on Russian disinformation |

Thank you, Tom, but this is something that we are advised not to promote, per the guidelines for political activities the University released last month. While all members of the University community may express their political opinions and engage in political activities in their individual capacities using personal resources, we must avoid even the appearance that they are speaking or acting for the University in political matters.

Thanks for your understanding,
Noa

Noa Ronkin, DPhil
Associate Director for Communications and External Relations
Walter H. Shorenstein Asia-Pacific Research Center (APARC)
Freeman Spogli Institute for International Studies
Stanford University

aparc.fsi.stanford.edu | █████████████

In an October 20 email to the signers of the statement, Morell wrote that "Politico did a nice job getting out the story of our letter."[133] Morell, however, expressed no concern about the story's conclusory headline that the laptop was Russian disinformation.

Similarly, on October 20, a day after *Politico* ran its story about the statement, Shapiro emailed another signatory, John Sipher, a former career CIA officer, to sit for an interview with MSNBC commentator Rachel Maddow.[134] Shapiro noted an interest in placing a statement signatory before a friendly talk show host and ensuring that signatory had "Russia expertise" and "will not be seen as political."[135] Here, too, there was no mention about nuancing *Politico*'s headline or caveating the assertions in the statement.

---

[133] Email from Michael Morell to Unnamed Intelligence Officials (Oct. 20, 2020, 1:40 PM) (on file with Committees).
[134] Email from Nick Shapiro to John Sipher (Oct. 20, 2020, 10:33 AM) (on file with the Committees).
[135] *Id.*

**Maddow tonight?**

From: Nick Shapiro (███████████████)

To: ███████████████

Cc: ███████████████

Date: Tuesday, October 20, 2020 at 10:33 AM EDT

Hey John -

Rachel Maddow is looking for a guest tonight to come on and talk about the letter we all signed.

Michael and I want to try and make sure we provide them someone with Russia expertise who will not be seen as political.

Would you be available and or interested in doing the intv?

The show is in the 9pm ET hour and the intv will be live somewhere in that hour.

Nick

Likewise, Jeremy Bash,[136] another former intelligence community official, appeared on MSNBC the same day the statement was released. His assertions about Hunter Biden's laptop and emails were unambiguous and did not include nuanced caveats in the statement. He said:

> We need to talk about it, Nicole. [The Hunter Biden allegations] looks like Russian intelligence, this walks like Russian intelligence, this talks like Russian intelligence. This effort by Rudy Giuliani and the *New York Post* and Steve Bannon to cook up supposed dirt on Joe Biden looks like a classic Russian playbook disinformation campaign.[137]

---

[136] President Biden appointed Bash to the President's Intelligence Advisory Board in August 2022. White House, *President Biden Announces Key Appointments to Boards and Commissions* (Aug. 26, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/26/president-biden-announces-key-appointments-to-boards-and-commissions-6/.

[137] Nicole Wallace, *Bash On Pushing Of Disinformation On Biden: This Looks, Walks, & Talks Like Russian Intelligence*, MSNBC (Oct. 19, 2020); *see also* Deadline: White House, MSNBC (Oct. 19, 2020).



The MSNBC host then amplified the falsehood: "I think Jeremy has made clear we shouldn't look at [the statement] as anything other than a Russian disinformation operation."[138] If these intelligence officials were concerned about *Politico*'s misrepresentation of their public statement, there has been no contemporaneous indication of such a concern.

### C. The *Politico* article and public statement helped to support the continued suppression of the allegations uncovered from emails on Hunter Biden's laptop.

In a recent retrospective, the *New York Post* explained how the public statement contributed to the continued suppression of the underlying allegations contained in the emails on Hunter Biden's laptop—namely, Hunter Biden's pattern of monetizing his familial relationship with Vice President Biden's likely knowledge. The *Post* piece reasoned:

> Yes, that letter from the Dirty 51 had "all the classic earmarks" of a disinformation operation, all right — one designed to ensure Joe Biden won the presidency. And it was essentially a CIA operation, considering 43 of the 51 signatories were former CIA.
>
> In the two years since, not one of them has admitted they are wrong.

---

[138] *Id.*

> [One signer] David Priess at least gets marks for subjecting himself to a cross-examination on Fox News one recent afternoon. He tried to defend the letter by saying people were too stupid to understand it. The letter was "still true" because it did not use the words "Russian disinformation," but concocted the weasel phrase "earmarks of a Russian information operation."
>
> He knows perfectly well that Biden and the media drew no distinction, that the letter he signed was used to censor and deride *The Post*'s accurate story and deny the American people the truth about one of the two candidates for president.[139]

Similarly, an opinion writer with the *Washington Post* observed:

> In addition to these meetings with current officials, a group of 51 former intelligence officials released a public letter when the story broke in which they alleged that the release of Hunter Biden's emails "has all the classic earmarks of a Russian information operation," adding, "If we are right, this is Russia trying to influence how Americans vote in this election."
>
> They were not right. But together, these warnings by current and former national security officials gave Twitter the pretext to censor the story — and mainstream news outlets the excuse to dismiss or ignore it, which many of them did.[140]

---

[139] Miranda Devine, *It's been two years since 51 intelligence agents interfered with an election — they still won't apologize,* N.Y. POST (Oct. 19, 2022).

[140] Marc A. Thiessen, *The suppression of Hunter Biden's laptop is a huge scandal*, THE WASHINGTON POST (Dec. 9, 2022).

## IV.     The statement had its intended effect of giving Vice President Biden a "talking point" to use in the presidential debate.

The public statement signatories had a common goal: "to help Vice President Biden in the debate" and to help him win the presidency.[141] Indeed, some of the former intelligence officials who signed the public statement were deeply satisfied that Vice President Biden referred to the statement in the final presidential debate before the election. After the debate, the signers congratulated themselves on a job well done, and the Biden campaign even called to thank Morell for organizing the effort.

### A.     Then-Vice President Biden relied on the public statement in the presidential debate to falsely assert that Hunter Biden allegations were a Russian "plan."

On October 22, 2020, the last debate between then-Vice President Biden and President Trump took place at Belmont University in Nashville, Tennessee.[142] After President Trump pressed Vice President Biden about his son's laptop and emails, Biden called the American people's attention to the statement, noting the significance of the intelligence community officials who signed the statement:

| | |
|---|---|
| President Trump: | It's the laptop from hell. |
| Moderator: | President Trump, we're talking about race right now and I do want to stay on the issue of race. President Trump – |
| Vice President Biden: | Nobody – Kristen, I have to respond to that. |
| Moderator: | Please, very quickly. |
| Vice President Biden: | Look, there are 50 former national intelligence folks who said that what this, he's accusing me of is a Russian plan. They have said that this has all the characteristics — four– five former heads of the CIA, both parties, say what he's saying is a bunch of garbage. Nobody believes it except him and his good friend Rudy Giuliani. |
| President Trump: | You mean, the laptop is now another Russia, Russia, Russia hoax? You gotta be – |
| Vice President Biden: | That's exactly what — That's exactly what – |

---

[141] Morell Interview at 78, 102.

[142] Comm. on Presidential Debates, *supra* note 5.

> President Trump:    Is this where you're going? This is where he's going. The laptop is Russia, Russia, Russia?[143]

Two days later, the *Washington Post* took note of Vice President Biden's reliance upon the public statement, noting critically:

> Joe Biden leaned heavily on a letter from former U.S. intelligence and defense officials in Thursday night's debate to argue that Russia orchestrated a disinformation operation allegedly involving damaging information obtained from his son's laptop that was promulgated by President Trump's personal attorney, Rudolph W. Giuliani.
>
> ***
>
> The Biden campaign's decision to lean into accusations of Russian involvement in the episode, despite lacking specific proof, risks eroding public trust in U.S. allegations of foreign election interference if the suspicions in this case turn out to be unfounded, according to intelligence and foreign policy experts.[144]

## B.  The statement's signatories celebrated after the debate.

The signers of the statement were pleased with Vice President Biden's response and his reliance upon the statement during the debate, as emails between them make clear. One signer, Gregory Tarbell, former CIA Deputy Executive Director, wrote that the talking points "worked well during the debate" and applauded Morell, Polymeropoulos, Wood, Shapiro, and others on what the "[g]reat idea" for the statement.[145]



---

143 *Id.*
144 Annie Linskey & Paul Soone, *Biden relies on pattern of activity to blame Russia for release of data from what is said to be his son's laptop*, The Washington Post (Oct. 24, 2020).
145 Email from Gregory Tarbell to Michael Morell (Oct. 23, 2020, 2:25 AM) (on file with the Committees).

54
EXHIBIT 6

In response, Wood stated that Vice President Biden's mention of the statement during the debate "was really cool."[146]

| | |
|---|---|
| **From:** | Kristin W ████████ |
| **Sent:** | 10/23/2020 3:02:06 AM |
| **To:** | Gregory Tarbell ████████ |
| **CC:** | Michael M ████████ ; Marc Polymeropoulos ████████ ; Nick Shapiro |
| | |
| **Subject:** | Re: Thank You!! |

That was really cool.

Hope you are well, Mr. Tarbell!

On Oct 22, 2020, at 10:25 PM, Gregory Tarbell ████████ wrote:

TP worked well during the debate. Great idea guys.

Sent from my iPhone

Polymeropoulos voiced similar sentiments, calling it "very cool."[147]

| | |
|---|---|
| **From:** | Marc Polymeropoulos ████████ |
| **Sent:** | 10/23/2020 4:34:13 AM |
| **To:** | Kristin W ████████ |
| **CC:** | Gregory Tarbell ████████ Michael M ████████ ; Nick Shapiro |
| | |
| **Subject:** | Re: Thank You!! |

I fell asleep! Just saw now....very cool.....

Sent from my iPhone

On Oct 22, 2020, at 23:02, Kristin W ████████ wrote:

That was really cool.

Hope you are well, Mr. Tarbell!

On Oct 22, 2020, at 10:25 PM, Gregory Tarbell ████████ wrote:

TP worked well during the debate. Great idea guys.

Sent from my iPhone

---

[146] Email from Kristin Wood to Gregory Tarbell (Oct. 23, 2020, 3:02 AM) (on file with the Committees).
[147] Email from Marc Polymeropoulos to Kristin Wood (Oct. 23, 2020, 4:34 AM) (on file with the Committees).

Four day earlier, in a private exchange with Morell, Polymeropoulos expressed his appreciation for "including me on this letter." He wrote:

> Thanks again for including me on this letter. I'm glad I could contribute. I am terrified of 11/3. Future of our country, internal and also external to the world, at stake. I'm not usually dramatic, but this is it. For our lifetimes. Four more years of this means I move to the greek [*sic*] islands and bury my head in the sand.[148]



Text message between Michael Morell and Marc Polymeropoulos (Oct. 19, 2020)

Morell testified to the self-satisfaction the signatories felt for their involvement in the presidential debate. He testified:

Q.    And then we also have a number of emails that have been produced

---

[148] Text message from Marc Polymeropoulos to Michael Morell (Oct. 19, 2020, 5:51 PM) (on file with the Committees).

to the committee where the people on – a number of the people who signed it were sort of congratulating each other for the fact that it was, in fact, used in the debate.

A.      Yes, sir.[149]

In a final email to the signatories, Morell expressed his own satisfaction in successfully getting the statement published. He wrote to his co-signatories:

> I think this is the most important election since 1860 and 1864 when the very existence of the country was on the ballot. Now, it is our democracy and the Constitution that are on the ballot. We all, of course, took an oath to "preserve, protect, and defend" the Constitution. I think all of you did that yesterday by signing this letter.[150]

---

[149] Morell Interview at 99.
[150] Email from Michael Morell to Unnamed Intelligence Officials (Oct. 20, 2020, 1:40 PM) (on file with the Committees).

| From: | Michael M ▮▮▮▮▮▮▮▮▮▮ |
|---|---|
| Sent: | Tuesday, October 20, 2020 9:40 AM |
| To: | Michael M |
| Cc: | Marc Polymeropoulos; Kristin Wood; Nick Shapiro |
| Subject: | Thank You!! |

To all,

[I put most everyone on the bcc line to protect email addresses]

I just want to thank everyone for signing the letter on the Hunter Biden emails. We ended up with over 50 signatories.

Politico did a nice job getting out the story of our letter. Here is a link to the article for those who have not seen it. https://www.politico.com/news/2020/10/19/hunter-biden-story-russian-disinfo-430276

We will monitor how much media coverage it gets and will let you know.

I also want to thank Marc for helping to draft the letter, Kristin for helping to spread the word, and Nick for working with the media.

By the way, if any reporters reach out to you, feel free to either talk to them or to send them Nick's way. Nick has the final version of the letter, if any reporters are looking for that (although there is a link to the letter itself in the Politico piece).

I think this is the most important election since 1860 and 1864 when the very existence of the country was on the ballot. Now, it is our democracy and the Constitution that are on the ballot. We all, of course, took an oath to "preserve, protect, and defend" the Constitution. I think all of you did that yesterday by signing the letter. Thank you.

Michael

**C. The Biden campaign called Morell and thanked him for his service to the campaign.**

After the October 22, 2020, presidential debate, Biden campaign chairman Steve Ricchetti called Morell and thanked him for the statement. Morell testified:

Q. Did you talk to [Steve Ricchetti] at all regarding the statement that you helped organize and put out?

A. Yes, sir.

Q. When did you talk with him?

A. After the debate – I think it was after the debate – in fact, I'm pretty sure it was after the debate – I got a phone call from Jeremy Bash, who I work with at Beacon and who is active politically. And Jeremy said: Do you have a minute to talk to Steve Ricchetti? I said: Of course. He was the head of the Biden campaign at the time. And

Jeremy got him on the line, and Steve thanked me for putting the statement out.[151]

---

[151] Morell Interview at 96-97.

### V.      Some signatories expressed outrage about Congressional oversight into the origins of the statement.

The Committees are in possession of emails exchanged among some of the senior former intelligence officials following the Committees' oversight requests regarding the origins of the statement. While the Committees fully recognize and respect every Americans' right to engage in the political process, the Committees have a legitimate legislative purpose in understanding how these officials used their intelligence credentials and official titles to mislead American voters about serious Biden family allegations in the final days before the 2020 election.

The emails exchanged following the Committees' oversight suggest outrage among some signatories for having to explain the origins of the statement. Former National Security Agency Director Michael Hayden asked some co-signers—including Morell, John Brennan, Jeremy Bash, Thomas Fingar, and others—if they "should have a coordinated response."[152] Brennan responded that he would voice his "strong opposition to such political tactics," asserting that complying with the Committees' request for documents and testimony "would serve as a precedent that [Chairman Jordan] and others could seek to leverage when making frivolous requests of other former intelligence officials in the future."[153]



---

[152] Email from Michael Hayden to Jim Clapper et al. (Feb. 7, 2023, 1:11 PM) (on file with the Committees).
[153] Email from John Brennan to Michael Hayden (Feb. 7, 2023, 2:18 PM) (on file with the Committees).



Morell, to his credit, rejected Hayden's suggestion to coordinate a response, counseling his former colleagues: "If at least some of us respond, I think it would be a mistake to coordinate. We would, for sure, be accused of a conspiracy to obstruct a Congressional investigation."[154]



---

[154] Email from Michael Morell to Michael Hayden et al. (Feb. 7, 2023, 1:39 PM) (on file with the Committees).

---

**Conclusion**

---

The American people deserve to know that Hunter Biden's laptop and emails were real. They always were real. The allegations that they were the product of Russian disinformation were false. Even the *New York Times* was forced to acknowledge, almost two years after the 2020 election, "a cache of files that appears to have come from a laptop abandoned by [Hunter] Biden in a Delaware repair shop" was "authenticated by people familiar with them and with the investigation."[155]

On the morning of October 19, 2020, at least 12 hours before the statement was released by *Politico*, then-Director Ratcliffe publicly stated, on behalf of the intelligence community, that Hunter Biden's laptop and emails were not Russian disinformation.[156] Within 24 hours of then-Director Ratcliffe's statement, the Department of Justice and the FBI confirmed his declaration.[157]

Reflecting on that moment, former-Director Ratcliffe recently stated:

> You had the intelligence community and the law enforcement community on behalf of the United States of America saying this is not Russian disinformation. . . . You have literally had the Bidens lie about it—Hunter Biden, Joe Biden, the Biden administration, Biden White House officials, the Democratic Party, Democratic politicians, the left-leaning media. . .
>
> The gaggle of former intelligence and law enforcement officials— you know—the famous 51 . . . . All of this was really a domestic disinformation campaign for political reasons. . . . There is no other explanation for it.
>
> The people that had access to the intelligence and had possession of Hunter Biden's laptop . . . all of the people in a position to talk about the evidence and the intelligence told the American people the truth.[158]

As the *Wall Street Journal* opined, the American people will "never know what effect the 'October Surprise' of 2020, the New York Post's reporting of the discovery of a laptop belonging to Hunter Biden containing all sorts of embarrassing emails, might have had on the election that year if it had received wider circulation."[159] Former Attorney General William Barr

---

[155] Katie Benner et al., *Hunter Biden Paid Tax Bill, but Broad Federal Investigation Continues*, N.Y. TIMES (Mar. 16, 2022).
[156] Moore, *supra* note 87.
[157] Perez, *supra* note 91.
[158] Brooke Singman, *Ratcliffe: Hunter Biden laptop was a partisan domestic 'disinformation campaign'*, FOX NEWS (Feb. 2, 2023).
[159] Gerard Baker, *Hunter Biden's Laptop and America's Crisis of Accountability*, WALL ST. J. (Mar. 21, 2022).

believes the suppression of the Hunter Biden laptop story "probably affected the outcome" of the 2020 election, "given how close the election was."[160]

On November 3, 2020, the American people went to the polls to elect the president of the United States with the false impression that Hunter Biden's laptop was Russian disinformation. The American people cannot get back the 2020 election, but they have every right to demand reforms from Congress so that the 2024 election will not be similarly compromised.

