An official website of the United States government
Here's how you know 

 U.S. Department of
**Health and Human Services**
Enhancing the health and well–being
of all Americans    </>

MENU

**Navigate to:**

   

# The Wanaque Center for Nursing & Rehabilitation, DAB CR6030 (2022)

Department of Health and Human Services
DEPARTMENTAL APPEALS BOARD
Civil Remedies Division

The Wanaque Center for Nursing & Rehabilitation,
(CCN: 31-5229),
Petitioner,

v.

Centers for Medicare & Medicaid Services.

Docket No. C-20-162
Decision No. CR6030
February 15, 2022

DECISION

EXHIBIT 21

In this case, a housekeeper at a long-term-care facility sexually assaulted a severely impaired and vulnerable resident. I now consider the facility's responsibility for the actions of its "rogue" employee.

Petitioner, The Wanaque Center for Nursing & Rehabilitation, was a long-term-care facility, located in Haskell, New Jersey, that participated in the Medicare program.[1] Following a complaint investigation survey, completed August 15, 2019, the Centers for Medicare and Medicaid Services (CMS) determined that the facility was not in substantial compliance with Medicare program requirements and that its deficiencies posed immediate jeopardy to resident health and safety. CMS imposed civil money penalties (CMPs) of $10,015 per day for 15 days of substantial noncompliance that posed immediate jeopardy to resident health and safety, and $110 dollars per day for 56 days of substantial noncompliance that did not pose immediate jeopardy (August 16 through October 10, 2019).

Petitioner has appealed, and CMS moves for summary judgment.

**Page 2**

For the reasons set forth below, I grant CMS's motion. I find that no material facts are in dispute and that this case turns on a question of law, so it may appropriately be decided on summary judgment. The parties agree that a facility housekeeper sexually abused a defenseless resident. They dispute whether, based on an earlier complaint filed against the abuser, the facility should have anticipated the abuse, but that question is not material. Because a facility employee sexually abused a resident, the facility was not in substantial compliance with 42 C.F.R. § 483.12(a), and that deficiency posed immediate jeopardy to resident health and safety. *Kindred Transitional Care & Rehab – Greenfield,* DAB No. 2792 (2017). The penalties imposed are reasonable.

## Background

The Social Security Act (Act) sets forth requirements for nursing facilities to participate in the Medicare program and authorizes the Secretary of Health and Human Services to promulgate regulations implementing those statutory provisions. Act § 1819. The Secretary's regulations are found at 42 C.F.R. Part 483. To participate in the Medicare program, a nursing facility must maintain substantial compliance with program requirements. To be in substantial compliance, a facility's deficiencies may pose no greater risk to resident health and safety than "the potential for causing minimal harm." 42 C.F.R. § 488.301.

EXHIBIT 21

The Secretary contracts with state survey agencies to conduct periodic surveys to determine whether skilled nursing facilities are in substantial compliance. Act § 1864(a); 42 C.F.R. § 488.20. Each facility must be surveyed annually, with no more than fifteen months elapsing between surveys. Facilities must be surveyed more often, if necessary, to ensure that identified deficiencies are corrected. Act § 1819(g)(2)(A); 42 C.F.R. §§ 488.20(a), 488.308. The state agency must also investigate all complaints. Act § 1819(g)(4).

In this case, surveyors from the New Jersey State Department of Health, Office of Long Term Care (state agency) went to the facility on August 12-15, 2019, to investigate the facility's report that one of its housekeepers had sexually assaulted a resident. CMS Ex. 38 at 2 (Slisz Decl. ¶¶ 5, 7); see CMS Ex. 18. Based on the survey findings, CMS determined that the facility was not in substantial compliance with the program requirement aimed at preventing abuse: **42 C.F.R. § 483.12(a)(1)** (Tag F600 – freedom from abuse and neglect), cited at scope and severity level J (isolated instance of substantial noncompliance that poses immediate jeopardy to resident health and safety). CMS Exs. 21, 32.[2]

**Page 3**

After multiple revisit surveys (August 27, September 12, October 8, and October 11, 2019), CMS determined that the facility corrected the immediate jeopardy on August 16, 2019, and returned to substantial compliance on October 11, 2019. CMS imposed against the facility penalties of $10,015 per day for 15 days of substantial noncompliance that posed immediate jeopardy to resident health and safety (August 1 through 15, 2019), and $110 dollars per day for 56 days of substantial noncompliance that did not pose immediate jeopardy (August 16 through October 10, 2019), for a total penalty of $156,385 ($150,225 + $6,160 = $156,385). CMS Ex. 33; see CMS Exs. 21, 32.

Petitioner timely requested review.

CMS has filed a motion for summary judgment with a pre-hearing brief (CMS Br.), along with 39 exhibits (CMS Exs. 1-39). Petitioner has submitted its own pre-hearing brief and opposition to summary judgment (P. Br.) with three exhibits (P. Exs. 1-3). CMS filed a reply. (CMS Reply).

## Issues

I consider first whether summary judgment is appropriate.

EXHIBIT 21

3. My findings of fact/conclusions of law are set forth, in italics and bold, in the discussion captions of this decision.

back to note 3

4. Rett syndrome is a neurodevelopmental disorder, characterized by normal early growth and development, followed by slowing of development, loss of purposeful use of the hands and loss of the ability to speak, distinctive hand movements, slowed brain and head growth, problems with walking, seizures, and intellectual disability. Apraxia – the inability to perform motor functions – is perhaps the most severely disabling feature of Rett syndrome, interfering with all body movements, including eye gaze and speech. https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Rett-Syndrome-Fact-Sheet (last visited February 11, 2022).

