# POLITICO

## Transcript: Jeff Sessions' testimony on Trump and Russia



Attorney General Jeff Sessions testifies Tuesday during a Senate Select Committee on Intelligence hearing on Capitol Hill. | AFP/Getty

By POLITICO STAFF
06/13/2017 03:14 PM EDT
Updated: 06/13/2017 07:45 PM EDT

   

*A transcript of Attorney General Jeff Sessions' testimony before the Senate Intelligence Committee on June 13.*

**CHAIRMAN RICHARD BURR**: Attorney General Sessions, appreciate your willingness to appear before the committee today. I thank you for your years of dedicated service as a member of this body, and your recent leadership at the Department of Justice. As I mentioned when Director Comey appeared before us last week, this committee's role is to be the eyes and ears for the other 85

EXHIBIT 10A

members of the United States Senate and for the American people, ensuring that the intelligence community is operating lawfully and has the necessary tools to keep America safe. The community is a large and diverse place.

We recognize the gravity of our investigation into Russia's interference in the 2016 U.S. elections, but I remind our constituents that, while we investigate Russia, we are scrutinizing CIA's budget, while we are investigating Russia, we are still scrutinizing CIA's budget, NSA's 702 program, our nation's satellite program, and the entire IC effort to recruit and retain the best talent we can find in the world. More often than not, the committee conducts its work behind closed doors, a necessary step to ensure that our most sensitive sources and methods are protected. The sanctity of these sources and methods are at the heart of the intelligence community's ability to keep us safe and to keep our allies safe from those who seek to harm us.

I've said repeatedly that I did not believe any committee -- that the committee does should be done in public. But I also recognize the gravity of the committee's current investigation and the need for the American people to be presented the facts so that they might make their own judgments. It is for that reason that this committee has now held its tenth open hearing of 2017--more than double that of the committee in recent years, and the fifth on the topic of Russian interference. Attorney General Sessions, this venue is your opportunity to separate fact from fiction and to set the record straight on a number of allegations reported in the press. For example, there are several issues that I'm hopeful we will address today. One, did you have any meetings with Russian officials or their proxies on behalf of the Trump campaign or during your time as attorney general? Two, what was your involvement with candidate Trump's foreign policy team and what were their possible interactions with Russians? Three, why did you decide to recuse yourself from the government's Russia investigation? And, fourth, what role, if any, did you play in the removal of then-FBI director Comey? I look forward to a candid and honest discussion as we continue to pursue the truth behind Russia's interference in the 2016 elections. The committee's experienced staff is interviewing the relevant parties, having spoken to more than 35 individuals to

EXHIBIT 10A

date--to include just yesterday, an interview of former Homeland Security Secretary Jeh Johnson. We also continue to review some of the most sensitive intelligence in our country's possession.

As I've said previously, we will establish the facts, separate from rampant speculation, and lay them out for the American people to make their own judgment. Only then will we as a nation be able to put this episode to rest and look to the future. I'm hopeful that members will focus their questions today on the Russia investigation and not squander the opportunity by taking political or partisan shots.

The Vice Chairman and I continue to lead this investigation together on what is a highly charged political issue. We may disagree at times, but we remain a unified team with a dedicated, focused and professional staff working tirelessly on behalf of the American people to find the truth. The committee has made much progress as the political winds blow forcefully around us, and I think all members would agree that despite a torrent of public debate on who and what committee might be best suited to lead on this issue, the intelligence committee has lived up to its obligation to move forward with purpose and above politics. Mr. Attorney General, it's good to have you back. I would now turn to the vice chairman for any remarks he might have.

**VICE CHAIRMAN MARK WARNER**: Thank you, Mr. Chairman. And I want to also thank the way that we're proceeding on this investigation. Mr. Attorney General, it is good to see you again. And we appreciate your appearance on the heels of Mr. Comey's revealing testimony last week.

I do, though, want to take a moment at the outset and first express some concern with the process by which we are seeing you, the attorney general, today. It is my understanding that you were originally scheduled to testify in front of the House and Senate Appropriations committees today. I know those appearances have been canceled to come here instead. While we appreciate his testimony, before our committee, I believe -- and I believe I speak for many of my colleagues -- that I believe he should also answer questions from members of those committees and the Judiciary Committee as well. Mr. Attorney

General, it's my hope that you will reschedule those appearances as soon as possible.

In addition, I want to say at the outset that while we consider your appearance today as just the beginning of our interaction with you and your department, Mr. Attorney General, we had always expected to talk to you as part of our investigation. We believed it would be actually later in the process. We're glad to accommodate your request to speak to us today, but we also expect to have your commitment to cooperate with all future requests and make yourself available, as necessary, to this committee for, as the chairman indicated with be this very important investigation.

Now let's move to the subject of today's discussion. Let's start with the campaign. You were an early and ardent supporter of Mr. Trump. In March, you were named as chairman of the Trump campaign's national security advisory committee. You were much more than a surrogate, you were strategic advisor who helped shape much of the campaign's national security strategy. No doubt, you will have key insights about some of the key Trump associates that were seeking to hear from in the weeks ahead.

Questions have also been raised about some of your own interactions with Russian officials during the campaign. During your confirmation hearing in January you said, "You did not have communications with Russians. Senator Leahy later asked you in writing whether you had been in contact with anyone connected to any part of the Russian government about the 2016 election. You answered, I believe with a definitive, no. Despite that fact, despite that, the fact is, as we discovered later, that you did have interactions with Russian government officials during the course of the campaign.

In March you acknowledged two meetings with the Russian ambassador. Yet, there has been public reports of a possible third meeting at the Mayflower Hotel on April 27th. I hope that today, you will help clear up the discrepancies. We'd also expect and I hope you will be able to provide the committee with any documents we need to shed light on the issue such as e-mails or calendars.

Then there is a topic of the firing of former Director Comey. Last Thursday, we received testimony from Mr. Comey under oath. He outlined his troubling interactions with the president as well as the circumstances of his firing. A few disturbing points stood out. Mr. Comey, who has decades of experience at the Department of Justice and the FBI serving under presidents of both parties was so unnerved by the actions of the president that he felt compelled to fully document every interaction they had.

Mr. Comey sat where you are sitting today and testified that he was concerned that the President of the United States might lie about the nature of their meetings. That's a shocking statement from one of the nation's top law enforcement official. We heard that Director Comey took it as a direction from the president that he was to drop the FBI's investigation into former adviser Mike Flynn. Finally, we heard from Mr. Comey that he believes he was fired over his handling of the Russia investigation. The president himself confirmed this in statements to the media. This is deeply troubling for all of us who believe on both sides in preserving the Independence of the FBI.

We have a lot of work in order to follow-up on these alarming disclosures. Mr. Attorney General, your testimony today is an opportunity to begin the process of asking those questions. For instance again, I know others will ask about this: You recused yourself from the Russia investigation and participated in the firing over the handling of that same investigation. We want to ask how you view your recusal and whether you believe you complied fully. We heard from Mr. Comey that the president asked to you leave the Oval Office so he could speak one-on-one with Mr. Comey. Again, a very concerning action. We will need to hear from you about how you viewed the president's request and whether you thought it was appropriate. We also want to know if you are aware of any attempts by the president to enlist leaders in the intelligence community to undermine this same Russia investigation.

Most importantly, our committee will want to hear what you are doing to ensure that the Russians or any other foreign adversaries cannot attack our

democratic process like this ever again. I'm concerned that the president still does not recognize the severity of the threat. He, to date, has not acknowledged the conclusions of the intelligence community that Russia massively intervened in our elections. The threat we face is real. It's not limited to us. The recent effects in France gives us a stark reminder that all western democracies must take steps to protect themselves. The United States can and must be a leader in this effort, but it will require the administration to get serious about this. Finally, we have seen a concerning pattern of administration officials refusing to answer public, unclassified questions about allegations about the president in this investigation. We had a hearing with this subject last week. I want to commend the chairman who at the end of that hearing made clear that our witnesses, it was not acceptable for them to come forward without answers. The the American people deserve to hear what's going on here. Thank you Mr. Chairman, I look forward to the witness' testimony.

**ATTORNEY GENERAL JEFF SESSIONS:** Thank you very much, Chairman Burr and ranking member Warner for allowing me to publicly appear before your committee today. I appreciate the committee's critically important efforts to investigate Russian interference with our democratic processes.

Such interference can never be tolerated and I encourage every effort to get to the bottom of any such allegations. As you know, the Deputy Attorney General has appointed a special counsel to investigate the matters related to the Russian interference in the 2016 election. I'm here today to address several issues that have been specifically raised before this committee. And I appreciate the opportunity to respond to questions as fully as the Lord enables me to do so. As I advise you, Mr. Chairman, with long standing Department of Justice practice, I cannot and will not violate my duty to protect confidential communications I have with the president. Let me address issues directly. I did not have any private meetings, nor do I recall any conversations, with any Russian officials at the Mayflower hotel.

I did not attend any meetings separately prior to the speech attended by the president today. I attended a reception with my staff, that included at least two dozen people and President Trump, though I do recall several conversations I had during that pre-speech reception, and I do not have recollection of meeting or talking to the Russian ambassador or any other Russian officials. If any brief interaction occurred in passing with the Russian ambassador in that reception, I do not remember it. After the speech, I was interviewed by the news media. There was an area for that in a different room and then I left the hotel. Whether I attended a reception where the Russian ambassador was also present is entirely beside the point of this investigation into Russian interference in the 2016 campaign.

Let me state this clearly, colleagues. I have never met with or had any conversation with any Russians or any foreign officials concerning any type of interference with any campaign or election in the United States. Further, I have no knowledge of any such conversations by anyone connected to the Trump campaign. I was your colleague in this body for 20 years, at least some of you. And the suggestion that I participated in any collusion that I was aware of, any collusion with the Russian government to hurt this country which I have served with honor for 35 years, or to undermine the integrity of our democratic process an appalling and detestable lie. Relatedly, there is the assertion that I did not answer Senator Franken's question honestly in my confirmation hearing.

Colleagues, that is false. I can't say colleagues now. I'm no longer a part of this body, but a former colleague. That is false. This is what happened. Senator Franken asked me a rambling question after some six hours of testimony that included dramatic new allegations that the United States intelligence community, the U.S. intelligence community had advised President-elect Trump "That there was a continuing exchange of information during the campaign between Trump's surrogates and intermediaries for the Russian government." I was taken aback by that explosive allegation which he said was being reported as breaking news that very day, in which I had not heard. I

wanted to refute that immediately. Any suggestion that I was part of such an

I replied to Senator Franken this way. "Senator Franken, I'm not aware of any of those activities. I have been called a surrogate a time or two in that campaign and I did not have communications with the Russians and I'm unable to comment on it."

That was the context in which I was asked the question and in this that context my answer was a fair and correct response to the charge as I understood it. I was responding to the allegation That surrogates had been meeting with Russians on a regular basis. It simply did not occur to me to go further than the context and to list any conversations that I may have had with Russians in routine situations as I had many routine meetings with other foreign officials.

So please hear me now. It was only in March, after my confirmation hearing, that a reporter asked my spokesperson whether I had ever met with any Russian officials. This was a first time that question had squarely been posed to me. On the same day, we provided that reporter with the information related to the meeting that I and my staff held in my Senate office with Ambassador Kislyak as well as the brief encounter in July after a speech that I had given during the convention in Cleveland, Ohio.

I also provided the reporter with a list of 25 foreign ambassador meetings that I had had during 2016. In addition, I provided supplemental testimony to the Senate Judiciary Committee to explain this event. So I readily acknowledged these two meetings and certainly not one thing happened that was improper in any one of those meetings. Let me also explain clearly the circumstances of my recusal from the investigation into the Russian interference with the 2016 election. Please, colleagues, hear me on this. I was sworn in as Attorney General on Thursday, February 9th. The very next day as I had promised to the judiciary committee I would do at least at an early date, I met with the career department officials including a senior ethics official to discuss things publicly reported in the press that might have some bearing on whether or not I should recuse myself in this case. From that point, February 10th until I announced my formal recusal on March 2nd, I was never briefed on any investigative

EXHIBIT 10A

details, did not access any information about the investigation. I received only the limited information that the department's career officials determined was necessary for me to form and make a recusal decision.

