Mary Basile Logan
Post Office Box 5237
Clinton, New Jersey 08809

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

---

| |
|---|
MARY BASILE LOGAN, individually and on behalf of those similarly situated, *Pro-Se*;

Plaintiff,

MERRICK GARLAND, in his official capacity Attorney General, Department of Justice; et al.

Defendants.

**CIVIL DOCKET: 3:24-CV-00040 ZNQ-TJB**

---

## PLAINTIFFS' EXHIBITS ERRONEOUSLY OMITTED IN SUPPORT OF AMENDED COMPLAINT

Plaintiff has attached the following Exhibits erroneously omitted from the Amended Complaint submission due to software error. These documents include:

1. EXHIBIT 10A:     AG Sessions (June 13, 2017 Senate Intelligence Committee Hearing).
2. EXHIBIT 14       BALENCIAGA_UKRAINE.
3. EXHIBIT 20:      NE Nursing Home Death Records COVID19.
4. EXHIBIT 28A      EXECUTIVE SUMMARY FINDINGS.
5. EXHIBIT 28D      EXECUTIVE SUMMARY FINDINGS – EXHIBITS
   - Democracy Works 990 Record.
   - Dropbox Recordation Evidence.
   - Printer Ballot Contract Analysis.
   - Middlesex County Letter seeking correction to registrant date of birth.
   - Correspondence requesting- grant facilitation:
     - New Jersey DCA;
     - New Jersey Board of Public Utilities;
     - New Jersey Comptroller;
     - New Jersey Cannabis Commission.
   - 2022 Election Analysis:

- a. Letter of no responsive record to the Department of Justice, Civil Rights Division;
- b. Letter of no responsive record to the State Board of Elections;
- c. Letter of no responsive record to the New Jersey Attorney General;
- d. Letter of no responsive record to the New Jersey Department of Homeland Security;
- e. Letter of no responsive record to the New Jersey Criminal Division;
- f. Letter of no responsive record to the New Jersey Civil Rights Division.
- 7-Points of Evidence structure.
- USPS OPRA Records.
  - a. 0301 USPS Ballot Imaging Letter Inspector General 112622.
  - b. 2023-IGFP-00127 Coons Donna Final Response.
  - c. Access Controls Over Mail Imaging Systems. Report number IT-AR-16-004.
  - d. RO Response to Photos of Mail pieces (002).
  - e. Pelosi, Maloney Joint letter_ House Committee on Oversight and Reform.
  - f. Deployment of Operational Changes. Report Number 21-014-R21_.
  - g. USC Title 39 USPS Section 3692 - Performance targets and transparency.
  - h. Pennsylvania v. DeJoy, Court Order.
  - i. Pennsylvania v DeJoy Clarification of codes.
  - j. Accenture Information Technology Contracts. Report Number 20-076-R21

Dated April 1, 2024

**/s/ Mary B. Logan**
Mary Basile Logan
Plaintiff, *Pro-Se*
Post Office Box 5237
Clinton, New Jersey 08809
Telephone:  908-200-7294
FAX:  888-237-2671
Email:  Trino@trinops.com

## LIBERTY PROJECT, INC. EXHIBITS – 7 POINTS OF EVIDENCE

## EXECUTIVE STATEMENT OF FACTS

Plaintiff, Mary Basile Logan, serving as the Executive Administrator for the Liberty Project, Inc. ("LP") presents analysis and fact finding as Exhibit to the amended complaint.

1. <u>New Jersey election process in overview</u>. The myriad of election changes in 2020 resulting from Executive Orders, Secretary of State, Attorney General, Legislative directives and/or adaptations by local and county officials in the attempt to conform to the foregoing mandates, has resulted in a hodgepodge ballot chain of custody ("CoC"). Historical election protocols augmented for COVID-19 that irrefutably fractured election integrity, leaving a myriad of opportunity for manipulation of independent vote, their autonomous voice in who leads at the local, county, state and federal levels among the 3-branches of government, beholden to the People, knowingly made vulnerable.

2. <u>Resignations</u>. Following the 2020 election, the entire Administrative staff of Hasbrouck Heights, New Jersey resigned. The Plaintiff, by OPRA request, met with the interim Clerk and IT Director to review CoC, wherein the staff explained that upon arrival exceptionally sensitive, statutorily guarded protocols had been compromised including contract administration, staffing protocols, IT security, reporting guardrails and election matters with video recordation of the ballot boxes limited in access.

3. <u>Registrant versus population voting record</u>. The Liberty Project analyzed election (e-hist and v-hist) records dating from 2000 – 2023. From the period of 2007, the registrant records became non-conforming under HAVA guidelines including:

a. Date of birth benchmarks and guardrails ignored by Board of Election officials with Legislative, Executive, Judicial and 3rd Party (non-profit) impositions reinforcement after the fact to extinguish validity of the facts disclosed.

b. Persons voting exceeding population, including 1st Amendment imposition of voter records absent disclosure involving the sharing of private information protected under Daniel's Law and the Constitution, shared with 3rd parties absent any guardrails in the manner of use up to and including restrictions to subsequent dissemination of the data; this includes foreign entities (e.g. the German Marshall Fund).

c. Votes certified exceed population and registrant records, this is an undisputable statement of fact with analysis conducted by the Liberty Project verifying validity of the statement. The appearance of certification in the election years from 2007 - present are called into question with the inclusive records stating, irrefutably, that the registrant records and votes cast cannot be reconciled. Plaintiff asserts that the New Jersey Defendants, PHILIP MURPHY, TAHESHA WAY, JUDITH PERSICHILLI, SEJAL HATHI and MATTHEW PLATKIN had full knowledge as with their co-Defendants, ANDREW CUOMO, KATHY HOCHUL and LETITIA JAMES, hence the use of alternative methods of audit, including the New Jersey First Pilot of Risk-Limiting Audits.

In training persons across the nation, the Plaintiff thoroughly analyzed the risk-limit audit structure, designed by the Democracy Fund Election Validation Project, a non-profit entity (See Exhibits "DEMOCRACY WORKS INC"). The audits rely on sampling of data and computer peripheries, drawing from the same

well of information to inform of "random sample" data findings.  The risk-limit audit protocol has no benchmarks or guardrails for the human interactives, touchpoints of ballots by human interface, in the election process; ignoring these imperative areas entirely, relying on the mechanical solely, science derived.

The Democracy Fund is unquestionably partisan in its associations, affiliations and funding mechanisms, compromising the voter-verifiable paper trail and the resulting certified confined audit.  The Democracy Fund shares direct association with the very same philanthropic organizations as the Center for Tech and Civic Life ("CTCL"), another election imposition non-profit artfully imposed into the People's voice under mask of COVID-19.  Both organizations are funded and affiliated with the MacArthur Foundation, the Knight Foundation, the Brookings Institute, the Council on Foreign Relations, the Berkman Klein Center at Harvard, the Pew Charitable Trust, the Tide Foundation, the Rockefeller Brothers Fund, the Omidyar Network Fund, the Civic Alliance, Arabela Advisors, Facebook, Amazon and Flaxman Strategies.  The inclusive non-profit entities share monetary contribution derived from a central tenon; George Soros and communist leaning organizations.  It is unquestionable as well unconscionable that the 3-branches of New Jersey government have affirmed the interface of the Democracy Fund, codified by the Legislature.  The voice of the People expressly eviscerated by fiat and policy dictum.

The founder of the Democracy Fund discloses his posture as unquestionably racist, "white supremacy and right-wing terrorism is (sic) the

greatest threat to our nation's democracy and security."[1]  The foregoing statement must be weighed against the fact that the risk-limit audit (NJ Rev. Stat. §19:61-9) is the curtain which the SoS employs to certify New Jersey elections, providing semblance of conformance to federal statutes under HAVA; unacceptable under the Rule of Law, the Constitution and founding principles, compromise by 3rd parties fracture integrity in the People's elections, fractures which the 3-branches of New Jersey government has knowingly compromised by codified law, caging voters and the expressed election certification.  Moreover, given to the Plaintiff's involvement in every State, the foregoing facts are reiterated as to all contractual integrations between the Democracy Fund nationwide.

4.  <u>COVID-19 Election Changes</u>.  The myriad of election changes in 2020 resulting from Executive Orders, Secretary of State, Attorney General, and Legislative directives citing COVID-19 prompted crevices within the election process that have been knowingly compromised.  Plaintiff physically met with 92 municipal and County designees, reviewing drop-box recordation, certification tapes, 2-hour reports and various mechanisms to election chain of custody.  In each and every instance, there were significant errors of record (See Exhibits – "DROPBOX"), as outlined below:

   a.  Certification tapes, the electronic fingerprint of elections, in many instances were uncertified by poll workers.

   b.  Certification tapes had no record of the corresponding seal numbers correlating to the votes cast, voiding the ability to conduct an audit.

---

[1] Flaxman, Seth. 66 "Our Democracy Fails If We Don't Protect Black Lives."  Democracy Works.  June 4, 2020.  Accessed June 17, 2021. https://www.democracy.works/blog/blacklivesmatter

c. Drop-boxes were used by voter patrons sparingly in New Jersey to the extent that
the recordation could be viewed, in many cases, the physical drop-box was
obscured entirely, partially or viewed only from the back voiding the policy of
video surveillance.

    i. Under codified law, the process of voting is designed to be free and fair.
    The knowing actions of the Defendants has compromised every facet of
    election law, moreover, Plaintiff asserts that their collective actions have
    been causational in the compromise of staff.

    ii. Plaintiff asserts that the design and apparatus impositions on elections
    under mask of COVID-19 was designed in orchestration with CTCL and
    the inclusive non-profits stated, but not limited solely to that list given the
    LP repository of 1,700 990 reports.  CTCL's Tiana Epps Johnson, a
    protégé of Defendant, BARACK HUSSEIN OBAMA, has clearly stated
    as early as 2003, the infrastructure of elections in the United States is
    aging.  The design of the COVID-19 roll-out from start to finish resulted
    in unprecedented election changes, presently, absent such imposition, the
    legislature has ensured their retention through codified law.  Plaintiff states
    that the acorn structure of the non-profit entities unquestionably mirror the
    ACORN structure dismembered under Chapter 7 bankruptcy in 2010.  In
    point of fact, the 990 records held in repository reflect an uptick of grants
    and donations following the 2010 bankruptcy action, in some cases, the
    5013c entities' formation date is a direct correlation, including CTCL.

      iii.  Plaintiff asserts that the knowing actions, in a 3-branch collaborative, have

stepped out of their Constitutional partnership with the People, choosing

instead to partner with public private entities, voiding all accountability in

the use of public taxpayer funds while usurping every facet of free and fair

elections, including their certification and audit(s).

5.  <u>Ballot Printing Contracts (2020).</u>  Plaintiff audited the analysis compiled by the LP

volunteer; as below:

    a.  Plaintiff was informed by the Hunterdon County Clerk, Mary Melfi, that the

Governor changed the bid requirement for ballot printing in 2020, Plaintiff retains

subject communication.

    b.  The Exhibit ("PRINTER BALLOT CONTRACT ANALYSIS") provides that

New Jersey utilized seven vendors for ballot printing; Election Graphics, Royal

Printing, Colorsource, Inc, Paulsboro Printers, LLC., Dominion Voting Systems

(Salem County), B&B Press, Premier Printing Solutions.  Plaintiff focused on one

of the vendors as a sample for analysis; Election Graphics, Inc. 9242 Kennedy

Boulevard, North Bergen, New Jersey.  President Adam Perna, Vice President

John Hollop, Vice President Louis Gelormini, and Medical Director, David John

Perna.

      i.  In 2022 the owner of Election Graphics Inc. donated $134,000 to Ocean

County Republican candidates, a clear violation of statute.  Open Secrets

discloses that Election Graphics, Inc. has made financial contributions to

candidates from 2000. (See:

https://www.opensecrets.org/search?q=election+graphics&type=donors)

These actions are egregious, unethical on their face as the company derives direct benefit by contractual relationship with the parties elected. The Governor's actions to dismiss bid requirements in 2020, ostensibly gave the green light for these actions to advance, extending liability and compromise in free and fair elections.  Plaintiff asserts that the monetary compromise is far more extensive, not a one-off, requiring further analysis in discovery as to the movement of funds between parties, including 501c3's entities.

ii.  Election Graphics former address is 15 Rockland Terrace, Verona, New Jersey (See: https://www.coanj.com/files/2019%20COANJ%20Gameboard%20Booklet.pdf).  The property is registered to K&K Enterprises c/oHofmann with an address of 42 Valleyview Avenue, Summit, New Jersey, the owner of the property in Summit is Brian Potasiewicz (See: https://njtaxrecords.net/r/r42-valley-view-ave-summit-union-county-nj-property-tax-record-3058206).

iii.  Brian Potasiewicz is a Vice President with Credit Suisse, formerly of Lehman Brothers who is also associated with Great Lakes Fasteners in Twinsburg, Ohio and Laudan Properties (2008) at 2204 E. Enterprise Parkway, Twinsburg, Ohio.  In 2019, Laudan Properties launched Lauden Inspection Services, nationwide, Brian serves as SVP.  Laudan Properties is associated with Lauden Investments Limited (Borehamwood, Hertfordshire) where Laurence Alana Bellman, Sarah Jane Bellman,

Gertrude Bellman and Neil Andrew Evans serve as Directors; owning

multiple properties and ventures:  Wiber-Wood Properties, Ltd., Carburton

Investments Ltd., Woodcock Investments Ltd., Anden Properties Ltd.,

Crippalm Ltd., Wiber-Wood & Partners Ltd., Anden Investments Ltd.,

Bellman Property Group Ltd., and Birkbeck Enterprises Ltd.

iv.   In August, 2016, High Road Capital Partners announced the acquired

Great Lakes Fasteners Corporation by All Integrated Solutions ("AID"),

where Brian Potasiewicz is associated.  In 2022, Great Lakes Fasteners

owner, Ron Harenberg (Mansfield, OH) announced his retirement.  In

October, 2022, The Lakeshore Fastener Group (Traverse City, MI)

purchased Hodges Fastener Group, formerly held by Great Lakes Fastener

Corporation which included subsidiaries – Nut & Bolt Fastener Solutions,

Lakeshore Shore Fastener and Hodges Fastener Corporation.

v.   Plaintiff reference to Brian Potasiewicz regards the Amended Complaint

and BCCI, herein referring to NYTimes article of February 20, 2022 *Vast

Leak Exposes How Credit Suisse Served Strongmen and Spies.*[2]  The

movement of Brian Potasiewicz and the shell companies that he has

amassed would not exist but for the moral bankruptcy that is presently in

play as exampled by the inclusive Defendants, presented to the public as

acceptable practice in governance.

vi.   Analyzing Brian Potasiewicz in the other direction of K&K Enterprises

c/o Hofman at 42 Valley View Avenue, Summit, New Jersey 07901,

---

[2] Drucker, Jesse and Hubbard, Ben. *Vast Leak Exposes How Credit Suisse Served Strongmen and Spies.*  Accessed August 4, 2023 https://www.nytimes.com/2022/02/20/business/credit-suisse-leak-swiss-bank.html.

connects with John Kapoor who serves as President of K&K Enterprises, a distributor of Carbon Steel Pipe in the United States, also associated are Neeru Kapoor and Madhav Kapoor. The warehouse for K&K Enterprises is located at 1850 Alumax Circle, Plant City, Florida 33566. K&K Enterprises has 26 locations in the United States according to Bizpedia, one of which is K&K Enterprises at 55 Crane Street, Southbridge, Massachusetts 01550; owners Marek and Teresa Kopec, Marek a native of Poland. A subsequent location of K&K Enterprises is PO Box 5309, Basking Ridge, New Jersey 07920; owner Mr. P.N. Kapoor, international business enterprise with 429 employees, including associates Karim Khan, K. Shail Ahmed, Dinessh Jain, Vijay Kadaganchi, Pete Gosai. The company has a warehouse located at 1650 Alumax Circle, Plant City, Florida 33566 Karim Khan has a mailing address of 4199 Main Street, Perry OH (Northeast Cleveland), the company site designates specialty in roofing and construction, while LinkedIn has his office address as Ueless, Texas. (See: https://www.kandkenterprisesinc.com/locations).

vii. K&K Enterprises (See: https://opencorporates.com/companies/us_ny/863050), formerly known as P&K Travel Service, Inc., K&P Travel Service, Inc. and M.B. Travel Service, Inc., registered out of New York, listing a subsequent address of 258 King George Road, STE 1L, Warren, NJ, 07059. Who transacts real estate in and among Hcri Ny-Nj Properties Llc., who's parent company is Welltower, Inc. a foreign enterprise owning 3,000 properties in the U.S.,

Canada and the United Kingdom, formerly operated as HealthCare REIT,

Inc., publicly traded company that invests in healthcare infrastructure.

(See: https://finance.yahoo.com/news/welltower-inc-reports-robust-

growth-213432050.html).

6. Plaintiff refers to the East Brunswick, NJ Commissioner of Registration of Middlesex

County (See Exhibit "MIDDLESEX COUNTY").  The Board of Elections

communication states that they seek to engage the voter regarding their date of birth,

reflecting as 01/01/1800 to request reply citing "mandate of electronic poll books to be

used for Early Voting and Election Days, an accurate date of birth is an important tool for

poll workers to correctly identify voters and between voters with similar names."  On

September  3, 2019, SoS Tahesha Way, published a Special Adoption of 51 N.J.R. Filed

August 1, 2019, Special Adoption New Rules – N.J.A.C. 15:10-7.  The rules regarded

poll book protocol and the introduction of risk-limit audits.  Plaintiff breaks down the two

factors below:

   a. <u>ERIC.</u>  The Electronic Registration Information Center (ERIC) is a registered

      non-profit, sharing funding with the exact funders as CTCL, see above.

      Moreover, with a direct association with Pew Charitable Trusts, also financial

      tethered to the non-profits herein with special projects including conservation of

      land, rivers, public health and government reform with dealings in fine art and

      antiques.  Pew was founded by the Sun Oil Company heirs.  The Sun Oil

      Company attaching directly to the BCCI, Occidental Petroleum and Marc Rich

      history as referred and evidenced in the amended complaint.  Sun Oil also

      connects NASCAR and Motorsports Partnerships, including racing which is

tethered to human trafficking. By way of the SoS's actions in 2019, fortified by the actions of the Governor under Executive Order and, thereafter, the Attorney General, the People are consummating contracts without disclosure or transparency with parties who conduct the most egregious and heinous actions against the most innocent – children. Plaintiff states that the co-Defendants have full knowledge of their actions, unequivocally.

The contract with ERIC is intent on securing three outcomes; 1)retain a wall of separation between the free and fair elections from citizens through lawfare, non-profit activism and contract manipulation, including withholding or withdrawing bid threshold requirements; 2)create the illusion of elections in process with predictive modeling, control and guardrails including reserve registrants to cheat, manipulate and exact election outcomes, and 3)perpetuate the undercurrent schema including wealth building through non-profit investment venues facilitating pump and dumps. The contract should immediately be terminated with ERIC and all other contracts executed under the above premise require a detailed audit and review to ascertain if they are viable in construct and measurable outcome benefiting the People.

b. <u>USPS.</u> In July, 2020, the newly appointed Postmaster General, Louis DeJoy, immediately began evaluating operations, seeking viable streamlined improvements to enhance existing service levels while reducing costs. Simultaneously, Congress sought oversight of the proposed changes, citing transparency and accountability while the new programs and protocols were introduced. It became apparent through the August joint Congressional hearings,

Committee on Oversight and Reform with USPS that Congressional pressure was mounting in dual track, performance of the Postal Service with the intent that universal mail-in-balloting would continue in use more broadly in the general election. The Defendant, PHILIP MURPHY at the forefront, the intent of universal mail-in-balloting announced by Executive Order under COVID-19 public health emergency authorization, fortified by co-Defendants, TAHESHA WAY, JUDITH PERSICHILLI and MATTHEW PLATKIN, the latter breaking to aid Senator Booker in the impeachment of the Chief Executive, Donald J. Trump. Plaintiff reserves the right to add co-Defendants as facts inform.

c.   The August hearing was a hallmark of prowess as Congress exerted legislative control in reversing areas within the USPS, including contract management, that reflected forward thinking with reduced governmental costs and improved service levels. Observing periphery matters including judicial lawfare, the astute ascertained intent with twelve pending lawsuits in combination with Congressional written directives; USPS not unlike the American public were effectively becoming spectators versus stakeholders in the evolution of political theatre, the conversation steered by Defendants, DEBBIE WASSERMAN SCHULTZ, NANCY PELOSI and CHARLES "CHUCK" SCHUMER.

d.   Accenture Information Technology Services. The Accenture December 29, 2020 Report (20-076-R21) under the auspices of the OIG/USPS which Plaintiff analyzed. Plaintiff states as a matter of record that the USPS IT service contract had not gone out to bid, allowing for transparency and public disclosure, these points are interesting from the perspective that the premise of the

lawsuits filed as well the posture of the Congressional body claimed to be seeking the same changes that the Postmaster sought to introduce, yet without disclosing the extent of their intent, Congress reversed cost savings measured and mandated the contractual relationship affixing Accenture Information Technology with a significant increase in cost.  Analysis of the report provides that the contracting party (Accenture) was given venue by the foregoing Defendants to advocate for themselves, creating a written articulation as a matter of record, to which the Congressional body layered in vitriol, accusing the Postmaster General of sabotage.  Plaintiff moved to analyze Accenture Information Technology.

e.   Since 2020, Accenture has obtained contracts with the Department of Commerce (2020), Department of Homeland Security (2021), the U.S. Patent Office, Department of State (2022), U.S. Customs and Border Protection (2023), United States Army (2023), United States Agency for International Development (USAID) (2023), Government-wide Acquisition Contracts (GWAC's), U.S. Department of Veterans Affairs (2022), U. S. Centers for Medicare and Medicaid (2023).

f.   In June, 2021, the Department of Homeland Security and Infrastructure Agency (CISA) executed a contract with Accenture for $112m to provide advanced cyber services for CISA to help FCEB agencies mitigate the effects of cyberattacks including ransomware, botnets, and malware campaigns, while enhancing real-time visibility into cyber threats.  On October 15, 2021, Global IT reported that LockBit ransomware operators stole data from Accenture systems during an attack that hit the company's systems in August, 2021; two months following the

CISA contract award and three months in advance of the November 2021 general election.

Applying the analysis herein, Plaintiff states that the contractual relationship between Accenture and the United States has been orchestrated with malicious intent; opening a crevice of opportunity formerly safeguarded. Plaintiff further states that but for the contract, such vulnerability would not otherwise exist.

From the lens of BCCI mapping, analysis directed the Plaintiff to geopolitical interactives which correlated back to the inclusive co-Defendants, MERRICK GARLAND, LLOYD AUSTIN, WILLIAM BURNS, CHRISTOPHER WRAY, ALEJANDRO MAYORKAS, MARCIA FUDGE, WILLIAM J. CLINTON, HILLARY R. CLINTON, THOMAS KEAN SR., ROBERT MUELLER, JAMES COMEY, CHRISTOPHER J. CHRISTIE, RICHARD "DICK" CHENEY, ELIZABETH "LIZ" CHENEY, JOHN KERRY, GEORGE W. BUSH, BARACK HUSSEIN OBAMA, LORETTA LYNCH, JAMES BAKER, ERIC HOLDER, JOSEPH R. BIDEN, JOHN ASHCROFT, JAIME GORELICK, NANCY PELOSI, GEORGE NORCROSS, PHILIP MURPHY, TAHESHA WAY, JUDITH PERSICHILLI, SEJAL HATHI, MATTHEW PLATKIN, KATHY HOCHUL, ANDREW CUOMO, LETITIA JAMES, SUSAN RICE, ADAM SCHIFF, CHARLES "CHUCK" SCHUMER, XAVIER BECERRA, JANET YELLEN, ROD ROSENSTEIN, HUMA ABEDIN, DEBBIE WASSERMAN SCHULTZ, BILL NELSON, OCCIDENTAL PETROLEUM, UNITED HEALTHCARE, the DEMOCRATIC NATIONAL

COMMITTEE, the REPUBLICAN NATIONAL COMMITTEE, JAMES

PITTINGER, LISA SELLA, and ROBERT JUNGE; as below.

g.   Julie Sweet, Esq., CEO Accenture with a distinct background in mergers and

acquisitions.  In 2022, Accenture formed a strategic partnership with Atlassian

(Scott Farquhar, global headquarters – Australia with U.S. headquarters at 350

Bush Street, San Francisco, CA – the Mining Exchange Museum).

h.   Plaintiff asserts that the co-Defendants directed USPS while collaborating with

non-profits to fortify twelve lawsuits against USPS, the principal case,

*Pennsylvania v. DeJoy*, resulting in a universal Order issuance regarding mail-in-

ballots and consummating Congressional directive for continuum of the

Accenture contract.  The contract opened the door to future contracts in and

among other federal departments, as above.  The inclusive co-Defendants

knowingly extinguished their covenant with the People, franchising with foreign

parties including Accenture while railroading the 2020 general election under

false pretense of heightened national health emergency.

i.   Plaintiff asserts that Defendants, NANCY PELOSI, JOSEPH R. BIDEN,

CHARLES "CHUCK" SCHUMER, WILLIAM J. CLINTON, HILLARY R.

CLINTON, BARACK HUSSEIN OBAMA, GEORGE W. BUSH and ADAM

SCHIFF and the DEMOCRATIC NATIONAL COMMITTEE had full knowledge

of the described actions which they withheld from the public while directing the

schema and intent to deceive, their actions steering these United States and her

People on a collision course towards national security conflict, including the

orchestration of unlawful entry in termination of Title 42.

17

j. Plaintiff asserts that Defendant, NANCY PELOSI fostered venue of Atlassian to San Francisco, California as United States headquarters.

k. Plaintiff states that Defendant, NANCY PELOSI orchestrated through the creation of Boards, Trusts, etc., including The Presidio, the means, mechanisms and venue to perpetrate fraud and malfeasance. Board members of such organizations and their inclusive spouses, extending such actions while allowing spatial crevice to avert legal conflict of interest thresholds. (e.g. Salesforce, Microsoft, Oracle, etc.) The modeling of the Defendant's orchestration, thereafter, mimicked in States held by Democratic Governors, including under the direction of Defendants, ANDREW CUOMO, KATHY HOCHUL, and PHILIP MURPHY. The modeled conduct was an intrinsic component of the mapping of BCCI, Plaintiff restates those claims setforth in the Amended complaint.

l. Through the conduit of Accenture and a broad range of strawmen capital investment firms, shell corporations have been formed, advancing in the marketplace through various media affiliate co-conspirators and Wall Street partners through special purpose acquisition companies ("SPAC") to which the Securities and Exchange Commission so too partnered; with the intent, following the BCCI model, to dismantle the United States economy, a trojan horse, economic espionage through human apparatus and corporate structures.

m. Plaintiff states that to facilitate the SPAC entities, the SPAC underwriters, institutional banking entities including Credit Suisse, Deutsche Bank, Citigroup, Goldman Sachs, EarlyBirdCapital, BTIG, UBS, B. Riley FBR, Jefferies, Barclays, Chardan, Morgan Stanley, BofA Securities, JP Morgan, and the

18

inclusive subsidiaries participated as co-conspirators, and in some cases, served as facilitators by merger and acquisition, have been compensated accordingly. They have been retained at the table of bargaining against the People and their Constitutional Rights. In their capitulation, they settle lawsuits outside of a jury hearing from trafficking victims, such cases never see a courtroom and the heinous actions of the perpetrators continue, unabated.

n. Plaintiff states that the events of September 11, 2001 facilitated the venue for the foregoing permeations, hence the persons and corporations so closely associated, e.g. Emergent BioSolutions' award of COVID-19 related contract, anthrax vaccine post-9/11 and presently, FDA approved over the counter ("OTC") nonprescription naloxone hydrochloride (Narcan). Emergent BioSolutions is one evidenced example in a roadmap of affixed parties to the schema.

o. Plaintiff states that Lee M. Amaitis, formerly of Canter Fitzgerald, through his Board capacity on Foundations including St. Paul's Cathedral, Boom Esiason, Shane Warne (Australia) and specifically Children in Crisis (U.K. – Sarah, Dutchess of York), has given venue to foreign non-profit entities including Street Child, sharing Board capacity with Tom Dannatt and James Henderson.

p. Plaintiff states that James Henderson through affiliation with U.K. M&A public relations advisers in merg6ers and acquisitions including Northumbrian Water Group of Cheung Kong Infrastructure Holdings, and Qatar Investment Authority of Harrods, and Universal Music of EMI Recorded Music. In 2012, through Bell Pottinger, Henderson worked with Oakbay Investments, owned by Atul Gupta, South Africa who is involved in minding, engineering, real estate and leisure as

19

well the Sahara Computers and Sahara Systems PLC; Oakbay Resources and
Energy precious metals and gem mining; the Shiva Uranium Mine; Tegeta
Exploration and Resources; Westdawn Investments Ltd., Black Edge Exploration;
VR Laser Services; TNA Media, and Infinity Media.  In 2017, Bell Pottinger
collapsed under the weight of orchestrated Gupta controversy, BDO
Administrators transferred clients to other firms, allegedly to protect their
financial interests.

q.  Shiva Uranium Mine was acquired in 2010 by Gupta and ex-president Zuma's
son, Duduzane, mining uranium, gold and processing company in
Hartbeesfontein, North West province of South Africa;[3]  Gupta retained the gold
mining operation ownership.  The ownership of the Shiva Uranium One mine fell
into dispute with claims of bribery, extortion and influence peddling by Guptas.
The South African Finance Ministry which would go through three Finance
Ministers in the early phase of development.  In 2015, the South African national
currency collapsed.  Citing weak uranium demand, the Dominion owned site
redevelopment continued and in 2014, Rostom announced it had secured the
rights to build the new South African plants; the site as renamed Shiva.

r.  Eskom, the South African power service ran into fiscal issues challenging its
viability, the Ministry of Finance demanded that a report be compiled on the debt
service obligations which provided that the Gupta Family had earned R1.6billion
or $120m USD, with additional fees anticipated of R11.7billion for coal supply,
corruption charges mounted.  According to the World Nuclear Association, as of

---

[3] Slideshare.net.  Oakbay Resources and Energy – 2015 Integrated Annual Report.   Accessed March 28, 2024
https://www.slideshare.net/oakbayinvestments-oakbay-resources-and-energy-2015-integrated...

March, 2024, the Shiva Nuclear two nuclear reactors generate 5% of its electricity.  Electricity remains unreliable with businesses and households facing frequent rolling blackouts, government commitment remains strong; however, financial constraints are severe.  As the remainder of this analysis will provide, the parties to the contract have benefited handsomely, the People of South Africa, like those of the United States have been gravely impacted.  By all appearances, the wealth of the South African People has been negotiated away, right out from under them, NGO's be damned, the Clinton Foundation be damned; these actions are not only unacceptable, but they are also violations of human rights and dignity, contradicting every championed effort of the 501c3 organizations and their accompany vitriol.

s.  Plaintiff states that in 2017, James Henderson was, at the time, seeing Heather Kerzner, ex-spouse of South African casino mogul Sol Kerzner (dec.) who was associated with Jeffrey Epstein.  Ms. Kerzner was a friend of Sarah, Duchess of York.  Plaintiff asserts that the associations are not a mistake, nor are the South African ties of business ventures.  Plaintiff will not yield.

t.  James Henderson would later serve on the Board of Children in Crisis in the company of Lee M. Amaitis, former partner in Canter Fitzgerald, as above.  Lee who also founded CG Technology, a subsidiary of Canter, which runs sports books in Las Vegas casinos; the Venetian Las Vegas, Palms Casino Resort, the Tropicana Las Vegas, etc., based out of the M. Resort's Race and Sports Book as well as the Bahamas, serving as the CEO.

u.  In 2013, the Nevada Gaming Control Board fined the company $5.5m for regulation violations, Michael Colbert (VP) was charged with enterprise corruption, fourth, third and first-degree money laundering; and fifth degree conspiracy; Amaitis was not investigated and found innocent. Amaitis also serves as CEO of the Las Vegas Sports Consultants.

v.  Canter Fitzgerald has 1,600 employees in 30-locations including the United States, Europe, Asia-Pacific, and the Middle East. Following September 11, 2001, Canter filed a civil lawsuit against Saudi Arabia for allegedly providing money to the hijackers and Al Qaeda, most of the claims were dismissed on January 18, 2005. In December, 2013, Canter settled a lawsuit against American Airlines for $135m for loss of property and interruption of business, alleging negligence by the airline for allowing the hijackers to have boarded Flight 11.

w.  Howard Lutnick, Amaitis' associate at Canter Fitzgerald, hosts the annual Global Charity Day in honor of September 11, 2001; since 2005, the charity has raised $114m. The event is attended by celebrities and sports stars including Defendants, GEORGE W. BUSH, WILLIAM J. CLINTON, as well as Rudy Giuliana, Lady Gaga, Venus Williams, Eli Manning, Susan Sarandon and Prince Harry. Lutnick also serves on the Board of the Solomon Guggenheim Museum Foundation as a Trustee.

