

# State of New Jersey

COMMISSION OF INVESTIGATION
28 WEST STATE STREET
PO Box - 045
TRENTON, NEW JERSEY 08625-0045
Telephone (609) 292-6767
Fax (609) 633-7366

Joseph F. Scancarella
*Chair*

Robert J. Burzichelli
Rosemary Iannacone
John A. Hoffman
*Commissioners*

Lee C. Seglem
*Executive Director*

March 19, 2019

Governor Phil Murphy
The President and Members of the Senate
The Speaker and Members of the General Assembly

    The State Commission of Investigation, pursuant to N.J.S.A. 52:9M, herewith submits for your information and review a report of findings and recommendations involving hospital-related oversight and accountability issues.[1]

Respectfully,

Joseph F. Scancarella
Chair

Robert J. Burzichelli
Commissioner

Rosemary Iannacone
Commissioner

---

[1] Commissioner John A. Hoffman, who joined the Commission in January, was formally recused from this matter and did not participate in any aspect of the inquiry.

*New Jersey Is An Equal Opportunity Employer ~ Printed on Recyclable Paper*

# SUMMARY

The State Commission of Investigation (SCI) is engaged in an ongoing examination of health-care matters, including hospital-related costs, in New Jersey. As part of this inquiry, the SCI reviewed certain aspects of the hospital industry and discovered a number of issues that the Department of Health (DOH) should be aware of as it develops new rules for ensuring effective scrutiny of hospital ownership, identifying and addressing conflicts of interest and other potential abuses, and providing for adequate financial disclosure and transparency in the public's best interest. These issues arise based upon the following findings:

- Certain hospitals have paid or are due to pay tens of millions of dollars in questionable management fees and allocations to private entities known as "related parties."

- These related-party management entities have no employees and only limited operating expenses which, in combination with other information, raises questions about the nature of their operations.

- Hospital owners are beneficiaries of management fees/allocations paid to the related-party management concerns.

- DOH's Early Warning System for identifying circumstances that potentially threaten a hospital's financial condition might be too narrowly drawn, particularly with regard to assessing the impact of related-party transactions.

- The current regulatory process for reviewing hospital financial statements might be outdated and inadequate, especially with regard to potential shortcomings of hospital margin calculations, which are used to measure financial viability.

- Under the current hospital oversight system, DOH cannot be assured that it is fully aware of and properly reviews intertwined ownership structures and the possible risks posed by those structures.

- Complicating matters, DOH has failed to fully use its existing regulatory authority and has encountered administrative difficulties relating to its tracking of hospital ownership.

The SCI recommends that DOH closely examine the financial and related information set forth in this report during its development of new transparency rules with respect to oversight and review. Based upon the findings herein, an analysis of such material might be helpful to DOH as it seeks to ensure that it obtains appropriate and complete information pursuant to the State's policy of ensuring that residents have access to quality and necessary health-care services at reasonable cost. At the conclusion, specific recommendations are outlined for DOH's consideration.

# BACKGROUND

The SCI's inquiry into the hospital arena has focused on a variety of hospital-related issues, including emergency room utilization, billing practices and the funding and regulatory oversight of hospitals in New Jersey. The findings in this report pertain to the funding and oversight prong of the SCI's inquiry.

As set forth in the Health Care Facilities Planning Act, DOH has the central responsibility for development and administration of the State's regulatory apparatus regarding hospital services.[1] It is the State's public policy that quality and necessary hospital services be available at reasonable cost.[2] In this context, DOH has issued hospital financial reporting regulations.[3]

Due to numerous hospital closures and bankruptcies over the years, the Planning Act was amended to create an early warning system (EWS) to predict when a hospital might experience financial distress and to prevent the sudden/irreplaceable disruption of services.[4] DOH then has the authority to provide consultation and, if necessary, appoint a monitor for a hospital in "financial distress" or "at risk" of being in such distress.[5] The agency requires hospitals to submit financial information (including quarterly and monthly unaudited and annual audited reports) and cost reports. DOH, at least in large part, delegates administration of its EWS and the financial aspects of Certificate of Need application reviews to the New Jersey Health Care Facilities Financing Authority (HCFFA) pursuant to a memorandum of agreement.

During this inquiry, it was learned that DOH is using a multi-phase approach in its development of possible rules to implement recommendations set forth in the department's July 2014 Hospital Transparency Report. In that report, DOH outlined the following rationale under the heading "Contracts with Related Parties":

> *Self-dealing and conflicts of interest can lead to losses that endanger the health care system, compromise access to hospital care, and bring into question the stewardship of public funds. In particular, transactions with related parties may be entered into for fraudulent purposes rather than for legitimate business purposes. The Department should work with stakeholders to explore reporting by hospitals of contracts with related parties over a certain threshold dollar amount and public access to this information. The Department is in favor of standardizing disclosure of related-party transactions across for-profit and not-for-profit hospitals, to the extent permitted by law.[6]*

---

[1] N.J.S.A. 26:2H-1, -5(b).

[2] N.J.S.A. 26:2H-1.

[3] See N.J.A.C. 8:31B-1.1 et seq.

[4] See N.J.S.A. 26:2H-5(d), -5.1a, -5.1b; DOH Hospital Transparency Report (2014), at 2-3, *available at* http://www.nj.gov/health/assets/documents/hospital_transparency_report.pdf.

[5] N.J.S.A. 26:2H-5(d).

[6] DOH Hospital Transparency Report, at 17 (internal footnote omitted).

The DOH transparency report stemmed from an August 2012 conditional veto of a bill (S-782) which would essentially have required all hospitals to disclose to DOH the same or equivalent information that nonprofit hospitals are required to submit to the U.S. Internal Revenue Service on Form 990, and DOH would have been required to post such information on its website.[7]  The conditional veto called instead for the Health Commissioner to review and report on hospital financial reporting requirements.  In January 2014, the Legislature approved a modified version of the bill, which set forth requirements as per the language provided with the veto (P.L. 2013, c.195).

The SCI is aware of DOH's recent adoptions of certain new rules as part of the first phase of its transparency rule development, 50 N.J.R. 815(a), effective February 5, 2018.  Although this phase did not address related-party transactions, it is the SCI's understanding that the department anticipates proposing additional hospital transparency rules in the near future.  It is also noteworthy that the department has an existing regulation, N.J.A.C. 8:31B-4.25, which sets forth rules pertaining to hospital disclosures of the existence of "related organizations" providing services to a hospital if the total transactions are greater than a specified dollar threshold, along with provisions relating to documentation and information that DOH may request.  In particular, "[f]or the purpose of insuring prudent buying," each hospital is required to "report the existence of a related organization and each type of service provided" if "total transactions amount to greater than $10,000 per year," and DOH may request, among other things, for any such hospital to produce "[t]he financial statements of all related organizations."[8]

## FINDINGS

The findings set forth below stem, in part, from a review of financial disclosures and other materials pertaining to three private, for-profit hospitals in Hudson County that, collectively, do business as the CarePoint Health System.  These three hospitals are the following: Bayonne Medical Center, operating under the entity IJKG Opco, LLC; Hoboken University Medical Center, operating under HUMC Opco, LLC; and Christ Hospital, operating under Hudson Hospital Opco, LLC.  These hospitals were acquired out of bankruptcy at various junctures, Bayonne Medical Center in February 2008, Hoboken University Medical Center in November 2011 and Christ Hospital in July 2012.  Bayonne Medical Center is a wholly-owned subsidiary of IJKG, LLC.  The three CarePoint Health hospitals are not a consolidated health system in that they have separate ownership structures, but the ultimate indirect owners of the hospitals overlap.

By way of various entities, including holding companies, three individuals – Vivek Garipalli, James Lawler and Jeffrey Mandler (via his role as trustee of a trust) – became the principal owners of the three now-CarePoint Health hospitals upon acquisition of the hospitals out of bankruptcy, with Garipalli obtaining the majority interest in each of the hospitals.  Information regarding the ownership structures of these hospitals and related entities is detailed later in this report.  The structures, in part, have changed over time.

---

[7] The bill would have specifically required this disclosure as a condition for hospitals to receive Charity Care payments pursuant to N.J.S.A. 26:2H-18.51 et al.  The IRS Form 990 - required to be filed annually by organizations exempt from taxation - contains governance, financial and operating information, which specifically details expenses and disbursements, including compensation to officers, directors and independent contractors.

[8] N.J.A.C. 8:31B-4.25(c)(1), (d).

At the outset, it is important to recognize that these formerly bankrupt hospitals could have closed if not for the actions, including investments and assumption of pre-existing liabilities, by the CarePoint Health hospitals' ownership in acquiring and improving the hospitals. Now, years after these acquisitions, these for-profit hospitals remain operational and servicing patients, including many who do not have the means to pay for treatment. With respect to Hoboken University Medical Center, the financial burden of the previously city-owned hospital was taken off the backs of taxpayers because of the acquisition. Furthermore, CarePoint Health has provided additional services to the hospitals' surrounding communities. One initiative, for example, involved the creation of neighborhood health centers. It should also not be overlooked that owners of for-profit hospitals take on burdens and risks that are not faced by nonprofit executives, many of whom receive significant salaries and other compensation. However, such remuneration to nonprofit executives is, at least at some level, already required to be disclosed via IRS Form 990s, which are publicly available.