The United States is witnessing in real time the growth of a censorship industrial complex, in which partisan "experts"—like the former intelligence officials who signed the statement—reserve for themselves the right to determine what is and is not true and what Americans can and cannot hear. Indeed, in the weeks leading up to the 2020 election, a writer for the *New York Times* observed that, in the United States, "[f]ree speech threatens democracy as much as it also provides for its flourishing."[161] To address this threat, progressive "experts prescribe[] two critical steps: [1] America must become less free and [2] less democratic. . . ."[162] These goals, in their view, will only be achieved by "following the wisdom of disinformation experts and outgrowing our parochial attachment to the Bill of Rights."[163] This is frightening and shows why the Committees' oversight is so important.

There is a direct line between Twitter's continued suppression of the *New York Post* story on Hunter Biden's laptop and the statement by the former intelligence officials. One disinformation commentator captured the significance of the censorship of the Hunter Biden laptop and emails story to American democracy and self-government:

> The laptops are real. The FBI has known this since 2019, when it first took possession of them. When the *New York Post* attempted to report on them, dozens of the most senior national security officials in the United States lied to the public, claiming the laptops were likely part of a Russian "disinformation" plot. Twitter, Facebook, and Google, operating as fully integrated branches of the state security infrastructure, carried out the government's censorship orders based on that lie. The press swallowed the lie and cheered on the censorship.
>
> The story of the laptops has been framed as many things, but the most fundamental truth about it is that it was the successful culmination of the yearslong effort to create a shadow regulatory bureaucracy built specifically to prevent a repeat of Trump's 2016 victory.

---

[160] Jerry Dunleavey, *Barr says Hunter Biden Russian disinformation claims 'probably affected' election outcome,* WASHINGTON EXAMINER (Mar. 22, 2022).

[161] Emily Bazelon, *The Problem of Free Speech in an Age of Disinformation*, N.Y. TIMES (Oct. 13, 2020) (internal quotations marks and citation omitted).

[162] Jacob Siegel, *A Guide to Understanding the Hoax of the Century*, TABLET (Mar. 28, 2023).

[163] *Id.*

> It may be impossible to know exactly what effect the ban on reporting about Hunter Biden's laptops had on the 2020 vote, but the story was clearly seen as threatening enough to warrant an openly authoritarian attack on the independence of the press. The damage to the country's underlying social fabric, in which paranoia and conspiracy have been normalized, is incalculable.[164]

This interim report presents the material facts the Committees have learned to date about the origins of the public statement signed by 51 former intelligence officials that falsely discredited—on the eve of the 2020 presidential election—legitimate allegations about the Biden family's influence-peddling operation. The Committees present this information now to keep the House of Representatives appraised of our oversight work. The Committees' oversight into this matter continues in earnest.

---

[164] *Id.*



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

October 20, 2020

The Honorable Ron Johnson
Chairman
Committee on Homeland Security and
  Governmental Affairs
United States Senate
Washington, D.C.  20510

Dear Chairman Johnson:

This responds to your letter, dated October 17, 2020, to the Federal Bureau of Investigation (FBI) regarding the authenticity of certain information provided to your Committee, including whether such information is linked to a foreign adversary's influence operation or is otherwise fraudulent.  You also ask several questions about a laptop computer reportedly produced pursuant to a grand jury subpoena.

As you may know, the Office of the Director of National Intelligence has advised the American public that, in advance of the 2020 election, a number of nation-states plan to use covert and overt influence measures in an attempt to sway voter preferences and perspectives, sow discord in the United States, and undermine the confidence of Americans in our democratic process.  The FBI is the primary investigative agency responsible for the integrity and security of the 2020 election, and as such, we are focused on an array of threats, including the threat of malign foreign influence operations.  Regarding the subject of your letter, we have nothing to add at this time to the October 19th public statement by the Director of National Intelligence about the available actionable intelligence.  If actionable intelligence is developed, the FBI in consultation with the Intelligence Community will evaluate the need to provide defensive briefings to you and the Committee pursuant to the established notification framework.

Finally, as the FBI advised the Committee in its letter, dated October 5, 2020, consistent with longstanding Department of Justice (Department) policy and practice, the FBI can neither confirm nor deny the existence of any ongoing investigation or persons or entities under investigation, including to Members of Congress.  As the Inspector General firmly reminded the Department and the FBI in recent years, this policy is designed to preserve the integrity of all Justice Department investigations and the Department's ability to effectively administer justice without political or other undue outside influences.  Therefore, the FBI cannot provide any additional information in response to the enumerated questions in your letter.

Thank you for your support of the FBI, its mission, and its people.

Sincerely,

Jill C. Tyson
Assistant Director
Office of Congressional Affairs

EXHIBIT 7

The Honorable Ron Johnson
Page Two


cc:     The Honorable Gary Peters, Ranking Member
        Senate Committee on Homeland Security and Governmental Affairs

EXHIBIT 7



**State of California**

**Office of the Attorney General**

XAVIER BECERRA
ATTORNEY GENERAL

October 19, 2020

Mark Zuckerberg
Chairman and Chief Executive Officer
Facebook, Inc.
1 Hacker Way
Menlo Park, CA 94025

Jack Dorsey
Chief Executive Officer
Twitter, Inc.
1355 Market Street, #900
San Francisco, CA 94103

Susan Wojcicki
Chief Executive Officer
YouTube, Inc.
901 Cherry Avenue
San Bruno, CA 94066

RE:  Election Interference via Social Media

Dear Messrs. Zuckerberg, Dorsey, and Ms. Wojcicki:

I write to express my concerns about the role of social media in spreading disinformation designed to harm our elections and democracy.  All of your companies report to have undertaken efforts recently to address the use of your platforms to interfere with free and fair elections.  I expect that you will see these efforts through and urge you to: (1) report illegal activity occurring on your platforms to appropriate law enforcement agencies, including my office; (2) continue to re-evaluate the need for revision to your policies as new threats arise, and most importantly; (3) consistently, transparently, and aggressively address violations of your policies with respect to disinformation and violations of state and federal law.

For years, your companies have operated multiple social media platforms, including Facebook, Instagram, YouTube, and Twitter.  During this time, Americans have increasingly relied on social media as a primary source of news and political discourse.  By 2016, nearly six in ten Americans relied on social media to get their news, and 44% of Americans got their news

EXHIBIT 8

Mark Zuckerberg
Jack Dorsey
Susan Wojcicki
October 19, 2020
Page 2

from Facebook.[1]  Yet, while social media can facilitate access to information and political engagement, it also leaves us vulnerable to coordinated disinformation attacks against fundamental democratic institutions, such as elections.

In 2016, the Russian government used social media to launch a brazen attack against the United States' political system.[2]  This attack exposed and exploited our nation's latent societal divisions, undermined Americans' trust in our democratic institutions, and was designed to influence our presidential election.  These efforts succeeded in part by cynically targeting African Americans and other historically disenfranchised groups with advertising designed to deter them from voting.

As we approach the 2020 presidential election, it has been reported that social media platforms are again being utilized to spread disinformation designed to stoke social and political divisions; suppress voting among certain groups; and attack the integrity of electoral processes, including vote-by-mail, which has become even more critical in light of safety concerns surrounding COVID-19.[3]  As California's Attorney General, I am sworn to enforce all laws protecting the civil rights of our residents, including the right to vote.  I urge you to employ your immense resources, tools, and familiarity with the operation of your social media platforms to prevent conduct that violates your policies and/or state and federal law.

---

[1] Jeffrey Gotfield & Elisa Shearer, *News Use Across Social Media Platforms 2016*, Pew Research Center (May 26, 2016), https://www.journalism.org/2016/05/26/news-use-across-social-media-platforms-2016/.

[2] *See, generally,* U.S. Senate, Report of the Select Committee on Intelligence on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume II: Russia's Use of Social Media, S. Rep. No. 116-XX (2019) (hereinafter "Senate Report Vol. II"), https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume2.pdf; *see also* Indictment, *United States v. Internet Research Agency, et al.*, Case 1:18-cr-00032-DLF (D.D.C. Feb. 16, 2018), https://www.justice.gov/file/1035477/download.

[3] *See* Craig Timberg & Isaac Stanley-Becker, *Fake Twitter Accounts Posing as Black Trump Supporters Appear, Reach Thousands, Then Vanish*, Wash. Post (Oct. 13, 2020), https://www.washingtonpost.com/technology/2020/10/13/black-fake-twitter-accounts-for-trump/; Julian E. Barnes & Adam Goldman*, Russia Trying to Stoke U.S. Racial Tensions Before Election, Officials Say*, N.Y. Times (Mar. 10, 2020), https://www.nytimes.com/2020/03/10/us/politics/russian-interference-race.html; David E. Sanger & Zolan Kanno-Youngs, *The Russian Trolls Have a Simpler Job Today. Quote Trump.*, N.Y. Times (Sept. 22, 2020), https://www.nytimes.com/2020/09/22/us/politics/russia-disinformation-election-trump.html.

EXHIBIT 8

Mark Zuckerberg
Jack Dorsey
Susan Wojcicki
October 19, 2020
Page 3

## I.      The State of California Has a Mandate to Protect its Citizens' Voting Rights.

California has a significant interest in protecting its citizens' constitutional right to vote. State laws protect citizens by, for example, prohibiting interference with voting rights through violence, threats, intimidation, and other coercive conduct (*see, e.g.,* Civ. Code, § 52.1(b); Elec. Code, §§ 18502, 18540).  State laws also prohibit knowingly distributing intentionally misleading information about the time, place, manner of voting, and voter eligibility (*see, e.g.,* Elec. Code, §§ 18302, 18543).  To further protect voters, state law requires social media companies that sell political advertisements to disclose who funded certain political advertisements and maintain an online record of such advertisements for public inspection (*see, e.g.,* Gov. Code, § 84504.6).

The California Department of Justice will not hesitate to enforce these laws against any individual or group that violates them.  However, given social media's prominence and influence in American political discourse, you share a responsibility to use the tools at your disposal to combat the dissemination of disinformation that interferes with our electoral system and to report any illegal activity detected on your respective social media platforms that interferes with Americans' right to vote.

## II.     The Use of Social Media to Undermine U.S. Democratic Institutions and Attack Civil Rights.

Social media manipulation was an integral component of Russia's effort to incite political division and discord, undermine Americans' confidence in U.S. electoral systems, and influence the outcome of the 2016 presidential election.  According to the Senate Select Committee on Intelligence, the Kremlin-backed Internet Resource Agency (IRA), armed with false American identities:

> used targeted advertisements, intentionally falsified news articles, self-generated content, and social media platform tools to interact with and attempt to deceive tens of millions of social media users in the United States. This campaign sought to polarize Americans on the basis of societal, ideological, and racial differences, provoked real world events, and was part of a foreign government's covert support of Russia's favored candidate in the U.S. presidential election.[4]

---

[4] Senate Report Vol. II, *supra* n.2 at p. 3.

EXHIBIT 8

Mark Zuckerberg
Jack Dorsey
Susan Wojcicki
October 19, 2020
Page 4

A key component of the IRA's interference effort involved deliberately targeting African Americans with posts and advertisements designed to minimize the African American vote.[5]  In fact, "no single group of Americans was targeted … more than African Americans."[6]  Tactics to suppress African American voter participation included embedding overtly anti-Hillary Clinton ads among memes and content that appealed to African Americans who were angered over police violence, and targeting African American supporters of Clinton with false information about how and when they could vote.[7]

The reach of Russia's social media influence campaign was vast.  In 2017, Facebook identified 470 IRA-controlled Facebook accounts that collectively made 80,000 posts between January 2015 and August 2017, and estimated that the IRA's Facebook content reached approximately 126 million users.  Twitter identified 3,814 IRA-controlled accounts and notified approximately 1.4 million people who Twitter believed may have been in contact with an IRA-controlled account.  Google similarly identified two accounts linked to the IRA that purchased advertisements and 18 YouTube channels associated with the IRA that posted 43 hours of content in 1108 videos.[8]

### III.    The Renewed Threat of Social Media Disinformation Campaigns in 2020.

We are now less than three weeks away from a presidential election that is proceeding against the extraordinary backdrop of a worldwide pandemic.  As in 2016, social media is playing a significant role in election-related discourse in the United States, and remains a conduit for disinformation campaigns targeting U.S. electoral systems and voters, including but not

---

[5] IRA operatives targeted African Americans using locational targeting "aimed at African Americans in key metropolitan areas with well-established black communities and flashpoints in the Black Lives Matter movement" and by establishing false group pages such as "Blacktivist" on Facebook and Instagram.  (Senate Report Vol. II, *supra* n.2 at p. 38.)

[6] Senate Report Vol. II, *supra* n.2 at p. 38 (noting that over 66% of IRA's advertising content contained a race-related terms, and most of its locational targeting was aimed at African Americans in metropolitan areas).

[7] For example, IRA used the Instagram account "Woke Blacks" to post a message stating: "a particular hype and hatred for Trump is misleading the people and forcing Blacks to vote Killary." (Indictment, *supra* n.2 at ¶ 46(a)).  *See also id.* at ¶ 46(b) (noting a November 3, 2016 post on the IRA controlled Instagram account "Blacktivist" stating: "Choose peace and vote for Jill Stein. Trust me, it's not a wasted vote."); *see also* Jane Mayer, *How Russia Helped Swing the Election for Trump*, New Yorker (Oct. 1, 2018), https://www.newyorker.com/magazine/2018/10/01/how-russia-helped-to-swing-the-election-for-trump.

[8] Senate Report Vol. II, *supra* n.2 at pp. 45-58; Sheera Frenkel & Katie Benner, *To Stir Discord in 2016, Russians Turned Most Often to Facebook,* N.Y. Times (Feb. 17, 2018), https://www.nytimes.com/2018/02/17/technology/indictment-russian-tech-facebook.html.

EXHIBIT 8

Mark Zuckerberg
Jack Dorsey
Susan Wojcicki
October 19, 2020
Page 5

limited to, efforts by foreign entities.  Yet these tactics have become more sophisticated and harder to detect.

For example, according to multiple reports, Russia continues to recycle and refine the disinformation techniques it employed in 2016, including: (1) promoting President Trump's candidacy while disparaging former Vice President Joe Biden; and (2) building the capacity to target African American social media users with content aimed at suppressing their voting power.[9]  Russia has also improved the way it conceals its involvement in disinformation campaigns, in part, by using proxy voices to spread state media under the guise of fringe journalism, and by developing better methods of disguising its surreptitious social media presence.[10]

Most alarming is Russia's recent shift in focus to discrediting U.S. electoral processes, including vote-by-mail, which states have necessarily adopted or expanded during the COVID-19 pandemic to allow Americans to vote while still physically distancing.  Specifically, Russian-controlled proxy sites and social media accounts have: (1) published and amplified unverified claims that vote-by-mail systems are associated with widespread voter fraud, ballot destruction, and unreliable ballot collection and delivery; and (2) falsely conjectured that vote-by-mail was developed to benefit "specific candidates and influence election outcomes."[11]

Your companies have undertaken reforms to curb the dissemination of harmful disinformation through social media.  Each of your companies is now equipped with robust policies that prohibit much of the disinformation, coordinated inauthentic behavior, and election interference exhibited in 2016, and you have taken action pursuant to those policies, including:

---

[9] U.S. Dep't of Homeland Security, *Homeland Threat Assessment* (Oct. 2020), https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-assessment.pdf; Žilvinas Švedkauskas, *Russia's Disinformation Campaigns Are Targeting African Americans*, Wash. Post (July 24, 2020), https://www.washingtonpost.com/politics/2020/07/24/russias-disinformation-campaigns-are-targeting-african-americans/.

[10] U.S. State Dep't, Global Engagement Center, *GEC Special Report: Pillars of Russia's Disinformation and Propaganda Ecosystem* (Aug. 2020), https://www.state.gov/wp-content/uploads/2020/08/Pillars-of-Russia%E2%80%99s-Disinformation-and-Propaganda-Ecosystem_08-04-20.pdf; Young Mie Kim, *New Evidence Shows How Russia's Election Interference Has Gotten More Brazen*, Brennan Center for Justice (Mar. 5, 2020), https://www.brennancenter.org/our-work/analysis-opinion/new-evidence-shows-how-russias-election-interference-has-gotten-more.

[11] U.S. Dep't Homeland Security, Office of Intelligence and Analysis, *Russia Likely to Continue Seeking to Undermine Faith in U.S. Electoral Process*, Intelligence in Focus (Sept. 3, 2020), https://info.publicintelligence.net/DHS-RussiaUnderminingElection.pdf.

EXHIBIT 8

Mark Zuckerberg
Jack Dorsey
Susan Wojcicki
October 19, 2020
Page 6

- <u>Twitter</u>: eliminating political advertising,[12] banning fake media likely to cause harm,[13] modifying its Civic Integrity Policy to prohibit manipulating or interfering in elections or other civic processes;[14]
- <u>YouTube</u>: removing content that (1) contains hacked material, "the disclosure of which may interfere with democratic processes," like elections and censuses; or (2) encourages others to interfere with democratic processes, such as obstructing or interrupting voting procedures;[15] and
- <u>Facebook</u>: (1) restricting political ads in the week before the election and on election day and night; (2) removing posts claiming that people will get COVID-19 if they take part in voting, and attaching a link to authoritative information about the coronavirus to posts that appear to use COVID-19 to discourage voting; (3) affixing informational labels to content that seeks to delegitimize the outcome of the election or discuss the legitimacy of voting methods; and (4) adding explanatory labels to candidate or campaign posts prematurely declaring victory before final election results come in.[16]

Despite these efforts, a recent study conducted by the German Marshall Fund concluded that user engagement with false and misleading information on social media has increased since 2016.[17]  More troubling is the prevalence of disinformation about vote-by-mail systems on social

---

[12] Avie Schneider & Shannon Bond, *Twitter To Halt Political Ads, In Contrast To Facebook*, NPR (Oct. 30, 2019), https://www.npr.org/2019/10/30/774865522/twitter-to-halt-political-ads-in-contrast-to-facebook; Jack Dorsey Twitter Account (Oct. 30, 2019), https://twitter.com/jack/status/1189634360472829952.