back to note 4

5. Registered Nurse, Katheryn Reap, investigated the incident for the facility. CMS Ex. 7; P. Ex. 1 at 8 (Reap Decl. ¶ 38). Both she and the facility's administrator, Rowena Bautista, confuse Nurse Aide #1 with Nurse Aide #2. P. Ex. 1 at 7-8 (Reap. Decl. ¶ 36); P. Ex. 3 at 7 (Bautista Decl. ¶ 33). They write that Nurse Aide #2 entered the room; however, it is certain that Nurse Aide #1 entered the room. *See* CMS Ex. 8 at 1 (Employee Confidential List); CMS Ex. 16 at 3 (surveyor notes identifying Nurse Aide #1); CMS Ex. 25 at 1 (police report identifying Nurse Aide #1).

back to note 5

6. Housekeeper #1 had apparently started working at the facility as an employee but later became a contract employee. P. Br. at 4. The facility is as responsible for the actions of its contract employees as it is for those of its direct employees. *See* 42 C.F.R. §§ 483.21(b)(3), 483.70(g).

back to note 6

7. CMS amended its regulations governing nursing home participation in the Medicare program. 81 Fed. Reg. 68,688 (Oct. 4, 2016); 82 Fed. Reg. 32,256 (July 13, 2017). However, the substance of the regulation governing abuse (much of which is statutory) has not changed, which means that the cases decided under the prior regulation (42 C.F.R. § 483.13(b)) are still valid.

back to note 7

8. Housekeeper #1 admitted to "patting the resident on the shoulder. He was known as a friendly custodian who would often pat residents on the shoulder or make kind comments to them." P. Br. at 10; *see* CMS Ex. 2 at 16 (police investigator advising facility administrator that Housekeeper #1 "needs to be told to stop touching patients."). For purposes of summary judgment, I accept the facility's claim that it took the allegations seriously, adequately investigated, and legitimately found that no abuse occurred. This is particularly important in cases involving problematic residents. It's no secret that unreliable residents are often vulnerable to abuse. *See, e.g., The Bridge at Rockwood,* DAB No. 2954 at 15 (2019) (in which a severely cognitively impaired

EXHIBIT 21

In examining the evidence for purposes of determining whether summary judgment is appropriate, I must draw all reasonable inferences in the light most favorable to the non moving party. *Heritage House of Marshall Health & Rehab.*, DAB No. 3035 at 8 (2021); *Livingston Care Ctr.*, 388 F.3d at 172; *Guardian Health Care Ctr.*, DAB No. 1943 at 8 (2004); *see also Brightview Care Center*, DAB No. 2132 at 2, 10 (2007) (entry of summary judgment upheld where inferences and views of non-moving party are not reasonable). However, drawing factual inferences in the light most favorable to the non moving party does not require that I accept the non-moving party's legal conclusions. *W. Tex. LTC Partners*, DAB No. 2652 at 6-7; *cf. Guardian*, DAB No. 1943 at 11 ("A dispute over the conclusion to be drawn from applying relevant legal criteria to undisputed facts does not preclude summary judgment if the record is sufficiently developed and there is only one reasonable conclusion that can be drawn from those facts."); *see Green Valley Healthcare & Rehab. Ctr.*, DAB No. 2947 at 8 (2019) (quoting *Johnson v. Perez*, 823 F.3d. 701, 705 (D.C. Cir. 2016) (noting that a genuine factual dispute does not exist "when a putatively disputed body of evidentiary material could not, even assuming a sympathetic factfinder, reasonably support a finding crucial to the nonmoving party's legal position.")).

**Summary judgment applied to administrative review in Medicare cases.** It is well established that an administrative law judge is empowered to decide a case on summary judgment, without an evidentiary hearing. *Shah v. Azar*, 920 F.3d 987, 996 (5th Cir. 2019) (citing *Cedar Lake Nursing Home v. U.S. Dep't of Health & Human Servs.*, 619 F.3d 453, 457 (5th Cir. 2010)); *see Fal-Meridian, Inc. v. U.S. Dep't of Health & Human Servs.*, 604 F.3d 445, 449 (7th Cir. 2010). Nevertheless, there seems to be some confusion about applying such well-founded principles of civil litigation to these proceedings, with some suggesting that doing so denies a party a fundamental right. In one succinct observation, Judge Posner of the Seventh Circuit Court of Appeals effectively refuted that position: "All it means for a decision to be based on a grant of

**Page 5**

summary judgment is that there are *no issues that would benefit from being resolved in an evidentiary hearing.*" *Fal-Meridian*, 604 F.3d at 449 (emphasis added).

Finally, deciding a case on summary judgment does not mean that it is decided without a hearing. In reviewing administrative appeals decided on summary judgment, courts describe the case as having been decided without an "oral hearing" or without an "evidentiary hearing." They recognize that, by considering the evidence and applying the law, the ALJ has granted the petitioner a hearing. *See CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1293 (D.C. Cir. 1994)

EXHIBIT 21

(2002) (holding that, to be found in substantial compliance earlier than the date of the resurvey, the facility must supply documentation "acceptable to CMS" showing that it was in substantial compliance and *was capable of remaining in substantial compliance* on the earlier date); *Cross Creek Health Care Ctr.,* DAB No. 1665 (1998).

Similarly, "immediate jeopardy is abated only when the facility has implemented necessary corrective measures so that there is no longer any likelihood of serious harm." *Countryside Rehab.,* DAB No. 2853 at 25 (quoting *Glenoaks Nursing Ctr.,* DAB No. 2522 at 19 (2013)). The facility must "do more than neutralize the threat to resident safety posed by [a single abuser's] presence in the facility." It must address and correct the problems underlying the noncompliance that created the immediate jeopardy. *Countryside Rehab.* at 26. CMS's determination that a facility's ongoing noncompliance remains at the level of immediate jeopardy during a given period "is subject to the clearly erroneous standard of review under [42 C.F.R. §] 498.60(c)(2)." *Life Care of Elizabethton, DAB* No. 2367 at 16 (quoting *Brian Center,* DAB No. 2336 at 7-8 (2010)).