As such, I have no knowledge about this investigation as it is ongoing today beyond what has been reported. I don't even read that carefully. I have taken no action whatsoever with regard to any such investigation. On the date of my formal recusal, my chief of staff sent an e-mail to the heads of relevant departments including by name to director Comey of the FBI to instruct them to inform their staffs of this recusal and advise them not to brief me or involve me in any way in any such matters. In fact they have not. Importantly I recuse myself not because of any asserted wrongdoing or any that I may have been involved in any wrongdoing in the campaign, but because a Department of Justice regulation. 28 cfr 45.2 I felt required it.

That regulation states in effect that department employees should not participate in investigations of a campaign if they served as a campaign adviser. So the scope of my recusal however does not and cannot interfere with my ability to oversee the Department of Justice, including the FBI which has an $8 billion budget and 35,000 employees. I presented to the president my concerns and those of Deputy Attorney General Rod Rosenstein about the ongoing leadership issues at the FBI as stated in my letter recommending the removal of Mr. Comey along with the Deputy Attorney General's memorandum on that issue, which have been released by the White House. Those represent a clear statement of my views. I adopted Deputy Attorney General Rosenstein's points he made in his memorandum and made my recommendation. It is absurd, frankly, to suggest that a recusal from a single specific investigation would render the attorney general unable to manage the leadership of the various department of justice law enforcement components that conduct thousands of investigations.

Finally, during his testimony, Mr. Comey discussed a conversation he had with the president. I'm happy to share with the committee my recollection of that conversation that I had with Mr. Comey. Following a routine morning threat

briefing, Mr. Comey spoke to me and my chief of staff. While he did not provide me with any of the substance of his conversation with the president, apparently the day before, Mr. Comey expressed concern about proper communications protocol with the white house and with the president.

I responded. He didn't recall this, but I responded to his comment by agreeing that the FBI and the department of justice needed to be careful to follow department policies regarding appropriate contacts with the white house. Mr. Comey had served in the department for better than two decades and I was confident he understood and would abide by the well established rules limiting communications with the White House, especially about ongoing investigations.

That's what is so important to control. My comments encouraged him to do just that and indeed as I understand it, he in fact did that. Our Department of Justice rules on proper communications between the department and the White House have been in place for years. Mr. Comey well knew them. I thought and assumed correctly that he complied with them. I will finish with this. I recuse myself from any investigation into the campaign for president, but I did not recuse myself from defending my honor against false allegations.

At all times throughout the course of the campaign, the confirmation process, and since becoming Attorney General, I have dedicated myself to the highest standards. I have earned a reputation for that. At home and in this body, I believe. Over decades of performance. The people of this country expect an honest and transparent government and that's what we are giving them. This president wants to focus on the people of this country to ensure they are treated fairly and kept safe. The trump agenda is to improve the lives of the American people.

I know some have different ways of achieving that and different agendas, but that is his agenda and one I share. Importantly as attorney general, I have a responsibility to enforce the laws of this nation to protect this country from its enemies and I intend to work every day with the fine team and the superb professionals in the department of justice to advance the important work we

EXHIBIT 10A

have to do. These false attacks and innuendos and the leaks, you can be sure will not intimidate me. These events have only strengthened my resolve to fulfill my duty. My duty to reduce crime and support the federal, state, and local law enforcement who work on the streets every day.

Just last week it was reported that overdosed deaths in this country are rising faster than ever recorded. Last year was 52,000 and The New York Times just estimated next year will be 62,000 overdose deaths. The murdis up over 10%. Together we are telling the gangs and cartels and the fraudsters and the terrorists we are coming after you.

Every one of our citizens no matter who they are or where they live has the right to be safe in their homes and communities. I will not be deter and allow this great department to be deterred from its vital mission. Thank you, Mr. Chairman and ranking member Warner. I have a great honor to appear before you today and will do my best to answer your questions.

**BURR:** General Sessions, thank you for that testimony. I would like to note for members, the chair and the vice chairman will be recognized for 10 minutes and members for five minutes. I would like to remind our members that we are in open session. No references to classified or committee-sensitive materials should be used relative to your questions. With that I recognize myself at this time for 10 minutes.

General Sessions, you talked about the Mayflower hotel where the president gave his first foreign policy speech. It has been covered in the press that the president was there and you were there and others were there. From your testimony, you said you don't remember whether the ambassador from Russia was there.

**SESSIONS:** I did not remember that, but I understand he was there. So I don't doubt that he was. I believe that representations are correct. I recently saw a video of him coming into the room.

**BURR:** You never remember having a conversation or meeting with the ambassador?

**SESSIONS:** I do not.

**BURR:** Was there ever a private room setting that you were involved in?

**SESSIONS:** No, other than the reception area that was shut off from I guess the main crowd. Two to three dozen people. BURR: I would take for granted that the president shook some hands. SESSIONS: He came in and shook hands in the group.

**BURR:** Okay. You mentioned that there were staff with you at that event.

**SESSIONS:** My legislative director at the time --

**BURR:** Your Senate staff?

**SESSIONS:** Senate legislative director who was a retired U.S. Army colonel, had served on the armed services staff with Senator John Warner before she joined my staff was with me in the reception area and throughout the rest of the events.

**BURR:** Would you say you were there as a United States Senator or as a surrogate of the campaign for this event?

**SESSIONS**: I came there as an interested person and very anxious to see how President Trump would do in his first major foreign policy address. I believe he had only given one major speech before and that was maybe at the Jewish event.

It was an interesting time for me to observe his delivery and the message he would make. That was my main purpose of being there.

**BURR:** You reported two other meetings with the ambassador, one in July on the sidelines of the Republican convention, I believe and one in September in your senate office. Have you had any other interactions with government

officials over the year in a campaign capacity? I'm not asking you from the standpoint of your single life, but in the campaign.

**SESSIONS**: No, Mr. Chairman. No. I've racked my brain to make sure I could answer those questions correctly and I did not. I would just offer for you that the -- when asked about whether I had any meetings with Russians by the reporter in March, we immediately recalled the conversation and the encounter I had at the convention and the meeting in my office and made that public. I never intended not to include that. I would have gladly have reported the meeting and encounter that may have occurred and some say occurred in the Mayflower if I had remembered it or if it actually occurred, which I don't remember that it did.

**BURR:** On March 2nd, 2017, you recused yourself in the investigation being conducted by the FBI and the Department of Justice. What are the specific reasons that you chose to recuse yourself?

**SESSIONS:** The specific reason, chairman, is a cfr code of federal regulations put out by the Department of Justice. Part of the Department of Justice rules and it says this. I will read from it. 28 cfr 45.2. Unless authorized, no employee shall participate in a criminal investigation or prosecution if he had a personal or political relationship with any person involved in the conduct of an investigation that goes on to say for political campaign and it says if you have a close identification with an elected official or candidate arising from service as a principal adviser, you should not participate in an investigation of that campaign. Many have suggested that my recusal is because I felt I was a subject of the investigation myself, I may have done something wrong. This is the reason I recused myself: I felt I was required to under the rules of the Department of Justice and as a leader of the Department of Justice, I should comply with the rules obviously.

**BURR:** Did your legal counsel know from day one you would have to recuse yourself because of the current statute?

**SESSIONS:** I have a timeline of what occurred. I was sworn in on the 9th, I believe, of February. I then on the 10th had my first meeting to generally discuss this issue where the cfr was not discussed. We had several other meetings and it became clear to me over time that I qualified as a significant, principal adviser-type person to the campaign and it was the appropriate and right thing for me.

**BURR:** This could explain Director Comey's comments that he knew there was a likelihood you would recuse yourself because he was familiar with the same statute?

**SESSIONS:** Probably so. I'm sure that the attorneys in the Department of Justice probably communicated with him. Mr. Chairman, let me say this to you clearly. In effect as a matter of fact, I recused myself that day. I never received any information about the campaign. I thought there was a problem with me being able to serve as attorney general over this issue and I felt I would have to recuse myself and I took the position correctly, I believe, not to involve myself in the campaign in any way and I did not.

**BURR:** You made a reference to the chief of staff sending out an e-mail immediately notifying internationally of your decision to recuse. Would you ask the staff to make that e-mail available? SESSIONS: We would be pleased to do so and I have it with me now.

**BURR:** Thank you. Have you had intersections with the special counsel Robert muller?

**SESSIONS:** I have not. With regard to the e-mail we sent out, director Comey indicated that he did not know when I recused myself or receive notice, one of them went to him by name. A lot happens in our offices. I'm not accusing him of wrongdoing and it was sent to him and to his name.

**BURR:** Okay. General Sessions, you said he testified about his interactions with the president in some cases highlighting your presence with the meetings. You addressed the meeting where all were asked to leave except for director

https://www.politico.com/story/2017/06/13/full-text-jeff-session-trump-russia-testimony-239503

Comey. You said he did inform you of how uncomfortable that was. Your recommendation was that the FBI and DOJ needed to follow the rules limning further correspondence. Did Director Comey express additional discomfort with conversations that the president might have had with him? He had two additional meetings and a total of six phone calls.

**SESSIONS:** That is correct. There is nothing wrong with the president having communication with the FBI director. What is problematic for any Department of Justice employee is to talk to any cabinet persons or White House officials about ongoing investigations that are not properly cleared through the top levels of the Department of Justice. So it was a regulation I think is healthy. I thought we needed and strongly believe we need to restore discipline to adhere to just those kinds of rules and leaking rules and some of the other things that I think are a bit lax and need to be restored.

**BURR:** You couldn't have had a conversation with the president about the investigation because you were never briefed on some.

**SESSIONS:** That is correct. I would note that with regard to the private meeting that Director Comey had by his own admission, I believe, as many as six such meetings. Several them he had with President Trump. I think two with President Obama. It's not improper, per se, but it would not be proper to share information without review and permission.

**BURR:** Just one last question. You were the chair of this foreign policy team for the Trump campaign. To the best of your knowledge, did that team ever meet?

**SESSIONS:** We met a couple of times. Maybe a couple of people did. We never functioned as a coherent team.

**BURR:** Were there any members you never met?

**SESSIONS:** Yes.

**BURR:** Okay. Vice chairman.

**WARNER:** Thank you, General Sessions. As I mentioned in my opening statement, we appreciate your appearance, but see this as the first step and I would like to get your commitment that you will agree to make yourself available as the committee needs in the weeks and months ahead.

**SESSIONS:** Senator, I will commit to appear before the committees and others as appropriate. I don't think it's good policy to continually bring cabinet members or the attorney general before multiple committees going over the same things over and over.

**WARNER:** Appropriations committee raised that issue.

**SESSIONS:** I just gave you my answer.

**WARNER:** Can we get your commitment since there will be questions about the meetings that took place or not, access to documents or memoranda or your day book or something?

**SESSIONS:** We will be glad to provide appropriate responses to your questions and review them carefully.

**WARNER:** Yesterday a friend of the president was reported to suggesting that President Trump was considering removing Director Mueller as special counsel. Do you have confidence in director Mueller's ability to conduct the investigation fairly and impartially?

**SESSIONS:** I don't know about the reports and have no basis to --

**WARNER:** I'm asking --

**SESSIONS:** The validity. I have known Mr. Mueller over the years and he served 12 years as FBI director. I knew him before that. I have confidence in Mr. Mueller.

**WARNER:** You have confidence he will do the job?

**SESSIONS:** I will not discuss hypotheticals or what might be a factual situation in the future that I'm not aware of today. I know nothing about the investigation. I fully recuse myself.