7.  In 2001, the Zug based Crown Resources AG, which is associated with Alpha Group, merged with the Zug-based Marc Rich & Co. Investment AG (MRI), which it the Swiss-based commodities trading arm of the Marc Rich Holding Company to create commodities trading house. Marc Rich's Swiss non-profit interests were managed by

Georg Stucky as Administrator, for Swiss parliamentarian and former Board member of Crypto AG.

8. Plaintiff states Crypto AG was unequivocally an espionage operation collaborative involving the CIA, NSA and a Liechtenstein-registered foundation involving in excess of 100 counties globally.[4]  Plaintiff states, the Crypto AG operation commenced in 1992, as BCCI was allegedly extinguished, "the Swiss government confirmed that it had opened an investigation into allegations that the Zug-based communications encryption firm was secretly owned and controlled by the CIA and West German intelligence services for decades."[5]  Plaintiff states that the relationship nexus between Marc Rich, Georg Stucky and the Defendants, WILLIAM J. CLINTON and HILLARY R. CLINTON extends into the Crypto AG operation.  Moreover, Plaintiff states that the association between the parties and Jeffrey Epstein was parasitic in nature, securing Defendant WILLIAM J. CLINTON access to investors and patent holder clients with emergent discoveries who were referred to Jeffrey Epstein.

9. Uranium One, a Canadian mining company, approved by the Committee on Foreign Investment, approved by Defendant, BARACK HUSSEIN OBAMA to Russia's Atomic Energy Agency, Rosatom,[6] facilitated by Defendant, HILLARY R. CLINTON, and subsequently investigated by Defendants, JAMES COMEY and ROD ROSENSTEIN at the direction of then-Attorney General Jeff Sessions (2017).  From the analytic lens of BCCI mapping, Plaintiff states:

---

[4] SRF/Tages-Anzeiger/RSI/sb – Former Swiss Defense Minister Denies Knowledge of Crypto-CIA links.  February 13, 2020.  Accessed March 29, 2024.  https://www.swissinfo.ch/eng/politics/crypto-spying-arrair_former-swiss-defence-minister-denies-knowledge-of-crypto-cia-links/45556496
[5] *Ibid*.
[6] Tatum, Mallonee and Schneider (CNN).  "DOJ gives FBI informant green light to testify on Russian uranium efforts."  October 27, 2017.  Accessed March 20, 2024  https://www.cnn.com/2017/10/26/politics/doj-fbi-informant-uranium-congress/indess.html

a. In 2005, Southern Cross Resources Inc. reverse merged with South African Aflease Gold and Uranium Resources Ltd. under the name sxr Uranium One, Inc.; following completion of the sale the name was changed to Uranium One Africa Ltd., the intact uranium an asset of Aflease was known as the <u>Dominion</u> mine.

b. In 2007, Uranium One, Inc. was acquired by UrAsia Energy Ltd. in reverse merger. UrAsia is owned by Frank Giustra; 70% in the Akdala and South Inkai uranium mines and 30% stake in the Kysylkum venture (Kazakhstan), while retaining 60% controlling interest in UrAsia Energy Ltd., Giustra announced a recurring donation to the Clinton Foundation, commencing with an initial contribution of $31.3m (2006). The Clinton Foundation transformed, conjoining with Giustra, establishing the Clinton Giustra Enterprise Partnership, thereafter the Clinton Giustra Sustainable Growth Initiative (June, 2007).

c. In 2008, the Aflease gold assets was divested and in 2010, the Gupta family, having preexisting involvement as evidenced by the carve out, purchased Uranium One Africa.

d. In 2008, Uranium One begins to purchase U.S. mines, acquiring sites in multiple states including Wyoming, representing 20% of the U.S. uranium deposits; the Willow Creek Mine site was closed in 2018.

e. In June, 2009, JSC Atomredmetzoloto (ARMZ) ($1.3b), a subsidiary of Rosatom, acquired 16.6% stake in Uranium One, negotiating a 50% stake in its joint venture with Kazatomrpom Karatau.

f. In 2010, Uranium One acquired 50% and 59% interests in southern Kazakhstan-based Akhastua and Zarechnoye uranium mines from ARMZ, negotiating an

24

increase in its stake of Uranium One to 51%.  In that same year, Uranium One acquired Irigaray uranium processing plant, the Christensen Ranch satellite uranium processing facility, located in Wyoming (Powder River Basin) from the joint venture of AREVA and Electricite de France.  In December, 2010, ARMZ increased its stake to 51.4%.  The U.S. Nuclear Regulatory Commission estimated Uranium One holdings and rights amounted to approximately 20% of the licensed uranium ore production capacity in the U.S., in its entirety amount to 0.2% of the world's uranium production.  By 2017, Uranium One's holding would reduce with additional mining licenses transacting to reflect 10%.

g.   Between 2010-2013, Uranium One acquired Mantra Resources, the developer of Mkuju River mine in Tanzania; the project was suspended due to the low uranium price.

h.   In 2013, Uranium One ARMZ took complete control of Uranium One, buying all shares it did not already own and in October, Uranium One, Inc. was delisted from the Toronto and Johannesburg exchanges, wholly owned by the ARMZ subsidiary, Rosatom.

i.   Between 2012 - 2014, an **unspecified** amount of uranium was reportedly exported to Canada via a Kentucky-based trucking firm; most of the processed uranium was returned to the U.S. , with approximately 25% going to Western Europe and Japan.

j.   In 2015, Uranium One relocated certain lead offices to Moscow including finance, internal audit and some technical services.  Also in 2015, Uranium One Australia, including the Honeymoon Uranium Project, was sold to Boss Resources.

k.  In 2017, Uranium One established a trading company Uranium One Trading in Zug, Switzerland and in January, 2018, trading function moved to Techsnabexport, an export arm of Rostom, subsidiary to ARMZ.  Later that year, Uranium One Trade A started its trading company. G in Zug, Switzerland, seeking to increase its international market share by carrying out spot and medium-term trading in natural uranium.

l.  By 2019, Uranium One's mineral resource base is estimated at 512.7 thousand tons, uranium production for the year amounted to 4,6 tonnes.  Also in that year, Uranium One's operations were transferred to TENEX.

10. Plaintiff draws from the Statoil/Horton case and the company's use of bribes in Iran between the period of 2002-2003, attempting to secure lucrative oil contracts.  Horton Services was hired as an Iranian consultant firm by Mehdi Hashemi Rafsanjani, son of former Iranian President, Hashemi Rafsanjani in which Horton Investments was paid US$15.2m by Statoil to influence important political figures in Iran to grant oil contracts to Statoil.  The corruptive practice was disclosed by Dagen Naeingsliv, a Norwegian paper on September 3, 2003, in 2006, the company accepted a $10.5m settlement for violating the U.S. Foreign Corrupt Practice Act.  The settlement terms included:

a.  Statoil agreed that it had paid bribes to the Iranian public servant in June, 2002 – January, 2003, with the aim of securing contracts for Statoil in the development of stages 6,7,8 of the South Pars gas field in Iran.

b.  Statoil agreed that bribes were paid to secure other contracts in the country, and to get hold of confidential information (unspecified/undisclosed).

    c.  Statoil agreed that it had used wrong accounting procedures in order to hide the bribes from its records.

    d.  A required stipulation included that no Statoil employee or representative for the company could make any statement to the media that contradicted the verdict for the next three years.

11. On January 20, 2001, Defendant, then-President, WILLIAM J. CLINTON granted Marc Rich and Pincus Green pardons from a 51-count indictment for illegal activity, including tax evasion, mail fraud, wire fraud, and racketeering. Advocates advancing the pardon included, Defendant ERIC HOLDER, Denise Rich, Rich's ex-wife, and foreign persons, including Mossad chief, Shabtai Shavit, and Israeli Prime Minister Ehud Barak, Shimon Peres and Ehud Olmert, Abraham Foxman, Michael Steinhardt, Rabbi Irving Greenberg, among others made appeal on Rich's behalf. A federal investigation regarding the pardon immediately commenced, headed by Mary Jo White, serving as Federal Prosecutor, appointed by Defendant JOHN ASHCROFT; Ms. White stepped down before completing her investigation with Defendant, JAMES COMEY, replacing Ms. White. Other federal parties were involved in a simultaneous Congressional investigation including John Podesta, White House Counsel, Beth Nolan and advisor, Bruce Lindsey.

    On February 18, 2001, an op-ed essay was published in the New York Times wherein Defendant WILLIAM J. CLINTON explained why he had pardoned Rich, referring to U.S. tax professors Bernard Wolfman of the Harvard Law School and Martin Ginsburg of Georgetown University Law Center who had concluded that no crime had been committed, and that Rich's companies' tax-reporting position had been reasonable. The article continued with the Defendant listing attorneys of noted distinction who

supported the pardon including Lewis "Scooter" Libby, Mr. Libby had over a period of time represented Rich specific to the time period when Rich traded with exported Iranian oil while Iran was holding American hostages.

12. Plaintiff states unequivocally that the missing uranium, unaccounted for as well the funds which were subject of The Hill[7] article, the New York Times, among others, were knowingly transacted by Defendant, HILLARY R. CLINTON to Frank Giustra and Marc Rich through various strawmen and corporate entity machinations.

13. Since 1993, the time in which BCCI was investigated, Denise Rich, Marc Rich's ex-wife, has donated $1.3m to the Defendant, the DEMOCRATIC NATIONAL PARTY, including $70,000.00 to Defendant, HILLARY R. CLINTON's political campaign and $450,000.00 for the Clinton Presidential Library in Arkansas.

14. Plaintiff states unequivocally that Defendant, WILLIAM J. CLINTON had full knowledge of the foregoing at the time of the pardon with the emoluments received by him a direct conflict to Article I, Section 9 of the Constitution, "A President cannot accept any emoluments from foreign governments. This means they cannot profit from their capacity. Accordingly, Plaintiff states that the Defendant, WILLIAM J. CLINTON is guilty of treason, trading with the enemy and giving aid and comfort to same, knowingly.

15. Plaintiff states, unequivocally, that the Defendants, MERRICK GARLAND, LLOYD AUSTIN, WILLIAM BURNS, CHRISTOPHER WRAY, ALEJANDRO MAYORKAS, MARCIA FUDGE, HILLARY R. CLINTON, THOMAS KEAN SR., ROBERT MUELLER, JAMES COMEY, CHRISTOPHER J. CHRISTIE, RICHARD "DICK" CHENEY, ELIZABETH "LIZ" CHENEY, JOHN KERRY, GEORGE W. BUSH,

---

[7] Soloman, John and Spann, Alison. Uranium One Deal Led to Some Exports to Europe, Memos Show. November 2, 2017. Accessed March 20, 2024, https://thehill.com/policynationalsecurity/358339-uranium-one-deal-led-to-some-experts...

BARACK HUSSEIN OBAMA, LORETTA LYNCH, JAMES BAKER, ERIC HOLDER,
JOSEPH R. BIDEN, JOHN ASHCROFT, JAIME GORELICK, NANCY PELOSI,
GEORGE NORCROSS, PHILIP MURPHY, TAHESHA WAY, JUDITH PERSICHILLI,
SEJAL HATHI, MATTHEW PLATKIN, KATHY HOCHUL, ANDREW CUOMO,
LETITIA JAMES, SUSAN RICE, ADAM SCHIFF, CHARLES "CHUCK" SCHUMER,
XAVIER BECERRA, JANET YELLEN, ROD ROSENSTEIN, HUMA ABEDIN,
DEBBIE WASSERMAN SCHULTZ, BILL NELSON, OCCIDENTAL PETROLEUM,
the DEMOCRATIC NATIONAL COMMITTEE, the REPUBLICAN NATIONAL
COMMITTEE had full knowledge of the foregoing and they stayed quite, concealing the
truth, living with dysfunction within government absent human compassion for the
unintended consequences that resulted and continue to unfold at the present day, as
exampled by the south Border, fentanyl invading communities and families, suicides
rising, vehicular accidents on the rise, alcoholism rising, etc.  Plaintiff will not yield to
the Defendant's collective trespass.

16. Plaintiff reiterates that Defendants, JAMES PITTINGER, LISA SELLA, and ROBERT
JUNGE, colluded with their co-Defendants, capitulating to some extraneous shiny thing
to ensure that the Plaintiff not be re-elected, up to and including telling people who to
vote and how to vote; voter caging is unlawful as is canvassing in the case of paid
employees, such as the Defendant, LISA SELLA with the municipal budget offset by
federal grant funds, see Hatch Act.

17. The inclusive Defendants MERRICK GARLAND, LLOYD AUSTIN, WILLIAM
BURNS, CHRISTOPHER WRAY, ALEJANDRO MAYORKAS, MARCIA FUDGE,
WILLIAM J. CLINTON, HILLARY R. CLINTON, THOMAS KEAN SR., ROBERT

MUELLER, JAMES COMEY, CHRISTOPHER J. CHRISTIE, RICHARD "DICK"

CHENEY, ELIZABETH "LIZ" CHENEY, JOHN KERRY, GEORGE W. BUSH,

BARACK HUSSEIN OBAMA, LORETTA LYNCH, JAMES BAKER, ERIC HOLDER,

JOSEPH R. BIDEN, JOHN ASHCROFT, JAIME GORELICK, NANCY PELOSI,

GEORGE NORCROSS, PHILIP MURPHY, TAHESHA WAY, JUDITH PERSICHILLI,

SEJAL HATHI, MATTHEW PLATKIN, KATHY HOCHUL, ANDREW CUOMO,

LETITIA JAMES, SUSAN RICE, ADAM SCHIFF, CHARLES "CHUCK" SCHUMER,

XAVIER BECERRA, JANET YELLEN, ROD ROSENSTEIN, HUMA ABEDIN,

DEBBIE WASSERMAN SCHULTZ, BILL NELSON, OCCIDENTAL PETROLEUM, ,

the DEMOCRATIC NATIONAL COMMITTEE, the REPUBLICAN NATIONAL

COMMITTEE, JAMES PITTINGER, LISA SELLA, and ROBERT JUNGE have traded

in commerce, aiding and abetting the enemy, including foreign entities, persons, and

corporations, covertly and of their own volition, benefiting from such actions financially

and continue to trespass on the Constitutional Rights of the People to retain their secrecy

as well their criminal acts.  Plaintiff has been harmed as a direct result, including but not

limited to:

    a.  The conniving and bribery between the Defendants to ensure loss of her elected

        capacity in an attempt to dissuade Plaintiff from pursuit of this action, and

    b.  Caused the market conditions including the residential mortgage-backed security

        failure resulting in TARP.  The Plaintiff, negotiating mortgage deficiency with the

        highest degree of integrity, was made to negotiate with Buyers who are

        collaborators to the Defendants' schema, exposing Plaintiff and her clients to

        fraud and deceptive practices for fifteen (15) years.

18. Plaintiff states that the Defendant, WILLIAM J. CLINTON has coveted knowledge of the inclusive facts, some of which are disclosed herein, withholding and obstructing these facts from public transparency as a means to deceive, subvert and willfully aid the enemy of these United States. The military serving honorably with every good intention in the protection of the United States took directive from the Defendant's subordinate designee under false pretense, the Defendant trading with the enemy, all parties knowing but the military soldiers, the finest men, and women of this Nation. As a direct consequence to the Defendant's conspiracy against these United States, our military lost their lives and limbs in combat, conflicts which could have been avoided but for the Defendant's treasonous actions.

Plaintiff states that the Defendant indoctrinated these United States into foreign statecraft through the assemblage of persons in his Cabinet, his Administration, and among non-profit entities to which the Defendant exacting taxpayer funds, whose full faith and allegiance was to that of foreign nation-states, having no semblance or honor to these United States.

> Whoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this Title or imprisoned not more than ten (10) years, or both; shall be incapable of holding any office under the United States.

Plaintiff states that the Defendant has given aid and comfort to the enemy, employing occupancy of capacity merely as a means to exact himself a saboteur, unable to avail himself allegiance to the United States or her People, the lies disclose his allegiance to an opposing government foreign in every construct and not merely a United States citizen opposing the United States government or part thereof. At the same time

deciding and consenting to continue in secrecy while employing propaganda activities on behalf of foreign principals, including but not limited to the World Economic Forum and Zug-based non-profit organizations, further subverting these United States and her citizens in conflict with Article I, Section 7 of the Constitution, separation of powers with the Defendant WILLIAM J. CLINTON participating in economic espionage.  Plaintiff evidences the foregoing, as below:

a.  On December 7, 2004, Defendant WILLIAM J. CLINTON helped launch a new internet search company, Accoona, backed by the Chinese government using artificial intelligence as a rival to Google.  The owner of Accoona is Valentine Zammit.

b.  On August 6, 2007, Accoona filed for an $80.5m IPO on the heels of its success in e-commerce in North America and its relationship with China Daily.

c.  On August 22, 2007, the New York Times published an article on the failings of Accoona, outlined the complex string of affiliate organizations which it had purchased for a total of $35m including, DOD Marketing, Inc., Digitaletailer, Inc., butterflyphoto.com, Skynet Communications Corp., Zylonet Systems Inc.[8]  Accoona has a corporate address of 101 Hudson Street, Suite 3501, Jersey City, New Jersey 07302.

d.  July 16, 2007,  POAP Corporation, a Georgia Foreign Profit Corporation where Valentine Zammit also serves as CEO, William J. Rose, CFO and

---

[8] Hansell, Saul.  The Accoona Files 2:The Electronics Business.  August 22, 2007.  Accessed August 22, 2007.
https://archive.nytimes.com/bits.blogs.nytimes.com/2007/08/22/the-accoona-files-2-the-electronics-business

William J. Rose, Secretary at 101 Hudson Street, Suite 3501, Jersey City, New
Jersey 07302; POAP is affiliated with Delphi Digital and Libertus Capital.

e. On August 22, 2007, a subsequent article from the New York Times which
discloses detailed records regarding the fraudulent actions associated with the
founder of Accoona including pleading guilty to stock fraud charged in 1998
and a conviction of stock fraud in France (1999), a gross mismanagement of
stockholder funds, echoing Emergent BioSolutions, subject of the 2001
anthrax incidents and COVID-19.  The founder of Accoona was paid $3m as a
consultant, his wife who also works for the company, was paid $1.4m.  In
1995, in the company of Philippe E. Hababou, took control of several
companies, promoting them publicly and liquidated their holdings through a
series of brokerage accounts in various names.  In 1998, a cashier at the
Trump Taj Mahal casino in Atlantic City noticed unusually large transactions,
following an investigation, the two men were found to be laundering money
garnered through the monetary schemes above.  They would also be
embroiled in the 1996 Senate campaign of Robert G. Torricelli (NJ), who pled
guilty to fundraising mishandling.

Plaintiff seeks relief from further harms so caused by the Defendant and his
subordinates, rightly being disqualified from holding any future public office pursuant to
Section Three of the Fourteenth Amendment to the United States Constitution, the
Treason statute, 18 U.S.C. §2381 and the invocation of the Disqualification Clause.
Plaintiff states that it is the duty of the President to take care that laws be faithfully
executed; in his capacity as President of the United States, the Defendant voided any and

all such duties, seeking to bring other parties into his purview, Cabinet and Administration with the sole intent to indoctrinate the citizenry of these United States affixed to policy, predicated on subversion of the vestiges of the Founding principles including but not limited to the Defendant's atrocities in the Caribbean and Haiti as setforth in the amended complaint; the Executive abuse of power, subversive in every manner in the action of inculcating these United States and her citizens to foreign enterprise with the matters of and concerning Occidental Petroleum; Marc Rich and Pincus Green as well the associated business entities to which the Defendant and his family garnered financial benefit, in direct conflict with Article I, Section 9 of the Constitution; the Defendant's subversive activities relating to MIT correlating to NASA pursuits, budget allocation and appropriation in furtherance of conspiracy to defraud these United States; the Mexico bailout and NAFTA, unequivocally conspiratorial in retention of secrecy to exact the most atrocious personal endeavors the likes of which are abhorrent to all human consciousness, etc. The foregoing Executive actions held unspoken covenants of secrecy, conspiratorial in nature, allowing crevices by which foreign agents and entities were permitted entry into the marketplace while simultaneously unduly burdening the citizenry, intent to limit discretionary income, independent thought, and the independent pursuit of life, liberty, and property.

Plaintiff states that the Defendant's knowing intent and journey to the Executive Branch was unlawfully secured by pretense and false representations, including but not limited to emoluments, undisclosed. The Executive capacity was secured through political leverage and consents apart from the People and the Constitution, an unlawful trespass. A succession of harms has resulted including but not limited to those stated

herein as well the Administrative agency under the directive of Executive Authority, inordinately mismanaged, transferring the wealth of these United States and her real property to foreign parties, knowingly unchecked by policy planning guardrails.

19. Plaintiff states that the Defendant, GEORGE W. BUSH has coveted knowledge of the inclusive facts, some of which are disclosed herein, withholding, and obstructing these facts from public transparency as a means to deceive, subvert and willfully aid the enemy of these United States.  The military serving honorably with every good intention in the protection of the United States took directive from the Defendant's subordinate designee under false pretense, the Defendant trading with the enemy, all parties knowing but the military soldiers, the finest men, and women of this Nation.  As a direct consequence to the Defendant's conspiracy against these United States, our military lost their lives and limbs in combat, conflicts which could have been avoided but for the Defendant's treasonous actions.

Plaintiff states that the Defendant indoctrinated these United States into foreign statecraft through the assemblage of persons in his Cabinet, his Administration, and among non-profit entities, whose full faith and allegiance was to that of foreign nation-states having no semblance or honor to these United States.

Whoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this Title or imprisoned not more than ten (10) years, or both; shall be incapable of holding any office under the United States.

Plaintiff states that the Defendant has given aid and comfort to the enemy, employing occupancy of capacity merely as a means to exact himself a saboteur, unable to avail himself allegiance to the United States or her People, the lies disclose his

allegiance to an opposing government foreign in every construct and not merely a United States citizen opposing the United States government or part thereof.  At the same time deciding and consenting to continue in secrecy while employing propaganda activities on behalf of foreign principals, including but not limited to the World Economic Forum further subverting these United States and her citizens.

Plaintiff seeks relief from further harms so caused by the Defendant and his subordinates, rightly being disqualified from holding any future public office pursuant to Section Three of the Fourteenth Amendment to the United States Constitution, the Treason statute, 18 U.S.C. §2381 and the invocation of the Disqualification Clause. Plaintiff states that it is the duty of the President to take care that laws be faithfully executed; in his capacity as President of the United States, the Defendant voided any and all such duties, seeking to bring other parties into his purview, Cabinet and Administration with the sole intent to indoctrinate the citizenry of these United States affixed to policy, predicated on subversion of the vestiges of the Founding principles including but not limited to the provocation of Iraqi enforcement of no fly zone on February 16, 2001; September 11, 2001 – the undisclosed, heinous facts concerning that atrocious day, not the least of which the Defendant's familial interests in Stratesec, colluding with foreign parties in private all the while body parts of our fallen citizens lay in pieces strewn about lower Manhattan as if subordinate to the Defendant's private monetary enterprise, grandstanding for photo-ops while volunteers toiled tirelessly moving earthen material bucket-by-bucket the inhalation would compromise their cellular design, a fact which the Defendant's Cabinet member, Christine Todd Whitman dismissed; the Defendant's father, George H. W. Bush's financial relationship with the

alleged perpetrator of those heinous events, Osama bin Laden in the company of Frank Carlucci and co-Defendant JAMES BAKER; the Patriot Act and every usurpation to Civil Rights and privacy Rights which has resulted; the known orchestration of security changes that were exacted under Executive direction including but not limited to the 9/11 Commission, including but not limited to those of the Department of Homeland Security, all of which held an undercurrent of undisclosed facts knowingly withheld and, in some cases, altering evidences to ensure a predetermined investigative outcome – treasonous, in every sense.

The foregoing Executive actions held unspoken covenants of secrecy, conspiratorial in nature, allowing crevices by which foreign agents and entities were permitted entry into the marketplace while simultaneously unduly burdening the citizenry, intent to limit discretionary income, independent thought, and the autonomous pursuit of life, liberty, and property.

Plaintiff states that the Defendant's knowing intent and journey to the Executive Branch was unlawfully secured by pretense and false representations conducted through election manipulation, yet another manifestation of subversion permitting a crevice by which laws were exacted including HAVA, never fixing the myriad of problems but ensuring that the People's Rights remained in check – cloaked subversion of the Constitution.  The Executive capacity was secured through emoluments and consents apart from the People and the Constitution, an unlawful trespass.  A succession of harms has resulted including but not limited to those stated herein as well the Administrative agency under the directive of Executive Authority for the Troubled Asset Relief Program

("TARP") and the inordinately mismanaged program, resulting in wealth transfer of real property to foreign parties, knowingly unchecked by policy planning guardrails.

20. Plaintiff states that the Defendant, BARACK HUSSEIN OBAMA, has coveted knowledge of the inclusive facts, some of which are disclosed herein, withholding, and obstructing these facts from public transparency as a means to deceive, subvert and willfully aid the enemy of these United States.  The military serving honorably with every good intention in the protection of the United States took directive from the Defendant's subordinate designee under false pretense, the Defendant trading with the enemy, all parties knowing but the military soldiers, the finest men, and women of this Nation.  As a direct consequence to the Defendant's conspiracy against these United States, our military lost their lives and limbs in combat, conflicts which could have been avoided but for the Defendant's treasonous actions.

Plaintiff states that the Defendant indoctrinated these United States into foreign statecraft through the assemblage of persons in his Cabinet, his Administration, and among non-profit entities, whose full faith and allegiance was to that of foreign nation-states having no semblance or honor to these United States.  Plaintiff states that the Defendant took knowing action after Legislative determination to disband ACORN, such action has resulted in exceptional criminal conduct, absent Constitutional protections with Internal Revenue Service Administration turn a blind eye to abuse of tax exemption status in a manner that permits an unspoken but no less active war being waged against the People and their Civil Rights, a violation of the Civil Rights Act of 1965.

> Whoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this Title or imprisoned not more than ten

(10) years, or both; shall be incapable of holding any office under the United States.

Plaintiff states that the Defendant has given aid and comfort to the enemy, employing occupancy of capacity merely as a means to exact himself a saboteur, unable to avail himself allegiance to the United States or her People, the lies disclose his allegiance to an opposing government foreign in every construct and not merely a United States citizen opposing the United States government or part thereof. At the same time deciding and consenting to continue in secrecy while employing propaganda activities on behalf of foreign principals, including but not limited to the World Economic Forum further subverting these United States and her citizens.

Plaintiff seeks relief from further harms so caused by the Defendant and his subordinates, rightly being disqualified from holding any future public office pursuant to Section Three of the Fourteenth Amendment to the United States Constitution, the Treason statute, 18 U.S.C. §2381 and the invocation of the Disqualification Clause. Plaintiff states that it is the duty of the President to take care that laws be faithfully executed; in his capacity as President of the United States, the Defendant voided any and all such duties, seeking to bring other parties into his purview, Cabinet and Administration with the sole intent to indoctrinate the citizenry of these United States affixed to policy, predicated on subversion of the vestiges of the Founding principles including but not limited to aid to Haiti, executed January 14, 2010; the Affordable Care Act, executed March 20, 2010 inclusive of the unconstitutional individual mandate, NASA budget increases, executed April 15, 2010; the Wall Street Reform Act, executed July 21, 2010, etc. The foregoing Executive actions held unspoken covenants of secrecy, conspiratorial in nature, allowing crevices by which foreign agents and entities were

39

permitted entry into the marketplace while simultaneously unduly burdening the

citizenry, intent to limit discretionary income, independent thought, and the autonomous

pursuit of life, liberty, and property.  Plaintiff states that the Defendant, BARACK

HUSSEIN OBAMA has conducted himself in conflict with Article I, Section 7 of the

Constitution, separation of powers in the company of the Defendant, HILLARY R.

CLINTON participating in economic espionage, in conflict with the Economic Espionage

Act of 1996, 18 U.S.C. §1831; Federal Bribery Statute, 18 U.S.C. §201(B); Federal

Program Bribery Statute, 18 U.S.C.§666; and Racketeer Influenced and Corruption

Organizations Act, 18 U.S.C. §§ 1931-1968, as regards the Uranium One handling and

resulting provocations; the Defendant specifically acted knowingly to usurp and/or

undermine the investigative outcome as undertaken by the CIA, FBI and DOJ, those

unequivocally in his charge.

Plaintiff states that the Defendant's knowing intent and journey to the Executive

Branch was unlawfully secured by pretense and false representations of citizenship to

which he does not hold.  The Executive capacity was secured through emoluments and

consents apart from the People and the Constitution, an unlawful trespass.  A succession

of harms has resulted including but not limited to those stated herein as well the

Administrative agency under the directive of Executive Authority for the Troubled Asset

Relief Program ("TARP") and inordinately mismanaged wealth transfer of real property

to foreign parties, knowingly unchecked by policy planning guardrails.

21. Plaintiff states that the Defendant, JOSEPH R. BIDEN has coveted knowledge of the

inclusive facts, some of which are disclosed herein, withholding, and obstructing these

facts from public transparency as a means to deceive, subvert and willfully aid the enemy

of these United States. The military serving honorably with every good intention in the protection of the United States took directive from the Defendant's subordinate designee under false pretense, the Defendant trading with the enemy, all parties knowing but the military soldiers, the finest men, and women of this Nation. As a direct consequence to the Defendant's conspiracy against these United States, our military lost their lives and limbs in combat, conflicts which could have been avoided but for the Defendant's treasonous actions.

Plaintiff states that the Defendant indoctrinated these United States into foreign statecraft through the assemblage of persons in his Cabinet, his Administration, and among non-profit entities, whose full faith and allegiance was to that of foreign nation-states having no semblance or honor to these United States.

> Whoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this Title or imprisoned not more than ten (10) years, or both; shall be incapable of holding any office under the United States.

Plaintiff states that the Defendant has given aid and comfort to the enemy, employing occupancy of capacity merely as a means to exact himself a saboteur, unable to avail himself allegiance to the United States or her People, the lies disclose his allegiance to an opposing government foreign in every construct and not merely a United States citizen opposing the United States government or part thereof. At the same time deciding and consenting to continue in secrecy while employing propaganda activities on behalf of foreign principals, including but not limited to the World Economic Forum further subverting these United States and her citizens.

Plaintiff seeks relief from further harms so caused by the Defendant and his subordinates, rightly being disqualified from holding any future public office pursuant to Section Three of the Fourteenth Amendment to the United States Constitution and the Treason statute, 18 U.S.C. §2381 and the invocation of the Disqualification Clause. Plaintiff states that it is the duty of the President to take care that laws be faithfully executed; in his capacity as President of the United States, the Defendant voided any and all such duties, seeking to bring other parties into his purview, Cabinet and Administration with the sole intent to indoctrinate the citizenry of these United States affixed to policy, predicated on subversion of the vestiges of the Founding principles including but not limited to the abuse of foreign aid to Haiti and the Caribbean with human atrocities resulting, harms of the most heinous for which the Defendant had every knowledge and knowingly withheld while laundering funds garnered, comingled said funds in and among federal Treasury so as to divest of guilt by means of involving innocent citizens to false enterprise and conspiracy all the while retaining secrecy concerning the unlawful foundation and tenons associated – subversive in every sense; fostering the termination of Title 42 and opening the southern Border of these United States, laying siege of criminal enterprise including but not limited to fentanyl, xylazine and methamphetamine across these United States at a time of substantial vulnerability to the citizens, most especially our nation's youth and African American communities; directing the forced, unconstitutional mandate of vaccination in the company of the contradictory Executive action to protect access to reproductive health while deriving financial benefit from biomedical and pharmaceutical entities with full knowledge of the undercurrent buttressed by domestic policy crafted and exacted by the Defendant

demanding vaccine among all, going so far as to iterate through Executive action, following lock-step the international yoking at the cost of human lives, both presently alive and those not yet of the womb; imposing on the marketplace with designee Agents sabotaging private enterprise, including Emergent BioSolutions; extinguishing the Johnson and Johnson d/b/a Janssen promising, non-invasive vaccination option, absent mRNA, CRISPR technology, etc.  The foregoing Executive actions held unspoken covenants of secrecy, conspiratory in nature, allowing crevices by which foreign agents and entities were permitted entry into the marketplace while simultaneously unduly burdening the citizenry, intent to limit discretionary income, independent thought; autonomous pursuit of life, liberty, and property.