Nevertheless, the SCI has uncovered concerns with respect to the State's hospital oversight system which is demonstrated by the findings set forth in this report.

- **Related Parties, Management Fees and Ownership**

*Significant and Questionable Management Fees and Allocations Paid to Related Entities*

The SCI reviewed documents and related information that raise questions about the payments of millions in management fees and allocations by the CarePoint hospitals to related parties in exchange for management services. According to the CarePoint hospitals' audited financial statements that were disclosed by CarePoint to DOH, the collective amount of related-party management fees and allocations paid/owed by the hospitals for the years 2013 through 2016 exceeded $157 million.

The breakdown of these fee/allocation obligations is as follows: Bayonne Medical Center paid/owes IJKG approximately $98.8 million. Christ Hospital paid/owes an entity identified as Sequoia Healthcare Management, LLC approximately $30 million in related-party management fees. Hoboken University Medical Center, meanwhile, paid/owes an estimated $28.8 million in related-party management fees. Hoboken University Medical Center's audit reports completed prior to 2018 refer to, but do not identify, a "healthcare management organization" providing services, but the SCI has determined that this entity is also Sequoia Healthcare Management.

The following table breaks down these fees by year:

| Table #1 | | | |
|---|---|---|---|
| | **Management fees & allocations that Bayonne Medical Center paid/owes to IJKG\*** | **Management fees that Christ Hospital paid/owes to Sequoia Healthcare Management** | **Management fees that Hoboken University Medical Center paid/owes to "a healthcare management organization"\*\*** |
| 2013 | $33,285,639 | $6,446,522 | $6,313,281 |
| 2014 | $24,189,564 | $7,108,447 | $7,180,132 |
| 2015 | $27,627,131 | $7,876,840 | $7,537,810 |
| 2016 | $13,647,816 | $8,525,229 | $7,776,739 |
| Total | $98,750,150 | $29,957,038 | $28,807,962 |
| | \*While management fees & allocations are reported in audit reports, they are not necessarily paid in a given year.  As of December 31, 2016, the outstanding amount due to IJKG was $28,145,600. | | \*\*SCI has estimated Hoboken's management fees by multiplying 4% times net patient service revenue in accordance with language in the hospital's audit reports. |

In the notes included as part of the CarePoint hospitals' audited financial statements, management fees and allocations to related parties are described as being in exchange for unspecified services that are referred to only in general terms.  For example, pertinent excerpts of the audit reports for 2016 (completed in April 2017) indicate that payments are made/due "[i]n exchange for certain services," as follows:

- Bayonne Medical Center:  "In exchange for certain services related to its operations, the Hospital pays, on a monthly basis, a management fee to a related party.  Also, certain other costs incurred by IJKG are allocated to the Hospital.  IJKG management fee and allocations were $13,647,816 and $27,627,131 in the years ended December 31, 2016 and 2015, respectively."

- Christ Hospital: "In exchange for certain services related to its operations, the Hospital pays . . . a related party, Sequoia Healthcare Management, LLC ('Sequoia'), management fees. . . . For the years ended December 31, 2016 and 2015, the Hospital . . . reported management fees . . . for Sequoia in the amount of $8,525,229 and $7,876,840, respectively."

- Hoboken University Medical Center: "In exchange for certain services related to its operations, the Hospital pays a healthcare management organization, on a monthly basis, four percent (4%) of patient service revenue generated."[9]

---

[9] For years 2013 to 2014, the related-party section of Bayonne Medical Center's audit reports states as follows: "IJKG provides certain general and administrative services to the Hospital, including finance, legal, regulatory and treasury." For 2015, the pertinent Bayonne Medical Center audit language was "certain managerial services related to its operations."  The audit reports for Christ Hospital for years 2013 through 2015 refer to "certain general and administrative services related to its operations" provided by Sequoia Healthcare Management.  Similarly, the audit reports for Hoboken University Medical Center for years 2013 through 2015 refer to "certain management services related to its operations."  Each hospital's audit report completed in 2018 contains new language, including that the respective "manager is responsible for the operations and economics of the Hospital in compliance with all applicable laws, statutes, ordinances and regulations."

The SCI found that IJKG and Sequoia Healthcare Management have only limited operating expenses and no employees receiving salaries or wages. This fact is documented by various evidence, including New Jersey Department of Labor records, audited financial statements and sworn witness testimony in SCI executive session.

IJKG's audited financial statements set forth consolidated figures of the parent (i.e. IJKG) and its subsidiary, Bayonne Medical Center. The notes to IJKG's financial statements explicitly state that IJKG is a "holding company." The SCI compared IJKG's statements to those of Bayonne Medical Center and found those records to reflect that the holding company alone appears to have paid no salaries or wages and incurred relatively minimal expenses in 2015 and 2016.

According to statements of income for 2015 and 2016, IJKG and Bayonne Medical Center reported the same amounts of salaries and wages. For example, for 2015, IJKG and Bayonne Medical Center each reported exactly $53,442,198 in expenses from salaries and wages. This means that IJKG, for its own part, had no salaries and wages, which is consistent with N.J. Labor Department records.

Moreover, an analysis of the financial statements demonstrates the limited amount of expenses of the holding company, despite the receipt of significant management fees and allocations from Bayonne Medical Center. The SCI compared IJKG's total expenses as set forth in its financial statements with those of its subsidiary hospital expenses after excluding management fees and allocations. This comparison shows that IJKG had approximately $1.9 million and $1.2 million in expenses in 2015 and 2016, respectively, despite having been credited over $27 million (2015) and $13 million (2016) in management fees and allocations from Bayonne Medical Center.

Similarly, Sequoia Healthcare Management's statements as of December 31, 2016, indicate that its only expenses (other than interest and amortization) were administrative expenses of approximately $110,000 and $62,000 in 2015 and 2016, respectively.

The three principal owners - including Jeffrey Mandler who served as the Chief Executive Officer of the CarePoint Health System from late 2015 to October 2017 - confirmed in sworn testimony that IJKG does not have any employees. Mandler's testimony, however, was inconsistent with respect to the provision of services by IJKG. At one point, he characterized IJKG as a holding company that does not provide any services to Bayonne Medical Center. However, upon subsequently being confronted with an audit report for 2016 referencing such services, Mandler reiterated that IJKG is a holding company but testified that its fee is paid for the services and "sweat equity" of himself, Vivek Garipalli and James Lawler. Although these three individuals have provided services to the three CarePoint Health hospitals, the extent of the services leading to more than $157 million in management fees and allocations for a four-year period is unclear.

With regard to Sequoia Healthcare Management, Garipalli and Lawler also confirmed that the company does not have any employees. All three principal owners testified that they are the sources of the management services provided by Sequoia Healthcare Management. In effect, these three individuals collectively maintain 100 percent ownership in Sequoia Healthcare Management.

Garipalli testified that the payments from the hospitals to IJKG and Sequoia Healthcare Management are "incentive payments" structured such that the payments are to be made only if the hospitals are successful. For example, he explained that Bayonne Medical Center's payments to IJKG would be made only if the hospital was covering its expenses, e.g. paying employees and suppliers and meeting all financial covenants with its lenders.

According to Garipalli, any management services of IJKG were provided by the three principal owners. Garipalli testified that in the early years of running Bayonne Medical Center, he worked "24/7" to turn the hospital around financially. Garipalli said that he instituted a detailed business strategy addressing a wide range of topics, including labor issues, the supply chain, revenue cycles, negotiations of payer agreements and supplier contracts, regaining physician confidence and determining where to deploy capital expenditures. In the context of Sequoia Healthcare Management, Garipalli testified similarly with respect to the efforts to turn around Hoboken University Medical Center and Christ Hospital.

That said, Garipalli also testified that in terms of day-to-day oversight of the CarePoint hospitals, his involvement has decreased through the years. Lawler similarly testified with respect to his own (and Garipalli's) decreased day-to-day role, ultimately transitioning into more of a board member role. Garipalli acknowledged that by 2015/2016, he was, to some extent, reaping the benefits of his earlier work. During those two years, Bayonne Medical Center reportedly incurred over $41 million in IJKG management fees and allocations. Mandler testified that his own "24/7" work for the hospitals continues. However, he also testified that since stepping down from his position as the system CEO (a position for which he was separately compensated), he remains a board member and still deals with board-related issues.

In any event, DOH should evaluate any and all management services to the CarePoint hospitals and determine if those services are being provided at a reasonable cost. It is the SCI's understanding that Sequoia Healthcare Management's financial statements have never been obtained by DOH and that prior to 2018, the financial statements of IJKG were not obtained by DOH. However, these types of statements are something that DOH historically has had the authority to request pursuant to an existing regulation, i.e. N.J.A.C. 8:31B-4.25. Although the respective CarePoint hospital audit reports were submitted to DOH, the SCI has found no indication that DOH ever utilized this regulation to request or obtain IJKG or Sequoia Healthcare Management financial statements.[10]

*A Third-Party Contract for Management Services*

Aside from the involvement of IJKG and Sequoia Healthcare Management, the three CarePoint hospitals have also each engaged a separate management services organization, CarePoint Health Management Associates, LLC (CPHMA) to provide management services. Unlike IJKG and Sequoia Healthcare Management, however, CPHMA employs hundreds – a total

---

[10] This reflects, among other things, the SCI's review concerning materials in the possession, custody, or control of DOH. It does not reflect materials requested and/or obtained by any other state agencies, including the Department of Human Services, Division of Medical Assistance and Health Services (DMAHS).

of 377 people were on its payroll in 2016, according to Labor Department records – and paid more than $30 million in salaries and wages in 2016.