[13] Twitter, *Building rules in public: Our approach to synthetic & manipulated media* (Feb. 4, 2020), https://blog.twitter.com/en_us/topics/company/2020/new-approach-to-synthetic-and-manipulated-media.html; Twitter, *Synthetic and manipulated media policy*, https://help.twitter.com/en/rules-and-policies/manipulated-media.

[14] Twitter, *Civic integrity policy* (Sept. 2020) https://help.twitter.com/en/rules-and-policies/election-integrity-policy; Twitter, *Expanding our policies to further protect the civic conversation* (Sept. 10, 2020), https://blog.twitter.com/en_us/topics/company/2020/civic-integrity-policy-update.html.

[15] YouTube, *An update on how youtube supports elections* (Aug. 13, 2020), https://blog.youtube/news-and-events/an-update-on-how-youtube-supports-elections/.

[16] Facebook, *New Steps to Protect the US Elections* (Sept. 3, 2020), https://about.fb.com/news/2020/09/additional-steps-to-protect-the-us-elections/; Facebook, *Preparing for Election Day* (Oct. 7, 2020), https://about.fb.com/news/2020/10/preparing-for-election-day/.

[17] Karen Kornbluh et al., *New Study by Digital New Deal Finds Engagement with Deceptive Outlets Higher on Facebook Today Than Run-up to 2016 Election*, German Marshall Fund (October 12, 2020), https://www.gmfus.org/blog/2020/10/12/new-study-digital-new-deal-finds-engagement-deceptive-outlets-higher-facebook-today.

EXHIBIT 8

Mark Zuckerberg
Jack Dorsey
Susan Wojcicki
October 19, 2020
Page 7

media.[18]  For example, between April 1, 2020 and July 1, 2020, nearly half of the top-50 performing Facebook posts that mentioned vote-by-mail were false or misleading.[19]

We appreciate that you must work to find a delicate balance in fostering the free exchange of ideas and opinions while ensuring that your platforms are not used to spread harmful disinformation.  However, as urged in Facebook's Internal Civil Rights Audit, social media platforms must implement a "stronger interpretation of [their] voter suppression policies" to help mitigate the real world threat that the spread of election-related disinformation on social media poses to our elections.[20]

The real world threat to our upcoming election is significant.  We urge you to enforce your policies against disinformation, voter suppression, and coordinated inauthentic behavior aggressively, consistently and transparently, and to preserve these efforts for review and evaluation after the 2020 election concludes.  To the extent that you discover activities that violate the law, my office stands ready to offer assistance.

Sincerely,

XAVIER BECERRA
Attorney General

---

[18] Davey Alba, *How Voting by Mail Tops Election Misinformation*, N.Y. Times (Sept. 30, 2020), https://www.nytimes.com/2020/09/30/technology/how-voting-by-mail-tops-election-misinformation.html.
    [19] Ryan McCarthy, "*Outright Lies": Voting Misinformation Flourishes on Facebook*, ProPublica (July 16, 2020), https://www.propublica.org/article/outright-lies-voting-misinformation-flourishes-on-facebook.
    [20] Laura W. Murphy, et al., *Facebook's Civil Rights Audit – Final Report* at p. 22 (July 8, 2020) https://about.fb.com/wp-content/uploads/2020/07/Civil-Rights-Audit-Final-Report.pdf.

EXHIBIT 8

# POLITICO



# Transcript: Jeff Sessions' testimony on Trump and Russia



Attorney General Jeff Sessions testifies Tuesday during a Senate Select Committee on Intelligence hearing on Capitol Hill. | AFP/Getty

By POLITICO STAFF
06/13/2017 03:14 PM EDT
Updated: 06/13/2017 07:45 PM EDT

   

*A transcript of Attorney General Jeff Sessions' testimony before the Senate Intelligence Committee on June 13.*

**CHAIRMAN RICHARD BURR**: Attorney General Sessions, appreciate your willingness to appear before the committee today. I thank you for your years of dedicated service as a member of this body, and your recent leadership at the Department of Justice. As I mentioned when Director Comey appeared before us last week, this committee's role is to be the eyes and ears for the other 85

EXHIBIT 9

members of the United States Senate and for the American people, ensuring that the intelligence community is operating lawfully and has the necessary tools to keep America safe. The community is a large and diverse place.

We recognize the gravity of our investigation into Russia's interference in the 2016 U.S. elections, but I remind our constituents that, while we investigate Russia, we are scrutinizing CIA's budget, while we are investigating Russia, we are still scrutinizing CIA's budget, NSA's 702 program, our nation's satellite program, and the entire IC effort to recruit and retain the best talent we can find in the world. More often than not, the committee conducts its work behind closed doors, a necessary step to ensure that our most sensitive sources and methods are protected. The sanctity of these sources and methods are at the heart of the intelligence community's ability to keep us safe and to keep our allies safe from those who seek to harm us.

I've said repeatedly that I did not believe any committee -- that the committee does should be done in public. But I also recognize the gravity of the committee's current investigation and the need for the American people to be presented the facts so that they might make their own judgments. It is for that reason that this committee has now held its tenth open hearing of 2017--more than double that of the committee in recent years, and the fifth on the topic of Russian interference. Attorney General Sessions, this venue is your opportunity to separate fact from fiction and to set the record straight on a number of allegations reported in the press. For example, there are several issues that I'm hopeful we will address today. One, did you have any meetings with Russian officials or their proxies on behalf of the Trump campaign or during your time as attorney general? Two, what was your involvement with candidate Trump's foreign policy team and what were their possible interactions with Russians? Three, why did you decide to recuse yourself from the government's Russia investigation? And, fourth, what role, if any, did you play in the removal of then-FBI director Comey? I look forward to a candid and honest discussion as we continue to pursue the truth behind Russia's interference in the 2016 elections. The committee's experienced staff is interviewing the relevant parties, having spoken to more than 35 individuals to

date--to include just yesterday, an interview of former Homeland Security Secretary Jeh Johnson. We also continue to review some of the most sensitive intelligence in our country's possession.

As I've said previously, we will establish the facts, separate from rampant speculation, and lay them out for the American people to make their own judgment. Only then will we as a nation be able to put this episode to rest and look to the future. I'm hopeful that members will focus their questions today on the Russia investigation and not squander the opportunity by taking political or partisan shots.

The Vice Chairman and I continue to lead this investigation together on what is a highly charged political issue. We may disagree at times, but we remain a unified team with a dedicated, focused and professional staff working tirelessly on behalf of the American people to find the truth. The committee has made much progress as the political winds blow forcefully around us, and I think all members would agree that despite a torrent of public debate on who and what committee might be best suited to lead on this issue, the intelligence committee has lived up to its obligation to move forward with purpose and above politics. Mr. Attorney General, it's good to have you back. I would now turn to the vice chairman for any remarks he might have.

**VICE CHAIRMAN MARK WARNER**: Thank you, Mr. Chairman. And I want to also thank the way that we're proceeding on this investigation. Mr. Attorney General, it is good to see you again. And we appreciate your appearance on the heels of Mr. Comey's revealing testimony last week.

I do, though, want to take a moment at the outset and first express some concern with the process by which we are seeing you, the attorney general, today. It is my understanding that you were originally scheduled to testify in front of the House and Senate Appropriations committees today. I know those appearances have been canceled to come here instead. While we appreciate his testimony, before our committee, I believe -- and I believe I speak for many of my colleagues -- that I believe he should also answer questions from members of those committees and the Judiciary Committee as well. Mr. Attorney

EXHIBIT 9

General, it's my hope that you will reschedule those appearances as soon as possible.

In addition, I want to say at the outset that while we consider your appearance today as just the beginning of our interaction with you and your department, Mr. Attorney General, we had always expected to talk to you as part of our investigation. We believed it would be actually later in the process. We're glad to accommodate your request to speak to us today, but we also expect to have your commitment to cooperate with all future requests and make yourself available, as necessary, to this committee for, as the chairman indicated with be this very important investigation.

Now let's move to the subject of today's discussion. Let's start with the campaign. You were an early and ardent supporter of Mr. Trump. In March, you were named as chairman of the Trump campaign's national security advisory committee. You were much more than a surrogate, you were strategic advisor who helped shape much of the campaign's national security strategy. No doubt, you will have key insights about some of the key Trump associates that were seeking to hear from in the weeks ahead.

Questions have also been raised about some of your own interactions with Russian officials during the campaign. During your confirmation hearing in January you said, "You did not have communications with Russians. Senator Leahy later asked you in writing whether you had been in contact with anyone connected to any part of the Russian government about the 2016 election. You answered, I believe with a definitive, no. Despite that fact, despite that, the fact is, as we discovered later, that you did have interactions with Russian government officials during the course of the campaign.

In March you acknowledged two meetings with the Russian ambassador. Yet, there has been public reports of a possible third meeting at the Mayflower Hotel on April 27th. I hope that today, you will help clear up the discrepancies. We'd also expect and I hope you will be able to provide the committee with any documents we need to shed light on the issue such as e-mails or calendars.

Then there is a topic of the firing of former Director Comey. Last Thursday, we received testimony from Mr. Comey under oath. He outlined his troubling interactions with the president as well as the circumstances of his firing. A few disturbing points stood out. Mr. Comey, who has decades of experience at the Department of Justice and the FBI serving under presidents of both parties was so unnerved by the actions of the president that he felt compelled to fully document every interaction they had.

Mr. Comey sat where you are sitting today and testified that he was concerned that the President of the United States might lie about the nature of their meetings. That's a shocking statement from one of the nation's top law enforcement official. We heard that Director Comey took it as a direction from the president that he was to drop the FBI's investigation into former adviser Mike Flynn. Finally, we heard from Mr. Comey that he believes he was fired over his handling of the Russia investigation. The president himself confirmed this in statements to the media. This is deeply troubling for all of us who believe on both sides in preserving the Independence of the FBI.

We have a lot of work in order to follow-up on these alarming disclosures. Mr. Attorney General, your testimony today is an opportunity to begin the process of asking those questions. For instance again, I know others will ask about this: You recused yourself from the Russia investigation and participated in the firing over the handling of that same investigation. We want to ask how you view your recusal and whether you believe you complied fully. We heard from Mr. Comey that the president asked to you leave the Oval Office so he could speak one-on-one with Mr. Comey. Again, a very concerning action. We will need to hear from you about how you viewed the president's request and whether you thought it was appropriate. We also want to know if you are aware of any attempts by the president to enlist leaders in the intelligence community to undermine this same Russia investigation.

Most importantly, our committee will want to hear what you are doing to ensure that the Russians or any other foreign adversaries cannot attack our

EXHIBIT 9

democratic process like this ever again. I'm concerned that the president still does not recognize the severity of the threat. He, to date, has not acknowledged the conclusions of the intelligence community that Russia massively intervened in our elections. The threat we face is real. It's not limited to us. The recent effects in France gives us a stark reminder that all western democracies must take steps to protect themselves. The United States can and must be a leader in this effort, but it will require the administration to get serious about this. Finally, we have seen a concerning pattern of administration officials refusing to answer public, unclassified questions about allegations about the president in this investigation. We had a hearing with this subject last week. I want to commend the chairman who at the end of that hearing made clear that our witnesses, it was not acceptable for them to come forward without answers. The the American people deserve to hear what's going on here. Thank you Mr. Chairman, I look forward to the witness' testimony.

**ATTORNEY GENERAL JEFF SESSIONS:** Thank you very much, Chairman Burr and ranking member Warner for allowing me to publicly appear before your committee today. I appreciate the committee's critically important efforts to investigate Russian interference with our democratic processes.

Such interference can never be tolerated and I encourage every effort to get to the bottom of any such allegations. As you know, the Deputy Attorney General has appointed a special counsel to investigate the matters related to the Russian interference in the 2016 election. I'm here today to address several issues that have been specifically raised before this committee. And I appreciate the opportunity to respond to questions as fully as the Lord enables me to do so. As I advise you, Mr. Chairman, with long standing Department of Justice practice, I cannot and will not violate my duty to protect confidential communications I have with the president. Let me address issues directly. I did not have any private meetings, nor do I recall any conversations, with any Russian officials at the Mayflower hotel.

I did not attend any meetings separately prior to the speech attended by the president today. I attended a reception with my staff, that included at least two dozen people and President Trump, though I do recall several conversations I had during that pre-speech reception, and I do not have recollection of meeting or talking to the Russian ambassador or any other Russian officials. If any brief interaction occurred in passing with the Russian ambassador in that reception, I do not remember it. After the speech, I was interviewed by the news media. There was an area for that in a different room and then I left the hotel. Whether I attended a reception where the Russian ambassador was also present is entirely beside the point of this investigation into Russian interference in the 2016 campaign.

Let me state this clearly, colleagues. I have never met with or had any conversation with any Russians or any foreign officials concerning any type of interference with any campaign or election in the United States. Further, I have no knowledge of any such conversations by anyone connected to the Trump campaign. I was your colleague in this body for 20 years, at least some of you. And the suggestion that I participated in any collusion that I was aware of, any collusion with the Russian government to hurt this country which I have served with honor for 35 years, or to undermine the integrity of our democratic process an appalling and detestable lie. Relatedly, there is the assertion that I did not answer Senator Franken's question honestly in my confirmation hearing.

Colleagues, that is false. I can't say colleagues now. I'm no longer a part of this body, but a former colleague. That is false. This is what happened. Senator Franken asked me a rambling question after some six hours of testimony that included dramatic new allegations that the United States intelligence community, the U.S. intelligence community had advised President-elect Trump "That there was a continuing exchange of information during the campaign between Trump's surrogates and intermediaries for the Russian government." I was taken aback by that explosive allegation which he said was being reported as breaking news that very day, in which I had not heard. I

wanted to refute that immediately. Any suggestion that I was part of such an

I replied to Senator Franken this way. "Senator Franken, I'm not aware of any of those activities. I have been called a surrogate a time or two in that campaign and I did not have communications with the Russians and I'm unable to comment on it."

That was the context in which I was asked the question and in this that context my answer was a fair and correct response to the charge as I understood it. I was responding to the allegation That surrogates had been meeting with Russians on a regular basis. It simply did not occur to me to go further than the context and to list any conversations that I may have had with Russians in routine situations as I had many routine meetings with other foreign officials.

So please hear me now. It was only in March, after my confirmation hearing, that a reporter asked my spokesperson whether I had ever met with any Russian officials. This was a first time that question had squarely been posed to me. On the same day, we provided that reporter with the information related to the meeting that I and my staff held in my Senate office with Ambassador Kislyak as well as the brief encounter in July after a speech that I had given during the convention in Cleveland, Ohio.

I also provided the reporter with a list of 25 foreign ambassador meetings that I had had during 2016. In addition, I provided supplemental testimony to the Senate Judiciary Committee to explain this event. So I readily acknowledged these two meetings and certainly not one thing happened that was improper in any one of those meetings. Let me also explain clearly the circumstances of my recusal from the investigation into the Russian interference with the 2016 election. Please, colleagues, hear me on this. I was sworn in as Attorney General on Thursday, February 9th. The very next day as I had promised to the judiciary committee I would do at least at an early date, I met with the career department officials including a senior ethics official to discuss things publicly reported in the press that might have some bearing on whether or not I should recuse myself in this case. From that point, February 10th until I announced my formal recusal on March 2nd, I was never briefed on any investigative

EXHIBIT 9

details, did not access any information about the investigation. I received only the limited information that the department's career officials determined was necessary for me to form and make a recusal decision.

As such, I have no knowledge about this investigation as it is ongoing today beyond what has been reported. I don't even read that carefully. I have taken no action whatsoever with regard to any such investigation. On the date of my formal recusal, my chief of staff sent an e-mail to the heads of relevant departments including by name to director Comey of the FBI to instruct them to inform their staffs of this recusal and advise them not to brief me or involve me in any way in any such matters. In fact they have not. Importantly I recuse myself not because of any asserted wrongdoing or any that I may have been involved in any wrongdoing in the campaign, but because a Department of Justice regulation. 28 cfr 45.2 I felt required it.

That regulation states in effect that department employees should not participate in investigations of a campaign if they served as a campaign adviser. So the scope of my recusal however does not and cannot interfere with my ability to oversee the Department of Justice, including the FBI which has an $8 billion budget and 35,000 employees. I presented to the president my concerns and those of Deputy Attorney General Rod Rosenstein about the ongoing leadership issues at the FBI as stated in my letter recommending the removal of Mr. Comey along with the Deputy Attorney General's memorandum on that issue, which have been released by the White House. Those represent a clear statement of my views. I adopted Deputy Attorney General Rosenstein's points he made in his memorandum and made my recommendation. It is absurd, frankly, to suggest that a recusal from a single specific investigation would render the attorney general unable to manage the leadership of the various department of justice law enforcement components that conduct thousands of investigations.

Finally, during his testimony, Mr. Comey discussed a conversation he had with the president. I'm happy to share with the committee my recollection of that conversation that I had with Mr. Comey. Following a routine morning threat

briefing, Mr. Comey spoke to me and my chief of staff. While he did not provide me with any of the substance of his conversation with the president, apparently the day before, Mr. Comey expressed concern about proper communications protocol with the white house and with the president.

I responded. He didn't recall this, but I responded to his comment by agreeing that the FBI and the department of justice needed to be careful to follow department policies regarding appropriate contacts with the white house. Mr. Comey had served in the department for better than two decades and I was confident he understood and would abide by the well established rules limiting communications with the White House, especially about ongoing investigations.

That's what is so important to control. My comments encouraged him to do just that and indeed as I understand it, he in fact did that. Our Department of Justice rules on proper communications between the department and the White House have been in place for years. Mr. Comey well knew them. I thought and assumed correctly that he complied with them. I will finish with this. I recuse myself from any investigation into the campaign for president, but I did not recuse myself from defending my honor against false allegations.