If CMS accepts a deficient facility's plan of correction, *the facility must then timely implement all of the steps that it identified in the plan as necessary to correct the cited problems. Cal Turner Extended Care Pavilion,* DAB No. 2030 at 19 (2006); *see also Meridian Nursing Ctr.,* DAB No. 2265 (2009); *Lake Mary Health Care,* DAB No. 2081 at 29 (2007).

Here, CMS rejected Petitioner's initial plan of correction and accepted its second plan on October 1, 2019. *See* CMS Exs. 13, 14; CMS Ex. 39 at 9-10 (San Juan Decl. ¶¶ 36-38). CMS's determination to reject a plan of correction is not an initial determination and is therefore not reviewable. 42 C.F.R. §§ 498.3(b), 498.5; *Hermina Traeye Mem'l Nursing Home,* DAB No. 1810 at 13 (finding that the "ALJ properly concluded that he lacked authority to adjudicate the question of whether [CMS] abused its discretion in deciding to reject the [plan of correction].").

As the facility's plan of correction shows, correction required significant time. The corrections included training staff and then following up to ensure that they were adhering to the new policies. After educating all staff, the Director/Designee/Nursing Supervisor would, for four weeks, observe their performance daily to ensure that they followed the new policies. After those four weeks, the facility would begin weekly

**Page 18**

EXHIBIT 21

At about 6:55 a.m. on August 1, 2019, two nurse aides observed a male housekeeper (Housekeeper #1) exit the elevator on the second floor. He had no reason to be on that floor. He was not assigned there and had no cleaning equipment with him. CMS Ex. 25 at 2; P. Ex. 1 at 7 (Reap Decl. ¶ 36). Housekeeper #1 entered R2's room and remained there. Suspicious, one of the nurse aides (Nurse Aide #1) went into the room.[5] She saw that the curtain around the resident's bed had been drawn closed. When the nurse aide pulled back the curtain, she saw Housekeeper #1 sexually assaulting the resident. The nurse aide screamed; the housekeeper fled. Staff called the nurse supervisor and the police. They sent R2 to the hospital. CMS Ex. 7 at 3; CMS Ex. 16 at 3; CMS Ex. 18 at 6; CMS Ex. 22 at 4, 15; CMS Ex. 25 at 1-2.

The police arrested Housekeeper #1 and charged him with aggravated criminal sexual contact. He was remanded to the county jail. CMS Ex. 25 at 4, 5; P. Ex. 1 at 8 (Reap Decl. ¶ 40).

The facility investigated and confirmed that Housekeeper #1 had sexually assaulted the resident and then fled the scene. Based on its finding of abuse, the facility discharged the housekeeper. CMS Ex. 25 at 17.

The crux of Petitioner's case is that the abuse was not foreseeable and "foreseeability must play an integral part in the decision to find the . . . facility deficient pursuant to the

## Page 7

Code of Federal Regulations." P. Br. at 2. This is simply wrong when, as here, *a staff member abuses a resident.*[6] In *Kindred Transitional Care* (and multiple other cases) the Departmental Appeals Board soundly rejected the notion that the facility is accountable only if CMS shows that it could have foreseen the abuse. "[C]onsiderations of foreseeability are inapposite when [as here] staff abuse has occurred." *Kindred Transitional Care,* DAB No. 2792 at 10 (quoting *Springhill Senior Residence,* DAB No. 2513 at 15 (2013) and *Gateway Nursing Ctr.,* DAB No. 2283 at 8 (2009)).[7]

The Medicare statute makes facilities responsible for any misconduct of their staff and agents that violate federal participation standards, "even that of which facility owners or management may not be aware." *Kindred Transitional Care,* DAB No. 2792 at 12 (citing Act §§ 1128A(l), 1819(h)(2)(B)(ii)). A facility may not disavow the wrongdoing of its staff and may properly be held responsible for its staff's actions. *Madison Cnty. Nursing Home,* DAB No. 2895 at 8-9 (2018); *Kindred Transitional Care,* DAB No. 2792 at 10; *Springhill Senior Residence,* DAB No. 2513 at 15; *Gateway Nursing Ctr.,* DAB No. 2283 at 8. This "applies equally to care-related and non-care-related staff." *Madison Cnty.,* DAB No. 2895 at 10.

EXHIBIT 21

- In April 2019, just four months before the abuse occurred here, the facility was not in substantial compliance with a related section of the abuse regulation, 42 C.F.R. § 483.12(b)(1)-(4) (Tag F607 – develop and implement policies to prevent abuse), cited at scope-and-severity level D (isolated instance of substantial noncompliance that causes no actual harm, with the potential for more than minimal harm).

- In November 2018, the facility was not in substantial compliance with multiple program requirements, the worst of which were cited at *scope-and-severity level L* (widespread substantial noncompliance that poses immediate jeopardy to resident health and safety): 42 C.F.R. § 483.70 (Tag F835 - administration); 42 C.F.R. § 483.70(e)(1)-(3) (Tag F838 - administration: facility assessment); 42 C.F.R. § 483.75(d), (e), (g) (Tag F867 - quality assurance: program feedback, program activities, quality assessment and assurance); 42 C.F.R. § 483.75(g)(1) and (2) (Tag F868 - quality assurance: quality assurance and performance improvement); and 42 C.F.R. § 483.80 (Tag F880 - infection control and prevention).

CMS Ex. 35 at 1, 2. Without regard to any other factor, the facility's history justifies the relatively low penalties imposed.

Petitioner does not claim that its financial condition affects its ability to pay the penalties.

With respect to the remaining factors, the facility is culpable because one of its staff sexually assaulted a resident, which shows a complete disregard for her care, comfort, and safety, and the facility is responsible for the actions of its staff. *Kindred Transitional Care,* DAB No. 2792 at 15; *Springhill Senior Residence,* DAB No. 2513 at 15; *Gateway Nursing Ctr.,* DAB No. 2283 at 8.