**WARNER:** I have a series of questions, sir. Do you believe the president has confidence?

**SESSIONS:** I have not talked to him about it.

**WARNER:** Will you commit to the committee not to take personal actions that might not result in director Mueller's firing or dismissal?

**SESSIONS:** I can say that with confidence. In fact the way it works, Senator Warner is that the acting attorney general.

**WARNER:** I'm aware, but I wanted to get you on the record.

**SESSIONS:** Deputy attorney general. --

**WARNER:** You would not take any actions to have the special investigator removed.

**SESSIONS:** I don't think that's appropriate for me to do.

**WARNER:** To your knowledge, have any Department of Justice officials been involved with conversations about any possibility of presidential pardons about any of the individuals involved with the Russia investigation?

**SESSIONS:** Mr. Chairman, I'm not able to comment on conversations with high officials within the white house. That would be a violation of the communications rule that I have to --

**WARNER:** Just so I can understand, is the basis of that unwilling to answer based on executive privilege?

**SESSIONS:** It's a long standing policy. The department of justice not to comment on conversations that the attorney general had with the president of

the united States for confidential reasons that rounded in the coequal branch.

**WARNER:** Just so I understand, is that mean you claim executive privilege?

**SESSIONS:** I'm not claiming executive privilege because that's the president's power and I have no power there.

**WARNER:** What about conversations with other Department of Justice or White House officials about potential pardons? Not the president, sir.

**SESSIONS:** Without in any way suggesting I had any conversations concerning pardons, totally apart from that, there are privileges of communication within the department of justice that we share all of us do. We have a right to have full and robust debate within the Department of Justice and encourage people to speak up and argue cases on different sides. Those arguments are not -- historically we have seen they shouldn't be revealed.

**WARNER:** I hope you agree since you recused yourself that if the president or others would pardon someone during the midst of this investigation while our investigation or Mr. Mueller's investigation, that would be problematic. One of the comments you made in your testimony is you reached a conclusion about then-Director Comey's ability to lead the FBI and you agreed with Deputy Attorney General Rosenstein's memo. The fact that you worked with Comey for sometime, did you ever have a conversation as a superior of Director Comey with his failure to perform or some of these accusations that he was not running in a good way and somehow the FBI is in turmoil. Did you have any conversations about the subjects?

**SESSIONS:** I did not.

**WARNER:** So you were his superior and there were fairly harsh things said about Director Comey. You never thought it was appropriate to raise those concerns before he was absolutely terminated by the president?

**SESSIONS:** I did not do so. A memorandum was prepared by the deputy attorney general who evaluated his performance and noted serious problems

EXHIBIT 10A

with it.

**WARNER:** You agreed with those?

**SESSIONS:** I agreed with those. In fact senator Warner, we talked about it before I was confirmed and before he was confirmed. It's something we both agreed to that a fresh start at the FBI was probably the best thing.

**WARNER:** It again seems a little -- I understand if you talk about that before you came on and had a chance for a fresh start. There was no fresh start. Suddenly we are in the midst of the investigation and with timing it seems peculiar that what was out of the blue he fires the FBI director and all the problems of disarray and a lack of the accord with the FBI that he denied is the case, I would think that somebody would have had that conversation. Let's go to the April 27th meeting. It is brought up and I think the chairman brought it up. By that time, you had been named as the chair of then-candidate Trump's advisory. Showing up, that meeting would be appropriate.

**SESSIONS:** That was the Mayflower hotel?

**WARNER:** Yes, sir. My understanding was that the president's son in law Jared Kushner was at that meeting as well.

**SESSIONS:** I believe he was, yes.

**WARNER:** You don't reccollect when he had the conversations with the ambassador?

**SESSIONS:** I do not.

**WARNER:** To the best of your memory you had no conversation with him at that meet something.

**SESSIONS:** I don't recall that, senator. Certainly I can assure you nothing improper if I had a conversation with him. It's conceivable, but I don't remember it.

**WARNER:** There was nothing in your notes or memory so when you had a chance and you did correct the record about the other two sessions in response to senator Franken and Leahy, this didn't pop into your memory with the caution you had to report that this session as well.

**SESSIONS:** I guess I can say that I possibly had a meeting, but I still do not recall it. I did not in any way fail to record something in my testimony or in my subsequent letter intentionally false.

**WARNER:** I understand. I'm trying to understand you corrected the record and clearly by the time you get a chance to correct the record, you would have known that the ambassador was at that April 27th session. It received quite a bit of press notoriety. And again, echoing what the chairman said, again for the record, there was no other meeting with any other officials of the Russian government in the campaign season.

**SESSIONS:** Not to my recollection. I would say with regard to the two encounters, one at the Mayflower hotel that you refer to, I came here not knowing he was going to be there. I didn't have any communications with him before or after that event. Likewise at the effect at the convention went off the convention grounds to a college campus for an event.

**WARNER:** At the Mayflower --

**SESSIONS:** Let me follow-up on that one. I didn't know he would be in the audience.

**WARNER:** At the Mayflower there was this vip reception first and people went into the speech. Just so I get a --

**SESSIONS:** That's my recollection.

**WARNER:** You were part of the vip reception?

**SESSIONS:** Yes.

**WARNER:** General Sessions, one of the troubling things that I need to sort through is Mr. Comey's testimony last week is he felt uncomfortable when the president asked everyone else to leave the room. He left the impression that you lingered with perhaps the sense that you felt uncomfortable with it as well. I will allow you to correct it if it's not right. After this meeting took place, which clearly director Comey felt had a level of uncomfortableness. You never asked him what took place in that meeting?

**SESSIONS:** I will say it this way. We were there and I was standing there and without revealing any conversation that took place, what I recall is that I did depart and I believe everyone else did depart and Director Comey was sitting in front of the president's desk and they were talking. I believe it was the next day that he said something and expressed concern about being left alone with the president.

That in itself is not problematic. He did not tell me at that time any details about anything that was said that was improper. I affirmed his concern that we should be following the proper guidelines of the Department of Justice and basically backed him up in his concerns. He should not carry on any conversation with the president or anyone else about an investigation in a way that was not proper.

I felt he so long in the want it, the former deputy attorney general knew the policy a good deal better than I did.

**WARNER:** Thank you. It did appear that Mr. Comey felt that the conversation was improper.

**SESSIONS:** He was concerned about it. His recollection of what he said to me about his concern is consistent with my recollection.

**BURR:** Senator?

**SEN. JIM RISCH:** Attorney General Sessions, good to hear you talk about how important this Russian interference and active measures on the campaign is. I don't think there is any American who would disagree with the fact this we

EXHIBIT 10A

need to drill down to this, know what happened, get it out in front of the American people and do what we can to stop it again. That's what the committee was charged to do and started to do. As you know on February 14th, The New York Times published an article alleging that there were constant communications between the Trump campaign and the Russians in collusion regarding the elections. Do you recall that article when it came out?

**SESSIONS:** Not exactly.

**RISCH:** Generally?

**SESSIONS:** Generally I remember the charges.

**RISCH:** Mr. Comey told us when he was here last week, he had a specific recollection. He chased it down through the intelligence community and was not able to find that evidence and then sought out both Republicans and Democrats to tell them that this was false and there was no such facts anywhere. Nonetheless, after that, this committee took that on as a thing we have spent really substantially more time on the Russian active measures. We have been through thousands of pages of information, interviewed witnesses and everything else who were no different than where we were when this thing started. There is no reports they know of of any factual information. Are you aware of any such information?

**SESSIONS:** Is that from the dossier or so-called dossier? I believe that's the report that Senator Franken hit me with when I was testifying--I think it's been pretty substantially discredited but you would know more than I. But what was said that would suggest I participated in the continuing communications with Russians as a surrogate is absolutely false?

**RISCH:** Mr. Sessions, there has been all this talk about conversations and you had conversations with the Russians. Senators up here who were on foreign relations and intelligence or armed services, conversations with officers of other governments or ambassadors or what you are everyday occurrences here, multiple time occurrences for most of us. Is that a fair statement?

**SESSIONS:** I think it is, yes.

**RISCH:** Indeed you run into one in the grocery store. Is that fair?

**SESSIONS:** That could very well happen. We did nothing improper.

**RISCH:** On the other hand collusion with the Russians or any other government when it comes to elections certainly would be improper and illegal. That that be a fair statement?

**SESSIONS:** Absolutely.

**RISCH:** You willing to tell the American people unfiltered by what the media will put out you participated in no conversations of any kind where there was collusion between the trump campaign and a foreign government?

**SESSIONS:** I can say that absolutely and have no hesitation to do so.

**RISCH:** The former U.S. Attorney and the attorney general of the United States, you participated as you described in the trump campaign. You travelled with the campaign?

**SESSIONS:** I did.

**RISCH:** You spoke for the campaign?

**SESSIONS:** Not continually on the --

**RISCH:** Based approximate your experience and based approximate your participation, did you hear a whisper or a suggestion or anyone saying the Russians were involved?

**SESSIONS:** I would not.

**RISCH:** What would you have done?

**SESSIONS:** Would know it was improper.

**RISCH:** You would head for the exit.

**SESSIONS:** This is a serious matter. You are talking about hacking into a private person or DNC computer and obtaining information and spreading that out. That's not right. It's likely that laws were violated if laws occurred. It's an improper thing.

**RISCH:** Has any person from the White House to the administration including the president of the United States either directed you or asked to you do any unlawful or illegal act since you have been attorney general of the United States?

**RISCH:** No, Senator Risch. They have not.

**RISCH:** Thank you, Mr. Chair.

**BURR:** Senator Feinstein.

**SEN. DIANNE FEINSTEIN:** Thanks very much, Mr. Chairman. Welcome, attorney general.

**SESSIONS:** Thank you.

**FEINSTEIN:** On May 19th, Mr. Rosenstein in a statement to the House of Representatives, essentially told them he learned on May 8th President Trump intended to remove Director Comey. When you wrote your letter on May 9, did you know that the president had already decided to fire Director Comey?

**SESSIONS:** Senator Feinstein, I would say I believe it has been made public that the president asked us our opinion and it was given and he asked us to put that in writing. I don't know how much more he said than that, but he talked about it and I would let his words speak for themselves.

**FEINSTEIN:** Well, on May 11th on NBC Nightly News two days later, the president stated he would fire Comey regardless of the recommendation. I'm puzzled about the recommendation because the decision had been made. What was the need for you to write a recommendation?

EXHIBIT 10A

**SESSIONS:** Well, we were asked our opinion and when we expressed it which was consistent with the letter we wrote, I felt comfortable and I asks the attorney general did too in providing that information in writing.

**FEINSTEIN:** Do you concur with the president he was going to fire Comey regardless of recommendation because the problem was the Russian investigation?

**SESSIONS:** Senator Feinstein, I will have to let his words speak for himself. I'm not sure what was in his mind explicitly when we talked to him.

**FEINSTEIN:** Did you discuss director Comey's handling of the investigations with the president or anyone else?

**SESSIONS:** Senator Feinstein, that would call for a communication between the director and the president and I'm not able to comment on that.

**FEINSTEIN:** You are not able to answer the question here whether you discussed that with him?

**SESSIONS:** That's correct.

**FEINSTEIN:** And how do you view that since you discussed his termination, why wouldn't you discuss the reasons?

**SESSIONS:** Well, those were put in writing and sent to the president and he made those public. He made that public.

**FEINSTEIN:** You had no verbal conversation with him about the firing of Mr. Comey?

**SESSIONS:** I'm not able to discuss with you or confirm or deny the nature of a private conversation that I may have had with the president on this subject or others. I know this will be discussed, but that's the rules that have been adhered to by the Department of Justice as you know.

**FEINSTEIN:** You are a long time colleague, but we heard Mr. Coats and Admiral Rogers say essentially the same thing. When it was easy just to say if the answer was no, no.