Plaintiff states that the Defendant's knowing intent and journey to the Executive Branch was unlawfully secured by pretense and false representations of election interference as provided herein, a litmus test to what took place across these United States in the 2020 election.  The Executive capacity was secured through emoluments and consents apart from the People and the Constitution, an unlawful trespass.  A succession of harms has resulted including but not limited to those stated herein as well the Administrative agency under the directive of Executive Authority under the CARES Act and American Rescue Plan, an inordinate mismanagement of Agency resulting in wealth transfer including real property to foreign parties and divesting of monetary wealth through grants to non-profits, unchecked, knowingly unimpeded by policy planning guardrails.

22. Plaintiff states that the Defendant, HILLARY R. CLINTON, sought elected capacity beyond that of a First Lady as a mechanism to advance personal wealth, aggrandizement,

and officiate capacity as to designated Title, a means of insurrection venue through indulgences of foreign enterprise, coveting such capacity apart from public disclosure, covert in all unlawful trespasses but for the parties to extraneous contracts and emoluments.  The Defendant's pursuits were at the forefront of every decision proffered, negotiated, or advanced, securing same at any cost or means including but not limited to personal expense and the welfare of others, e.g. Seth Rich, Donald Trump Jr., Paula Jones, etc.

Plaintiff states that during the period which following the investigation of BCCI, while the Defendant toiled amid the Whitewater Affair in Arkansas, her aspirations and greed remained at the forefront of her natural tendency.  Discontent with the vestiges of maladjustment left in her wake in the State of Arkansas, the Defendant lobbied to advance her spouse's political career, affixing herself in his company as the Nation's First Lady.  During that period, undisclosed to the public, the co-Defendant spouses, HILLARY R. CLINTON and WILLIAM J. CLINTON were under investigation by the FBI and the New York Attorney General's office concerning their endeavors with Marc Rich and Pincus Green, their unlawful business practices would resurrect as leverage, repeated in the future.  The relationship between the Clintons and the Rich's continues to the present day by way of Denise Rich, her non-profit venture honoring her daughter's memory, a shared parallel to that of the Clinton Foundation; 501c3 tax exempt organizations which bring together individuals under the guise of advancing human interest while progressing personal interests not the least of which, those in the Caribbean and Haiti through mutual friends, the likes of Jeffrey Epstein.

Plaintiff states during the time period of 2012 – 2014, the Defendant, HILLARY

R. CLINTON negotiated as designee of co-Defendant BARACK HUSSEIN OBAMA in

and among United States federal government and third parties including Rosetom as to

Uranium One, Inc., subject to the herein content.  Plaintiff refers to The Hill article of

November 2, 2017, as below:

> Neither Uranium One Inc nor AMRZ holds a specific NRC export license.  In order to export uranium from the United States, Uranium One Inc. or AMRX would need to apply for and obtain a specific NRC license authorizing the exports of uranium for use in reactor fuel….Rather than give Rosatom a direct export license – which would raise red flags inside a Congress already suspicious of the deal – the NRC in 2012 authorized an amendment to an existing export license for a Paducah, Kentucky based trucking firm calls RSB Logistics Services, Inc. to simply add Uranium One to the list of clients whose uranium it could move to Canada.  The license, reviewed by the Hill, is dated March 16, 2012, and it increased the amount of uranium ore concentrate that RSB Logistics could ship to the Cameco Corporation in Ontario from 7,500,000 kilograms to 12,000,000 kilograms and added Uranium One to the 'other parties to export.'  The move escaped notice in Congress…(Senate Judiciary Investigation ensued.)  'It now appears that despite pledges to the contrary, U.S. uranium made its way overseas as part of the Uranium One deal…those transactions were apparently made possible by various Obama Administration agencies while the Democrat-controlled Congress turned a blind eye.[9]

23. Plaintiff analyzed all and inclusive peripheral issues related to Uranium One, including

but not limited to the associated transactions and name adaptations or changes, as below:

a.  On December 6, 2005, the High Court of South Africa approved the acquisition of

Aflease Gold and Uranium Resources by Canadian-listed South Cross Resources,

the name would subsequently change to sxr Uranium One, Inc., holding gold and

uranium assets in South Africa, Canada, and Australia including the Australian

uranium project, Honeymoon.

---

[9] *Ibid.*

b. Alfrease' intent was voiced to bring the Dominion Reefs mine, Klerksdorp, South Africa into production by 2007 while continuing to explore and prepare for development of other properties.

c. Rosetom was formed on December 3, 2007.

d. In 2015, Uranium One Australia, the owner of UOA Operations, including Honeymoon Uranium Project was sold to Boss Resources.

e. Plaintiff states that the export licensed utilized by RSB Logistics Services Inc., requiring an amendment to an existing license, shipping to the Cameco Corporate plant in Ontario, Canada, outside of the United States.   Moreover, absent any manifest, export license or bill of lading, uranium retained as a strategic asset of and belonging to the United States, was exported to various locations as far away as Europe and Japan.  The inclusive events are in conflict with National Security for which the Defendant knowingly consented.

f. Cameco, a Canadian Corporation owes the United States a significant amount of back taxes owed $32m, the investigation continues and may result in higher outstanding fines.

g. To avoid tax burden, Cameco has a 17-year uranium supply agreement with Zug (Switzerland) which includes a fixed price of $10.00/lb., selling their product through Zug versus Canada to dodge paying taxes.

24. Plaintiff states that in the wake of the foregoing actions of the colluding co-Defendants, the following has resulted, each outcome having devastating impacts on the citizens of these United States not the least of which is the absolute threat to National Security.

a. On November 4, 2022, the Green Organic Dutchman Holding Ltd., a sustainable
Canadian cannabis company, announced completion of the acquisition of the used
and outstanding common shares of BZAM Holdings.  Plaintiff affirms that
BZAM is owned by a Kuwaiti expatriate residing in Canada, Bassam Alghanim,
BZAM a foreign enterprise;- the business model, in all respects following the
BCCI mapping.  On January 13, 2023, the company changed its name to Herbal
Dispatch, Inc. under Luff Enterprises Ltd.  On August 15, 2022, Luff Enterprises
Ltd. completed acquisition of the National Green Biomed group of companies
(NG Biomed).  The owner and Chairman of National Green Biomed, Herb
Dhaliwal, is a native of Punjab, India, emigrating to Canada where he resides with
his wife, Amrit Kaur (dec.).  Herb Dhaliwal serves as a member of the Canadian
Parliament.  Plaintiff included this example based on the venue affiliation, noting
that Uranium One originated by purchase from Canada.  Cannabis is having a
devastating impact on communities and States that have decriminalized, the data
layered by the complexities of fentanyl, xylazine and co-opted cannabis that has
been tainted with the foregoing additives; too often there is a focus on the
potential monetary benefit through excise tax with limited, if any, conversation
regarding the unintended consequences, impacts to communities and families.
Plaintiff refers to the amended complaint with this certified Exhibit, reminding the
reader and Court, it was by the Defendant's actions that drugs including cocaine
and crack devastated our inner cities as well the African American families, those
facts follow with cannabis legalization, our inclusive citizens deserve every
opportunity for a full and healthy life, pursuing life, liberty and the pursuit of

happiness absent an invisible hand that would knowingly seek to disrupt those pursuits for a derived financial benefit at the cost of human life. The data provided below was secured through Plaintiff's academic demand in Master thesis. Since 2014, the legislative bodies associated with legalized states have lowered the guardrails regarding roadside testing and public safety protocols, resulting in inordinate risk to police – the frontline of defense to the public as to roadway traverse, drug and gang activity, and drug related trafficking.

i. During its most recent survey, the *2013-2014 National Roadside Survey (NRS) of Alcohol and Drug Use by Drivers*, the National Highway Traffic Safety Administration (NHTSA) collected breath, oral fluid, and blood samples to detect alcohol and drug use by weekday daytime and weekend nighttime drivers, from a nationally representative sample (Berning, Compton, & Wochinger, 2015). Nearly one in four drivers tested positive for at least one drug that could affect safety (22.4% of daytime weekday drivers and 22.5% of weekend nighttime drivers). In 2007, some 16.3 percent of weekend nighttime drivers tested positive for drugs based on the combined results of oral fluid and blood tests (Compton & Berning, 2009). In 2013-2014, the percentage of weekend nighttime drivers who tested positive for drugs (using the same criteria that had been used in 2007) had increased to 20 percent. The percentage of drivers with marijuana in their system increased by nearly 50 percent (from 8.6% in 2007 to 12.6% in 2013-2014).

ii. A second NHTSA study, the *2015 Drug and Alcohol Crash Risk Study*, initially seemed to find a statistically significant increase in **unadjusted** crash risk for drivers who tested positive for use of illegal drugs (1.21 times), and THC (1.25 times). However, when the crash risk analysis was **adjusted** for other well-known risk factors, such as age, gender, race, and ethnicity, there was no longer a statistically significant difference in crash risk associated with the presence of these drugs. This finding indicates that these other variables (age, gender, race, and ethnicity) accounted for the detected increase in risk. This may be due, at least in part, to the fact that young males are more likely to test positive for illegal drugs and marijuana, and they are also more likely to be involved in crashes (Compton & Berning, 2015). Alcohol use was highly correlated with increased crash risk, even after adjusting for other known risk factors.

iii. The *Impact of the Legalization and Decriminalization of Marijuana on the DWI System* project examines how the legalization and decriminalization of marijuana impacts a State's DWI system. It will focus on the impacts following enactment of recreational and/or medical marijuana laws on various aspects of the State's DWI system, including enforcement, prosecution, adjudication, probation, toxicology, communication, and highway safety operations. Lawmakers, State and local governments, the Governor's Highway Safety

48

Association (GHSA), State Highway Safety Offices, NHTSA, and other Federal agencies, will be the primary audience.

b.   Stratoil Energy Ventures and Forum Equity Ventures associated with United Wind have been permitted to enter the United States marketplace which has resulted in permeation of BCCI structures integration with Russell Tencer and Rajeev Viswanathan no less culpable for their actions than the Defendants.   Plaintiff states that the actions of these shell companies are not isolated, the marketplace is flooded with them, and the good People of these United States are none the wiser, being swindled while the body politic restrains their legal remedy and Rights. The foregoing action are made unconscionable as disclosure include policy affixed on extinguishing private enterprise recourse including but not limited to manufacturers, suppliers, private business owners, pigeonholing the marketplace as well the decision making of citizens, steering both towards those green industries and enterprise associated with political faction.   Moreover, many such green industry entities are built on the BCCI model, quicksand absent foundational structures and intent to fail, the substrate of infrastructure investment advanced under the ARPA intent not on bridge repairs but rather on the fictitious substrate of their designation.

c.   Plaintiff states that the conduit to the Defendant, HILLARY R. CLINTON's actions was either Frank Giustra or the Gupta Brothers giving venue to Marc Rich and Zug Foundations, laundered back and forth between and among the parties. Evidencing the foregoing and further per Defendant WILLIAM J. CLINTON's Mexico bailout, the first action taken by the Giustra/Clinton joint foundation was

49

with Carlos Slim, a subsequent joint enterprise (2014). Plaintiff provides two

tableaux as below in advance of discovery.

    i. Frank Guistra – In 2013, Guistra was promoting Petroamerica Oil

      Corporation traveling in Colombia. In that same year, the owner of

      Petroamerica Oil was convicted of conspiracy, securities fraud, aggravated

      currency structuring, money laundering and two counts of wire fraud in

      connection with his Missouri-based company, Israel Owen Hawkins was

      sentenced to 30-years.

    ii. In April, 2023, the Gupta family fled South Africa, traveling to

      Switzerland, the UAE, and Vanuatu. Plaintiff reiterates the statements

      above concerning the People of South Africa, mirroring that of Haiti;

      while business entities conduct themselves unlawfully garnering financial

      benefit, the People of South Africa are left with a devastated economy,

      unreliable public utilities and rolling energy blackouts. The Defendant's

      collective actions are unconscionable as they are inexcusable.

25. Plaintiff states that the Defendant, HILLARY R. CLINTON has conducted herself in

conflict with Article I, Section 7 of the Constitution, separation of powers, participating

in economic espionage, in conflict with the Economic Espionage Act of 1996, 18 U.S.C.

§1831; Federal Bribery Statute, 18 U.S.C. §201(B); Federal Program Bribery Statute, 18

U.S.C.§666; and Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§

1931-1968.

26. Plaintiff attaches FOIA requests authored by the Plaintiff which sought specific public

records resulting from changes made to the election process directed by the Defendant

MERRICK GARLAND or his designee as to changes made in the election process during the 2022 General election, same being reiterated by the Defendant MATTHEW PLATKIN. The language of the request sent was taken verbatim from the DOJ communication. Despite the DOJ interfering in the election process by intimidation, the request for records resulted in either a denial, was ignored completely as was the case by GARLAND's office or, as was the case by Mercer County, New Jersey under separate request, responsive in very limited disclosure despite an utter failure to retain secure ballot records and chain of custody.

Plaintiff confirms that the Defendants, REPUBLICAN NATIONAL COMMITTEE and the DEMOCRATIC NATIONAL COMMITTEE despite having knowledge specific to the actions resulting from the ballot security task force and ongoing lawfare so imposed from 1981 – 2017 with the Consent Order expiring, the Defendants, the DOJ nor any of the co-Defendants represented the interests of the People in ensuring ballots cast retained chain of custody, end to end, the informed expression of the People so affixed by vote. Plaintiff states that to affirm votes cast, the Defendants, RNC and DNC expressly direct those running for office to use the voter registration lists for canvassing in a manner that reiterates the 1982 ballot security task force Consent Order and those which subsequently followed by Judicial authorship. Moreover, Plaintiff states that the People do not consent to such usurpation by fiat, non-conforming to the Constitution of free and fair elections, the changes to elections having been exacted to affirm to the Defendants every forecast of election outcome in advance of the counting of such ballots, caging the People with the faction of parties, the Defendants proving through any number of actors, including New York and New Jersey, that extraneous

persons create ballots to offset the difference in the canvass registrant list of votes cast. Plaintiff notes that both Defendants, the RNC and DNC instruct those running for office in specific manner regarding the canvass registrant list management to forecast election outcome, caging voters, their sovereign voice and the protections of the Constitution an imposition on the Civil Rights Act of 1965.

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY that I filed today, Monday, April 1, 2024, the foregoing Certified Exhibits associated with the Amended Complaint submitted by ECF on March 22, 2024 with the Federal Clerk of the Court for the United Stated District Court, District of New Jersey, which will send notification of such filing to all parties registered for this case, including the Defendant's counsel.

/s/   Mary B. Logan
Mary Basile Logan
Pro-Se Plaintiff

cc:  All Counsel of Record (Via ECF)



# The Liberty Project

# EXECUTIVE SUMMARY
# ALL PROJECTS

# April 1, 2024

# FINAL REPORT

Donna Coons
FOIA Administrator

Mary B. Logan
Executive Director Introduction

# Table of Contents

**INTRODUCTION** ..................................................................................... 55

    **PURPOSE** ........................................................................................ 56

    **METHODOLOGY** ............................................................................. 56

**EXHIBIT 1: The Seven Points of Evidence** ....................................... 56

**EXHIBIT 2: 2021 General Election Initial Forensic Findings** ............... 58

    **STATEMENT OF FACT** .................................................................... 58

    **PURPOSE** ........................................................................................ 59

    **METHODOLOGY** ............................................................................. 59

    **CONCLUSION** ................................................................................ 60

    **GRAPH** .......................................................................................... 60

**ADMINISTRATIVE REPORT** .................................... Error! Bookmark not defined.

**EXHIBIT 3: Registration Data Analysis** .......................................... 62

    **STATEMENT OF FACT** .................................................................... 62

    **METHODOLOGY** ............................................................................. 62

    **PURPOSE** ........................................................................................ 63

    **FINDINGS** ...................................................................................... 64

    **CONCLUSION** ................................................................................ 68

**EXHIBIT 4: Election Data Analysis for 2020, 2021 and 2022.** ............ 68

    **STATEMENT OF FACT** .................................................................... 68

    **PURPOSE** ........................................................................................ 69

    **METHODOLOGY** ............................................................................. 69

    **CONCLUSION** ................................................................................ 71

**EXHIBIT 5: Mail-In Ballot Printing Bids and Contract Analysis** ......... 71

    **STATEMENT OF FACT** .................................................................... 71

    **PURPOSE** ........................................................................................ 72

    **METHODOLOGY** ............................................................................. 72

    **CONCLUSION** ................................................................................ 73

**EXHIBIT 6:  UNITED STATES POSTAL SERVICE (USPS) Scanning of Mail-In Ballots** ........... 73

    **STATEMENT OF FACT** .................................................................... 73

    **PURPOSE AND METHOD** ................................................................ 74

    **FINDINGS** ...................................................................................... 74

    **CONCLUSION** ................................................................................ 78

**EXHIBIT 7: "The Unzipped Bag"** ........................................................................ 78

    **STATEMENT OF FACT** ...................................................................... 78

    **PURPOSE** .................................................................................. 78

    **METHODOLOGY** ........................................................................ 79

    **FINDINGS** ................................................................................. 79

**EXHIBITS 8, 9, and 10: Analysis of FOIA Responsive Records** ............................. 80

    **STATEMENT OF FACT** ...................................................................... 80

    **PURPOSE** .................................................................................. 81

    **METHODOLOGY** ........................................................................ 81

    **FINDINGS** ................................................................................. 81

    **CONCLUSION** ........................................................................... 88

**EXHIBIT 20: NEW JERSEY Turnout Growth, Campus Related Engagement Activities, And The Foundation Behind It** ................................................................................... 89

    **STATEMENT OF FACT** ...................................................................... 89

    **PURPOSE** .................................................................................. 90

    **METHODOLOGY** ........................................................................ 90

    **FINDINGS** ................................................................................. 92

    **CONCLUSION** ........................................................................... 96

## **INTRODUCTION**

The Liberty Project, Inc., ("LP") is a volunteer group of researchers and data analysts with responsibilities divided into small groups with specific functions.  All members of the LP were provided extensive training and support in maintaining protocols established by the administration's project workflow by the Executive Administrator.  This report provides a critical overview of the data obtained and analyzed by the smaller groups that comprise the LP from the period of 2020-2024.

**PURPOSE**

The purpose of this report is to provide a comprehensive overview of the conditions and circumstances regarding the implementation of elections in the State of New Jersey as well as the processing and reconciliation of election results.

**METHODOLOGY**

A thorough analysis of existing LP member summaries was conducted. Members used government reports, media reports, and filed OPRA and/or FOIA requests as well as open source to obtain information. Analysts utilized the data separate and apart from one another to dismiss any bias while maintaining chain of custody ("CoC"). This report outlines each summary produced by group members and conclusions supported by the facts in evidence.

## EXHIBIT 1: The Seven Points of Evidence

The LP Administrator developed a project workflow for small groups following seven points of evidence to ensure data integrity absent of bias with engrained checks/balance throughout the project.  The workflow was utilized in New Jersey as well across the country by various other states.

- **Points 1 and 2 Research Team and Evidentiary Fact:**  LP Research Lead maintained master spreadsheet, tracking origination/CoC, and was responsible for the Executive Summary.  The team members collected, analyzed, and extrapolated responsive records data findings, prepared summaries, maintained the Forensic Data Spreadsheet ("FDS"), provided formula-derived anomalous counties of interest, and executive summaries.

- **Point 3 USEIP/EDA Training Evidentiary Fact:** Research Team Leader and Communications Leader train under U.S. Elections Integrity Plan ("USEIP") for Election Data Analyses ("EDA").

- **Points 4 and 5 Transfer from FOIA/DOCS Team to Legal Review Team Evidentiary Facts**: FOIA (Freedom of Information Act) team members received extensive training for retaining CoC; New Jersey statute holds to the Open Public Records Act ("OPRA"), in both instances, chain of custody ("CoC"). The CoC is the most critical process of evidence documentation, creating sourced evidentiary fact. CoC is the paper trail that records the sequence of custody, control, and transfer of records from origin to LP. The CoC ensures that the LP analysts follow similar protocols as would the custodian of the record in their original retention. The records obtained by OPRA process are handled in a custodial manner to constrain tampering and verify original sources of records/origin. The documents and records the FOIA team use in the CoC process are:(a) submittal confirmation of requests, generally within five (5) business days, (b) responses of requests, including: back and forth dialog with record custodian, (c) attachments sent by record custodian, (d) closure of requests by record custodian, (e) record custodian requests for fees as applicable. OPRA documents categorically organized with CoC/origination are forwarded to the Legal Team for review of CoC and origination.

- **Point 6 Canvassing Evidentiary Facts:** Team members were trained over the course of six weeks, thereafter, canvassing sampled counties and districts to avoid bias and implication of influence on focused communities. Throughout the canvassing process, the Canvass Captain maintained all records but for the day of canvass event. Each canvasser was paired, always ensuring two persons, one to secure the declarative statement and the second to witness the document thereafter. Full CoC was maintained by the Canvassing Captain who consistently was present at each canvass event. Walk lists were redacted to ensure anonymity of voter records but for address and name. There were three incidents,

documented of resident complaints and interface with police. The LP Administrator was present and the interface with the police became a positive interaction; however, the LP canvass Team left the vicinity following the interaction with police to ensure the residents felt secure and affirmed. The declarative statements are maintained in hard copy as a component of the LP repository, scanning is ongoing. Once scanning is complete, an Affidavit of Custodial record will be completed, and the documents will be properly stored in a sealed, airtight container.

- **7-Points of Evidentiary Facts:** The LP Administrator is responsible for the compilation of the inclusive findings, tables, charts, and hypotheses culminating into an Executive Summary which is reflected in this final report. The design of the 7-Points of Evidence provided a step-by-step process in obtaining primary sourced evidence while maintaining end-to-end CoC, proper custodial care and legal review and, thereafter retention of origination, development of hypotheses, data analyses and final individual reports which would be extrapolated into Member Summaries and, thereafter a Team Executive Summary.

The process ensured that findings and conclusions were based upon strict, unbiased, and untainted facts in evidence, absent conjecture.

## EXHIBIT 2: 2021 GENERAL ELECTION FINDINGS

**STATEMENT OF FACT**

From November 23, 2021, and December 15, 2021, the LP research team collected and analyzed originated election data from the Presidential election of 2020. All data utilized was obtained from the custodian of record, the New Jersey SoS ("SoS"), to ensure comprehensive richness of the data, the same material was requested of the County custodian of records for the

inclusive twenty-one (21) Counties within New Jersey ("NJ"). Additionally, the team sourced data from government-maintained websites, including but not limited to Census data, while maintaining CoC screenshots with the origination inclusive of website address.

The inclusive data was analyzed using the forensic data spreadsheets ("FDS"), the analyzer has three built-in mechanisms of independent audit by autonomous parties, eliminating errors and bias; the foregoing exceeds the State of New Jersey model of data entry and outcome test. The resulting data produces clean, untainted pivot tables, formulaic expressions, and graphics outputs from which the Team derived the Counties of focus based on anomalies identified apart from human interactive. In the case of New Jersey, the analyzer identified eleven (11) Counties; Bergen, Essex, Hudson, Sussex, Warren, Cape May, Ocean, Passaic, Middlesex, Monmouth, and Gloucester; Cumberland and Burlington were added for 2022 and 2023.

**PURPOSE**

The purpose of the data collection was to investigate hypotheses drawn from the initial forensic findings from 2020.  The 2021 data allowed a comprehensive contrast/comparison, identification of potential areas of anomaly and any consistencies in and among the two years, 2020 and 2021. This is the first report in a series of reports that will address citizens' concerns with potential voter fraud, irregularities and anomalies related to the broad expansion of Vote by Mail (VBM) ballots, the introduction of early voting, and delays in results reporting, among other aspects of the 2021 general election voting process, as disclosed in primary sourced research and analyses. As the anomalous focus Counties are derived, the remainder of the project had a determined and fixed focus, versus the entire State.

**METHODOLOGY**

The methodology applied for gathering data was assigning volunteer team members who collected official election night reports from County websites, as custodians of record. This data

was then compared to the SoS reporting and analyzed against historical data on population

growth and other continuum of government-maintained Census figures, year-over-year voter

registration numbers, and total ballots cast by type for the 2021 Gubernatorial and New Jersey

Senate elections.

**CONCLUSION**

In-person voting reflected a strong showing for the Republican candidate in the

2021 Gubernatorial Election with all but four (4) counties being held by Republican candidates,

and three (3) counties flipped from Democrat-held in the 2017 Gubernatorial Election to

Republican in 2021. The Democrats held the line with 30% of the Mail-In Ballots (MIB) going

to Democratic candidates. The significance of this high percentage of MIB in favor of

Democratic candidates are as follows: (a)Most MIB were not cast for down ticket candidates,

meaning the voter only selected certain candidates and not every candidate listed under the party

name. (b)There were a greater number of registered voters in each County as compared to the

number of eligible voting age adults. (c)A rapid and significant increase in voter registration and

participation in 2021 Gubernatorial Election versus 2017 race. (d)A tepid growth in the 2020

census providing evidence of discrepancies in the voter rolls.

Voter turnout is evaluated by the LP Senior analysts in Exhibits 4 (Election Data

Analysis) and 11 (New Jersey Turnout Analysis), including charts with written explanation

drawn from initial findings and hypotheses which were later analyzed by a subsequent member

to reduce bias and objectivity.

**GRAPH**

The graph below compares the 2020 census growth versus registered and actual voter

growth in Cape May, Gloucester, Hunterdon, Ocean, and Warren Counties reflecting a

significant growth pattern in the number of registered voters which far exceeds the growth in the

2020 census and a disproportionate growth in number of people that voted.



***This contribution made by a former LP member is no longer a volunteer.***

## <u>BACKGROUND</u>

In August 2022, a pleading was entered and later "misplaced" by the Court, LP made

subsequent emergent application in September, 2022, to stay the election records for the 2020

and 2021 elections, citing the DORES retention statutes.  The plea to the Court was

comprehensive, including a detailed enumeration of the LP repository to date, same was

disseminated to all other states with North Carolina having secured a Court Order.

Throughout 2021-2022, LP members were meeting with Legislators at the State and Federal levels, representing New Jersey, and New York; there were two Legislators in favor of retaining the records, State Senator Oroho (D24) and Congressman Van Drew, (D2) with the remainder passive despite ongoing apprehension regarding the validity of the ballot received as counted. LP analysts' findings disclosed that 186,000 voter registrations had been purged in March, 2022 with only Morris County cleaning the voter rolls in the intervening period, (2020 and 2021) citing COVID-19. Despite disserted effort on the part of LP, the Court found in favor of the SoS, and the records were destroyed in accordance with the DORES custodial statute. The matter of the Gubernatorial election records (2021) was never addressed by the SoS, nor the Judiciary; however, the 2021 election data was included in the Final Order issued by the Court.

## EXHIBIT 3: REGISTATION ANALYSIS

### STATEMENT OF FACT

The LP's research team members collected and analyzed voter registrant data for the period 2000-2023, as reported by the New Jersey Department of State Division of Elections, as well as demographic data from the United States Census Bureau websites. Analysts utilized the data separate and apart from one another to ensure data purity while dismissing bias, each retaining independent chain of custody for records received.

### METHODOLOGY

Analysts utilized the American Community Survey ("ACS") and census data, formatting the combined data into spreadsheets, using autofill calculations which generated graphs, and pivot tables. Auto calculations were utilized to avoid bias and human error. One research analyst created a count/estimate of the eligible voting age population (over the age of 18 and a citizen = 18+C). The structured spreadsheet calculated the 18+C applied as a contrast/comparison against hypothetical maximum number for population in each County and within the State, the resulting

data was then analyzed against the sourced data obtained from the Division of Election registration reports; origination of data was open sourced. The research included an analysis of the four types of registration reporting: General Election Day Voter Registration by County (GE-ED), Primary Election Day Voter Registration by County (PM-ED), General Election Registered Voters and Ballots Cast (GE-TO), and Primary Election Registered Voters and Ballots Cast (PM-TO).

**PURPOSE**

To investigate what percentage of New Jersey's eligible voting age population is legally registered to vote. In addition, trends in eligible voting age population and registrant reports were analyzed, as below.   Open-sourced demographic data was utilized to calculate the hypothetical maximums which were then applied to compare to open-sourced registrant data. The spreadsheets identify any irregularities and/or anomalies that may exist within the data sets.

The purpose of the data collection for the years 2000-2023 and analysis was to:

A.  Observe any trends in the percentage of the population over the age of 18 (O 18+) and over the age of 18 and a citizen (18+C) in New Jersey for the years 2000 – 2023.

B.  Compare the hypothetical maximum number of 18+C to the actual registered voter counts.

C.   Contrast and Compare Statewide Voter Registrant vs County Turnout Registrant reports for both General and Primary elections.

D.  Analyze the changes in the registered voters from the Primary to the General Elections from 2000-2023 using the Statewide Voter Registrant and County Turnout reports.

E.  Statewide Voter Registrants and County Turnout Voter Registrants for the Primary and General Elections year over year compared.

**FINDINGS**

**A. Population Trends Analysis**

Analysis of the data from the ACS, census, and computed estimates clearly discloses that twenty Counties, and the State of New Jersey have increased as a percentage of the population over the age of eighteen (18) from the years 2000-2023. The net change in percentage of the population over the age of eighteen varies from a decrease of less than 2% to an increase of almost 9% (2000 – 2023).

- The County with the lowest percentage of population over the age of 18 in 2000 was Sussex County and the highest was Cape May County for all years 2000-2023.
- In 2023 the lowest was Ocean County and Cape May County remained the highest.

**B. Number of 18+C compared to the actual registered voter counts varies:**

The eligible voting age population (18+C) is correlated to the population over 18, but not perfectly so. This is due to the number of noncitizens that naturalize each year, as well as inflows and outflows of both citizens and noncitizens in a particular County or statewide. The percentage of a County population that is eligible voting age (18+C%) varies greatly from County to County as some counties have a much larger noncitizen population or percentage of their population.

Over the 23-year span from 2000-2023, the growth in the number of registered voters for the state of New Jersey is more than double that of the growth in eligible voting aged people. The General Election Turnout Report shows growth rates over 100% in every County, except for Salem, when comparing the change in registered voters to change in eligible voting aged people.

64

No County in New Jersey was over 90% registered until 2004 (taking the number of registered voters and dividing it by the calculated maximum number of voting age eligible people). In 2008, Monmouth was the first County to eclipse 95%. No County exceeded 95% again until 2014.  By 2016 there were three counties above 96%. As of 2019, three counties were over 99.5% and 100%, respectively; while five other counties were over 95% in that same year. By 2020, seven counties were over 100% with five others and the State at over 98.5%. In 2021 and 2022, eleven counties and the State were over 100% with three more over 98.5%. In 2023, according to the higher adjusted population estimates, six counties exceeded 100% registration, six counties were over 98.5%, and the State was at 99.85%.

The analysis of the four types of registration reports (GE-ED, PM-ED, GE-TO, and PM-TO) resulted in the following finding.  In the last four years, some Counties as well as the State have, at times, had more registered voters than the calculated maximum number of total eligible voting age citizens.

**C. Contrast and Compare Statewide reports vs turnout reports for both General and Primary elections.**

Analyzing the General Election variances in the number of registered voters reported on the statewide registration statistics compared to turnout reports obtained from the counties have been more consistent for each election until 2008 when the State, for the first time, had a variance above 0.5% and again in 2010 and 2014. The highest variances in the General Election analysis of the statewide registration statistics report compared to the turnout report were seen in six of the last seven years (2017-2023) with variances as high as 1.22%, in 2020, representing 79,000 more voters reported on the statewide registration statistics report as compared to the turnout report.