Provisions in contracts, effective January 1, 2015, between CPHMA and each of the CarePoint hospitals specify that the management firm is to "supervise and manage the entire business and operations of" the hospitals. This is despite the fact that Sequoia Healthcare Management's management services agreements with Christ Hospital and Hoboken University Medical Center state that Sequoia Healthcare Management "will undertake the general day-to-day supervision and management" and that it will provide "sufficient and qualified management personnel . . . [t]o manage, oversee and direct the hospital operations." IJKG's management services agreement with Bayonne Medical Center requires IJKG to, among other things, "supervise and direct the general operations of the" hospital, "supervise and manage the executive management team of the" hospital, and "operate the" hospital "with proper economics."

Both the CPHMA and Sequoia Healthcare Management contracts state that the respective company has responsibilities pertaining to various areas, including finance and human resources. In fact, the Sequoia Healthcare Management agreements specifically state that it will provide management personnel to hire, oversee and supervise various hospital executives, including the chief financial officer. Meanwhile, CPHMA employs an individual to act in the capacity of a chief financial officer for the system, while the hospitals, on their own, have not had such a staff position for at least parts of recent years.

Garipalli explained the situation from his perspective. Garipalli reiterated that the three principal owners are responsible for setting the entire hospital business strategy, i.e. putting together a team, executing on that, monitoring in terms of board meetings, and determining what key decisions need to be made each year. Garipalli testified that CPHMA is providing the actual operational services as it is "responsible for the execution of the strategy that we set." Garipalli stated that he interacts with individuals from CarePoint on a weekly basis, sometimes daily depending upon the issues that arise.

According to the CPHMA contracts, each CarePoint hospital was, at least initially, contractually required to pay 30 percent of CPHMA's annual budgeted operating costs. For 2015, the management company's projected operating expenses were approximately $65.6 million, which would translate into a $19.7 million per hospital fee (i.e. over $59 million collectively) to CPHMA.[11] The Christ Hospital and Hoboken University Medical Center management services agreements with Sequoia Healthcare Management call for these hospitals to pay 4 percent of their net patient service revenue to Sequoia Healthcare Management. Meanwhile, Bayonne Medical Center's operating agreement specified that its Manager is IJKG. In turn, IJKG's operating agreement specified three Managers for IJKG, i.e. Vivek Garipalli, Jeffrey Mandler and James Lawler, each of whom signed the agreement as managing members of limited liability companies that own IJKG. Evidence shows that the calculation of Bayonne Medical Center's management

---

[11] Based on evidence obtained by the SCI, the basis for the fee was changed from budgeted to actual expenses. Along these lines, Lawler testified that adjustments are made at the end of the year such that the ultimate fee is based on actual amounts. Based on unaudited figures provided to the SCI by CarePoint Health, the actual expenses of CPHMA in 2015, 2016 and 2017 were $75.6 million, $76.7 million and $89.3 million, respectively.

fees and allocations is the lesser of (a) 95 percent of the hospital's net income or (b) the amount that would not cause a violation of hospital loan agreement(s).

Furthermore, despite the fact that the ownership of CPHMA overlaps with the ultimate ownership of the three hospitals, fees to CPHMA are not, at least explicitly, disclosed in the audit reports of the hospitals. This overlap is evidenced by the overview of CarePoint Health-related ownership structures below.

Although these circumstances do not necessarily establish impropriety, they do – particularly in combination – highlight areas in which DOH should inquire to ascertain and confirm the precise nature of the services being provided and assess any potential risks to the ultimate financial viability of the affected hospitals.

*Intertwined Ownership Structures*

Although the direct owners of the three CarePoint hospitals are, on paper, different than the direct owners of Sequoia Healthcare Management and CPHMA, the ultimate ownership significantly overlaps. Of note, Vivek Garipalli obtained ultimate majority interests in each of the three hospitals at the time of their respective acquisitions. Garipalli's interests were obtained through multiple limited liability companies, including his direct and sole ownership of Benego Ventures, LLC (with respect to Bayonne Medical Center and Hoboken University Medical Center) and Briar Hill Ventures, LLC (with respect to Christ Hospital).

Subsequently, during the period of late 2012 to early 2015, Garipalli granted those interests to the Vivek Garipalli Family Trust I, which on May 8, 2018, then assigned those interests to the Freehold Trust. With respect to both trusts, Garipalli is the Settlor (i.e. creator) and an immediate family member of Garipalli is independent trustee.[12] Similarly, these trusts obtained majority interests in Sequoia Healthcare Management and CPHMA.

Garipalli has testified that he is the majority owner of each of the hospitals, despite the use of a trust. In this context, with respect to Benego Ventures, he specifically testified that he has "always been the end beneficiary" and that the use of a trust in ownership has been "purely an estate planning construct." Furthermore, Garipalli is the Manager of the respective LLCs through which the trusts have held ownership of the hospitals (along with Sequoia Healthcare Management and CPHMA). Along these lines, although the underlying trust agreements provide that the independent trustee is the absolute owner of interests held by the trusts, Garipalli, by his own account, has retained control of the hospitals.

The Freehold Trust currently holds about a 68 percent indirect interest in Bayonne Medical Center (via IJKG), along with a 60 percent indirect interest in both Hoboken University Medical

---

[12] Both trusts are irrevocable trusts which were created pursuant to the laws of the State of Alaska and utilize Alaska-based entities as administrative trustees. When Garipalli was asked if he created the Vivek Garipalli Family Trust I, he testified that he had estate planning counsel do all the paperwork and documents, but Garipalli further testified that "[a]ny assets that are in the trust are assets that were affiliated with me."

Center and Christ Hospital.  This trust also holds an 80 percent indirect interest in both Sequoia Healthcare Management and CPHMA.

The elaborate intersection of these various entities and the layered nature of the ownership structure is demonstrated, in part, by examining the interests connected to Garipalli with respect to Christ Hospital, Sequoia Healthcare Management and CPHMA shown as follows:

(1) Garipalli maintains a 60 percent interest in Christ Hospital.  This interest is through Briar Hill Ventures, which is owned 100 percent by the Freehold Trust.[13]  In turn, Briar Hill Ventures, with Garipalli as its Manager, owns 80 percent of Christ Intermediate Holdco, LLC, which wholly owns Hudson Hospital Holdco, LLC, which owns 75 percent of CH Hudson Holdco, LLC, which owns 100 percent of Christ Hospital.

(2) Garipalli maintains an 80 percent interest in Sequoia Healthcare Management.  This interest is through Pheasant Run Ventures, LLC, which is wholly owned by the Freehold Trust.  Pheasant Run Ventures, with Garipalli as its Manager, owns 80 percent of Sequoia Healthcare Management.

(3) Garipalli maintains an 80 percent interest in CPHMA.  This interest is through Titus Ventures, LLC, which is wholly owned by the Freehold Trust.  Titus Ventures, with Garipalli as its Manager, owns 80 percent of Sequoia Healthcare Services, LLC, which owns 100 percent of CPHMA.

These extensive ownership interconnections are illustrated as follows:

---

[13] Information recorded annually with the New Jersey Department of Treasury, Division of Revenue and Enterprise Services for Briar Hill Ventures, including on September 25, 2018, continues to show Vivek Garipalli as being a "Member" (i.e. owner) of that company.  As noted, technically he is Briar Hill Ventures' Manager and the Freehold Trust is Briar Hill Ventures' sole member.

Exhibit 3



Accordingly, (a) even though the direct majority owners of Christ Hospital (i.e. CH Hudson Holdco), Sequoia Healthcare Management (i.e. Pheasant Run Ventures) and CPHMA (i.e. Sequoia Healthcare Services) are different and (b) even though the ultimate indirect majority owners (at the LLC level) of Christ Hospital (i.e. Briar Hill Ventures), Sequoia Healthcare Management (i.e. Pheasant Run Ventures) and CPHMA (i.e. Titus Ventures) are different, the ultimate effective majority owner is consistent, i.e. the Freehold Trust which owns the aforementioned LLCs managed by Garipalli.

The complete ownership structures of the CarePoint hospitals and certain affiliated entities appear to be as follows:

1. *Christ Hospital*:  Wholly owned by CH Hudson Holdco, the ownership of which is shared 75 percent by Hudson Hospital Holdco and 25 percent by J.C. Opco, LLC. Hudson Hospital Holdco is owned by Christ Intermediate Holdco.  Christ Intermediate Holdco is 80 percent owned by Briar Hill Ventures, with the remaining 20 percent split between Strategic Ventures, LLC and Heights Healthcare Services, LLC.[14]  Briar Hill Ventures is 100 percent owned by the Freehold Trust.  Strategic Ventures is owned by the Mandler Family Trust of which Jeffrey Mandler is the trustee.  Heights Healthcare Services is owned by James Lawler.