At all times throughout the course of the campaign, the confirmation process, and since becoming Attorney General, I have dedicated myself to the highest standards. I have earned a reputation for that. At home and in this body, I believe. Over decades of performance. The people of this country expect an honest and transparent government and that's what we are giving them. This president wants to focus on the people of this country to ensure they are treated fairly and kept safe. The trump agenda is to improve the lives of the American people.

I know some have different ways of achieving that and different agendas, but that is his agenda and one I share. Importantly as attorney general, I have a responsibility to enforce the laws of this nation to protect this country from its enemies and I intend to work every day with the fine team and the superb professionals in the department of justice to advance the important work we

EXHIBIT 9

have to do. These false attacks and innuendos and the leaks, you can be sure will not intimidate me. These events have only strengthened my resolve to fulfill my duty. My duty to reduce crime and support the federal, state, and local law enforcement who work on the streets every day.

Just last week it was reported that overdosed deaths in this country are rising faster than ever recorded. Last year was 52,000 and The New York Times just estimated next year will be 62,000 overdose deaths. The murdis up over 10%. Together we are telling the gangs and cartels and the fraudsters and the terrorists we are coming after you.

Every one of our citizens no matter who they are or where they live has the right to be safe in their homes and communities. I will not be deter and allow this great department to be deterred from its vital mission. Thank you, Mr. Chairman and ranking member Warner. I have a great honor to appear before you today and will do my best to answer your questions.

**BURR:** General Sessions, thank you for that testimony. I would like to note for members, the chair and the vice chairman will be recognized for 10 minutes and members for five minutes. I would like to remind our members that we are in open session. No references to classified or committee-sensitive materials should be used relative to your questions. With that I recognize myself at this time for 10 minutes.

General Sessions, you talked about the Mayflower hotel where the president gave his first foreign policy speech. It has been covered in the press that the president was there and you were there and others were there. From your testimony, you said you don't remember whether the ambassador from Russia was there.

**SESSIONS:** I did not remember that, but I understand he was there. So I don't doubt that he was. I believe that representations are correct. I recently saw a video of him coming into the room.

**BURR:** You never remember having a conversation or meeting with the ambassador?

**SESSIONS:** I do not.

**BURR:** Was there ever a private room setting that you were involved in?

**SESSIONS:** No, other than the reception area that was shut off from I guess the main crowd. Two to three dozen people. BURR: I would take for granted that the president shook some hands. SESSIONS: He came in and shook hands in the group.

**BURR:** Okay. You mentioned that there were staff with you at that event.

**SESSIONS:** My legislative director at the time --

**BURR:** Your Senate staff?

**SESSIONS:** Senate legislative director who was a retired U.S. Army colonel, had served on the armed services staff with Senator John Warner before she joined my staff was with me in the reception area and throughout the rest of the events.

**BURR:** Would you say you were there as a United States Senator or as a surrogate of the campaign for this event?

**SESSIONS**: I came there as an interested person and very anxious to see how President Trump would do in his first major foreign policy address. I believe he had only given one major speech before and that was maybe at the Jewish event.

It was an interesting time for me to observe his delivery and the message he would make. That was my main purpose of being there.

**BURR:** You reported two other meetings with the ambassador, one in July on the sidelines of the Republican convention, I believe and one in September in your senate office. Have you had any other interactions with government

officials over the year in a campaign capacity? I'm not asking you from the standpoint of your single life, but in the campaign.

**SESSIONS**: No, Mr. Chairman. No. I've racked my brain to make sure I could answer those questions correctly and I did not. I would just offer for you that the -- when asked about whether I had any meetings with Russians by the reporter in March, we immediately recalled the conversation and the encounter I had at the convention and the meeting in my office and made that public. I never intended not to include that. I would have gladly have reported the meeting and encounter that may have occurred and some say occurred in the Mayflower if I had remembered it or if it actually occurred, which I don't remember that it did.

**BURR:** On March 2nd, 2017, you recused yourself in the investigation being conducted by the FBI and the Department of Justice. What are the specific reasons that you chose to recuse yourself?

**SESSIONS:** The specific reason, chairman, is a cfr code of federal regulations put out by the Department of Justice. Part of the Department of Justice rules and it says this. I will read from it. 28 cfr 45.2. Unless authorized, no employee shall participate in a criminal investigation or prosecution if he had a personal or political relationship with any person involved in the conduct of an investigation that goes on to say for political campaign and it says if you have a close identification with an elected official or candidate arising from service as a principal adviser, you should not participate in an investigation of that campaign. Many have suggested that my recusal is because I felt I was a subject of the investigation myself, I may have done something wrong. This is the reason I recused myself: I felt I was required to under the rules of the Department of Justice and as a leader of the Department of Justice, I should comply with the rules obviously.

**BURR:** Did your legal counsel know from day one you would have to recuse yourself because of the current statute?

**SESSIONS:** I have a timeline of what occurred. I was sworn in on the 9th, I believe, of February. I then on the 10th had my first meeting to generally discuss this issue where the cfr was not discussed. We had several other meetings and it became clear to me over time that I qualified as a significant, principal adviser-type person to the campaign and it was the appropriate and right thing for me.

**BURR:** This could explain Director Comey's comments that he knew there was a likelihood you would recuse yourself because he was familiar with the same statute?

**SESSIONS:** Probably so. I'm sure that the attorneys in the Department of Justice probably communicated with him. Mr. Chairman, let me say this to you clearly. In effect as a matter of fact, I recused myself that day. I never received any information about the campaign. I thought there was a problem with me being able to serve as attorney general over this issue and I felt I would have to recuse myself and I took the position correctly, I believe, not to involve myself in the campaign in any way and I did not.

**BURR:** You made a reference to the chief of staff sending out an e-mail immediately notifying internationally of your decision to recuse. Would you ask the staff to make that e-mail available? SESSIONS: We would be pleased to do so and I have it with me now.

**BURR:** Thank you. Have you had intersections with the special counsel Robert muller?

**SESSIONS:** I have not. With regard to the e-mail we sent out, director Comey indicated that he did not know when I recused myself or receive notice, one of them went to him by name. A lot happens in our offices. I'm not accusing him of wrongdoing and it was sent to him and to his name.

**BURR:** Okay. General Sessions, you said he testified about his interactions with the president in some cases highlighting your presence with the meetings. You addressed the meeting where all were asked to leave except for director

Comey. You said he did inform you of how uncomfortable that was. Your recommendation was that the FBI and DOJ needed to follow the rules limning further correspondence. Did Director Comey express additional discomfort with conversations that the president might have had with him? He had two additional meetings and a total of six phone calls.

**SESSIONS:** That is correct. There is nothing wrong with the president having communication with the FBI director. What is problematic for any Department of Justice employee is to talk to any cabinet persons or White House officials about ongoing investigations that are not properly cleared through the top levels of the Department of Justice. So it was a regulation I think is healthy. I thought we needed and strongly believe we need to restore discipline to adhere to just those kinds of rules and leaking rules and some of the other things that I think are a bit lax and need to be restored.

**BURR:** You couldn't have had a conversation with the president about the investigation because you were never briefed on some.

**SESSIONS:** That is correct. I would note that with regard to the private meeting that Director Comey had by his own admission, I believe, as many as six such meetings. Several them he had with President Trump. I think two with President Obama. It's not improper, per se, but it would not be proper to share information without review and permission.

**BURR:** Just one last question. You were the chair of this foreign policy team for the Trump campaign. To the best of your knowledge, did that team ever meet?

**SESSIONS:** We met a couple of times. Maybe a couple of people did. We never functioned as a coherent team.

**BURR:** Were there any members you never met?

**SESSIONS:** Yes.

**BURR:** Okay. Vice chairman.

**WARNER:** Thank you, General Sessions. As I mentioned in my opening statement, we appreciate your appearance, but see this as the first step and I would like to get your commitment that you will agree to make yourself available as the committee needs in the weeks and months ahead.

**SESSIONS:** Senator, I will commit to appear before the committees and others as appropriate. I don't think it's good policy to continually bring cabinet members or the attorney general before multiple committees going over the same things over and over.

**WARNER:** Appropriations committee raised that issue.

**SESSIONS:** I just gave you my answer.

**WARNER:** Can we get your commitment since there will be questions about the meetings that took place or not, access to documents or memoranda or your day book or something?

**SESSIONS:** We will be glad to provide appropriate responses to your questions and review them carefully.

**WARNER:** Yesterday a friend of the president was reported to suggesting that President Trump was considering removing Director Mueller as special counsel. Do you have confidence in director Mueller's ability to conduct the investigation fairly and impartially?

**SESSIONS:** I don't know about the reports and have no basis to --

**WARNER:** I'm asking --

**SESSIONS:** The validity. I have known Mr. Mueller over the years and he served 12 years as FBI director. I knew him before that. I have confidence in Mr. Mueller.

**WARNER:** You have confidence he will do the job?

**SESSIONS:** I will not discuss hypotheticals or what might be a factual situation in the future that I'm not aware of today. I know nothing about the investigation. I fully recuse myself.

**WARNER:** I have a series of questions, sir. Do you believe the president has confidence?

**SESSIONS:** I have not talked to him about it.

**WARNER:** Will you commit to the committee not to take personal actions that might not result in director Mueller's firing or dismissal?

**SESSIONS:** I can say that with confidence. In fact the way it works, Senator Warner is that the acting attorney general.

**WARNER:** I'm aware, but I wanted to get you on the record.

**SESSIONS:** Deputy attorney general. --

**WARNER:** You would not take any actions to have the special investigator removed.

**SESSIONS:** I don't think that's appropriate for me to do.

**WARNER:** To your knowledge, have any Department of Justice officials been involved with conversations about any possibility of presidential pardons about any of the individuals involved with the Russia investigation?

**SESSIONS:** Mr. Chairman, I'm not able to comment on conversations with high officials within the white house. That would be a violation of the communications rule that I have to --

**WARNER:** Just so I can understand, is the basis of that unwilling to answer based on executive privilege?

**SESSIONS:** It's a long standing policy. The department of justice not to comment on conversations that the attorney general had with the president of

the united States for confidential reasons that rounded in the coequal branch.

**WARNER:** Just so I understand, is that mean you claim executive privilege?

**SESSIONS:** I'm not claiming executive privilege because that's the president's power and I have no power there.

**WARNER:** What about conversations with other Department of Justice or White House officials about potential pardons? Not the president, sir.

**SESSIONS:** Without in any way suggesting I had any conversations concerning pardons, totally apart from that, there are privileges of communication within the department of justice that we share all of us do. We have a right to have full and robust debate within the Department of Justice and encourage people to speak up and argue cases on different sides. Those arguments are not -- historically we have seen they shouldn't be revealed.

**WARNER:** I hope you agree since you recused yourself that if the president or others would pardon someone during the midst of this investigation while our investigation or Mr. Mueller's investigation, that would be problematic. One of the comments you made in your testimony is you reached a conclusion about then-Director Comey's ability to lead the FBI and you agreed with Deputy Attorney General Rosenstein's memo. The fact that you worked with Comey for sometime, did you ever have a conversation as a superior of Director Comey with his failure to perform or some of these accusations that he was not running in a good way and somehow the FBI is in turmoil. Did you have any conversations about the subjects?

**SESSIONS:** I did not.

**WARNER:** So you were his superior and there were fairly harsh things said about Director Comey. You never thought it was appropriate to raise those concerns before he was absolutely terminated by the president?

**SESSIONS:** I did not do so. A memorandum was prepared by the deputy attorney general who evaluated his performance and noted serious problems

EXHIBIT 9

with it.

**WARNER:** You agreed with those?

**SESSIONS:** I agreed with those. In fact senator Warner, we talked about it before I was confirmed and before he was confirmed. It's something we both agreed to that a fresh start at the FBI was probably the best thing.

**WARNER:** It again seems a little -- I understand if you talk about that before you came on and had a chance for a fresh start. There was no fresh start. Suddenly we are in the midst of the investigation and with timing it seems peculiar that what was out of the blue he fires the FBI director and all the problems of disarray and a lack of the accord with the FBI that he denied is the case, I would think that somebody would have had that conversation. Let's go to the April 27th meeting. It is brought up and I think the chairman brought it up. By that time, you had been named as the chair of then-candidate Trump's advisory. Showing up, that meeting would be appropriate.

**SESSIONS:** That was the Mayflower hotel?

**WARNER:** Yes, sir. My understanding was that the president's son in law Jared Kushner was at that meeting as well.

**SESSIONS:** I believe he was, yes.

**WARNER:** You don't reccollect when he had the conversations with the ambassador?

**SESSIONS:** I do not.

**WARNER:** To the best of your memory you had no conversation with him at that meet something.

**SESSIONS:** I don't recall that, senator. Certainly I can assure you nothing improper if I had a conversation with him. It's conceivable, but I don't remember it.

EXHIBIT 9

**WARNER:** There was nothing in your notes or memory so when you had a chance and you did correct the record about the other two sessions in response to senator Franken and Leahy, this didn't pop into your memory with the caution you had to report that this session as well.

**SESSIONS:** I guess I can say that I possibly had a meeting, but I still do not recall it. I did not in any way fail to record something in my testimony or in my subsequent letter intentionally false.

**WARNER:** I understand. I'm trying to understand you corrected the record and clearly by the time you get a chance to correct the record, you would have known that the ambassador was at that April 27th session. It received quite a bit of press notoriety. And again, echoing what the chairman said, again for the record, there was no other meeting with any other officials of the Russian government in the campaign season.

**SESSIONS:** Not to my recollection. I would say with regard to the two encounters, one at the Mayflower hotel that you refer to, I came here not knowing he was going to be there. I didn't have any communications with him before or after that event. Likewise at the effect at the convention went off the convention grounds to a college campus for an event.

**WARNER:** At the Mayflower --

**SESSIONS:** Let me follow-up on that one. I didn't know he would be in the audience.

**WARNER:** At the Mayflower there was this vip reception first and people went into the speech. Just so I get a --

**SESSIONS:** That's my recollection.

**WARNER:** You were part of the vip reception?

**SESSIONS:** Yes.

**WARNER:** General Sessions, one of the troubling things that I need to sort through is Mr. Comey's testimony last week is he felt uncomfortable when the president asked everyone else to leave the room. He left the impression that you lingered with perhaps the sense that you felt uncomfortable with it as well. I will allow you to correct it if it's not right. After this meeting took place, which clearly director Comey felt had a level of uncomfortableness. You never asked him what took place in that meeting?

**SESSIONS:** I will say it this way. We were there and I was standing there and without revealing any conversation that took place, what I recall is that I did depart and I believe everyone else did depart and Director Comey was sitting in front of the president's desk and they were talking. I believe it was the next day that he said something and expressed concern about being left alone with the president.

That in itself is not problematic. He did not tell me at that time any details about anything that was said that was improper. I affirmed his concern that we should be following the proper guidelines of the Department of Justice and basically backed him up in his concerns. He should not carry on any conversation with the president or anyone else about an investigation in a way that was not proper.

I felt he so long in the want it, the former deputy attorney general knew the policy a good deal better than I did.

**WARNER:** Thank you. It did appear that Mr. Comey felt that the conversation was improper.

**SESSIONS:** He was concerned about it. His recollection of what he said to me about his concern is consistent with my recollection.

**BURR:** Senator?

**SEN. JIM RISCH:** Attorney General Sessions, good to hear you talk about how important this Russian interference and active measures on the campaign is. I don't think there is any American who would disagree with the fact this we

need to drill down to this, know what happened, get it out in front of the American people and do what we can to stop it again. That's what the committee was charged to do and started to do. As you know on February 14th, The New York Times published an article alleging that there were constant communications between the Trump campaign and the Russians in collusion regarding the elections. Do you recall that article when it came out?

**SESSIONS:** Not exactly.

**RISCH:** Generally?

**SESSIONS:** Generally I remember the charges.

**RISCH:** Mr. Comey told us when he was here last week, he had a specific recollection. He chased it down through the intelligence community and was not able to find that evidence and then sought out both Republicans and Democrats to tell them that this was false and there was no such facts anywhere. Nonetheless, after that, this committee took that on as a thing we have spent really substantially more time on the Russian active measures. We have been through thousands of pages of information, interviewed witnesses and everything else who were no different than where we were when this thing started. There is no reports they know of of any factual information. Are you aware of any such information?

**SESSIONS:** Is that from the dossier or so-called dossier? I believe that's the report that Senator Franken hit me with when I was testifying--I think it's been pretty substantially discredited but you would know more than I. But what was said that would suggest I participated in the continuing communications with Russians as a surrogate is absolutely false?

**RISCH:** Mr. Sessions, there has been all this talk about conversations and you had conversations with the Russians. Senators up here who were on foreign relations and intelligence or armed services, conversations with officers of other governments or ambassadors or what you are everyday occurrences here, multiple time occurrences for most of us. Is that a fair statement?

**SESSIONS:** I think it is, yes.

**RISCH:** Indeed you run into one in the grocery store. Is that fair?

**SESSIONS:** That could very well happen. We did nothing improper.

**RISCH:** On the other hand collusion with the Russians or any other government when it comes to elections certainly would be improper and illegal. That that be a fair statement?

**SESSIONS:** Absolutely.

**RISCH:** You willing to tell the American people unfiltered by what the media will put out you participated in no conversations of any kind where there was collusion between the trump campaign and a foreign government?

**SESSIONS:** I can say that absolutely and have no hesitation to do so.

**RISCH:** The former U.S. Attorney and the attorney general of the United States, you participated as you described in the trump campaign. You travelled with the campaign?

**SESSIONS:** I did.

**RISCH:** You spoke for the campaign?

**SESSIONS:** Not continually on the --

**RISCH:** Based approximate your experience and based approximate your participation, did you hear a whisper or a suggestion or anyone saying the Russians were involved?