The facility is also culpable because it did not implement its directive to ensure that housekeepers were not alone with residents and because facility staff did not know that they were supposed to report suspicious activities. Although I accept (for purposes of summary judgment) that, in January 2018, Housekeeper #1 was falsely accused, this doesn't mean that the facility was then problem-free when it came to keeping its residents safe from abuse. The investigators recognized that the facility had some vulnerabilities

**Page 16**

notably that Housekeeper #1 was inclined to touch residents. His intentions (in January 2018) may have been benign, but he should not have been entering resident rooms and touching them, particularly if the resident was alone. Based on its assurances to the state agency, the facility

EXHIBIT 21

- On August 13, 2019, Surveyor Slisz interviewed Nurse Aide #2, who confirmed that, sometime before August 1, she and Nurse Aide #1 had seen Housekeeper #1 go into R2's room. "It did not make sense for him to be on the floor at the time." It took them a couple of minutes to walk down there, and she didn't know if he heard them coming. When they arrived, he was leaving the room. "We did not report because he is a housekeeper [and] he is assigned at times to clean rooms and empty garbage. It was a little suspicious, but, because he has been in and out of rooms, buffing the floors [and] taking out the garbage, we did not report." CMS Ex. 16 at 19.

- Housekeeper #1's supervisor told police that he did not know why Housekeeper #1 would be in R2's section of the facility because he was assigned to the pediatric section, which, as the police officers noted, is not near R2's room. CMS Ex. 25 at 2.

## Page 9

Petitioner has not challenged the truth of the nurse aides' statements, much less tendered evidence suggesting that a factual dispute exists as to whether the nurse aides previously observed Housekeeper #1's suspicious behavior. *See Matsushita Elec.,* 475 U.S. 574, 586 n.11; *Vandalia Park,* DAB No. 1939; *Lebanon Nursing & Rehab. Ctr.,* DAB No. 1918. Moreover, these statements were made by the facility's own employees, and those individuals have not refuted them. *See Beatrice State Developmental Ctr.,* DAB No. 2311 at 17, 18 (2010) (pointing out that the facility could have but did not present employee testimony that refuted the statements the surveyors claimed they made); *Omni Manor Nursing Home,* DAB No. 1920 at 11 (2004) (holding that statements of facility employees to the surveyors may be admitted in an administrative proceeding and may constitute substantial evidence; *see Richardson v. Perales,* 402 U.S. 389, 410 (1971).

This undisputed evidence thus establishes that the nurse aides observed Housekeeper #1's suspicious behavior well before he was caught molesting the resident. Yet, they did not report it.

Although the facility was out of substantial compliance based solely on the fact of the sexual assault, these facts – that the nurse aides observed suspicious behavior, did not report it, indeed, did not even realize that they should report it – not only undercut Petitioner's claim that the facility could not have anticipated the abuse, they provide a second basis for finding the facility out of substantial compliance.

EXHIBIT 21

Moreover, I reject Petitioner's effort to trivialize the significance of what happened to R2. For purposes of summary judgment, I will accept that R2's understanding was limited. But I do not accept that this means that the facility's failure to protect her (or any resident) from sexual assault did not cause serious harm. Housekeeper #1 attacked a young woman who was completely defenseless. She could not speak; she could not control her movements. We cannot know what was going through R2's mind as she was being assaulted, but, as the regulations recognize, by its very nature, sexual abuse causes physical harm, pain, or mental anguish *"irrespective of any mental or physical condition"* attributable to the victim. 42 C.F.R. § 488.301 (emphasis added). And the fact that R2 was sent to the emergency room and subjected to physical examinations is additional evidence that she was seriously harmed.

In any event, the regulation does not require a finding of actual harm. It is well-settled that failing to protect a vulnerable resident from sexual assault is likely to cause serious harm. *See, e.g., Maysville Nursing and Rehab.,* DAB No. 2874 at 21 (2018) (citing *Neighbors Rehab. Ctr.,* DAB No. 2859 at 18 (2018)); *Libertywood Nursing Ctr.,* DAB No. 2433 at 18 (2011); *Somerset Nursing & Rehab. Facility,* DAB No. 2353 at 23 (2010).

Finally, in *Kindred Transitional Care,* the Board rejected the facility's argument (also based on sub-regulatory authority) that the scope-and-severity level of a deficiency involving staff abuse depends on how the facility implemented its abuse policies and reacted to the abuse. There, the facility claimed that it "had an appropriate abuse policy in place and properly administered that policy." A finding of immediate jeopardy was not justified (according to the facility) based on the abuse committed by a "rogue"

## Page 14

employee, who had no history of abuse, so long as the facility responded appropriately, conducting a thorough investigation, protecting the resident from further abuse, disciplining the perpetrator, and retraining staff. *Kindred Transitional Care,* DAB No. 2792 at 20.

Petitioner has thus not met its burden of establishing that CMS's immediate jeopardy determination is clearly erroneous.

### 3. *The penalties imposed are reasonable.*

EXHIBIT 21

In Petitioner's view, the August 2019 survey was tainted by the surveyors' profound misunderstanding of the January 16, 2018 allegations. As discussed above, the surveyors' purported misunderstanding of the allegation of abuse leveled by a different resident on January 16, 2018, is irrelevant. The facility was not in substantial compliance because one of its housekeepers sexually assaulted a resident.

**The non-directive directive.** In any event, the surveyors' attitudes regarding what the facility failed to do in order to keep its residents safe were based on the facility's own representations, for which it is accountable.

In a follow-up to its January 2018 investigative report, the facility told the state agency that it had created a new directive for housekeeping staff:

> [N]o floor cleaning or buffing should take place if a resident is in bed. If a resident [is] unable to leave the bed and room,

**Page 11**

> the cleaning would be postponed, [if] possible. If this was not possible, an additional staff member would be in the room for the duration of the cleaning.

CMS Ex. 2 at 3; P. Ex. 1 at 6 (Reap Decl. ¶ 28); P. Ex. 3 at 5 (Bautista Decl. ¶ 26).