**SESSIONS:** The easy would have been easier to say yes, yes. Both would have been improper.

**FEINSTEIN:** Okay. So how exactly were you involved in the termination of director Comey? Because I am looking at your letter dated May 9 and you say the Director of the FBI must be someone who follows faithfully the rules and principles and sets the right example for our law enforcement officials therefore I must recommend you remove director Comey and identify an experience and qualified individual to lead the great men and women of the FBI. Do you really believe that this had to do with director Comey's performance with the men and women of the FBI?

**SESSIONS:** There was a clear view of mine and of Deputy Attorney General Rosenstein as he set out at some length in his memoranda which I adopted and sent forward to the president that we had problems there and it was my best judgment that a fresh start at FBI was the appropriate thing to do. And when I said that to the president, deputy Rosenstein's letter dealt with a number of things. When Mr. Comey declined the Clinton prosecution, that was really a usurpation of the authority of the federal prosecutors in the Department of Justice. It was a stunning development. The FBI is the investigative team. They don't decide the prosecution policies.

That was a thunderous thing. He also commented at some length on the declination of the Clinton prosecution which you should not do. Policies have been historic. If you decline, you decline and don't talk about it. There were other things that had happened that indicated to me a lack of discipline and it caused controversy on both sides of the aisle and I had come to the conclusion that a fresh start was appropriate and did not mind putting that in writing.

**FEINSTEIN:** My time is up. Thank you very much.

**BURR:** Senator Rubio.

**SEN. MARCO RUBIO:** Thank you for being here. I want to go back to February 14th and go back to the details and the Director was here and provided great detail. There was a meeting in the Oval Office and you recall being there along with him and the meeting concluded and the president asked the director to stay behind, correct?

**SESSIONS:** That's a communication in the White House that I would not comment on.

**RUBIO:** You remember seeing him stay behind?

**SESSIONS:** Yes.

**RUBIO:** His testimony was that you lingered and his view of it was you lingered because you knew you needed to stay. Do you remember lingering and feeling like you needed to stay?

**SESSIONS:** I do recall being one of the last ones to leave.

**RUBIO:** Did you decide to be one of the last to leave?

**SESSIONS:** I don't know how that occurred. I think we finished a terrorism or counter terrorism briefing and people were filtering out. I eventually left and I do recall and I think I was the last or one of the last two or three to leave.

**RUBIO:** Would it be fair to say you needed to stay because it involved the FBI director?

**SESSIONS:** I don't know how I would characterize that, senator. It didn't seem to be a major problem. I knew that Director Comey, long-time experienced individual of the Department of Justice, could handle himself well.

**RUBIO:** He characterized it as he said never leave me alone with the president again. It's not appropriate. This is his characterization, you shrugged as if to say what am I supposed to do about it?

**SESSIONS:** I think I described it more completely and correctly. He raised that issue with me. I believe the next day. I think that was correct. He expressed concern about that private conversation. I agreed with him essentially that there are rules on private conversations with the president. It is not a prohibition on a private discussion with the president as I believe he acknowledged six or more himself with president Obama and president trump. I didn't feel like -- he gave me no detail about what it was that he was concerned about.

I didn't say I wouldn't be able to respond if he called me. He certainly knew with regard that he could call his direct supervisor which in the Department of Justice, a supervisor to the FBI, the deputy attorney general could have complained any time if he felt pressured, but I had no doubt he would not yield to any pressure.

**RUBIO:** Do you know if the president records conversations in the oval office or anywhere in the white house some.

**SESSIONS:** I do not.

**RUBIO:** If any president was to record conversations in their official duties, would there be an obligation to preserve those records?

**SESSIONS:** I don't know, senator. Probably so.

**RUBIO:** I want to go to the campaign for a moment. I'm sure you are aware it is widely reported. They often pose not simply as an official, but undercovers such as businessman, journalist and the like. At any point during the campaign, did you have an interaction who in hindsight you look back and say they tried to gain influence and in hindsight you look back and wonder?

**SESSIONS:** I don't believe in my conversations with the three times.

**RUBIO:** Just in general.

**SESSIONS:** Well, I meant a lot of people and a lot of foreign officials who wanted to argue their case for their country and to point out things they thought were important for their countries. That's the Normal thing we talk about.

**RUBIO:** As far as someone who is not an official from another count row and a businessman or anyone walking down the street, it struck me as someone who wanted to find out what the campaign was up to. In hindsight it appears suspicious some.

**SESSIONS:** I don't recall it now.

**RUBIO:** My last question, you were on the foreign policy team and the Republican platform was changed to not provide defensive weapons to Ukraine. Were you involved in that decision and do you know how the change was made?

**SESSIONS:** I was not active in the platform committee and did not participate in that, and I don't think I had direct involvement.

**RUBIO:** Do you know who did or you have no recollection of a debate about that issue internally in the campaign?

**SESSIONS:** I never watched the debate, if it occurred, on the platform committee. I think it did. So I don't recall that, Senator. I'd have to think about that.

**RUBIO:** Thank you.

**BURR**: Senator Wyden?

**SEN. RON WYDEN**: Thank you very much. Mr. Chairman, I want to thank you for holding this hearing in the open and in full view of the American people where it belongs. I believe the American people have had it with stonewalling.

Americans don't want to hear the answers are privileged and off limits or they can't be provided in public or it would be inappropriate for witnesses to tell us

EXHIBIT 10A

what they know. We are talking about an attack on our democratic institutions and stonewalling of any kind is unacceptable. General Sessions acknowledged that there is no legal basis for this stonewalling. So now to questions. Last Thursday, I asked the former director Comey about the FBI's intersections with you prior to your stepping aside from the Russia investigation. Mr. Comey said your continued engagement with the Russian investigation was "problematic " and he said he could not discuss it in public.

Mr. Comey had also said that FBI personnel were calling for to you step aside from the investigation at least two weeks before you finally finally did so. In your prepared statement you said you received, quote, limited information necessary to inform your recusal decision. Given director Comey's statement, we need to know what that was. Were you aware of any concerns at the FBI or elsewhere in government about your contacts with the Russians or any other matters relevant to whether you should step aside from the Russian investigation?

**SESSIONS**: Senator Wyden, I am not stonewalling. I am following the historic policies of the Department of Justice. You don't walk into hearing or committee meeting and reveal confidential communications with the President of the United States who is entitled to receive conventional communications in your best judgment about a host of issues and have to be accused of stonewalling them. So I would push back on that.

Secondly, Mr. Comey, perhaps he didn't know, but I basically recused myself the first day I got into the office because I never accessed files. I never learned the names of investigators. I never met with them. I never asked for any documentation. The documentation, what little I received, was mostly already in the media and was presented by the senior ethics public -- professional responsibility attorney in the department and I made an honest and proper decision to recuse myself as I told Senator Feinstein and the members of the committee I would do when they confirmed me.

**WYDEN**: Respectfully, you're not answering the question.

EXHIBIT 10A

**SESSIONS**: What is the question?

**WYDEN**: The question is, Mr. Comey said there were matters with respect to the recusal that were problematic and he couldn't talk about them. What are they?

**SESSIONS**: Why don't you tell me. There are none, Senator Wyden. There are none. I can tell you that for absolute certainty. This is a secret innuendo being leaked out there about me, and I don't appreciate it. I try to give my best and truthful answers to any committee I've appeared before, and it's really -- people are suggesting through innuendo that I have been not honest about matters, and I've tried to be honest.

**WYDEN**: My time is short. You made your point that you think Mr. Comey is engaging in innuendo. We're going to keep digging.

**SESSIONS**: Senator Wyden, he did not say that.

**WYDEN**: He said it was problematic, and asked you what was problematic about it.

**SESSIONS**: Well, some of that leaked out of the committee that he said in closed session.

**WYDEN**: Okay. One more question. I asked the former FBI director whether your role in firing him, given that he was fired because of the Russian investigation. Director Comey said this was a reasonable question. I want to ask you point-blank, why did you sign the letter recommending the firing of Director Comey when it violated your recusal?

**SESSIONS**: It did not violate my recusal. It did not violate my recusal. That would be the answer to that. And the letter that I signed represented my views that had been formulated for some time.

**WYDEN**: Mr. Chairman, just so I can finish. That answer in my view doesn't pass the smell test. The president tweeted repeatedly about his anger about

investigations into his associates and Russia. The day before you wrote your letter, he tweeted the collusion story was a total hoax and asked when will this taxpayer-funded charade end. It doesn't pass the smell test.

**SESSIONS**: Senator Wyden, I should be able to briefly respond at least and say the letter, the memorandum that Deputy Rosenstein wrote and my letter that accompanied it represented my views of the situation.

**WYDEN**: I'll ask more on the second round. Thank you.

**BURR**: Senator Collins.

**SEN. SUSAN COLLINS**: Thank you, Mr. Chairman. Attorney General Sessions, I want to clarify who did what with regard to the firing of Mr. Comey. First, when did you have your first conversation with Rod Rosenstein about Mr. Comey.

**SESSIONS**: We talked about it before either one of us were confirmed. It was a topic of conversation among people who served in the department for a long time. They knew what happened that fall was pretty dramatically unusual. Many people felt it was very wrong. So it was in that context that we discussed it. We both found that we shared common view that a fresh start would be appropriate.

**COLLINS**: This was based on Mr. Comey's handling of the investigation involving Hillary Clinton in which you said he usurped the authority of prosecutors at the Department of Justice?

**SESSIONS**: Yes. That was part of it, and the commenting on the investigation in ways that go beyond the proper policies. We need to restore, Senator Collins, I think, the classic discipline in the department. My team, we've discussed this. There's been too much leaking and too much talking publicly about investigations. In the long run, the department's historic rule that you remain mum about investigations is the better policy.

**COLLINS**: Now, subsequently the president asked you to put your views in writing you've testified today. I believe that you were right to recuse yourself from the ongoing Russian investigation, but then on May 9th you wrote your recommendation that Mr. Comey be dismissed. Obviously this went back many months to the earlier conversations you had had with Mr. Rosenstein. My question is why do you believe that your recommendation to fire director Comey was not inconsistent with your March 2nd recusal?

**SESSIONS**: Thank you. The recusal involved one case involved in the Department of Justice and in the FBI. They conduct thousands of investigations. I'm the attorney general of the United States. It's my responsibility to our Judiciary committee and other committees to ensure that that department is run properly. I have to make difficult decisions, and I do not believe that it is a sound position to say that, if you're recused for a single case involving any one of the great agencies like DEA or U.S. Marshals or ATF that are part of the Department of Justice, you can't make a decision about the leadership in that agency.

**COLLINS**: Now, if you had known that the president subsequently was going to go on TV and in an interview are Lester holt of NBC would say this Russian thing was the reason for his decision to dismiss the FBI director, would you have felt uncomfortable about the timing of the decision?

**SESSIONS**: Well, I would just say this, Senator Collins. I don't think it's appropriate to deal with those kind of hypotheticals. I have to deal in actual issues. I would respectfully not comment on that.

**COLLINS**: Well, let me ask you this. In retrospect, do you believe that it would have been better for you to have stayed out of the decision to fire director Comey?

**SESSIONS**: I think it's my responsibility. I mean I was appointed to be attorney general, supervising all the federal agencies is my responsibility, trying to get the very best people in those agencies at the top of them is my responsibility, and I think I had a duty to do so.

**COLLINS**: Now, director Comey testified that he was not comfortable telling you about his one-on-one conversation with the president on February 14th because he believed that you would shortly recuse yourself from the Russian investigation which did did. Yet, Director Comey testified that he told no one else at the department outside of the senior leadership team at the FBI. Do you believe that the director received information about the president saying that he hoped he could let Michael Flynn go to someone else at the Department of Justice? There are an awful lot of lawyers at the department of justice, some 10,000 by last count.

**SESSIONS**: I think the appropriate thing would have been for Director Comey to talk with the acting deputy attorney general who is his direct supervisor. That was Dana Boente who had 33 years in the Department of Justice and was even then still serving for six years and continues to serve of as attorney general appointed by President Barack Obama, so he's a man of great integrity and everybody knows it, a man of decency and judgment.