For the Primary Elections, some counties began withholding unaffiliated and third-party registrants from the turnout reports, beginning in 2016 through 2023. There was one exception, in 2021, where this data was provided again allowing for complete analysis. The findings of these analyses are: (a). Prior to 2017 there were no variances above 0.5%, in statewide registrants to turnout registrants (b). From 2019-2023 there were variances of at least 1.43% in statewide registrant reports vs turnout registrant reports (note, counties that did not provide UNA or third-party registrant info were not included) and (c). In 2020 the highest variance of 2.67% represents 130,873 more registrants on the state report than registrants on the turn out reports. Only eighteen (18) counties of the twenty-one (21) New Jersey Counties reported all registrant information, therefore, three (3) counties have been excluded from the statistical analysis for 2020. The largest variances in the voter registrant reporting statewide vs County turnout reporting for both the General and Primary elections occur over the last six years, from 2017-2023.

**D. Changes in the registered voters from the Primary to the General Elections from 2000-2023 using the state voter registrant and County turnout reports indicate anomalies.**

The largest growth in registered voters on the statewide reports for the primary to the general election occurred during the presidential election years of 2000, 2004, 2008, 2012, 2016 and 2020. In the analysis of the statewide registrant reports from 2000-2023, decreases in statewide registrations are seen in 2007, 2010, and 2011, respectively. County Turnout reports indicate a decline in County Registrant findings during non-presidential election years, with numbers varying from year to year and County to County.

Continuing with the non-presidential election years, 2022 was the first time the statewide registrant report grew above 1%. From 2017 -2022, the statewide report showed growth in registrants of over 1.45% from the primary to the general election. In 2023, seventeen (17) out of the twenty-one (21) New Jersey Counties showed a decrease on the turnout registrant reports comparing the primary to the general election.

It is important to note that there exists no reporting data for turnout records for the periods of 2001 and 2009 primaries which did not allow for comparative analysis of turnout registrants from primary to general elections in those years. However, in 2023, the County turnout reports show an increase of 0.62% or almost 33,000 more registrants in the reporting from the period between the primary to general elections (excluding three counties for non-reporting).

**E. Statewide Voter Registrants and County Turnout Voter Registrants for the Primary and General elections year over year compared.**

The four registration reports (GE-ED, PM-ED, GE-TO, and PM-TO) were analyzed comparing the net changes in registrants year over year. The registrant voter counts for General Elections peaked during presidential elections, consistently, and dipped the following year, despite being a gubernatorial election in New Jersey. While increases during the mid-term elections occurred, they were still lower than the previous presidential election year's registrant count. The exception to this was in the years 2018 and 2022. The remaining "off election years" (no presidential, gubernatorial, or mid-terms) tend to be the lowest. There were two anomalous years, one in 2019 and 2023, where increases in registrants were observed after the presidential elections.

Note, for Primary Elections, there is a carryover of registrant growth from the presidential election years to the gubernatorial election years. This is expected since the

highest growth in registrants occurred from the primary to the general election in presidential years; this would not be captured until the primary report in the following year. All other trends seem to match the general elections. Because there is no data for PM-TO for 2001 and 2009, and some counties began withholding UNA and third-party data as of 2016, it was difficult and, at times, impossible to compare year-over-year changes at the statewide level. However, because variances are low compared to the PM-ED report type, for the years that all data is available, findings are the same, except for the 2014 mid-term where only the PM-TO report showed a slight increase in registrants.

**CONCLUSION**

Based on the hypothesis that the number of registered voters should never be higher than the estimated maximum eligible voting age population, and based on the maxima being calculated using the highest population, the highest percentage of population over 18 years of age, the highest margin of error, excluding incarcerated persons and the mentally incapacitated populations, as neither group is eligible to register to vote in accordance to statute, voter trends followed a pattern up until the 2016 Presidential Election when a new trend pattern emerges. The registrant percentages over 100%, registrant growth year over year including "off-years", and large variances between the statewide voter registrant reports and the County turnout registrant reports for the same election have become the norm. New Jersey's 2023 voter registrant reports indicate that the state is near 100% registration capacity already.

**EXHIBIT 4: Election Data Analysis (2020, 2021 and 2022)**

**STATEMENT OF FACT**

The Liberty Project's ("LP") research analyst utilized voter history files originated by the custodian of records from New Jersey's SoS ("SoS"), three (3) New Jersey counties including

Bergen, Hudson, and Morris, for the 2020, 2021 and 2022 elections and the 2020 U.S. Census report. These reports provided a cumulative record of citizens who voted in the 2020 Presidential election, 2021 Gubernatorial election and 2022 Congressional election.  In a comprehensive contrast/comparative analysis, the analyst observed a significant number of anomalies in the categorical data, redacting inclusive personal identifiers (e.g. names and addresses) as required by Daniel's Law.

**PURPOSE**

The intended purpose of the analysis responded to initial LP hypothesis: <u>eligible voter population was less than the voter registrants in New Jersey</u>. The initial review of 2020, 2021 and 2022 General Elections voter history data sets affirmed with specificity the anomalies found in the SoS voters' records. The SoS is required by federal law under the  Help America Vote Act ("HAVA"), as well State statutes, to remedy any discrepancies, a primary guardrail in maintenance of accurate voting records.

**METHODOLOGY**

The originated voter history files were requested by OPRA and provided to the LP by the custodians of record at the New Jersey SoS and within Morris, Hudson, and Bergen Counties. The data incorporates the autonomous analyses by another LP senior analyst utilizing data derived from the current U.S. Census record. This analysis parsed each voter file by election year and analyzed the results through six (6) points of methodology, which are outlined below.

- Voter status (Active/ Active Needs ID/ Active Fed Only/ Inactive Confirmation/ Pending).

- Voter registration date.

- Voter DOB (info redacted for privacy in this report).

- Ballot type (Mail-in/ Machine/ Provisional/ and Emergency).

- Differential of total voter records; contrast between the custodial history of SoS and County Boards of Election voter records.

- Any unique identified voters reflected in the originated records maintained by the SoS and/or County files and totals for each.

This final analysis also incorporates the 2020 Census figures, which defined the expected maximum number of voting age citizens within each County. Analysts chose to utilize data derived from the U.S. Census because of its integrity in origination and retention by government bodies. The Census has an official cap with a margin of error and is subject to population growth and/or decline post-2020.

The analyses of the SoS and County voter history reports revealed several anomalous data points. These findings included Voters with a Date of Birth of 1/1/1800, voters being registered after the registration deadline and voters being register post-election date, a clear violation of the statute N.J.S.A. 19:31-6. While corrective notice is sent to these voters, given the persistence of those persons with a birth date of 1/1/1800, by all appearances, these non-conforming records are retained within the registrant data. LP received by OPRA a letter from the East Brunswick, New Jersey Board of Elections Commissioner of Registration, Middlesex County (2022) which states, "…the Middlesex County Board of Elections is contacting you today…with the mandate of electronic poll books to be used in Ealy Voting and Election Days, an accurate date of birth is an important tool for poll workers to correctly identify voters with similar names…please return this letter with your correct and legible date of birth…"

The "1/1/1800" date of birth ("DOB") anomalous finding is consistent across the Nation, with every State subject to HAVA, yet having the identical subset outlier which remains intact regardless of registrant record corrective action in accordance with federal and state statutes. The

analyst was unable to verify registrant status numbers on the County reports for 2020 and 2021 as the OPRA requested documents were unfulfilled by the custodians of record. Voter history reports for 2022 were provided by three counties and found the voter status numbers reported by the counties did not match that of the State. The incomplete data provided by the County Boards of Election made it impossible to do a comprehensive comparative analysis of inclusive statewide data sets.  Analysis provides that these records remain on the voter rolls and become a recurring issue, unresolved.

**CONCLUSION**

The analyst's findings indicate discrepancies between and among the County to that of the State managed voter registration data sets, signifying that the data sets are out of conformance with Federal HAVA law.  The foregoing results in recurring errors with each subsequent election cycle, requiring remedy through a simultaneous audit of the County and/or State reports for reconciliation in advance of election certification by the SoS; these actions would be required with each election cycle to avoid registration and/or voter records exceeding eligible population records.

<u>**EXHIBIT 5: Mail-In Ballot Printing Bids and Contract Analysis**</u>

**STATEMENT OF FACT**

The LP's FOIA team submitted OPRA requests to sixteen New Jersey counties, requesting documents relating to the ballot printing contracts for election years 2016 through 2022. The responsive records were requested to include the following, thereafter, analyzed by a senior LP analyst.

- Copies of annual bidding request for ballot printing contract (advertisement can suffice). copy of subject contract for the calendar years. Contract details should include comprehensive contractual details including mailing, if so applies.

- Copies of resulting award with respective resolutions regarding ballot printing contractor selected.

**PURPOSE**

The purpose was to collect the data from the counties to do a contrast/ comparative analysis of the process employed in selecting the printing company, the companies that awarded contracts through the bidding process or other means and the details of the contracts such as ballot printing and/or mailing costs during the period 2016-2022, and contract longevity (term).

**METHODOLOGY**

Data was compiled into an Excel spreadsheet with columns labeled: County, Contract year, Year Specifics (date ranges), Contract or Resolution Dollar Amount, Vendor Awarded contract, Contract Provided (yes or no), Contract Included MIB Printing (Yes, No, unknown=?), and Comments. If contractual agreements, not provided by the counties, were found through open-sourced research, and included costs, they were entered onto the spreadsheet.

Atlantic, Bergen, Cape May, Hudson, Hunterdon, Middlesex, Morris, and Sussex Counties were non-responsive to OPRA requests. Passaic County provided the Request for Proposal (RFP) notice submitted to the bidders.

Eight different printing companies were referenced in the responsive records received from the counties:

1. Election Graphics Inc.
2. Royal Printing Services
3. Color Source, Inc.
4. Reliance Graphics
5. Paulsboro Printers, LLC
6. Dominion Voting Systems
7. Premier Printing Solutions
8.  B&B Press

The responsive records received and analyzed by the FOIA team revealed the following results: Beginning in July 2017, Salem County changed from using Dominion Voting systems to

72

Royal Printing. Gloucester County approved Color Source, Inc. in lieu of their previous vendor Paulson Printer, LLC in May 2020. Burlington County awarded Royal Printing Services their printing contract in January 2021; however, their responsive record included an RFP from Election Graphics, Inc. and provided information regarding Essex, Ocean, Morris, Cape May, Hudson, and Mercer Counties having already secured contracts with Election Graphics. The year of those contracts was not provided. Union County uses three different vendors for printing services: Premier Printing Solutions, Royal Printing Services and B&B Press.

The information reported (e.g. contracts, etc.) was obtained from open-sourced including Resolutions with the county OPRA requests going unfulfilled. Analysis of materials received under OPRA requests showed that the public process to review and select contracts via RFP bidding was changed, not requiring the bidding of contracts for ballot printing.

**CONCLUSION**

The process of submitting a Request for Proposal (RFP) for vendors to bid on contracts pertaining to the printing of "The People's" ballots has been abrogated by removing the requirement for elected officials to present in a public forum the review and selection of contracts. Ballot Integrity is a critical component of sound, fair and transparent elections. When this is undermined by outsourcing responsibilities and governmental policies change without oversight or checks and balances by the people, it creates an opportunity for nefarious acts to occur.

**UNITED STATES POSTAL SERVICE (USPS) Scanning of Mail-In Ballots**

**STATEMENT OF FACT**

Prior to 2020, the United States Postal Service ("USPS") was under financial strain, facing staffing and systems-related issues that dramatically impacted service delivery and

increased the amount of undeliverable mail. In July 2020, a newly appointed Postmaster General

Louis DeJoy, implemented a series of policy and operational changes meant to address these

issues. According to published OIG audits and reports, these changes were having a positive

effect. The LP FOIA Lead originated an OPRA, following the chain of custody to determine if

all mail goes through a scanned imaging process and is being retained for several months.

## PURPOSE AND METHOD

The purpose of the research done by the analyst was to ascertain if any existing findings

supported the changes made in the USPS services prior to, up to and after the election, to the

present day. The analyst also reviewed information obtained by the LP Team.

The analyst reviewed government reports, and media announcements such as:

- OIG Audit Report: Access Controls Over Mail Imaging System
- Report # IT-AR-16-004.

- Press Release August 12, 2020: Pelosi, Maloney Joined by 173 House Democrats in Calling on Postmaster General to Reverse Assault on Postal Service House Committee on Oversight and Reform.

- OIG Report: Deployment of Operational Changes Report # 21-014-R21.

- USC Title 39 Section 3692: Performance Targets and Transparency.

- Pennsylvania v DeJoy Lawsuit.

- Pennsylvania v DeJoy Clarification of Codes.

- OIG Report: Accenture Information Technology Contracts Report# 20-076-R21.

## FINDINGS

A OPRA request was submitted on November 26, 2022, seeking copies of inclusive

ballot imaging for the November 2022 General Election specifically, Vote by Mail (VBM) ballot

imaging. The request sought: "Imaging ballots confined to the populous of the State of New

Jersey only. Imaging to be provided by thumb drive or excel, whichever is best suited for any

non-confidential reporting associated with the final ballot imaging count records from the Office of the Inspector General."

In a letter dated December 1, 2022, the Office of the Inspector General ("OIG") denied the FOIA request, stating they are not the custodian of records and referred the request to the Postal Service FOIA office along with contact information.

A subsequent FOIA was emailed to the address provided by the OIG in their December 4, 2022, response letter. The Policy and Records Management Office ("PRMO") replied by emailing a letter dated December 5, 2022, stating no responsive records existed. The PRMO stated that for imaging of a ballot to occur they would have to open the envelope it was mailed in, and they do not do that by law.

A clarification letter was sent by email to the custodian of record advising that the request was for the images of the ballot envelope and not the actual ballot. The PRMO reply remained the same, that the images of the tens of thousands of pieces of mail processed in a single facility every day are retained for only a few minutes, and later specified the retention period to be three (3) minutes. The PRMO also included information on "Mail Tracing" used by the USPS to track potentially contaminated pieces of mail to possible sources; generally done under the auspices of law enforcement. They went on to explain that one technology operated for "Mail Tracing" is "Mail Imaging" technology that has been operational since the 1990's for automated sorting that resulted in maximizing efficiency and potential cost savings; these images generally serve as a processing function with images being retained for less than 3 minutes.

The OIG's Audit Report number, IT-AR- 16- 004 dated January 14, 2016, indicated that it has more than 6,600 pieces of mail processing equipment that capture mail images that are retained from four (4) seconds to one hundred twenty (120) days, depending on the equipment.

75

The OIG's audit report conflicts when the response sent to the LP indicates that mail images are not retained more than 3 minutes. The Postal Service does not catalog, or store scanned images in a central database; however, these mail images can be retained for longer periods if specific requests are made that meet USPS operational requirements.

Further research uncovered that the Postmaster General Louis DeJoy was appointed in June 2020, when the USPS was under financial strain. By July 2020, DeJoy implemented cost savings measures, including consolidating offices, eliminating, or reducing overtime, and other measures curing the backlog of undelivered mail and other issues. He announced these changes in organizational and operating plans, orally, to the Board of Governors on August 7, 2020.

Despite this, in a press release summarizing a letter written by House Speaker Nancy Pelosi and 173 other House Democrats, they called for a reversal in the very same policies that exacerbated the amount of delayed and undeliverable mail prior to DeJoy's appointment. However, the Committees' letter also reminded the Postmaster General of his pledge to provide information on operational changes in writing and the Postal Services promise to deliver 2020 election mail successfully. The letter reiterates the Postal Service's motto "Neither snow nor rain, nor heat, nor gloom, of night stays these couriers from the swift completion of their appointed rounds" while asking Mr. DeJoy to keep the promises made to the American People, provided for in the Constitution.

A day later, on August 13, 2020, the Postmaster again reiterated improvements in areas of on-time dispatch and a reduction in extra trips. On August 18, 2020, Postmaster DeJoy made a statement that operational initiatives were being suspended, due to limitations imposed by the Oversight Committee.

On August 20, 2020, the NAACP filed a lawsuit, one of twelve filed against the USPS and Postmaster General DeJoy by various parties, regarding the implementation of the restrictive operating plans. Only four (4) days later, on August 24, 2020, Postmaster DeJoy appeared, again, before the House Oversight Committee to testify in response to questions regarding the timely delivery of medication and Mail-In Ballots. OIG report # 21-014-R21 dated November 6, 2020, Deployment of Operational Changes, proved there were operational improvements from July through the first week of September 2020. This review coincides with U.S.C. Title 39 subsection 3692 Performance Targets and Transparency.

One month later, on September 28, 2020, in the case *Pennsylvania v DeJoy* 490 F. Supp. 3d 833 (E.D. Pa. 2020), case law brought by the Pennsylvania Attorney General, the United States District Judge, Gerald Austin McHugh, issued an Order that mandated nationwide reinstatement of the USPS policies setforth prior to July 2020, that led to issues mail delivery and budgeting. He also issued a clarification in CIVIL ACTION No. 20-4096 (E.D. Pa. Oct. 9, 2020) adding additional states to the original Order. To date, the LP Legal, Research and FOIA analysts have been unable to locate the original judicial Orders.

The December 29, 2020, OIG audit report number 20-079-R21 states the 2009 Accenture Federal Services contract which supports the USPS to fulfill its essential activities was not sent out for recompeting until 2020 for non-conformance with the established internal protocols for contractual compliance and oversight. The report stated that the Accenture Federal Services contracts for fiscal years 2018 and 2019 were approximately $332 million dollars and the contract ceiling was raised from $750 million dollars to $1.95 billion dollars this reflects a sizable increase in government spending without oversight or accountability. In 2020 this contract was sent out for recompeting and was to be awarded in 2021.

## CONCLUSION

The judge's Order issued in the *Pennsylvania v DeJoy* lawsuit resulted in a nationwide set of precedents which were applied in the settlement of twelve other lawsuits of similar claims. Concurrent ongoing congressional hearings facilitated a reversal of procedures that were in place prior to Postmaster General, DeJoy's appointment in 2020. These knowing actions served to limit the effective measures intended to improve the processing of mail in a safe and secure manner having a direct impact on the outcome of elections. The procedural changes in the amount of time images of scanned mail, including Mail-In ballot envelopes are retained does not allow for tracking of ballots or auditing of the election process. These retention of scanned image procedures do not comply with the DORES record retention schedule for MIB. It is, however, evidence of a broken chain of custody and an opportunity for nefarious activities to occur.  In addition, there was a significant increase in the operational costs paid to a third-party vendor, Accenture, which did not  provide any safeguards in protecting the people's vote cast. Once again, the American taxpayer has borne the financial obligations for these unwieldy unaccounted-for actions and expenditures.

## EXHIBIT 16: "The Unzipped Bag"

**STATEMENT OF FACT**

This is a report on New Jersey Voter History review of a random sample of one hundred voters selected from the twenty-one New Jersey counties voter history files for the year 2021. This document identifies the methodology of selecting the voters' data and an overview of findings and observations.

**PURPOSE**

The purpose of collecting this voter data is to verify if any of the voters selected are deceased and if so, to obtain date of death using open-source data.

**METHODOLOGY**

The following describes the methodology utilized to select voters for review from each of the twenty-one County files in the State of New Jersey:

- Analyst opened the individual County file. (Note: some County files were too large and did not fully load).

- Sorted the opened file by date of birth, oldest to newest.

- Filtered by general election for years 2020 and 2021.

- Selected from 4 to 6 voters from the first two filtered display pages and copied the selected voter into an excel file.

- Ran an open-source search by name, County, and state and/or name and address.

- Screen captured information returned (e.g., obituaries, DOB, address, etc.) and saved in excel file into appropriate County tab.

- Typed notes in research tab (e.g., inconsistent DOB between voter history file and search results, Date of Death, etc.)

**FINDINGS**

The most concerning finding is that of a possible dead person voting by mail in the 2020 general election. Based on a sample size of 100, 1% of that sample size represents a potential dead person voting. For perspective, in 2020, there were 4,635,686 New Jersey ballots cast. One percent of total New Jersey ballots cast is 46,356. Is it statistically possible that there were potentially thousands of New Jersey dead voters casting ballots? Findings also indicate that voters may not live at the address associated with their ballot. Furthermore, findings showed that voters in nursing homes over the age of one hundred had recent voter registration dates. It is worth noting that based on a 100-voter sample, approximately 43% of the date of births (DOB) may be incorrect.

According to the latest 2023 NJ news, Alex Mendez's campaign allegedly collected ballots that were sealed by voters and later examined at campaign headquarters to see if Mendez cast them. Ballots that were not cast for Mendez were allegedly destroyed and replacement ballots, which were allegedly stolen from voters' mailboxes, were used for Mendez. Additionally, Dr. Henrilynn Ibezim, a candidate for Plainfield mayor in 2021, has been charged with directing his associates to fill out blank voter registration applications and bringing them to the post office. In an article published by the NY Post on 8/29/2020, Jon Levine a democratic whistleblower says voter fraud is no myth, especially with mail in ballots, and he knows this because he has been doing it for decades. This whistleblower says he changed ballots himself and led teams of fraudsters and mentored at least twenty operatives in New Jersey, New York and Pennsylvania.  One approach was to visit assisted living facilities to help the elderly fill out their absentee ballots, including discussing for whom to vote. Media reporting indicates there are nursing homes where nurses are paid operatives.

These instances indicate how voter fraud is possible. Our current voting process is vulnerable to fraud particularly through absentee and mail in balloting. One sure way to reduce mail in ballot fraud is to eliminate mail in ballots from our elections and use absentee ballots in a limited number of circumstances, such as American citizens traveling abroad.

## EXHIBITS 17, 18, AND 19: Analysis of FOIA Responsive Records

STATEMENT OF FACT

The New Jersey Liberty project's FOIA team, submitted nearly one thousand OPRA requests to New Jersey's 21 counties, municipalities, and other State and Local Government offices. The team was trained in how to maintain chain of custody and how to reference the SoS issued guidelines, DORES and other election retention directives, statutes, and legislation

pertaining to New Jersey elections. Additionally, LP Team members have expended nearly 2,900 hours at in-person meetings viewing drop-box recordation, certification tapes, 2-hour reports and various other election repository records.

**PURPOSE**

The purpose of submitting OPRA's was to collect the data necessary to analyze the election process in the State of New Jersey focusing on the election years 2020 through present, while retaining chain of custody. The data was utilized to compare the counties' data to one another and the SoS's data where applicable.

**METHODOLOGY**

Members of the LP were able to obtain the documentation of all-inclusive ballots cast through Open-Source research when the FOIA's submitted to all twenty-one counties requesting primary sourced data were unfulfilled. Each original FOIA chain of custody was originated by the FOIA lead and assigned to a FOIA team member for submission. The team member, following the chain of custody protocol, would submit a request to the custodian of record, and maintain the records correspondence to and from the custodian of record. A FOIA was considered complete once it was fulfilled, unfulfilled or deemed non-responsive record by the custodian of record. The CoC along with all the saved pdf files would be transferred to the team lead to retain a working copy and then chain of custody would be submitted to the LP President being retained in the repository. The Chain of Custody would be transferred to the research team for analysis, and new requests would be submitted if necessary.

**FINDINGS**

In response to our request for voter rolls in 2023, counties responded to team members stating that the data was fluid and could only be captured on the day the request was being fulfilled. In 2023, Ocean County replied stating that Daniel's Law (passed in 2020 and effective

81

in 2023) no longer allowed the custodian of record to create a voter list prior to the current date. This is evidence that voter rolls can, in fact, be generated for a specific period.

In response to our request for registration correction lists in 2020 and 2021, we received corrupted files, cloud links to voter rolls and registration lists, but no registration correction lists as requested. However, for the 2023 primary, the twelve counties that LP submitted OPRA requests to provided responsive records, which calls to attention a discrepancy in responses.

On August 14, 2020, Governor Murphy signed Executive Order 177 which required every vote to be cast by Mail-In Ballot for the 2020 Presidential Election. This dramatically altered the election process and set a precedent that additional amendments and changes made over time. He also signed Executive Order 179 which led to the passage of N.J.SA. 19:63-16.1(b)(2)(e) requiring the use of Mail-In Ballots as the only form of voting due to COVID-19 State of Emergency.

Two-hour ("2-hour") reports capture the number of on-person and provisional votes tallied during that two-hour period, providing a human audit against the mechanical against the machines; documenting and retaining 2-hour reports is critically important for quality assurance. The 2-hour reports rightly reflect a mirror image between the machine generated reports, later certified by poll workers of the ballots cast, adding a layer of assurance in the case where machine "glitch" occur.

In-person voting at polling locations returned in 2021 along with 2-hour reports; however, LP OPRA requests noted that multiple counties reported that either districts/municipalities are not required to submit 2-hour reports, or the records no longer existed. When LP team members requested the receipts for destruction of records, they were

informed that these reports were not a component of the schedule of election retention documents.

For the 2023 Primary, one OPRA response stated that 2-hour report records were dynamic, temporary, and not subject to any retention schedule.

It is evident there is no consistency in the recordation of the person(s) sorting, counting, adjudicating ballots in each County as provided in the variety of responses to the OPRA request for visitor logs, thus proving broken chain of custody. In a significant number of cases for 2020, the ballot CoC is called into question due to the haphazard security attentiveness related to visitors, including off-site ballot counting locations.

Findings also indicate non-conformance to the SoS, subsequent Executive, and Legislative ballot drop boxes protocols. The creation and implementation of The Guide to Mail-In Ballot Boxes issued September 25, 2020, by the SoS: required the SoS to approve the Mail-In ballot drop box locations for all 21 Counties in the State of New Jersey based upon specific criteria. Amended legislation N.J.SA. 19:63-16.1b(2)(e) was passed a year later in 2021, stating that no ballot drop box shall be within one hundred feet of an entrance or exit of State, County, or municipal police stations. However, if a drop box was already installed and permanently affixed prior to the effective date of this act P.L.2021, c.459, the drop box may remain at its location subject to approval by a majority vote of the County. This legislation that was passed appears ineffective as many of the MIB Drop Box locations approved by the SoS found on NJ.com for 2022 are at the same address as the police station. The Attorney General also provided guidance for law enforcement to be able to use their discretion to be present at the precinct/districts if requested by a poll worker during that time; the OPRA requests submitted for lists indicated requests for law enforcement were returned as unresponsive record.

According to the September 25, 2020, guidelines, the pickup schedule for the Mail-In Ballot Drop Boxes started after the first day the ballots had been issued to be at least once a day and a Mail-In Ballot Drop Box chain of custody form was provided with the guidelines. On September 16, 2022, an updated version was issued by the SoS permitting the County Board of Elections the discretion to establish a pickup schedule. Municipal employees stated that no schedule was provided by the County. The inclusive amendments, updates and changes create chaos allowing for a plethora of mistakes, missteps, and other nefarious activities. Many of the County employees stated that the process has become overwhelming.

Mail-In Ballot Drop Box Pick Up Logs were requested over multiple election years. Copies of these records were provided by some of the counties while other counties required team members to view them in person and others stated non-responsively. Members that reviewed these logs found many to be incomplete; forms not properly filled in, signatures missing, dates not included, the number of ballots retrieved missing, some were even void of the security seal and seal number, indicating a broken chain of custody.

Specific instructions regarding video recordation of unstaffed ballot drop boxes and retention of the video recordings provided in the same SoS guideline manual for September 25, 2020, stated that the video surveillance needed to be 24 hours per day, 7 days per week. The system could include using an existing system in County, city, or private buildings. The videos needed to be retained, minimally, until the period to challenge since they are considered an election record. The retention guidelines were amended slightly in September 2022, adding that County and Municipal records retention schedules for video surveillance may apply.

Responses to the LP OPRA requests for the video recording varied: (a) non-responsive record (b) videos were recorded over (c) fees required for video recordation being copied onto

devices ranging in price from $0.10 to over $5000.00 (d) referred to the Municipalities/Districts and (e) denial based on security and safety issues; requests submitted to the Municipalities received similar responses. The responsive records received were made available to The LP members on external devices or at in-person viewings. In most cases, The LP members were required to pay for the device or provide a new device, to pick up the device or pay for mailing it. The LP denied pursuit of request fulfillment, in some cases, for being too costly. The LP ultimately paid the counties/municipalities $3489.63 for responsive video recordation.

Observations made by the LP members that viewed the Mail-In Ballot Drop Box Video Recordation include:

- Drop Box placement, obscured in many cases, without visibility to voter patron use, voiding intent.

- Daily Pick up was not conducted (this was affirmed with postal boxes adjacent being picked up).

- Pick up schedules for each County were non-existent or limited.

- Records destruction within 30 days of election or less.

- If hosted by public safety, recordation could not be viewed.

- Chain of Custody Forms consistently incomplete or haphazard.

- Videos were only viewed by LP team members.

- The number of ballots deposited in these boxes were very few.

- There is no end-to-end chain of custody for these ballots.

LP members viewed video recordation, post election, both on location at counties and municipal offices as well privately through recordation purchased by the LP, the on-location

included the FOIA Lead and Executive Administrator in all cases. The following non-conforming issues were observed:

- Location and types of recording equipment were put together piecemeal to capture and record the MIB drop box from inside the building for fear the equipment would be damaged by weather or persons outside.

- This type of surveillance was less than optimal as it also captured plants and windowpanes.

- The view of the actual dropbox was obscured to the camera, unable to capture the voter patron while placing a ballot in the drop box.

- The MIB drop boxes, themselves, were located against the building housing the video equipment creating a blind spot in a significant number of instances.

- If placement was near an entrance/exit to a building the opening and closing of the door would create an obstruction.

- MIB drop boxes were placed near vegetation that made surveillance nearly impossible. These issues were in direct conflict with the statute (C.19:63-1) requiring MIB drop boxes be available for use at locations equipped with security cameras allowing for 24 hour/ day use and surveillance.

LP members also viewed MIB drop boxes placed near a USPS mailbox or municipal tax payment drop box and observed voters' confusion when deciding which box to deposit their ballot into. If ballots were deposited in tax drop boxes, the employee responsible for collecting the tax mail would place the ballot into the MIB drop box breaking chain of custody and creating an opportunity for tampering.

The amount of time, personnel and money required to implement, maintain, and retain these procedures far outweigh the results.  The LP team members have substantiated, by viewing the videos, that the number of Mail-In Ballots retrieved from these drop boxes is antithetical to the claims. The taxpayer whose voices were extinguished in the approval or disapproval of these government decisions now bears the full burden of these costs.

Only three of ten counties provided responsive records for the 2016-2022 certified election tapes. Several LP members went in-person to view the tapes and witnessed firsthand that the certified election tapes from 2016-2022 had all been retained. During the review of certified election tapes, it was observed that many tapes had no signatures, dates did not match the election date, and there were no seal numbers, proving broken chain of custody. All the certified election tapes for 2016-2022 were still available long after the time required to retain such records had passed, leaving one to question why the two-hour reports for the 2020 General Election are not also on the record retention list.

LP members received very few responsive records to the OPRA seeking event logs, summary event log, system log, write-in review, status barcode inventory reports and movement chain of custody logs for scanner/tabulator flash drives used in the general elections. Most of the counties stated that these reports were held by third party vendors requiring a fee to obtain these election records.

Only one of 21 Counties provided responsive record to the OPRA requesting a list of third-party contractors and W9's associated with Mail in Ballot (MIB) tabulation/counting and curing and adjudicating ballots beginning with early voting through election certification for the 2021 and 2022 elections. Most Counties responded by stating they use third party vendors, ES&S or Dominion, but did not provide any of the requested documents. Only two counties

replied they do not use third party vendors, but recent findings have proven those responses to be inaccurate.

Only three counties provided responsive records. The SoS was unresponsive to our request for Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) Absentee Ballots. Most of the counties requested payments ranging from $1000.00 to over $10,000.00 which LP members graciously declined paying. The inconsistency in fees requested by the counties suggests that all counties are not applying the rules and regulations as set forth in the Handbook for Records Custodians in a consistent, even-handed manner.

A few members had the opportunity to review the UOCAVA absentee ballots for 2022 Primary and General Election. Members observed that the forms being reviewed were not like those received from other counties. The custodian of record advised LP members that the UOCAVA voters receive both a hard copy ballot and an emailed ballot. This may provide an opportunity for someone to vote twice.

**CONCLUSION**

The New Jersey LP members' responsive record demonstrates there is no consistency in the recordation of the person(s) sorting, counting, and adjudicating ballots in each County. Nor is there consistency regarding retention of records and protocols. The changes in protocol for selecting the printer of Mail-In ballots, the placement of Mail-In Ballot Drop Box locations, and the retention of video recordation of these ballot boxes is unusual and opaque. These actions create distrust between the public and their elected officials.

The changes made to the election process by executive orders and legislative action have made the process arduous, complex, expensive and time consuming, allowing for errors and broken CoC. Many counties found ways to work around it by hiring third party vendors or temporary staff to ease the workload. The absence of primary documents being provided to the

public for analysis and/or audit creates uncertainty about the accuracy of the election results. With no elected official oversight, requiring fees to obtain election records, and the broken chain of custody extinguishes the ability to analyze or audit any election data.