2. *Bayonne Medical Center*:  Wholly owned by IJKG, 85.5 percent of which is owned by Sequoia BMC Holdco, LLC, with the remaining shares held by three minority shareholders.    Sequoia BMC Holdco is 100 percent owned by Bayonne Intermediate Holdco, LLC.  Bayonne Intermediate Holdco is 80 percent owned by Benego Ventures, with the remaining 20 percent split between Strategic Ventures and JPL Healthcare Consulting, LLC.  Benego Ventures is 100 percent owned by the Freehold Trust.  JPL Healthcare Consulting is owned by Lawler.[15]

3. *Hoboken University Medical Center*:  75 percent owned by HUMC Holdco, LLC and 25 percent by MPT of Hoboken TRS, LLC.  HUMC Holdco is wholly owned by Hoboken Intermediate Holdco, LLC.  Hoboken Intermediate Holdco, in turn, is 80 percent owned by Benego Ventures, with the remaining 20 percent split between Strategic Ventures and Willow Healthcare Services, LLC, which is owned by Lawler.

4. *Sequoia Healthcare Management*:   Receives fees from Christ Hospital and Hoboken University Medical Center and is 80 percent owned by Pheasant Run Ventures, 10 percent by Infinity Healthcare Strategies, LLC and 10 percent by Oak Management, LLC.  Pheasant Run Ventures is owned by the Freehold Trust, while Infinity Healthcare Strategies is owned by Mandler, and Oak Management is owned by Lawler.

---

[14] According to testimony of Mandler, Strategic Ventures is an owner of Christ Hospital. This is consistent with information provided to the SCI by CarePoint Health. However, information maintained by the New Jersey Department of Treasury, Division of Revenue and Enterprise Services which was filed with respect to Christ Intermediate Holdco identifies three members of that entity, including Infinity Healthcare Strategies.  Although Strategic Ventures is not one of these three listed members, Infinity Healthcare Strategies, according to Mandler, is owned by him.

[15] Lawler testified that the organizational structure involving IJKG Opco and IJKG was put together so money could be raised from different sources, and IJKG needed to make sure that the hospital survived.  More generally, based on testimony of the principal owners, arrangements of management companies used by the CarePoint hospitals were guided by advice from legal counsel, accountants and lenders.

5. *CarePoint Health Management Associates*:  Wholly owned by Sequoia Healthcare Services, LLC, the ownership of which is shared 80 percent by Titus Ventures, with the remaining 20 percent split between Infinity Healthcare Strategies and Sunnyside Enterprises, LLC. Titus Ventures is wholly owned by the Freehold Trust.  Sunnyside Enterprises is owned by Lawler.

Accordingly, Mandler (including as trustee of a family trust) and Lawler each maintain approximately an 8.5 percent effective interest of Bayonne Medical Center (via IJKG), along with a 7.5 percent interest of both Hoboken University Medical Center and Christ Hospital, and they both hold a 10 percent interest in Sequoia Healthcare Management and CPHMA.

*Payments to Multiple Entities for Services Provided by the Same Individuals*

Bayonne Medical Center (i.e. IJKG Opco) has wired payments collectively totaling at least $1 million per year during the period 2013 through 2016 to entities linked to IJKG's Managers, i.e. Vivek Garipalli (Benego Ventures), James Lawler (JPL Healthcare Consulting) and Jeffrey Mandler (the Mandler Family Trust) for their services.  More specifically, most of this money was distributed as follows:  Bayonne Medical Center wired payments of $10,000 per week to Benego Ventures and $5,000 per week to both JPL Healthcare Consulting and the Mandler Family Trust.

As noted earlier in this report, Benego Ventures, JPL Healthcare Consulting and the Mandler Family Trust (via Strategic Ventures) hold equity interests in Bayonne Medical Center for Garipalli, Lawler and Mandler, respectively.  Hence, Bayonne Medical Center has wired payments to two limited liability companies and a trust that ultimately own the hospital and its parent, IJKG.

Based on Lawler's testimony, the weekly payments to JPL Healthcare Consulting are considered guaranteed payments for general management that, for tax purposes, are actually charged to IJKG as the parent of IJKG Opco.  To the extent that the guaranteed weekly payments to each of IJKG's Managers are, in fact, expenses of IJKG, such expenses for 2015 and 2016 actually make up the majority of IJKG's limited expenses referenced earlier.  Lawler further testified that he did not recall any contract between JPL Healthcare Consulting and IJKG Opco relating to his $5,000 weekly payment.

Garipalli contrasted his situation with a typical CEO who has not invested his/her own capital in a hospital.  He testified that if you take the $10,000 guaranteed weekly payment, it would probably make him the least compensated hospital/health system CEO in the state.

In addition, Mandler initially testified that during the nearly two-year period that he was the CarePoint Health System's CEO, yet another LLC linked to Mandler (i.e. Strategic Medical Solutions, LLC) received $10,000 per week in compensation from CarePoint Health Management Associates (CPHMA).  Mandler later testified that he was not sure if the payments were from CPHMA or collectively from Hoboken University Medical Center and Christ Hospital.

*Additional Questionable Circumstances*

- Same Individual Signing on Behalf of Hospitals and Management Service Providers

For the Sequoia Healthcare Management-Christ Hospital and Sequoia Healthcare Management-Hoboken University Medical Center agreements, the same person, Vivek Garipalli, signed both on behalf of Sequoia Healthcare Management and on behalf of the respective hospitals. He is the only person who signed either of these agreements.

Likewise, the IJKG agreement with Bayonne Medical Center is signed solely by Garipalli on behalf of both IJKG and the hospital.

- Apparent Lack of Other Clients

Based on evidence reviewed by the SCI, neither Sequoia Healthcare Management nor IJKG receive any revenue from any client (or any source) other than the CarePoint hospitals. Accordingly, it is reasonable to conclude that neither Sequoia Healthcare Management nor IJKG have other clients. In fact, the audit reports for Sequoia Healthcare Management explicitly provide that "[a]ll management fees received by [Sequoia Healthcare Management] are from two healthcare organizations that have certain common ownership," and show that Sequoia Healthcare Management's only sources of revenue are such management fees. These two organizations are Christ Hospital and Hoboken University Medical Center. Similarly, IJKG and Bayonne Medical Center reported identical amounts of total revenue for each year during the period of 2014 through 2016. For example, both entities reported exactly $182,436,684 of total revenue for 2016. The fact that Sequoia Healthcare Management has never had any clients other than Christ Hospital and Hoboken University Medical Center was confirmed by the testimony of James Lawler. Likewise, Lawler confirmed that IJKG has never received any management fees from any entity other than Bayonne Medical Center.

- Commonality of Addresses

Based on information maintained by the New Jersey Department of Treasury, Division of Revenue and Enterprise Services ("Division of Revenue"), the current main business addresses of each of the following are 10 Exchange Place, 15th Floor, Jersey City, NJ:

- o IJKG, the parent company that receives management fees from Bayonne Medical Center;
- o Sequoia Healthcare Management, the company that receives management fees from Hoboken University Medical Center and Christ Hospital;
- o CarePoint Health Management Associates, which contracts with each of the CarePoint hospitals to supervise and manage them;
- o Sequoia Healthcare Services, which owns CarePoint Health Management Associates;

- o HUMC Holdco, which owns 75 percent of Hoboken University Medical Center;
- o Bayonne Intermediate Holdco, which holds a majority interest in Bayonne Medical Center;
- o Christ Intermediate Holdco, which holds a majority interest in Christ Hospital; and
- o Hoboken Intermediate Holdco, which holds a majority interest in Hoboken University Medical Center.

With respect to CarePoint Health Management Associates and the three aforementioned intermediate holding companies, 10 Exchange Place, 15th Floor, Jersey City, NJ has been identified as the main business address since their initial registrations with the Division of Revenue. This 10 Exchange Place address has been identified as the main business address for Sequoia Healthcare Management since January 2014, and for Sequoia Healthcare Services and HUMC Holdco since April 2014. With respect to IJKG, although this 10 Exchange Place address has only been identified as the main business address since September 2016, its previously identified main business address was 29 E. 29th Street, Bayonne, NJ, i.e. the physical address of Bayonne Medical Center.

Although these circumstances are not, in and of themselves, evidence of wrongdoing, they do indicate the potential interrelationship of the companies involved and highlight the need for further review.[16]

- **Financial Reporting Issues**

*Is the DOH "Early Warning System" Too Narrowly Drawn?*

Pursuant to statutory language governing the Department of Health's Early Warning System (EWS) for detecting issues, problems and circumstances that could threaten the financial integrity of hospitals in New Jersey,

> [t]he Commissioner of Health shall prescribe, by regulation: (1) specific indicators by which a general hospital may be evaluated for financial soundness, and the thresholds at which it may be considered to be in financial distress or at risk of being in financial distress; and (2) the progressive levels of monitoring and department participation in the development and oversight of corrective measures to resolve a general hospital's financial or potential financial difficulties . . . .[17]

---

[16] Furthermore, the Division of Revenue does not maintain any registrations for Sequoia BMC Holdco, i.e. the entity that directly owns approximately 85 percent of IJKG, or CH Hudson Holdco, i.e. the entity that wholly owns Christ Hospital. Both Sequoia BMC Holdco and CH Hudson Holdco are registered in the State of Delaware. The Division of Revenue filing information, however, for IJKG identifies Sequoia BMC Holdco as a member with an address of 10 Exchange Place, 15th Floor, Jersey City, NJ. Similarly, the Division of Revenue filing information for Hudson Hospital Opco (Christ Hospital) identifies CH Hudson Holdco as a member with the same 10 Exchange Place address.
[17] N.J.S.A. 26:2H-5.1a(a).