**SESSIONS:** I would not.

**RISCH:** What would you have done?

**SESSIONS:** Would know it was improper.

**RISCH:** You would head for the exit.

**SESSIONS:** This is a serious matter. You are talking about hacking into a private person or DNC computer and obtaining information and spreading that out. That's not right. It's likely that laws were violated if laws occurred. It's an improper thing.

**RISCH:** Has any person from the White House to the administration including the president of the United States either directed you or asked to you do any unlawful or illegal act since you have been attorney general of the United States?

**RISCH:** No, Senator Risch. They have not.

**RISCH:** Thank you, Mr. Chair.

**BURR:** Senator Feinstein.

**SEN. DIANNE FEINSTEIN:** Thanks very much, Mr. Chairman. Welcome, attorney general.

**SESSIONS:** Thank you.

**FEINSTEIN:** On May 19th, Mr. Rosenstein in a statement to the House of Representatives, essentially told them he learned on May 8th President Trump intended to remove Director Comey. When you wrote your letter on May 9, did you know that the president had already decided to fire Director Comey?

**SESSIONS:** Senator Feinstein, I would say I believe it has been made public that the president asked us our opinion and it was given and he asked us to put that in writing. I don't know how much more he said than that, but he talked about it and I would let his words speak for themselves.

**FEINSTEIN:** Well, on May 11th on NBC Nightly News two days later, the president stated he would fire Comey regardless of the recommendation. I'm puzzled about the recommendation because the decision had been made. What was the need for you to write a recommendation?

EXHIBIT 9

**SESSIONS:** Well, we were asked our opinion and when we expressed it which was consistent with the letter we wrote, I felt comfortable and I asks the attorney general did too in providing that information in writing.

**FEINSTEIN:** Do you concur with the president he was going to fire Comey regardless of recommendation because the problem was the Russian investigation?

**SESSIONS:** Senator Feinstein, I will have to let his words speak for himself. I'm not sure what was in his mind explicitly when we talked to him.

**FEINSTEIN:** Did you discuss director Comey's handling of the investigations with the president or anyone else?

**SESSIONS:** Senator Feinstein, that would call for a communication between the director and the president and I'm not able to comment on that.

**FEINSTEIN:** You are not able to answer the question here whether you discussed that with him?

**SESSIONS:** That's correct.

**FEINSTEIN:** And how do you view that since you discussed his termination, why wouldn't you discuss the reasons?

**SESSIONS:** Well, those were put in writing and sent to the president and he made those public. He made that public.

**FEINSTEIN:** You had no verbal conversation with him about the firing of Mr. Comey?

**SESSIONS:** I'm not able to discuss with you or confirm or deny the nature of a private conversation that I may have had with the president on this subject or others. I know this will be discussed, but that's the rules that have been adhered to by the Department of Justice as you know.

**FEINSTEIN:** You are a long time colleague, but we heard Mr. Coats and Admiral Rogers say essentially the same thing. When it was easy just to say if the answer was no, no.

**SESSIONS:** The easy would have been easier to say yes, yes. Both would have been improper.

**FEINSTEIN:** Okay. So how exactly were you involved in the termination of director Comey? Because I am looking at your letter dated May 9 and you say the Director of the FBI must be someone who follows faithfully the rules and principles and sets the right example for our law enforcement officials therefore I must recommend you remove director Comey and identify an experience and qualified individual to lead the great men and women of the FBI. Do you really believe that this had to do with director Comey's performance with the men and women of the FBI?

**SESSIONS:** There was a clear view of mine and of Deputy Attorney General Rosenstein as he set out at some length in his memoranda which I adopted and sent forward to the president that we had problems there and it was my best judgment that a fresh start at FBI was the appropriate thing to do. And when I said that to the president, deputy Rosenstein's letter dealt with a number of things. When Mr. Comey declined the Clinton prosecution, that was really a usurpation of the authority of the federal prosecutors in the Department of Justice. It was a stunning development. The FBI is the investigative team. They don't decide the prosecution policies.

That was a thunderous thing. He also commented at some length on the declination of the Clinton prosecution which you should not do. Policies have been historic. If you decline, you decline and don't talk about it. There were other things that had happened that indicated to me a lack of discipline and it caused controversy on both sides of the aisle and I had come to the conclusion that a fresh start was appropriate and did not mind putting that in writing.

**FEINSTEIN:** My time is up. Thank you very much.

**BURR:** Senator Rubio.

**SEN. MARCO RUBIO:** Thank you for being here. I want to go back to February 14th and go back to the details and the Director was here and provided great detail. There was a meeting in the Oval Office and you recall being there along with him and the meeting concluded and the president asked the director to stay behind, correct?

**SESSIONS:** That's a communication in the White House that I would not comment on.

**RUBIO:** You remember seeing him stay behind?

**SESSIONS:** Yes.

**RUBIO:** His testimony was that you lingered and his view of it was you lingered because you knew you needed to stay. Do you remember lingering and feeling like you needed to stay?

**SESSIONS:** I do recall being one of the last ones to leave.

**RUBIO:** Did you decide to be one of the last to leave?

**SESSIONS:** I don't know how that occurred. I think we finished a terrorism or counter terrorism briefing and people were filtering out. I eventually left and I do recall and I think I was the last or one of the last two or three to leave.

**RUBIO:** Would it be fair to say you needed to stay because it involved the FBI director?

**SESSIONS:** I don't know how I would characterize that, senator. It didn't seem to be a major problem. I knew that Director Comey, long-time experienced individual of the Department of Justice, could handle himself well.

**RUBIO:** He characterized it as he said never leave me alone with the president again. It's not appropriate. This is his characterization, you shrugged as if to say what am I supposed to do about it?

**SESSIONS:** I think I described it more completely and correctly. He raised that issue with me. I believe the next day. I think that was correct. He expressed concern about that private conversation. I agreed with him essentially that there are rules on private conversations with the president. It is not a prohibition on a private discussion with the president as I believe he acknowledged six or more himself with president Obama and president trump. I didn't feel like -- he gave me no detail about what it was that he was concerned about.

I didn't say I wouldn't be able to respond if he called me. He certainly knew with regard that he could call his direct supervisor which in the Department of Justice, a supervisor to the FBI, the deputy attorney general could have complained any time if he felt pressured, but I had no doubt he would not yield to any pressure.

**RUBIO:** Do you know if the president records conversations in the oval office or anywhere in the white house some.

**SESSIONS:** I do not.

**RUBIO:** If any president was to record conversations in their official duties, would there be an obligation to preserve those records?

**SESSIONS:** I don't know, senator. Probably so.

**RUBIO:** I want to go to the campaign for a moment. I'm sure you are aware it is widely reported. They often pose not simply as an official, but undercovers such as businessman, journalist and the like. At any point during the campaign, did you have an interaction who in hindsight you look back and say they tried to gain influence and in hindsight you look back and wonder?

**SESSIONS:** I don't believe in my conversations with the three times.

**RUBIO:** Just in general.

**SESSIONS:** Well, I meant a lot of people and a lot of foreign officials who wanted to argue their case for their country and to point out things they thought were important for their countries. That's the Normal thing we talk about.

**RUBIO:** As far as someone who is not an official from another count row and a businessman or anyone walking down the street, it struck me as someone who wanted to find out what the campaign was up to. In hindsight it appears suspicious some.

**SESSIONS:** I don't recall it now.

**RUBIO:** My last question, you were on the foreign policy team and the Republican platform was changed to not provide defensive weapons to Ukraine. Were you involved in that decision and do you know how the change was made?

**SESSIONS:** I was not active in the platform committee and did not participate in that, and I don't think I had direct involvement.

**RUBIO:** Do you know who did or you have no recollection of a debate about that issue internally in the campaign?

**SESSIONS:** I never watched the debate, if it occurred, on the platform committee. I think it did. So I don't recall that, Senator. I'd have to think about that.

**RUBIO:** Thank you.

**BURR**: Senator Wyden?

**SEN. RON WYDEN**: Thank you very much. Mr. Chairman, I want to thank you for holding this hearing in the open and in full view of the American people where it belongs. I believe the American people have had it with stonewalling.

Americans don't want to hear the answers are privileged and off limits or they can't be provided in public or it would be inappropriate for witnesses to tell us

EXHIBIT 9

what they know. We are talking about an attack on our democratic institutions and stonewalling of any kind is unacceptable. General Sessions acknowledged that there is no legal basis for this stonewalling. So now to questions. Last Thursday, I asked the former director Comey about the FBI's intersections with you prior to your stepping aside from the Russia investigation. Mr. Comey said your continued engagement with the Russian investigation was "problematic " and he said he could not discuss it in public.

Mr. Comey had also said that FBI personnel were calling for to you step aside from the investigation at least two weeks before you finally finally did so. In your prepared statement you said you received, quote, limited information necessary to inform your recusal decision. Given director Comey's statement, we need to know what that was. Were you aware of any concerns at the FBI or elsewhere in government about your contacts with the Russians or any other matters relevant to whether you should step aside from the Russian investigation?

**SESSIONS**: Senator Wyden, I am not stonewalling. I am following the historic policies of the Department of Justice. You don't walk into hearing or committee meeting and reveal confidential communications with the President of the United States who is entitled to receive conventional communications in your best judgment about a host of issues and have to be accused of stonewalling them. So I would push back on that.

Secondly, Mr. Comey, perhaps he didn't know, but I basically recused myself the first day I got into the office because I never accessed files. I never learned the names of investigators. I never met with them. I never asked for any documentation. The documentation, what little I received, was mostly already in the media and was presented by the senior ethics public -- professional responsibility attorney in the department and I made an honest and proper decision to recuse myself as I told Senator Feinstein and the members of the committee I would do when they confirmed me.

**WYDEN**: Respectfully, you're not answering the question.

**SESSIONS**: What is the question?

**WYDEN**: The question is, Mr. Comey said there were matters with respect to the recusal that were problematic and he couldn't talk about them. What are they?

**SESSIONS**: Why don't you tell me. There are none, Senator Wyden. There are none. I can tell you that for absolute certainty. This is a secret innuendo being leaked out there about me, and I don't appreciate it. I try to give my best and truthful answers to any committee I've appeared before, and it's really -- people are suggesting through innuendo that I have been not honest about matters, and I've tried to be honest.

**WYDEN**: My time is short. You made your point that you think Mr. Comey is engaging in innuendo. We're going to keep digging.

**SESSIONS**: Senator Wyden, he did not say that.

**WYDEN**: He said it was problematic, and asked you what was problematic about it.

**SESSIONS**: Well, some of that leaked out of the committee that he said in closed session.

**WYDEN**: Okay. One more question. I asked the former FBI director whether your role in firing him, given that he was fired because of the Russian investigation. Director Comey said this was a reasonable question. I want to ask you point-blank, why did you sign the letter recommending the firing of Director Comey when it violated your recusal?

**SESSIONS**: It did not violate my recusal. It did not violate my recusal. That would be the answer to that. And the letter that I signed represented my views that had been formulated for some time.

**WYDEN**: Mr. Chairman, just so I can finish. That answer in my view doesn't pass the smell test. The president tweeted repeatedly about his anger about

investigations into his associates and Russia. The day before you wrote your letter, he tweeted the collusion story was a total hoax and asked when will this taxpayer-funded charade end. It doesn't pass the smell test.

**SESSIONS**: Senator Wyden, I should be able to briefly respond at least and say the letter, the memorandum that Deputy Rosenstein wrote and my letter that accompanied it represented my views of the situation.

**WYDEN**: I'll ask more on the second round. Thank you.

**BURR**: Senator Collins.

**SEN. SUSAN COLLINS**: Thank you, Mr. Chairman. Attorney General Sessions, I want to clarify who did what with regard to the firing of Mr. Comey. First, when did you have your first conversation with Rod Rosenstein about Mr. Comey.

**SESSIONS**: We talked about it before either one of us were confirmed. It was a topic of conversation among people who served in the department for a long time. They knew what happened that fall was pretty dramatically unusual. Many people felt it was very wrong. So it was in that context that we discussed it. We both found that we shared common view that a fresh start would be appropriate.

**COLLINS**: This was based on Mr. Comey's handling of the investigation involving Hillary Clinton in which you said he usurped the authority of prosecutors at the Department of Justice?

**SESSIONS**: Yes. That was part of it, and the commenting on the investigation in ways that go beyond the proper policies. We need to restore, Senator Collins, I think, the classic discipline in the department. My team, we've discussed this. There's been too much leaking and too much talking publicly about investigations. In the long run, the department's historic rule that you remain mum about investigations is the better policy.

**COLLINS**: Now, subsequently the president asked you to put your views in writing you've testified today. I believe that you were right to recuse yourself from the ongoing Russian investigation, but then on May 9th you wrote your recommendation that Mr. Comey be dismissed. Obviously this went back many months to the earlier conversations you had had with Mr. Rosenstein. My question is why do you believe that your recommendation to fire director Comey was not inconsistent with your March 2nd recusal?

**SESSIONS**: Thank you. The recusal involved one case involved in the Department of Justice and in the FBI. They conduct thousands of investigations. I'm the attorney general of the United States. It's my responsibility to our Judiciary committee and other committees to ensure that that department is run properly. I have to make difficult decisions, and I do not believe that it is a sound position to say that, if you're recused for a single case involving any one of the great agencies like DEA or U.S. Marshals or ATF that are part of the Department of Justice, you can't make a decision about the leadership in that agency.

**COLLINS**: Now, if you had known that the president subsequently was going to go on TV and in an interview are Lester holt of NBC would say this Russian thing was the reason for his decision to dismiss the FBI director, would you have felt uncomfortable about the timing of the decision?

**SESSIONS**: Well, I would just say this, Senator Collins. I don't think it's appropriate to deal with those kind of hypotheticals. I have to deal in actual issues. I would respectfully not comment on that.

**COLLINS**: Well, let me ask you this. In retrospect, do you believe that it would have been better for you to have stayed out of the decision to fire director Comey?

**SESSIONS**: I think it's my responsibility. I mean I was appointed to be attorney general, supervising all the federal agencies is my responsibility, trying to get the very best people in those agencies at the top of them is my responsibility, and I think I had a duty to do so.

**COLLINS**: Now, director Comey testified that he was not comfortable telling you about his one-on-one conversation with the president on February 14th because he believed that you would shortly recuse yourself from the Russian investigation which did did. Yet, Director Comey testified that he told no one else at the department outside of the senior leadership team at the FBI. Do you believe that the director received information about the president saying that he hoped he could let Michael Flynn go to someone else at the Department of Justice? There are an awful lot of lawyers at the department of justice, some 10,000 by last count.

**SESSIONS**: I think the appropriate thing would have been for Director Comey to talk with the acting deputy attorney general who is his direct supervisor. That was Dana Boente who had 33 years in the Department of Justice and was even then still serving for six years and continues to serve of as attorney general appointed by President Barack Obama, so he's a man of great integrity and everybody knows it, a man of decency and judgment.

If he had concerns, he should have raised it to Deputy Attorney General Boente who would be the appropriate person in any case really, but if he had any concern that I might be recusing myself, that would be a double reason for him to share it with deputy attorney general Boente.

**COLLINS**: Thank you.

**BURR**: Senator Heinrich.

**SEN. MARTIN HEINRICH**: Attorney General Sessions, has the president ever expressed his frustration to you regarding your decision to recuse yourself?

**SESSIONS**: Senator Heinrich, I'm not able to share with this committee private communications --

**HEINRICH**: You're invoking executive privilege.

**SESSIONS**: I'm not able to invoke executive privilege. That's the president's prerogative.

**HEINRICH**: My understanding is that you took an oath, you raised your right hand here today and you said that you would solemnly tell the truth, the whole truth and nothing but the truth. And now you're not answering questions. You're impeding this investigation, so my understanding of the legal standard is that you either answer the question. That's the best outcome. You say this is classified, can't answer it here. I'll answer it in closed session. That's bucket number two.

Bucket number three is to say I'm invoking executive privilege. There is no appropriateness bucket. It is not a legal standard. Can you tell me why what are these long-standing DOJ rules that protect conversations made in the executive without invoking executive privilege?

SESSIONS: Senator, I'm protecting the president's constitutional right by not giving it away before he has a chance to review it.

**HEINRICH**: You can't have it both ways.

**SESSIONS**: And second I am telling the truth in answering your question and saying it's a long-standing policy of the department of justice to make sure that the president has full opportunity to decide these issues.

**HEINRICH**: Can you share those policies with us. Are they written down at the Department of Justice?

**SESSIONS**: I believe they are.

**HEINRICH**: This is the appropriateness legal standard for not answering congressional inquiries.

**SESSIONS**: That's my judgment that it would be inappropriate for me to answer and reveal private conversations with the president when he has not had a full opportunity to review the questions and to make a decision on

whether or not to approve such an answer, one. There are also other privileges that could be invoked. One of the things deals with the investigation of the special counsel as other --

**HEINRICH**: We're not asking questions about that investigation. If I wanted to ask questions about that investigation, I'd ask those of Rod Rosenstein. I'm asking about your personal knowledge from this committee which has a constitutional obligation to get to the bottom of this. There are two investigations here. There is a special counsel investigation. There is also a congressional investigation, and you are obstructing that congressional delegation -- investigation by not answering these questions, and I think your silence, like the silence of Director Coats, like the silence of Admiral Rogers speaks volumes.

**SESSIONS**: I would say that I have consulted with senior career attorneys in the department.

**HEINRICH**: I suspect you have.

**SESSIONS**: And they believe this is consistent with my duties.

**HEINRICH**: Senator Risch asked you a question about appropriateness if you had known that there had been anything untoward with regard to Russia in the campaign, would you have headed for the exits? Your response was maybe. Why wasn't it a simple yes?

**SESSIONS**: Well, [if] there was an improper illegal relationship in an effort to impede or to influence the campaign I absolutely would have depart.