It turns out that the facility did not share this "directive" with any staff, other than Housekeeper #1, claiming now that "it would have been inappropriate to do so." P. Ex. 1 at 7, 9 (Reap Decl. ¶¶ 34, 35, 43); P. Ex. 3 at 6, 7-8 (Bautista Decl. ¶¶ 31, 35, 36).[9] Indeed, what the facility characterized as a "directive" was apparently more of a "suggestion," limited to Housekeeper #1, which he was free to ignore:

> [Housekeeper #1] was not subject to any restriction that did not permit him to enter a resident's room. He was not subject to any restriction that would have prevented him from entering a room unaccompanied. We had made this recommendation to him to protect him against another false accusation like the one that happened in January of 2018[,] when he was falsely accused.

P. Ex. 1 at 8-9 (Reap Decl. ¶ 42); Id. at 10 (Reap Decl. ¶ 49); P. Ex. 3 at 6, 7 (Bautista Decl. ¶¶ 31, 32).

EXHIBIT 21

Petitioner complains that the surveyors simply did not understand the "nuance" that attached to the facility's policies. P. Ex. 1 at 10 (Reap Decl. ¶ 50); P. Ex. 3 at 9 (Bautista Decl. ¶ 42). I see no "nuance" here. I see that the facility promised the state agency that it would implement a very specific policy – housekeepers would not be allowed in a resident's room if the resident was alone. But the facility didn't implement the promised policy, and now claims that it was not policy and was never intended to be policy. I accept that, contrary to what it told the state agency, the facility did not implement this "directive." However, the facility can hardly complain that the state agency expected it to adhere to its promises.

Petitioner also alludes to the state agency's silence after the facility reported the January 2018 events and the facility's response. Petitioner infers that this means that that the agency approved the facility's actions. P. Br. at 13. The problem with drawing this inference is that, in assessing whether the facility's response was adequate, the state

**Page 12**

agency thought that the facility was implementing the housekeeper directive, which turned out not to be true.

### 2. CMS's determination that the facility's substantial noncompliance posed immediate jeopardy to resident health and safety is not clearly erroneous.

Immediate jeopardy exists if a facility's noncompliance has caused or is likely to cause "serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. CMS's determination as to the level of a facility's noncompliance (which would include an immediate jeopardy finding) must be upheld unless it is "clearly erroneous." 42 C.F.R. § 498.60(c). Once CMS presents evidence supporting a finding of substantial noncompliance, it need not offer evidence to support its immediate jeopardy determination. The burden is on the facility to show that CMS's determination is clearly erroneous. *Grace Healthcare of Benton,* DAB No. 2189 at 13 (2008) (citing *Liberty Commons Nursing & Rehab Center- Johnston,* DAB No. 2031 at 17-18 (2006), *aff'd, Liberty Commons Nursing & Rehab Ctr. – Johnston v. Leavitt,* 241 F. App'x 76 (4th Cir. 2007)).

The Board has observed repeatedly that the "clearly erroneous" standard imposes on facilities a "heavy burden" to show no immediate jeopardy and has sustained determinations of immediate jeopardy where CMS presented evidence "from which '[o]ne could reasonably conclude' that immediate jeopardy exists." *Florence Park Care Ctr.,* DAB No. 1931 at 27-28 (2004) (citing *Koester Pavilion,* DAB No. 1750 (2000)); *Daughters of Miriam Center,* DAB No. 2067 at 7, 9 (2007); *see Yakima*

EXHIBIT 21

*Valley Sch.,* DAB No. 2422 at 8 (2011) (holding that the "clearly erroneous" standard is highly deferential and "places a heavy burden on the facility to upset CMS's finding regarding the level of noncompliance").

Relying on selected provisions of the State Operations Manual and a subsequent policy memo (QSO), Petitioner attempts to shift this burden by arguing that CMS has not established the "threshold requirements" for finding immediate jeopardy: 1) that the facility was noncompliant; 2) that the noncompliance led to or was likely to lead to a serious adverse outcome; and 3) immediate action was required. P. Br. at 16-17.

I have already explained why the facility was not in substantial compliance.

With respect to the remaining "requirements," Petitioner argues that the sexual assault did not rise to the level of "serious injury, harm, impairment, or death." Pointing to the opinion of a facility psychologist, Petitioner suggests that because of her significant mental incapacity, R2 was incapable of processing the event and therefore was not harmed. P. Br. at 18. In light of those circumstances, Petitioner argues, a finding of immediate jeopardy is not consistent with the "high standard of a probability of serious injury or harm" described in the manual and policy memo.Petitioner also claims that,

**Page 13**

because it acted promptly when it learned of the abuse, there was no need for immediate corrective action to prevent serious harm.

The Board has discouraged this kind of reliance on the State Operations Manual, pointing out that its provisions are "instructive," but they are not binding. Instead, we are bound by the regulatory definition of immediate jeopardy found in section 488.301. *Countryside Rehab. and Health Ctr.,* DAB No. 2853 at 25 (2018) ("The imminence of resident harm is not an element of the regulatory definition of immediate jeopardy."); *Kindred Transitional Care,* DAB No. 2792 at 20; *Miss. Care Ctr. of Greenville,* DAB No. 2450 at 15-16 (2012); *Foxwood Springs Living Ctr.,* DAB No. 2294 at 9 (2009). That definition "neither defines the term 'likelihood' nor sets any parameters as to the timing of potential harm." *Miss. Care Ctr.,* DAB No. 2450 at 16 (quoting *Agape Rehab. of Rock Hill,* DAB No. 2411 at 19 (2011)). Thus, the Board has concluded that a facility's deficiencies may pose immediate jeopardy even though they do not create a "crisis situation." *Miss. Care Ctr.,* DAB No. 2450 at 16.[10]

EXHIBIT 21

The facility had in place a written policy that required staff to report "all suspicion of abuse." According to the policy, whenever a staff member witnessed a person (including an employee) "having contact with the resident to suggest that 'something may not be right,'" he/she was required to report it. CMS Ex. 1 at 1. The nurse aides' failing to report Housekeeper #1's suspicious behavior violated the facility's policy and put the facility out of substantial compliance with section 483.12(a). *See Green Oaks Health & Rehab. Ctr.,* DAB No. 2567 at 5 (2014) (holding that the methods a facility chooses to protect its residents are reflected in its policies, assessments, and care plans).