If he had concerns, he should have raised it to Deputy Attorney General Boente who would be the appropriate person in any case really, but if he had any concern that I might be recusing myself, that would be a double reason for him to share it with deputy attorney general Boente.

**COLLINS**: Thank you.

**BURR**: Senator Heinrich.

**SEN. MARTIN HEINRICH**: Attorney General Sessions, has the president ever expressed his frustration to you regarding your decision to recuse yourself?

**SESSIONS**: Senator Heinrich, I'm not able to share with this committee private communications --

**HEINRICH**: You're invoking executive privilege.

**SESSIONS**: I'm not able to invoke executive privilege. That's the president's prerogative.

**HEINRICH**: My understanding is that you took an oath, you raised your right hand here today and you said that you would solemnly tell the truth, the whole truth and nothing but the truth. And now you're not answering questions. You're impeding this investigation, so my understanding of the legal standard is that you either answer the question. That's the best outcome. You say this is classified, can't answer it here. I'll answer it in closed session. That's bucket number two.

Bucket number three is to say I'm invoking executive privilege. There is no appropriateness bucket. It is not a legal standard. Can you tell me why what are these long-standing DOJ rules that protect conversations made in the executive without invoking executive privilege?

SESSIONS: Senator, I'm protecting the president's constitutional right by not giving it away before he has a chance to review it.

**HEINRICH**: You can't have it both ways.

**SESSIONS**: And second I am telling the truth in answering your question and saying it's a long-standing policy of the department of justice to make sure that the president has full opportunity to decide these issues.

**HEINRICH**: Can you share those policies with us. Are they written down at the Department of Justice?

**SESSIONS**: I believe they are.

**HEINRICH**: This is the appropriateness legal standard for not answering congressional inquiries.

**SESSIONS**: That's my judgment that it would be inappropriate for me to answer and reveal private conversations with the president when he has not had a full opportunity to review the questions and to make a decision on

whether or not to approve such an answer, one. There are also other privileges that could be invoked. One of the things deals with the investigation of the special counsel as other --

**HEINRICH**: We're not asking questions about that investigation. If I wanted to ask questions about that investigation, I'd ask those of Rod Rosenstein. I'm asking about your personal knowledge from this committee which has a constitutional obligation to get to the bottom of this. There are two investigations here. There is a special counsel investigation. There is also a congressional investigation, and you are obstructing that congressional delegation -- investigation by not answering these questions, and I think your silence, like the silence of Director Coats, like the silence of Admiral Rogers speaks volumes.

**SESSIONS**: I would say that I have consulted with senior career attorneys in the department.

**HEINRICH**: I suspect you have.

**SESSIONS**: And they believe this is consistent with my duties.

**HEINRICH**: Senator Risch asked you a question about appropriateness if you had known that there had been anything untoward with regard to Russia in the campaign, would you have headed for the exits? Your response was maybe. Why wasn't it a simple yes?

**SESSIONS**: Well, [if] there was an improper illegal relationship in an effort to impede or to influence the campaign I absolutely would have depart.

**HEINRICH**: I think that's a good answer. I'm not sure why it wasn't the answer in the first place. I find it strange that neither you nor deputy attorney general rod Rosenstein brought up performance issues with director Comey, and, in fact, deputy FBI director McCabe has directly refuted any assertion that there were performance issues.

This is troubling because it appears that the president decided to fire director Comey because he was pursuing the Russia investigation and had asked you to come up with an excuse. When your assessment of director Comey didn't hold up to public scrutiny, the president finally admitted that he had fired director Comey because he was pursuing the Russia investigation, ie the Lester holt interview. You said you did not break recusal when participating in the Comey firing, but it appears that it was directly related to Russia and not department mismanagement. How do you square those two things?

**SESSIONS**: You have a lot in that question. Let me say first. Within a week or so, I believe may 3rd, director Comey testified that he believed the handling of the Clinton declination was proper and appropriate and he would do it again.

I know that was a great concern to both of us because it did not -- that represented something that I think most professionals in the Department of Justice would totally agree that the FBI investigative agency does not decide whether to prosecute or decline criminal cases. Pretty breathtaking usurpation of the responsibility of the attorney general. So that's how we felt. That was sort of additional concern that we had heading the FBI someone who boldly asserted the right to continue to make such decisions. That was one of the things we discussed. That was in the memorandum I believe and it was also an important factor for us.

**BURR**: Before I recognize Senator Blunt, I would like the record to show that last night Admiral Rogers spent almost two hours in closed session with the -- with almost the full committee fulfilling his commitment to us in the hearing that in closed session he would answer the question, and I think it was thoroughly answered and all members were given an opportunity to ask the question. I want the record to show with what senator Heinrich stated. Senator Blunt.

**SEN. ROY BLUNT**: Thank you, chairman. Attorney General, it's good to see you here and it's good to see Mary. I'm sure there's probably other places you would both rather be today but you've always looked at public service as

EXHIBIT 10A

something you did together, and it's good to see you here together and know that your family continues to be proud and supportive of what you do.

**SESSIONS**: Thank you, I've been blessed indeed.

**BLUNT**: I agree with that. I agree with that. Let me just get a couple of things clear in my mind here of notes I've taken while people were asking questions, and you were talking. On the April 27, 2016 event, I think that's the Mayflower Hotel speech that the presidential candidate gave on foreign policy. You didn't have a room at that event where you had private meetings, did you?

**SESSIONS**: No, I did not.

**BLUNT:** And as I understand i,t you went to a reception that was attended by how many people?

**SESSIONS**: I think two to three dozen.

**BLUNT**: Two to three dozen people. You went and heard a speech and may have seen people on your way out?

**SESSIONS**: Correct.

**BLUNT**: So when you said you possibly had a meeting with Mr. Kislyak, did you mean you possibly met him?

**SESSIONS**: I didn't have any formal meeting with him. I'm confident of that, but I may have had an encounter during the reception. That's the only thing I cannot say with certainty I did not. That's all I can say.

**BLUNT**: Well, that's what I thought you were saying, but sometimes when I hear meeting, that would mean more to me than I met somebody. You might have met him at the reception. Could you have met other ambassadors at that reception as well?

**SESSIONS**: I could. I remember one in particular that we had a conversation with, whose country had an investment in Alabama, and we talked a little

EXHIBIT 10A

length about that, I remember that, but otherwise I have no recollection of a
discussion with the Russian ambassador.

**BLUNT**: Alright, so you were there. You've read since he was there, you may
have seen him, but you had no room where you were having meetings with
individuals to have discussions at the Mayflower Hotel that day.

**SESSIONS**: No, that is correct.

**BLUNT**: Whenever you talked to Mr. Comey after he had had his meeting with
the president, you think that was probably the next day. You didn't stay
afterwards and see him after he left the oval office that night?

**SESSIONS**: No. I understand his testimony may have suggested that it
happened right afterwards, but it was either the next morning, which I think it
was, or maybe the morning after that. It was, we had a three times a week
national security briefing with the FBI that I undertake, and so it was after that
that we had that conversation.

**BLUNT**: Where you had that conversation. What I'm not quite clear on is: did
you respond when he expressed his concern or not?

**SESSIONS**: Yes, I did respond. I think he's incorrect. He indicated I believe
that he was not totally sure of the exact wording of the meeting, but I do recall,
my chief of staff was with me, and we recall that I did affirm the long-standing
written policies of the Department of Justice concerning communications with
the White House. We have to follow those rules and in the long run you're
much better off if you do. They do not prohibit communications one-on-one by
the FBI director with the president, but if that conversation moves into certain
areas, it's the duty -- the rules apply to the Department of Justice, so it's a duty
of the FBI agent to say, "Mr. President, I can't talk about that." That's the way
that should work, and apparently it did, because he says he did not improperly
discuss matters with the president.

**BLUNT**: When Mr. Comey talked to you about that meeting, did he mention
Mr. Flynn?

**SESSIONS**: No. He mentioned no facts of any kind. He did not mention to me that he had been asked to do something he thought was improper. He just said he was uncomfortable I believe with it.

**BLUNT**: After that discussion with Mr. Comey --

**SESSIONS**: Actually I don't know that he said he was uncomfortable. I think he said maybe it was what he testified to was perhaps the correct wording. I'm not sure exactly what he said, but I don't dispute it.

**BLUNT**: Well, exactly what I think -- what I remember him saying was that you didn't react at all and kind of shrugged, but you're saying you referred him to the normal way these meetings are supposed to be conducted.

**SESSIONS**: I took it as a concern that he might be asked something that was improper, and I affirmed to him his willingness to say no or not go in an improper way, improper direction.

**BLUNT**: Just finally, I'm assuming you wouldn't talk about this. cause it would relate to the May 8 meeting, but my sense is that no decision is final until it's carried out. I guess is that there are people at this who have said they were going to let somebody go or fire somebody and never did that, so the fact that the president said that on May 8 doesn't mean that the information he got from you on May 9 was not necessary or impactful, and I'm sure you're not going to say how many times the president said we ought to get rid of that person, but I'm sure that's happened, and, chairman, I'll yield.

**BURR**: Senator King.

**SENATOR ANGUS KING**: Mr. Attorney General, thank you for joining us today.

**SESSIONS**: Thank you.

**KING**: I respect your willingness to be here. You testified a few minutes ago I'm not able to invoke executive privilege. That's up to the president. Has the

president invoked executive privilege in the case of your testimony here today?

**SESSIONS**: He has not.

**KING**: Then what is the basis of your refusal to answer these questions?

**SESSIONS**: Senator king, the president has a constitutional --

**KING**: I understand that, but the president hasn't asserted that. You said you don't have the power to exert executive privilege so what is the legal basis for your refusal to answer the questions?

**SESSIONS**: I'm protecting the right of the president to assert it if he chooses and there may be other privileges that could apply in this circumstance.

**KING**: Well, I don't understand how you can have it both ways. The president can't not assert it, and you've testified that only the president can assert it and yet I just don't understand the legal basis for your refusal to answer.

**SESSIONS**: What we try to do, I think most cabinet officials, others that you questioned recently, officials before the committee, protect the president's right to do so. If it comes to a point where the issue is clear and there's a dispute about it, at some point the president will either assert the privilege or not or some other privilege would be asserted, but at this point I believe it's premature

**KING**: You're asserting a privilege.

**SESSIONS**: It would be premature for me to deny the president a full and intelligent choice about executive privilege. That's not necessary at this point.

**KING**: You testified a few minutes ago, that quote, we were asked for our opinion. Who asked for your opinion? You testified we were asked for our opinion.

**SESSIONS**: My understanding is I believe I'm correct in saying the president had said so.

**KING**: He didn't ask you directly.

**SESSIONS**: I thought you were asking about the privilege. If you want to go back to the --

**KING**: You said, quote, we were asked for our opinion, you and Mr. Rosenstein.

**SESSIONS**: I believe that was appropriate for me to say that because I think the president had said --

**KING**: I'm just asking for your opinion. Who asked you for your opinion?

**SESSIONS**: Yes, right. The president asked for our opinion.

**KING**: All right. So you just testified as to the content of a communication to the president.

**SESSIONS**: But I believe he's already revealed that. I believe I'm correct in saying, that that's why I indicated that when I answered that question, but if he hasn't and I'm in error, I would have constricted his constitutional right of privilege. You're correct.

**KING**: You're being selective about the use --

**SESSIONS**: I'm doing so only because I believe he made that piece of information public.

**KING**: Did the question of the Russia investigation in the firing of James Comey come up?

**SESSIONS**: I cannot answer that because it was a communication by the president or if any such occurred it would be a communication that he has not waived.

**KING**: But he has not asserted the executive privilege.

**SESSIONS**: He's not exerted executive privilege.

**KING**: Do you believe the Russians interfered with the 2016 elections?

**SESSIONS**: It appears so. The intelligence community seems to be united in that, but I have to tell you, senator king, I know nothing but what I've read in the paper. I've never received any details, briefing on how hacking occurred or how information was alleged to have influenced the campaigns.