The changes made to the OPRA process to obtain our public records have become a web of confusion. The laws passed and amended to restrict or limit the public's access to public records, especially those being held or handled by third party vendors, coupled with the exorbitant fees being demanded for these records, is a cause for alarm. The voting public is unable to hold our elected officials accountable through a transparent process.

Creating established protocols, guidelines, and training would prevent confusion and establish a secure CoC for election recording, reporting, and auditing. Until all 21 Counties and municipalities in the state of New Jersey follow the same protocols that require the preservation of election documents that can be accessed by the voting public, our elections are not and will not be sovereign or secure.

**TURNOUT GROWTH REPORT**
**STATEMENT OF FACT**
The 2020 Election saw record turnout across the country.  In voting aged citizen population turnout metrics (census reported or turnout of registered voters reports) New Jersey ranked at or near the top compared to the other 50 states in both turnout in 2020 and the growth in turnout from 2016 to 2020 (See Spreadsheet of Total and Citizen Turnout from census: EXHIBIT 21). Some articles attribute a portion of this higher turnout due to the massive growth in participation of the youngest voting age demographic 18 to 29-year-olds.

New Jersey, like many states, over the last several years, began initiatives on college campuses to increase civic engagement by growing the number of young voter registrants and

improving their turnout in elections. Tahesha Way, New Jersey's SoS (appointed in January 2018) and the current Lieutenant Governor (appointed in September 2023) is credited with starting New Jersey's "Ballot Bowl." Ballot Bowl, along with ALL IN Campus Democracy Challenge (founded in 2016), and The National Study of Learning, Voting, and Engagement (NSLVE launched in 2013) all aim to encourage civic learning and engagement on college campuses.

As of 2021, Ballot Bowl partnered with ALL IN, yet maintains that they are separate programs (https://www.nj.gov/state/nj-ballot-bowl-all-in-challenge.shtml). ALL IN, like Ballot Bowl and the NSLVE is said to be a non-partisan effort. ALL IN's parent organization is Civic Nation a 501(c)3, who per their website, is a nonprofit ecosystem for high impact organizing and education initiatives working to build a more inclusive, equitable America (https://civicnation.org/about/ ). ALL In also worked with the nonprofit behavioral design lab ideas42 to develop and assess a concept that would reward colleges and universities for their work in this area.

**PURPOSE**

The purpose of this analysis was to look at the changes in voter turnout for the youngest age group in New Jersey over time (18 to 24-year-olds per census), as well as compared to other states. In addition to this, a detailed look at donors and other work performed by Civic Nation (parent org of ALL IN) and ideas42 (also known as Behavioral Ideas Lab Inc, partner of ALL IN) was conducted to see if these organizations are non-partisan efforts like they claim to be.

**METHODOLOGY**

To review turnout of New Jersey voters and the United States, first data needed to be collected. The majority of this could be found on census.gov under the Voting and Registration Publications (census.gov Voting and Registration Publications). Note while the New Jersey

Liberty Project retains the New Jersey Statewide Registrant Reports and Turnout Reports, it does not have possession of other state registrant data as of the time of this report March 14, 2024. It is also worth noting the Voting and Registration Publication reports show counts, at least for New Jersey, that are significantly lower than the 2020 census, ACS, or New Jersey DOE data shows for things such as people over the age of 18, the number of citizens, those who are registered to vote, and those who voted. The actual counts are not what this report focused on, but rather the state turnout percentage of age eligible citizens, as this is what many of the articles found via internet search referenced. For example, in the Stacker article Voter Demographics of Every State (https://stacker.com/politics/voter-demographics-every-state) there is a link directly to the census supplemental data (https://www.census.gov/newsroom/press-releases/2021/2020-presidential-election-voting-and-registration-tables-now-available.htmls).

Once turnout rates were found for the last several presidential elections, each state's turnout percentage was ranked for each election. Similarly, the net change in turnout rate (2020 rate – 2016 rate) was calculated and then ranked. Once those rankings and calculations were completed, trends could be observed.

Regarding the other part of the report, Civic Nation and ideas42 are both 501(c)3 organizations and thus file form 990s with the IRS. There are two open source and free sites that were used to access 990s: Cause IQ and Pro Publica. 990s were downloaded for these two organizations and then their EINs were searched on Pro Publica, as this site provides results for at least some of the filings involving organizations that gave grants to the EIN of the organization searched. Those organizations were then researched to see where else they gave donations and what their organizations' missions were. Similarly, a few college foundations were researched to see grants received and paid.

**FINDINGS**

Upon review of countrywide turnout in the 2020 election, not all states saw an increase in turnout percentage according to the census supplemental data (7 states saw a decline and 4 saw an increase of less than 1%). The entire US turnout percentage saw a net increase of 5.4% or a approximately 8.8% overall (2020%/2016% - 1). The highest turnout overall was in Washington DC where reported turnout was 84.0%. New Jersey ranked second at 78.3%, followed by Minnesota at 77.9%, Oregon at 74.1%, and New Hampshire at 74.0%. In terms of net change in turnout percentage, Hawaii was first at 17.03% (an increase of 36.03%), second was New Jersey at 16.78% (an increase of 27.28%), third was Tennessee at 12.41% (a 22.98% increase), fourth was Kentucky at 11.52% (an increase of 20.21%), and fifth was Arizona at 11.50% (an increase of 19.05%).

Prior to 2020 New Jersey never ranked above 19th (in 1988) for presidential election turnout and more recently rank 31st in 2008, 28th in 2012, and 31st in 2016. No other state moved up in rank more than New Jersey for 2016 to 2020 (29 spots). The census supplemental report broke down turnout into five different age brackets (18 to 24, 25 to 34, 35 to 44, 45 to 64, and 65+). The largest percentage change in turnout in the country from 2016-2020 was in New Jersey for the 18 to 24 age group with a net change of 34.6% (representing an increase of 74.43%). Only three other states had age groups see net changes above 20%: Iowa for 18 to 24-year-olds increased by 25.7%, Wisconsin 25 to 34-year-olds increased by 23/4%, and Hawaii 18 to 24-year-olds increased by 22.7%. Ranking the net changes in turnout for each age group, only New Jersey was in the top 5 for all age groups. Only Hawaii appears in the top 5 four times (all groups except 65+) and Kentucky appears in the top-5, three times (35 to 44, 45 to 64, and 65+).

92

New Jersey allowed the SoS and other organizations on college campuses to promote

voter registration initiatives that were said to be non-partisan. The following are some of Civic

Nation's donors and their mission statements:

1. The Skoll Foundation- Catalyze transformational social change by investing in, connecting, and championing social entrepreneurs and other social innovators who together advance bold and equitable solutions to the world's most pressing problems.

2. When We All Vote (Liquidated)- nonpartisan organization that is on a mission to increase participation in every election and close the race and age voting gap.

3. Act Blue Charities (a sub-organization of Act Blue); Act Blue's mission- To develop and promote innovative fundraising tools and practices that utilize internet technology among social welfare organizations for the purpose of increasing grassroots engagement in social welfare activities, as well as accountability and effectiveness in those organizations.

4. Foundation for Civic Leadership Inc.- To foster a more vibrant local and global democracy by supporting more sustainable, united, and stronger communities of action.

5. Nextgen Climate Action- Prevent climate disaster, promote prosperity, and protect the fundamental rights of every American.

6. The Proteus Fund- Proteus fund is a public charity that partners with foundations, advocates, and individual donors to advance democracy, human rights, and peace.

7. Foundation to Promote Open Society (One of George Soros' Foundations)- The Open Society Foundations work to build vibrant and tolerant societies whose governments are accountable and open to the participation of all people. We seek to strengthen the

rule of law, respect for human rights, minorities, and a diversity of opinions, democratically elected governments, and a civil society that helps keep government power in check.

8. The Hopewell Fund- The Hopewell Fund is a 501(c)(3) public charity that specializes in helping donors, social entrepreneurs, and other changemakers quickly launch new, innovative social change projects.

9. The Tides Foundation- Tides' vision of a world of shared prosperity and social justice is founded on equality and human rights; a sustainable environment; healthy individuals and communities; and quality education.

10. Multiple Hedge Funds' Charitable Foundations- Missions vary, but all are for philanthropy and some focus more on social change.

The donors for Ideas42 are not all the same as Civic Nation, but there are some organizations that donated to both foundations (Hedge fund charitable and Tides Foundations). Where connections do not directly exist via a common donor, they can often be related via other organizations (like universities) that received grants from the same large foundations and are involved in Civic Nation's Campus Democracy Challenges.  Further, there are many links created via organizations that often donate funds to one another, becoming both parents and siblings to ideas42 and/or Civic Nation through these large donors, and to one another.  A brief example of this is the Foundation to Promote Open Society gave donations to Civic Nation, Harvard, Rutgers University, and the Tides Foundation (also a donor of Civic Nation, Harvard, Rutgers, Ideas42, and other donors to Civic Nation).  While this is not a direct indication of malfeasance, it does make it impossible to follow money given from one organization to another, as it can create infinite loops between them.

Two things occurred during COVID 19, especially in the years 2020-2021 that are important before arriving at any final findings or conclusions.  First, many colleges across the country, and especially in New Jersey were mostly to fully remote for the majority of 2020 including through the presidential election.  Second, many foundations, just as small businesses, and publicly traded companies, received government funding during COVID 19.  Some of the larger foundations received billions of dollars in government grants, which were used for foundation expenses, many of which are grants to other organizations.

In conclusion, while the rapid growth in New Jersey turnout is not a direct indication of fraud, it is anomalous.  The youngest age group of the voting populace, during a time that they were not on college campuses for voting related initiatives, due to COVID 19, had the largest growth rate in turnout in the entire country.

Large foundations, some funded with government grant monies, have given funds to universities that take part in the New Jersey SoS's and Civic Nation, working by way of ALL IN's, a subsequent non-profit, campus related voter engagement activities and contests, which were also funded by these foundations.  The SoS and the organizations involved in promoting voter registration and turnout claim to be non-partisan, and while foundation donors to Civic Nation, the universities involved in ALL IN, Ideas42, etc. appear to donate to non-partisan causes, they seem to create partisanship and division amongst the people of the United States of America.  The SoS, Civic Nation, ALL IN continue to celebrate their success with non-partisan campus related increases in voter turnout, but based on the findings in this report, anomalies appear to exist and the foundations that are funding these activities are not doing so in the best interest of the citizens of the United States of America.

## **CONCLUSION**

The research and findings provided by the Liberty Project's analysts lay bare the despotism in our government. The data presented reveals the statements made and laws enacted or amended by our elected officials run contrary to each other. The 2016 -2020 data found by originated open- source research revealed several New Jersey counties with a significant growth in the number of registered voters far exceeded the growth in numbers provided in the 2020 census and further compounded by the disproportionate growth in number of people that voted. The fact that the number of registered voters should never be higher than the estimated maximum eligible voting age population LP analysts discovered a new pattern emerging in 2016 depicting the percentage of registered voters being over 100% when comparing year over year growth and statewide registration reports to County turnout registration reports. New Jersey's 2023 voter registrant reports indicate that the state is near 100% registration capacity already.

The data findings disclosed by the Liberty Project's Analyst reveal the voter rolls continue to be poorly maintained. However, further analysis of County records was hindered by Daniel's Law being enacted due to the unfortunate murder of Judge Salas's son Daniel. This law was passed in 2020 and became effective in 2023, amending Open Public Records Act ("OPRA") to exclude from public record the portion of any document which discloses the home address of any active or retired 1) judge, 2) prosecutor 3) law enforcement officer or 4) any immediate family member. The bill prohibits government agencies, individuals, and businesses from knowingly publishing on the internet, or otherwise making available, the home address or unpublished home telephone number if a written request is made for the removal of information; and must be implemented within 72 hours of receipt.

Counties citing Daniel's Law and Common Law denied election records requested by LP FOIA team for privacy and protection of public officials and for being governmental records. However, these same records are shared, transmitted, and received between and among the governmental bodies and non-profit organizations and have been deemed non-governmental and exempt from Common Law. This sharing of people's personal information without consent is not transparent and counter intuitive of Daniel's Law, protecting the safety and well-being of public officials and not that of private citizenry. Unfortunately, this law did not prevent the murders of two New Jersey elected officials; a Councilwoman from Sayreville, February 2023, and a Councilman from Milford, just one week later.

In a press release dated August 9, 2022, New Jersey joins the Electronic Registration Information Center ("ERIC"), former SoS, Tahesha Way, exclaimed joining ERIC would help support eligible voters and improve accuracy in the voter rolls. The findings provided by LP's research analyst depicting the discrepancies when comparing the Statewide voter rolls to the counties' voter rolls and the counties' voter rolls in a year over year comparison indicate a lack of maintenance in the voter rolls from 2020 to 2022 in advance of the contract.

The press release further stated that Legislation was signed by Governor Murphy the previous year. Additional research revealed, on June 30, 2021, the bill S3999 was enacted into law allowing the SoS and New Jersey Motor Vehicle Commission (NJMVC) to share voter information with ERIC. This bill supplements Title 19 and Title 39 as follows: C.19:31-34 Allows the SoS to share, transmit and receive confidential, personal, and personally identifiable information, excluding information unrelated to voter eligibility. Information regarding the status of one's citizenship was banned from being shared or transmitted. All the information shared, transmitted, or received to or from the SoS and the non-profit organization is not considered a

governmental record and therefore falls outside the common laws concerning governmental records. Under Title 39 (C: 39:2-3.9) NJMVC is permitted to share, receive, and transmit the same information to non-profit organizations under consent of New Jersey Executive authority. And the same holds true for governmental records falling outside common law.

In 2021, the State of New Jersey became a "member" of Electronic Registration Information Center ("ERIC"), a non-governmental organization requiring a one-time membership fee of twenty-five-thousand-dollar ($25,000.00) for technology upgrades and other miscellaneous expenses.  Annual dues are based, in part, on the citizen voting age population in each state for operating costs with members approving their dues and budgets. ERIC's operating budget for FY 2023-2024 is approximately $1,729,000 and the dues for the same fiscal year range from $37,000 to $174,000.  If the current 28 States were to pay the minimum dues of $37,000 that amount to $1,036,000.  A search for New Jersey's ERIC contract agreement proved fruitless and therefore, hindering the ability for public audit of taxpayer dollars. There have been several lawsuits opposing ERIC's contract that ensued; one in Alaska that resulted in favor of the Plaintiff receiving the list of dead voters they were being denied. Louisiana, Colorado, and District of Columbia have also sued for similar reasons. Several states have resigned or withdrawn membership with ERIC stating lack of transparency and partisan participation in the membership and the organization.  The ability for The People to hold their elected officials accountable is extinguished when elected officials outsource their responsibility to third party vendors paid for by the taxpayer, absent transparency, bidding requirements in many cases, and the transparent record of ownership of the third party indicating the organizations posture.

There were several New Jersey Counties that experienced In-Person Voting issues during the 2021 and 2022 General Elections; inclusive of difficulty signing in on the new electronic

pads, voting machines that were locked out and scanners not working, long lines and voters being turned away. Several counties in New Jersey experienced such events in the 2021 Gubernatorial Election including Bergen, Essex, Mercer, Somerset, Sussex, and Union Counties.

Any disturbance that might reasonably keep voters from casting their ballots, including malfunctioning voting machines, long lines, or understaffing at polling places would disenfranchise voters. Republicans' who have historically voted In-Person, as a preference, have been victim to these disturbances.

The facts provided herein depict our sovereign elections have been usurped by the manipulation of the voting process by outsourcing the responsibility of our elected officials by using third party vendors or non-governmental organizations like Dominion, and no-bid contracts for printing contracts, ERIC, Accenture Federal Services and Civic Nation to name a few. These partnerships allow for changes in policy, laws, amendments, and guidelines without oversight or checks and balances of taxpayer dollars. The fact remains that the people no longer have control over their elections, the ability to scrutinize, audit or question the results or process of their elections or actions taken by the government.

To remedy these actions all partnerships with NGO's, non-profits, and third-party vendors need to be revoked and taxpayer dollars refunded. Elections must be held on one day using paper ballots and voter ID proving that every voter is eligible to vote, and the election results are legitimate. These actions are essential to restore the People's Constitutional unalienable right to sovereign elections, secured and informed by the people.

Case 3:24-cv-00400-ZNQ-TJB Document 46-3 Filed 04/15/24 Page 100 of 163 PageID: 2052
Case 3:24-cv-00400-ZNQ-TJB Document 57-3 Filed 04/25/24 Page 31 of 63 PageID:
PageID: 2761



**Liberty Project**
**2021 Election Voter History Analysis**
**Final Summary**

**November 20, 2023**

**Opening Statement**

This is a report on NJ Voter History review of 100 voters selected from the twenty one NJ counties voter history files for the year 2021. This document identifies the methodology of selecting the voters' data and an overview of findings and observations.

**Purpose**

The purpose of collecting this voter data is to verify if any of the voters selected are deceased and obtain date of death using open source data.

**Methodology**

The following describes the methodology used to select voters for review from each of the 21 county files:

- I opened up the individual county file. Note: some county files were too large and did not fully load.

- Sorted the opened file by date of birth, oldest to newest.

- Fileted by general election for years 2020 and 2021.

- Selected from 4 to 6 voters from the first two filtered display pages and copied the selected voter into an excel file.

- Ran an open source search by name, county and state and/or name and address

- Screen captured information returned (e.g., obituaries, DOB, address, etc.) and saved in excel file into appropriate county tab.

- Typed notes in research tab (e.g., inconsistent DOB between voter history file and search results, Date of Death, etc.)

**Findings and Observations**

1. **Possible dead person voted in the 11/3/2020 general election:**  The 2021 Voter History file listed a Constance J Baker with DOB as 11/5/1902, voter registration date of 3/27/1996, address 111 Gates Ave, Montclair, NJ, and registered as a republican.  On the website www.newjerseydeathindex.com, I found a person with the same DOB (11/5/1902) as Constance J Baker, same last name of Baker and similar first name of "Conetance" not "Constance" (perhaps a misspelling of the first name).  The New Jersey death index has her date of death as 6/11/2004.   Constance's address of 111 Gates Ave, Montclair NJ is that of a nursing home, Montclair Care Center.  Information found has Constance deceased on 6/11/2004 but voted by mail in the 11/3/2020 general election.

2. **Persons voted using commercial address (Ark Hotel-commercial property, owned by Ukraine 13, LLC with address in Atlantic City)**:  The 2021 Voter History file listed a Stefan Vasilovich Yatsklv with DOB as 4/6/1916, voter registration date of 5/14/2018, address 632 Wesley Ave, Ocean City NJ (Cape May County) and registered as unaffiliated. Stefan Vasilovich Yatsklv voted by mail in the 11/3/2020 general election

and by machine in the 11/2/2021 general election.  The open source search did not return results for a Stefan Vasilovich Yatsklv and I could not verify this person's age or any other information. Since a name search did not provide results, I then searched the address 632 Wesley Ave, Ocean City NJ and found that this was a commercial property, Ark Hotel – housing for students and tourists, owned by Ukraine 13, LLC with an address of 32 S Elberon Ave, Atlantic City NJ.  Other search results provided a Rusian Yatsklv as owner of 32 S Elberon Ave, Atlantic City, NJ. Also found that a Ruslan Yatsklv was a registered voter at the Ark Hotel address of 632 Wesley Ave, Ocean City NJ. Also found that Ruslan Stefanovich Yatskiv is a real estate agent.  The voter history file has Ruslan Stefanovich Yatsklv with DOB 11/16/1984, registered to vote on 5/14/2018, at address 632 Wesley Ave, Ocean City NJ,  registered as unaffiliated and voted in the 2018 and 2020 general election. For the 11/2/2021 general election, there is a new registration date of 9/1/2021, a change in party affiliation from unaffiliated to republican, and a spelling change to name Ruslan Yatskiv (dropped middle name and changed last name to Yatskiv from Yatsklv, and letter "i" replaced letter "l"). Also Stefan Vasilovich Yatsklv (DOB 4/6/1918) and Ruslan Stefanovich Yatsklv (DOB 1/16/1984) live at same address and both registered to vote on 5/14/2018.

3. **Persons with recent voter registration dates in years 2018 and 2020 with nursing home/senior living community address and  DOB in year 1918:**

The 2021 Voter History file listed a George Mcnicol, with DOB as 3/13/1918, voter registration date of 5/28/2020, address 1 Leisure Ct, Flemington NJ (Hunterdon County) and is a registered democrat.  I was able to verify his DOB and also found that he was

placed in nursing home, Hunterdon Care Center, in 2019. Hunterdon Care Center has an address of 1 Leisure Ct, Flemington NJ (Hunterdon County) which matches the voter history. This voter registered to vote 5/28/2020 at the age of 102 approximately, while living at Hunterdon Care Center.

The 2021 Voter History file listed a Mildred Baron with DOB as 6/1/1918, voter registration date of 9/5/2018, address 2213 Applewood Dr., Freehold NJ (Monmouth County) and is a registered democrat. I was not able to verify her DOB but her address is that of a senior living community. This voter registered to vote 9/5/2018 at the age of 100 approximately, most likely living at Applewood Estates.

4. **Persons may have lived and voted at a different address from the address in voter history file:**

The 2021 Voter History file listed a Lucy Pomilla, with DOB as 10/19/1921, voter registration date of 10/29/2019, address 2 Campbell Dr, Hamburg NJ (Sussex County) and is a registered democrat. The property with address 2 Campbell Dr, Hamburg, NJ was sold in 9/30/2019 and Lucy Pomilla's current address is in Garfield, NJ. The voter history has Lucy Pomilla as voting in the 2020 election by mail at 2 Campbell Dr, Hamburg NJ but based on information found it is likely that Lucy Pomilla lived at an address in Bergen county, NJ after 2019.

The 2021 Voter History file lists a Concetta C Fessler, with DOB as 7/14/1922, voter

registration date of 9/15/2020, with address 7208 Richmond Rd, West Milford NJ (Passaic County), and voter registration as unaffiliated.  Search results returned show that the property at 7208 Richmond Rd, West Milford NJ was owned by Fessler Concetta transferred to Fessler Concetta IRR Trust on 8/17/2020 (**Note:** appears to list first name Fessler and last name Concetta?) and was sold on 3/23/21 and the person now living at this address is Barbara H Davies.   The voter history has Concetta C Fessler as voting in the 2020 election by mail and by machine in 2021 with the address of  7208 Richmond Rd, West Milford NJ but based on information found it is likely that Concetta C Fessler was no longer living at address listed in voter history file. Also interesting to note is that a Concetta C Fessler with same DOB 7/14/1922 was possibly living at 12 Durham Ct, Middleton NY and a previous address of 30370 Hunky Dory Ln, Trabuco Canyon, CA (period of residence 2013-2021).  Further research should be conducted.

5.  Deceased persons after 2020 and/or 2021 general elections

Approximately 28% (28 of the 100) of the voters sampled have likely passed away since the 2020 and/or 2021 general elections.

6.  Incorrect date of birth (DOB)

It is likely that approximately 43% (43 of the 100) of the voters likely have an incorrect date of birth (DOB) in the 2021 voter history file.

7.   Voters sampled within the voter registration dates

| Voter Registration Dates | % of Voters Sampled (100 sampled) | No of voters likely deceased after 2020 or 2021 | No of voters likely with incorrect DOB |
|---|---|---|---|
| 1940-1949 | 8% | 4 | 1 |
| 1950-1959 | 6% | 4 | 3 |
| 1960-1969 | 13% | 2 | 7 |
| 1970-1979 | 5% | 1 | 3 |
| 1980-1989 | 19% | 5 | 6 |
| 1990-1999 | 16% | 5 | 9 |
| 2000-2009 | 20% | 5 | 12 |
| 2010-2019 | 6% | 2 | 0 |
| 2020-2021 | 7% | 2 | 2 |

8.  Voter  Status

Two voters sampled have a status of "Inactive Confirmation" and have voted in the 2020 general election by mail. The two voters are Elizabeth C Bray of Bergen County and Barbara M Haun of Gloucester County.

One voter sampled has a status of "Active need ID" and voted in the 2021 general election (and registered to vote in 2021 with DOB 1/1/1900).  The voter is Celin A Alava Moreno of Hudson county.

9.  Four voters not found using open source search

   a.  MAFRUHA CHOWDHURY, Atlantic county
   b.  VICTORIA DYER, Essex County
   c.  HELEN A CONNELLY, Sommerset county
   d.  LUIS CANO, Union county

## Closing/Conclusions

Given the above findings and observations, the most concerning finding is that of a possible dead person voting by mail in the 2020 general election.  Based on a sample size of 100, 1% of that sample size is that of a possible dead person voting.    In 2020 there were 4,635,686 NJ ballots cast and 1% of total NJ ballots cast is 46,356.  Is it statistically possible that there were potentially thousands of NJ dead voters casting ballots? Then there are the findings of voters potentially not living at the address where they voted, and voters in nursing homes over the age of 100 years old with recent voter registration dates.  Also, based on the 100 voter sample, approximately 43% of the date of births (DOB) are likely incorrect.


How is voter fraud possible?  According to the latest 2023 NJ news, Alex Mendez's campaign allegedly collected ballots that were sealed by voters and later examined at campaign headquarters to see if they were cast by Mendez.  Ballots that were not cast for Mendez were allegedly destroyed and replacement ballots, which were allegedly stolen from voters' mailboxes, were used for Mendez. Additionally, Dr. Henrilynn Ibezim, a candidate for Plainfield mayor in 2021, has been charged with directing his associates to fill out blank voter registration applications and bringing them to the post office.  And, in an article published by NY Post on 8/29/2020 by Jon Levine a democratic operative (whistleblower) says voter fraud, more so with mail in ballots, is no myth and he knows this because he has been doing it for decades. This whistleblower says he changed ballots himself and also led teams of fraudsters and mentored at least 20 operatives in NJ, NY and Pennsylvania.  One approach was to hit up assisted living facilities and to help the elderly fill out their absentee ballots. And, there are nursing homes where nurses are paid operatives.

Given the above, our voting process is vulnerable to fraud particularly through absentee and mail in balloting. One sure way to reduce mail in ballot fraud is to eliminate mail in ballots from our elections and use absentee ballots in a limited no of circumstances (e.g., out of country).

**Recommendations**

Deceased voters date of death should be checked against an official source and then compared to the 2022 Voter registration and history files to verify that they were removed and no votes cast.

Incorrect date of birth should be checked against an official source to confirm findings.

Create a database from the individual county voter files then sort by name and the results should be reviewed to see if the same person voted in multiple counties (given findings that some voters may not have lived at address in voter history).



# Executive Summary

# FOIA Spreadsheet Analysis

**November 22, 2023**

**Donna Coons**

## OPENING STATEMENT

Serving as the FOIA lead, for the New Jersey Liberty Project, Inc., I consulted the Secretary of State issued guidelines as well, DORES and all other election retention directives at which point the entire FOIA team was trained regarding these documents.

The New Jersey Liberty Project, Inc.'s (NJLP) members submitted close to 1000 FOIAS to the 21 New Jersey Counties, Municipalities and other State and Local Government offices to obtain the data necessary to analyse the election process in the State of New Jersey. Outlined below are a plethora of responses provided by the Record Custodians to those requests.

A request for voter rolls years 2020, 2021 and 2022, were mostly responsive records. In 2023 the Ocean County record custodian responded stating that "Due to Daniel's Law Ocean County Board of Elections can No longer distribute voter lists that have been created any day prior to the current day". Daniel's law intended to protect law enforcement, judicial and elected officials, was passed November 20, 2020, and compliance with Daniel's Law and recent amendments became effective January 13, 2023.This statement provides evidence that these reports can in fact be generated for a specific timeframe.

Responses to requests for registration correction lists were inconsistent among the Counties they included corrupt files, cloud links to voter rolls and registration lists in lieu of the requested documents for 2020 and 2021. One county even responded saying "We are not aware of any such list". It seems rather uncanny that for the 2023 primary 12 Counties were able to provide responsive record. (only 12 FOIAS submitted)

In 2020 Governor Murphy implemented Executive Order 179 and signed into law N.J.SA. 19:63-16.1(b)(2)(e) requiring the use of Mail-In Ballots be the only form of voting due to COVID19 State of Emergency. In accordance with this statute there were no 2-hour reports for 2020 as there were limited or no in-person voting locations. In 2021, the counties returned to in-person voting at polling locations and the 2-hour reports would again be required as part of the chain of custody for the ballots cast. Several Counties in their responsive records reported that not all districts submitted 2-hour reports or "These records no longer exist". NJLP members requested destruction of record reports and were immediately told that these records do not need to be retained because they are not on the records retention destruction list. For the 2023 primary, one county responded stating these records were dynamic and temporary and not subject to any retention schedule. These responses cause one to take pause and ask why an election record would not be on the record retention destruction list when it is a vital part of the chain of custody and would be critical in an audit enabling the re-creation of election results.

An interesting response was received from a record custodian to a request for visitor logs for 2020, 2021 and 2022: "The Elections Board didn't keep visitor logs in 2020- our office is typically closed to the public for security reasons (we have a window to serve votes, so they don't enter the office environment). Beginning in March 2021 Executive Order 192 required us to keep visitor logs for COVID reasons to ensure that anyone walking into our office certified they were COVID -symptom free". Other counties' responses included non-responsive record, exorbitant fees, denied for causing a substantial disruption or MIB drop box logs were provided in lieu of the requested visitor logs. Visitor logs and timesheets fulfilling the FOIA request were

also received by a few counties.  It is evident, there is no consistency in the recordation of the person(s) sorting, counting, adjudicating ballots in each county.

The New Jersey Liberty Project's request for primary documentation of inclusive ballots cast was denied by all counties. The members of the Liberty Project were able to obtain this information through Open-Source research or links provided by some counties.

Due to Governor Murphy's executive order 177 signed August 14, 2020, ordering every vote to be cast by Mail-In Ballot for the 2020 Presidential Election and the implementation of The Guide to Mail-In Ballot Boxes issued September 25, 2020, the Secretary of State was to approve the Mail-In ballot drop box locations for all 21 Counties. FOIAS requesting the approved ballot box lists for 2020, 2021, 2022 and 2023 respectively and a FOIA to the Secretary of State requesting the approved list for 2022 were sent. The responses varied from unresponsive, excel spreadsheets with drop box locations or denied for being overly broad. In the case of the Secretary of State the FOIA was unresponsive.  This is a perplexing response (or lack of response) coming from the person responsible for approving these locations.

NJLP team members, using Open-Source research found all the Secretary of State approved MIB drop box locations for the requested years. In doing so they also found amended legislation N.J.S.A. 19:63-1b)(2)(e) signed into law by Governor Murphy on August 14,2021 stating that no ballot drop box shall be within 100 feet  of an entrance or exit of State, county or municipal police stations.  However, if a drop box was already installed and permanently affixed prior to January 18, 2022 at any of the following locations  within 100 feet of a police station, the drop box may remain at its location subject to approval by a majority vote of the County Commissioners, stating the reasons for its continued presence at that location being subject to public disclosure: any county government building in which the main office of the county clerk is located; any municipal government building in which the main office of the municipal clerk is located in the municipalities with populations larger than 5000 residents; the main campus of a community college, the main campus of a State College or university: and the  main campus of an independent four-year college or university with enrollments larger than 5000 students. The Guide to Ballot Drop Boxes was updated on September 16, 2022, and Acting AG Matthew Platkin also provided guidance for law enforcement to be able to use their discretion to be present at the precinct/districts if requested by a poll worker during that time. The fact that these amendments, updates, and guidelines were all implemented less than two months before a general election is cause for concern with early voting beginning 45 days prior to the election. These changes create confusion and chaos allowing for a plethora of mistakes, missteps, and the potential for fraud. Many of the county employees stated that the process has become overwhelming and difficult to keep up with.

Only three of ten counties provided responsive records for the 2016-2022 certified election tapes.  Several NJLP members went in-person to view the tapes and witnessed firsthand that the certified election tapes from 2016-2022 had all been retained.  During the review of certified election tapes, it was observed that many tapes had no signatures, dates didn't match the election date, and no seal numbers proving broken chain of custody.

All the certified election tapes for 2016-2022 were available long after the time required to retain such records leaving one to question, yet again, why the two-hour reports are not on the record retention list at all.