DOH has not promulgated by regulation any indicators, thresholds or progressive levels of monitoring as required. However, at a minimum, there are six specific statutorily mandated indicators, including those relating to margin, earnings before depreciation, the number of days cash-on-hand, days in accounts receivable and average payment period.[18] Furthermore, the agency is authorized by statute to evaluate "any other factor which the commissioner deems appropriate."[19] Pursuant to EWS statutory language, if after considering the various indicators, the Commissioner of Health determines that a hospital is in financial distress/at risk, the Commissioner, in consultation with the hospital, may appoint a monitor.[20]

The governing EWS statutory language also indicates that the financial indicators should be guided by the January 24, 2008, report by the New Jersey Commission on Rationalizing Health Care Resources ("Reinhardt Report").[21] According to this report, the State should, among other things, impose monitoring when any one of certain indicators is triggered, including when its cash-on-hand – the number of days a hospital could continue to operate solely from cash assuming it had no income – falls below 50 days, its total margin falls to zero or below, its earnings before depreciation falls below 4 percent, or its days in accounts payable figure is above 70. A representative for the Health Care Facilities Financing Authority (HCFFA) has explained that imposing monitoring on hospitals that trigger just one factor would not be practical.

According to DOH and HCFFA representatives, certain hospitals have been flagged based on the EWS as being of concern. It is the SCI's understanding that these agencies conduct weekly conference calls to discuss the financial condition of such hospitals. The SCI was provided a spreadsheet containing quarterly EWS statistics for the second quarter of 2017 (which also contains statistics for the same period in the two prior years). While nine New Jersey hospitals were identified as being of "high" or "moderate" concern by HCFFA, the three CarePoint hospitals were not among them. In comparison, the majority of New Jersey hospitals/hospital systems (as delineated in the spreadsheet), including the CarePoint hospitals, hit on multiple Reinhardt Report triggering thresholds. (The EWS statistics in the spreadsheet with respect to hospital systems were, in part, shown at the system, not hospital, level. The total number of hospitals and hospital systems listed in the spreadsheet was 46.)

*No Red Flag for Questionable Related-Party Transactions*

The current Early Warning System lacks financial indicators relating to specific expenses. Accordingly, there are no specific indicators involving management fees or any related-party expenses. During the period 2013-2016, the holding company IJKG, on average, annually charged Bayonne Medical Center management fees and allocations worth nearly 14 percent of the hospital's net patient service revenue. Meanwhile, the management fees charged to Christ Hospital

---

[18] N.J.S.A. 26:2H-5.1a(b).

[19] Id.

[20] N.J.S.A. 26:2H-5.1a(c).

[21] N.J.S.A. 26:2H-5.1a(a). See http://www.nj.gov/health/rhc/documents/entire_finalreport.pdf. The Chair of the New Jersey Commission on Rationalizing Health Care Resources was Uwe E. Reinhardt, James Madison Professor of Political Economy at the Woodrow Wilson School of Public and International Affairs, Princeton University.

and Hoboken University Medical Center during the same period averaged approximately 4 percent of net patient service revenue. While the SCI is not in a position to judge the reasonableness of either of these figures, DOH should evaluate such types of fees, particularly in comparison to revenue and expenses, and evaluate whether such fees can affect the long-term viability of any hospital. This may be particularly prudent when conditions at a given hospital trigger multiple official EWS indicators.

It is also important that DOH ensures that contracted services are actually delivered and are provided at a reasonable cost. Moreover, even though it is possible that a parent or related company could put money back into a hospital in the event of financial difficulties, there is no EWS requirement mandating that this must be done. Accordingly, the department should properly analyze questionable transactions to determine whether, and to what extent, they may be factors contributing to potential financial distress.

*Apparent Shortcomings with Hospital Margin Calculations*

HCFFA's review of hospital margins does not, at least specifically, take into account certain key information. As set forth in more detail below, there appear to be shortcomings with hospital margin calculations that do not explicitly set forth the effect that related parties, including parent companies, have on such calculations.

With regard to margin calculations, HCFFA has, at least in recent years, analyzed operating and profit margins. Financial summaries compiled by HCFFA show hospital margins as compared to statewide medians. According to HCFFA's <u>Financial Summaries of New Jersey Hospitals</u>, which contain such information, "[t]he operating margin assesses the profitability of an institution based on operations. It measures the percentage of total operating revenue that remains after the payment of all operating expenses. Positive and increasing values indicate an institution's revenues exceeded expenses and are therefore preferable."

IJKG's operating and profit margins for 2013 through 2016 were significantly higher than that of Bayonne Medical Center. This is primarily due to the fact that the holding company's net income (including that of Bayonne Medical Center) has been significantly higher than that of the medical center alone due to the related-party management fees paid by the hospital. For the years 2013-2016, collectively, IJKG's net income was approximately $105 million – roughly eight times that of Bayonne Medical Center alone.[22]  For example, IJKG's net income was approximately $26.1 million in 2015 and $15.3 million in 2016, as compared with the medical center's $336,000 and $2.8 million for those years. The following table sets forth a comparison of net income calculations for IJKG and Bayonne Medical Center ("BMC") on an annual basis for the years 2013-2016:

---

[22] Based on IJKG's 2017 audited financial statements: (1) a $27 million liability was established in 2017 due to a settlement pertaining to a $5 million convertible note, (2) payments stemming from this liability are scheduled to be spread over three years – 2018 through 2020, and (3) these payments, at least in part, were recognized as an interest expense on December 31, 2017. Due to an increase in IJKG's overall 2017 interest expense, Bayonne Medical Center's 2017 net income was, in contrast to prior years, higher than that of IJKG, which reported a net loss.

| Table #2 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2013** | | | **2014** | | | **2015** | | **2016** |
| | IJKG (including BMC) | BMC | | IJKG (including BMC) | BMC | | IJKG (including BMC) | BMC | IJKG (including BMC) | BMC |
| (A) Total Revenues | 190,680,187 | 190,230,187 | | 192,043,288 | 192,043,288 | | 188,887,078 | 188,887,078 | 182,436,684 | 182,436,684 |
| (B) Total Expenses (before Interest & Depreciation) | 137,072,225 | 167,152,578 | | 148,319,901 | 171,782,492 | | 141,618,258 | 167,817,511 | 152,448,723 | 164,925,521 |
| (C) Income from Operations before Interest Expense, Depreciation and Amortization and Loss in Equity of Unconsolidated Affiliates | 53,607,962 | 23,077,609 | | 43,723,387 | 20,260,796 | | 47,268,820 | 21,069,567 | 29,987,961 | 17,511,163 |
| (C) Interest Expense | 6,433,755 | 5,983,755 | | 6,821,529 | 6,371,529 | | 6,325,888 | 5,875,888 | 5,597,271 | 5,597,271 |
| (D) Depreciation Expense | 12,430,098 | 12,430,098 | | 13,610,623 | 13,610,623 | | 10,548,137 | 10,548,137 | 9,126,140 | 9,126,140 |
| (E)  Income before Loss in Equity of Unconsolidated Affiliates | 34,744,109 | 4,663,756 | | 23,291,235 | 278,644 | | 30,394,795 | 4,645,542 | 15,264,550 | 2,787,752 |
| (F) Loss (Gain) of Equity of Unconsolidated Affiliates | 2,595,906 | 2,595,906 | | 2,883,158 | 2,883,158 | | (4,309,805) | (4,309,805) | - | - |
| **(G) Net Income** | **37,340,015** | **7,259,662** | | **26,174,393** | **3,161,802** | | **26,084,990** | **335,737** | **15,264,550** | **2,787,752** |

Accordingly, using one method to calculate operating margin, i.e. calculating the excess of total operating revenue over expenses including interest and depreciation and then dividing that result by total operating revenue, IJKG's operating margins were significantly greater than Bayonne Medical Center's margins during the period 2013 through 2016. For example, in 2015, the medical center's operating margin was only 2.46 percent while IJKG's margin was 16.09 percent. Furthermore, IJKG's margins for 2013-2016 were greater than certain statewide medians, but Bayonne Medical Center's margins were less than the medians in the last three of those four years.[23] The following table contains SCI's calculation of IJKG's and Bayonne Medical Center's operating and profit margins, along with HCFFA statewide margin median calculations:

---

[23] The SCI utilized HCFFA statewide median margins as per the version on HCFFA's Apollo System Bayonne Medical Center printout as of 12/31/2016 (i.e. which has figures for the current and three prior years). It is the SCI's understanding that the Apollo System is updated on an ongoing basis and that the certain Apollo figures (e.g. medians), even for dates in the past, can and do change. Changes occur for reasons including hospital closures and consolidations. The Apollo System contains data that was keyed in to the system by hospital representatives. Summaries of HCFFA median information, including that found on its website, contain the following disclaimer: "[HCFFA] makes no representation or warranty as to the accuracy or completeness of the . . . information or its suitability for any purpose, and disclaims all liability which could arise from its compilation, distribution or use by any party."

| Table #3 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2013** | | **2014** | | **2015** | | **2016** | |
| | IJKG (including BMC) | BMC | IJKG (including BMC) | BMC | IJKG (including BMC) | BMC | IJKG (including BMC) | BMC |
| SCI Calculated Operating Margin (E divided by A in prior chart) | 18.22% | 2.45% | 12.13% | 0.15% | 16.09% | 2.46% | 8.37% | 1.53% |
| SCI Calculated Profit Margin (G divided by A in prior chart) | 19.58% | 3.82% | 13.63% | 1.65% | 13.81% | 0.18% | 8.37% | 1.53% |
| | | | | | | | | |
| HCFFA Statewide Median - Operating Margin | 2.34% | | 3.09% | | 5.25% | | 3.40% | |
| HCFFA Statewide Median - Profit Margin | 2.45% | | 3.43% | | 5.46% | | 4.91% | |

Along these lines, the operating and profit margins of the three CarePoint hospitals would be higher if the related-party management fees were excluded from the calculations. In the case of Bayonne Medical Center, the operating margins for the years 2013-2016 without having paid the management fees would have been similar to those of IJKG. The key point is that when analyzing margins, it is important to understand how key items can drastically skew the figures. On the one hand, the CarePoint hospitals have actually done better financially than the margins would suggest, at least on the surface. On the other, to the extent that any hospital's equity is being diminished through expenses such as significant related-party transactions, this could change the picture dramatically, depressing operating margins and bringing into question long-term financial viability.