**HEINRICH**: I think that's a good answer. I'm not sure why it wasn't the answer in the first place. I find it strange that neither you nor deputy attorney general rod Rosenstein brought up performance issues with director Comey, and, in fact, deputy FBI director McCabe has directly refuted any assertion that there were performance issues.

EXHIBIT 9

This is troubling because it appears that the president decided to fire director Comey because he was pursuing the Russia investigation and had asked you to come up with an excuse. When your assessment of director Comey didn't hold up to public scrutiny, the president finally admitted that he had fired director Comey because he was pursuing the Russia investigation, ie the Lester holt interview. You said you did not break recusal when participating in the Comey firing, but it appears that it was directly related to Russia and not department mismanagement. How do you square those two things?

**SESSIONS**: You have a lot in that question. Let me say first. Within a week or so, I believe may 3rd, director Comey testified that he believed the handling of the Clinton declination was proper and appropriate and he would do it again.

I know that was a great concern to both of us because it did not -- that represented something that I think most professionals in the Department of Justice would totally agree that the FBI investigative agency does not decide whether to prosecute or decline criminal cases. Pretty breathtaking usurpation of the responsibility of the attorney general. So that's how we felt. That was sort of additional concern that we had heading the FBI someone who boldly asserted the right to continue to make such decisions. That was one of the things we discussed. That was in the memorandum I believe and it was also an important factor for us.

**BURR**: Before I recognize Senator Blunt, I would like the record to show that last night Admiral Rogers spent almost two hours in closed session with the -- with almost the full committee fulfilling his commitment to us in the hearing that in closed session he would answer the question, and I think it was thoroughly answered and all members were given an opportunity to ask the question. I want the record to show with what senator Heinrich stated. Senator Blunt.

**SEN. ROY BLUNT**: Thank you, chairman. Attorney General, it's good to see you here and it's good to see Mary. I'm sure there's probably other places you would both rather be today but you've always looked at public service as

something you did together, and it's good to see you here together and know that your family continues to be proud and supportive of what you do.

**SESSIONS**: Thank you, I've been blessed indeed.

**BLUNT**: I agree with that. I agree with that. Let me just get a couple of things clear in my mind here of notes I've taken while people were asking questions, and you were talking. On the April 27, 2016 event, I think that's the Mayflower Hotel speech that the presidential candidate gave on foreign policy. You didn't have a room at that event where you had private meetings, did you?

**SESSIONS**: No, I did not.

**BLUNT:** And as I understand i,t you went to a reception that was attended by how many people?

**SESSIONS**: I think two to three dozen.

**BLUNT**: Two to three dozen people. You went and heard a speech and may have seen people on your way out?

**SESSIONS**: Correct.

**BLUNT**: So when you said you possibly had a meeting with Mr. Kislyak, did you mean you possibly met him?

**SESSIONS**: I didn't have any formal meeting with him. I'm confident of that, but I may have had an encounter during the reception. That's the only thing I cannot say with certainty I did not. That's all I can say.

**BLUNT**: Well, that's what I thought you were saying, but sometimes when I hear meeting, that would mean more to me than I met somebody. You might have met him at the reception. Could you have met other ambassadors at that reception as well?

**SESSIONS**: I could. I remember one in particular that we had a conversation with, whose country had an investment in Alabama, and we talked a little

EXHIBIT 9

length about that, I remember that, but otherwise I have no recollection of a discussion with the Russian ambassador.

**BLUNT**: Alright, so you were there. You've read since he was there, you may have seen him, but you had no room where you were having meetings with individuals to have discussions at the Mayflower Hotel that day.

**SESSIONS**: No, that is correct.

**BLUNT**: Whenever you talked to Mr. Comey after he had had his meeting with the president, you think that was probably the next day. You didn't stay afterwards and see him after he left the oval office that night?

**SESSIONS**: No. I understand his testimony may have suggested that it happened right afterwards, but it was either the next morning, which I think it was, or maybe the morning after that. It was, we had a three times a week national security briefing with the FBI that I undertake, and so it was after that that we had that conversation.

**BLUNT**: Where you had that conversation. What I'm not quite clear on is: did you respond when he expressed his concern or not?

**SESSIONS**: Yes, I did respond. I think he's incorrect. He indicated I believe that he was not totally sure of the exact wording of the meeting, but I do recall, my chief of staff was with me, and we recall that I did affirm the long-standing written policies of the Department of Justice concerning communications with the White House. We have to follow those rules and in the long run you're much better off if you do. They do not prohibit communications one-on-one by the FBI director with the president, but if that conversation moves into certain areas, it's the duty -- the rules apply to the Department of Justice, so it's a duty of the FBI agent to say, "Mr. President, I can't talk about that." That's the way that should work, and apparently it did, because he says he did not improperly discuss matters with the president.

**BLUNT**: When Mr. Comey talked to you about that meeting, did he mention Mr. Flynn?

**SESSIONS**: No. He mentioned no facts of any kind. He did not mention to me that he had been asked to do something he thought was improper. He just said he was uncomfortable I believe with it.

**BLUNT**: After that discussion with Mr. Comey --

**SESSIONS**: Actually I don't know that he said he was uncomfortable. I think he said maybe it was what he testified to was perhaps the correct wording. I'm not sure exactly what he said, but I don't dispute it.

**BLUNT**: Well, exactly what I think -- what I remember him saying was that you didn't react at all and kind of shrugged, but you're saying you referred him to the normal way these meetings are supposed to be conducted.

**SESSIONS**: I took it as a concern that he might be asked something that was improper, and I affirmed to him his willingness to say no or not go in an improper way, improper direction.

**BLUNT**: Just finally, I'm assuming you wouldn't talk about this. cause it would relate to the May 8 meeting, but my sense is that no decision is final until it's carried out. I guess is that there are people at this who have said they were going to let somebody go or fire somebody and never did that, so the fact that the president said that on May 8 doesn't mean that the information he got from you on May 9 was not necessary or impactful, and I'm sure you're not going to say how many times the president said we ought to get rid of that person, but I'm sure that's happened, and, chairman, I'll yield.

**BURR**: Senator King.

**SENATOR ANGUS KING**: Mr. Attorney General, thank you for joining us today.

**SESSIONS**: Thank you.

**KING**: I respect your willingness to be here. You testified a few minutes ago I'm not able to invoke executive privilege. That's up to the president. Has the

president invoked executive privilege in the case of your testimony here today?

**SESSIONS**: He has not.

**KING**: Then what is the basis of your refusal to answer these questions?

**SESSIONS**: Senator king, the president has a constitutional --

**KING**: I understand that, but the president hasn't asserted that. You said you don't have the power to exert executive privilege so what is the legal basis for your refusal to answer the questions?

**SESSIONS**: I'm protecting the right of the president to assert it if he chooses and there may be other privileges that could apply in this circumstance.

**KING**: Well, I don't understand how you can have it both ways. The president can't not assert it, and you've testified that only the president can assert it and yet I just don't understand the legal basis for your refusal to answer.

**SESSIONS**: What we try to do, I think most cabinet officials, others that you questioned recently, officials before the committee, protect the president's right to do so. If it comes to a point where the issue is clear and there's a dispute about it, at some point the president will either assert the privilege or not or some other privilege would be asserted, but at this point I believe it's premature

**KING**: You're asserting a privilege.

**SESSIONS**: It would be premature for me to deny the president a full and intelligent choice about executive privilege. That's not necessary at this point.

**KING**: You testified a few minutes ago, that quote, we were asked for our opinion. Who asked for your opinion? You testified we were asked for our opinion.

**SESSIONS**: My understanding is I believe I'm correct in saying the president had said so.

**KING**: He didn't ask you directly.

**SESSIONS**: I thought you were asking about the privilege. If you want to go back to the --

**KING**: You said, quote, we were asked for our opinion, you and Mr. Rosenstein.

**SESSIONS**: I believe that was appropriate for me to say that because I think the president had said --

**KING**: I'm just asking for your opinion. Who asked you for your opinion?

**SESSIONS**: Yes, right. The president asked for our opinion.

**KING**: All right. So you just testified as to the content of a communication to the president.

**SESSIONS**: But I believe he's already revealed that. I believe I'm correct in saying, that that's why I indicated that when I answered that question, but if he hasn't and I'm in error, I would have constricted his constitutional right of privilege. You're correct.

**KING**: You're being selective about the use --

**SESSIONS**: I'm doing so only because I believe he made that piece of information public.

**KING**: Did the question of the Russia investigation in the firing of James Comey come up?

**SESSIONS**: I cannot answer that because it was a communication by the president or if any such occurred it would be a communication that he has not waived.

**KING**: But he has not asserted the executive privilege.

**SESSIONS**: He's not exerted executive privilege.

EXHIBIT 9

**KING**: Do you believe the Russians interfered with the 2016 elections?

**SESSIONS**: It appears so. The intelligence community seems to be united in that, but I have to tell you, senator king, I know nothing but what I've read in the paper. I've never received any details, briefing on how hacking occurred or how information was alleged to have influenced the campaigns.

**KING**: Between the election, there was a memorandum from the intelligence community on October 9th, that detailed what the Russians were doing after the election, before the inauguration. You never sought any information about this rather dramatic attack on our country?

**SESSIONS**: No.

**KING**: You never asked for a briefing or attended a briefing or ruled are the intelligence reports?

**SESSIONS**: You might have been very critical if I as an active part of the campaign was seeking intelligence related to something that might be relevant to the campaign. I'm not sure --

**KING**: I'm not talking about the campaign. I'm talking about what the Russians did. You received no briefing on the Russian active measures in connection with the 2016 election.

**SESSIONS**: No, I don't believe I ever did.

**KING**: Let's go to your letter of May 9th. You said based upon my evaluation and for the reasons expressed by the deputy, was that a written evaluation?

**SESSIONS**: My evaluation was an evaluation that had been going on for some months.

**KING**: Is there a written evaluation?

**SESSIONS**: I did not make one. I think you could classify deputy attorney general Rosenstein's memorandum as an evaluation, and he was the direct

EXHIBIT 9

supervisor of the FBI director.

**KING**: And his evaluation was based 100% on the handling of the Hillary Clinton e-mails, is that correct?

**SESSIONS**: Well, and a number of other matters as I recall, but he did explicitly lay out the errors that he thought had been made in that process by the director of the FBI. I thought they were cogent and accurate and far more significant than I think a lot of people have understood.

**KING**: Thank you, Mr. Chairman.

**BURR**: Senator Lankford.

**SEN. JAMES LANKFORD**: Attorney General Sessions, good to see you again.

**SESSIONS**: Thank you.

**LANKFORD**: You've spoken very plainly from the beginning from your opening statement all the way through this time. I am amazed at the conversations as if an attorney general has never said there were private conversations with the president and we don't need to discuss those. It seems to be a short memory about some of the statements Eric Holder would and would not make to any committee in the House or the Senate and would or would not turn over documents even requested. That had to go all the way through the court systems for the courts to say no, the president can't hold back documents and the attorney general can't do that. So somehow the accusation that you're not saying every conversation about everything, there's a long history of attorney generals standing beside the president saying there are some conversations that are confidential, and then it can be determined from there.

It does seem as well that every unnamed source story somehow gets a hearing. I was in the hearing this morning with Rod Rosenstein as we dealt with the appropriations request that originally you were expected to be at, that rod

Rosenstein was taking your place to be able to cover. He was very clear and peppered with questions about Russia during that conversation as well. He was very clear that he has never had conversations with you about that and that you have never requested conversations about that.

He was also peppered with questions of the latest rumor of the day that is somehow the president is thinking about firing Robert Mueller and getting rid of him and was very clear that Rosenstein himself said I'm the only one that could do that, and I'm not contemplating that nor would I do that and no one has any idea where the latest unnamed sourced story of the day is coming from, but somehow it's grabbing all the attention. I do want to be able to bring up a couple of things to you specifically. One is to define the word recuse, and I come back to your e-mail that you sent to Jim Comey and others that day, on March the 2nd. This was what you had said during -- in your e-mail. "After careful consideration following meetings with career department officials over the course of the past several weeks the attorney general has decided to recuse himself from any existing or future investigations of any matters related in any way to the campaigns for president of the United States. The attorney general's recusal is not only with respect to such investigations, if any, but also extends to the department responses to congressional and media inquiries related to such investigations." Is that something you have maintained from March 2nd on?

**SESSIONS**: Absolutely. Actually I maintained it from the first day I became attorney general. We discussed those matters, and I felt until -- until and if I ever made a decision to not recuse myself I should not, as an abundance of caution, involve myself in studying the investigation or evaluating it so I did not. I also would note that the memorandum from my chief of staff directs these agencies and one of the people directly it was sent to was James B. Comey, director of the FBI.

You should instruct members of your staffs to not -- not to brief the attorney general or any other officials in the office of the attorney general about or otherwise involve the attorney general or other officials in the office of the

attorney general in any such matters described above, and we took the proper and firm and crystal clear position that the recusal meant recusal.

**LANKFORD**: The National Interest was asked specific by this as well who was the host of that event. They stated this in writing. "As the host, the Center for National Interest decided whom to invite and then issued the invitations. The Trump campaign did not determine or approve the invitation list. Guests of the event included both Republicans and Democrats with some of the lighter supporting other candidates. Most of the guests Washington-based foreign policy experts and journalists, Center for National Interest invited Russian Ambassador Kislyak and several other ambassadors to the speech. We regularly invite ambassadors and other foreign representatives to our events to facilitate dialogue."

Then they said, "We seated all four in the front row during the speech in deference to the diplomatic status. The Trump campaign had nothing to do with the seating arrangement. The Center for National Interest extended equal treatment of the four ambassadors attending the event and invited each to a short reception prior to the trump speech. It includes approximately two dozen guests in a receiving line. The line moved quickly and any conversations with Mr. Trump in that setting were inherently brief and could not be private. Our recollection is, the interaction with Mr. Trump and Ambassador Kislyak was limited to polite exchange and pleasantries. Appropriate on such occasions, we are not aware of any conversations with Ambassador Kislyak and Senator Jeff Sessions at the reception. However, in a small group setting like this one, we consider it unlikely that anyone would have engaged a meaningful private conversation without drawing attention from others present. Do you have any reason to disagree with that?

**SESSIONS**: No, I think that's a very fair description of the reception situation. I appreciate them having made that statement.

**LANKFORD**: I yield back.

**BURR**: Senator Manchin.

EXHIBIT 9

**SEN. JOE MANCHIN**: Mr. Chairman, thank you. Thank you, Mr. Attorney General, for being here. It's good to see you again.

**SESSIONS**: Thank you, Senator Manchin.

**MANCHIN**: I want to follow up on what Senator King had asked concerning. You are and I are about the same vintage and back in our lifetime we've never known the Russians to be -- the Russian government or the Russian military to ever be our friend, and wanting the same things we wanted out of life. With that being said, the seriousness of this Russian hacking is very serious to me and concerning, and you're saying that you had not been briefed on that. October -- I think it was October 9, when it was known that the ODNIi I think at that time Mr. Clapper and also Mr. Jay Johnson, homeland security made that public what was going on, then on December 29 President Obama at that time expelled 35 Russian diplomats, denied access to two Russian-owned compounds. and he broadened the existing sanctions. Sir, I would ask did you have any discussions at all -- have you had any discussions or sat in on any type of meetings or recommendations made to remove those sanctions?

**SESSIONS**: I don't recall any such meeting.

**MANCHIN**: And during the time not from the president being inaugurated on January 20, prior to that in the campaign, up until and through the transition, was there ever any meetings that he showed any concern or consideration or just inquisitive of what the Russians were really doing and if they had really done it?

**SESSIONS**: I don't recall any such conversations. I'm not sure I understood your question. Maybe I better listen again.

**MANCHIN**: You were part of the national security team, so if he would have heard something about Russia and with their capabilities and our concern about what they could do to our election process, was there ever any conversations concerning that whatsoever?

**SESSIONS**: I don't recall it, Senator Manchin.

EXHIBIT 9

**MANCHIN**: I know it's been asked of you things, your executive privilege in protecting the president. I understand that, but also when we had Mr. Comey here, you know, he couldn't answer a lot of things in open session. He agreed to go into a closed session. Would you be able to go in a closed session? Would it change your answers to us or your ability to speak more frankly on some things we would want to know.

**SESSIONS**: Senator Manchin, I'm not sure. The executive privilege is not waived by going in camera or in closed session. It may be that one of the concerns is that when you have an investigation ongoing as the special counsel does, it's often very problematic to have persons, you know, not cooperating with that counsel in the conduct of the investigation, which way or may not be a factor in going into closed session.

**MANCHIN**: It would be very helpful, I think the committee, a lot of questions that they would like and you would like to answer if possible and maybe we can check into that a little further. If I could, sir, did you have any meetings, any other meetings with Russian officials that have not previously been disclosed?

**SESSIONS**: I've racked my brain and I do not believe so.

**MANCHIN**: Are there any other --

**SESSIONS**: I can assure you that none of those meetings discussed manipulating the campaign a the United States in any way. shape or form or any hacking or any such ideas.

**MANCHIN**: I'm going to go quick through this. Are there any other meetings between Russian government officials and any other Trump campaign associates that have not been previously disclosed that you know of?

**SESSIONS**: I don't recall any.

**MANCHIN**: To the best of your knowledge, did any of the following individuals meet with Russian officials at any point during the campaign? You can just go yes or no as I go down through the list: Paul Manafort.

**SESSIONS**: Repeat that now.

**MANCHIN**: To the best of your knowledge, sir, did any of these following individuals meet with Russian officials at any point during the campaign, and you can just yes or no on this: Paul Manafort.