In the absence of contemporaneous documentation justifying their failure to follow facility policy, it is "certainly reasonable" to infer that staff were not aware of it, or that they simply disregarded it. *Oxford Manor,* DAB No. 2167 at 5-6 (2008). I find it far more likely that the nurse aides – who ultimately showed admirable concern for R2's welfare – were simply not aware of their responsibility to report suspicious activity. But no matter what inference I draw, staff failed to follow the facility's policy for protecting its residents from abuse, which puts the facility out of substantial compliance with section 483.12(a)(1).

**The (immaterial) January 2018 accusations.** The parties spend an inordinate amount of time arguing about an allegation of abuse that a resident leveled against Housekeeper #1 on January 16, 2018. According to Petitioner, the resident who alleged the abuse was

**Page 10**

completely unreliable. She was known to make false accusations and was considered a racist. She abused staff and wanted Housekeeper #1 fired. P. Ex. 1 at 2-3, 5-6 (Reap Decl. ¶¶ 8, 10, 27, 29, 30); P. Ex. 3 at 2, 5 (Bautista Decl. ¶¶ 7, 8, 9, 25). After thoroughly investigating the allegation, facility staff and the local police exonerated Housekeeper #1. P. Ex. 1 at 4 (Reap Decl. ¶ 16-18, 20); P. Ex. 3 at 3, 4, 5, 6 (Bautista Decl. ¶¶ 15, 18, 23, 27, 28); P. Br. at 9-10, 12; *see* CMS Ex. 2 at 6. On the other hand, there is no question that Housekeeper #1 touched the resident; however, the investigators concluded that the touching did not constitute abuse. CMS Ex. 2 at 16.[8]

To protect the housekeeper from additional false allegations – and for no other reason – the facility provided him with one-on-one in-service training on abuse and advised him not to be alone in a room with a resident and never to touch a resident. P. Ex. 1 at 4, 5, 10 (Reap Decl. ¶¶ 21, 26, 49); P. Ex. 2 at 2-4 (Bourgholtzer Decl. ¶¶ 5, 8, 10-15, 18); P. Ex. 3 at 7 (Bautista Decl. ¶ 32); P. Br. at 11.

EXHIBIT 21

Citing another CMS policy memo, Petitioner complains that CMS imposed a per-day rather than a per-instance penalty. P. Br. at 21. Petitioner is not entitled to review of CMS's choice of remedy. 42 C.F.R. §§ 488.408(g)(2), 498.3(d)(11); *see* 42 C.F.R. § 498.5(b).[11]

To determine whether the CMP is reasonable, I apply the factors listed in 42 C.F.R. § 488.438(f): 1) the facility's history of noncompliance, including repeat deficiencies; 2) the facility's financial condition; 3) factors specified in 42 C.F.R. § 488.404; and 4) the facility's degree of culpability, which includes neglect, indifference, or disregard for resident care, comfort, or safety. The absence of culpability is not a mitigating factor. The factors in 42 C.F.R. § 488.404 include: 1) the scope and severity of the deficiency; 2) the relationship of the deficiency to other deficiencies resulting in noncompliance; and 3) the facility's prior history of noncompliance in general and specifically with reference to the cited deficiencies.

I consider whether the evidence supports a finding that the amount of the CMP is at a level reasonably related to an effort to produce corrective action by a provider with the kind of deficiencies found, and in light of the above factors. I am neither bound to defer to CMS's factual assertions, nor free to make a wholly independent choice of remedies without regard for CMS's discretion. *Barn Hill Care Ctr.,* DAB No. 1848 at 21 (2002); *Cmty. Nursing Home,* DAB No. 1807 at 22 et seq. (2002); *Emerald Oaks,* DAB No. 1800 at 9 (2001); *CarePlex of Silver Spring,* DAB No. 1638 at 8 (1999).

The burden is on *the facility* to demonstrate that a reduction is necessary to make the CMP amount reasonable. *Heritage Plaza Nursing Ctr.,* DAB No. 2829 at 22 (2017).

Here, CMS imposed a penalty of $10,015 per day for each day of immediate jeopardy, which is in the low end of the penalty range ($6,524 to $21,393), and $110 per day for each day of substantial noncompliance that did not pose immediate jeopardy, which is barely above the minimum penalty amount required ($107 to $6,418). 42 C.F.R. §§ 488.408(e), 488.438; 45 C.F.R. § 102.3; 83 Fed. Reg. 51369 (Oct. 11, 2018); 84 Fed.

**Page 15**

Reg. 59549 (Nov. 5, 2019).[12] Considering the relevant factors, these amounts are reasonable.

The facility has a significant history of substantial noncompliance. Among the more troubling survey findings:

EXHIBIT 21

[A]n employee's deliberate wrongdoing – and even criminal misconduct – may properly be imputed to the facility where the employee had 'the means and opportunity' to commit the misfeasance, by virtue of his or her assigned duties and facility access.

*Madison Cnty.*, DAB No. 2895 at 9 (citing *Kindred Transitional Care*, DAB No. 2792 at 14).

Further, one episode of abuse is sufficient to support a finding of substantial noncompliance. "Nothing in section 483.13's [now 483.12] language contemplates that finding a violation turns on the number of incidents or perpetrators, or pervasiveness of abuse." *Kindred Transitional Care*, DAB No. 2792 at 15, 18-19.

**Page 8**

Thus, here, the abuse itself is sufficient to support a finding that the facility was not in substantial compliance with section 483.12(a)(1). Because Petitioner admits that the abuse occurred, CMS is entitled to summary judgment.