**KING**: Between the election, there was a memorandum from the intelligence community on October 9th, that detailed what the Russians were doing after the election, before the inauguration. You never sought any information about this rather dramatic attack on our country?

**SESSIONS**: No.

**KING**: You never asked for a briefing or attended a briefing or ruled are the intelligence reports?

**SESSIONS**: You might have been very critical if I as an active part of the campaign was seeking intelligence related to something that might be relevant to the campaign. I'm not sure --

**KING**: I'm not talking about the campaign. I'm talking about what the Russians did. You received no briefing on the Russian active measures in connection with the 2016 election.

**SESSIONS**: No, I don't believe I ever did.

**KING**: Let's go to your letter of May 9th. You said based upon my evaluation and for the reasons expressed by the deputy, was that a written evaluation?

**SESSIONS**: My evaluation was an evaluation that had been going on for some months.

**KING**: Is there a written evaluation?

**SESSIONS**: I did not make one. I think you could classify deputy attorney general Rosenstein's memorandum as an evaluation, and he was the direct

EXHIBIT 10A

supervisor of the FBI director.

**KING**: And his evaluation was based 100% on the handling of the Hillary Clinton e-mails, is that correct?

**SESSIONS**: Well, and a number of other matters as I recall, but he did explicitly lay out the errors that he thought had been made in that process by the director of the FBI. I thought they were cogent and accurate and far more significant than I think a lot of people have understood.

**KING**: Thank you, Mr. Chairman.

**BURR**: Senator Lankford.

**SEN. JAMES LANKFORD**: Attorney General Sessions, good to see you again.

**SESSIONS**: Thank you.

**LANKFORD**: You've spoken very plainly from the beginning from your opening statement all the way through this time. I am amazed at the conversations as if an attorney general has never said there were private conversations with the president and we don't need to discuss those. It seems to be a short memory about some of the statements Eric Holder would and would not make to any committee in the House or the Senate and would or would not turn over documents even requested. That had to go all the way through the court systems for the courts to say no, the president can't hold back documents and the attorney general can't do that. So somehow the accusation that you're not saying every conversation about everything, there's a long history of attorney generals standing beside the president saying there are some conversations that are confidential, and then it can be determined from there.

It does seem as well that every unnamed source story somehow gets a hearing. I was in the hearing this morning with Rod Rosenstein as we dealt with the appropriations request that originally you were expected to be at, that rod

Rosenstein was taking your place to be able to cover. He was very clear and peppered with questions about Russia during that conversation as well. He was very clear that he has never had conversations with you about that and that you have never requested conversations about that.

He was also peppered with questions of the latest rumor of the day that is somehow the president is thinking about firing Robert Mueller and getting rid of him and was very clear that Rosenstein himself said I'm the only one that could do that, and I'm not contemplating that nor would I do that and no one has any idea where the latest unnamed sourced story of the day is coming from, but somehow it's grabbing all the attention. I do want to be able to bring up a couple of things to you specifically. One is to define the word recuse, and I come back to your e-mail that you sent to Jim Comey and others that day, on March the 2nd. This was what you had said during -- in your e-mail. "After careful consideration following meetings with career department officials over the course of the past several weeks the attorney general has decided to recuse himself from any existing or future investigations of any matters related in any way to the campaigns for president of the United States. The attorney general's recusal is not only with respect to such investigations, if any, but also extends to the department responses to congressional and media inquiries related to such investigations." Is that something you have maintained from March 2nd on?

**SESSIONS**: Absolutely. Actually I maintained it from the first day I became attorney general. We discussed those matters, and I felt until -- until and if I ever made a decision to not recuse myself I should not, as an abundance of caution, involve myself in studying the investigation or evaluating it so I did not. I also would note that the memorandum from my chief of staff directs these agencies and one of the people directly it was sent to was James B. Comey, director of the FBI.

You should instruct members of your staffs to not -- not to brief the attorney general or any other officials in the office of the attorney general about or otherwise involve the attorney general or other officials in the office of the

attorney general in any such matters described above, and we took the proper and firm and crystal clear position that the recusal meant recusal.

**LANKFORD**: The National Interest was asked specific by this as well who was the host of that event. They stated this in writing. "As the host, the Center for National Interest decided whom to invite and then issued the invitations. The Trump campaign did not determine or approve the invitation list. Guests of the event included both Republicans and Democrats with some of the lighter supporting other candidates. Most of the guests Washington-based foreign policy experts and journalists, Center for National Interest invited Russian Ambassador Kislyak and several other ambassadors to the speech. We regularly invite ambassadors and other foreign representatives to our events to facilitate dialogue."

Then they said, "We seated all four in the front row during the speech in deference to the diplomatic status. The Trump campaign had nothing to do with the seating arrangement. The Center for National Interest extended equal treatment of the four ambassadors attending the event and invited each to a short reception prior to the trump speech. It includes approximately two dozen guests in a receiving line. The line moved quickly and any conversations with Mr. Trump in that setting were inherently brief and could not be private. Our recollection is, the interaction with Mr. Trump and Ambassador Kislyak was limited to polite exchange and pleasantries. Appropriate on such occasions, we are not aware of any conversations with Ambassador Kislyak and Senator Jeff Sessions at the reception. However, in a small group setting like this one, we consider it unlikely that anyone would have engaged a meaningful private conversation without drawing attention from others present. Do you have any reason to disagree with that?

**SESSIONS**: No, I think that's a very fair description of the reception situation. I appreciate them having made that statement.

**LANKFORD**: I yield back.

**BURR**: Senator Manchin.

**SEN. JOE MANCHIN**: Mr. Chairman, thank you. Thank you, Mr. Attorney General, for being here. It's good to see you again.

**SESSIONS**: Thank you, Senator Manchin.

**MANCHIN**: I want to follow up on what Senator King had asked concerning. You are and I are about the same vintage and back in our lifetime we've never known the Russians to be -- the Russian government or the Russian military to ever be our friend, and wanting the same things we wanted out of life. With that being said, the seriousness of this Russian hacking is very serious to me and concerning, and you're saying that you had not been briefed on that. October -- I think it was October 9, when it was known that the ODNIi I think at that time Mr. Clapper and also Mr. Jay Johnson, homeland security made that public what was going on, then on December 29 President Obama at that time expelled 35 Russian diplomats, denied access to two Russian-owned compounds. and he broadened the existing sanctions. Sir, I would ask did you have any discussions at all -- have you had any discussions or sat in on any type of meetings or recommendations made to remove those sanctions?

**SESSIONS**: I don't recall any such meeting.

**MANCHIN**: And during the time not from the president being inaugurated on January 20, prior to that in the campaign, up until and through the transition, was there ever any meetings that he showed any concern or consideration or just inquisitive of what the Russians were really doing and if they had really done it?

**SESSIONS**: I don't recall any such conversations. I'm not sure I understood your question. Maybe I better listen again.

**MANCHIN**: You were part of the national security team, so if he would have heard something about Russia and with their capabilities and our concern about what they could do to our election process, was there ever any conversations concerning that whatsoever?

**SESSIONS**: I don't recall it, Senator Manchin.

EXHIBIT 10A

**MANCHIN**: I know it's been asked of you things, your executive privilege in protecting the president. I understand that, but also when we had Mr. Comey here, you know, he couldn't answer a lot of things in open session. He agreed to go into a closed session. Would you be able to go in a closed session? Would it change your answers to us or your ability to speak more frankly on some things we would want to know.

**SESSIONS**: Senator Manchin, I'm not sure. The executive privilege is not waived by going in camera or in closed session. It may be that one of the concerns is that when you have an investigation ongoing as the special counsel does, it's often very problematic to have persons, you know, not cooperating with that counsel in the conduct of the investigation, which way or may not be a factor in going into closed session.

**MANCHIN**: It would be very helpful, I think the committee, a lot of questions that they would like and you would like to answer if possible and maybe we can check into that a little further. If I could, sir, did you have any meetings, any other meetings with Russian officials that have not previously been disclosed?

**SESSIONS**: I've racked my brain and I do not believe so.

**MANCHIN**: Are there any other --

**SESSIONS**: I can assure you that none of those meetings discussed manipulating the campaign a the United States in any way. shape or form or any hacking or any such ideas.

**MANCHIN**: I'm going to go quick through this. Are there any other meetings between Russian government officials and any other Trump campaign associates that have not been previously disclosed that you know of?

**SESSIONS**: I don't recall any.

**MANCHIN**: To the best of your knowledge, did any of the following individuals meet with Russian officials at any point during the campaign? You can just go yes or no as I go down through the list: Paul Manafort.

EXHIBIT 10A

**SESSIONS**: Repeat that now.

**MANCHIN**: To the best of your knowledge, sir, did any of these following individuals meet with Russian officials at any point during the campaign, and you can just yes or no on this: Paul Manafort.

**SESSIONS**: I don't have any information that he has done so. He served as campaign chairman for a few months.

**MANCHIN**: Steve Bannon.

**SESSIONS**: I have no information that he did.

**MANCHIN**: General Michael Flynn.

**SESSIONS**: I don't recall it.

**MANCHIN**: Reince Priebus?

**SESSIONS**: I don't recall.

**MANCHIN**: Steve Miller?

**SESSIONS**: I don't recall him ever having such a conversation.

**MANCHIN**: Corey Lewandowski.

**SESSIONS**: I do not recall any of those individuals having any meeting with Russian officials.

**MANCHIN**: Carter Page.

**SESSIONS**: I don't know.

**MANCHIN**: And would I finally ask this question, because I always think -- we try to -- you have an innate knowledge.

**SESSIONS**: There -- there may have been some published accounts of Mr. Page talking with Russians, I'm not sure. I don't recall though.

**MANCHIN**: As a former senator you bring a unique holistic perspective to this investigation because you've been on both sides.

**SESSIONS**: I have indeed. All in all it's better on that side.

**MANCHIN**: Okay. If you were sitting on this side of the dious

**SESSIONS**: Nobody gets to ask you about your private conversations or your staff.

**MANCHIN**: Here you go. Give us a chance to give us some advice. If you were sitting on this side of the dious, what question would you be asking?

**SESSIONS**: I would be asking whether or not -- I would be asking questions related to whether or not there was an impact on this election.

**MANCHIN**: And what part of the story do you think you're missing?

**SESSIONS**: By a foreign power, particularly the Russians, since the intelligence community has suggested and stated that they believe they did, but I do think members of this government have offices to run and departments to manage and they -- and the questions should be focused on that.

**MANCHIN**: Is there a part of the story we're missing, I'm so sorry Mr. Chairman, is there a part of the story that we're missing?

**SESSIONS**: I don't know, because I'm not involved in the campaign and had no information concerning it. I have no idea at what stage it is. You members of the committee know a lot more than I.

**MANCHIN**: Thank you, General Sessions.

**BURR:** General sessions, I will assure you we're very much focused on Russia's involvement.

**SESSIONS:** Doesn't seem like to.

**BURR:** And our hope is that as we complete the process we will lay the facts out for the American people, so they can make their own determinations as well. We're grateful for what we've done. Senator Cotton.

**SEN. TOM COTTON:** Well, I am on this side of the dious and I could say a very simple question that should be asked. I am on this side of the dious, so a very simple question that should be asked is: "Did Donald Trump or any of his associates in the campaign collude with Russia in hacking those e-mails and releasing them to the public? That's where we started six months ago. We have now heard from six of the eight Democrats on this committee, and to my knowledge. I don't think a single one of them asked that question. They have gone down lots of other rabbit trails but not that question. Maybe that is because Jim Comey said last week as he said to Donald Trump on three times he assured him he was not under investigation. Maybe it's because multiple Democrats on this committee have stated they have seen no evidence thus far after six months of our investigation and ten months or 11 months of an FBI investigation of any such collusion. I would suggest what do we think happened at the Mayflower? Mr. Sessions, are you familiar with what spies call trade craft?