NJLP members received very few responsive records to the FOIAS seeking event logs, summary event log, system log, write-in review, status barcode inventory reports and movement chain of custody logs for scanner/tabulator flash drives used in the general elections. Most of the counties stated that these reports were held by third party vendors requiring a fee to obtain these election records.

Mail-In Ballot Drop Box Pick Up Logs were requested over multiple election years. Copies of these records were provided by some of the counties while other counties required team members to view them in person and others stated non-responsive record. Members that reviewed these logs found many to be incomplete; forms not properly filled in, signatures missing, dates not included, the number of ballots retrieved missing, some were even void of the security seal and seal number indicating broken chain of custody.

A FOIA request was made to have copied or view the video recordings of the Mail-In Ballot Drop Boxes as required in the Guide to Ballot Drop Boxes issued September 25, 2020, and updated September 15, 2022. Responses included requests for fees to copy the recordation, copying without a fee if NJLP members provided a thumb drive or external drive in its original package, video recordings no longer exist, extensions were requested until the video recordings were no longer available, "They Do Not Exist" or records were destroyed following the Guide to Ballot Drop Boxes video recordation retention. Some members requested the destruction of record report only to be told that none exists. The NJLP team members that viewed the video recordings provided came to similar conclusions; that none of these videos were looked at by anyone but NJLP team members, the number of ballots deposited in these boxes were very few, and there is no end-to-end chain of custody for these ballots.

Only one of 21 Counties provided responsive record to the FOIA requesting a list of third-party contractors and W9's d associated with Mail in Ballot (MIB) tabulation/counting, curing and adjudicating ballots beginning with early voting through election certification for the 2021 and 2022 elections. Most Counties responded by stating they use third party vendors, ES&S or Dominion, but did not provide any of the requested documents. Only two counties replied they do not use third party vendors but recent accounts have proven those responses to be inaccurate.

A FOIA requesting copies of annual bidding requests for ballot printing contracts and resulting award with resolution regarding ballot printing contractor selected for the years 2016-2022 was denied by only one county. Two counties responded stating New Jersey law does not require a contract for this service and the requested records are not retained, they fall outside of bidding guidelines since the law changed and no longer requires bids. Most provided responsive records with all the contracts being awarded to the same company, Royal Printing.

Only 3 counties provided responsive records and the Secretary of State was unresponsive to our request for Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) Absentee Ballots. Most of the counties requested payments ranging from $1000.00 to over $10,000.00 which the NJLP members graciously declined paying. Based on the inconsistency in fees requested by the counties one might assert that The Handbook for Records Custodians pages 20-24 was not referenced. A few members had the opportunity to review the UOCAVA absentee ballots for 2022 Primary and General Election. Members observed that the forms being reviewed were not like those received from other counties. The custodian of record advised the NJLP members that the UOCAVA voters receive both a hard copy ballot and an emailed ballot. This raised some concerns since it provides an opportunity for someone to vote twice.

## METHODOLOGY

| Document Title | Source Citation | Significance |
|---|---|---|
| FOIA Spreadsheet | Donna Coons/ Mary B. Logan | Repository for FOIA Chain of Custody. |
| | | |

## ADD THE SPREADSHEET ANALYSIS

## SUMMMARY

The New Jersey Liberty Project members responsive record demonstrate there is no consistency in the recordation of the person(s) sorting, counting, and adjudicating ballots in each county. Nor is there consistency regarding retention of records and protocols. The changes in protocol for selecting the printer of Mail-In ballots, the placement of Mail-In Ballot Drop Box locations, and the retention of video recordation of these ballot boxes is unusual and opaque. These actions create distrust between the public and their elected officials.

The changes made to the election process by executive orders and legislative action have made the process arduous, complex, expensive and time consuming, allowing for errors and broken chain of custody. Many of the counties acknowledge this and found ways to work around it by hiring third party vendors or temporary staff to ease the workload. The absence of primary documents being provided to the public for analysis and/or audit creates uncertainty about the accuracy of the election results. With no elected official oversight, requiring fees to obtain election records and annihilating the chain of custody extinguishes the ability to analyse or audit any election data.

The changes made to the FOIA process to obtain our public records have become a web of confusion. The laws passed and amended to restrict or limit we the people access to our public records along with the exorbitant fees being demanded for these records is a cause for alarm; since these records are being held by third party vendors leaving the voting public unable to hold our elected officials accountable.

The People should never be kept from what is rightfully theirs while seeking truth in their elections. These abhorrent actions are the reason there is a lack of public trust regarding our sovereign elections. Creating established protocols, guidelines and training would prevent confusion and establish a secure Chain of Custody for election recording, reporting, and auditing. Until all 21-Counties and municipalities in the state of New Jersey follow the same protocols, requiring preservation of the same documents that can be accessed by the voting public our elections are not and will not be sovereign or secure.

We the People's Rights to sovereign elections have been usurped, manipulated, or not cast at all. Elections must be held on one day using paper ballots and voter ID proving that every voter is eligible to vote, and the election results are legitimate. I pray that we restore the People's Constitutional unalienable right to sovereign elections, secured and informed by the people.



**Liberty Project**
**2021 Election Voter History Analysis**
**Final Summary**

**November 20, 2023**

**NJ Turnout Growth, campus related engagement activities, and the
foundation behind it.**

John Caprio
Senior Research Analyst
March 14, 2024

## Opening Statement

The 2020 Election saw record turnout across the country.  In voting aged citizen population turnout metrics (census reported or turnout of registered voters reports) NJ ranked at or near the top compared to the other 50 states in both turnout in 2020 and the growth in turnout from 2016 to 2020 (See Spreadsheet of Total and Citizen Turnout from census).  Some articles attribute a portion of this higher turnout due to the massive growth in participation of the youngest voting age demographic 18 to 29-year-olds.

NJ, like many states, over the last several years, began initiatives on college campuses to increase civic engagement by growing the number of young voter registrants and improving their turnout in elections.  Tahesha Way, New Jersey's Secretary of State (appointed in January 2018) and the current Lieutenant Governor (appointed in September 2023) is credited with starting NJ's "Ballot Bowl."  Ballot Bowl, along with ALL IN Campus Democracy Challenge (founded in 2016), and The National Study of Learning, Voting, and Engagement (NSLVE launched in 2013) all aim to encourage civic learning and engagement on college campuses (ALL IN History Page).

As of 2021 Ballot Bowl partnered with ALL IN, yet maintains that they are separate programs (per NJDOS: ALL IN Page on nj.gov ). ALL IN, like Ballot Bowl and the NSLVE is said to be a non-partisan effort.  ALL IN's parent organization is Civic Nation a 501(c)3, who per their website, is a nonprofit ecosystem for high-impact organizing and education initiatives working to build a more inclusive, equitable America (https://civicnation.org/about/ ).  ALL In also worked with the nonprofit behavioral design lab ideas42 to develop and assess a concept that would reward colleges and universities for their work in this area (ALL IN History Page ).

## Purpose

The purpose of this analysis was to look at the changes in voter turnout for the youngest age group in NJ over time (18 to 24-year-olds per census), as well as compared to other states.  In addition to this, a detailed look at donors and other work performed by Civic Nation (parent org of ALL IN) and ideas 42 (also known as Behavioral Ideas Lab Inc, partner of ALL IN) was conducted to see if these organizations are non-partisan efforts like they claim to be.

## Methodology

To review turnout of NJ voters and the United States, first data needed to be collected. The majority of this could be found on census.gov under the Voting and Registration Publications (census.gov Voting and Registration Publications).  Note while the NJ Liberty Project has NJ Statewide Registrant Reports and Turnout Reports, it does not have possession of other state registrant data as of the time of this report March 14, 2024.  It is also worth noting the Voting and Registration Publication reports show counts, at least for NJ, that are significantly lower than the 2020 census, ACS, or NJ DOE data shows for things such as people over the age of 18, the number of citizens, those who are registered to vote, and those who voted.  The actual counts are not what this report focused on, but rather the state turnout percentage of age eligible citizens, as this is what many of the articles found via internet search referenced.  For example, in the Stacker article Voter Demographics of Every State (Stacker Voter Demographics Every State) there is a link directly to the census supplemental data (Census.gov 2020 Presidential Election voting and registration tables).

Once turnout rates were found for the last several presidential elections, each state's turnout percentage was ranked for each election.  Similarly, the net change in turnout rate (2020

rate – 2016 rate) was calculated and then ranked.  Once those rankings and calculations were completed, trends could be observed.

Regarding the other part of the report, Civic Nation and ideas42 are both 501(c)3 organizations and thus file form 990s with the IRS.  There are two open source and free sites that were used to access 990s: Cause IQ and Pro Publica.  990s were downloaded for these two organizations and then their EINs were searched on Pro Publica, as this site provides results for at least some of the filings involving organizations that gave grants to the EIN of the organization searched.  Those organizations were then researched to see where else they gave donations and what their organizations' missions were.  Similarly, a few college foundations were researched to see grants received and paid.

## Findings

Upon review of countrywide turnout in the 2020 election, not all states saw an increase in turnout percentage according to the census supplemental data (7 states saw a decline and 4 saw an increase of less than 1%).  The entire US turnout percentage saw a net increase of 5.4% or a approximately 8.8% overall (2020%/2016% - 1).  The highest turnout overall was in Washington DC where reported turnout was 84.0%.  NJ ranked second at 78.3%, followed by Minnesota at 77.9%, Oregon at 74.1%, and New Hampshire at 74.0%.  In terms of net change in turnout percentage, Hawaii was first at 17.03% (an increase of 36.03%), second was NJ at 16.78% (an increase of 27.28%), third was Tennessee at 12.41% (a 22.98% increase), fourth was Kentucky at 11.52% (an increase of 20.21%), and fifth was Arizona at 11.50% (an increase of 19.05%).

Prior to 2020 NJ never ranked above 19th (in 1988) for presidential election turnout and more recently rank 31st in 2008, 28th in 2012, and 31st in 2016.  No other state moved up in rank

more than NJ for 2016 to 2020 (29 spots). The census supplemental report broke down turnout into 5 different age brackets (18 to 24, 25 to 34, 35 to 44, 45 to 64, and 65+). The largest percentage change in turnout in the country from 2016-2020 was in NJ for the 18 to 24 age group with a net change of 34.6% (representing an increase of 74.43%). Only three other states had age groups see net changes above 20%: Iowa for 18 to 24-year-olds increased by 25.7%, Wisconsin 25 to 34-year-olds, and Hawaii 18 to 24-year-olds increased by 22.7%. Ranking the net changes in turnout for each age group, only NJ was in the top 5 for all age groups. Only Hawaii appears in the top 5 four times (all groups except 65+) and Kentucky appears in the top 5 three times (35 to 44, 45 to 64, and 65+).

NJ allowed the Secretary of State and other organizations on college campuses to promote voter registration initiatives that were said to be non-partisan. The following are some of Civic Nation's donors and their mission statements:

1. The Skoll Foundation- Catalyze transformational social change by investing in, connecting, and championing social entrepreneurs and other social innovators who together advance bold and equitable solutions to the world's most pressing problems.

2. When We All Vote (Liquidated)- nonpartisan organization that is on a mission to increase participation in every election and close the race and age voting gap.

3. Act Blue Charities (a sub-organization of Act Blue); Act Blue's mission- To develop and promote innovative fundraising tools and practices that utilize internet technology among social welfare organizations for the purpose of increasing grassroots engagement in social welfare activities, as well as accountability and effectiveness in those organizations.

4. Foundation for Civic Leadership Inc.- To foster a more vibrant local and global democracy by supporting more sustainable, united, and stronger communities of action.

5. Nextgen Climate Action- Prevent climate disaster, promote prosperity, and protect the fundamental rights of every American.

6. The Proteus Fund- Proteus fund is a public charity that partners with foundations, advocates, and individual donors to advance democracy, human rights, and peace.

7. Foundation to Promote Open Society (One of George Soros' Foundations)- The Open Society Foundations work to build vibrant and tolerant societies whose governments are accountable and open to the participation of all people. We seek to strengthen the rule of law, respect for human rights, minorities, and a diversity of opinions, democratically elected governments, and a civil society that helps keep government power in check.

8. The Hopewell Fund- The Hopewell Fund is a 501(c)(3) public charity that specializes in helping donors, social entrepreneurs, and other changemakers quickly launch new, innovative social change projects.

9. The Tides Foundation- Tides' vision of a world of shared prosperity and social justice is founded on equality and human rights; a sustainable environment; healthy individuals and communities; and quality education.

10. Multiple Hedge Funds' Charitable Foundations- Missions vary, but all are for philanthropy and some focus more on social change.

The donors for ideas42 are not all the same as Civic Nation, but there are some organizations that donated to both foundations (Hedge fund charitable and Tides Foundations).  Where connections

do not directly exist via a common donor, they can often be related via other organizations (like universities) that received grants from the same large foundations and are involved in ALL IN's Campus Democracy Challenges.  Further, there are many links created via organizations that often donate funds to one another, becoming both parents and siblings to ideas42 and/or Civic Nation through these large donors, and to one another.  A brief example of this is the Foundation to Promote Open Society gave donations to Civic Nation, Harvard, Rutgers University, and the Tides Foundation (also a donor of Civic Nation, Harvard, Rutgers, ideas42, and other donors to Civic Nation).  While this is not a direct indication of malfeasance, it does make it impossible to follow money given from one organization to another, as it can create infinite loops between them.

Two things occurred during COVID 19, especially in the years 2020-2021 that are important before arriving at any final findings or conclusions.  First, many colleges across the country, and especially in NJ were mostly to fully remote for the majority of 2020 including through the presidential election.  Second, many foundations, just as small businesses, and publicly traded companies, received government funding during COVID 19.  Some of the larger foundations received billions of dollars in government grants, which were used for foundation expenses, many of which are grants to other organizations.

In conclusion, while the rapid growth in NJ turnout is not a direct indication of fraud, it is anomalous.  The youngest age group of the voting populace, during a time that they were not on college campuses for voting related initiatives, due to COVID 19, had the largest growth rate in turnout in the entire country.

Large foundations, some funded with government grant monies, have given funds to universities that take part in the NJ Secretary of State's and ALL IN's campus related voter

engagement activities and contests, which were also funded by these foundations. The Secretary of State and the organizations involved in promoting voter registration and turnout claim to be non-partisan, and while foundation donors to Civic Nation, the universities involved in ALL IN, ideas42, etc. appear to donate to non-partisan causes, they seem to create partisanship and division amongst the people of the United States of America. The Secretary of State and ALL IN continue to celebrate their success with non-partisan campus related increases in voter turnout, but based on the findings in this report, anomalies appear to exist and the foundations that are funding these activities are not doing so in the best interest of the citizens of the United States of America.



**Liberty Project**
**2021 Election Voter History Analysis**
**Final Summary**

**Skrzyniarz**
**LP Lead Analyst**
**March 8, 2024**

## **Opening Statement**

This is the final report on analyses of voter history files originate by the State of New Jersey, custodian of record, pertaining to the 2020 Presidential election, the 2021 Gubernatorial election, and the 2022 Congressional election. This document is intended to analyze reports from three (3) counties; Bergen, Hudson, and Morris Counties with reports published by the New Jersey Secretary of State ("SoS") and the inclusive counties as well as the U.S Census report of 2020. The inclusive reports provide cumulative records of citizens who voted in the 2020, 2021, and 2022 elections.  All names, addresses and personal identifiers have been redacted for the protection of individuals to ensure that data category identified in the methodology is measured purely against the New Jersey voter registration statutes, incorporating all changes to the present time.

## **Purpose**

The voter history files for the 2020, 2021, and 2022 General Elections analyses is intended to cure a Liberty Project hypothesis identified through initial review by the Research Team.  The data presented herein identifies, with specificity, the type of anomalies found in the SoS voters' records.  The State, holding to statute, would be required to remedy the identified areas to conform with HAVA as well the State statutes as regard the legally informed maintenance of accurate voter rolls.  This report does not take into account the State's consent agreement in outsources voter rolls

to ERIC which took effect in 2022; under ERIC, public access to voter roll records is inhibited with the assertion that ERIC properly maintains the intact records.

## **Methodology**

The originated voter history files provided by the custodian of record, the NJ SoS as well as, the custodian of record for Morris, Hudson, and Bergen Counties. The data incorporates the autonomous analyses by another LP senior analyst utilizing data derived from the current U.S Census record; this analysis parsed each voter file, by election year and analyzed the resultant data through six (6) points of methodology, same is outlined below.

- Voter status (Active/ As/ Active Fed Only/ Inactive Confirmation/ Pending).

- Voter registration date.

- Voter DOB (info redacted for privacy in this report).

- Ballot type (Mail-in/ Machine/ Provisional/ and Emergency).

- Differential of total voter records; contrast between the custodial history of Secretary of State and County Boards of Election voter records.

- Any unique identified voters reflected in the originated records maintained by the SoS and/or County files and totals for each.

This final analysis also incorporates the 2020 Census figures, provided by LP senior analyst John Caprio which defined the expected maximum number of voting age citizens within each County. The LP analysts chose to utilize data derived from the U.S. Census, because of its integrity in origination and retention by government bodies, the Census has an official cap with a margin of error and is subject to population growth and/or decline post-2020.

The analysis represented in tables below is reflective of two distinct areas of sourced, originated records; 2022 includes both Counties and SoS the 2020 and 2021 election records reflect only of SoS, with the inclusive County Boards of Election returning the LP OPRA requests, as "no responsive records" for those years.

| Document Title | Source Citation | Significance |
|---|---|---|
| SoS Bergen 2020 | Ehist_Bergen.csv | The Secretary of State files revealed anomalous data categories that needed to be addressed, including large increases in Provisional Ballots, requiring remediation prior to certification. |
| SoS Bergen 2021 | Ehist_Bergen.csv | The Secretary of State files continue to reveal unresolved data points not addressed in 2020, inclusive of provisional ballots |
| SoS Bergen 2022 | Ehist_Bergen.csv | There are discrepancies in data comparing the SoS data to the county data, inclusive data received by FOIA. The Secretary of State files continue to reveal unresolved data points not addressed in 2020 and 2021 inclusive of provisional ballots |
| Bergen County 2022 | Main.csv | Bergen County records received by FOIA did **not** contain all-inclusive data therefore analysis could not be completed. Voter records still have unverified data being sent the SoS |
| SoS Hudson 2020 | Ehist_Hudson.csv | The Secretary of State files revealed anomalous data that needed to be addressed, including large increases in Provisional Ballots, requiring remediation prior to certification. |
| SoS Hudson 2021 | Ehist_Hudson.csv | The Secretary of State files continue to reveal unresolved data points not addressed in 2020, inclusive of provisional ballots |
| SoS Hudson 2022 | Ehist_Hudson.csv | There are discrepancies in data comparing the SoS data to the county data, inclusive data received by FOIA. The Secretary of State files continue to reveal unresolved data points not addressed in 2020 and 2021 inclusive of provisional ballots |

| Hudson County 2022 | HUD_2022_ELECTION_HIS TORY county level | Hudson county provided all data requested by FOIA but voter records still have unverified data being sent to the SoS |
| SoS Morris 2020 | Ehist_Morris.csv | The Secretary of State files revealed anomalous data that needed to be addressed, |
| SoSMorris 2021 | Ehist_Morris.csv | The Secretary of State files continue to reveal unresolved data points not addressed in 2020 |
| SoS Morris 2022 | Ehist_Morris.csv | Morris counties data is better maintained however the Secretary of State files continue to reveal unresolved data points not addressed in 2020 and 2021 |
| Morris County 2022 | Morris_County_Voter_Record s_with_Voter_History_Jan_1_ 2022_thru_Nov_8_2022.23 | Morris County provided a nearly complete voter history list without the voter ID numbers. Morris County still has unresolved issues |
| LP Sr. Analyst John Caprio's Report | NJ Population Estimates 2000-2023.xlsx | Data analysis of the Census and ACS numbers to compare the registered voters in 2020 against the 2020 Census as a measure the maximum number of voters a county could have. |

## **FINDINGS**

The inclusive files originated from the SoS and County records and were analyzed under the methodologies named below.

- Date of Birth (DOB). DOB was analyzed to determine those registrants as to preexisting issues related to formatting and/or concerns regarding the registrant's age. Such that the county and/or state should have remedied, conforming to standing law NJSA 19:31-5. E.g. 1/1/1800. The data records reflect non-conformance.
- As of 2022, the eldest registrant was 111; however, open-source public record provides the eldest resident in New Jersey is 110. Therefore, those dates which exceed 1914 with a registrant history exceeding two election cycles, require a written contact to affirm or purged from the registrant record by the custodian of record.
- Registration Date. Registrant records were analyzed to determine those non-conforming to statute including those whose registration date is outside the statute, (Post election and/or before 17 years old and did not turn 18 until after the election. NJSA 19:31-5) Those registered with dates reflecting those close to Date of birth, or those who missed the registration deadline and would therefore be ineligible to vote in any of the last 3 elections. NJSA 19:31-6 Registration places, time, requirements.
- Voter Status. This is a contrast/comparison analysis as to matching or mismatched registrant data between records maintained by the SoS, as custodian to that of County reports.

- <u>Ballot Type</u>. This analysis evaluated the volume of each ballot type (Machine, Mail-in, Provisional, and emergency) present and active within the respective County and SoS record to verify State and County conformance to records management and reconciliation with each other. Originated data was analyzed; however, it did not contain ballot type referencing "uniformed and overseas citizens absentee voting act" (UOCAVA).
- <u>Unique IDs and Names.</u>  This contrast/comparison analyzing the voter e-history to verify if the County and SoS records have correlating voter data records, inclusive of any unique IDs, and/or registrants who do not appear on both lists and therefore make the lists out of conformity to the statute.

The foregoing evaluation points were chosen from statutory law. The tables below report the findings of each methodology stated above for the subject time period.

## 2020 Census Ages 18+ vs Registered Voters

| County | Census 18+ Est Max | Registered Voters General Election | Registered Voters % of Census |
|---|---|---|---|
| Bergen | 669,639 | 678,826 | 101.37% |
| Hudson | 445,118 | 413,208 | 92.83% |
| Morris | 374,114 | 391,173 | 104.56% |

- This census data used in this table was calculated by the Liberty Project's Senior Analyst allowing for the maximum variance in comparing data records by Estimating 18+ C rate from ACS data multiplied by the 2020 census population data and added the margin of error rate = The hypothetical maximum for eligible voting age people.
- A variance of 95% or higher is considered anomalous and cause for concern.
- The voter registration records for Bergen and Morris counties revealed more registered voters than people reported on the census.
- Hudson County reports provided showed better maintenance of records since they variance fell with acceptable limits.

## 2022 Overall Voter Differences and Unique ID's

| Unique ID's and Difference in Total by County | Voters on County List Not on SoS List | Voters on SoS List Not on County List |
|---|---|---|
| Bergen | 482 | 65 |
| Hudson | 89 | 95 |
| Morris | N/A | N/A |

## 2022 Overall Voter Differences and Unique ID's (cont.)

| Duplicates in 2022 Voter Lists | County Voter List | SoS Voter List |
|---|---|---|
| Bergen | 2 | 260 |
| Hudson | 0 | 173 |
| Morris | 4823* | 266 |

| County | Overall Difference in Number of Voters Comparing County to SoS Voter Registration Lists |
|---|---|
| Bergen | County has 159 more |
| Hudson | SoS has 167 more |
| Morris | SoS has 684 more |

*Morris County reports did not include Voter ID data, requiring the analyst to use names which resulted in an extraordinarily large number of pairs and does not presume they are duplicate voters.

## Date of Birth and Registration Date Issues in County and State Reports
## 2020 Election

| County Report | Date of Birth Issues | Registration Date Issues |
|---|---|---|
| Bergen | 736 | 673 |
| Hudson | 153 | 552 |
| Morris | 1635 | 452 |

## 2021 Election

| County Report | Date of Birth Issues | Registration Date Issues |
|---|---|---|
| Bergen | 485 | 215 |
| Hudson | 80 | 182 |
| Morris | 1108 | 158 |

## 2022 Election

| County Report | Date of Birth Issues | Registration Date Issues |
|---|---|---|
| Bergen | 190 | 973 |
| Hudson | 59 | 599 |
| Morris | 903 | 667 |

## 2022 Election

| Secretary of State Report | Date of Birith Issues | Registration Date Issues |
|---|---|---|
| SoS Bergen | 285 | 795 |
| SoS Hudson | 59 | 670 |
| SoS Morris | 905 | 758 |

- Date of Birth (DOB) was analyzed to determine those registrants as to preexisting issues related to formatting and/or concerns regarding the registrant's age. Such that the county and/or state should have remedied, conforming to standing law NJSA 19:31-5. e.g. 1/1/1800.
- As of 2022, the eldest registrant was 111, public record provides the eldest resident in New Jersey is 110. Therefore, those dates which exceed 1914 with a registrant history exceeding two election cycles, require a written contact to affirm or purged from the registrant record by the custodian of record.
- The State does not presently require any State or Federal issued ID documentation (birth certificate, social security card, passport) to verify Date of Birth on the Voter

Registration. The state does require either a NJ driver's license or Social Security number on the Voter Registration form, both of which contain the voters date of birth; however, as ID is not required to vote, the registrant form completion is not indicative of secure elections. N.J.S.A 19:31-6.4-line 11a and 11b.

## Ballot Types in Each Election as Reported by the Counties and State
### 2020 Election*

| Secretary of State | Vote by Machine | Mail-In Ballot | Provisional Ballot |
|---|---|---|---|
| SoS Bergen | 17 | 470,498 | 33,415 |
| SoS Hudson | 0 | 219,132 | 34,898 |
| SoS Morris | 6 | 292,145 | 12,746 |

- In 2020 by Executive Order all registered voters received a Mail-In Ballot due to COVID-19 Emergency.

## 2021 Election

| Secretary of State | Vote by Machine | Mail-In Ballot | Provisional Ballot |
|---|---|---|---|
| SoS Bergen | 222,273 | 49,917 | 7,829 |
| SoS Hudson | 100,198 | 20,092 | 4,986 |
| SoS Morris | 149,491 | 33,729 | 4,459 |

## 2022 Election Compares County to the Secretary of State Reports*

| County v SoS | Vote by Machine | Mail-In Ballot | Provisional Ballot |
|---|---|---|---|
| Bergen | 49,894 | 239,852 | 7,312 |
| SoS Bergen | 49,832 | 239,652 | 7,413 |
| **Difference** | **+62** | **+200** | **(101)** |
| Hudson | 17,543 | 94,868 | 4,200 |
| SoS Hudson | 17,594 | 94,858 | 4,326 |
| **Difference** | **(51)** | **+10** | **(126)** |
| Morris | 35,117 | 154,735 | 4,524 |
| SoSMorris | 35,441 | 154,827 | 4,792 |
| **Difference** | **(324)** | **(92)** | **(268)** |

- In response to FOIA request submitted by FOIA team to obtain Election History Data from the counties only yielded the 2022 reports, making it impossible to compare to data reported by the Secretary State data for 2020 and 2021.
- The County voting history data when compared to the State data should be the same to ensure accuracy in reporting. When the data does not match the issues should be remedied before elections are certified.

## Secretary of State v County Voter Status for 2020, 2021 and 2022 Elections
### 2020 Election

| County | Active | Active Needs ID | Active Federal Election Only Needs ID | Inactive Confirmed Needs ID | Pending |
|--------|--------|-----------------|----------------------------------------|------------------------------|---------|
| Bergen | 495,643 | 682 | 2,412 | 5,157 | 172 |
| Hudson | 251,647 | 1,059 | 959 | 64 | 301 |
| Morris | 298,877 | 343 | 1,017 | 4,324 | 336 |

## 2021 Election

| County | Active | Active Needs ID | Active Federal Election Only Needs ID | Inactive Confirmed Needs ID | Pending |
|--------|--------|-----------------|----------------------------------------|------------------------------|---------|
| Bergen | 230,001 | 493 | 8 | 80 | 259 |
| Hudson | 124,312 | 879 | 1 | 8 | 76 |
| Morris | 187,297 | 258 | 10 | 20 | 94 |

## 2022 Election

| County | Active | Active Needs ID | Active Federal Election Only Needs ID | Inactive Confirmed Needs ID | Pending |
|--------|--------|-----------------|----------------------------------------|------------------------------|---------|
| Sof Bergen | 295,600 | 777 | 380 | 57 | 83 |
| Bergen* | Incomplete | Incomplete | Incomplete | Incomplete | Incomplete |
| **Difference** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |
| **SoS Hudson** | 115,019 | 1,373 | 262 | 38 | 86 |
| **Hudson** | 114,864 | 1,370 | 266 | 41 | 70 |
| **Difference** | **+155** | **+3** | **(4)** | **(3)** | **+16** |
| **SoS Morris** | 194,317 | 150 | 290 | 178 | 125 |
| **Morris** | 193,972 | 148 | 0 | 172 | 84 |
| **Difference** | **+345** | **+2** | **+290** | **+6** | **+41** |

- In response to FOIA request submitted by FOIA team to obtain Election History Data from the counties only yielded the 2022 reports, making it impossible to compare to data reported by the Secretary State data for 2020 and 2021. In addition, Bergen reported incomplete Status data making it impossible to a comparative analysis.
- The County voting history data when compared to the State data should be the same to ensure accuracy in reporting. When the data does not match the issues should be remedied before elections are certified.

## Further Analysis

1. Seek to obtain from the custodial records custodian the corrective documentation retained

   from the process of adjudication and the judicial process in confirming IDs to affirm the

   New Jersey election and legally informed vote totals for each impacted area of the

election. This requires further work to determine if the inclusive counties or the state went through their voter rolls to allow for enough time for voters to verify themselves before election day and if the state made enough judges available and clear material provided to voting precincts as to where to go to find their judge, as well as any materials (Id, forms, etc.) necessary to complete the process.

2.  Request information from the inclusive Counties for the inclusive voter records who were declared inactive, for analysis whether they had been contacted by the correct legal authority or their record statutorily scrutinized to inform the eligibility of these voters. This requires further documentation and analysis because statute requires that the inclusive counties who have determined an inactive voter send them a confirmation notice and if they fail to confirm their address or ID in the specified timeframe they are to be removed from the list.  NJSA 19:31-15 Removal of name from Statewide voter registration system; change of residence; confirmation.

3.  Request the voter status of inclusive voters in Bergen County omitted from the OPRA request by the custodian of record. Inclusive records of voter status are necessary to be able to determine what additional records may or may not be pertinent to the voters, e.g., judicial records for ID confirmation and the status of confirmation letters sent out to inactive voters.

4.  Request information from the inclusive counties on voters who have dates of birth such as 1/1/1800 and whether any attempt was made to ascertain an actual date of birth that does not raise issues legally. These voters age raise questions about either the format of the inclusive data, or issues with data entry. Given the state is required to be as accurate

as possible there should be records of attempts made to provide voters with proper

remedy for any issues in each voter's file.

Records provided indicated issues with registration dates including but not limited to dates after

registration deadline, day of election registration, and after the election date, the last of which

may be a new registration but on the record is clearly in violation of the law N.J.S.A 19:31-6.

Each of the foregoing anomalies were observed in the analyzed data from 2020, 2021 and 2022.

## **Conclusion**

The analyses has determined that in both the County and State records there are

insurmountable and irreconcilable issues, creating a non-conformance in reconciliation between

the SoS and County data files as well a non-conformance to federal law ("HAVA"). The SoS and

County election history and registration reports for 2020, 2021 and 2022 revealed voters' dates

of birth that exceeded the eldest recorded person living in New Jersey one such example is a

DOB of 1/1/1800 but is not limited to 1/1/1800.

Records provided indicated issues with Registration dates including but not limited to

dates of registration exceeding statutory deadline, day of voting election registration, and

registration subsequent to election date; the last of which may be a new registration but on the

record is clearly in violation of the law N.J.S.A 19:31-6. Voter status numbers as reported by the

SoS do not match those of the Counties as seen in the 2022 comparative analysis. Unfortunately,

this end-to-end identical analysis could not be verified for the years of 2020 and 2021 as the

requested reports were unfulfilled by custodian of record.

The incomplete data provided by the County Boards of Election made it impossible to do

a comprehensive comparative analysis of the inclusive data points. To ensure accurate and

reliable election outcome, verifiable and absent flawed or reliance on flawed registrant data points, with each election cycle, the State of NJ and County's data should be reconciled in advance of election certification.  Absent such initiatives as is the present case, the registrant reports cannot be reconciled and are non-conforming to federal law, therefore certification is promulgated on false election results.