As noted earlier in this report, calculation of Bayonne Medical Center's management fees and allocations to IJKG is the lesser of (a) 95 percent of the hospital's net income or (b) the amount that would not cause a violation of hospital loan agreement(s). James Lawler testified regarding this calculation and his understanding of the reasoning behind it. He explained that it was done so that "ultimately there would be appropriate flexibility such that the parent [IJKG] could have the best chance of having this hospital [be] successful." Lawler explained that through the underlying management agreement (between Bayonne Medical Center and IJKG), Bayonne Medical Center was left with a net margin probably similar to what many nonprofit hospitals were achieving, i.e. possibly 3 or 4 percent, while any of the hospital's "additional profits were brought up to the parent." In this context, Lawler testified that, at one point, a threat to Bayonne Medical Center's survival was ongoing litigation and there was a concern that the opposing litigant, if successful, could "claw back" money previously paid to the hospital.[24]

Lawler also testified that it was accurate to put the management fee on Bayonne Medical Center's books with the proper related-party note disclosure. He explained that if Bayonne Medical Center had instead shown a higher net income, while there was "an actual document that said that that income was going to be upstreamed for whatever purposes the parent deemed

---

[24] Lawler also testified that the amount of Sequoia Healthcare Management's management fees was a negotiated figure deemed acceptable by a company assisting with the financing of Hoboken University Medical Center.

appropriate, that would have been an incorrect reporting, that would have been an inaccurate reporting at the Opco level."  Indeed, without explanation, showing a higher net income of Bayonne Medical Center would have been misleading.  The best approach going forward is for DOH and HCFFA to require production of financial statements of hospitals and related parties with whom the hospitals engaged in significant transactions and for these state agencies to properly analyze such statements.

Furthermore, with respect to the importance and relevance of a proper understanding of margins, in the fall of 2014, a then-CPHMA executive told the New Jersey Legislature in committee testimony that the CarePoint hospitals experienced an average operating margin similar to the state average for healthy hospitals in New Jersey – generally between 2 percent and 5 percent, according to this testimony.  No reference was made in this verbal testimony to the method used to calculate margins.  To the extent that the margins of hospitals are relevant in making legislative decisions, it is important to discern whether certain items, such as related-party management fees, are skewing the figures and to determine the calculation method.

*Failure to Utilize Existing Regulatory Authority*

In March 2014, the Health Professionals and Allied Employees union raised questions concerning $96 million that had been transferred from Bayonne Medical Center to IJKG.[25]  More specifically, a report prepared by the union stated, in part:

> *Since taking over the hospital in 2008, IJKG Opco, the entity that owns Bayonne Medical Center, has transferred over $96M to its parent company, IJKG LLC, for "general and administrative services to the Hospital, including finance, legal, regulatory and treasury. Also, certain other costs incurred by IJKG are allocated to the Hospital."[26]  Without any further itemization of these expenses, we cannot know what portion of these financial transfers represent reasonable expenditures as opposed to pure profit to the owners.[27]*

More than three years later (i.e. in November 2017), the SCI queried DOH representatives as to how DOH dealt with these concerns.  In response to the SCI's question, DOH merely referred to the following:  DOH's July 2014 hospital financial transparency report, a DOH voluntary request of hospitals to post financial statements on their websites, and DOH's ongoing development of transparency rules.  There is no evidence that DOH responded directly to the union's concerns.

---

[25] HPAE, The Christie Administration's Department of Health: Failures in Enforcement, Accountability and Transparency (2014) ("HPAE Report"), at 9, *available at* http://www.hpae.org/wp-content/uploads/2016/07/HPAE-NJ-Dept-of-Health-White-Paper_3_2014.pdf.

[26] HPAE Report, at 9.  The report cited the "Audited Financial Statements for 2010, 2011 and 2012 for IJKG-OPCO LLC and Subsidiaries (d/b/a Bayonne hospital Center)."  Id. at 22 n. 11.

[27] HPAE Report, at 9.  HPAE further alleged that "services and staff have been cut, contracts with insurance carriers cancelled, and the hospital buildings and property sold to a real estate investment trust in an opaque and unregulated sale-leaseback agreement."  Id.

In fact, DOH could have utilized an existing DOH regulation which provides that the financial reports for related parties, like IJKG, could have been obtained by the department upon request. This regulation allows DOH to ask for an array of information, including financial statements of a hospital's related organizations, if transaction amounts exceed $10,000 in a year.[28] As noted earlier in this report, it is the SCI's understanding that Sequoia Healthcare Management's financial statements have never been obtained by DOH and that prior to 2018, the financial statements of IJKG were not obtained by DOH.[29] In response to SCI questions concerning what information DOH requires to be disclosed concerning related parties, DOH has simply acknowledged that it could request data as per the aforementioned regulation and that the regulation is being revised.

Not only could DOH have utilized this existing regulation to obtain pertinent information regarding IJKG, it could have also obtained relevant information about Sequoia Healthcare Management, an entity whose sole sources of revenue are management fees paid by Christ Hospital and Hoboken University Medical Center. In this regard, records, i.e. audited hospital financial statements submitted to DOH, demonstrate that DOH has been on notice for years that Christ Hospital had been paying millions of dollars in management fees to Sequoia Healthcare Management and that DOH has similarly been on notice with respect to related-party management fees paid by Hoboken University Medical Center. Nevertheless, the SCI has found no evidence that this ever triggered DOH to utilize its existing regulatory authority to obtain Sequoia Healthcare Management's financial statements.

If DOH had utilized such authority to obtain Sequoia Healthcare Management's audited financial statements, DOH would have learned of Sequoia Healthcare Management's limited operating expenses and presumably would have ascertained that the sole sources of its revenue were indeed Christ Hospital and Hoboken University Medical Center. DOH also would have learned about a substantial five-year term loan to Sequoia Healthcare Management. The notes to Sequoia Healthcare Management's audited financial statements indicate that on July 17, 2014, Sequoia Healthcare Management entered into a credit agreement with a financial institution to obtain a $60 million loan with a maturity date of July 17, 2019, annual principal payments totaling $3 million, and an effective interest rate of approximately 16 percent.[30] Based on Sequoia Healthcare Management's audited financial statements, such principal payments and interest totaled over $10 million in 2015 alone.

The majority of the loan proceeds were used to pay a dividend to Sequoia Healthcare Management's shareholders, i.e. LLCs linked to Garipalli, Lawler and Mandler. On the day the loan closed, LLCs linked to them collectively received approximately $54.4 million. The SCI has

---

[28] N.J.A.C. 8:31B-4.25(c)(1), (d).

[29] In March 2018, a CarePoint Health System executive provided all prior year IJKG audited financial statements to DOH. Nevertheless, the DOH office responsible for collecting audited financial statements initially believed that these documents were duplicative of IJKG Opco statements because that office did not recognize any distinction between IJKG and IJKG Opco until after the SCI issued a subpoena to DOH for documents in June 2018.

[30] The 16 percent is broken down into 12 percent annual interest, along with 4 percent Paid-In-Kind (PIK). PIK interest reflects a percentage amount that is added onto the outstanding principal.

found no evidence that DOH is aware of this loan.  Accordingly, there is no indication that DOH has evaluated the terms and purpose of the loan or ascertained whether the loan presents any potential risk to the financial viability of any hospitals.[31]

In addition, the DOH's existing related-party regulation also requires hospitals to "maintain documentation of the actual management service for which a management fee is recorded."[32] However, this regulation does not require hospitals to affirmatively provide such documentation to DOH.[33]

As noted earlier in this report, DOH's first phase of new transparency rules did not address matters involving contracts with related parties.[34]  When the department solicited comment concerning this phase, one individual who responded raised a concern about the related-party regulatory gap due to the potential for abuses such as self-dealing and conflicts of interest.  Further, State Senate Majority Leader Loretta Weinberg wrote an August 2017 letter to DOH echoing this concern.  In its response, the department raised the prospect that the matter could be addressed in a forthcoming wave of regulations.