**SESSIONS**: I don't have any information that he has done so. He served as campaign chairman for a few months.

**MANCHIN**: Steve Bannon.

**SESSIONS**: I have no information that he did.

**MANCHIN**: General Michael Flynn.

**SESSIONS**: I don't recall it.

**MANCHIN**: Reince Priebus?

**SESSIONS**: I don't recall.

**MANCHIN**: Steve Miller?

**SESSIONS**: I don't recall him ever having such a conversation.

**MANCHIN**: Corey Lewandowski.

**SESSIONS**: I do not recall any of those individuals having any meeting with Russian officials.

**MANCHIN**: Carter Page.

**SESSIONS**: I don't know.

**MANCHIN**: And would I finally ask this question, because I always think -- we try to -- you have an innate knowledge.

**SESSIONS**: There -- there may have been some published accounts of Mr. Page talking with Russians, I'm not sure. I don't recall though.

**MANCHIN**: As a former senator you bring a unique holistic perspective to this investigation because you've been on both sides.

**SESSIONS**: I have indeed. All in all it's better on that side.

**MANCHIN**: Okay. If you were sitting on this side of the dious

**SESSIONS**: Nobody gets to ask you about your private conversations or your staff.

**MANCHIN**: Here you go. Give us a chance to give us some advice. If you were sitting on this side of the dious, what question would you be asking?

**SESSIONS**: I would be asking whether or not -- I would be asking questions related to whether or not there was an impact on this election.

**MANCHIN**: And what part of the story do you think you're missing?

**SESSIONS**: By a foreign power, particularly the Russians, since the intelligence community has suggested and stated that they believe they did, but I do think members of this government have offices to run and departments to manage and they -- and the questions should be focused on that.

**MANCHIN**: Is there a part of the story we're missing, I'm so sorry Mr. Chairman, is there a part of the story that we're missing?

**SESSIONS**: I don't know, because I'm not involved in the campaign and had no information concerning it. I have no idea at what stage it is. You members of the committee know a lot more than I.

**MANCHIN**: Thank you, General Sessions.

**BURR:** General sessions, I will assure you we're very much focused on Russia's involvement.

**SESSIONS:** Doesn't seem like to.

**BURR:** And our hope is that as we complete the process we will lay the facts out for the American people, so they can make their own determinations as well. We're grateful for what we've done. Senator Cotton.

**SEN. TOM COTTON:** Well, I am on this side of the dious and I could say a very simple question that should be asked. I am on this side of the dious, so a very simple question that should be asked is: "Did Donald Trump or any of his associates in the campaign collude with Russia in hacking those e-mails and releasing them to the public? That's where we started six months ago. We have now heard from six of the eight Democrats on this committee, and to my knowledge. I don't think a single one of them asked that question. They have gone down lots of other rabbit trails but not that question. Maybe that is because Jim Comey said last week as he said to Donald Trump on three times he assured him he was not under investigation. Maybe it's because multiple Democrats on this committee have stated they have seen no evidence thus far after six months of our investigation and ten months or 11 months of an FBI investigation of any such collusion. I would suggest what do we think happened at the Mayflower? Mr. Sessions, are you familiar with what spies call trade craft?

**SESSIONS:** A little bit.

**COTTON:** That involves things like covert communications and dead drops and brush passes, right?

**SESSIONS:** That is part of of it.

**COTTON:** Do you like spy fiction: John le Carre, Daniel Silva, Jason Matthews?

**SESSIONS:** Yeah, Alan Furst, David Ignatius' books.

**COTTON:** Do you like Jason Bourne or James Bond movies?

**SESSIONS:** No, yes, I do.

**COTTON:** Have you ever ever in any of these fantastical situations heard of a plot line so ridiculous that a sitting United States senator and an ambassador of a foreign government colluded at an open setting with hundreds of other people to pull off the greatest caper in the history of espionage?

**SESSIONS**: Thank you for saying that, Senator Cotton. It's just like through the looking glass. I mean, what is this? I explained how in good faith I said I had not met with Russians, because they were suggesting I as a surrogate had been meeting continuously with Russians. I said I didn't meet with them and now, the next thing you know I'm accused of some reception plotting some sort of influence campaign for the American election. It's just beyond my capability to understand, and I really appreciate, Mr. Chairman, the opportunity to at least to be able to say publicly I didn't participate in that and know nothing about it.

**COTTON:** And I gather that's one reason why you wanted to testify today in public. Last week Mr. Comey in characteristic dramatic and theatrical fashion alluded ominously to what you call innuendo, that there was some kind of classified intelligence that suggested you might have colluded with Russia or that you might have otherwise acted improperly. You've addressed those allegations here today. Do you understand why he made that allusion?

**SESSIONS:** Actually I do not. Nobody's provided me any information.

**COTTON:** Thank you. My time is limited and I have a lot of questions. Mr. Blunt asked you if you had spoken in response to Mr. Comey's statement to you after his private meeting with the president on February 14 or February 15. You said that you did respond to Mr. Comey. Mr. Comey's testimony said that you did not. Do you know why Mr. Comey would have said that you did not respond to him on that conversation with you on February 14 or 15?

**SESSIONS:** I do not. It was a little conversation, not very long, but there was a conversation, and I did respond to him, perhaps not to everything he asked,

but he -- I did respond to him. I think in an appropriate way.

**COTTON:** Do you know why Mr. Comey mistrusted President Trump from their first meeting on January 6? He stated last week that he did. He didn't state anything from that meeting that caused him to have such mistrust.

**SESSIONS:** I'm not able to speculate on that.

**COTTON:** Let's turn to the potential crimes that we know have happened: leaks of certain information. Here's a short list of what I have. The contents of alleged transcripts of alleged conversations between Mr. Flynn and Mr. Kislyak, the contents of President Trump's phone calls with Australian and Mexican leaders, the content of Mr. Trump's meetings with the Russian foreign minister and the ambassador, the leak of Manchester bombing -- the Manchester bombing suspect's identity and crime scene photos and last week within 20 minutes of this committee meeting in a classified setting is with Jim Comey, the basis of Mr. Comey's innuendo was. Are these leaks serious threats to our national security, and is the Department of Justice taking them with the appropriate degree of seriousness and investigating and ultimately going to prosecute them to the fullest extent of the law?

**SESSIONS:** Thank you, Senator Cotton. We have had one successful case very recently in Georgia. That person has been denied bail I believe and is being held in custody, but some of these leaks, as you well know, are extraordinarily damaging to the United States security, and we have got to restore a regular order principle. We cannot have persons in our intelligence agencies, our investigative agencies or in Congress leaking sensitive matters on staff, so this is -- I'm afraid will result -- is already resulting in investigations, and I'm -- I fear that some people may find that they wish they hadn't leaked it.

**COTTON**: Thank you. My time has expired but for the record it was stated earlier that the Republican platform was weakened on the point of arms for Ukraine. That is incorrect. The platform was actually strengthened, and I would note that it was the Democratic president who refused repeated bipartisan requests of this Congress to supply those arms to Ukraine.

**BURR:** Senator Harris.

**SEN. KAMALA HARRIS:** Attorney General Sessions, you have several times this afternoon prefaced your responses by saying to the best of your recollection. Just on the first page of your three pages of written testimony, you wrote nor do I recall, do not have recollection, do not remember it, so my question is for any of your testimony today, did you refresh your memory with any written documents, be them your calendar, written correspondence, e-mails or notes of any sort?

**SESSIONS:** I attempted to refresh my recollection but so much of this is in a wholesale campaign of extraordinary nature that you're moving so fast that you don't keep notes, you meet people. I didn't keep notes of my conversations with the Russian ambassador at the Republican convention. I didn't keep notes on most of these things.

**HARRIS:** Sir, will you provide the committee with the notes that you did maintain?

**SESSIONS:** As appropriate I will supply the committee with documents.

**HARRIS:** Can you please tell me what you mean when you say appropriate?

**SESSIONS:** I would have to consult with lawyers in the department who know the proper procedure before disclosing documents that are held within the Department of Justice. I'm not able to make that opinion today.

**HARRIS:** Sir, I'm sure you prepared for this hearing today and most of the questions that have been presented to you were predictable. So my question to you is did you then review with the lawyers of your department if you as the top lawyer are unaware what the law is regarding what you can share with us and what you cannot share with us, what is privileged and what is not privileged.

**SESSIONS:** We discussed the basic parameters of testimony. I frankly have not discussed documentary disclosure rules.

**HARRIS:** Will you make a commitment to this committee that you will share any written correspondence, be they your calendars, records, notes, e-mails or anything that has been reduced at any point in time in writing to this committee where legally you actually have an obligation to do so.

**SESSIONS:** I will commit to reviewing the rules of the department and as and when that issue is raised to respond appropriately.

**HARRIS:** Did you have any communications with Russian officials for any reason during the campaign that have not been disclosed in public or to this committee?

**SESSIONS:** I don't recall it, but I have to tell you, I cannot testify to what was said as we were standing at the Republican convention before the podium where I spoke.

**HARRIS:** My question --

**SESSIONS:** I don't have a detailed memory of that--

**HARRIS:** It is a relates to your knowledge.

**SESSIONS:** To the best of my knowledge.

**HARRIS:** Did you have any communication with any Russian businessman or any Russian nationals?

**SESSIONS:** I don't believe I had any conversation with Russian businessmen or Russian nationals.

**HARRIS:** Are you aware of any communications --

**SESSIONS:** A lot of people were at the convention, it's conceivable --

**HARRIS:** Sir. I have just a few

**SESSIONS:** Well, you let me qualify -- if I don't qualify, it you'll accuse me of lying so I need to be correct as best as I can.

EXHIBIT 9

**HARRIS:** I do want you to be honest.

**SESSIONS:** And I'm not to be able to be rushed this fast. It the makes me nervous.

**HARRIS:** Are you aware of any communications with other Trump campaign officials and associates that they had with Russian officials or any Russian nationals?

**SESSIONS:** I don't recall that.

**HARRIS:** And are you aware --

**SESSIONS:** At this moment.

**HARRIS:** Are you aware of any communications with any Trump officials or did you have any communications with any officials about Russia or Russian interests in the United States before January 20?

**SESSIONS:** No. I may have had some conversations, and I think I did, with the general strategic concept of the possibility of whether or not Russia and the United States could get on a more harmonious relationship and move off the hostility. The soviet union did in fact collapse. It's really a tragic strategic event that we're not able to get along better than we are today.

**HARRIS:** Before being sworn in as Attorney General, how did you typically communicate with then candidate or President-Elect Trump?

**SESSIONS:** Would you repeat that?

**HARRIS:** Before you were sworn in as Attorney General, how did you typically communicate with then candidate or President-Elect trump?

**SESSIONS:** I did -- : I did not submit memorandum. I did not make formal presentations.

**HARRIS:** Did you ever communicate with him in writing?

**SESSIONS:** I don't believe so.

**HARRIS:** And you referred to a long-standing DOJ policy. Can you tell us what policy it is you're talking about.

**SESSIONS:** Well, I think most cabinet people as the witnesses, you had before you earlier, those individuals declined to comment, because we're all about conversations with the president --

**HARRIS:** Sir, I'm just asking you about the DOJ policy you've referred to.

**SESSIONS:** A long-standing policy, a policy that goes beyond just the attorney general.

**HARRIS:** Is that policy in writing somewhere?

**SESSIONS:** I think so.

**HARRIS:** So did you not consult it before you came before this committee knowing we would ask you questions about that?

**SESSIONS:** Well, we talked about it. The policy is based --

**HARRIS:** Did you ask that it would be shown to you?

**SESSIONS:** The policy is based on the principle that the president --

**HARRIS:** Sir, I'm not asking about the principle. I'm asking when you would be asked these questions --

**SESSION:** Well, I'm unable to answer the quest--

**HARRIS:** and you would rely on that policy --

**SEN. JOHN MCCAIN:** Chairman --

**HARRIS:** Did you not ask your staff to show you the policy that would be the basis for you refusing to answer the majority --

EXHIBIT 9

**MCCAIN:** The witness should be allowed to answer the question.

**BURR:** Senators will allow the chair to control the hearing. Senator Harris, let him answer.

**HARRIS:** Please do.

**BURR:** Thank you.

**SESSIONS:** We talked about it, and we talked about the real principle that's at stake is one that I have some appreciation for as far as having spent 15 years in the department of Justice, 12 as United States attorney, and that principle is that the Constitution provides the head of the Executive Branch certain privileges and that members -- one of them is confidentiality of communications, and it is improper for agents of any of the department -- any departments in the Executive Branch to waive that privilege without a clear approval of the President.

**HARRIS:** Mr. Chairman. I have asked --

**SESSIONS:** And that's the situation we're in.

**HARRIS:** I asked for a yes or no. Did you ask --

**SESSIONS:** The answer is yes, I consulted.

**BURR:** The senator's time has expired.

**HARRIS:** Apparently not.

**BURR:** Senator Cornyn.

**SEN. JOHN CORNYN:** Attorney General Sessions, former director Comey in his letter to FBI employees when he was terminated started this way. He said I've long believed that a president can fire an FBI director for any reason or no reason at all. Do you agree with that?

EXHIBIT 9

**SESSIONS:** Yes, and I think that was a -- good for him to say because I believe we're going to have a new and excellent FBI director, a person who is smart, disciplined, with integrity and proven judgment that would be good for the bureau, and I think that statement probably was a valuable thing for Director Comey to say. I appreciate that he did.

**CORNYN:** Just to reiterate, the timeline of your recusal and the Rosenstein memo and your letter to the president recommending the termination of director Comey, you recused from the Russian investigation hon March the 2nd, correct?

**SESSION:** The formal recusal took place on that date.

**CORNYN:** The letter that you wrote forwarding the Rosenstein memo to the president as a basis for director Comey's termination was dated May the 9th, a couple of months after you had recused from the Russian investigation, correct?

**SESSIONS:** I believe that's correct.

**CORNYN:** So isn't it true that the Russian investigation did not factor into the -- into your recommendation to fire director Comey?

**SESSIONS:** That is correct.

**CORNYN:** The memorandum written by the deputy attorney general, your letter to the president forwarding that recommendation didn't mention Russia at all. Is that your recollection?

**SESSIONS:** That is correct.

**CORNYN:** So let's review what the basis was of deputy attorney general Rosenstein's recommendation. He wrote in his memo on May the 9th. He said I cannot defend the director's handling of the conclusion of the investigation of secretary Clinton's e-mails, and I do not understand his refusal to accept the nearly universal judgment that he was mistaken, and, of course, he's talking

about director Comey. He went on to say the director -- that was director Comey at the time was wrong to usurp the attorney general's authority on July the 5th, 2016. You'll recall that was the date of the press conference he held. He went on to say that the FBI director is never empowered to supplant federal prosecutors and assume command of the Justice department. Finally, he said compounding the error, the director ignored another long-standing principle, that we do not hold press conferences to release derogatory information about the subject of a declined criminal investigation. In fact, there is written policy from the Department of Justice, is there not, entitled Election Year sensitivities. Are you familiar with the prohibition of the Justice Department making announcements or taking other actions that might interfere with the Normal elections?

**SESSIONS:** I am generally familiar with that. Some of those were the Holder memoranda after my time in the department.

**CORNYN:** Well, let me --

**SESSIONS:** There's always been rules about it though.

**CORNYN:** Well, let me ruled just an excerpt from a memo from the attorney general. March theth, 2012, entitled election year sensitivities. It says law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the department's mission and with the principles of federal prosecution. Do you agree with that?

**SESSIONS**: Essentially, yes.

**CORNYN:** So what essentially the deputy attorney general said is that former director Comey violated Department of Justice directives when he held a press conference on July the 5th, 2016. He announced that Secretary Clinton was extremely careless with classified e-mail and went on to release other derogatory information, including his conclusion that she was extremely

careless but yet went on to say that no reasonable prosecutor would prosecute her. That is not the role of the FBI director, is it? That is a job for the prosecutors at the Department of Justice. That's what was meant by deputy attorney general Rosenstein when he said that director Comey usurped the role of the Department of Justice prosecutors. Is that right?

**SESSIONS:** That is correct, and former attorney general Bill Barr wrote an op-ed recently in which he said he had assumed that attorney general lynch had urged Mr. Comey to make this announcement so she wouldn't have to do it, but in fact it appears he did it without her approval totally and that is a pretty stunning thing. It is a stunning thing, and it violates fundamental powers and then when he reaffirmed that the rightness he believe of his decision on May 3rd, I think it was, that was additional confirmation that the director's thinking was not clear.

**BURR:** Senator Reed.

**SEN. JACK REED:** Thank you very much, Mr. Chairman. First, point, attorney general. Senator Heinrich and others have raised the issue of long-standing rules. If there are written rules, would you provide them to the committee, please.

**SESSIONS:** I will.

**REED:** Thank you very much. Now senator Cornyn has made the point that director Comey's conduct was unprofessional with respect to the Clinton campaign?

**SESSIONS:** I respect everything that the deputy attorney general put in his memoranda as good and important factors to use in determination whether or not he had conducted himself in a way that justified continuing in office. I think it pretty well speaks for itself, and I believe most of it did deal with that. The discussion about his performance was a bipartisan discussion. It began during the election time. Democrats were very unhappy about the way he

conducted himself and in retrospect, in looking at it, I think it was more egregious than I may have even understood at the time.

**REED:** General, if I may, and I don't want to cut you off.

**SESSIONS:** I'll let you go, sorry.

**REED:** Excuse me, sir, on July 7th when Mr. Comey made his first announcement about the case, you were on Fox News, and you said, first of all, director Comey is a skilled former prosecutor and then you concluded by saying essentially that it's not his problem. It's Hillary Clinton's problem. Then in November, on November 6th, after Mr. Comey again made news in late October by reopening, if you will, the investigation, you said, again, on Fox News, you know, FBI director Comey did the right thing when he found new evidence. He had no choice but to report it to the American Congress where he had under oath testified. The investigation was over. He had to direct that and say this investigation ongoing now. I'm sure it's significant, or else he wouldn't have announced that. So in July and November director Comey was doing exactly the right thing. You had no criticism of him. You felt that in fact he was a skilled professional prosecutor. You felt that his last statement in October was fully justified so how can you go from those statements to agreeing with Mr. Rosenstein and then asking the president or recommending that he be fired?