**Housekeeper #1's suspicious behavior.** Although not critical to my finding substantial noncompliance, CMS has come forward with evidence establishing that, in the weeks leading up to August 1, 2019, facility staff observed – but did not report – Housekeeper #1's suspicious behavior. The record includes no written statements signed by Nurse Aide #1 or by Nurse Aide #2, not even as part of the facility's investigative report. However, the nurse aides spoke to the police and to the surveyors. Petitioner has not challenged the veracity of their statements.

- Nurse Aide #1 told police that she had observed Housekeeper #1 enter R2's room "on multiple occasions in the past[,] which she found suspicious as he [had] no reason to be in there." CMS Ex. 25 at 1.

- In interviews conducted on August 12 and 13, 2019, Nurse Aide #1 told Surveyor Theresa Slisz that three weeks to a month earlier, she and another employee observed Housekeeper #1 go into R2's room. "He had no business to be there." They went into the room but, by the time they got there, the housekeeper was leaving. They asked him what he was doing in the room, and he did not answer. "It was suspicious because he had no machine, no garbage bags, [and] no can." The nurse aides did not report his suspicious behavior "because he was a housekeeper." CMS Ex. 16 at 3, 18; see CMS Ex. 15 at 2, 10-11 (Surveyor San Juan notes confirming Nurse Aide #1's statement); CMS Ex. 38 at 3 (Slisz Decl. ¶ 11).

EXHIBIT 21

recognized this. The facility assured the state agency that it would implement a very specific policy – housekeepers would not be allowed into a resident's room if the resident was alone. This is undisputed. The directive is in writing, in the record, and, as Petitioner must concede, sent to the state agency. CMS Ex. 2 at 3. But the facility didn't implement the promised directive and did not tell staff about it.

Nor did staff know to report suspicious activities. As discussed above, it is undisputed that the nurse aides observed what they admittedly recognized as a suspicious activity – Housekeeper #1 entering R2's room, when he had no business being there. Adding to their suspicions, when they asked him what he was doing there, he did not answer.  And yet, they did not understand that they should report what they observed. For this, the facility is also culpable.

For these reasons, I find that the CMP is reasonable.

### 4. CMS's determinations as to the duration of the facility's substantial noncompliance and immediate jeopardy are consistent with statutory and regulatory requirements.

Finally, Petitioner laments the total amount of the penalty, which is largely attributable to the duration of the immediate jeopardy and substantial noncompliance.[13] Petitioner claims that the deficiency, "if substantiated," was resolved the same day. P. Br. at 22. In fact, it was not.

Once a facility has been found to be out of substantial compliance (as Petitioner was here), it remains so until it affirmatively demonstrates that it has achieved substantial compliance once again. CMS determines substantial compliance based on a revisit survey or "after an examination of credible written evidence" that CMS can verify without an onsite visit. 42 C.F.R. § 488.454(a)(1); *Ridgecrest Healthcare Ctr.,* DAB No. 2493 at 2-3 (2013); *Taos Living Ctr.,* DAB No. 2293 at 20 (2009); *Premier Living & Rehab Ctr.,* DAB No. 2146 at 3 (2008); *Lake City Extended Care Ctr.,* DAB No. 1658 at 12-15 (1998). The burden is on the facility to prove that it is back in compliance, not on

**Page 17**

CMS to prove that deficiencies continued to exist. *Asbury Ctr. at Johnson City,* DAB No. 1815 at 19-20 (2002).

The facility must show that the incidents of noncompliance have ceased and that it has implemented appropriate measures to ensure that similar incidents will not recur. *Libertywood Nursing Ctr.,* DAB No. 2433 at 15 (citing *Life Care Ctr. of Elizabethton,* DAB No. 2367 at 16 (2011)); accord 42 C.F.R. § 488.454(a) and (e); *Hermina Traeye Mem'l Nursing Home,* DAB No. 1810 at 12

EXHIBIT 21

(holding that a "paper hearing" satisfies statutory requirements for "notice and opportunity for hearing."). Thus, granting summary judgment (or deciding a case on the written record) satisfies the hearing requirements of sections 205(b) and 1866(h) of the Act.

*1. CMS is entitled to summary judgment because the parties agree that a facility housekeeper sexually assaulted a severely impaired and vulnerable resident. As a matter of law, the facility is responsible for the actions of its staff, which means that it was not in substantial compliance with 42 C.F.R. § 483.12(a)(1), without regard to whether the facility should have anticipated the assault.* [3]

**Program requirement:  42 C.F.R. § 483.12(a)(1) (Tag F600).** The Act mandates that facility residents be free from "physical or mental abuse, corporal punishment, [and] involuntary seclusion." Act § 1819(c)(1)(A)(ii). Consistent with the statute, the regulation governing abuse provides that each resident has the right to be free from abuse, neglect, misappropriation of resident property, and exploitation. 42 C.F.R. § 483.12. Abuse is defined as "the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish." Instances of abuse, *"irrespective of any mental or physical condition,"* cause harm, pain, or mental anguish. Abuse includes verbal, sexual, physical, and mental abuse. "Willful" means that the individual acted deliberately, not that the individual must have intended to inflict injury or harm. 42 C.F.R. § 488.301 (emphasis added).

**The abuse.** The material facts in this case are deeply disturbing, but also straight forward and undisputed. *See, e.g.,* CMS Ex. 25 at 17; P. Ex. 1 at 9 (Reap Decl. ¶ 44) ("[I]t would be less than credible to say that it simply did not happen."); (Reap Decl. ¶ 45) ("[T]his August 2019 event did not appear in any way to be fabricated or any type of targeting of Housekeeper #1."); P. Ex. 1 at 10 (Reap Decl. ¶ 51) ("[I]t is not credible to say that the event of August 1, 2019 did not occur.").