**SESSIONS:** A little bit.

**COTTON:** That involves things like covert communications and dead drops and brush passes, right?

**SESSIONS:** That is part of of it.

**COTTON:** Do you like spy fiction: John le Carre, Daniel Silva, Jason Matthews?

**SESSIONS:** Yeah, Alan Furst, David Ignatius' books.

**COTTON:** Do you like Jason Bourne or James Bond movies?

**SESSIONS:** No, yes, I do.

**COTTON:** Have you ever ever in any of these fantastical situations heard of a plot line so ridiculous that a sitting United States senator and an ambassador of a foreign government colluded at an open setting with hundreds of other people to pull off the greatest caper in the history of espionage?

**SESSIONS**: Thank you for saying that, Senator Cotton. It's just like through the looking glass. I mean, what is this? I explained how in good faith I said I had not met with Russians, because they were suggesting I as a surrogate had been meeting continuously with Russians. I said I didn't meet with them and now, the next thing you know I'm accused of some reception plotting some sort of influence campaign for the American election. It's just beyond my capability to understand, and I really appreciate, Mr. Chairman, the opportunity to at least to be able to say publicly I didn't participate in that and know nothing about it.

**COTTON:** And I gather that's one reason why you wanted to testify today in public. Last week Mr. Comey in characteristic dramatic and theatrical fashion alluded ominously to what you call innuendo, that there was some kind of classified intelligence that suggested you might have colluded with Russia or that you might have otherwise acted improperly. You've addressed those allegations here today. Do you understand why he made that allusion?

**SESSIONS:** Actually I do not. Nobody's provided me any information.

**COTTON:** Thank you. My time is limited and I have a lot of questions. Mr. Blunt asked you if you had spoken in response to Mr. Comey's statement to you after his private meeting with the president on February 14 or February 15. You said that you did respond to Mr. Comey. Mr. Comey's testimony said that you did not. Do you know why Mr. Comey would have said that you did not respond to him on that conversation with you on February 14 or 15?

**SESSIONS:** I do not. It was a little conversation, not very long, but there was a conversation, and I did respond to him, perhaps not to everything he asked,

but he -- I did respond to him. I think in an appropriate way.

**COTTON:** Do you know why Mr. Comey mistrusted President Trump from their first meeting on January 6? He stated last week that he did. He didn't state anything from that meeting that caused him to have such mistrust.

**SESSIONS:** I'm not able to speculate on that.

**COTTON:** Let's turn to the potential crimes that we know have happened: leaks of certain information. Here's a short list of what I have. The contents of alleged transcripts of alleged conversations between Mr. Flynn and Mr. Kislyak, the contents of President Trump's phone calls with Australian and Mexican leaders, the content of Mr. Trump's meetings with the Russian foreign minister and the ambassador, the leak of Manchester bombing -- the Manchester bombing suspect's identity and crime scene photos and last week within 20 minutes of this committee meeting in a classified setting is with Jim Comey, the basis of Mr. Comey's innuendo was. Are these leaks serious threats to our national security, and is the Department of Justice taking them with the appropriate degree of seriousness and investigating and ultimately going to prosecute them to the fullest extent of the law?

**SESSIONS:** Thank you, Senator Cotton. We have had one successful case very recently in Georgia. That person has been denied bail I believe and is being held in custody, but some of these leaks, as you well know, are extraordinarily damaging to the United States security, and we have got to restore a regular order principle. We cannot have persons in our intelligence agencies, our investigative agencies or in Congress leaking sensitive matters on staff, so this is -- I'm afraid will result -- is already resulting in investigations, and I'm -- I fear that some people may find that they wish they hadn't leaked it.

**COTTON:** Thank you. My time has expired but for the record it was stated earlier that the Republican platform was weakened on the point of arms for Ukraine. That is incorrect. The platform was actually strengthened, and I would note that it was the Democratic president who refused repeated bipartisan requests of this Congress to supply those arms to Ukraine.

EXHIBIT 10A

**BURR:** Senator Harris.

**SEN. KAMALA HARRIS:** Attorney General Sessions, you have several times this afternoon prefaced your responses by saying to the best of your recollection. Just on the first page of your three pages of written testimony, you wrote nor do I recall, do not have recollection, do not remember it, so my question is for any of your testimony today, did you refresh your memory with any written documents, be them your calendar, written correspondence, e-mails or notes of any sort?

**SESSIONS:** I attempted to refresh my recollection but so much of this is in a wholesale campaign of extraordinary nature that you're moving so fast that you don't keep notes, you meet people. I didn't keep notes of my conversations with the Russian ambassador at the Republican convention. I didn't keep notes on most of these things.

**HARRIS:** Sir, will you provide the committee with the notes that you did maintain?

**SESSIONS:** As appropriate I will supply the committee with documents.

**HARRIS:** Can you please tell me what you mean when you say appropriate?

**SESSIONS:** I would have to consult with lawyers in the department who know the proper procedure before disclosing documents that are held within the Department of Justice. I'm not able to make that opinion today.

**HARRIS:** Sir, I'm sure you prepared for this hearing today and most of the questions that have been presented to you were predictable. So my question to you is did you then review with the lawyers of your department if you as the top lawyer are unaware what the law is regarding what you can share with us and what you cannot share with us, what is privileged and what is not privileged.

**SESSIONS:** We discussed the basic parameters of testimony. I frankly have not discussed documentary disclosure rules.

**HARRIS:** Will you make a commitment to this committee that you will share any written correspondence, be they your calendars, records, notes, e-mails or anything that has been reduced at any point in time in writing to this committee where legally you actually have an obligation to do so.

**SESSIONS:** I will commit to reviewing the rules of the department and as and when that issue is raised to respond appropriately.

**HARRIS:** Did you have any communications with Russian officials for any reason during the campaign that have not been disclosed in public or to this committee?

**SESSIONS:** I don't recall it, but I have to tell you, I cannot testify to what was said as we were standing at the Republican convention before the podium where I spoke.

**HARRIS:** My question --

**SESSIONS:** I don't have a detailed memory of that--

**HARRIS:** It is a relates to your knowledge.

**SESSIONS:** To the best of my knowledge.

**HARRIS:** Did you have any communication with any Russian businessman or any Russian nationals?

**SESSIONS:** I don't believe I had any conversation with Russian businessmen or Russian nationals.

**HARRIS:** Are you aware of any communications --

**SESSIONS:** A lot of people were at the convention, it's conceivable --

**HARRIS:** Sir. I have just a few

**SESSIONS:** Well, you let me qualify -- if I don't qualify, it you'll accuse me of lying so I need to be correct as best as I can.

**HARRIS:** I do want you to be honest.

**SESSIONS:** And I'm not to be able to be rushed this fast. It the makes me nervous.

**HARRIS:** Are you aware of any communications with other Trump campaign officials and associates that they had with Russian officials or any Russian nationals?

**SESSIONS:** I don't recall that.

**HARRIS:** And are you aware --

**SESSIONS:** At this moment.

**HARRIS:** Are you aware of any communications with any Trump officials or did you have any communications with any officials about Russia or Russian interests in the United States before January 20?

**SESSIONS:** No. I may have had some conversations, and I think I did, with the general strategic concept of the possibility of whether or not Russia and the United States could get on a more harmonious relationship and move off the hostility. The soviet union did in fact collapse. It's really a tragic strategic event that we're not able to get along better than we are today.

**HARRIS:** Before being sworn in as Attorney General, how did you typically communicate with then candidate or President-Elect Trump?

**SESSIONS:** Would you repeat that?

**HARRIS:** Before you were sworn in as Attorney General, how did you typically communicate with then candidate or President-Elect trump?

**SESSIONS:** I did -- : I did not submit memorandum. I did not make formal presentations.

**HARRIS:** Did you ever communicate with him in writing?

**SESSIONS:** I don't believe so.

**HARRIS:** And you referred to a long-standing DOJ policy. Can you tell us what policy it is you're talking about.

**SESSIONS:** Well, I think most cabinet people as the witnesses, you had before you earlier, those individuals declined to comment, because we're all about conversations with the president --

**HARRIS:** Sir, I'm just asking you about the DOJ policy you've referred to.

**SESSIONS:** A long-standing policy, a policy that goes beyond just the attorney general.

**HARRIS:** Is that policy in writing somewhere?

**SESSIONS:** I think so.

**HARRIS:** So did you not consult it before you came before this committee knowing we would ask you questions about that?

**SESSIONS:** Well, we talked about it. The policy is based --

**HARRIS:** Did you ask that it would be shown to you?

**SESSIONS:** The policy is based on the principle that the president --

**HARRIS:** Sir, I'm not asking about the principle. I'm asking when you would be asked these questions --

**SESSION:** Well, I'm unable to answer the quest--

**HARRIS:** and you would rely on that policy --

**SEN. JOHN MCCAIN:** Chairman --

**HARRIS:** Did you not ask your staff to show you the policy that would be the basis for you refusing to answer the majority --

**MCCAIN:** The witness should be allowed to answer the question.

**BURR:** Senators will allow the chair to control the hearing. Senator Harris, let him answer.

**HARRIS:** Please do.

**BURR:** Thank you.

**SESSIONS:** We talked about it, and we talked about the real principle that's at stake is one that I have some appreciation for as far as having spent 15 years in the department of Justice, 12 as United States attorney, and that principle is that the Constitution provides the head of the Executive Branch certain privileges and that members -- one of them is confidentiality of communications, and it is improper for agents of any of the department -- any departments in the Executive Branch to waive that privilege without a clear approval of the President.

**HARRIS:** Mr. Chairman. I have asked --

**SESSIONS:** And that's the situation we're in.

**HARRIS:** I asked for a yes or no. Did you ask --

**SESSIONS:** The answer is yes, I consulted.

**BURR:** The senator's time has expired.

**HARRIS:** Apparently not.

**BURR:** Senator Cornyn.

**SEN. JOHN CORNYN:** Attorney General Sessions, former director Comey in his letter to FBI employees when he was terminated started this way. He said I've long believed that a president can fire an FBI director for any reason or no reason at all. Do you agree with that?

**SESSIONS:** Yes, and I think that was a -- good for him to say because I believe we're going to have a new and excellent FBI director, a person who is smart, disciplined, with integrity and proven judgment that would be good for the bureau, and I think that statement probably was a valuable thing for Director Comey to say. I appreciate that he did.

**CORNYN:** Just to reiterate, the timeline of your recusal and the Rosenstein memo and your letter to the president recommending the termination of director Comey, you recused from the Russian investigation hon March the 2nd, correct?

**SESSION:** The formal recusal took place on that date.

**CORNYN:** The letter that you wrote forwarding the Rosenstein memo to the president as a basis for director Comey's termination was dated May the 9th, a couple of months after you had recused from the Russian investigation, correct?

**SESSIONS:** I believe that's correct.

**CORNYN:** So isn't it true that the Russian investigation did not factor into the -- into your recommendation to fire director Comey?

**SESSIONS:** That is correct.

**CORNYN:** The memorandum written by the deputy attorney general, your letter to the president forwarding that recommendation didn't mention Russia at all. Is that your recollection?

**SESSIONS:** That is correct.

**CORNYN:** So let's review what the basis was of deputy attorney general Rosenstein's recommendation. He wrote in his memo on May the 9th. He said I cannot defend the director's handling of the conclusion of the investigation of secretary Clinton's e-mails, and I do not understand his refusal to accept the nearly universal judgment that he was mistaken, and, of course, he's talking

about director Comey. He went on to say the director -- that was director Comey at the time was wrong to usurp the attorney general's authority on July the 5th, 2016. You'll recall that was the date of the press conference he held. He went on to say that the FBI director is never empowered to supplant federal prosecutors and assume command of the Justice department. Finally, he said compounding the error, the director ignored another long-standing principle, that we do not hold press conferences to release derogatory information about the subject of a declined criminal investigation. In fact, there is written policy from the Department of Justice, is there not, entitled Election Year sensitivities. Are you familiar with the prohibition of the Justice Department making announcements or taking other actions that might interfere with the Normal elections?