In conclusion the analyst's findings indicate significant discrepancies between and among the County and State Voter Registration reports, indicating the records are not maintained.  The foregoing statement is well established in the data findings in the contrast/comparison analysis on each voter registration report.  Certification of elections built on the present model are unreliable and cannot pass logics tests due to inherent faults, in lieu, the SoS has opted for the Garden State risk-limited audit.

Case 3:24-cv-00040-ZNQ-TJB   Document 57-3   Filed 04/15/24   Page 136 of 163 PageID: 2797



**Liberty Project**
**2021 Election Voter History Analysis**
**Final Summary**

**November 20, 2023**

# Eligible Voter Calculations
# Executive Summary

**Statement of Fact and Purpose**     **Pg. 2**

**Methodology Part 1: NJ and County Populations; Voter Registrant Counts**     **Pg. 3**

**Methodology Part 2: Calculations**     **Pg. 6**

**Analysis and Findings**     **Pg. 23**

**Conclusion**     **Pg. 27**

**By John Caprio**
**Senior Research Analyst**

**Statement of Fact**

A count/estimate of the eligible voting age population does not exist for the State of New Jersey because it is ever changing due to the registration requirements. To register in NJ a person must be a United States citizen, at least 17 years of age (cannot vote until 18); have been a resident of the county for 30 days before the election; and not serving a sentence of incarceration.

The census bureau through the decennial census, along with the American Community Survey, provide counts of the US population, housing estimates and a plethora of other information. The two most important components for this report are the overall population for a region and the portion of that region that is over the age of 18 and a US citizen. While this is not the same as the eligible voting age population, it is very similar. Also, because it ignores some of the limiting factors of voter registration requirements, the count should be theoretically higher than the eligible voting age population. It is for this reason the over 18-year-old and citizen population was utilized in the analysis of voter registrations in the state of NJ. Also, for the purpose of this report any reference to over 18-years-old and citizen, 18+C, Voting Age Eligible, voting eligible population, will mean the same thing.

Voter registration statistic counts are kept by the Department of the State, Division of Elections and are reported by county and statewide. This makes a direct comparison to eligible voter estimates both possible and replicable for any points in time where both datasets exist or can be calculated.

ACS and census data, along with voter registration counts were formatted into spreadsheets, autofill calculations (to avoid bias and human error), graphs, and pivot tables were used. A hypothetical maximum number of eligible voting age people was calculated for the years 2000-2023 for each county and the state of NJ. Origination of data was through open source.


**Purpose**

To investigate what percentage of New Jersey's eligible voting age population is legally registered to vote. In addition, trends in eligible voting age population and registrant reports were analyzed. Open-sourced demographic data was used to calculate the hypothetical maximums which were then used to compare to open-sourced registrant data. The spreadsheets were built and used to help identify any irregularities or anomalies that exist over the 2000-2023 period.

*Some additional information on the datasets used and a more precise location on how to find them will be given in Methodology Part 1 beginning on Page 3. Calculations used to complete the datasets will be given in Methodology Part 2 beginning on Page 6. The analysis and findings appear in the final section starting on page 23.*

**Methodology Part 1: NJ and County Populations; Voter Registrant Counts**

*Population and Demographic Data*
As mentioned in the Introduction, all information gathered for this analysis was publicly sourced. It was all accessed online from two main sources: census.gov and nj.gov.  The following table provides a brief description of the datasets that were gathered and what they were used for.

There are four different Population counts that were accessed and analyzed from census.gov:

| Table type | Description |
|---|---|
| Decennial Census | This is the best and most comprehensive count of population.  The population is as of April 1st of the census year, occurs every ten years, and this analysis used the 2000, 2010, and 2020 datasets. |
| Intercensal/Annual Estimates of Resident Population | These provide an estimate for July 1st each year from the census year up until the year before the next census (Example July 2000 to July 2009).  This report looked at the 2000-2009, 2010-2019, and the 2020-2022 population estimates.  Note, there was also a 2020 estimate ahead of the 2020 census found, but the one for 2010 could not be located.  Further, a 2023 statewide population estimate came out in December 2023, but the county estimates will not be out until later in 2024. |
| The American Community Survey (ACS) 1-year population estimate | This is an estimate based on an annual survey of 3.5M households.  While these started in 2005, only 2010 and beyond were easily accessible. This report used the 2010-2019, 2021, and 2022 datasets.  *A special note, due to COVID-19 the census bureau did not release its standard 1-year estimates for the year 2020.  Moving forward throughout this report, for simplicity, when it is stated that ACS 1-year data was used for a span of years (for example 2010-2022), that 2020 is excluded from this. |
| ACS 5-year population estimate | This is similar to the 1-year, except the survey takes place over five calendar years. This report used the 2010 (encompassing 2006-2010) through 2022 (2018-2022). |

The above datasets were all found searching data.census.gov and search terms like population and the year.

There were multiple datasets downloaded and analyzed with regards to population, sex, age, and citizenship status. The following is a brief description of each table downloaded:

| Table | Description |
|---|---|
| DP2- Profile of Selected Social Characteristics from the 2000 Census | Prior to the ACS, citizenship and demographic data was given in the decennial census. While it makes locating the information easier, there is not nearly the detail that presently exists under the ACS. This table was used to provide the total population and the total citizen population. Note, 18+C was not given. |
| B05001- Nativity and Citizenship Status | The years 2010-2022 for 1-year datasets and 5-year datasets were used to analyze the total population and citizen population but does not provide 18+C information. |
| B05003- Sex by Age by Nativity and Citizenship Status | The years 2010-2022 for 1-year and 5-year datasets were used, as these provided an 18+C estimate broken out by sex. |
| DP05- ACS Demographic and Housing Estimates | The years 2010-2022 for 1-year and 5-year datasets were used to get total population estimates and the 18 and over population. As of 2015 it also began providing Citizen, Voting Age Population counts as well. These 18+C estimates were given as a total, as well as broken down by sex. |
| B29001- Citizen, Voting-Age Population by Age | The years 2018-2022 for 1-year and 5-year datasets were used to compare to DP05 and also provide additional detail to the 18+C population by age. |

These tables were also found on data.census.gov with search terms like citizenship, age, population, etc.

Once a table was found there were tabs allowing to easily click onto a different year or between 1-year and 5-year datasets. They could all be filtered by geography by clicking on the Geo button and selecting the parameters desired. For this analysis, the state of New Jersey was selected, and All Counties for NJ were also selected. Each table could be downloaded by clicking the more tools and then selecting the file type desired (for this analysis it was Excel).

The population numbers used, calculations made, and reasoning will be mentioned in Part 2.

4

*Voter Registrant Counts*

There were four different registration types accessed for analysis in this report. The following is a brief description of each:

| Type of Registration Report | Abbreviation used | Description |
| --- | --- | --- |
| General Election Day Voter Registration by County | GE-ED | These show the number of registered voters per county, broken down by party affiliation. The years 2000-2023 were used in this report. |
| Primary Election Day Voter Registration by County | PM-ED | These show the number of registered voters per county, broken down by party affiliation, but for the Primary Election. The years 2000-2023 were analyzed. |
| General Election Registered Voters and Ballots Cast | GE-TO | These show the number of registered voters, numbers of ballots cast, rejected, turnout percentage, and number of election districts. These are all broken out by county and the years 2000-2023 were analyzed. |
| Primary Election Registered Voters and Ballots Cast | PM-TO | These are the same as GE-TO reports, but for the primary. The years 2000-2023 were analyzed. |

These four types of election reports can all be located by going to nj.gov and clicking on the Government tab at the top and selecting Departments & Agencies. This will navigate to the Departments and Agencies page where Department of State can be found and clicking on the website, opens the Department of the State page. At the top of this page there is a tab for Elections and clicking on it will navigate to the New Jersey Voter Information Portal. The Statewide Voter Registration Statistics Archive (for GE-ED and PM-ED), Summary of Registered Voters and Ballots Cast (for most GE-TO and PM-TO), and the Election Results Archive can all be accessed by clicking on the resources tab at the top of the page or scrolling down the page there is also an Election Resources section. Once any report is opened it can be downloaded or printed into PDF format.

*Some special notes:

    1. The names of the Turnout reports vary over the years, but all show the same information.

    2. If a report is not located under the Summary of Registered Voters and Ballots Cast page, it can typically be found by clicking on the Election Results Archive and then the year for either General Election or Primary Election Information, navigating to that page.

    3. The 2001 and 2009 Primary Turnout reports could not be found.

**Methodology Part 2: Calculations**

*Population*

As mentioned in Part 1 there were four different population datasets downloaded and analyzed all administered by the Census Bureau.  The US Census estimate is the only one required by the US Constitution and is used to count the population and housing in all 50 states, the District of Columbia, Puerto Rico, and the Island Areas.  Results from each census determine the number of seats in the US House of Representatives, are used to draw congressional and state legislative districts, and the annual distribution of hundreds of billions of dollars in federal funds.[4]

In addition to this, the 2020 census population estimate came in much higher than both ACS estimates and the 2020 intercensal/annual estimate (before it was adjusted after the 2020 census count).  It is for these reasons that census population was selected as the basis for population.

To fill in non-census years 2001-2009 and 2011-2019, an annual growth rate was determined and applied to the state and each county.  A couple of calculation examples and screenshots of these calculations are on the next few pages.

Example 1.  NJ population estimate for 2001-2009.

10-year growth rate = 2010 population / 2000 population - 1
10-year growth rate = (8,791,894 / 8,414,764) - 1 ≈ 4.4818%

This is the 10-year change in population and needs to be adjusted to an annual rate.  This is a more precise estimate assuming consistent growth, as opposed to taking the net change and dividing it by 10.

The formula for average rate of change is [(rate of change +1)^(1/10)] -1, which is the same as saying the 10th root of the rate of change - 1.

1.044818^(1/10) − 1 ≈ 0.43939%.

Using this rate and multiplying it by the 2000 population will give the 2001 population change estimate.  Adding the 2001 population change estimate to the 2000 population will give the 2001 population estimate.  This can be simplified into the following equation, making it much easier to complete each year in the series.

2001 estimate = 2000 pop + {2000 pop * [(2010 pop / 2000 pop)^(1/10)] – 1}, lets substitute R for the [(2010 pop / 2000 pop)^(1/10)] portion of the equation.
2001 estimate = 2000 pop + [2000 pop * (R-1)]
2001 estimate = 2000 pop + 2000 pop * R – 2000 pop
2001 estimate = 2000 pop * R ; and now put back in the formula for R
2001 estimate = 2000 pop * [(2010 pop / 2000 pop)^(1/10)]
2001 estimate = 8,414,764 * [(8,791,894 / 8,414,764)^(1/10)] = 8,451,737

Trying it the longer way will also provide the same solution.

6

2001 estimate = 8,414,764 + {8,414,764 * [(8,791,894 / 8,414,764)^(1/10)]-1]
2001 estimate = 8,414,764 + (8,451,737 – 8,414,764)
2001 estimate = 8,414,764 + 36,973 = 8,451,737

Also, to predict any year in the series from 2001-2009, the 2000 population can be multiplied by the calculated rate of change risen to the power of (year – 2000).  For example, 2008 would be the 2000 pop X rate of change to the 8th power.

2008 estimate= 2000 pop * {[(2010 pop / 2000 pop )]^[(2008-2000)/10]}
2008 estimate = 8,414,764 * [(8,791,894 / 8,414,764)^(8/10)] = 8,715,139.
Note, rounding may cause a slight variance in calculated population, especially if rounded to the nearest whole number year after year.

*Note, all calculations shown can be done via a calculator or using Excel.

Example 2.  Morris County population estimate for 2011-2019

As mentioned on the previous page to predict any year in the series, the 2010 population can be multiplied by the calculated rate of change risen to the power of (year – 2010).  For example, 2017 would be the 2010 pop X rate of change to the 7th power.

2017 estimate= 2010 pop * {[(2020 pop / 2010 pop )]^[(2017-2010)/10]}
2017 estimate = 492,276 * [(509,285 / 492,276)^(7/10)] = 504,121

### *Population Continued*
The proceeding calculations will help fill in population estimates for the years 2001-2009 and 2011-2019.  For the years 2021 and 2022, the 1-year ACS population estimates were used because there is only a small variance between the 2021 1-year ACS and the intercensal estimates and for 2022 the estimates are identical.  For the 2023 population estimates different calculations must be completed, as there is only data for the years 2020-2022.  The formulas and some example calculations are below:

2023 growth rate = Average of 2021 and 2022 growth rates
Note, this is a two-year average rate of change.

Thus, 2023 growth rate = [(2022 pop / 2020 pop) ^ (1/2)] – 1

Example 3. NJ growth rate and 2023 population estimate:

2023 growth rate = [(9,261,699 / 9,288,994)^(1/2)] – 1
2023 growth rate = [(0.99706158)^(1/2)] – 1
2023 growth rate = 0.99852971 – 1 = -0.00147029 or approximately -.147029%

Note, the negative number is due to a slight decrease in population.  Like the formula used to get the population estimates on the previous pages, the formula for the 2023 population estimate can be simplified:

2023 population estimate = 2022 population * 2023 growth rate
2023 pop estimate = 2022 pop * [(2022 pop / 2020 pop) ^ (1/2)]
2023 pop estimate = 9,261,699 * [(9,261,699 / 9,288,994)^(1/2)]
2023 pop estimate = 9,261,699 * [(0.99706158)^(1/2)]
2023 pop estimate = 9,261,699 * 0.99852971 = 9,248,081.62 or rounding up to 9,248,082.


Example 4: Passaic County 2023 population estimate

2023 pop estimate = 2022 population * 2023 growth rate
2023 pop estimate = 513,936 * [(513,936 / 524,118)^(1/2)]
2023 pop estimate = 513,936 * [(0.98057308)^(1/2)]
2023 pop estimate = 513,936 * 0.99023890 = 508,919.42; rounding down to 508,919


*A special note regarding 2023 population.  As of December 2023, the census bureau released a statewide population estimate showing an increase of nearly 30,000 people, which is against the trend from 2020-2022.  There is no detail on the counties, as this will not be released until later in 2024.  This higher statewide total was also included in the analysis, and adjusted 2023 county estimates were made based on their 2023 percentage of the total NJ population (For example, Bergen County 2023 population was estimated at 951,632 and this would be approximately 10.29% of the NJ population.  Multiplying this by the higher NJ 2023 estimate population gives a 2023 adjusted Bergen population of 956,032.  The same estimate can be calculated by taking the higher NJ pop and dividing it by the lower NJ pop, then multiplying that ratio by the Bergen population).  The lower 2023 calculated totals are included in the main spreadsheet as 2023 and the higher estimates are included under 2023.1.  The net difference from the calculated population (9,248,042) and the new reported total (9,290,841) is 42,759 people.  This leads to an overall difference in 18+C of just under 30,000 statewide.*

*Another thing worth mentioning is 2022 percentage of total population could have been used, as it is the latest ACS data available.  This would also lead to all counties adding up to the statewide total of 9,290,841.  Accounting for trends county by county for 2023 led to the sum of all counties adding up to 9,248,804 versus the statewide estimate of 9,248,082; this is a surplus of 722 total people when comparing the data county by county.  Because of this the 2023 percentage estimates were chosen to use as the weight adjusted basis against the higher 2023 population estimate.  This leads to a sum of county populations of 9,291,567 versus the statewide total of 9,290,841 or a net surplus of 726 for the counties.*

***Percent of Population over 18, Percent over 18+C, and 18+C estimates***

After population estimates have been calculated and filled in, the next step is to determine the percentage of population that is over 18+C. The reason the 18+C percentage must be calculated is because the ACS population is understated most of the time compared to the census count and/or the population estimates calculated in this report. By calculating the 18+C percentage and then multiplying it by the total population estimates the 18+C estimate can be made. For consistency, even when the ACS population was higher than the census population the percentage calculations were made and then multiplied by the total population estimate (or actual count during census years).

The 1-year ACS data table B05003 was used to calculate the 18% and 18+C% values because these produced higher percentages compared to the 5-year datasets. The higher percentages lead to higher 18+C estimates. Below are a couple examples of how these percentages were determined and a comparison between 1-year and 5-year values.

Example 1: 2010 over 18-year-old % NJ using 1-year and 5-year data

Because table B05003 separates the population by sex the first step is to determine the total number of people that are over the age of 18. The next step is to divide that total by the total population.

2010 1-year ACS data 18+% = (Males over 18 + Female over 18) / Total population
2010 1-year ACS 18+% = (3,229,289 + 3,509,523) / 8,801,624
2010 1-year ACS 18+% = 6,738,812 / 8,801,624 = 0.7656328 or approximately 76.56%

2010 5-year ACS 18+% = (3,179,389 + 3,460,648) / 8,721,577
2010 5-year ACS 18+% = 6,640,037 / 8,721,577 = 0.76133445 or approximately 76.13%

Similarly, to get the 18+C% the total population that is over 18 and a citizen must be determined and then divided by the total population. Table B05003 gives native born and naturalized estimates by sex. Adding these four values together will give the ACS count for 18+C. Dividing by the total population will give the 18+C%.

Example 2: 2011 18+C% for Atlantic County

2011 1-year ACS 18+C% = (Over 18 Native born M + over 18 Naturalized M + over 18 Native F + over 18 Naturalized F) / Total population
2011 1-year ACS 18+C% = (79,867 + 11,332 + 88,916 + 11,986) / 274,338
2011 1-year ACS 18+C% = 192,101 / 274,338 = 0.70023475 or approximately 70.02%

2011 5-year ACS 18+C% = (80,582 + 10,199 + 89,473 + 10,180) / 273,674
2011 5-year ACS 18+C% = 190,434 / 273,674 = 0.69584250 or approximately 69.58%

With the 2000 census and the 2010-2022 1-year ACS data (excluding 2020), over 18% and 18+C% can be calculated for all those years. This was also done with 5-year data, as in some

instances 5-year data was needed. While the over 18% is not directly needed for the 18+C estimate, it can be used to compare the average age of each county and NJ and how the population age changes over time. Further, the change in ratio of 18+C% to over 18%, year over year, was used to estimate an 18+C% where no data was available (2020 had no county level 1-year ACS and 2023 data is not yet available). This will be further elaborated on a little later in this subsection. First, calculating 18+C estimates where percentages are more straightforward will be covered.

The calculation is as follows:

18+C estimate = pop estimate * 18+C%

Example 3: 18+C estimate for Bergen County 2011 and 2015

2011 18+C estimate = 2011 pop estimate * (2011 18+C%)
2011 18+C estimate = 910,055 * 66.801% = 607,925.84 or approximately 607,926

Taking the percentage out to more than two digits after the decimal allows for a better estimate as rounding to only 66.80% would yield a result of 607,917. Excel or a calculator would use even more precise numbers, but the variance becomes less and less, so for simplicity a few decimals should be good enough, but there may be some slight variance in the examples to what Excel or a calculator will show.

2015 18+C estimate = 2015 pop estimate * (2015 18+C%)
2015 18+C estimate = 930,080 * 68.173% = 634,063.44 or approximately 634,063.

This formula allows the years 2000 and 2010-2022 (excluding 2020) to be estimated. The years 2001-2009 for over 18% and 18+C% are calculated the same way the population growth rate was calculated due there not being any data available. The formulas and a couple examples are below.

Example 4: over 18% NJ in 2001 and 18+C% Cumberland County in 2004

2001 over 18% = 2000 over 18% * (2010 over 18% / 2000 over 18%)^(1/10)
2001 NJ over 18% = 75.263% * (76.563% / 75.263%)^(1/10)
2001 NJ over 18% = 75.263% * 1.001714 = 75.392%

2004 18+C% = 2003 18+C% * (2010 18+C% / 2000 18+C%)^(1/10)
2004 Cumberland County 18+C% = 75.036% * (76.039% / 74.610%)^(1/10)
2004 Cumberland 18+C% = 75.036% * 1.00189898 = 75.17849% or approximately 75.178%

With these two formulas the years 2001-2009 can now be calculated allowing for over 18% and 18+C estimates for the years 2000-2019 and 2021-2022.

The formulas and calculations for over 18% and 18+C% for 2020 and 2023 will be covered on the next six pages.

10

For the year 2020 the census gives numerical and percentage data for the population over 18 for NJ and all counties.  However, it only rounds to the tenths digit (one after the decimal point).  Dividing the over 18 population by the total population and keeping five or six digits after the decimal will allow for more precise estimates when calculating the 18+C%.

Multiple methods were considered for estimating 2020 18+C% for NJ and all counties:

1. Using the 2020 5-year ACS data directly, but this would have led to a large understatement, as the 2020 ACS has nearly 350,000 less people over the age of 18 compared to the 2020 census count.
2. Using 5-year ACS 18+C% and multiplying them by the 2020 census counts.  This will give a better estimate for 2020 compared to the first option.
3. Using the 5-year ratio of 18+C%/over 18% and multiplying that by the 2020 census over 18 count.
4. Taking the average of the 2019 and 2021 1-year ACS 18+C percentages and multiplying them by the 2020 census counts.
5. Calculating the average ratio of 2019 and 2021 1-year ACS 18+C%/over 18% and multiplying that by the 2020 census over 18 count.

While it is easy to rule out the first method, some deeper analysis is required to determine which of the four remaining methods provides the highest 18+C Estimates.

As mentioned above the census provided an over 18%, so this can be compared to the 1-year ACS average that was calculated and the 2020 5-year ACS data.  Statewide and most counties show a higher over 18% on the 2020 census compared to the other two datasets.

| State or County | 2020 Census | 1-year estimate | difference | 5-year ACS | difference |
|---|---|---|---|---|---|
| NJ | 78.386% | 78.187% | 0.199% | 78.02% | 0.371% |
| Atlantic | 79.405% | 79.023% | 0.382% | 78.74% | 0.663% |
| Bergen | 79.022% | 78.960% | 0.062% | 78.79% | 0.227% |
| Burlington | 79.116% | 79.370% | -0.254% | 79.15% | -0.037% |
| Camden | 77.653% | 77.393% | 0.261% | 77.22% | 0.428% |
| Cape May | 82.898% | 82.881% | 0.017% | 82.47% | 0.433% |
| Cumberland | 76.821% | 76.005% | 0.816% | 75.99% | 0.833% |
| Essex | 76.588% | 76.307% | 0.280% | 76.21% | 0.380% |
| Gloucester | 78.493% | 78.435% | 0.058% | 78.12% | 0.373% |
| Hudson | 80.396% | 79.689% | 0.707% | 79.56% | 0.839% |
| Hunterdon | 80.669% | 81.279% | -0.610% | 80.69% | -0.017% |
| Mercer | 78.658% | 78.762% | -0.105% | 78.67% | -0.016% |
| Middlesex | 78.781% | 78.409% | 0.372% | 78.23% | 0.555% |
| Monmouth | 79.499% | 79.152% | 0.348% | 78.80% | 0.695% |
| Morris | 79.247% | 79.303% | -0.056% | 78.87% | 0.378% |
| Ocean | 75.734% | 75.547% | 0.187% | 75.92% | -0.187% |
| Passaic | 77.047% | 76.307% | 0.740% | 76.15% | 0.893% |
| Salem | 77.946% | 78.573% | -0.626% | 78.50% | -0.551% |
| Somerset | 78.528% | 78.603% | -0.076% | 78.09% | 0.441% |
| Sussex | 80.741% | 80.648% | 0.093% | 80.26% | 0.479% |
| Union | 76.625% | 76.612% | 0.012% | 76.52% | 0.107% |
| Warren | 80.103% | 80.749% | -0.646% | 80.28% | -0.176% |

11

Since the census over 18% is higher, this should theoretically have led to a higher 18+C% if citizenship was counted on the 2020 census. There is a way to estimate this which will lead to higher 18+C estimates and thus, method 2 and 4 on the previous page can also be ruled out. To work towards this, the 18+C to over 18 ratio (called the 18C-ratio for simplicity) must be calculated.

This is a straightforward calculation:

18C-ratio = 18+C% / over 18% or 18+C count / over 18 count

Example 5: 18-C ratio for NJ in 2020 using 5-year data

2020 18C-ratio = 69.29% / 78.02% = 0.8881 or 88.81%

or alternatively = 6,156,380 / 6,931,965 = 0.8881 or 88.81%

What this ratio is giving is the percentage of people that are citizens and over 18 out of the over 18 population.

2020 5-year calculations will allow for 18+C estimates described in method 3 on the previous page.

The method used to get a 2020 estimate using 1-year ACS data is taking the average ratio of 2019 and 2021. This calculation is as follows:

2020 18C-ratio = Average of 2019 and 2021 18C-ratios
2020 18C-ratio = Average of [(2019 18+C% / over 18%) * (2021 18+C% / over 18%)]
2020 18C-ratio = [(2019 18C-ratio) * (2021 18C-ratio)]^(1/2)

Example 6: 2020 18C-ratio for Union County using 1-year data:

2020 18C-ratio = [(63.60% / 76.62%) * (62.84% / 76.60%)]^(1/2)
2020 18C-ratio = (83.00% * 82.03%)^(1/2)
2020 18C-ratio = (.68086)^(1/2) = 0.8251 or 82.51%

Doing this for every year from 2010-2022 was not required for the final analysis, but it does provide another dataset to analyze how the demographics of NJ change over time. However, once the 2020 5-year and 1-year 18C-ratios have been calculated the final two methods for 18+C estimates can be completed.

A quick example of each will be shown on the next page along with a comparison of all 2020 18+C estimates to see which option produces the highest and best estimates.

12

The 2020 18+C estimate under methods 3 and 5 can be calculated as follows:

2020 18+C Estimate = 2020 18C-ratio * 2020 over 18 population

The only difference between method 3 and 5 is the 18C-ratio used; for method 3 the 5-year ACS ratio is used and under method 5 the average of 2019 and 2021 1-year ratios is used. A quick example of each follows.

Example 7: 2020 Ocean County 18+C estimate using 5-year ACS ratio (method 3)

18+C estimate = 0.967617 * 482,600 = 466,971.96 or 466,972 people

Example 8: 2020 Ocean County 18+C estimate using average 2019 and 2021 1-year ACS ratios (method 5)

18+C estimate = 0.963559 * 482,600 = 465,013.09 or 465,013 people

Note, in both calculations 6 digits after the decimal were used as this kept the difference to less than one to what excel or a calculator with storage capabilities would show. These calculations were done in Excel for statewide and each county.

| County or State | 1-year average ratio | 5-year 2020 ratio | variance | 2020 over 18 pop | 1-year ratio | 5-year ratio | net difference |
|---|---|---|---|---|---|---|---|
| NJ | 0.888156308 | 0.888114698 | 0.0000416 | 7,281,310 | 6466941.41 | 6466638.43 | 303 |
| Atlantic | 0.919796845 | 0.91757282 | 0.0022240 | 217,993 | 200509.274 | 200024.452 | 485 |
| Bergen | 0.882662584 | 0.874223042 | 0.0084359 | 755,234 | 666616.794 | 660242.965 | 6374 |
| Burlington | 0.961248514 | 0.959907717 | 0.0013408 | 365,405 | 351245.013 | 350755.079 | 490 |
| Camden | 0.943423969 | 0.94662612 | (0.0032022) | 406,504 | 383505.617 | 384807.304 | -1302 |
| Cape May | 0.971609854 | 0.974897313 | (0.0032875) | 78,971 | 76729.0018 | 76988.6157 | -260 |
| Cumberland | 0.911211376 | 0.924504809 | (0.0132934) | 118,421 | 107906.562 | 109480.784 | -1574 |
| Essex | 0.843718288 | 0.852708364 | (0.0089901) | 661,508 | 558126.397 | 564073.405 | -5947 |
| Gloucester | 0.979500392 | 0.977333456 | 0.0021669 | 237,281 | 232416.833 | 231902.66 | 514 |
| Hudson | 0.756042346 | 0.747606434 | 0.0084354 | 582,751 | 440584.433 | 435668.397 | 4916 |
| Hunterdon | 0.95429118 | 0.95351211 | 0.0007791 | 104,020 | 99265.3686 | 99184.3297 | 81 |
| Mercer | 0.869778253 | 0.865912026 | 0.0038662 | 304,672 | 264997.08 | 263819.149 | 1178 |
| Middlesex | 0.840901561 | 0.844909735 | (0.0040082) | 680,009 | 571820.63 | 574546.224 | -2726 |
| Monmouth | 0.951876954 | 0.943891651 | 0.0079853 | 511,670 | 487046.881 | 482961.041 | 4086 |
| Morris | 0.911829178 | 0.913082638 | (0.0012535) | 403,593 | 368007.874 | 368513.761 | -506 |
| Ocean | 0.963558504 | 0.967616801 | (0.0040583) | 482,600 | 465013.314 | 466971.868 | -1959 |
| Passaic | 0.833727901 | 0.831622579 | 0.0021053 | 403,816 | 336672.666 | 335822.503 | 850 |
| Salem | 0.988646154 | 0.98317093 | 0.0054752 | 50,538 | 49964.1993 | 49687.4924 | 277 |
| Somerset | 0.883281726 | 0.886184854 | (0.0029031) | 271,204 | 239549.537 | 240336.877 | -787 |
| Sussex | 0.975747148 | 0.97460368 | 0.0011435 | 116,445 | 113620.877 | 113487.725 | 133 |
| Union | 0.825143442 | 0.834179158 | (0.0090357) | 440,856 | 363769.437 | 367752.887 | -3983 |
| Warren | 0.957169234 | 0.962287492 | (0.0051183) | 87,819 | 84057.645 | 84507.1252 | -449 |
| Total Variance | | | | | | | 194 |

Looking at the 21 counties and statewide values it appears the 1-year average ratios are higher 12 times compared to 5-year ratios. Adding up total variances produces a slightly negative number

13

potentially indicating that 5-year ratios would lead to a higher 18+C estimate. This is also true when adding up the net differences for all 21 counties, a sum of -109. However, when calculating 18+C estimates for all 21 counties and the state, the net differences show that 1-year data produces a slightly higher 18+C estimate. Either method would provide a "best estimate," but since the 5-year ratios are based on ACS datasets, these were ultimately chosen. Also, when it comes to estimating 2023 values, 2020 data was used, so it is better to use ACS data instead of estimates.

As mentioned earlier in this subsection, the calculation used to estimate 18+C for any year is:

18+C estimate = pop estimate * 18+C%

At first glance this appears different from the way 2020 18+C estimates were calculated, but they are the same. The following proves this.

18+C estimate = over 18 pop * 18C-ratio
18+C estimate = (pop estimate * over 18%) * (18+C% / over 18%)
The over 18%'s "cancel out" leaving: 18+C estimate = pop estimate * 18+C%.

Granted the over 18 pop uses the over 18% from the census and the 18C-ratio uses the over 18% from the ACS, so the real equation would look like this:

18+C estimate = (pop estimate * over 18% Census) * (18+C% / over 18% ACS)
18+C estimate = pop estimate * [(18+C% * over 18% Census) / over 18% ACS].

The term [(18+C% * over 18% Census) / over 18% ACS] can be called 18+C% adjusted or 18+C% adj (as it is adjusting the 18+C% by the difference between the over 18% from the census and the over 18% from the ACS).

And therefore the 2020 18+C estimates can be rewritten as:
18+C estimate = pop estimate * 18+C% adj

The adjusted 18+C% are what appear on the final spreadsheet for the year 2020 and multiplying that by the total population is how the 18+C estimates are derived. Note, this method produces the same results as method 3 and can be seen on the spreadsheet on the previous page under the 5-year ratio column.

2023 is the final year that needs to be calculated for the final comparison of 18+C estimates versus registered voters. This will be covered on the next few pages.

14

Similar to 2020, there is limited data for 2023, but with respect to 2023, this is due to the ACS data not being out at the time of this report (Typically 1-year data comes out September the following year and 5-year data is released December the following year).  Because of this, all of 2023 over 18% and 18+C% need to be calculated/estimated.

Also, like 2020 there were multiple methods considered and analyzed when it came to estimating 2023 O18% and 18+C%:

1.  2022 base multiplied by the average growth rate from 2020-2022 using main spreadsheet data for O18% and 18+C%.  Note, this is a combination of 2020 census (for O18% in 2020), 5-year ACS 2020 ratio adjusted to the 2020 census O18% (18+C% for 2020), and all other data is 1-year ACS.
2.  2022 base multiplied by the average growth rate from 2020-2022, but using 1-year ACS data for O18% and 18+C%, with exception of substituting the 2020 census O18% and using the 2020 18C-ratio estimate (2-year average of 2019 and 2021) to get a 2020 18+C%.
3.  2022 base multiplied by the average growth rate from 2020-2022, but using 5-year ACS data for O18% and 18+C%, with exception of substituting the 2020 census O18%.
4.  2022 base multiplied by the average growth rate from 2018-2022 using main spreadsheet data for O18% and 18+C%.  Note, while this includes 2020 Census data for O18% and 5-year ACS for the 2020 18+C%, these ultimately get canceled out when dealing with growth rates and thus this dataset is the same as 1-year ACS.
5.  2022 base multiplied by the average growth rate from 2018-2022 using 5-year ACS data for O18% and 18+C%.