It is the SCI's understanding that DOH does not routinely examine funds flowing from a hospital to a parent company.  Furthermore, HCFFA's financial review is, in part, based on unaudited data.  HCFFA typically will only review audited data for the hospitals for which it provides financing.  In contrast, the bulk of the SCI's analysis has been with respect to audited financial information of both the hospitals and parent entities.  Based on the SCI's inquiry, it appears to be unclear who, if anyone on behalf of DOH/HCFFA, is responsible for substantively reviewing the audited financial data of hospitals that receive no financing from HCFFA.[35]  Rather, it appears that any DOH review of audited financial data is limited to simply cross-checking the figures to ensure consistency among different types of reports.  Furthermore, DOH neither reviews the fees charged to hospitals by management companies nor regulates management companies.

---

[31] The loan was refinanced in August 2018.  The interest rate and loan amount are both lower as compared with the original loan terms.

[32] N.J.A.C. 8:31B-4.25(b).

[33] In the context of the Certificate of Need application and review process for an increase of a minority-interest holder's ownership interest in Hoboken University Medical Center (from 9.9 percent to 25 percent; approved in 2016), the management agreement between Sequoia Healthcare Management and Hoboken University Medical Center was provided to DOH.

[34] This phase did, however, result in a DOH mandate that each hospital post links to annual audited financial information onto its website within 180 days of the close of its reporting period.  N.J.A.C. 8:96-2.1; 50 N.J.R. 815(a). Although DOH has received IJKG Opco's audited financial statements for the period ending December 31, 2017, there is not, at least of February 13, 2019, a link to this material on CarePoint Health's website.  Although its website contains a link to IJKG's audited statements for this time period, both IJKG and IJKG Opco financials are necessary to do the type of comparison illustrated in this SCI report because IJKG's statements neither contain a breakdown for just Bayonne Medical Center nor set forth the amounts of management fees.

[35] DOH does not technically review the audited financial data, though it does, with the assistance of contractors, use such information to perform a desk audit of acute care hospital cost reports, e.g. by ensuring that revenues and expenses in the cost reports match the figures in the audit reports.

*Hospital Owners as Beneficiaries of Hospital Management Fees*

Owners of the CarePoint hospitals are beneficiaries of the hospitals' management fees. Because IJKG is the parent company of Bayonne Medical Center, the owners of IJKG are inherently the ultimate owners of Bayonne Medical Center as well.  Meanwhile, Sequoia Healthcare Management is ultimately owned by Garipalli, Lawler and Mandler, through their respective entities.  Accordingly, Garipalli, Lawler and Mandler are beneficiaries of the fees and allocations to IJKG and Sequoia Healthcare Management.

However, the money flow from the hospitals to the management companies' owners is not apparent from the hospitals' financial statements because such statements do not set forth how much money was distributed by the management companies to their owners.  This situation is revealed by an analysis of IJKG's financial statements, which provide that IJKG "member distributions" (i.e. distributions from IJKG to its owners) for the period of 2013 through 2016 exceeded $32 million.  In comparison, based on Bayonne Medical Center's financial statements disclosed to DOH, the hospital itself reported zero distributions to its sole owner, i.e. IJKG, for this time frame of 2013-2016 (and, in fact, the same is true for every year since the 2008 acquisition).

Although IJKG's financial statements do not provide a breakdown of the specific recipients of the aforementioned 2013-2016 member distributions, the SCI's analysis of bank records shows that separate entities (i.e. limited liability companies) linked to each of Bayonne Medical Center's principal owners (i.e. Garipalli, Lawler and Mandler) collectively received more than $15 million from IJKG during this four-year time period.  At least some of the money from IJKG and Sequoia Healthcare Management to the owners' respective entities were tax distributions.  Owners of an LLC are responsible for paying the taxes of the LLC.  This, however, does not alter the importance of ensuring that DOH has access to related-party financial statements.

Meanwhile, between 2013 and 2016, separate limited liability companies and a trust linked to these same principal owners collectively received more than $77 million from Sequoia Healthcare Management.  Of this amount, approximately $54.4 million were loan proceeds received by Sequoia Healthcare Management from the aforementioned $60 million loan.  More specifically, on July 17, 2014, i.e. the date the loan closed, Sequoia Healthcare Management transferred the $54.4 million to three limited liability companies separately linked to Garipalli (over $43.5 million), Lawler (over $5.4 million) and Mandler (over $5.4 million).

Regarding this $60 million loan, these principal owners borrowed against future income stemming from management fees.  According to Lawler's testimony, the insurance side of CarePoint's business used $20 million to $25 million of the loan proceeds to pay off intercompany debt to Bayonne Medical Center.  Indeed, records confirm as follows: (1) during the period of July 18-21, 2014, a collective amount of $25 million was wired from accounts of the principal owners to Sequoia Healthcare Services, which, at least at that time, owned NJ Healthcare Investments, LLC ("NJHI"); (2) on July 21, 2014, Sequoia Healthcare Services wired over $24.5 million to

NJHI; and (3) on July 22, 2014, NJHI wired approximately $24 million to Bayonne Medical Center.

Furthermore, notes to audited financial statements of Bayonne Medical Center indicate that the hospital had provided temporary advances to NJHI over multiple years "to assist in complying with reserve requirements mandated by regulatory agencies as well as providing financing for further product development of health insurance options offered by its wholly-owned subsidiary, CarePoint Health Plans" and that "[o]n July 22, 2014, NJHI repaid the [h]ospital all outstanding advances and unpaid accrued interest."  Vivek Garipalli testified that he is the CEO of Clover Health, a health insurance provider.  Clover Health Investments, Corp. was incorporated in the State of Delaware on July 17, 2014, i.e. the date the $60 million loan closed.  Garipalli confirmed that there is a connection between the loan closing and the incorporation of Clover Health Investments.  He explained, "[W]e needed to raise outside capital.  You cannot raise outside capital as long as the insurance company owed money, so we had to pay off that loan before anyone would want to invest capital into what became Clover."

Lastly, Sequoia Healthcare Management has also incurred expenses (e.g. principal and interest) related to the servicing of this $60 million loan.  Moreover, at the outset, Sequoia Healthcare Management and the three other borrowers (Bayonne Intermediate Holdco, Christ Intermediate Holdco and Hoboken Intermediate Holdco) were designated ultimately responsible for ensuring that that the loan obligations would be satisfied.[36]  These three other borrowers are each indirect majority owners of the CarePoint hospitals, and they each were created shortly before the loan closed in July 2014.[37]  They have no operations or employees.

- **DOH - Administrative Difficulties regarding Review of Hospital Ownership**

Given that DOH is responsible for the monumental task of overseeing an estimated 2,400 healthcare facilities, including over 70 hospitals, it would seem virtually impossible to monitor hospital ownership without doing so in a systematic manner.

Moreover, the layered nature of certain hospital ownership organizations, such as the CarePoint hospitals' ownership structure, further exemplifies the need for a systematic process to ensure that DOH is fully aware of and properly reviews ownership structures of hospitals and related parties.  Although the CarePoint hospitals' ownership structure has, at least in large part, been disclosed to DOH by various means and in a variety of contexts over the years by and on behalf of the hospitals and, at times, other entities, DOH has struggled to thoroughly keep track of and analyze such information.  Furthermore, the timeliness of the underlying disclosures is not always clear.  The need for improvement in this arena is highlighted by the situations below.

*DOH Record-Keeping Issues*

DOH does not maintain a database or spreadsheet that keeps complete track of changes in hospital ownership.  In November 2018, John Calabria, then-Director of Certificate of Need and

---

[36] Although all four entities were designated as borrowers, the loan proceeds were directed to Sequoia Healthcare Management.

[37] The three intermediate holding companies were formed in the State of Delaware on June 25, 2014, i.e. less than one month before the loan closed.

Healthcare Facility Licensing, testified concerning DOH's record keeping of hospital ownership information. With respect to the process it would take for him to identify all the direct, indirect and ultimate owners of any particular hospital, he responded, "I don't know if it can get done in a day, but it would get done." When asked how long it would take, he testified, "I don't know if all the stuff is in an electronic database." He added that DOH has been moving over the last five or six years to capture information electronically. When asked when the process started for capturing information in an electronic database, Calabria testified,

> I tell a story, when the department decided to have a data unit of its own as opposed to having each individual division ask data for a facility, that way there would not be so many people asking facilities for similar data, that director came to me and said, ". . . do you see those files over there, in two years they are going to be electronic database." That was 1982. It hasn't happened yet. We are almost there. I would say within a year we will be there.

With this backdrop, the SCI identified multiple instances whereby DOH received information regarding change of ownership but did not, at least completely, track that information. For example, in connection with the annual licensing renewal process, DOH sends hospital ownership information to hospitals to be certified. At times, this information does not reflect material that DOH previously received.

Along these lines, the licensing renewal information submitted annually by DOH to hospitals is inconsistent with respect to the level of ownership. For example, DOH references a hospital's ultimate ownership in certain renewals, but other times, DOH only refers to direct or intermediary owners and not to the entities/persons that own them.

Furthermore, the SCI encountered instances in which material was provided to DOH by private parties, but DOH was unable to produce such records in response to an SCI subpoena. In this regard, DOH Certificate of Need application reviews can involve multiple rounds of completeness questions and responses (Q&A's) with an applicant. Relating to a minority-interest holder's 2014 application to increase its ownership stake in Hoboken University Medical Center from 9.9 percent to 25 percent, DOH produced Round 3 Q&A's to the SCI, but DOH did not produce Rounds 1 and 2 Q&A's, which contained key information relating to the hospital's and Sequoia Healthcare Management's ownership. In fact, the SCI only obtained these Rounds 1 and 2 Q&A's from CarePoint Health, rather than from DOH. These Q&A's are significant because the first time that DOH became aware of Hoboken Intermediate Holdco's majority ownership stake in Hoboken University Medical Center was through a disclosure by a third party (minority-interest holder representative) in the January 2015 Round 1 answers, rather than based upon direct notification from the hospital or its majority owners to DOH.