**SESSIONS:** I think in retrospect, as all of us began to look at that clearly and talk about it as respectives of the department of justice, once the director first got involved and embroiled in a public discussion of this investigation which would have been better never to have been discussed publicly, and said he -- it was over. Then when he found new evidence that came up, I think he probably was required to tell Congress that it wasn't over, that new evidence had been developed. It probably would have been better and would have been consistent with the rules of the Department of Justice to never have talked about the investigation to begin with. Once you get down that road, that's the kind of thing that you get into that went against classical prosecuting policies that I

learned and was taught when I was United States attorney and assistant united States attorney.

**REED:** If I may ask another question. Your whole premise in recommending to the president was the actions in October involving Secretary of State Clinton, the whole Clinton controversy. Did you feel misled when the president announced that his real reason for dismissing Mr. Comey was the Russia investigation?

**SESSIONS:** I don't have -- I'm not able to characterize that fact. I wouldn't try to comment on that.

**REED:** So you had no inkling that there was anything to do with Russia until the president of the United States basically declared not only on TV but in the oval office to the Russian foreign minister saying the pressure is off now. I got rid of that nutjob. That came to you as a complete surprise?

**SESSIONS:** Well, all I can say, Senator Reed, that our recommendation was put in writing and I believe it was correct and I believe the president valued it, but how he made his decision was his process.

**REED:** And you had no inkling that he was considering the Russia investigation?

**SESSIONS:** Well, I'm not going to try to guess what he thought about that.

**REED:** That's fair. There is a possibility -- there is a scenario in which this whole recapitulation of Clinton was a story basically, a cover story that the president tried to put out and he quickly abandoned and his real reason was the Russia investigation which if it had been the case I expect you would have recused yourself from any involvement. Thank you.

**BURR:** Senator McCain.

**MCCAIN:** Over the last few weeks the administration has characterized your previously undisclosed meetings with Russia ambassador Kislyac as meetings

you took in your official capacity as a U.S. Senator and a member of the Senate Armed Services Committee. As chairman of the that committee, let me ask you a few questions about that. At these meetings did you raise concerns about Russia invasion of Ukraine or annexation of Crimea?

**SESSIONS:** I did, Senator McCain, and I would like to follow up a little bit on that. That's one of the meetings -- that's one of the issues that I recall explicitly. The day before my meeting with the Russian ambassador, I'd met with the Ukrainian ambassador, and I heard his concerns about Russia, and so I raised those with Mr. Kislyak, and he gave, as you can imagine, not one inch. Everything they did, the Russians had done, according to him was correct, and I remember pushing back on it, and it was a bit testy on that subject.

**MCCAIN:** Knowing you on the committee, I can't imagine that. Did you raise concerns about Russia's support for President Bashar Al Assad and his campaign of indiscriminate violence against his own citizens including his use of chemical weapons?

**SESSIONS:** I don't recall whether that was discussed or not.

**MCCAIN:** Did you raise concerns about Russia's interference in our electoral process or interferences of the electoral processes cause of our allies?.

**SESSIONS:** I don't recall that being discussed.

**MCCAIN:** At those meetings, if you spoke with Ambassador Kislyak in your capacity as a member of the Armed Services Committee you presumably talked to him about Russia-related security issues that you have demonstrated as important to you as a member of the committee?

**SESSIONS:** Did I discuss security issues --

**MCCAIN:** I don't recall you as being particularly vocal on such issues.

**SESSIONS:** Repeat that, Senator McCain, I'm sorry.

**MCCAIN:** The whole Russia-related security issues that you demonstrated is important to you as a member of the committee, did you raise those with him?

**SESSIONS:** You mean such issues as nuclear issues, or?

**MCCAIN:** Yeah. In other words, Russia-related security issues, in your capacity as the chairman of the Strategic Forces Subcommittee, what Russia-related security issues did you hold hearings on or otherwise demonstrate a keen interest in?

**SESSIONS:** We may have discussed that. I just don't have a real recall of the meeting. I may, I was not making a report about it to anyone. I just was basically willing to meet and see what he discussed.

**MCCAIN:** And his response was?

**SESSIONS:** I don't recall.

**MCCAIN:** During that 2016 campaign season, did you have any contacts with any representative, including any American lobbyist or agent of any Russian company within or outside your capacity as a member of congress or a member of the armed services committee?

**SESSIONS:** I don't believe so.

**MCCAIN:** Politico recently reported in the middle of the 2016 election the FBI found that Russian diplomats whose travel to the state department was supposed to track had gone missing. Some turned up wandering around the desert or driving around Kansas and reportedly intelligence services reported after a year of inattention, these movements indicate, one, that Moscow's espionage ground game has grown stronger and more brazen and that quietly, the Kremlin has been trying to map the United States telecommunications infrastructure. What do you know about this development and how the justice department and other relevant U.S. Government agencies are responding to it?

**SESSIONS:** We need to do more, Senator McCain. I am worried about it. We also see that from other nations with these kind of technological skills like China and some of the other nations that are penetrating our business interests, our national security interests. As a member of the Armed Services Committee, I did support and advocate -- and I think you supported -- legislation that would -- and it's ongoing now, that requires the defense department to identify weaknesses in our system and how we can fix them, but I would say to you, Senator McCain, that in my short tenure here in the Department of Justice I've been more concerned about computer hacking and those issues than I was in the Senate. It's an important issue, you're correct.

**MCCAIN:** "The Washington Post" reported yesterday Russia's developed a cyber weapon that disrupt the United States power grids and telecommunications infrastructure. This weapon is similar to what Russia or Russia-allied hackers used to disrupt Ukraine's electrical grid in 2015. Can you discuss a little bit in open session how serious that is?

**SESSIONS:** I don't believe I can discuss the technological issues, just to say that it is very disturbing that the Russians continue to push hostile actions in their foreign policy, and it is a -- not good for the United States or the world or Russia in my opinion.

**MCCAIN:** Do you believe we have a strategy in order to counter these ever increasing threats to our national security and our way of life?

**SESSIONS:** Not sufficiently. We do not have a sufficient strategy dealing with technological and I.T. penetrations of our system. I truly believe it's more important than I ever did before, and I appreciate your concern and leadership on that issue, and in fact, all of Congress is going to have to do better.

**BURR:** Senator's time has expired. The chair would recognize the vice-chair.

**WARNER:** Thank you, Mr. Chairman, and General Sessions, thank you. I particularly appreciate your last comments with Senator McCain about the

seriousness of this threat and it's why so many of us on this committee are concerned when the whole question of Russian intervention.

The president continues to refer to it as a witch-hunt and fake news, and there doesn't seem to be a recognition of the seriousness of this threat. I share, I think most members do, the consensus that the Russians massively interfered and want to continue to interfere, not to favor one party or another but to favor their own interests, and it is of enormous concern that we have to hear from the administration how they are going to take that on. I also believe comments have been made here about where we head in terms of some of the trump associates who may have had contacts with Russians.

We've not gotten to all that you have yet because of the unprecedented firing of the FBI director that was leading this very same Russia investigation, that superseded some of our activities, so those members when I hope will equally pursue the very troubling amount of smoke at least that's out there between individuals that were affiliated with the Trump campaign and possible ties with Russians. I've not reached any conclusion. We've got to pursue that. Final comment, and I understand your point, but you have to -- there were a series of comments made by Mr. Comey last week. I think members on this side of the aisle have indicated, you understand executive privilege, understand classified setting. I do think we need, as Senator Reed indicated and Senator Harris and others, if there are these long-standing written procedures about this ability to have some other category to protect the conversations with the president, we'd like to get a look at them because we need to find out in light of some of the contradictions between today and last week where this all heads.

At the end of the day, this is not only -- let me restate what I stated last time. It's not about relitigating 2016. It's about finding out what happened, about some serious allegations about potential ties, but on a going forward basis making sure that the Russians who are not finished in terms of their activities didn't end on Election Day 2016. We know that's ongoing and we have to be better prepared going forward. Thank you, Mr. Chairman.

EXHIBIT 9

Case 3:24-cv-00040-ZNQ-TJB   Document 43   Filed 03/11/24   Page 226 of 231 PageID: 960

Mining Secrets: Solway-Linked Companies Moved Nearly $2 Billion in Suspicious Funds

🖼 Credit: Forbidden Stories

by **Joachim Dyfvermark (SVT), Linda Kakuli (SVT), Holger Roonemaa (Eesti Ekspress), and Karina Shedrofsky (OCCRP)**

*9 March 2022*

🐦 (http://twitter.com/intent/tweet?text=Solway was labeled a "high-risk" client over suspect transactions, while companies tied to the mining group a

𝑓 (http://www.facebook.com/share.php?u=https://www.occrp.org/en/investigations/mining-secrets-solway-linked-companies-moved-nearly-2-billion-

❤ DONATE (https://www.occrp.org/en/donate)

**Solway was labeled a "high-risk" client over suspect transactions, while companies tied to the mining group and its executives were reported to U.S. regulators.**

## Key Findings

Swedbank Estonia dropped Solway as a customer in 2011 because shell companies related to the mining group had carried out suspicious transactions.

Reporters identified hundreds of transactions worth almost $1.9 billion between 23 companies with links to Solway between 2007 and 2015 in leaked banking data.

Several of these companies were reported to U.S. regulators during that period for millions of dollars' worth of suspicious payments.

Others transacted with companies that have been used in several Russian tax evasion and money laundering scandals.

EXHIBIT 10

It was early 2019 and executives at Swedbank were worried. News that their bank's Estonia business may have been used to launder billions of dollars had broken a few days earlier (https://www.svt.se/special/swedbank/english/), and they were scrambling to contain the fallout.

On February 25, a memo was circulated to staff outlining measures that the bank had taken to deal with "high-risk" clients in previous years, including hundreds of customers whose accounts had been closed. Among them was Solway Investment Group, a metals company that operates mines and smelting facilities around the world.

Most of the companies in the Solway group were identified as "holding/transaction entities," some of which had carried out "questionable transactions," said the memo, obtained by Eesti Ekspress. It noted Solway had "declined the request to present correct ownership documentation" and so was "offboarded in 2011."

Swedbank dropped Solway at a time when huge sums of suspect money were flowing through its Baltic operations. Investigators would later find that at least 200 billion euros were laundered through accounts in the Estonian branches of Swedbank and Denmark's Danske Bank between 2007 and 2015. Much of this flowed from Russia and Eastern Europe to shell companies, in one of the world's largest-ever money laundering scandals (/en/the-fincen-files/rinse-profit-repeat-how-a-small-team-of-estonians-turned-a-danish-bank-into-a-laundromat).

Now, a data from these banks leaked to Swedish broadcaster SVT — analyzed as part of the Mining Secrets project led by Forbidden Stories (/en/investigations/mining-secrets-major-nickel-producer-accused-of-polluting-guatemalas-largest-lake) — has identified hundreds of questionable payments that might have led Swedbank to drop Solway as a customer.

Reporters identified 23 companies related to the mining group that moved close to $1.9 billion between 2007 and 2015 in large, round-dollar payments without a clear business purpose — hallmarks of what is known as "suspicious activity." OCCRP established that all of them have been linked to the Solway group or its senior executives.

Maíra Martini, who leads Transparency International's anti-money laundering work, said anonymous companies are commonly used to move questionable money because it is so difficult to determine who owns them.

"It is not uncommon to use a network of companies, including shell companies and others with real operations, to engineer transactions that mix legitimate and illegitimate funds," she said.

Swedbank wasn't alone in its concerns about these companies. Other banks also flagged some of them to the U.S. Treasury's financial crimes bureau for making suspicious transactions during the same period, according to reports leaked to BuzzFeed News as part of a project coordinated by the International Consortium of Investigative Journalists, known as the FinCEN files.

It's unclear where any of the $1.9 billion originated, or why Solway would need to move money around like this. But buried in banking records from previous OCCRP investigations, reporters found that companies from the group of 23 had transacted with other companies used in Russian tax evasion and money laundering scandals.

A former Swedbank official, who spoke on condition of anonymity, said the country of Estonia positioned itself as a "kind of transit republic" for Russian money at that time.

"Today, having connections to the Kremlin is a negative," the former official said. "At that time, it was more of a reassurance that your client would probably have a slightly longer career than other clients."

Solway denied it had been involved in any illicit transactions, saying it acts "strictly in line with applicable national laws and international regulations" and works to combat corruption. A spokesperson declined to comment on Swedbank's decision, except to say Solway had "followed all the necessary procedures to comply" with the bank's new policies.

"Solway Investment Group firmly rejects the allegations of money laundering and corruption. No accusations of wrongdoing were ever brought against us by any financial or regulatory bodies," the company said.

After OCCRP and 20 partners published an array of stories this week as part of the Mining Secrets project, Solway released a statement (https://solwaygroup.com/2022/03/06/solway-investment-group-firmly-rejects-the-false-and-defamatory-allegations/) rejecting reporters' findings and adding that the company has exited all of its investments in Russia.

EXHIBIT 10

## FinCEN Files

Read more of OCCRP's reporting from the FinCEN files here.

**Read more** 

**(/en/the-fincen-files/)**

Swedbank declined to comment on individual customers, but noted that it had already been fined by authorities for "past shortcomings in the management and control of measures against money laundering in the bank's Baltic operations."

Danske Bank also declined to discuss its Estonian business, which is still being investigated, but said it had invested significantly in compliance systems. "We are now in a different position with respect to combating financial crime and money laundering than when the situation in Estonia developed," said chief administrative officer Philippe Vollot.

Credit: Agencja Fotograficzna Caro/Alamy Stock Photo
**Swedbank's office in Tallinn, Estonia.**

EXHIBIT 10

## *Red Flags*

OCCRP scoured corporate registries and leaked documents to identify who controlled the 23 companies involved in the suspicious transactions. In a few cases, details of their owners and directors were publicly available.

Other companies were based in secrecy jurisdictions, so reporters relied on listings of subsidiaries or "related entities" in old Solway annual reports. Filings to the U.S. regulator, found in the FinCEN files, gave clues that two more were linked to Solway.

By piecing together this disparate information, reporters found 21 companies had corporate ties to Solway or its senior executives at some point during the period of the suspicious transactions.

In several cases these executives — which included Solway's co-founders Aleksandr Bronstein as his son Dan, along with Solway group secretary Andre Seidelsohn — directly represented or controlled the companies. One was owned by companies belonging to another group director, Christodoulos Vassiliades, a Cypriot lawyer who has reportedly worked with notorious Russian crime boss Semion Mogilevich (https://www.icij.org/investigations/pandora-papers/alcogal-panama-latin-america-politicians/).

It's not clear who owned the other two companies, Core Trading Ltd and Raznoimport Holdings Ltd, but media reports and official investigations show that they have ties to the mining group and its founders stretching back years.

EXHIBIT 10



Credit: Edin Pasovic/OCCRP

Solway disputed the connections, saying that only 13 companies out of the 23 identified by reporters are related to the mining group. Vassiliades did not respond to a request for comment, but his law firm has previously said that it complies with due diligence regulations (https://www.icij.org/investigations/pandora-papers/alcogal-panama-latin-america-politicians/).

EXHIBIT 10

SVT used the same techniques as financial investigators to identify suspect transfers made by these companies, looking for frequent transfers of large, round-dollar amounts made for no clear reason. In total, reporters flagged more than 1,000 transactions, together worth close to $1.9 billion, made between 2007 and 2015. Anti-money laundering experts who reviewed some of the data confirmed the transfers ought to raise red flags.

Most of the transactions were described as payments for loans. The records show some of the companies moved money back and forth between them, or made several payments in the same week or day citing the same or similarly named agreements.

"Why is a company apparently both borrowing and lending similar amounts? This doesn't make commercial sense," said Graham Barrow, an expert in financial crime who reviewed some of the transaction data.

"When a company has a complex corporate structure and moves money around within that structure for no obvious commercial benefit, it will likely be viewed by the bank as a 'red flag.'"

One of the most prolific companies was Tactica Limited, which a leaked 2011 report from the FinCEN files suggested was affiliated with Aleksandr Bronstein. Tactica made over 750 transactions worth more than $900 million between 2007 and 2011, most of them with another company from the group of 23 named Core Trading. Almost all the transactions, including multiple payments on the same or consecutive days, were described as related to the same loan agreement.

Solway declined to comment on the transactions, but said that "in general, all transfers and deposits were held as a normal course of business and are common entrepreneurial practices." A spokesperson denied that Solway was affiliated with Core Trading or Tactica, but did not address whether Bronstein had any relationship with Tactica.

"Swedbank and Danske Bank have been subjected to thorough and long-term criminal and civil investigations. Solway group has never received any questions from either the banks [or a] prosecutors' office during those legal actions," added a spokesperson.

Natalja Kesler, who has been a representative of Tactica, declined to comment on the company's transactions, but said "everything with it is in order." She said she had worked with Aleksandr Bronstein for 33 years and he was only ever involved in lawful dealings.

"Mr. Bronstein's principle is that everything should be transparent," she said.

OCCRP could not confirm who owned Core Trading, which was at one point registered in St. Vincent and the Grenadines at the same address as Tactica. Reporters did, however, find leaked documents linking the company to alleged tax evasion by two of Solway's subsidiaries.

One of them, the Pobuzhsky Ferronickel Plant in Ukraine, was accused of using fake contracts with Core Trading and several local companies to evade around $1 million of taxes between 2011 and 2014. The case was thrown out after the company convinced a court the transactions were valid.

North Macedonia's Ministry of the Interior also accused another Solway company, which operates a copper and gold mine there, of working with Core Trading to manipulate prices of copper concentrate to evade taxes between 2006-2008. Investigators put together a report outlining the allegations and prosecutors opened a case, but it has since stalled, as often happens in the country.

Solway did not address questions about the mining company's relationship with Core Trading, except to say it is not part of the group. A spokesperson added that there had been "a number of audits and investigations related to the operational activity of Pobuzhsky Ferronickel Plant," none of which "resulted in any further legal actions."

Reporters were unable to reach Core Trading for comment.