Resident 2 (R2) was a 37-year-old woman, admitted to the facility on August 12, 2003.  She was severely disabled, suffering from cerebral palsy, an intellectual disability, Rett

**Page 6**

syndrome,[4] and seizure disorder. CMS Ex. 6 at 1, 2; CMS Ex. 18 at 6.  She was nonverbal and unable to participate in a Brief Interview for Mental Status (BIMS). CMS Ex. 22 at 15. She was also quite small, about five feet tall, weighing just under 89 pounds. CMS Ex. 6 at 9, 14.

EXHIBIT 21

audits, continuing for three months or until 100% adherence was achieved. The audit results would be reported to the Quality Assurance Committee, which would provide review and oversight for further evaluation recommendations.  CMS Ex. 14 at 3-4. Moreover, during follow-up surveys, surveyors found that staff members were unaware of and failed to follow the new policies. *See, e.g.,* CMS Ex. 14 at 1, 3, 13-14; CMS Ex. 39 at 9 (San Juan Decl. ¶ 35). Petitioner tenders no evidence suggesting a dispute concerning those facts.

The facility has thus not met its burden of establishing that it alleviated the immediate jeopardy prior to August 16. 2019, nor that it returned to substantial compliance any earlier than October 11, 2019.

## Conclusion

For the reasons discussed above, I find that, from August 1 through October 10, 2019, the facility was not in substantial compliance with 42 C.F.R. § 483.12(a)(1). From August 1 through 15, its deficiency posed immediate jeopardy to resident health and safety. The penalties imposed are reasonable.

/s/

Carolyn Cozad Hughes
Administrative Law Judge

## Footnotes

1. The facility has changed its name and is now known as Phoenix Center for Rehabilitation and Pediatrics. P. Ex. 1 at 1 (Reap. Decl. ¶ 1).
   back to note 1

2. In challenging CMS's scope-and-severity finding, Petitioner argues that the deficiency "involved one resident and was not widespread." P. Br. at 2. In fact, this issue is not in dispute. CMS cited the deficiency as "isolated," not "widespread."
   back to note 2

EXHIBIT 21

On the merits the issues are:

1. From August 1 through October 10, 2019, was the facility in substantial compliance with 42 C.F.R. § 483.12(a)(1)?

2. If, from August 1 through 15, 2019, the facility was not in substantial compliance, did its deficiencies then pose immediate jeopardy to resident health and safety?

3. Are the penalties imposed – $10,015 per day for 15 days and $110 per day for 56 days – reasonable?

## Discussion

**Summary judgment.**  Summary judgment is appropriate if a case presents no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Bartley Healthcare Nursing & Rehab.*, DAB No. 2539 at 3 (2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)); *Ill. Knights Templar Home*, DAB No. 2274 at 3-4 (2009), and cases cited therein.

The moving party may show the absence of a genuine factual dispute by presenting evidence so one-sided that it must prevail as a matter of law or by showing that the non moving party has presented no evidence "sufficient to establish the existence of an element essential to [that party's] case, and on which [that party] will bear the burden of

**Page 4**

proof at trial." *Livingston Care Ctr. v. U.S. Dep't of Health & Human Servs.*, 388 F.3d 168, 173 (6th Cir. 2004) (quoting *Celotex*, 477 U.S. at 322).  To avoid summary judgment, the non-moving party must then act affirmatively by tendering evidence of specific facts showing that a dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *see also Vandalia Park*, DAB No. 1939 (2004); *Lebanon Nursing & Rehab. Ctr.*, DAB No. 1918 (2004).  The non-moving party may not simply rely on denials, but must furnish admissible evidence of a dispute concerning a material fact. *Ill. Knights Templar*, DAB No. 2274 at 4; *Livingston Care Ctr.*, DAB No. 1871 at 5 (2003).  In doing so, the non-moving party must show more than "some metaphysical doubt as to the material facts." *W. Tex. LTC Partners, Inc.*, DAB No. 2652 at 6 (2015), *aff'd sub nom. W. Tex. LTC Partners, Inc. v. U.S. Dep't of Health & Human Servs.*, 843 F.3d 1043 (5th Cir. 2016); *1866ICPayday.com, L.L.C.*, DAB No. 2289 at 3 (2009) (quoting *Matsushita*, 475 U.S. at 587).

EXHIBIT 21

and partially paralyzed resident was abused by his roommate); *Vibra Hosp. of Charleston TCU,* DAB CR5091 (2018) (in which high-level facility employees physically assaulted a combative, troublesome resident).

   back to note 8

9. According to Petitioner, sharing the "directive" with staff would unfairly have singled out Housekeeper #1 based on an unreliable complaint. This doesn't seem plausible inasmuch as the directive applied to all housekeeping staff and was a perfectly reasonable means by which both residents and staff could be protected.

   back to note 9

10. This approach comports with the Supreme Court's comments as to the value of sub regulatory guidance. *Azar v. Allina Health Servs.,* 139 S. Ct. 1804 (2019).

   back to note 10

11. Again, I am bound by the statute and regulations, not sub-regulatory guidance.

   back to note 11

12. Penalties are inflation-adjusted and change annually. The amount is determined as of the date the penalty is assessed, in this case, October 8, 2019. CMS Ex. 32; 83 Fed. Reg. at 51380.

   back to note 12

13. Petitioner characterizes the amount of the penalty as "shocking," "inconsistent," and "at the middle to higher end of the per diem scale." P. Br. at 22. In fact, as we have shown, the penalty amounts are at the low to minimal ends of the penalty ranges. Moreover, even for Petitioner itself, the amount of the penalty is hardly "shocking" or "inconsistent." *See* CMS Ex. 35 at 2 (indicating a total penalty of $600,331, based on a November 2018 survey).

   back to note 13

EXHIBIT 21

<https://hhs.gov>



<https://www.facebook.com/hhs>   <https://twitter.com/hhsgov>   <https://www.instagram.com/hhsgov/>   <https://www.linkedin.com/company/hhs.gov>

## HHS Headquarters

200 Independence Avenue, S.W.

Washington, D.C. 20201

Toll Free Call Center: 1-877-696-6775

EXHIBIT 21