**SESSIONS:** I am generally familiar with that. Some of those were the Holder memoranda after my time in the department.

**CORNYN:** Well, let me --

**SESSIONS:** There's always been rules about it though.

**CORNYN:** Well, let me ruled just an excerpt from a memo from the attorney general. March theth, 2012, entitled election year sensitivities. It says law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the department's mission and with the principles of federal prosecution. Do you agree with that?

**SESSIONS**: Essentially, yes.

**CORNYN:** So what essentially the deputy attorney general said is that former director Comey violated Department of Justice directives when he held a press conference on July the 5th, 2016. He announced that Secretary Clinton was extremely careless with classified e-mail and went on to release other derogatory information, including his conclusion that she was extremely

careless but yet went on to say that no reasonable prosecutor would prosecute her. That is not the role of the FBI director, is it? That is a job for the prosecutors at the Department of Justice. That's what was meant by deputy attorney general Rosenstein when he said that director Comey usurped the role of the Department of Justice prosecutors. Is that right?

**SESSIONS:** That is correct, and former attorney general Bill Barr wrote an op-ed recently in which he said he had assumed that attorney general lynch had urged Mr. Comey to make this announcement so she wouldn't have to do it, but in fact it appears he did it without her approval totally and that is a pretty stunning thing. It is a stunning thing, and it violates fundamental powers and then when he reaffirmed that the rightness he believe of his decision on May 3rd, I think it was, that was additional confirmation that the director's thinking was not clear.

**BURR:** Senator Reed.

**SEN. JACK REED:** Thank you very much, Mr. Chairman. First, point, attorney general. Senator Heinrich and others have raised the issue of long-standing rules. If there are written rules, would you provide them to the committee, please.

**SESSIONS:** I will.

**REED:** Thank you very much. Now senator Cornyn has made the point that director Comey's conduct was unprofessional with respect to the Clinton campaign?

**SESSIONS:** I respect everything that the deputy attorney general put in his memoranda as good and important factors to use in determination whether or not he had conducted himself in a way that justified continuing in office. I think it pretty well speaks for itself, and I believe most of it did deal with that. The discussion about his performance was a bipartisan discussion. It began during the election time. Democrats were very unhappy about the way he

conducted himself and in retrospect, in looking at it, I think it was more egregious than I may have even understood at the time.

**REED:** General, if I may, and I don't want to cut you off.

**SESSIONS:** I'll let you go, sorry.

**REED:** Excuse me, sir, on July 7th when Mr. Comey made his first announcement about the case, you were on Fox News, and you said, first of all, director Comey is a skilled former prosecutor and then you concluded by saying essentially that it's not his problem. It's Hillary Clinton's problem. Then in November, on November 6th, after Mr. Comey again made news in late October by reopening, if you will, the investigation, you said, again, on Fox News, you know, FBI director Comey did the right thing when he found new evidence. He had no choice but to report it to the American Congress where he had under oath testified. The investigation was over. He had to direct that and say this investigation ongoing now. I'm sure it's significant, or else he wouldn't have announced that. So in July and November director Comey was doing exactly the right thing. You had no criticism of him. You felt that in fact he was a skilled professional prosecutor. You felt that his last statement in October was fully justified so how can you go from those statements to agreeing with Mr. Rosenstein and then asking the president or recommending that he be fired?

**SESSIONS:** I think in retrospect, as all of us began to look at that clearly and talk about it as respectives of the department of justice, once the director first got involved and embroiled in a public discussion of this investigation which would have been better never to have been discussed publicly, and said he -- it was over. Then when he found new evidence that came up, I think he probably was required to tell Congress that it wasn't over, that new evidence had been developed. It probably would have been better and would have been consistent with the rules of the Department of Justice to never have talked about the investigation to begin with. Once you get down that road, that's the kind of thing that you get into that went against classical prosecuting policies that I

learned and was taught when I was United States attorney and assistant united States attorney.

**REED:** If I may ask another question. Your whole premise in recommending to the president was the actions in October involving Secretary of State Clinton, the whole Clinton controversy. Did you feel misled when the president announced that his real reason for dismissing Mr. Comey was the Russia investigation?

**SESSIONS:** I don't have -- I'm not able to characterize that fact. I wouldn't try to comment on that.

**REED:** So you had no inkling that there was anything to do with Russia until the president of the United States basically declared not only on TV but in the oval office to the Russian foreign minister saying the pressure is off now. I got rid of that nutjob. That came to you as a complete surprise?

**SESSIONS:** Well, all I can say, Senator Reed, that our recommendation was put in writing and I believe it was correct and I believe the president valued it, but how he made his decision was his process.

**REED:** And you had no inkling that he was considering the Russia investigation?

**SESSIONS:** Well, I'm not going to try to guess what he thought about that.

**REED:** That's fair. There is a possibility -- there is a scenario in which this whole recapitulation of Clinton was a story basically, a cover story that the president tried to put out and he quickly abandoned and his real reason was the Russia investigation which if it had been the case I expect you would have recused yourself from any involvement. Thank you.

**BURR:** Senator McCain.

**MCCAIN:** Over the last few weeks the administration has characterized your previously undisclosed meetings with Russia ambassador Kislyac as meetings

you took in your official capacity as a U.S. Senator and a member of the Senate Armed Services Committee. As chairman of the that committee, let me ask you a few questions about that. At these meetings did you raise concerns about Russia invasion of Ukraine or annexation of Crimea?

**SESSIONS:** I did, Senator McCain, and I would like to follow up a little bit on that. That's one of the meetings -- that's one of the issues that I recall explicitly. The day before my meeting with the Russian ambassador, I'd met with the Ukrainian ambassador, and I heard his concerns about Russia, and so I raised those with Mr. Kislyak, and he gave, as you can imagine, not one inch. Everything they did, the Russians had done, according to him was correct, and I remember pushing back on it, and it was a bit testy on that subject.

**MCCAIN:** Knowing you on the committee, I can't imagine that. Did you raise concerns about Russia's support for President Bashar Al Assad and his campaign of indiscriminate violence against his own citizens including his use of chemical weapons?

**SESSIONS:** I don't recall whether that was discussed or not.

**MCCAIN:** Did you raise concerns about Russia's interference in our electoral process or interferences of the electoral processes cause of our allies?

**SESSIONS:** I don't recall that being discussed.

**MCCAIN:** At those meetings, if you spoke with Ambassador Kislyak in your capacity as a member of the Armed Services Committee you presumably talked to him about Russia-related security issues that you have demonstrated as important to you as a member of the committee?

**SESSIONS:** Did I discuss security issues --

**MCCAIN:** I don't recall you as being particularly vocal on such issues.

**SESSIONS:** Repeat that, Senator McCain, I'm sorry.

**MCCAIN:** The whole Russia-related security issues that you demonstrated is important to you as a member of the committee, did you raise those with him?

**SESSIONS:** You mean such issues as nuclear issues, or?

**MCCAIN:** Yeah. In other words, Russia-related security issues, in your capacity as the chairman of the Strategic Forces Subcommittee, what Russia-related security issues did you hold hearings on or otherwise demonstrate a keen interest in?

**SESSIONS:** We may have discussed that. I just don't have a real recall of the meeting. I may, I was not making a report about it to anyone. I just was basically willing to meet and see what he discussed.

**MCCAIN:** And his response was?

**SESSIONS:** I don't recall.

**MCCAIN:** During that 2016 campaign season, did you have any contacts with any representative, including any American lobbyist or agent of any Russian company within or outside your capacity as a member of congress or a member of the armed services committee?

**SESSIONS:** I don't believe so.

**MCCAIN:** Politico recently reported in the middle of the 2016 election the FBI found that Russian diplomats whose travel to the state department was supposed to track had gone missing. Some turned up wandering around the desert or driving around Kansas and reportedly intelligence services reported after a year of inattention, these movements indicate, one, that Moscow's espionage ground game has grown stronger and more brazen and that quietly, the Kremlin has been trying to map the United States telecommunications infrastructure. What do you know about this development and how the justice department and other relevant U.S. Government agencies are responding to it?

**SESSIONS:** We need to do more, Senator McCain. I am worried about it. We also see that from other nations with these kind of technological skills like China and some of the other nations that are penetrating our business interests, our national security interests. As a member of the Armed Services Committee, I did support and advocate -- and I think you supported -- legislation that would -- and it's ongoing now, that requires the defense department to identify weaknesses in our system and how we can fix them, but I would say to you, Senator McCain, that in my short tenure here in the Department of Justice I've been more concerned about computer hacking and those issues than I was in the Senate. It's an important issue, you're correct.

**MCCAIN:** "The Washington Post" reported yesterday Russia's developed a cyber weapon that disrupt the United States power grids and telecommunications infrastructure. This weapon is similar to what Russia or Russia-allied hackers used to disrupt Ukraine's electrical grid in 2015. Can you discuss a little bit in open session how serious that is?

**SESSIONS:** I don't believe I can discuss the technological issues, just to say that it is very disturbing that the Russians continue to push hostile actions in their foreign policy, and it is a -- not good for the United States or the world or Russia in my opinion.

**MCCAIN:** Do you believe we have a strategy in order to counter these ever increasing threats to our national security and our way of life?

**SESSIONS:** Not sufficiently. We do not have a sufficient strategy dealing with technological and I.T. penetrations of our system. I truly believe it's more important than I ever did before, and I appreciate your concern and leadership on that issue, and in fact, all of Congress is going to have to do better.

**BURR:** Senator's time has expired. The chair would recognize the vice-chair.

**WARNER:** Thank you, Mr. Chairman, and General Sessions, thank you. I particularly appreciate your last comments with Senator McCain about the

seriousness of this threat and it's why so many of us on this committee are concerned when the whole question of Russian intervention.

The president continues to refer to it as a witch-hunt and fake news, and there doesn't seem to be a recognition of the seriousness of this threat. I share, I think most members do, the consensus that the Russians massively interfered and want to continue to interfere, not to favor one party or another but to favor their own interests, and it is of enormous concern that we have to hear from the administration how they are going to take that on. I also believe comments have been made here about where we head in terms of some of the trump associates who may have had contacts with Russians.

We've not gotten to all that you have yet because of the unprecedented firing of the FBI director that was leading this very same Russia investigation, that superseded some of our activities, so those members when I hope will equally pursue the very troubling amount of smoke at least that's out there between individuals that were affiliated with the Trump campaign and possible ties with Russians. I've not reached any conclusion. We've got to pursue that. Final comment, and I understand your point, but you have to -- there were a series of comments made by Mr. Comey last week. I think members on this side of the aisle have indicated, you understand executive privilege, understand classified setting. I do think we need, as Senator Reed indicated and Senator Harris and others, if there are these long-standing written procedures about this ability to have some other category to protect the conversations with the president, we'd like to get a look at them because we need to find out in light of some of the contradictions between today and last week where this all heads.

At the end of the day, this is not only -- let me restate what I stated last time. It's not about relitigating 2016. It's about finding out what happened, about some serious allegations about potential ties, but on a going forward basis making sure that the Russians who are not finished in terms of their activities didn't end on Election Day 2016. We know that's ongoing and we have to be better prepared going forward. Thank you, Mr. Chairman.

**SESSIONS:** Mr. Chairman, one brief comment, if you don't mind. I do want

FILED UNDER: JEFF SESSIONS, SENATE

they have not been altered in any way.

**WARNER:** But there were are a number of very strange comments that Mr.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

_____

© 2024 POLITICO LLC

EXHIBIT 10A

agreement to have a continuing dialogue with us as we might need to ask some additional questions as we go a little further down the investigation. That certainly does not have to be a public hearing, but it -- it may be an exchange and a dialogue that we have. You have helped us tremendously, and we're grateful to you and to Mary for the unbelievable sacrifice that you made in this institution but also now in this administration. This hearing is now adjourned.