For methods 1-3 the formulas are essentially the same, but as mentioned the data inputs are different:

2023 O18% estimate = 2022 O18% * [(2022 O18% / 2020 O18%)^(1/2)]

2023 18+C% estimate = 2022 18+C% * [(2022 18+C% / 2020 18+C%)^(1/2)]

For methods 4 and 5 the formulas are the same, but with different data inputs:

2023 O18% estimate = 2022 O18% * [(2022 O18% / 2018 O18%)^(1/4)]

2023 18+C% estimate = 2022 18+C% * [(2022 18+C% / 2018 18+C%)^(1/4)]

For all methods the 18+C estimate = 2023 pop * 2023 18+C%

As mentioned previously the 5-year ACS data for O18% and 18+C% tends to be lower than the 1-year ACS data, and a few calculations would prove this rather quickly, so for this reason methods 3 and 5 can be eliminated leaving methods 1, 2, and 4 remaining for the "best estimate."

Calculating the 18+C% under each method and then multiplying that by the total population will give the 18+C estimate. This was done for all remaining methods and a screenshot of these calculations is below.

| County or State | 2023 Population | Method 1 EV 2-year | Method 2 1-year acs 2yr | net difference | Method 4 1-year acs 4 | net difference |
|---|---|---|---|---|---|---|
| NJ | 9,248,082 | 6,446,343 | 6,446,192 | 151 | 6,445,870 | 473 |
| Atlantic | 276,192 | 204,964 | 204,716 | 248 | 204,659 | 305 |
| Bergen | 951,632 | 671,451 | 668,233 | 3,218 | 670,172 | 1,279 |
| Burlington | 468,239 | 354,498 | 354,251 | 247 | 354,439 | 59 |
| Camden | 525,619 | 377,665 | 378,305 | (640) | 379,249 | (1,584) |
| Cape May | 95,820 | 77,402 | 77,533 | (131) | 76,963 | 439 |
| Cumberland | 149,977 | 101,436 | 102,174 | (738) | 101,905 | (469) |
| Essex | 842,440 | 542,123 | 545,003 | (2,880) | 543,657 | (1,534) |
| Gloucester | 308,777 | 237,408 | 237,146 | 262 | 237,727 | (319) |
| Hudson | 692,862 | 436,895 | 434,451 | 2,444 | 435,878 | 1,017 |
| Hunterdon | 130,194 | 102,208 | 102,166 | 42 | 101,682 | 526 |
| Mercer | 377,405 | 249,203 | 248,649 | 554 | 250,242 | (1,039) |
| Middlesex | 860,547 | 569,583 | 570,939 | (1,356) | 570,539 | (956) |
| Monmouth | 644,340 | 487,661 | 485,611 | 2,050 | 487,164 | 497 |
| Morris | 512,087 | 383,224 | 383,487 | (263) | 379,878 | 3,346 |
| Ocean | 665,189 | 482,175 | 483,190 | (1,015) | 481,995 | 180 |
| Passaic | 508,919 | 320,226 | 319,822 | 404 | 321,388 | (1,162) |
| Salem | 65,257 | 51,579 | 51,436 | 143 | 51,336 | 243 |
| Somerset | 347,634 | 246,719 | 247,124 | (405) | 244,791 | 1,928 |
| Sussex | 147,025 | 116,326 | 116,258 | 68 | 116,389 | (63) |
| Union | 567,070 | 351,352 | 353,270 | (1,918) | 353,285 | (1,933) |
| Warren | 111,579 | 85,782 | 86,011 | (229) | 85,582 | 200 |
| | | sum of net diff. | | 256 | | 1,433 |

The net differences in column 5 is 18+C estimate using Method 1 – Method 2 and then in column 7 is Method 1 – Method 4. While method 4 uses data over a larger timeframe, it produces a slightly lower value than under both methods 1 and 2. It also ignores 2020 census data, as these values are "canceled out" in the average rate of growth calculation. Finally, it is not consistent with how the 2023 population estimates were derived (avoided using 2018 and 2019 as they too were estimates based on 2010 and 2020 population figures). For these reasons, method 4 can be eliminated. This leaves methods 1 and 2 and by comparing the values are very close. Because Method 1 produces slightly higher 18+C estimates and includes a 2020 5-year ACS data point to estimate the 2020 18+C estimate versus Method 2 where the 2020 1-year ACS data does not exist and had to be estimated to then estimate a 2020 18+C estimate, Method 1 was chosen as the better estimate.

With this the percent of the population over 18, percent over 18+C, and 18+C estimates can be calculated for all years 2000-2023.

16

*Margin of Error*

Now that 18+C estimates can be made for all years from 2000-2023, there is only one component missing before 18+C estimates can be compared to voter registration statistics and that is the Margin of Error. The margin of error is a statistic expressing the amount of random sampling error in the results of a survey. The MOE utilized by the ACS is for a 90% confidence interval and as of 2010 each dataset reports a specific + and – number for each datapoint. Taking that datapoint and then adding the MOE to it will provide the upper bound and subtracting the MOE from the same datapoint will provide the lower bound. What this means is there is an approximately 90 percent probability that the true value lies within the lower and upper bounds.

For example, in 2011 the ACS estimated that Atlantic County had 274,338 people residing in that county and of that the ACS estimated that 133,115 were males. The margin of error was stated as + or – 312. So, in this case, the lower bound is 132,803, and the upper bound is 133,427. There is approximately a 90% probability that the number of males living in Atlantic County in 2011 was between 132,803 and 133,427.

For this analysis the MOE that is needed is for the 18+C estimates and, only the upper bound is necessary, as this is the hypothetical maximum number of voting aged citizens in a given year. Starting in 2015 the ACS began providing Citizen, Voting Age Population counts on table DP05. These 18+C estimates were given as a total, as well as broken down by sex. Further starting with the 2018 ACS table B29001 became available providing some additional details of the 18+C population. Both tables DP05 and B29001 provide MOE figures for the 18+C estimates, so the only calculation that needs to be made is adjusting the MOE for the population estimates calculated in this report. This is a two-part calculation:

First, the MOE % of pop must be calculated. This is MOE / ACS population. Then that MOE% can be multiplied by the higher population estimates. These two equations could also be combined. A quick example of this for Essex county in 2018.

2018 Essex MOE = 2018 Essex MOE / 2018 Essex ACS Pop * 2018 Essex Pop estimate
2018 Essex MOE = 5,677 / 799,767 * 847,152 = 6,013.35 or approximately 6,013.

The margin of error can then be added to the 18+C estimate to give a maximum expected value. In this case the 2018 Essex 18+C estimate is 552,429, so adding 6,013 to that will give a maximum value of 558,442. In theory there should be approximately 90% confidence that the registered voter total will not be above this maximum value.

For the years 2015-2019 and 2021-2022 the MOE% were taken directly from the 1-year ACS tables. These were all adjusted based on the population estimates that were made. However, the MOE for 2000-2014, 2020, and 2023 still need to be calculated to complete the datasets.

For the years 2010-2014 the ACS only provides MOE for over 18 citizens broken out by sex. In order to estimate an MOE for combined population a simple method would be to add up the MOE for all components, but this would be statistically incorrect. A Google search for the terms "sums of margin of error ACS" produced results navigating back to a document on census.gov and the ACS. To find the document on census.gov, navigate to the census website. At the top of

17

the page there are tabs. Under the Surveys & Programs tab click on American Community Survey (ACS). This will navigate to the ACS page. On the left-hand side click on Technical Documentation, taking the user to this page. On the left-hand side or the first heading on the middle of the page is Code Lists, Definitions, and Accuracy. Clicking on that will open the corresponding page. In the middle of the page there are two columns, in the right column and the second heading down the Worked Examples for Approximating Margins of Error document can be found.

Inside this document it explains how to convert the MOE to the standard error (SE) by simply dividing the MOE by 1.645. The reason why the SE is needed at first glance is because the formulas given are for combined SE and not MOE. On page 4 and 5 of the Worked Examples document the following formula and information is given:

The standard error of the sum or difference of two sample estimates is the square root of the sum of the two individual standard errors squared plus a covariance term. That is, for standard errors SE(X1) and SE(X2) of estimates X1 and X2:

$$SE(X_1 \pm X_2) = \sqrt{[SE(X_1)]^2 + [SE(X_2)]^2 \pm 2cov(X_1 X_2)}$$

The covariance measures the interactions between two estimates. Currently the covariance terms are not available. The other approximation formula provided in this document also do not take into account any covariance.

For calculating the SE for sums or differences of estimates, data users should therefore use the following approximation:

$$SE(X_1 \pm X_2) = \sqrt{[SE(X_1)]^2 + [SE(X_2)]^2}$$

However, it should be noted that this approximation will underestimate or overestimate the standard error if the two estimates interact in either a positive or a negative way.

While this only provides the sum of two estimates it can be written for an infinite amount of estimates:

SE(Xn) = (SE1$^2$ + SE2$^2$ +…+ SEn$^2$)^(1/2)

Stated verbally the Standard Error for n estimates is the square root of the sum of the Standard Errors squared.

The Worked Examples document shows how to use MOE, convert them to SE and then proceed with the calculation, and then convert back to the combined MOE. However, these equations can be combined and simplified into a single MOE equation. This is shown on the next page.

SEn = MOEn / 1.645
SEn = (SE1$^2$ + SE2$^2$ +…+ SEn$^2$)^(1/2)
SEn =[(MOE1 / 1.645)$^2$ + (MOE2 / 1.645)$^2$ +…+ (MOEn / 1.645)$^2$]^(1/2)
MOEn / 1.645 = [(MOE1 / 1.645)$^2$ + (MOE2 / 1.645)$^2$ +…+ (MOEn / 1.645)$^2$]^(1/2)
MOEn = 1.645 * {[(MOE1$^2$ + MOE2$^2$ +…+MOEn$^2$)^(1/2)] / [(1.645$^2$)^(1/2)]}
MOEn = 1.645 * [(MOE1$^2$ + MOE2$^2$ +…+MOEn$^2$)^(1/2)] / 1.645

Thus, MOEn = [(MOE1$^2$ + MOE2$^2$ +…+MOEn$^2$)^(1/2)].

This equation is used on page 14 of the Worked Example document and the document does state on Page 3 that data users do not need to convert the MOEs obtained from data.census.gov to SEs before using these formulas. Instead, simply replace the SEs in the formulas with the appropriate MOEs. However, the document did show how or why this is true, which is why it was proven above.

This MOE equation was used to calculate the MOEs for 18+C estimates for the years 2010-2014. There are four variables that are needed like the 18+C and 18+C% estimates on page 11. Here is the equation with the four variables that are needed:

MOE$_{18+C}$ = [(MOE of O18 Native born M)$^2$ + (MOE O18 Naturalized M)$^2$ + (MOE O18 Native F)$^2$ + (MOE O18 Naturalized F)$^2$]^(1/2)

The MOE$_{18+C}$% is found by dividing the MOE by the total ACS population. This is done to then adjust the MOE for the estimated population that was calculated or multiplying MOE% by the estimated population.

Here is an example for Mercer County in 2012.

Mercer 2012 MOE$_{18+C}$ = (2,524$^2$ + 2,233$^2$ + 2,411$^2$ + 1,955$^2$)^(1/2)
Mercer 2012 MOE$_{18+C}$ = (6,370,576 + 4,986,289 + 5,812,921 + 3,822,025)^(1/2)
Mercer 2012 MOE$_{18+C}$ = (20,991,881)^(1/2) / 368,303 = 4581.68 or approximately 4,582

Dividing this by the 2012 Mercer population will give the MOE% or what percentage of the population the MOE represents.

Mercer 2012 MOE% = 4,582 / 368,303 = 0.01244084 or approximately 1.244084%

This can then be adjusted for the higher estimated population used in the analysis.

Mercer 2012 MOE = 1.244084% * 370,587 = 4,610.41 or approximately 4,610. Adding this to the 18+C estimate gives the upper bound or expected maximum for registered voters. Further, MOE can now be calculated or found directly on the ACS for the years 2010-2019 and 2021-2022.

For any instance where the ACS gave MOEs for 18+C they were used, but the longer calculations were also performed. Using the MOE calculation produced higher MOEs than what

19

was listed for the ACS in every calculation.  These higher calculated values are what were used to create estimates for 2000, 2020, and 2023 MOEs to not risk understating the Margins of error.

2000 was first estimated so the years 2001-2009 where no data could be found could be estimated in a fast and efficient manner.  It will later be shown that the years 2000-2010 do not produce estimates where the number of registered voters approaches the assumed maximums, so producing a more detailed calculation would not be the best use of time and resources.

For the 2000 estimate the average of all calculated MOE% were used.  That means the average of (2010MOE%, 2011MOE%,…, 2019MOE%, 2021MOE%, 2022MOE%).  Here is a quick example of this:

2000Salem County MOE% = (1.086924% + 1.819368% + 1.322711% + 1.519197% + 1.169744% + 1.313493% + 1.177565% + 1.923812% + 1.788937% + 1.149315% + 1.18839% + 2.010228%) / 12 = 1.455807%

Multiplying this by the total population of 64,285 produces a total MOE of 936.

Note, while a hybrid method using ACS data where available and the higher calculated values when not could also be used, this would result in an MOE% of 1.282082% or an MOE of 824. Using the higher estimate further prevents the chance of accidentally underestimating the MOE.

Now that 2000 MOEs can be calculated, the method used to populate the years 2001-2009 can be shown.  This method is the same that was used to estimate population, O18, and 18+C%.

MOE%$_{2001to2009}$= 2000MOE% * {[(2010MOE% / 2000 MOE% )]^[(year-2000)/10]}

Here is a quick example of this for Monmouth County in 2005.

2005Monmouth MOE% = 0.836556% * {[(0.805432% / 0.836556%)]^[(2005-2000)/10]}
2005Monmouth MOE% = 0.00836556 * [(0.96279508)^(5/10)]
2005 Monmouth MOE% = 0.00836556 * 0.98122122 = 0.00820846 or 0.8208846%
2005 Monmouth MOE = 0.8208846 % * 622,771 = 5,112.23 or 5,112.

This now allows the years 2001-2009 to be estimated, leaving just 2020 and 2023.

Since there is no 1-year ACS for 2020 a few different approaches were considered.  The first would be to use the 5-year ACS data.  However, the margins of error for the 5-year data are significantly less than 1-year data.  This would likely lead to an understatement.

Another method that was considered was taking the ratio of 1-year MOEs to 5-year data for either the years 2019 and 2021 or 2018, 2019, 2020, 2021.  Using the averages of these ratios and then multiplying them by the 2020 5-year ACS MOE% produced higher MOEs compared to using 5-year ACS alone.  MOE% were all calculated using ACS data that was available.  The next step is to divide the 1-year MOE% by the 5-year MOE% producing a ratio.  This ratio shows that the 1-year ACS MOE% is 2.2 times higher than the 5-year for 2018, and so on.

20

Taking the average of 2019 and 2021 produced a ratio of 2.3727. Multiplying that by the 2020 5-year ACS MOE% produced a 1-year MOE% estimate of 0.267144%. The MOE% would produce a population adjusted MOE of 24,465.

Here is a quick look at NJ for the two-year average ratio:

| YEAR | ACS 1-year | ACS 5-year | ratio 1 to 5 |
|------|-----------|-----------|--------------|
| 2018 | 0.202941% | 0.092244% | 2.2000 |
| 2019 | 0.222704% | 0.092594% | 2.4052 |
| 2020 | 0.267144% | 0.112589% | 2.3727 |
| 2021 | 0.228658% | 0.097704% | 2.3403 |
| 2022 | 0.203062% | 0.096356% | 2.1074 |

And here is the four-year average ratio:

| YEAR | ACS 1-year | ACS 5-year | ratio 1 to 5 |
|------|-----------|-----------|--------------|
| 2018 | 0.202941% | 0.092244% | 2.2000 |
| 2019 | 0.222704% | 0.092594% | 2.4052 |
| 2020 | 0.254815% | 0.112589% | 2.2632 |
| 2021 | 0.228658% | 0.097704% | 2.3403 |
| 2022 | 0.203062% | 0.096356% | 2.1074 |

Because the ratios in 2018 and 2022 are lower than 2019 and 2021, the four-year average is lower in this case. This fluctuates county by county which method produces a higher MOE%.

One final method was considered and that is taking the two-year average from the calculated MOE%. For example, 2020 NJ MOE% under this third method is as follows:

2020MOE% = (2019MOE% + 2021 MOE%) / 2
2020MOE% = (0.272973% + 0.310895%) / 2 = 0.291934%

This would give a 2020 population adjusted MOE of 27,118. This is the highest estimate and thus would be the best at limiting the chance of understating the margin of error. This method almost always produced the highest MOE% estimate and thus it was chosen to produce MOE estimates for 2020.

The only remaining year left to calculate MOEs for is 2023. Looking at the MOEs from the ACS data, it is clear they fluctuate each year, as it is a measure of the statistical uncertainty or potential sampling error associated with the estimates derived from the dataset. Thus, the two-year average growth rate * 2022 base will not work with respect to calculating 2023 MOE% and MOE estimates. Because 2023 calculations are all based on estimates, a method to produce a larger MOE% should be used. Using the same method as 2000 was considered, but when comparing it to taking the average of the 2021 and 2022 MOE's it was always lower and thus the average calculated MOE% for 2021 and 2022 is what was chosen as an estimate for 2023. As with other year estimates using the calculate MOEs instead of the ACS values produces a higher MOE estimate and reduces the risk of understating the MOE. A brief example of a 2023 MOE calculation in on the next page.

21

2023 Gloucester County MOE% and population adjusted MOE.

Gloucester 2023 MOE% = (2021MOE% + 2022MOE%) / 2
Gloucester 2023 MOE% =  (0.871659% + 0.933787%) / 2 = 0.902723%
Gloucester MOE = 0.902723% * 308,777 = 2,787

With the 2023 calculation, now MOEs can be estimated for all years from 2000-2023.  These MOEs can be added to the 18+C estimates to produce the upper bound, which is the values needed to compare to the voter registrant data.

### *Methodology Summary*
A quick recap summarizing how to go from raw data to calculating 18+C upper bounds.

First, population figures must be calculated to see what the total population is for a county or statewide each year.  The Decennial census is the basis for population calculations.

Next, the O18% and 18+C% should be determined from the ACS or the census (in the case of 2000 data).  When 18+C% are not directly given, table B05003 can be used to calculate it.

To estimate the 18+C population each year the 18+C% must be multiplied by the estimated population. Due to the 2020 census count coming higher than the ACS estimates, this is a critical step in determining a reasonable estimate for voting age eligible citizens in a location at a given time.  For example, the 2019 ACS estimate for 18+C in NJ was 6.170M, but adjusting this to the higher population estimate in the report gives an 18+C estimate of 6.417M, a difference of 247,000 people.

After 18+C has been determined, the Margin of error % should be found.  When the 1-year ACS provides data, those values should be used, but adjusted up for the higher population estimates.  When they are not given the sum of margins equations should be utilized to determine an MOE% estimate.  While these may lead to an overstatement of MOE, it is better to err on the side of caution, as an understatement could lead to false positives for over registration of the voting populace.

Finally, adding the MOE to the 18+C estimate will give the upper bound or 90% confidence level that the estimate is the maximum number of voting age eligible citizens.

With these values a comparison can now be performed against the voter registration statistics to see approximately what percentage of voting age eligible persons are registered to vote each year from 2000-2023.

## Analysis and Findings

Analysis and findings were grouped into five different categories:

1. Over 18% and 18+C% trends for the years 2000-2023

2. Registered voter counts from statewide registration and turnout reports for Primaries and General Elections compared to the calculated 18+C and 18+C Max or the maximum calculated voting age eligible population.

3. Election report type comparisons to each other. General Election statewide reports versus turnout reports and the same for the two Primary reports.

4. Changes in registered voters from Primary reports to General Election reports. Primary statewide registration to General Election statewide registration reports and the same for turnout reports to each other.

5. Contrast and compare the changes of Statewide Voter Registrants and County Turnout Voter Registrants for the Primary and General elections year over year.

### *18% and 18+C% trends*

The data from the ACS, census, and calculated estimates shows that all counties and New Jersey, except for Ocean County, have increased as a percentage of the population over the age of 18 from the years 2000-2023. The change in the percentage of the population over the age of 18 varies from a couple percentage points (Cumberland for example 74.61% in 2000 to 76.06% in 2023) to almost 9% (Sussex County 72.16% in 2000 to 80.97% in 2023). The county with the highest percentage of population over the age of 18 was Cape May for all years 2000-2023 (77.69% to 83.61%). The lowest percentage of population over the age of 18 was Sussex County in 2000 (72.16%), but this changed over time, with Ocean County now representing the county with the lowest percentage of population over 18 (75.17%).

The voting age eligible population percentage (18+C%) is correlated to the percentage of the population over the age of 18, but not perfectly so. This is due to the number of noncitizens that naturalize each year and due to an inflow or outflow of noncitizens in a particular county and the state. Cape May has the highest 18+C% for all years 2000-2023. Hudson County has the lowest 18+C% for all years 2000-2022, with Union County taking over in 2023, but this could be due to the assumptions made in the 2023 calculations. Both counties likely have an 18+C% in the low 60% range for 2023.

The overall net change in the percentage of the population over 18 from the year 2000-2023 is 3.312% (78.574% in 2023 versus 75.263% in 2000). The overall net change in the 18+C% from the year 2000-2023 is 2.606% (69.705% in 2023 versus 67.098% in 2000). This indicates that the percentage of the population over the age of 18 and noncitizen is growing slightly faster than the percentage of the population over the age of 18 and a citizen.

23

*Registered Voter Counts compared to Voting Age Eligible Population*

The calculated data points and voter registration data was analyzed both by looking at each county and the state for each year 2000-2023 (For example all NJ data for 2000-2023) and then each year for 2000-2023 by county or statewide (For example the year 2022 with the data for every county and state).

Starting with each county and state for each year from 2000-2023, the population growth varied and as mentioned in the previous section, so did the percentage of the population over the age of 18 and 18+C%. The data was analyzed was as follows:

The NJ population in the year 2000 was 8,414,764, with an 18+C estimate of 5,646,162, an estimated maximum 18+C of 5,668,325, and the number of Registered voters of 4,710,768 per the GE-ED, 4,699,026 per the GE-TO, 4,530,819 per the PM-ED, and 4,518,964 per the PM-TO.

The NJ population in the year 2023 was 9,290,841, with an 18+C estimate of 6,476,148, an estimated maximum 18+C of 6,504,863, and the number of Registered voters of 6,494,988 per the GE-ED, 6,459,097 per the GE-TO, 6,550,101 per the PM-ED, and 5,982,469 per the PM-TO.

This works out to a net change in population of 876,077, a change in 18+C of 829,986, a change in 18+C max of 836,538, a change in RV-ED of 1,784,220, a change in RV-TO of 1,760,071, a change in PM-ED of 2,019,282, and a change in PM-TO of 1,463,505 (A quick note, three counties did not report Unaffiliated and third party registrants in the 2023 PM-TO report).

The growth in the number of registered voters over the 23-year span from 2000-2023 for the state of NJ is more than double that of the growth in Voting Aged Eligible people.

Every county with exception of Salem County for the GE-TO have growth rates over 100% comparing the change in RVs to change in 18+C's.

Moving to the year over year by county and statewide datasets, per the GE-ED there was no county over 90% registered until 2004 when Monmouth at 92.22% and Morris at 93.33% eclipsed 90%. This percentage is found by taking the number of registered voters divided by the number of 18+C max for every county and the state. No county eclipsed 95% until 2008 when Monmouth hit 95.01%. No county breaks above 95% again until Somerset in 2014. By 2016 three counties are above 96% Hunterdon, Morris, and Somerset. As of 2019 three counties are over 99.5% or even 100%: Hunterdon, Morris, and Somerset. Five other counties are over 95% also in this year. By 2020 seven counties are over 100%, with five others and the state over 98.5%. In 2021 and 2022 eleven counties and the state are over 100% with three more over 98.5%. In 2023 according to the higher adjusted estimates six counties are over 100%, six counties are over 98.5%, and the state is at 99.85%.

While the GE-TO, PM-ED, and PM-TO reports show varying registration numbers and lead to some different results, all reports indicate that some counties and the state in general, over the last four years, have more registered voters than the calculated maximum number of voting age eligible citizens.

24

*Comparison of GE-ED to GE-TO and PM-ED to PM-TO*

Comparing each election report for the same election year after year allows for the differences in reported registered voters between each report type to be found. This was done for the General Election and the Primary Election. Subtracting the number of RVs on the turnout reports from the number of RVs on the statewide registration statistics reports provided the net difference. Dividing the net difference by the RVs on the statewide registration statistics is how the percentage difference was calculated. If the difference and percentage are positive, then the RVs reported on the statewide registration statistics are higher. If negative, then the RVs on the turnout reports was higher.

Starting with the General election reports, no year had all RVs equal, meaning there are variances in every year. There were four years where the NJ turnout report number of RVs was higher (2001, 2004, 2008, 2012). In all remaining years the RVs on the statewide registration statistics were higher. Even including the 7.15% more registered voters on the turnout report in 2001 in Camden County (representing 19,091 more RVs on the turnout report), the state of NJ did not have a net difference of over 0.5% until 2008 (-0.51%). This- 0.51% difference represented 27,123 more voters on the turnout report than on the statewide registration statistics in 2008. The percentage difference of RV-ED to RV-TO is above 0.5% in 2010 (0.54% or 28,258 more voters on RV-ED) and 2014 (0.51% or 28,033 more voters on RV-ED). The percentage difference is above 0.5% six of the last seven years (2017-2023) with only 2021 coming in slightly below this threshold at 0.47%. The largest discrepancy is in 2020 where there are 79,002 more registered voters on RV-ED compared to RV-TO. The largest difference for any county is Bergen in 2018 where there were 44,108 more RVs on the RV-ED report representing 7.21% more RVs. The largest percentage difference was in Mercer County in 2022 where the difference of 27,685 more RVs on the RV-ED represents a 10.49% difference in RVs.

Moving to the Primary election reports, the PM-TO could not be located for 2001 and 2009, so no comparisons could be made. Further, beginning in 2016 some counties started withholding unaffiliated and third party registered voters from the PM-TO report. Those counties were not included in that year's analysis in the percentage differences between PM-ED to PM-TO. No year prior to 2017 had a difference above 0.5%. 2017 and 2018 were 0.62% and 0.69% respectively. Every year from 2019-2023 saw a difference of at least 1.43%. The maximum difference occurred in 2020 where 130,873 more registered voters were on the PM-ED compared to PM-TO; this is only for only 18 counties that reported information for all parties and represented a difference of 2.67%.

Based on the voter registration statistics the largest variances on both the General Election and Primary reports have occurred in the last six to seven years.

### Changes in RVs from Primary to General Elections

Looking at the net change in registered voters from the primary election to the general election each year it was obvious that the largest growth was seen during every presidential election year (2000, 2004, 2008, 2012, 2016, and 2020). While some counties see decreases in non-presidential election years, only two years had a decrease in registered voters (2007 and 2023) at the statewide level. For non-presidential election years, no year saw growth of 1% or higher until the years 2017-2019 where all years were over 1% growth in registrants. 2023 is the only year over the span of the analysis that most of the counties (17 out of 21) saw a decrease in registrants from the primary report to the general election report.

With respect to the turnout reports, the following observations were made. There is no data for the primary in 2001 and 2009, so comparative analysis of turnout registrants from primary to general elections in those years could not be completed. From 2016 to 2023 (except 2021) some counties began excluding unaffiliated (UNA) and third-party registrants from the turnout report totals, so those counties were not included when reporting any net changes in the statewide total for the years this occurred. The largest growth was seen during presidential election years. Decreases in statewide registrations are seen in 2007, 2010, and 2011. For non-presidential years only 2002 saw growth greater than 1% until 2017, when every non-presidential year through 2022 saw growth of at least 1.45%. For 2023 the turnout reports show an increase of 0.62% or almost 33,000 more voters on the rolls during the general election compared to the primary (this excludes three counties).

### Year over Year Changes of RV on each Report

The final way the data was analyzed was comparing the net changes in registered voters year over year for each of the four registration reports. For General Elections, registration counts generally peak during presidential elections, meaning the highest count over a 4-year period is during presidential election years (2000, 2004, 2008, 2012, 2016, and 2020). Up until 2016 this was true looking both back, the three years before a presidential election, and forward, the three years after the presidential election.

There is typically a noticeable dip in registrants the year after a presidential election even though these are gubernatorial election years in NJ (2001, 2005, 2009, 2013, 2017, and 2021). Note, this did not occur in 2013, as the GE-ED shows an increase of 13,726 registrants, while the GE-TO shows a decrease of 11,445 registrants. The previous three gubernatorial elections showed decreases of at least 93,000 registrants compared to the preceding presidential election year. There are noticeable decreases again in 2017, but then large increases in 2021 on both the GE-ED and GE-TO reports (89,605 and 137,953, respectively).

For most mid-term elections (2002, 2006, 2010, 2014, 2018, and 2022) there is an increase in registrants from the gubernatorial election the year before (except in 2014), but the totals are still less than the previous presidential election registration counts. This trend seems to change in 2018 where there was an increase in registrants, but more registrants on the rolls than in the previous presidential election. For 2022, there was a decrease in registrants from the previous year, but still more registrants on the rolls than during the previous presidential election (2020).

Traditionally "off-election years" (no presidential, gubernatorial, or mid-terms; so 2003, 2007, 2011, 2015, 2019, and 2023) tend to have the lowest registration counts compared to the previous three years up until 2019 and 2023 that actually saw registration increases from the previous presidential elections. Said differently 2003 had lower registrant totals than 2000-2002, 2007 had lower than 2004-2006, 2011 had lower than 2008-2010, and 2015 had lower than 2012-2014. However, 2019 had higher registrant totals compared to 2016 and was the highest over the entire period from 2016-2019. 2023 registrant totals are higher than the 2020 presidential election but are not the highest over the period 2020-2023 (2021 is the highest for this four-year period). These trends were for both the GE-ED and GE-TO reports.

Regarding year over year changes in the primary reports, there are noticeable trends, just like with the general election reports, but there are also some differences. The largest increase in registrants typically occurs in the gubernatorial election years (2001, 2005, 2009, 2013, 2017, and 2021); this did not occur in 2017, as the growth in 2016 was approximately 22,000 higher, but both were over 135,000. Due to this shift, the highest point of any election cycle was the gubernatorial election for the preceding three years. This is what is expected when referring to the change in registrants from the primary to the general election during presidential years. Those months would not be captured on the primary reports until the following year (the gubernatorial election years). Other trends from the general election reports carry over to the primary reports where there were slight increases in mid-term election years, except for 2014 (also saw a slight decrease on the primary report). Also, all "off-election" years except for 2019 saw decreases from the prior year.

Note, because there is no data for PM-TO for 2001 and 2009 and then some counties began withholding UNA and third-party data as of 2016, it was difficult and at times impossible to compare year over year changes for this report type at the statewide level. However, because variances are low compared to the PM-ED report type for the years that all data is available, findings are the same, except for the 2014 mid-term where only the PM-TO report showed a slight increase in registrants. For a more detailed look at changes at the county level, refer to the attached spreadsheets.

**Conclusion**
The number of registered voters should never be higher than the estimated maximum eligible voting age population. Especially because the maxima were calculated using the highest population, highest percentage of population over 18 years of age, the highest margin of error, and included incarcerated persons and the mentally incapacitated population. Neither group is eligible to register to vote, but are very difficult to quantify, so to avoid the risk of understating the maximum eligible voting age population, they were not excluded. For many of the years analyzed, voter registrations were under the estimated maximum number of voting age eligible people. Voter registrant trends also followed a pattern up until the 2016 election when a new trend pattern emerged. The registrant percentages over 100%, higher registrant growth year over year including "off-years", and large variances between the statewide voter registrant reports and the county turnout registrant reports for the same election have become the norm. New Jersey's 2023 voter registrant reports indicate that the state is near 100% registration capacity leaving one to ask what can be expected leading up to the 2024 primary and general elections if the trend remains intact.

27