Even though DOH approved the minority-interest holder's application (to increase its ownership stake from 9.9 to 25 percent) in August 2016, DOH subsequently sent out a licensing renewal form which indicated that this minority-interest holder's ownership percentage was zero.

In addition, although the overlap between the ultimate owners of Sequoia Healthcare Management and the now-CarePoint Health hospitals was disclosed to DOH as part of the application process pertaining to the acquisition of Hoboken University Medical Center in 2011, it is unclear to what degree this information was tracked and understood by DOH staff. This is

exemplified by the fact that DOH did not understand Sequoia Healthcare Management's
ownership structure in 2014, during the aforementioned Q&A process pertaining to the minority-
interest holder's application. More generally, DOH does not typically require the ownership of
management companies to be disclosed. Calabria testified, "We don't look at the owners of a
management company unless the management company is going to be an owner of the hospital at
ten percent or more."

*Need for Clarification regarding DOH Procedures for Ownership Disclosures*

According to Calabria, changes in hospital ownership are to be made via a Certificate of
Need application and approval process, or in certain instances a notification can be made via letter
to DOH. He further testified that such notification is not supposed to be provided during the annual
licensing renewal process, though it is less problematic when the change is not one that requires
DOH approval. Calabria testified that any change in ownership is to be reflected in DOH's
licensing file for the respective hospital.

Nevertheless, the SCI uncovered instances in which a hospital, during the licensing renewal
process, would include a handwritten note and/or ownership chart referencing owners not included
in DOH's annual licensing certification packet. This means either one of two things would be the
case. Either DOH had previously received notification and did not record it within its files (i.e. a
record-keeping issue), or the hospital was noting a change in ownership during the licensing
renewal process, which is contrary to DOH's procedures.

*Inconsistencies regarding DOH's review of Hospitals Owned by Trusts*

It is the SCI's understanding that DOH requires disclosure of the trustee of a hospital-
owning trust, rather than any other person (e.g. beneficial owner) connected to such a trust.
Calabria testified that with respect to trusts, "[w]e want to know what percentage of ownership the
trust owns. We would look at the trustees to see whether the trustees own anything in healthcare."

As part of DOH's recommendations for its 2016 approval of the aforementioned increase
in the minority-interest holder's stake in Hoboken University Medical Center, a DOH staff
summary (which is publicly available) sets forth Vivek Garipalli as being the trustee of a trust
holding indirect ownership in Hoboken University Medical Center.[38] However, Vivek Garipalli
has not been the trustee of any trust that has held ownership in Hoboken University Medical
Center. Rather, an immediate family member of Garipalli has been independent trustee of the
respective trusts (the Vivek Garipalli Family Trust I, the Freehold Trust) which have held such
ownership.

Moreover, in November 2015, the minority-interest holder (via its representative) disclosed
the Vivek Garipalli Family Trust as being 45 percent owner of Benego Ventures (i.e. the majority

[38] The DOH summary referenced the trust as the Vivek Garipalli Family Trust (i.e. without a Roman numeral),
rather than the Vivek Garipalli Family Trust I. This summary is available at
https://web.doh.state.nj.us/apps2/documents/bc/Staff%20Recommendations%20Hoboken-MPT.pdf.

owner of Hoboken University Medical Center), with Garipalli holding the remaining 55 percent personally. These percentages were correct at the time that the minority-interest holder's application was initially submitted in 2014. However, by November 2015, the Vivek Garipalli Family Trust I was 100 percent owner of Benego Ventures. Based on DOH's response to a June 2018 SCI subpoena, DOH possessed no records within its Hoboken University Medical Center files reflecting the trust's 100 percent interest in Benego Ventures.[39]

Meanwhile, a June 2017 letter from CarePoint Health to Calabria contains a chart that references the Vivek Garipalli Family Trust I's 100 percent interest in Benego Ventures and correctly identifies the independent trustee, i.e. an immediate family member of Vivek Garipalli. This letter pertained to a Certificate of Need application for adult acute care psychiatric beds at Bayonne Medical Center. Subsequently, in the fall of 2017, Calabria sent a letter to a CarePoint Health attorney reflecting DOH's understanding that Vivek Garipalli is that hospital's ultimate majority owner. Accordingly, this again exemplifies an inconsistency between Calabria's testimony that DOH focuses on the trustees of hospital-owning trusts with the fact that Garipalli is not the trustee of the trust that owns Bayonne Medical Center.

In addition, there is also an issue to consider with respect to J.C. Opco, i.e. 25 percent owner of Christ Hospital. Based on records provided by CarePoint Health to the SCI, J.C. Opco is owned by a trust with a named trustee. However, DOH's records reflect J.C. Opco as being owned by a different trust and list the name of the trustee of that trust. Mandler and Garipalli each testified that this 25 percent ownership of Christ Hospital is held by a specified person. (Mandler stated that this person's interest was through an LLC and Garipalli assumed the same.) This person, however, is not either of the aforementioned trustees referenced as owning J.C. Opco.

It is worthy of note that the DOH regulation (N.J.A.C. 8:33-3.3) pertaining to ownership changes does not, at least explicitly, reference trusts or trustees. Thus, hospitals may not be on notice as to when, and to what extent, trust information should be disclosed.

## CONCLUSION AND RECOMMENDATIONS

The findings set forth in this report should be carefully considered by the State of New Jersey Department of Health as it develops additional transparency regulations for hospitals in New Jersey and develops appropriate internal department practices. The SCI believes, in particular, that an examination of related-party financial arrangements and the nature of management fees is necessary to get a true picture of hospitals' financial status for a number of key reasons. First, it would enhance DOH's ability to help ensure the long-term adequacy and viability of hospitals by ensuring money is properly spent. Second, it would enable DOH to conduct comparisons between and among various hospitals to best determine which hospitals may be in financial distress. Finally, ensuring a proper understanding of the financials will only help

---

[39] Likewise, as part of a Certificate of Need application by a third party (partially owned by two CarePoint hospitals) to transfer rehabilitation beds to Hoboken University Medical Center, an April 2016 letter to DOH contains an enclosure incorrectly reflecting the Vivek Garipalli Family Trust I as being 45 percent owner of Benego Ventures.

the department and other state agencies, legislators and others make well-informed policy decisions regarding the amounts and types of state aid that should be allocated to hospitals.

To that end, the State Commission of Investigation makes the following recommendations:[40]

- To the extent that related parties engaged in transaction(s) with a hospital over a specified dollar amount in a given year, DOH should ensure that hospitals produce all financial statements of such related parties and that such statements be made publicly available. Under the current regulations, DOH is permitted to request such information.

- DOH should ensure that any regulation pertaining to related parties clearly identifies what constitutes a related party. Among other things, management companies that are owned by owners of hospitals should be deemed related parties. Accordingly, it is imperative that DOH require that it is provided with current ownership information for both hospitals and related parties. This should include direct, indirect and ultimate ownership, including ownership by individuals via limited liability companies and trusts.

- With respect to trusts, disclosures to DOH should include the actual trust agreement, including reference to, among others, the trustee(s), beneficial owner(s) and the grantor/settlor (i.e. the creator of the trust). DOH regulations should explicitly make clear that if the trust is or becomes an owner of a hospital, this should be disclosed, and to the extent that the trust is amended, DOH should be notified accordingly.

- To assess risks to the financial viability of and ensure prudent purchasing by hospitals, DOH should evaluate related-party management services being paid for by New Jersey hospitals to determine if they are being provided at a reasonable cost.

- DOH should expand the scope of its Early Warning System to include the identification and review of related-party transactions.

- DOH should recognize the potential limitations of hospital margin calculations, particularly when they are significantly affected by related-party transactions.

- DOH should ensure that a review is conducted of audited financial statements of all hospitals, not just hospitals that receive financing from HCFFA.

- DOH should implement Early Warning System regulations to fulfil the statutory mandate for DOH to set forth specific Early Warning System indicators and thresholds.

---

[40] Although these recommendations are specifically addressed to the Department of Health, the Legislature, as a separate and concurrent matter, should consider revisiting earlier legislation that would have mandated statutory requirements in this arena. Such legislation includes the version of S-782 that was conditionally vetoed in August 2012 and a prior version that specifically outlined certain types of financial and ownership disclosures.

- DOH should require that hospitals provide documentation of the actual management service for which a management fee is recorded, particularly when such fee exceeds a certain dollar threshold in a given year. Such documentation is currently required to be maintained by hospitals; however, there is no requirement that such documentation be provided to the department.

- Based on the SCI's inquiry, it has become apparent that DOH has faced administrative challenges, and DOH does not, at least currently, have an adequate system to track ownership information. Accordingly, DOH should create an ownership tracking database containing all levels of hospital ownership. Without such information, disclosures of ownership and related-party information will not be useful.

- DOH should clarify procedures as to the manner in which hospitals are to notify and/or seek DOH approval of hospital ownership changes.

Exhibit 3



***State of New Jersey***
***Commission of Investigation***