# The BCCI Affair

**A Report to the Committee on Foreign Relations
United States Senate
by
Senator John Kerry and Senator Hank Brown
December 1992
102d Congress 2d Session Senate Print 102-140**

REENTERED AS EXHIBIT 3

## Contents

EXECUTIVE SUMMARY

INTRODUCTION AND SUMMARY OF INVESTIGATION

THE ORIGIN AND EARLY YEARS OF BCCI

BCCI'S CRIMINALITY

BCCI'S RELATIONSHIP WITH FOREIGN GOVERNMENTS  CENTRAL BANKS, AND INTERNATIONAL ORGANIZATIONS

BCCI IN THE UNITED STATES: PART I

BCCI IN THE UNITED STATES: PART II

BCCI AND LAW ENFORCEMENT: PART I

BCCI AND LAW ENFORCEMENT: PART II

BCCI AND ITS ACCOUNTANTS

BCCI, THE CIA AND FOREIGN INTELLIGENCE

THE REGULATORS

CLARK CLIFFORD AND ROBERT ALTMAN

ABU DHABI: BCCI'S FOUNDING AND MAJORITY SHAREHOLDERS

MOHAMMED HAMMOUD: BCCI'S FLEXIBLE FRONT-MAN

BCCI AND GEORGIA POLITICIANS

BCCI'S LAWYERS AND LOBBYISTS

HILL AND KNOWLTON AND BCCI'S PR CAMPAIGN

ED ROGERS AND KAMAL ADHAM

BCCI AND KISSINGER ASSOCIATES

LEGISLATIVE RECOMMENDATIONS

APPENDICES

# EXECUTIVE SUMMARY

## 1. BCCI CONSTITUTED INTERNATIONAL FINANCIAL CRIME ON A MASSIVE AND GLOBAL SCALE.

BCCI's unique criminal structure -- an elaborate corporate spider-web with BCCI's founder, Agha Hasan Abedi and his assistant, Swaleh Naqvi, in the middle -- was an essential

REENTERED AS EXHIBIT 3

component of its spectacular growth, and a guarantee of its eventual collapse. The structure was conceived by Abedi and managed by Naqvi for the specific purpose of evading regulation or control by governments. It functioned to frustrate the full understanding of BCCI's operations by anyone.

Unlike any ordinary bank, BCCI was from its earliest days made up of multiplying layers of entities, related to one another through an impenetrable series of holding companies, affiliates, subsidiaries, banks-within-banks, insider dealings and nominee relationships. By fracturing corporate structure, record keeping, regulatory review, and audits, the complex BCCI family of entities created by Abedi was able to evade ordinary legal restrictions on the movement of capital and goods as a matter of daily practice and routine. In creating BCCI as a vehicle fundamentally free of government control, Abedi developed in BCCI an ideal mechanism for facilitating illicit activity by others, including such activity by officials of many of the governments whose laws BCCI was breaking.

BCCI's criminality included fraud by BCCI and BCCI customers involving billions of dollars; money laundering in Europe, Africa, Asia, and the Americas; BCCI's bribery of officials in most of those locations; support of terrorism, arms trafficking, and the sale of nuclear technologies; management of prostitution; the commission and facilitation of income tax evasion, smuggling, and illegal immigration; illicit purchases of banks and real estate; and a panoply of financial crimes limited only by the imagination of its officers and customers.

Among BCCI's principal mechanisms for committing crimes were its use of shell corporations and bank confidentiality and secrecy havens; layering of its corporate structure; its use of front-men and nominees, guarantees and buy-back arrangements; back-to-back financial documentation among BCCI controlled entities, kick-backs and bribes, the intimidation of witnesses, and the retention of well-placed insiders to discourage governmental action.

## 2. BCCI SYSTEMATICALLY BRIBED WORLD LEADERS AND POLITICAL FIGURES THROUGHOUT THE WORLD.

BCCI's systematically relied on relationships with, and as necessary, payments to, prominent political figures in most of the 73 countries in which BCCI operated. BCCI records and testimony from former BCCI officials together document BCCI's systematic securing of Central Bank deposits of Third World countries; its provision of favors to political figures; and its reliance on those figures to provide BCCI itself with favors in times of need.

These relationships were systematically turned to BCCI's use to generate cash needed to prop up its books. BCCI would obtain an important figure's agreement to give BCCI deposits from a country's Central Bank, exclusive handling of a country's use of U.S. commodity credits, preferential treatment on the processing of money coming in and out of the country where monetary controls were in place, the right to own a bank, secretly if necessary, in countries where foreign banks were not legal, or other questionable means of securing assets or profits. In return, BCCI would pay bribes to the figure, or otherwise give him other things he wanted in a simple quid-pro-quo.

The result was that BCCI had relationships that ranged from the questionable, to the improper, to the fully corrupt with officials from countries all over the world, including Argentina,

REENTERED AS EXHIBIT 3

Bangladesh, Botswana, Brazil, Cameroon, China, Colombia, the Congo, Ghana, Guatemala, the Ivory Coast, India, Jamaica, Kuwait, Lebanon, Mauritius, Morocco, Nigeria, Pakistan, Panama, Peru, Saudi Arabia, Senegal, Sri Lanka, Sudan, Suriname, Tunisia, the United Arab Emirates, the United States, Zambia, and Zimbabwe.

### 3. BCCI DEVELOPED A STRATEGY TO INFILTRATE THE U.S. BANKING SYSTEM, WHICH IT SUCCESSFULLY IMPLEMENTED, DESPITE REGULATORY BARRIERS THAT WERE DESIGNED TO KEEP IT OUT.

In 1977, BCCI developed a plan to infiltrate the U.S. market through secretly purchasing U.S. banks while opening branch offices of BCCI throughout the U.S., and eventually merging the institutions. BCCI had significant difficulties implementing this strategy due to regulatory barriers in the United States designed to insure accountability. Despite these barriers, which delayed BCCI's entry, BCCI was ultimately successful in acquiring four banks, operating in seven states and the District of Colombia, with no jurisdiction successfully preventing BCCI from infiltrating it.

The techniques used by BCCI in the United States had been previously perfected by BCCI, and were used in BCCI's acquisitions of banks in a number of Third World countries and in Europe. These included purchasing banks through nominees, and arranging to have its activities shielded by prestigious lawyers, accountants, and public relations firms on the one hand, and politically-well connected agents on the other. These techniques were essential to BCCI's success in the United States, because without them, BCCI would have been stopped by regulators from gaining an interest in any U.S. bank. As it was, regulatory suspicion towards BCCI required the bank to deceive regulators in collusion with nominees including the heads of state of several foreign emirates, key political and intelligence figures from the Middle East, and entities controlled by the most important bank and banker in the Middle East.

Equally important to BCCI's successful secret acquisitions of U.S. banks in the face of regulatory suspicion was its aggressive use of a series of prominent Americans, beginning with Bert Lance, and continuing with former Defense Secretary Clark Clifford, former U.S. Senator Stuart Symington, well-connected former federal bank regulators, and former and current local, state and federal legislators. Wittingly or not, these individuals provided essential assistance to BCCI through lending their names and their reputations to BCCI at critical moments. Thus, it was not merely BCCI's deceptions that permitted it to infiltrate the United States and its banking system. Also essential were BCCI's use of political influence peddling and the revolving door in Washington.

### 4. THE JUSTICE DEPARTMENT MISHANDLED ITS INVESTIGATION AND PROSECUTION OF BCCI, AND ITS RELATIONSHIPS WITH OTHER GOVERNMENT AGENCIES CONCERNING BCCI.

Federal prosecutors in Tampa handling the 1988 drug money laundering indictment of BCCI failed to recognize the importance of information they received concerning BCCI's other crimes, including its apparent secret ownership of First American. As a result, they failed adequately to investigate these allegations themselves, or to refer this portion of the case to the FBI and other agencies at the Justice Department who could have properly investigated the additional information.

REENTERED AS EXHIBIT 3

The Justice Department, along with the U.S. Customs Service and Treasury Departments, failed to provide adequate support and assistance to investigators and prosecutors working on the case against BCCI in 1988 and 1989, contributing to conditions that ultimately caused the chief undercover agent who handled the sting against BCCI to quit Customs entirely.

The January 1990 plea agreement between BCCI and the U.S. Attorney in Tampa kept BCCI alive, and had the effect of discouraging BCCI's officials from telling the U.S. what they knew about BCCI's larger criminality, including its ownership of First American and other U.S. banks.

The Justice Department essentially stopped investigating BCCI following the plea agreement, until press accounts, Federal Reserve action, and the New York District Attorney's investigation in New York forced them into action in mid-1991.

Justice Department personnel in Washington lobbied state regulators to keep BCCI open after the January 1990 plea agreement, following lobbying of them by former Justice Department personnel now representing BCCI.

Relations between main Justice in Washington and the U.S. Attorney for Miami, Dexter Lehtinen, broke down on BCCI-related prosecutions, and key actions on BCCI-related cases in Miami were, as a result, delayed for months during 1991.

Justice Department personnel in Washington, Miami, and Tampa actively obstructed and impeded Congressional attempts to investigate BCCI in 1990, and this practice continued to some extent until William P. Barr became Attorney General in late October, 1991.

Justice Department personnel in Washington, Miami and Tampa obstructed and impeded attempts by New York District Attorney Robert Morgenthau to obtain critical information concerning BCCI in 1989, 1990, and 1991, and in one case, a federal prosecutor lied to Morgenthau's office concerning the existence of such material. Important failures of cooperation continued to take place until William P. Barr became Attorney General in late October, 1991.

Cooperation by the Justice Department with the Federal Reserve was very limited until after BCCI's global closure on July 5, 1991.

Some public statements by the Justice Department concerning its handling of matters pertaining to BCCI were more cleverly crafted than true.

## 5. NEW YORK DISTRICT ATTORNEY MORGENTHAU NOT ONLY BROKE THE CASE ON BCCI, BUT INDIRECTLY BROUGHT ABOUT BCCI'S GLOBAL CLOSURE.

Acting on information provided him by the Subcommittee, New York District Attorney Robert Morgenthau began an investigation in 1989 of BCCI which materially contributed to the chain of events that resulted in BCCI's closure.

Questions asked by the District Attorney intensified the review of BCCI's activities by its auditors, Price Waterhouse, in England, and gave life to a moribund Federal Reserve investigation of BCCI's secret ownership of First American.

REENTERED AS EXHIBIT 3

The District Attorney's criminal investigation was critical to stopping an intended reorganization of BCCI worked out through an agreement among the Bank of England, the government of Abu Dhabi, BCCI's auditors, Price Waterhouse, and BCCI itself, in which the nature and extent of BCCI's criminality would be suppressed, while Abu Dhabi would commit its financial resources to keep the bank going during a restructuring. By the late spring of 1991, the key obstacle to a successful restructuring of BCCI bankrolled up Abu Dhabi was the possibility that the District Attorney of New York would indict. Such an indictment would have inevitably caused a swift and thoroughly justified international run on BCCI by depositors all over the world. Instead, it was a substantial factor in the decision of the Bank of England to take the information it had received from Price Waterhouse and rely on it to close BCCI.

## 6. BCCI'S ACCOUNTANTS FAILED TO PROTECT BCCI'S INNOCENT DEPOSITORS AND CREDITORS FROM THE CONSEQUENCES OF POOR PRACTICES AT THE BANK OF WHICH THE AUDITORS WERE AWARE FOR YEARS.

BCCI's decision to divide its operations between two auditors, neither of whom had the right to audit all BCCI operations, was a significant mechanism by which BCCI was able to hide its frauds during its early years. For more than a decade, neither of BCCI's auditors objected to this practice.

BCCI provided loans and financial benefits to some of its auditors, whose acceptance of these benefits creates an appearance of impropriety, based on the possibility that such benefits could in theory affect the independent judgment of the auditors involved. These benefits included loans to two Price Waterhouse partnerships in the Caribbean. In addition, there are serious questions concerning the acceptance of payments and possibly housing from BCCI or its affiliates by Price Waterhouse partners in the Grand Caymans, and possible acceptance of sexual favors provided by BCCI officials to certain persons affiliated with the firm.

Regardless of BCCI's attempts to hide its frauds from its outside auditors, there were numerous warning bells visible to the auditors from the early years of the bank's activities, and BCCI's auditors could have and should have done more to respond to them.

By the end of 1987, given Price Waterhouse (UK)'s knowledge about the inadequacies of BCCI's records, it had ample reason to recognize that there could be no adequate basis for certifying that it had examined BCCI's books and records and that its picture of those records were indeed a "true and fair view" of BCCI's financial state of affairs.

The certifications by BCCI's auditors that its picture of BCCI's books were "true and fair" from December 31, 1987 forward, had the consequence of assisting BCCI in misleading depositors, regulators, investigators, and other financial institutions as to BCCI's true financial condition.

Prior to 1990, Price Waterhouse (UK) knew of gross irregularities in BCCI's handling of loans to CCAH/First American and was told of violations of U.S. banking laws by BCCI and its borrowers in connection with CCAH/First American, and failed to advise the partners of its U.S. affiliate or any U.S. regulator.

REENTERED AS EXHIBIT 3

There is no evidence that Price Waterhouse (UK) has to this day notified Price Waterhouse (US) of the extent of the problems it found at BCCI, or of BCCI's secret ownership of CCAH/First American. Given the lack of information provided Price Waterhouse (US) by its United Kingdom affiliate, the U.S. firm performed its auditing of BCCI's U.S. branches in a manner that was professional and diligent, albeit unilluminating concerning BCCI's true activities in the United States.

Price Waterhouse's certification of BCCI's books and records in April, 1990 was explicitly conditioned by Price Waterhouse (UK) on the proposition that Abu Dhabi would bail BCCI out of its financial losses, and that the Bank of England, Abu Dhabi and BCCI would work with the auditors to restructure the bank and avoid its collapse. Price Waterhouse would not have made the certification but for the assurances it received from the Bank of England that its continued certification of BCCI's books was appropriate, and indeed, necessary for the bank's survival.

The April 1990 agreement among Price Waterhouse (UK), Abu Dhabi, BCCI, and the Bank of England described above, resulted in Price Waterhouse (UK) certifying the financial picture presented in its audit of BCCI as "true and fair," with a single footnote material to the huge losses still to be dealt with, failed adequately to describe their serious nature. As a consequence, the certification was materially misleading to anyone who relied on it ignorant of the facts then mutually known to BCCI, Abu Dhabi, Price Waterhouse and the Bank of England.

The decision by Abu Dhabi, Price Waterhouse (UK), BCCI and the Bank of England to reorganize BCCI over the duration of 1990 and 1991, rather than to advise the public of what they knew, caused substantial injury to innocent depositors and customers of BCCI who continued to do business with an institution which each of the above parties knew had engaged in fraud.

From at least April, 1990 through November, 1990, the Government of Abu Dhabi had knowledge of BCCI's criminality and frauds which it apparently withheld from BCCI's outside auditors, contributing to the delay in the ultimate closure of the bank, and causing further injury to the bank's innocent depositors and customers.

### 7. THE CIA DEVELOPED IMPORTANT INFORMATION ON BCCI, AND INADVERTENTLY FAILED TO PROVIDE IT TO THOSE WHO COULD USE IT.

### THE CIA AND FORMER CIA OFFICIALS HAD A FAR WIDER RANGE OF CONTACTS AND LINKS TO BCCI AND BCCI SHAREHOLDERS, OFFICERS, AND CUSTOMERS, THAN HAS BEEN ACKNOWLEDGED BY THE CIA.

By early 1985, the CIA knew more about BCCI's goals and intentions concerning the U.S. banking system than anyone else in government, and provided that information to the U.S. Treasury and the Office of the Comptroller of the Currency, neither of whom had the responsibility for regulating the First American Bank that BCCI had taken over. The CIA failed to provide the critical information it had gathered to the correct users of the information -- the Federal Reserve and the Justice Department.

REENTERED AS EXHIBIT 3

After the CIA knew that BCCI was as an institution a fundamentally corrupt criminal enterprise, it continued to use both BCCI and First American, BCCI's secretly held U.S. subsidiary, for CIA operations.

While the reporting concerning BCCI by the CIA was in some respects impressive -- especially in its assembling of the essentials of BCCI's criminality, its secret purchase of First American by 1985, and its extensive involvement in money laundering -- there were also remarkable gaps in the CIA's reported knowledge about BCCI.

Former CIA officials, including former CIA director Richard Helms and the late William Casey; former and current foreign intelligence officials, including Kamal Adham and Abdul Raouf Khalil; and principal foreign agents of the U.S., such as Adnan Khashoggi and Manucher Ghorbanifar, float in and out of BCCI at critical times in its history, and participate simultaneously in the making of key episodes in U.S. foreign policy, ranging from the Camp David peace talks to the arming of Iran as part of the Iran/Contra affair. Yet the CIA has continued to maintain that it has no information regarding any involvement of these people, raising questions about the quality of intelligence the CIA is receiving generally, or its candor with the Subcommittee. The CIA's professions of total ignorance about their respective roles in BCCI are out of character with the Agency's early knowledge of many critical aspects of the bank's operations, structure, personnel, and history.

The errors made by the CIA in connection with its handling of BCCI were complicated by its handling of this Congressional investigation. Initial information that was provided by the CIA was untrue; later information that was provided was incomplete; and the Agency resisted providing a "full" account about its knowledge of BCCI until almost a year after the initial requests for the information. These experiences suggest caution in concluding that the information provided to date is full and complete. The relationships among former CIA personnel and BCCI front men and nominees, including Kamal Adham, Abdul Khalil, and Mohammed Irvani, requires further investigation.

## 8. THE FLAWED DECISIONS MADE BY REGULATORS IN THE US WHICH ALLOWED BCCI TO SECRETLY ACQUIRE US BANKS WERE CAUSED IN PART BY GAPS IN THE REGULATORY PROCESS AND IN PART BY BCCI'S USE OF WELL-CONNECTED LAWYERS TO HELP THEM THROUGH THE PROCESS.

When the Federal Reserve approved the take over of Financial General Bankshares by CCAH in 1981, it had substantial circumstantial evidence before it to suggest that BCCI was behind the bank's purchase. The Federal Reserve chose not to act on that evidence because of the specific representations that were made to it by CCAH's shareholders and lawyers, that BCCI was neither financing nor directing the take over. These representations were untrue and the Federal Reserve would not have approved the CCAH application but for the false statements made to it.

In approving the CCAH application, the Federal Reserve relied upon representations from the Central Intelligence Agency, State Department, and other U.S. agencies that they had no objections to or concerns about the Middle Eastern shareholders who were purporting to purchase shares in the bank. The Federal Reserve also relied upon the reputation for integrity of BCCI's lawyers, especially that of former Secretary of Defense Clark Clifford and former

REENTERED AS EXHIBIT 3

Federal Reserve counsel Baldwin Tuttle. Assurances provided the Federal Reserve by the CIA and State Department, and by both attorneys, had a material impact on the Federal Reserve's willingness to approve the CCAH application despite its concerns about BCCI's possible involvement.

In 1981, the Office of the Comptroller of the Currency had additional information, from reports concerning BCCI's role in the Bank of America and the National Bank of Georgia, concerning BCCI's possible use of nominee arrangements and alter egos to purchase banks on its behalf in the United States, which it failed to pass on to the Federal Reserve. This failure was inadvertent, not intentional.

In approving the CCAH application, the Federal Reserve permitted BCCI and its attorneys to carve out a seeming loophole in the commitment that BCCI not be involved in financing or controlling CCAH's activities. This loophole permitted BCCI to act as an investment advisor and information conduit to CCAH's shareholders. The Federal Reserve's decision to accept this arrangement allowed BCCI and its attorneys and agents to use these permitted activities as a cover for the true nature of BCCI's ownership of CCAH and the First American Banks.

After approving the CCAH application in 1981, the Federal Reserve received few indicators about BCCI's possible improper involvement in CCAH/First American. However, at several critical junctures, especially the purchase by First American of the National Bank of Georgia from Ghaith Pharaon in 1986, there were obvious warnings signs that could have been investigated and which were not, until late 1990.

As a foreign bank whose branches were chartered by state banking authorities, BCCI largely escaped the Federal Reserve's scrutiny regarding its criminal activities in the United States unrelated to its interest in CCAH/First American. This gap in regulatory oversight has since been closed by the passage of the Foreign Bank Supervision Enhancement Act of 1991.

The U.S. Treasury Department failed to provide the Federal Reserve with information it received concerning BCCI's ownership of First American in 1985 and 1986 from the CIA. However, IRS agents did provide important information to the Federal Reserve on this issue in early 1989, which the Federal Reserve failed adequately to investigate at the time.

The FDIC approved Ghaith Pharaon's purchase of the Independence Bank in 1985 knowing him to be a shareholder of BCCI and knowing that he was placing a senior BCCI officer in charge of the bank, and failed to confer with the Federal Reserve or the OCC regarding their previous experiences with Pharaon and BCCI.

Once the Federal Reserve commenced a formal investigation of BCCI and First American on January 3, 1991, its investigation of BCCI and First American was aggressive and diligent. Its decisions to force BCCI out of the United States and to divest itself of First American were prompt. The charges it brought against the parties involved with BCCI in violating federal banking standards were fully justified by the record. Its investigations have over the past year contributed substantially to public understanding to date of what took place.

Even after the Federal Reserve understood the nature and scope of BCCI's frauds, it did not seek to have BCCI closed globally. This position was in some measure the consequence of the Federal Reserve's need to secure the cooperation of BCCI's majority shareholders, the

REENTERED AS EXHIBIT 3

government and royal family of Abu Dhabi, in providing some $190 million to prop up First American Bank and prevent an embarrassing collapse. However, Federal Reserve investigators did actively work in the spring of 1991 to have BCCI's top management removed.

In investigating BCCI, the Federal Reserve's efforts were hampered by examples of lack of cooperation by foreign governments, including most significantly the Serious Fraud Office in the United Kingdom and, since the closure of BCCI on July 5, 1991, the government of Abu Dhabi.

U.S. regulatory handling of the U.S. banks secretly owned by BCCI was hampered by lack of coordination among the regulators, which included the Federal Reserve, the FDIC, and the OCC, highlighting the need for further integration of these separate banking regulatory agencies on supervision and enforcement.

## 9. THE BANK OF ENGLAND'S REGULATION OF BCCI WAS WHOLLY INADEQUATE TO PROTECT BCCI'S DEPOSITORS AND CREDITORS, AND THE BANK OF ENGLAND WITHHELD INFORMATION ABOUT BCCI'S FRAUDS FROM PUBLIC KNOWLEDGE FOR FIFTEEN MONTHS BEFORE CLOSING THE BANK.

The Bank of England had deep concerns about BCCI from the late 1970s on, and undertook several steps to slow BCCI's expansion in the United Kingdom.

In 1988 and 1989, the Bank of England learned of BCCI's involvement in the financing of terrorism and in drug money laundering, and undertook additional, but limited supervision of BCCI in response to receiving this information.

In the spring of 1990, Price Waterhouse advised the Bank of England that there were substantial loan losses at BCCI, numerous poor banking practices, and evidence of fraud, which together had created a massive hole in BCCI's books. The Bank of England's response to the information was not to close BCCI down, but to find ways to prop up BCCI and prevent its collapse. This meant, among other things, keeping secret the very serious nature of BCCI's problems from its creditors and one million depositors.

In April, 1990, the Bank of England reached an agreement with BCCI, Abu Dhabi, and Price Waterhouse to keep BCCI from collapsing. Under the agreement, Abu Dhabi agreed to guarantee BCCI's losses and Price Waterhouse agreed to certify BCCI's books. As a consequence, innocent depositors and creditors who did business with BCCI following that date were deceived into believing that BCCI's financial problems were not as serious as each of these parties already knew them to be.

From April, 1990, the Bank of England relied on British bank secrecy and confidentiality laws to reduce the risk of BCCI's collapse if word of its improprieties leaked out. As a consequence, innocent depositors and creditors who did business with BCCI following that date were denied vital information, in the possession of the regulators, auditors, officers, and shareholders of BCCI, that could have protected them against their losses.

REENTERED AS EXHIBIT 3

In order to prevent risk to its restructuring plan for BCCI and a possible run on BCCI, the Bank of England withheld important information from the Federal Reserve in the spring of 1990 about the size and scope of BCCI's lending on CCAH/First American shares, despite the Federal Reserve's requests for such information. This action by the Bank of England delayed the opening of a full investigation by the Federal Reserve for approximately eight months.

Despite its knowledge of some of BCCI's past frauds, and its own understanding that consolidation into a single entity is essential for regulating a bank, in late 1990 and early 1991 the Bank of England tentatively agreed with BCCI and its Abu Dhabi owners to permit BCCI to restructure as three "separate" institutions, based in London, Abu Dhabi and Hong Kong. This tentative decision demonstrated extraordinarily poor judgment on the part of the Bank of England. This decision was reversed abruptly when the Bank of England suddenly decided to close BCCI instead in late June, 1991.

The decision by the Bank of England in April 1990 to permit BCCI to move its headquarters, officers, and records out of British jurisdiction to Abu Dhabi has had profound negative consequences for investigations of BCCI around the world. As a result of this decision, essential records and witnesses regarding what took place were removed from the control of the British government, and placed under the control of the government of Abu Dhabi, which has to date withheld them from criminal investigators in the U.S. and U.K. This decision constituted a costly, and likely irretrievable, error on the part of the Bank of England.

## 10. CLARK CLIFFORD AND ROBERT ALTMAN PARTICIPATED IN IMPROPRIETIES WITH BCCI IN THE UNITED STATES.

Regardless of whether Clifford and Altman were deceived by BCCI in some respects, both men participated in some BCCI's deceptions in the United States.

Beginning in late 1977, Clifford and Altman assisted BCCI in purchasing a U.S. bank, Financial General Bankshares, with the participation of nominees, and understood BCCI's central involvement in directing and controlling the transaction.

In the years that followed, they made business decisions regarding acquisitions for First American that were motivated by BCCI's goals, rather than by the business needs of First American itself; and represented as their own to regulators decisions that had been made by Abedi and BCCI on fundamental matters concerning First American, including the purchase by First American of the National Bank of Georgia and First American's decision to purchase branches in New York City.

Clifford and Altman concealed their own financing of shares of First American by BCCI from First American's other directors and from U.S. regulators, withheld critical information that they possessed from regulators in an effort to keep the truth about BCCI's ownership of First American secret, and deceived regulators and the Congress concerning their own knowledge of and personal involvement in BCCI's illegalities in the United States.

## 11. ABU DHABI'S INVOLVEMENT IN BCCI'S AFFAIRS WAS FAR MORE CENTRAL THAN IT HAS ACKNOWLEDGED, INVOLVING IN SOME CASES NOMINEE RELATIONS AND NO-RISK TRANSACTIONS THAT ABU DHABI IS

REENTERED AS EXHIBIT 3

**TODAY COVERING-UP THROUGH HIDING WITNESSES AND DOCUMENTS FROM U.S. INVESTIGATORS.**

Members of Abu Dhabi's ruling family appear to have contributed no more than $500,000 to BCCI's capitalization prior to April 1990, despite being the record owner of almost one-quarter of the bank's total shares. An unknown but substantial percentage of the shares acquired by Abu Dhabi overall in BCCI appear to have been acquired on a risk-free basis -- either with guaranteed rates of return, buy-back arrangements, or both.

The interest held in BCCI by the Abu Dhabi ruling family, like the interests held by the rulers of the three other gulf sheikdoms in the United Arab Emirates who owned shares of BCCI, materially aided and abetted Abedi and BCCI in projecting the illusion that BCCI was backed by, and capitalized by, Abu Dhabi's wealth. Investments made in BCCI by the Abu Dhabi Investment Authority appear to have been genuine, although possibly guaranteed by BCCI with buy-back or other no-risk arrangements.

Shares in Financial General Bankshares held by members of the Abu Dhabi royal family in late 1977 and early 1978 appear to have been nominee arrangements, adopted by Abu Dhabi as a convenience to BCCI and Abedi, under arrangements in which Abu Dhabi was to be without risk, and BCCI was to guarantee the purchase through a commitment to buy-back the stock at an agreed upon price.

Abu Dhabi's representative to BCCI's board of directors, Ghanim al Mazrui, received unorthodox financial benefits from BCCI in no-risk stock deals which may have compromised his ability to exercise independent judgment concerning BCCI's actions; confirmed at least one fraudulent transaction involving Abu Dhabi; and engaged in other improprieties pertaining to BCCI; but remains today in place at the apex of Abu Dhabi's committee designated to respond to BCCI's collapse.

In April, 1990, Abu Dhabi was told in detail about BCCI's fraud by top BCCI officials, and failed to advise BCCI's external auditors of what it had learned. Between April, 1990 and November, 1990, Abu Dhabi and BCCI together kept some information concerning BCCI's frauds hidden from the auditors.

From April, 1990 through July 5, 1991, Abu Dhabi tried to save BCCI through a massive restructuring. As part of the restructuring process, Abu Dhabi agreed to take responsibility for BCCI's losses, Price Waterhouse agreed to certify BCCI's books for another year, and Abu Dhabi, Price Waterhouse, the Bank of England, and BCCI agreed to keep all information concerning BCCI's frauds and other problems secret from BCCI's one million depositors, as well as from U.S. regulators and law enforcement, to prevent a run on the bank.

After the Federal Reserve was advised by the New York District Attorney of possible nominee arrangements involving BCCI and First American, Abu Dhabi, in an apparent effort to gain the Federal Reserve's acquiescence in BCCI's proposed restructuring, provided limited cooperation to the Federal Reserve, including access to selected documents. The cooperation did not extend to permitting the Federal Reserve open access to all BCCI documents, or substantive communication with key BCCI officials held in Abu Dhabi, such as BCCI's former president, Swaleh Naqvi. That access ended with the closure of BCCI July 5, 1991.

REENTERED AS EXHIBIT 3

From November, 1990 through the present, Abu Dhabi has failed to provide documents and witnesses to U.S. law enforcement authorities and to the Congress, despite repeated commitments to do so. Instead, it has actively prevented U.S. investigators from having access to vital information necessary to investigate BCCI's global wrongdoing.

The proposed agreement between Abu Dhabi and BCCI's liquidators to settle their claims against one another contains provisions which could have the consequence of permitting Abu Dhabi to cover up any wrongdoing it may have had in connection with BCCI.

There is some evidence that the Sheikh Zayed may have had a political agenda in agreeing to the involvement of members of the Abu Dhabi royal family and its investment authority in purchasing shares of Financial General Bankshares, then of CCAH/First American. This evidence is offset, in part, by testimony that Abu Dhabi share purchases in the U.S. bank were done at Abedi's request and did not represent an actual investment by Abu Dhabi until much later.

## 12. BCCI MADE EXTENSIVE USE OF THE REVOLVING DOOR AND POLITICAL INFLUENCE PEDDLING IN THE UNITED STATES TO ACCOMPLISH ITS GOALS.

BCCI's political connections in Washington had a material impact on its ability to accomplish its goals in the United States. In hiring lawyers, lobbyists and public relations firms in the United States to help it deal with its problems vis a vis the government, BCCI pursued a strategy that it had practiced successfully around the world: the hiring of former government officials.

BCCI's and its shareholders' cadre of professional help in Washington D.C. included, at various times, a former Secretary of Defense (Clark Clifford), former Senators and Congressmen (John Culver, Mike Barnes), former federal prosecutors (Larry Wechsler, Raymond Banoun, and Larry Barcella, a former State Department Official (William Rogers), a former White House aide (Ed Rogers), a current Presidential campaign deputy director (James Lake), and former Federal Reserve Attorneys (Baldwin Tuttle, Jerry Hawke, and Michael Bradfield). In addition, BCCI solicited the help of Henry Kissinger, who chose not to do business with BCCI but made a referral of BCCI to his own lawyers.

At several key points in BCCI's activities in the U.S., the political influence and personal contacts of those it hired had an impact in helping BCCI accomplish its goals, including in connection with the 1981 CCAH acquisition of FGB and the handling and aftermath of BCCI's plea agreement in Tampa in 1990.

The political connections of BCCI's U.S. lawyers and lobbyists were critical to impeding Congressional and law enforcement investigations from 1988 through 1991, through a variety of techniques that included impugning the motives and integrity of investigators and journalists, withholding subpoenaed documents, and lobbying on capital hill to protect BCCI's reputation and discourage efforts to close the bank down in the United States.

## 13. BCCI'S PUBLIC RELATIONS FIRM SMEARED PEOPLE WHO WERE TELLING THE TRUTH AS PART OF ITS WORK FOR BCCI.

When Hill and Knowlton accepted BCCI's account in October, 1988, its partners knew of BCCI's reputation as a "sleazy" bank, but took the account anyway. In 1988 and 1989, Hill and Knowlton assisted BCCI with an aggressive public relations campaign designed to demonstrate that BCCI was not a criminal enterprise, and to put the best face possible on the Tampa drug money laundering indictments. In so doing, it disseminated materials unjustifiably and unfairly discrediting persons and publications who were telling the truth about BCCI's criminality.

Important information provided by Hill and Knowlton to Capitol Hill and provided by First American to regulators concerning the relationship between BCCI and First American in April, 1990 was false. The misleading material represented the position of BCCI, First American, Clifford and Altman concerning the relationship, and was contrary to the truth known by BCCI, Clifford and Altman.

Hill and Knowlton's representation of BCCI was within the norms and standards of the public relations industry, but raises larger questions as to the relationship of those norms and standards to the public interest.

### 14. BCCI ACTIVELY SOLICITED THE FRIENDSHIPS OF MAJOR U.S. POLITICAL FIGURES, AND MADE PAYMENTS TO THESE POLITICAL FIGURES, WHICH IN SOME CASES MAY HAVE BEEN IMPROPER.

Beginning with Bert Lance in 1977, whose debts BCCI paid off with a $3.5 million loan, BCCI, BCCI nominees, and top officials of BCCI systematically developed friendships and relationships with important U.S political figures. While those which are publicly known include former president Jimmy Carter, Jesse Jackson, and Andrew Young, the Subcommittee has received information suggesting that BCCI's network extended to other U.S. political figures. The payments made by BCCI to Andrew Young while he was a public official were at best unusual, and by all appearances, improper.

### 15. BCCI'S COMMODITIES AFFILIATE, CAPCOM, ENGAGED IN BILLIONS OF DOLLARS OF LARGELY ANONYMOUS TRADING IN THE US WHICH INCLUDED A VERY SUBSTANTIAL LEVEL OF MONEY LAUNDERING, WHILE CAPCOM SIMULTANEOUSLY DEVELOPED SIGNIFICANT TIES TO IMPORTANT U.S. TELECOMMUNICATIONS INDUSTRY EXECUTIVES AND FOREIGN INTELLIGENCE FIGURES.

BCCI's commodities affiliate, Capcom, based in Chicago, London and Cairo, was principally staffed by former BCCI bankers, capitalized by BCCI and BCCI customers, and owned by BCCI, BCCI shareholders, and front-men. Capcom employed many of the same practices as BCCI, especially the use of nominees and front companies to disguise ownership and the movement of money. Four U.S. citizens -- none of whom had any experience or expertise in the commodities markets -- played important and varied roles as Capcom front men in the United States.

While investigation information concerning Capcom is incomplete, its activities appear to have included misappropriation of BCCI assets; the laundering of billions of dollars from the

Middle East to the US and other parts of the world; and the siphoning of assets from BCCI to create a safe haven for them outside of the official BCCI empire.

Capcom's majority shareholders, Kamal Adham and A.R. Khalil, were both former senior Saudi government officials and successively acted as Saudi Arabia's principal liaisons to the Central Intelligence Agency during the 1970's and 1980's.

Its U.S. front men included Robert Magness, the CEO of the largest U.S. cable telecommunications company, TCI; a vice-President of TCI, Larry Romrell; and two other Americans, Kerry Fox and Robert Powell, with long-standing business interests in the Middle East. Magness, Romrell and Fox received loans from BCCI for real estate ventures in the U.S., and Magness and Romrell discussed numerous business ventures between BCCI and TCI, some of which involved the possible purchase of U.S. telecommunications stock and substantial lending by BCCI.

Commodities regulators with the responsibility for investigating Capcom showed little interest in conducting a thorough investigation of its activities, and in 1989 allowed Capcom to avoid such an investigation through agreeing to cease doing business in the United States.

The Subcommittee could not determine whether BCCI, Capcom, or their shareholders or agents actually acquired equity interests in the U.S. cable industry and believes further investigation of matters pertaining to Capcom is essential.

### 16. INVESTIGATIONS OF BCCI TO DATE REMAIN INCOMPLETE, AND MANY LEADS CANNOT BE FOLLOWED UP, AS THE RESULT OF DOCUMENTS BEING WITHHELD FROM US INVESTIGATORS BY THE BRITISH GOVERNMENT, AND DOCUMENTS AND WITNESSES BEING WITHHELD FROM US INVESTIGATORS BY THE GOVERNMENT OF ABU DHABI.

Many of the specific criminal transactions engaged in by BCCI's customers remain hidden from investigation as the result of bank secrecy laws in many jurisdictions, British national security laws, and the holding of key witnesses and documents by the Government of Abu Dhabi. Documents pertaining to BCCI's use to finance terrorism, to assist the builders of a Pakistani nuclear bomb, to finance Iranian arms deals, and related matters have been sealed in the United Kingdom by British intelligence and remain unavailable to U.S. investigators. Many other basic matters pertaining to BCCI's criminality, including any list that may exist of BCCI's political payoffs and bribes, remain sequestered in Abu Dhabi and unavailable to U.S. investigators.

Many investigative leads remain to be explored, but cannot be answered with devoting substantial additional sources that to date no agency of government has been in a position to provide.

Unanswered questions include, but are not limited to, the relationship between BCCI and the Banco Nazionale del Lavoro; the alleged relationship between the late CIA director William Casey and BCCI; the extent of BCCI's involvement in Pakistan's nuclear program; BCCI's manipulation of commodities and securities markets in Europe and Canada; BCCI's activities in India, including its relationship with the business empire of the Hinduja family; BCCI's relationships with convicted Iraqi arms dealer Sarkis Sarkenalian, Syrian drug trafficker,

REENTERED AS EXHIBIT 3

terrorist, and arms trafficker Monzer Al-Kassar, and other major arms dealers; the use of BCCI by central figures in the alleged "October Surprise," BCCI's activities with the Central Bank of Syria and with the Foreign Trade Mission of the Soviet Union in London; its involvement with foreign intelligence agencies; the financial dealingst of BCCI directors with Charles Keating and several Keating affiliates and front-companies, including the possibility that BCCI related entities may have laundered funds for Keating to move them outside the United States; BCCI's financing of commodities and other business dealings of international criminal financier Marc Rich; the nature, extent and meaning of the ownership of other major U.S. financial institutions by Middle Eastern political figures; the nature, extent, and meaning of real estate and financial investments in the United States by major shareholders of BCCI; the sale of BCCI affiliate Banque de Commerce et Placement in Geneva, to the Cukorova Group of Turkey, which owned an entity involved in the BNL Iraqi arms sales, among others.

The withholding of documents and witnesses from U.S. investigators by the Government of Abu Dhabi threatens vital U.S. foreign policy, anti-narcotics and money laundering, and law enforcement interests, and should not be tolerated.

## SUMMARY OF LEGISLATIVE RECOMMENDATIONS

**1. THE SUBCOMMITTEE RECOMMENDS THAT THE UNITED STATES DEVELOP A MORE AGGRESSIVE AND COORDINATED APPROACH TO INTERNATIONAL FINANCIAL CRIME, AND TO MOVE FURTHER AGAINST FOREIGN PRIVACY AND CONFIDENTIAL LAWS THAT PROTECT CRIMINALS.**

**2. THE SUBCOMMITTEE RECOMMENDS THAT THE JUSTICE DEPARTMENT RECONSIDER THE POLICIES AND PRACTICES THAT LED TO ITS INEFFECTIVENESS IN INVESTIGATING AND PROSECUTING BCCI, AND IMPAIRED ITS ABILITY TO COOPERATE WITH OTHER INVESTIGATIONS OF BCCI BEING CONDUCTED BY THE FEDERAL RESERVE, NEW YORK DISTRICT ATTORNEY, AND THE SENATE.**

**3. THE SUBCOMMITTEE RECOMMENDS THAT THE CENTRAL INTELLIGENCE AGENCY AND STATE DEPARTMENT UPGRADE THE TRACKING OF FOREIGN FINANCIAL INSTITUTIONS AND ACTIVITIES, AND THE DISSEMINATION OF INFORMATION CONCERNING SUCH INSTITUTIONS.**

**4. THE SUBCOMMITTEE RECOMMENDS THAT THE CONGRESS CONSIDER WHETHER ADDITIONAL OVERSIGHT MECHANISMS ARE NECESSARY TO ENSURE THE CIA'S ACCOUNTABILITY ON THE PROVISION OF INFORMATION.**

**5. THE SUBCOMMITTEE RECOMMENDS THAT FEDERAL AGENCIES IMPOSE NEW REQUIREMENTS ON FOREIGN AUDITORS TO PROTECT U.S. INTERESTS IN ANY CASE IN WHICH ANY SUCH AGENCY IS RELYING ON AN AUDIT CERTIFIED BY A FOREIGN AUDITOR. AT MINIMUM, THIS SHOULD REQUIRE FOREIGN AUDITORS WHOSE CERTIFICATIONS ARE USED BY INSTITUTIONS DOING BUSINESS IN THE U.S. AGREE TO SUBMIT THEMSELVES TO U.S. LAWS.**

REENTERED AS EXHIBIT 3

6. THE SUBCOMMITTEE RECOMMENDS THAT THE PRESIDENT AND THE SECRETARY OF STATE ADVISE THE GOVERNMENT OF ABU DHABI THAT ITS WITHHOLDING OF DOCUMENTS AND WITNESSES PERTAINING TO BCCI FROM U.S. FEDERAL LAW ENFORCEMENT INVESTIGATORS, THE FEDERAL RESERVE, THE NEW YORK DISTRICT ATTORNEY AND THE CONGRESS THREATENS VITAL U.S. INTERESTS AND WILL NOT BE TOLERATED.

7. FURTHER ATTENTION NEEDS TO BE GIVEN TO THE PROBLEM OF THE REVOLVING DOOR IN WASHINGTON, AND THE IMPACT ON THE REGULATORY PROCESS AND ON LAW ENFORCEMENT OF POLITICAL INFLUENCE IN WASHINGTON. THE SUBCOMMITTEE RECOMMENDS THE CONSIDERATION OF LEGISLATING A FEDERAL STATUTORY CODE OF CONDUCT FOR ATTORNEYS WHO PRACTICE BEFORE FEDERAL AGENCIES.

8. THE SELF-REGULATION OF THE U.S COMMODITIES MARKETS BY THE COMMODITIES FUTURES TRADING COMMISSION, THE CHICAGO BOARD OF TRADE, AND THE CHICAGO MERCANTILE EXCHANGE IS INADEQUATE TO PROTECT THOSE MARKETS AGAINST MONEY LAUNDERING INVOLVING TRADES

FROM ABROAD. THE SUBCOMMITTEE RECOMMENDS THAT THE EXCHANGES MAKE MONEY LAUNDERING ILLEGAL, AND DEMAND THAT THIS REQUIREMENT BE ACCEPTED BY FOREIGN COMMODITIES EXCHANGES WITH WHOM THEY DO BUSINESS, AS A CONDITION OF ACCESS TO US EXCHANGES.

9. THE SUBCOMMITTEE RECOMMENDS THAT FURTHER STEPS BE TAKEN TO INSURE ADEQUATE ACCOUNTABILITY OF FOREIGN FINANCIAL INSTITUTIONS DOING BUSINESS IN THE UNITED STATES, INCLUDING REQUIRING FOREIGN BANKS FORM SEPARATELY CAPITALIZED HOLDING COMPANIES IN THE UNITED STATES AS A CONDITION OF LICENSE AND THE CONSIDERATION BY THE FEDERAL RESERVE OF ESTABLISHMENT A MINIMUM STANDARD FOR CONSOLIDATED REGULATION THAT EXCLUDES BANK REGULATORY HAVENS.

10. THE SUBCOMMITTEE RECOMMENDS THAT FOREIGN INVESTORS WHO PURCHASE SUBSTANTIAL SHARES OF U.S. BUSINESSES BE REQUIRED TO APPEAR PERSONALLY IN THE UNITED STATES AS INSURANCE THAT THE FOREIGN INVESTOR IS NOT ACTING AS A NOMINEE FOR SOMEONE ELSE.

11. TURF WARS CONTINUE TO SEVERELY DAMAGE THE ABILITY OF LAW-ENFORCEMENT AGENCIES IN THE UNITED STATES TO DO THEIR JOB. THE SUBCOMMITTEE RECOMMENDS THE ESTABLISHMENT OF A COMMITTEE OF LAW ENFORCEMENT OFFICIALS WHOSE JOB IT IS TO CONDUCT OVERSIGHT OF, PREVENT, AND RESPOND TO FAILURES OF COOPERATION IN LAW ENFORCEMENT.

**12. THE SUBCOMMITTEE RECOMMENDS THAT A STATUTORY MECHANISM FOR THE RECEIPT BY CONGRESS OF FOREIGN FINANCIAL INFORMATION BE ESTABLISHED.**

## INTRODUCTION AND SUMMARY OF INVESTIGATION

BCCI cannot be taken as an isolated example of a rogue bank, but a case study of the vulnerability of the world to international crime on a global scope that is beyond the current ability of governments to control. Its multi-billion dollar collapse is merely the latest in a series of international financial scandals that have bedeviled international banking this century. Its techniques and its associations with government officials, intelligence agencies, and arms traffickers, were neither new nor unique.

For example, as far back as the 1920's, the International Match Corp bilked shareholders and lenders out of some $500 million through switching company assets and liabilities among a series of shell entities, creating fictional assets when existing ones were adequate, and through transferring funds from the United States offshore. All the while, its chairman, Ivan Kreuger, maintained friendships with numerous world leaders including then U.S. President Herbert Hoover, in a manner reminiscent of BCCI's founder Agha Hasan Abedi's relationships wit President Carter a half a century later.

During the 1960's, the Channel Islands off the coast of England became the host to a series of post-off box banks, including the infamous Bank of Sark, whose facilities including a room over a pub, a desk and a telephone. That headquarters proved adequate to enable the swindlers who established the bank to use it to sell some $100 million in fraudulent checks and letters of credit on the phantom bank before their criminality was discovered.

In the same period, Bernie Cornfeld, chairman of the Investors Overseas Service (IOS), which sold "The Fund of Funds," and fugitive financier Robert Vesco, siphoned off hundreds of millions of dollars from investors in the mutual fund that at its height had $3 billion in assets under its management. In doing so, it moved funds held at Credit Suisse to a small bank which IOS itself owned based in Luxembourg, from which the funds disappeared. Again, this technique anticipated the methods used by BCCI to shift assets from legitimate institutions to its own, and then to engage in wire transfers sufficient to make them impossible to track.

Similar techniques were used by Italian financier Michele Sindona in connection with his management of Banco Ambrosiano in Italy; and by former CIA agent Michael Hand in the drug money laundering Nugan Hand Bank in Australia during the late 1970's and early 1980's. The latter institution had numerous ties to U.S. intelligence and military personnel which have never been explained.

REENTERED AS EXHIBIT 3

Thus, the rise and fall of BCCI is not an isolated phenomenon, but a recurrent problem that has grown along with the growth in the international financial community itself. Given the extraordinary magnitude of international financial transactions -- which amount to some $4 trillion per day moving through the New York clearance system alone -- the opportunities for fraud are huge, the rewards great, and the systems put in place to protect against them, far from adequate, as this report demonstrates in some detail.

The scope and variety of BCCI's criminality, and the issues raised by that criminality, are immense, and beyond the scope of any single investigation or report. This report, the product of some four years of investigation by the Subcommittee, while extensive, can merely provide a basic guideline to the fundamental facts and issued raised by the BCCI affair.

The Subcommittee investigation of BCCI began in February, 1988, early in the second year of a two-year investigation of the relationship between drug trafficking to U.S. foreign policy and law enforcement that had been authorized by the full Committee. During a hearing on General Noriega's drug trafficking and money laundering, BCCI was identified as facilitating Noriega's criminal activity. In March, 1988, the Foreign Relations Committee authorized the issuance of subpoenas to BCCI and those at the bank involved in handling Noriega's assets, and the accounts of others in Panama and Colombia. Service of those subpoenas was delayed, at the request of the Justice Department and U.S. Customs Service, due to concern that its service could interfere with an ongoing sting operation of BCCI in Tampa, Operation C-Chase. By the time the Subcommittee secured the permission of federal authorities to move forward with service of the subpoena, in late July 1988, the Subcommittee had completed the public hearings in connection with its investigative mandate, and was proceeding to complete its final report, with no further investigative efforts planned.

However, service of the subpoena set into motion a series of contacts during the late summer and early fall involving the Subcommittee, BCCI officials, and BCCI's attorneys, including Clark Clifford and Robert Altman. During those contacts, BCCI officials advised Subcommittee counsel Jack Blum that in their view, BCCI and its attorneys were obstructing the Subcommittee's efforts to investigate the bank. The Subcommittee conducted a deposition of one key BCCI official, Amjad Awan, shortly before his arrest in the Customs' sting, and deposed a second, former BCCI officer following the sting, during the final days of the authorization given the Subcommittee by the Foreign Relations Committee. Thus, as the two-year investigation of the Subcommittee authorized by the Foreign Relations Committee ended, investigating BCCI remained a major piece of unfinished Subcommittee business.

In the spring of 1989, Senator Kerry, chairman of the Subcommittee, authorized Blum as he was leaving the Subcommittee, to provide the information he had developed to the Justice Department. After the Justice Department, in Blum's view, had failed to follow up on the information provided, he took the same information to New York District Attorney Robert Morgenthau, who shortly commenced his investigation of BCCI, based in substantial part on the leads provided him by Blum and the Subcommittee.

In the meantime, Senator Kerry asked two members of his personal staff to continue the investigation from within his personal office until such time as further authorization might be granted from the Foreign Relations Committee, or another Committee of formal jurisdiction for a committee investigation.

REENTERED AS EXHIBIT 3

During 1989 and 1990, staff in Senator Kerry's office had numerous contacts with BCCI's attorneys, certain BCCI customers, and, in a truncated fashion, with BCCI officials, in an attempt to determine whether allegations concerning BCCI's secret ownership of First American Bankshares were correct, and as part of an effort to identify the extent and nature of BCCI's support of drug money laundering.

In January, 1990, when the Justice Department entered into a plea agreement with BCCI, Senator Kerry criticized the plea agreement for permitting BCCI to avoid trial, and the $14 million fine as insufficient punishment for an institution which had a corporate policy of laundering drug money. At the same time, the Subcommittee published a report on drug money laundering which focused in part on further questions concerning BCCI, including BCCI's alleged secret ownership of First American.

During the spring and summer of 1990, the Senator Kerry's staff conducted further investigative efforts concerning BCCI, met with BCCI's and First American's attorneys on several occasions attempting to obtain BCCI documents. In July, 1990, Senator Kerry, in his capacity as chairman of the Subcommittee, scheduled hearings on BCCI which were postponed after BCCI's attorneys and the Justice Department advised staff that each of the requested witnesses, including BCCI attorney and First American President Robert Altman, would decline the Subcommittee's request to testify.

After efforts to obtain authorization for the investigation within the Banking Committee failed, Senator Kerry decided in early 1991 to formalize the personal staff investigation within the Subcommittee and to seek formal authorization for an investigation from the Foreign Relations Committee, which was granted on May 23, 1991, without dissent. Together with this authorization, the Foreign Relations Committee authorized the issuance of a subpoena to BCCI for records pertaining to its dealings with foreign officials of a number of countries, arms dealers, and focusing on its secret ownership of U.S. financial institutions. At this time, Senator Kerry was joined in further investigative efforts by his ranking member, Senator Brown.

While the Foreign Relations Committee provided consistent support for the Subcommittee's efforts through 1991 and 1992, staffing resources for the investigation remained limited, amounting to two attorneys, with no budget for travel. The lack of resources particularly hampered efforts to investigate matters pertaining to BCCI's activities outside the United States.

Authority for subpoenas and writs were granted by the Committee to the Subcommittee on May 23, 1991, November 27, 1991, February 29, 1992, June 4, 1992. In all, the Subcommittee conducted thirteen days of public hearings, on August 1, 2, 8, October 18, 22, 23, 24, 25, and November 21, 1991; February 19, March 18, May 14, and July 30, 1992; one day of closed hearings, on October 31, 1991 and staffed an additional day of hearings in the Senate Banking Subcommittee on Consumer and Regulatory Affairs on May 23, 1991.

Both by subpoena and by request, documents were received from many institutions, agencies and individuals, including BCCI itself; many of BCCI's attorneys and law firms; many former BCCI officials; representatives of BCCI's creditors and depositors; Price Waterhouse, BCCI's accountants; Clark Clifford and Robert Altman; the First American Bank; the Federal Reserve,

Office of Thrift Supervision, Resolution Trust Corporation, Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Majority Shareholders of BCCI (Abu Dhabi), the Central Intelligence Agency, the U.S. Customs Service, the State Department; the Department of Agriculture; former federal prosecutors and investigators; and many others.

In addition, the Subcommittee has been vitally assisted by certain BCCI insiders who, while still working at BCCI during the period of its operation, became sufficiently angered and disgusted by what they had observed that they contacted the Subcommittee and agreed to provide the Subcommittee with information on an ongoing basis. These insiders helped the Subcommittee to document improprieties involving BCCI's attorneys, senior officers, and shareholders, as well as, certain failures to act on information by federal law enforcement.

Many matters remain to be investigated, and these are outlined in the Executive Summary and in the final chapter on conclusions and legislative recommendations.

What is absolutely clear is that the United States needs to exercise far more leadership in helping develop a system for monitoring and regulating the movement of funds across international borders to replace the current, inadequate, patchwork system that BCCI, with all of its faults, so aptly took advantage of to defraud over one million depositors and thousands of creditors from countries all over the world.

Equally important is for the United States to give renewed attention to the difficulty of monitoring the actual circumstances and intentions, of foreign investors seeking to acquire U.S. institutions. As the BCCI case demonstrates, such investments pose special difficulties for both investigation and prosecution should something go wrong.

Finally, influence peddling, the revolving door, and the willingness of well-placed and prominent people in Washington to provide services to whoever wants in the door and is willing to pay ones fees is a phenomenon that poses very substantial dangers for our system of government. As the BCCI case suggests, higher standards of conduct by the private sector in Washington that lives alongside of government is an essential part of making it possible for government to work. The lack of those standards was a significant factor in BCCI's success in committing crimes, and the government's failures in doing anything them.

## THE ORIGIN AND EARLY YEARS OF BCCI

BCCI's conception, growth, collapse, and criminality are inextricably linked with the personality of its founder, Agha Hasan Abedi, who in turn was a product of the unique conditions of Muslim India in the final period of British rule prior to partition, and the first years after partition.

REENTERED AS EXHIBIT 3

These were years of fundamental change in the region, involving the creation of an entire new ruling class in both Hindu and Moslem India to replace the departing British foreign service. While the period created special opportunities for a newly-emerging professional class in both countries, Abedi and many of the others who later became prominent in Pakistani banking made up a special class. In India, they had grown up as members of a minority, of ineradicably lower status than similarly educated Hindus, despite their university educations. Following partition, these Indian Moslems migrated northward to the new Muslim state of Pakistan, but remained forever regarded as outsiders by the natives. Accordingly, as they settled in the newly-developing cities, such as Karachi and Lahore, they formed a clannish class of Muslim professionals who kept themselves apart from other Pakistanis.

Abedi himself was especially suited to succeed in the post-colonial environment, given his family's experience in northern Indian in Mahmudabad, where his father had served the Rajah. At the Rajah's court, Abedi was exposed to great wealth, and to the concept that access to it could be had for anyone who managed to make himself indispensable to the person who controlled such wealth. Abedi also learned that the previously immutable laws of the British colonial power could be changed, at whim, by the new Indian and Pakistani rulers that followed, and that as often as not, legal obstacles to any goal could be eliminated if they interfered with the plans of a sufficiently important political figure. These were lessons which Abedi applied throughout his career as a banker, and at the core of BCCI's unique history.

A history of BCCI, prepared in 1982 by Khusro Karamat Elley, a key figure in BCCI's secret management of First American, provides a rosy, public-relations view of Abedi's career to the founding of BCCI a decade earlier.

The story begins in the early forties, when the Habib family of India set up a Bank in Bombay, India. They started hiring young graduates as trainee officers and among the first was a young and warm hearted individual named Agha Hasan Abedi. In 1947, when Pakistan was formed, the Habibs [as Moslems] moved their bank to Pakistan.

The Habibs ran the bank like a family business. All decisions were centralized with family members and working hours were long and hard. Agha Hasan Abedi rose very rapidly but soon found the atmosphere to be too restrictive for the great number of ideas welling up inside him. In 1958 he left Habib Bank and was able to get together Investors to form a new bank to be known as United Bank. The Central Bank in Pakistan gave the license and was quite happy with Mr. Abedi's statements that he wanted to make this the largest bank in Pakistan. They however did find it disturbing when he described to them in great detail how high the salaries of the employees of this bank would be, what would be the quality of the offices and the extent of the mechanization that he would go into. Within ten years, United Bank became the second largest bank in Pakistan and all that Mr. Abedi envisioned, relating to the facilities, the staff, and relating to the high quality of appearance of the offices, and to the modern outlook of the Bank, had been achieved. Additionally, the Bank had opened branches overseas in quite a few countries including the Middle East. The Bank was already poised to become the largest bank in Pakistan but political conditions were making it apparent to Mr. Abedi that Pakistan could probably not form the basis for an operation of the size which he and his team were capable of.[1]

https://info.publicintelligence.net/The-BCCI-Affair.htm

This internal BCCI history focuses on key elements of BCCI's operation already present in the Habib and United Banks: a close knit family structure for management, high salaries and benefits to motivate employees, unusually luxurious offices for the purpose of impressing customers, aggressive expansion, beginning with the Middle East, and Abedi's refusal to live within the constraints of governments.

Press accounts of Abedi's life from the 1970's and 1980's typically note Abedi's wish for his success to be seen as a Pakistani version of a Horatio Alger story: success in the material world as being merely the logical reward for piety, hard work, sobriety, discipline, and loyalty. Internal BCCI documents make clear Abedi's ability to motivate his employees to work exceptionally hard. Yet in this, Abedi approach was little different from other successful super-salesmen. What distinguished Abedi's method as a banker was his focused attention on cultivating individuals of wealth, deemed "high net worths," at BCCI, and those who controlled wealth, such as Pakistani government officials.[2]

**Abedi's Charisma**

By all accounts -- ranging from statements made by Bert Lance to Jimmy Carter to the Pakistani bankers who went to work for him at BCCI -- Agha Hasan Abedi was a man of extraordinary personal charisma. That charisma was the glue which held BCCI together. Its absence following Abedi's stroke in early 1989, which led to Carter arranging an emergency heart transplant for him, had a substantial impact on BCCI's ability to survive the drug money laundering indictments in Tampa and the banks subsequent misfortunes.

According to former BCCI chief financial officer Massihur Rahman, who worked alongside Abedi for nearly two decades, Abedi was a man whose personality dominated all those around him, who could simultaneously turn great personal powers to good and to evil.

I remember looking into his eyes and seeing God and the Devil balanced equally in them. He was already an older man when he began BCCI, and he was determined to not to waste time in taking his vision and turning it into something very big.[3]

Abedi asked the total devotion of everyone around him. Should one of his employees decide to abandon an Abedi project, he took it personally, as if it reflected badly on Abedi himself, and would focus every attention in an effort to persuade the employee to change his mind.

For example, when BCCI officer Abdur Sakhia received two offers from other banks and decided to leave BCCI, Abedi refused to accept the situation:

I said I have to leave. They said you can do what you want, but please stay we wont let you go. I said, Mr. Abedi you are making things very difficult. I have two offers, one from Citicorp and one from BOP Canada. He started crying. It was absolutely heartbreaking. We used to sit in 15,000 square feet of open space. Mr. Abedi is at the head of the room and he started crying. We are people from the East, we are not trained to handle things like that. I said Mr. Abedi, my fate is in your hands, you can do with me what you like.[4]

**Abedi As Pakistani Political Paymaster**

REENTERED AS EXHIBIT 3

Abedi's earliest successes were largely the result of his having recognized the importance in Pakistan of providing payoffs or other under-the-table services to Pakistani officials, especially the leadership of any current governing party. For example, when the United Bank was formed in 1959, Abedi appointed as chairman of its board I. I. Chundrigar, the former Prime Minister of Pakistan, who was a close confidante of Pakistani's then current prime minister, Ayub Khan. Abedi maintained close ties to Khan's government, later hiring General Khan's minister of information to become the "publisher" of a BCCI promotional magazine, "South."[5] When the Pakistani military government was replaced following the debacle that resulted in the severance of East Pakistan into Bangladesh, Abedi became just as cozy with Pakistani "socialist" Ali Bhutto, Khan's ideological opposite. When Bhutto was overthrown in 1978 in a military coup, Abedi swiftly changed allegiances again to Bhutto's successor, Islamic "puritan" General Zia.[6] Zia later executed Bhutto for financial crimes, in which Abedi, among others, was clearly involved, while forming close ties to Abedi, on whose financial skills he increasingly relied.

Abedi's personal involvement in Bhutto's "crimes" was described officially in a White Paper issued by the Government of Pakistan in July, 1978 on "The Conduct of the General Elections in March 1977." In a section analyzing the illegal funding of campaign activities for the PPP, the party of Bhutto, the White Paper describes how "the other large source of funds was the money brought in by Agha Hasan Abdi [sic]" amounting to "two or three crores of rupees." A later reference to Abedi in the White Paper describes his "travels . . . loaded as he used to be with bagfuls of money."[7]

Abedi also sought out key pillars of the Pakistani private sector, securing the Saigol family as a key client of Abedi's in three successive banks -- Habib, United, and then BCCI. The Saigol group was one of the major industrial and trade groups in Pakistan by the mid-1950's, with its initial fortune made in textiles, and as close to "old wealth" as existed at the time within Pakistan's commercial class. Abedi first secured the Saigol account while at Habib, and took the account with him when he left to form United Bank, making the Saigol's United's principal shareholders. At the time, some in Pakistani's commercial community wondered how Abedi had managed to take the important Saigol relationship from the Habib Bank. Thirty years later, Price Waterhouse was to detail the reason -- Abedi's willingness to reschedule millions in loans to the Saigols whenever they found it inconvenient to repay them.[8]

Through these and similar relationships, Abedi built the United Bank into the second largest bank in Pakistan, complete with a protocol department responsible for taking care of the personal needs of VIPs. As founder, president and Chairman of United, Abedi was already a great success in Pakistani terms. But Abedi himself felt this was insufficient to meet his ambitions. And so Abedi increasingly began to focus on "high net worth individuals" outside Pakistan to liberate him from the inherent limitations of being nothing more than a very big fish in a Pakistan which Abedi viewed as too small to accommodate his vision.

**Impact of Nationalization**

By the early 1970's, there was an ongoing tension between Abedi's ambition to move beyond Pakistan, and that of the Pakistani government to keep Pakistani institutions generally and Abedi's bank specifically under its control. From the time he took power, Pakistani Prime

Minister Ali Bhutto, typifying the socialist cast of much of the former colonial world in this period, was threatening to nationalize the banks, as he already had nationalized other sectors. Accordingly, Abedi began moving forward with the initial steps to form BCCI as a Pakistani-managed bank outside of Pakistan. When Bhutto in turn learned about Abedi's attempt to circumvent his new socialist order, he not only went ahead with plans for nationalizing the United Bank, but promptly placed Abedi under house arrest.[9]

While under house arrest, Abedi further developed his scheme for his new institution. Unlike United Bank, it would operate in a manner to defy the ability of the Pakistani government, or any other, to impede any objective it might seek. It would be the first global, international, and indeed, trans-national bank, and something more: a charity, a foundation, a shipping empire, an insurer, a brokerage firm, a commodities exchange, a publishing house, a world-class hospital for the rich, a real estate empire, an employee cooperative, an Islamic investment bank, and a Third World powerhouse.[10]

As a politicized, post-colonial Pakistani, Abedi frequently articulated the goal of achieving equality of status with the financial institutions of the former colonial powers. During the colonial period, millions of Indian and Pakistani expatriates had fanned out across British possessions to become the commercial class in many of them. But they had not yet developed their own financial institutions, and had still to rely on European financial institutions to do business, institutions whose attitude towards them ranged from ignorance to neglect to contempt. A bank of their own would treat them better, be able to do far more to help them, and make itself great at the same time.

As Abedi explained while under house arrest to Massihur Rahman, who later became his chief financial officer at BCCI:

Up to that stage in the early 1970's there were mostly national banks and savings banks. The few banks which are international are indeed the colonial banks from Britain, France, Germany, and lately from America. So they were normally not international, they were really national banks, big national banks of countries which were international in network only. So he felt that if a genuinely global bank would be started bridging all the Third World countries and also bridging the first world, there would be a unique banking structure which could be very, very useful socially and also very profitable.[11]

The nationalization of Pakistani banking which provided the impetus for BCCI also insured that BCCI would retain the Saigol relationship, as a substantial portion of their businesses were also nationalized by Bhutto in 1972. Nationalization also provided other Pakistani businessmen with powerful motivation to find a bank that could not be controlled by the Pakistani government. The most important of these proved to be the Gokal brothers, Pakistanis who became in the 1970's, through BCCI lending, owners of the largest shipping empire in the world, with a business that ultimately included commodity trading, general trading, manufacturing, financial services, and real estate.[12] In addition to freeing them from the threat of Pakistani appropriation, BCCI provided both the Saigols and the Gokals one key service from BCCI that no other bank could provide -- the freedom to defer repayment of past loans and to borrow new money at will. Moreover, both clients received a special privilege similar to that afforded BCCI's own officers: when something went wrong and they lost

REENTERED AS EXHIBIT 3

money, BCCI would help them cover it up. This was a matter not just of loyalty to ones intimate business associates -- it was also a matter of sound business practice, as recognizing losses on the loans would have hurt BCCI's balance sheets.[13]

### Critical Elements of BCCI's Creation

Abedi needed five things to create BCCI. First, a bank secrecy and confidentiality haven, which he found first in Luxembourg, and then in Grand Caymans. Second, a source of capital, $2.5 million, which Abedi ultimately obtained from Bank of America, supplemented by another $500,000 from Sheikh Zayed of Abu Dhabi. Third, a source of initial assets, $100 million, of which at least half were provided as deposits by Sheikh Zayed. Fourth, a group of like-minded Pakistanis to operate the bank. These were now widely available as a result of Bhutto's nationalization of their banks. Lastly, credibility in the international community, through a relationship with an established Western financial institution which would provide prestige to BCCI, but not interfere with its unique approach to banking. This too was provided by Bank of America during BCCI's formative years.[14]

The most critical of these five elements was the relationship between BCCI and Abu Dhabi.

### Abedi and Sheikh Zayed of Abu Dhabi

Abu Dhabi is the largest and wealthiest member of the United Arab Emirates, an oil-rich federation of sheikhdoms with a combined population of under 1.5 million, bordering on Saudi Arabia and Oman, with one of the world's highest standards of living as a result of oil wealth. Like all of the Gulf sheikdoms, Abu Dhabi is unusual among modern states in that its ruler, and the ruling family, owns all the land and natural resources of the country in fee simple absolute, with no distinctions being made among the wealth of the ruler, his family, and the nation itself. As lawyers for Abu Dhabi have described it:

By tradition and historical background of the Trucial States, the ruler of an Emirate owns all of the land of his State. However, he allots land to his subjects individually for their use. Similarly, all the natural resources of the States are also regarded as the personal property of the ruler and his heirs who enjoy complete authority to utilize them as they consdier fit.[15]

As early as 1967 Abedi's high net worth customers included the ruler of Abu Dhabi, Sheikh Zayed bin Sultan Al Nahayan, and his family. The illiterate Sheikh, a formerly impoverished desert Bedouin, was the recently installed head of a newly wealthy oil state who owed his power to a British coup against his brother in 1966. The brother had been deposed for having been unwilling to spend Abu Dhabi oil revenues for any purpose, including easing conditions for members of the British foreign service posted there.

After installing Sheikh Zayed, British officialdom had failed to pay attention to his desire to be taken seriously as an important world political leader. By contrast, Abedi viewed Sheikh Zayed to be a potentially important resource. By one account, the relationship began when Abedi made the decision to fly to Abu Dhabi in 1966 to solicit the right of the United Bank to take deposits from the thousands of Pakistani workers assisting in its modernization. Travelling with one assistant and bringing an oriental rug as a gesture of goodwill, Abedi secured Sheikh Zayed's permission for the United Bank to open a branch in Abu Dhabi.[16] By

REENTERED AS EXHIBIT 3

a second account, Abedi beat out the Habib Bank for taking care of arrangements for Sheikh Zayed's first bustard hunting and falconry vacation in Pakistan, personally waiting patiently outside the Pakistani government guest house while the Sheikh napped, and securing the right to handle the Sheikh's logistics when he awoke.[17]

By 1967, what had begun with Abedi handling the Sheikh's falconry and bustard-hunting trips in Pakistan, and the finances of Pakistani workers in Abu Dhabi, wound up with Abedi running the Sheikh's financial life. As far as Pakistani bankers observing the relationship were concerned, Abedi coordinated everything for Sheikh Zayed, from the building of the Sheikh's palaces in Pakistan, the furnishing of his villas in Morocco and Spain, his medical appointments, to the digging of wells for his homes in the desert.[18] As BCCI officer Abdur Sakhia put it,

Digging a well or two was a minor cost of doing business. Abedi's philosophy was to appeal to every sector. If you were religious people he would help you pray.[19]

From the point of view of BCCI, Sheikh Zayed and his family were ill-equipped to handle the demands of the modern world, and in the early days, dependent on Abedi and Abedi's bank for their every need. Even in the late 1970's, Sheikh Zayed, whose personal tastes were quite simple, would on trips abroad routinely write checks for $100,000 or $200,000 at a time for members of his retinue to spend as they liked, written on the back of a matchbook or a piece of toilet paper. This practice continued until BCCI officers provided the Sheikh with a gold checkbook and insisted that drafts be written on it.[20] As Akbar Bilgrami described his experiences with Zayed:

He would pray or listen to the news. He had a court jester-type person who made him laugh and told him poetry. He was a simple man, simple but shrewd. On a trip to spain which lasted two weeks, his retinue spent $20 million, but he only spend $400 on himself the entire trip for two dogs whose price he negotiated down from $1,000.

He was a simple man who did not spend a lot of money on himself. It is part of Arab culture. The Sheikh is a sort of farther figure. It is hard for him to say no to people, especially because he knows that everybody knows that he has the money. He would carry about a briefcase filled with expensive watches, Cartiers, Rolexes.[21]

Among BCCI officers it was believed that the United Arab Emirates itself owed its creation to Abedi, who came up with the idea as a means of reducing instability among the gulf emirates and increasing the stature of Sheikh Zayed.[22] As Sakhia recalled:

Abedi created the UAE. He planted the idea of the UAE as a federation to Sheikh Zayed. These people had no standing anywhere in the world. They were smugglers and tribesmen. When Sheik Zayed would come for months in Pakistan, not even a policeman would give him any attention. Yet two months after meeting Abedi, Sheikh Zayed finally gets a state visit to Islamabad and meets the President of Pakistan which then became the first country to give him any status. The first embassy of UAE was opened in Pakistan and the second in London, and both were staffed by Abedi's appointments.[23]

REENTERED AS EXHIBIT 3

In time, Sheikh Zayed would unburden himself to Abedi, and tell Abedi that he felt ignored by westerners, a sentiment he later repeated to Bert Lance, as Lance recalled to Senate investigators, and in testimony on October 24, 1991.

I remember a long conversation I had with Sheikh Zayed at his palace outside of Islamabad. There were three of us there: Bert Lance, Abedi, and Sheikh Zayed. The Sheikh was unhappy that the US hadn't paid any attention to him. The US Ambassador hadn't focused on him. . . He was being reated in a manner that really wasn't befitting the strategic importance or the fiscal importance of the UAE. [Zayed was] concerned about the discrimination as it related to the UAE vis-a-vis other Arab countries . . . receiving more attention and more concern than the UAE was.[24]

It is absolutely clear from BCCI documents that Abedi's relationship with the Sheikh of Abu Dhabi and the Al Nahayan family was the foundation of the establishment of the bank without which BCCI never could have come into existence. Throughout the first critical decade of BCCI's eighteen year existence, as much as 50% of BCCI's overall assets were from Abu Dhabi and the Al Nayhan family, who were earning about $750 million a year in oil revenues in the early 1970's, an amount that rose to nearly $10 billion a year by the end of the decade. Until the formation of a separate affiliate, the Bank of Credit and Commerce Emirates (BCCE), BCCI functioned as the official bank for the Gulf emirates, and handled a substantial portion of Abu Dhabi's oil revenues. And yet from the beginning, there was an oddity about this central relationship: at no time while Abedi was in charge of BCCI did Abu Dhabi hold more than a small share of BCCI's recorded shares. Abu Dhabi appears not to have capitalized BCCI, but instead to have insisted on guaranteed rates of return for the use of its money.

As Akbar Bilgrami, who handled Sheikh Zayed's personal finances in the late 1970's at BCCI, has described it, BCCI provided Zayed with great benefits for what appeared at the time to be very little risk. Zayed deposited substantial funds, amounting to billions of dollars, in BCCI, receiving a guaranteed rate of return on these deposits -- sometimes as high as 1.5 percent over LIBOR, a standard European funds rate. In return for a relationship that was costing him little and indeed, making him profits, Sheikh Zayed received the prestige and benefits of having people all over the world believe it was his bank, without his own funds being at risk.[25] Thus, rather than being a major investor in fact in BCCI, in the early years, Abu Dhabi only agreed to place extremely large sums of money as deposits at the bank, which BCCI used in lieu of capital.

An eyewitness to BCCI's creation described Abedi's elation after Sheikh Zayed agreed to back his new bank in a scene that took place in late 1972, in the late evening, in the living room of a Pakistani banker in Abu Dhabi. Abedi addressed the Pakistanis present in the following terms:

It is truly the grace of God that the prayers of all the U.B.L. [United Bank of Pakistan] employees who had to flee Bangladesh and who had been kept on the U.B.L. payroll by us, have been provided a source of livelihood by God. The Sheikhs have been kind enough to give me their trust and support the new bank that we are creating for these employees.[26]

Abedi used the expression "rizq," or "providence" to describe the deal he had consummated with Sheikh Zayed. But there would have been a number of compelling reasons for Sheikh

Zayed to respond to Abedi's offer. Sheikh Zayed was financially unsophisticated and in need of assistance from someone he could trust to handle his finances in a manner that would meet his personal, cultural and political needs. These included the need for secrecy as to the location and size of his wealth, given the political instability within the region; the need to adhere to Islamic law, through structuring transactions so that they could be profitable and safe without the payment of interest in violation of that law. There was, moreover, no one within Abu Dhabi who the Sheikh could trust to provide the adequate secrecy. Indeed, apart from Abedi, Sheikh Zayed may well have known no one inside or outside Abu Dhabi with the apparent sophistication to handle finances of the magnitude that were being generated by the petrodollars. In any case, Abedi had already been attending to all of the Sheikh's personal needs in Pakistan for five years, thereby demonstrating his ability to make the relationship worry-free for the Sheikh.

Abol Helmy, an Iranian BCCI officer, described the relationship as a logical outgrowth of the post-colonial period in the Third World:

The British ruled India, Pakistan, and the Arab countries. Traditionally, the Indians and then the Pakistanis because of the Moslem thread that linked them became the civil servants for the British working in the Gulf. It was a continuation of the policies of the Empire.[27]

As a result of the Abedi-Zayed agreement, Abedi now had essentially unlimited resources to create BCCI. He could now act simultaneously as manager of billions of Sheikh Zayed's personal wealth, as banker to the United Arab Emirates of which Sheikh Zayed was chief of state, and as chairman of a new bank that had guaranteed assets of hundreds of millions of dollars from its inception.[28] Moreover, Sheikh Zayed was accustomed to the use of nominees, as nominee purchases were frequently employed whenever he wished to buy anything to avoid the price increasing if the Sheikh's name had been mentioned as part of the negotiations.[29]

One consequence of this arrangement, however, was that Abedi's success was overly dependent on his relationship with Abu Dhabi and its assets. He was managing the Sheikh's resources, he had use of them, and if he did not meet the Sheikh's needs, he could lose everything. Recognizing this dependence, Abedi made it a practice to insure that BCCI would provide whatever the Sheikh required, whenever the Sheikh or his family wanted it. As BCCI records demonstrate, payments, often characterized as loans, were made to members of the Abu Dhabi royal family on an as-needed basis by BCCI, without any regard as to whether these same resources were also being committed elsewhere. With Abedi relying on the Sheikh's resources to finance his rapid expansion, BCCI's finances quickly became so intermingled with the finances of Abu Dhabi that it was difficult even for BCCI insiders to determine where one left off and the other began.

**BCCI's Protocol Department**

By all accounts, Abedi flattered Zayed, and to ensure that no detail of his needs would be neglected, established a large protocol department, first at the United Bank and later at BCCI.

The most detailed account of the protocol department's activities provided publicly to date has been that of Nazir Chinoy, who as a branch manager of BCCI in Pakistan had substantial

REENTERED AS EXHIBIT 3

direct contact with the head of BCCI's protocol department, Sani Ahmad, and had first-hand knowledge of the protocol department's finances.

According to Chinoy, upon his arrival at BCCI-Pakistan in 1978, the protocol department employed about 120 people, whose job was "to establish and further the rapport with the sheiks of and ruling families of Dubai and Abu Dhabi." The protocol department was financed by BCCI, and had nothing to do directly with the bank. Instead, it was handled as an adjunct to special activities of Abedi, managed by Ahmad under Abedi's direction, and housed in Karachi in a separate building opposite Mr. Abedi's house.[30] From 1978 through 1982, the period Chinoy was at BCCI-Pakistan, the protocol department principally functioned as the administrative wing of the Abu Dhabi royal family for their foreign travel.

The rulers and their families would come very frequently. Ninety-percent of the time, the guests were from Abu Dhabi and Dubai; occasionally, Oman, and the other emirates. They would come for shooting at the Game Reserves. There was one particular cashier called Ibrahim. Sani would call me and tell me to make Ibrahim available. He would take 5 million in huge notes of rupees. At that time about $400,000. In Pakistan that is a hell of a lot of cash money. It would be carried out in steel trunks. We would be given money from the rulers account in Abu Dhabi in US Dollars.[31]

As of 1978, the expenses of the protocol department were about 300,000 rupees a month -- about $600,000 a year, rising to $2.5 million a year by the early 1980's, and as much as $10 million a year at the height of BCCI's success. The protocol department was not responsible for financing its own operations. Its expenses were instead paid by the Pakistani branch of BCCI each month after it received a statement from BCCI protocol chief Sani Ahmad describing his expenditures. These expenditures were always paid by the BCCI branch, even though often, the bankers were unable to determine the nature of the expenses or the reasons for the expenditures.

According to Chinoy:

Sani would tell me that I need one million rupees today and we would give him the moneys and the branch would pay the money. What it was paid for we would have no idea I did not want to get involved in this either and he would report to Mr. Abedi and I would tell Abedi what money had been given to Sani Ahmed. Abedi would never initial or sign [any of the documents], but he looked at and approved everything.[32]

Each hunting trip's expenses would amount to several million dollars, requiring a special exemption from the State Bank of Pakistan to permit the funds to be debited from BCCI's protocol department. This exemption was granted by the State Bank after arguments by Abedi that Pakistan needed to maintain BCCI's relationship with Abu Dhabi as a means of improving its overall balance of payments.[33]

By the late 1970s, BCCI's protocol department handled all affairs for the 18-20 palaces BCCI maintained for the ruler of Abu Dhabi in Pakistan, all under the direct control of Sani Ahmed. In return, money was sent each month from BCCI Abu Dhabi to Pakistan to pay for the gardeners, telephones, and maintenance of houses.

REENTERED AS EXHIBIT 3

The protocol department also established a special relationship with Pakistani Customs airport authorities so that members of Arab royal families would receive VIP treatment that avoided the usual delays associated with entering Pakistan.

Along with the construction of palaces and vacation homes, BCCI handled private matters for the visiting Al-Nahayans, including the procurement of Pakistani prostitutes for the male members of the family. These were typically teenage girls, known as "singing and dancing girls," and selected, outfitted and trained by a woman named Begim Hashari Rahim, who later was promoted to the official position of Interior Decorator to the Royal Family of Abu Dhabi. (34)

As head of the protocol department before becoming head of BCCI's Washington, D.C. representative office, Sani Ahmad had a unique role at BCCI and special relationship with Abedi. He was treated with deference by other BCCI officers, who did not consider him to be a banker, but a fixer. As Chinoy recalled:

Sani was the trusted man for things no one else was supposed to know. We were the technocrats. Sani Ahmed would handle the things we wouldn't, like get girls. If anyone paid anyone any money [as a bribe], Sani would have been the one to do it.(35)

**Bank of America**

Ironically, although Abedi now had a large source of assets for BCCI, the Sheikh of Abu Dhabi could not provide him with credibility in the west. Abedi's first choice for a prestigious western partner, American Express, insisted on having a major say in BCCI's management, which Abedi would not tolerate.(36) Abedi's search for a more compliant partner brought him to Bank of America, which in 1972 was one of the most aggressive of U.S. international banks, with a presence in Iran already and in Pakistan. For BCCI, a relationship with Bank of America would provide recognition in the west and access to the Bank of America's global network for correspondent banking. For the Bank of America, BCCI provided a potentially lucrative entry to Arab oil wealth, at a tiny capitalization cost of just $2.5 million.(37) Following what Abedi referred to as "an historic lunch" in San Francisco, Bank of America agreed to provide the money and to be a passive partner in BCCI, permitting Abedi to run the operation as he pleased.(38) As Abedi told a British magazine, Euromoney, in the summer of 1978:

Bank of America agreed to become a shareholder, but we made it a condition that we would establish the management style.(39)

With only $3 million in total capital, Abedi kept BCCI's initial overhead down through promising the central Pakistani recruits to his team that they were members of a family, employed for life, whose future prosperity was being built collectively. He made the founder group shareholders of BCCI and put them to work in a tiny office in Abu Dhabi sharing what Massihur Rahman later described as "mess-type flats."(40) Working conditions in Abu Dhabi, and at BCCI in the early days, were extremely primitive, but more easily accepted by the Pakistani bankers than they would be by western ones.(41)

Simultaneously, Abedi relied upon senior Bank of America officials to sit on BCCI's board of directors, to recruit additional bankers for BCCI, and to approve all major loans by the bank. Among the key figures retained by Abedi as directors from Bank of America were Yves Lamarche, who had previously managed Bank of America operations in the Middle East, J.D. Van Oenen, a European Bank of America official, and P.C. Twitchen, formerly, Vice President of Bank of America. Another prominent Bank of America figure, Roy Carlson, who was based in Iran, later became President of National Bank of Georgia at a time when it became secretly owned by BCCI.

## Ownership of BCCI

Although Abu Dhabi had a key interest in BCCI from its creation, in accord with Abu Dhabi's failure to provide the initial funds for capitalization, BCCI's early stock recordations did not show Abu Dhabi as the actual owner of the bank. A snapshot of BCCI shares from Bank of America files as of September 30, 1977 described BCCI's majority owner as ICIC, at 50.1 percent; its most important minority owner as Bank of America, at 30 percent; and its largest Arab owner as Majid Al-Futaim of Dubai in the United Arab Emirates at just 4 percent, with the members of the family of Abu Dhabi owning just 3.4 percent all told.[42]

This list indicated that the Pakistanis actually owned BCCI at a time when to the outside world, the bank was ostensibly owned by oil-rich Middle Eastern Arabs, including the ruling families of Bahrain, Sharjah, Dubai, Saudi Arabia, and Iran, as well as that of Abu Dhabi.[43]

That picture was complicated still further, however, by the fact that ICIC was not the owner of record of any of its shares of BCCI on the share register of BCCI in Luxembourg. Instead, several of the shareholders on the register were acting as nominees for BCCI, according to the Bank of America records. Moreover, some of the subsidiaries owned by BCCI also relied on nominees, and by the late 1970's, ICIC was the record controller of as much of 70 percent of BCCI all told.[44] Yet even at the time, BCCI officers were told by Abedi that ICIC really owned only about 30 percent of BCCI.[45]

A further difficulty in interpreting the issue of ownership was that ICIC continuously was borrowing very substantial amounts from BCCI with inadequate documentation, with the result that for all practical purposes, BCCI was repeatedly buying itself, and using various nominees along the way to hide this fact.

Looking to BCCI's capitalization was of little help in determining its ownership, either. Apart from the tiny, real capital of $2.5 million placed in BCCI by the Bank of America, and an additional $500,000 acknowledged by Abu Dhabi, there remains no evidence of other substantial cash infusions in the bank in the early years, suggesting that from the beginning, Abedi and Sheikh Zayed had agreed to provide BCCI only the assets of Sheikh Zayed as a depositor, rather than his capital as an investor. This pattern, in which Abedi asked for little in the way of cash on the line from potential "investors," would be repeated in other cases, except that often, a shareholder would contribute merely the prestige of his name and aura of wealth, rather than deposits or any actual financial contribution.

## The Early Use of Front-Men

As a privately held company, BCCI was obliged to no one to provide detailed information about shareholders. BCCI made it a practice never to reveal exactly who owned how much of the bank. However, in direct contradiction to BCCI's obsessive secrecy about the actual facts of its ownership, Abedi heavily publicized the fact that most of the most important royal families of the oil-rich states of the Middle East were "shareholders" from the first in BCCI, and therefore were ostensibly backing the bank with their fabulous petrowealth.

What the outside world did not know is that in every case -- with the possible exception of Zayed's and Abu Dhabi's acknowledged holdings in BCCI -- these backers had been provided hold harmless agreements by BCCI, providing them guarantees against loss, and that the interest in BCCI held by these royal families had been essentially provided to them by Abedi as a "gift," accompanied by generous terms on lending and other BCCI services.

Just as BCCI's board of directors would later contemptuously be referred to as "RAF," for "rent-a-face," by BCCI insiders, Abedi had essentially rented the names of many of the Arab world's most prominent oil-rich monarchs. Instead of the public image of their backing BCCI with their money, BCCI was paying them for the illusion that they were behind the bank.

BCCI's glossy promotional materials were characteristically

misleading on the issue of its initial capitalization. In describing its history in a mid-1980's Group Profile made available to the public, BCCI wrote:

The BCC Group was originally conceived as an international banking organization backed by Middle Eastern investors to provide commercial banking services world-wide . . . Its initial paid up capital of $2.5 million wa subscribed by Bank of America (25% later increased to 30%) and the balance by investors from the Middle East (emphasis added).[46]

The deliberate vagueness of the phrase "the balance" underscores the lack of any substantial additional initial capital in BCCI beyond that provided by Bank of America. The $500,000 investment acknowledged by Abu Dhabi to the Subcommittee for the first time on May 14, 1992 would have been considered surprisingly tiny had it been revealed in 1972.

Some hint of how Abedi approached the capitalization problem is found in Abedi's motivational rhetoric, in which he constantly talked of BCCI as something that could be created out of pure willpower. "Western Banks concentrate on the visible, whereas we stress the invisible," Abedi told a British journalist in 1978.[47] Such a statement could be taken as many did take it, as mystical gobbledygook. But it well described Abedi's technique for building a banking empire -- building something out of nothing by relying on something invisible but powerful: images of wealth. These images, from BCCI's fancy buildings to the photographs of Abedi posing with its fabulously wealthy Middle Eastern "shareholders," provided as much power for Abedi as the real money would have done, so long as everyone believed it was there. It was far easier to ask a Middle Eastern potentate for his name than for his money, and as far as Abedi was concerned, the results were the same.

Although ICIC "owned" 70 percent of BCCI in 1980 upon Bank of America's withdrawal, ICIC mysteriously became a minority owner of BCCI by the end of the decade. As of December 31, 1989, ICIC held less than 11 percent of BCCI, with Abu Dhabi becoming the

principal shareholder, holding over 35 percent, including shares owned by various members of the Al-Nahyan family and the Abu Dhabi investment authority.[48]

Yet the actual picture as to BCCI's ownership even then remains clouded. Several of the larger shareholders registered at that date, including Wabel Pharaon with 11.55 percent, Mohammed Hammoud, with 3.44 percent, Abdul Raouf Khalil, the Saudi government's intelligence liaison to the United States and other foreign governments, with 3.08 percent, and Kamal Adham, Khalil's predecessor as Saudi intelligence chief, with 2.94 percent, were acting as BCCI's nominees for ownership of its own shares, through guarantees that prevented them from being at risk. Moreover, Price Waterhouse could at the time find no evidence of the bank's actual contact with Khalil, its supposed "shareholder," for a number of years, although there were numerous transactions in his name undertaken in that period.[49]

A year later, following the disclosure of massive losses at BCCI as a result of Price Waterhouse reports to the Board of Directors, the Abu Dhabi royal family had took full legal title of BCCI, increasing its share to over 78 percent of all BCCI shares, with the new shares obtained entirely from those formerly held by the nominees.[50]

Given the many mysteries about BCCI's shareholding from its creation and the fact that critical records remain missing, it remains difficult to determine retrospectively whether or not Abu Dhabi had the ability at all times to do what it ultimately did in 1990 -- obtain direct and complete formal control of the majority of BCCI shares.

**BCCI's Rapid Expansion**

Throughout the 1970's, BCCI expanded rapidly, with Abedi adding new corporate members to the BCCI family by the month. Initially, BCCI was incorporated in one location only, Luxembourg. Two years later, a holding company was created, BCCI Holdings, with the bank underneath it BCC S.A., split into two parts, BCCI S.A., with head offices in Luxembourg, and BCCI Overseas, with head offices in Grand Cayman. Luxembourg was used mostly for BCCI's European and Middle East locations, and the Grand Caymans mostly for Third World Countries.[51]

This structure was intentionally further complicated by the establishment of a series of additional entities, used as "parallel banks" by BCCI as needed for financial manipulations. These parallel entities included the Kuwait International Finance Company (KIFCO), in which BCCI ostensibly had only a minority interest; a Swiss bank, Bank de Commerce et Placements SA (BCP), in which BCCI also ostensibly had only a minority interest; the National Bank of Oman, again with BCCI formally holding only a minority interest; a 100% owned finance subsidiary, Credit & Finance Corporation Ltd,; and the series of entities based in the Grand Caymans and collectively known as "ICIC," which became the principal "bank within a bank" at BCCI. In the cases in which BCCI's official interest was minority, its apparent lack of control was the consequence of local regulations prohibiting a foreign bank from owning a majority share. Each time, BCCI found ways to evade the regulations through the use of front-men or nominees, and wound up being able to direct the operations of these institutions as if they were wholly-owned subsidiaries.

REENTERED AS EXHIBIT 3

BCCI's aggressive drive for expansion was necessitated by a financial strategy that pursued asset growth, rather than profitability, as the key to success. This approach was a necessity because of the underlying lack of working capital and BCCI's high-start up costs. The idea was that through rapid growth, BCCI would eventually fill the holes in its capital through commissions on its frenzy of activity. In the meantime, growth could disguise temporary operating losses through creative bookkeeping. In fact, the growth did not end the losses, but exacerbated the underlying capital problem, because BCCI needed to increase its retained capital in order to show an adequate cushion for its billions in new assets. The solution to this problem, like all others, for Abedi, was relentless growth.

To implement this approach, BCCI officers were directed to focus their attention on individuals and entities who controlled large sums of cash: people like central bank officials, heads of state, "high net worth individuals," and black marketeers, and offer them terms significantly better than the terms offered by competing banks, or services, such as kick-backs and freedom from documentation, that the competition was unwilling to provide. As a marketing document from BCCI in the United States, prepared during the mid-1980's, advises BCCI officers, they should vigilantly look for "client relationships which are considered special for . . . reasons such as confidentiality, high sensitivity, requirement of special attention and service, large size deposit, business or profit, complexity of business, etc.," which would receive specialized attention from BCCI higher-ups.[52]

BCCI's trans-national character continued to be a critical ingredient of its marketing. As BCCI historian K.K. Elley noted in 1982, BCCI because "serves no country of individual. . . No customer need fear that their assets will be frozen because their country is having a difference with the country of BCCI's origin."[53]

Fueled in part by infusions of petrodollar deposits from Gulf State rulers during the hey-day of the OPEC years, BCCI's early growth was exponential, especially in the United Arab Emirates, the Sultanate of Oman, Yemen, and Bahrain, as the following profile of the first five-years of BCCI's performance demonstrates.

Year # Branches # Countries Assets Growth

1973 19 5 $200 m --

1974 27 7 610 m 204%

1975 64 13 1.2 b 98%

1976 108 21 1.6 b 37%

1977 146 43 2.2 b 33%

After consolidating its position in the Middle East, BCCI identified Africa as the next area for growth. A number of African countries possessed many of the traits that BCCI had learned to exploit in the Middle East -- autocratic rulers who controlled much of the wealth of their nations, primitive working conditions for bankers which discouraged westerners, and non-western attitudes towards the payment of gratuities as a cost of doing business.

African expansion began in Egypt, Sudan, Mauritius and Seychelles, and extended by 1979 into Kenya, Swaziland, Liberia, Nigeria and Sierra Leone. Typically, BCCI operated in these countries in a corrupt environment marked by cash bribes, kickbacks to senior central bank officials of the nation involved, and special arrangements with the heads of state.[54] As a consequence of its willingness to do things that most westerns banks were not, BCCI soon became the largest foreign bank operating in Africa.

The third phase of BCCI's growth targeted Asia, and included the acquisition of the Hong Kong Metropolitan bank from the Swiss Bank Corporation. This branch of BCCI later became the vehicle for handling very large transactions by the Chinese government, whose business Abedi secured through a mixture of public charitable activities and private kick-backs.[55] Simultaneously, BCCI decided to expand into the Americas, opening offices in Canada, branches in the United States, and in Venezuela, Columbia, Panama, and Jamaica. By the mid-1980s, BCCI's empire extended to banks or branches in 73 countries, and assets totalling about $22 billion.

BCCI's amazing rate of growth continued in good years and bad, without regard to macro-economic conditions. For example, in Hong Kong during the 1983-1984 period, BCCI prospered while other foreign banks were forced to retrench because of economic downturn. This phenomenon was repeated in the United Arab Emirates during a slump that began around 1983 because of the fall in oil prices; and in Nigeria in the late 1980's -- a time when other foreign banks withdrew from operations there. As BCCI officer Nazir Chinoy later explained, in the case of Nigeria, at least, this result was because BCCI was willing to bribe officials and assist them in handling their payments in a manner that the competition, hemmed in by auditors and lawyers, could not meet.[56]

**Abedi's Mysticism As Component of BCCI Strategy**

While engaging in corporate legerdemain as a means for hiding what he was doing, Abedi developed a peculiar mystic philosophy for BCCI, which was shared with BCCI's recruits in annual means as part of motivating them to give their "all" to BCCI's expansion. Many of BCCI's more senior officials viewed Abedi's philosophical musings as boring and unintelligible material which had to be endured.[57] At annual meetings of BCCI officials, Abedi would often speak about his philosophy for hours at a time. However, Abedi's stature at BCCI was such that no one ever challenged him, and instead, younger officers seeking to rise in the ranks would parrot Abedi's philosophy and describe how it had changed their lives.[58]

Abedi's philosophy was an often obscure mix of Islamic mysticism focusing on the links between the individual, the family, and the universe; and self-help sales motivational pitches. For example, in describing BCCI's decentralized and obscurantist structure in philosophical terms, Abedi wrote:

Our restructuring and reorganization has its own meaning that emerges out of our own needs, our own purpose and our quality and quantity of human resource that we from time to time become. We accept the truth that each one of us is different and like every human being each one of us is inadequate, but unlike others we genuinely accept each other and we have a tremendous urge and desire to constantly move towards adequacy. . . [T]he quality of

REENTERED AS EXHIBIT 3

relationships . . . is the essence of an organization. It is the shining truth. It is the truth that every individual member of the family must unveil in his feelings -- in his psyche. It must spark like a brilliant star in his heart.[59]

Abedi described the key functions of BCCI's support centers to BCCI officers under their jurisdiction as "keep their energy flow," and "becoming an agent of change," including "extricating the Managers and the staff from the malady of containment and psychological lethargy and inertia wherever it has set in."[60]

In an earlier management meeting in New York in 1983, on memo paper featuring a sepia-toned highlight of the hand of God touching the hand of Adam in Michelangelo's Creation from the Sistine Chapel, Abedi explained that BCCI's spiritual aspect was much more important to its success than its material aspects.

We must learn to "feel" that BCCI is this <u>Power</u> and not merely a group of branches, a set of facts and figures. Since, BCC is a power, a spirit, a Desire - it is all encompassing and enfolding - it relates itself to cosmic power and wisdom, which is the will of God. . . . <u>OUR MAJOR FUNCTION</u>: To have a desire, Improve its volume and quality, Make others have such a Desire, Merge this in the pool of corporate Desire, Make the purpose of this Desire our major purpose, Make it BCC identity.[61]

Abedi then asked the key pertinent question: "IS BCC A DESIRE, OR IS BCC A BANK?"[62]

While on one level these philosophic discussions appear far removed from the practical elements of banking, in fact there was an important link between the philosophy and BCCI's strategy of asset growth. The philosophy, obscure as it was, described the importance of relentless, ceaseless activity as a means of growth, and of the need to remove "obstacles" to the growth, regardless of the source. Junior officers were encouraged to keep things moving and not to worry much about rules. Senior managers were advised to encourage junior officers to experiment, and to help them circumvent even the rather relaxed procedures that applied to doing business at BCCI. As Abedi told forty-five of his managers in 1985:

If our colleagues who represent young energy and young hope do not live up to our standards in the task they perform, how do we deal with them? Our response could either encourage them to flow and in time enable them to come closer to the desired standards or may stifle and discourage them early on in their careers, thereby diminishing any chance of them improving and performance towards excellence. Do not nip the flower in the bud. . . give them room to breathe. [63]

Under Abedi's guidance, BCCI officers learned that they would be rewarded for any technique that allowed them to acquire customers and assets, and would not be punished by the bank even for engaging in unorthodox or illegal banking practices. In the words of BCCI official Akbar Bilgrami:

Abedi had a saying to younger employees, that if a banker cannot make money for himself, he cannot make money for the bank. It was an invitation to enrich yourself, that I never felt comfortable with.[64]

When a BCCI banker was caught by local regulations, he would not be punished, but simply transferred from the location or from BCCI to another entity controlled by the bank, often with a bonus payment.[65] By contrast, if an officer refused to facilitate an obviously illegal transaction, BCCI's senior officials would simply go around him, and his career would suffer accordingly.[66]

Abedi made use of mysticism as a motivational technique even on the most mundane of banking matters. When BCCI developed Travellers Cheques in 1986 as a new product, Abedi convened a conference of BCCI employees to announce that these cheques were "a profitful instrument of relationship." Abedi announced that "travellers cheques add a new dimension to my personality. They are a means of making a profit and at the same time a means of fulfilling my aspirations. There is great happiness in selling the largest possible volume of travellers cheques."[67]

## Compartmentalization

As a technique for insuring security and control, Abedi adopted a strategy taken from intelligence operations. He compartmentalized information about BCCI. Compartmentalization insured that even within the bank, officers in one operation would have little to no information about the nature of the activities of an officer in another area. Not only was information about BCCI's activities closely held, but even senior officials were discouraged by Abedi from asking questions. As Massihur Rahman testified:

I was very uncomfortable because in [previous bank jobs], I could go across the board and go to any division and see any of the operation. But here I could see these Chinese walls were getting very, very watertight and we were always taught about humility and ego and anything that was slightly out of context was considered just an ego trip.[68]

Instead of having vice presidencies, the bank had 50 senior executives and 198 managers, with only two people considered to be higher up than all others: Abedi and his chief assistant, Swaleh Naqvi. As Rahman described it:

There was Mr. Abedi at the very top, there was Mr. Naqvi who was like a chief operating officer, who converted . . . Mr. Abedi's ideas and things into practical shapes. And then there was a big gap between these two and the other executives who were all called general managers. All of us were called general managers. . . You couldn't be senior to anybody else, you're all the same pay, the same benefits.[69]

## Consequence of BCCI Structure and Philosophy on Audits

Abedi's unique approach to banking had the effect of removing most checks and balances on BCCI. Other senior officers did not have a complete picture of BCCI's operations. The board of directors learned little beyond what Abedi and Naqvi told them. And outsiders, including BCCI's auditors, could be easily manipulated.

This manipulation was facilitated by Abedi's decision to divide its annual audits between two of the then "Big Eight" accounting firms -- Ernst & Whinney and Price Waterhouse, with Ernst & Whinney taking responsibility over only the holding company and BCCI Luxembourg, and

Price Waterhouse taking responsibility over only BCCI Overseas in the Grand Cayman, a state of affairs which ended with Ernst & Whinney's withdrawal in 1986, and Price Waterhouse gaining responsibility for a consolidated audit of all BCCI activities in 1987. Even then, however, Price Waterhouse was not in the position to review BCCI's overall picture due to the exclusion from its audit work of a number of BCCI affiliates, some secretly owned, including ICIC, KIFCO, and BCP. Moreover, as late as 1990, key documents involving guarantees against loss by BCCI to principal shareholders, held in the Grand Caymans and in Abu Dhabi, do not appear to have been made available to auditors.

## Obstacles In the United Kingdom

Some of the same factors that made BCCI's growth possible also inhibited it from further expansion. Its rapid expansion had prompted intense speculation in the United Kingdom, which was interfering with BCCI's ability to obtain a full banking license from the Bank of England, as Abedi implicitly acknowledged in a 1978 interview.

The Bank of England probably hasn't given permission because of the atmosphere surrounding the BCCI and the propaganda that has been spread about us. . . It is not only the Bank of England that is against us, but the Club.[70]

The hostility to BCCI in the United Kingdom, which was the headquarters for BCCI's operations, was all too reminiscent to Abedi of the conditions that had lead to the demise of the United Bank in Pakistan. Abedi needed to move outside the reach of the United Kingdom. An obvious solution was to find a new home for BCCI in the United States.

Unfortunately, the relationship with Bank of America had become an obstacle to such a move for BCCI. Rather than see BCCI expand into its home base, Bank of America was increasingly uncomfortable with its partner. Despite its initial agreement to let BCCI be BCCI, Abedi's original U.S. partner, Bank of America, had found itself bewildered by many BCCI practices from the beginning. An internal "family history" of BCCI, written as a case study by one of BCCI's key officers in the United States, Khusro Karamat Elley on October 27, 1982, provides a sanitized version, from BCCI's point of view, of what went wrong between BCCI and Bank of America:

The Bank of America found on their hands an affiliate which had already become one of their largest and in which they had no management control. They were also being required to contribute every year to the increase of capital in order to maintain their portion of the shareholding. Perhaps most importantly they had also arrived at the conclusion that the Middle East had become far too important not to have a direct presence.[71]

In fact, by 1976, Bank of America had already stopped contributing to new infusions of capital for BCCI, reducing its share from 30 percent to 24 percent. By the spring of 1976, extensive discussions within Bank of America about BCCI's unusual practices had resulted in a series of memos being created and circulated among senior officials at the bank. Two of these memoranda, introduced as exhibits in the 1978 litigation over the FGB takeover, make explicit the profound disquiet at Bank of America over BCCI's handling of its Arab clients and its management style.

REENTERED AS EXHIBIT 3

The first memo, written May 10, 1976 from Bank of America Executive Vice President Alvin C. Rice to Scudden Hersman, Jr., a senior vice president, noted the concerns that some in Bank of America had expressed about BCCI's unusual attention to meeting the personal needs of leading political figures, especially in the Middle East, but stated that no bookkeeping entries demonstrating abuses had been found. Rice warned, however, that the overall relationship between Bank of America and BCCI was a difficult one:

We are just not operating on the basis of mutual trust and cooperation that make the whole effort and exercise worthwhile. Substantial profits usually have a way of curing problems but this case is an exception. If we can't make some major breakthroughs in the near future, we will have to consider alternatives such as divestiture.[72]

In the second memo, written following a meeting between Rice and Abedi, Rice described how he and Abedi had discussed the problem of BCCI officials withholding information from Bank of America officials. Abedi attributed this to cultural differences:

According to Abedi, frank criticism "American style" is something Pakistanis are not accustomed to. Criticism is taken as a personal affront and for this reason, sometimes BCCI officers have not wanted to disclose fully operating procedures that they knew would not meet BofA's quality standards.[73]

Later, Rice would tell journalists that the fundamental problem he encountered with BCCI was that BCCI thought nothing of bribery, and believed that even obstacles with regulators could be fixed through "baksheesh."[74]

These concerns simmered for another year at Bank of America. But by the fall of 1977, disapproving questions from an auditor from the U.S. Comptroller of the Currency in London responsible for reviewing Bank of America's overseas holdings, intensified Bank of America's concerns. These concerns had already been acknowledged privately in other Bank of America internal memoranda about BCCI: its overly-cozy relationship with its shareholders, its practice of providing shareholders with unusual banking services, Bank of America's inability to penetrate BCCI's banking practices, and BCCI's hostility to Bank of America inquiries about those practices.

By February, 1978 the OCC auditor had concluded that Bank of America was substantially at risk from BCCI.[75] But by then, divestiture of BCCI by Bank of America was in the interests of both banks. BCCI needed to sever its relationship with Bank of America to provide itself with additional options in connection with its ongoing attempt to buy Financial General Bankshares. Bank of America needed to reduce what might soon become an actual liability on its books. Accordingly, Bank of America had begun to implement a rapid divestment agreement with BCCI through the purchase of the Bank of America shares by BCCI's bank-within-a-bank, ICIC, described by the Bank of America in a January 30, 1978 press release merely as "one of the other major BCCI shareholders." In announcing the sale of its stake in BCCI, Bank of America emphasized that "the close co-operation that has developed between the two banks will be maintained."[76] Over the following decade, Bank of America would in fact maintain correspondent banking relationships with BCCI, continually seek additional business from BCCI, collude in at least one of BCCI's purchases of foreign banks through

nominees in South America, and earn a great deal of money from the relationship until BCCI's closure.[77]

1. "Growth of International Banking: Case Study of Bank of Credit and Commerce Intl, Khruso Karamat Elley, October 27, 1982, Senate Document 385.
2. See e.g. "The Mysteries Behind Abedi's Bank," Euromoney July 1978; S. Hrg. 102-350 Pt. 3, pp. 305-310; "The man who adds a touch of mysticism to banking," Financial Times, May 17, 1978; S. Hrg. 102-350 Pt. 3, pp. 303-304.
3. Staff interview, Rahman, August 7, 1991.
4. Staff interview, Sakhia, October 7, 1991.
5. Testimony of Rahman, S. Hrg. 102-350 Pt. 1, p. 540.
6. Former BCCI Pakistan branch chief Nazir Chinoy provided detailed information about the Zia-Abedi relationship in a series of interviews with Senate staff from March 9-16, 1992; see also check to General Zia from BCCI-UAE, May 25, 1985, S. Hrg. 102-350, Pt. 2 p. 511.
7. White Paper on the General Elections, Government of Pakistan, July 1978, S. Hrg. 102-350, Pt. 3, pp. 314-317.
8. See Price Waterhouse reports to BCCI on "Problem Loans," February 14, 1990, in S. Hrg. 103-350, Pt. 1, pp. 359-360 and BCCI Task Force Report on Saigols, id, pp. 437-438.
9. Massihur Rahman, S. Hrg. 102-350, Part One, p. 489.
10. Id.
11. Id. at 490-491.
12. BCCI Task Force Report on Selected International Loans, S. Hrg. 102-350, Pt. 1 p. 417, testimony of Rahman, Id. p. 532-533.
13. Id at 455-456.
14. See testimony of Rahman, S. Hrg. 102-350, Pt. 1, pp. 489-491; Financial Times, May 17, 1978, "The man who adds mysticism to banking," S. Hrg. 102-350, Pt. 3, pp. 303-304; "The mysteries behind Abedi's bank, Euromoney, July 1978.
15. Letter from Baldwin Tuttle to Lloyd W. Nostian, Jr., Federal Reserve Richmond, November 5, 1980.
16. "BCCI Founder: These Things Happen," Najam Sethi, Wall Street Journal, July 29, 1991.
17. See e.g. Bankrupt, The BCCI Fraud, Kochan & Whittington, p. 23.
18. Staff interviews with Massihur Rahman, August 7, 1991; Abdur Sakhia, October 9, 1991; Nazir Chinoy, March 9-16, 1991.
19. Id.
20. Akbar Bilgrami, Staff interview, July 13, 1992.
21. Staff interview, Bilgrami, July 13, 1992.
22. Id.
23. Staff interview, Abdur Sakhia, October 7, 1991.
24. Staff interview, Lance, October, 1991; testimony of Lance, S. Hrg. 102-350 pp 20-21.
25. Bilgrami, staff interviews, July 13-14, 1992.
26. Transcribed verbatim statement of BCCI insider, April 8, 1991.
27. Staff interview, Abol Helmy, January 13, 1991.
28. Id.
29. Staff interview, Akbar Bilgrami, July 13, 1992.
30. Staff interviews, Chinoy, March 9-16, 1992.
31. Id.
32. Staff interviews, Chinoy, March 9-16, 1992.
33. Id.
34. Testimony, Nazir Chinoy, Subcommittee on Terrorism, Narcotics and International Operations, March 18, 1992, p. 26.

35. Id.

36. Euromoney July 1978, S. Hrg. 102-350 Pt. 3, pp. 305-310.

37. Growth of International Banking, Case Study of Bank of Credit and Commerce Intl, Khruso Karamat Elley, October 27, 1982; BCCI internal document, Senate investigation.

38. Id.

39. The Mysteries Behind Abedi's Bank, Euromoney, July 1978; S. Hrg. 103-350, Pt. 3, pp. 305-310.

40. Testimony of Rahman, S. Hrg. 102-350, Pt. 1, p. 491.

41. Growth of International Banking, Case Study of Bank of Credit and Commerce Intl, Khruso Karamat Elley, October 27, 1982; BCCI internal document, Senate investigation.

42. Exhibit I, OCC Report of Joseph Vaez to Robert Bench, February 15, 1978.

43. See e.g. Euromoney July 1978 chart, S. Hrg. 102-350, Pt. 3, p. 306.

44. Exhibit II, OCC Report of Joseph Vaez to Robert Bench, February 15, 1978.

45. Staff interview, Sakhia, October 7, 1991.

46. BCC Group Profile, undated, 1985.

47. Financial Times, May 17, 1978, S. Hrg. 102-350, Pt. 3, p. 303.

48. BCC Holdings (Luxembourg) S.A., List of Shareholders as On 15.10.1990, Senate Document 300.

49. BCCI documents from Abu Dhabi, Grand Caymans, Panama, showing Khalil transactions; Price Waterhouse, Report to Board of Directors of BCCI, February 18, 1989, S. Hrg. 102-350, Pt. 1, pp. ___.

50. BCCI Holdings (Luxembourg) S.A>, List of Shareholders as on 31.12.89, Senate Document 298.

51. Testimony of Rahman, S. Hrg. 102-350, Pt. 1 p. 491.

52. "Client Contact and Relationship Programme," BCCI internal document from Agha Hasan Abedi to U.S. employees, October 9, 1985, Senate document.

53. "Growth of International Banking: Case Study of Bank of Credit and Commerce Intl, Khruso Karamat Elley, October 27, 1982, Senate Document 385.

54. Staff interviews, Nazir Chinoy, March 9-16, 1992.

55. Confidential source, Senate investigation, March, 1991.

56. Staff interview, Chinoy, March 9-16, 1992.

57. Interview, Nazir Chinoy, March 9-16, 1992.

58. Staff interviews, various BCCI officers; various Senate BCCI documents.

59. "Context and Rationale," Statement of Agha Hasan Abedi to BCCI officials, undated, Senate BCCI Document 1269.

60. Id.

61. BCCI document, Summary of the Management Meeting, New York, 12.2.83 p. 7.

62. Id.

63. Note of Meeting with the President on 17.1.85 at 5pm, Senate BCCI document.

64. Bilgrami, staff interview, July 13, 1992.

65. Testimony of Rahman, S. Hrg. 102-350, Pt. 1, p. 513.

66. Staff interview, Chinoy, March 9-16, 1992; staff interview. Sakhia, October 7, 1991.

67. Abedi, BCCI International, internal publication of BCCI, May 1986, Number 35, p. 12.

68. Id. at 495.

69. Id. at 497.

70. Abedi, quoted in Euromoney, July 1978, in S. Hrg. 1 03-350 Pt. 3, p. 308.

71. Growth of International Banking, Case Study of Bank of Credit and Commerce Intl, Khruso Karamat Elley, October 27, 1982; BCCI internal document, Senate investigation.

72. Bank of America Memo, Rice to Mersman, May 10, 1976, Lamarche Dep Exhibit No 6, August 11, 1978, FGB litigation.

73. Bank of America Memorandum for the Files, May 26, 1976, Lamarche Deposition Exhibit 7, August 14, 1978, FGB Litigation.

74. London Telegraph Magazine, November 10, 1991, No Questions Asked, p. 12.

REENTERED AS EXHIBIT 3

75. Office of Comptroller of the Currency Report of Joseph Vaez, February 15, 1978, memo to Robert R. Bench from J.E. Vaez, National Bank Examiner London regarding BCCI Holdings (Luxembourg).
76. Id.
77. Staff interviews, Sakhia, October 7, 1991; Chinoy, March 9-16, 1992.

# BCCI'S CRIMINALITY

REENTERED AS EXHIBIT 3

BCCI's unique criminal structure -- an elaborate corporate spider-web with BCCI's founder, Agha Hasan Abedi and his assistant, Swaleh Naqvi, in the middle -- was an essential component of its spectacular growth, and a guarantee of its eventual collapse. The structure was conceived by Abedi and managed by Naqvi for the specific purpose of evading regulation or control by governments. It functioned to frustrate the full understanding of BCCI's operations by anyone.

Unlike any ordinary bank, BCCI was from its earliest days made up of multiplying layers of entities, related to one another through an impenetrable series of holding companies, affiliates, subsidiaries, banks-within-banks, insider dealings and nominee relationships. By fracturing corporate structure, record keeping, regulatory review, and audits, the complex BCCI family of entities created by Abedi was able to evade ordinary legal restrictions on the movement of capital and goods as a matter of daily practice and routine. In creating BCCI as a vehicle fundamentally free of government control, Abedi developed in BCCI an ideal mechanism for facilitating illicit activity by others, including such activity by officials of many of the governments whose laws BCCI was breaking.

As one BCCI officer later recalled, Abedi had a saying that expressed his view about law:

The only laws that are permanent are the laws of nature. Everything else is flexible. We can always work in and around the laws. The laws change.[1]

BCCI would not change to accommodate human laws. On the occasions that such laws actually interfered with BCCI's business, BCCI would, as necessary, change the laws to accommodate BCCI -- or ignore them entirely.

Significantly, at the same time that BCCI created its elaborate corporate structure for the purpose of deceiving and defrauding those outside BCCI, within BCCI, BCCI's various entities were largely disregarded, and treated interchangably. As BCCI's liquidators concluded one year after the bank's closure in a report to the bank's creditors committee, "in a number of respects, the BCCI Group appears to have conducted its affairs as a single entity, witout clearly identifying which company or entity within the BCCI Group was responsible for any particular transaction."[2]

As a result, the records of BCCI's criminal activity constitute an accounting and legal nightmare, and a full record of what actually took place is unlikely to be reconstructed. BCCI's multiplicity of locations, layered corporate structure, front-companies, front-men, its willingness from the top down to falsify information, and its pervasive disregard for the national laws of each country it operated in, combined to create a culture of criminality within the bank so massive as to defy investigation.

BCCI records in the United States are fragmentary and incomplete. To the extent that they are organized at all, that organization is in chronological order document by document, rather than according to any subject matter, customer account, or transaction. Though fragmentary, these records are also voluminous, amounting to at least 9,000 boxes in New York and Miami alone, and several million pages. Foreign BCCI document repositories of BCCI, especially in the United Kingdom, the Grand Caymans, and Abu Dhabi, are even larger, with access for U.S.

REENTERED AS EXHIBIT 3

investigators limited by foreign bank confidentiality, privacy laws, and the willingness of the foreign jurisdictions to cooperate.

One year following the closure of BCCI, federal investigators in the U.S. were still in the process of microfilming BCCI documents from Miami, and liquidators for BCCI in the United Kingdon had indexed 1600 boxes containing approximately 2.4 million separate BCCI documents -- approximately 2.5 percent of the total of BCCI's documents in the United Kingdom.[3]

Adding to the inherent problem of investigating the largest case of organized crime in history, spanning over some 72 nations, has been the destruction of documents at BCCI and its affiliates by shredding and arson; document backdating and falsification; the removal of most key documents from London to Abu Dhabi in 1990; the refusal of authorities in the United Kingdom and in the Grand Caymans to share information with Congress and other U.S. investigators as a consequence of their interpretation of local bank confidentiality and privacy laws; the inability to question Abedi due to his stroke, the inability to question BCCI's other key officials due to their incarceration and segregation in Abu Dhabi by Abu Dhabi officialdom since July 5, 1991, and BCCI's haphazard method of record-keeping.

Regardless of what might be shown in the missing material, the remainder is more than adequate to document BCCI's criminality, including fraud by BCCI and BCCI customers involving billions of dollars; money laundering in Europe, Africa, Asia, and the America; BCCI's bribery of officials in most of those locations; its support of terrorism, arms trafficking, and the sale of nuclear technologies; its management of prostitution; its commission and facilitation of income tax evasion, smuggling, and illegal immigration; its illicit purchases of banks and real estate; and a panoply of financial crimes limited only by the imagination of its officers and customers.

Among BCCI's principal mechanisms for committing crimes were shell corporations, bank confidentiality and secrecy havens, layering of corporate structure, front-men and nominees, back-to-back financial documentation among BCCI controlled entities, kick-backs and bribes, intimidation of witnesses, and retention of well-placed insiders to discourage governmental action.

As Robert Mueller III, the Assistant Attorney General at the Justice Department now in charge of the BCCI investigation, testified in October, 1991:

BCCI was not an ordinary bank. It was set up deliberately to avoid centralized regulatory review, and operated extensively in bank secrecy jurisdictions. Its affairs are extraordinarily complex. Its offers were sophisticated international bankers whose apparent objective was to keep their affairs secret, to commit fraud on a massive scale, and to avoid detection.[4]

In the words of former Senate investigator Jack Blum:

The problem that we are all having in dealing with this bank is that . . . it had 3,000 criminal customers and every one of those 3,000 criminal customers is a page 1 story. So if you pick up an one of [BCCI's] accounts you could find financing from nuclear weapons, gun running,

narcotics dealing, and you will find all manner and means of crime around the world in the records of this bank.[5]

However daunting the task of explicating the full extent of BCCI's criminality, it is essential to recognize that at core, BCCI was not a bank which made an adequate return on investment through lending out depositors funds like other banks, but a "Ponzi scheme," which used new depositors funds to pay current expenses and to repay earlier depositors, creating a pyramid of mounting obligations that ultimately and inevitably would bring about BCCI's collapse.

As Blum testified:

"The people I talked to at the bank would say, this was a bank that was very strange, because it needed deposits all the time, and if you're running a Ponzi scheme you need more and more cash in to support the whole system of fraud that you've generated. What it meant was that BCCI people would go out and bribe central bank officials and high government officials to get them to deposit their country's foreign exchange at BCCI, and in exchange for whatever amount of money, suddenly the foreign exchange reserves of a country would be put there and put to use."[6]

From the beginning, BCCI President Abedi conceived of BCCI as a machine with two driving mechanisms -- asset growth and faith. The latter was essential to prevent a day of reckoning when depositors and creditors alike would cause a run on the bank. The former was necessary to sustain the latter through bad times. Together, they worked to sustain the illusion that BCCI was solvent, when in fact, it is unlikely BCCI was ever solvent.

On December 18, 1991, in an agreement with the Justice Department and New York District Attorney, BCCI's liquidators pled guilty to having engaged in a criminal conspiracy through financial fraud, and thereby constituting a Racketeering Influenced and Corrupt Organization (RICO), whose entire assets, legitimate and illegitimate, were subject to confiscation by the government. Specific crimes admitted to by BCCI's liquidators in the agreement included:

** Seeking deposits of drug proceeds and laundering drug money

** Seeking deposits from persons attempt to evade U.S. income taxes

** Using "straws" and nominees to acquire control of U.S. financial institutions

** Lying to regulators and falsifying regulatory documents

** Creating false bank records and engaging in sham transactions to deceive regulators.[7]

Thus, the criminality at BCCI was not, as has sometimes been suggested, a side-effect of the bank's enormous growth during the 1970's, an unintended consequence of overly rapid expansion, but inherent in the bank's philosophy of asset expansion from the beginning, and pervasive to its closure.

While U.S. law enforcement was not able to legally establish BCCI as organized crime until December, 1991, the scope of BCCI's criminality had been clear to both prosecutors and BCCI's defense team at least a year earlier. As BCCI's own private investigators, hired by the

bank after its indictment in Tampa for money laundering in October, 1988, told BCCI officials in 1990:

It is [the government's] view that BCC is a full service bank in the worse sense of the phrase. [Prosecutors] believe that it is official bank policy to actively seek out and market high net-worth individuals, and to gain from them large and frequent deposits, preferably in cash. They see such marketing efforts as being done at best without regard for the source of the customer's cash, ant at worst with tacit acceptance or even actual knowledge that in many cases the customer's money is derived from illegal enterprises, most notably narcotics. . . In the eyes of some prosecutors and investigators, the Bank's "services" are not limited merely to accepting the proceeds of illegal activities. They believe that BCC[I] officers and employees, with express upper management approval, also actively assist and even advise their customers on the most effective methods of hiding their money and evading taxes. Money, for example, is seen to be hidden or "laundered" by the constant, carefully controlled transfer of funds from one account to another within BCC and its world-wide branches or between BCC and other banks related to BCC, thus making the money almost impossible for U.S. law enforcement to trace. (8)

As an officer of BCCI Canada wrote to law enforcement just three days after the closure of BCCI worldwide, even those inside BCCI were often appalled by its practices.

We have read with a sense of relief that finally somebody had the guts to investigate into the affairs in the Bank . . . BCCI s.a., BCCI Overseas and BCC Canada have been for years conducting false accounting practices, concealment of losses (more so to avoid displeasing the Arab Owners) and making irregular loans. (9)

The letter went on to describe the knowledge of principal officers of BCCI, including its chief executive officer in the Americas, knowledge of money laundering, drug trafficking, loans created in "bogus" names, and advances of funds to non-existent companies in London, Luxembourg, Cyprus, Malta, the Channel Islands, and other locations. The writer begged investigators prosecute "the big crooks in London and Abu Dhabi." (10)

BCCI Paris branch manager Nazir Chinoy would later admit to investigators that essentially all of BCCI's activity in France was the result of the customer or the bank or both violating somebody's laws.

All the money we got [at BCCI-France] in some way we were breaking the law. If you taking it with a kickback, you are breaking foreign exchange, all Africans who brought their money got commissions which meant kick-backs. Back to back LCs to misrepresent financial deals, taking out less money in a third world country and keeping a share, kickbacks, exchanges, laundering, in some way you are breaking the law in each case. The law breaking was pretty systematic. (11)

### Scope, Types and Techniques of Fraud

BCCI's financial empire was built on the fiction that it was heavily capitalized by oil-rich Arab leaders, when the reality was that most of them -- and according to some credible information, all of them -- were acting as nominees, providing either their names to BCCI, or their names

plus their funds in the form of deposits to BCCI to get a guaranteed no-risk return, rather than as actual investors at risk.

As a result, BCCI never had a substantial capital base, and was forced from the beginning to use deposits to meet operating expenses rather than to properly invest them in legitimate loans or other financing. Not having the actual capital base, BCCI simply pretended it was there, and enlisted the reputations of its shareholders to assist it in so pretending, in order to lure others to deposit their funds with BCCI. As BCCI officers have told the Subcommittee, BCCI in effect had to create retained capital out of operating profits through juggling its books because of the lack of real capitalization. Because of the lack of real profits as well, the supposed profits had to in turn be manufactured through juggling the books pertaining to deposits. These deposits, in turn, could only receive a good return on investment through taking the funds from new deposits, requiring BCCI to grow at a frenzied pace in order to avoid collapse.

As Manhattan prosecutor Robert Morgenthau described in his indictment against BCCI of July 29, 1991, to whose first six counts BCCI's liquidators plead guilty as part of the December, 1991 plea agreement,

[BCCI's] scheme was premised on the fact that banks rely on credit. The essence of the scheme was to convince depositors and other banking and financial institutions, by means of false pretenses, representations, and promises that the BCC Group was a safe financial repository and institution for funds, and thereby defendants acted to persuade depositors and banking and other financial institutions to provide the BCC Group banks with deposits and credit.[12]

The New York District Attorney found that among the major actions taken by BCCI to carry out its fraud were:

** Employing the ruling families of a number of Middle Eastern states as nominees for BCCI, who pretended to be at risk in BCCI but who were in fact guaranteed to be held harmless by BCCI for any actual losses.

** Using bank secrecy havens including Luxembourg and the Cayman Islands to avoid regulation on a consolidated basis by any single regulator of BCCI, and thereby to permit BCCI to transfer assets and liabilities from bank to bank as needed to conceal BCCI's true economic status.

** Paying bribes and kickbacks to agents of other banking and financial institutions, thereby avoiding the scrutiny of regulators. [13]

**The Sandstorm Report**

An insider's account of BCCI's fraud created by BCCI's own auditors, Price Waterhouse, and provided to the Bank of England dated June 22, 1991, the "Sandstorm Report," was the final evidence that lead to the shutdown of BCCI globally on July 5, 1991. That draft report, based on a review of banking records from several countries and interviews carried out through the spring of 1991, found evidence of "widespread fraud and manipulation," at BCCI, reflecting "the general scale and complexity of the deceptions which have undoubtedly taken place over

REENTERED AS EXHIBIT 3

many years."[14] This information was developed when Price Waterhouse investigated some $600 million of BCCI deposits not recorded in BCCI's books. Other major losses related to BCCI accounts in related entities, including ICIC in the Grand Caymans, sometimes know as BCCI's "bank-within-a-bank," the Bank de Commerce et Placements, a BCCI subsidiary in Switzerland, the Kuwaiti Investment Finance Company (KIFCO), a secret BCCI subsidiary ostensibly owned by a BCCI nominee.

The Sandstorm report has been provided to the Subcommittee solely in a heavily censured form by the Federal Reserve at the insistence of the Bank of England, which forbid the Federal Reserve from providing a clean copy of the report to the Congress on the ostensible ground that to do so would violate British bank secrecy and confidentiality laws. However, even with the hundreds of items and almost every identifiable name in the report censured, it is clear that the Sandstorm report outlines criminality on a vast scale.

Among the specific types of BCCI fraud described by Price Waterhouse in Sandstorm were account manipulation of non-performing loans, fictitious profits and concealed losses, fictitious loans set up in connection with repurchases of shares, misappropriation of deposits, fictitious transactions and charges, unrecorded deposit liabilities, nominee arrangements to create false capitalization, unorthodox and apparently illegal repurchasing arrangements for shareholders, the "parking" of loans to avoid recognition of losses, shoddy lending, bad investments, off-book transactions, false confirmations of transactions, misrepresentations with respect to beneficial ownership of shares, fictitious customer loans, falsified audit confirmations, and the drafting of fraudulent agreements.[15]

The Sandstorm report -- prepared by Price Waterhouse for the benefit of BCCI's final group of managers, brought in for the purpose of finding a way to help BCCI survive as a wholly-owned subsidiary of Abu Dhabi -- describes BCCI's fraud, rather kindly, as originating in BCCI's sense of vulnerability in case of any losses because of its lack of any lender of last resort and the hostile attitude of the international banking community. According to Price Waterhouse, to compensate for this weakness, BCCI's management, including Abedi and Naqvi, believed it was essential to declare profitability every year regardless of the true financial condition of BCCI. Accordingly, Abedi and Naqvi provided guaranteed rates of return to principal Middle Eastern shareholders of BCCI, and then falsified and manipulated accounts and records as necessary in order to pay those returns, while still showing profits. [16]

When BCCI actually lost money due to poor lending practices, rather than accept provisions for the losses, it simply disguised them, through what Price Waterhouse described as "a very complicated series of manipulations of loan and deposit accounts, treasury activities and purchases of its own shares." [17]

Price Waterhouse found significant account manipulation at BCCI beginning as early as 1976. [18] These account manipulations were, according to BCCI officials interviewed by the Subcommittee, carried out in order to make BCCI appear to be a far more profitable institution than it really was, and thus provide a sufficient capital base to justify its level of lending and provide "security" for its deposits.

REENTERED AS EXHIBIT 3

As BCCI's losses grew, so did its manipulation of accounts and its frauds, as well as its use of affiliated and related entities such as ICIC in the Grand Caymans, the Banque de Commerce et Placements in Geneva, the National Bank of Oman, and the Kuwaiti Investment Finance Corporation (KIFCO).

The bank has a history of poor lending where it now appears that a significant amount of account manipulation has gone on. This has included the utilization of funds routed through Fork [ICIC], including funds managed by Fork Investments [ICIC Investments]; the use of fictitious lionize drawn down in the names of third parties; and the use of unrecorded deposits, in an attempt to avoid the need to make provisions. This routing of funds has been carried out on a very significant scale, involving a number of related companies, including the Fork Holdings Group [ICIC Holdings Group], LOANS, NBO, and KIFCO, and third party banks such that it is now difficult for anyone to ascertain the true nature of external exposures recorded in the names of certain major customers.

It now appears that over the period from 1977 to 1985, the Treasury operations of Sandstorm made significant losses. These losses were concealed and at the same time significant profits were manufactured. The precise amount of such loans/fictitious profits cannot now be established but may well have been of the order of $600-$700 million before funding costs, or approaching $1 billion if funding costs are added.

These losses were originally funded through unorthodox means at the behest of Abedi. . .[19]

The underlying situation at BCCI, already bad, worsened dramatically in 1985 as a result of $500 million in losses "incurred" by BCCI in commodity trading undertaken through Capcom, BCCI's commodity trading affiliate, managed for BCCI by S.M. Akbar. According to Massihur Rahman, who was BCCI's chief financial officer at the time, this was equivalent to BCCI's entire capital, and threatened to wipe out the bank.[20]

Price Waterhouse concluded:

In 1986 . . . it was discovered that significant losses had been incurred in option trading. When Akbar resigned, he left a record of his activities with [redacted by Bank of England] who brought under his own control the amounts which had been financed by unorthodox means. [Redacted by Bank of England] set up a small central team under [redacted by Bank of England] to review the record left by [redacted by Bank of England] to verify the representations made by Akbar and maintain contact with the customers. We understand that whilst [redacted by Bank of England] attempted to establish some control by [illegible] customers deposits, largely by using funds from Fork [ICIC], he could not bring himself to make full disclosure, which would almost certainly have brought the bank down.

Instead as a result of continued pressure for profits and loan servicing he continued to use unrecorded deposits, certain external funds (with Fork Holdings [ICIC Holdings] and companies controlled but not legally owned, by it) and funds were drawndown on bogus loan accounts in the name of prominent Middle East investors. These funds were applied to adjust other balances in order to avoid making provision for bad loans and to conceal the past Treasury losses, in an enormous and complex web of fictitious transactions in what is probably one of the most complex deceptions in banking history.

REENTERED AS EXHIBIT 3

These losses now form a major part of the current deficit in the bank which has been rectified by the financial support arrangements providing by the Government of Abu Dhabi.[21]

**Manager's Ledgers and Numbered Accounts**

Among BCCI's unusual practices was the use of "managers ledgers" in addition to numbered accounts to manipulate accounts through back-to-back transactions that were essentially untraceable.

BCCI insiders advised the Subcommittee in early 1991 that these accounts often were designated solely as "ML" with a number following it, and often no one other than the BCCI officer responsible for the account would have any idea who, if anyone, owned it. In some cases, even the BCCI officer in charge of the account would be unable to identify its owner.

Price Waterhouse described this practice in BCCI Grand Caymans as early as April 1986, stating that "we have no particular objection to [using numbered accounts]," but "we found that in most instances none of the officers of the Grand Cayman office were able to correctly identify either the name of the borrower or the credit officer responsible for monitoring the account at other locations."[22] At the time, Price Waterhouse suggested that BCCI should improve its management of such accounts to prevent such occurrences, but when the bank failed to do so, Price Waterhouse took no additional action other than adding an asterisk (*) to this notation in later audit reports, indicating that the recommendation had been made to BCCI more than once.

Later, Price Waterhouse noted how financial transactions from BCCI to its secretly held Swiss subsidiary, LOANS, were marked "PAY WITHOUT MENTIONING OUR NAME," with the result that the recipients of the funds from LOANS were unable to determine from whom or where the money had come.[23]

Price Waterhouse's findings were later affirmed by its successor accountants, Touche Ross, who handled the liquidation of BCCI. A year after becoming liquidator, Touche Ross noted that the true picture of BCCI's activities was distorted by such practices as "loan parking," "artificial fund transfers," the provision of multiple loans to a customer, each secured by the same property, and many similar improper practices.[24]

**BCCI Concealment of Treasury Losses**

In 1985, after rumors of BCCI's losses in options trading reached bank regulators, Luxembourg bank regulators asked BCCI to provide an audited review of its central treasury activities. BCCI selected Price Waterhouse Cayman to perform the work, which determined in early 1986 that significant losses had been incurred and not recorded. According to Price Waterhouse, it concluded then that the losses and lack of record keeping were due to "incompetence."[25] However, in the 1991 Sandstorm Report, Price Waterhouse found that "with the benefit of hindsight, it appears more sinister in that it now seems to have been a deliberate way to fictitiously inflate income."[26]

REENTERED AS EXHIBIT 3

BCCI officials have confirmed that the account provided Price Waterhouse in 1986 was designed to conceal the long-term nature of BCCI's inflation of its books.[27]

Ziauddin Akbar, the Treasury official held responsible for the massive losses in 1986 and fired by BCCI at the time following their discovery, told two BCCI officials in the U.S. in 1988 that Akbar had been a "scapegoat," used by BCCI's management to deceive the auditors when the auditors had accidently caught on to long-term manipulations by BCCI of its financial condition.

Ziauddin Akbarr told these officials that BCCI had been inflating its assets from the mid-1970's in order to make the make look profitable when it was not. When Price Waterhouse discovered this activity in 1986, BCCI's top officials worked out a scheme with Akbar under which he would accept responsibility, and pretend that the losses had just happened in the previous year due to unwise commodity speculations by BCCI. In that way, the losses would be viewed by outsiders as an unforunate one-time occurence, and with the sacrifice of Akbar, BCCI could continue.[28]

In its 1991 review, Price Waterhouse found that among the specific techniques used by BCCI to hide its losses were:

** misappropriation of deposits without depositors knowledge to provide funds to adjust non-performing and bogus loan accounts, and Treasury losses.

** misappropriation of external funds deposited under trust with Sandstorm [BCCI] and Fork [ICIC] to be managed on behalf of a few prominent people who are also shareholders of [BCCI] Holdings.

** the creation of loans with no commercial substance in the names of people without their knowledge.

** selling certificates of deposit placed with the Central Treasury without informing the depositors, and using the proceeds to fund adjustments.

** routing funds through [ICIC], LOANS, KIFCO, SDCC and other affiliates and third parties to make adjustments prior to accounting reference dates and audit confirmation dates, which were often reversed at a later date.[29]

**ICIC -- The Bank Within A Bank**

From the early days of BCCI, the various legal entities known collectively as ICIC, functioned officially as a BCCI pension fund for BCCI officers, and unofficially as BCCI's principal "bank within a bank."

The flexibility of ICIC to carry out many different schemes for Abedi is indicated by the number of different entities Abedi created using the identical ICIC abbreviation, including International Credit and Investment Company Overseas, Ltd.; International Credit and Investment Co., Ltd.; International Credit and Commerce (Overseas) Ltd.; ICIC Holdings of Grand Cayman; ICIC Apex Holdings; ICIC Overseas, Cayman; ICIC Foundation; the ICIC

REENTERED AS EXHIBIT 3

Staff Benefit Fund; the ICIC Staff Benefit Trust; ICIC Business Promotions; ICIC Business and Promotions; and others.

As BCCI liquidators in the Grand Caymans found, ICIC was not really a bank at all, but a post-office box location to "book" transactions that were initiated, organized, and approved in other parts of BCCI. In essence, ICIC was a "conduit" or mechanism for BCCI's fraud.[30]

Some of the bewildering number of purposes and uses of the different ICICs included:

ICIC Apex Holding Limited. Incorporated on October 2, 1987 as the ultimate holding company for the ICIC Group, equivalent to a charitable trust, with the beneficiaries designated as "mankind at large."

ICIC Holdings. Incorporated on April 6, 1976 as the holding company for the ICIC Group, created as the holding company for ICIC Overseas. ICIC Holdings "invested" in ICIC (Overseas) and loaned money to ICIC Foundation and the ICIC Staff Benefit Fund.

ICIC (Overseas) Limited. Incorporated on April 6, 1976 as an offshore bank to facilitate the purchase and sale of BCCI shares and to provide private banking services for BCCI shareholders and customers. (ICIC Overseas also advanced funds to nominees to allow them to purchase interests in the three other BCCI affiliates -- Attock Oil, Credit and Commerce Insurance, and the Saudi Development Company.)

ICIC Foundation Cayman. A charitable foundation wholly owned by the ICIC Foundation in the United Kingdom, established by a gift of BCCI shares owned by ICIC Holdings. The assets of the Foundation were shares in BCCI, and the assets of the UK Foundation were one-third of the shares of LOANS, the secretly-owned Swiss affiliate of BCCI.

ICIC Staff Benefit Fund. A Cayman entity wholly owned by the ICIC Staff Benefit Trust for the benefit of BCCI Employees, established by a gift of BCCI shares from ICIC Holdings. This entity held another one-third of the shares of LOANS.[31]

Usually, correspondence and transactions involving any of these ICIC entities would refer merely to ICIC, leaving it to top BCCI management to determine which of the entities, if any, would get "credit" or be "debited" for the particular transaction.

No one within BCCI other than Abedi, Naqvi, and small circle of younger assistants, had an overall picture of ICIC. To early Pakistani recruits to BCCI, such as Massihur Rahman, ICIC was described as a "parallel organization" to BCCI which would "hold shares of the bank for the founder group," in essence, a holding company controlling the stock of the BCCI holding companies.[32] ICIC was also, from the beginning, a mechanism to disguise and misrepresent the ownership of BCCI. As needed, ICIC took on additional characteristics: bank, foundation, and finance company. But its most usual purpose was to act as a vehicle for BCCI's inflation of assets and concealment of losses, acting as a mechanism for at least $1 billion of circular transactions to inflate BCCI's books.

The first detailed audit of ICIC conducted by Price Waterhouse took place in 1991, with its draft conclusions provided to BCCI's board of directors on June 17, 1991, in a report classified

by Price Waterhouse as "strictly private and confidential." The Price Waterhouse report provides cautions that its findings were based on records which were missing, falsified, or incomplete. But the picture drawn in the report again details fraud on a massive scale.

The Price Waterhouse audit found that BCCI effectively controlled ICIC, and that most ICIC transactions were initiated at the instructions of senior BCCI management: Swaleh Naqvi, the number two man at BCCI, and two of his assistants, Mr. Hafeez and Mr. Imam. ICIC's uses included:

** Financing BCCI shares and capitalization, through the use of nominees, buy-back arrangements, and guaranteed minimum returns on investments.

** Routing funds in a manner to disguise their true nature and effect on BCCI.

** Providing guarantees, through commitments signed by BCCI management on ICIC letterhead, for various nominee arrangements for shareholders of companies secretly controlled by BCCI, such as First American through its holding company, CCAH.

** Lending to BCCI shareholders and customers.

** Paying BCCI expenses.

** Handling the management of customer funds controlled by BCCI chairman Abedi through powers of attorney.

** BCCI buying its own shares through nominees through ICIC.

** Processing financial transactions that were "unrecorded" at BCCI and which therefore remain untraceable.[33]

In all, ICIC made $290 million in loans, of which all but perhaps $25 million is apparently lost. About $93.5 million of those loans were used to purchase shares of BCCI itself; another $100 million in loans went to nominees for BCCI, or for "routing" transactions aimed at disguising BCCI's financial status; another $20 million went to an ICIC subsidiary, ICAC, and effectively disappeared in ICAC's insolvency. Another $62 million in lending went to "secure" interests in other entities by BCCI "shareholders," including people who were clearly serving as nominees.

ICIC lending included millions to major front-men for BCCI including Ghaith and Wabel Pharoan, Faisal al Fulaij, Prince Turki, and Mohammed Hammoud. The role at BCCI of Hammoud, who purchased the shares of Clark Clifford and Robert Altman in First American in 1988 with funds lent him by BCCI, is illustrated by the fact than when his BCCI loans become delinquent, they were simply transferred from BCCI to ICIC.[34]

Examples of ICIC being used by BCCI to handle nominee relations include:

** Wabel Pharoan writing ICIC on December 4, 1984 to confirm that all transactions in BCCI shares in his name were undertaken as a nominee.

REENTERED AS EXHIBIT 3

** Faisal al Fulaij writing ICIC on February 16, 1985 to confirm that ICIC was entitled to all profits, and was required to bear all losses, on the CCAH (First American Bank) shares in his name which were being managed by ICIC.

** BCCI officer H.M. Kazmi writing Saudi Sheikh Kamal Adham on August 2, 1987 to confirm that Adham was not liable for any loans recorded in his name on the books of ICIC, including Adham's loans secured by his shares of CCAH for the First American Bank and Attock Oil.[35]

ICIC also offered unorthodox services, including guarantees against loss, to prominent Middle Eastern political figures, including the rulers of several Gulf states. For example, BCCI #2, Swaleh Naqvi, sent confirmation letters in February 1990 from ICIC Holdings to the Rulers of Ajman and Fujairah advising them that loans to them from BCCI would be paid off through proceeds from the disposal of their shares in CCAH, owner of the First American bank. In the event that their shares did not cover losses, Naqvi confirmed that these Rulers would not be required by ICIC or BCCI to pay them. It is notable that at the time Naqvi made this commitment, CCAH and the First American Banks had not been offered for sale to anyone.[36]

## Money Laundering

From the time of BCCI's indictment on drug money laundering charges in Tampa, Florida in October, 1988, there was little doubt to anyone looking at the facts that BCCI had been used to launder drug money.

The Customs agents working on the "C-Chase" case against BCCI, moved millions of dollars in U.S. currency, representing the proceeds of cocaine sales through BCCI Panama, BCCI Luxembourg, and LOANS Switzerland as a result of the knowing participation of several BCCI officials.[37]

As Robert Mazur, the Customs agent in Tampa who selected BCCI as the target of the Customs money laundering sting testified, BCCI bank executives volunteered methods to enhance and improve his techniques for money laundering, and shortly before the sting ended the operation, offered to introduce Mazur to other potential "cash" customers for money laundering services from Bogota, Colombia.[38]

Attorneys for BCCI and the bank itself contended that the Tampa case represented an accident involving a small number of bank officers. Indeed, when BCCI itself pled guilty to money laundering in January, 1990, the bank continued to take the position that this guilty plea only constituted an admission that a few of its employees had engaged in the activity, and that its guilty plea was based solely on a theory of corporate responsibility, "respondeat superior." As BCCI's attorneys argued to federal prosecutors and Senate staff prior to the bank's January 1990 plea agreement, it was inevitable that a bank operating in so many countries would be used by drug traffickers. This was partially true, as the Deputy Assistant Secretary of State for International Narcotics Matters acknowledged:

Setting aside those instances where BCCI managers knowingly promoted money laundering, BCCI seemed attracted to traffickers for the same reasons that other banks have been found attractive. First, traffickers seek international banks that are sophisticated in wire transfers, that

have branches in those parts of the world where they operate, and which permit quick retrieval of funds. Second, traffickers seek banks in those countries where national banking laws afford maximum secrecy to depositors, permit nominee accounts, and do not provide for close monitoring of cross border transactions of currency movements.[39]

Given BCCI's size and dispersion, money laundering at BCCI would have been inevitable under any circumstances. Given BCCI's never ending quest for assets and its management's attitude towards laws, it was ubiquitous. As Akbar Bilgrami explained, Abedi was constantly telling BCCI employees that the only thing that mattered was the generation of assets. When Bilgrami was in Colombia in the mid-1980's, a period when Colombia had already developed the reputation as the center for cocaine smuggling and drug money, Abedi told him that he needed to increase BCCI's activity in Colombia to $1 billion in local currency in deposits, and $1 billion in U.S. denominated deposits -- funds which obviously could only be generated, directly or indirectly, from the drug trade.[40]

BCCI's December, 1991 plea agreement with U.S. law enforcement outlines the systematic nature of the money laundering as follows:

40. The BCCI Defendants and their affiliates . . . would and did formulate and implement a corporate strategy for increasing BCCI's deposits by encouraging placements of funds from the proceeds of drug sales, in conscious disregard of the currency regulations, tax laws, and anti-drug laws of the United States, and of other nations;

41. In furtherance of the BCCI Group's corporate strategy to pursue deposits in disregard of United States and foreign law, the BCCI Defendants . . . would knowingly offer a full range of services to drug importers, suppliers and money launderers;

42. Co-conspirators would and did conduct . . . financial transactions with narcotics drug proceeds including the wire transfer of said proceeds from places in the United States to and through other places outside the United States, with the intent to conceal and disguise the nature, location, source and ownership of these drug proceeds.[41]

The criminal information entered into by the liquidators outlined how BCCI laundered money, detailing its use of certificates of deposits held at foreign branches to offset cash deposits made in the U.S.; its technique of crediting "counter-balancing loan proceeds" to foreign corporate bank accounts designated by drug traffickers; and BCCI's use of false names, codes, and counter-surveillance techniques against law enforcement, among other money-laundering techniques.

Knowledge of the bank's money laundering activity was not limited to a few high-level officials at the bank, as former BCCI chief financial officer Massihur Rahman contended.[42] As Abdur Sakhia, formerly BCCI's chief officer in the United States testified, it been obvious within BCCI as of 1983 that the bank had adopted a conscious policy of soliciting drug funds when it decided to purchase a bank in Colombia. It was obvious to Sakhia and other BCCI officers then that BCCI's motivation for obtaining the Colombia bank was its recognition that enormous amounts of U.S. currency were being generated as a result of narcotics trafficking, and that Colombia could become an extremely profitable operation for BCCI.

According to Sakhia,

We knew that the money that we would be getting in Colombia would be drug money. We knew that all the dollar deposits we would be getting would be drug money.[43]

Sakhia contended that his own attempts to discourage BCCI's entry into the Colombian market resulted in his being denied the position of becoming regional manager for BCCI throughout the Americas, in retaliation for his unwillingness to go along with BCCI's plan:

If I had agreed to the purchase of the Colombia bank I would have been head of the Latin American region total but I opposed the purchase of the Colombian bank. I opposed it for two reasons. I didn't want that size of acquisition. We wouldn't know who the 500 people of staff we were taking over well enough. We were getting branches in lawless areas like Cartegena, Cali and Medellin. There were armed guards every time I went from Bogota to the hotel in Colombia. I made an effort to get controls on our accounts in Miami because of concerns about drug money. I was opposed by London and by Amir and Saleem Saddiqi, who was also head of audit and compliance and simultaneously head of growth and profit.[44]

While Sakhia provided key information to U.S. investigators about wrong-doing at BCCI, other BCCI officers remaining at the institution scoffed at his professions of innocence in the banks criminality.[45] Similarly, Massihur Rahman, who likewise provided vital information to this and other investigations, professed to have been excluded from all wrongdoing at the bank. But other BCCI insiders contended that Rahman assisted BCCI's inner circle in deception, if inadvertently, through noting deficiencies in BCCI's books and warning other officials of the risks if they were not corrected. As one BCCI official told investigators in the spring of 1992:

Massihur Rahman was head of finance and he was a member of the Central Management Committee. He was never part of the inner clique of the top four or five and yet he had a very significant position because all of the balance sheets were reviewed by him. He packaged the balance sheets. He is a very intelligent man. If there were any shortcomings here or there, he came up with the ideas of how to make it look good. As a professional, he dressed them up when he saw deficiencies. He was a technocrat, he understood what the international world wants, whereas a lot of the others did not meet outsiders at all. From their point of view what was good enough for Pakistan or India was good enough. Massihur Rahman had a higher standard. He told them what they had to come up with and Naqvi produced the proper figures in response.[46]

The degree of BCCI-U.S.'s reliance on money laundering as a principal business was demonstrated by what happened when BCCI put into place a "compliance program" as part of its January 1990 plea agreement resolving the Tampa money laundering case: business dropped noticeably, especially referrals from other BCCI locations, because neither BCCI nor its customers wanted to provide details about the customers' businesses.[47]

BCCI's clients for money laundering included Panamanian General Manuel Noriega, for whom it managed some $23 million of criminal proceeds out of its London branches; Pablo

Escobar, of the Medellin cartel; Rodriguez Gacha, of the Medellin cartel; and several members of the Ochoa family.[48]

**Bribery**

Bribery was a key component of BCCI's strategy for asset growth worldwide, from the earliest days of the bank. In some case, the recipients of funding from BCCI may not have considered the payments to be "bribes," but simply a mechanism by which BCCI obtained what it wanted from an official, and in return the official helped BCCI, such as BCCI's payments to two of the Gulf emirs in return for the use of their names as nominees for the purchase of First American. In other cases, the bribes were naked and direct quid pro quos, such as BCCI's payments to Central Bank officials in return for Central Bank deposits in countries like Peru. In other cases, BCCI made campaign contributions to politicians, such as it did with General Zia in Pakistan and Carlos Andres Perez in Venezuela. In still other cases, BCCI's payments came in the guise of charitable contributions, and provided BCCI with an entree to generate deposits from others, as in the case of President Jimmy Carter. Among the Americans who BCCI provided with financial assistance in addition to Carter, were U.S. Ambassador to the United Nations Andrew Young, Bert Lance, and Jesse Jackson. Abroad, important figures with extensive contact with BCCI included former British Prime Minister James Callahan, then United Nations Secretary General Javier Perez de Cueller, Jamaican prime minister Edward Seaga, Antiguan prime minister Lester Byrd; a large number of African heads of state; and many Third World central bank officials.

The courting of important governmental and political figures was a task ordinarily undertaken directly by Abedi, usually with considerable secrecy. Typically, a local BCCI official would make contact with a key national political figure, who would then be passed on to Abedi. Abedi would then assess that official's needs and try to put together a transaction suitable to the official's status and needs. [49]

In some cases, Abedi would not make a "bribe" per say, but would instead use BCCI's resources to build goodwill, which he in turn would then make use of to generate assets elsewhere. This was Abedi's approach, for example, with President Jimmy Carter, who received millions of dollars in BCCI funding for charitable activities, and then travelled with Abedi to developing nations, providing Abedi with entry to their leaders and, often, the assets of their central banks.[50]

Abedi used a similar approach with Jesse Jackson and Andrew Young, both of whom had business expenses paid for by BCCI, and either solicited business for BCCI in return, or offered to do so. [51]

When it came to General Noriega, bribes were unnecessary, as BCCI provided the far more important service of laundering $23 million of his money and keeping it safe from other governments and his eventual successors in Panama by insuring its disappearance following his indictments. But to demonstrate BCCI's hospitality, the bank still made sure that it provided Noriega with an expensive gift -- a $25,000 persian carpet, hand delivered with Abedi's regards to Noriega by Alauddin Sheikh.[52]

REENTERED AS EXHIBIT 3

In other cases, however, BCCI would make direct payments to key officials, sometimes in suitcases filled with cash. As BCCI officer Abdur Sakhia stated in interviews with Subcommittee staff:

Abedi's philosophy was to appeal to every sector. President Carter's main thing was charity, so he gave Carter charity. [Pakistani President] Zia's brother in law needed a job, he got a job. [Bangldeshi President] Ashraf's mistress needed a job, she got a job. Admission of your son to a top college, he would arrange it somehow.[53]

According to Sakhia,

There was a world wide list of people who were in the payoff of BCCI. It was my understanding this included the family of Indira Ghandi, Ashad of Bangladesh, and General Zia. In Africa, most of the leaders of Africa in Zambia, Zimbabwe, Mugabe, and others, were all understood to have received money.[54]

According to both Sakhia and BCCI's Paris manager, Nazir Chinoy, BCCI official Alauddin Sheikh would sometimes take cash to people at Abedi's request.[55] Both officials stated that they understood that Nigerian central bankers were paid off in cash by Mr. Sheikh at a World Bank meeting in Seoul, Korea.[56]

Chinoy said that such payments were typically made in great secrecy, but that it was obvious to him and others at BCCI what was going on. He described one such apparent payment by Abedi to President Mugabe in Zimbabwe.

I accompanied Mr. Abedi and Mr. Sheikh to the opening of a joint venture with Zimbabwe. I believe that to get permission to open that venture, money was paid to President Mugabe and to Nkomo. The basis I am making this statement was that when I went there with Mr. Sheikh, I was acting as Mr. Abedi's personal assistant or secretary. Mr. Sheikh went off on his own to see Nkomo who was the chief opposition at that time, and then he went off to see President Mugabe, and when they talked they wanted me out of the room. A number of us were there for the opening. But only Sheikh and Abedi left in the room with these two political figures. Otherwise I was accompanying him and acting with him. Sheikh carried a bag with him. At the time I had a suspicion that you don't get permission as a foreign bank so easily without a payment. Without favors, it wouldn't be so easy to get a bank that fast, especially given the opposition of the British banks who were already established there. And I can think of no other reason for the exclusion of everyone but Sheikh and Abedi.[57]

The New York District Attorney's indictment of BCCI alleged that in 1986 and 1987, BCCI president Abedi and number two official, Swaleh Naqvi, opened a bank account in a Swiss bank in Panama to "transmit bribes and kickbacks in the amount of a percentage of the deposits maintained by the Central Reserve Bank of Peru to the two senior officers of that bank," in a total amount of $3 million, in return for Peru maintaining large central bank deposits in BCCI.[58] These bribes were paid following a meeting involving BCCI officials and Peruvian president Alan Garcia. According to BCCI official Akbar Bilgrami, the purpose of the meeting was to make sure that President Garcia would not undercut the decision by the Central Bank and that if the payments were made to the Central Bankers, BCCI would indeed

receive the Peruvian deposits in return. Upon returning from Peru, Shafi told Bilgrami that Garcia had given his blessing to the transaction.[59]

Chinoy contended that BCCI was simply efficiently exploiting the prevailing business practices in many of the countries in which it operated, suggesting that in Nigeria and many other African countries it was not possible to do business without buying presents, giving kickbacks, or making bribes to officials.

Commission means kick-back. The government approves a $300 million contract. A multinational corporation agrees with the government which has helped him, 10 percent gets kicked back. A company is established abroad or they nominate a cousin or someone who is paid 3 percent. It is known as a commission but it is actually a kickback. It is the only way to do business.[60]

### Support of Terrorism and Arms Trafficking

BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

Arms trafficking involving BCCI included the financing of Pakistan's procurement of nuclear weapons through BCCI Canada, as documented in the Parvez case, involving a Pakistani who attempted to procure nuclear related materials financed by BCCI through the United States. [61]

In a November 22, 1991 letter to the Subcommittee, the CIA stated that "the Agency did have some reporting [as of 1987] on BCCI being used by third world regimes to acquire weapons and transfer technology," but was unwilling to elaborate on the nature of this activity in public. [62]

In early August, 1991, the Committee was provided with documents from the Latin American and Caribbean Region Office (LACRO) of BCCI, describing the offer for sale by the Argentine air force of 22 Mirage aircraft for $110 million. [63] The planned sale was to have been made to Iraq, as part of Saddam Hussein's massive military buildup prior to the Gulf war. BCCI was acting as the broker for the transaction, which was to take place in August or September of 1989, but not completed as a result of a dispute within the Argentine military itself.[64] Arms sales involving BCCI from Latin America to the Middle East remain, as of April 1992, under active investigation by U.S. law enforcement.[65]

### Abu Nidal

In the United Kingdom, a key window on BCCI's support of terrorism was an informant named Ghassan Qassem, the former manager of the Sloan Street branch of BCCI in London.

3/4/24, Case Case 3:24-00-400-404000D-MQ-ZNQ-TDB Document Sbit Ffile-d-02/28-1124-11-07-Page 61 of Page 61/40 Page 540 01156

PageID: 5027

Qassem had been given the accounts of Palestinian terrorist Abu Nidal at BCCI, and then proceeded, while at BCCI, to provide detailed information on the accounts to British and American intelligence, apparently as a paid informant, according to press accounts based on interviews with Qassem.[66]

As of 1986, the information obtained about Abu Nidal's use of BCCI was sufficiently detailed as to justify dissemination within the U.S. intelligence community.[67]

In July, 1987, as a result of the information provided by Qassem, a State Department report concerning Abu Nidal and Qassem, declassified in 1991 at the request of the Subcommittee, describes Abu Nidal's use of BCCI.

The ANO commercial network comprises several businesses created over the past seven years with the long-term goal of establishing legitimate trading enterprises in various countries, gaining experience in commercial trade, and making a profit for the group. . . The general manager of the commercial network and the principal agent in gray-arms transactions is Samir Hasan Najm al-Din (Samir Najmeddin). He has directed many of ANO's commercial activities, both licit and illicit, from his offices in the INTRACO building in Warsaw, Poland.. . . He has maintained a general account at a major West European Bank [BCCI in London] from which he transfers money to individual company accounts at local banks. He maintains joint control of each company's ban accounts, along with the company manager, and he is responsible for forwarding all major contracts to Sabri al-Banna for final approval.[68]

Following dissemination of this material by the U.S., the U.S. coordinated efforts to shut down the financing of the activities exposed in its targeting of Abu Nidal through BCCI-London, with some success.[69]

Other terrorist groups continued to make use of BCCI, including one "state sponsor of terrorism," and the Qassar brothers, Manzur and Ghassan, who have been associated with terrorism, arms trafficking, and narcotics trafficking in connection with the Government of Syria, and with the provision of East Bloc arms to the Nicaraguan contras in a transaction with the North/Secord enterprise paid for with funds from the secret U.S. arms sales to Iran.[70]

**Training of Cartel Death Squads**

In April 1989, a network of Israeli arms traffickers, operating out of Miami, made a shipment of 500 Israeli manufactured machine guns through the Caribbean island of Antigua for the use of members of the Medellin cartel. Later, one of these weapons was used in the assassination of Colombian presidential candidate Luis Carlos Galan, and several other of the weapons were found in the possession of cartel kingpin Jose Gonzalo Rodriguez Gacha after his death in a gunfight with Colombian drug agents.

The principals in the arms trafficking included Yair Klein, who had previously been identified in Colombian drug enforcement documents as involved in training paramilitary squads for the cocaine cartel in Medellin; Pinchas Shahar, an Israeli intelligence operative, and Maurice Sarfati, an Israeli "businessman" operating out of Miami and Paris.

The scandal broke after a broadcast by NBC News on August 21, 1989 about Klein's activities, and a Colombian judge charged Klein with having engaged in criminal conspiracy in training the private armies for the cartel. In the months that followed, the scandal extended to Antigua as well, an island with no substantial military force and no need for the 500 machine guns its foreign minister ordered from Israeli military industries.

Subsequent investigations of the affair, including one by the Government of Antigua conducted by a Washington attorney, Lawrence Barcella, left many questions unanswered. However, it became clear that the Antigua project had been outgrowth of the establishment of a "melon farm" by Sarfati in Antigua in 1983,

financed by the United States government through a $2 million loan from the Overseas Private Investment Corporation (OPIC), in part on the basis of financial references for the principals provided OPIC by BCCI.

Before providing the $2 million to Mr. Sarfati for his melon farm, OPIC requested financial references. Sarfati provided references from his principal bank, BCCI Miami. In a letter from its Miami office, BCCI advised OPIC on June 14, 1983 that Sarfati, "who is one of our valued customers" had a number of major accounts with BCCI.[71]

Ultimately, OPIC lost its entire investment in the melon farm and concluded that it had been defrauded by Sarfati. After filing suit against Sarfati, OPIC sold its remaining interest in the melon farm, at a loss of 50 cent on the dollar, to an Israeli businessman, Bruce Rappaport, and an entity owned by him called the Swiss American Bank. Rappaport, a confidante of former CIA director William Casey, was in this period also in frequent contact with BCCI's original U.S. contact, Bert Lance. Coincidentally, one of BCCI's principal board members, Alfred Hartmann, who was also chairman of BCCI's secretly-owned Swiss affiliate BCP, also sat on the board of another of Rappaport's banks.[72]

In 1990, when the Subcommittee sought records pertaining to Mr. Sarfati from BCCI, it was advised by lawyers for BCCI that the Sarfati accounts at BCCI were "missing." Additional investigative work later located most of the accounts pertaining to one of Sarfati's partners in the Antigua venture, Haim Polani, but the accounts of Sarfati and his businesses remained lost. BCCI Latin American and Caribbean Region (LACRO) documents now maintained at the Federal Reserve in Miami document millions in BCCI loans to various Sarfati businesses.

## BCCI and BNL

BCCI was also involved with the Banco Nationale del Lavoro (BNL), Italy's biggest bank, whose Atlanta office was involved in a scheme to provide as much as $4 billion in fraudulent loans to facilitate illegal arms sales for the government of Iraq. In March 1991, three officials from BNL were indicted.

Although much about the relationship between the two banks remains unclear, BCCI documents in the United States show that BCCI loaned short-term -- often overnight -- its substantial U.S. surpluses to BNL in Atlanta, with transactions amounting to billions a year. While such lending from a bank with a surplus to another bank that could use the assets would

be normal, what was not normal about the transaction was BCCI taking funds from its overseas branches for overnight use by BNL.

BCCI and BNL shared a key figure in common, Alfred Hartmann, who was on the board of directors of both banks and the head of BCCI's secretly controlled Swiss affiliate, Banque de Commerce et Placements (BCP).

Ironically, when BCCI was closed, its Swiss affiliate was almost immediately sold to a Turkish banking group, Cukorova, whose subsidiary, EndTrade, was BNL's partner in the illegal arms sales from the U.S. to Iraq, and part of the federal investigation into BNL.

## Prostitution

BCCI's involvement in prostitution arose out of its creation of its special protocol department in Pakistan to service the personal requirements of the Al-Nahyan family of Abu Dhabi, and on an as-needed basis, other BCCI VIPs, including the families of other Middle Eastern rulers.

Several BCCI officers described the protocol department's handling of prostitution to Senate investigators in private, and two -- Abdur Sakhia and Nazir Chinoy -- confirmed their general knowledge of the practice in testimony.

The prostitution handled by BCCI was carried over from practices originally instituted by Abedi at the United Bank, when working with a woman, Begum Asghari Rahim, he cemented his relationship with the Al-Nahyan family through providing them with Pakistani prostitutes.

Among BCCI bank officials in Pakistan, Begum Rahim was reputed to have in United Bank first won the favors or attention of the royal family by arranging to get virgin women from the villages from the ages of 16 to 20. Rahim would make payments to their families, take the teenaged girls into the cities, and there taught them how to dress and how to act, including the correct mannerisms. The women would be then brought to the Abu Dhabi princes. For years, Rahim would take 50-60 of these girls at a time to large department stores in Lahore and Karachi to get them outfitted for clothes. Given the size of Rahim's retinue and her spending habits -- $100,000 at a time was not unusual when she was engaged in outfitting her charges -- her activities became notorious in the Pakistani community generally, and there was substantial competition among clothiers and jewelers for her business.[73]

According to one U.S. investigator with substantial knowledge of BCCI's activities, some BCCI officials have acknowledged that some of the females provided some members of the Al-Nahyan family were young girls who had not yet reached puberty, and in certain cases, were physically injured by the experience. The official said that former BCCI officials had told him that BCCI also provided males to homosexual VIPs.[74]

## Intimidation of Witnesses

After his experience with the nationalization of the United Bank in Pakistan, Abedi never forgot the ability of governments to destroy his creations. Bribery and prostitution were two techniques to discourage government inquiry. Intimidation of potential witnesses and whistle blowers was another.

REENTERED AS EXHIBIT 3

Throughout investigations of BCCI, would-be BCCI whistle blowers have expressed fears for their lives, including Noriega's BCCI banker, Amjad Awan, who told Senate investigator Jack Blum that he would be killed if the details of the limited information he gave the Senate about BCCI were revealed; a second former BCCI official who was a source of Blum; and the two BCCI officials who ultimately testified before the Senate in 1991: Massihur Rahman and Abdur Sakhia.

Both Rahman and Sakhia left BCCI in 1990, together with a few others from the bank in the period when Abu Dhabi was taking active control of BCCI and forcing out those of the original Pakistani group who lacked close ties to the Al-Nahyan family.

These departures came at an especially vulnerable time for BCCI, and the threats to them should they break the code of silence left nothing to the imagination.

In the testimony of Abdur Sakhia, formerly the BCCI official in charge of Latin America and the Caribbean,

When I left the bank in April 1990, we left as a group, about 12 of us, Each one was told you go quietly, if you make any noise, they are going to fix you. I got the word from Naqvi's secretary that if I made any noise, Altman's firm will get me involved in a drug case.[75]

In the account of Massihur Rahman,

I left. Since then, my family and I have been hounded. All sorts of direct and indirect threats have been used, to the extent that Scotland Yard got to know about it and the Guildford police got to know about it . . . and they had special security put around our house and special equipment put in the house for direct access to the police station, and my wife and children were suffering greatly . . . they were being terrorized by these situations and my wife was having to put the children under the bed every night for fear of some physical violence or some gunshots.[76]

It had long been part of BCCI internal lore that erring Pakistani officers in Pakistan could wind up having an accident if they talked about BCCI when they left. In the United Kingdom, another senior BCCI executive, John Hilbery, had told Rahman that there had been a gunshot through his window shortly after he left the bank. As a result, Hilbery decided he would not go to court against BCCI to assert any claims against his former employer, but would simply quietly withdraw.[77]

During the Tampa money laundering case against BCCI, information was received through government sources about potential plans to try to affect the government's case by kidnapping witnesses.[78]

Moreover, in that same case, BCCI retained private investigators to investigate the Customs agents who had brought the case against BCCI, with the investigators ultimately destroying the business of a key informant who assisted in the prosecution of the case. As chief undercover Customs agent Robert Mazur testified:

BCCI, had in fact, retained another investigative firm for the sole purpose of investigating me, and the IRS agent who is the affined to the BCCI searches. That was something that not only happened to me, but also happened to many other people who tried to work on behalf of the Government, and in particular, a citizen who showed tremendous courage to allow the Government to use his business in part as their cover, who later became a victim of malicious statements that were made by the investigators that led later to his financial ruin, and its a shame that that type of thing occurred, but it did.[(79)]

## Black Network?

None of the BCCI officers interviewed by the Senate claimed to have knowledge of a "black network" of intelligence operatives, arms dealers, drug traffickers, burglars, or assassins employed by BCCI, as described in a Time magazine cover-story on BCCI on August 15, 1991. They declared, to a person, that they did not believe such a network existed at the bank. However, several suggested that if the black network were recharacterized as a team of officials carrying out Abedi's most secret missions, then it could exist on a somewhat smaller scale then that characterized by Time, operating out of either BCCI's Pakistani protocol department or its Pakistani BCCI Foundation.

1. Staff interview, Abdur Sakhia, October 7, 1991.
2. Touche Ross, Bank of Credit and Commerce International (SA) in Liquidation, Report on the Activities Undertaken in Luxembourg and the UK Covering the Liquidation Period Up to April 15, 1992.
3. Touche Ross, Report on the Activities Undertaken in Luxembourg and the UK Covering the Liquidation Period Up to April 15, 1992.
4. S. Hrg. 102-350, Pt. 3 pp. 790-791.
5. Blum, S. Hrg. 102-350, Pt. 1, p. 61.
6. Blum, S. Hrg. 102-350, Pt. 1, p. 37
7. Superseding Information, U.S. v. BCCI, Crim. No. 91-0655, U.S. District Court for the District of Colombia, December 19, 1991.
8. Report of Internal Investigation to BCCI, Philip Manuel Resources Group, November 1990, S. Hrg. 102-350, Pt. 2, pp. 387-388.
9. Letter to Whom It May Concern, July 8, 1991 on BCC Canada letterhead.
10. Id.
11. Staff interview, Chinoy, March 9-16, 1992.
12. People v. BCCI, Supreme Court of the State of New York, County of New York, July 29, 1991.
13. Id.
14. Price Waterhouse, Draft Report on Sandstorm SA Under S. 41 of the Savings Act of 1987.
15. Price Waterhouse, Draft Report on Sandstorm SA Under S. 41 of the Savings Act of 1987.
16. Id at 1.
17. Id at 1.
18. Id at 1.
19. Id at 2
20. Testimony of Rahman, S. Hrg. 102-350, Pt. 1, p. 502.
21. Id at 2.
22. Price Waterhouse report to BCCI, Internal Control Report, April 28, 1986, p. 3.
23. Price Waterhouse, Draft Report on Sandstorm SA Under S. 41 of the Savings Act of 1987, p. l3.
24. Touche Ross, Report on the Activities Undertaken in Luxembourg and the UK Covering the Liquidation Period Up to 15 April 1992.

25. Id at 17.
26. Id.
27. Staff interviews, Akbar Bilgrami and Amjad Awan, July, 1992.
28. Staff interviews, Akbar Bilgrami, July 13-14, 1992; Amjad Awan, July 20-21, 1992.
29. Id.
30. Report of Grand Caymans Liquidators to Grand Caymans Court, August 30, 1991, Deloitte Ross Tohmatsu, International Credit and I nvestment Company (Overseas) Ltd.
31. Price Waterhouse, Report to the Director on ICIC Group, June 17, 1991, Sec. 1.
32. Testimony of Rahman, S. Hr. 102-350, Pt. 1, p. 517.
33. Price Waterhouse, Report to the Director on ICIC Group, June 17, 1991, Sec. 1.
34. Id.
35. Id.
36. Id.
37. S. Hrg. 102-350, Pt. 3, p. 737.
38. Testimony of Robert Mazur, S. Hrg. 102-350, Pt. 3, p. 682.
39. Testimony of Grant Smith, Deputy Assistant Secretary of State, S. Hrg. 102-350, Pt. 3, p. 579.
40. Staff interviews, Akbar Bilgrami, July 13-14, 1992.
41. Superseding Information, U.S. v. BCCI, Crim. No. 91-0655, U.S. District Court for the District of Colombia, December 19, 1991.
42. Testimony of Rahman, S.Hrg. 102-350, Pt. 1, p. __.
43. Interview, Abdur Sakhia, October 7, 1991
44. Sakhia, id.
45. Staff interviews with various BCCI officers, October 1991 and July 1992, including Akbar Bilgrami, who worked with Sakhia in Miami in the mid-1980's.
46. Staff interview, BCCI officer, March, 1992. In defense of Sakhia and Rahman, it is notable that neither is the subject of investigation by law enforcement in connection with BCCI's activities, and neither have sought immunity from prosecution, demonstrating substantial limits on their culpability. Both voluntarily provided critically important information about BCCI to U.S. investigators, including the Senate.
47. Price Waterhouse, Interim Report on Results and Operations to BCCI Holdings, September 30, 1989, S. Hrg. 102-350, Pt. 1, p. 279.
48. BCCI Records and customer lists, LACRO, Federal Reserve, Miami.
49. Staff interviews with Abdur Sakhia, October 7, 1991; Nazir Chinoy, March 9-16, 1991; Confidential BCCI informant, March, 1990.
50. See e.g. AP, July 15, 1991.
51. Staff interview, Nazir Chinoy, March 9-16, 1991; BCCI documents, Andrew Young trip to Nicaragua.
52. Chinoy, id.
53. Staff interview, Abdur Sakhia, October 7, 1991.
54. Staff interview, Abdur Sakhia, October 7, 1991.
55. Staff interviews with Sakhia, id., and with Chinoy, March 9-16, 1991.
56. Id.
57. Staff interview, Chinoy, March 9-16, 1992.
58. People v. BCCI, Supreme Court of the State of New York, County of New York, July 29, 1991.
59. Staff interview, Akbar Bilgrami, July 13-14, 1992.
60. Staff interview, Chinoy, id.
61. Testimony of Alan Kreczo, Deputy Legal Adviser, Department of State, S. Hrg. 102-350, Pt. 3, p. 599.
62. S. Hrg. 102-350 Pt. 3 p. 601.
63. BCCI LACRO documents in S. Hrg. 102-350 Pt. 1 pp. 126-162.

64. Interview with Argentine, Mick Anderson, staff, Senator Alan Cranston, August 6, 1991, S. Hrg. 102-350, p. 253.
65. Internal Customs source, April, 1992.
66. See e.g. Financial Times, November 13, 1991, p. 6.
.
67. Testimony of Laurence Pope, Associate Coordinator for Counter-Terrorism, Department of State, S. Hrg. 102-350, Pt. 3, p 580.
68. Abu Nidal's Terror Network, U.S. Department of State, S. Hrg. 102-350, Pt. 3, pp. 640-641.
69. Testimony of Pope, id, at 581.
70. See Testimony of Pope, id., at 581; staff interviews.
71. Loan Application to the Overseas Private Investment Corporation, submitted by Roydan (Antigua) Limited.
72. OPIC Documents provided to Subcommittee, July, 1990; Testimony of Bert Lance, S.Hrg. 102-350, Pt.3 pp. 44-46.
73. Staff interview, Nazir Chinoy, March 9-16, 1991; see also account of Sakhia, October 7, 1991; practice described by other anonymous BCCI officers to Senate staff.
74. Staff interviews, U.S. investigator, February, 1992.
75. Sakhia interview, October 13, 1991
76. Testimony of Rahman, S. Hrg. 102-350 Pt. 1 p. 256.
77. Id.
78. Testimony of Robert Mazur, S. Hrg. 102-350, Pt. 3, p 692.
79. Id at 692.

# BCCI'S RELATIONSHIP WITH FOREIGN GOVERNMENTS
# CENTRAL BANKS, AND INTERNATIONAL ORGANIZATIONS

## Introduction

On July 5, 1991, when BCCI was closed, some one million small depositors in BCCI around the world lost their deposits.

In addition to these small depositors, there were other, larger depositors. Among those depositors were central banks, governmental organizations, government investment funds, and government officials, involving most of the countries in the world.

There is no way of knowing even now precisely who were among all those who lost money. BCCI made frequent use of "managers' ledgers" or numbered accounts for its most sensitive depositors, whose identities were typically kept secret from everyone other than their personal banker at BCCI. Given the anonymity, the secrecy, and the source of the income behind many of these deposits, some depositors, including governmental officials or agencies, have not necessarily been in a position to assert claims to the money they have lost.

However, some sense of the impact on governmental entities and global officialdom is provided by an account appearing in the French wire service Agence France Presse a few days after BCCI's global shut-down, concerning BCCI losses at its tiny branch in Korea, entitled "Angry Diplomats Urge Government To Release Their BCCI Assets":

A major row is erupting between the South Korean government and foreign diplomats whose deposits have been frozen by the suspension of the Seoul branch of the scandal-hit Bank of Credit and Commerce International (BCCI). Incensed diplomats from 33 countries met last Thursday at a European embassy here to coordinate strategy after a protest they filed with the central bank of Korea went unheeded, diplomats said. The diplomats said that 120 of their colleagues from 33 embassies have had part or all of their deposits frozen. In addition, the accounts of several embassies have been frozen, forcing some to cut back operations. . . The local branch of BCCI had strongly lobbied diplomats here to use the bank, offering interest rates slightly above average and putting a wide international network at their disposal, officials said. . . . The envoys said that among those countries [in Korea alone] whose embassies were in partial or deep trouble were [a number of] Latin American countries, Bangladesh, Belgium,

Iran, Italy, Hungary, Liberia, Libya, Pakistan, the Philippines, Saudi Arabia, Spain, Switzerland, Thailand, Turkey, the United Arab Emirates and Yugoslavia . . . Peru and Argentina have suspended consular operations [entirely] because of lack of funds.[1]

BCCI's offices in Korea were among the bank's smallest, containing just $92 million out of BCCI's total of $23 billion in assets. Yet small as the branch was, the impact of its closure on the foreign diplomatic corps in Seoul was devastating. This tiny branch of BCCI had, somehow, developed relationships with these embassies that neither domestic banks in Korea, nor any of the other foreign banks doing business in Korea had obtained.

The fact so many officials from so many countries banked at a single, obscure BCCI office provides an insight into the success of BCCI's overall strategy of targeting government officials everywhere to use its array of banking services.

In his July 29, 1992 indictment of BCCI's former heads, Agha Hasan Abedi and Swaleh Naqvi, and two of BCCI's front-men, Ghaith Pharaon and Faisal Saud Al Fulaij, New York District Attorney Robert Morgenthau alleged, in some detail, how BCCI systematically engaged in criminal activity with officials and prominent political figures from many countries to generate assets for BCCI's Ponzi scheme, both from the governments involved, and from innocent, legitimate depositors.

As the indictment alleges:

. . . members of the BCC Group, acting to further the conduct and affairs of the criminal enterprise, assisted various nations, including Pakistan, Senegal, Zambia and Nigeria, to evade fiscal restraints placed on them by such world institutions as the World Bank and the International Monetary Fund. . . . The BCC Group agreed to bribe employees, agents and fiduciaries entrusted with Third World money to place it at risk in the BCC Group, which was insolvent.

Members of the enterprise sought to secure a preferential position for the BCC Group in various countries through the use of corrupt payments of monies and other benefits to powerful individuals and to make and cause to be made deposits of money with the BCC Group. Specifically, defendants Abedi and Naqvi plotted to deliver cash and other benefits to countries' finance ministers, head of countries' central banks and senior executives of international and regional organizations to obtain deposits. . .

Among the countries in which members of the BCC group made such corrupt payments for deposits and favorable treatment were the Congo, Nigeria, Morocco, Senegal, Tunisia, the Ivory Coast, Argentina and Peru. Among the institutions defrauded were the World Bank, the International Monetary Fund, the African Development Bank and the Economic Cooperation of West African States.[2]

Similarly, over the past four years, the Subcommittee has developed extensive documentary and testimonial evidence of BCCI's systematic reliance on relationships with, and as necessary, payments to, prominent political figures in most of the 73 countries in which BCCI operated. BCCI records and testimony from former BCCI officials together document BCCI's systematic securing of Central Bank deposits of Third World countries; its provision of favors

REENTERED AS EXHIBIT 3

to political figures; and its reliance on those figures to provide BCCI itself with favors in times of need.

As BCCI's former senior official for the Caribbean, Abdur Sakhia, testified:

BCCI's strategy globally had been to be very well-known, to make an impact in the marketplace, to have contacts or relationships . . . with all the people who matter. . . You name it, we would develop relationships with everyone of consequence . . . In the Caribbean, every major country I knew the heads of state, I knew the finance ministers, I knew the governors of the central bank. I knew heads of all the major banks in the area, the heads of foreign banks. I knew the people in various official agencies, like the Caribbean Development Bank, Inter-American Development Bank, Organization of American States. Everyone of consequence in this region I knew. . . . [3]

These relationships were systematically turned to BCCI's use to generate cash needed to prop up its books. BCCI would obtain an important figure's agreement to give BCCI deposits from a country's Central Bank, exclusive handling of a country's use of U.S. commodity credits, preferential treatment on the processing of money coming in and out of the country where monetary controls were in place, the right to own a bank, secretly if necessary, in countries where foreign banks were not legal, or other questionable means of securing assets or profits. In return, BCCI would pay bribes to the figure, or otherwise give him other things he wanted in a simple quid-pro-quo. For example, BCCI would help an official move flight capital out of his country to a safe haven elsewhere, to launder funds skimmed by the official from an official bank account or official commercial transaction, create a foundation for a head of state to provide charitable services for his home village or province, take him on a shopping spree at a fancy London department store, or secure him sexual favors.

The result was that BCCI had relationships that ranged from the questionable, to the improper, to the fully corrupt with officials from countries all over the world, including but certainly not limited to Argentina, Bangladesh, Botswana, Brazil, Cameroon, China, Colombia, the Congo, Ghana, Guatemala, the Ivory Coast, India, Jamaica, Kuwait, Lebanon, Mauritius, Morocco, Nigeria, Pakistan, Panama, Peru, Saudi Arabia, Senegal, Sri Lanka, Sudan, Suriname, Tunisia, the United Arab Emirates, the United Kingdom, the United States, Zambia, and Zimbabwe.

Typically, these relationships were handled personally and in secrecy by BCCI's top two officials -- Abedi and Naqvi -- with the occasional assistance of trusted lieutenants. Accordingly, a full accounting of these relationships may not be possible. Sakhia told the Subcommittee that he believed there was a list of BCCI's payments to political figures somewhere at BCCI's headquarters in London, held closely by Abedi and Naqvi, that contained all the names. When BCCI's headquarters were moved to Abu Dhabi in the spring of 1990, the list, if it still existed, was likely moved there with BCCI's other records:

There was a world wide list of people who were in the payoff of BCCI. The family of Indira Gandhi. President [Ershad] of Bangladesh. General Zia of Pakistan. Many of the leaders of Africa. I went to a World Bank meeting in Seoul, Korea and [BCCI official] Alauddin Shaikh was handing out cash in the hall to the staff of the Central Bank of Nigeria . . . Abedi's philosophy was to appeal to every sector. If you were religious people he would help you pray. President Carter's main thing was charity, so he gave Carter charity. [Pakistani] President Zia's

brother-in-law needed a job, he got a job. [Bangladeshi] President [Ershad]'s mistress needed a job, she got a job. You needed the admission of your son to a top college? Abedi would arrange it somehow.[4]

According to Sakhia, the form of the payoff varied with the needs of the customers, but the purpose was always the same -- "to buy influence."[5]

In addition to cash payments, which were kept secret, BCCI routinely gave presents to government officials around the world, a fact disclosed to auditors. As BCCI officer Nazir Chinoy explained:

The auditors will not object if the manager certifies that $50,000 was spent on entertainment on a particular day. They will accept it without bills. It is understood that Christmas presents, giving and taking are common. We tell them we are looking after our people, I have 50 people I want 50 shirts from Harrads for Christmas for my staff, or a Senator from some country telling you I want my people to be looked after. Then he says, when I come to power you take a favor from me. It is an accepted form of operation.[6]

According to Chinoy, these presents would routinely involve gifts worth $5,000 or more if the official was sufficiently important. In the case of Manuel Noriega, for example, the antique oriental rug selected by BCCI and provided to him one year in his honor was worth substantially more.

In other cases, BCCI would make a form of payments to high ranking officials through one of its Foundations, which would create an annual "prize," and bestow it upon a person either whom BCCI wished to influence, or whose receipt the prize would provide BCCI needed legitimacy. For example, from 1980 to 1988, a BCCI foundation called The Third World Foundation bestowed an annial Third World Prize of $100,000 as follows:

1980. Dr. Paul Prebish, international development economist from Argentina. At the time, BCCI was seeking to enter Argentina through nominees.

1981. Dr. Julius Nyerere, President of Tanzania. The Prime Minister of India, Indira Gandhi, presented the prize. At the time, BCCI had alleged financial relationships with various persons associated with Gandhi and was seeking to expand in Tanzania.

1982. Zhao Ziyang, the Chinese premier. Again, BCCI was looking to, and soon thereafter was able to, become one of the first foreign banks to open offices in China.

1983. Professor Arvid Pardo, a UN diplomatic from Malta, whose prize was presented by Belisario Betancur, President of Colombia. In 1983, BCCI purchased a bank in Colombia through nominees.

1984. Willy Brandt, former German chancellor, with UN Secretary General Javier Perez de Cuellar giving his approval.

1985. Nelson and Winnie Mandela.

1986. Musician Bob Geldorf, for his work in raising funds for the hungry in Ethiopia.

REENTERED AS EXHIBIT 3

1987. The International Planned Parenthood Federation of India, presented by Jose Sarney, President of Brazil. In this very period, BCCI was seeking to strengthen its ties to President Sarney, and had just purchased a bank in Brazil through nominees which included close associates of Sarney.

1988. Gro Harlem Brundtland, the Norweigian Prime Minister, presented by Robert Mugabe, Prime Minister of Zimbabwe. Mugabe had according to many BCCI officials received cash payments from BCCI in previous years.[7]

The Subcommittee has not obtained internal BCCI documents describing its global strategy for bribery, or any list of payments made to officials. However, the Subcommittee does have a collection of documents and testimony which outline individual cases of bribery, payoffs, or financial benefits provided by BCCI to officials in particular countries. Thus, the case histories set forth below are illustrative, rather than comprehensive, and do not necessarily represent the worst examples of the practice, but merely the ones the Subcommittee has been best able to document.

**Deposits From Foreign Governments**

A baseline for assessing BCCI's principal relationships with foreign governments is to review the deposits it received from Central Banks. At one level, the choice of BCCI as a depository for a Central Bank of a Third World country might seem logical. BCCI had marketed itself as the Third World bank, devoted to providing the best possible services to the Third World. However, every central banker also knew that BCCI, as a bank not based in any one country, had no lender of last resort, and no consolidated audit.

Thus, deposits in BCCI were potentially a very substantial risk for any Central Bank. If BCCI failed, the Central Bank funds would not be protected, but would be treated like the funds of any other depositor. Despite these obvious risks to placing funds with BCCI, dozens of countries placed their reserves with the bank, in some cases, at very substantial, and imprudent, levels.

BCCI document repositories in the United States, unfortunately only contain records pertaining to such deposits in BCCI-Miami, and thus, these represent only a fraction of the total. For example, a number the countries that had deposits at BCCI in the United States would also maintain deposits -- usually larger ones -- at BCCI in Panama, where they would be more protected from creditors.

Typical deposits at BCCI-Miami by central banks and governmental organizations, usually in certificates of deposit, are listed below:

| Organization | Amount | Date |
|---|---|---|
| Andean Reserve Fund | $15,884,000 | July 31, 1988 |

REENTERED AS EXHIBIT 3

```
Central Bank of Aruba         6,000,000     July  31, 1988

Central Bank of Barbados      5,000,000     May   31, 1985

Central Bank of Belize       12,000,000     July  31, 1988

Central Bank of Bolivia      14,414,000     July  31, 1988

Banco de la Rep de Colombia   3,050,346     Aug    4, 1986

Central Bank of Curacao      25,000,000     July  31, 1988

Eastern Caribbean Bank        2,000,000     March 28, 1985

Caribbean Development Bank     3,025,786     June  28, 1985

Bank of China                15,000,000     Dec   31, 1985

Fed. Cafeterios Colombia     10,000,000     July  31, 1985

Banco de Guatemala            3,000,000     July  31, 1988

Bank of Jamaica              13,700,000     July  31, 1986

Jamaica Petroleum/PETROJAM    7,137,437     Jan   31, 1986

Banco Nacional de Panama     UNKNOWN        Dec   31, 1984
```

REENTERED AS EXHIBIT 3

```
Central Bank of Paraguay      5,000,000      Oct   10, 1989

Central Bank of Suriname      UNKNOWN        Nov    3, 1986

Central Bank St. Kitt         8,500,000      July  31, 1988

Central Bank Trinidad         5,000,000      Oct   31, 1984

Venezuela Investment Fund    24,000,000      July  31, 1988
```

Additional central banks had developed relationships with BCCI, but had their accounts shifted by BCCI from its offices in Miami to the National Bank of Georgia in Atlanta. These included Costa Rica, El Salvador, and Honduras, whose "territory" was given by BCCI to its secretly-held subsidiary in Georgia.[8]

It is not possible from BCCI's records in the U.S. to determine even the neighborhood of the degree to which the other Central Banks were depositing funds in BCCI as a whole. For example, the Central Bank of Peru, which did not deposit any funds in BCCI-Miami and therefore is absent from the above extensive list, placed Central Bank deposits at BCCI-Panama that rose to a level of $270 million dollars in June, 1987 -- nearly 30 percent of the total cash reserves of the Government of Peru.

Thus, what is significant, simply, is the large number of central banks and government organizations -- twenty in all -- who were willing to place what was substantial uninsured deposits with BCCI's Miami branch alone, at a time when BCCI was known to have no lender of last resort behind it, and no one to insure a country's repayment should BCCI default.

An appendix to a September 30, 1988 Price Waterhouse Report to BCCI's Audit Committee shows a substantial number of additional governmental entities from other countries making deposits at BCCI as of that date, as follows:

```
Organization              Location          Amount

China Civil Eng &

Construction Corporation  UAE               $11,414,000
```

REENTERED AS EXHIBIT 3

|                                          |                | Hong Kong        | 34,400,000 |
| International Fund for                    |                |                  |            |
| Agricultural Development                  | Luxembourg     |                  | 17,200,000 |
| OPEC                                      | United Kingdom |                  | 60,000,000 |
| Central Bank of Sri Lanka                 | United Kingdom |                  | 15,070,000 |
| Bangladesh Bank                           | United Kingdom |                  | 25,340,000 |
| Bank Foreign Trade                        |                |                  |            |
| USSR                                      | United Kingdom |                  | 10,135,000 |
| State Bank Pakistan                       | United Kingdom |                  | 48,960,000 |
| National Bank Hungary                     | United Kingdom |                  | 15,000,000 |
| Arab Bank for Natl                        |                |                  |            |
| Development in Africa                     | United Kingdom |                  | 42,569,000 |
| Central Bank Syria                        | United Kingdom |                  | 21,855,000 |
| Bank of Zambia                            | France         |                  | 10,920,000 |
| Bank Milli Afghan                         | United Kingdom |                  | 20,000,000 |

REENTERED AS EXHIBIT 3

Perhaps especially worthy of note from the above list are the Soviet Union's foreign trade account at BCCI, the account for the State Bank of Hungary, and the account for the Central Bank of Syria. In each case, the Subcommittee knows essentially nothing about the underlying nature of the relationship between BCCI and these governments, other than the fact that British sources have contended that BCCI in the United Kingdom was used by numerous intelligence agencies, including most of the major intelligence agencies of the world.[9]

**Loans to Foreign Governments and Government Banks**

As a consequence of BCCI's collapse, determining what governments were credited by BCCI as receiving loans is a far easier matter than determining who, in the past, placed funds with BCCI. A consolidated loan report for BCCI dating from March 31, 1991, shows numerous governmental organizations credited as receiving very substantial lending from BCCI as follows:

```
Abu Dhabi Finance Department       $35,704,000

Abu Dhabi National Food Stuff Co    21,749,000

Banca Nazional del Lavaro           13,737,000

Botswana Railways                    9,400,000

Botswana Telecommunications          2,600,000

Cameroon Ministry of Finance        29,172,000

China International Water & Elec     42,268,000

China National Complete Plant Exp   32,606,000

China Road & Bridge Eng. Co.        20,641,000
```

REENTERED AS EXHIBIT 3

```
China State Construction Group        32,450,000

State of Gabon                         7,771,000

Bank of Jamaica                       33,895,000

Central Bank of Nigeria              226,060,000

Sultanate of Oman                     14,444,000

Petrojam (Jamaica Petroleum)          45,420,000

Government of Seychelles              22,957,000

Bank of Sudan                         53,987,000

Republic of Zimbabwe                  17,063,000(10)
```

Price Waterhouse reports 18 months earlier had listed BCCI's exposure on lending to governments and Central Banks as follows:

```
Country         Nature of Loans    Exposure 9/30/89

                                   (in millions)

Nigeria         Government         216.9

Philippines     Central Bank       30

Zambia          Central Bank       24.6
```

REENTERED AS EXHIBIT 3

| | | |
|---|---|---|
| Sudan | Central Bank | 19.9 |
| Iraq | Unspecified | 11.8 |
| Mexico | Unspecified | 7.3 |
| Cuba | Unspecified | 2.3 |
| Sierra Leone | Unspecified | 3.3 |
| Ivory Coast | Unspecified | .8 |
| Panama | Unspecified | .6[11] |

Many normal banks have such exposures, and apart from the situation involving Nigeria and to some extent Sudan, the exposure faced by BCCI on its lending to governments was within reasonable commercial norms. However, beneath the veneer of normal practice, the underlying manner by which BCCI developed these relationships was anything but normal. As the case histories below demonstrate, in country after country, BCCI's relationships with officials were fundamentally corrupt.

**Use of Nominees and Fronts Generally**

In the early 1980's, as part of BCCI's program of expansion in Latin America, BCCI decided that it was essential to expand banking operations in the Americas. Accordingly, a team of BCCI's acquisition experts, including Amir Lodhi and Abol Helmy, began meeting with Central Bankers and government officials in such places as Argentina, Brazil, Colombia, Peru and Venezuela to find suitable banks to purchase. In most of these countries, there were at the time restrictions on the ability of foreign banks to purchase local banks. Accordingly, Lodhi and Helmy were directed to identify prominent figures in each country who would agree to act as BCCI nominees in purchasing local institutions, under agreements where the nominees would not be at risk, while BCCI would secretly finance their purchases -- precisely as it had done in its purchase of First American Bankshares and the National Bank of Georgia in the United States.

While the financial details of each proposed transaction differed, the model for the transactions had been drawn up by BCCI years previously, and had been relied upon by BCCI in its secret purchase of First American. Helmy was provided with draft structures of these

REENTERED AS EXHIBIT 3

previous transactions, which he used as a guide in preparing fresh proposals for these Latin American countries. Ultimately, using this mechanism, BCCI was able to purchase banks in Argentina, Brazil, and Colombia; however, Helmy contended that in the case of Argentina, the laws changed prior to the purchase of the bank, and so the nominee arrangements that had been agreed upon were not needed.[12]

As BCCI's former head of its Latin American and Caribbean operations, Akbar Bilgrami explained:

Using a nominee was a typical way of going about things. Argentina, Brazil, Ghana, Colombia, Venezuela, Nigeria. All these places started out as nominee relationships. Some were cleaned up. But it was always preferable that there not be a nominee relationship. When we bought a bank or set up a subsidiary, we would often use the nominee relationship because the laws of the country wouldn't allow BCC to have majority control. For example, we used it briefly in Colombia until we received permission to have majority control for BCCI from the government.[13]

In each case, various forms of payments for the individuals who facilitated the purchases of the banks were made by BCCI, including bribes to officials in many of the countries.

**Money Laundering, Commodities Frauds and Skimming**

According to BCCI officers interviewed by the Subcommittee, there were consistent themes in BCCI's activities in the Third World, in terms of the kinds of services that government officials would be looking for from BCCI. First, to the extent the official controlled a source of government funds, the official typically wanted to be compensated in connection with his decision on where to place the funds. The solution to this problem was simple enough -- BCCI would pay a "commission" to the official involved. Second, to the extent the official controlled transactions involving government funds, the official might well want to be compensated on a fee basis, transaction by transaction. BCCI developed a number of techniques in response to this requirement, which typically involved one form or another of skimming the government funds that moved through the transaction, again with the revenues deposited in a safe place outside the official's country. Third, to the extent the official was in a position to generate substantial resources of his own through non-BCCI corruption, he often would want a safe and confidential place to hide his money. Again, BCCI would comply.

In each of these cases, BCCI would make use of applicable techniques for hiding and laundering cash: manager's ledgers or numbered accounts; phony loans to hide (and legitimize) real, but unclean deposits; circuitous routing of funds through bank secrecy havens like the Grand Caymans and Panama, and so on.

**Pay-Offs to Avoid Prosecution**

Inevitably, BCCI's criminal practices as a bank would set off alarm bells in one or another of the nations in which it was operating. Because of BCCI's underlying financial fragility, any such problem could potentially mushroom. Accordingly, the bank made it a high priority to fix such cases through payoffs. Usually, this could be accomplished with existing relationships.

REENTERED AS EXHIBIT 3

For example, in Nigeria, on the several occasions when BCCI's activities had been discovered by officials who had not been compromised, investigations were quelled by a top Nigerian religious and governmental official, Al Haji Ibrahim Dasuki, who was also president of BCCI's Nigerian bank.[14] This pattern was repeated all over the world. As Sakhia testified:

BCCI officers were indicted and jailed in other countries, like Sudan, Kenya, India, and in each case there was a terror in the bank that, you know, this has happened, that has happened. And somehow then some deal would be struck. People would be freed, BCCI would start doing business all over again.[15]

This practice did not only take place in Third World countries. Notes taken by BCCI's lawyers in the United States at Patton, Boggs & Blow in Washington, D.C. refer to possible payments to French officials by BCCI in 1989 to solve a criminal legal matter that had developed for BCCI there. According to the U.S. lawyers involved, each of them was disturbed about the proposed bribe, and were trying to prevent it from happening.[16]

Thus, BCCI's system of payoffs was not by any means an occasional practice, but one that pervaded the institution from its creation, and continued through to its collapse.

**CASE STUDIES**

**ARGENTINA**

In Argentina, BCCI targeted and ultimately successfully purchased, the Finamerica Bank, a small Argentina financial institution that was at the time owned by FIAT and by the Banco de Italia. In December, 1984, through a local middle-man, Ricardo Gotelli, Fiat authorized the sale to BCCI.[17] Internal BCCI memoranda show that in the original structuring of the transaction, BCCI was intending to lend money to the current shareholders of the bank and have them pledge their shares back to BCCI in order to avoid having to notify the Central Bank, and receive its authorization for the purchase. Ultimately, however, this plan was found not to be necessary as a result of BCCI securing the Central Bank's permission for the transaction.[18]

The New York indictment of Abedi, Naqvi, Faisal al Fulaij and Ghaith Pharaon on July 29, 1992 succinctly sets forth why BCCI was able to abandon the nominee structure and directly, publicly purchase the Argentine bank:

The BCCI Group made corrupt payments to the President of the Central Bank of Argentina and a member of its Board of Directors. In or about 1983 and 1984, the BCC Group made and caused to be made a five hundred thousand dollar "political" contribution to the President and a member of the Board of Directors of the Central Bank of Argentina upon an agreement and understanding that it would influence the conduct of said President and Director in relation to the establishment of a bank of the BCC group in Argentina and in relation to the business of the BCC Group.[19]

At the same time BCCI decided to move into Argentina, so did its front-man, Ghaith Pharaon. According to published reports, Pharaon came to Argentina by way of Paraguay, where he had

established a personal friendship with military strongman Alfredo Stroessner. Argentine press accounts quote Pharaon as stating he had visited Paraguay to assist in developing BCCI's relationships there, which culminated in the Central Bank of Paraguay placing some of its central bank deposits with BCCI.

The new BCCI bank quickly made one enormous set of loans to Pharaon -- for the construction of a luxury five-star hotel in downtown Buenos Aires -- the first such hotel in the city, including an 18-story tower, convention center, and shopping gallery, built on the grounds of a historic mansion.

According to a letter submitted to Argentine economic authorities by the Hotel Corporation of Argentina, most of the financing for Pharaon's hotel project -- $26.3 million in all -- was to come through selling Argentina Debt under the government's debt equity conversion program. In the letter, Pharaon was described as "a prominent international businessman who has investments in banks, insurance companies, real state [sic] development projects, and numerous other businesses worldwide."[20] During an application for Argentinean citizenship Pharaon made on June 16, 1988, he listed BCCI, CenTrust Bank in Florida, and Independence Bank in California as among his principal investments, and declared he had helped arrange BCCI's acquisition of FinAmerica -- renamed BCCI Argentina.[21]

BCCI's direct involvement in the debt-for-equity project was suspected by some Argentinean press at the time, given the lavishness of the project and questions about whether a hotel could possibly be profitable. However, BCCI's actual involvement was not proven until after BCCI's global closure on July 5, 1991. A week later, investigators in Buenos Aires reported that BCCI Argentina had been heavily involved in the construction of the Pharaon hotel, but that all accounts at the bank had been "cleared out a week before the central bank's move to revoke the license," leaving no depositors in the bank and no deposits. BCCI had financed the Buenos Aires hotel through buying Argentinean foreign debt at a huge discount and cashing it with the central bank, with the result that the Argentine central bank, in essence, financed the bulk of the hotel.[22]

In addition, the hotel project required legislative and regulatory action by various Argentine political figures. In mid-1989, Pharaon reached out to new-elected Argentine President Carlos Menem himself, through ties Pharaon had developed to Menem's former chief of staff, Alberto Kohan. A few months later, Pharaon was introduced to President Menem, and following a meeting with Pharaon, President Menem personally telephoned local officials in Buenos Aires to eliminate the red tape that had been delaying the construction of the BCCI-Pharaon hotel. The delays ended the following day.[23]

The intimate nature of the relationship between top Argentine officials, BCCI, and Pharaon was further demonstrated when Pharaon hired Argentine economist Gonzalez Fraga. On Pharaon's behalf, Fraga arranged the debt-equity swap to help finance the hotel, and then became the new president of the Central Bank under Menem. Fraga told journalists, "it's a pretty story that President Menem made me head of the Central Bank as a favor to Pharaon. But it wasn't that way."[24]

In practice, BCCI's Buenos Aires bank never developed much of the business anticipated for it. Ultimately, its principal activities were mainly to manage the financing of Pharaon's hotel venture and a jojoba planation also financed through an Argentine debt-equity swap involving BCCI.

In the meantime, Pharaon had unwittingly brought about official action against BCCI Argentina in April, 1991 as a result of testifying in a court case, unrelated to BCCI, that:

As much as BCCI, the First National Bank of Boston, the Credit Suisse and the National Bank of Greece -- all are equally lawbreakers.[25]

In response to this suggestion that all banks were laundering money, Argentina ordered BCCI to begin winding up its affairs in Argentina as of the end of 1991, and began a formal investigation of BCCI in Argentina. Little further happened until BCCI's global closure on July 5, 1991, which soon resulted in BCCI Argentina's closure as well. Argentine Federal Judge Maria Servini then combined the investigation into BCCI with another ongoing case implicating the former appointment's secretary of Argentine President Carlos Menem, and his sister-in-law, Amira Yoma, in an alleged international drug and money laundering network. However, little has been made public about the investigation since that time, and many of the key questions about BCCI's and Pharaon's relationships in Argentina remain unanswered.

**BCCI and Argentine Arms Deals**

In response to the Foreign Relations Committee subpoena to BCCI, BCCI's liquidators produced documents concerning two proposed arms sales involving Argentina that had been maintained at BCCI's offices in Miami.

The first set of documents held at BCCI-Miami referred to the sale by the Argentine Air Force of what handwritten notes described as "22 units of Aircraft plus adequate space parts, including 6 spare engines at a price of $110,000,000.00," consisting of Mirage IIIC/B jets manufactured in France and "modified to Argentine Air Force requirements following years of combat experience."[26]

The prospectus included technical drawings of the Mirage jets and basic military specifications, with a commitment that the "AAF," or Argentine Air Force, would provide all technical documentation in support of the planes, ground support equipment, and, if the "customer country" wished, a full program of flight training in Argentina for customer country pilots.[27]

This proposal had never gone through the legal processes in Argentina required for such sales, and was a secret in Argentina until the Subcommittee released these documents. As former Argentine Defense Secretary Raul Alconada Sempe testified before the Subcommittee, the sales had never been authorized, and that if such a proposal had been made legally, it would have required notification to the Argentine parliament:

Sales without the Defense Minister knowing, from 1983 on, it was impossible, because it was only the Defense Ministry that authorized such sales. What does exist, and I think this is a general problem throughout all countries, is that there are countries that have arms, countries

that need arms, and the famous middleman crop up. The brokers, the sales agents, and these are the people that try to match the buyer and the seller. . . . They just try to look for such a deal. This is what may have happened.[28]

Following the conclusion of the hearing, investigators in Argentina determined that the sale appeared to be a proposal made unofficially by a general in the Argentine air force to various countries in the Middle East, including Iraq. BCCI had offered to act as a broker and possible financier for the proposed sale of the Mirage jets, which represented a substantial percentage of the total possessed by Argentina. However, the general involved had never been able to convince Argentine governmental figures that the transaction was in the interest of Argentina, and the proposal died.

Other BCCI documents describe BCCI's involvement in a possible sale of night vision equipment by Litton Electron Devices in Arizona to the Government of Argentina, guaranteed by an Argentine government bank, through a company owned by the Argentine government. It is not clear from the documents whether BCCI ultimately financed the night-vision equipment sales or not.

## BANGLADESH

When BCCI was closed globally on July 5, 1991, one of the nations that was worst hit was Bangladesh, which had deposits of $171 million at the time of its closure. Following the collapse, some 40,000 depositors threatened a hunger strike after losing their life savings, 500 depositors actually conducted a sit-down strike in the capitol's financial district, and another thirty depositors threatened to engage in self-immolation if the government did not find a way to restore some of their losses. One month later the Bangladeshi government promised to provide up to $1400 to each of the banks depositors, as a means of ending the highly-publicized strikes.

Thus, the impoverished government of one of the poorest countries in the world was forced, in essence, to raid its own treasury to alleviate the suffering of the small depositors to make up for millions stolen from Bangladesh by BCCI and former Bangladeshi government officials, including the man who had been president and dictator of Bangladesh throughout the 1980's, Mohammed Ershad. These schemes included massive tax evasion and an equally massive illegal currency trafficking ring involving then-president Ershad, top aides, and President Ershad's mistress, which continued until Ershad was deposed in December, 1990.

According to various press accounts, supplemented by information from BCCI insiders provided the Subcommittee, President Ershad worked with his brother-in-law, former Bangladeshi diplomat A.G.M. Mohiuddin, to smuggle millions of dollars out of Bangladesh through BCCI into the United States. BCCI also hired various relatives of Ershad to work at BCCI branches in Hong Kong, Britain and Canada, and in return, Bangladesh hired one of BCCI's top officers to serve as Bangladesh's first ambassador to Brunei -- whose embassy functioned primarily as a sales office in Brunei for BCCI.[29]

The BCCI-Ershad connection was essential to the Bangladesh president because given his country's impoverishment, he had relatively limited opportunities outside of what BCCI could bring him to get rich. His salary was only $13,000 a year as president, but through making use

REENTERED AS EXHIBIT 3

of BCCI he was able to move millions of dollars of fund siphoned out of Bangladesh governmental accounts.

As BCCI officer Abdur Sakhia testified in response to a question about payments by BCCI to the leading political families of India, Pakistan and Bangladesh, including President Ershad:

The payoff [came] either in the form of cash, or hiring of their relatives, contribution to their favorite charities, payment of their medical bills. It took various shapes. So in some cases cash may have been given, in some cases their relatives were hired, in other cases their charities were funded, their projects were financed at favorable rates, loans at favorable rates. So it took different shapes and forms.[30]

In the case of Bangladesh, the payoffs in fact came in almost every shape and form. By far the most detailed account of these payoffs was provided by the Los Angeles Times, which sent a reporter to Bangladesh to interview government officials, BCCI officers, and private business there about the relationship between BCCI and Bangladesh after BCCI's collapse. Its account has been generally corroborated by testimony to the Subcommittee from statements by BCCI officials, including Sakhia and Chinoy. As the Times found:

Here, in a land that perpetually ranks among the poorest of the world's poor, BCCI stretched the law to its limits to avoid paying desperately needed government taxes, to skirt national banking regulations and to remit as much profit as possible out of Bangladesh and into the bank's international web of corporations and subsidiaries.[31]

The practices described in the Los Angeles Times article were typical of BCCI's practices in other countries. After the Central Bank of Bangladesh forbid BCCI from exporting profits in Bangladesh abroad -- the "flight capital" BCCI specialized in -- BCCI created the BCCI Foundation, a charitable trust based in Bangladesh, whose official purpose was to fund scholarships, rural health care centers and school libraries. Funding for the BCCI Foundation came from BCCI's banking operations in Bangladesh. Those profits became tax-free because they were given to the Foundation. And the foundation in turn gave funds not principally to the needy, but to a joint venture investment bank, called the Bank of Small Industries & Commerce or BASIC, staffed by BCCI officials, in which President Ershad and his top aides had a financial stake.[32]

Towards the end of Ershad's rule in Bangladesh, the scheme had become sufficiently transparent that it created outrage within the country. For example, the Foundation's most important scholarship program, to provide interest-free loans to talented college students, received about $10,500 in donations from the Foundation in 1990, in a year when the Foundation earned over $21,000 in interest alone.[33]

In the meantime, BCCI hired three of Ershad's close relatives, along twelve other sons and daughters of prime ministers, finance ministers, police chiefs, central bank governors and deputy governors.[34]

In late 1990, Ershad resigned under fire, and was tried for a variety of arms trafficking offenses in Bangladesh, and sentenced to a ten year prison term, while awaiting trial on

additional corruption charges, including some pertaining to his relationship with BCCI. Following BCCI's collapse, the new government retained an investigative firm in New York in an attempt to trace what the new government contended as much as $520 million in funds misappropriated from the Bangladesh treasury by BCCI, Ershad, and his relatives. The investigators have alleged that Ershad moved millions of dollars through BCCI accounts in London and Hong Kong.[35]

Even disaster relief aid provided by foreign governments to Bangladesh to help victims of a devastating cyclone in 1990 wound up being deposited in BCCI and lost with the closure of the bank.[36]

Thus, BCCI, which promoted itself as a Third World Bank devoted to assisting the Third World in development, stole millions from Bangladesh, in concert with Bangladesh's ruling political family, in what one BCCI official was later to describe as "a perverse, reverse Robin Hood."[37]

**BRAZIL**

By early 1986, BCCI had identified Brazil as a prime target for BCCI expansion. Latin American banker Brian Jensen, then an Alternate Executive Director of the International Monetary Fund, had been working closely with BCCI, on an unofficial basis in this period, to help BCCI obtain its relationship with Peru through payments to Peruvian central bankers. In addition to his work on BCCI's Peruvian activities, Jensen studied the Brazilian economy and Brazilian banking system for BCCI, and wrote Abedi a memorandum which Jensen faxed to BCCI from offices at the IMF in early 1986 describing his approach to Brazil:

The establishment of a banking concern in Brazil can become a priority. I feel I can be useful in identifying and putting together a concrete and well-balanced possibility for BCCI while at the same time protecting for a positive attitude from the local authorities to such initiative. . .

A US $230 billion economy with an external trade component that exceeds 25 percent of GNP, Brazil offers the advantages of a large internal market of 135 million people and a rapidly growing export sector . . . Brazilian legislation . . . and long standing traditions or practices . . . exclude foreign banks from establishing branches or investing in domestic commercial banks at present. However, foreign equity participations of up to one-third of the common stock or half of non-voting shares are allowed in investment banks. These are specialized financial intermediaries authorized to issue certificates of deposits and other savings investments, as well as to extend loans to the private sector. . .[38]

Abedi told Jensen to talk with Brazilian bank officials to find a way to get around the regulations. The following month, Jensen sent a second memorandum from his IMF offices in Washington to BCCI:

Conscious of BCCI's interest in Brasil and according to our recent conversations in London. . . I have held discrete conversations (on a no-name basis) with central Bank authorities and existing banking groups (well know to me) as to the better possibilities and strategies. . .

The route followed by most new investors in Brasilian banking in recent years has been to buy equity into existing groups, assuring in his manner an important presence in the market. All foreign investment has been in this fashion. The rationale has been to find a solid and reputable local group (ongoing concern) and acquire up to 30 percent. . .[39]

BCCI well-understood the concept. It did not mind holding a public minority interest in a Brazilian bank, so long as it had sufficient additional secret interests through nominees to insure that in reality the local bank was BCCI anyway. BCCI directed its acquisitions officer, Abol Helmy, who was already handling the Argentine FinAmerica purchase, to locate possible nominees for BCCI in Brazil.[40] Eventually, two were found -- Sergio da Costa and Carlos Leoni Siqueira, to be BCCI's nominees, each to hold on BCCI's behalf one-third of the bank, with the remaining investor, Jacque Eluf, to hold an additional one-third, which he himself would pay for, but which BCCI would guarantee against loss.

The nominees chosen by BCCI were extremely prominent members of BCCI's elite. Jacque Eluf, who it was guaranteeing against loss, was one of the wealthiest men in Brazil, owner of IAT Co., Brazil's largest exporter of industrial alcohol, with a net worth in 1986 of about $100 million. BCCI nominee Carlos Leoni Siqueria was one of Brazil's leading attorneys, on the board of directors of companies such as IBM Brazil and Grupo Gerda, Brazil's largest privately owned steel manufacturing company. BCCI Nominee Sergio da Costa was at the time the most senior member of the Brazilian diplomatic corps and a close associate of then Brazilian president Jose Sarney.[41]

Da Costa was available to BCCI because at the age of 67 after four decades of serving Brazil as its Ambassador to such significant postings as England, Canada, the United Nations, and the United States, he was retiring and anxious to make money. Da Costa had been brought to BCCI by BCCI shareholder and front-man Ghaith Pharaon, who in late April, 1986 had met with Da Costa in Miami to seek Da Costa's help in responding to the problems posed for BCCI in circumventing the Brazilian bank laws. A telex from Miami branch manager Abdur Sakhia to BCCI-London on May 6, 1986 described the meeting having ended positively for BCCI:

Ambassador Da Costa has promised Dr. Pharaon to assist the Bank in any way he can and he also had asked Mr. Ferreira [a prominent Brazilian businessman close to President Sarney] to use his association with the President of the Republic to assist BCC.[42]

By September of 1986, da Costa had agreed to himself become a front-man for BCCI in Brazil. In return, BCCI agreed to pay him $150,000 a year, with no further responsibilities beyond being a front-man and using his influence to help BCCI with Brazilian authorities in Brasilia, the capital city.

Under the terms of the arrangement, da Costa agreed to be a director and shareholder, secretly acting as BCCI's nominee, of the bank BCCI was purchasing in Brazil, in a transaction structured by BCCI officer Abol Helmy.

Helmy drafted a memorandum, "Strictly Private and Confidential," regarding "Brazil," on September 2, 1986, under which da Costa and a second prominent Brazilian would each own 50 percent of a Brazilian company that would buy 12,622,500 voting ordinary shares in BCCI

Brazil, pledge those shares to BCCI, give BCCI the right to vote its shares, and give BCCI the right to buy those shares. Da Costa would agree to serve on the three man board of directors as BCCI's front-man, to guarantee BCCI control of the bank. He would 'pay' $1,233,580 for his 'share' of BCCI Brazil's stock, and BCCI would reimburse him that amount in New York. The internal BCCI memorandum drafted by Helmy makes explicit the fact that these arrangements were designed to deceive Brazilian authorities:

It must be emphasized that the Brazilian economy and bureaucracy are highly sophisticated. As such any payments made by Brazilians must have the appropriate ORIGINATION OF FUNDS. That is, the Brazilian 'investors' must have the necessary net worth for Brazilian taxation authorities' purposes to support any investments made. . .

Messrs. Da Costa and Leoni to ensure that the transaction is fully acceptable to the Central Bank and to ensure that there are no adverse public consequences will be purchasing their shares in cash. . .

Both Ambassador Da Costa and Mr. Leoni are reluctant to take loans from any bank to finance the transaction for Central Bank and public image purposes . . . I have negotiated, subject to BCC management approval, an interest free loan to the individuals concerned . . . to enable them to complete the transaction.[43] (emphasis in original)

The memorandum demonstrated that BCCI would provide da Costa and Leoni with $2,467,160 for the purchase of his stock in BCCI Brazil, every penny the stock would cost. In a staff interview, Helmy acknowledged that da Costa and Leoni were not at risk and that the transaction was a standard nominee arrangement by which BCCI circumvented local laws and that this approach had been used a numerous of times previously by BCCI. Helmy also said it was BCCI's understanding that da Costa and Leoni would take care of arrangements with Brazil's central bank and other Brazilian officials to make sure that they acquiesced in the transaction as structured.[44] Thus, in essence, Helmy at BCCI and da Costa, while still Brazil's Ambassador to the United States, had with other BCCI officials and other prominent Brazilians, created a plan by which they would together make possible BCCI's purchase of a bank in Brazil to circumvent Brazilian law.

BCCI officials were ecstatic at da Costa's participation in their plan for Brazil, and his agreement to be a Senior Advisor to BCCI. On October 28, 1986, while da Costa was still Brazil's Ambassador to the United States, the head of BCCI's Miami office, S. M. Shafi, sent him a congratulatory telex at the Embassy:

congratulations from myself and my colleagues on your joing [sic] our Brazilian project. We welcome you to the fold BCC family. I am very certain your experience, qualifications and contacts not only in Brazil but also internationally will go a long way in turning our subsidiary in Brazil into one of the most successful units of BCCI.[45]

Da Costa signed a three-year consultancy agreement with BCCI on November 3, 1986, under which he committed to acting as "Director of [BCCI's] investment bank in Brazil," and a front-man for BCCI there.[46] Da Costa then followed through in participating in the plan developed by Helmy under which BCCI would secretly purchase a majority interest in BCCI Brazil

through nominees. He received his 'loans,' from BCCI, and purchased his 'stock' in the Brazilian bank. BCCI duly reported its loans to him on its books in Panama, characterized as "International Loans," as if they were normal loans that BCCI anticipated would be repaid. By April 30, 1988, da Costa's 'loans,' from BCCI amounted to $1,563,723.85. In fact, da Costa did not pay interest or principal on the loans, which were shams to mask BCCI's ownership of the 'da Costa' shares of the bank.

Among themselves, BCCI officials were also pleased about another aspect of being connected to da Costa. As he entered his agreement with BCCI to circumvent Brazilian banking laws, he had told them that he was also joining Kissinger Associates. A full account of da Costa's and BCCI's relationship with Kissinger Associates is set forth separately.[47]

To penetrate the Brazilian market, BCCI had once again made pay-offs to some of the most prominent people in Brazil -- this time among others to the country's most senior and prestigious diplomats -- in order for them to participate with BCCI in circumventing the laws of their country.

## CAMEROON

BCCI developed a number of relationships with governmental entities in the impoverished Central African country of Cameroon, including the United Nation's account there and the U.S. embassy's account there. But the most critical relationship for BCCI in Cameroon was with the country's ministry of finance, which, after BCCI began making payments to its officials, agreed to borrow funds from BCCI on which BCCI charged Cameroon interest, and then to redeposit them in non-interest bearing accounts, benefiting no one other than BCCI and the bribed officials.[48]

At the same time, BCCI went into a joint venture with the government of Cameroon to finance BCCI's bank in Cameroon. The joint venture was successful for both BCCI, which held 60 percent of the banks shares, and for Kanga Zamb Jean, who was previously Cameroon's finance secretary and governor of a province of Cameroon before he became chairman and managing director of the bank. In that capacity, Jean was officially representing the interests of the Republic of Cameroon, which held a minority interest in the bank. In fact, Jean was also lining his own pockets.[49]

BCCI's relationships with Cameroon were flourishing by the time of BCCI's indictment in Tampa on drug money laundering. In 1988, Cameroon started directing oil export financing through BCCI, as a result of payments being made by BCCI to people in the finance department of the Cameroon national oil company. The payments were small, amounting to no more than $3,000 to $4,000 per person, but enough to secure BCCI what it needed in such a low-income country. In return for this small investment, BCCI benefitted a number of ways. As Nazir Chinoy, Paris regional manager in this period, explained:

The deposits from the purchasers of the oil are kept from 7-10 days in Paris. You can use that money to make a small profit there. But more important than the deposit was the exchange. The money is kept in Paris then is converted into French francs. There is an exchange profit to be made for BCC Paris as well as for BCC Cameroon.[50]

REENTERED AS EXHIBIT 3

BCCI Cameroon became a cash cow for BCCI, with deposits amounting to between 90 and 100 million pounds sterling. When BCCI was closed globally, Cameroon was caught with most of that money still deposited -- including a substantial amount of government funds -- amounting to about $90 million, which for Cameroon constituted a substantial loss.[51] Of those funds, approximately $63 million amounted to real deposits by Cameroon that had been discovered by BCCI's auditors, but never recorded by BCCI on the books. BCCI had kept the deposits off-the-books in order to use the cash to finance other BCCI operations elsewhere.[52] Later, BCCI's chief financial officer, Massihur Rahman, was to refer to the treatment of Cameroon's as unrecorded deposits at BCCI as "major fraud."[53]

**COLOMBIA**

As Colombia was transformed during the 1980's from a country whose biggest cash crop was coffee, to one whose biggest cash crop was cocaine, BCCI decided to enter the Colombian market through buying Banco Mercantile, a troubled bank there.

It did so fully aware of the nature of most of the dollars that were being generated in Colombia. According to Abdur Sakhia, who was then on BCCI's top officials in the United States, BCCI's decision to acquire a Colombian bank was exceptionally controversial even within BCCI:

In December, around Christmas 1982, we had a meeting in Panama, and Mr. Akbar Bilgrami, who was indicted and convicted, and Mr. Amjad Awan, brought in a proposal of this bank in Colombia. We wanted to expand in Colombia in terms of a branch in Bogota which would do international business, but according to them the only way we could get an entry into Colombia would be to buy this bank.

I was vehemently opposed to the acquisition, one, because the bank was doing very poorly . . . I said: What are we going to do with all of this? We do not know what people they are, what type of clients they are, what are they doing in Cartagena, Cali, Medellin? How are we going to control this.

I had been to Colombia twice before this meeting to our office. We used to have a representative office in Bogota. And every time they would take me from the airport escorted by an armed guard to my hotel. . . I said: How are we going to manage offices in remote arts of Colombia when you cannot walk in Bogota unescorted? I said: We don't know what types of clients they are, what type of business they have, what type of money they have; we shouldn't go into this acquisition.

Later on I learned that we would now divide the operation into Caribbean and U.S. on one side and Latin America on the other side. So Colombia, Panama, Peru were taken out of my jurisdiction.[54]

We knew that the money that we would be getting in Colombia would be drug money. We knew that all the dollar deposits we would be getting would be drug money.[55]

Thus, when Sakhia complained about the concept of expansion into Colombia at a time when Colombia had already become lawless as a result of the drug trade, BCCI's response was to

REENTERED AS EXHIBIT 3

take away his jurisdiction over BCCI operations pertaining to Colombia, as well as its drug-producing neighbor Peru, and its drug-money laundering neighbor, Panama.

Akbar Bilgrami, convicted of money laundering in the Tampa case, told the Subcommittee that he could not, for legal reasons, discuss in any detail his activities in Colombia. He was willing, however, to make some general statements about the flow of funds from BCCI Colombia to the United States.

First, it was true that BCCI, like other foreign banks based in Colombia, was moving dollars out of Colombia into FDIC-secured banks in the United States. According to Bilgrami, one of the key goals of many of his Colombian clients was to obtain federal insurance for their cash deposits. Accordingly, BCCI would take their funds, and immediately transfer the funds to accounts set up in their names in First American, which BCCI secretly controlled, and in National Bank of Georgia, which BCCI then separately secretly controlled. According to Bilgrami, most of this was typical flight capital:

You know, all flight capital is questionable money: Tax evasion, drugs money, arms transactions, pure political corruption. But we were small, only able to take in $100 million yearly. Other banks were taking in a billion each. So we were losing out on that business. Credit Suisse was repatriating $1 billion per year in flight capital from Colombia. Union Bank of Switzerland, another $1 billion. We only handled $100 million. But that amount did go from BCCI Colombia into the United States.[56]

In Colombia, as in so many other nations, BCCI found that to stay in business, it had to pay bribes. Because the bank it had acquired was in such poor shape, and so near to collapse, the Colombian government had made no objections to BCCI's acquisition of it, and no payments by BCCI to officials were necessary. That changed, however, after BCCI bought the bank. According to Bilgrami:

Colombia was a unique situation. We never paid any illegal money to purchase the bank. But when we inherited the bank, we learned that it was a tradition to pay the treasurer of the bank commissions on the largest accounts. I asked Mr. Naqvi for clarification, you know, should we pay it? And he said to pay it in dollars so that it couldn't be traced to us. So we paid it, around $20,000 to $30,000 monthly.[57]

**CONGO**

BCCI's situation in the Congo was different from its situation in many other countries, in that the best known example of its criminality emanated from government cheating, rather than BCCI's.

Originally, BCCI had purchased government securities, at a discount, under an agreement by which the government promised to repay BCCI, and then the government had, after making some of the repayments, failed to follow through on the deal. Thus, BCCI's original wrongdoing was merely its creation of a mechanism for repayment through skimming off commodities transactions. However, BCCI then wound up paying bribes only after Congo officials failed to honor the deal worked out originally. In essence, BCCI made the payoffs to protect itself after it had been the victim of fraud by the Congo.

As Nazir Chinoy advised the Subcommittee, in August 1985, BCCI had worked out what looked like a profitable arrangement with the Government of the Congo by purchasing notes issued by the Congo in the range of $65 million to $67 million. These notes had been originally purchased by Mohsen Hujaj, a Lebanese contractor, with extensive contacts in the Congo. Hujaj accepted the notes from the Congo in payment for services he had performed after the government proved unable to pay under the terms of its contract with Hujaj. In a three-way deal, Hujaj got the government to acknowledge this indebtedness to BCCI and agree to certain repayments starting every three months.

A complex scheme was devised to insure that BCCI would be repaid on the notes without the government of the Congo having to acknowledge the payments or set aside funding for them. The Congo government placed 17 million in deposits in dollar terms in BCCI Paris, while BCCI was given the right to handle funds generated through the sale of oil and to take a charge off the proceeds of these sales. Under the terms of the deal, the oil sales were made from the Government of the Congo to a French company called ELF. ELF paid the money to an offshore account in a Swiss bank which had lent Congo $60 million. When the oil proceeds came in, the balance after paying for the oil would be sent to BCCI Paris, which got about $20 million of the proceeds and would use this for repayment on the notes. The arrangements worked well until January 1986, when suddenly the money stopped coming in from the Swiss bank.[58]

With some difficulty, BCCI learned from the Swiss bank that the government of the Congo had repaid the Swiss bank directly for its lending, and in the future they took payment directly for the oil from ELF, bypassing BCCI entirely. In response, BCCI turned once again to a tried and tested technique -- bribery. As Chinoy explained:

We had to make expensive presents to the finance minister to get much of our money out. We were still owed $40 million by 1987 and having difficulty with the Lebanese, Hujaj, who threatened to get me killed because we were holding $11 million of his deposits at BCCI which were pledged. We released $6 million and had to find other means of securing repayment on the rest.[59]

In the meantime, French authorities, under the leadership of Jacques Chirac, had recognized the Congo's parlous financial condition, and convened a meeting of bankers in an attempt to restructure Congo's debt. Under the terms of the restructuring, BCCI, which was the second largest of all lenders to the Congo, would be forced to accept losses on its lending, which it did not wish to do. Accordingly, BCCI officials discussed what kind of payments could be made to the ministry of finance in the Congo to solve the problem:

Dildar Rizve [a senior BCCI official] said, if I can get to him, if he releases our funds, I'll set up a scholarship for him. I have a feeling it was $100,000 for his children. But in 1987 the finance minister was replaced and a new finance minister came in who was a younger and more honest man. The new chap wanted $5 million as a temporary overdraft to assist the President for his tribe. If we could get him that, they would pay us back within 5-10 days. I spoke to Naqvi [then BCCI's second highest ranking official] who said, go and do it. It was repaid and he was honest. He said, if you want money, lend me another $20 million. Congo had changed from socialism to joining the World Bank and becoming capitalist. He said I will

see that your outstanding [loan]s are paid before we join the World Bank. The money was given. On June 29 1988, the new finance minister was in Paris and Security Pacific [which was lending the Congo new funds] paid us the full amount outstanding.[60]

BCCI was one of only two out of 32 banks that was fully repaid on its lending. While the new finance minister was, in Chinoy's view, honest, to keep him that way, BCCI did make sure that he and the Governor of the Central Bank received presents from BCCI. According to Chinoy, "we gave him the expensive presents and that made the difference."[61]

## JAMAICA

Shortly after establishing offices in the United States, BCCI cornered the market for government funds and programs in Jamaica as the result of establishing a personal relationship with then-Prime Minister Edward Seaga. Ultimately, this relationship involved BCCI being involved in financing all of Jamaica's commodity imports from the United States under the U.S. Commodity Credit Corporation (CCC) program and handling essentially every foreign current account of Jamaican government agencies.

According to Abdur Sakhia, who brought in the Jamaican account, unlike BCCI's practice in so many other countries, its relationship with Jamaica was based on nothing more than reaping more benefits for having taken some additional risk.

Sakhia told the Subcommittee that the relationship began, in part, because he had known Mr. Seaga's family as a result of his children and Sakhia's children attending the same school in Toronto, Canada. Soon thereafter, Seaga invited Sakhia to Jamaica to find out if BCCI would lend Jamaica any money. Jamaica began to borrow from BCCI, and the borrowing continued until BCCI executives began to become concerned about whether or not BCCI would be repaid. Seaga began personally telephoning BCCI, and Sakhia personally, to beg for additional money for Jamaica.

They owed a lot of money to BCCI. Seaga told me, we need oil, we need seeds for planting, can we make an exception here? Finally he called me in desperation at home. He told me, there is an oil ship which is here in Kingston already, it is ready to unload the oil. If we don't unload it we will have a dark Christmas in Jamaica. Just give us and extra $4 million or $5 million and we will make it up to BCCI. I promise you personally.[62]

Sakhia decided to take the risk. When the crisis was over, Seaga insured that BCCI received essentially all Jamaica's foreign business. BCCI soon wound up with "practically every foreign currency account of Jamaican government agencies at BCCI," including lucrative concessions in which Jamaica selected BCCI as the bank to handle all of the U.S. government or international organization sponsored guarantee programs. As Sakhia told the Subcommittee:

By the mid-1980's, we handled every penny that came into or out of Jamaica in terms of foreign currency.[63]

We were bankers to the central bank, we were bankers to all official governmental organizations in Jamaica.[64]

REENTERED AS EXHIBIT 3

Typically, BCCI would provide financing, usually for the import or export of products, which in turn would be guaranteed by the foreign or international organization. Jamaica provided BCCI a no-risk means of generating profits through international organizations and foreign governments, and BCCI in return loaned funds to Jamaica which other banks refused to provide, on the basis of the personal relationships involved, and BCCI's expectation that these relationships would in the long run guarantee its repayment.[65]

At the time of BCCI's collapse, Jamaica owed about $34 million to BCCI. Thus, Jamaica may well be one of the few nations to have actually benefitted from the unusual deal worked out between BCCI and its political leaders.[66]

**NIGERIA**

BCCI's activities in Nigeria were so profoundly, overwhelmingly corrupt as to suggest a very significant level of corruption in Nigerian officialdom generally. Whereas BCCI's activities in most countries merely involved corrupting a few, key people, in Nigeria the corruption was systemic and endemic, and touched nearly every operation of the bank in Nigeria.

According to BCCI officers, this was not the consequence of BCCI applying its practices to Nigeria, but rather, BCCI adapting itself to the conditions already present in Nigeria. According to BCCI officers interviewed by the Subcommittee, few European or American businesses active in Nigeria would have been able to do business without making one or another form of pay-off to Nigerian officials during the 1980's, and, to the knowledge of some BCCI officials, several such corporations, including some well-known European and U.S. banks, did.

During the Subcommittee's original investigation of BCCI in 1988, corruption involving Nigerian officials was one of the earliest allegations of BCCI criminality made to staff. As former Subcommittee investigator Jack Blum testified:

There are extraordinarily close relationships at all levels of the Nigerian Government with BCCI. [During my intial investigation] I had been called . . . by the Nigerian Ambassador who had been asked to call by the President [of Nigeria] to say, what's happening here? What are you guys doing with respect to BCCI?[67]

Several BCCI officials described BCCI having made cash payments to officials of the Nigerian central bank. As Abdur Sakhia testified:

During a meeting of the World Bank in Seoul, Korea -- I think it was in 1985 -- I saw one of the BCC officers with a lot of cash, handing it out to the staff of the central bank of Nigeria. This is what I saw personally being given to them.[68]

The most detailed account of BCCI's activities in Nigeria came from Nazir Chinoy, convicted in the Tampa case of money laundering during the time he was BCCI's Francophone regional manager. Prior to moving to BCCI-Paris, Chinoy had been stationed by BCCI in Nigeria for the first half of the 1980's, where he saw first hand the pervasive corruption of the Nigerian banking system, and BCCI's solutions for dealing with it profitably.

REENTERED AS EXHIBIT 3

At the time Chinoy arrived in Nigeria in December, 1980, he found that BCCI already had purchased a minority interest in a commercial bank in Nigeria -- owning just 40 percent of the Nigerian bank, with corrupt Nigerian officials insisting on controlling the remaining 60 percent. But even with only 40 percent, the Nigerian offices of BCCI were earning BCCI very significant profits. In fact, the profits were so large that BCCI feared the Nigerians might try to take remaining interest in the bank away from BCCI. Chinoy's job was to establish a second bank for BCCI in Nigeria to protect BCCI against the possible expropriation by the government of the first bank.[69]

BCCI was already being used for short-term commercial financing through letters of credit for the purchase and sale of goods by various Nigerian governmental entities. Moreover, some Nigerian officials were using BCCI in London and elsewhere to store cash they had earned through off-the-books deals while in the government. As Chinoy explained:

Nigerians were keeping large laundered funds generated by influential people who got contracts from international companies and commissions paid abroad. The money was kept abroad and not repatriated to Nigeria. BCCI was a good place to keep it.[70]

The simplest means of generating funds for Nigerian officials was requiring a "commission" on each transaction. As Chinoy stated:

Commission means kick-back. The government approves a $300 million contract. A multinational corporation agrees with the government which has helped him, 10 percent gets kicked back. A company is established abroad or they nominate a cousin or someone who is paid 3 percent. It is known as a commission but it is actually a kickback.[71]

Other mechanisms by which these funds were generated for Nigerian officials were through over invoicing of imports and under invoicing of exports. When over invoicing would take place, the government would pay more for goods than the actual market price. BCCI would disguise this through shell entities which would appear to any outsider as arms-length brokers, but which in fact were mere mechanisms by which money would be skimmed off from the government and deposited in BCCI, to be shared by BCCI and by the official responsible for handling the purchase. When under invoicing would take place, the reverse would happen. The government would ship greater commodities than were reflected on the government invoices; the additional commodity would be sold at the same time as that invoiced, and the additional funds generated would again be split by BCCI and the Nigerian official, who of course would have keep his profits outside his home country. As Chinoy explained it:

Essentially, BCCI was handling the financing of commodities through bribery. For example, BCCI loaned $250 million to Nigeria to be repaid within the next six months for oil exports. Nigeria would charge OPIC prices but would load ten percent more than the invoice. That way you are giving a 10 percent discount.[72]

Business was so good that Chinoy's predecessor and superior at BCCI, Alauddin Shaikh, who was a senior official at the bank, decided to leave BCCI to form a partnership with a Nigerian, Razar Sareef, who had gained control of Nigerian oil exports. Shaikh has been implicated by numerous BCCI officials in making pay-offs not only in Nigeria, but in several other

countries. His new venture was in any case a success. It wound up controlling the National Petroleum Corporation of Nigeria account for the United States, an account it continued to control at least as of 1991.[73]

Other techniques used by Nigerian officials with the connivance of BCCI were currency swaps involving government funds. Government funds were placed in an account at BCCI in London. BCCI would place the funds with Lloyds or another bank and swap it into different currencies or make stock investments with it. If there was a loss, Nigeria bore it. If there was a profit, the first 8 percent went to Nigeria, on anything additional, the money was split between Nigeria and the traders at BCCI.[74]

In addition to the skimming that was taking place of government funds, BCCI found itself in the position of being able to earn enormous fees from ordinary commercial transactions in Nigeria, because Nigerian officials insured that financial transactions undertaken by BCCI for its customers would be handled much more efficiently than similar transactions undertaken by any other foreign bank doing business in Nigeria. While other banks would have to wait days or weeks for their transactions to be processed by the relevant government ministries, BCCI, would have their transactions handled promptly. As Chinoy explained:

BCCI got big profits because early release of foreign exchange was the crux of any deal. BCCI was two to three times faster than Chase Manhattan or the Bank of America or any other joint venture. BCCI was faster than any Nigerian bank in getting foreign exchange out of the Central Bank. It had very good relations with Central Bank of Nigeria. Unless you were friendly with receptionist, it would lie in the tray and wouldn't go anywhere for days. BCCI used to look after the girl at the foreign exchange desk. When the BCCI clerk would hand in the foreign exchange she would do that first for processing its release. Release of foreign exchange was important. Clerks at every level were looked after by presents. We had an officer, Mr. Saddiqui, who used to go and spend at least 10 days a month in Nigeria. His specific job was to look after people at all levels. In addition, he had appointed one to two expatriates who did nothing but spend their time at Central Bank. I do not think that cash was actually paid, but presents were bought in large amounts, as much as 20-40 dresses, shirts, ties at a time brought in from London and given. Everybody was kept happy. so that there is no objection raised by a clerk that a document isn't filled in exactly correctly. Because BCCI was so good and there was a BCCI application where someone had forgot to cross a "t" or dot an "i" and they would get it rectified quickly. This is Nigeria.[75]

The result was that BCCI began to develop almost a monopoly on handling import-export financing in Nigeria. As Chinoy explained:

For banks other than BCCI, sometimes it could take 90 days for your letter of credit to take. If some clerk is unhappy he says your documents are not in order and he throws it back and doesn't give a reason. In Nigeria it is very important to have contacts because it takes 14 days for a letter to reach you. BCCI would get its letters of credit three times faster than anyone else. They will get it through the Central Bank faster than other banks. Business increases due to this reputation.[76]

REENTERED AS EXHIBIT 3

According to Chinoy, the price-tag on some of the presents provided Nigerian bureaucrats was not small -- typically, they included such items as silver canteens, cutlery sets, tea sets, coffee sets, and $5,000 luxury watches and similar goods valued at a few thousand pounds, and given to Central Bank and other Nigerian officials.

Chinoy knew about the corruption of top Nigerian officials personally. During his residence in Nigeria, three Nigerians controlled the release of foreign exchange in Nigeria. One of the three, the country's comptroller of foreign exchange, was named Al Haji Balu:

Once when I was in marketing in 1985-1986, I saw a deposit from Balu of 280,000 Deutschmarks in a certificate of deposit in Frankfort. I knew what his salary in Nigeria was. This was at the time worth about $150,000 US, for deposit at BCCI Frankfort. He didn't have that kind of money from his government salary. It was obvious what was going on.[77]

Another extremely prominent Nigerian political figure who was being paid bribes by BCCI was Al Haji Ibrahim Dasuki, chairman of BCC Nigeria up until 1990-1991, when he became the Sultan of Sokoto. BCCI audit records show a $1 million loan from BCCI to Dasuki which BCCI provided him to pay for his shares of BCCI-Nigeria. Dasuki repaid this favor -- although not this loan -- to BCCI in many ways. According to Chinoy:

Dasuki had fantastic contacts with the government. He was a politician and religious leader of great eminence, and in line then to be Sultan of Sokoto. He could help the bank and used to be paid. He was paid from Caymans as well as from Nigeria. He was paid in London by one of Mr. Naqvi's special assistants, Asad Matualah, now in custody in Abu Dhabi.[78]

Chinoy explained that Dasuki was the one who would fix problems with other government officials for BCCI if anyone noticed that exchange laws were being broken or other problems arose. Dasuki was able to perform this role because of his position as a religious leader, making his support indispensable to other key Nigerian officials:

Dasuki came from the North where all presidents in Nigeria come from, and even the President has to go and pay homage to the Sultan of Sokoto. When he became Sultan all of the leaders would owe him a measure of deference. He took full advantage of that. Two to three times BCCI got into trouble and Dasuki would sort it out.[79]

Dasuki also acted as a local representative for BCCI, obtaining the right to import goods for Nigeria, and providing that right to a business associate affiliated with BCCI. The BCCI associate would then arrange for import of the commodity involved, such as rice. According to Chinoy:

It was like a license to make money. Rice was gold. Dummy companies were created on a per transaction basis and had no other life beyond that.[80]

Dasuki had so much business activity, he was able to establish his nephew, Ibrahim Katuni, to a level where by the mid-1980's, every foreign country did business with him because he had access to every ministry and had cut deals with each of them.

REENTERED AS EXHIBIT 3

Katuni would tell a foreign businessman, this is how you'll make $100,000, and I'll take 20 percent. He kept Dasuki happy and was hoping to become President of BCCI.[81]

BCCI found other ways of circumventing practices in Nigeria which frustrated other banks and prevented them functioning normally. As the indictment of BCCI officials in New York described it, BCCI's success in this area involved defrauding the Central Bank of Nigeria. Foreign exchange shortfalls in Nigeria had caused the government in about 1981 to impose restrictions on imports, requiring letters of credit used in connection with imports to be secured by 100 percent cash deposits in Nigerian banks. In turn, the banks were required to certify that the payment had been made to the Central Bank. As the transactions involved might take months to be completed, this would tie up the company's funds for substantial amounts of time, discouraging the import activity altogether. BCCI's way around the problem was to create phony loans for the importers and deposit the "proceeds" from the phony loans on BCCI's books in Nigeria, and then inform the Central Bank that the deposits had been made. Once the import transaction was over, the paperwork would be reversed. Through this technique, BCCI generated letter-of-credit business from importers who would not otherwise have been able to do business; earned commissions on opening the letters of credit; earned interest on the fictitious loans it granted; and realized exchange profits from converting currencies.[82]

BCCI also handled black market foreign exchange transactions for Nigerian officials for use in Nigerian elections. Because Nigeria has never developed credit cards, and Nigerians rarely use checks, essentially all transactions in Nigeria are in cash, with few record-keeping requirements adequate to monitor graft, which is endemic.[83] Most of the time, officials sell their cash in Nigerian currency and buy foreign exchange with it for purchasing goods abroad, or for maintaining deposits and homes abroad, typically in the United Kingdom. But sometimes the Nigerians found they needed Nigerian currency, especially during election time. According to Chinoy:

At elections, the officials need the money and sell the foreign exchange at black market price and that money is paid in Nigerian currency to them and they return the foreign exchange abroad. This method is employed by Nigerian politicians to obtain political money. It is commonplace throughout Africa.[84]

As noted above, BCCI's Nigerian operations were among the bank's most profitable. This is understandable. In the case of BCCI and the Nigerian government, crime paid.

**PAKISTAN**

Pakistan was the home of almost all of BCCI's top officials, including founder Agha Hasan Abedi. Long before BCCI itself was started by Abedi, he began the practice of making pay-offs to politicians as a mechanism for securing business and strengthening his banks.

For example, when Abedi formed the United Bank in 1959, he appointed as chairman of its board I. I. Chundrigar, the former Prime Minister of Pakistan, who was a close confidante of Pakistani's then current prime minister, Ayub Khan. Abedi maintained close ties to Khan's

government, later hiring General Khan's minister of information to become the "publisher" of a BCCI promotional magazine, "South."[85]

When the Pakistani military government was replaced following the civil war that resulted in the severance of East Pakistan into Bangladesh, Abedi became just as cozy with Pakistani "socialist" Ali Bhutto, Khan's ideological opposite, making political payoffs on behalf of Bhutto during elections.[86] When Bhutto was overthrown in 1978 in a military coup, Abedi swiftly changed allegiances again to Bhutto's successor, Islamic "puritan" General Zia.[87] Zia later executed Bhutto for financial crimes, in which Abedi, among others, was clearly involved, while forming close ties to Abedi, on whose financial skills he increasingly relied.

The relationship was personal as well as professional. A sample BCCI payment to General Zia was obtained by the Subcommittee, showing BCCI's branch in the United Arab Emirates making a payment to Zia of 40 million Pakistani rupees -- several hundred thousand dollars -- on May 26, 1985.[88]

The BCCI-Pakistan relationship was important to both the bank and a succession of Pakistani governments. Although Abedi had been close to Bhutto, and formed a close relationship with the current President of Pakistan as well, it was General Zia was who in charge of Pakistan during most of BCCI's existence, and General Zia who did the most for BCCI. As Nazir Chinoy, who was based in Pakistan in the late 1970's and early 1980's, recalled:

Every time Mr. Abedi came, he always called on President Zia. President Zia did not meet Abedi during office hours, but in the night when Mr. Abedi would fly in, they would finish official dinners first and I would be sitting with Abedi and Abedi would leave for two to three hours and meet with Zia. It was the President Zia that he spoke to first before speaking to the finance minister. I think that Abedi used Zia and Zia used Abedi also for the gulf countries, when he wanted some assistance. It was a two way street.[89]

The Pakistani government guaranteed BCCI's ability to push aside immigration and customs requirements for its distinguished Arab visitors on their holidays in Pakistan, and BCCI's ability to engage in profitable banking. In return, BCCI assisting Pakistan in violating monetary controls imposed on its government by international organizations. As Chinoy explained:

In 1979, Pakistan was very short of foreign exchange, and under pressure from the World Bank to devalue the rupee. The World Bank had placed credit ceilings. The total lendings by commercial banks were limited to a figure by the World Bank. For BCCI's lending, the figure given was $750,000 US. This was just not viable to maintain. We had large deposits and had large surplus funds. Mr. Abedi was very keen that these limits go up. The World Bank would increase the limits each quarter based on how much foreign exchange Pakistan was able to generate based on central bank records. If the dollar reserves of the country went up, the World Bank would allow larger lendings in rupees. I am not sure who was the brains behind it, Mr. Abedi or Naqvi but between the two of them they came up with the idea. $50 million would be placed with BCCI Pakistan through BCCI's Kuwaiti affiliate, KIFCO. BCCI transferred

REENTERED AS EXHIBIT 3

money to KIFCO. I have a feeling that KIFCO got the money from Caymans. In any case, Kifco placed the money with BCCI Karachi.[90]

Thus, according to Chinoy, BCCI used an affiliate which was officially separate from BCCI, but secretly controlled by it and owned by it, to launder BCCI funds from one BCCI location to BCCI Pakistan, in order to make it seem as if BCCI Pakistan had generated an extra $50 million in legitimate deposits through this paper transaction. BCCI reported the extra $50 million to the Pakistan central bank, which in turn reported it to the World Bank to show the a $50 million increase in Pakistan's dollar reserves from abroad.[91]

A similar account of these transactions is described in the indictment of BCCI's top officials by the New York District Attorney on July 29, 1992. According to that indictment, the amount involved in all totalled $100 million.[92]

Zia died in a plane crash in mid-August, 1988, leaving a vacuum in relationships that BCCI very much regretted. Among BCCI officials, it was generally believed that if Zia had still been alive in October, 1988, he would have used his influence with the U.S. government to soften the handling of the case against BCCI in Tampa.[93]

With Zia gone, BCCI was not left without resources in Pakistan, however. The man who became President, Ishaq Khan, had served as chairman of the BCCI Foundation throughout the 1980's, and had close ties to Abedi.

The relationship between BCCI, the Pakistani government, and the BCCI Foundation had been deeply entangled from the start. As in the Bangladesh version of the BCCI Foundation, the Pakistani BCCI Foundation was created as a means of sheltering BCCI profits from taxation. In 1981, it received tax-free status while Ishaq Khan was Pakistan's minister of finance. In turn, the foundation received BCCI's profits from Pakistani operations, and then used some of those profits to finance projects the Pakistani government wanted and could not pay for itself. For example, BCCI provided $10 million in grants in the late 1980's to finance an officially "private" science and technology institute named for Pakistani President Ishaq Khan, whose director, A. Qadir Khan, has been closely associated with Pakistan's efforts to build a nuclear bomb. The institute is believed by some experts to be the headquarters for Pakistan's efforts to build an Islamic bomb. In the same period, other BCCI officials were assisting Pakistanis in purchasing nuclear technologies paid for by Pakistani-front companies through BCCI-Canada. (94)

The Foundation also made payments to somewhat less political entities, such as $3 million dollars for an "investment" in Attock Cement, a private cement company in Pakistan ostensibly owned by BCCI front-man Ghaith Pharaon, but in fact a front for BCCI itself. As BCCI officer Nazir Chinoy testified:

this foundation was set up . . . with the government of Pakistan nominating as the chairman, one or two trustees from the public and two or three from BCCI management . . . 90 percent of [BCCI Pakistan's] pre-tax profits being generated in rupees [were] given to the Foundation. It is a lot of money. . . .A charitable foundation is not subject to the same audit strict audit procedures or scrutiny by the central bank or the state bank of Pakistan. . . it becomes an

https://info.publicintelligence.net/The-BCCI-Affair.htm

opportunity to get employment. If you want to do somebody a favor, you could put him on the staff of the foundation and find a job for him.[95]

Among other officials whose activities were financed by BCCI in Pakistan were Jam Sadiq Ali, the highest ranking official in the province of Sind -- where Karachi is located -- whose personal expenses were financed by BCCI for years of self-exile in London, and who defended BCCI and Abedi after its collapse.[96]

Yet another high-ranking Pakistani official placed on BCCI's payroll after his government service was Pakistan's former Ambassador to China, Sultan Khan, who was provided a job at BCCI at its representative office in Washington, D.C. There, according to BCCI records, Khan solicited business for BCCI and its secretly-held subsidiary, First American, from the Chinese Embassy and Chinese officials in the mid-1980's, sponsored occasional events on behalf of the Chinese to which he invited prominent Americans, and had lunch with foreign diplomats who controlled accounts whose business BCCI was interested in acquiring. By the late 1980's, Khan continued to go to BCCI's Washington representative office, but according to him had little to do there beyond reading the newspapers and picked up his paycheck until the office closed after BCCI's indictment in Tampa.[97]

According to BCCI's former head of Latin American and Caribbean operations, Akbar Bilgrami, such appointments of retired Pakistani officials were typical.

## PANAMA

Repatriating U.S. dollars from Latin America to the United States was an essential function of BCCI Panama from its inception. This was apparent to anyone who had contact with BCCI's Panama offices. As a Colombian marijuana trafficker and cooperating Justice Department witness told the Subcommittee:

Everyone who did business in the drug trade knew about BCCI. We all used it. It was very conveniently located at the airport when you came into Panama. Its officers were very attentive. And even if something went wrong, and your money was frozen at the request of the United States, BCCI would make sure you could get your money back.[98]

As this trafficker explained, his accounts at BCCI had been frozen at the request of the United States as a result of an anti-drug operation it had mounted called Operation Pisces. After the funds were frozen, he went to Panama, where he was told by his lawyer that if he was willing to give up 10 percent of the full amount, BCCI would find a way to release his funds to him, while telling the U.S. government they were frozen. He agreed, and soon the lawyer produced a letter from the Attorney General of Panama -- who at the time was supposedly working closely with the United States on anti-drug efforts -- ordering the release of the funds.[99]

Cartel money-launderer Ramon Milian Rodriguez, who testified before the Subcommittee in February, 1988 concerning his knowledge of Noriega's involvement with drug trafficking and money laundering, wrote the Committee after BCCI's global closure to inform the Committee that he too banked at BCCI, and that a substantial portion of his remaining funds following his arrest and conviction in Tampa had remained at BCCI and was lost in its closure.[100]

Following BCCI's plea agreement with the U.S. Attorney in Tampa in January 1990 which required BCCI to cooperate with law enforcement in anti-money laundering activities, BCCI's own employees in Miami began to recommend that BCCI's attorneys refer to the Justice Department BCCI's overall operations in Panama, as well as Colombia, for possible further criminal investigation. When BCCI's attorneys refused to undertake this action, apparently out of concern that such a referral would wind up destroying the bank, these lower-level BCCI employees again asked the lawyers to criminally refer BCCI's Panama and Colombian operations to Justice. The lawyers again refused to do so.[101]

BCCI officials argued that in handling flight capital and dirty funds out of Panama, BCCI was little different from most other foreign banks which had decided to locate there.[102]

However, it was no accident that BCCI was the foreign bank that obtained the bank account of Panama dictator Manuel Antonio Noriega. Once again, BCCI systematically solicited relationships in Panama with top officials as the key to long-term profitability. While Noriega was in charge of Panamanian intelligence, G-2, under the government of General Torillos, Noriega had come to know Alauddin Shaikh, a BCCI official who frequently handled payoffs to government officials in a number of countries.

As Nazir Chinoy explained:

Originally Panama was set up by Alauddin Shaikh, Amjad Awan was his understudy only. Awan reported to Shaikh, not anyone else. Up until I was in London in 1985, Shaikh used to fly to Panama two to three trips a year to meet with General Noriega. The relationship was very close. General Noriega gave a copy of old hand-written Koran to Alauddin Shaikh.[103]

When Noriega visited London, Shaikh provided him with dinners and entertainment, and soon thereafter, Noriega assisted BCCI in obtaining a license to open a bank in Panama. Shortly thereafter, Shaikh's assistant, Awan, who had met Noriega in London, was transferred by BCCI from London to Panama, where he made the acquisition of Noriega's account a priority.[104]

Awan pressed Noriega on numerous occasions to open an account at BCCI, and in early 1982, Noriega agreed, opening an account in the name of the Panamanian defense forces. Under his agreement with Awan, Noriega would have sole control over the funds, which would be maintained by BCCI in the United Kingdom in numbered accounts.[105]

During the first two years he held the account with BCCI, Noriega used his accounts at BCCI to make political payoffs in the course of elections, and for intelligence operations. For example, Noriega directed BCCI to payoff the mortgage of his hand-picked candidate for president of Panama, Nicholas Barletta. Later, this changed, and he used his accounts with BCCI as a personal account for himself and his family, who received credit cards from BCCI and began making extensive charges for shopping trips in Miami, New York, London, Paris, and at popular European resorts on the BCCI "Panamanian Defense Forces" account. At its height, Noriega maintained about $25 million in the account, mostly from cash deposits. The largest single deposit of currency into the accounts was approximately $4 million.[106]

REENTERED AS EXHIBIT 3

Noriega introduced members of his business clique to BCCI, and encouraged BCCI to make loans to them, including businessman Enrique Pretelt and arms dealer and drug trafficker Cesar Rodriguez. BCCI provided them with lines of credit that were secured by Noriega's promise to Awan that he would make sure that the loans were made good. However, these loans were defaulted on. In the case of Rodriguez, when BCCI raised the issue with Noriega, Noriega advised the bank to look his estate and that he would have no further responsibility. Against Awan's wishes, BCCI chose to swallow the losses -- which amounted to $10 million in all -- rather than irritate Noriega by pushing forward with attempts at recovery.[107]

The closeness of the relationship between BCCI and Noriega extended to Noriega's wife and children as well, each of whom made use of BCCI accounts. Noriega handled the purchase of Noriega residences in the United Kingdom. And Noriega's daughter was even hired as an employee at BCCI-Miami, where the bank trained her in its own techniques for banking.[108]

Later, when Noriega was indicted in Miami in February 1988, he told BCCI to move his bank accounts at BCCI-London to another location, in an effort to hide them from U.S. authorities. Awan and other BCCI officials, including Swaleh Naqvi, then BCCI's Acting CEO, discussed Noriega's request and decided to move the funds to BCCI-Luxembourg as a means of keeping the funds concealed from detection by law enforcement in the United States and United Kingdom. The funds stayed in Luxembourg for the next four months.

In July, 1988, when BCCI learned that the Subcommittee had subpoenaed it for Noriega's records, Awan met with BCCI officials Naqvi, Dildar Rizvi, and S.M. Shafi to discuss whether Noriega's funds needed to be hidden still further. Noriega then called Awan and asked Awan to transfer the money out of BCCI entirely, to Panama's government bank, Banco Nacional de Panama, and immediately from there to a small European bank. Awan then met Ziauddin Akbar, BCCI's former head of Treasury operations, who in 1986 had left BCCI to become the head of Capcom, its commodities trading affiliate. Awan discussed Noriega's problems with Akbar, who offered to hold the $23 million in Noriega funds for BCCI in one of the trading accounts Capcom maintained for laundering money, a company sometimes referred to as Finley and sometimes as Findley. At BCCI's direction, Awan then travelled to Panama through a circuitous route designed to ensure that there would be no record of Awan's travel to Panama through the United States, and while in Panama, met with General and Mrs. Noriega. The Noriegas authorized BCCI to transfer their money to the Findley account at the Middle East Bank in London, and Akbar then moved the Noriega funds through Capcom to different entities, breaking up the trail by which Noriega's money could easily be traced by anyone.[109]

Thus, BCCI officials in the United States, Panama, the United Kingdom and Luxembourg colluded with one another to hide funds which they knew were the subject of a pending criminal action in the United States from law enforcement. They hid the funds through using the rather traditional mechanism in money laundering of layering -- moving the funds from entity to entity and from location to location until they could no longer be traced.

**PERU**

**Overview**

REENTERED AS EXHIBIT 3

BCCI's method and scope of operations in Peru parallelled its functions in most, if not all, other countries. First, officers of the bank cultivated favorable relationships with powerful members of government and the private sector. Second, BCCI sought to do business in Peru with the hope of securing the high net worth depositors upon which its operations depended regardless of the source of the deposits. Finally, the bank conducted the full range of highly suspect or outright illegal activities that it conducted in other countries, including allegedly giving bribes and kickbacks, hiding money in numbered accounts, evading regulatory inspection, and laundering stolen government funds and drug profits.

### Background

Near the end of 1984, the government of Peru ceased making any payments on its national debt. The breach of its debt repayment obligations subjected Peru to two direct results over the next year. First, Peru became a bad risk to which very few, if any, banks or countries outside of Peru would extend loans and lines of credit. These loans and lines of credit were essential to financing trade between Peru and other nations because the external sources were Peru's only source of foreign currency. Second, those banks and countries to which Peru had already become indebted sought to collect the money that Peru owed them. The directors and managers of Peru's central bank -- the Banco Central de Reservas del Peru ("BCRP"), which managed all the funds of the government -- particularly feared attachment and seizure of Peruvian assets located in other countries.[110] In short, Peru was faced with a dilemma: On the one hand, its need to finance foreign trade compelled it to form a relationship with a bank outside the state. Yet Peru faced attachment and seizure of any funds placed outside of the protection of its own borders.

Thus, entering 1986, Peru was faced with two immediate needs as a result of its refusal to pay its debt obligations. First, it needed to form a relationship with a bank which would extend lines of credit in foreign currency in exchange for deposits of Peruvian currency. Second, insofar as Peru faced attachment and seizure of its assets by countries and banks to which it was indebted, it needed to form a relationship with a bank which could "hide"[111] Peruvian deposits from creditors. These two criteria -- "reciprocity" and "safety" -- formed the express agenda of the BCRP as it began to approach BCCI and other banks in mid-1986.[112]

### Formation of the Relationship

Just as in the United States, one of BCCI's very first actions lay in hiring a prestigious law firm. Jorge del Castillo, a member of the Peruvian House of Delegates, testified that, upon entering the country in 1984,

BCCI . . . asked for and got the legal advice of a very important law firm in Peru, . . . Arias & Davis & Associates, which is a very well known law firm.[113]

Moreover, just as in the United States, the law firm hired was well-connected to the Peruvian government. Del Castillo testified that the partner at Arias & Davis's representing BCCI was:

. . . Dr. Sterling, . . . a person whom all of us respect and could not possibly be suspected of anything illegal, he is a member of Dr. Lunes Flores' party, and is the President of the Peruvian

Senate. He is beyond reproach.[114]

Thus, from its entry into Peru, BCCI sought to cultivate the patina of respectability that it had sought to cultivate since its creation.

In the meantime, BCCI began to promise Peru terms that it, alone among international banks, could meet. Peru would deposit its funds at BCCI-Panama, BCCI-Panama would hide those funds under Panama's strict bank confidentiality laws, and BCCI would then lend money to Peru at a rate of about 50 cents on the dollar, which Peru could use to purchase foreign goods.

This attractive offer was offset, in part, from the beginning, by Peru's legitimate concerns about BCCI as a bank. The central bankers of Peru understood that BCCI had no lender of last resort, and that their funds could disappear if something went wrong. These concerns were met, in part, through bribes by BCCI to at least two of the decision-makers at the central bank, who from there on would become staunch supporters of the BCCI relationship.[115]

Following the bribe payments, the BCRP entered into a formal banking relationship with BCCI on April 28, 1986. The BCRP and BCCI signed two documents, "General Business Agreement for the Handling of Numbered Account" and "Operative Covenant for Numbered Account." These two documents described the accounts to be provided to the BCRP. The deposits were to be in a numbered account, with BCCI to "keep absolute secrecy about [the BCRP's] identity." The accounts were to be kept in Panama, which maintained strict bank secrecy laws. In a letter dated the same day, a $60 million line of credit was extended to the BCRP. In exchange for the credit line, the BCRP promised to keep at least $200 million in its accounts.[116]

These agreements were advantageous to BCCI for three reasons. First, BCCI required that the BCRP deposit four times the amount that it was obligated to lend. Thus, as long as the relationship between the two lasted, BCCI would have $140 million to use for purposes other than its loan obligations to the BCRP. Loans are traditionally considered assets to a bank, and deposits, because they are due upon a customer's demand, are considered liabilities. Thus, the $140 million wouldn't be considered a traditional asset increasing the book value of the branch.[117] However, within the context of the transaction itself, the $200 million minimum requirement limited the BCRP's ability to withdraw the money at will and thus provided a near-certain $140 million for BCCI's use.

Second, the account agreements were advantageous to BCCI because they did not obligate BCCI to pay any interest on the BCRP deposits. This savings in interest would amount to millions in itself.[118] However, the letter of credit did obligate the BCRP to pay an interest rate on any amounts borrowed, as well as "[o]ther charges like Confirmation, Commitment, Negotiation, etc. . . . as per BCCI schedule of charges."[119]

The agreement between BCCI and the BCRP was advantageous to the BCRP in at least one way. Peruvian Central Bank official Ricardo Llaque testified that no other bank with which the BCRP had a relationship would provide a letter of credit as high as BCCI:

Senator Kerry[:] Did not other banks in Panama offer numbered accounts?

Mr. Llaque[:] Yes, but not levels of credit which were very high . . . . It [the size of the line of credit] was one of the most important points in the decision of the board to accept the corresponding relationship . . . and since it was a revolving line of credit it meant that this was a benefit . . . at an amount much higher than what the nominal amount of the line of credit really was.[120]

Llaque was contending that the line of credit BCCI was advancing Peru was greater than that offered by any other bank. However, it was still substantially below the level of the amounts deposited by Peru. More importantly, since BCCI needed Peru's assets, and as an institution tended not to be concerned about the repayment schedule of loans, BCCI's needs and Peru's needs fit one another perfectly.

**Relationship Between BCCI And Peruvian Elite**

As described above, in the course of obtaining the Central Bank account, BCCI officials paid bribes to the Central Bank officials handling the accounts.[121] The purpose of these bribes was to ensure that once the relationship was established and BCCI had agreed to lend funds against Peru's central bank assets, the Peruvians would have a personal stake in keeping Peru's assets at BCCI.

As the District Attorney of New York has alleged in his July 29, 1991 indictment of BCCI, and his indictment on July 29, 1992 of BCCI's top officials and front-men:

The BCC Group made corrupt payments to the President and the General Manager of the Central Bank of Peru. In or about 1985, the BCC Group made payments of money to the President and General Manager of the Central Bank of Peru upon an agreement and understanding that said President and General Manager would take deposits of hundreds of millions of dollars of Peruvian government reserves with banks of the BCC Group. Hundreds of millions of dollars of the Central Bank of Peru's funds were placed on deposit with banks of the BCC Group, and said payments to the President and General Manager of the Central Bank of Peru were calculated as a percentage of the amount on deposit.[122]

Or, as BCCI's head of Latin American and Caribbean operations, Akbar Bilgrami put it:

We had to make payments into a Special Project Accounts. I was told that BCC's relationship with Peru arose because Mr. Brian Jensen joined the bank in 1986; he was an ex-Central Bank official. BCC's push in 1987-1988 was to get big chunks of deposits from Peru. You see, Peru was being cheap, not paying its foreign debt. BCC offered to keep Peru's money hidden: $320 million in Panama.[123]

Or, in the more laconic conclusion of Abdur Sakhia, the head of BCCI's Miami office:

the relationship between Peru and BCCI was not kosher.[124]

However, even with the payment of bribes, BCCI officials worried that the $250 million in assets could disappear from BCCI if the officials they had paid-off were to lose favor. Given the significant size of the lending BCCI had agreed to in return, they wanted assurances that in the view of BCCI, could only be had from Peru's president, Alan Garcia. Accordingly, after the

relationship had been established, S. M. Shafi, head of BCCI's Latin American operations, went to Lima, Peru to meet with Garcia and receive such assurances. The meeting took place in mid-February, 1987, and Garcia promised BCCI that the funds would remain at BCCI. Following the meeting with Garcia, the Peruvian central bank raised its limit for deposits with BCCI by another $50 million.[125] Moreover, the BCRP agreed to "irrevocably and unconditionally" guarantee any loan provided by BCCI. That is, if a local bank or institution defaulted on a loan from the BCCI letter of credit, the BCRP promised to repay the loan. Moreover, the guarantee covered the entire $110 million dollars. In August, 1987, the BCRP received another $50 million increase, but it appears that no corresponding deposit was required.[126]

BCCI sought and had been granted permission from the government (as required by law) to open branches in Peru as early as 1984. Although BCCI never in fact opened branch offices in Peru, its actions in 1984 established a presence in the country which laid the groundwork for the deal eventually struck between BCCI and the BCRP in 1986. Llaque said, "It [BCCI] had sent its people to Peru, and when we began to look for new corresponding banks the bank was already there."[127]

However, it has been alleged that, when the BCRP began searching for corresponding banks in 1986, the relationship between BCCI and the government was already so strong that the BCRP did not even seek proposals from banks other than BCCI. Fernando Olivera, presiding officer of an committee formed by the Peruvian Parliament to investigate Peru's financial operations, testified before the Subcommittee on August 2, 1991. Olivera suggested but did not clearly state that his investigation had revealed that the BCCI proposal was the only proposal sought and entertained by the BCRP.[128] He also testified that the BCRP based its decision to invest in BCCI based solely on a three-page report regarding BCCI Holdings, S.A., in Luxembourg.

The documents do not provide a clear answer as to whether Llaque's explanation or Olivera's explanation was correct. For example, it is unclear how BCCI's mere presence in Peru would in itself be helpful in convincing the BCRP to make deposits with it. Even the placement of deposits in numbered accounts in Panama was not a service unique to BCCI; the BCRP held similar numbered accounts in Panama branches of four European banks other than BCCI as early as December, 1985, six months before its accounts with BCCI were opened.[129]

In opening the BCCI accounts, four BCCI executives held meetings with members of the BCRP.[130]

Over the next year and a half, while the BCRP's relationship with BCCI continued, several more meetings were held between members of the Peruvian government, BCCI executives, and foreign VIPs. On 12/18/86, Akbar Bilgrami came to Peru accompanied by Panamanian General Manuel Noriega. On 07/21/87, Alberto Calvo, an agent of BCCI, met with Daniel Carbonetto, Economic Advisor to Alan Garcia Perez, the President of Peru, who Calvo described to his superior at BCCI, S. M. Shafi, as the person "who the public opinion considers the most influential person in the decision-making process regarding economic policies." Carbonetto and Calvo discussed how the Peruvian government could obtain additional lines of credit through BCCI. They also described the risk of BCCI continuing to

hold Peru's central bank reserves at BCCI-Panama, given "Panama's political situation."[131] Calvo concluded:

Mr. Carbonetto asked me to go with him to visit the President Mr. Alan Garcia, and to brief him about our conversation. I politely refused with the excuse that I was leaving for Chile.

In reality I prefer to meet with the President after knowing what will be the policy of the Central Bank regarding the placement of it's reserves and after having a chance of receiving your instructions on this matter.

We agree to meet with the President of the Central Bank one week after he takes office and after that we will visit the President of the Republic.[132]

This meeting between Shafi and Alan Garcia appears to have occurred finally in October of 1987. A separate meeting involving Garcia, Manuel Noriega, and BCCI official Akbar Bilgrami, apparently took place December 18, 1986, according to Fernando Olivera, a Peruvian legislator who headed a commission reviewing the relationship in 1991, discussed below.

**Illegal Activities**

There is a characteristic of BCCI's activities in Peru not present in other countries which should be emphasized at the outset. The BCRP's purpose in entering into a relationship with BCCI, if not illegal, was at least highly suspect. The BCRP -- a branch of the Peruvian government acting in this matter as government -- expressly intended to conceal its country's funds from legitimate creditors, because of its desire to avoid paying off its debts. Just as Manuel Noriega used BCCI with the intention of hiding funds which rightfully belonged to the Panamanian government, the BCRP used BCCI to conceal funds with were rightfully owed to private banks and other countries. The formal difference between Noriega's use of BCCI and the BCRP's lies in the fact that Noriega was acting as an individual using the bank to deceive his government, while the BCRP was acting as an arm of government using BCCI to deceive banks and other countries. In his testimony before the Subcommittee, deputy central banker Llaque used the euphemism of "safety" to describe the BCRP's purpose:

Senator Kerry[:] . . . [O]ne of the services that you were looking for was an ability to be able to hide the money from seizure, was it not? . . .

Mr. Llaque[:] Yes. Perhaps "hide" is not the word . . . . We had at least two cases of embargoes of funds from the Central Bank in U.S. banks, and also an embargo of funds from commercial banks in the United States as well.[133]

It is apparent from the Subcommittee's review of testimony and documents that "hide" was exactly the word to describe the BCRP's intent in using BCCI. No witness or document disputed that the funds were due to legitimate creditors; not did any witness or document question the propriety of an outside nation seeking to attach funds.

The need for safety manifested itself in two requirements. First, the funds had to be kept in an account shielded from creditors. Thus, BCCI provided Peru with a numbered account which

bore no connection with the Peruvian government on its face. Second, the account needed to be kept in a country with strict regulatory laws protecting disclosure of account owners. Thus, the account was opened not in Peru, but in Panama.[134]

### End of BCCI Relationship With Peruvian Central Bank

By mid-1987, despite the bribes paid by BCCI and its efforts to secure the support of President Garcia, officials at the Peruvian central bank were becoming increasingly uneasy about the bank's relationship with BCCI. The officials had learned about BCCI's massive commodities trading losses in London, which had in effect wiped out BCCI's capital. They also feared that the Noriega regime in Panama was potentially unstable, and that the United States might ultimately take action against it -- as it did just six months later in shutting down Panama's banks through refusing to accept dollars.

Accordingly, they asked the senior analyst of foreign banks at the Central Bank to provide the Central Bank with an analysis as to the safety and security of Peru's funds at BCCI. The analyst, Gonzalo Aramburu, was only too glad to provide the facts about BCCI -- it had no lender of last resort in case of a default in any of its operational units; over the previous two years BCCI had showed significant losses in operations in the options market; and BCCI "uses an unusual accounting system in that it does not make it possible to clearly identify the level of losses of the fiscal year, or the activity that led to them."[135] Accordingly, Aramburu recommended the Central Bank to take immediate action to protect itself by cutting back on the $270 million in was then maintaining in BCCI.[136]

Over the following month, Peru removed $70 million in deposits from BCCI. By the end of the year, it had removed over $150 million. The remaining funds were pulled at the end of January, 1988, as Panama fell into a crisis over accusations concerning Noriega's drug trafficking.

### Peruvian Legislative Commission

Following BCCI's indictment on drug money laundering charges in Tampa in October 1988, and growing international concern about BCCI during 1989 and 1990, a legislative commission was created in Peru to review a number of charges of Peruvian corruption, including issues pertaining to the Central Bank's decision to place the government funds at BCCI. The head of that commission, Fernando Olivera, a member of the Peruvian House of Deputies from an opposing political party to former President Alan Garcia, testified before the Subcommittee on August 2, 1991 about the meaning of BCCI's activities in Peru:

We think that the cause of this behavior and the decision to place Peru's international reserves in BCCI was corruption. And here we have a document of the Swiss Bank Corp. in Panama providing that BCCI oversees George Town Bank Corp Grand Cayman. From there, transfers were made to the Security Bank to the Swiss Bank in New York and transferred from there to an account in Panama of the Swiss Bank. These were the bribes for these officers [Lionel Figueroa and Hector Neyra of Peru's Central Bank]. . . . There are some other people under the Selva Negra and Terra Firma codes, and . . . we are convinced that there are other authorities higher up who intervened.[137]

As another member of the Commission, Pedro Cateriano, testified before the Subcommittee:

In Peru the members of the [Central Bank] board of directors are political. They are named by the President and members of the board . . . That is why the function they carry out is not really technical. It is basically political.[138]

The clear message of the legislative commission was that the Central Bank officials could not have been acting alone, and that other important Peruvian political figures, including former President Alan Garcia, were involved.

Another Peruvian legislator, Jorge Del Castillo, who requested to testify before the Subcommittee to defend President Garcia, stated that the Central Bank was independent of the President and autonomous in all respects with no relationship to the Peruvian executive branch. Del Castillo also provided documents to the Subcommittee consisting of an investigation on behalf of Garcia of alleged BCCI accounts maintained by Garcia that did not, in fact, exist. Del Castillo testified that this investigation disproved that allegations concerning Garcia's involvement in any bribes that may have been failed.[139]

BCCI officer Akbar Bilgrami, who, unlike the other witnesses is neither Peruvian nor affiliated with any Peruvian political party, told the Subcommittee that it was his understanding that Garcia had indeed provided assistance BCCI, but that he had not heard of specific payments being made to Garcia.

My main sources for information on payments in Peru were two BCCI officials, Amir Lodhi and S.M. Shafi. According to them, President Garcia approved that funds be placed in BCCI. Mr. Shafi told me that the BCC had to pay for the deposit, but we didn't know how much, or to whom the money went. This was handled by Mr. Saddiqui [one of BCCI's top officers in London]. Two Central Bank officials and Mr. Jensen were handling it in Peru. Mr. Shafi went to President Garcia as an insurance policy of getting the amounts. I heard that the money went into the hands of the Central Bank officials and Mr. Jensen. Mr. Shafi did not tell me that Mr. Garcia received money. He said that he went there to guarantee that the money would be placed in the account, as an insurance policy. Mr. Tariq Jan [another BCCI officer] also went with Mr. Shafi to the meeting with Garcia. I believe that Mr. Shafi went to see him to make sure that the relationship would occur. You know, it wouldn't be good for BCC to start down this road without the support of the country's president. I also think that Mr. Lodhi also met with Mr. Garcia, but that meeting was more general. The meeting with Shafi was just with regard to this relationship -- the money for the letters of credit. Lodhi's meeting with Garcia was about Latin America and third world causes, and so on.[140]

On September 22, 1992, the Attorney General of Peru announced that she would seek Garcia's extradition from Colombia after charging him with alleged irregularities for his role in depositing Peruvian resesrves in BCCI. The official, Blanca Nelida Colan, had "drawn up charges against Garcia for the possible existence of foreign bank accounts for his alleged participation in depositing $287 million in reserves" in BCCI.[141]

**Conclusion**

REENTERED AS EXHIBIT 3

There were more than enough reasons for BCCI and Peru's Central Bank for the two to development a relationship in 1986. Peru was seeking to hide its money from foreign creditors, as it began refusing to pay its foreign debt. BCCI was engaged, as always, in a quest for deposits to prop up finances which were in an especially rickety and fragile state in this period. BCCI, as usual, met with top officials in the country to secure and strengthen its relationship with the Central Bank, including President Garcia. Bribes allegedly were paid to two Peruvian central bankers. When BCCI finally collapsed, Peru escaped harm principally because its exposure had previously been so large and so imprudent, especially given both Panama and BCCI's shaky state by the beginning of 1988, that responsible officials in Peru had acted to end the relationship.

## SENEGAL

In Senegal, BCCI paid bribes to employees of the Foreign Exchange Department of the Central Bank, and provided them with gifts, to assure that BCCI received preferential treatment in the release of foreign exchange funds. This preferential treatment again placed BCCI in a favorable position in relationship to other banks for handling imports to Senegal, similar to that described in some detail above concerning BCCI's activities in Nigeria.

Additionally, BCCI helped the Central Bank of Senegal in defrauding the International Monetary Fund through falsifying deposits in Senegal to the IMF. At the time, Senegal was required by the IMF to maintain cash deposits of a certain level on reserve, and was unable to do so. On the critical reporting dates for the Central Bank, BCCI discounted a $5 million to $6 million promissory note to a Senegal corporation for two to three weeks, the corporation then placed the funds on deposit with the Central Bank of Senegal for that period, showing the IMF that Senegal was meeting its banking obligations, and when the IMF review was concluded, the transaction was reversed.[142]

## SUDAN

BCCI's situation in Sudan was similar to its situation in a number of African countries -- it assured its access to central bank funds through making payoffs to officials. As Akbar Bilgrami described it, this was a general practice which he personally participated in only once, by his superiors at BCCI London when he was a very junior officer of the bank:

In 1977, I was asked to go with the Senior Official of the Central Bank and given 100,000 pounds. I was told to buy him anything he wanted. I kept the receipts as we were buying items. This made the central bank official very nervous, the keeping of receipts. He said, 'Barclays doesn't keep receipts.' I brought the receipts back to my boss, who said 'What did you do that for?' and threw them away. We spent about 70,000 pounds that day.[143]

## ZAMBIA

In Zambia, BCCI once again worked with government officials to defraud an international lending institution, in this case, the World Bank. In 1987, the World Bank required Zambia to reduce its borrowings by making a $35 million payment by December 31, 1987 from internal sources or savings. When Zambia could not come up with the funds, BCCI loaned $45 millon to Zambia, hiding the source of the funds so that they appeared to be from Zambia's own

https://info.publicintelligence.net/The-BCCI-Affair.htm

sources.[144] As a result, the World Bank granted a new $60 million loan to Zambia. As Nazir Chinoy explained the transaction:

The funds were given to Zambia by BCCI. The routing was that they were sent from BCC Paris to a Zambian commercial bank to London and from there, the World Bank was repaid. Two days later, Zambia was able to draw on the $60 million tranche from the World Bank. BCCI Paris was repaid from Copper exports. The terms for BCCI Paris were one percent front-end fees; one and a half percent over LIBOR [a standard European international banking rate].[145]

According to Chinoy, BCCI was able to make money in several additional ways off the Zambian transaction. In addition to the transaction fees specified above, BCCI made money converting the payments it received in French francs on the copper exports to dollars. Moreover, BCCI was able to use the transaction to assist with internal bookkeeping problems, by sending 50 percent of the front end fee to BCCI-Grand Cayman in compensation for BCCI-Grand Cayman having issued a letter to BCCI Paris underwriting the risk in case Zambia defaulted. In this way, BCCI-Paris reduced its taxable income.

**ZIMBABWE**

Several BCCI officials interviewed by the Subcommittee referred to bribes paid to Zimbabwe's prime minister, and the political chief opposition figure in Zimbabwe, by BCCI at the time it opened a joint venture with Zimbabwe. By the account of Nazir Chinoy:

I accompanied Mr. Abedi and Mr. Sheikh to the opening of a joint venture with Zimbabwe. I think to get permission for establishing a bank in Zimbabwe that money was paid to President Mugabe and to Nkomo. The basis I am making this statement was that when I went there with Mr. Sheikh I was acting as Mr. Abedi's personal assistant or secretary. Mr. Sheikh went off on his own to see Nkomo who was the chief opposition at that time, and then he went off to see President Mugabe, and when they talked they wanted me out of the room. Many of us were there for the opening. But only Alauddin Sheikh and [BCCI CEO] Abedi were left in the room with these two political figures. Otherwise I was accompanying him and acting with him.

Mr. Sheikh carried a bag with him. At the time I had a suspicion that you don't get permission as a foreign bank so easily without a payment. Without favors, it wouldn't be so easy to get a bank that fast, especially given the opposition of the British banks who were already established there.[146]

By the account of Akbar Bilgrami:

We paid Mugabe and Nkomo. I was at the Parklane Branch. BCC was approached to look after the expenses of the delegates, which were paid. In addition, we paid 500,000 pounds from the Parklane Branch. Someone from Mr. Naqvi's office came to Parklane and picked up the money. I don't think than Ian Smith was getting paid by us. I think that the Rhodesian government was taking care of him. That was in 1980-1981.[147]

By the account of Abdur Sakhia:

I drove one of my colleagues in London to a hotel, and he went with a briefcase and he came back without a briefcase, and I asked him: What happened to your briefcase? And he smiled at me and he said: This was for those people. I said: What, did you carry gold bars? He said: No, some cash. . . So this was prior to independence of Zimbabwe, when they were negotiating for independence. Some officials, some politicians from Zimbabwe were staying at a hotel in London.[148]

**AFRICAN DEVELOPMENT BANK**

BCCI official Nazir Chinoy provided a detailed account of corruption in the African Development Bank to the Subcommittee, which he referred to in a much more limited way in public testimony.

According to Chinoy, BCCI had a long relationship with African Development Bank, maintaining about $32 million in deposits in BCCI's Paris branch in the mid-1980's. When Chinoy arrived, he found the hard way that the African Development Bank was placing those funds on the basis of bribes being paid to the officials at the African Development Bank who controlled the placements.

Fifteen days after my appointment, we lost a deposit of $14.3 million. When this deposit was lost I was concerned. [Another BCCI official] rushed to me and asked me whether I had made the payment? I said, what are you talking about? She said, haven't you been briefed by London? I said, no. She said, have you failed to look after the Treasurer? We were giving them top of the market rates. So I said, no I haven't been briefed. I learned from [BCCI official] Zafir Iqbal that when my predecessor was here, he drew up his expense account and he took cash dollars in travellers checks to give to the man controlling the African Development Bank's accounts, his name was Ismael Emay. I asked how much? Either 1/32nd or 1/16th. $8,000 to $10,000 a year in all. I said, fine, will I be getting the money from Cayman? He said I don't know, you'll have to manage.[149]

Chinoy made a round of courtesy calls at the African Development Bank, meeting the president of the bank and the Treasurer. Chinoy stated that he told the Treasurer that he should look Chinoy up in Paris, that Chinoy did not know what his predecessor had failed to do, but if it hadn't been paid to the Treasurer, Chinoy would pay it. According to Chinoy:

We debited the account and started to pay him. $5000 back due. We opened an account for him and his wife in Monte Carlo. He would draw maybe a couple of thousand dollars as he wanted in expenses. The balance he would send to Monte Carlo. The account he opened later in 1986. The money came from BCCI Paris. We started building up a relationship. By the way, BCCI London had 10m in investment funds of African development bank, this was kept by Investment and finance section for investments in stocks and bonds and this was controlled by Iqbal Rizvi directly with African Development Bank. At this stage, there was rivalry between me and general manager. He wanted ADB under his wing and I wanted to push for Paris. I started building up a relationship but he wouldn't allow me to attend the ADB conference and he didn't take anyone from France in 1986 for meeting in Zimbabwe. Gradually, we started acting in parallel rather than in coordination. Deposits went up to $35 million, $45 million in dollar terms.[150]

Chinoy and BCCI intensified their marketing campaign to the African Development Bank and became friendly with its president, eventually obtaining the bank's entire French franc account, amounting to 200 million or more francs -- some $35 million dollars. According to Chinoy:

We continued the payment to the Treasurer. But I told him no more than $50,000 a year. Which he made in 1987-88.[151]

**Conclusion**

The above account of corruption involving officials of fifteen countries outlines typical methods by which BCCI acquired and maintained accounts and relationships with governments and government officials around the world. While lengthy, it is by no means complete and the size of the iceberg below remains difficult to measure. The above account should be enough, however, to demonstrate the fundamentally corrupt nature of BCCI's relationships with the politically prominent, and its strategy of corrupting those in or with access to government, for its own purposes.

The pervasiveness of BCCI's corruption of officials in so many countries also raises larger questions about the persistence of corruption as a way of doing business generally, around the world. BCCI officials contend that its practices were typical of those engaged in by other banks, including U.S. banks, doing business in developing countries. For example, if true, this would suggest that international lending institutions financed by the U.S. taxpayers, such as the IMF and World Bank, are routinely being defrauded by collusion between the governments of those countries and unethical banks that see the opportunity to make profits through helping such governments defraud those institutions.

BCCI officials further suggested that U.S. and European businesses that are successful in many of the countries in which BCCI was doing business, especially in Africa, can be so only to the extent that they themselves meet local standards and participate in the endemic corruption. Such participation by U.S. entities is, of course, prohibited by the Foreign Corrupt Practices Act. The testimony in staff interviews by BCCI officials raises the question of whether violations of that act may be substantially greater in number has been recognized.

Finally, the information concerning BCCI's corruption of officials around the world illustrates the public policy interest to lift the veil of secrecy regarding financial information that still obtains in too many jurisdictions. Strong bank secrecy and confidential laws were essential to BCCI preventing the detection of its criminality and its corruption of public officials. In case after case, BCCI shifted funds to bank secrecy havens in order to protect its payoffs from exposure. Moreover, secrecy laws have to this day impeded the ability of the Subcommittee to detail numerous further cases of such corruption that clearly exist. For example, documents subpoenaed in the United States by the Senate, and in the possession and control of BCCI's liquidators in the United Kingdom, have been withheld from the Subcommittee by the British courts on the basis of British secrecy laws. Little progress can be made in combatting corruption so long as many jurisdictions continue to promote numbered accounts and secrecy to flight capital and dirty money. The United States needs to take a fundamentally more active and aggressive role in changing the attitudes of many foreign governments on this issue.

1. Agence France Presse, July 12, 1991.

REENTERED AS EXHIBIT 3

2. Indictment, People v. Abedi, et. al, Supreme Court of the State of New York County of New York, July 29, 1992.

3. S. Hrg. 102-350 Pt. 2 pp. 507-508.

4. Staff interview, Sakhia, October 7, 1991.

5. S. Hrg. 102-350 Pt. 2 p. 515.

6. Staff interview, Chinoy, March 9, 1992.

7. See Bankrupt: The BCCI Fraud, Kochan and Whittingon, Gollancz, London 1991, pp. 61-62.

8. Sakhia, S. Hrg. 102-350 Pt. 2 p. 508.

9. See reference to November 5, 1986 letter in minutes of Evidence Taken Before House of Commons Treasury and Civil Service Committee, Banking Supervision and BCCI, February 5, 1992, Sec. 252.

10. BCCI -- Consolidated Report, EWP, Loans Over $7.5 million, March 31, 1991.

11. s. Hrg. 102-350 Pt. 1 p. 288.

12. Staff interview, Helmy, January 12, 1992.

13. Staff interview, Akbar Bilgrami, July 20-28, 1992.

14. Staff interview, Chinoy, March 9, 1992.

15. S. Hrg. 102-350 t. 2 p. 528.

16. See documents published in S. Hrg. 102-350 Pt. 6.

17. BCCI-FinAmerica-Gotelli documents, provided to Senate by BCCI liquidators, July, 1992.

18. Id.

19. People v. Abedi, Supreme Court of the State of New York, County of New York, July 29, 1992, p. 23.

20. Letter, to Dr. Juan Sommer, February 4, 1988.

21. See Los Angeles Times, May 8, 1991, "Encino Bank Ordered Sold."

22. UPI, July 30,1 991, "Argentine Central Bank revokes BCCI license."

23. Reuters, August 1, 1991, "Argentina Had No Funds in BCCI; Minister Angry at Media," Washington Post, August 24, 1991, "BCCI Trail in Argentina Remains Untraced."

24. Associated Press, August 1, 1991, "BCCI in Argentina -- Political Headaches, But Little Economic Impact."

25. Associated Press, July 31, 1991, "Court Probes Alleged Money Laundering by Foreign Banks."

26. S. Hrg. 102-350 Pt. 1 p. 127.

27. S. Hrg. 102-350 Pt. 1 p. 159.

28. S. Hrg. 102-350 Pt. 1 p. 243.

29. See e.g. Los Angeles Times, November 2, 1991, id.; Newsday, August 13, 1991, "Ex-Bangladesh Ruler Linked to BCCI;" Daily Telegraph, August 13, 1991, "Bank Linked to Missing Bangladesh Disaster Aid."

30. S. Hrg. 102-350 Pt. 2 p. 515.

31. Mark Fineman, Los Angeles Times, "BCCI Left its Mark on Bangladesh, November 2, 1991.

32. Id.

33. Los Angeles Times, id.

34. Id.

35. See Daily Telegraph, "BCCI Scandal: Bank Linked To Missing Bangladesh Disaster Aid," August 13, 1991.

36. See Agence France Presse, "Bangladesh Appeals to Canada to Unfreeze Some BCCI Accounts," July 26, 1991.

37. Mark Fineman, Los Angeles Times, "BCCI Left its Mark on Bangladesh, November 2, 1991.

38. Memorandum from Brian Jensen to Agha Hasan Abedi, January 30, 1986, Senate document 001546.

39. Banking Venture in Brasil - Aide Memoire, Jensen to Saddiki at BCCI-London, February 24, 1986, Senate document 001545.

REENTERED AS EXHIBIT 3

40. Staff interview, Abol Helmy, January 12, 1992 and BCCI documents pertaining to Brazil, produced by BCCI liquidators and from BCCI document repository in Miami.

41. Id.

42. Memorandum/telex, Sakhia to Siddiki, May 6, 1986, Senate document.

43. BCCI internal memorandum, Helmy to Ameer Saddiki, September 2, 1986, Senate document 000653.

44. Staff interview, Abol Helmy, January 12, 1992.

45. Telex, Shafi to da Costa, October 28, 1986, BCCI Senate Document 000645.

46. BCCI Luxembourg Letter of Appointment, Ameer H. Siddiki to Ambassador Correa da Costa, October 28, 1986, Senate document.

47. Staff interview, Abdur Sakhia, October, 1991; see also BCCI telex concerning Da Costa, October 28, 1986, id..

48. Staff interview, Nazir Chinoy, March 9, 1992; see indictment, People v. Abedi, New York Supreme Court, July 29, 1992, p. 24.

49. Staff interviews, Chinoy, id. See also People v. Abedi, New York County, indictment, July 29, 1991, id. p. 23.

50. Staff interview, Chinoy, March 9, 1992.

51. See testimony of Alan Kreczko, Deputy Legal Advisor, Department of State, S. Hrg. 102-350 Pt. 3 pp. 575-578.

52. See Price Waterhouse Section 41 Report to the Bank of England, June 1991.

53. Commentary, Massihur Rahman, to Price Waterhouse Section 41 Report to the Bank of England, June 1991.

54. Sakhia testimony, S. Hrg. 102-350 Pt. 2 p. 526.

55. Staff interview, Sakhia, October 7, 1991.

56. Staff interviews, Bilgrami, July 20-28, 1992.

57. Staff interview, Bilgrami, July 20-28, 1992.

58. Staff interview, Chinoy, March 9, 1992.

59. Staff interview, Chinoy, March 9, 1992.

60. Staff interview, Chinoy, March 9, 1992.

61. Id.

62. Staff interview, Sakhia, October 7, 1991.

63. Staff interview, Sakhia, October 7, 1991.

64. Sakhia, S. Hrg. 102-350 Pt. 2 . 508.

65. Id.

66. Price Waterhouse audit report, December 31, 1990.

67. S. Hrg. 102-350 Pt. 1 p. 63.

68. S. Hrg. 102-350 Pt. 2 p. 515.

69. Staff interview, Nazir Chinoy, March 9, 1991, see also Chinoy testimony S. Hrg. 102-350 Pt. 4 p. 829.

70. Staff interview, March 9, 1991.

71. Staff interview, March 9, 1992.

72. Staff interview, Chinoy, March 9, 1992.

73. Id.

74. Id.

75. Staff interview, March 9, 1992.

76. Staff interview, Chinoy, March 9, 1992.

77. Staff interview, Chinoy, March 9, 1992.

78. Staff interview, Chinoy, March 9, 1992.

79. Staff interview, Chinoy, March 9, 1992.

80. Staff interview, Chinoy, id.

REENTERED AS EXHIBIT 3

81. Staff interview, Chinoy, id.

82. <u>People v. Abedi</u>, July 29, 1992, New York County Supreme Court, p. 20-21.

83. Staff interview, Chinoy, id.

84. Chinoy staff interview, id.

85. Testimony of Rahman, S. Hrg. 102-350 Pt. 1, p. 540.

86. White Paper on the General Elections, Government of Pakistan, July 1978, S. Hrg. 102-350, Pt. 3, pp. 314-317.

87. Former BCCI Pakistan branch chief Nazir Chinoy provided detailed information about the Zia-Abedi relationship in a series of interviews with Senate staff from March 9-16, 1992; see also check to General Zia from BCCI-UAE, May 25, 1985, S. Hrg. 102-350, Pt. 2 p. 511.

88. S. Hrg. 102-350 Pt. 2 p. 510.

89. Staff interview, Chinoy, March 9, 1992.

90. Staff interview, Chinoy, March 9, 1992.

91. Chinoy testimony S. Hrg. 102-350 Pt. 4 pp. 368-369.

92. See <u>People v. Abedi</u>, New York Supreme Court, County of New York, July 29, 1992.

93. Staff interview, Sakhia, October 7, 1991.

94. S. Hrg. 102-350 Pt. 3 p. 599.

95. S. Hrg. 102-350 Pt. 4 pp. 392-393.

96. Los Angeles Times, August 9, 1991.

97. Staff interview, Sultan Khan, March, 1991.

98. Staff interview, Colombian marijuana trafficker and federal cooperating witness, September, 1989.

99. Id; the trafficker provided copies of the original letters to the Subcommittee in 1989, signed by the Attorney General of Panama.

100. Milian-Rodriguez letter to Senator Kerry, August, 1991.

101. Letters, Lino Linares, Miami branch, BCCI to Holland and Knight and to Raymond Banoun, July and August, 1990, and January 1991. Details on this interaction are set forth in the chapter on BCCI's lawyers.

102. Staff interviews, Akbar Bilgrami and Amjad Awan, July, 1992.

103. Staff interview, Chinoy, March 9, 1992.

104. Awan testimony, S. Hrg. 102-350 Pt. 6; see also Blum memorandum of Awan interview, Pt 1 pp. 17-22.

105. Id.

106. Id., see also Affidavit of Amjad Awan, Government Exhibit O, <u>U.S. v. Noriega</u>, Southern District of Florida.

107. Id.

108. Staff interviews, BCCI attorney Raymond Banoun, May-July 1990; see also Banoun notes produced to Subcommittee September 3, 1992.

109. Id.

110. An understanding of the nature and composition of the BCRP is important to the discussion which follows. Del Castillo testified that the Peruvian constitution designates the BCRP as "an autonomous body . . . not depend[ent] upon the executive branch." S. Hrg. 102-350 Pt. 1 p. 233. However, Cateriano testified that its directors are partisan politicians "named by the President and . . . by the Senate." at 199. Thus, the BCRP should not be considered an autonomous body free from political pressure or private influence.

111. S. Hrg. 102-350 Pt 1 p. 167.

112. S. Hrg. 102-350 Pt. 1 p. 166.

113. at 232.

114. S. Hrg. 102-350 Pt. 1 p. 232.

115. See <u>People v. BCCI</u>, New York Supreme Court, July 29, 1991.

REENTERED AS EXHIBIT 3

116. Letter from A.M. Bilgrami and Ishtiaq Nasim to the BCRP, dated 28 April 1986 ("[T]his is to advise you that in consideration of your placing U.S. $200 [million] [sic] deposits with our Panama Office, we are placing at your disposal a line of [sic] credit for $ U.S. 60 [million]. It is our mutual understanding that you will continue to maintain equivalent sufficient balances in your Placement Account.").

117. Staff interview, Akbar Bilgrami, July 1992.

118. At an interest rate of 5% per year, for example, BCCI would save $7,200,000 per year in fees.

119. "Agreement on operational procedure between BCR and BCCI regarding utilization of credit line for US $60 millions by Peruvian local banks (PLBs)," dated May 30, 1986.

120. S. Hrg. 102-350 Pt. 1 p. 167.

121. Staff interviews, Akbar Bilgrami, July 20-28, 1992; see also indictments People vs. BCCI, July 29, 1991 and People vs. Abedi, July 29, 1992, brought by New York District Attorney.

122. People v. Abedi, et. al, New York County Supreme Court, July 29, 1992.

123. Staff interviews, Bilgrami, July 20-28, 1992.

124. Staff interview, Abdur Sakhia, October 9, 1991.

125. Staff interviews, Akbar Bilgrami, July 20-28, 1992; documents reprinted in S. Hrg. 102-350 pp. 202, 206-207.

126. S. Hrg. 102-350 Pt. 1 p. 165.

127. S. Hrg. 102-350 Pt. 1 p. 166.

128. 196-197. Compare the 8 July 1987 memorandum from Carlos Saito to Ana Ma. de Reategui (both of the BCRP) entitled "Evolution of BCRP deposits abroad" ("At the end of June 1986 work was already underway with seven banks" . . . . "The last bank with which correspondent relations were established was . . . BCCI.").

129. See the Evolution of BCRP deposits abroad, hearing book at 176.

130. S. Hrg. 102-350 PT. 1 p. 170.

131. S. Hrg. 102-350 Pt. 1 p. 206.

132. Id.

133. S. Hrg. 102-350 Pt. 1 p. 167.

134. See the Evolution of BCRP deposits abroad, at 175 ("[I]t was decided to open special accounts in the market in Panama, which have maximum security.").

135. S. Hrg. 102-350 Pt. 1 p. 173, "Central Reserve Bank of Peru, Memorandum to Juan Villanueva from Gonzalo Aramburu, August 7, 1987.

136. Id.

137. S. Hrg. 102-350 Pt. 1 p. 199.

138. Id.

139. S. Hrg. 102-350 Pt. 1 p. 233.

140. Staff interviews, Akbar Bilgrami, July 20-28, 1992.

141. Reuters, September 22, 1992, "Attorney General To Seek Extradition of Ex-President Garcia."

142. People v. Abedi, Supreme Court of the State of New York, County of New York, July 29, 1992.

143. Staff interview, Bilgrami, July 20-28, 1992; Bilgrami testimony, S. Hrg. 102-350 Pt. 6.

144. People v. Abedi, Supreme Court of the State of New York, County of New York, July 29, 1992, p. 18.

145. Staff interview, Chinoy, March 9, 1992.

146. Staff interview, Chinoy, March 9, 1992.

147. Staff interview, Bilgrami, July 20-28, 1992.

148. S. Hrg. 102-350 Pt. 2 p. 515.

149. Staff interview, Chinoy, March 9, 1992.

150. Chinoy, id.

151. Id.

# BCCI IN THE UNITED STATES: PART I

**INITIAL ENTRY AND FGB AND NBG TAKEOVERS**

### Introduction

BCCI's entry into the United States was inevitable, given Abedi's desire to make BCCI into a global bank, and the size and importance of the United States financial and banking markets. Since BCCI was undercapitalized from its inception, its success required constant growth as a means of filling the ever-increasing hole created by its lack of capital and its operational losses. Securing a base in the United States was intended by Abedi from the beginning as a means of obtaining new opportunities for growth. The United States was one of the largest money havens for flight capital. It was also unique among banking systems in insuring deposits at a very substantial level for FDIC member banks. FDIC insurance made deposits in U.S. banks more secure than deposits anywhere else in the world. As a foreign bank, BCCI could not legally accept deposits from U.S. citizens, or itself become an FDIC member bank. But if BCCI could find a way to enter the FDIC system, it would be able to offer a whole new, and highly valued, service to its customers -- U.S. government guaranteed deposit insurance. Abedi decided that he would first acquire legitimate banks in the United States for BCCI, and then determine later how to merge BCCI into them.

BCCI's initial strategy for the United States was to infiltrate the U.S. banking system through purchasing beachhead banks in major banking centers, and then to expand the beachhead operations until BCCI had U.S. banking operations of sufficient size that they could ultimately merge with BCCI itself. Later, after state regulators in New York had proven resistent to BCCI, and BCCI had successfully acquired National Bank of Georgia and FGB/First American, this strategy was modified. BCCI expanded in the United States by opening BCCI branch offices in regions with significant populations from the Third World engaged in trans-national commercial activity, such as Miami, Houston, Los Angeles, San Francisco, New York, and Chicago. BCCI's intention was to use these branch offices to feed depositors and banking activity to NBG and First American, expanding BCCI's activities through pushing deposits into the federal deposit insurance system. BCCI then formed an additional beachhead

institution in California in 1985 through a nominee. By then, Abedi had decided that he would work systematically to integrate the various U.S. banks BCCI now secretly owned, until the survivor was strong enough and large enough to in turn purchase BCCI.[1]

BCCI had significant difficulties implementing this strategy due to regulatory barriers in the United States designed to insure accountability. These barriers included:

** a strong bias against any bank, such as BCCI, which did not have a primary regulator with the responsibility for conducting oversight on a consolidated basis of the foreign bank.

** requirement for certified financial statements from would-be foreign shareholders seeking to acquire a U.S. target.

** reporting requirements in take-over attempts of federally chartered banks, subjecting any shareholders seeking to acquire a bank to the diverse disclosure rules of the Securities and Exchange Commission (SEC).

** prohibitions on the ability of a bank holding company, such as Bank of America of California, which still had a 28 percent interest in BCCI, from purchasing banks in other states, directly or indirectly.

** limitations against interstate banking and branching, which slowed the ability of BCCI's flag-ship U.S. bank, First American, to purchase the National Bank of Georgia, and prevented First American from integrating with any bank in California, such as the Independence Bank, as desired by BCCI.

However, while these barriers did delay BCCI's purchases of banks in the United States, and the integration of its U.S. empire, they failed to stop the purchases. In the end, BCCI was successful in acquiring four banks, operating in seven states and the District of Colombia, with no jurisdiction successfully preventing BCCI from infiltrating it. The techniques used by BCCI in the United States had been previously perfected by BCCI, and were used in BCCI's acquisitions of banks in a number of Third World countries and in Europe. These included purchasing banks through nominees, and arranging to have its activities shielded by prestigious lawyers, accountants, and public relations firms on the one hand, and politically-well connected agents on the other. These techniques were essential to BCCI's success in the United States, because without them, BCCI would have been stopped by regulators from gaining an interest in any U.S. bank. As it was, regulatory suspicion towards BCCI required the bank to deceive regulators in collusion with nominees including the heads of state of several foreign emirates, key political and intelligence figures from the Middle East, and entities controlled by the most important bank and banker in the Middle East.

Equally important to BCCI's successful secret acquisitions of U.S. banks in the face of regulatory suspicion was its aggressive use of a series of prominent Americans, beginning with Bert Lance, and continuing with former Defense Secretary Clark Clifford, former U.S. Senator Stuart Symington, well-connected former federal bank regulators, and former and current local, state and federal legislators. Wittingly or not, these individuals provided essential assistance to BCCI through lending their names and their reputations to BCCI at critical moments. Thus, it was not merely BCCI's deceptions that permitted it to infiltrate the United

REENTERED AS EXHIBIT 3

States and its banking system. Also essential were BCCI's use of political influence peddling and the revolving door in Washington.

**Decision to Enter U.S.**

By 1976, it had become clear to both BCCI and its U.S. partner, Bank of America, that their relationship was causing problems for both parties and might not long survive. Moreover, BCCI's top officials, especially Abedi, had come to believe that entry into the U.S. market in a manner that BCCI could control was critical. Since its creation, BCCI had been a bank whose deposits and activities were denominated in dollars. Its settlements with other banks were carried out in dollars. There were numerous inconveniences associated with BCCI's inability to conduct business in the U.S. itself, and its forced reliance on western banks like Bank of America to act as its correspondent banks for all dealings with the U.S. Moreover, given the hostile attitude of regulators in the United Kingdom, BCCI had to make sure it was not fenced out of expansion in the industrialized countries. If the Bank of England ever acted against it, and BCCI had no alternative site in a major western financial center, it might be destroyed.[2] Additionally, the U.S. was home to numerous "high net worth" individuals from Third World countries, who could be induced to bank at BCCI. Unlike many countries, the U.S. had no restrictions on the movement of capital in and out of its borders, making it an attractive place to park BCCI's real financial assets. Finally, both Abedi and his key financial backer, Sheikh Zayed of Abu Dhabi, may have had political motives to strengthen their position in the U.S.

According to T. Bertram Lance, BCCI's initial partner in its most important acquisitions in the United States, both Sheikh Zayed and Abedi felt that BCCI could become a critical element in strengthening ties between the United States and their constituencies. As Lance described a meeting between him, Sheikh Zayed and Abedi in Islamabad, Pakistan in late 1977:

Abedi was concerned about the shifting tides towards the Soviets in Afghanistan, Iran, India and the Mideast. Both Abedi and Zayed each expressed their concerns about the Arab worlds lack of ties to the US. They wanted to do something about it.[3]

Friends of Lance told journalists at the time gaining access to President Carter and the White House was one of the explicit goals of doing business with Lance and one of the reasons the "Arabs" were interested in having Lance represent them and in buying his interest in the National Bank of Georgia.

An Atlanta source close to the negotiations says the Arabs see Lance as giving them access to the administration. Though a private citizen, Lance is a regular visitor at the White House and is the chairman of a $500-to-$1000-a-plate fund-raiser for President Carter scheduled for January in Atlanta.

"Under normal circumstances," says this source, "NBG would be the last bank anyone would be interested in. But the investors see this as an opportunity to do a favor for someone close to the President."[4]

**Initial Attempts to Enter U.S.**

BCCI's initial attempt to obtain a bank in the United States was notably unsuccessful. Initially, BCCI decided it would begin with a small acquisition, that of the Chelsea Bank, a national bank with a state-chartered holding company in New York. In order to keep the transaction low-key, BCCI decided to proceed through a nominee, a member of the Gokal family, whose shipping empire could be characterized as much BCCI affiliate as BCCI customer. Unfortunately, the nominee chosen had few resources of his own, and was a transparent alter ego for BCCI, prompting the very regulatory scrutiny in New York that BCCI had sought to avoid. As recounted by former Comptroller of the Currency John Heimann:

My first supervisory contact with BCCI occurred when I was New York Banking Superintendent. New York law requires the Superintended to approve the change of control of a New York chartered bank. . . A young Pakistani national was the proposed purchaser. His uncertified financial statement showed total assets of $4.5 million, of which $3 million was in the form of a loan from his sister. His reported annual income for the prior year was, as I recall, approximately $34,000. Since he was not an experienced banker . . . and since BCCI was his primary banking relationship, he indicated that he would be relying upon that institution for advice and counsel.

Since he was relying upon BCCI to meet his qualifications of experience, we sought to determine what we could about that organization.[5]

Heimann determined that BCCI had no central regulator, which meant that there was no banking authority anywhere with the right to review and the responsibility to oversee all of BCCI's activities. BCCI also had divided its operations between two auditors, and thus had no consolidated financial report, so it was impossible for Heimann to be certain he could identify and understand BCCI's actual financial condition. According, Heimann put a hold on the application. BCCI identified a second bank in New York, and a second nominee, and made a second application, with the same result. Finally, Abedi decided to approach Heimann directly.

On each occasion, the subject of the meeting . . . concerned itself with BCCI's apparent desire to enter the United States. In each instance, Mr. Abedi attempted to convince us of the secure nature and correct operations of BCCI, its financial strength, etc. On each of these occasions, I expressed my concern that BCCI did not have a primary regulator, and that, until it did, my office was reluctant to permit entry into the US.[6]

Abedi had by now tried the back door into the United States twice and been rejected, and the front door once, with the same result. New York, the most important U.S. banking market for BCCI, would be closed to BCCI so long as Heimann was its chief regulator.

Soon thereafter, however, Jimmy Carter was elected President, and Heimann was appointed to become Comptroller of the Currency, responsible for supervising national banks, and in a position to opine on nearly any attempted purchase by BCCI in the United States. At the same time, Carter appointed as his new director of the Office of Management and Budget, T. Bertram Lance, head of the National Bank of Georgia (NBG), which Lance had purchased in 1975 from the Financial General Bankshares (FGB) group, a bank holding company headquartered in metropolitan Washington. BCCI alone might not be able to circumvent Heimann. Abedi knew that in such circumstances, the only way to proceed was through going over a bureaucrat's head through making use of one's political ties. In 1975, Abedi had few

such ties in the United States. In 1977, however, Abedi was introduced to Bert Lance, and BCCI's previous failures in trying to penetrate the U.S. banking system were replaced with success.

**History of Financial General Bankshares**

In 1910, a socialist visionary named Arthur J. Morris decided to find a means of providing credit to small wage earners and consumers through creating a kind of cooperative banking system later to be known as the "Morris Plan."

Under the Morris Plan, wage earners depositing their paychecks in a cooperative fashion into Morris' institutions became entitled to receive small loans back in return. The concept was successful, and lead to Morris building consumer banks that by the 1940's extended to Florida, Georgia, Maryland, New York Tennessee, Virginia, and the District of Colombia. All of these lending institutions were under the control of another entity, incorporated in 1925, called Financial General Bankshares ("FGB"). Eventually, these banks converted to and merged with conventional banks, and expanded their services to cover insurance, venture capital, mortgage banking and industrial operations.[7]

In 1955, FGB came under the control of retired Army General George Olmstead. By then, the FGB franchise was one of a small number of banks that had been grandfathered to permit interstate banking, generally prohibited by the McFadden Act. The Federal Reserve grandfathering also permitted Financial General's ownership by another corporate entity of Olmstead's, International Bank ("IB"), despite the fact that IB also had several non-banking subsidiaries.[8]

FGB's unique market position attracted criticism from other banks and by 1966, the Federal Reserve decided that FGB was a holding company subject to its regulation, and that International Bank could not retain FGB. General Olmstead was forced by the Federal Reserve to sell out his interests in FGB on or before 1978.[9]

General Olmstead decided to retire as soon as he could sell FGB, and began looking for buyers. Bank stocks were not in favor with investors at the time. Olmstead was initially unable to find anyone who would buy the entire franchise. But in June 1975, he was able to sell FGB's Georgia operation, the National Bank of Georgia, to Georgia banker Bert Lance.

**Bert Lance**

By September 21, 1977, when Bert Lance tendered his resignation from the position of director of the Office of Management and Budget (OMB) to President Jimmy Carter, Lance had become the most notorious banker in the United States.

Prior to coming to Washington, Lance's entire career had been in banking in Georgia, starting in 1951 with his work as a teller at the Calhoun National Bank, a bank owned by the grandfather of his wife, Labelle. Lance had stayed with the Calhoun Bank and eventually become its president. He began to support Jimmy Carter in his political activities in 1966, when Carter first ran for governor and lost, and again in 1970, when Carter ran for governor and won. In 1974, at the end of Carter's term, Lance himself ran for governor and lost, before

REENTERED AS EXHIBIT 3

emerging as Carter's most important fund-raiser and political advisor in his successful race for President in 1976.

Lance had become president of National Bank of Georgia in January 1975, and quickly come into conflict with Financial General's headquarters in Washington for making loans which both exceeded his lending limit and were not secured by collateral. FGB's chairman, William J. Schuiling, was sufficiently disturbed by Lance's practices that he intended to force a show-down with Lance. But by June, 1975, Lance instead offered to buy FGB's controlling interest in National Bank of Georgia for $7.8 million.[10]

When Olmstead needed to sell the rest of FGB in 1976, he turned first to Lance. At the time, Lance was working to elect Jimmy Carter president. Anxious to join the Administration, rather than to remain in banking, he turned Olmstead down.[11]

Lance was formally precluded from engaging in financial transactions while director of OMB. However, according to later SEC charges, Lance continued to meet with General Olmstead regarding the sale of FGB, and put Olmstead in touch with William G. Middendorf, a former secretary of the Navy who ultimately decided to take over FGB. Lance met with both Olmstead and Middendorf at the Washington Metropolitan Club about the proposed sale while director of OMB.[12]. As of April 1977, Middendorf and a group of twenty investors purchased Olmstead's interests in FGB, and Middendorf was installed as the chairman of the bank. But the takeover group, including former ambassador to Iran Joseph Farland, Arkansas banker Jackson Stephens, and Occidental Petroleum chairman Armand Hammer, swiftly began to disintegrate. By November, 1977 the shareholders had split, with Stephens heading a group opposed to Middendorf -- even as the Federal Reserve ordered Olmstead and his group to end their dual relationship to both International Bank and FGB by January 31, 1978.[13]

It was precisely at this point that FGB, Bert Lance, and BCCI came together to bring about BCCI's secret purchase of a $2 billion bank in the nation's capitol.

Lance's problems had begun on July 11, 1977, when President Carter asked the Congress to suspend ethics rules that would have forced Lance to sell 190,000 shares of stock he owned in National Bank of Georgia. He based his request on the ground that Lance would lose $1.6 million if he was forced to sell, because the bank's stock was depressed. Weeks of bad publicity followed, as well as an investigation by the Office of the Comptroller of Lance's Georgia banks which found "unsafe and unsound" banking practices at NBG and the other banks, but no criminal behavior by Lance.

Following Congressional hearings in which he was represented by Clark Clifford and Robert Altman on September 8-14, 1977, Lance resigned from OMB and found himself in terribly difficult circumstances. Not only was he exiled from President Carter's Administration, but his greatest asset -- his network and experiences as a banker in Georgia -- had been turned into an apparent liability. Also, Lance was still deeply in debt as a result of his borrowing $3.4 million to purchase NBG just two years earlier, and had no ready buyer for his interest in the National Bank of Georgia, his principal asset, given the fall in the price of its stock. Moreover, as Lance's practices at NBG had received a vast amount of negative national publicity, the value of the franchise itself was potentially permanently impaired.

REENTERED AS EXHIBIT 3

Lance's and NBG's perilous position, coinciding with FGB's perilous position, provided a unique opportunity for Agha Hasan Abedi and BCCI to exploit.

The marriage between Lance and BCCI in 1977 was one not merely of convenience, but necessity. At the time, BCCI had already attempted to enter the United States market and failed; and Lance was facing indictment, deeply in debt, and had literally no other place to turn. Moreover, Abedi and Lance shared some characteristics in common. Both Abedi and Lance were entrepreneurial financiers who liked to operate at the border of legal restrictions, in disregard of customary and usual banking practices. Both had reached high positions in their home countries through providing financial and other backing to political figures in their home countries -- Abedi to a succession of Pakistani prime ministers, Lance to Jimmy Carter. And both had come to a point in their respective careers where their entrepreneurial spirit had been stymied by their respective establishments. They both needed to create new opportunities to escape their difficulties. Without Abedi, Lance was only a few steps away from bankruptcy. Without Lance, Abedi lacked any clear means of entering the United States. Together, they were able to make Lance wealthy, and to gain for BCCI secret entry to several of the most important financial and banking markets in the United States.

During the process, both BCCI and Lance -- each notorious within banking circles -- drew the persistent scrutiny of bank regulators, federal investigators, and journalists alike. Both experienced the most bitterly contested bank take-over in U.S. history in connection with the Financial General Bankshares' takeover litigation. In the face of this unusual regulatory scrutiny and public attention, BCCI was still ultimately able not merely to enter the U.S. market, but to acquire the most important bank in metropolitan Washington. This advantageous market entry would ultimately result in BCCI owning a network of U.S. banks extending coast to coast through seven states and the District of Colombia.

### BCCI's Targeting of National Bank of Georgia

### And Financial General Bankshares

As in most areas concerning BCCI, there is more than one, mutually inconsistent, account of how BCCI and Bert Lance came together, and of how BCCI came to target Financial General Bankshares (FGB) for takeover.

The first account, as testified to by Lance himself, suggests that a former Georgia state Senator named Eugene Holly had developed a relationship with Abedi and BCCI and wanted Lance to meet Abedi to see if they could help one another. By this account, Lance went to New York in October 1977, met Senator Holly there, was joined by Abedi and his number two at BCCI, Swaleh Naqvi. Lance was told that BCCI had developed a unique approach of economic development for the Third World which it wanted to expand in the United States. As Lance testified:

Basically, Mr. Abedi said to me: I am building a bank headquartered in London that has a deep and abiding interest in the problems of health, hunger, economic development. . . I shared that concern, especially about economic development, because I had come from a poor section of Georgia.[14]

REENTERED AS EXHIBIT 3

After discussing economic development issues, Lance and Abedi got down to basics: BCCI was looking to expand into the United States, and wanted Lance's help. As Lance testified, Abedi understood that Lance might need to know more about BCCI -- the last thing either Abedi or Lance would wish to do was further embarrass the President of the United States. Accordingly, Abedi would leave Lance with BCCI's annual reports, and Lance could get back to him as to whether Lance could help. According to Lance, he then turned to Clark Clifford, who had represented him in Congressional hearings into Lance's activities in Georgia, and asked Clifford to do due diligence on BCCI. When Clifford called Lance back to tell Lance that Abedi was "a man of integrity and character," Lance agreed to meet with Abedi and Naqvi in London, and there became BCCI's agent for its forays into the U.S.[15] Thus, by Lance's account, Clifford first had contact with BCCI on behalf of Lance in October, 1977.

According to Lance, while in London on October 15, 1977, he learned that Abedi had already targeted the Bank of Commerce in New York for possible purchase by BCCI. Lance told Abedi that FGB was a much better prospective purchase for BCCI, because it "enjoyed a very unique position in American banking at that point in time in the sense that it was one of the two or three, maybe four, multistate holding companies that were in existence in the United States."[16]

Lance testified that while he had read other accounts of how BCCI became interested in FGB, it was his belief that he brought FGB to Abedi's attention, not anyone else.[17]

Lance also testified that in London, he also piqued Abedi's interest in purchasing National Bank of Georgia from Lance -- on behalf of Abedi's investor clients, not BCCI, and that Abedi soon advised him that Ghaith Pharaon might be interested. As a result, Abedi arranged to have the Pharaon purchase of National Bank of Georgia proceed on one track, while Abedi arranged for the other Middle Eastern "investors" to work on the FGB takeover on a second track.[18]

### Jackson Stephens: BCCI's Principal U.S. Broker?

A second, and inconsistent, account of BCCI's initial entry into the U.S. was provided to the Washington Post in 1978 by participants in the FGB takeover battle, and later reiterated in filings with the Federal Reserve by Lance and BCCI attorney Robert Altman. By this account, the initial contact between BCCI and FGB came from Arkansas multi-millionaire and FGB shareholder Jackson Stephens.

At the time, Stephens was both a close friend of Lance's, and a longtime activist in Democratic political circles. Stephens had been instrumental in fundraising efforts for President Jimmy Carter, who had been his classmate at the U.S. Naval Academy in Annapolis. Moreover, Stephens retained a financial interest in National Bank of Georgia after Lance purchased it from FGB.[19]

According to the Post account, by the time of Lance's resignation, Stephens had already begun to broker the sale of National Bank of Georgia to "a client of BCCI" -- BCCI front-man Ghaith Pharaon -- as a means of assisting Lance. Stephens then went to BCCI and Abedi to see if BCCI might be interested in acquiring the metropolitan Washington FGB franchise directly. As the Post wrote:

REENTERED AS EXHIBIT 3

A BCCI executive said the Arabs weren't interested in FGB, but the subject came up again on Nov. 26 when Stephens and Lance met Abedi in Atlanta for more talks about National Bank of Georgia. Abedi began to sound interested, and Stephens reportedly offered to sell a block of 4.9 percent of FGB and recommended Abedi meet [Eugene Metzger, a dissident shareholder with a significant number of FGB shares] to pursue the matter.[20]

Altman's account to the Federal Reserve removed Lance from the picture even further, contending that Jackson Stephens, not Lance, handled all the negotiations regarding National Bank of Georgia, and first proposed to BCCI the possibility of buying FGB.

As set forth in a May 9, 1978 letter from Altman to the Federal Reserve, Jackson Stephens told a BCCI representative during negotiations over the sale of National Bank of Georgia to Pharaon in November, 1977 that FGB might be available and could be a good investment for other BCCI customers. In late November, Stephens told Abedi that Abedi should meet with FGB investor Eugene Metzger, and designate Metzger and Stephens as agents for these Middle Eastern investors. Neither BCCI nor any of its affiliates provided financing for the purchase of the stocks, although BCCI advanced the funds through the accounts the Middle East investors maintained at BCCI. Some funds were borrowed by one "investor," Fulaij, from the Kuwait International Finance Company ("KIFCO"), which BCCI purportedly had a 49 percent interest in, but actually owned and controlled through its nominee, Faisal al-Fulaij.

### Adham's Account of Origin of FGB Takeover

A fourth account of the genesis of the BCCI's interest in FGB, completely inconsistent with the Lance, Post, and Altman accounts, came from BCCI shareholder and front-man Kamal Adham, who advised the Federal Reserve on April 10, 1991 by letter that an Middle Eastern friend of his, Hasan Yassin, told him that FGB would be a good investment, and Adham as a result brought the prospective investment to BCCI for review as his business agent. Adham did not explain to the Federal Reserve how Yassin had known of FGB's availability, or why Yassin believed Adham might be interested, nor had Lance ever heard of Yassin. Two weeks later, Adham reiterated these statements in formal testimony before the Federal Reserve.[21]

Oddly, given Altman's representation to the Federal Reserve that the Middle Eastern investors became involved as a result of a meeting between Stephens and Abedi, Clifford himself told the Federal Reserve in 1981 that Adham's involvement came "from a friend who was associated with the Saudi Arabian embassy" with "contacts" to Mr. Middendorf. Clifford's reiterated this statement to the Senate on October 24, 1991, testifying that "the man in the Saudi Arabian Embassy looked into [FGB] in more detail and concluded that it might be an attractive acquisition. Apparently, that was one of his functions in the Saudi Arabian Embassy, to pass information of that kind back to Saudi Arabia."[22]

Later, Adham, Clifford, and Altman would seek to resolve the contractions in these accounts in testimony before the Federal Reserve, discussed below.

### The Federal Reserve's Findings

On July 29, 1991, the Federal Reserve issued findings concerning the genesis of the 1977-78 takeover suggesting that in fact, Lance, Stephens and BCCI, working together, had initiated

REENTERED AS EXHIBIT 3

the discussions regarding the BCCI group's purchase of FGB in a meeting on November 7, 1977. According to the Federal Reserve:

At the suggestion of T. Bertram Lance ("Lance"), Abdus Sami ("Sami"), a senior BCCI officer from its inception and a close associate of Abedi, met with Jackson Stephens ("Stephens") to discuss the purchase by a BCCI client of the interest of Lance and others in NBG. . . During the meeting, Stephens, who was dissatisfied with his investment in Financial General, told Sami that Financial General might be a good investment for BCCI clients.[23]

The Federal Reserve findings are indeed the only account that is consistent with the contemporaneous documentary records concerning what took place. These Federal Reserve findings show Lance's testimony to have incorrectly omitted Stephens' key role; Altman's account to have incorrectly omitted the key roles of Lance and of BCCI; and Adham's account, bolstered by Clifford at the Federal Reserve hearing, to be at best, immaterial to the FGB purchase, and at worst, an outright fabrication.

**Ghaith Pharaon and the NBG Takeover**

In both the National Bank of Georgia and Financial General Bankshares takeovers, although BCCI was the real party at interest, it disguised that interest for a number of reasons, including the fact that at the time, Bank of America's 24 percent ownership of BCCI would have made BCCI's purchase of a U.S. bank outside California illegal under any circumstance.

Both purchases began moving on a fast track in November and December, 1977. Although Lance and the others involved took pains to suggest that the two purchases were unrelated, as Lance acknowledged, Lance, Abedi, Clark Clifford, and Robert Altman were central to both of them, and the two transactions took place simultaneously.[24]

For example, while Clifford and Altman have testified that they did not become involved with Lance and the FGB transaction until February, an article in the Washington Post on December, 18, 1977, quotes Altman, as Lance's representative, confirming negotiations among "Middle Eastern financial interests" and Lance concerning Lance's establishment of "a holding company to direct their capital into banks and other U.S. investments."[25]

The article describes Abedi's role as the "matchmaker" for the proposed transactions, and specified that "Lance's attorney, Altman" had announced earlier in December that Lance was negotiating to sell shares of NBG stock for $20 each -- precisely the price paid in early 1978 to Lance by BCCI nominee Ghaith Pharaon.[26]

Of the two transactions, the National Bank of Georgia transaction was far simpler, and consummated with far greater ease. The principal reason for the difference was that the National Bank of Georgia was not a bank holding company, and as a result, was regulated only by the Office of the Comptroller of the Currency, which was more worried about the wretched condition of the bank and its possible failure than about the possibility that its purchaser, Saudi "billionaire" Ghaith Pharaon, might be a front-man for BCCI.

BCCI's relationship with Pharaon went back to the foundation of Pharaon's fortune. Pharaon inherited funds and opportunities, from his father Rashid, who had been a physician for the

founder of Saudi Arabia, Abdul Aziz. His father became close to the King, and was posted abroad as a Saudi Arabian Ambassador to all Europe from 1948 to 1954, during which the younger Pharaon was educated in Paris. Later, Pharaon studied in Lebanon, Syria, and Switzerland. He completed his education in the U.S. at the Colorado School of Mines and Stanford University, where he studied petroleum engineering, and completing it with a Harvard MBA, after which he began referring to himself as "Dr. Pharaon."[27]

While in his twenties in the mid-1960's, Pharaon became friendly with then-Saudi intelligence chief Kamal Adham, who introduced him to Abedi and BCCI. Pharaon and Adham went into business together, building a Hyatt Hotel in Jeddah, Saudi Arabia, financed by BCCI, which in turn generated enough money for Pharaon to found a construction firm, REDEC, whose success formed the basis for Pharaon's reputation as a billionaire. Ultimately, numerous banks financed Pharaon's activities as well as BCCI, and by 1977, Pharaon had already taken short-term passive interests in banks in Texas and Michigan.

**Chronology of the Sale of NBG to Pharaon**

The National Bank of Georgia sale to Pharaon and BCCI began, according to testimony by Bert Lance, through discussions and negotiations between Lance, Abedi and other BCCI officials in Atlanta over Thanksgiving weekend in 1977.[28] It was precisely the same time that Lance, Abedi and BCCI reached agreement on beginning the takeover of Financial General Bankshares as well.[29]

Abedi handled all the negotiations with Lance concerning the purchase of National Bank of Georgia. Although Pharaon was the apparent buyer, Lance never even met him until January 1978, after the negotiations had been completed, the day before the sale of National Bank of Georgia from the Lance group to Pharaon was announced. Ultimately, Lance received $2.4 million for his interest in the bank, twice the previous market value of the shares.[30] In addition, Lance received another $3.5 million from BCCI's Grand Caymans affiliate, ICIC, for acting as BCCI's business agent. Lance used these funds to repay debts to the National Bank of Chicago, and to purchase shares of FGB.[31] The funds provided Lance were originally described as "loans," but BCCI never asked Lance to sign a note or to arrange terms for repayment, and in time, the payment came to be understood as a consulting fee, or retainer.[32]

Unlike the bitterly contested FGB takeover, the sale of National Bank of Georgia from Lance and its other investors proceeded quickly, and reasonably smoothly. The $20 per share tender offer, with a total cost of $21 million for Pharaon at twice the recent market value of the shares, assured little opposition from the shareholders. Moreover, Pharaon's purchase of his stake of NBG shares from Lance was completed by the beginning of January, 1978 -- before the regulators knew of the BCCI group's attempt to take over FGB, and before a federal grand jury in Atlanta began a criminal probe of Lance's banking affairs.

Nevertheless, federal regulators were uneasy about the Pharaon transaction from the beginning because of the involvement of BCCI officials in it. A memorandum to the files from then-Comptroller of the Currency John Heimann on January 4, 1978 articulated the nature of the concerns:

Tomorrow, January 5th, the sale of Lance's stock to Pharaon will be completed at 2 pm. . . Guyton [President of NBG since Lance's departure for OMB] noted he was somewhat disturbed about the role played by the Pakistanis in this transaction. Not that he knew anything negative about them but their role at present or in the future, seemed to be ill defined and caused him some concern. He believes that Lance is presently on the BCCI payroll working with Addabi [sic] and Sami. As a matter of fact, Lance went to London last week and will be back today. The purpose of that trip, presumably, was to discuss further expansion of BCCI in the U.S.[33]

In the conclusion of the memo, Heimann noted that Pharaon and BCCI apparently had plans for acquiring additional U.S. banks. This fact gave Heimann additional cause for concern given his opposition to BCCI's entry into the U.S. in New York two years previously.

Pharaon had told [Guyton, the NBG president] that Pharaon was negotiating for another bank in the United States and would have an announcement to make within 30 days. Guyton also understands that BCCI is looking for another bank in the United States.[34]

There is no evidence that Pharaon was looking at any other U.S. bank at this time, apart from BCCI's still secret interest in FGB. Thus, while Pharaon was ultimately not involved in the 1978 FGB takeover, in retrospect, this reference suggests that Pharaon may have been considering participating with BCCI in its FGB takeover as a nominee for the bank.

Within two weeks, OCC received additional disturbing information. A small aviation company was requesting an unsecured loan for $890,000 from NBG to purchase a Grumman airplane, backed up by a irrevocable letter of credit issued by BCCI, all at Lance's request. The president of the company was Lance's personal pilot, and the loan was being made to purchase a plane to facilitate Lance's business activities for BCCI. The loan was not one that NBG, or any well-run bank would ordinarily make, because the credit was unsecured. However, NBG officers felt they were under pressure from Lance to approve the loan, who was now on BCCI's payroll, receiving "a tremendous salary," an airplane, office space, and secretarial assistance from BCCI. NBG president Guyton told the OCC that BCCI intended to invest for its own account as well as for other investors in the U.S., and Lance was to be its business agent.[35]

OCC officials told Guyton it would be "foolish" to make the loan, and NBG accordingly agreed not to make it. The incident represented precisely the kind of self-dealing that Heimann had already seen in reviewing Lance's finances at part of the inquiry that arose while Lance was director of OMB. When the FGB takeover attempt became public month later, Heimann directed OCC officials in enforcement to determine whether Pharaon, like Gokal before him, was a front for BCCI.

On March 30, 1978, Robert B. Serino, director of Enforcement and Compliance of OCC, met with Pharaon, to find out just what role BCCI and Lance were going to play in Pharaon's NBG. Pharaon assured the OCC that Lance would not be involved further in his bank, and that BCCI would act merely as an advisor, but Serino, in a memorandum to Heimann, was uncertain as to whether to believe him.

REENTERED AS EXHIBIT 3

Pharaon . . . indicated that there never was an understanding or desire on his part to have Lance participate in the management of NBG and this was not to be a term of his purchase. This is contrary to the representations given to us and the SEC by Lance's counsel during the original meetings . . . at that time, they indicated that one of Pharaon's conditions of the purchase would be that Lance would be acting as chief executive officer.

Pharaon indicated that Abedi, in fact, was the one who suggested to him that this would be a good investment and essentially put the deal together for him. He indicated that BCCI was, in fact, one of his financial advisors and that he had hoped to use employees of BCCI (paid by him personally) to review the transactions at NBG periodically to advise him as a controlling shareholder of the condition of the bank in the future. . .

My conclusions from meeting with Pharaon are that he tells a convincing story; however, it appears that he is "beholden" to or at least influenced by Abedi. I believe he could, in fact, be Abedi's alter ego in the United States.[36]

There is no evidence in OCC files to suggest that OCC sought to investigate further its suspicions about Pharaon acting as a front man for BCCI in the purchase of National Bank of Georgia. Instead, the OCC, accompanied by the SEC, filed a joint civil suit against Lance, National Bank of Georgia, and Lance's other bank, the Calhoun bank, charging them with "fraud and deceit" in violating banking and securities laws, and including among the charges allegations that Lance used the banks to personal enrich himself by providing himself with excessive and unsecured loans. All three signed consent decrees, neither admitting nor denying the allegations -- but agreeing not to engage in unsafe and unsound banking practices in the future.

Given OCC's concerns about Lance, there was an obvious tension between trying to protect the National Bank of Georgia from Lance's practices by letting a sale to Pharaon go forward, and with trying to protect the National Bank of Georgia by stopping the sale because of concerns about BCCI. The likely consequence of the latter course of action, however, would be that no one would buy NBG at all and it would be left in Lance's hands. The OCC knew in private what was not known by the public, although it was whispered in banking circles -- that NBG was in financial trouble, and had inadequate capital. Pharaon's tender offer for the shares of the bank would expire on June 20, 1978. If the OCC took any action to delay or prevent that acquisition, NBG might never recover.[37] The OCC gave Pharaon permission to move forward and he concluded his tender offer to purchase a 60 percent interest in NBG on May 30, 1978. OCC thus took the conservative approach of accepting Pharaon's dubious account about his relationship to BCCI, and permitting Pharaon to "rescue" the bank, rather than challenging Pharaon's purchase and placing the bank at immediate risk.

The truth was that Pharaon and BCCI had purchased NBG in a partnership, with BCCI lending Pharaon some of the funds to buy the bank, and agreeing to share the expenses, profits, and losses with Pharaon 50-50. This arrangement was convenient for both Pharaon and BCCI because it permitted them to rearrange the ownership of NBG as needed depending on their respective financial situations.[38] It went undetected until 1991, when the Federal Reserve for the first time investigated the NBG takeover of 1978 and concluded that Pharaon had

https://info.publicintelligence.net/The-BCCI-Affair.htm

borrowed at least part of the funds he used for the acquisition, with BCCI as his partner in the transaction from the beginning.[39]

OCC's decision about NBG was unfortunate. As later bank examination documents demonstrate, NBG remained what OCC termed a "problem" bank for years following its sale to Pharaon, with a substantial number of Lance-related substandard and non-performing loans remaining in its portfolio. A decade later, after its purchase by First American at the behest of BCCI, NBG -- renamed First American Georgia -- remained in "unsatisfactory" condition according to OCC examiners, with serious problems of asset quality, earnings, loan losses, and monitoring system. Moreover, in buying National Bank of Georgia through its nominee, Pharaon, BCCI had succeeded in overcoming the regulators to acquire its first bank in the United States. This lesson would have been especially powerful to Abedi. During this very time, he was in the very midst of high publicized actions in Washington involving many of the same players and where allegations were again being raised about BCCI's possible use of front-men. It was a lesson that with persistence, BCCI would also be able to succeed in deceiving the regulators in its attempt to take over FGB.

### Clifford and Altman and FGB Takeover

By all accounts, Clifford and Altman's introduction to BCCI and FGB came as a consequence of their representation of Lance before Congress beginning on Labor Day weekend in 1977. But the parties involved provide differing accounts of how and when Lance brought Clifford and Altman into his bank deals in the ensuing months.

According to Lance, he first discussed the possibility of Clifford becoming counsel for Abedi and BCCI as early as October, 1977, because Lance "thought that Mr. Clifford ought to be Mr. Abedi's counsel in regard to what he was doing." Lance said that Clifford was already familiar with BCCI at this time, because Clifford had on Lance's behalf "done the due diligence that he reported back to me on from the standpoint of BCCI and Mr. Abedi" before Lance became involved with them in October.[40]

By contrast, Clifford testified that his and Altman's involvement with BCCI began in December 1977 when Lance, as a "former client," brought Abedi in to talk with Clifford for "a social visit." Although the FGB takeover attempt had in fact already begun in November, according to Clifford, there was no discussion at the meeting involving Lance, Clifford, and Abedi, of any prospective takeover. Rather, according to Clifford, Abedi confined himself to telling Clifford of his philosophy of banking -- to provide the Third World with banking services which they had never had before, as a means of bringing progress to developing lands.[41]

According to Clifford, in the weeks that followed, he would "hear from time to time [from] little reports [that] would sift in that Mr. Abedi and BCCI were in the process of acquiring stock in a company called Financial General Bank Shares . . . I had not heard of them before." [42] According to Clifford, only after BCCI and the Middle Eastern investors had made their acquisitions of FGB stock, and only after the SEC had been alerted by the Middendorf group of the action by the BCCI group, did Abedi and the others involved retain Clifford and his firm, Clifford & Warnke to assist them in the litigation regarding the attempted takeover.

REENTERED AS EXHIBIT 3

Clifford testified that his representation of the bank and its investors began in February, 1978. (43)

As Clifford affirmed in his written testimony to the Senate:

Without our involvement or advice, four of these investors had purchased stock in an American bank holding company called Financial General Bankshares ("FGB"), the predecessor to First American, without filing certain disclosures with the Securities and Exchange Commission ("SEC"). The SEC investigated these transactions, and the management of FGB, concerned that these purchased foreshadowed a possible corporate takeover effort, filed suit against the Arab investors, BCCI, Mr. Abedi and others. We were retained to represent Bert Lance, Agha Hasan Abedi, BCCI, Sheikh Mohammed bin Zaied al Nahyan, Sheikh Sultan bin Zaied al Nahyan, Faisal al Fulaij, and Abdullah Darwaish, certain of these defendants.[44]

Thus, by Clifford's account, the entire structure of the FGB transaction and the assembling of the shareholders had been conceived and implemented by BCCI and the "investors" before Clifford had ever become involved. The representation began in connection with SEC action that took place in mid-February, 1978. This account would buttress Clifford and Altman's contentions that they were "grossly deceived" from the first by BCCI.[45]

However, the chronology described by Clifford is inconsistent with both the details and the sense of Lance's testimony, and with a contemporaneous telex sent to Abedi and BCCI by BCCI official Abdus Sami, who was working closely with Lance in late 1977 and early 1978 on the FGB takeover.

**The Sami Memo:**

**Documentary Evidence of BCCI's Actual Intentions**

The Sami memo to BCCI chairman Agha Hasan Abedi, written January 30, 1978, provides the best documentary summary of the actual structuring of the FGB takeover by Lance and BCCI. It reveals the clear involvement of Clark Clifford in the month of January, 1978, a time when Clifford contends he was uninvolved in BCCI's attempt to take over FGB, and prior to what Clifford described as the triggering event for his involvement, the commencement of litigation involving the SEC in mid-February, 1978.

The Sami memo, written in Washington and sent to Abedi in Karachi, Pakistan, first describes the "situation of acquisition of FGB," noting the purchase to date by the BCCI group of 17.5 percent of the FGB stock, with commitments or control over 23 to 24 percent of the stock, and that a meeting needed to take place between "our friend," Bert Lance, and the Middendorf group, to determine whether the BCCI takeover would proceed by with the consent of the Middendorf group, or through a contest. In the telex, Sami advised Abedi that they needed to prepare for litigation in which the Middendorf group would argue that it was undesirable for FGB to be taken over by foreigners. He added that BCCI needed to retain Clark Clifford as counsel in the event of a contest for control. Sami then described further steps BCCI needed to take in preparation for such a struggle:

REENTERED AS EXHIBIT 3

To keep individual ownership to below 5 percent we have to distribute the ownership to 4 persons of substance. We have already given the names of Sheikh Kamal Adham and Mr. Fulaig [sic]. We want two other names immediately. Under Securities and Exchange Regulations we are also obligated to report to Commission as well as Financial General details of purchases. We require their biodata and powers of attorney for them. We must have this early this week to avoid possible liability on Mr. Metzger and purchases. We have to be careful that our name does not appear as financier to most of them for this acquisition. The necessity of filing this return has arisen on account of concentration of over 5 percent in the hands of Metzger, his knowledge and our intention to acquire control.[46]

The Sami memo described an intentional strategy by BCCI, Lance, Adham, Fulaij, and other members of the BCCI group to disguise BCCI's underlying interest in the transaction, and the fact that the individuals were acting as a group, in order to circumvent SEC disclosure rules. Under American securities law, anyone who buys five percent of a publicly traded company must file a disclosure form with the Securities and Exchange Commission. In the memo, Sami also advised Abedi that he has "met Clark Clifford and explained to him our strategy and our goal. He was happy to know the details and has blessed the acquisition," suggesting that Clifford was a knowing participant in BCCI's takeover scheme on or before January 30, 1978, and had already been retained as lawyer for the group prior to that date.[47]

Sami's dating of Clifford's involvement is buttressed by the legal bill sent by Clifford to BCCI for this period. The bill, dated May 24, 1978, describes the legal services rendered them by Clifford as dating not from mid-February, but from January 1978.

Significantly, the federal district court judge who heard the case brought by the Middendorf group against BCCI and the Lance group made a specific finding regarding BCCI's apparent use of nominees in connection with the initial takeover, as suggested by the Sami memorandum. On April 27, 1978, the court found that in early December 1977, BCCI's agents sought to purchase a percentage of Financial General shares substantially in excess of any amount for which Abedi then had purchasers.[48] Thus, rather than responding to investment requests from clients, BCCI was in effect acting not only as agent but as principal in the takeover.

Within a matter of days following the writing of the Sami memorandum, BCCI added the crown prince of the Abu Dhabi royal family, Sheik Sultan bin Zayed al Nahyan, and Abdulah Darwaish, financial adviser to the Abu Dhabi royal family, as the two additional shareholders for the purpose of the takeover referred to by Sami. Significantly, during this period, Abedi also solicited Iranian millionaire Mohammed Rahim Motaghi Irvani, a business partner of former CIA director Richard Helms, to be a nominee shareholder. Irvani, was listed in the original SEC filing in the early, 1978 takeover attempt, as a 5 percent shareholder of CCAH, and BCCI's lead front-man in the original takeover. Several documents, introduced in civil litigation involving Irvani in Georgia, describe Irvani's recruitment by Abedi in early 1978 to act as a front-man for BCCI.[49]

**The FGB Litigation, Consent Decree and Takeover**

On February 7, 1978, a meeting of FGB shareholders was convened at which Lance announced that the BCCI group controlled 20 percent of the FGB stock and wanted eventual control -- despite having never previously disclosed its takeover intentions, as required by federal securities laws, to the SEC.

The Middendorf group, recognizing that Lance's statements amounted to a confession of violating SEC disclosure laws, immediately complained to the SEC and the Federal Reserve, which launched investigations.

Lance had made a significant mistake in advising the Middendorf group of the coordinated takeover effort by the BCCI group. Within days, both Lance and BCCI began publicly announcing that FGB investors had purchased the stock individually, not as a group. He also announced that BCCI was uninvolved in the purchases and honoring the legal prohibitions against its involvement that existed due to its partial ownership by Bank of America.[50] The revised version of events by Lance and BCCI had come too late: the Middendorf group, which still controlled FGB, filed suit on February 17, 1978 alleging violations of securities laws.

A month later, the SEC filed its own suit to block the Lance-BCCI FGB takeover attempt. Eleven defendants were named in the action, including Lance, Abedi, BCCI, and four BCCI clients. However, an agreement had already been struck between the SEC and the Lance-BCCI group, which suited both the SEC and the would-be investors.

Given Lance's admissions, and the careless assemblage of the Middle Eastern shareholders by BCCI, the SEC case against the Lance-BCCI group was formidable, and hard to contest. For example, each "individual" Middle Eastern investor sought to acquire, at precisely the same time, an identical interest in the bank of 4.9 percent, which placed each one, supposedly acting independently, at just under the level that would otherwise have required them to disclose their purchase to the SEC. It was all too obvious that they were acting jointly, as a group. But the SEC was not looking for punitive action, merely corrective action. So long as Lance-BCCI group agreed to live by SEC rules in the future, and compensate the injured parties by paying more for the shares of the bank, the SEC would let them go forward. The Lance-BCCI group agreed to pay the highest price to date for stock in FGB to any shareholders who wanted to sell -- and promised to keep BCCI out of any continued takeover efforts of FGB, other than as an investment "advisor."

The SEC's surprisingly mild position, given the baldness of the group action, was a further demonstration of Abedi's principal of not being overly concerned about laws. Here, BCCI had broken SEC laws and while hampered by SEC action, would be permitted to move forward with its arrangements to take over FGB so long as it paid the current FGB shareholders enough for the privilege.

On April 27, a federal judge permanently enjoined Lance and ten other defendants form violating securities laws, and the SEC consent decree was issued. In its injunction, the federal district court made specific findings that there was evidence BCCI was at the center of the takeover, and might well have controlled the takeover. The court said that the BCCI clients relied "heavily, if not exclusively" on Abedi and BCCI in deciding to purchase the FGB shares and, tellingly, that BCCI's agents had to sought to purchase a percentage of FGB shares substantially in excess of any amount for which Abedi then had purchasers. These findings

https://info.publicintelligence.net/The-BCCI-Affair.htm

should have been warning lights to regulators. In fact, because of these warnings, the Federal Reserve later sought and received assurances from BCCI, the Middle Eastern investors, and the attorneys, that BCCI was not behind the purchase.

In the meantime, BCCI executives began making false statements to the press in an apparent attempt to rewrite history and discourage further litigation. For example, two top BCCI officials, Allaudin Shaikh and Dildar H. Rizvi, told the Washington Post in mid-March, 1978 that Lance was merely "an informal adviser who pointed out investment opportunities in the U.S." for BCCI," suggesting that he was "not employed by the bank . . . was paid nothing by the bank. . . and had received absolutely no loans from BCCI or loans arranged by BCCI." The executives also told the Post that the Middle Eastern investors advised by BCCI were "four individuals from different countries, absolutely unknown to each other."[51]

On March 28, 1978, a memorandum to the Federal Reserve Board of Governors discussed the Fed's investigation into the Lance-BCCI activities, stating that the SEC had found "no evidence" that the Middle Eastern investors had actually acted in concert, despite Abedi's and BCCI's serving as their joint financial advisor. However, within days, the U.S. District Court judge hearing the SEC complaint found that BCCI, Abedi and the four investors had indeed acted as a group.

By April, the Federal Reserve was asking detailed questions of Clark Clifford and Robert Altman as attorneys for Lance and the "individuals" in the BCCI group, inquiring whether ICIC, BCCI's Grand Caymans affiliate, was acting as a vehicle for the acquisition of FGB. On May 9, 1978, Altman told the Federal Reserve that Abedi and BCCI were acting as the commercial banker and financial advisor for the Middle Eastern investors, and that while BCCI had been used to move funds for the investors into the U.S., it had not financed any of the FGB purchases.[52]

Thus, by mid-1978, BCCI had developed a theory of its involvement with the Middle Eastern investors in FGB designed to reconcile its central role in the original takeover with the various securities and banking laws which prohibited it having an actual direct interest in taking over FGB. The theory was that BCCI was a financial advisor to the actual parties at interest, and never a principal itself in their purchases of FGB stock. From May 9, 1978 onward, Clark Clifford and Robert Altman, as attorneys for Lance, BCCI, and the BCCI-related shareholders, would articulate the position that BCCI at no time acted inconsistently with this role.

Although the takeover was now able to move forward, Lance's poor judgment would soon result in his being severed from both National Bank of Georgia and FGB. In February, his statements had set off the SEC action and FGB civil litigation. Moreover, his own legal problems pertaining to his sloppy banking practices in Georgia were mounting. Over the remainder of 1978, Lance was eased out by Clifford, and replaced at the apex of the BCCI group by retired Senator Stuart Symington. Symington would later become chairman of the Board of Directors of the acquisition vehicle BCCI created for the takeover, and would remain so until his death.

In the months that followed, the Middendorf group and the BCCI group continued to litigate the takeover. Dozens of depositions were taken, and all the parties to the takeover were placed on the record. During those depositions, the BCCI investors repeatedly stated under oath that

they were purchasing FGB shares for their own interest; that BCCI did not control, vote, or have the power to dispose of their shares; that BCCI would not finance the purchase of their shares; and that BCCI's role was limited to that of commercial banker and investment advisor for the Middle Eastern investors.[53]

In 1991, Clifford testified that "nothing in the course of this litigation . . . indicated in any way that they [the Middle Eastern investors] were nominees for BCCI, as is now alleged."[54] However, throughout the litigation and takeover, there were in fact recurrent allegations that BCCI was behind the takeover, and regulators, including the Federal Reserve, the Office of the Comptroller of the Currency, and various state banking authorities, continued to insist on receiving affirmations from everyone involved that BCCI was not a principal.

The ambiguous nature of BCCI's role was demonstrated again during the summer of 1978, when BCCI, ostensibly on behalf of the Middle Eastern investors, formed Credit and Commerce American Holdings ("CCAH"), N.V., as a Netherlands Antilles holding company, which in turn held a subsidiary, Credit and Commerce American Investment, B.V., of the Netherlands, as vehicles for acquiring shares of FGB. In statements filed with the SEC, BCCI, Abedi, and the four Middle Eastern investors stated that BCCI would have no interest in CCAH. They advised the SEC that ICIC Overseas would own up to 5 percent of CCAH's shares. At the time, ICIC Overseas was ostensibly a staff benefit fund for BCCI, but in fact was then and remained a slush fund for and alter ego of BCCI itself.

### The 1978 CCAH Application

By October, no agreement had yet been reached between the Middendorf group and the BCCI group. However, the BCCI group in the form of CCAH pressed forward with making a formal application to the Federal Reserve for the acquisition of all the voting shares of FGB. Under the terms of the application, CCAH, CCAI, and FGB would become bank holding companies and acquire all of the shares of Financial General Bankshares. The four Middle Eastern "investors" would contribute all of their shares of the bank to CCAI, in return for shares of CCAH. CCAI would then make a tender offer for the remaining shares of Financial General Bankshares. As stated to the Federal Reserve by Robert Altman in his capacity as counsel to CCAH, "neither BCCI nor any other organization related to BCCI contemplates owning any equity interests in CCAH."[55]

At the time, Clifford and Altman were dealing simultaneously with BCCI on the acquisition and with BCCI's various front-men and nominees.

For example, in this precise period, Clifford and Altman received a power of attorney from one acknowledged BCCI front-man or nominee, Iranian businessman Mohammed Irvani, for Irvani's proposed involvement as a participant as a shareholder of CCAH, in a transaction handled on Irvani's behalf by former CIA director Richard Helms. Helms drafted an agreement indemnifying Irvani from any loss in connection with Irvani giving Clifford's law firm a power of attorney to act in Irvani's name in purchasing CCAH shares.[56] The fact that Irvani was acting as a front-man for BCCI at the time was confirmed recently by his son, Bahman Irvani, who told the Atlanta Constitution that his father "lent his name to the 1978 takeover bid at the request of BCCI founder Agha Hasan Abedi."[57]

Through the remainder of 1978 and early 1979, the critical issue focused on by regulators was whether BCCI actually had a hidden interest in CCAH. For example, on November 7, 1978, Federal Reserve Lloyd Bostian of the Richmond Fed wrote Altman to ask for more information on the relationship between CCAH, CCAI, and BCCI. Two weeks later, Altman replied that although ICIC would have an ownership interest of 4.5 percent in CCAH, and one or two persons associated with BCCI or ICIC might serve as directors of FGB, neither BCCI nor ICIC would have contracts with the bank or their holding companies relating to management or investments. Soon thereafter, the Comptroller of the Currency raised concerns about who would be providing financing for the proposed FGB purchase. On January 12, 1979, Altman wrote the Federal Reserve to specify that no more than $20 million would be borrowed by the shareholders for the acquisition, and that all such borrowing would be made by institutions having no affiliation with either CCAH or CCAI.

In the meantime, the Middendorf group had continued to object to the takeover, and on January 26, 1979, the Attorney General of Maryland issued an opinion stating that Maryland law precluded a hostile takeover of a bank. On February 16, 1979, the Federal Reserve dismissed the 1978 CCAH application on the ground that it violated Maryland law, and in response, CCAH and CCAI sued to overturn the Maryland decision.

**The 1980 CCAH Application**

Those involved in the original takeover believed that the Federal Reserve's objections would end if they were able to resolve the continuing fight with the Middendorf group and end the take-over battle. They therefore sought to sweeten the financial reward to the non-CCAH shareholders of FGB, and find ways to shield the CCAH purchase from the shadow of BCCI. Tentative agreement was reached with the non-CCAH shareholders for the sale of the bank in March 1980, while Senator Symington was pressed into a leading role as chairman of CCAH and a would-be director of Financial General Bankshares. Thus BCCI had arranged to replace its shady reputation with the very distinguished and respectable reputation of retired United States Senator and former Democratic Presidential nominee. In May, the non-BCCI faction sent a letter of understanding to Symington setting out the guiding principles of the FGB acquisition, which included the requirement that Symington himself hold and vote 60 percent of the stock of CCAH for the first five years, with Clifford succeeding Symington in the event of his death or inability to complete his term. The provision was suggested by Clifford as a means of assuring regulators that BCCI would not secretly control the bank.[58]

Even at this point, lawyers for the Middle Eastern investors knew that the actual shareholders they were representing were potentially a fluid group. As former Federal Reserve lawyer Baldwin Tuttle explained in a May 27, 1980 memorandum to Robert Altman and two other BCCI attorneys, entitled "The Application (At Long Last!)":

It will be necessary **to determine who the new investors will be** (we should try to keep as closely as possible to the original cast of characters to help with our moratorium problem.) (emphasis added)[59]

The memorandum from Tuttle implies that even in 1980, the attorneys for the acquiring group believed that the identities of the "investors" were not in control of the proposed takeover, but

names to be manipulated at will to deal with legal, regulatory, and financial issues as they arose.

On November 25, 1980 -- three years after the original takeover of the bank began with Bert Lance -- CCAH and CCAI filed a second application with the Federal Reserve to become bank holding companies. The application made a number of key representations, required by the regulators, regarding the nature and source of the financing of the venture, in part to demonstrate that BCCI had no direct or indirect interest in the transaction. These representations included:

** None of those purchasing the CCAH stock would retain any personal indebtedness in connection with the transaction.

** All of the funds used in the transaction would be provided from the personal funds of the investors.

** None of the funds would be from financial institutions affiliated with BCCI.

The application, filed on CCAH's behalf by Clifford and Altman, also made an iron-clad statement that BCCI had no interest, direct or indirect, in the bank:

BCCI owns no shares of [Financial General], CCAH, or CCAI, either directly or indirectly, nor will it if the application is approved. Neither is it a lender, nor will it be, with respect to the acquisition by any of the investors of either [Financial General], CCAI or CCAH shares."

In a written response to questions concerning the relationship between BCCI and CCAH, Altman further stated that the shareholders of CCAH had all made personal investments, and none of them were acting "as an unidentified agent for another individual or organization."

As part of the application process, the investors provided the Federal Reserve with financial information, typically consisting of extremely general statements about the net worth of the applicants. For example, the certificate provided for Kamal Adham consisted of a declaration by a Middle East accountant based in Saudi Arabia on June 19, 1978, addressed "To whom it may concern," that states:

Without any responsibility, we here certify that the estimation of the net worth properties [sic] and investments of H.E. Kamal Adham, as at June 15th 1978, is U.S. dollars 134.000.000 ($134 million).

According to the accountants, this conclusion was based on an estimated value of his investments in land and buildings at $100 million, buildings outside Saudi Arabia at $8 million, and "investments" not otherwise specified at $26 million.

The Federal Reserve made additional efforts to secure more precise information on the finances of the would-be purchasers, and were eventually told that the financial resources of many of the shareholders could not be calculated, because they were rulers of nations who owned all of the land of the countries they ruled, and their financial resources were essentially the net national wealth of their countries.

REENTERED AS EXHIBIT 3

In a letter from BCCI lawyer Baldwin Tuttle to the Federal Reserve, dated November 5, 1990, Tuttle advised the Federal Reserve:

By tradition and historical background of the Trucial Sates, the ruler of an Emirate owns all of the land of his State . . . Similarly, all the natural resources of the State are also regarded as the personal property of the ruler and his heirs who enjoy complete authority to utilize them as they consider fit.[60]

Tuttle told the Federal Reserve that it was "impossible to estimate or segregate" the assets of the Al Nayhan family from those of the Sheikh himself or of the emirate of Abu Dhabi because they are "not regarded as separate entities." According to Tuttle, the legal situation of all property in these emirates was identical -- the proposed investors in FGB owned everything of value in the emirates they ruled.[61]

Assured of the solvency of these apparent investors in FGB, by early 1981 the Federal Reserve was moving to lift the remaining barriers to the purchase, if it could be certain that BCCI was not secretly behind the transaction. This issue was of deep concern not only to the Federal Reserve, but to the Office of the Comptroller of the Currency, which knew the most about BCCI. OCC had learned of BCCI's use of nominees in connection with its review of Bank of America's interest in BCCI; it had concerns about Ghaith Pharaon being BCCI's alter ego in his purchase of National Bank of Georgia. Given its knowledge, the FGB transaction made OCC officials uneasy. But the Federal Reserve was the primary regulator, and the OCC was not willing to stop the FGB transaction from moving forward, so long as they received assurances from everyone involved that BCCI was not a party to the transaction.

On March 12, 1981, the OCC finally signed off on the CCAH takeover based on the understanding that BCCI would have no involvement with the management of the bank or the holding companies or with the financing of the acquisition.

As Charles Muckenfuss III, the senior deputy comptroller of the currency, explained in the letter to the Federal Reserve:

We note that in the October, 1978 application a relationship between the investors group and the Bank of Credit and Commerce International (BCCI) was outlined. Members of the proposed investors group or Credit and Commerce American holdings, N.V. and Credit and Commerce American Investment, B.V., also hold an interest in BCCI. It has now been represented to us that BCCI will have no involvement with the management and other affairs of Financial General nor will BCCI be involved in the financing arrangements, if any are required, regarding this proposal. This commitment is critical, both now and in the future, since such a relationship with another financial institution would be a significant factor in appraising this application. This is especially important in light of the overlapping ownership which will exist between Credit and Commerce American Holdings N.V., Credit and Commerce American Investment, B.V., and BCCI. Moreover, any enhanced direct or indirect affiliation or relationship would take on even greater significance in light of the fact that BCCI is not subject to regulation and supervision on a consolidated basis by a single bank supervisory authority.[62]

REENTERED AS EXHIBIT 3

Thus, by early 1981, the technical securities and banking regulatory issues had been solved by the CCAH group. The only remaining obstacle to approval of the CCAH group takeover was continued suspicion by regulators that BCCI -- investment advisor to most of the shareholders and owned by a number of the shareholders -- might still somehow be a direct or indirect shareholder. The regulators therefore repeatedly asked Clifford, Altman, and the CCAH shareholders for assurances on this point, and repeatedly received them. The Federal Reserve and the OCC were now ready to accept these assurances. State regulators, especially Sidney A. Bailey, the chief bank regulator for Virginia, responsible for overseeing FGB banks in Virginia, were not.

**Virginia's Objection to the CCAH Takeover**

Bailey had served at OCC for twenty years as a bank examiner before becoming the number one bank regulator for Virginia in 1978. Bailey had previously been visited at the state banking offices in Richmond by Clifford and Altman, and had felt that Clifford's representations to him were theatrical and rehearsed. Clifford had argued that America was strengthened by foreigners recycling petrodollars to the U.S., while Bailey believed in local control, so that regulators would have access to the people in charge if there were trouble.[63]

As far as Bailey was concerned, there was no way of knowing who this Middle Eastern group really represented, what they intended to do with the bank after they took it over, or why they had selected this bank in the first place. Bailey believed that banks were like churches, not just basic local institutions in which citizens placed their money, but the repositories for that which is good and sound in a community, the embodiments of a community's past, present and future. The representations that were being made to him by Clifford and Altman were designed to provide comfort to him concerning the intentions of the Middle Eastern investors, but to Bailey, they were inherently unverifiable. For that reason, Bailey had told the Federal Reserve that as far as the State of Virginia was concerned, "the proposed acquisition will be inimical to the convenience and needs of the community."[64]

As Bailey later testified:

Representations were made that the operation of the subsidiary banks of Financial General Bankshares . . . would be improved, that their quality and quantity of service to the communities they served would be raised . . . However, how that was to be done was not made clear and it seemed, with control to pass outside the country, it seemed, well, a little hard to believe that the real intent of this group of individuals was to improve the quality of banking service in the Shenandoah Valley or Virginia or in McLean and Washington, D.C. or anywhere else. There wasn't any real incentive for them to do that . . . Take me at my word. Believe me. Have I ever lied to you? That sort of thing. . . I had the word of the people speaking to me that none of these negative detrimental things would occur, and nothing more.[65]

Bailey was also concerned about the corporate walls created by the holding company structure of CCAH, CCAI, and FGB. With neither CCAH nor CCAI being located in the U.S., Bailey felt the offshore holding company structure provided an invitation to abuse. He was sufficiently concerned about the problem that he had contacted both the State Department and CIA in an effort to learn more about the shareholders, but had received no information from

either about any of those involved in the transaction.[66] In all of these objections, Bailey was joined by state regulators from Tennessee, who, in concert with the local bankers at FGB's Tennessee branches, opposed the takeover as against the interests of the community.

### The April 23, 1981 Federal Reserve Hearing

In response to Bailey's concerns, and in an effort to put the allegations concerning BCCI's involvement to rest, the Federal Reserve scheduled an unusual hearing on the CCAH application for April 23, 1981, convened by associate counsel Robert Mannion. Prior to the hearing the Federal Reserve advised Baldwin Tuttle, as lawyer for the CCAH group, that the first issue the Federal Reserve wanted answered was how the various shareholders became involved in investing in U.S. banks and decided to acquire FGB. In the letter, the Federal Reserve also asked the applicants to "clarify the historical, current and expected future relationships between the Bank of Credit and Commerce International, S.A., London, England, and its affiliated companies, on the one hand, and Applicants and their principals, on the other."

The hearing opening with Bailey reiterating his opposition to the takeover, and reiterating the concerns he had previously expressed to the Federal Reserve by letter. First, the U.S. might not be able to insure that these foreign owners would abide by its laws. Second, it would be difficult to tell who really controlled the bank. Third, it was possible the bank's new Middle Eastern owners might strip the bank of its assets and move them elsewhere before anyone found out. Bailey listed another half dozen related reasons, mostly related to the difficulties of verifying financial information of foreign shareholders. Finally, Bailey suggested that the key issue the Federal Reserve should consider was why the Middle Eastern investors were willing to pay so much for the bank.

What is the motive giving rise to these protracted, expensive campaign to buy Financial General? Allegedly, Financial General is viewed by these applicants simply as an investment, but it is obvious that the price which the applicants are prepared to offer for control of Financial General bears little logical relationship to either the actual book value of those shares or their price in the market prior to the initial stimulation of the market by the applications or their agents. There can be little doubt that some incentives other than orthodox investment motives must have prompted this effort. . . One obvious plausible answer to this riddle lies in the unique position of Financial General in the market. No other single financial institution is situated in both the financial and government hubs of the United States.[67]

Bailey warned the other regulators that he believed the purchasers had some secret agenda. Bailey did not know for sure what it was, and neither did any of the other regulators. Until they could determine what it was, the Federal Reserve should turn the application down.

In response to this impassioned presentation by Bailey, Clark Clifford opened the presentation of the case on behalf of the Middle Eastern investors. He began by expressing his regret at Bailey's concerns, and promised to answer them, noting that if the Fed permitted the acquisition, Clifford looked forward "to many years of an agreeable relationship between us, Mr. Bailey."

REENTERED AS EXHIBIT 3

Clifford described the genesis of the FGB takeover as arising from Adham -- not BCCI and Abedi, not Jackson Stephens or Lance -- and that as a result of Adham becoming interested in the bank, Adham had interested his associates and friends, and brought BCCI into the picture to analyze FGB as an investment.[68]

Clifford said that the Middle Eastern group put together by Adham was interested in bringing substantial new capital to the bank as passive investors, and that in addition to Senator Symington and Clifford, other prominent Americans such as retired General Elwood Quesada and General James Gavin would serve on FGB's boards, demonstrating the honorable intentions of the bank's shareholders and their commitment to quality.

He also suggested that it was critical for the national interests of the Untied States itself that the Federal Reserve permit the application to go forward.

It is in the interest of our country that an effort is made to bring back to the United States as many of the dollars as we can that through the years we send over to the OPEC countries.[69]

Clifford explained that some $90 billion in payments had left the U.S. for crude oil to the Persian Gulf countries the previous year. If those funds were taken and invested in West Germany, Great Britain, Switzerland, they would bring no benefit to the United States, whereas if the application was approved, it would be the U.S. that would benefit.

Clifford then introduced the investors, beginning with Sheikh Kamal Adham, whom Clifford described not as the brother-in-law to the late King, nor as the former head of Saudi intelligence, but merely as a prominent Saudi businessman. Clifford said that he had the "deepest respect for his [Adham's] character, for his reputation, for his honor and for his integrity." Clifford suggested that Bailey's concerns were founded on some naive form of anti-foreign bias. He warned that such anti-Arab bigotry was unfair and implied that such a factor could not justify a refusal to grant the CCAH application:

I believe deeply in this country. I believe deeply in its attitude of fairness. I believe deeply in its attitude that it is a country of laws and not of men. I do not believe in prejudice. I do not believe in bias. Our government does not, and with all of these factors, it seems to me that these men bring into this operation those qualities that our country can well receive.[70]

Adham then addressed the Federal Reserve, reiterating the account that his interest in FGB began not with Abedi and BCCI, but with Hassan Yassin of the Saudi Arabian embassy, that BCCI was brought in by Adham to evaluate the bank, and that Adham then learned that BCCI was already independently and coincidentally involved in evaluating the bank for other Middle Eastern investors.

Adham told the Federal Reserve that BCCI was a banker for him and some of the other investors, but that there were no understandings or agreements involving him or any of the investors and BCCI concerning FGB. Parroting language used by Clifford and Altman in formal statements to the Federal Reserve, Adham testified that "whatever relationships are developed between Financial General and BCCI in the future, if any, are matters to be decided by the new management of Financial General based upon that institution's best interests."[71]

Similar statements followed from Faisal al Fulaij, Abdul Raouf Khalil, and El Sayed El Gohary.

At this point in the hearing, Mannion, the Federal Reserve lawyer conducting the hearing, focused on the contradiction between Adham's explanation of how he became interested in FGB, and the apparent earlier involvement of BCCI and Abedi with the Lance group.

MR. MANNION: As I read the statements . . . Sheikh Adham and Mr. Fulaij were originally interested in this investment by the Bank of Credit and Commerce, BCCI.

MR. ALTMAN: That is not correct. . . I believe that Sheikh Adham's testimony was that he was advised of this by a friend who worked in the Saudi Arabian Embassy, Mr Yassin . . . Mr. Fulaij has said that he was seeking to make investments abroad, particularly in the United States, and asked for his representatives to locate some of them and advise him of their availability. They had contacted BCCI in that effort, and BCCI brought to their attention the fact that there was stock available in Financial General.[72]

Thus, according to Adham, Fulaij and Altman, it was sheer coincidence that BCCI was the investment advisor for everyone involved. This testimony, provided to the regulators for the purpose of attempting to reconcile the otherwise inconsistent accounts provided by Lance, Altman and others of how BCCI came to be involved in the takeover, strained the credulity of regulators even in 1981. Mannion again asked Altman whether Adham was the leader of the investor group, the person who had brought together all of the other investors. Adham responded by explaining, again, that there were two independent groups of Middle Eastern investors -- one Saudi, the other Kuwaiti -- who had become interested in FGB as a matter of utter coincidence. Oddly, at this point, Adham had chosen to ignore the third group involved, the Abu Dhabi investors, entirely. Given the fact that Abu Dhabi was even then the largest shareholder in BCCI apart from BCCI itself, the omission may not have been inadvertent.

SHEIKH ADHAM: I invited some of my friends from my part of the world and I guess some friends from Kuwait invited some friends from Kuwait and some of their friends. But I am called the lead because perhaps I now own more shares than the others.[73]

After a lunch break, Mannion returned to the issue that was troubling him.

MR. MANNION: We are still a little bit uncertain as to how the group came about. In Sheikh Adham's written and oral presentation this morning, he indicated how he became interested in Financial General, and then went to BCCI and had them do an analysis of the organization. Then we understand that Mr. Fulaij, on his own, was looking for investments in the United States, and he was advised by BCCI to get involved in or suggested that he might want to get involved in Financial General. Was Sheikh Adham aware that Mr. Fulaij was getting involved in Financial General or when Mr. Fulaij made his investment, was he aware that Sheikh Adham was involved in it?[74]

This question had apparently not been anticipated by Adham, Fulaij, or their lawyers, and hence Adham and Fulaij replied as follows:

SHEIKH ADHAM: I don't know what -- I certainly don't know.

REENTERED AS EXHIBIT 3

MR. FULAIJ: The same.[75]

Mannion, troubled by the unbelievable nature of the coincidence, persisted.

MR. MANNION: So you were told that Financial General was a good investment by BCCI, and on that basis, is it just a coincidence that BCCI is first asked by Sheikh Adham to do an investigation or analysis of Financial General, and . . . they then gave advice to several of their investment clients to be involved in Financial General?

MR. FULAIJ: (Nods in the affirmative.)

SHEIKH ADHAM: That is very possible. Such things happen in our parts of the world.[76]

Adham then advised the Federal Reserve -- falsely -- that he had not met Fulaij for ten years, had no immediate contacts with him and that their mutual involvement was mere coincidence. In fact, both had been involved with other transactions involving BCCI, including acting as nominees for BCCI in connection with recent stock transactions involving BCCI's oil company, Attock Oil.

Concerned by the nature of Mannion's questions, Adham sought to put his concerns to rest directly.

SHEIKH ADHAM: I think that from the line of questions, it appears there is doubt that somebody or BCCI is behind all of this deal. I would like to assure you that each one on his own rights will not accept in any way to be a cover for somebody else.[77]

In an effort to enlighten the Federal Reserve, Clifford and Altman then compared BCCI's role as an investment advisor to Merrill Lynch in the United States -- independently looking at investment opportunities for its clients. Another lawyer for the BCCI group, Baldwin Tuttle, a former Federal Reserve attorney who previously had been Mannion's superior at the Fed, then took his turn to explain his understanding of what had happened:

MR. TUTTLE: Both [Adham] and Mr. Fulaij have stated that originally they were buying shares as an investment like anyone else buys a small minority interest as an investment. It is only after Financial General commenced the litigation that they considered the possibility of increasing their shareholding.[78]

Mannion then returned to the issue of BCCI directly, noting the similarity of the names "Bank of Credit and Commerce" on the one hand, and "Credit and Commerce Holdings" on the other. Why were the names so similar? Clifford responded:

The terms "Credit" and the term "Commerce" are terms that are used extensively in the Persian Gulf in financial affairs. His Excellency [referring to Adham] has said that he deals with banks that used the terms "credit," and used the terms "commerce." Of course a number of banks used the term "Commerce." . . . I know of no additional reasoning behind it.[79]

Clifford then reiterated the key representation pertaining to the application before the Federal Reserve. In response to a question from Mannion as to precisely the function of BCCI in the

application, Clifford testified:

None. There is no function of any kind on the part of BCCI. I think when the question was asked, having to do with what might occur in the future, I think somehow may have given the answer, "well, that would depend upon the judgment of Financial General in the future." I know of no present relationship. I know of no planned future relationship that exists, and other than, I don't know what else there is to say.[80]

Based on the representations made by Clifford, Altman, Tuttle, Adham, Fulaij, and the other Middle Eastern investors, the Federal Reserve, despite its obvious suspicions, approved the application on August 25, 1981. The Federal Reserve also granted a request, made by Altman on behalf of the Middle Eastern investors and CCAH on June 2, 1981, to seal portions of the transcript of the hearing, preventing anyone outside the Federal Reserve from learning the identities of several of the shareholders.[81] A year later, perhaps as a way of breaking with the past and moving beyond the ugly publicity pertaining to the litigation over the takeover, and the bank's new Middle Eastern ownership, FGB formally changed its name of its banks to First American, and its holding company to First American Corporation.

In approving the application, the Federal Reserve explicitly accepted "the entire record" of statements made to it by the Middle Eastern investors, BCCI, and their attorneys. These included certain statements made in the April 23, 1981 hearing and in the applications which constituted loop-holes regarding BCCI's ability to be involved with FGB in the future, and which were contrary to the understandings which the OCC had said were critical for its approval of BCCI's application. These statements suggested that if BCCI loaned funds to the shareholders after the original acquisition in connection with CCAH, such loans would not be precluded. Together with the Federal Reserve's acceptance of the concept that BCCI could act as a liaison between FGB and the shareholders in its capacity as "investment advisor," the ability of BCCI to "lend" to its shareholders following the initial acquisition created a mechanism by which BCCI could at any time "call" its interest in CCAH shares, in collusion with its nominees, by "lending" funds, secured by those shares, on which the nominees defaulted, leaving BCCI in possession of the shares. In the decade to come, this device was used by BCCI repeatedly to deceive the regulators, in some cases with the apparent knowledge of some of BCCI's attorneys and agents in the U.S.

**The True Account of the 1978 Takeover**

While there had been numerous warning signs in front of the Federal Reserve prior to its approval of the CCAH application to take over CCAH, and again, recurrently, through the 1980's, the Federal Reserve did not conclude that it had been lied to about BCCI's role until December, 1990, when attorneys for Sheikh Zayed and BCCI at the firm of Patton, Boggs & Blow, prompted by investigative activity by the District Attorney of New York and other factors, advised the Federal Reserve of the apparent control of First American by BCCI. Seven months later, after BCCI had been closed globally, the Board of Governors of the Federal Reserve voted to issue an order banning the four Middle Eastern investors from banking activities in the United States forever, on the basis of the false statements they made to the Federal Reserve in the course of the 1978 and 1980 applications to take over FGB, and in the

course of the April 23, 1981 hearing. In that order, the Federal Reserve also made findings as to the true state of affairs pertaining to the FGB takeover a decade earlier.

On July 29, 1991, the Federal Reserve found:

** BCCI owned CCAH in violation of the Bank Holding Company Act.

** BCCI concealed its intended ownership and control of CCAH at the time of CCAH's 1980 application to acquire First American.

** At least four of the Middle Eastern investors involved in the 1980 application were nominees for BCCI, including all of the Middle Easterners who had appeared in person before the Federal Reserve during its April 23, 1978 hearing, Adham, Fulaij, Khalil, and Jawhary. In addition, other BCCI nominees included the head of one emirate within the United Arab Emirates -- Sheikh Naomi, ruler of the Emirate of Ajman and a corporation wholly owned by the head of a second emirate, Sheikh Hamad bin Mohammed al-Sharqi, ruler of the Emirate of Fujeriah. Other nominees included Sheikh Shorafa, a government official of the United Arab Emirates.

** The head of BCCI, Agha Hasan Abedi, and his chief assistance, Swaleh Naqvi, had coordinated the nominee scheme for BCCI.

The Federal Reserve found that beginning in late 1977, BCCI began using these nominees to purchase stock in Financial General through an arrangement under BCCI loaned the money to the nominees to purchase the CCAH shares, subject to side agreements under which the nominees were not liable for serving or repaying the loans. Under the terms of the scheme, the nominees signed deeds to transfer their stock in blank, leaving it to BCCI to fill in the name of the transferee at BCCI's convenience. BCCI was also authorized by the nominees to sell the shares at whatever price it chose and to keep any profits it might earn, and BCCI promised to indemnify the nominees against any losses they might sustain for acting as nominees. BCCI was also given the power to vote the shares held by its nominees, had powers of attorney to sell the shares, and agreed to make fixed payments in fees to the nominees in compensation for their agreement to act as nominees.[82] The Federal Reserve found that BCCI also financed the start-up costs of CCAH and a $50 million loan to First American supposedly from an outside bank, BAII, which had interlocking directors with BCCI.[83]

In short, BCCI, Kamal Adham, Faisal al Fulaij, A.R.K. Khalil, and the other Middle Eastern nominees had secretly done precisely what the Federal Reserve had sought to assure they would not do, and had done precisely what they had promised not to do, in writing and in testimony to the Federal Reserve prior to its approval of the 1980 CCAH application. From late 1977 through December 1990, BCCI and its nominees lied to the Federal Reserve, repeatedly filling out false reports to the Federal Reserve, and providing the Federal Reserve false statements and information.

1. See e.g. Price Waterhouse Note of Audit Committee Meeting on 4 April 1989, BCCI, "SN [Swaleh Naqvi] said that it was unlikely there could be a merger between BCCI and CCAH in the immediate future, although it is possible that there could be a reverse merger in the future. In the view of BCCI's

problems in the USA, he did not consider it advisable that this possibility was discussed [publicly] for a couple of years."

2. London Daily Telegraph Magazine November 19, 1991, "No Questions Asked."

3. Staff interview, Lance, October, 1991.

4. Harris and Berry, "Arab Investors Want Lance to Manage Funds," Washington Post, December 18, 1977, A1.

5. Testimony of Heimann, S. Hrg. 102-379, p. 76.

6. Id at 77.

7. Washington Post, April 2, 1978, John F. Berry and Jerry Knight.

8. Id.

9. See Washington Post, April 2, 1978.

10. Washington Post, April 2, 1978.

11. Id.

12. SEC civil complaint, US District Court Washington DC, March 17, 1078; see also Washington Post, March 18, 1978.

13. Id.

14. Lance, S. Hrg. 102-350, Pt. 3, p. 5.

15. Id. p. 6.

16. Id at 8.

17. Id.

18. Id. p. 11.

19. Forbes, December 15, 1976, p. 95, "A Couple of Country Slickers."

20. Washington Post, April 2, 1978.

21. S. Hrg. 102-350, Pt. 3 pp. 8-9; see also Federal Reserve Hearing April 23, 1981 transcript p. 54.

22. Federal Reserve Hearing transcript, April 23, 1981, p. 25; Clifford, S. Hrg. 102-350 Pt 3., p. 59.

23. Summary of Charges, U.S. Board of Governors of the Federal Reserve System, In the Matter of BCCI, No. 91-043, Paragraph 22, July 29, 1991.

24. Id. at 12.

25. Harris and Berry, Washington Post, December 18,1 977, A1.

26. Id.

27. Resume, Ghaith Pharaon, in BCCI Senate documents; see Atlanta Business Chronicle, April 27, 1987. While "Dr." Pharaon's doctorate was self-conferred, his decision to adopt the honorific had lasting impact. Even after Pharaon had been indicted by the Justice Department and New York District Attorney and cited for numerous violations of banking law, federal banking regulators continued to refer to him in prepared and oral testimony before the Subcommittee as "Dr. Pharaon." See, e.g. prepared testimony of John Stone, head of enforcement, FDIC, May 14, 1992, which refers to Pharaon as "Dr Pharaon" some 33 times, S. Hrg. 102-350 Pt. 5 pp. 158-163.

28. Id.

29. In its suit in the FGB case, the SEC found the FGB takeover battle formally began just a few days later, on November 29, 1977, when Lance, Stephens, Metzger and BCCI, through Abedi, set in motion a plan for taking over FGB. Lance began buying up the bank's stock, telling none of the sellers that the secret purchaser was BCCI.

30. The Economist, April 1, 1978; Lance, id., p. 14.

31. See e.g. The Economist, April 1, 1978, "The Nine Lives of Bert Lance."

32. Facts on File, March 24, 1978; The Economist, September 9, 1978.

33. Memorandum, Office of the Comptroller of the Currency, January 4, 1978, Comptroller John Heimann.

34. Id.

35. Memorandum, OCC, to File from John G. Hensel, January 17, 1978.

36. Memorandum, OCC, Serino to Heimann, April 3, 1978, "Notes On Meeting with Pharaon."

37. Various documents, OCC files on NBG, March-July, 1978.

38. See e.g. memorandum, Patton, Boggs & Blow re: National Bank of Georgia, March 14, 1991.

39. Summary of Charges, U.S. Board of Governors of the Federal Reserve, In the Matter of BCCI, #91-043 Paragraph 181, July 29, 1991.

40. Lance, S. Hrg. 102-350 Pt. 3 p. 32.

41. Clifford, Id., p. 70.

42. Id. at 59.

43. Id. at 60.

44. Clifford, id., p. 70.

45. S. Hrg. 102-350 Pt. 3 p. 63.

46. S. Hrg. 102-350 Pt. 3 pp 25-27.

47. Id.

48. See e.g. Summary of charges, Federal Reserve, In re Clifford, 92-080, July 29, 1992, Paragraph 23.

49. Confidential and Privileged Attendance Note, November 19, 1990, BCCI Attorney memcom of meeting with Roy Carlson, Exhibit D in G&H Montage case, id.; S Hrg. 102-350 Pt. 4 pp. 286-298.

50. Wall Street Journal, February 14, 1978.

51. Washington Post, March 22, 1978.

52. Letter, Robert Altman to Mannion of Federal Reserve, May 9, 1978.

53. See e.g. Clifford written testimony, id., at 71.

54. Clifford, id., at 72.

55. Federal Reserve Application, October 19, 1978.

56. Plaintiff's exhibit, Helms 9, G&H Montage, id., reprinted S. Hrg. 102-350 Pt. 4 p. 237. Helms' involvement with various BCCI figures is discussed in detail in the chapter concerning BCCI's links to U.S. and foreign intelligence.

57. Peter Mantias, "BCCI: Case reveals former CIA chief's ties to bank," Atlanta Constitution, February 15, 1992, A1.

58. S. Hrg. 102-350 Pt. 3 pp. 75-77.

59. Letter, Tuttle to Altman, May 27, 1980, on file at Federal Reserve.

60. Tuttle to Bostian, Federal Reserve Bank Richmond, November 5, 1980.

61. Id.

62. S. Hrg. 102-350, Pt. 3 pp. 328-330.

63. Staff interview, Bailey, April, 1991. See also testimony of Bailey, S. Hrg. 102-379, pp. 60-63.

64. S. Hrg. 102-379, p. 61.

65. S. Hrg. 102-379 pp. 61-63.

66. Staff interview with Bailey, April, 1991; at the time, the CIA knew precisely who Adham was, having had extensive contact with him in his role as the liaison between Saudi and U.S. intelligence, but did not advise Bailey of this relationship. A detailed treatment of Adham and of the CIA are contained in separate chapters of this report.

67. Bailey, Federal Reserve Hearing, April 23, 1981, pp. 15-17.

68. Federal Reserve Hearing Transcript, April 23, 1978 p. 26.

69. Transcript, Federal Reserve Hearing, April 23, 1981.

70. Clifford, Federal Reserve Hearing April 23, 1981, transcript p. 46.

71. Adham, Federal Reserve Hearing transcript April 23, 1981 p. 56.

72. Federal Reserve Hearing transcript April 23, 1981 p. 75.

73. Id p. 76.

74. Id. p. 78.

75. Id p. 78.

76. Id. p. 79.

77. Id. p. 80.

78. Id p. 90.

79. Id. p. 143.
80. Id. p. 144.
81. The Federal Reserve only unsealed this material in 1990, after providing it in a heavily redacted form to journalist Larry Gurwin following repeated requests from Gurwin in the preparation of his ground-breaking story on the BCCI-First American connection for Regardies' magazine.
82. Summary of Charges, US Board of Governors of the Federal Reserve, No. 91-043, July 29, 1992, pp. 1-11.
83. Id. Paragraphs 152-154; see also staff interview, Akbar Bilgrami, July 13, 1992.

# BCCI IN THE UNITED STATES: PART II

## ACQUISITION, CONSOLIDATION, AND CONSEQUENCES

### Initial Plan For BCCI in the U.S. After the Takeover

Following the exhausting process of the FGB takeover, BCCI began undertaking a number of steps to carry out Abedi's plan for penetrating the U.S. banking and capital markets, with the intention of making BCCI's U.S. holdings its largest and of controlling a substantial market share of U.S. banking overall by building First American into one of the twenty largest banks in the United States.[1]

Abedi set into motion a dual approach, in which he would establish branch offices of BCCI in the U.S. which would be permitted to accept deposits from foreigners but not take deposits from Americans, and use those offices to feed business to the U.S. banks BCCI owned. An

REENTERED AS EXHIBIT 3

undated BCCI memorandum, titled, "A Strategy for the USA," gives the flavor of the bank's thinking.

The memorandum states that BCCI's purpose in the U.S. is "to make it the most successful country in the BCC network in the next 5 years," through building upon BCCI's existing base of correspondent banking for Third World Central Banks, trade finance, and private banking, and adding to that base the financing of the "export of technology and services from USA." In addition, BCCI would use its U.S. network to branch out into the U.S.'s then profitable real estate development industry, growing through direct investments in U.S. real estate.[2]

According to the memorandum, "penetration of the market" would require BCCI's presence in at least twelve jurisdictions: California, Washington state, Arizona, New York, New Jersey, Connecticut, Florida, Texas, Chicago, DC, Virginia and Maryland.

Accordingly, Abedi assembled a team of BCCI people for North America, placing them, variously, at the BCCI representative offices and branches, at First American, and at National Bank of Georgia. Within BCCI, management discussions on operations in the United States viewed the operations of FGB/First American, National Bank of Georgia and BCCI's branch offices as an organic whole, to be thought of together.

As described by BCCI regional general manager Abdur Sakhia:

In any management discussions, in any discussions on our future in the United States, we would think of three entities -- BCCI, National Bank of Georgia, First American, then Financial General -- in the same breath. Who would be going where, who would work in which entity, what area of business would be handled by which entity, allocation of businesses, markets, geographical territories, all took place as if this was one entity.[3]

To ensure a discreet BCCI role in its new U.S. empire, Abedi placed key employees at each of the institutions BCCI had purchased. At National Bank of Georgia, four officials with ties to Abedi or BCCI were installed. At First American, BCCI limited its direct employment of officers to First American New York, where long-time BCCI officials K. K. Elley and Aijaz Afridi were put into place, where they continued to draw benefits from BCCI while officially employed by First American. Elley obtained his job at First American in 1983 as a consequence of Swaleh Naqvi, the number two official at BCCI, telling Altman to hire him. Afridi, who had previously worked for another secretly-controlled BCCI entity in Switzerland, Banque de Commerce et de Placement of Geneva, was placed at the First American through Abedi's intervention.[4]

From the point of view of BCCI, it was the senior partner in this arrangement, despite the official title given to Clark Clifford as chairman of the board following the death of Stuart Symington. As an article written for Worldpaper on August 24, 1982 following interviews with BCCI officials, including Abedi, described it, BCCI's intention was to "manage" First American and all of its branches in the U.S., just as it was already managing the National Bank of Oman. However, in the years that followed, mid-level BCCI officials in the United States would feel that they were engaged in a struggle for control of First American with Clifford and Altman. Whenever BCCI officials would push too hard to more directly involved

https://info.publicintelligence.net/The-BCCI-Affair.htm

in controlling First American's affairs, Clifford and Altman would appeal to Abedi, and Abedi would usually -- but not always -- take steps limiting the BCCI intrusion into First American.

To preserve deniability for the regulators, Abedi and top BCCI management sought to segregate and compartmentalize their activities, making certain that Clifford and Altman would meet separately with Abedi outside the presence of other BCCI officials. As BCCI regional manager Abdur Sakhia described it, typically, when Clifford and Altman visited BCCI offices in New York and Miami from 1982 onwards, Mr. Abedi would meet with them first, they would leave, and Abedi would then separately brief the BCCI staff as to what happened.[5]

In pursuit of a unified U.S. strategy, within one year of the FGB takeover, BCCI moved to establish its U.S. presence directly, opening offices in New York, Miami, and San Francisco, with later branches and representative offices targeted for Chicago, Houston, Los Angeles, Tampa, Boca Raton, and Washington, D.C. These offices primarily engaged in marketing commercial banking services to import-export businesses, and in providing personal banking to "high net worth" individuals who were non-U.S. citizens, and therefore permitted to make deposits at a branch office of a foreign bank in the U.S.

BCCI worked make these branch offices high-profile from the beginning. In Miami, for example, BCCI deliberately sought out well-known public officials and invited them to visit the bank. Both past and present Florida governors accepted the invitation, as did a U.S. Senator, and the then-son of the Vice President of the United States, Jeb Bush, who was at the time Florida's Secretary of State. Miami branch chief Abdur Sakhia said although BCCI had only been in south Florida a short time before its opening, it was already growing rapidly and becoming profitable, and political figures were glad to help the bank celebrate its growth.

We started in April 1982, but our formal opening in August 1982. Governor Graham came to that opening. Jeb Bush came to that opening too, along with Atlanta Mayor Andrew Young. Oil ministers from Venezuela, Abu Dhabi, the minister of economy and finance from Jamaica, Barbados, officials from Central Banks from all over the region. We had eight to ten ministers and central bank governors and leading businessmen from Venezuela and Peru and Trinidad, everywhere. . .It was a very successful opening. . .I have a videotape of portions of those in which Graham is being introduced to all BCCI people. Jeb Bush is also in those videotapes. Dante Fascell came to my house. We had met socially a couple of times. Reuben Askew came to the bank several times and had been to my house. Paula Hawkins came to the bank several times separately.[6]

**BCCI's Involvement in First American Management**

Shortly after purchasing First American, BCCI recognized that expansion of First American's operations to include offices in New York would be expensive. Accordingly, Abedi and BCCI decided to add $30 million in capitalization to First American/CCAH, with some of these funds coming from the Crown Prince of Abu Dhabi's deposits with BCCI, and the remainder from BCCI itself, as loans to its nominees, Fulaij, Khalil, and Shorafa.[7]

Initially, First American had intended to retain the Bank of Commerce in New York, which had been one of the banks owned by FGB in New York. However, the Bank of Commerce

board opposed the acquisition, and purchased the New York branch themselves, leaving First American without offices in New York City. As Robert Altman testified:

In the spring of 1982 we were then in a very awkward, and to some extent, unhappy posture. We were under an obligation to sell the New York City bank. And we were under a need to set up a new bank and really start it from scratch. We had nothing in the city. We had no staff. We had no location. We had no resources. It put us, as I say, in a difficult position. . . We essentially had two contacts in New York. One was the law firm of Wachtell, Lipton, Rosen & Katz that was cocounsel with us . . . the other was BCCI which had a representative office and was acting as an investment advisor. And we used those resources to try to get set up in New York.[8]

Thus, according to Altman, BCCI, acting as an investment advisor to the shareholders, helped First American set up its New York offices as a convenience to Clifford, Altman and First American. This account raises the question of why, under the circumstances of having no resources in New York City, First American would have wanted to establish officers there at all. New York City was already among the most competitive of all banking environments in the United States with giants as Citibank, Chase Manhattan, Chemical Bank, as well as dozens of other already well-established domestic and foreign banks.

The key business reason for opening a New York bank of First American was BCCI's desire to have it become the correspondent bank for BCCI's commercial bank relationships in the United States, and to act as BCCI's U.S. alter ego, free from interference by the DC-Maryland-Virginia banks of First American, which were being managed by Clifford and Altman.

A memorandum dated July 25, 1983, from BCCI employee Aijaz Afridi to BCCI Number 2 Swaleh Naqvi, with copies to BCCI officials Kemal Shoaib and K.K. Elley, described BCCI's plan for First American New York in terms that suggest it would operate independently from the other First American banks, apart from using them as sources of funds and sources for "their entire international business," in which First American New York would "become their Central Treasury."[9]

The memorandum discusses such issues as how to achieve growth and profitability for First American New York, how to project its image domestically and internationally, how to introduce the bank to Third World countries, new products and services, and related issues. Under "basic assumptions," Afridi noted:

Management style and Philosophy will be on the pattern of BCC -- No interference from the Holding Co. and free hand to the Management.[10]

The record also shows that BCCI's involvement in directing the establishment of this office was pervasive. For example, as both BCCI officials and BCCI documents show, it was BCCI, not First American, that determined how much office space First American would lease in New York. As Sakhia testified:

The decision of hiring, decision for acquisition of space . . . the New York office of First American was identified by BCC officers and approved by Mr. Abedi. He made the decision to rent that space.[11]

REENTERED AS EXHIBIT 3

Over the ensuing decade, the space would prove grossly excessive for the actual needs of First American, and its costs would become a significant drain on First American's resources. A letter dated December 13, 1982 from Elley to Swaleh Naqvi, Abedi's number two at BCCI, on BCC New York stationery, documents the nature of the relationship between BCCI and First American in New York. In the letter, Elley brings Naqvi up to date with a meeting he has had with Altman concerning the First American Bank in New York, and covering the subletting of space at 350 Park Avenue, renovation of the space, selection of board directors, recruitment of key staff, selection of auditors and attorneys, and coordination with the holding company and the shareholders -- all matters being handled for First American by Elley as a BCCI employee and reported to Naqvi, the BCCI senior executive at a time when Clifford and Altman were ostensibly in control of First American.[12]

BCCI also handled the purchase of new branch offices in New York for First American. In March 1983, while Elley was still employed by BCCI as head of its New York representative office, he began discussions with Bankers Trust officials regarding the purchase of branches of their bank for First American. Six weeks later, when First American submitted bids for the branches, BCCI officials -- not First American officials -- handled the negotiations.[13]

From the outset, officials at National Bank of Georgia and First American frequently travelled to meet with top management at BCCI. Soon after Pharaon's purchase of the National Bank of Georgia was approved by the OCC, NBG hired as its president former Bank of America officer Roy Carlson, who had worked closely with Abedi in the Middle East. Carlson soon began making trips to London to visit BCCI and in return, entertaining Abedi and his wife in Atlanta. In 1983, Carlson made two BCCI-related trips abroad, to London and Athens. In 1984, he made three such trips. In 1985, he made three such trips again, together with trips to Miami and Chicago to meet with BCCI officials there. Tariq Jamil, a former BCCI employee who went to National Bank of Georgia until its sale to First American in 1986, when he returned to BCCI, had a similar pattern of BCCI-related trips, as did two other Pakistani NBG employees with ties to BCCI. And National Bank of Georgia in turn financed the travel of top BCCI officials like Abedi and Naqvi to the United States, beginning as early as August, 1982. (14)

## U.S. Marketing Meetings

Apart from the situation in New York, where BCCI's branch office managed the start up of First American before its two principal officers there, Elley and Afridi, transferred to the new start up office of First American, BCCI was sufficiently busy during the first two years of its start-up in the U.S. that little effort was made to coordinate the activities of First American and BCCI overall. For example, the first branch in Manhattan of First American Bank opened its doors for the first time on March 1, 1984. By late 1984, BCCI had established a network of branches, representative offices and agencies in the U.S., Canada, and Latin America, including Miami, San Francisco, Los Angeles, New York, and Washington, D.C. Abedi believed that both First American and BCCI were sufficiently well-established that it was time to begin coordinating the different parts of BCCI's empire. In early 1984, Abedi asked the BCCI officials in the Americas to form a committee, which first met in April, 1985 in New York, "to coordinate the efforts of different locations of BCC and other institutions so that the President's desire to have a totality in approach is achieved." (emphasis added)[15]

In attendance at this first meeting were representatives of all of BCCI's offices in the United States and Canada, along with Elley and Afridi from First American New York and Tariq Jamil from the National Bank of Georgia. Its purpose was described by BCCI officers as coordinating the efforts of the entire group of BCCI-controlled institutions, including National Bank of Georgia and First American, to increase their overall market share in the United States. During the meeting, Jamil presented a report on the operations of NBG and Elley presented a report on the operations of First American Bank of New York. The memorandum summarizing the meeting ended with the following conclusion:

Mr. Elley concluded that in America we are sitting on 7 Billion dollar assets and this is just the beginning. There is much to do and inspite [sic] of diversity of operations as different agencies and banks we have to find a common denominator.[16]

The reference to seven billion dollars accurately described BCCI's assets in the U.S. only if one included both National Bank of Georgia and First American.

According to Abdur Sakhia, who was the U.S. coordinator for the meetings, the key mission of the meetings was to find ways to better cross-market between BCCI, First American, and National Bank of Georgia:

There was a plan within BCCI to market for First American. The international division, based in London, marketed for correspondent relationships for BCC group, including First American. So not only the branches of BCCI worldwide sent business to First American, but BCCI correspondents also were sending business to First American. Similarly, the deposits of U.S. residents or U.S. corporations that we could not take in BCCI branches because of the agency status we would market to First American. . . we were parking -- we were giving profits to First American. . . because the overhead, the marketing overhead, was absorbed by BCCI, the profit that was made was made in First American. But it was coming back to us because it was one and the same thing. . . because First American was owned by BCCI.[17]

Later memoranda of the America's Coordinating Committee of BCCI described the sharing of information between First American's officers handling Latin America and BCCI's; the possibility of BCCI procuring mortgages and selling them to First American; and similar coordination among BCCI, National Bank of Georgia, and First American New York.

The absence of First American's Virginia, Maryland and DC banks from these memoranda, despite the inclusion of First American New York, is notable. Clifford and Altman, in their Senate testimony, suggested that the lack of involvement of their branches was evidence that they were deceived by BCCI and BCCI officers at First American New York, Afridi and Elley. An alternate explanation, consistent with the testimony of a number of BCCI officials interviewed, suggests that there was an ongoing battle between BCCI's officials in the United States on the one hand, and between Clifford and Altman on the other, for control of BCCI's empire in the United States; that Abedi insisted on the purchase of First American New York to meet BCCI's needs, despite the lack of market justification for the purchase on the part of First American itself; and that Clifford and Altman temporarily ceded control of aspects of First American New York while jealously guarding First American's metropolitan Washington franchises against encroachment by BCCI's Pakistani second-level managers. Later, Altman would try to regain that control.

REENTERED AS EXHIBIT 3

Nazir Chinoy, head of BCCI's Paris branch, learned of the struggle over First American New York at a BCCI annual conference in Luxembourg in 1985, from Afridi himself, who confessed over a glass of wine that he was increasingly unhappy at First American New York.

Afridi felt that Altman was not permitting him to run First American on BCCI lines and yet he was answerable to Mr. Abedi for profits. He said Altman was interfering in the management and that he had reported to Naqvi on many an occasion about Altman interfering with his management, or trying to change the management structure or style.[18]

As Chinoy described it, from his point of view as a BCCI official operating outside the U.S., there was not so much a separation between First American and BCCI as two different types of management, one Pakistani and one American.

I saw rivals competing for power -- Afridi wanting to be the top man, and Altman wanting to be the top man.[19]

Abdur Sakhia, who was directly involved in U.S. expansion plans for BCCI, saw the problem in similar terms.

I was insistent that BCCI should have a direct presence of BCCI in the United States because we had a lot of opportunity, we were marketing with out hands tied behind our back because we were agencies. And he would say: Well, why don't you do marketing for our other banks, First American Bank, for National Bank of Georgia? Here are two banks; what do you want? I'd say: Sir, it makes a difference because we do not control the transactions, we do not provide the services directly . . . We were frustrated at the response time, turnaround time, service of First American. In BCC we in terms of business used to give a very good turnaround time, very good service. First American was in that sense very bureaucratic.[20]

**Joint Marketing**

Numerous BCCI and First American documents demonstrate that the offices of the two banks were working together in the early 1980's in an effort to expand First American's and National Bank of Georgia's business, especially in the international realm. For example, BCCI officers helped First American develop relationships with the Government of Sri Lanka for handling it imports of U.S. agricultural products under the Department of Agriculture's PL 480 program; BCCI officials set up meetings with the World Bank and International Monetary Fund to which officials of First American and National Bank of Georgia would be invited; and sponsored meetings with officers of various Latin American central banks.

Documents retrieved by Subcommittee staff from BCCI's files at its former offices in New York after liquidation provide detailed information about some of the joint marketing efforts. One such document, a discussion paper concerning "Relationship With First American Bank," describes the relationship between BCCI and First American for joint marketing as follows:

We are liasing [sic] closely with First American Bank in their marketing efforts in the Washington area. Already a number of accounts of individuals/corporations have been subpoenaed and a good beginning has been made on Embassy accounts (Brunei, Bangladesh, Guatemala, Pakistan, Panama). We hope to gear up this activity and make substantial progress

in the coming months. In addition next week we are jointly calling on thirteen embassies in Washington to get PL 480 business. . . . All efforts are being made to mobilize deposits for other BCC offices and in some cases for First American Bank.[21]

Another document from BCCI's Washington representative office, written by BCCI protocol chief Sani Ahmad, and dated July 5, 1985, suggests that First American would takeover any business in the United States that BCCI could not lawfully engage in, such as taking deposits, or participating in U.S. government programs like agricultural credits.

All business that our own agencies in the United States are precluded from handling is being passed on to First American Bank, and also those contacts who desire local bank accounts. The accounts worth mentioning in this respect are the [deleted] Account with balances of around $100,000, [deleted] restaurant with a turnover of about $35,000 per month and the Bangladesh Embassy who have placed a Term Deposit of over $1 million with First American. . . Bangladesh business is already being routed through [First American] because of this office. [22]

A later BCCI memorandum states that "a number of personal accounts have been opened at different branches of First American bank" through BCCI's efforts . . . we are now working with their [First American's] Asset Management Group who have provided us with a number of top multinational contacts such as Westinghouse and Northrop Corporation."[23]

In early 1986, BCCI officials at the Washington representative office began conducting meetings with prospective clients at First American's Washington offices. Later that year, BCCI introduced First American officers to officials at the Chinese Embassy. According to a BCCI "Business Call Memorandum," dated April 18, 1986:

The purpose of the meeting was to introduce First American to the Chinese Embassy to try and obtain their account. Mr. Barry Blank and Ms. Maureen Mcdonald from First American attended the meeting. . . This meeting was with officers of the political section [which] maintains both current and fixed deposit accounts.[24]

First American documents maintained by BCCI describe the same transactions from the point of view of First American. These documents typically underplay the involvement of BCCI officials in the marketing, simply noting their presence at meetings. However, BCCI officers were provided copies of at least some of the letters produced by First American concerning the joint marketing operations, and were even copied on First American's internal memoranda.

The fullest documentary record of the joint marketing program pertains to BCCI's successful solicitation of UPI to use BCCI as its international bank and First American as its U.S. bank.

In May 27, 1986, Barry Blank of First American wrote to Mario Vazsquez Rana, whose Mexican company was about to purchase UPI, as a follow up to a meeting in Mexico City attended by representatives of both First American and BCCI, and referring to BCCI's involvement in the meetings. In July, additional follow up letters were written by First American officials to UPI, referring to BCCI as First American's "affiliate." In this letters, written by First American personnel, First American officials describe the interrelationship of First American and BCCI and the benefits of banking with them together:

REENTERED AS EXHIBIT 3

First American Bank, N.A., in cooperation with its affiliate Bank of Credit and Commerce International (BCCI) and its extensive international correspondent bank network, is prepared to establish an international cash management program to meet your company's needs. . . The first step we recommend is that UPI establish banking relationships with BCCI in the locations where they have full service branches corresponding with your bureau locations, and that UPI establish the remaining banking relationships with our [First American's] correspondent banks . . . [25]

Ultimately, UPI agreed to open accounts at both BCCI and First American. [26] From the First American correspondence, it would appear that First American itself successfully solicited the business. A fuller account of the solicitation, contained in the BCCI memoranda, makes it clear that the UPI relationship was initiated by and developed by BCCI officials, and that UPI selected First American for its U.S. banking at BCCI's request. Ironically, UPI was unhappy with the handling of its accounts by First American and quickly ended the relationship. [27]

### Correspondent Banking

BCCI sought to strengthen First American through providing it with profitable activity from BCCI. As of February, 1991, some 46 branches of BCCI world-wide still maintained accounts at First American, with First American holding an average of $35 million in BCCI demand deposits, overnight placements and term placements. As part of its relationship with BCCI, First American made credit lines available to numerous BCCI branches and affiliates, for which First American received compensation in the form of demand deposits and cash fees. [28]

### Expansion: Purchase of Independence Bank

Abedi had from the beginning intended to expand BCCI's operations into California, as a means of linking BCCI's U.S. operations with its rapidly growing operations on the Pacific rim. Accordingly, BCCI officials in the U.S. were directed in 1983 and 1984 to investigate California banks for secret acquisition by BCCI. In November, 1984, they selected Independence Bank of Encino and began negotiating its sale. Soon thereafter, Abedi and Pharaon agreed to make Pharaon BCCI's nominee for the purchase in order to avoid the regulatory scrutiny that would follow if BCCI sought to purchase Independence directly. Abedi arranged for BCCI's alter ego, ICIC, to enter into an agreement with Pharaon in which Pharaon agreed to act as nominee and agent for ICIC in acquiring Independence. Under the terms of the arrangement, Pharaon would hold 15 percent of Independence Bank on his own behalf, and the 85 percent would be held by ICIC for BCCI. [29]

Regulators were told that Pharaon would pay for Independence through a mixture of his own funds and from a loan from a major domestic bank. However, in fact, BCCI loaned or guaranteed the funds for the purchase, laundering the funds through other banks.

As BCCI Number Two Swaleh Naqvi admitted to BCCI's London attorneys in early 1991, BCCI in fact provided all the financing for the acquisition and later increases in capital. The financing was provided from accounts in Pharaon's name with BCCI holding all the shares as

security, although BCCI's security interest was never registered with the company in order to evade detection by regulators.[30]

First, BCCI loaned $8.5 million to Pharaon and transferred the proceeds to Pharaon's account at Banque Arabe et Internationale d'Investissement, Paris (BAII), a bank which shared directors in common with BCCI, and which had also been used to shield BCCI's funding of the First American purchase four years earlier. BCCI instructed BAII to send a telegram to California banking authorities stating that Pharaon had deposits of that amount with BAII that were being held for the purchase of Independence, and thereby disguising the fact that the funds came from BCCI. The remainder of the funding for the transaction came from First National Bank of Boston -- with a letter of credit, guaranteeing First National Bank of Boston against loss coming from BAII, which in turn received a counter-guarantee from BCCI holding BAII harmless against any claim that might arise. Thus, BCCI in effect was responsible for the entire financing of the Pharaon purchase, and disguising this role through both of the banks involved.[31]

After acquiring Independence through Pharaon, BCCI undertook its typical follow-up. Abedi appointed a high-level BCCI official, Kemal Shoaib, to become chief operating officer of Independence, while abandoning its original plan of also placing Roy Carlson, president of National Bank of Georgia, on the bank's board of directors. Shoaib then continued to report to BCCI while heading Independence, and to receive benefits from BCCI such as a subsidized home mortgage loan and accrual of his BCCI pension benefits. Independence's budget, strategy and planning, its directors and senior employees, all were run by BCCI's number two, Swaleh Naqvi, for approval. As Independence required additional capital infusions, BCCI loaned the money to Pharaon.[32] Just as envisioned in BCCI planning memoranda, Independence Bank began to make direct investments in real estate, as permitted by California law, and incurring losses as a result of BCCI's management which ultimately would bring about Independence Bank's collapse.

By 1991, when federal regulators finally conducted a serious review of Independence Bank's condition, they found atrocious conditions at the bank, unusual in a U.S. financial institution, but typical of BCCI's practices:

Loans subject to adverse classification total $194 million, representing nearly 44% of total loans, a phenomenal ratio for a commercial bank. . . The bank has an especially unenviable record of selecting or attracting borrowers of questionable character and creditworthiness. Many files include derogatory credit information, such as delinquencies, tax liens, litigation, and judgments, which were often not addressed in internal memoranda or excused as normal in the real estate business . . . Financial statements were often not complete . . . lacking supporting specifics, sometimes not even signed by the borrower, often not of the legal entity borrowing the funds, and frequently not on the bank's forms, which included a number of pertinent questions which therefore went unanswered. Requesting tax returns was almost unheard of. Rarely were the existence of assets verified, and less frequently were values independently confirmed. In many cases even the most basic financial analysis was not attempted, and when it was, it was often badly flawed.[33]

REENTERED AS EXHIBIT 3

In all, BCCI spent $90 million on Independence, whose collapse in 1992 later cost the bank insurance fund, and indirectly, the U.S. taxpayers, some $140 million.[34]

**Consolidation:**

**First American Purchases National Bank of Georgia**

**On BCCI's Behalf**

As the Office of the Comptroller of the Currency had suspected in early 1978, BCCI in fact owned 50 percent of National Bank of Georgia (NBG) from the moment of its ostensible sale to Ghaith Pharaon in May of that year, with Pharaon acting as BCCI's nominee for those shares to avoid the hostility regulators had already demonstrated towards any direct acquisition by BCCI. As the Federal Reserve ultimately found following BCCI's closure, when Pharaon acquired his shares of NBG from Lance, he borrowed at least part of the funds used for the acquisition from BCCI.

In November 1981, Pharaon established a holding company, GRP, Inc., of which he owned 100 percent, to hold his shares of NBG, and established a cost-sharing arrangement with BCCI concerning NBG under which BCCI and Pharaon would divide expenses equally and consider NBG to be equally owned by both. The following year, this holding company changed its name to NBG Financial Corporation. A year later, in August, 1983, Pharaon formed two more holding companies, Interedec (Georgia) N.V. or Curacao in the Netherlands Antilles, and a second Interedec (Georgia), incorporated in Nassau, Bahamas. Under this arrangement, shares in the National Bank of Georgia were held by NBG Financial, shares in NBG Financial were held by Interedec of the Netherlands Antilles, and shares in Interedec of the Netherlands Antilles were held by Interedec of Nassau Bahamas, which in turn were held by Pharaon. The obvious purpose and intent of this series of holding companies -- so similar to the holding companies and locations set up to hide BCCI's ownership of First American -- was to permit Pharaon and BCCI to sell or mortgage Pharaon's interest in NBG without regulators or creditors finding out.[35]

Soon after setting up these holding companies, Pharaon formed another company, Pharaon Holdings Limited of Nassau, which immediately acquired Pharaon's 50% interest in NBG, making Pharaon Holdings a bank holding company under U.S. law and requiring Pharaon under U.S. law to notify the Federal Reserve of the change in ownership, which Pharaon ignored.[36] The other 50% of the stock, held by Pharaon as a nominee for BCCI from the beginning, remained in NBG Financial.

During the years NBG was "owned" by Pharaon, it adopted a number of BCCI's practices and employed a number of former BCCI employees. NBG personnel regularly attended BCCI conferences, at BCCI's expense. NBG adopted BCCI's management style and hexagonal logo, and reoriented its orientation as a bank from focusing on local business at the retail level to international transactions.[37]

On January 1, 1985, Pharaon, who was experiencing significant financial difficulties, executed a secret "Memorandum of Deposit" with BCCI which provided that all of the outstanding shares of NBG Financial would be deposited with BCCI as collateral for loans to Pharaon and

his companies, and giving BCCI "or its nominees" the right to vote the shares. As a result, as of that date, BCCI had effective control over the 50% of the shares of NBG which had been BCCI's from the beginning.[38]

By November 1985, with Pharaon's financial difficulties intensifying, BCCI's auditors, Price Waterhouse, began to express concern to BCCI about its exposure to Pharaon and calling on the bank to reduce this exposure. In fact, a portion of this exposure was related to Pharaon's holding of NBG on BCCI's behalf.

Accordingly, BCCI and Pharaon agreed to liquidate Pharaon's 50% interest in NBG, and sell his holdings of NBG stock held by Pharaon Holdings Limited back to NBG Financial, now controlled by BCCI. At this point, BCCI had direct and total secret control of all of the outstanding shares of National Bank of Georgia, and had demonstrated to Price Waterhouse its ability to force "loans" to major borrowers like Pharaon to be "repaid." But these financial manipulations did not solve the other serious problem created by Pharaon's deteriorating financial condition -- the possibility that creditors might seek to attach the shares of NBG Financial -- still officially "owned" by Pharaon. The result would not merely put BCCI's ownership of NBG at risk, but could set in motion the destruction of BCCI's entire empire in the United States and possibly globally.[39]

In London, Abedi looked at the NBG situation and determined that the simplest solution to the Pharaon problem was to merge National Bank of Georgia into First American, and thereby take Pharaon out of the picture. In the terms of the Federal Reserve charges, "in December 1986, BCCI caused CCAH to agree to purchase the shares of NBG [Financial] from Pharaon for $220 million."[40]

Significantly, while the transaction did not close until August 19, 1987, First American provided $80 million at the end of December, 1986 as an option on the purchase, securing those $80 million worth of shares and leaving Pharaon "holding" only a remainder of $140 million worth of the bank -- shares already held by BCCI as security for defaulted loans. Thus, any outsider who tried to attach Pharaon's shares in NBG would find that as creditors, they were now in back of First American and BCCI, making such an attachment of little legal value and thereby protecting the shares.

Within BCCI at the time, it was generally understood that the sale of NBG from "Pharaon" to "First American" was principally a consolidation of BCCI entities within the United States. As Abdur Sakhia testified, First American had been planning to expand its operations to Florida in the mid-1980's, and had never discussed a move into Georgia, until 1985. In late 1985, he became aware that Pharaon's financial situation had become shaky, and at Abedi's request arranged for a meeting to take place in Miami in November of 1985 involving Abedi, Naqvi, Clifford, Altman, and two officials from National Bank of Georgia -- Carlson and Jamil. No one else was permitted to attend the meeting. After it ended, Abedi came out and told Sakhia and other BCCI officials that National Bank of Georgia would be merged with First American. [41] Later, in preparation for BCCI's possible purchase of a bank in Florida, Sakhia was provided with a model file of the Independence Bank transaction, which had the details of the National Bank Transaction showing Pharaon's role as a nominee.[42]

https://info.publicintelligence.net/The-BCCI-Affair.htm

After the Miami meeting, Sakhia wrote Abedi in London in February 1986 regarding BCCI's "Future Plans in the United States." In the memorandum, Sakhia referenced his discussions with Altman concerning the planned purchases by BCCI of banks in Florida. In a paragraph concerning the National Bank of Georgia, Sakhia suggested that in view of "the forthcoming restructuring of the bank in Georgia, it may be useful to merge their Miami operation with BCC Overseas, Miami, as this will offer additional dollar deposit and correspondent banking relationship to BCCI Overseas."[43]

In their written testimony before the Senate, Clifford and Altman denied that the acquisition of NBG by First American was directed by BCCI, stating instead that the acquisition "was as reflection of First American's consistent corporate strategy of expansion since 1982 . . . in December 1986, based solely on its judgment of First American's best interests, the CCAH Board approved the proposed acquisition of NBG. BCCI did not influence these deliberations, nor did it control the Company's decision to acquire NBG. First American, not BCCI, initiated the NBG transaction."[44]

Pharaon himself took a similar position, which he has maintained to this date, that he was never a BCCI nominee and acted independently in connection with his sale of NBG to First American, as in all other matters. As Pharaon told reporters in 1987, the transaction took place for sound reasons of banking business on both sides:

[NBG] really needed to be part of a larger organization. We let First American take a very deep look at the bank because we knew that we were not selling them anything they wouldn't be totally satisfied in purchasing. It was not a situation where I was simply telling them no look, no see, no touch, just pay. I'm dealing with people with whom I have other dealings and I can't afford to pass on to them something they wouldn't be totally happy with."[45]

As Altman said at the same time:

It was clearly an arms-length business deal, that is to suggest we didn't get any special consideration in terms of price. . . It's a logical move for us in terms of our market expansion. [46]

The statements made by Clifford and Altman to the Committee and to journalists, and by Pharaon to regulators and journalists, cannot be reconciled with the documentary and testimonial accounts of all the other parties involved, as well as the findings of the Federal Reserve concerning the NBG sale to First American, and fails to account for the manner in which BCCI and Pharaon handled the transaction.

At BCCI, the transaction was viewed to be a matter of utmost secrecy, because of the risk to the bank if the regulators should understand that BCCI was directing the National Bank of Georgia sale. Paris branch manager Nazir Chinoy, who had no direct involvement with the sale of NBG to First American, only happened to learn of BCCI's involvement in the deal -- and the secrecy involved concerning BCCI's real role in it -- when Abedi came to Paris and lost a briefcase containing key documents regarding the sale:

Either in December 86 or January 87 Naqvi and Abedi came to meet with Pharaon and through a communications error I was not there to receive them at the airport. They wound up having

to take a taxi to BCCI's offices at the Champs Elysee. Abedi gave the taxi driver $30 for a $5 drive. When Abedi got into the bank he said, where's my briefcase. All of us looked surprised. It had been left in the luggage compartment of the taxi. I talked to the girl at the airport and offered a $100 (1000 franc) reward. The next morning at 9 am I got a call. The taxi driver came up and said, the briefcase is there. Naqvi said, you collect it and bring it to London. I said I am leaving for Ivory Coast. They said never mind then you go back and catch your flight. It was a trip I didn't want to make. It's tiring. I saw written National Bank of Georgia written on the briefcase. Naqvi told me to open it and see if the papers are right to the top. I did and they were. The following week they came again and Naqvi and Abedi arranged for it. Abedi told Naqvi in Urdu, thank god the National Bank of Georgia deal is done. Then Naqvi signalled to Abedi to keep quiet because I was in the front seat.[47]

Internal documents produced by British lawyers for BCCI in 1990 and 1991 describe admissions by Naqvi to the bank's lawyers about the true state of affairs between Pharaon and BCCI, at a time when Pharaon was threatening to "trade information for protection from prosecution" with the Manhattan District Attorney if BCCI did not cooperate with Pharaon.[48] According to Naqvi, BCCI and Pharaon had undertaken a complex series of financial maneuvers in 1985, months before Clifford and Altman supposedly initiated the transaction over NBG, to sell Pharaon's interests in NBG to BCCI in response to Pharaon's shortages of funds, even setting an expected price for NBG's sale:

The bank agreed to settle [Pharaon's] 50% interest in advanced based on expected proceeds of $205 million, giving him $102.5 million [as BCCI already secretly owned the other half of National Bank of Georgia]. This payment date was taken as 17 May 1986. In fact Pharaon received some funds before this in 1985 and the remainder through 1986 and 1987, with a small balance carried forward. The payments were structured [not as payment for the stock but] as loans to Pharaon. These payments also covered $95 million due to Pharaon on the sale of his own BCC shares. . . the bank and Pharaon entered a formal agreement signed by Pharaon dated 17 October 1986 for the bank to receive a 10% commission for finding a buyer for the NBG shares. The agreement warrants that Pharaon/Interdec [sic] own all the NBG shares.[49]

When First American purchased National Bank of Georgia a year after Pharaon started receiving his "loans," the funds -- which came from BCCI itself into First American and from First American to NBG -- were used to pay off the "loans." Ironically, since the "loans" were used by BCCI to wipe out Pharaon's shares of BCCI itself and Pharaon's interests as a nominee in other BCCI-related institutions such as Attock Oil, the entire transaction was largely a wash, with the consequence of eliminating Pharaon's nominee interests in National Bank of Georgia, BCCI itself, and BCCI-related entities and consolidating [50]

### CenTrust: BCCI Schemes With A Dirty S&L

Throughout the 1980's, BCCI had wanted to establish a foot-hold in Florida through owning a bank in that state with the ability to take deposits from Americans, a power precluded BCCI's branch operation there under federal bank laws applying to foreign banks, which are outside the U.S. federal deposit insurance system. Internal memoranda at BCCI begin referring to a variety of possible acquisitions of banks in South Florida, and a number of different BCCI

officials, including Abdur Sakhia, who testified before the Subcommittee, began investigating possible target banks in Florida for BCCI's acquisition. A memorandum from Sakhia to Abedi in early 1986, entitled, "Future Plans in the United States," describes BCCI's intentions:

With reference to our brief meeting in London, we are pursuing bank acquisition with Mr. Altman the two institutions I mentioned to you in London. As you are aware, the statewide banking in the state of Florida is achieved either through acquisition in different counties and subsequent merger or by incorporation of Denovo Banks in each county, and merging them subsequently . . . As I suggested to your good self, we may apply for state chartered agencies of BCC Overseas in Ft. Lauderdale, Orlando and Jacksonville counties. Because of our relationship with state authorities we can get approval ourselves within two to three months without involving any legal cost whatsoever. When we complete the acquisition of a bank we may then transfer existing agencies with the exception of the Miami Agency to the acquired bank with considerable savings of cost and time.[51]

In point of fact, BCCI had expanded its branch offices to three in Florida -- Miami, Tampa and Boca Raton -- but was unable to find a suitable target bank in Florida over the remainder of 1986. Moreover, BCCI had decided by early 1986 that whatever it did in Florida would have to be secret, because the Treasury losses discovered by BCCI's auditors in 1985 and announced publicly in December 1985 had made BCCI even more notorious in international banking circles, and would subject any proposed purpose of a U.S. bank by BCCI to even more scrutiny.[52] Sakhia, as well as others affiliated with BCCI, had already begun meeting with CenTrust chief David Paul beginning in early 1985 and continuing through 1986, socializing with Paul. According to Sakhia, nothing came of these meetings. [53]

By early 1987, however, Pharaon, who had developed a personal relationship with CenTrust Savings & Loan high-flyer David Paul, had advised BCCI that Paul was looking for financing for CenTrust, and might ultimately be willing to give up control of BCCI. Paul was at the time an active political fundraiser for the Democratic party, the Democratic Senate Campaign Committee, which the Subcommittee chairman then chaired, a number of Democratic politicians, and some Republican politicians and entities as well.

At the time, BCCI was not sufficiently satisfied it knew the full extent of CenTrust's problems to be willing to simply purchase the bank. But BCCI and CenTrust's top officials saw a second opportunity. BCCI did not have to make a final decision regarding its ownership of CenTrust. It was sufficient that it could help CenTrust strengthen its eroding capital base through a scheme that would help both CenTrust and BCCI. Working in collusion, Pharaon, BCCI and CenTrust could create a profitable market in CenTrust subordinated debentures by artificially propping up the price through BCCI buying debentures from CenTrust, demonstrating their marketability, and then CenTrust i turn agreeing to repurchase the debentures under a buy-back agreement.

As the Justice Department described the scheme in its late 1991 indictment of BCCI, Abedi, Naqvi, and Pharaon, Pharaon would seek to sell CenTrust subordinated debentures to investors; arrange for a branch of BCCI to purchase $25 million of the debentures to deceive other investors as to their market value; and CenTrust would in turn agree to repurchase any of the debentures that had been purchased by BCCI.[54] As a result, CenTrust -- whose ultimate

REENTERED AS EXHIBIT 3

collapse is likely to cause the taxpayers $1 billion to $2 billion -- was kept afloat and its true condition withheld from regulators. As the Justice Department has charged:

Paul and Pharaon on or about May 16, 1988 would and did cause Pharaon to use his position and relationship with BCCI to arrange BCCI's assistance in purchasing approximately $25,000,000 (par value) of the $150,000,000 offering, with the condition that the debentures would be purchased within a short period of time at full par value. Under this arrangement, the apparent purchaser of the debentures would hold the bonds briefly, creating the appearance that the $150 million offering had been fully sold, and then return the bonds and receive a full refund of the purchase price, assuming no risk of a drop in the market price while earning interest on the bonds for the period they were held.[55]

At first, Pharaon himself was intending to purchase the CenTrust debentures, but as was typical of Pharaon's ventures with BCCI, there was a great deal of flexibility between Pharaon and BCCI as to who between them would actually undertake a particular transaction.

Paris branch manager Nazir Chinoy, who testified before the Subcommittee, developed detailed knowledge of the arrangements involving Pharaon and BCCI as a result of his having had a surplus of dollar funds available for investment out of BCCI's Paris office. Chinoy had in 1988 advised Naqvi that Paris would be happy to loan funds for BCCI investments elsewhere, on a "parked loan" basis, under which the Paris office would not take the credit risk, which would be taken on by BCCI's Central Office in London, but would earn interest and commissions. Soon after, Chinoy received a call from BCCI London that Ghaith Pharaon wish to borrow $25 million to purchase the bonds of a U.S. bank. According to Chinoy:

They asked me, would I be interested in lending it? My initial response was, why is Mr. Naqvi giving this to Paris and not to New York or Miami region? Why not to the States? The answer I got back was that Dr. Pharaon -- I don't know why he was referred to as Dr. Pharoan -- that he had dealings with Paris and his staff knew our people in Paris and he was happy with the service in Paris and he would like it there. The rates were 1 percent front end fee and that was juicy -- $250,000 straight -- and 1 and a half over LIBOR. The loan would be for a period of six months. Collateral American bank bonds. Mr. Naqvi felt they were good bonds and there would be no problem in getting credit committee approval. He may have said the name but it didn't mean anything to me.[56]

Chinoy was told that Pharoan expected the price of the debentures to improve and would ultimately sell the bonds, and that he should make payment for the bonds to Drexel, Lambert, which was handling the transaction for the U.S. bank, CenTrust. According to Chinoy, in making the decision to go ahead with the financing, he was relying not on financial information for CenTrust or for Pharaon, but on the reputation of Drexel, Lambert as an investment banker which created markets, and on Naqvi in London.

If Mr. Naqvi as president of the bank says the collateral is good, he knows better than you. I said fine, and set in progress the loan formalities. The paper work was set into operation and we got instructions to pay Drexel in NY. Payment was made through traditional BCCI bankers in New York Security Pacific. The bonds were held by Drexel in NY to order of BCCI-Paris. Almost $25 million were disbursed. Later negotiations with Imran Iman indicated that Pharaon was not willing to let BCCI buy the bonds after all, instead he wanted to buy them

and have BCCI loan him the funds. In April or May of 1988, we had booked a front-end fee of $200,000. $25 million was one of the biggest loans of Paris to an individual. If you did any loan over $5 million you prepared a credit report based on the Bank of Americas loan reporting procedure adopted years ago -- profitability, shareholders profitability etc. 15 pages. In this case, we did not prepare this. We did a CYA letter instead to cover ourselves -- shot off a memo, signed by me, to London.[57]

As branch manager of BCCI Paris, Chinoy was told by BCCI London that he had to go ahead with the transaction however it was structured, and regardless of how the terms changed over the course of the transaction. Ultimately, the debentures arrived at BCCI-Paris as security, and Pharaon later sold the bonds and BCCI Paris was repaid, earning almost $700,000, with another $300,000 being provided to Pharaon as commission or interest. The funds for the repayment of BCCI-Paris in turn came from BCCI London.[58]

Later, Chinoy saw a fabricated document, ostensibly from the Paris branch of BCCI, addressed to BCCI's credit committee and requesting the loans for the CenTrust transaction, which he believed was created by Naqvi after the fact to cover the unusual transaction and to make it appear to auditors that authority for it had been requested and granted by the committee. According to Chinoy, Pharaon's "profits" on CenTrust were transferred to BCCI's offices in Bahrain as a means of reducing Pharaon's defaults to BCCI there, and demonstrating to auditors that Pharaon's loans from BCCI were being serviced.[59]

In the meantime, BCCI also agreed to finance Pharaon's purchase of an interest in CenTrust, with the possibility of assuming actual control of the bank.

On August 12, 1987, Pharaon filed disclosure statements with the SEC stating that he had purchased 16.9 percent of CenTrust common stock and 24.4 percent of its Series One participating stock, a preferred stock, from two insurance companies which had purchased the shares the preceding year. Reminiscent of the FGB takeover purchases of just under the 5 percent holdings required for reporting in 1977, this represented just under the 25 percent ownership that would constitute the legal definition of "control" of CenTrust by Pharaon. The next day, Paul advised inquiring journalists that Pharaon was "one of my very close personal friends. He is probably one of the three or four closest personal friends Mrs. Paul and I have." By January 7, 1988, Pharaon acquired 748,901 shares of voting common stock of CenTrust, and on April 14, 1989, he purchased an additional 812-681 shares of Centrust, bringing his total holdings of CenTrust voting shares to 1,561,582 shares. At no time did Pharaon or BCCI disclose the fact that all of these purchases had been financed by BCCI, and that the CenTrust shares purchased by Pharaon would be held by BCCI as security for those borrowings, placing BCCI in the position of being able to control CenTrust. As a Memorandum of Deposit signed by Pharaon and BCCI stated, "BCC or its nominees may exercise . . . in respect of the [CenTrust] Securities or any of them any voting rights as if BCC or its nominees were a sole beneficial owner thereof." At the very time that BCCI was under indictment in Tampa, Florida for money laundering, it had secretly acquired and controlled the largest S&L in Florida, CenTrust.[60]

Ironically, consistent with its pattern of expanding into areas of operation that BCCI had been interested in exploiting, First American also purchased a bank in Florida, the Bank of

Escambia, at almost the same time as BCCI acquired its interest in CenTrust. The purchase of the bank, renamed First American Florida, caused federal regulators to ask for further information concerning First American's dealings with BCCI. On receiving assurances that First American's shareholders still were not nominees for BCCI, and that BCCI was not in back of the transaction, the Federal Reserve permitted the purchase to go forward.[61]

**BCCI's Attempts to Sell its US Empire**

BCCI's secret purchase of U.S. banks had been extraordinarily expensive for BCCI. Because it had used nominee arrangements to pay for the banks, its ownership of the banks was carried on its books as loans which were not being serviced. As a result, each year, BCCI was forced to add the interest to the amount secured by its shares of First American to its books. Additionally, First American's series of acquisitions, including operations in Tennessee and Florida, had stripped BCCI of further capital. By 1989, Price Waterhouse, as BCCI's auditors, were becoming increasingly unhappy and vocal about the size of BCCI's exposure on First American, and demanding that BCCI contact the shareholders and have them at least been servicing the loans they supposedly had. Since both the shareholders and BCCI knew the loans were bogus, BCCI was left in the position of having to consider the forced sale of First American.

Indeed, that strategy was first considered, and attempted, by BCCI, in 1986 in connection with the purchases of BCCI and CCAH stock by the Khalid bin Mahfouz, head of the National Commercial Bank of Saudi Arabia and the most powerful banker in the Middle East. Bin Mahfouz had purchased shares of both BCCI and CCAH under a complex agreement that would permit him to purchase both banks, or to hold his interests temporarily with BCCI guaranteeing to buy them back at no risk to bin Mahfouz. After auditors for National Commercial Bank raised questions about bin Mahfouz's actions regarding BCCI, the transactions were fully unwound by 1989, leaving the First American problem for BCCI unsolved.

In 1989, after meetings with auditors, BCCI concluded that it should place First American on the market, and asked Clifford to retain an investment banker to seek purchasers for First American. As an internal task force headed by BCCI chief financial officer Massihur Rahman noted in April, 1990:

Since 1989 the bank has advised the major borrowers to dispose of their shares in CCAH to repay their loans in BCCI . . . the legal representatives of the shareholders of CCAH have retained the services of a major U.S. investment bank to advise, evaluate and assist either in the outright sale or in the merger of the CCAH group of First American banks with a larger banking entity.[62]

Goldman Sachs was retained by Clifford, on behalf of "CCAH" in July 1989. On October 10, 1989, Clifford wrote First American's shareholders to inform them that they had been approached by Barnett Banks "to discuss their interest in a possible merger or acquisition arrangement with First American," and had retained Goldman Sachs to evaluate the "express interest of Barnett Banks as well as other possible candidates."[63]

REENTERED AS EXHIBIT 3

By April, 1990, Price Waterhouse concluded that BCCI's financial situation was perilous, and demanded that action be taken immediately. BCCI's $702 million exposure had not been reduced, as bank officials had promised, but had gone up, with interest, to a staggering amount -- $870 million. Price Waterhouse concluded that based on its estimate, if a buyer were found, BCCI would still lose $200 million or more on a sale of First American at 2.1 times net tangible assets.[64] Price Waterhouse also warned that if a buyer were not found, the auditors might well classify a portion of this debt, wiping out BCCI capital in the process and drawing public attention to the loans in BCCI's annual report. Given the ignorance of U.S. regulators about the nature of BCCI's lending for First American, this would be a catastrophe.

The only way out of this problem was a sale of First American, and the initial interest from Barnett Banks had disappeared. However, at Clifford's recommendation, Goldman Sachs had also contacted NCNB, now known as Nation's Bank, to determine whether NCNB might be interested in purchasing First American. NCNB was indeed interested, and prepared to offer $1 billion for First American based on the financial information provided to them by Goldman Sachs. The offer, which represented 1.5 book value, was subject to a number of conditions, including "satisfactory completion of normal business and legal due diligence by both you and us."[65] Oddly enough, NCNB and BCCI never moved ahead with the due diligence. Little further paperwork was done, and within two months, BCCI executives were told that negotiations had stopped entirely.[66]

By the end of July, BCCI's board of directors had become involved in seeking other ways to dispose of BCCI's holdings in First American. In a letter from BCCI director J.D. Van Oenen to BCCI's then senior executive, Swaleh Naqvi, Van Oenen noted that there were "many problems of which we were not fully aware" in selling the franchise, because of limits on interstate banking, foreign ownership, and because of unspecified problems with the New York operation of First American. Van Oenen noted that if BCCI could not sell First American, it would lose another $60 to $70 million by the end of 1990 on holding the bank. Further, Price Waterhouse had developed an "attitude" regarding the First American shares that might well result in the auditors classifying a portion of the loans, which could damage BCCI's balance sheets further. An attachment to the Van Oenen letter showed annual losses for BCCI connected with First American as amounting to $106 million, and that BCCI would have to sell First American at three times book value to break even, at a time when it had been unable to move ahead with an offer for half that amount.[67]

According to the memorandum the preferred option BCCI was considering was the "internal solution" -- a sale of First American to Abu Dhabi. Unfortunately, the questions that regulators would raise appeared to make this approach impossible. Alternatively, Abu Dhabi might be convinced to lend funds to BCCI and "call the loans, at a time of their choosing, take possession of the security and thus gain two years breathing space to dispose of it." Under this scheme, Abu Dhabi would in effect replace BCCI as the lender to the nominees, and then remove them at its convenience, at which time it could hold or sell First American as it pleased. Van Oenen acknowledged that there was a fundamental flaw with this plan -- if Abu Dhabi called all of its loans simultaneously, regulators would again ask questions, and might charge that Abu Dhabi had secretly gained control of the bank without due notification.[68]

REENTERED AS EXHIBIT 3

A third approach recommended in the BCCI/Van Oenen memorandum would involve BCCI "garaging" loans with other institutions to "slim down" its balance sheets, either on a "re-purchase basis," or "as an outright sale." The former approach amounted to juggling BCCI's books to take its loans for First American off the balance sheets. The approach had already been effectively used by BCCI in connection with purchases and sales of CCAH stock by Khalid bin Mahfouz and the National Commercial Bank of Saudi Arabia in 1986. But it would do nothing to resolve the underlying losses other than buy time, and it would face severe criticism from regulators, if they found out, and from BCCI's own auditors. Outright sale of First American stock was simpler, but faced an equally daunting objection -- no institution would buy the stock without some form of guarantee from BCCI's shareholders, and favorable terms, costing BCCI further funds it could not afford.[69]

The BCCI directors also wished further to explore selling First American to a domestic U.S. bank, but recognized that the only bank that expressed interest, NCNB, had for unknown reasons done nothing further to move ahead with negotiations. Finally, they considered the possibility of the sale of First American to a foreign bank, noting that the only identifiable institution that might be interested would be the National Bank of Abu Dhabi, a very small institution, with assets of $150 million, that could "theoretically qualify for a 'reverse' procedure by merging into CCAH." Van Oenen acknowledged that "the chances [for approval of such a transaction] do not rate very high."[70]

In fact, by the summer of 1990, the Morgenthau investigation of BCCI's activities in the United States had already moved into high gear, and BCCI's lawyers in the United States, including Clifford and Altman, were in the position of resisting the attempts of the New York District Attorney to obtain documents concerning the relationship between First American and BCCI. Subcommittee staff were also questioning the relationship, and had scheduled hearings for July or August, 1990 on the topic of BCCI's possible ownership of First American. In such an environment, any orderly sale of First American to any potential buyer would be fraught with difficulty, and there is no documentation following the Van Oenen letter indicating that an actual sale of First American was anticipated by anyone.

### Consequences for First American

### Of BCCI-Related Expansion

Up and until the indictment of BCCI in October, 1988 in Tampa on money-laundering charges, BCCI continued its expansion and consolidation in the United States, with First American expanding operations in Tennessee and Florida, and considering the development of operations in Utah and elsewhere. While the metropolitan branches of First American were kept largely free of BCCI's direct involvement, its New York and Georgia operations were never completely free of BCCI's influence, and even in the metropolitan branches of First American, BCCI had provided a variety of services up to the Tampa indictment. As Abdur Sakhia concluded:

You have enumerated the whole list of interlocking relationship, joint business, joint marketing, joint . . . staff transfers, hiring of staff, merger of First American and National Bank

REENTERED AS EXHIBIT 3

of Georgia, renting of space, appointment of chief executives . . . how the raising of capital and purchase prices were circulated. It is nothing but one institution.[71]

In the face of Clifford and Altman's position that First American bank was never controlled by BCCI, and that the two operations were separate, officials at First American New York took pains to reiterate to BCCI officials at far-away locations elsewhere that the two banks were operating jointly. One such letter, to a BCCI official in Nairobi, Kenya, written on First American stationery, and signed by two First American officials specifically sought to rebut assertions to the contrary:

Recently an article appears in the Financial Times of February 13, 1990 ascribing certain comments to an unnamed senior First American officer. We have taken exception to the report where it states that, in the future, our two institutions shall not be dealing together.

To set the record straight, we wish to reiterate that First American values the relationship between our two institutions, and we are continually desirous of enhancing it. As you are aware, we are maintaining about forty accounts of the BCC Group's various locations. Additionally, sizable credit facilities are also available in all categories.[72]

Unfortunately, a number of BCCI's purchases in the U.S. were proving unprofitable. Independence Bank grew ever weaker as the value of its real estate plummeted. First American New York's operations never justified the costs of the space in Manhattan which BCCI insisted that it lease, and which was still costing First American substantial sums as of May, 1992. And National Bank of Georgia remained a weak institution, with very significant problems, including, as bank regulators late found, "inadequate supervision by board and management, an eroding capital base, an ineffective corporate liquidity function, and deteriorating asset quality and earnings performance."[73]

Even First American's core banks had become severely stressed by the end of the 1980's, in part due to the softening real estate and office building markets on the East Coast generally and in metropolitan Washington in particular. Thus, by the time BCCI was closed internationally on July 5, 1991, federal regulators had sought and received an additional $200 million in new financing and capitalization for First American to keep the bank from being at risk of failure even before the avalanche of negative publicity hit the bank during the second and third quarters of 1991.

By the time BCCI closed, federal bank organizations would find that overall, the First American banks owned by BCCI were "run in a very disorganized manner [with] very little direction being given to the banks" by central management, and Georgia and New York operating "virtually autonomously" from the central management associated with the metropolitan banks of First American.[74]

Similarly, First American's current management, including president George L. Davis, told the Subcommittee in May that despite the opportunities for First American to have used its unique multi-state status to provide enhanced banking services, in actual fact they found the various franchises of First American to have never been centrally coordinated or managed. Instead, each entity had maintained a largely separate existence from others, with the result that there

were few benefits to First American from extending its geographic reach. Accordingly, Clifford and Altman's successors at First American were choosing to sell off the various branches of First American other than the metropolitan banks, because they could find no adequate business purpose to keep them.[75]

## Conclusions

By the time of the October 1988 indictment of BCCI in Tampa as a result of a Customs money-laundering sting operation, BCCI had secretly acquired a coast-to-coast network of United States banks operating in New York, Maryland, Virginia, the District of Colombia, Georgia, Florida, Tennessee, and California without U.S. or state regulators ever catching on to BCCI's ownership and control of the institutions. Accomplishing this goal had been expensive for BCCI, which had consistently paid more for each bank than the market would dictate for any normal banking institution. Moreover, in some cases, such as the lease for First American New York, BCCI made poor business judgments which cost First American money. In other cases, such as the purchase of National Bank of Georgia, BCCI financed First American's costs, so that First American itself was not stripped of its resources by the purchase, but found itself buying a bank that it did not need, failed to make use of, and which had severe ongoing operational problems that were clearly not taken into account in its pricing.

Thus, even apart from the events that took place as a consequence of the Tampa money-laundering sting and the concurrent Subcommittee investigation of BCCI in 1988, and the resulting investigation conducted by New York District Attorney Morgenthau in 1989, BCCI's U.S. empire was in serious difficulties by the end of the 1980's. Maintaining that empire was already proving increasingly costly to BCCI, which was already being pressured to liquidate its loans to First American shareholders by its auditors and the Bank of England. Yet through financial manipulations which had become routine at BCCI, these banks were kept afloat regardless, because the consequences for BCCI of not maintaining them would have been catastrophic.

1. See e.g. Clifford statement to First American Board re First American growth, October 4, 1984.
2. Senate BCCI document 391-393, produced by BCCI liquidators July, 1991.
3. Sakhia, S. Hrg. 102-350 Pt 2. p. 505.
4. Findings, U.S. Board of Governors of the Federal Reserve System, In the Matter of BCCI, 91-043, July 29, 1991, Paragraphs 165-167.
5. Sakhia, staff interviews, October 7, 1991.
6. Abdur Sakhia, staff interviews, October, 1991.
7. U.S. Board of Governors of the Federal Reserve, In the Matter of BCCI Holdings, 91-043, Paragraph 61, July 29, 1991.
8. Altman testimony, S. Hrg. 102-350 Pt. 3 pp. 234-235.
9. Board of Governors Federal Reserve System Exhibit AD 134, Afridi to Naqvi, July 25, 1983.
10. Id.
11. Sakhia testimony, S Hrg. 102-350 Pt. 2 p. 513.
12. S. Hrg. 102-350 Pt. 3 p. 332.
13. Charges, Board of Governors of the Federal Reserve System, In the Matter of BCCI Holdings, 91-043, July 29, 1991, Paragraphs 176-178.
14. Travel reimbursement records of Tariq Jamil, 1981-1987, First American Georgia.
15. Minutes of U.S. Marketing Meeting, April 24, 1985, S. Hrg. 102-350, Pt. 3 p. 336.

REENTERED AS EXHIBIT 3

16. Minutes of U.S. Marketing Meeting, S. Hrg. 102-350 Pt 3 p. 342.

17. Testimony of Sakhia, S. Hrg. 102-350 Pt. 2 p. 547.

18. Staff interview, Chinoy, March 9, 1992.

19. Id.

20. Sakhia testimony, S. Hrg. 102-350 Pt. 2 pp. 598-599.

21. BCCI Discussion Paper, dated "London, 1985," retrieved from documents at BCCI offices at 350 Park Avenue, New York, March, 1992.

22. Sani Ahmed, BCCI internal memo, July 5, 1985.

23. BCCI Washington Rep Office Marketing Report, September 30, 1985.

24. BCCI Business Call Memorandum, April 18, 1986.

25. First American Bank/BCCI joint presentation, United Press International, July 1986, retrieved from BCCI files, BCCI-New York.

26. See Office Call Report Form, S.P. Schmidt, November 20, 1986.

27. First American documents, Barry Blank to Mario Vasquez Rana, UPI, May 27, 1986; Susan Schmidt to Miguel A. Bursat, General Manager, UPI, July 23, 1986; BCCI memoranda, Akbar Bilgrami, to S.M. Shafi, August 8, 1986; letter, Susan [Schmidt] to Amjad [Awan], BCCI, regarding UPI account, September 26, 1986.

28. Memo, First American New York, "Correspondent Banking Relationship Between First American Bank of New York and BCCI," February 7, 1991.

29. Charges, Board of Governors of the Federal Reserve System, In the Matter of Ghaith R. Pharaon, 91-037, September 17, 1991, Paragraphs 10-15.

30. Strictly Privileged & Confidential Produced For Legal Advice Memorandum, Pharaon, Background Paper, For Discussion with Messrs Blair and Siddiqui, Considerations Before Pharaon Meeting 5/6 March 1991.

31. Id, paragraphs 20-23.

32. Id, paragraph 28.

33. FDIC, Report of Examination, November 25, 1991.

34. Prepared testimony of Comptroller of the Currency, May 14, 1992.

35. Charges, Board of Governors of the Federal Reserve, In the Matter of BCCI, 91-043, July 29, 1991, Paragraphs 179-195.

36. Id.

37. See summary of charges, Federal Reserve, In re Clifford, id., Paragraph 129.

38. Id. Paragraph 184.

39. Id,. Paragraphs 184-187.

40. Charges, Board of Governors of the Federal Reserve, In the Matter of BCCI, 91-043, July 29, 1991, Paragraph 188.

41. Sakhia testimony, S. Hrg. 102-350 Pt. 2 p. 604.

42. S. Hrg. 102-350 Pt. 2, p. 606.

43. Sakhia letter to Abedi, Future Plans in the United States, February 10, 1986, S. Hrg. 102-350, Pt. 2 p. 595.

44. Written statement, Clifford and Altman, S. Hrg. 102-350 Pt. 3 p. 78.

45. Atlanta Business Journal, April 27, 1987, "Pharaonic reflections: Thoughts on an empire."

46. Id.

47. Staff interview, Chinoy, March 9, 1992.

48. Privileged and Confidential Pharaon Background Paper, unattributed, "For Discussion With Messrs. Blair and Siddiqi, Considerations Before Pharaon Meeting 5/6 March 1991.

49. Id.

50. See February 25, 1990 draft "Strictly Privileged & Confidential, Produced for Legal Advice, re: Dr. GR Pharaon," BCCI Attorneys, London.

REENTERED AS EXHIBIT 3

51. Sakhia letter to Abedi, Future Plans in the United States, February 10, 1986, S. Hrg. 102-350, Pt. 2 p. 595.
52. Sakhia, S. Hrg. 102-350, Pt. 2 p. 606.
53. S. Hrg. 102-350, Pt. 2 pp. 643-650.
54. Indictment, U.S. v. BCCI, US District Court for DC, Grand Jury January 16, 1991.
55. U.S. v. Paul, Indictment, US District Court for the Southern District of Florida, February 23, 1992.
56. Staff interviews, Chinoy, March 9, 1992.
57. Chinoy id.
58. Chinoy, id.
59. Chinoy, id.
60. Charges, Board of Governors of the Federal Reserve, In the Matter of BCCI, July 29, 1991, Paragraphs 201-206.
61. S. Hrg. 102-350 Pt. 3 p. 83.
62. S. Hrg. 102-350 Pt. 1 p. 408.
63. S. Hrg. 102-350 Pt. 3 p. 453.
64. Price Waterhouse letter to shareholder, S. Hrg. 102-350 Pt. 1 p. 483.
65. S. Hrg. 102-350 Pt. 3 pp. 457-458.
66. BCCI Memo from J.D. van Oenen to S. Naqvi, July 30, 1990, S. Hrg. 102-350 Pt. 3 pp. 463-479.
67. Id.
68. Id.
69. See e.g. Charges, Board of Governors of the Federal Reserve System, In the matter of Khalid bin Mahfouz, 92-074, July 2, 1992.
70. Id.
71. S. Hrg. 102-350 Pt. 2 p. 640.
72. Letter from Maurice Acoca and Mansoor Shafi to S. S. Dinamani, February 21, 1990, First American New York to BCCI Kenya.
73. OCC letter to the Board of Directors, First American Bank Georgia, as of August 30, 1990.
74. OCC, FAB Exam Status Report, June 13, 1991.
75. Staff interview, George Davis, May, 1992.


# BCCI AND LAW ENFORCEMENT: PART I

**The Justice Department**

**Introduction**

Over the past two years, the Justice Department's handling of BCCI has been criticized in numerous editorials in major newspapers, including the Wall Street Journal, the Washington Post, and the New York Times, reflecting similar criticism on the part of several Congressmen, including the chairman of the Subcommittee, Senator Kerry; the chief Customs undercover officer who handled the BCCI drug-money laundering sting, Robert Mazur; his superior at Customs, Commissioner William von Raab; New York District Attorney Robert Morgenthau; former Senate investigator Jack Blum, and, within the Justice Department itself, the former U.S. Attorney for the Southern District of Florida, Dexter Lehtinen.

Typical editorials criticized Justice's prosecution of BCCI as "sluggish," "conspicuously slow," "inattentive," and "lethargic." Several editorials noted that there had been "poor cooperation" by Justice with other agencies. One stated that "the Justice Department seems to have been holding up information that should have been passed on" to regulators and others. Another that "the Justice Department's secretive conduct in dealing with BCCI requires a better explanation than any so far offered."[1]

In response to all these critics, the Justice Department has suggested that their comments are ill-informed, their motives suspect, and that in time, the wisdom and probity of the Justice Department's approach would emerge. As Assistant Attorney General Robert S. Mueller III stated to the Subcommittee in prepared testimony on November 21, 1991:

We are responsible, ethical prosecutors. We will not indict simply to get favorable press coverage or to quiet our critics. We require evidence sufficient to prove a crime beyond a reasonable doubt, and we will not indict if that evidence does not exist . . . It is premature to assess our performance. We cannot even respond fully to criticism, because we cannot reveal grand jury proceedings or the details of our investigations. Our record when the investigations and prosecutions have concluded will speak for itself. . . a fair review of the available facts will show that the Department of Justice has done an excellent job on the BCCI investigations, and that the criticisms of the Department are fundamentally unfair.[2]

Unfortunately, as time has passed it has become increasingly clear that the Justice Department did indeed make critical errors in its handling of BCCI prior to the appointment of Attorney General Barr in October, 1991, and moreover masked inactivity in prosecuting and investigating the bank by advising critics tat matters pertaining to BCCI were "under investigation," when in fact they were not.

These critical strategic errors, which arose in the earliest stages of the Justice Department's handling of the Customs sting, Operation C-Chase, in 1988, were compounded by the Justice Department's attempts to hinder other legitimate investigative efforts, and by the Justice Department's inability to admit that it had made any of these mistakes.

While mid-level officials in the US Attorney's office in Tampa worked long hours under atrocious conditions to bring the money laundering case against BCCI which arose out of Operation C-Chase, it is clear now, and should have been clear as of the date of the C-Chase indictment against BCCI in October 1988, that BCCI represented much more than a drug money laundering case.

Nevertheless, the US Attorney's office chose to bring, and not to supersede, a limited, money-laundering case against the bank in Florida and indicted several mid-level BCCI officials, throwing out a possible Racketeering Influenced and Corrupt Organizations (RICO) case that would have enabled it to have gone after all of BCCI's assets in the United States -- possibly including any interest it had in the First American bank.

The US Attorney in Tampa then made its second strategic mistake as it allowed the bank to plead out while prosecuting the individual bankers. BCCI mounted a $20 million defense in Florida and provided for the legal costs and living expenses of its former employees throughout their trials. The bank's strategy was obviously to blunt to the extent possible any

attempt by the US Attorney's office to "flip" individual defendants, causing them to plead out of the case and to agree to provide damaging testimony against the institution itself. BCCI's strategy largely succeeded when in January, 1990, the U.S. Attorney and Justice Department agreed to permit the bank to avoid trial, and pled guilty to the narrow set of offenses contained in the indictment, and thereby end investigation and prosecution of BCCI in the only judicial district where any such activity existed. The October, 1988 indictment had charged BCCI as institution with having a corporate policy of soliciting drug money. Following the plea, prosecutors changed their underlying theory of the case to suggest that the real guilt lay not with the bank, but with the individual bankers at BCCI who happened to fall into the net of the Customs' sting.

The result was that the Justice Department permitted BCCI to sever its Florida operations and sacrifice a handful of bank employees and thereby to continue its worldwide criminal activity.

Soon after the January 1990 plea agreement, the Justice Department stopped investigating BCCI entirely. Despite the fact that hundreds of leads had not been followed up on in the C-Chase investigation, and that law enforcement officials in the filed recognized the importance of those leads, the Justice Department took which government agents later characterized as a "time-out".

There does not appear to have been anything sinister that prompted this decision. Rather, the decision to stop investigating BCCI appears to be an example of poor communication, overwork, understaffing, inadequate understanding of the meaning of information in the possession of Justice, and a flawed prosecutorial and investigative strategy. It was also the unintended consequence of the BCCI case arising as a Treasury Department investigation brought by Customs and IRS agents only, without the involvement of the FBI. Given the focus of Treasury agents on crimes pertaining to issues such as money laundering and customs violations, the failure to bring the FBI into the case may have contributed to the lack of follow through on the broader criminality pertaining to BCCI.

During the remainder of 1990 and the first half of 1991, it became increasingly clear from the Subcommittee's investigation, New York District Attorney Morgenthau's investigation and media investigations that BCCI was an international criminal organization. Throughout that period, the Justice Department found itself in the apparently uncomfortable position of having to give the public impression that it was aggressively moving against BCCI, at a time when it was doing very little concerning the bank, and investigators and prosecutors involved in the Tampa case were no longer working on matters pertaining to BCCI. Instead of immediately renewing their investigation, the Department sought to impede the investigations of others through a variety of mechanisms, ranging from not making witnesses available, to not returning telephone calls, to claiming that every aspect of the case was under investigation in a period when little, if anything, was being done.

Only after regulatory agencies around the world seized the bank on July 5, 1991, did the Justice Department begin to give the BCCI investigation an unprecedented urgency and importance. Under Assistant Attorney General Mueller, the Department assigned nearly three dozen attorneys to the case. During 1992, the Department brought several indictments, which remained narrower, less detailed and, at times, seemingly in response to the efforts of District Attorney Robert Morgenthau of New York, the Federal Reserve, or both.

REENTERED AS EXHIBIT 3

## Findings

** Federal prosecutors in Tampa handling the 1988 drug money laundering indictment of BCCI failed to recognize the importance of information they received concerning BCCI's other crimes, including its apparent secret ownership of First American. As a result, they failed adequately to investigate these allegations themselves, or to refer this portion of the case to the FBI and other agencies at the Justice Department who could have properly investigated the additional information.

** The Justice Department, along with the U.S. Customs Service and Treasury Departments, failed to provide adequate support and assistance to investigators and prosecutors working on the case against BCCI in 1988 and 1989, contributing to conditions that ultimately caused the chief undercover agent who handled the sting against BCCI to quit Customs entirely.

** The January 1990 plea agreement between BCCI and the U.S. Attorney in Tampa kept BCCI alive, and had the effect of discouraging BCCI's officials from telling the U.S. what they knew about BCCI's larger criminality, including its ownership of First American and other U.S. banks.

** The Justice Department essentially stopped investigating BCCI following the plea agreement, until press accounts, Federal Reserve action, and the New York District Attorney's investigation in New York forced them into action in mid-1991.

** Justice Department personnel in Washington lobbied state regulators to keep BCCI open after the January 1990 plea agreement, following lobbying of them by former Justice Department personnel now representing BCCI.

** Relations between main Justice in Washington and the U.S. Attorney for Miami, Dexter Lehtinen, broke down on BCCI-related prosecutions, and key actions on BCCI-related cases in Miami were, as a result, delayed for months during 1991.

** Justice Department personnel in Washington, Miami, and Tampa actively obstructed and impeded Congressional attempts to investigate BCCI in 1990, and this practice continued to some extent until William P. Barr became Attorney General in late October, 1991.

** Justice Department personnel in Washington, Miami and Tampa obstructed and impeded attempts by New York District Attorney Robert Morgenthau to obtain critical information concerning BCCI in 1989, 1990, and 1991, and in one case, a federal prosecutor lied to Morgenthau's office concerning the existence of such material. Important failures of cooperation continued to take place until William P. Barr became Attorney General in late October, 1991.

** Cooperation by the Justice Department with the Federal Reserve was very limited until after BCCI's global closure on July 5, 1991.

** Some public statements by the Justice Department concerning its handling of matters pertaining to BCCI were more cleverly crafted than true.

## Early Warnings About BCCI

REENTERED AS EXHIBIT 3

Although the Justice Department did not indict BCCI until 1988, there were rumors about the bank virtually since its inception. BCCI officially first came to the United States as a branch in New York during the 1970's. New York state banking officials subsequently denied BCCI's takeover of a small bank. Furthermore, bank regulators and law enforcement agencies in other countries, such as the United Kingdom, had reservations about the bank. The British, in fact, refused to grant BCCI full banking status. According to U.S. banking regulators, they routinely make inquiries to the Justice Department about BCCI.

In September 1991, the House Subcommittee on Crime and Criminal Justice, issued a report detailing federal law enforcement's handling of allegations involving BCCI. According to the report, "[F]ederal authorities had scores of contacts concerning BCCI as far back as 1983," and "the government had enough information on BCCI by the mid-1980's to have put BCCI on the most wanted list."[3]

Among the findings of the House Subcommittee:

a.) The DEA had a plethora of case information which, taken in totality, led to the inevitable conclusion that "BCCI is the place to launder money."[4] The report stated that:

[A] review of the files has, so far, revealed 125 cases that have been identified "as having something to do with BCCI." Most of the cases are undercover storefront operations which lead to warrants to seize BCCI bank accounts containing suspected drug proceeds.[5]

b.) Senior IRS officials refused to begin an undercover investigation of BCCI despite the fact that the criminal division had developed important information about the bank. The report states:

Former BCCI employee Aziz Rehman was interviewed by IRS special agents in IRS's Miami office in April 1984 shortly after he was fired by BCCI for refusing to transport large volumes of currency which he believed to be in violation of existing Federal laws. He provided them with documentation of deposits to a nonexistent BCCI branch in Nassau, Bahamas, and described his role as a former courier for large cash deposits to BCCI accounts of "customers" and other banks.[6]

c.) The Customs Service had information as far back as 1983 concerning the illegal smuggling operations of one of BCCI biggest customers, a Jordanian arms merchant named Munter Bilbeisi. According to the House Subcommittee report, "Any reasonable investigation into Bilbeisi's operations would have uncovered that Bilbeisi's coffee business had established a financial relationship with BCCI in 1983, and that BCCI had issued phony letters of credit from 1983 to 1986 to finance smuggling."[7]

d.) Representatives of the Government of India provided the IRS with evidence of a money laundering scheme involving BCCI. However, according to the report, because India did not have a tax treaty with the United States, the allegations were not followed-up on.[8]

Abdur Sakhia, the former regional manager for BCCI in the United States, testified before the Subcommittee on Narcotics, Terrorism and International Operations that he met with Justice

REENTERED AS EXHIBIT 3

Department officials in the autumn of 1984 in the office of former then-Senator Paula Hawkins to discuss allegations of BCCI's involvement in drug money laundering. Sakhia testified that he was told by the President of BCCI, Agha Hasan Abedi, to meet with Senator Hawkins after the Senator, on a trip to Pakistan, told President Zia that she was concerned about drug money laundering by a Pakistani bank in the Cayman Islands, which she subsequently identified as BCCI. According to Sakhia, he was told by the Justice Department that BCCI was not under investigation and that he subsequently learned that the US Department of State had communicated the same message to the Pakistani government.[9]

The Subcommittee has been unable to determine the source for Senator Hawkin's information, although notes that she was at the time the Chairman of the Subcommittee on Narcotics, Terrorism and International Operations and would have had access to classified material from both the DEA and the CIA.

There is also evidence that the regulators had passed on information about BCCI to the Justice Department in 1987. Robert Forrestal, President of the Federal Reserve of Atlanta, testified before the House Banking Committee on Sept. 1992, and stated that "while participating in an April, 1987 examination of BCCI Miami, our examiners discovered possible money laundering transactions that appeared to be structured to evade reporting requirements, The transactions were detected in a review of checks and money orders sent from BCCI Panama to BCCI Miami for payment. A criminal referral concerning the activities discovered at the Miami agency was filed with the U.S. Attorney's office in Miami and with the Federal Bureau of Investigation in North Miami Beach on May 18, 1987.

**Operation C-Chase**

In 1986 undercover Customs agent Robert Mazur wrote a memorandum to his superiors proposing an undercover money laundering operation called Operation C-Chase. According to Mazur, the proposal sprung from almost two and one half years of undercover work in Florida on international money laundering. Mazur's proposal was accepted and the Customs Agency notified the Justice Department which provided strategic and tactical assistance.[10]

Mazur, who coordinated the undercover operation, posed as a businessman coordinating a number of investment and mortgage businesses which were used as a cover for the laundering of drug proceeds. According to Mazur, after the front was established, an informant approached members of a Colombian drug ring based in Medellin. Cartel members slowly gained confidence in Mazur and his team and over a period of time began to provide him with substantial amounts to drug money to be laundered. Mazur testified that in an "effort to ultimately obtain a Panamanian account" he opened an account at BCCI because it was the only bank with which he was familiar that had international branches.[11] Mazur testified that he had not been "armed with any particular information that BCCI was involved in that type of activity."[12]

Operation C-Chase ultimately proved an extremely successful undercover operation and helped to shed light on the massive drug money laundering taking place in the United States. Mazur testified that one of the money launderers ensnared in Operation C-Chase had gross receipts in the United States "of roughly $200 million per month in currency that needed to be

removed from the United States on his behalf."[13] While the early stages of the investigation focused on the cartel and drug money laundering, as Mazur learned more about BCCI, he began to focus his efforts on the bank's complicity in money laundering.

From his very first meeting with officials at BCCI, Mazur was struck by the bank's "polished marketing approach . . . everything fit to have an institution that might have an ulterior motive for its locations."[14] After Mazur checked with local prosecutors in Tampa and discovered that the bank showed up in another drug-related investigation, his suspicions were heightened. [15] Directing the activities of his undercover team, Mazur set about to investigate BCCI and he quickly discovered that the bank was all too willing to assist him in the laundering of funds.

Mazur testified that after he opened his account in Panama:

"the bank came back to have a broader relationship ... an operations officer .. recognized the nature of the transactions and called me, unsolicited, to inform me that he would be in the United States and that he felt the bank, being a full service bank, had the types of abilities to keep my transactions conducted in a very confidential way that would enhance the businesses I was involved in."[16]

According to Mazur, the bank provided him with a sophisticated means for laundering money which entailed receiving the cash at "either their Panama branch or their Luxembourg branch and several locations in the Middle East." Mazur described in Subcommittee testimony how an officer at BCCI, Sayed Hussain, advised him not to repeat the mistakes that other drug money launderers had made in Operation Pisces, a previous U.S. government undercover money laundering sting which had traced the proceeds of drug money laundering to BCCI accounts in Panama. BCCI clients had been implicated in that government undercover operation and apparently Hussain believed that there were better ways to conceal client's funds.

Mazur told the Subcommittee that his undercover operation handled "roughly $14 million through BCCI on behalf of clients." BCCI earned banking fees on these transactions totaling in excess of $250,000, but according to Mazur the bank was much more interested in getting large deposits so as cause "their balance sheets to look very strong."[17]

During the winter of 1988, a tentative date was established for the takedown of BCCI. That date was altered slightly during the ensuing months but remained within a two week time frame at the beginning of October. In July, an implementing plan was put into effect with the October time frame in mind.[18]

However, it became increasingly evident to agent Mazur that there were significant leads and evidence that could not be followed up on by October. Moreover, Mazur testified that he was on the verge of meeting with the "inner circle" at BCCI which could have potentially unlocked many of the criminal secrets about the bank. Senator Kerry asked agent Mazur if the predetermined date in October, which seemed increasingly arbitrary to the agents, was politically motivated:

REENTERED AS EXHIBIT 3

Senator Kerry: Did you have any discussion with anybody about whether or not October was the date? Because October 1988 was a Presidential election year. And by having an October takedown it would make Customs be able to present the administration with a sort of present on a platter.

Mr. Mazur: There certainly was mere speculation that that played a part by people at low levels like mine. But beyond that I cannot say more.

Senator Kerry: But it went through your head that might have been a reason that there was such a compulsion to terminate this thing in October.

Mr. Mazur: I was at a loss for understanding why October. I would say that for sure.[19]

Mark Jackowski, the Assistant US Attorney overseeing the case testified to the Subcommittee, however, that the decision was predicated on other considerations. He testified that his office had made a decision that "if there came a point in the investigation where we continued to launder funds on behalf of old clients without developing evidence against additional defendants, we would attempt to terminate the operation." Jackowski added that the date had been originally set -- in February -- with the expectation that they would be able to make a case by the fall against BCCI officers and that, in fact, they had accumulated the requisite evidence.[20]

By the summer of 1988 Mazur had compiled enough evidence to indict the bank and several of its officers. But Mazur believed that the corruption went much higher than the mid-level officers with whom he had been dealing. As he explained to the Subcommittee, "It appeared to me that the knowledge of the source of the funds and the method of seeking out drug proceeds as a source of deposits for the bank was something that was promoted at every level of senior management within the bank."[21]

On September 9, 1988, one month before the sting operation against BCCI was scheduled to be taken down, Mazur, in his undercover role as drug-money launderer Robert Musella, had met with Amjad Awan, BCCI's personal banker to Panamanian General Manuel Noriega, at the Grand Bay Hotel in Miami, Florida, where he engaged in a conversation with Awan that was wired and recorded by Federal agents. In that conversation, Awan told Mazur that he had been subpoenaed by the Foreign Relations Committee of the U.S. Senate in connection with his handling of Noriega's accounts, and the accounts of others in Panama. He also told Mazur about his understanding of BCCI's secret ownership of First American, about the political implications of Clark Clifford's chairmanship of First American, and about alleged obstruction of the Subcommittee's investigation into Noriega and BCCI by BCCI lawyer Robert Altman. As the transcript of the wiretap showed, Awan told Mazur:

What's happened is that we were served a subpoena last month. The bank was and Mr. Shafi our general manager was. I was supposed to have been served also . . . This is why I've been going up and down to London with our attorneys in Washington . . . On a personal level, last Friday, I was told that, ah, our lawyers, Mr. Altman was there, and he suggested to the bank that I should be immediately transferred from the U.S. to Paris. . . . So, they duly transferred me Friday to Paris. . . I'm not too, too happy on, on what our attorneys are telling us to do. I think that's they're doing a very stupid thing. As long as I am an employee of the bank, I can

be anywhere, I can, I can be in Timbuctu, if they throw a subpoena on me, they can demand that the bank produce him. . . So I think that's a very stupid policy to take. . . .

I went to, ah, I met with the counsel to the Foreign Relations Committee . . . I've got a good rapport going with them. And ah, without really damaging the bank or without, without ah, disclosing anything about, uh, business, I think I can, with a bit of luck, I can extricate myself from the whole situation quite cleanly. . . I think they're going to go through BCCI's records with a tooth comb . . . if anything gets released there that BCCI is being investigated, BCCI is dead . . . no customer is going to keep an account with BCCI. . . I don't think the bank could stand up to any sort of publicity. It's gonna, it's going to, it's gonna hit them bad. . .

Our attorneys are, are, they're heavyweights, I mean Clark Clifford is, is sort of the Godfather of the Democratic party. I mean, when he calls Jesse Jackson for dinner, that means Jesse Jackson can receive us for dinner. . . .

I have, I have totally different, uh, uh, assessment of the situation. And it might be far-fetched, it might sound stupid, but my assessment is, that we own a bank in washington . . . We own a bank, uh based in Washington, it's called the First American Bank. The holding company is in Washington, and there are 5 banks actually. First American of New York, First American of Washington, D.C., First American of Virginia, Maryland, Tennessee and Georgia. There's six banks. Six large banks, they are $10 billion banks. Bought out by BCCI about 8 years ago . . . And BCCI was acting as advisor to them, but truth of the matter it is that the bank belongs to BCCI. Those guys are just nominee shareholders. . . Clark Clifford and his, uh, law partner Bob Altman are the chairman and capital holders. I personally feel it would suit them if BCCI withdrew . . . and they just take over that entire part of the bank. . . . I wouldn't at all be surprised if, you know, if they're totally screwing BCCI to take over this bank. I, I don't know, but this is the way I see it. Because the advice he's giving, in my opinion, I, I just don't respect it. . . . He, he knows a lot, and uh, that's why I don't want him to represent me. That's why I've gone on to another lawyer.[22]

Awan had provided Mazur with sufficient background information regarding violations of federal law to enable another agent assigned to the case, IRS Special Agent David Burris, to conclude that seven separate federal criminal statutes had been apparently violated. In addition to the money laundering charges already being contemplated, Awan had now alerted the C-Chase agents to an apparent conspiracy to obstruct a Senate investigation by BCCI and its lawyers, and to BCCI's possible illegal ownership of First American. Accordingly, Burris set down the relevant facts from the Awan wiretap, and drafted an affidavit stating that he believed there was sufficient evidence to make out a case that these statutes, including obstruction of the Senate, had been violated.[23] Burris understood the meaning of Awan's statements, describing them in Paragraph 4 of his affidavit in the following terms:

Awan said that BCCI has bought and controls First American Bank and National Bank of Georgia through private individuals. The banks were bought through individual names rather than BCCI because BCCI could not buy the banks and run them due to U.S. law.[24]

Nevertheless, in the weeks that followed, the prosecutors directing Operation C-Chase made no effort to broaden the case against BCCI, or to investigate any of the new allegations raised

by the Awan wiretap. There was no attempt to interview Clifford or Altman, no attempt to seek further information from the Subcommittee to determine whether its investigation had been interfered with, no subpoenas prepared to be issued against First American, and, even after the take-down of the sting, no investigation of any links between BCCI and First American.

Against the desires of Mazur, who wanted to keep the C-Chase operation going longer, the takedown was set in motion on October 8, 1988. A phony wedding had been arranged between Mr. Mazur and another undercover agent posing as his fiancee. The ruse of the wedding successfully lured BCCI officers and narcotics traffickers into the United States who believed they were attending the marriage of an important customer. At a phony bachelor's party for Mr. Mazur, federal agents swooped in and made numerous arrests. The operation had been coordinated with law enforcement authorities in the UK and France who also conducted searches and made arrests.[(25)]

With the arrests, the effort to make the money-laundering case against BCCI and the BCCI officials indicted in Tampa took precedence over any further investigative efforts concerning broader issues of criminality regarding BCCI. The small team of agents and attorneys, who soon became grossly outnumbered by the defense team retained by BCCI, and selected and coordinated by Clark Clifford and Robert Altman, soon had all they could do to prepare for trial on the specific money-laundering counts brought in the October, 1988 indictments.

### Justice Handling of Operation C-Chase:

### Failure to Charge RICO

Months before the takedown of Operation C-Chase, many of those most involved in investigating and prosecuting BCCI had concluded that BCCI was a quintessential example of corporate organized crime, and suitable for being prosecuted under the Racketeering Influenced and Corrupt Organizations Act (RICO), whose provisions contained powerful tools for prosecutors, including broad forfeiture possibilities.

Under RICO, any business that is convicted of investing the proceeds of two or more criminal acts, constituting a pattern of racketeering activity, in a legitimate business, is subject to having all of the proceeds of its criminal activity, including the legitimate businesses, forfeited to the government.

RICO would have an especially powerful tool against BCCI, because once the government proved that BCCI committed two or more acts of money laundering, the government might be able to take the entire bank. Given BCCI's actual secret ownership of First American, a RICO case against BCCI would have had a devastating impact on BCCI, and might well have blown open BCCI's core secrets.

A series of memoranda from early 1988 detail the discussions within the Justice Department and among the agents about the basis for a RICO prosecution of BCCI. By March, 1988, high level Customs officials were reporting to Commissioner Von Raab that several BCCI officials were indictable under RICO. On April 6, 1988, another Customs memorandum stated that it was the opinion of the U.S. Attorney's Office in Tampa that "probative evidence exists to establish corporate criminality against BCCI as an institution," and that "current plans for

prosecution are to indict BCCI as an institution under the provisions of the RICO statutes." This recommendation was reiterated in a second memorandum, May 10, 1988.[26]

Mazur and the other undercover agents involved in Operation C-Chase strongly supported the bringing of a RICO case against BCCI, because if the bank were convicted of racketeering, they could "seek forfeiture of a lot of the bank's assets that would be located in the United States."[27]

Yet, for reasons that were never explained to the Customs agents, the Justice Department in the fall of 1988 did not give approval to a RICO prosecution, and the RICO case against BCCI was abandoned.[28]

Robert Genzman, the US Attorney for Tampa, told the Subcommittee that it was his view that "RICO charges would have complicated an already complicated case."[29] According to Genzman:

Put simply, we believed that RICO charges would have added nothing, and would have greatly complicated the case. It is absolutely, untrue, as has been suggested, that the entire bank could have somehow been forfeited out the U.S. government had RICO charges been brought in Tampa. There was simply insufficient evidence to support such a sweeping international forfeiture.[30]

Thus, according to Genzman, RICO charges would not have placed additional pressure on BCCI and would not have created the risk of significant additional assets at the bank being forfeited to the government, beyond the $14 million at stake in the narrower case ultimately brought.

Genzman's statements again suggest the blindness at the U.S. Attorney's office to the broader evidence already developed by Mazur and the other Customs agents. This material included, but was not limited to, the Awan allegations contained in the Burris memorandum. Genzman's position also fails to take into account the obvious potential, if Justice had indeed decided to make a RICO case, of seeking plea agreements with the individual officers as a means of securing a broader RICO case against the bank itself in a superseding indictment. Such a strategy, unlike the strategy actually pursued by the U.S. Attorney in Tampa, could well have resulted in a forfeiture of BCCI's assets in the U.S., and led to the uncovering of its ownership of First American as well.

In addition, a RICO case could have permitted the United States to achieve the critical objective for Operation C-Chase defined by Customs agents in March, 1988 -- establishing the corporate culpability of BCCI's involvement in the laundering of "literally hundreds of millions of dollars in drug proceeds," rather than the mere $14 million handled in connection with the sting.[31] In a RICO case against the bank, one or another of BCCI's officers could have been turned to help make the larger case against BCCI that was so important.

**Justice Handling of Operation C-Chase:**

**Failure to Provide Adequate Resources**

REENTERED AS EXHIBIT 3

During the entire post indictment investigation, Mazur and the entire investigative team were strapped for resources. According to Mazur, "I was confronted with some 1,200 tapes that needed to be perfected for the benefit of the defendants.... I and a small number of other agents, two or three, spent at times literally twenty-four hours in a given day transcribing and trying to meet deadlines." When asked by Senator Wofford if he felt "outgunned" by the BCCI defense team, Mazur replied "tremendously," noting that BCCI had investigated him personally, and that there were threats to the lives of agents and witnesses.[32]

As Mazur advised his superiors:

The problems created by defense tactics have resulted in the need for resources to be expended to document improper conduct (ie, misleading business associates of government witnesses, improperly issuing subpoenas, intimidating government witnesses.[33]

Mazur recalled a pretrial hearing at which AUSA Mark Jackowski appeared alone on behalf of the government and 23 lawyers appeared on behalf of BCCI.[34] In recalling the incident to the Subcommittee, Jackowski offered that "it was a fair fight."

Subpoenas and searches related to the takedown had also produced some 16,600 documents from individual defendants, and another 100,000 documents from BCCI itself. These documents, some of which have since been reviewed by Subcommittee staff, contained significant information concerning BCCI's broader criminality. But more than six months after the takedown, the government had yet to review a single page.[35]

In an effort to keep the investigation and prosecution of BCCI on track, Mazur and his colleagues in Tampa made numerous requests to their superiors for help, requests which were largely ignored. As Mazur testified:

After the undercover operation was concluded, the Government was confronted with a massive task. Records had been seized from BCCI in Miami, from the homes of several officers in Miami, from the BCCI offices in London and Paris, from the homes of traffickers. And a tremendous task with a tremendous potential benefit faced the Government in using those records . . .And very little resources of those that were available could be used to deal with those matters because of the tremendous resources that were needed just to attend to pretrial motions and the upcoming trial in Tampa . . .

For one reason or another it was impossible for the Government to locate people who could fill that void or it was in the opinions of those who had the authority to make that decision an unnecessary use of resources, one or the other.

And I think a lot of follow up in contacting witnesses and reviewing records that was lost . . . would have been a great advantage to us all to see the things that are happening in the BCCI case happen more quickly and smarter . . . I think that that was, that time out, was a costly time out.[36]

On April 11, 1989, Mazur wrote superiors to remind them that Operation C-Chase was being severely damaged by the inability to add resources to the case, noting that the problem had

REENTERED AS EXHIBIT 3

been discussed repeatedly since November, 1988 without improvements, and that a much biggest case could yet be made against BCCI if additional resources were provided:

The network of the bank is awesome. Since the have over 14,000 employees and operate in 74 countries, the viable leads are endless. Attempts to superceed [sic] the indictment to include a nucleus of evidence that would reveal BCCI's criminal enterprise is a monumental task, in view of the bank's magnitude. There are inadequate resources to follow up professionally relative to: [next half page of text redacted by Justice Department][37]

Mazur summarized the conditions under which he worked as being a soldier on a forward mission in a war zone, backed up by a government that refused to send in reinforcements when they were needed:

We were somewhat of a reconnaissance squad that had been out in the middle of the desert and encountering the enemy, and sent word back to the fort that we needed some help. And waited and fought and fought and fought but no help came.[38]

Mazur continued to work for the U.S. Customs Service on the BCCI prosecution through to the conviction of the BCCI officers indicted in the case in August, 1990. But the experience had left him frustrated and angry. In April, 1991, Mazur resigned from the U.S. Customs Service in a letter to Customs Commissioner Carol Hallett, to whom he wrote the following:

I know that my formally advising you of the deplorable conditions in Tampa could cause some individuals in a professional circle to question my loyalty. But it is simply out of my love for this country and our critical need for ethical government that I think its appropriate to respond to a request for my candor. . . If it had not been for the nearly two years of achievement prior to March 1988, the ultimate outcome would also have been lost. The outcome of the case, while notable, was considerably less than it could have been. The indictment of additional defendants and the seizure of substantially more drug proceeds was lost, directly as a result of the application of inadequate resources . . . to the investigation. This opinion is shared by individuals meaningfully involved int he successes preserved within Operation C-Chase, including the lead prosecutor.[39]

Mark Jackowski, the assistant U.S. Attorney in Tampa who worked most closely with Mazur on Operation C-Chase, expressed his own unhappiness with the handling of the C-Chase investigation in a memorandum, attached to the Mazur letter, which the Justice Department withheld from the Subcommittee. Jackowski testified about the memorandum, however, in response to questions from Senator Kerry, as follows:

My unhappiness with the C-Chase investigation . . . was that there were a number of documents that were seized as a result of searches conducted in Miami and other places. It was my view that included within those records were leads to other narcotics traffickers and money launderers.l It was my further view, as of the time I wrote my memorandum, which was at the end of January 1991, that those documents had not been adequately reviewed to pursue all those leads. That was the nature of my unhappiness.[40]

In direct contradiction to Customs Special Agent Mazur and Jackowski, an assistant U.S. attorney from his own office, Robert Genzman, the U.S. Attorney in Tampa, testified that the

REENTERED AS EXHIBIT 3

BCCI investigation and prosecution were **not** substantially impeded by the lack of resources, arguing that the case was extremely successful, because BCCI pled guilty and its officers were convicted, and BCCI paid what was then the largest fine ever imposed on a financial institution in a money-laundering case -- $14 million.

But while characterizing the results of the Tampa prosecution as superb, Genzman acknowledged that the investigative and prosecutorial resources in Tampa had indeed been stretched to the breaking point by the case, due to the complexity of the money-laundering sting; the "scorched earth" strategy of BCCI's lawyers, who "filed hundreds of motions and briefs on every imaginable subject," and the need to transcribe some 2,000 taped conversations between the undercover agents and their targets.[41]

This situation was typical of the kind of conditions faced by government prosecutors, Genzman testified, and nothing unique to the BCCI case:

More resources could always be added to a case of this magnitude and complexity. While agents and prosecutors had to put in very long hours and work under severe time constraints along the way to bring the case to a successful conclusion, that is a regular, albeit unfortunate, fact of law enforcement.[42]

**Justice Handling of Operation C-Chase:**

**Failure To Follow-Up**

Robert Genzman, the US Attorney in Tampa, told the Subcommittee that "[I]t was never our intention to simply stop investigating BCCI after the first indictment."[43]

But Genzman's own assistant, Mark Jackowski, told the Subcommittee that the grand jury investigation of BCCI had to be suspended "due to a lack of available leads and the press of the upcoming trial."[44]

A dearth of leads, however, was clearly never a problem in the case. As Mazur told the Subcommittee, the "time-out" consisted of leads that were not followed up, bank officers who were not interviewed and superseding indictments which were not issued. When Senator Kerry suggested that "there was not a follow up and there was not really a continuation of investigation into the leads that existed at the time," Mazur responded, "To a limited extent there was, but not in effect, no."[45] In fact, the "time out" lasted for a full thirteen months, by the calculation of Tampa prosecutor Jackowski.[46]

Mazur testified that among the things not followed up because of the resource crunch were criminal activity involving other BCCI officers and the subpoena of records which could have lead to additional indictments of others or broader, superseding indictments of BCCI.[47] In all, there were hundreds of leads not followed up, including BCCI's involvement in illegal arms transactions, what Mazur described as "the association between BCCI, First American, and National Bank of Georgia," and possibly on payoffs to government officials.[48]

In fact, by mid-1989, the US Attorney's office in Tampa had information on BCCI's alleged ownership of First American in four instances from two separate sources. Initially, a few steps were taken by the Tampa office to follow-up on this information. AUSA Jackowski moved to subpoena the Federal Reserve for First American documents. But following this action, the pressure of preparing for trial against BCCI and the inability to get additional resources allowed the effort to peter out without further efforts being made.[49]

Various officials at the Justice Department provided different explanations as to why the information was not followed-up on. Assistant Attorney General Mueller "passed the buck" to the Federal Reserve, noting that "the essence of the information. . . regarding the allegations of secret ownership was passed on to the Federal Reserve after the October 1988 takedown of the undercover case." Quoting from the Federal Reserve General Counsel Virgil Mattingly's testimony before the Subcommittee, Mueller claimed the Federal Reserve disregarded the information as "the kind of allegation [that] they had heard before."[50]

Kehoe explained to the Subcommittee that once the US Attorney in Tampa had indicted Awan, one of the sources of the allegations regarding First American, it became difficult for him "to point to the documents to corroborate that piece of information." But even on this narrow point Kehoe's testimony is at odds with his colleague, AUSA Jackowski, who told the Subcommittee, "we obtained information from Mr. Awan throughout the course of the case concerning that [First American]."[51]

In the view of the Subcommittee, none of the officials provided an adequate explanation as to why the Justice Department did not follow-up on the evidence it received relating to the secret ownership of First American.

Jackowski perhaps best summed up the myopic strategy of the US Attorney's office in Tampa when he told Senator Kerry, "this, our case, was a money laundering case.[52] As Jackowski testified:

We were at dinner, and the first course was to eat the money laundering plate. And when you look at the evil behind this bank . . . the alleged evil is that they facilitated the cartel. That was what was on our plate. We ate that meal. We did not ignore the dessert, which was First American Bank; we simple put it aside.[53]

However, as Senator Kerry pointed out, "That is the problem. It was not a money laundering case. It was a case that was much bigger than that."[54]

What appears to have happened is that some members of the Operation C-Chase team were never able to move conceptually beyond the original goal of Operation C-Chase, namely, to target drug money laundering. The team of agents working on Operation C-Chase did not include anyone from the FBI with a broader perspective on criminal investigation or a background in major financial fraud. The Tampa prosecutors responsible for trying Operation C-Chase viewed any of the broader panoply of issues pertaining to BCCI as being, as Jackowski testified, "dessert," to be digested following the main course, money laundering. There was little recognition even as late as November 1991 by Jackowski or the other Tampa prosecutors that focusing attention on BCCI as a case study of global organized financial

REENTERED AS EXHIBIT 3

crime could have been more rewarding and more important than the narrower approach they adopted. Given the difficulties facing the Operation C-Chase team, the real solution would have been a referral of the First American and other broader allegations concerning BCCI from the Tampa office to a financial crimes unit at main Justice, and to the FBI, or to another appropriate office within the Justice Department. Unfortunately, rather than make such a referral, the Tampa prosecutors held onto all the BCCI-related matters, while failing to follow up on many of the key ones.

**Justice Handling of Operation C-Chase:**

**The Plea Agreement**

The plea agreement reached between BCCI and the U.S. Attorney for the Middle District of Florida (Tampa) in January, 1990, came as a surprise to many. On November 17, 1989, Price Waterhouse informed BCCI's directors that the lawyers for BCCI "will attempt to come to a pre-trial settlement with the prosecution, but the lawyers do not expect the prosecution to be amenable. As such there is now a real prospect of a trial."[55] Similarly, BCCI officers indicted in the Tampa case were told by BCCI higher-ups up to the day of the agreement that they should expect no agreement, but if there was one, the settlement would include bank and officers alike.[56]

During mid-December, a series of meetings took place among BCCI's lawyers and representatives of the US Attorney's office in Tampa, together with representatives of the Customs Service, Internal Revenue Service, and Drug Enforcement Administration. Representing BCCI were two prominent former federal prosecutors from Washington, D.C., Lawrence H. Wechsler and E. Lawrence Barcella, Jr. The lawyers for BCCI were anxious to avoid a trial, and offered a guilty plea by BCCI to money laundering and the complete cooperation of the bank in helping convict other drug money launderers, if they could in return obtain a commitment by the U.S. Attorney that this would end BCCI's criminal problems for all offenses then known to the government.

The offer was intriguing to the prosecutors, but they wanted to make sure that BCCI would not be seen as getting off lightly. The trial judge had indicated during a pre-trial conference that he was of the opinion that BCCI's participation in laundering drug money would be insufficient to prove to him that BCCI and its officers were also guilty of drug trafficking. As a result, given the state of the government's evidence, BCCI could not be convicted on any drug offense itself, but only for laundering drug money. As a result, the most the government might gain if it convicted BCCI was a $28 million fine, twice the amount which the government had moved through BCCI. In practice however, the judge would be unlike to impose much more than the $2.5 million fine imposed against another bank in Puerto Rico the previous year. Accordingly, if BCCI was willing to pay a substantially larger fine -- such as the $14 million fine it ultimately agreed to pay, to be characterized as forfeiture so that it would go to law enforcement instead of back to the U.S. Treasury -- the prosecutors were willing to deal. BCCI's lawyers, after consulting with the bank, agreed, and the plea agreement was struck. According to everyone involved, those making the decision on behalf of the government were in Tampa, not Washington.[57]

REENTERED AS EXHIBIT 3

As Robert Genzman, the Tampa US Attorney, testified:

We made that determination in the district ...[a]s a courtesy, we advised the Department of Justice of what we were about to do, and received no opposition.[58]

Genzman explained that the plea agreement was entered into for several reasons:

First, the Government secured the conviction of the bank, one of its principle objectives. Second, eliminating the corporation from the trial prevented a recurrence of a problem confronted in the 1986 case against the Bank of New England, where the corporation was convicted, but all the individual defendants were acquitted. Third, BCCI agreed to a number of substantial terms beyond the plea of guilty, including cooperation with the government and a probation condition which incorporated the terms of its consent decree with the Federal Reserve. Most importantly, the Government had been threatened with an adverse legal ruling, which would have substantially reduced the amount of any financial penalty that could be imposed against the bank, had it gone to trial. The $14 million was forfeitable only if the bank was convicted of drug conspiracy.[59]

This rationale was correct, to the extent that one viewed the case against BCCI to be no bigger than the amount of drug funds it demonstrably moved. But the indictment had alleged something larger -- that BCCI itself had a corporate policy of drug money laundering -- and as a result of the plea, there would be testimony about this practice, and no further exposure of what BCCI was doing.

As Mazur testified, the Justice Department and Jackowski "went out of their way" to solicit the opinions of those involved in the case, including him, before agreeing to the plea. Unlike Genzman, Mazur saw advantages to keeping BCCI in the case. Mazur testified that "I was, in the long run, of the opinion that we may as well go to trial [against BCC itself], in view of the terms."[60]

There was one obvious and foreseeable consequence of permitting BCCI itself to plead out, while prosecuting the nine individual officers of BCCI and its commodities trading affiliate, Capcom, involved in the indictment. With BCCI having taken a plea, there was no incentive for the individual officers to negotiate a plea based on their offering up information about BCCI's other criminality. The basic notion of using lower-level employees of a company to go after higher-ups was effectively lost, as the lower-level officers felt betrayed and abandoned, while the prosecutors in Tampa had given up any right to go after BCCI for other crimes.

Thus, Genzman's rationale, while understandable from a technical point of view, missed the underlying point. Long before the trial, the Tampa prosecutors had before them information that BCCI secretly owned First American, that BCCI's lawyers, Clark Clifford and Robert Altman, might well have committed crimes, and that BCCI itself might well be a host for criminality activity on a global basis. Amjad Awan, Akbar Bilgrami, Nazir Chinoy, and likely several other of the Tampa defendants could have provided the information to have led to the swift indictment of BCCI on an array of offenses far more serious than those on which the bank was indicted in Tampa. According to Bilgrami and Awan, they and perhaps several of the other defendants would have been receptive to providing information about BCCI's larger criminality if they had ever been informed by the government that there was a possibility that

BCCI itself would plea and leave them in the lurch, and that if they talked, the government would agree to reduce their sentences.[61] The decision to permit BCCI to plead out of the case, while continuing to prosecute its individual officers, effectively put an end on that rather obvious and important, prosecutorial strategy.

While it is always easier to be critical in hindsight, Senator Kerry, among other members of Congress, was harshly critical of the plea bargain at the time and went so far as to write a letter to the Judge. First, while the $14 million fine represented three times the largest money forfeiture ever, was, as Senator Kerry said at the time, a drop in the ocean of the proceeds BCCI had derived from criminal activity. Ultimately, that fine was dwarfed by the $200 million assessment later made against BCCI on these larger issues by the Federal Reserve.

Anticipating this criticism in his testimony, Genzman told the Subcommittee that:

"[T]hose who used the $200 million fine figure imposed by the Federal Reserve in July as an example of that the Justice Department should have obtained are confusing apples with oranges. These are simply two cases for which BCCI has been punished separately according to the law that applied in each offense."[62]

What Genzman appears to be saying is that the Justice Department brought a narrow case and received an appropriate fine. The issue, of course, is whether a broader indictment should have been brought, and whether anything was lost by the plea agreement, which ended the ability of the Tampa prosecutors to take further action against BCCI.

US Attorney Genzman testified that "BCCI did, in fact, cooperate, and its cooperation during the seven-month trial against individual defendants in 1990 was utilized in obtaining the convictions and the resulting jail sentences against those individuals."[63]

Genzman may not have been aware that while the bank was allegedly cooperating, it was also paying the astronomical lawyer's fees -- reaching upwards of $20 million -- for the defendants, providing for their housing, and working to insure that they could continue to stay silent about what they knew concerning the bank.[64] Nor is there evidence that BCCI has provided meaningful assistance in helping Justice make any significant criminal case. Indeed, other information obtained by the Subcommittee suggests that BCCI may have used information it obtained from the government in the course of "cooperation" to alert foreign money-launderers of U.S. law enforcement interests, goals, and strategies, providing the criminals important information used to evade the U.S.[65]

Genzman's argument that it was more important to convict the individuals than prosecute the bank was incorrect. The strategy was wrong, not only in hindsight, but clearly flawed at the outset given that the investigators understood that the corruption in the bank reached the highest levels, and that sworn affidavits by one of them, David Burris, articulated other important crimes involving BCCI's lawyers that cried out for investigation and prosecution.

**Double Jeopardy**

Perhaps the most controversial aspect of the plea bargain relates to the question of double jeopardy or possible future prosecution of the bank. Justice Department officials repeatedly

REENTERED AS EXHIBIT 3

denied that the plea agreement between the U.S. Attorney in Tampa and BCCI did anything more than preclude that federal prosecutor's office from undertaking further action against BCCI. In no case, according to the Justice Department, did the entering of the plea by BCCI result in any limitation being placed on any other office of the Justice Department in investigating or prosecuting BCCI. As US Attorney Genzman testified:

The plea agreement contained relatively standard language, committing the US Attorney's office for our district not to prosecute BCCI for any other Federal criminal offense then known to the government. . . It does not prevent the US Attorney in Tampa, or any other prosecutor, state or federal, from prosecuting any individual from the President of BCCI on down. .. [Nor does it] bar any other prosecutors, state or federal, from prosecuting BCCI for offense. [66]

Genzman's first assistant, Greg Kehoe, added, the issue "had been discussed at length within the Department," and had concluded that it would not be an impediment.[67]

Notwithstanding the testimony of Genzman and Kehoe, the plea bargain apparently did cause double jeopardy problems for the only other federal prosecutor then looking into BCCI, the US Attorney in Miami, Dexter Lehtinen.

In testimony before the Subcommittee, Lehtinen, who in 1991 was set to indict BCCI on tax fraud charges, stated:

"By the middle of September (1991). . . I couldn't indict and we set the grand jury each Friday. . . [T]he statement made to use each Friday, was the statement made to us from the Department of Justice that you are blocked from bringing the indictment because of the Tampa plea and the Tampa double jeopardy. You can't do it, period. Nothing like lack of evidence." [68]

While the plea agreement did not technically bar any office of the Justice Department outside Tampa from prosecuting BCCI, the entrance of the plea by BCCI protected it on double jeopardy grounds from being prosecuted for any of the actions it took which arguably were included within the substance of the Tampa indictment. The exact extent of this coverage would in any subsequent indictment of BCCI have been a matter for substantial legal argument. What is significant about Lehtinen's testimony is that contrary to the statements of other Justice Department personnel, the Tampa plea did in fact interfere with further prosecution of BCCI. Justice Department statements to the contrary to the Congress were thus to that extent misleading.

**Justice Provides Assistance to BCCI**

Following the plea agreement, some Justice Department officials adopted an inexplicably benign attitude towards the bank, taking at least two separate actions to help BCCI. First, Justice Department officials asked another U.S. Attorney's office not involved in the negotiations to join in the plea agreement, and thereby be utterly barred from taking any further action against BCCI. Second, another Justice Department official asked state regulators in Florida, New York and California to keep BCCI open when they were considering closing it, and a few days later, on being asked to explain this request, denied having made it.

Each of these requests were made by the Justice Department officials involved at the explicit behest of BCCI's lawyers, who themselves were former prominent federal prosecutors. They raise the question of whether the revolving door, and personal relationships among prosecutors, may have influenced certain Justice Department officials to assist BCCI in contravention of sound public policies.

**The Request to Broaden the Plea to Include Miami**

In January, 1990, after negotiating the plea agreement, at BCCI's request, the Tampa prosecutors entreated the US Attorney's office in Miami to join them.

This was an odd request. At the time, the US Attorney for the Southern District of Florida had its own investigation of BCCI. It had not participated in the negotiations over the plea agreement and if it joined the Tampa plea it would be completely precluded from prosecuting BCCI further. Arguably, there could be some benefit to the Miami office for entering such a plea, in that it would facilitate that office's receipt of BCCI's cooperation in making cases against other criminals. On the other hand, BCCI was already legally required under its plea agreement with Tampa to provide such cooperation to the government on every matter. Obviously, the real beneficiary of Miami joining Tampa in the plea would be BCCI, whose attorneys were aggressively pushing the concept. As the then US Attorney for the southern district, Dexter Lehtinen, told the Subcommittee:

[In] the normal course of events, the defendant . . . in order to gain a benefit form a plea agreement, would want as much of the government estopped or barred from prosecuting again. (69)

According to Lehtinen, "In this particular case, we saw no benefit to the Government by our participation."(70) The Miami's office refused to join the plea agreement, which went forward without the Southern District of Florid's participation.

**The Request to Keep BCCI Open**

At the time of the plea agreement, BCCI's attorneys became aware of the possibility that BCCI's guilty plea on drug money laundering charges might well result in BCCI's closure by the various state banking regulatory agencies that had licensed it to do business in Florida, New York, and California. The BCCI lawyers pointed out to prosecutors that if BCCI were closed, it would be more difficult for BCCI to cooperate in making cases against other criminals. Accordingly, the attorneys asked the Tampa prosecutors to send a letter to the state regulators asking the regulators to keep the bank open.

Within the U.S. Attorney's offices, there was some sentiment that Justice should recommend BCCI should be closed down entirely. Dexter Lehtinen told the Subcommittee that "Tampa [the US Attorney for the Middle District of Florida] wanted to know our position with respect to BCCI's license, and that BCCI's lawyer's wanted to know . . . my position." According to Lehtinen, he told "both groups that we were of the opinion that a license should be in jeopardy if we made a successful prosecution."(71)

Despite US Attorney's Lehtinen's recommendation, US Attorney Genzman decided to adopt a neutral position regarding the revocation of the license. The Tampa prosecutors accordingly on January 31, 1990, wrote state regulators to advise them that the Tampa U.S. Attorney's office had no position whatsoever as to whether BCCI should be closed down, or stay open.

BCCI's lawyers, principally former federal prosecutors Lawrence Wechsler, Lawrence Barcella, and Raymond Banoun, dissatisfied with this result, decided to talk to others in the Justice Department to bring about a different result. Two weeks later, they achieved their goal. Chuck Saphos, head of the narcotics section of the Criminal Division of Justice in Washington, D.C., agreed to write a letter to the state regulators urging them to keep BCCI open. In return, BCCI would be able to cooperate with Justice.

BCCI's lawyers contacted the state regulators' office in Florida, and told the regulators that a letter would be coming from Washington, asking them to keep BCCI open. Soon afterwards, the letter did, in fact, arrive, signed by Saphos, stating that BCCI's cooperation was important to the Justice Department and that keeping it open would allow the Department to monitor BCCI's customer accounts:

"We are, therefore, requesting that BCCI be permitted to operate in your jurisdiction, with the understanding that certain accounts may be maintained by the bank, at the request of the Department of Justice, which otherwise would be closed to avoid legal and regulatory violations."[72]

In addition to the regulators, Saphos sent copies of his letters to the Federal Reserve, and to BCCI lawyers Banoun and Wechsler.

The rationale for keeping the bank open was in fact, very weak. First, there were like to be few significant drug money launderers still using BCCI following its highly publicized indictment in October, 1988. Second, to the extent such accounts existed at the time of the indictment, BCCI's lawyers had systematically sought to shut down them or refer them over to law enforcement as part of its consent decree entered into with the Federal Reserve in early 1989 as a result of the indictment. Finally, the plea agreement, and promise to cooperate with the government, would be as public as the indictments had been. It would be hard to imagine that any drug money launderers could still be enticed to use BCCI under such conditions. Saphos' letter had adopted BCCI's position about the case, rather than recognizing the true facts at the time.

In Florida, state regulators were baffled by the Saphos letter. They felt there was no logical reason to allow BCCI to continue to operate in Florida. The day after receiving the Saphos letter, Florida Comptroller Gerald Lewis wrote Saphos back in the following terms:

Thank you for your letter of February 13, 1990, requesting that the Bank of Credit and Commerce International (Overseas) Limited ("BCCI") be permitted to continue operating in Florida as a state licensed foreign bank agency despite BCCI's guilty plea to money laundering charges . . . Because BCCI has pled guilty to felony charges, the ultimate decision of renewal becomes a difficult one. Your letter indicates that you may have information I should consider in resolving this matter. To this end, I invite you and any other appropriate Department of Justice officials to meet with me in Tallahassee on February 19, 1990.[73]

REENTERED AS EXHIBIT 3

Saphos, although chief of the narcotics section, had little previous involvement with any aspect of the BCCI investigation or prosecution. His position that BCCI should be kept open had evidently not been approved by the Attorney General, or by anyone else at Justice. Accordingly, Saphos was in no position to travel to Tallahassee to explain why BCCI should be kept open. He immediately wrote Lewis back to change his position:

I must apologize if there was ambiguity in my letter of February 13, 1990, which led to a belief on your part that the Department of Justice wished to influence your decision on whether to permit BCCI to retain its license. The Department of Justice takes no position in that regard. The sole purpose of my letter was to indicate that, if you allow BCCI to continue in business, there may be occasions where the Department of Justice may request BCCI, pursuant to its obligations under the plea agreement, to make or continue a banking relationship with customers who are the subjects of criminal investigations. . . . I merely wanted to make certain that you and I were communicating concerning criminal investigations.[74]

Thus Saphos who had only three days earlier stated "we are therefore requesting that BCCI be permitted to operate in your jurisdiction," was now forced to state on the record that this was <u>not</u> the position of the Department of Justice, and to mischaracterize the position he had clearly taken to help BCCI in his earlier letter.

In testimony before the Subcommittee, Assistant Attorney General Mueller struggled to explain the circumstances surrounding the Saphos letters, admitting, "that first letter is ambiguous at best," and "I do not know what initiated it ..."[75]

Greg Kehoe, US Attorney Genzman's First Assistant testified that when he first learned about Saphos' letter to the state regulators, he was upset.[76] As Kehoe testified, "[O]bviously the attorneys for BCCI were talking to Mr. Saphos" and "[they] tried to go behind my back." Yet Kehoe, who negotiated the plea agreement, seemed indifferent to the incident, testifying that in his view, "Saphos' efforts were with the best intentions of law enforcement involved," while acknowledging that, "nothing surprises me in the murky world of criminal law enforcement." [77]

In testimony before the Subcommittee, US Attorney Genzman did little to clarify this bizarre chain of events. The US Attorney told the Subcommittee that "... in this case we told the Comptroller's office that we were taking no position" relative to the reissuing of BCCI's license to operate in Florida.

The obvious explanation for what happened is that Saphos was personally lobbied by people he knew who had formerly been with the Justice Department and now represented BCCI on the outside, and agreed to do them a favor. There is no record of any other person within the Justice Department signing off on Saphos' letter, and it appears likely that he sent it without the letter having gone through any formal approval process. When his recommendation to keep BCCI open became an issue, he retreated from it.

**The Miami Investigation**

By the latter part of 1989 another investigation of BCCI had been launched, in the Southern District of Florida under the direction of US Attorney Dexter Lehtinen.[78] The Miami investigation centered on the theory that BCCI could be indicted for various tax frauds. It was Lehtinen's belief that this case would not be barred by double jeopardy, because it involved different facts from the Tampa case, and because the Miami office had refused to participate in the plea agreement with BCCI. Lehtinen testified that the investigation was "an important matter . . . a priority matter."[79]

At the time Lehtinen was also investigating David Paul's dealings in Miami's largest Savings & Loan, CenTrust, which had a variety of ties to BCCI and in which BCCI held a secret interest of 25 percent through its nominee, Ghaith Pharaon. Lehtinen described to the Subcommittee the strategy behind his two-track investigation and the aggressiveness with which his assistants moved to make the case against the bank:

"CenTrust was alleged to have had some relationships to BCCI, and so we had two teams which would issue what would you call BCCI subpoenas. One team would issue BCCI subpoenas on behalf of its CenTrust investigation, one would issue BCCI subpoenas on behalf of its BCCI investigation."[80]

Lehtinen explained that the case was "records intensive," which made the subpoenas vitally important.[81]

In late 1990 and early 1991, Lehtinen's office issued a series of subpoenas pursuant to the CenTrust and BCCI investigations. Many of the subpoenas were to BCCI in other countries for records and documents that had been moved from the Miami branch.[82] As Lehtinen described the subpoenas, "[they] never mentioned foreign countries."[83] The investigators in Miami, however, were frustrated when BCCI asserted the bank secrecy laws of foreign jurisdictions. Lehtinen's assistants then proposed to seek compulsion through the courts to have the records located abroad produced. Lehtinen told Senator Brown, "[O]ur circuit, the Eleventh circuit is very clear, those subpoenas will be enforced. Some other circuits are a little bit different, but our circuit is very aggressive."[84]

Before proceeding, however, Lehtinen's office was first required to have authorization from the Justice Department's Office of International Affairs. However, according to Lehtinen, the response from the Justice Department was that they would not authorize enforcement of the subpoenas.[85] Lehtinen told the Subcommittee that he didn't "recall a specific reason for the refusal."

Ultimately, with the assistance of Deputy Assistant Attorney General Mark Richard, the US Attorney's office in Miami did seek compulsion for enforcement to two of the subpoenas, one in the United Arab Emirates and one in Panama. When BCCI continued to refuse to comply with the two subpoenas, the bank was fined $50,000 a day, until seven days later, when it capitulated and supplied the records.[86]

Lehtinen and his assistants continued to urge the Department of Justice to assist in the enforcement of the other subpoenas. By August, 1991, following the Morgenthau indictment,

the Justice Department began a series of meetings in an effort to move more swiftly against BCCI. In one such meeting at Justice in Washington, Lehtinen again raised the issue of the failure to enforce his subpoenas in response to Assistant Attorney General Mueller's offer to provide assistance to any US Attorney office pursuing a case against BCCI. Despite Mueller's offer, no assistance was forthcoming and the subpoenas continued to languish, leaving Lehtinen perplexed:

[E]xactly why the Department of Justice handles matters as they do is -- whatever factors they take into account are not particularly known to us in Miami in all circumstances. We in Miami wanted all of those steps taken that we proposed. They were not taken and we are just not able to say why.[87]

Despite the problems with not having the subpoenas enforced, Lehtinen's office continued to pursue the investigation of BCCI for tax fraud. Lehtinen testified that in his meeting with Assistant Attorney General Mueller in early August, Mueller encouraged him to "work aggressively on it as much as possible."[88] By the third week in August, Lehtinen was ready to move forward with an indictment after having been notified by his assistants that "there was no problem with the on-site review by the Justice department's tax division. Then, suddenly, on August 22, Dennis Saylor, chief assistant to Assistant Attorney General Mueller, called Lehtinen and, according to the US Attorney, "indicated to me that I was directed not to return the indictment."[89] As Lehtinen testified:

[I] asked who was requesting me not to return it, and he said [Acting] Attorney General William Barr. I asked why we weren't returning the indictment, if it was tax, tax was on-site and tax would talk to us. . . I asked, why we are being told this way not to indict, and he said he didn't know. . . [90]

Lehtinen thought that it was strange that he would be receiving a telephone call from "non-tax" people telling not to proceed.[91]

The next day Lehtinen received a letter from the Assistant Attorney General for the Tax Division Bruton, informing him that he should not move forward because his investigation of BCCI was not "an authorized" tax investigation. Lehtinen told the Subcommittee, "I don't know what they are talking about there...That is very odd."[92] Later in his testimony, Lehtinen added:

Well, the statement that you are not doing an authorized Tax Division case is foolish. If it is not an authorized tax case that is because the Tax division -- I don't know what that means. I mean, you are doing a grand jury. The Tax Division knows it. You are urged for more than a month by DOJ to indict it. You coordinate with tax. You ask for a special review and then a day after you get a phone call saying the Attorney General says don't do it. The tax division tells you, oh, by the way, your grand jury isn't an authorized grand jury. In late July or early August, the head of the criminal division, Mr. Mueller, told us he -- he told Andreas Rivera directly that he would specifically make sure the Tax Division handled this case effectively and efficiently. So to say tax didn't know until August 19th doesn't make a lot of sense."[93]

https://info.publicintelligence.net/The-BCCI-Affair.htm

Moreover, Lehtinen had sent a letter to the Justice Department on May 13, 1991 in which he concluded that "the BCCI tax case is a case of the greatest national urgency."[94]

Lehtinen was particularly concerned because the statute of limitations was set to run on one his counts. When he conveyed his concern, the reply from the tax division, according to Lehtinen was "Why don't you just claim that BCCI was out of the country," because the statute does not run if the target is out the country. Lehtinen testified that he dismissed this advice as "disingenuous and a real legal problem."[95] When pressed by Senator Brown on the ramifications of the Department's actions, Lehtinen testified "We believed that a decision to not go to the grand jury would mean a decision to drop the charge."[96]

Lehtinen testified that he would have understood had the tax division criticized his case on evidentiary grounds, but, at the time, that did not appear to be the case. Instead the Miami US Attorney was given the somewhat ambiguous instructions that more work needed to be done on the case. According to Lehtinen, "[T]here was functionally speaking no additional work that could be done," pointing out that "if you [the Justice Department] want me to do additional work, you should have approved my grand jury subpoena."[97]

Lehtinen became even more confused when one month later he was told by the Justice Department that he could not indict because of problems of double jeopardy arising out of the Tampa case. Senator Brown spoke for the Subcommittee when he characterized the unwillingness of the Justice Department to allow the Grand Jury to return indictments in the southern district as "very strange."[98]

By early November, the concerns over evidence and double jeopardy previously expressed by the Justice Department had all but vanished. On November 6, 1991, Deputy Attorney General, George J. Terwilliger, wrote Lehtinen that he was "prepared to defer to your prosecutorial judgment on this matter..." When asked by Senator Kerry if the state of his evidence had changed from August, Lehtinen responded, "No, it was the same evidence."[99] Lehtinen implied to the that the reversal by the Department of Justice was the result of Congressional and media pressure:

There had been significant, Time Magazine and New York Times articles, very critical of the Department.

I know Congressman Schumer sent staffers to Miami and to various districts on behalf of the House Judiciary Subcommittee on Crime.[100]

While it is difficult to sort out precisely what went wrong between the U.S. Attorney for Miami and main Justice in Washington, it is obvious from the above account that two important cases involving BCCI in Miami were frustrated, if not paralyzed, by inaction at main Justice in Washington during much of 1991. In part, that outcome may have been the result of continuing attempts by the Justice Department to defend the plea agreement in Tampa, and to steer any further activities pertaining to BCCI to the Tampa office. Additionally, the Justice Department may have been uncomfortable dealing with the possible preclusion of investigation or prosecution in Miami arising out of the double-jeopardy problems created by

BCCI's plea in Tampa, problems that had to date not surfaced even in interviews with Congressional investigators.

**Jack Blum and the Justice Department**

In March of 1988, months before the takedown of Operation C-Chase in Tampa, the chief investigator for the Foreign Relations Committee, Jack Blum, contacted the Justice Department with startling information about BCCI. In the course of his investigation into narcotics trafficking in Panama, Blum had come into contact with "a very senior BCCI officer who was in the process of disengaging from the bank."[101] According to Blum, the BCCI banker provided him with a substantial amount of information about the bank's criminality. Blum proceeded to seek authorization from the Foreign Relations Committee to issue subpoenas to the bank, which were granted. Before issuing the subpoenas, however, Blum contacted the US attorney's office in Miami and Tampa, which asked him not to proceed. Blum told the Subcommittee:

I talked to Joe Maigre, who was then the deputy in Tampa, who told me there was an undercover operation underway. . . the well-advanced Operation C-Chase. . . I was not told the nature of the operation. What I was told was that agent's lives were in danger, and that he -- and that he was followed-up by the Department of Justice in a formal way -- requested that we defer the issuance of a subpoena until we get a go-ahead.[102]

Blum did defer issuance of the subpoenas until late July, 1988. At that time, he contacted Tampa, and asked if he had clearance for now issuing the subpoenas. He was told there was no objection. The four Committee on Foreign Relations subpoenas were then served on BCCI and its officers.

Blum's next contact with the Department of Justice occurred in March 1989. The contact was precipitated after Blum received a telephone call from a former client who knew a highly placed BCCI officer who claimed that the Senate investigation "almost brought the house down and there was a full court press to make sure that it didn't get anywhere."[103] Blum had his friend convince the BCCI officer to talk to Blum. Blum then arranged to have Customs and IRS secretly "wire" a hotel room in Miami to secretly record their conversation.

Blum debriefed the BCCI official over the course of the next three days. He testified that the BCCI official "laid out in exquisite detail the false capitalization of the bank, the question of straw men holding stock, the use of the bank to purchase First American, National Bank of Georgia, Independence Federal in Encino, CA..."[104] According to Blum, he then:

"flew up to Tampa and met with a team that consisted of other Customs and IRS agents and two representatives of the U.S. attorney's office. The agents were quite excited. They seemed ready and eager to go forward. I had lengthy conversations with at least one of the assistants, Mark Jackowski. He was eager to go forward."[105]

Two weeks later, after Blum had left the Subcommittee, he made arrangements with law enforcement to secretly tape the BCCI official who had originally provided him a great deal of information about the bank. Again, Blum secretly met the individual in a hotel room in Miami

REENTERED AS EXHIBIT 3

and debriefed him for several hours. And, again, Blum believed that the Justice Department would use the information in its investigation of the bank.[106]

Following the taping, Blum had further contact with the Tampa investigators and prosecutors, providing further information over the course of a lengthy conference call.

However, according to Blum, the Justice Department did not follow-up on the information:

"I waited for something to happen and, and what happened was, I started getting calls from the two guys I took to Tampa who said they're [the Justice Department] is not following up. Then, I talked to the agents, and the agents said, well, we're very busy. . . No follow-up. And I began to worry that something was very wrong with this case. In -- I now believe it was late May, I decided that I would bring this matter to another jurisdiction, and that was New York... [I] talked to Bob Morgenthau and essentially told him what I knew. On the basis of the same evidence essentially, and he ultimately communicated with the same witnesses, he produced the indictment. . ."[107]

Mark Jackowski, the principal assistant United States attorney in Tampa handling the prosecution of BCCI from 1988 through 1990, presents a very different version of events:

The ex-BCCI official who had been portrayed by Blum as having direct, firsthand knowledge concerning various matters, either did not have such information, or was unwilling to admit it. The ex-official's information appeared to be primarily hearsay, gossip, rumor and innuendo. He was also unwilling to testify at any public proceeding. . . We were disappointed because Mr. Blum had led us to believe that the witness could provide firsthand information relative to the bank's involvement in money laundering and other matters.[108]

Rather than tell Blum that the interviews had been failures, and that the U.S. Attorney's office would not make use of the witnesses he had proffered, Jackowski and the Tampa prosecutorial team issued a subpoena to the Federal Reserve for documents pertaining to the First American relationship, and then permitted the broader inquiry suggested by Blum to lapse.

In justification of this failure to act, Jackowski, in sworn testimony, raised questions about Blum's credibility and even his honesty. Jackowski testified that he discounted what Blum told him about BCCI because Blum had made several wild accusations about the Subcommittee and asked for money for the information he was providing the Justice Department.[109] In staff interviews prior to his testimony, Jackowski claimed Blum had made even more outrageous statements -- that Senator Kerry had been paid one million dollars by BCCI, and that as a result Blum was fired from his job.[110] Jackowski contended that he did not believe these claims, any more than he believed the other information Blum had provided him, characterizing Blum as a "wacko."[111] Jackowski acknowledged that he failed to make any contemporaneous memorandum of the alleged conversations during which Blum supposedly made the statements cited by Jackowski, failed to investigate Blum's alleged wrongdoing, failed to investigate Kerry's alleged wrongdoing. failed to inform the Subcommittee of Blum's alleged remarks, and first raised the allegations 30 months later, in interviews with Congressional staff and at the public hearing, some five months after Blum had made his public criticisms of Justice.

REENTERED AS EXHIBIT 3

Blum took the same information that he had presented to Jackowski to the Manhattan District Attorney's office some weeks later after he had been told by his BCCI informants that Justice Department officials in Florida were not following up on the information. According to the Manhattan District Attorney's office, which provided the Subcommittee with a letter dated November 21, 1991:

At no time did Mr. Blum ever seek or request money form this office for his assistance to us in the investigation of BCCI, nor did he receive any money from this office for his out-of-pocket expenses.

At no time did Mr. Blum ever ask for or suggest that he wanted, employment with this office.

At no time, during this office's dealings with Mr. Blum, did he ever accuse you, Senator Kerry, of misconduct.[112]

It seems highly illogical and unlikely that Blum would make the kind of representations to Jackowski which Jackowski has asserted, and then, only weeks later, adopt an entirely different demeanor with the Manhattan District Attorney's Office. What is more likely is that Blum did complain about not being able to complete the investigation of BCCI that had begun to develop in his final months with the Subcommittee, and may have offered to assist the U.S. Attorney's office on the case if they wanted his help.

It is notable that both of the witnesses who were taped with Blum by Justice, and who Jackowski viewed to have no useful information, were in fact placed before a grand jury by the New York District Attorney, to provide the testimony they had originally offered the Justice Department. That testimony became part of the record on which the grand jury then voted to indict BCCI on July 29, 1991.

The Subcommittee finds Jackowski's testimony not merely unconvincing, but given the severity of the charges, malicious. The Subcommittee believes Jackowski's testimony may stem from a personal dislike of Blum, who has not only been critical of the Justice Department, but who garnered significant media attention for having broken open the case when Jackowski had labored long and hard for months as the principal Justice Department official dedicated to Operation C-Chase. Jackowski deserves significant credit for his work, but not for his testimony.

Notably, in response to questions from Senator Brown, Jackowski acknowledged that the tape recordings made by the U.S. Attorney's office, involving Blum and his BCCI informant, focused on the issue of BCCI's use of nominees in the course of its secret take-over of U.S. banks. As Jackowski acknowledged:

The tapes, sir, contained information with respect to First American, that is correct. They contained information relative to NBG, that is correct. They contained information relative to Independence. With respect to Independence, the first witness said that he had in fact gone to a law firm because he suspected that Independence Bank might be owned by BCCI through Ghaith Pharaon.[113]

Because the witness did not have what Jackowski regarded as sufficient first hand information concerning these issues, Jackowski and the other Tampa prosecutors considered the information offered to be of little value, and shrugged off the witnesses Blum had believed to be so important.

### Cooperation with the District Attorney

### and the Federal Reserve

Inexplicably, at times in the investigation the Justice Department has provided halting or reluctant cooperation with other law enforcement and regulatory bodies. In some instances the cooperation was non-existent, and in others, the Subcommittee has concluded that the Justice Department actually tried to frustrate or delay the provision of witnesses and documents to other law enforcement.

In testimony before the Senate Banking Committee, the General Counsel of the Federal Reserve, Virgil Mattingly, described to Senator Kerry the cooperation that his office was receiving from law enforcement:

Senator Kerry. What kind of cooperation is the Fed receiving from the New York District Attorney who is investigating both CCAI and CCAH?

Mr. Mattingly. Superb.

Senator Kerry. What kind of cooperation have you received from the Justice Department?

Mr. Mattingly. We have cooperated fully with the Justice department. We have given them everything we have on this matter.

Senator Kerry. What kind of cooperation are you receiving from them?

Mr. Mattingly. We are actively working with them.[114]

What Mattingly did not state in his public testimony is that over the past year, the Justice Department had actually been refusing to provide assistance to the Federal Reserve, and to some extent, had actually mislead the Federal Reserve about the existence of important information.

On February 7, 1990, the Federal Reserve had sent investigators to Tampa to meet with federal prosecutors, who were at the time in the midst of the trial of five BCCI officers who had been indicted in the Tampa case. The prosecutors said that while rumors of the BCCI-CCAH relationship abounded, they had investigated them and found no evidence to substantiate them. [115] This position was then confirmed by IRS agents working with the Tampa prosecutors. The agents told the Federal Reserve that they wrote a report to the grand jury setting out the facts, which they would be glad to provide to the Federal Reserve, and that they had an informant who could also provide further information on the issue. Following the meeting, the Federal Reserve investigator was told by a Tampa prosecutor that the report contained no relevant information, and therefore would not be provided. The Federal Reserve persisted in requesting the report, and the Tampa prosecutor, for reasons not explained, continued to refuse

REENTERED AS EXHIBIT 3

to cooperate by providing it. In the meantime, the investigator tried repeatedly to talk to the informant, and was told by the informant's wife that the informant was out of the country.[116] Instead of cooperating with the Federal Reserve, the Tampa prosecutor had actually refused to provide requested information. At the time of Mattingly's testimony, the Federal Reserve had yet to be obtain the report it had been requesting from the Justice Department for 18 months.

During that same hearing District Attorney Morgenthau spoke directly to some of the problems that his office was having in working with the Justice Department. The District Attorney stated, "We've had a number of meetings with senior people in the fraud section of the Justice Department, and I think that their position is that they would rather go it alone." [117]

District Attorney Morgenthau also testified that he had sought documents from the US Attorney's office in Tampa and that those documents had not been provided. According to Morgenthau,

"I wrote him a letter on March 8. I've never had a response to that letter. We were told that it had to be cleared by main Justice and a name was given to us. We called that lawyer three or four times on the phone, and he didn't answer his phone. I'm sure they are all very busy down there."[118]

As the New York District Attorney's case continued to develop, the tapes that had been created by Blum became of significant concern to the office. Given their assessment of the importance of the information they had been provided by Blum's witnesses, the New York prosecutors wanted to be sure they had told Justice the same thing, and that the stories had not changed. Accordingly, District Attorney Morgenthau requested that the tapes made in March, 1989 of the Blum-BCCI official conversations be made available to his office. Initially, his assistants were advised by the U.S. Attorney for Tampa's office that no such tapes existed. Later, the U.S. Attorney acknowledged their existence, but refused to provide them to the Manhattan District Attorney on the ground that to do so would threaten to reveal a source -- the BCCI official who Blum had been taped with, with whom the Justice Department had had no contact since March 1989, and whose identity was already known to the Manhattan District Attorney.

In another case, District Attorney Morgenthau requested that the Justice Department provide a witness to New York who had important information that New York needed.

Senator Kerry. I have heard through the grapevine as we have been investigating this of an instance or instances in which the Justice Department has access to or custody of a witness with material information regarding this case, which your office would like to interview but they have refused to provide your office with access to such a witness. Is that accurate?

Mr. Morgenthau. With this correction. They have said that he may be available in a year.

Senator Kerry. In a year?

Mr. Morgenthau. Yes. Not at this time. . . in a year. I don't want you to think that they have refused to let us see him.[119]

Morgenthau went on to say that his office had offered to exchange information with the Justice Department, but that they had rejected the offer. The District Attorney told the Subcommittee that he had run many collaborative investigations in the past and that the actions of the Justice Department in the BCCI case represented the "exception, not the rule."[120]

In response to Morgenthau's criticisms, US Attorney Genzman argued that "all sorts of problems crop up" in cooperative efforts and he specifically noted that "because of the differing systems of immunity, giving up information [to a county DA] might taint the Federal investigation."[121] There was a certain irony to Genzman's remarks given that at this point in time, the investigation of the Manhattan District Attorney's office was far in advance of his own. Indeed, the US Attorney's September 1991 indictment closely mirrored that of District Attorney Morgenthau, although it trailed the local prosecutor by nearly six weeks.

**The Investigation Begins Again**

In late 1990, upon receiving information from several sources, including lawyers for Abu Dhabi and BCCI, that BCCI might well own First American, the Federal Reserve made a criminal referral to the Justice Department. As a result, for the first time, a grand jury was sworn in to hear evidence concerning BCCI's secret ownership of First American on January 16, 1991.

At that point, the New York District Attorney had been investigation these issues for about 18 months, and the Federal Reserve was in the initial stages of what would soon became a very significant investigatory effort to sort out who had participated in violating the Bank Holding Company Act and other banking statutes.

After the collapse of the bank on July 6, 1991, and the impending indictments by the District Attorney in Manhattan, the Justice Department in Washington moved swiftly to broaden its investigation. According to Dexter Lehtinen:

"[S]omewhat prior to the indictment, briefly, believing that he [Morgenthau] would indict, and thereafter, the Department's criminal division surveyed all of the United States Attorney's offices. Of course, they knew all about us because of our efforts to enforce the subpoenas, but [they] surveyed everyone with respect to what they were doing on any of these issues that Morgenthau had dealt with and what did they need?"[122]

As Lehtinen put it, "There was substantially more interest after [Morgenthau's] indictment." [123]

On September 5, 1991, the US Attorney in Tampa returned an indictment alleging racketeering and additional money laundering charges. And on November 15, 1991 the Department of Justice in Washington issued BCCI related indictments alleging racketeering and other offenses based on the secret acquisition and control of Independence Bank and the parking of securities in Centrust.[124]

According to Assistant Attorney General Mueller, "It was only in May of this year [1991] that we received a referral from the Federal Reserve on this bank.....the Department has moved with remarkable speed given the complexity of the matters involved."[125]

REENTERED AS EXHIBIT 3

In testimony before the Subcommittee, Mueller described the importance which the Justice attached to the BCCI case after the worldwide collapse of the bank. He stated that:

The Department is pursuing allegations of wrongdoing of BCCI and its employees. It is conducting investigations through a Washington based task force, and in a number of US Attorneys' offices. At present 37 Federal prosecutors, supported by dozens of agents and supervisory and support personnel, are conducting or supporting investigations nationwide....The Washington task force alone has interviewed dozens of witnesses and reviewed tens of thousands of pages of records. It is interviewing witnesses and securing evidence in locations such as Britain, France, Abu Dhabi, Pakistan, Egypt, the Cayman Islands, the Channel Islands, Argentina, Peru and other countries.[126]

On July 29, 1992, the Justice Department, the District Attorney of New York, and the Federal Reserve each moved against BCCI's top officials, some of BCCI's nominees, and Clark Clifford and Robert Altman in a coordinated effort. Clearly, at least as of the time that Attorney General Barr was confirmed at Justice, many of the problems that had surfaced between the Justice Department and other law enforcement agencies had been worked through by the end of 1991, and a clear effort was being made to collaborate effectively on investigating and prosecuting BCCI.

**Justice and the CIA**

From early 1985 on, the CIA possessed and disseminate to other governmental agencies detailed and important information about BCCI's plans in the United States, and its secret ownership of First American. That information was made available initially to the Treasury and to the Comptroller of the Currency, neither of which passed the information on to anyone else. In 1986, a broader group of agencies received the same information. In neither case did the CIA's memoranda trickle down to the agents or prosecutors responsible for investigating and prosecuting BCCI, until after the takedown of Operation C-Chase, when information in a third memorandum from the CIA did reach Tampa Customs agents.

Undercover Customs agent Mazur testified that during Operation C-Chase he never received any information from his superiors "about information the CIA might have."[127] According to Mazur, information from the CIA was brought to his attention "after the conclusion of the undercover operation."

Assistant Attorney General Mueller told the Subcommittee that while the CIA may have known about BCCI's criminality and illegal ownership of First American dating as far back as 1985, "regrettably, the Justice Department was not on the CIA's dissemination list until 1990 and therefore the Department never received this 1986 report at the time it was disseminated." Mueller is correct that no component of DOJ ever received the 1986 report, but the May 1989 report, which contained many of the same facts, including BCCI's ownership of First American -- in some cases with more detail provided -- was provided to both the DEA and the FBI.

As Assistant Attorney General Mueller testified:

REENTERED AS EXHIBIT 3

At no time, to my knowledge, has anyone from the CIA, or any agency, attempted to obstruct or interfere with the Department of Justice's investigation and prosecution of BCCI.[128]

For the record, assistant US Attorney Mark Jackowski, who oversaw the undercover operation and prosecuted the case, has provided a variety of answers on this subject. When asked by a journalist whether he had uncovered any CIA involvement in BCCI or whether the agency had ever interfered with Operation C-Chase or the ensuing prosecution, Jackowski responded "no comment." When asked the same question by Subcommittee staff, Jackowski replied that "I read a lot of spy novels. Let's leave it at that." When asked by Senator Kerry in a public hearing, Jackowski, under oath, stated that he did not come into contact with the CIA.

### The Justice Department and the Senate Investigation

Through much of the Subcommittee's four year investigation into BCCI, the Justice Department treated the Subcommittee's investigation with visible disdain, at times bordering on contempt. As Jackowski testified, the Tampa prosecutors viewed the principal Subcommittee investigator of BCCI in 1988 and 1989, Jack Blum, to be unreliable at best, someone who wished to trade his information for money, and who had produced little of real value for them. In interviews with Senate staff in the fall of 1991, Jackowski characterized Blum as a "wacko," who had done little more than provide him with "bullshit."[129] Accordingly, after initial interviews of his witnesses, Jackowski and his colleagues did nothing further with the information and leads he had provided.

Following Blum's departure, other Senate staff efforts were treated equally cavalierly.

In the fall of 1989, the Subcommittee sought to depose a Colombian money-launderer who was also cooperating with the Tampa prosecutors, and who had used BCCI in Panama. The Tampa prosector's office and the Justice Department, without prior notification to Subcommittee staff, began making telephone calls to other Senate offices, not involved in the investigation, in an effort to prevent the deposition. The Justice Department told these offices, and Subcommittee staff that even staff interviews with the witness would inevitably prejudice the federal prosecution of BCCI and of Manuel Noriega, and that the government could be forced to provide to the defendants any material the Colombian provided to the Subcommittee. Staff advised the Justice Department that the deposition would be held Committee confidential, and was in any case constitutionally protected against disclosure. However, because of the level of concern the Justice Department expressed, and the implicit threat by Justice that the Subcommittee would be blamed if something did go wrong with the Noriega prosecution in connection with the Colombian, the deposition was halted. As a result, the important information possessed by the witness concerning BCCI's criminal activity in Panama was never provided to the Subcommittee on the record. To make matters worse, the communications by Justice seeking to stop the deposition with other Senate offices not involved in the investigation resulted in a leak that the Colombian was cooperating with the government, imperiling his family and property in Colombia. As a result of this leak, generated through incautious actions by Justice, the Colombian refused to cooperate further with the Subcommittee. Ironically, the Colombian, far from being essential to the government's criminal cases against BCCI and Noriega, was never used by the government in either trial.

REENTERED AS EXHIBIT 3

During the spring of 1990, when the Subcommittee was seeking to obtain documents from BCCI directly, lawyers for BCCI took the position that they would gladly provide documents they were making available to the Justice Department from overseas if the Justice Department would in turn provide copies to BCCI's lawyers in the United States. In response, Justice attorneys advised the BCCI lawyers on May 25, 1990, that the Subcommittee staff should contact Justice directly for the documents involved, which came from Panama. Subcommittee staff contacted federal prosecutors in Tampa and Miami about the documents, who did not return telephone calls or reply to letters for many weeks. In early July, a prosecutor from Tampa advised the Subcommittee staff to ask main Justice in Washington for its position regarding the documents. Following repeated telephone calls, the Justice Department finally advised the Subcommittee in mid-July, 1990, that it could not provide the Subcommittee any documents whatsoever from any location whatsoever, other than the materials entered into the record in the BCCI trial in Tampa. The decision was made by Justice following a meeting between Subcommittee staff and Chuck Saphos, the head of Justice's narcotics section who had six months earlier written the state regulators to recommend that BCCI be kept open.

In the meeting with the Subcommittee, Saphos took the position that any question the Subcommittee might ask about BCCI would inevitably prejudice ongoing matters at the Justice Department. Saphos told staff that there was no matter pertaining to BCCI that could be discussed without prejudicing the Noriega trial. Accordingly, the Justice Department could not consent to testify concerning any aspect of the BCCI case, nor would it provide any information concerning any aspect of the BCCI case apart from what was on the public record in the Tampa trial.

Following the meeting between Subcommittee staff and Saphos, Deputy Assistant Attorney General Bruce Navarro advised Senator Kerry in a letter dated July 24, 1990:

Your questions about the nature of BCCI's cooperation under the plea, BCCI's potential involvement in the handling of assets of Antonio Noriega and the possibility of further investigative efforts by the United States concern matters upon which the Department can not comment without jeopardizing any future prosecutions that might be undertaken. . .

Many of the specific questions you have raised may be addressed by BCCI itself. The Department simply can not testify on matters which are under investigation or subject to pending litigation.[130]

As is now made clear by the record, this was during a period in which law enforcement had taken an acknowledged "time-out" from its investigation.

Even after the global closure of BCCI, the Justice Department continued to impede attempts by the Subcommittee to gather information concerning BCCI, and its own handling of the BCCI case. The Subcommittee had requested copies of Customs Service memoranda related to Operation C-Chase. As the Customs Service is an agency of the US Treasury -- not the Justice Department -- it would have been the Treasury's decision as to whether to release them. Treasury had no objection to their release. However, after conferring with Justice, Treasury explained to the Subcommittee that it would not release them without Justice's permission, and that permission had not been granted by Justice.

REENTERED AS EXHIBIT 3

The Subcommittee then asked Justice to explain its refusal to release the documents. The reason provided by the Department was that the memoranda contained information that would jeopardize ongoing investigations. After considerable wrangling, and after the Justice Department was advised that any additional delays in providing the documents could result in equal delays in a Senate vote on confirmation Acting Attorney General Barr in a permanent position, Subcommittee staff were allowed to review the memoranda in an unredacted form.

When the documents had been produced, few revealed anything about ongoing investigations. Many referred to embarrassing criticisms by Customs agents of the handling of the BCCI investigation, including the lack of resources that had been devoted to Operation C-Chase, internal discussions concerning the advisability of bringing a RICO case and the advisability of pursuing a plea agreement with the bank.

Prior to the warning concerning a delay in the Barr nomination, the Justice Department also refused to allow Senator Kerry to meet one-on-one with DEA agent Mazur, formerly the lead Customs agent in Operation C-Chase. The Department insisted that a member of the Justice Department be present in the interview, contending that any private interview between a Senator and a Department of Justice employee was precluded by "Attorney General Order 504-73," which charges the Assistant Attorney General for Legislative Affairs "with the responsibility of coordinating all Department of Justice activities relating to the Congress." The Assistant Attorney General for Legislative Affairs stated that a private meeting between a United States Senator investigating BCCI and the undercover agent who exposed the bank, without the presence of officials from Justice's legislative relations office, would prevent him with "fulfilling the responsibilities charged to him by the Attorney General."[131] As a result, despite numerous requests from Senator Kerry to meet with Mazur personally, the meeting did not place. Senator Kerry therefore decided to simply request Mazur to testify publicly, without any prior debriefing of what he might say to either the Senator or the Senator's staff. Senator Kerry also decided to seek testimony from Mark Jackowski as the chief prosecutor in the Tampa case.

On September 16, 1991, September 18, 1991, and October 16, 1991, in response to a series of requests from the Subcommittee, the Justice Department expressed its refusal to accede to Subcommittee requests for the testimony of Jackowski and Mazur before the Subcommittee concerning BCCI. At the time, neither of them were involved in further activities concerning BCCI. In the September 16, 1991, the Justice Department suggested that the Subcommittee's requests would not only compromise ongoing cases, but put Mazur's personal safety at risk:

Department's policy on provision of Departmental representatives for Congressional hearings is that line attorneys and investigative personnel do not represent the Department in Congressional hearings . . . One effect of having Mr. Mazur testify in an open Congressional hearing on his role in the undercover operation which led to the successful prosecutions in the BCCI matter, even with safeguards such as attempting to disguise his identity, would increase the possibility of drug traffickers attempting to seek revenge by harming Mr. Mazur or his family.[132]

Mazur's personal attorney advised staff that Mazur believed his identity could be protected through the mechanism of having him testify behind a screen with his voice altered, an

approach that was ultimately adopted by the Subcommittee. Later, Mazur personally advised staff of the Subcommittee that he had no reason to believe his testimony before the Subcommittee, with those precautions, would create any risk to him or his family.

The Justice Department also advised the Subcommittee that if Mazur testified, he could never be used again in an undercover assignment.[133] Later, after Mazur testified before the Subcommittee, he in fact returned to an undercover role, without incident. Finally, the Justice Department, reiterating a line that it had previously taken on several occasions with the Subcommittee, said that the Subcommittee's requests threatened to prejudice ongoing matters. [134]

After attempting to resolve any legitimate problems the Justice Department might have, without success, the Subcommittee chairman advised the Justice Department on October 31, 1991, that if it continued in its refusal to provide these witnesses, the Subcommittee would seek the authorization of subpoenas to compel the Justice Department to produce them as witnesses.

At this point, having delayed hearings concerning the Justice Department's handling of BCCI for months in 1991, and for more than a year since the Subcommittee's original request for its testimony in July, 1990, the Justice Department agreed to produce the witnesses in order to prevent the confrontation between the Senate and the Justice Department that would ensue should a subpoena be issued.[135]

In summary, between March 1988 and October 1991, the Justice Department repeatedly requested delays or halts to action by the Subcommittee concerning BCCI, criticized Subcommittee staff and information concerning BCCI, refused to provide assistance to the Subcommittee concerning BCCI, and, on occasion, made misleading or false statements to the Subcommittee concerning the status of investigative efforts concerning BCCI. This pattern shifted substantially after Senator Kerry advised the Justice Department that its handling of the Subcommittee could impede the Barr nomination. While some differences of opinion concerning Congressional access to documents have taken place, following Attorney General Barr's confirmation, the Justice Department has generally demonstrated a dramatically improved responsiveness to Subcommittee inquiries and requests concerning matters relating to BCCI.

**Post-Script**

On August 26, 1992, some weeks after the date of the drafting of this chapter of the report, the Justice Department delivered to the Subcommittee chairman and ranking member a response to a request made to Justice by the Subcommittee one year earlier, on August 1, 1991, and reiterated on November 21, 1991, for a rebuttal by the Justice Department to any of the statements made by former Subcommittee investigator Jack Blum before the Subcommittee which the Justice Department considered incorrect.[136]

The rebuttal provided on August 26, 1992 consisted of a thirteen page statement challenging the August 1, 1991 sworn testimony of former Customs Commissioner William von Raab, an eleven page statement challenging the August 1, 1991 sworn testimony of former

Subcommittee investigator Blum, and a cover letter apologizing "for any inconvenience our delay in responding may have caused you."

Nearly all of the statements contained in the rebuttals were previously made by Justice Department officials either in prepared statements or in sworn testimony before the Subcommittee on November 21, 1991 and May 18, 1992, and have been previously analyzed, incorporated, and referred to within the body of this chapter.

As noted at the start of this section, editorial writers commenting on the Justice Department's handling of BCCI frequently described its response as "sluggish," an assessment which the Justice Department has termed unfair. The delay of over nine months by the Justice Department before providing the Subcommittee the requested response unfortunately provides some ironic further demonstration of the underlying problem.

Given the lack of celerity of this response, and the repetitious character of its rebuttals, the Subcommittee, rather than attempt to incorporate these further statements at the last minute in the body of the section, includes them, without comment or further analysis, as appendices below.

1. See e.g. editorials, "Why So Slow on BCCI?", Washington Post, May 29, 1991, "What the U.S. Knew About BCCI," Washington Post September 9, 1991, "Greed, Influence and BCCI," The Washington Post, November 1, 1991; "Questions For Mr. Barr," Washington Post, November 12, 1991; "What Took So Long?," New York Times, August 3, 1991.
2. S. Hrg. 102-350 Pt. 3 p. 789.
3. Federal Law Enforcement's handling of Allegations Involving the Bank of Credit and Commerce International. Staff Report Issued On September 5, 1991 by the Committee on the Judiciary. September 1991., p.2.
4. Id. p.3.
5. Id.
6. Id.
7. Id.
8. Id. p.4.
9. S. Hrg. 102-350 Pt. 2. p. 524.
10. S. Hrg. 102-350, Pt. 3, p. 716.
11. Id. p. 671.
12. Id. p.672.
13. S. Hrg. 102-350, Pt. 3, p. 669.
14. Id. p. 672.
15. Id. p. 672
16. Id. p. 678.
17. Id. p. 681.
18. Id. p. 688.
19. Id. p. 689.
20. Id. p. 732.
21. Id. p. 683.
22. Transcript, federal wiretap of conversation between Robert Musella, undercover agent and Amjad Awan, September 9, 1988, 5:05 pm, Grand Bay Hotel, Miami, Florida.
23. S. Hrg. 102-350 Pt. 1 p. 52.
24. S Hrg. 102-379, Subcommittee on Consumer and Regulatory Affairs, Senate Committee on Banking, Housing and Urban Affairs, May 23, 1991, p. 231.

REENTERED AS EXHIBIT 3

25. S. Hrg. 102-350 Pt. 3, p.731.
26. S. Hrg. 102-350 Pt. 3 p. 686.
27. Id. p. 687.
28. Id.
29. Id. p.721
30. S. Hrg. 102-350 Pt. 3 p. 721.
31. Customs Memorandum from Mazur to Group Supervisor, March 15, 1988.
32. Id. p.691.
33. Memorandum from Mazur to [redacted by Justice Department], April 11, 1989, Subject: Current Resource Needs of Operation C-Chase.
34. Id. p.691
35. S. Hrg. 102-350 Pt. 3 p. 753.
36. S. Hrg. 102-350 Pt. 3 p. 696.
37. Mazur Memorandum to [redacted by Justice Department] April 11, 1989, Subject: Current Resource Needs of Operation C-Chase.
38. Id. p. 701.
39. Id. p. 695.
40. S. Hrg. 102-350 p. 746.
41. S. Hrg. 102-350 Pt. 3 p. 723.
42. Id. p.717
43. Id. p.719.
44. Id. p. 736.
45. Id. p.697.
46. S. Hrg. 102-350 p. 773.
47. Id p. 697.
48. Id p. 698.
49. Id. p. 749.
50. Id. p. 792.
51. Id. p.750.
52. Id. p. 754.
53. S. Hrg. 102-350 Pt. 3 p. 752.
54. Id. p. 754.
55. S. Hrg. 102-350 Pt. 1 p. 279.
56. Staff interviews, Amjad Awan and Akbar Bilgrami, July 20-29, 1992.
57. Testimony of Deputy Assistant Attorney General Paul Maloney, S. Hrg. 102-379 pp. 222-223.
58. S Hrg 102-379. p. 233.
59. S. Hrg. 102-350. Pt. 3. pp. 718-719.
60. Id. p.694.
61. Staff interviews, Bilgrami and Awan, July 20-29, 1992.
62. Id. p.719.
63. Id. p. 718.
64. Staff interviews, Amjad Awan and Akbar Bilgrami, July 20-29, 1992.
65. Oral communication, June, 1992, U.S. government official.
66. Id. p. 720.
67. Id. p.782.
68. Lehtinen testimony, p.64.
69. Id. p. 13.
70. Id.
71. Id. p.16.
72. Id. p. 768.

73. Gerald Lewis to Charles S. Saphos, February 14, 1990.

74. Saphos letter to Lewis, February 16, 1990.

75. Id. p.799.

76. S. Hrg. 102-350 Pt. 3 p. 768.

77. Id. p.768.

78. S. Hrg. 102-350 Pt. 5, Lehtinen testimony, p. 11.

79. Id. p.19

80. Id. p. 15.

81. Id.

82. Lehtinen recalled in testimony that the countries included the United Kingdom, France, Holland, Luxembourg, Switzerland, panama, United Arab Emirates, and the Bahamas and Grand Cayman. Id. p. 23.

83. Id. p.23.

84. Id. p.39.

85. d. p.26.

86. Id. p. 28.

87. Id. p. 34.

88. Id. p.50.

89. Id. p.51.

90. Id. p.52.

91. Id. p.54.

92. Id. p.58.

93. Id. p. 63.

94. Id. p.70.

95. Id. p. 76.

96. Id. p. 82.

97. Id. p.80.

98. Id. p.77.

99. Id. p. 60.

100. Id. p. 61.

101. S. Hrg. 102-350, Pt. 1. p.27.

102. Id. p.27.

103. Id. p. 32.

104. Id. p.32.

105. Id. p.33.

106. Id. p.33.

107. Id. p. 33. Greg Kehoe, First Assistant US Attorney in Tampa testified that District Attorney Morgenthau's indictment was based on Price Waterhouse audit reports. However, District Attorney Morgenthau credits Blum with providing him the evidentiary foundation for beginning his investigation that led, months later, to New York's securing the audit reports.

108. Id. p.735.

109. Id. p. 735.

110. Winer memo to files, Jackowski interview, September 23, 1991.

111. Id.

112. Letter to Senator John Kerry, signed Michael Cherkasky, District Attorney of the County of New York, November 21, 1992, Id. p. 770.

113. S. Hrg. 102-350 Pt. 3 p. 759.

114. Id. p.137. In testimony later in the day, Robert Genzman explained that "With regard to cooperation with the Federal reserve, let me mention one problem... If we gave certain information to

REENTERED AS EXHIBIT 3

the federal Reserve, that information could become subject to the regulatory scheme under which the federal Reserve works." p. 235.

115. Chronology, House Banking Committee, BCCI Pt 1, id., p. 689.

116. Chronology, House Banking Committee, BCCI Pt. 1, id. pp. 689-690.

117. Id. p. 163.

118. Id.

119. S. Hrg. 102-379, pp. 166-167.

120. Id.

121. Id. p.235.

122. Lehtinen testimony, p. 29.

123. Id. p.30.

124. S. Hrg 102-350, Pt. 3, p. 787.

125. Id. p. 788.

126. Id. p, 788.

127. Id. p. 673.

128. S. Hrg. 102-350 Pt. 3, p. 789.

129. Memo to files, Winer, Re: Jackowski interview, September 23, 1991.

130. Letter, Navarro to Senator Kerry, July 24, 1990.

131. Letter to US Senators Hank Brown and John Kerry from Assistant Attorney General W. Lee Rawls, September 18, 1991.

132. Letter from Assistant Attorney General W. Lee Rawls to Senator Kerry and Senator Brown, September 16, 1991.

133. Id.

134. Id.

135. Letter, W. Lee Rawls, Assistant Attorney General, to Senators Kerry and Brown, November 4, 1991.

136. S. Hrg. 102-350 Pt. 4 p. 778.

# BCCI AND LAW ENFORCEMENT: PART II

**District Attorney of New York**

**Introduction**

While the Justice Department's handling of BCCI has received substantial criticism, the office of Robert Morgenthau, District Attorney of New York, has generally received credit for breaking open the BCCI investigation.

It did so not on the basis of having any witnesses or information available to it which were not available to other investigators, including the Justice Department, and the Federal Reserve. Rather, District Attorney Morgenthau broke the case because he recognized BCCI's

REENTERED AS EXHIBIT 3

importance and significance as a case of global international organized crime, and devoted sufficient attention and resources to force out the truth.

As District Attorney Morgenthau testified, he made the decision to target BCCI once the bank's activities came to its attention because of his recognition that prosecuting a financial institution handling many millions in drug money could, in the long run, have as much impact on fighting crime as the hundreds of prosecutions his office was making every week against traffickers themselves in New York.

[J]ust as illegal drugs are smuggled into this country, illegal profits must be smuggled out. The sums involved are truly staggering . . . the simple truth is that the wire transfer and the bank book are as much the tools of the drug trade as the scale and the gun. . . the nexus between drugs and money means that if we are to succeed in the war against drugs, we must be as vigorous in our prosecution of corrupt bankers as we are of street dealers.[1]

In going after BCCI, Morgenthau's office quickly found that in addition to fighting off the bank, it would receive resistance from almost every other institution or entity connected to BCCI, including at various times, BCCI's multitude of prominent and politically well-connected lawyers, BCCI's accountants, BCCI's shareholders, the Bank of England, the British Serious Fraud Office, and the U.S. Department of Justice. Each, while professing to cooperate with the District Attorney, in fact withheld information from the District Attorney and in some cases, impede, delay, or obstruct his inquiry for months. Ultimately, Morgenthau proved BCCI's criminality, not because of information or cooperation provided by other government agencies -- with the key exception of the Federal Reserve, there was almost none -- but because BCCI had left a trail of evidence of wrongdoing there for anyone with the tenacity to pursue it.

### Information From Senate Aide Initiates Investigation

In the late spring of 1989, Jack Blum, who had been the chief counsel to the Subcommittee investigation concerning "Drugs, Law Enforcement, and Foreign Policy," during 1987 and 1988, went to New York to meet with prosecutors working for District Attorney Robert Morgenthau concerning information he had about criminal activity involving BCCI.

Blum knew Morgenthau's reputation as an aggressive prosecutor, and had worked with Morgenthau in the course of the 1987-1988 Subcommittee investigation. Morgenthau had testified as the lead witness before the Subcommittee in February, 1988 concerning the importance of money laundering in attacking crime. In that testimony, he had stated that some $5 billion to $10 billion a year was being laundered through New York banks and other financial institutions, suggesting that laws combatting money laundering were inadequate, and that the New York banks had a role in preventing the laws from being tougher.[2] In that testimony, Morgenthau made a commitment to the Subcommittee concerning his approach to money-laundering:

We are going to spend more resources now in trying to trace [illegal] funds. I think we are going to be successful, although, again, that is a labor-intensive kind of activity.[3]

REENTERED AS EXHIBIT 3

Based on the statements made to the Subcommittee by Morgenthau, Blum believed he might be in a position to follow up on the information Blum had developed about BCCI in connection with his work for the Senate. As Blum testified, he believed he had critical information and witnesses about BCCI's criminality, and had taken that information in March, 1989 to the U.S. Attorney for the Middle District of Florida in Tampa who had prosecuted BCCI on money laundering charges as a result of the Operation C-Chase sting. Blum had brought in two witnesses with information concerning, and arranged for a lengthy conversation to take place between him and the witnesses under circumstances where they could be secretly taped by the government. Moreover, Blum had convinced both of the witnesses to cooperate with the Justice Department. Yet in Blum's view, after all of his efforts,

the Justice Department had done nothing with the information:

The strange thing is that after that effort to put this all in the hands of the Justice Department -- and I might add that at the time I went to Miami, at the instruction of the chairman [Senator Kerry], I shared with the agents working the case materials we had gathered, memos I had written, and other materials we had gathered, so that they would have a complete picture of what we knew.

I waited for something to happen, and what happened was, I started getting calls from the two guys I took to Tampa who said, they're not following up. Then I talked to the agents, and the agents said well we're very busy. We're working on preparations for the trial.

No follow up, and I began to worry that something was very wrong with this case. In . . . late May, I decided that I would bring this matter to another jurisdiction, and that was New York. Our Federal system mercifully allows for parallel activities. If the State government fails, the Federal Government is there, and vice versa. . .

So I went up to New York and I talked to Bob Morgenthau and essentially told him what I knew. On the basis of the same evidence, essentially, and he ultimately communicated with the same witnesses, he produced the indictment that you read about the other day.[4]

After Blum met with Morgenthau, he was introduced to other prosecutors in the New York DA's office, and debriefed them. He told them he believed BCCI had engaged in money-laundering in New York, and described the evidence that BCCI owned First American. Morgenthau's prosecutors found his information to be startling, and viewed it with skepticism. As Michael Cherkasky, Morgenthau's chief of investigations later stated:

Blum's story was ridiculous. [He said] the entire Third World was involved and that they had bought and sold entire governments and maybe some United States officials. It was a fascinating tale -- this guy was telling us the world was corrupt![5]

Morgenthau decided to move forward, and assigned the investigation of the case to John Moscow, an experienced fraud prosecutor. Moscow in turn interviewed Blum's witnesses, looked at documents, investigated the case Blum brought to them, and, in Cherkasky's words, Blum's "'story' was proven to be true."[6] While the Justice Department prosecutors who had the most information about BCCI regarded Blum as a "wacko," and his information as worth

REENTERED AS EXHIBIT 3

little, the New York District Attorney's office took it seriously, investigated it, and proved it out.

## BCCI's Reputation

### Contributing to Initiation of Investigation

During the July 4th weekend of 1989, several members of District Attorney Morgenthau's staff attended an international conference on money laundering in Cambridge, England. At the conference, they learned that BCCI had an international reputation for capital flight, tax fraud, and money laundering that far exceeded the conduct charged in the Florida indictment.[7]

In addition, Morgenthau's staff learned that BCCI did not have a single regulator and did not operate on a consolidated basis anywhere and that its two major operating subsidiaries were chartered in separate bank secrecy havens -- Luxembourg and the Cayman Islands -- where customer privacy was paramount. They concluded that this structure multiplied BCCI's opportunities to conceal fraud. Following the trip, they conferred with the District Attorney and decided to pursue an investigation against BCCI in earnest. At the time they made this decision, all of the information they had was also available to the Justice Department.[8]

From the start, given the allegations presented to them by Blum, the New York District Attorney's office recognized that an important part of the investigation would be uncovering the exact relationship between BCCI and First American. After Blum left Morgenthau's office, Morgenthau looked at First American in Moody's stock guide, and noted that First American was owned by a series of holding companies starting in Delaware that then moved offshore to various bank secrecy havens, and that First American itself was headed by Clark Clifford. Morgenthau later said that looking at the series of holding companies and seeing Clifford's name at the top, he concluded that "somebody was trying to hide something.[9]

Because First American had a New York operation, First American Bank of New York, any misrepresentations made in connection with that bank by BCCI or anyone else would confer a primary basis for jurisdiction for Morgenthau's office.

Thus, while BCCI's possible ownership of First American was never more than a peripheral issue for the Tampa prosecutors, one which prosecutor Jackowski termed "dessert," with money laundering being the main course, the issue was always at the center of attention at the District Attorney's office. As Moscow stated later:

We kept asking one basic question: 'Who owns B.C.C.I. and where did the money come from?' We never got to the advanced questions. We got stock on the simple questions and on 'Who owns First American?'"[10]

### Problems Obtaining Information

While the New York District Attorney was able to subpoena those documents held at BCCI New York, and at the offices of First American in New York, subpoenas outside the immediate jurisdiction of New York posed greater problems for a local district attorney. These problems, while in some cases substantial, were dwarfed further by the District Attorney's difficulties in

REENTERED AS EXHIBIT 3

obtaining information pertinent and material to BCCI's activities in New York, but held at such locations as the United Kingdom, Luxembourg, the Grand Caymans, Panama, and Abu Dhabi. Moreover, on even simple issues, New York was finding tremendous obstacles in getting answers.

When New York sought documents from the Serious Fraud Office in London -- the British version of the financial crimes unit within the Justice Department -- the SFO was unwilling to provide it with any assistance in obtaining BCCI documents. When New York met with BCCI's lawyers, former federal prosecutors Lawrence Wechsler and Lawrence Barcella, they told the New York prosecutors that the documents concerning the issues of BCCI's capitalization and stock were held abroad and protected by bank secrecy, and the prosecutors could not obtain them.[11] As Morgenthau later testified, BCCI had been careful to keep its critical records in countries that would protect its right to keep them secret, making investigation of BCCI extraordinarily difficult:

When you try to get the records, they invoke the secrecy laws of all those jurisdictions. The main audit of BCCI was done by Price Waterhouse U.K. They are not permitted, under English law, to disclose, at least they say that, to disclose the results of that audit, without authorization from the Bank of England. The Bank of England, so far -- and we've met with them here and over there -- have not given that permission.

The audit of BCCI, the financial statement, profit and loss balance sheet that was filed in the State of New York was certified by Price Waterhouse Luxembourg. When we asked Price Waterhouse U.S. for the records to support that, they said, oh, we don't have those, that's Price Waterhouse U.K.

We said, can you get them for us? They said, oh, no, that's a separate entity owned by Price Waterhouse Worldwide, based in Bermuda.

So, here you have financial statements, profit and loss, filed in Washington, filed in Virginia, filed in Tennessee, filed in New York, and audited by auditors who are beyond the reach of law enforcement.

So that creates some very, very serious problems.[12]

Thus, accounting firms in the United States affiliated with those elsewhere that had certified BCCI responded to subpoenas with the claim that they could not provide the documents that could prove BCCI's criminality; the Bank of England, which could have made those documents available also refused to provide them; and the British Serious Fraud Office refused to provide them. Moregenthau's attempts to obtain documents concerning BCCI's money laundering and other crimes from Panama met similar resistance. Finally, when the District Attorney of New York turned to the Justice Department for assistance, it too refused to cooperate. As Morgenthau testified on May 23, 1991:

We've had a number of meetings with senior people in the fraud section of the Justice Department, and I think their position has been that they'd rather go it alone.[13]

REENTERED AS EXHIBIT 3

In fact, at the time the Justice Department had, as detailed in the chapter on the Justice Department, refused to provide the New York District Attorney with access to its documents and certain witnesses under its control in connection with BCCI, and in one case, a prosecutor in Tampa actually lied to the Morgenthau office and claimed that the Blum tapes pertaining to his debriefings of the BCCI witnesses did not exist and had never existed.[14]

## Techniques to Obtain Information

Documents subpoenaed by the Foreign Relations Committee from BCCI and provided by BCCI's liquidators to the Committee after the closure of the bank on July 5, 1991 provide a base-line mechanism for assessing how the District Attorney of New York put together his case. The documents initially provided by the liquidators to the Committee consisted almost entirely of materials that had previously been subpoenaed in 1990 by the District Attorney of New York.

What the documents show is that the District Attorney had several insiders who either still worked at BCCI, or had formerly done so, who had provided guidance to the relationships between BCCI and First American.

Subpoenas to BCCI in New York had revealed hundreds of documents pertaining to BCCI's involvement in various aspects of decision making concerning the First American Bank in New York. They also revealed financial benefits to First American and National Bank of Georgia employees being paid them by BCCI while they ostensibly were employed by the U.S. banks, numerous and differing kinds of financial transactions involving BCCI and First American, and participation by First American employees who formerly worked for BCCI in BCCI's annual conferences.

A number of the witnesses who testified before the Subcommittee were first interviewed by investigators from Morgenthau's office. These BCCI insider, such as Abdur Sakhia, who testified in detail about the ties between BCCI and First American, Clifford and Altman's alleged knowledge of these ties, and Clifford and Altman's alleged actions at First American at the direction of BCCI, provided critical information linking together the documents and leading to subpoenas to other, less cooperative, BCCI insiders.

Thus, based on the information that existed within the United States, it was possible to develop a theory of what had taken place, as well as a substantial amount of direct and circumstantial evidence to confirm it. However, it was clear from the first additional critical information was outside the United States, and had to be obtained to further document some of the essential matters to bring an indictment.

Morgenthau's office had learned in the autumn of 1990 that audits of BCCI by Price Waterhouse UK would detail massive fraud at BCCI, and describe in detail BCCI's interest in First American. But subpoenas to Price Waterhouse in the United States produced no information, as the accounting firm's attorneys took the position that the U.S. firm had no power to obtain such information from its foreign affiliates. Accordingly, Morgenthau, as described in a journalistic account, used personal contacts he had in the United Kingdom to cut the knot of secrecy the UK had imposed on the audit reports:

REENTERED AS EXHIBIT 3

[Morgenthau] contacted Eddie George, the deputy governor of the Bank of England. Morgenthau reminisced about his time in England during the war. . . "Morgenthau told George, 'We are going to charge this bank.' . . . And when we charge them you are going to be looked at publicly. We would like to be able to say that the Bank of England helped us."[15]

It is not by any means clear that the Bank of England responded to Morgenthau's plea. However, ultimately, through a mechanism that has never been made public, Morgenthau was able to obtain the Price Waterhouse audit reports, detailing BCCI's frauds, its massive lending on First American, its use of nominees, and related matters. As his investigation intensified, he found that the Federal Reserve had by late 1990 became engaged in its own investigation of BCCI and First American, and the two offices began working closely to assist one another.

The Federal Reserve was able to conclude by February, 1991 that there had been violations of the Federal Bank Holding Company Act in connection with failures by BCCI to keep it apprised of changes in share holdings at First American/CCAH. The situation threatened the restructuring of BCCI that was going on in the United Kingdom, and the Federal Reserve was able to convince the Abu Dhabi government that cooperation with it was essential if Abu Dhabi and BCCI were to have any hope of keeping the bank alive. Federal Reserve investigators Richard Small and Thomas Baxter went to Abu Dhabi and there found the key documents showing BCCI's secret ownership of First American through nominees, which were in turn provided to the District Attorney's office. Thus, as of the spring of 1991, Morgenthau had assembled more than enough information to indict BCCI as a classic Ponzi scheme from its beginning. Yet even as he prepared to indict BCCI, he continued to face massive obstacles in obtaining information from any government agency besides the Federal Reserve, let alone from the vigorous defense being pursued by his targets. As Morgenthau testified on May 23, 1991:

We are finding problems at every step of the way. We are finding problems with the Justice Department in getting records. We have had subpoenas out to various banks for records which have not been honored. We have been trying to get the cooperation of the Bank of England. We are trying to get the cooperation of Price Waterhouse U.K., and we have not been successful.

The one organization that has been very helpful to us is the Federal Reserve Bank of New York and the Federal Reserve Board in Washington.[16]

**The New York Indictment**

On July 29, 1991, the New York District Attorney indicted BCCI. In contrast to the narrow money laundering charges brought against BCCI by the Justice Department in Tampa, the indictment alleged a broad, international criminal organization which stole funds from poor countries and small depositors and used them to keep BCCI afloat despite massive mismanagement and the fact that the bank had no real assets of its own.

As the indictment described it:

[BCCI's] scheme was premised on the fact that banks rely on credit. The essence of the scheme was to convince depositors and other banking and financial institutions, by means of

false pretenses, representations, and promises that the BCC Group was a safe financial repository and institution for funds, and thereby defendants acted to persuade depositors and banking and other financial institutions to provide the BCC Group banks with deposits and credit.[17]

Thus under Morgenthau's theory of the case, BCCI had from the beginning never had the assets it purported to have, but relied on the reputations of prominent people to provide it with the aura of wealth and respectability it needed. He saw BCCI to a massive, multi-billion dollar confidence scheme, whose collapse was inevitable if the facade BCCI had so carefully constructed were ever ripped away. During the months prior to his July 29, 1991 indictment of BCCI, the New York grand jury had heard witness after witness detail the mechanisms by which the facade had been maintained, and having hearing those details, they indicted.

The New York District Attorney found that among the major actions taken by BCCI to carry out its fraud were:

** Employing the ruling families of a number of Middle Eastern states as nominees for BCCI, who pretended to be at risk in BCCI but who were in fact guaranteed to be held harmless by BCCI for any actual losses.

** Using bank secrecy havens including Luxembourg and the Cayman Islands to avoid regulation on a consolidated basis by any single regulator of BCCI, and thereby to permit BCCI to transfer assets and liabilities from bank to bank as needed to conceal BCCI's true economic status.

** Paying bribes and kickbacks to agents of other banking and financial institutions, thereby avoiding the scrutiny of regulators. [18]

By December, 1991, BCCI's liquidators had pled guilty to the first six counts of the New York indictment as part of an agreement concerning BCCI's assets in the United States. Essentially every one of the matters which Blum had put in front of the District Attorney two and a half years earlier had proven to be true, and had now been acknowledged by BCCI's representatives in formal court proceedings.

### Consequences of New York's Investigation

The persistence of the District Attorney in 1989 and 1990 led to a series of events which brought BCCI down. First, the questions being asked by the District Attorney intensified the review of BCCI's activities by its auditors, Price Waterhouse, in England. Second, the District Attorney's questions led to the Federal Reserve again seeking information about BCCI's possible ownership of First American beginning in late 1989. Third, the District Attorney's efforts were critical to stopping an intended reorganization of BCCI worked out through an agreement among the Bank of England, the government of Abu Dhabi, BCCI's auditors, Price Waterhouse, and BCCI itself, in which the nature and extent of BCCI's criminality would be suppressed, while Abu Dhabi would commit its financial resources to keep the bank going during a restructuring.

By the late spring of 1991, the key obstacle to a successful restructuring of BCCI bankrolled up Abu Dhabi was the possibility that the District Attorney of New York would indict. If such an indictment came, the restructuring could prove exceedingly embarassing for the Bank of England, depending on what Morgenthau charged and whether it had the consequence of causing a global run on BCCI.

The Federal Reserve, the only other government agency then engaged in an active investigation of BCCI, was focused on a relatively narrow set of issues. It had already reached a consent decree with BCCI under which BCCI would agree to give up its interest in First American and cease to do business in the United States. These were serious steps, but related to issues that BCCI could characterize as technical violations of U.S. banking laws, rather than matters that went to the fundamental integrity of BCCI's record keeping and bookkeeping and finances.

By contrast, a criminal indictment in New York might be far broader. The questions asked to date by the District Attorney's office indicated it might well charge that since BCCI's inception, it had been an insolvent pyramid scheme to obtain credit by pretending to have the deep pockets of its Middle Eastern shareholders, when in fact at least a majority of these shareholders were not at risk. Such an indictment would have inevitably caused a swift and thoroughly justified international run on BCCI by depositors all over the world. In threatening such an indictment, the New York District Attorney was making the restructuring proposal intended by the Bank of England, Abu Dhabi, Price Waterhouse, and BCCI, impossible.

The result was that in late June, 1991, confronted both with mounting evidence of BCCI's frauds and with the probability of an indictment within weeks by the New York District Attorney, the Bank of England was forced to begin setting into motion the process of BCCI's international closure.

Thus, the pressure from a single, local prosecutor's office that would not relent when it found evidence of global criminality, proved sufficient to shut down a $23 billion criminal bank operating in some 73 countries. The result is testament to the power of a single local district attorney unwilling to abandon his search for the truth, and the trail of evidence left by BCCI of its crimes around the world.

1. S. Hrg. 102-379, pp. 152-153.
2. S. Hrg. 100-773, Pt. 2 pp. 20-21.
3. Id.
4. S. Hrg. 102-350 p. 33.
5. Vanity Fair, April, 1992, "How They Broke the Bank," p. 261.
6. Letter, Michael Cherkasky to Senator Kerry, November 21, 1991, S. Hrg. 102-350 Pt. 3 p. 771.
7. S. Hrg. 102-379 p. 148.
8. Id p. 149.
9. Vanity Fair, April 1992, "How They Broke the Bank," p. 261.
10. Id.
11. Id p. 262.
12. Morgenthau, S. Hrg. 102-379 p. 158.
13. Id. p. 162.
14. See Vanity Fair, April 1992, "How They Broke the Bank," p. 266.
15. Vanity Fair, April, 1992, "How They Broke the Bank," p. 266.

REENTERED AS EXHIBIT 3

16. S. Hrg. 102-379 p. 167.
17. People v. BCCI, Supreme Court of the State of New York, County of New York, July 29, 1991.
18. Id.

REENTERED AS EXHIBIT 3

# BCCI AND ITS ACCOUNTANTS

**Introduction**

External auditors of banks everywhere play a critical role in the self-regulatory process by which both ordinary depositors as well as players in the financial marketplace evaluate their own business performance, and that of those with whom they may place their savings or do business. In addition, in many foreign jurisdictions, external auditors of banks are relied upon by regulators to provide them with important internal information about bank practices, performing the kind of function in those countries that federal bank examiners do in the United States.

In the case of BCCI, there can be no question that the auditing process failed to work. As the Bank of England stated in determining that BCCI be closed:

It appears from the Price Waterhouse Report [of June 1991] that the accounting records [of BCCI] have completely failed and continue to fail to meet the standard required of institutions authorised under the Banking Act. It further appears that there is not [a] proper or adequate system of controls for managing the business of BCCI.[1]

Given the demonstrable failure of the auditing process, serious questions have been raised about how and why BCCI's outside auditors permitted BCCI to flourish as long as it did, despite fraud and other bad practices which went back many years. The record offers both support for assessing blame on BCCI's auditors, and the suggestion that their work in the spring of 1991 was an essential component of the investigative process that ultimately forced BCCI's closure.

One view of the culpability of BCCI's accountants was expressed by BCCI's own chief financial officer, Masihur Rahman. Rahman testified that as BCCI's top financial official, he did not know of BCCI's frauds prior to the spring of 1990. He testified that has the bank's chief financial officer in London, he did not have access to any of the underlying loan information and related files at BCCI's various field offices. Rahman testified that he therefore relied on the work of the outside auditors, operating around the world at the local level, to review BCCI's records at its various offices and branches, and thereby ensure their truth and accuracy.

At the other extreme was the position taken by BCCI's principal auditor, Price Waterhouse (UK), that it was completely deceived by BCCI until the spring of 1990, and handled its responsibilities concerning BCCI without any fault whatsoever.

As Masihur Rahman expressed his position, regarding the auditors' handling of BCCI's first set of major losses in 1985:

I used to tell the Price Waterhouse and Ernst & Whinney to please review these reports and also please keep me informed, because you are more my eyes and ears than my own inspection division . . .[if] Price Waterhouse had been doing its job, there's no way that this $1 billion exposure [in BCCI's Central Treasury] which was taken to $11 billion exposure in the course of 3 or 4 months [in 1985] could have happened.[2]

REENTERED AS EXHIBIT 3

According to Rahman, Price Waterhouse (UK) had signed off on BCCI practices year after year without issuing any red flags, until suddenly, in April, 1990, it found massive deficiencies at the bank, in which, as Senator Kerry put it, "every red flag in the world was flying," raising the question of how Price Waterhouse could have missed all of BCCI's bad practices previously.[3] From Rahman's point of view, local auditors at each of BCCI's locations had the opportunity to review the underlying loan documentation from the beginning. Rahman believed that process of review was precisely what they had been hired to do and failed at. From his point of view, as chief financial officer, his job was to accept the numbers provided him and audited locally the accountants, and from there to put together the overall financial accounts of BCCI. Thus, the deceptions that took place were made possible through the auditors' failure to have looked sufficiently closely at BCCI's customer-by-customer financial records around the world, and especially in the Grand Caymans. As Rahman explained in an annotation to the report prepared by Price Waterhouse to the Bank of England in June, 1991 which helped bring about the closure of BCCI globally:

Price Waterhouse should have known from their audit of Grand Cayman over many years that deposits of BCCI were being misused. The 'fictitious' loan accounts were in most cases so obviously fictitious that the year after year audit of PW should have detected most, if not all. PW not only knew about ICIC Overseas accounts [where some $600 million of the fraud had at BCCI had taken place] but irregularly "certified these accounts. . . It all happened in, or were initiated by Grand Cayman. . . done by a few people in an amateurish way, right under the nose of PW (Grand Cayman) and PW (UK), who had done audit of these units from their inception (1975.)[4]

Rahman further stated to the British inquiry into BCCI undertaken by Lord Justice Bingham that essentially all of BCCI's serious treasury problems were related to the activities at Grand Cayman, which had taken place in a blatant and repetitive form over many years. According to Rahman, BCCI was paying its auditors $5 million per year to conduct audits which each year took nearly five months. According to Rahman, if properly done, these audits should have uncovered the problems and forced action long before April, 1990.

In contrast, as Price Waterhouse expressed their position, BCCI had deceived them through colluding with shareholders and borrowers to create false documentation that mislead them:

The auditor's responsibility is to design and execute an audit so as to have reasonable expectation of detecting material misstatement in the financial statements whether due to fraud, irregularity, or error. However, common sense dictates, and it is accepted internationally, that even the best planned and executed audit will not necessarily discover a sophisticated fraud, especially one where there is collusion at the highest level of management and with third parties. Under such circumstances, it is reasonable to expect that it may take a number of annual audits before accumulating concerns change to suspicions and ultimately lead to the identification of fraud; in fact, this is what happened in our audit of BCCI.[5]

Price Waterhouse found that BCCI Treasury losses had been concealed and its profits manufactured through BCCI's failure to record deposits and other liabilities; the creation of fictitious loan accounts; the use of funds from ICIC which were controlled by BCCI; use of

REENTERED AS EXHIBIT 3

third party funds which BCCI was managing; circular routing of funds using various BCCI affiliates; the purchase and repurchase of BCCI's own shares through nominees with buy-back arrangements; and the collusion between BCCI and major customers in supplying false confirmations to the external auditors, among other techniques.[6]

In fact, many aspects of BCCI's relationship to its auditors, especially Price Waterhouse's partnerships outside the United States, were sufficiently unusual to provide evidence for both the positions expressed by Rahman and by Price Waterhouse.

Over BCCI's nineteen year existence, BCCI lent at least two Price Waterhouse partnership's funds for business projects, while those partnerships were auditing BCCI; had an affiliate make substantial payments to at least one key former Price Waterhouse official after he had had handled audits of BCCI; allegedly "took care" of Price Waterhouse partners through providing benefits to them such as the use in the Grand Caymans of a villa; according to federal regulators, made use of BCCI-Hong Kong to handle its routine banking needs in the Far East; and according to one BCCI official, may even have been compromised by mid-level BCCI employees who allegedly provided them with sexual favors for that purpose.

Moreover, when Price Waterhouse (UK) discovered massive losses at BCCI in 1985 which the bank falsely characterized as commodities trading losses, Price Waterhouse (UK) accepted BCCI's explanation and did not undertake the kind of comprehensive review of BCCI's Treasury operations in the Grand Caymans which should, even then, according to statements by various BCCI officials, have demonstrated BCCI's fraud.

After 1985, Price Waterhouse (UK) made note of and reported to BCCI's directors and officers exceptionally poor practices by many BCCI entities year after year, including BCCI's failure to keep adequate records. Nevertheless, Price Waterhouse (UK) did not inform regulators of this or other problems at BCCI until April, 1990, and continued through 1990 to sign off on BCCI's annual statements that its consolidated audits "give a true and fair view of the financial position of the group."

Moreover, Price Waterhouse (UK) according to its own audit reports was told by BCCI officials in years prior to 1990 that they had violated U.S. law in failing to inform the Federal Reserve of changes in ownership by shareholders of CCAH/First American, and in various practices relating to CCAH/First American. Yet the firm took no action to advise any regulator, let alone the Federal Reserve, of what they had knew -- or, alternatively, to resign their position as BCCI's auditors.

In defense of the auditors, it should be noted that BCCI's top officials, key major shareholders and some principal borrowers did seek to deceive them through creating false records and documents. The full nature and extent of the fraud would indeed have been difficult to penetrate, given BCCI's far-flung empire and structural complexity, and the bank's decision for its first 15 years of operation to divide responsibility for its audits between Price Waterhouse and Ernst & Whinney, thus ensuring that no one auditor had an overall view of its activities. It is also true that once Price Waterhouse recognized that the hole in BCCI's books had grown so significant that it threatened the solvency of the institution in early 1990, they brought the matter to the attention of the Bank of England. As a result, from that date forward, the Bank of

England shared in whatever blame might be attached to Price Waterhouse's decisions following that date, and prior to its final certification of BCCI's books in April, 1990.

**Difficulties of Investigating BCCI's Auditors**

A full understanding of what took place between BCCI and its auditors has been severely impeded by the inability to obtain documents and testimony from BCCI's principal auditors, especially Price Waterhouse. While Price Waterhouse's US partnership provided full cooperation regarding its audits of BCCI activities in the United States, it took the position that it had neither any knowledge of, or responsibility for, BCCI's overall auditing, which was handled solely by their affiliated partnership in the United Kingdom, Price Waterhouse (UK).

Price Waterhouse (UK), which handled the consolidated audit of BCCI world-wide from 1987 on, and which previously was responsible for over 15 years for the audits of one of BCCI's two flag banks, BCCI Overseas (Grand Cayman), where a substantial portion of the frauds took place, refused to provide the Subcommittee with **any** of its voluminous audit reports pertaining to BCCI in response to the subpoena of the Committee on Foreign Relations. Price Waterhouse (UK) argued that provision of such material was precluded by British law, and that the British partnership of Price Waterhouse did not do business in the United States and could not be reached by any subpoena.

Price Waterhouse (US), which said it did not possess any documents pertaining to BCCI operations outside the United States, explained its relationship with other Price Waterhouse partnerships in other countries as one of a loose affiliation of independent partnerships linked together by a set of agreed-upon standards for audit work, but entirely separate from one another in legal responsibilities. As set forth in a Price Waterhouse (US) letter to Subcommittee staff on October 17, 1991:

[T]he 26 Price Waterhouse firms practice, directly or through affiliated Price Waterhouse firms, in more than 90 countries throughout the world. Price Waterhouse firms are separate and independent legal entities whose activities are subject to the laws and professional obligations of the country in which they practice. . .

PW-US, like other Price Waterhouse firms throughout the world, is a separate and distinct partnership. For your immediate purposes, it is appropriate to note that no partner of PW-US is a partner of the Price Waterhouse firm in the United Kingdom; each firm elects its own senior partner; neither firm controls the other; each firm separately determines to hire and terminate its own professional and administrative staff. . . each firm has its own clients; the firms do not share in each other's revenues or assets; and each separately maintains possession, custody and control over its own books and records, including work papers. The same independent and autonomous relationship exists between PW-US and the Price Waterhouse firms which practice in Luxembourg and Grand Cayman.[7]

As Price Waterhouse (US) partners explained to the Subcommittee, when Price Waterhouse, or any auditing firm, signs off on an audit and certifies that its audit represents a true and accurate picture of a company's books, the certification is not made by Price Waterhouse as a single entity, as would be true in a corporate structure. Rather, the certification is made by, and

binds only the members of the partnership of the accounting firm in the country in which they themselves are certified as accountants.

In the case of BCCI, Price Waterhouse (UK), relying on work performed by its affiliates in a number of locations around the world, conducted the consolidated audit of BCCI from 1987 through 1992. During that time, many other Price Waterhouse partnerships, including Price Waterhouse (US), provided Price Waterhouse (UK) with written summaries of BCCI's financial condition locally, in accordance with their audit instructions from Price Waterhouse (UK), which were then incorporated into the consolidated accounts of the group. Questions about BCCI's activities in the Grand Caymans or Panama or Colombia could be answered only by Price Waterhouse (UK), in connection with its consolidated audits, or by the local partnerships of Price Waterhouse in those countries.

Thus, under the partnership system that all the international accounting firms use, Price Waterhouse (US) has maintained that it has no knowledge of, or responsibility for, a consolidated audit certified by any of its partnerships in other countries, including those done pertaining to BCCI. Accordingly, in response to the Committee subpoena to Price Waterhouse, Price Waterhouse (US), provided complete documentation of its work on behalf of BCCI in the United States, but no documents regarding Price Waterhouse's work on behalf of BCCI elsewhere, including its reports to BCCI's board of directors, and the background to its annual certifications of BCCI's books and records. On these critical issues, Price Waterhouse (US) referred all questions to Price Waterhouse (UK), which in turn took the position that it was legally precluded by British bank confidentiality and privacy laws from providing any of the documents subpoenaed by the Committee. In lieu of testimony or documents, Price Waterhouse (UK)'s attorney provided the Subcommittee a copy of the firm's written answers to questions from a Committee of the British House of Commons.[8]

It is worth noting, for the record, Masihur Rahman's view that for years, Price Waterhouse has held themselves out to be a global firm with uniform standards and one single responsibility. According to Rahman, Price Waterhouse brochures were submitted to BCCI repeatedly emphasizing Price Waterhouse's global integration as a critical strength of the firm.

Due to Price Waterhouse (UK)'s refusal to respond to the subpoena, the Committee has been unable to obtain a complete set of Price Waterhouse's audit reports concerning BCCI, and has had to rely on fragments of such reports obtained from the Federal Reserve and other sources amounting to a small percentage of the total work. As a result, for some years, no audit reports of any kind have been obtained. For other years, the audit reports obtained are limited to fragments of the whole. These fragments do provide some important information about Price Waterhouse's concerns about BCCI from the early 1980's on; unfortunately, the fragments exclude other critical information necessary to evaluate the history of Price Waterhouse's handling of these audits.

In reaching its conclusions, the Subcommittee has sought to make use of all available information, including the answers provided by the auditors to questions from the British House of Commons. However, given the incomplete state of the information the Subcommittee has been able to obtain, it is possible that additional documents from the auditors concerning BCCI could have changed the conclusions reached by the Subcommittee on some of these matters. It is therefore especially unfortunate that the foreign auditors refused

REENTERED AS EXHIBIT 3

to honor the Committee's subpoena.

**Findings**

As noted above, reaching conclusions concerning the responsibility of the auditors in connection with BCCI's maintenance of its deceptions until July, 1991 have been hampered by the inability to obtain full documentation and any interviews from any of BCCI's foreign auditors. Nevertheless, the information and testimony gathered by the Subcommittee is adequate to find:

** BCCI's decision to divide its operations between two auditors, neither of whom had the right to audit all BCCI operations, was a significant mechanism by which BCCI was able to hide its frauds during its early years. For more than a decade, neither of BCCI's auditors objected to this practice.


** BCCI provided loans and financial benefits to some of its auditors, whose acceptance of these benefits creates an appearance of impropriety, based on the possibility that such benefits could in theory affect the independent judgment of the auditors involved. These benefits included loans to two Price Waterhouse partnerships in the Caribbean. In addition, there are serious questions concerning the acceptance of payments and possibly housing from BCCI or its affiliates by Price Waterhouse partners in the Grand Caymans, and possible acceptance of sexual favors provided by BCCI officials to certain persons affiliated with the firm.

** Regardless of BCCI's attempts to hide its frauds from its outside auditors, there were numerous warning bells visible to the auditors from the early years of the bank's activities, and BCCI's auditors could have and should have done more to respond to them.

** By the end of 1987, given Price Waterhouse (UK)'s knowledge about the inadequacies of BCCI's records, it had ample reason to recognize that there could be no adequate basis for certifying that it had examined BCCI's books and records and that its picture of those records were indeed a "true and fair view" of BCCI's financial state of affairs.

** The certifications by BCCI's auditors that its picture of BCCI's books were "true and fair" from December 31, 1987 forward, had the consequence of assisting BCCI in misleading depositors, regulators, investigators, and other financial institutions as to BCCI's true financial condition.

** Prior to 1990, Price Waterhouse (UK) knew of gross irregularities in BCCI's handling of loans to CCAH/First American and was told of violations of U.S. banking laws by BCCI and its borrowers in connection with CCAH/First American, and failed to advise the partners of its U.S. affiliate or any U.S. regulator.

** There is no evidence that Price Waterhouse (UK) has to this day notified Price Waterhouse (US) of the extent of the problems it found at BCCI, or of BCCI's secret ownership of CCAH/First American. Given the lack of information provided Price Waterhouse (US) by its United Kingdom affiliate, the U.S. firm performed its auditing of BCCI's U.S. branches in a

https://info.publicintelligence.net/The-BCCI-Affair.htm

manner that was professional and diligent, albeit unilluminating, concerning BCCI's true activities in the United States.

** Price Waterhouse's certification of BCCI's books and records in April, 1990 was explicitly conditioned by Price Waterhouse (UK) on the proposition that Abu Dhabi would bail BCCI out of its financial losses, and that the Bank of England, Abu Dhabi and BCCI would work with the auditors to restructure the bank and avoid its collapse. Price Waterhouse would not have made the certification but for the assurances it received from the Bank of England that its continued certification of BCCI's books was appropriate, and indeed, necessary for the bank's survival.

** The April 1990 agreement among Price Waterhouse (UK), Abu Dhabi, BCCI, and the Bank of England described above, resulted in Price Waterhouse (UK) certifying the financial picture presented in its audit of BCCI as "true and fair," with a single footnote material to the huge losses still to be dealt with, failed adequately to describe their serious nature. As a consequence, the certification was materially misleading to anyone who relied on it ignorant of the facts then mutually known to BCCI, Abu Dhabi, Price Waterhouse and the Bank of England.

** The decision by Abu Dhabi, Price Waterhouse (UK), BCCI and the Bank of England to reorganize BCCI over the duration of 1990 and 1991, rather than to advise the public of what they knew, caused substantial injury to innocent depositors and customers of BCCI who continued to do business with an institution which each of the above parties knew had engaged in fraud.

** From at least April, 1990 through November, 1990, the Government of Abu Dhabi had knowledge of BCCI's criminality and frauds which it apparently withheld from BCCI's outside auditors, contributing to the delay in the ultimate closure of the bank, and causing further injury to the bank's innocent depositors and customers.

**BCCI's Early Audit Relationships**

As specified in the chapter of BCCI's criminal activity, BCCI was from its earliest days made up of multiplying layers of entities, related to one another through an impenetrable series of holding companies, affiliates, subsidiaries, banks-within-banks, insider dealings and nominee relationships. By fracturing corporate structure, record keeping, regulatory review, and audits, the complex BCCI family of entities created by Abedi was able to evade ordinary legal restrictions on the movement of capital and goods as a matter of daily practice and routine. As a result, the records of BCCI's criminal activity were buried beneath a layering that substantially impeded anyone's ability to make sense of them.

Yet, this problem was not something which developed slowly, near the end of BCCI's existence in 1991, but rather, a structure which BCCI's head, Abedi, created from the earliest days of the bank, and which was accepted for over a decade by both of BCCI's principal auditors, Price Waterhouse and Ernst & Whinney.

According to Masihur Rahman, he recognized the potential for abuse in the system developed by Abedi from the beginning, and insisted on retaining top accounting firms for BCCI as a mechanism to counter Abedi's complexities. As Rahman explained it:

Soon after formation of the bank, it started as BCCI S.A. which was the Luxembourg Bank, but within a couple of years, Mr. Abedi decided to restructure it, and the holding company was produced. It was called BCCI Holdings. And the bank underneath it, BCC S.A. was split into two parts, one bank was left with its head office in Luxembourg called BCCI S.A., and another bank was created with its head office in Grand Cayman. The BCC S.A. bank was mostly with European and Middle East locations, and BCC Overseas Bank was mostly Third World countries. . . .

Well, the more number of entities there are in any organization, obviously the more isolation you can put each section to. And if you do an intercompany position, then unless you know both companies' position, you could get half a picture. So there was that situation also . . .

Because I realized the danger of this evolving structure and the management style, I insisted that we had the best and biggest auditors. And so we from the early days had two of the biggest audit firms, Ernst & Whinney which became Ernst & Young, and Price Waterhouse.[9]

Initially, both the holding company and all BCCI's other banks other than its Grand Cayman's banking unit, BCCI Overseas, was handled by Ernst & Whinney, with BCCI Overseas in Grand Caymans as a "flag-ship" bank, handled by Price Waterhouse from its formation in 1975. According to Rahman, in an effort to deal with BCCI's "free-wheeling structure," both firms were instructed by him to notify him, as BCCI's chief financial officer, of any abnormalities they encountered at the local level in the course of their audits, as they found them, and not to wait until the end-of-the-year audit to report them. Moreover, controls were placed on BCCI's Treasury operations requiring the Treasury department of BCCI to maintain 90 percent of its deposits in a liquid form -- such as placements with prime banks and U.S. and European government securities -- and permitting the Treasury to engage in trading on no more than a maximum of 10 percent of BCCI's dollar surpluses, which would limit the exposure to about $100 million in all.

**Price Waterhouse Audits -- Mid-1980's**

The earliest audit for which the Subcommittee has been able to obtain any records consists of a few sample pages of audit findings and recommendations from Price Waterhouse Grand Caymans to BCCI dated December 31, 1983, prepared by Price Waterhouse Grand Cayman personnel Richard W. Harris and Richard D. Fear. As of the end of 1983, the auditors found that BCCI's loan portfolio contained:

a relatively high concentration of risk to a number of prominent clients. The inherent risk associated with these major exposures is significant in the context of the capital base of the Bank particularly in cases were advances have been made on an unsecured basis.[10]

Accordingly, the auditors recommended that BCCI consider limiting the maximum loan exposure to individual clients or groups, and increasing its loan loss provisions. The pages provided the Subcommittee do include references to other problems with the bank, but the full

explanation of those problems was apparently set forth on pages not obtained by the Subcommittee.

Excerpts from a report prepared in 1984 by Price Waterhouse provides a fuller account of the nature of the problems Price Waterhouse had previously found. While again the documents provided are fragmentary, they contain the following:

Although there have been marked improvements in the quality of the credit files maintained at Head Office [Grand Cayman's] we have again noted instances where the files contain inadequate financial information such that the credit worthiness of the borrow cannot be readily established.[11]

Portions of an internal control report prepared by Price Waterhouse dated April 26, 1986 concerning BCCI's Grand Caymans office described numerous additional problems pertaining to BCCI's lending practices and documentation:

We noted instances where funds had been disbursed . . . prior to the perfection of the security arrangements required . . .

Instances were noted in which items of security were not supported by independent valuations . ..

We have noted some instances where the documentation received by the Bank to create a charge or pledge over security had been accepted without any evidence of consideration having been given to its legal enforceability in the jurisdiction in which the enforcement would be made . . .

We noted instances where exposure exceeded authorized limits, occasionally by significant amounts, and also that in many such cases such excesses were caused by the accrual of interest. .

During the course of our audit we had several requests from local auditors to review loans for which documentation was not available locally . . .

No regular reporting procedures exist at Head Office whereby senior management, the Central Credit Committee or the Board of Directors are notified of non-compliance with the terms and conditions of borrowing, particularly in relation to the non-payment of principal and interest . . .

We noted instances whereby the interest rate being applied to an account differed from that quoted . . .

We noted instances, where for general reasons of confidentiality, certain borrowers were designated with a numbered account reference rather than the account being entitled with the full name of the borrower. Whilst we have no particular objection to this practice, **we found that in most instances none of the officers of the Grand Caymans office were able to correctly identify either the name of the borrower or the credit officer responsible for monitoring the account at other locations**. . .(emphasis added)

REENTERED AS EXHIBIT 3

We noted instances of errors occurring in the accounting records at Head Office accounting to ensure their completeness and accuracy. . .

We have noted during the past few years that the level and number of staff loans booked at Head Office has steadily increased but that regular monitoring is not carried out to ensure that the terms and conditions of such loan are being followed.[12]

Asterisks adjacent to a number of these concerns were placed by the auditors to indicate issues which they had previously raised with BCCI, in some cases for several years. Many of the concerns taken independently might not be cause for unusual concern. But taken together, they demonstrate at minimum that as early 1986, BCCI's auditors knew of a significant number of exceptionally poor practices at BCCI concerning its record keeping, treatment of interest to borrowers, handling of numbered accounts, and handling of accounts where customers were failing to pay interest or principal or both.

While Price Waterhouse may have considered BCCI's poor banking practices to be a demonstration of a lack of sophistication or professionalism on the part of BCCI, in fact, these practices, taken together, were essential mechanisms by which BCCI maintained its global frauds.

For example, BCCI's practice of simply tacking on interest to principal in cases in which loans were non-performing was necessitated by its practice of using nominees to disguise transactions in which BCCI was the real party at interest, such as BCCI's secret ownership of First American. The nominees understood from the beginning that they were not responsible for paying interest, and that BCCI would take care of it. The simplest means for BCCI to take care of it, was, so long as the auditors permitted it, to just add the interest to the principal. Then, when BCCI was ready, it would proceed against the borrower, its nominee, and "acquire" the property secured by these loans. Accordingly, BCCI often would not want any independent valuation of the secured property, because its intention from the beginning was to own or control the secured property -- such as First American -- rather than to sell the property if its "borrower" did not pay BCCI back its "loan."

Similarly, the practice of BCCI officials not being able to identify the borrower behind a numbered account, or the BCCI officer responsible for monitoring the account at other locations, would have been a logical means of compartmentalizing knowledge about accounts in order to limit the possible criminal exposure of the officials and the bank for irregular loans or drug money laundering. To the extent that an official monitoring a numbered account cannot identify a customer, he cannot very well know the quality of his credit or the source of the customer's funds. To the extent that the official cannot identify the other bank officials involved in monitoring the account, they can each claim that they are not responsible for the recovery of this loan, or in a drug-related case, did not possess adequate knowledge to recognize that the funds they were moving were laundered funds.

Without speculating on the possible reasons for these deficiencies, or expressing any concerns that these deficiencies might not be inadvertent on the part of BCCI, the auditors made a number of recommendations to BCCI in 1986 on how to correct them:

REENTERED AS EXHIBIT 3

We recommend that efforts be made to obtain current financial and other supporting information in respect to all borrowers. . .

We recommend that, except in the most exceptional circumstances, funds should not be disbursed prior to the perfection of any required security arrangements. . .

We recommend that independent valuations be obtained on a regular periodic basis to enable the adequacy of security to be properly monitored. . .

We recommend that all charge or pledge documentation be approved by the legal department before funds are disbursed . . .

We recommend that loans should not be allowed to be drawn down in excess of approved limits prior to increased facilities being sanctioned in writing. . .

We again recommend that, in accordance with the group policy, interest on loans against which there is a specific loan loss provision is always created to reserve and not to income . . .

We again recommend that the Central Credit Division take positive steps to ensure that branch managers throughout the Bank are fully aware that they are responsible locally for maintaining complete credit files for all loans. . .

We recommend that procedures be introduced to enable management to readily identify non-performing loans. . .

We recommend that all credit files contain written authorization to support the interest rate being applied to an account. . .

We recommend that the Head Office manager maintain a private register of borrowers using numbered accounts. . .

We again recommend that procedures be introduced to monitor and control staff loans and advances.[13]

These recommendations, if followed by BCCI, and if insisted upon by Price Waterhouse, backed up by the threat of qualifying the accounts, or by the threat of resignation, would have limited BCCI's ability to continue to engage in many of the deceptions that were essential for its continued survival -- including the use of nominees to own BCCI's secretly-held subsidiaries, such as First American and the Independence Bank. In practice, BCCI continued over its remaining five years of life to abide by few of these recommendations, with the result that the auditors repeated them year after year, with ever greater specificity, while continuing to sign off year after year on BCCI's accounts, concluding that their audit reports represented a "fair and true" picture of BCCI's actual financial status when in fact they did not.

**BCCI's 1985 Treasury Losses**

In 1985, BCCI and its auditors faced the first major crisis of the bank. The crisis came in one of BCCI's flag-ship operations -- BCCI Overseas (Grand Caymans), which had been audited from its inception by Price Waterhouse. The crisis was acute and involved BCCI's Central Treasury. It required the recognition of a loss of approximately $500 million, the equivalent of

the bank's entire capitalization. BCCI characterized the loss as due to as trading losses in the securities and commodities markets, ostensibly brought about through unauthorized trades by a junior BCCI officer, Ziauddin Akbar, who had been placed to run the Treasury Department by BCCI CEO Abedi.

By the account of BCCI chief financial officer Rahman, Abedi and Naqvi had permitted Akbar to take "very, very large exposures," in securities and commodities trading, in what was actually a Ponzi scheme, in which front-end commissions received, representing offsets against liabilities under open futures contracts, were treated as profits rather than as offsets, and actual losses were hidden through BCCI taking ever-larger futures positions in securities and commodities trades to create offsets against the past losses; plus additional "profit" as and when required; until by the autumn of 1985 the forward exposures had become $11 billion against a board approved limit of $1 billion. According to Rahman:

This was done by not more than two or three of the executives in the treasury division directly under Mr. Naqvi.[14]

These huge losses imperiled BCCI on several accounts. First, they had nearly wiped out the capital of the bank, and BCCI would have to find ways to recapitalize. Second, they suggested recklessness on the part of BCCI's top officials, and made many wonder what had prompted the recklessness. But most dangerous of all, these losses could have prompted a thorough review of all BCCI's books and records from the beginning by BCCI's auditors, a review which would have brought down the bank if the auditors had discovered the frauds involved.

As Ziauddin Akbar later told associates, the truth was that the losses had taken place over a number of years and were in fact not really losses at all, but falsified bookkeeping instituted by Abedi and Naqvi to inflate BCCI's books and show phony profits. According to Akbar, he agreed to be the scapegoat for the losses in an effort to avoid a situation in which the auditors would conclude that there been systematic fraud at BCCI, conducted at the top. In fact, the auditors wrongly concluded that the losses had taken place over a short period, and that did not force the further review of BCCI documents which would likely have revealed the years of systematic and massive fraud in the bank's books.[15]

Instead, Price Waterhouse, working closely with Abedi and Naqvi, agreed to the shift of $150 million from the ICIC Staff Foundation/Trust to meet part of this loss, and then splitting the balance of the loss into three years on technical grounds. Akbar was fired, and BCCI was saved.

Nevertheless, recognition of the losses was costly for BCCI. The losses became a significant factor in the decision soon thereafter of BCCI's regulators in Luxembourg, the Institut Monetaire Luxembourgeois (IML) to notify BCCI's other regulators that the Luxembourg authority was unhappy with its responsibility for monitoring BCCI while BCCI actually was headquartered in London. Moreover, it brought about a crisis among the auditors themselves.

According to Ernst & Whinney, the Treasury losses had caused it to doubt whether the auditors could trust BCCI and Naqvi, although Price Waterhouse's confidence in Naqvi remained unshaken. As Ernst & Whinney told the British House of Commons:

PW say that "Until Price Waterhouse exposed him [in 1990], Naqvi enjoyed the respect and engendered the confidence of all those who met him". E&W's confidence in Mr Naqvi was shaken when it was told for the first time on 13 February 1986 of the problems in the Treasury Division of BCCI Overseas and of his involvement therein.[16]

In May 1986, Ernst & Whinney advised BCCI that unless they were permitted to assume responsibility for the whole audit and BCCI's management style were changed and its record keeping systems were improved, they would resign from their commission as auditors for BCCI. In addition to the Treasury losses, Ernst & Whinney were concerned about "a marked reluctance by both Mr. Abedi and the board of BCCI Holdings to take prompt action to disclose these [Treasury losses] to the regulators, to disclose them in the group accounts in a manner satisfactory to E&W and to discipline those responsible." Finally, Ernst & Whinney had advised BCCI that if it were to continue to act as the bank's auditors, BCCI needed to achieve "a marked improvement in the financial and managerial controls exercised throughout the group."[17]

Over the following several months, BCCI, Ernst & Whinney and Price Waterhouse had extensive discussions about the changes which needed to be implemented, and had mutually agreed about the nature of the changes to be put into effect.[18] Nevertheless, for reasons which Ernst & Whinney has declined to specify, it resigned from further work auditing for BCCI, leaving Price Waterhouse for the first time in the position of being BCCI's sole global, consolidated auditor. At the time of Ernst & Whinney's withdrawal, it was auditor to 12 of BCCI's various subsidiaries and affiliates, and Price Waterhouse was auditor for the remaining 19.[19]

**1987 Audits**

Year after year, BCCI's auditors continued to find evidence of poor banking practices and imprudent lending on issues unrelated to the massive Treasury losses. In its end of year report for 1987, Price Waterhouse noted numerous concerns on accounts involving close to $1 billion of exposure to BCCI involving many of the accounts which regulators would later conclude involved front-men. Yet no action was taken by Price Waterhouse, by BCCI's directors, or by regulators who later received these reports, to require any concrete action by BCCI, backed up by sanctions for any failure to comply, to correct the obvious banking irregularities.

For example, in its 1987 audit of accounts pertaining to the Gokal brothers and their shipping empire, the Gulf Group, Price Waterhouse found that exposure to the group amounted to $318 million -- or 23 percent of BCCI's capital base, with exposure rising every year, repayment performance "below expectations," security held against the lending likely unenforceable, and financial information regarding the loans "inadequate." Three years later, Price Waterhouse would conclude that on many of the Gokal related loans, the financial information was not merely "inadequate" but non-existent. Price Waterhouse also found that "cash allocations to [some Gokal] accounts appear to be arbitrary and, as a result of this and the lack of formal repayment schedules, it is difficult to assess the underlying performance of each account."[20]

In the same set of audits, Price Waterhouse found that BCCI faced exposure on loans to former Saudi intelligence chief Kamal Adham of over $200 million, involving large, unsecured

exposures, "poor interest repayment performance," "no evidence of long term repayment schedule," "other related exposures with BCCI/ICIC," and that bank documents showed little evidence of regular contact between BCCI and Adham.[21] Worse, Price Waterhouse found that many of the shares Adham had in the First American Bank, CCAH, were pledge as security for loans BCCI had made to other BCCI borrowers. Nevertheless, Price Waterhouse did not require that the loans to Adham -- or to the Gokal brothers -- be classified or that BCCI make "provision" against them, so long as BCCI promised to correct the problems in the account in the future, which BCCI of course did not do.

The audit of the Adham accounts mirrored that of the audit of the accounts of his successor at Saudi intelligence, Abdul Raouf Khalil. In its end of the year audit for 1987, Price Waterhouse described the situation in the following terms:

AR Khalil is a Saudi Arabian national who has had facilities with the bank for a number of years. In the past the bank operated a large investment trading portfolio on his behalf, however this ceased in 1985 and he now channels his trading activities into Capcom Financial Services Limited, an independently managed investment house with a paid up capital of f25m of which he owns 20%.

Little is known publicly about Khalil, however he is the owner of a substantial museum of Arabian artifacts in Jeddah reputed to be worth some $350m. This value is inherently subjective, but it is understood that he is attempting to arrange the sale of the museum to the Saudi Arabian authorities.

MAJOR CONCERNS.

- Lack of documented evidence of contact with borrower for 1987

- Balance confirmation outstanding

-Interest unpaid

-Lack of evidence of long term repayment schedule

-Lack of formal documentation to secure CCAH shares . . .[22]

Price Waterhouse expressed its anxieties about the Khalil account, but once again, decided that it would not force BCCI to classify any of the loans to Khalil as doubtful or bad, or require BCCI to make provision in a manner that would be reflected in its public audit, again so long as BCCI promised to clean up the problems in the future:

We remain concerned about his account however no provision will be required for 1987 providing:

- the account balance is confirmed to us by the borrower

- interest for 1987 is fully repaid

For the future we require:

- full loan files to be maintained to include all details of correspondence, meetings and other pertinent evidence of the monitoring the account

- adherence to an agreed repayment schedule

- formalization of security arrangements.[23]

In the months that followed, BCCI did not undertake any of the promised reforms, but Price Waterhouse took no action to force BCCI's hand for another two years.

**1989 Audit**

The Subcommittee was not able to obtain any of Price Waterhouse (UK)'s reports to BCCI covering the period between December, 1987 through December, 1988, which includes the date of the indictment of BCCI and seven of its officers on drug money laundering charges by the U.S. Attorney in Tampa in October 1988, following a "sting" by the Customs Service.

Audit reports to BCCI from Price Waterhouse dated November 17, 1989, demonstrate that BCCI had made very little progress in responding to any of Price Waterhouse's expressed concerns, but that relations between Price Waterhouse and BCCI had remained cordial and cooperative, and that Price Waterhouse felt at the time that BCCI was actually "performing reasonably."

The audit report begins with the following sanguine assessment:

Overall the bank has performed reasonably over the past year considering the significant repercussions that could have resulted from the US indictment. The Group has continued to remain relatively liquid and also attract some new business.[24]

While over the course of the report, Price Waterhouse reiterated several of the concerns it had previously expressed in various other audit reports taking place over the previous six years, its overall tone was of an auditor reporting that outstanding issues were in the process of being resolved. While not free of all warnings and caveats, this 1989 interim report did indeed, consistent with Masihur Rahman's testimony, imply that no obvious major problems existed.

**1990 Audit: Price Waterhouse Puts Out Red Flags**

The Subcommittee does not have any coherent account of why, suddenly, Price Waterhouse began in the spring of 1990 to shift from its previous position of politely making recommendations to BCCI to change its behavior, to aggressive criticism of practices at the bank that for the most part it had already been aware of for years. However, the consequences for both Price Waterhouse and BCCI were obvious. Under British law, Price Waterhouse in finding gross irregularities at BCCI, would now be able to report these findings to the Bank of England, and thereby share any responsibility for BCCI's future.

In the April 1990 audit report, Price Waterhouse found that all the previous practices it had condemned and recommended be corrected, had instead persisted and worsened. Among Price

REENTERED AS EXHIBIT 3

Waterhouse's findings was the recognition that BCCI's lending in connection was among serious problems facing BCCI. As Price Waterhouse noted:

** BCCI faced more than $850 billion of exposure in connection with lending for First American (CCAH). BCCI's practices regarding these loans were atrocious. The number of shares pledged by some borrowers had been changing from year to year. BCCI held blank transfer deeds and powers of attorney on the shares that allowed it to transfer them at will, against lending that had been for First American itself, or any other lending to First American's shareholders. Worse, BCCI's were giving conflicting stories about whether BCCI itself owned First American or not. In past years, Price Waterhouse stated, they had been told that BCCI held all the shares of First American, and not simply those pledged as security on lending. This year, they were saying the reverse.[25]

** Many of the loans for First American had never been reduced to writing with loan agreements involving the shareholders, so there was no real way to determine what the terms of the lending were supposed to be, or whether the shareholders had actually authorized them.

** The files maintained by the bank concerning the $850 billion in lending against First American were sparse, with little evidence of customers acknowledging decisions concerning their "investments," let alone directing them.

** Interest was not being serviced on loans for First American. And the interest charges BCCI was crediting on the First American loans were substantial, without evidence that the shareholders had agreed to the interest charges.

** Audits of two companies, Midgulf and Rubstone, who had secured loans from BCCI against their ownership of stock in First American, had been certified by representatives of BCCI shareholder Mohammed Hammoud, yet now BCCI was stating that Hammoud did not own those companies, and it was not clear who, if anyone, did.

** In the past, management had told the auditors that they had not reported all the changes in share holdings in First American to federal regulators as required by law.

Price Waterhouse thus acknowledged for the first time that there were serious questions as to who owned First American, and that it had known from past representations by BCCI management that the bank was violating U.S. laws in failing to tell regulators about changes in ownership when they occurred.

Other findings of the new audit reports by Price Waterhouse were equally damning. Price Waterhouse found that there had been little or no direct contact with Saudi intelligence figure A. R. Khalil since 1985. Yet Khalil had still somehow purchased an additional 57,748 shares of BCCI in April 1989 in a rights offering, with money loaned by BCCI. Price Waterhouse found this disturbing, given "an apparent breakdown in the relationship between the borrower and the bank," and the fact that Khalil had not made any interest payments in five years on previous borrowing from BCCI. Price Waterhouse also found that documentation to support Khalil's borrowings from BCCI was absent, and representations by various BCCI officers about his relationship with the bank were "inconsistent." Price Waterhouse found it impossible

REENTERED AS EXHIBIT 3

to determine whether Khalil still owned the 13,250 shares of First American/CCAH attributed to him, which BCCI held as security against $120 million it had ostensibly lent Khalil.[26]

The new Price Waterhouse reports on BCCI's relationship with the Gokal brothers and their Gulf shipping group, who together owed BCCI over $400 million, were similarly dismal. Price Waterhouse noted in addition to the kind of problems described above, violations of Indian and Pakistani exchange control violations in connection with loans to the Gokals, and statements by BCCI management that the auditors should look to the relationship of trust between the Gokals and BCCI's top officials rather than to any documents in determining BCCI's ability to recover its lending to the Gokals.[27]

Concerning BCCI's banking arm in Kuwait, the Kuwait International Finance Company (KIFCO), Price Waterhouse found that placements recorded by BCCI with KIFCO were inconsistent with Kifco's financial statements regarding the same transactions. Price Waterhouse noted that the principal mechanism for repaying Kifco's loans from BCCI was a mysterious Kuwaiti entity called "the IZ company for Exchange," and that "we now have suspicions as to the propriety of the transactions." Price Waterhouse noted that it had requested access to KIFCO's records which had been denied.[28]

Concerning BCCI's relationship with its Swiss banking representative (and secretly held subsidiary) Banque de Commerce et de Placements SA (BCP), Price Waterhouse stated "Swiss secrecy laws have prevented us from being provided with information relating to customer accounts by the incumbent auditors," and described a number of transactions involving BCCI, its affiliates, and BCP, which Price Waterhouse could not penetrate.[29]

Concerning BCCI front-man Mohammed Hammoud, Price Waterhouse noted that it had no evidence that Hammoud owned any of the companies to which BCCI and its Grand Caymans affiliate ICIC had lent some $110 million. Worse, various companies which had BCCI officials had previously said were owned by Hammoud were now being claimed by BCCI officials not be owned by Hammoud, but by others, who in turn reiterated that Hammoud did own the companies. Finally, Hammoud supposedly now owned 2.6 million shares of BCCI itself, but there were no records backing up this purported ownership.[30]

Concerning the Saigol family, who now owed BCCI $44 million, Price Waterhouse found that there was no evidence that loans or interest on loans were being repaid. Worse, BCCI had lied about the Saigol accounts to the auditors in the past:

Representations previously given about the beneficial ownership of companies to which new loans were extended in Bahrain in 1989 have been false. The loans have been given, in part, to repay delinquent loans in other locations.[31]

The reporting on lending to other prominent BCCI shareholders such as Ghaith Pharaon, the bin Mahfouz family, and members of the Abu Dhabi royal family raised similarly serious problems.

REENTERED AS EXHIBIT 3

In total, the new audit reports by Price Waterhouse -- the first of which reached BCCI acting head Swaleh Naqvi in February, 1990 -- were devastating, and raised fundamental questions as to whether the bank could -- or should -- survive. And yet the information in the audits was different from previous audit reports largely in tone and detail rather than in substance. All but one or two of the issues identified had been raised by the auditors before, and reasons for the sudden shift in attitude remain obscure.

Price Waterhouse's own account of the sudden change is unilluminating. As it told a committee of the British House of Commons in February, 1992:

Our 1987 and 1988 audits revealed imprudent lending: during the 1989 audit we identified that, contrary to management's previous assurances, further lending had been permitted on the major customer accounts where the credit risk was already heavily concentrated. Additionally, around this time, Price Waterhouse identified certain loan transactions in a number of locations for which senior management were unable to provide adequate explanation. Price Waterhouse communicated concerns about these matters and their implications on the credibility of management to the Bank of England early in 1990.[32]

What appears to have happened is that the auditors had spent many years detailing record keeping, documentation, and other problems with BCCI's lending practices, without having had any appreciable impact on change those practices, while each year receiving approximately $5 million for their audit work. By early 1990, it was becoming increasingly clear that the lending problems were so severe that the auditors themselves might be held at risk if they did not alert authorities. What is striking is Price Waterhouse's decision to notify the Bank of England "early in 1990," before it notified BCCI's own board of directors of the problems, and without telling BCCI it had reached out to the regulators. As the visible financial hole at the heart of BCCI grew ever larger, the relationship between BCCI and Price Waterhouse had finally snapped.

### Response to 1990 Audit Report

BCCI chief financial officer Rahman testified that he was shocked by the sudden change in attitude by Price Waterhouse, as well as by some of the information provided to him by them in their new reports, which he received on March 14, 1990:

In the usual process, the whole world audit was completed in the month of February, 1990. . .my wife and family were planning to go on holiday the later part of March, April. And when I received a call on a weekend from Price Waterhouse saying that they wanted to meet me, the partners, and -- I was a bit hesitant because I had been seeing all the partners throughout the last few months and I did not know what it was that they wanted to bring up. Anyway, I went to their office and they produced for me a whole list of what they thought was irregularities, illegalities, and misuse of funds.[33]

According to Rahman, the problem cases identified were exactly those Price Waterhouse had identified for years, but this time the attitude of the auditors was completely different.

Senator Kerry: Now, the irregularities and problems that they put forward to you had been in existence for several prior years, had they not?

Mr. Rahman: Yes. All the names that they listed were names which had appeared in prior years. . .


Senator Kerry: Some were fronts?

Mr. Rahman: Some were fronts, obviously. . . . They presented this list of huge problems whose potential loss could be $1 billion, plus. . . . They said the only thing before we go to the regulator . . . is that we can allow you to have an inquiry of your own from all our findings, and come up with your interpretation and facts.[34]

Price Waterhouse was now taking the hard line with BCCI that it had no choice but to notify the regulators, when in fact, they had already been notified. All that BCCI could do was supplement Price Waterhouse's reporting with its own analysis, which Price Waterhouse urged Rahman to undertake as head of a BCCI interim task force.

Rahman testified that as chief financial officer of a $22 billion concern, he had previously been relying year after year on the auditors reports in preparing BCCI's overall books, and had never been permitted to look at the underlying documentation himself. Now, as he began for the first time reviewing the underlying documentation on the loans, he was shocked at what he found. On the one hand, Price Waterhouse's criticisms of BCCI's operations were valid. On the other hand, from Rahman's point of view, these obvious frauds and illegal acts should have been brought to his attention years previously, and the auditors should not have permitted the practices to go on so long.

The Task Force report prepared by Rahman and three other BCCI officers during March 1990, began by acknowledging BCCI's failures, but criticized Price Waterhouse for taking so long in alerting management to how bad the problem was:

The Task Force after many hours of interviews with the concerned Accounts Executives . . . and reviewing many files and documents made available to it (most of which were of very poor quality) . . . confirms the 'concern' of PW in many of the referred cases . . . The Task Force simultaneously expresses considerable surprise and disappointment at such obvious flaws in basic banking procedures and documentation. The Task Force feels that the annual audit thereof should have easily detected and corrected such haphazard transaction several years ago.

The Task Force concludes that there is little doubt from the sparse records available and inadequate explanations given by the Accounts Executives/Officers that there must be some 'interlocking' arrangements between the shareholders of both BCCI Holdings (Lux) SA and CCAH whereby in several cases 'nominee' routes may have been taken to front each others investment in these two banking groups with corresponding loans being drawn from BCCI (& ICIC) to fund such 'interim' holdings. . .

It took the Task Force only a few days to note that nearly each of these cases had common patterns of initiation, activity, fund flow, weak documentation and vague explanations from the

https://info.publicintelligence.net/The-BCCI-Affair.htm

concerned account officers which any reasonable audit process should have tracked down, identified and stopped forthwith. That is extended over so many years is a great disappointment to the Task Force -- particularly since their initiations was all rom the same source in Grand Caymans (and London).[35]

Thus, as of April, 1990, both Price Waterhouse and BCCI's senior financial official, Rahman, had explicitly recognized, in writing, BCCI's dire financial condition, its poor lending practices, and its frauds in connection with First American and other matters. Ironically, in the weeks to come, it would be Rahman who would voluntarily resign his commission and leave BCCI, and the auditors who would stay and try to find a way to save the bank.

**Price Waterhouse's Sign Off on 1990 Audit in May, 1990**

On April 18, 1990, Price Waterhouse provided a report to the Bank of England which stated that a number of financial transactions at BCCI booked in its Grand Caymans affiliates and other offshore banks were "false and deceitful," and that it was impossible at the present time to determine just how far the fraud reached. Thus, a critical decision had to be made. Either BCCI had to be closed down now, or the Bank of England itself had to give its assent to keeping it open in some new form as a means of avoiding losses to BCCI's million or more depositors. New management needed to be installed. New financing had to be found, and the holes in BCCI's books had to be plugged.

The obvious solution was to ask Sheikh Zayed and the government of Abu Dhabi to take over the bank. As Zayed and the Al Nayhan family who ruled Abu Dhabi had been major depositors of BCCI, and had long had billions in family finances handled by BCCI, they stood to lose as much as anyone if the bank collapsed. Accordingly, Abu Dhabi would have to be told the truth about BCCI's perilous condition, and asked to commit funds to keeping the bank solvent.

A series of urgent meetings were held in Abu Dhabi and Luxembourg, beginning in March, 1990, in which Naqvi confessed his errors and resigned from his position as CEO at BCCI. A new management team was brought in. Unfortunately, rather than constituting a strong group of banking professionals, the new team was headed by a long-time Abu Dhabi insider from BCCI itself, Zafar Iqbal, the former head of BCCI's branch in the United Arab Emirates, the Bank of Credit and Commerce Emirates, or BCCE, who had long had a close personal relationship with important members of the royal family of Abu Dhabi arising out of his provision of intimate personal services for them in Pakistan and elsewhere. Within the bank, Iqbal was not considered to be an expert on much besides pleasing the Abu Dhabi royal family. BCCI junior officers knew him as the man who had for years provided "singing and dancing girls" to the royal family, and related personal services.[36] BCCI operations were moved, with the apparent approval of the Bank of England, to Abu Dhabi, along with all of BCCI's most important records. And assurances were given to Price Waterhouse that Abu Dhabi would back BCCI all the way.

These assurances were needed because Price Waterhouse was threatening to refuse to sign-off once again on BCCI's books with an unqualified audit report, and relations between the auditors and BCCI had deteriorated substantially after BCCI's directors had criticized the auditors for providing their audit reports to the Bank of England. On April 20, a meeting was held in Luxembourg with the shareholders in which Price Waterhouse made a dire

REENTERED AS EXHIBIT 3

presentation, and during which Abu Dhabi representatives advised Price Waterhouse that Abu Dhabi would make an open-ended financial commitment to bail out BCCI. As Price Waterhouse stated to the chairman of the Abu Dhabi Finance Department on April 25, 1990:

Your representative, HE G Al Mazrui, has confirmed to use that you are fully aware of the nature and magnitude of the uncertainties and prepared to provide the necessary financial support in the event that losses arise from realisation of these loans.[37]

In return for Abu Dhabi bankrolling BCCI's restructuring, Price Waterhouse would agree to certify BCCI's books, subject to a single caveat -- that the basis of the preparation of the certification was Abu Dhabi's intention to maintain BCCI's capital base while it reorganized and restructured. Instead of telling the world the truth -- that the consolidated accounts reported by Price Waterhouse in April 1990 did not in fact give a "true and fair view of the financial position of the group at December 31, 1989," Price Waterhouse contends that it did, using the Abu Dhabi commitment as its justification for so doing.

In justification of this decision, Price Waterhouse stated the following:

The circumstances existing in the last week of April 1990, when Price Waterhouse had to decide on the form of report on the accounts of BCCI for the year ended 31 December 1989, were extremely complex as there was material uncertainty about the recoverability of significant loans and advances shown in the balance sheet. Significant matters taken into account including the following:

-- The Abu Dhabi Government had given a commitment to indemnify BCCI against loss either by taking over balances at no loss to BCCI or by contributing equivalent funds to make good any losses incurred on the loans and advances in question;

-- the Government of Abu Dhabi and related institutions had taken a controlling (over 77 per cent) interest in BCCI and stated their intention to make further share acquisitions and to reorganize and restructure BCCI;

-- the Bank of England the Institut Monetaire Luxembourgeois had been informed of all the uncertainties known to Price Waterhouse and of the financial support commitment by the Government of Abu Dhabi and had decided to allow BCCI to continue to operate;

-- whilst evidence of certain false and deceitful transactions had been discovered we believed the extent of these transactions to be limited to a small number of specific situations;

-- the individuals in management who were thought to have been responsible were to be removed.[38]

Accordingly, after receiving these sign-offs from everyone else involved, including most importantly the Bank of England, Price Waterhouse signed off once again on BCCI's books stating:

In our opinion, the consolidated accounts give a true and fair view of the financial position of the group at December 31, 1989 and the results of its operations and changes in financial position for the year ended in accordance with International Accounting Standards.[39]

REENTERED AS EXHIBIT 3

The certification was subject to a small footnote, listed as Note 1 in BCCI's annual report, which cited that the "Basis of Preparation" for the Price Waterhouse report was the fact that "the Government of Abu Dhabi has subscribed US$400 million for new shares and acquiring a major holding from an existing shareholder such that together with related institutions they now hold over 77 per cent of the share capital of the holding company. They have advised the directors of their intention to maintain the group's capital base whilst the reorganization and restructuring necessary for its continued development is undertaken." Price Waterhouse also charged off a loan loss for BCCI of $600 million, a loss for the year of nearly $500 million, and a reduction in shareholders equity of approximately 50 per cent, from $886 million to $424 million. In so doing, Price Waterhouse for the first time recognized losses that had in actuality, taken place over many preceding years.

By agreement, Price Waterhouse, Abu Dhabi, BCCI, and the Bank of England had in effect agreed upon a plan in which they would each keep the true state of affairs at BCCI secret in return for cooperation with one another in trying to restructure the bank to avoid a catastrophic multi-billion dollar collapse. Thus to some extent, from April 1990 forward, BCCI's British auditors, Abu Dhabi owners, and British regulators, had now become BCCI's partners, not in crime, but in cover-up. The goal was not to ignore BCCI's wrongdoing, but to prevent disclosure of the wrongdoing from closing the bank. Rather than permitting ordinary depositors to find out for themselves the true state of BCCI's finances, the Bank of England, Price Waterhouse, Abu Dhabi and BCCI had together colluded to deprive the public of the information necessary for them to reach any reasonable judgment on the matter, because the alternative would have been BCCI's collapse.

For its part, in June, 1990, Price Waterhouse was actually to file another report with the Bank of England, known as a Section 39 report, finding that BCCI's systems and controls were satisfactory -- findings that Price Waterhouse would have to entirely abandon just five months later.

**Abu Dhabi Deceives the Auditors**

In April, 1990, Naqvi and the other chief officers who resigned with him from their positions in BCCI were placed under house arrest in Abu Dhabi, as Abu Dhabi took formal control of BCCI. Unfortunately, as it did so, it did not disclose to Price Waterhouse certain information that it now had about the extent of the fraud at BCCI, and it took positions that had the clear intention of seeking to sweep the true nature of BCCI's problems under the rug, and to avoid the disclosure to BCCI's regulators of what had really taken place. Essentially, Abu Dhabi was now seeking to make certain that the money it was spending on BCCI would suffice to keep secret the relationship between Abu Dhabi and other Arab shareholders in BCCI, even, as necessary, from Price Waterhouse, the outside auditors for the bank it now owned.

In September, 1990, Price Waterhouse learned that BCCI had concealed further lending of over $500 million to its major customs by "parking" that lending with a Middle Eastern bank, namely, the National Commercial Bank of Saudi Arabia controlled by Khalid bin Mahfouz, the most powerful banker in the Middle East, who was later indicted in the United States in connection with his activities pertaining to BCCI and First American. This was bad enough, but was worse was the fact that since Naqvi's removal, the practice had continued, "with the knowledge and approval of the Board representative of the controlling shareholders" -- the

REENTERED AS EXHIBIT 3

government of Abu Dhabi. The auditors had begun to realize that Abu Dhabi was now colluding with BCCI in continuing fraudulent practices, and in hiding them from Price Waterhouse.

According to Price Waterhouse, worse was to come. Since March or April, 1990, Naqvi, who had personally handled many of BCCI's frauds, had been living under house arrest in Abu Dhabi. Incredibly, Abu Dhabi had decided to retain Naqvi as a consultant to advise them on BCCI, and were giving him access to BCCI's documents. Even more incredibly, Naqvi was said to be maintaining some 6,000 files personally in Abu Dhabi, whose very existence had still never been disclosed to the auditors. For months, as Price Waterhouse continued its efforts to review BCCI's books, it had been lied to by BCCI and it was finding, by Abu Dhabi, kept in ignorance of some of the bank's most vital records, and only stumbling onto the fact of their existence in November, 1990.

As Price Waterhouse described it, when they confronted Abu Dhabi with their concerns about Naqvi, and a request to review the files he controlled, they were told by Abu Dhabi authorities that the auditors could not have access to them, and that they would remain under the control of the discredited Naqvi:

Price Waterhouse's report to the directors of 3 October 1990 revealed that management may have colluded with some of BCCI's major customers to misstate or disguise the underlying purpose of significant transactions. Following this, the controlling shareholders of BCCI [Abu Dhabi], under pressure from Price Waterhouse, agreed to a full investigation of the problem accounts and to enforce the resignations of Abedi and Naqvi as directors.

An Investigative Committee comprising representatives from Price Waterhouse, E&W Middle East Firm (who were auditors of the Abu Dhabi Government interests), two firms of lawyers and the Abu Dhabi Government was established in November 1990 to supervisor the investigation into the problem accounts. Price Waterhouse were advised by senior BCCI management that Naqvi had been retained as an "advisor" to provide explanations to the Abu Dhabi Government and that they could not have access to files being used by him. Price Waterhouse made clear to the controlling shareholders that without access to Naqvi and the files he was using there could be no investigation.

Ultimately access was granted and we were shocked to find that Naqvi was holding around 6,000 files. After initial steps to secure the files, a preliminary review revealed that amongst them were details of transactions and agreements not previously disclosed to us despite management's prior assurances that they had provided all relevant information to Price Waterhouse.[40]

For reasons the auditors could not fathom, Abu Dhabi had placed Naqvi, a principal architect of BCCI's frauds, in charge of BCCI's most important and secret records without telling them. For the past eight months, Naqvi and Abu Dhabi had maintained exclusive control of those records, with essentially unlimited opportunities to destroy them or falsify them throughout that time. By the time Price Waterhouse finally obtained access to these records in November and December, 1990, it found massive fraud in the materials that still existed. But the auditors had no way of determining the extent to which those documents were already cleansed of any

material damaging to the new owners of BCCI, along with any other material which Abu Dhabi or Naqvi wanted hidden forever.

## Section 41 Report and BCCI's Closure

Throughout the remainder of 1990, and the spring of 1991, BCCI, Abu Dhabi, and the Bank of England continued to work on a restructuring of BCCI as a means of saving the bank, with the intention of collapsing its dozens of entities into three banks, to be based in London, Abu Dhabi, and Hong Kong. At the same time, Price Waterhouse continued to provide each of them with the information that the fraud at BCCI was massive, and that the losses associated with the fraud were mounting into the billions. All the while, BCCI, Abu Dhabi, the Bank of England, and Price Waterhouse worked together to keep what they knew about BCCI secret. The secrecy had become critical now that they all knew about the ongoing criminal investigation into BCCI taking place in New York City by the District Attorney. Each made a strenuous effort to prevent the District Attorney from obtaining the Price Waterhouse audit reports which contained the information that if known would destroy BCCI. But by late 1990, the District Attorney, after months of effort, had obtained some of the audit reports, and appeared to be narrowing in on an indictment of BCCI.

Oddly enough, Price Waterhouse continued to resist finding that fraud had taken place for many months after the information available to it provided ample basis for such a conclusion. As late as its October, 1990 report to the Bank of England, the auditors avoided concluding that BCCI was involved in fraud, and suggested that they believed that the restructuring and remedial efforts being taken would be adequate to solve the bank's problems.

During December, 1990, at the very time that the New York District Attorney had obtained some of the most critical of its earlier audit reports, Price Waterhouse completed its initial review of the formally hidden Naqvi files. In that review, Price Waterhouse found evidence of phony loans and hidden deposits amounting to hundreds of millions of dollars, nominee arrangements, hold harmless agreements relieving borrowers of any obligation to repay loans, and other, similarly criminal practices at the bank. Again, to Price Waterhouse's shock, Abu Dhabi had known of these practices since at least April, 1990, and never disclosed them to the auditors.[41]

The implications of these findings for BCCI's future were devastating. If there were in fact deposits that had been made to BCCI amounting to hundreds of millions that had never been recorded at the bank, how was anyone to ever determine what claims by BCCI depositors might be real, and what claims might be phony? Price Waterhouse decided that it dare not put this information in writing, and would confine itself to reporting it orally to the Bank of England, which it did in January 1991. In response, Abu Dhabi again agreed to make good any losses in connection with these unrecorded deposits.

In the months that followed, Price Waterhouse began tracing the circuitous routing of funds between BCCI and its Grand Caymans affiliate, ICIC, and found additional fraudulent activity amounting to as much as $1 billion through this mechanism alone. In March, the Bank of England commissioned it formally to investigate BCCI under Section 41 of the UK's Banking Act. Finally, on June 22, 1991, Price Waterhouse delivered a draft report to the Bank of

England, known under British law as a Section 41 report, demonstrating that "fraud on a significant scale had been committed and that it had involved a significant number of people both inside and outside the bank."[(42)] Nine days later, at the direction of the Bank of England, BCCI's offices around the world were closed down and BCCI ceased to exist.

## BCCI's U.S. Auditors

Given the limited extent of BCCI's official activities in the United States, which were limited to state-licensed local branches and representative offices, and not licensed to accept deposits in the United States, the audit activities of BCCI's United States outside auditors, Price Waterhouse (US), were extremely narrow in scope. As noted above, Price Waterhouse (US) responded to a subpoena by the Committee by providing all requested documents and full cooperation regarding any materials it possessed regarding BCCI in the United States.

These documents demonstrate that over the course of that audit relationship, Price Waterhouse (US) did find that BCCI's U.S. offices maintained inadequate documentation on many of their loans, and engaged in other sloppy banking practices. But the documents provided by Price Waterhouse (US) to the Subcommittee also confirmed that Price Waterhouse (US) handled its auditing of BCCI's U.S. activities professionally and diligently, albeit within the narrow confines of its commission from its UK partnership.

Such a finding might be odd, given BCCI's extensive involvement in this period in laundering funds from Latin America and the Caribbean. But until the spring of 1989, the Price Waterhouse (US) audits were designed to look only at lending practices and overall bookkeeping issues, rather than the issue of whether BCCI might be laundering funds from abroad. Moreover, given Price Waterhouse (US)'s ignorance of BCCI's true relationships with First American, the Independence Bank, and other entities, there would have been any number of improper activities by BCCI in the United States in the aggregate that would fall outside the ordinary purview of auditors.

In early 1989, after BCCI had been indicted on money laundering charges in Tampa, Price Waterhouse (US) was selected by BCCI to create a compliance program under which BCCI would submit to extremely rigorous standards for the handling of transactions from abroad which were designed to trace and stop money laundering. The compliance program was put into place under a June 1989 Memoranda of Understanding with the Federal Reserve, which permitted BCCI to stay open in the United States only if it developed policies to insure its compliance with Bank Security Act and anti-money laundering regulations.

The Price Waterhouse compliance program, designed to be state-of-the-art, for the first time established a comprehensive anti-money laundering regime at BCCI, and forced BCCI's U.S. offices to become ever more careful in handling funds from foreigners. Its implementation was effective, and its results positive in terms of compliance with U.S. law for BCCI's U.S. branches, but very negative in terms of BCCI's U.S. cash-flow. As Price Waterhouse (UK) noted in November, 1989:

We understand there has been a noticeable drop in the funds transferred from other BCCI locations to the US agencies because of this onerous requirement to obtain the necessary

REENTERED AS EXHIBIT 3

details from their customers. Most of their US dollar transactions formerly with the US agencies are being routed to third party banks. Management are investigating this matter to satisfy themselves that there is nothing untoward in such transactions.[43]

By insisting the BCCI's offices in the US document where their funds were coming from, Price Waterhouse had ended the ability of the U.S. offices to engage in profitable activity. BCCI's business dried up, demonstrating the degree to which the US operations had been functioning largely to launder dirty money from other countries in the first place.

However, there were substantial limitations the effectiveness of the compliance effort undertaken by Price Waterhouse, which were built into its design by BCCI. Originally, Price Waterhouse (US) had proposed to BCCI the establishment of a very broad global review of the bank's procedures to insure that the bank was able to stop laundering money world-wide, and turn BCCI into bank that rigorously honored the laws of every country in which it did business. On February 1, 1989, Price Waterhouse (US) wrote Robert Altman to propose to:

Work with BCCI officials on an immediate to medium term plan to regularize the bank's regulatory and supervisory status on a global consolidated basis. This would necessitate visiting key supervisors around the world and learn of their concerns and expectations and provide the framework to enable BCCI to meet these expectations.[44]

The naive approach by Price Waterhouse (US) was of course, incompatible with BCCI's survival. BCCI could tolerate such a program in any case. But by 1989, the UK auditors already knew of dozens of problems that BCCI was supposed to have cleaned up and had failed to rectify. That failure was because the practices were ones which BCCI relied upon for its continued survival. If BCCI had agreed to permit Price Waterhouse (US) to undertake this court, Price Waterhouse (US) would have swiftly learned of these practices, and possibly have been forced to tell U.S. regulators about them. But there was an even more direct problem. The information already contained in Price Waterhouse (UK)'s audits, that there had been massive lending by BCCI on CCAH shares and securing those shares, contained the great secret that BCCI effectively owned controlled First in violation of U.S. laws. Such a confrontation with reality was obviously not in BCCI's interests, or in the interest of Altman himself. The terms of engagement were swiftly narrowed to include only an anti-money laundering compliance program focused on the particular BCCI entities that had been implicated in the C-Chase sting in Tampa. The narrower engagement was signed by Price Waterhouse and sent to Altman, as BCCI's attorney, on March 9, 1989.[45] For this engagement, together with its regular audits of BCCI branches, Price Waterhouse (US) received approximately $4.5 million per year.[46]

Thus, before hiring the Price Waterhouse (US), BCCI and Altman narrowed the framework for their efforts, with the result that they were sufficiently narrow to preclude Price Waterhouse (US) from learning of problems at BCCI in the United States already known to Price Waterhouse (UK), but apparently never communicated to their US affiliated partnership.

**Loans, Payments and Favors from BCCI to Accountants**

REENTERED AS EXHIBIT 3

One especially troubling aspect of BCCI's relationship to its accountants was its practice of providing them with loans. While the Subcommittee has not been able to determine the complete extent of this practice, the Subcommittee has received documentation of at least two such instances -- the first involving a 1987 loan of BDS $587,000 to Price Waterhouse's partners in Barbados, the second involving a loan of $17,000 to Price Waterhouse's partners in Panama in 1984, increased to $50,000 a year later.[47]

Even within BCCI, this practice was controversial. When Price Waterhouse applied for the Panama loan, BCCI official A. M. Akbar wrote Amjad Awan, then head of BCCI's Panama branch, to express his concern about the propriety of lending money to one's auditors:

The firm is our auditors and we do not consider it proper to sanction or enhance the limit of USDLR 50,000.00 to our own auditor. However, we shall re-exam the matter on receipt of your justification as well as your confirmation that local laws does not prohibit loans & advances to the company's auditors.[48]

In response, Awan advised Akbar that "there are no restrictions about advances to company auditors [which] may be allowed" and the lending was approved.

Separately, regulatory reviews of the books and records of Capcom Financial Services Ltd., BCCI's commodities trading affiliate, showed payments of $100,000 by Capcom to former Price Waterhouse Grand Caymans partner Richard Fear in the three years since he left Price Waterhouse in 1986. Fear had previously handled audits of the books of BCCI in the Grand Caymans, the location of many of the worst frauds at BCCI.

Both Capcom's head, Ziauddin Akbar, and former Price Waterhouse partner Fear, had been held at fault in connection with BCCI's massive trading losses in 1985, described above, which were discovered in 1986. At the time, Akbar was the head of BCCI's Treasury, and therefore held responsible for the losses, and Fear was the principal person responsible for insuring the propriety of BCCI Grand Cayman's books and records.

In late June, 1992, at the behest of the Serious Fraud Office of the United Kingdom, Royal Cayman Islands police conducted dawn raids of Price Waterhouse officers in the Grand Caymans, as well as the home of Fear and a second Price Waterhouse partner there, as well as the office of Price Waterhouse's local Grand Caymans attorney, conducting searches for records.

In late February, the Subcommittee requested copies of any reports or memoranda created by Price Waterhouse concerning Fear and BCCI, and related documents. Price Waterhouse refused to provide the documents requested, stating that in its view it was "inappropriate to produce the work product of its lawyers for examination by any governmental or private third-party," and that in any case, "Mr. Fear's participation [in PW's investigation] was predicated upon implicit understandings of confidentiality." However, despite the "implicit understandings of confidentiality" Price Waterhouse reached with Fear, Price Waterhouse did advise the Subcommittee that it had concluded Fear was innocent of wrongdoing in accepting funds from BCCI's affiliate, Capcom. According to Price Waterhouse (UK):

Richard Fear left the employment of PW-UK in July, 1986. . . PW-UK first became aware of the payments to Mr. Fear mentioned in the Wall Street Journal article, in September, 1991.

Upon learning of the payments, PW-UK obtained Richard Fear's agreement to cooperate in an inquiry by lawyers acting for PW-UK. Counsel for PW-UK had discussions on the subject with Richard Fear and ascertained from looking at various records which he showed to them that the payments were indeed made in two installments in July and August 1988 by Capcom Financial Services Limited ("Capcom"). The payments, which totalled $100,000, were stated to be for referral to Capcom of potential clients requiring brokerage or investment services.

We understand that the United Kingdom Serious Fraud Office ("SFO") has investigated the circumstances in which the payments were made and has interviewed Mr. Fear. We further understand that the SFO has concluded its investigation with respect to Mr. Fear and the matter is not being pursued.

Based on all the above, PW-UK concluded that these payments by Capcom to Richard Fear, which were made two years after he had ceased to be employed by PW-UK, were unconnected with any work that he did on the audit of BCCI or while at PW-UK.[49]

According to press accounts, Fear's alleged receipt of funds from Capcom remains under investigation by the British Serious Fraud Office.

In sworn testimony before the Subcommittee on July 30, 1992, Akbar Bilgrami, formerly head of BCCI's Latin American and Caribbean region and convicted in the Tampa money laundering case, stated that he had been informed by other BCCI officials that Price Waterhouse in the Grand Caymans had been "taken care of." Bilgrami said he did not have details as to how the auditors had been taken care of, other than that it was his understanding that BCCI had provided one or more of them with the use of a villa.[50]

**Robert Bench**

Robert Bench, a partner in Price Waterhouse (US), had minimal involvement in any BCCI affair while at Price Waterhouse, becoming responsible for some assistance to BCCI in early 1989 in connection with the compliance program instituted by Price Waterhouse for BCCI as part of BCCI's first consent decree with the Federal Reserve following its indictment on money laundering charges in October, 1988.

However, in his previous positions as a senior official of the U.S. Comptroller of the Currency during the late 1970's to the mid 1980's, Bench was exposed on two occasions to important information regarding BCCI which, taken together, raise questions as to Bench's handling of BCCI affairs as a partner at Price Waterhouse.

First, in 1978, as Associate Deputy Comptroller for International Banking, Bench was provided with information about a variety of shoddy banking practices at BCCI, including BCCI's use of nominees, by an OCC bank examiner working under him, Joseph Vaez. The memorandum prepared by Vaez and provided to Bench was a clear warning signal to OCC, as well as the Bank of America, which still had an ownership interest in BCCI, that BCCI was a

danger to anyone involved with it. As the Vaez memorandum noted, if the Bank of America did not sever its relationship with BCCI, the OCC might well classify its entire investment in BCCI.[51]

Second, in 1985, Bench was provided a report by the CIA concerning BCCI that detailed BCCI's plans for the United States. This memorandum, described in detail in the chapter on BCCI's ties to the intelligence community, contained striking information, including the fact that BCCI secretly owned First American.

Bench testified that he had only a very limited memory of the 1985 report:

I do recall reviewing a classified piece of information that dealt with BCCI. . . it was somewhere in the middle of the '82 to '87 period. I feel comfortable about that. . . I recall receiving a document from the CIA that dealt with BCCI. To the best of my recollection it didn't deal with First American and it didn't deal with anything in the United States. There is an action step that I took within the office on that information . . . which was to look at this information in terms of LCD [Lesser Developed Country] debt.[52]

In staff interviews prior to this testimony, Bench emphasized that he had no memory whatsoever of having ever been advised that BCCI held interests in any financial institution in the United States, let alone First American.[53]

In fact, the memorandum provided Bench by the CIA focused significantly on BCCI's plans in the United States, including its ownership of a Washington, D.C., based, multistate bank holding company that Bench would have surely known was First American.

Obviously, this was information that the Federal Reserve should have had and did not have at the time that Bench was participating in BCCI's compliance program in connection with its consent decree with the Federal Reserve following its money-laundering indictment.

Bench testified that he had no memory of the 1978 memorandum prepared by Joseph Vaez for him at OCC, and that his memory of the 1985 memorandum was almost equally dim.[54] According to Bench, based on his lack of memory of either memorandum, there was no reason for him to have connected any of the information in them to his ongoing work on BCCI compliance years later at Price Waterhouse.

During that compliance work, Bench travelled to London twice to meet with BCCI officials in London, including Abedi and Naqvi, and provided technical assistance to BCCI in the United Kingdom and the U.S. in anti-money laundering matters, "under the direction of Robert Altman."[55] At the time, Altman was not only BCCI's attorney, but the President of First American. Yet according to Bench, it never occurred to him that there might be a relationship between the two institutions that needed to be understood to determine whether BCCI was truly complying with the Federal Reserve's requirements.

According to Bench, the reason for this was that the focus of the compliance effort solely focused on money laundering. As he testified:

Senator, to the best of my recollection, there was no linkage whatsoever, in any of the work we did or any of the discussions we had, with First American . . . I don't recall any First American issues . . . it was very clear that in this exercise Mr. Altman and Mr. Clifford were lawyer for BCCI.[56]

At the time Bench met with BCCI officials and Price Waterhouse (UK) partners in London, both the BCCI officials and the British accountants knew that BCCI has massive loans on First American secured by First American's shares. Bench himself had been told by the CIA that BCCI owned First American back in 1985. Thus, Bench's personal obliviousness to this issue as a partner of Price Waterhouse (US) raises obvious questions. If Bench had remembered, recognized, or understood the information that was available to him from his days at the OCC, or reviewed any of the recent audit reports at Price Waterhouse (UK) to BCCI's directors, Bench would have had the truth in front of him concerning BCCI's secret ownership of First American. Price Waterhouse (US) and BCCI would have been ethically required to tell the Federal Reserve the truth. And the Federal Reserve would have learned about BCCI's ownership of First American as of the spring of 1989 -- almost two years earlier than the time it actually learned of the relationship.

Instead, according to Bench's testimony, he never focused his attention on the BCCI-First American relationship in any respect, and so confined himself to advising BCCI on how to improve its practices to avoid being used to launder drug money. Bench's approach was narrow and incurious at best.

**Conclusions Regarding The Auditors' Role**

From the beginning, BCCI's fractured system of banking, involving a multiplicity of entities spanning the globe, posed an obvious challenge to auditors responsible for providing a base-line of protection to those relying on its annual certifications of BCCI, which the auditors failed to meet.

The auditors' options in responding to this problem were quite clear. First, they could respond by highlighting problems, and working with BCCI to solve them, an approach applied through the first 15 years of BCCI's existence. Second, when BCCI failed to respond to their recommendations, the auditors could respond by resigning, an option adopted by Ernst & Whinney in 1986. Price Waterhouse, for reasons that are not clear, but which may relate to the $5 million a year being generated by BCCI-related work, remained with BCCI, and signed off on BCCI's books year after year until early 1990. At that time, recognizing that the financial hole inside the bank required emergency action, Price Waterhouse sought to avoid the risk of being destroyed together with BCCI by taking the information it had developed to the British regulators, and seeking further guidance from them.

The auditors' role also created special problems for those investigating BCCI. BCCI's consolidated audits were based on the work product from auditors around the world. Yet those investigating BCCI in the U.S. found that the local partnership of the auditing firm involved possessed none of the information it requires, and contended it had no power to obtain any of the information it requires.

REENTERED AS EXHIBIT 3

This problem raises squarely the question of whether remedial legislation is necessary to require international accounting firms to include as a condition of their relationship with foreign affiliated partnerships, that these foreign partnerships agree to provide information in response to valid subpoenas in the United States on cases affecting the United States.

Additional institutional issues arose regarding the auditors' role in BCCI's failure in the UK. In the UK, the issue is whether external auditors have responsibilities to depositors, customers, and the general public independent of their duty to a bank's shareholders.

When an external auditor certifies the financial statement of a business, it is simultaneously providing different services to different audiences.

For the shareholders of the institution it is certifying, it is providing what is supposed to be a clear, full, and fair description of the actual performance of the business to assist the shareholder in determining the value of his investment, the performance of the company, and the strength of the company's management, as well as assurances that the company has no untoward risks from violations of law or regulatory compliance.

To anyone else, an annual certification represents what may be the principal means by which an outsider can evaluate the safety of entering into a transaction with a business. An annual report tells a would-be depositor in a bank about the health of the bank and its business, its level of capital, its past returns on investment, its areas of difficulty. In reviewing such a report's audit certification, an outsider is assuming the reputation for expertise of the auditor, and focusing not on the quality of the audit, but on the information the ostensible neutral and complete audit is providing.

Thus, true and accurate financial statements, certified by reputable accounting firms, are at the heart of the self-regulatory process of financial markets throughout the world. In the United States, this seldom has significant implications because first, depositors are insured by the federal government and therefore need not worry about a bank's solvency, so long as they maintain less than $100,000 per account; and second, the United States conducts independent bank examinations by seasoned examiners employed by bank regulators. Outside the United States, however, bank deposits remain largely uninsured, and outside auditors, rather than bank examiners, are relied upon to insure that reliable financial information is provided to the markets.

Unfortunately, the accounting profession generally has regarded its primary responsibilities as being to shareholders of a company, rather than to potential customers, creditors, or others who might have an interest in obtaining accurate information concerning a company. In the case of a bank, this approach is potentially quite dangerous for uninsured depositors, as it leaves them in the position of having to rely on the work of auditors whose principal duties are not to them, but to those who have placed capital in the bank. This result is especially unfortunate as depositors provide the preponderance of funds used by banks -- typically 90 to 95 percent -- while working capital tends to be limited to 10 percent of a bank's assets or less.

In the case of BCCI, the duty Price Waterhouse viewed itself to owe was to BCCI's shareholders -- a small number of Middle Eastern sheikhs most of whom were in fact not real shareholders at all, but nominees, who were not even paying interest to BCCI on its lending to

REENTERED AS EXHIBIT 3

them in their capacity as nominees. Thus, Price Waterhouse in fact wound up owing a duty principally to the people who were deceiving it.

Moreover, even apart from the nominee issue, because BCCI was a bank, the vast preponderance of its funds came not from capital contributions for stock, but from its one million or more depositors, to whom it surely also had a duty. As Professor Richard Dale of the University of Southampton has noted, this problem was inherent in the system of regulation in the United Kingdom:

BCCI's 1989 accounts were not qualified, even though the auditors were aware of serious problems the nature of which had been reported to the bank's majority shareholders. In explaining the decision not to qualify, the auditors have argued that in general terms a bank's accounts cannot be qualified without risking a collapse in confidence and a potentially calamitous withdrawal of deposits. While this approach may be consistent with an auditor's established legal obligation to shareholders, it is not necessarily in the interests of existing depositors, cannot be in the interests of prospective depositors and is difficult to justify on public policy grounds. . . For the banking system as a whole the absence of credible financial information is likely to mean an increased incidence of destablising bank runs.[57]

Thus, under the system as it stood in 1990 and 1991, Price Waterhouse (UK) was in the unenviable position of having to try to keep BCCI open, even as it uncovered ever more information demonstrating that the only fit conclusion to BCCI's existence was its swift termination. Only a few choices presented themselves. Once again, Price Waterhouse could have resigned its commission as BCCI's auditors, a choice available to it from the beginning. Or it could do as it belatedly did, and make use of a provision of British law that enabled it to advise the regulators of its findings of improper banking practices in early 1990, and seek the regulators' advice on how to proceed further. When it chose the latter course, it obtained the comfort of knowing that its every action was being reviewed contemporaneously by regulators at the Bank of England who would share ultimate responsibility for whatever happened.

### Possible Changes in International Accounting Practice

The BCCI case raises the issue of whether the current structure for accounting firms as independent partnerships, with authority and liability limited to the nation in which they are licensed, is appropriate and adequate to meet the challenges posed by an international financial marketplace.

One of the great difficulties in uncovering BCCI's fraud for regulators and investigators was the fact that its frauds were carried out through diverse and widespread jurisdictions spanning the globe, while its activities were audited by local accounting partnerships.

Arguably, the current system by which one partnership of an accounting firm sets out audit instructions to all of its global affiliated partnerships in other countries, for them to carry out its instructions, should be adequate to maintain the standards of an audit that would be carried out within the borders of one country. But in cases where something goes wrong, as in BCCI, the structure leaves those injured in countries other than that in which the accounting firm is licensed, in a difficult situation. The firm responsible for the consolidated audit may be located in a jurisdiction with strong financial confidentiality and privacy laws that preclude disclosure

of essential information. It may, as Price Waterhouse (UK) did, contend that it does not do business in a jurisdiction in which people have been injured by its handling of audits, and may even refuse, as Price Waterhouse (UK) did, to honor subpoenas issued to it. Such a result is against public policy, and new structures for international accounting firms need to be considered to avoid a recurrence.

One efficient approach that could be adopted unilaterally by the United States, would be to require accounting partnerships, as a condition of being licensed in the United States, or as a condition of being permitted to have their certifications relied upon by any government agency, to reach agreements with its foreign affiliated entities insuring that they will respond to authorized subpoenas in the United States, and provide information as required by U.S. law.

A second approach would rely on the major accounting firms to modify their partnership agreements without being explicitly required by government to do so, as a matter of self-regulation, to insure the availability of documents from their affiliates in accord with the domestic law of the countries in which they are licensed. Thus, a firm such as Price Waterhouse (US) would seek to amend the Memorandum of Association and Bye-Laws of Price Waterhouse World Firm Limited (PWWF) to reach a new binding understanding among it and its affiliates. Under that new binding understanding, if Price Waterhouse (US) received a legal subpoena in the United States concerning documents possessed by any of its affiliates, the affiliates would have to provide that information to U.S. authorities, subject to the requirements of the laws of their jurisdictions. While such a change would not solve all problems in countries which retain strict financial secrecy laws, it would provide a mechanism by which lawful U.S. subpoenas could be cooperatively enforced in many cases.

A third approach would be legislation prohibiting the use or reliance by any federal agency on an audit prepared by any accounting firm not licensed in the United States. This approach would dramatically reduce the risk to the United States from certifications by foreign accounting firms who do not view themselves to be subject to U.S. subpoenas, such as Price Waterhouse (UK). On the other hand, it could well impose some substantial additional costs on firms, especially foreign firms, whose consolidated audits are prepared by non-U.S. auditors, and further hearings and comments on the proposal would be appropriate.

1. Affidavit of John Bartlett, Bank of England, July 5, 1991.
2. S. Hrg. 102-350 Pt. 1 p. 498 and 500.
3. S. Hrg. 102-350 Pt. 1 p. 516.
4. Commentary, Massihur Rahman, Price Waterhouse Section 41 Report to the Bank of England, June, 1991.
5. Memorandum submitted by Price Waterhouse in response to questions from the British Treasury and Civil Service Committee of the House of Commons; provided to the Subcommittee by counsel to Price Waterhouse (UK), February 5, 1992, Answer 1.
6. Section 41 Report, Price Waterhouse, Bank of England, June 1991.
7. Letter, Gilbert Simonetti, Jr., Price Waterhouse, to Jonathan Winer, Subcommittee staff, October 17, 1991.
8. For the record, Price Waterhouse (UK) did offer to provide the Subcommittee with the opportunity to interview Price Waterhouse (UK) partners in London without the provision of the subpoenaed documents, an offer precluded by Subcommittee rules regarding staff travel,

REENTERED AS EXHIBIT 3

and which, in the absence of the provision of the subpoenaed documents would have been of marginal utility in any case.

9. S. Hrg. 102-350 Pt. 1 p. 496.

10. Price Waterhouse Grand Caymans papers dated December 31, 1983.

11. "Commentary on the Independent Examination of the Accounts of Bank of Credit and Commerce International (Overseas) Ltd. for the year ended 31 December 1984," Price Waterhouse Grand Caymans.

12. "Internal Control Report," 28 April 1986, Bank of Credit and Commerce International (Overseas) Ltd., S. Hrg. 102-350 Pt. 4. pp. 152-155.

13. Price Waterhouse report to BCCI, id, S. Hrg. 102-350 Pt. 4 pp. 152-155.

14. S. Hrg. 102-350 Pt. 1 p. 500.

15. Staff interviews, Akbar Bilgrami and Amjad Awan, July 20-30, 1992.

16. Memorandum submitted by Ernst & Young in reply to Questions from the Treasury and Civil Service Committee, February 21, 1992, p. 102.

17. Memorandum submitted by Ernst & Young in reply to Questions of House of Commons Committee on Treasury and Civil Service, February 21, 1991, p. 101, Fourth Report, Banking Supervision and BCCI.

18. Id.

19. Memorandum submitted by Ernst & Young in reply to Questions from the Treasury and Civil Service Committee of the House of Commons, February 21, 1992.

20. Price Waterhouse Audit Report, "Our Large Exposures," December, 1987, BCCI, Subcommittee document.

21. Id.

22. Id, re "AR Khalil."

23. Id.

24. S. Hrg. 102-350 Pt 1 p. 264.

25. S. Hrg. 102-350 Pt. 1 p. 307.

26. S. Hrg. 102-350 Pt. 1 pp. 314-316.

27. S. Hrg. 102-350 Pt. 1 pp. 317-324, 332-343.

28. S. Hrg. 102-350 Pt. 1 p. 352.

29. S. Hrg. 102-350 Pt. 1 p. 353.

30. S. Hrg. 102-350 Pt. 1 pp. 356-358.

31. S. Hrg. 102-350 Pt. 1 p. 360.

32. Memorandum submitted by Price Waterhouse in reply to Questions from the Committee on Treasury and Civil Service, February 5, 1992.

33. S. Hrg. 102-350 Pt. 1 p. 518.

34. S. Hrg. 102-350 Pt. 1 pp. 518-520.

35. S. Hrg. 102-350 Pt. 1 pp. 450-458.

36. Staff interviews, Nazir Chinoy, Abdur Sakhia, Akbar Bilgrami.

37. S. Hrg. 102-350 Pt. 1 p. 481.

38. Memorandum submitted by Price Waterhouse in reply to Questions from the House of Commons Committee on Treasury and Civil Service, February 5, 1992.

39. BCCI Annual Report For the Year 1989, dated April 1990.

40. Memorandum submitted by Price Waterhouse in reply to Questions from the House of Commons Committee on Treasury and Civil Service, February 5, 1991.

41. Memorandum submitted by Price Waterhouse in reply to Questions from the House of Commons Committee on Treasury and Civil Service, February 5, 1991.

REENTERED AS EXHIBIT 3

42. Id. Price Waterhouse's findings of the Section 41 report are reviewed in some detail in the chapter concerning BCCI's criminality.
43. S. Hrg. 102-350 Pt. 1 p. 279.
44. S. Hrg. 102-350 Pt. 4 p. 50.
45. S. Hrg. 102-350 Pt. 4 p. 53.
46. S. Hrg. 102-350 Pt. 4 p. 92.
47. BCCI Loan documents obtained by Subcommittee; some reprinted in S. Hrg. 102-350 Pt. 2 pp. 624-629.
48. BCCI Documents, Federal Reserve, Miami, obtained pursuant to Committee subpoena.
49. Letter, James E. Tolan to Jonathan Winer, March 4, 1992.
50. Bilgrami testimony, S. Hrg. 102-350 Pt. 6, July 30, 1992, and staff interviews, July 20-29, 1992.
51. S. Hrg. 102-350 Pt. 4 pp. 15-23.
52. Testimony Bench, S. Hrg. 102-350 Pt. 4 pp. 36-37.
53. Staff interview, Bench, February 14, 1992.
54. S. Hrg. 102-350 Pt. 4 pp. 36, 85.
55. S. Hrg. 102- 350 Pt. 4 p. 86.
56. S. Hrg. 102-350 Pt. 4 p. 89-91.
57. Professor Richard Dale, Minutes of Evidence Taken Before the Treasury and Civil Service Committee, id, January 15, 1992, p. 4.

# BCCI, THE CIA AND FOREIGN INTELLIGENCE

### Introduction

The relationships involving BCCI, the CIA, and members of the United States and foreign intelligence communities have been among the most perplexing aspects of understanding the rise and fall of BCCI. The CIA's and BCCI's mutual environments of secrecy have been one obvious obstacle. For many months, the CIA resisted providing information to the Subcommittee about its involvement with and knowledge of BCCI. Moreover, key players who might explain these relationships are unavailable. Some, including former CIA director William Casey, and BCCI customers and Iranian arms dealers Ben Banerjee and Cyrus Hashemi, are dead. Others, including most of BCCI's key insiders, remain held incommunicado in Abu Dhabi. While promising in public hearings to provide full cooperation to the Subcommittee, to date the Abu Dhabi government has refused to make any BCCI officers available for interview by the Subcommittee. Former BCCI chairman Agha Hasan Abedi remains severely incapacitated due to a heart attack. Finally, some persons in a position

REENTERED AS EXHIBIT 3

to know portions of the truth have denied having any memory of events in which they participated and of documents which they reviewed.

A baseline for assessing the BCCI-CIA story is the CIA's official record of its use of BCCI and its targeting of the bank, as set forth in several hundred CIA records created from 1982 through 1992. That record was, by and large, accurately represented by CIA acting director Richard Kerr in public testimony on October 25, 1991, supplemented by more detailed, classified testimony on October 31, 1991. Unfortunately, that record also contains ostensible gaps in knowledge on the part of the CIA about the activities of key contacts in the Middle East for U.S. intelligence -- including BCCI shareholders Kamal Adham and Abdul Raouf Khalil, and BCCI customer and Iran/Contra arms merchant Adnan Khashoggi -- which strain belief.

Outside the documentary record provided to the Subcommittee by the CIA, there is additional material, consisting of BCCI documents, testimony from BCCI officials and insiders, and extrinsic, circumstantial and historic information describing other substantial contacts between BCCI and the intelligence community. These include contacts between BCCI and:

** former U.S. intelligence officials, including a former head of the CIA;

** former and current foreign intelligence officials; and

** individuals engaged in covert operations on behalf of the United States government, including in the Iran/Contra affair.

In addition, the Subcommittee has received allegations of meetings between former CIA director William Casey and BCCI's head, Agha Hasan Abedi.

CIA officials have told the Subcommittee that the CIA as an institution has rules requiring the creation of written records on every activity engaged in by the Agency, and on all significant information reported to the Agency. In the summer of 1991, the CIA engaged in what its officials described as a "dumb" or "brute force" review of its documents, essentially reviewing all possible files for information on BCCI, rather than relying on knowledgeable individuals to select such information. The review located a substantial amount of material generated by the CIA throughout the 1980's, which was produced in July and August, 1991 for CIA internal reviews, in September and October for the Congressional intelligence oversight committees, and beginning in March, 1992, to the Subcommittee.

Unfortunately, there remains a wide disparity between the CIA's official account of critical relationships between BCCI and persons associated with the CIA, and the information available from other sources, including BCCI's own records. One is left with the choice of accepting the official record, which requires an assessment that the other contacts between BCCI and U.S. intelligence figures and operations are coincidental, or of assuming that the full story of BCCI's relationship to the United States has been intentionally veiled by critical players on both sides of that relationship.

**The Subcommittee Investigation and the CIA**

REENTERED AS EXHIBIT 3

The Subcommittee's contact with the CIA regarding BCCI began in March, 1991, when staff learned from a Subcommittee source that the CIA had prepared a report concerning BCCI's criminality which was made available to Customs in late 1988. Cleared staff contacted the CIA's congressional liaison office to request a copy of the document. The staff was told that no such document had ever existed. Perplexed, staff contacted its source to determine whether he was certain that the material had been provided. The source referred staff to former Customs Commissioner William Von Raab, who confirmed the existence of the document. Staff contacted the CIA a second time, and informed the agency that a senior Reagan administration official had viewed the document. Again, the Subcommittee was told that no documents concerning BCCI had ever been created by the CIA.[1]

Staff then met with Von Raab, who revealed that not only had the CIA provided him with a briefing paper regarding BCCI, but that he obtained it through the offices of then-CIA assistant director Robert Gates, who referred to BCCI as "the Bank of Crooks and Criminals." Von Raab also advised the Subcommittee that Customs agents handling the C-Chase investigation of BCCI had discovered in the course of their work several BCCI accounts that were actually accounts held by the CIA. Von Raab told Subcommittee staff that his agents were told to cease their investigation of those particular accounts.[2] However, in an interview with Subcommittee staff, AUSA Mark Jackowski denied that he had ever uncovered any CIA involvement with the bank and Assistant Attorney General Robert Mueller testified that "at no time ...has anyone from the CIA ... attempted to obstruct or interfere with the Department of Justice's investigation and prosecution of BCCI."[3]

On May 14, 1991, Senator Kerry wrote CIA Director Webster to again request the briefing paper on BCCI prepared by the CIA, as well as information on the CIA's own use of the bank. No reply was received in response to this letter from the CIA for over two months, during which BCCI was closed globally following its seizure in the United Kingdom by the Bank of England on July 5, 1991.

In the meantime, cleared staff requested a formal briefing from CIA staff concerning the CIA's knowledge of BCCI's activities. The CIA provided an oral briefing at its offices in June, 1991 at the "secret" level, consisting of very general information concerning BCCI's use by drug traffickers, material which was by then already largely a matter of public record. The briefer provided by the CIA to Congressional staff was unfamiliar with other basic information about BCCI, such as the names of BCCI's shareholders, including former Saudi intelligence chief Kamal Adham, the key figure in BCCI's secret takeover of First American, and the CIA's former principal contact in the Arab Middle East. Further, the briefer also appeared to be ignorant of the principal analytic documents concerning BCCI previously prepared by the CIA and disseminated to Executive Branch agencies, which contained this and other more important information about BCCI.[4]

On July 23, 1991, CIA director Webster replied to Senator Kerry's May 14 request by letter, admitting to the existence of two documents concerning BCCI, which were described as "extremely sensitive" and therefore restricted to being held by the Senate intelligence committee.[5] On reviewing these memoranda, Senator Kerry recognized that the earlier of the two documents, created in early 1986, contained startling information -- that the First

https://info.publicintelligence.net/The-BCCI-Affair.htm

American Bank in Washington was secretly owned by BCCI. The distribution list attached to the memorandum indicated that the CIA had communicated this information at the time to the Treasury Department. These was no indication that either Treasury or the CIA had ever advised the Federal Reserve, the primary regulator of First American, of this critical information.

Senator Kerry asked Judge Webster to declassify immediately the fact that the CIA had known as of 1986 that BCCI owned First American, and to begin the process of declassifying the entirety of both memoranda. On July 31, 1991, the CIA advised Senator Kerry that he could reveal the information concerning BCCI's secret ownership of First American, but no other information from the memos. The CIA had not yet acknowledged its own use of BCCI to the Subcommittee, or provided access to any other materials prepared by the CIA concerning BCCI.

When the single sentence from the 1986 memorandum was declassified, Senator Kerry supplied it immediately to the Federal Reserve, whose counsel expressed shock that the CIA, Treasury, State Department, and Office of the Comptroller of the Currency had possessed this information in 1986 and never provided it to the Federal Reserve.[6]

On August 2, 1991, with Congress in recess, acting CIA director Richard Kerr chose to provide the first public account of the CIA's involvement with BCCI at the National Press Club, to a group of high school students, who were not permitted to ask questions.

During the August recess, the Senate Select Committee on Intelligence began its audit of the CIA's relationship with BCCI, and requested that the CIA provide its auditors with all documents prepared by the CIA concerning BCCI. In the same period, the CIA began its own internal reviews of its handling of BCCI, including a management review, an intelligence review, and an "independent investigation" by the CIA's statutory Inspector General.[7] By the end of August, 1991, the CIA had determined that there were several hundred reports on BCCI by the CIA, of which perhaps four dozen contained substantial information regarding the bank.

Through early October, 1991, in response to further requests from Senator Kerry, the CIA continued to refuse to declassify any of the remainder of the information concerning BCCI on the ground that to do so might imperil sources and methods. The CIA also remained unwilling to permit staff outside the Intelligence Committees to review this material. As CIA legal staff later explained it, the CIA was unaccustomed to providing information pertaining to oversight issues to staff outside the Intelligence Committees, and felt uncomfortable with the questions being posed by the Subcommittee.[8]

Ultimately, Acting Director Richard Kerr agreed to testify before the Subcommittee concerning BCCI in public, after Senator Kerry advised the CIA that the nomination of CIA director Robert Gates would be delayed until the CIA provided such testimony.

On October 25, 1991, Acting Director Kerr testified in open session before the Subcommittee regarding the CIA-BCCI relationship, expressing from his opening statement his personal discomfort about providing information concerning intelligence matters in public:

As an intelligence officer for 30 years, I find myself a little reluctant in an open hearing to talk about intelligence, intelligence sources, and intelligence methods, and the information that we acquire through that process (emphasis added).

Despite Kerr's reluctance, the information contained in his testimony, summarized below, substantially advanced the Subcommittee's knowledge of the official record regarding the CIA's contacts with BCCI. For example, the Subcommittee learned for the first time that there were not two memoranda regarding BCCI prepared by the CIA, but hundreds which had been disseminated to other agencies. Kerr also disclosed that he had provided the Treasury Department with information about BCCI's secret ownership of First American in 1985, a year earlier than previously known, and implying the existence of a separate memorandum to Treasury not previously acknowledged.

Kerr refused to answer a number of questions in open session. In closed session the following week, Kerr acknowledged that several of the questions he refused to answer did not refer to classified information or concern national security. Instead, he had refused to discuss the information in open session because he felt uncomfortable discussing information in public that might embarrass the United States, or any U.S. agency or official.[9]

Initially, Kerr resisted providing the Senators serving on the Subcommittee the opportunity to review the documentary material pertaining to BCCI created by the CIA, suggesting instead that the CIA provide the Senators only general information characterizing the number of reports and the general substance, to "protect sources and methods." Following the closed session, during which Senator Kerry pressed again for the documents, it was agreed between the Subcommittee and the CIA that all the memoranda prepared by the CIA concerning BCCI would be sent to the Senate Intelligence Committee storage facility to permit review. Months later, that material had still not been provided.

Finally, on February 18, 1992, some eleven months after the Subcommittee had first sought information concerning BCCI from the CIA, Director Gates, after meeting with Senator Kerry, directed the CIA to permit staff to review additional records at the CIA pertaining to BCCI. Following this directive from Gates, the CIA for the first time made substantial information regarding its knowledge of BCCI available to the Subcommittee, although information on CIA operations using the bank remained unavailable, channeled solely to the Congressional intelligence committees.

The Subcommittee review culminated in the CIA agreeing to declassify certain material from the 1985 memorandum about BCCI, discussed below.

### The Official Record

The CIA's first user request in connection with BCCI was from the Federal Reserve in 1981, which asked the CIA whether the CIA had any derogatory information concerning the Middle Eastern shareholders who were about to buy Financial General Bankshares (FGB), which later became First American Bankshares, through the holding company CCAH. The CIA, after reviewing its records, told the Federal Reserve that it had no derogatory information on the shareholders, who included Kamal Adham and Abdul Raouf Khalil, the past and then-current Saudi intelligence liaisons to the United States.[10]

The CIA did not tell the Federal Reserve that Adham and Khalil were foreign intelligence liaisons of the United States, nor did it advise the Federal Reserve that both Adham and a third FGB shareholder, Faisal al-Fulaij, had been the subject of a Securities and Exchange Commission probe in connection with violations of the Foreign Corrupt Practices Act by Boeing and Lockheed for arms sales to Saudi Arabia.[11]

There is conflicting evidence as to whether the Governors of the Federal Reserve were aware of the intelligence background of any of the CCAH shareholders. However, at the staff level at least the Federal Reserve did learn in 1981 of both the intelligence contacts of Adham and the SEC probe into his and Fulaij's alleged receipt of bribes.[12] Former Federal Reserve Chairman Paul Volcker, who signed the order approving the application of CCAH shareholders to take over Financial Bankshares, testified before the Senate Banking Committee in early 1991 that he "wasn't aware" of Mr. Adham's intelligence background, and that "he was sure that it might send an eyebrow or two up," and that "it might provoke further investigation."[13]

Because BCCI was not officially purchasing FGB, and a condition of the purchase was that BCCI not be involved in the transaction except as an investment advisor, the Federal Reserve did not ask the CIA about BCCI itself. If it had done so, it would likely have learned about BCCI's involvement in money laundering.

According to the contemporaneous CIA records retrieved during the search of Agency files during the summer of 1991, the CIA first developed information concerning BCCI, which it provided users in the U.S. government, in 1979. After learning in the early 1980's that BCCI was, as an institution, involved in money laundering activities, the CIA began by the mid-1980's to target BCCI as an institution for foreign intelligence collection. Initially, this collection operation was small. The CIA began a larger and more comprehensive operation as of 1986, which continued through 1990. This operation focused on the "people, the mechanisms, and the way that BCCI laundered narcotics money."[14]

In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.[15]

Between 1979 and 1991, the Directorate of Operations of the CIA produced several hundred reports containing intelligence concerning BCCI. BCCI was also discussed in a number of finished Directorate of Intelligence analytic studies, as part of larger discussions of terrorism and counter narcotics.[16] Among these reports was detailed reporting on the use of BCCI Panama by major narcotics traffickers. The Operations Directorate also prepared three special analytic reports, incorrectly characterized by Kerr as having been prepared by the CIA's Intelligence Directorate, one each in 1985, 1986, and 1989, discussed below in some detail.[17]

Kerr acknowledged that the CIA had also used BCCI for certain intelligence-gathering operations, and characterized the use as limited and routine, and undertaken without the knowledge of any person at BCCI. A Senate Intelligence Committee audit, conducted in the

summer and fall of 1991, confirmed Kerr's testimony on that point, according to a briefing provided by the auditor to Subcommittee staff. The Subcommittee was not permitted by the CIA to read the actual report generated by Senate Intelligence Committee staff, and thus detailed review by the Subcommittee of that audit has not been possible.[18]

Kerr also acknowledged what the Subcommittee had learned in testimony just one day previously from former First American president Robert Altman, that the CIA had made extensive use of First American for a variety of purposes, including as a repository for "normal banking" and for savings accounts.[19]

The agency later informed Subcommittee staff that neither Clifford nor Altman had been made aware of the existence of the accounts prior to the summer of 1991.

According to Kerr, critical to understanding the contacts between the CIA and BCCI were a number of things the CIA did not do. Kerr testified that contrary to press reports, the CIA had not been involved with any BCCI black network of thugs and assassins, had not been involved with or had knowledge of any use of BCCI for the same of arms to Iran or the diversion of funds for the Nicaraguan Contras, had not violated any laws, had no relationship with BCCI's head, Agha Hasan Abedi, and had never placed Abedi on a watch list.[20]

### The 1985, 1986 and 1989 Reports

The Operations directorate produced two finished analytic reports regarding BCCI, the first in early 1986, and the second in early 1989, as well as a special intelligence report in early 1985, which was the basis of the material provided to the Treasury and to OCC. Kerr testified that as of early 1985, the CIA had learned that BCCI had succeeded in gaining control of Financial General Bankshares in late 1981, which then was renamed First American, and told the Treasury and Office of the Comptroller of the Currency ("OCC"), about BCCI's secret purchase.[21] Kerr did not inform the Subcommittee that the original report containing this information was then lost, and has never since been located by the CIA.[22] Congressional Relations at the Agency did inform Subcommittee staff that the author of the 1985 could not be identified. However, in a subsequent meeting, the Associate Director of Operations informed Subcommittee staff that, indeed, the author had been identified and that he had been asked to reconstruct the memo to the extent possible.

### The 1985 Report

There are a number of oddities pertaining to the early 1985 report by the CIA on BCCI.

The first oddity is the fact that original report is missing and has not been located by the CIA, which has instead, at the request of the Subcommittee, reconstructed the contents of the report by looking to the source information it was based upon, and relying on its normal procedures for analyzing and disseminating similar material.

The second unusual aspect of the report is that the CIA has records showing it to have been commissioned by the then-head of the International Division of the OCC, Robert Bench, who has denied under oath having ever sought the information.

REENTERED AS EXHIBIT 3

A third oddity is that CIA records also show Douglas P. Mulholland, then the intelligence chief of the Treasury Department, as having also solicited the information. Yet like Bench, Mulholland denies having any recollection of having done so.

Fourth, the information contained in the report -- that BCCI owned First American -- was important and startling, and would have been so recognized by anyone in the position of Mulholland or Bench -- yet neither of them recollect that the report discussed this issue. First American was by then the largest bank holding company in the metropolitan Washington area, and BCCI's prohibition from ownership had received widespread attention in the Washington Post and the financial press.

Firth, no action was taken by Mulholland or Bench in response to this critical information to alert federal law enforcement or the Federal Reserve, the primary regulator. The CIA, having provided the information to Treasury and the OCC, believed it had no further obligation to disseminate the information, either.

In an effort to sort through these anomalies, the Subcommittee in the spring of 1992 reviewed the material provided by the CIA to Mulholland and Bench in 1985. During the course of that review, the CIA provided a complete record to the Subcommittee of all the raw information upon which the 1985 memo was based. The Subcommittee requested the declassification of material from the 1985 material concerning First American and the bribery of officials. The declassification was completed on April 9, 1991, and consisted of the following account, which excerpts the substance, and on critical factual issues, the actual language, of the original 1985 material:

The CIA's Summary

Background:

In the early 1980s, as part of the overall U.S. Government effort to stop international narcotics trafficking, the Agency began collecting strategic foreign intelligence on narco-dollar money laundering. A successful intelligence collection operation in the Caribbean developed operational leads to several major foreign banks, including BCCI, suspected of narcotics money laundering. Pursuing these leads, CIA initiated a mutually productive dialogue with international banking experts at the Office of the Comptroller of the Currency to determine how CIA could meet OCC's intelligence needs. In late 1984, Agency officers met with a senior official from OCC, who expressed interest in a broad range of international financial intelligence CIA could provide. One of several issues in which the OCC official expressed interest was the takeover efforts and suspicious activities of institutions such as BCCI, which he specifically cited for its spectacular growth and the mystery surrounding its activities. In a later meeting, a Treasury intelligence liaison official expressed the interest of that organization in BCCI because of a possible concern about the less than wholesome reputation of the bank.

Foreign Intelligence Collection:

In late 1984 and early 1985, the Agency collected some intelligence on BCCI and disseminated the information to the Treasury Department. The foreign intelligence provided to the Treasury dealt with several activities, including the following information.

REENTERED AS EXHIBIT 3

The primary goal of BCCI senior management was growth in deposits at all branches internationally. The strategy being employed by BCCI to achieve rapid growth in assets and profits included manipulation of international financial markets and bribery, which was an approved policy encouraged by senior executives, including the general managers and President Abedi. The objectives of BCCI included developing both profits and political/economic leverage in the Near East, Africa, and Asia through the use of a tremendous volume of financial assets. BCCI expansion in the United States included the secret ownership of the Washington, D.C.-based bank holding company with which BCCI was affiliated. All of the shareholders in the Washington D.C.-based bank holding company were fronts for BCCI. BCCI loaned them the capital to make the purchase in return for their shares as collateral, which was regarded as a sensitive secret within BCCI management circles. If all of BCCI's assets in the U.S. were included in their balance sheet, the bank would be much higher in the worldwide ranking of the top one hundred financial institutions.

<u>The Agency-Treasury Dialogue:</u>

CIA provided this foreign intelligence to the Treasury intelligence community liaison representative in January 1985 [Douglas P. Mulholland], who reported to CIA that he carried it directly to the Secretary [Donald Regan] for his further disposition. The Treasury intelligence liaison officer also recommended only two persons in the Comptroller hierarchy see this material, which he described as "dynamite." The liaison officer praised this information, promised to keep the Agency fully informed of Treasury's reaction to it, and provided follow-up collection requirements to the Agency. These included a request for examples of BCCI management encouraging the use of bribery. The Treasury liaison officer also requested the name of the Washington, D.C.-based bank holding company owned by BCCI and the names of any other U.S.-based companies controlled by BCCI.

In April 1985, Agency officers had a curiously unsatisfactory discussion with the Treasury intelligence liaison representative concerning BCCI activities reported earlier by the Agency. The Treasury official explained that the position of the Treasury enforcement offices was that the BCCI activities reported by the Agency were not surprising and complemented the general picture Treasury had of BCCI. The Treasury officer stated that although his organization was interested in BCCI's activities to manipulate an international financial market and in the bank's buying into the U.S. along the lines of its acquisition of Financial General Bankshares [First American], Treasury was not concerned enough to levy further collection requirements on the Agency. The Treasury intelligence liaison officer said that money laundering remained the major focus of Treasury's enforcement side.[23]

What is notable about the information contained in the memorandum is that it was emphatic on BCCI's ownership of a Washington, D.C. based holding company, identified by Treasury as First American. The Treasury's senior intelligence official, Mulholland, initially considered the information to be "dynamite," but by April, after conferring with then Secretary of the Treasury Donald Regan, had concluded that Treasury saw no need for receiving further information about BCCI's ownership of First American, or its plans in the United States generally.

**Mulholland's Testimony**

On February 19, 1992, Douglas P. Mulholland, currently the Assistant Secretary of State for Intelligence and Research, testified about his contacts with the CIA concerning BCCI as the special assistant for national security to the Secretary of the Treasury from 1982 through 1987, when he was the CIA's chief liaison in the Treasury.

Mulholland, a career officer of the CIA, had been placed in Treasury by CIA chief William Casey, and left his job at Treasury on retirement from the CIA in 1987 to become a researcher for the Bush election campaign, before being appointed to his current position as head of intelligence at the State Department.

Mulholland described his contacts with the CIA concerning BCCI as follows:

I have a very limited memory of any specific documents, discussions, or events relating to BCCI, including any information that may have been introduced by the intelligence community during the mid-1980's.

Although I may well have discussed sensitive information on BCCI with senior department officials, including then-Secretary Donald Regan, that was not such an unusual experience as to ingrain such a discussion in my mind. . . With regard to BCCI, I recall only receiving one report during my time at the Treasury . . . The report was hand carried to me by a CIA officer who emphasized the sensitivity of the report.

I also recall this report because of its unusual format. The report lacked any heading or identifying numbers, and was typed on a plain piece of paper. One substantive aspect of the report struck me as particularly surprising, but because this information was produced and remains controlled by CIA, I am unable to discuss with you today any of the substance.[24]

In public testimony, Mulholland therefore declined to discuss the substance of the single aspect of the report which he found surprising. However, in interviews with Subcommittee staff prior to his testimony, Mulholland advised the Subcommittee that his memory concerned a matter in the CIA report which had nothing to do with BCCI's possible ownership of U.S. institutions, and that he had no personal memory that the issue was raised in the report.[25]

Mulholland emphasized throughout his testimony that his own memory regarding the BCCI report was very limited. He acknowledged that the CIA's documents reported him having provided the report Secretary Regan, but he stated he had no personal memory of having done so.[26] He estimated the frequency of his meetings with Secretary Regan regarding CIA reports as being anywhere from "zero to one hundred percent" of the time, and said he had not the "vaguest idea" of how often he had discussed such matters with the Secretary. He testified that the secondary source chronology the CIA concerning his activities was plausible, but that he could not say for certain whether it was correct, as he had no memory of having asked for any information, or having briefed anyone else on the information.[27]

Mulholland stated that even if he had recognized that the information contained in the report important, he would not have the right at the Treasury Department, let alone the responsibility, to take any action to disseminate the information further, since the CIA was the agency which created the information and controlled it.[28]

REENTERED AS EXHIBIT 3

Mulholland acknowledged that he had never received a comparable report from the CIA about any other bank besides BCCI, and that the BCCI report was not "normal." He testified that there was no record maintained at the Treasury Department of the report having been logged in, and he could not give any reason for this omission.[29]

Mulholland said he had no memory of having commissioned such a report, despite the CIA's documentary record that he had done so, and hence, he was unable to provide the Subcommittee with any reason why any person at Treasury might have asked the CIA to develop information concerning BCCI in late 1984 and early 1985.

## Bench's Testimony

Bench, like Mulholland, had only a very limited memory of the 1985 report. As he testified:

I do recall reviewing a classified piece of information that dealt with BCCI. . . it was somewhere in the middle of the '82 to '87 period. I feel comfortable about that. . . I recall receiving a document from the CIA that dealt with BCCI. To the best of my recollection it didn't deal with First American and it didn't deal with anything in the United States. There is an action step that I took within the office on that information . . . which was to look at this information in terms of LCD [Lesser Developed Country] debt.[30]

In staff interviews prior to this testimony, Bench emphasized that he had no memory whatsoever of having ever been advised that BCCI held interests in any financial institution in the United States, let alone First American.[31]

Bench also told staff that not only had he no memory of having commissioned a report on BCCI, but he would have been unlikely to have done so in any case, because of the OCC's need to work abroad without officials from other countries being concerned that it was doing so in conjunction with U.S. intelligence. Bench was therefore perplexed that the CIA had identified him as the requester, noting that to the extent he had an interaction concerning BCCI, it was the CIA asking him if he wanted information.[32]

## Regan's Recollection

Following the declassification of the 1985 memorandum by the CIA, the Subcommittee contacted former Secretary of the Treasury Donald Regan to determine what memory he had regarding Mulholland having provided him with the 1985 memorandum. According to an aide to Regan, he initially believed he had not been shown the memorandum by Mulholland because he had left Treasury to take the position of chief of staff at the White House, and so advised a Wall Street Journal reporter who contacted him at home in August, 1991. Regan was then contacted by Mulholland in August or September, 1991, who advised Regan that Mulholland had reviewed records at the CIA showing that he did provide the memorandum to Regan, and that Mulholland had no personal recollection regarding the matter, either. According to Regan's aide, Regan still has no recollection of Mulholland ever providing information regarding BCCI to him.[33]

In reviewing the CIA documents and the testimony of Kerr, Mulholland and Bench, it appears that the CIA has accurately set forth the information regarding First American provided

Mulholland, Regan and Bench in 1985, and that Mulholland, Bench and Reagan's memories that the CIA did not tell them about BCCI's secret control of First American are, at best, incorrect.

**The 1986 and 1989 Reports**

While the 1985 report received oddly limited distribution, the 1986 report, containing most of the key elements of the earlier report, including the fact that BCCI was owned by First American, was distributed more widely, to the Department of State, Defense Intelligence Agency, National Security Agency, National Security Council, Commerce Department, and to Treasury. Thus, every major CIA user that might be interested in the information received it, except for the two agencies which would have had a statutory responsibility to begin investigations in response -- the Federal Reserve and the Justice Department. However, Treasury logs again showed no actual receipt of the document, and there is no record of Treasury having passed the information to its agents in U.S. Customs, including those in Tampa whose investigation of BCCI lead to its indictment on money laundering charges in October, 1988.[34] The 1989 report, which provided detailed information concerning BCCI's criminality, was provided both Customs and the FBI, and reiterated the information, reported in the 1985 and 1986 memos, that First American was owned by BCCI. Even at this late date, the Federal Reserve was notified by no one of the existence of the report, or of any of the material in it.

**Unofficial BCCI-CIA Links**

The unofficial story of BCCI's links to U.S. intelligence is complicated by the inability of investigators to determine whether private persons affiliated with U.S. intelligence were undertaking actions such as selling U.S. arms to a foreign government outside ordinary channels on their own behalf, or ostensibly under sanction of a U.S. government agency, policy, or operation.

In the 1970's and 1980's, there have been cases of people with ties to U.S. intelligence engaging in operations on their own behalf which in fact had no ties to any approved U.S. government interest, such as former CIA officer Edwin Wilson's illegal arms sales to Idi Amin of Uganda and to Colonel Qaddafi of Libya. There have been other cases, such as retired General Richard Secord's arms sales to Iran and to the contras in the Iran/Contra affair, which are hard to distinguish from Wilson's case, except for the fact that the sales had actual secret approval and support from officials within the government, although they were not authorized by law under the Arms Export Control Act, and although Congress did not receive notifications required by law from the President.

In the case of BCCI, former CIA officials, including former CIA director Richard Helms and the late William Casey; former and current foreign intelligence officials, including Kamal Adham and Abdul Raouf Khalil; and principal foreign agents of the U.S., such as Adnan Khashoggi and Manucher Ghorbanifar, float in and out of BCCI at critical times in its history, and participate simultaneously in the making of key episodes in U.S. foreign policy, ranging from the Camp David peace talks to the arming of Iran as part of the Iran/Contra affair.

As early as the mid-1980's, sources in the United Kingdom were alleging that BCCI was providing services not only to the CIA, but to intelligence agencies of a number of countries, including the Soviet Union. For example, a November 5, 1986 letter to the Governor of the Bank of England, written anonymously, stated the following:

The BCCI is involved in helping people avoid Tax, illegal transfers of money, Hawala transfers, off the record deposits, conduit for drug and crime money and also as banker to intelligence agencies for most major agencies of the world.[35]

Did BCCI, its shareholders, or its officers, perform services for the United States government during any part of its existence? Were such services linked in any respect to BCCI's activities, such as its acquisition of First American? The unofficial record, explored below, raises these questions but cannot answer them definitively.

**Kamal Adham: BCCI's Godfather of Middle East Intelligence**

Kamal Adham, who was the CIA's principal liaison for the entire Middle East from the mid-1960's through 1979, was the lead front-man for BCCI in its takeover of First American, was an important nominee shareholder in BCCI, and remains one of the key players in the entire BCCI affair. On July 29, 1992, he reached a plea agreement with the District Attorney of New York, acknowledging that he had been a BCCI front-man in the United States, and agreeing to provide full cooperation with U.S. law enforcement in BCCI-related investigations and prosecutions.

Adham was at the time of BCCI's creation in 1972, the brother-in-law of King Faisal of Saudi Arabia, and the head of Saudi Intelligence, responsible for internal security and relations with external intelligence agencies. Press accounts concerning Adham from the late 1970's refer to him as the "godfather of Middle East intelligence," emphasize the closeness of his ties to the Central Intelligence Agency, and describe his having had responsibility for making payments, on behalf of the CIA, to Egyptian President Anwar Sadat when Sadat was merely Nasser's Vice President and having financial troubles.[36] As Bob Woodward described it:

Relations between the CIA and the Saudi intelligence service were generally good, going back to the days when the legendary and enormously wealthy Kamal Adham had been its head. In 1970, the Saudis had provided then Egyptian Vice President Sadat with a regular income. It was impossible to determine where Saudi interests in these arrangements ended and American CIA interests began.[37]

Adham's historic relationship with U.S. intelligence was indeed unusually close. While Adham was still in place as the CIA's liaison in 1977, the CIA's station chief for Saudi Arabia, Raymond H. Close, chose to go to work for Adham upon leaving the CIA, according to press reports at the time which Close has only denied since the BCCI scandal broke.[38] As Jeff Gerth of the New York Times reported in 1981:

In the case of Mr. Close, the one time station chief in Saudi Arabia, former Government officials say his actions, while in the CIA and since retirement, are often clouded in mystery. In the first place, some think Mr. Close may still be working for the CIA in some capacity,

although he officially retired in 1977. They add that a further complicating factor is that some Saudis privately share the same perception.[39]

The Times account describes how Close had actually given approval to weapons sales from Saudi Arabia to Pakistan in the early 1970's, in contravention of the "official policy" enunciated by the American ambassador, and states that Close went into business with Kamal Adham upon leaving the CIA.[40]

Within months of going into business with Close, Kamal Adham became the "lead investor" for the CCAH group taking over First American, officially on his own behalf, but in fact, acting as a nominee for BCCI. On April 23, 1981, Adham personally appeared at the Federal Reserve's hearing on the First American takeover, to inform the Federal Reserve of his personal wealth and background, and his desire to be a passive investor. In that appearance, Adham neglected to tell the Federal Reserve of his background in Saudi Arabian intelligence, historic ties to the CIA, or that Adham had acted as the most important liaison between the United States and his long-time friend, Anwar Sadat, in helping negotiate the Camp David accords.[41]

As President Carter's former Director of the Office of Management and Budget, Bert Lance, testified,

There was an opportunity there for Kamal Adham to have done the kind of work he did with regard to Sadat's visit to Jerusalem and that sort of thing, and subsequently playing a role in regards to satisfying some of the Arab countries with regard to the action that Sadat had taken, both in going to Jerusalem and also in Camp David.[42]

The key role played by Adham in Camp David was apparently to encourage other Arab political figures not to repudiate Sadat for agreeing to peace with Israel. Although such attempts may have appeared unsuccessful in terms of public statements by Gulf rulers, it is clear that many of the Gulf rulers in private provided some support for Sadat, including then-Crown Prince and now King Faud of Saudi Arabia, who sought to strengthen ties with the United States as a means of defending the Saud family from a variety of possible instabilities.

The actual intent of BCCI and its Arab shareholders in participating with BCCI in the takeover of First American remains a matter of speculation. One article, appearing in the Washington Post on December 18, 1977, at the very beginning of the takeover efforts regarding First American and the National Bank of Georgia, described the intent of BCCI and the Arabs as gaining "access to the administration" through Lance.[43] The involvement of Gulf leaders in the takeover in Washington at the same time as the Camp David accords were put into place, would have been recognized within the Middle East at the time as an important symbolic gesture by each of them to strengthen ties with Israel's superpower sponsor, the United States. Their ownership of First American also would have providing a direct means to gain influence in the U.S. through the ownership of the bank.

To recapitulate: Adham was at the same time in business with a retired CIA station chief whose activities caused people in the U.S. and Saudi governments to question whether he was truly "retired," acting as an intermediary for the U.S. in negotiations regarding Camp David,

and acting as a phony "lead shareholder" in a take-over of the largest bank in the nation's capital on behalf of BCCI. The simultaneity was thus either part of a larger political plan of Adham, BCCI, and people within the Carter Administration and the CIA, or merely a coincidence.

Questioned about the concurrence of these events, Adham has told U.S. investigators that they were unrelated, and thus, BCCI's purchase of First American was not a quid pro quo for Camp David. Instead, Adham has suggested that his involvement in these events, and BCCI's later involvement in financing the Presidential library, charities, and travel of President Jimmy Carter, for whom Camp David was the major achievement of his presidency, were in fact coincidence.[44]

Clark Clifford, in sworn interrogatories, stated that he, too, believed Adham's roles in Camp David and in the simultaneous takeover of Financial General were coincidence. Clifford stated that while Adham had told him of his friendship with Sadat, he had not advised Clifford of having any role in Camp David.[45]

A fuller account of Adham's role as a front-man for BCCI from its creation and in connection with the CCAH takeover is contained in the chapter on BCCI's nominees.

**Abdul Raouf Khalil**

Abdul Raouf Khalil, like Kamal Adham, was a BCCI shareholder and front man from its creation, and a key nominee in BCCI's secret takeover of First American. Like Adham, Khalil appeared at the Federal Reserve on April 23, 1981 to tell the Federal Reserve he intended to be a passive investor. Like Adham, Khalil failed to advise the Federal Reserve that he was, at the time of the Federal Reserve's hearing, a key figure in Saudi Arabian intelligence, and its liaison to the United States. Indeed, Khalil's description of his activities at the hearing were fundamentally misleading on this point, as they presented Khalil to be nothing more than a private Arab businessman, who as a friend of Adham, joined Adham to be passive investor of Middle Eastern money in the stable U.S. banking system. As Khalil told the Federal Reserve:

My career has been devoted to business and I presently hold interests in real estate, mechanical and electrical maintenance projects, and commodities. In addition, I have been involved in some business ventures with American and British manufacturers for the installation of electronic and computer equipment in Saudi Arabia.[46]

Khalil did not characterize the kind of electronics and computers he was installing in Saudi Arabia, or advise the Federal Reserve of the telling name of one of his businesses: the Saudi Security and Technical Services Company. In fact, the electronic and computer equipment which Khalil referred to included the electronic and computer equipment for the Government of Saudi Arabia, and for its intelligence operations.

Price Waterhouse audit reports suggest that Khalil had no written contact with BCCI from 1985 on. By the late 1980's, senior officials of BCCI knew of no way to contact Khalil, and in some cases, such as that of chief financial officer Massihur Rahman, even doubted his existence.[47] Yet throughout this period, BCCI used Khalil -- or his name -- extensively as a nominee in transactions in Latin American and the Caribbean, as well as in Europe, while

REENTERED AS EXHIBIT 3

Khalil continued to have ongoing contact with the CIA, which continued, according to law enforcement officials, until well after BCCI's closure on July 5, 1991. Moreover, Khalil simultaneously was a principal shareholder and director of Capcom, BCCI's commodities trading affiliate, throughout this period.

Khalil's continuing ties to the CIA are exemplified by the experience of U.S. regulators, who asked the State Department in 1991 to locate Khalil for service of legal documents, and were told that Khalil could not be located. After some months, the regulators determined that Khalil was frequently found in the offices of the CIA station chief in Saudi Arabia. Upon making this suggestion to the State Department, the regulators found that service of the legal documents on Khalil was quickly arranged.[48]

**Former CIA Director Richard Helms**

**and BCCI Front Man Mohammed Irvani**

Adham and Khalil were not the only BCCI and CCAH shareholders with intelligence ties. Before Adham acted as the lead shareholder in the takeover of First American, another person acted as BCCI's chief front-man in an earlier, unsuccessful takeover attempt. That man, Mohammed Rahim Motaghi Irvani, was listed in the original SEC filing in the early, 1978 takeover attempt, as a 5 percent shareholder of CCAH. Irvani was at the time the principal partner of former CIA director Richard Helms in Helms' international consulting firm, Safeer, and the chief financier of that firm. During the time Irvani acted as BCCI's lead front-man in the original takeover, he received advice on how to be protected from any liability in that role by Helms. Thus, there were personal, legal, and financial links between Helms and Irvani at a critical time in the history of BCCI's acquisition of First American.

Irvani founded the Melli Industrial Group in Iran in 1949 to manufacture footwear and leather goods, and developed close ties to the government of the Shah of Iran. By the time of the first Financial General Bankshare's takeover in 1978, the Melli Industrial Group owned 23 operating companies, as well as joint ventures with foreign firms such as Goodyear and United Chemical. Irvani also owned the Alwand Industrial Co., which held interests in the Iran Arab Bank, and had a net worth estimated in financial documents of over $50 million personally and a financial empire whose corporate value was as much as $800 million.[49]

Irvani's friendship and financial support were critical to Helms in this period. Helms, a thirty-year veteran of the CIA and its predecessor, the OSS, was dismissed in February, 1973 from his position as CIA director by President Nixon and appointed Ambassador to Iran until 1977, where he met Irvani. When he returned to the U.S., Helms was indicted for lying before a Congressional committee concerning CIA activities in Chile. On October 31, 1977, Helms plead no contest to two charges, in return for a recommendation by the government that he not be sentenced to prison.

In arranging this plea agreement, Helms was represented by Washington defense attorney Edward Bennett Williams. But in addition to Williams' negotiations, Helms also called upon Clark Clifford for help. In the fall of 1977, Clifford visited a top Justice Department official to argue against an indictment of Helms, saying such charges could damage the U.S. intelligence community.[50]

REENTERED AS EXHIBIT 3

Despite Clifford's successful intervention with Justice, as a result of the guilty plea, Helms was, in the words of the federal judge who presided over the case, "in disgrace and shame."[51] It was precisely at this time that Irvani provided a critical lifetime to Helms through financing the Safeer Company, named for the Iranian word for "Ambassador," as an international consulting firm whose initial business was mostly supplied by Irvani and Irvani's contacts.

According to Safeer Company corporate records and other documents on file in civil litigation in Atlanta in the case of G&H Montage, Gmbh v. Irvani, Superior Court of Gwinnett County, Georgia, 88-A-03571-6, 80 percent of Safeer was capitalized and owned by Irvani. Moreover, much of Safeer's early business activity was handled by Irvani's former chief U.S. assistant, Roy Carlson, who became Vice President of Safeer and had close ties to BCCI.

Carlson, who served as a Naval officer in the Pacific during World War II, joined the U.S. foreign service and was detailed to South Africa, before moving to the Bank of America, where he spent twenty years. While working for BOA, Carlson was stationed in Teheran in the 1960's and in Beirut in the early 1970's. Carlson ultimately became head of the bank's operations throughout the Middle East and East Africa. During that time, he came into close contact with Abedi, advising Abedi on the formation of BCCI in 1972, prior to BCCI's incorporation in Luxembourg. In turn, Abedi had introduced Carlson to Irvani, one of the most successful industrialists in Iran, who hired him to be manager of the Melli group.

During this period Carlson started his own company, the "North West Investment Company", which was created in order "to help expedite shipments through Europe to companies in Iran."[52] North West invested $120,000 into Safeer Company during its first year, and one year later, liquidated this investment in Safeer, selling its shares to an entity, "Brockton Leather Company," which in turn sold them to Richard Helms for one dollar.[53]

Corporate records obtained from Switzerland in May, 1992 show that North West is still listed as in operation, and that Carlson is listed as Vice-President of the Company and as a resident of Teheran, although Carlson lives in Snellville, Georgia. Northwest corporate records also show that Dr. Marco Jagmetti, the lawyer for Northwest, is a director of Rothschild Continuation Holdings, a holding company run by BCCI director Dr. Alfred Hartmann.[54] Although it has not been able to determine if they are related companies, the Subcommittee has uncovered documents indicating that BCCI shareholder Kamal Adham was President of a Panamanian holding company called "North West International".[55]

After the Iranian revolution, Carlson fled Iran and went to work for Richard Helms in Safeer, on transactions financed by Irvani. Then, after Ghaith Pharaon purchased National Bank of Georgia from Bert Lance on behalf of BCCI, Agha Hasan Abedi personally selected Carlson as the new head of National Bank of Georgia.[56]

A memorandum prepared by BCCI lawyers following a meeting with Carlson in November, 1990 describes how Irvani by early 1978 became a front-man for BCCI in its takeover of First American, at the very time Irvani was financing Helms' international consulting firm. The memorandum described Carlson as telling BCCI the following:

In the mid-1970's, and arising out of the relationship which had grown from Agha Hasan Abedi's involvement with Irvani over Iran Arab Bank, Agha Hasan Abedi had invited Rahim Irvani to take a 5% stake in [First American]. Carlson said that Agha Hasan Abedi wished the consortium holding the shares to have a broad background including those from Iran. Carlson said the material produced at trial purported to indicate that Rahim Irvani had applied to Credit & Commerce Americas for a loan in order to purchase the share stake... The investment had not proceeded because firstly, Rahim Irvani had never been keen to make the investment at all, but had been persuaded that he could do so on the basis of the loan to be made to him [by Abedi and BCCI.][57]

When Irvani agreed to act as a front-man, Richard Helms drafted legal language to protect Irvani against possible liability for the use of his name as a shareholder by Abedi, BCCI, and the Clifford law firm. A telex from Helms to Irvani, dated October 20, 1978, describes Helms' assistance to Irvani as follows:

Roy Carlson asked on October 19 that I have an independent attorney review the seven documents he sent me by telex. . . you are not running undue risks.

Carlson also told me that you wanted a draft of a simple agreement which would hold you harmless in these arrangements. The text of this agreement is as follows:

LETTER AGREEMENT. For value received, the undersigned jointly and severally agree to indemnify you from any liability, loss, or damage, including reasonable attorneys' fees, arising out of or caused by your granting, as shareholder or a director, a power of attorney to any partner of Clifford, Glass, McIlwain and Finney, a Washington D.C. law firm, to act in your name with respect to the transaction involving Financial General Bankshares of Washington, D.C.[58]

The telex ended with the sign-off, "With Warmest Regards, HELMS."

With this suggestion, Helms was assisting Irvani in acting as a front-man for BCCI, who would not be at risk for the use of his name by the BCCI group represented by Clark Clifford and Robert Altman. Helms was assisting Irvani in his acting as a BCCI front-man in the takeover being handled by Clifford just

one year after Clifford had assisted Helms in his negotiations with the Justice Department on his perjury indictment.

Irvani's role in the takeover was acknowledged recently by his son, Bahman Irvani, who told the Atlanta Constitution that his father "lent his name to the 1978 takeover bid at the request of BCCI founder Agha Hasan Abedi."[59]

Despite the existence of the October, 1978 telex from him to Irvani regarding how to structure the hold-harmless agreement for Irvani to the Clifford firm in the original FGB takeover, Helms has recently denied that he was involved in the transaction, terming the allegation "totally untrue . . . absolute nonsense."[60]

REENTERED AS EXHIBIT 3

Irvani's role in BCCI's initial attempt to acquire Financial General ended with the Iranian revolution in January 1979, as he became an unnecessary nominee.

Over the following decade, Irvani, Carlson, and Helms continued to interact with one another and with BCCI.

Helms provided introductions for Irvani to then U.S. Ambassador to Germany Walter J. Stoessel, Jr in January, 1979, and through former Senator Albert Gore Senior, contacted Senator Bumpers' office for assisting on locating rice dealers for Irvani. Helms and Irvani also continued to refer business to one another.[61]

During the 1980's, Helms continued to introduce Irvani to prominent Americans, writing Vice President Bush on Irvani's behalf in October 29, 1987, forwarding an October 16, 1991 letter from Irvani to Bush, and forwarding letters of congratulations from Irvani to President-elect Bush and Secretary of State James Baker on November 28, 1988. None of the actual letters from Irvani to George Bush discussed in the Helms-Irvani correspondence have been located. But the cover letter from Irvani to Helms on the October 16, 1987 letter, refers to Irvani's desire to provide Vice President Bush with advice on his presidential campaign.[62]

Helms took other steps on Irvani's behalf, including introducing Irvani's son Ali to Ambassador Paul Nitze, arms control advisor to President Reagan, and writing to U.S. Ambassador to Egypt Frank Wisner on Irvani's behalf on May 22, 1989. Helms introduced Irvani's son, Ali, to former CIA station chief for Saudi Arabia Raymond Close -- who had previously worked for Irvani's successor as BCCI's lead front-man in the First American takeover, Kamal Adham -- on July 11, 1989.[63]

Throughout this period, BCCI financed Irvani investments in the United Kingdom and in the United States, which in 1989 amounted to $38 million in a single transaction to buy a New York office building, 140 East 58th Street. Other BCCI documents show numerous loans, typically of millions of dollars at a time, to the Irvani family, as well as indications that the Irvanis also received substantial loans from the National Bank of Georgia, both while that bank was owned by BCCI through Ghaith Pharaon, and after Pharaon was replaced as a nominal owner by First American.

**BCCI and William Casey and His Network**

On February 23, 1992, NBC News broadcast the allegation that former Director of Central Intelligence William Casey met secretly for three years with Abedi, that such meetings took place every few months at the Madison Hotel in Washington, D.C., and that they discussed matters relating to U.S. arms deals to Iran and the arming of Afghani rebels.

Prior to the broadcast, NBC contacted the CIA and was advised of the following by the CIA:

"An extensive search of CIA files and cable traffic revealed no evidence that CIA was involved in or had any knowledge of any use of BCCI for the sale of arms to Iran or the diversion of funds for the Nicaraguan contras, in connection with the Iran-contra affair."[64]

Previously, Kerr had testified before the Subcommittee on October 25, 1991 that:

allegations that the Agency had any direct or indirect relationship with Abedi or recruited him for CIA activities are absolutely baseless.[65]

According to the CIA in February, 1992, the CIA found "no records or evidence whatsoever to indicate that former Director Casey or the Agency had any sort of relationship with Abedi."[66]

Balanced against these flat denials are statements to the contrary by one BCCI official in a position to know to U.S. officials. The BCCI official explicitly described meetings between Casey and Abedi at the Madison Hotel in the mid-1980's, identified one other person who had personal knowledge of the meetings, and provided an account which one U.S. official deemed credible.[67] In addition, there are statements by BCCI officer Abdur Sakhia and Bert Lance that each had noticed in 1985 a change in Abedi's attitudes towards the United States, which they attributed to his developing a relationship with the CIA.

Sakhia testified that in 1984, he was told by Abedi, or one of his associates in London that Abedi was uncomfortable about travelling in the United States because he feared he was on a CIA watch list, but that as of a year later, Abedi's attitude had changed completely, giving Sakhia an impressions that "a deal had been struck somewhere."[68]

Lance provided a more detailed account, describing a meeting with Abedi at a symposium on conflict resolution at Emory University sponsored by President Carter in October 1983:

What [Abedi] said was . . . from the precise moment that Ronald Reagan was sworn in as President of the United States, I have been on the CIA Watch List. And my every movement, my every act, whatever I do, personally as well as through BCCI, is noted, watched, observed, under surveillance of the Central Intelligence Agency. . . I said: Well, why, Mr. Abedi? . . . And he said something that was very interesting, Mr. Chairman. He said: You have to understand that I fall into the category of being a Third World liberal . . .[69]

According to Lance, Abedi's attitude and concern about the CIA suddenly changed significantly in 1984. Where he had been concerned about making visits to the United States, and about expanding his operations in the United States, he now felt confident, leading Lance to conclude that Abedi had received "an assurance" that the U.S. government would no longer impede his activities. Lance, acknowledging he had no hard evidence for his assertion, nevertheless concluded that the CIA had made an effort "to coopt Mr. Abedi and BCCI, and in effect, turn them into the bank of the CIA."[70]

Neither Lance nor Sakhia had been exposed to the other's testimony at the time of making these statements, or had ever met one another.

One possible explanation of the contradictory accounts is that Casey undertook actions in the foreign policy or intelligence sphere while director of the CIA outside its record keeping and operations. The CIA's legal department has described such activity by Casey, including any role he had in the Iran/Contra affair, as being undertaken in his position as an advisor to the President, rather than in his position as Director of Central Intelligence.[71] In such cases, Casey would have taken actions which were outside the record keeping of the CIA, undocumented, fully deniable, and effectively irretrievable.

**Iranian Arms Deals and Dealers**

Regardless of whether Abedi and CIA director Casey concluded a deal under which BCCI would provide off-the-books assistant to any unofficial or "off-the-books" operation of Casey, BCCI was incontestably used by key Iran/Contra figures to finance arms shipments to Iran in connection with the secret Reagan Administration initiative. CIA records, as well as Kerr's testimony, state the CIA did not know this. However, the record is clear that a number of BCCI officials knew of the U.S. government arms sales to Iran at the time. Ironically, BCCI knew of this Reagan Administration initiative at a time when the Iranian arms sales remained secret not only from the U.S. public but the Congress, and at a time when the CIA knew that BCCI was a criminal enterprise.

BCCI was also involved in a number of other Iranian arms sales after the fall of the Shah, some of which appear not to have been completed, and others of which appear not to have involved the United States. In still other cases involving BCCI's use for arms sales to Iran, it is simply not possible to determine the extent of involvement by U.S. officials.

BCCI was used from the late 1970's in London by Iranian arms brokers who became the central figures in the "October Surprise" allegations of secret negotiations with Iran involving Casey and Iranians over the fate of U.S. hostages. It was also used by Iranian arms dealers in Britain who never completed arms sales with Iran. Most important, it was extensively used by Adnan Khashoggi and Manucher Ghorbanifar in arms deals that were directly on behalf of the United States.

**1984-1986: Adnan Khashoggi and Manucher Ghorbanifar**

Both Saudi businessman Adnan Khashoggi and Iranian arms merchant Manucher Ghorbanifar were central agents of the United States in selling arms to Iran in the Iran/Contra affair. According to the official chronologies of the Iran/Contra committees, Khashoggi acted as the middleman for five Iranian arms deals for the United States, financing a number of them through BCCI; and Ghorbanifar was the individual who conceptualized the arms-for-hostage negotiations, and provided the initial channel to the "Iranian moderates" with whom the Reagan Administration negotiated prior to delivering shipments of U.S. TOW missiles and HAWKs to Iran in 1985 and 1986.

Khashoggi was served as the "banker" for arms

shipments as the undercover scheme developed in 1985 and 1986. Khashoggi himself said he advanced $1 million in August 1985 to "get the deal going." According to his own and other published accounts, he provided some $30 million in loans altogether, depositing money in a Swiss bank account controlled by Lake Resources, the company run by former White House aide Oliver North, who played the pivotal role in the operation involving the arms sales and diversion of funds to Nicaraguan Contra rebels.

Both Khashoggi and Ghorbanifar banked at BCCI's offices in Monte Carlo, and for both, BCCI's services were essential as a means of providing short-term credit for sales of arms from the U.S. through Israel to Iran. Khashoggi's use of BCCI for the Iranian arms sales was first described, in passing, in an Iran/Contra committee deposition on June 8, 1987, describing the movement of $10 million from Credit Swisse which would to through BCCI four times to

REENTERED AS EXHIBIT 3

produce $40 million of sales "and therefore, additional profit." In the same deposition, the witness, Khashoggi business manager Emanuel Floor, described Ghorbanifar as stating, "these are my associates," and writing down the name, "BCCI." Floor described BCCI as acting not merely as Ghorbanifar and Khashoggi's bank for the purpose of these transactions, but as an actual partner in the Iranian arms deals.[72]

As described in detailed Subcommittee testimony by BCCI Paris manager Nazir Chinoy on March 18, 1992, Khashoggi came to Paris to meet with Chinoy in early 1986 to discuss continuing transactions he had until then been conducting through BCCI's Monte Carlo branch. According to Chinoy, the meeting was set up when Chinoy wished to learn more about the reasons for the sudden increase in assets and activity of the Monte Carlo branch of BCCI, which was under his jurisdiction as chief manager for the French region of the bank. He learned from Manir Karim, the branch manager for Monte Carlo that most of the new assets and activity were the result of a very successful relationship that had been developed with Saudi arms dealer Adnan Khashoggi. Khashoggi had two to three "very active" deposit accounts at Monte Carlo, according to Chinoy, and kept very large balances there, paying "his crew" through travellers checks at the rate of $100,000 to $150,000 each month. Chinoy decided to learn more, and met with Khashoggi and Karim in BCCI's office in Paris:

I met Khashoggi in a small room at the bank. He told me he had a deal, he was to be a supplier, buy American arms through Israel and supply them to the Iranians. What he wanted was a four-day credit.[73]

Khashoggi told Chinoy he was working directly for the U.S. government and the CIA, and needed BCCI because none of the parties involved in the Iran/Contra affair trusted one another:

The Israelis wanted their money for the arms whereas the Iranians would only pay when the arms physically would reach them. The Americans wanted their money as soon as they gave their arms to the Israelis and Khashoggi did not have the money himself at the time. Khashoggi wanted a revolving $5 million credit, and the charges he was prepared to pay were generous -- 2% front end fees per transaction. For $2 million you would get $40,000 per transaction. Then you would get interest at 1 1/2 % over LIBOR for the actual number of days the overdraft loan or line of credit was operating. This was juicy.[74]

In meeting Khashoggi, Chinoy learned for the first time that BCCI had been providing these services for Khashoggi for a number of months through the Monte Carlo office of BCCI, without the knowledge of the Paris office, which was responsible for the Monte Carlo office. Karim explained that there had been at least five transactions as of early 1986, that had never been detected by other BCCI offices and which had never received formal approval in writing by BCCI's headquarters in London. This was done by exploiting BCCI's "float," through BCCI's officer taking a check on a Thursday or Friday from Khashoggi and holding it over the weekend, while giving Khashoggi credit for the check immediately. Khashoggi in return would use the money and make the payments to the Israelis. The arms would be delivered over the weekend and by Monday or Tuesday Khashoggi would have the check from a Swiss bank, normally Credit Suisse, where the North/Secord "Enterprise" maintained its accounts. Credit Suisse would give Khashoggi a "Demand draft," which BCCI would then cash for its credit on

the transaction on a Tuesday or Wednesday after Khashoggi had his funds from the Iranians. (75)

According to Chinoy, the five or more transactions had involved eight to ten million dollars in all. Chinoy recognized that the activity was profitable, but he was uncomfortable about BCCI being involved in a transaction that secretly involved the U.S., Israel and Iran in arms deals, and that had not been and would not be approved in writing by BCCI's London office. Chinoy said that he told Khashoggi he could not continue the deals, that they would have to stop them. In the weeks that followed, Chinoy noticed that profits at the Monte Carlo branch fell, indicating to him that his subordinate had obeyed Chinoy's order. But he then learned that the arms deals started up again anyway, and that Khashoggi and Karim completed two to three more transactions out of Monte Carlo totalling $15 million to $17 million dollars.[76]

In the same period, Chinoy learned from Karim that Iranian arms sales Manucher Ghorbanifar also maintained a regular deposit account at BCCI Monte Carlo, in amounts ranging from $2 million to $2.5 million, typically kept in short-term certificates of deposit. Chinoy suggested to Karim that BCCI sever its relation with Ghorbanifar and was told:

We should let the account be. He is in very good books with French intelligence, with the American government, he is helping everybody and he has good accounts in Switzerland and I hope we will get more money from him.[77]

According to Chinoy, BCCI officers understood that Ghorbanifar had helped the French government obtain the release of hostages held in Beirut, and that accordingly, BCCI would strengthen its status in France by handling Ghorbanifar's business.

Further confirmation for Chinoy's account came from BCCI's senior office in the United States, Abdur Sakhia, who testified that in the mid-1987, he was contacted by FBI agents investigating the Iran/Contra affair who needed to obtain records from BCCI Monte Carlo, which was the "missing link" in their documentary chain involving the U.S. and Credit Suisse. According to Sakhia, the FBI told him that a BCCI branch manager in Monte Carlo had been paid $100,000, "presumably by the U.S. government," and deposited that check in Switzerland in his own account. They asked Sakhia to obtain BCCI's records concerning the transaction from Europe. Sakhia contacted his superiors in London and they discussed whether or not BCCI should provide the information to the FBI despite the fact that to do so would violate French secrecy laws. The official at BCCI-London, Ameer Siddiki, agreed with Sakhia that if BCCI's involvement in Iran/Contra became known, it would focus dangerous attention on the bank's other activities. BCCI London informed Sakhia that if the United States government agreed to prevent BCCI's involvement from becoming public, BCCI would violate French law and provide the records to the United States. The FBI agreed to this arrangement, and the records regarding the Iranian transactions were provided by BCCI to the FBI.[78]

Following this agreement, Sakhia remained concerned about the fact that the BCCI official involved, Manir Karim, had accepted a $100,000 bribe to handle the transactions, and deposited them in a non-BCCI institution, and yet had not been disciplined by BCCI. Based on this and related information, Sakhia concluded that the handling of the arms sales by BCCI "was all being orchestrated from London and London was aware of what was happening."[79]

According to the Iran/Contra deposition of Albert Hakim, banker for the North/Secord Enterprise, Khashoggi made deposits in the North/Secord accounts from BCCI in the amount of $2.5 million on February 7, 1986; $2.5 million on February 10, 1986; and two checks of $5 million each on February 18, 1986. Still additional deposits were made from BCCI by Khashoggi for $5 million on May 18, 1986. Provocatively, Hakim referred to additional transactions amounting to millions more involving an entity referred to simply as "IC" of the Grand Caymans, reminiscent of BCCI's own Grand Caymans affiliate "ICIC." [80]

Three payments to BCCI from the North/Secord accounts, including Lake Resources, the account used to finance arms to the contras, are shown in the ledger books maintained by Hakim on behalf of the enterprise, amounting to $10 million only.[81] In addition, the Hakim ledgers show five wire transfers amounting to $346,000 to First American Bank, which may merely indicate that Secord, North, or the fourth partner of the enterprise, former CIA agent Thomas Clines, may have had an account there.

Evidence for the involvement of BCCI headquarters in London and Abedi in the Iran/Contra arms transactions is contained in documents between BCCI Grand Caymans and BCCI London in March 1986 involving a $10 million arms transaction -- the exact amount referred to by Emanuel Floor as having been intended for movement through BCCI by Khashoggi and Ghorbanifar, and tracking the February 18, 1986 payments referred to by Hakim.

The documents, which refer to the use of a front company "in formation" to handle the transaction, are in the nature of preliminary discussions regarding whether BCCI would handle the transaction. But they contain a critical fact: they demonstrate the involvement of BCCI-London in transactions involving BCCI Monte Carlo and BCCI Grand Caymans. From Chinoy's point of view, the meaning of the documents is that when he expressed concern about the Khashoggi transaction, London simply went around him. From Sakhia's, the documents showed that Abedi had approved the BCCI project from the beginning. [82]

Ironically, Clark Clifford had his own long-standing ties to Khashoggi. In 1981, Khashoggi took $250,000 from Northrop intended for Saudi Arabian Air Force General Hashim M. Hashim. Four years later, Northrop released documents accusing Khashoggi of demanding the bribe for the general, and then converting it to his own use, Khashoggi retained Clifford to represent him in the subsequent federal grand jury investigation of the matter. Significantly, both Kamal Adham and Faisal al Fulaij, BCCI's front-men for the 1981 takeover, were investigated as well as Khashoggi for taking money from Northrop and Lockheed in connection with U.S. arms sales to Saudi Arabia.[83]

Perhaps as a matter of coincidence, the business formed by Secord in May, 1983 immediately upon his retirement from the U.S. government in partnership with Hakim, Stanford Technology Trading Group International of Vienna, Virginia, used a BCCI shareholder as its local agent in Saudi Arabia for contracts to provide security services in the Middle East. The person who Secord hired to help him acquire Saudi government contracts was Abdullah Said Bugshan and his brothers. Together, the Bugshan brothers owned about one half of one percent of BCCI during the period they reprsented Secord and Hakim in Saudi Arabia. While

representing Secord, they had also deposits in BCCI ranging from $13 million to $21 milllion in BCCI and had outstanding loans of about $6 million from BCCI.[84]

**Other Iranian Arms Dealers and BCCI**

**Ben Banerjee**

A recurring question about the Iran/Contra scandal is the issue of whether there may have been earlier arms sales to Iran, prior to the period covered by the Iran/Contra Congressional committees. On September 29, 1987, Die Welt, a German newspaper, reported that in 1984, Iran's ambassador authorized the purchase of 20,000 U.S.-made TOW missiles after talks between U.S. Lt. Col. Oliver North and Iranian officials in Hamburg. According to Die Welt, the deal fell through and the weapons were never delivered after an Iranian contact disappeared with the letter of credit.

According to Die Welt, Iran's ambassador to West Germany, Mohammad Djavad Salari, signed a letter authorizing the purchase of the anti-tank weapons worth $264 million, and North, then a member of the U.S. National Security Council, took part in one

negotiating session on Nov. 20, 1984. The newspaper said the purchase authorization came after talks in a Hamburg hotel between Iranians and two British-based arms dealers, Michael J. Aspin, owner of the weapons dealership Delta Investments and Indian-born millionaire weapons dealer Ben Banerjee, chief of the British company BR and W. Industries.[85] Both Banerjee and North denied the allegation.

Documents obtained by the Subcommittee, filed in a British criminal case later brought against Aspin for fraud in connection with the attempted sale of the American TOW missiles to Iran in 1984, and a second attempted sale in 1985, include a "pro-forma invoice," dated November 21, 1985, for the supply and delivery of 1250 units of BCM 71A TOW MISSILES, manufactured in the USA, "all brand new in manufacturers original packing," from B.R. & W. Industries, Ltd., signed by Ben Banerjee, U.S., denominated "lift trucks" for the purpose of bank and customs documentation, and handled by BCCI in London. The invoice was accompanied by telexes and letters on BCCI stationary of a nature and type ordinarily used by BCCI, showing BCCI providing counter guarantees and letters of credit for a transaction involving the "lift trucks" in November and December, 1985, involving the Iranian government and its bank, Bank Melli, and channeled through the Arabian Gate General Trading Co. of Dubai, United Arab Emirates.[86] In staff interviews, BCCI Paris manager Chinoy confirmed that Banerjee banked with BCCI in London and was involved in "large dealings with Iran."[87]

During the Aspin trial, Leslie Aspin, Michael Aspin's brother, testified that the TOW missile sale was a legitimate sale authorized by the United States government as part of a 1984 -1985 effort to ransom CIA agent William Buckley, with the weapons to be transferred from Portugal to Iran. In a sworn statement of May 1, 1987, Aspin attested that he and Oliver North opened three joint accounts in BCCI Paris into which North deposited $5 million on November 15, 1984, and listed the account numbers and signature cards of the three accounts, one of which was maintained for an entity called "Devon Island," allegedly, under the signature of North

and Bannerjee, and the other two accounts, which were numbered accounts, maintained under the signatures of Aspin, Bannerjee and Ghorbanifar.[88]

The Subcommittee has confirmed the existence of accounts in London involving Banerjee and in Monte Carlo involving Ghorbanifar, but has not received access to BCCI's accounts in Paris to determine whether or not the accounts referred to by Aspin existed. North has denied having maintained such an account. However, BCCI Paris manager Chinoy did learn of an account in the name "Devon Island" when he received a telephone call in 1988 from a London office of BCCI asking about it, and was advised by his assistant that the account existed but had not been used.[89]

Both Banerjee and Aspin are dead. The Subcommittee is continuing to seek Banerjee and Aspin's records from BCCI's liquidators in hopes of determining whether the arms sales to Iran in which they were participated had the backing of or involvement of any U.S. official.

### 1980: BCCI and October Surprise: Cyrus Hashemi

The late Cyrus Hashemi, an Iranian expatriate living in London, is a key figure in the "October Surprise" allegations charging that William Casey and other members of President Reagan's election team in 1980 engaged in negotiations with Iran, whereby Iran would delay the return of U.S. hostages held in Iran until after the November, 1980 election, in return for the U.S. providing Iran with needed arms for its war against Iraq. According to these allegations, which are substantially based on states made by Hashemi's brother Jamshid, who was based in Paris in this period, Cyrus Hashemi was to have acted as the middle-man in these secret negotiations between Casey and Iran. Later, Hashemi was indicted by the U.S. Attorney for the Southern District of New York for weapons dealings with Iran in a case that was ultimately thrown out of court as a result of complications arising out of the Iran/Contra affair.[90]

Without reaching any judgments concerning these allegations, records obtained by the Subcommittee demonstrate that BCCI was one of the principal banks used by Cyrus Hashemi in the United Kingdom.[91]

### Bruce Rappaport, Alfred Hartmann, and BCCI

Bruce Rappaport, an Israeli-born Swiss businessman who was investigated in 1987 by Independent Counsel Robert McKay for certain activities he engaged in on behalf of former CIA director Casey, had several connections to important participants in the BCCI affair. For example, he placed one of BCCI's key "rent-a-faces," Alfred Hartmann, who headed BCCI's secretly-held Swiss affiliate, Banque de Commerce et Placements, on the board of directors of his Intermaritime Bank of Geneva and New York; developed a relationship with BCCI's original contact in the U.S., Bert Lance, in the mid-1980's, and purchased an Antiguan melon-farm from Israeli arms dealers who were significant customers of BCCI in Miami.[92]

Rappaport's links to BCCI are significant chiefly because of his relationship to Casey, a frequent golfing partner. For example, Rappaport threw a party in Washington in the summer of 1985 for Casey to demonstrate high-level support for a project to build a pipeline to ship oil from Iraq through Jordan. Rappaport was also the person who allegedly controlled accounts

which received $10 million for the contras provided the North-Secord operation by the Sultan of Brunei, at the request of Elliot Abrams. The Iran/Contra Committees were told by Swiss authorities that the $10 million had disappeared, and was found to have "mistakenly" gone to an unwitting Swiss businessman, who then returned the money after the Iran/Contra affair was discovered. Press accounts, which Rappaport has denied, contend that the businessman was Rappaport. If Rappaport did indeed receive the funds, the placement of the $10 million with him would not likely have been in error, given his close relationship with Casey.[93]

**Oman**

While reviewing the complex relationships between BCCI and the Bank of Oman, which was affiliated with BCCI, the Subcommittee came across several linkages suggesting ties between the Sultanate of Oman, key figures in Saudi intelligence and U.S. persons with connections to the intelligence community.

As a 1985 article in the New York Times noted, Western intelligence has been a major influence in this tiny, but strategically placed, Gulf State, adjacent to the United Arab Emirates headed by Sheik Zayed. Although BCCI is not mentioned in the article, there is a substantial amount of evidence which demonstrates that both BCCI and the CIA has played a major role in the foreign policy and economic affairs of that country. The article discusses a Pasadena corporation, Tetra Tech, operated by a former CIA agent, which "helps manage several key Omani government agencies."[94]

It is clear that several companies and government agencies in Oman had multimillion dollar loans from BCCI. BCCI's loan book, dated March 3, 1991, for example, shows: Oman Aviation Service had an $8 million loan; Oman Building and Contracting Co. had over $11 million; Oman Flour Mills Co. had a $13 million loan; Oman Development Bank had $13 million; Oman Investment and Finance Company had a $10 million loan; Oman Building and contracting Services had a $16 million loan; and Sultanate of Oman had $14 million in loans. These are, of course, only the companies or government agencies which are clearly identifiable as having an Oman connection: there are undoubtedly other companies which the Subcommittee has been unable to identify.[95]

Besides the entities listed above, BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. British journalists have written:

"BCCI's role in assisting the U.S. to fund the Mujaheddin guerrillas fighting the Soviet occupation is drawing increasing attention. The bank's role began to surface in the mid-1980's when stories appeared in the New York Times showing how American security operatives used Oman as a staging post for Arab funds. This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%."[96]

The National Bank of Oman and its CEO, Case Zawawi, also did business with Bruce Rappaport. Jerry Townsend, the President of Colonial Shipping in Atlanta, told the Subcommittee that his former employer, Bruce Rappaport, had business relations in Oman

https://info.publicintelligence.net/The-BCCI-Affair.htm

with Case Zawawi at the National Bank of Oman. Townsend, who claims to have worked as a soviet analyst with the CIA, was employed by Rappaport between 1981 and 1990. Townsend recalled that Rappaport flew Zubin Mehta and the London Philharmonic to Oman on one occasion to entertain the Sultan and other members of the royal family. More importantly, according to Townsend, Rappaport and Zawawi had numerous "contracts with the Saudis." The consolidated loan report for BCCI of March 3, 1991 shows a loan authorization of almost $11 million to the Zawawi group with an outstanding balance of nearly $8 million.[97]

## Conclusions

Key questions about the relationship between U.S. intelligence and BCCI cannot be answered at this time, and may never be answered, without the ability for investigators to review BCCI records and interview BCCI witnesses held by the government of Abu Dhabi. Other questions could be answered from documents available in the United Kingdom, and subpoenaed by the Committee, but for the decision by the British judge on an application of BCCI's liquidators not to permit the Committee to receive them without the written "permission" of the depositors involved, such as Abu Nidal, and the deceased Ben Banerjee and Cyrus Hashemi. Still other BCCI documents in the United Kingdom have been segregated and sealed by British intelligence (MI-5), and withheld from dissemination to anyone.[98]

Finally, other relevant information in the possession of the CIA concerning certain important figures in BCCI's history remains classified, and hence outside the scope of this report. Summaries of some of this classified material have been provided to staff in a classified form that cannot be referred to. However, even there, the underlying material upon which these summaries were based, has been withheld, and therefore any additional relevant information the underlying material may contain can only be a matter of speculation.

However, even by its own account of its activities, the CIA made two significant mistakes in its handling of BCCI.

First, the CIA failed to provide the critical information it had gathered to the correct users of the information -- the Federal Reserve and the Justice Department. Kerr testified that he was "not sure it was a bad decision," a judgment challenged immediately during the hearing by Senator Hank Brown, who noted:

My training was that somebody's supposed to take responsibility. . . . And when a decision is made that is a bad decision, you identify who made it. . . You may feel a failure to get information about a criminal activity to the Federal Reserve is not [a bad judgment], I have a different view of it.[99]

Second, even when the CIA knew that BCCI was as an institution a fundamentally corrupt criminal enterprise, it used both BCCI and First American, BCCI's secretly held U.S. subsidiary, for CIA operations. In the latter case, some First American officials actually knew of this use.[100]

While the reporting concerning BCCI by the CIA was in some respects impressive -- especially in its assembling of the essentials of BCCI's criminality, its secret purchase of First

American by 1985, and its extensive involvement in money laundering -- there were also remarkable gaps in the CIA's reported knowledge about BCCI.

According to Kerr, the CIA did not have any information regarding the involvement of Kamal Adham -- its chief intelligence liaison in the Arab Middle East during the 1960's and 1970's -- in BCCI, or that of his successor, Abdul Raouf Khalil, or of Iran/Contra arms dealer Adnan Khashoggi.[101] Those statements have since been reiterated to the Subcommittee by the CIA in April 1992, following a further review of CIA records, with the caveat by the CIA that CIA record keeping is not consolidated, and that it remains possible that information which exists has not been retrievable.

The professed lack of knowledge by the CIA about the activities of its foreign intelligence liaisons and operatives who were BCCI's major shareholders and customers is perplexing and disturbing. The relationships between the CIA and Adham and Khalil were, according to public accounts, among the most important intelligence relationships the United States has had in Saudi Arabia over a quarter of a century. Similarly, Khashoggi and Ghorbanifar performed a central role for the U.S. government in connection with the Iran/Contra affair in operations that involved the direct participation of CIA personnel.

The CIA's professions of total ignorance about their respective roles in BCCI are out of character with the Agency's detailed knowledge of many critical aspects of the bank's operations, structure, personnel, and history.

If one accepts these statements at face value, it is hard not to conclude that the CIA's ignorance on these matters constituted a significant intelligence failure on the part of the CIA. Given the CIA's responsibilities to protect the U.S. against covert action by foreign powers, it would be especially disturbing if the United States does not, as a general matter, know anything whatsoever -- as the CIA has testified here -- of very substantial financial activities within the United States of chief foreign intelligence liaisons such as Adham and Khalil.

The errors made by the CIA in connection with its handling of BCCI were complicated by its handling of this Congressional investigation. Initial information that was provided by the CIA was untrue; later information that was provided was incomplete; and the Agency resisted providing a "full" account about its knowledge of BCCI until almost a year after the initial requests for the information. These experiences suggest caution in concluding that the information provided to date is full and complete. Caution is especially warranted given the CIA's recurrent statements that its record keeping has not been consolidated, and that it is possible that records pertaining to BCCI, or its shareholders, could have been missed in its search.

The lack of recollection by the chief intelligence officer of the Treasury, Douglas Mulholland, and by a then-senior official of the Office of the Comptroller of the Currency, Robert Bench, of the CIA having told them about BCCI's secret ownership of First American, is troubling.

According to the CIA's records, Mulholland recognized at the time that the information was important, and sought more information. The original memoranda are written in a fashion that makes it unlikely that any recipient would have not have noted BCCI's secret ownership of

REENTERED AS EXHIBIT 3

Washington's largest bank holding company, and have remembered it later. Accordingly, the testimony of both Bench and Mulholland raises questions about their candor.

1. S. Hrg. 102-350 Pt. 3, pp. 569-570.
2. Id.
3. S. Hrg. 102-350, p. 794.
4. . Hrg. 102-350 pt.3, pp.569-570
5. Letter, Webster to Kerry, S. Hrg. 102-350, Pt. 3, p. 607.
6. Communication between Subcommittee staff and Virgil Mattingly, Federal Reserve, July 31, 1991.
7. Testimony of Richard Kerr, Acting Director of Central Intelligence, S. Hrg. 1012-350 Pt. 3 p. 573.
8. Briefings, Subcommittee staff, by CIA office of general counsel and deputy director of operations, March-April, 1991.
9. Kerr testimony, closed session, Subcommittee, October 31, 1991.
10. Testimony of Virgil Mattingly, Senate Banking Subcommittee on Consumer and Regulatory Affairs, S. Hrg. 102-379 p. 141.
11. Staff interview, Virgil Mattingly, Federal Reserve, June, 1991, and review of Federal Reserve documents.
12. Testimony of Virgil Mattingly and William Taylor, Senate Banking Subcommittee on Consumer and Regulatory Affairs, S. Hrg. 102-379 pp. 141-143.
13. Senate Banking Committee Testimony, March, 1991.
14. Testimony of Kerr, S. Hrg. 102-350, Pt. 3 p. 573.
15. Id.
16. Id.
17. Id.
18. Id. at 590-591.
19. Id., testimony of Altman, S. Hrg. 102-350, Pt. 3, p. 259. 268.
20. Testimony of Kerr, id. at 374.
21. Testimony of Kerr, S. Hrg. 102-350, Pt. 3, p. 573.
22. See February 18, 1992 testimony of Douglas P. Mulholland before Subcommittee.
23. CIA summary, declassified on April 9, 1992, based on Subcommittee review of internal Agency cable traffic on BCCI and CIA's interaction with Treasury, S Hrg. 102-350 Pt. 4, pp. 360-363.
24.
[24]Mulholland Testimony, S. Hrg. 102-350 Pt. 4, pp. 6-7.
25. Staff interviews with Mulholland, February 14, 1991.
26. Mulholland Testimony, id. at 8.
27. Id at 32-33.
28. Mulholland Testimony, S. Hrg. 102-350, Pt. 4 p. 9.
29. Id. p. 28.
30. Testimony Bench, S. Hrg. 102-350 Pt. 4 pp. 36-37.
31. Staff interview, Bench, February 14, 1992.
32. Interview, Bench, March 13, 1991.
33. Staff interview with secretary to Donald Regan, May 5, 1992.
34. Kerr, id, at 573; Mazur, S Hrg. 102-350, Pt. 3, p. 673.
35. Minutes of Evidence Taken Before House of Commons Treasury and Civil Service Committee, Banking Supervision and BCCI, February 5, 1992, Sec. 252.
36. BBC, excerpts, Radio Peace and Progress in Arabic, July 1, 1981, S. Hrg. 102-350, Pt. 3 p. 291.
37. Woodward, Veil, Simon & Schuster, New York, 1987 p. 352.
38. See Jeff Gerth, New York Times December 6, 1981, "Former Intelligence Aides Profiting From Old Ties," S. Hrg. 102-350 Pt. 3 pp. 293-299.
39. Id.

REENTERED AS EXHIBIT 3

40. Id.
41. Statements of Adham to U.S. law enforcement officials, March, 1992.
42. Testimony of Lance, S. hrg. 102-350 p. 22.
43. Harris and Berry, "Arab Investors to Manage Funds; Arabs Want Lance to Direct Investments," Washington Post, December 18, 1977, A1.
44. Statements of Adham, id.
45. Affidavit of Clark M. Clifford, February 7, 1992, S. Hrg. 102-350 Pt. 4 p.710.
46. Transcript, Federal Reserve Board hearing, April 23, 1981, p. 65.
47. Testimony of Rahman, S. Hrg. 102-350, Pt. 1, p. 501.
48. Staff interview, U.S. investigator, April, 1992.
49. S. Hrg. 102-350 Pt. 4 pp. 310-316.
50. National Law Journal, December 22, 1980; UPI, December 13, 1980.
51. Washington Post, March 1, 1981, G1.
52. staff interview by telephone with Roy Carlson, July 16, 1991.
53. Safeer Company, Second Annual Meeting, minutes, November 23, 1979, S. Hrg. 102-350, Pt. 4, p. 255.
54. Swiss corporate register, Zurich, p.155.
55. documents filed by Kamal Adham with the Federal Reserve, 1989 FRY-6: Principal Shareholder data, p.3.
56. BCCI documents, including telex to Frank Van Court from Swaleh Naqvi, 11/12/79, "seen by Agha Saheb," curriculum vitae of Irvani, Alwand Investment Company.
57. Confidential and Privileged Attendance Note, November 19, 1990, BCCI Attorney memcom of meeting with Roy Carlson, Exhibit D in G&H Montage case, id.; S Hrg. 102-350 Pt. 4 pp. 286-298.
58. Plaintiff's exhibit, Helms 9, G&H Montage, id., reprinted S. Hrg. 102-350 Pt. 4 p. 237.
59. Peter Mantias, "BCCI: Case reveals former CIA chief's ties to bank," Atlanta Constitution, February 15, 1992, A1.
60. Atlanta Constitution, "Ex-CIA chief Helms denies helping BCCI," February 18, 1992, S Hrg. 102-350 Pt. 4 p. 236.
61. Letter, Stoessel to Helms, January 26, 1979; Letter, Rahim Irvani to Helms, March 21, 1984, S. Hrg. 102-350 Pt. 4 pp. 270-277.
62. Letters on file in G.M.H. Montage case, id.; S. Hrg. 102-350 Pt. 4, pp. 259-260, 265, 272-273, 275.
63. Id.. S Hrg. 102-350 Pt. 4 p. 266.
64. NBC Memo, February 21, 1992.
65. Testimony of Kerr, S. Hrg. 102-350, Pt. 3 p. 573.
66. NBC Memo, id; communications of CIA DDO to Subcommittee staff, April 9, 1992.
67. Staff interview, federal investigator.
68. Testimony of Sakhia, S. Hrg. 102-350, Pt. 2, p. 527.
69. Testimony of Lance, S. Hrg. 102-350, p. 39.
70. Id at 40-41.
71. Staff briefing, CIA legal department staff, February, 1992.
72. Deposition of Emanuel Floor, Congressional Iran/Contra Committees, June 8, 1987, pp. 31-34, reprinted S. Hrg. 102-350 PT 2. pp. 539-540.
73. Chinoy, Staff interview, March 9-16, 1992.
74. Id.
75. Id.
76. Testimony of Chinoy, March 18, 1992, staff interviews, March 9-16, 1992.
77. Chinoy staff interview, March 9-16, 1992.
78. Testimony of Sakhia, S. Hrg. 102-350, Pt. 2, pp. 529-531.
79. Id.
80. Hakim Deposition, April 20, 1987, Vol 13, Iran/Contra Depositions, pp. 16-17.

81. Iran-Contra Affair, Appendix A: Volume 2, Source Documents S. Rept. No. 100-216, pp. 255-256.

82. Chinoy, staff interviews, March 9-16, 1992; Sakhia testimony, S. Hrg. 102-350, Pt. 2, pp. 530-531.

83. The New York Times, p. 56, September 3, 1975.

84. BCCI Holdings (Luxembourg), Statement of Shareholders, Giving Percentage of Shareholders, Deposits and Liabilities Including Contingent Liabilities of Each Shareholder, 1985-1987, Subcommittee document, Iran/Contra Appendix A, Volume 2, Source Documents, S. Rept. No. 100-216, p. 200.

85. See Associated Press, September 27, 1987.

86. S. Hrg. 102-350 Pt. 3 p. 618-628.

87. Staff interview, Chinoy, March 9-16, 1992.

88. Affidavit of John J. Loftus, Esq., September 12, 1991.

89. Staff interviews, Chinoy, March 9-16, 1992.

90. See generally October Surprise, Gary Sick, _____, New York (1991).

91. FBI teletype, October 8, 1980, New York to Director, Attn Criminal Investigative Division, Terrorism Section, re Cyrus Hashemi.

92. See e.g. testimony of Lance, S. Hrg. 102-350, Pt. 3, p. 43-44.

93. See e.g. Legal Times, July 31, 1989, "I'm Not Rappaport."

94. New York Times, Jeff Gerth, 3/28/85 p. 5

95. BCCI Consolidated loan book, March 3, 1991.

96. Bankrupt, the BCCI Fraud, Kohan and Whittington p. 220

97. BCCI consolidated loan report. March 3, 1991

98. Communications, firm of Nussbaum and Wald, legal representatives to BCCI liquidators, Touche Ross, June, 1992.

99. S. Hrg. 102-350 Pt. 3 pp. 592-593.

100. Testimony of Altman, S. Hrg. 102-350 Pt 3 p. 259.

101. Id. at 574.

# THE REGULATORS

REENTERED AS EXHIBIT 3

## Introduction

BCCI, which managed to penetrate every country it targeted, including the United States, was a bank which regulators always recognized as a risky institution. Having no lender of last resort and no consolidated auditor, BCCI presented a structure which to Western bank regulators was unsound, regardless of how BCCI happened to use the structure. From the beginning, regulators in the United Kingdom and the United States sought to discourage BCCI from entering their jurisdictions. Their hostility was not based on a cultural contempt for a Third World or Pakistani bank, as BCCI's chief, Agha Hasan Abedi, sometimes contended. Rather, it was based on the very structure of the bank, which was viewed, correctly, as having been deliberately created to avoid regulation.

As William Taylor, then staff director of the Federal Reserve's Division of Banking Supervision and Regulation testified in May, 1991:

I want to make it clear that BCCI, unlike virtually any other major international bank, was not subject to a comprehensive system of supervisory oversight by authorities in its home country. . . both the holding company for BCCI and one of its major banking subsidiaries are chartered in Luxembourg; but neither the holding company nor the subsidiary has conducted a banking business in that country. BCCI appears to manage most of its global business out of offices in London. The regulatory authorities in Luxembourg, therefore, did not provide consolidated supervision of the BCCI organization.[1]

Luxembourg was thus one of BCCI's homes, yet did not regulate it, because BCCI did not engage in banking business there. BCCI's other home, the Grand Caymans, did not regulate any bank licensed there. The Caymans lack of regulation was precisely the inducement for banks to charter themselves there.[2] BCCI's operational home, the United Kingdom, also did not regulate BCCI's activities: the UK regulator, the Bank of England, considered BCCI to be a foreign bank, based in Luxembourg and the Grand Caymans, and thus the responsibility of regulators in those countries.

This neat arrangement by BCCI, together with its division of its auditing functions between two auditors, one for "Luxembourg" and the other for "Grand Caymans," ensured that BCCI's activities could not be adequately monitored by anyone. As former Comptroller of the Currency John Heimann testified:

Early on in my government service, I learned one very important and fundamental lesson; namely, that those so inclined to manipulate banks for their own benefit find it easiest to do so if they operate between different supervisory regimes.

Many bank swindles have been built around this practice. For example, an individual owns a bank in New York State, another bank in Belgium, a third bank in Switzerland, and still another bank in Argentina. Each of these banks is regulated by a different Supervisor. . . For years, the same situation applied domestically. There were some who owned both state chartered and national chartered banks who moved assets between them to improve examination results. This practice was stopped during my term as Comptroller when all relevant agencies began to coordinate examinations.[3]

REENTERED AS EXHIBIT 3

Despite being chartered elsewhere, BCCI chose London as its operational home and headquarters, creating oversight problems that gave regulators headaches for years. The Bank of England indeed considered BCCI "the most difficult bank we have to deal with," as far back as the 1970's.[(4)] It repeatedly limited BCCI's ability to expand there and to gain full bank powers, even as the U.S. halted BCCI's attempts to purchase U.S. banks openly, leaving it with the legal ability only to enter the U.S. through establishing foreign branches which could not accept deposits from Americans.

Yet in the face of this regulatory hostility, BCCI ultimately succeeded in developing large banking operations in both the United States and the United Kingdom anyway, through its secret ownerships of U.S. banks and its accretion of licensed deposit taking status in the UK. While BCCI did not need to bribe central officials in the United States and the United Kingdom, as it did in many other countries, its success in flourishing in both countries for so long demonstrates obvious flaws in the regulatory process.

In the U.S., BCCI was able first to deceive the Federal Reserve, despite making numerous errors in the course of its takeover of Financial General Bankshares that provided obvious warnings of its intentions. It then was permitted to merge that bank, renamed First American, with National Bank of Georgia, which the Federal Reserve also knew to be associated with BCCI. It then was permitted to expand further into Florida, despite further warning signs to the Federal Reserve about the identity between BCCI's shareholders and those of First American. Even after it was indicted on drug money laundering charges, the Federal Reserve undertook only limited investigative efforts. The Federal Reserve's extensive current investigation of BCCI began after the Federal Reserve was notified by the New York District Attorney that BCCI had massive loans securing First American's stock which had never been disclosed to the Federal Reserve. As late as the spring of 1991, after the Federal Reserve understood that BCCI and many of First American's shareholders had lied to the regulators, and that BCCI itself was involved in massive fraud, the Federal Reserve still took no position as to whether BCCI should be closed globally, so long as the bank was shut down in the United States.

In the UK, the Bank of England took minimal steps to investigate the bank until it was notified by BCCI's auditors in early 1990 that BCCI had engaged in fraud. Even then, the Bank of England's approach to the problems posed by BCCI was not to close BCCI, but to find ways to keep BCCI alive and thus avoid embarrassing financial losses. In order to prevent BCCI from collapse, the Bank of England arranged with BCCI's auditors, with the government of Abu Dhabi, and with BCCI itself to keep secret what it had learned about BCCI. The Bank of England simultaneously committed itself to an agreement with Abu Dhabi whereby if Abu Dhabi would guarantee BCCI's losses, the Bank of England would lend its hand to helping BCCI survive, and with BCCI auditors that they would certify BCCI's books and accounts for another year, in return for Abu Dhabi's guarantee. The Bank of England even agreed to permit BCCI to restructure in the form of three banks, headquartered in three different jurisdictions -- precisely the structure already identified as the key to BCCI's previous success in evading regulation. Finally, as part of its agreements with Abu Dhabi, the Bank of England encouraged BCCI to move its headquarters and officers out of British jurisdiction to Abu Dhabi, along with its records, a move which later deprived investigators in the US, as well as the UK, with essential information about what BCCI had done.

REENTERED AS EXHIBIT 3

Together, these actions by the regulators highlight the lack of accountability that still exists internationally in dealing with financial institutions as they cross national borders. BCCI's homes in Luxembourg and the Grand Caymans were not responsible for keeping track of what BCCI was doing. Neither was the United Kingdom, where BCCI was actually headquartered. So far as the Federal Reserve was concerned, BCCI's activities in the U.S. were limited to small state-chartered branch offices over which it had no jurisdiction whatsoever. Yet even after each of these authorities knew that BCCI had losses amounting to billions of dollars, none of the regulators had a picture of BCCI's whole operations, none of the regulators considered BCCI to primarily their problem, and each of the regulators remained prepared to permit BCCI to continue to survive if its survival meant that the interests of their country were protected.

In the case of the Federal Reserve, this meant leaving it to the Bank of England to make judgments concerning whether BCCI would continue to exist or not, so long as BCCI withdrew entirely from the United States and the Abu Dhabi government continued to provide funds to help prop up the now shaky First American Bank.

In the case of the Bank of England, this meant planning to permit BCCI to reopen as three "independent" banks so long as Abu Dhabi was willing to put in the cash necessary to prevent the bank from collapsing. That judgment by the Bank of England only changed at the end of June, 1991 when two simultaneous factors converged -- the announcement by Price Waterhouse in its Section 41 report that it was impossible to tell how deep, or how far, BCCI's frauds might ultimately extend -- and the fact that BCCI might shortly be indicted by the New York District Attorney as an example of organized crime, an indictment that would cause the collapse of the bank in any case.

Thus, in the end, it was not the regulatory process itself that brought about the exposure and removal of BCCI from either the United States or the United Kingdom. In both cases, the ultimate regulatory action was prompted by the criminal investigation brought by a local district attorney, Manhattan prosecutor Robert Morgenthau. But for Morgenthau's investigation, the Federal Reserve may well never have learned from the Bank of England, Price Waterhouse, Abu Dhabi, or anyone else that reports prepared by BCCI's auditors showed massive loans against the shares of CCAH/First American, information that caused them to open the investigation that swiftly led to BCCI's closure in the United States. But for Morgenthau's investigation, the Bank of England might well have proceeded with BCCI's restructuring regardless of the new revelations about fraud, and simply hoped for the best.

**Findings: The U.S. Regulators**

** When the Federal Reserve approved the take over of Financial General Bankshares by CCAH in 1981, it had substantial circumstantial evidence before it to suggest that BCCI was behind the bank's purchase. The Federal Reserve chose not to act on that evidence because of the specific representations that were made to it by CCAH's shareholders and lawyers, that BCCI was neither financing nor directing the take over. These representations were untrue and the Federal Reserve would not have approved the CCAH application but for the false statements made to it.

REENTERED AS EXHIBIT 3

** In approving the CCAH application, the Federal Reserve relied upon representations from the Central Intelligence Agency, State Department, and other U.S. agencies that they had no objections to or concerns about the Middle Eastern shareholders who were purporting to purchase shares in the bank. The Federal Reserve also relied upon the reputation for integrity of BCCI's lawyers, especially that of former Secretary of Defense Clark Clifford and former Federal Reserve counsel Baldwin Tuttle. Assurances provided the Federal Reserve by the CIA and State Department, and by both attorneys, had a material impact on the Federal Reserve's willingness to approve the CCAH application despite its concerns about BCCI's possible involvement.

** In 1981, the Office of the Comptroller of the Currency had additional information, from reports concerning BCCI's role in the Bank of America and the National Bank of Georgia, concerning BCCI's possible use of nominee arrangements and alter egos to purchase banks on its behalf in the United States, which it failed to pass on to the Federal Reserve. This failure was inadvertent, not intentional.

** In approving the CCAH application, the Federal Reserve permitted BCCI and its attorneys to carve out a seeming loophole in the commitment that BCCI not be involved in financing or controlling CCAH's activities. This loophole permitted BCCI to act as an investment advisor and information conduit to CCAH's shareholders. The Federal Reserve's decision to accept this arrangement allowed BCCI and its attorneys and agents to use these permitted activities as a cover for the true nature of BCCI's ownership of CCAH and the First American Banks.

** After approving the CCAH application in 1981, the Federal Reserve received few indicators about BCCI's possible improper involvement in CCAH/First American. However, at several critical junctures, especially the purchase by First American of the National Bank of Georgia from Ghaith Pharaon in 1986, there were obvious warnings signs that could have been investigated and which were not, until late 1990.

** As a foreign bank whose branches were chartered by state banking authorities, BCCI largely escaped the Federal Reserve's scrutiny regarding its criminal activities in the United States unrelated to its interest in CCAH/First American. This gap in regulatory oversight has since been closed by the passage of the Foreign Bank Supervision Enhancement Act of 1991.

** The U.S. Treasury Department failed to provide the Federal Reserve with information it received concerning BCCI's ownership of First American in 1985 and 1986 from the CIA. However, IRS agents did provide important information to the Federal Reserve on this issue in early 1989, which the Federal Reserve failed adequately to investigate at the time.

** The FDIC approved Ghaith Pharaon's purchase of the Independence Bank in 1985 knowing him to be a shareholder of BCCI and knowing that he was placing a senior BCCI officer in charge of the bank, and failed to confer with the Federal Reserve or the OCC regarding their previous experiences with Pharaon and BCCI.

** Once the Federal Reserve commenced a formal investigation of BCCI and First American on January 3, 1991, its investigation of BCCI and First American was aggressive and diligent. Its decisions to force BCCI out of the United States and to divest itself of First American were prompt. The charges it brought against the parties involved with BCCI in violating federal

banking standards were fully justified by the record. Its investigations have over the past year contributed substantially to public understanding to date of what took place.

** Even after the Federal Reserve understood the nature and scope of BCCI's frauds, it did not seek to have BCCI closed globally. This position was in some measure the consequence of the Federal Reserve's need to secure the cooperation of BCCI's majority shareholders, the government and royal family of Abu Dhabi, in providing some $190 million to prop up First American Bank and prevent an embarrassing collapse. However, Federal Reserve investigators did actively work in the spring of 1991 to have BCCI's top management removed, including the then head of BCCI, Zafar Iqbal, who had close ties to the Abu Dhabi shareholders.

** In investigating BCCI, the Federal Reserve's efforts were hampered by examples of lack of cooperation by foreign governments, including most significantly the Serious Fraud Office in the United Kingdom and, since the closure of BCCI on July 5, 1991, the government of Abu Dhabi.

** The Federal Reserve has fully cooperated with the Subcommittee in its investigative efforts, providing essential information, documentation, and assistance in obtaining access to witnesses. This cooperation was unique among federal agencies, and materially assisted the Subcommittee's work.

** U.S. regulatory handling of the U.S. banks secretly owned by BCCI was hampered by lack of coordination among the regulators, which included the Federal Reserve, the FDIC, and the OCC, highlighting the need for further integration of these separate banking regulatory agencies on supervision and enforcement.

**Findings: The Bank of England**

** The Bank of England had deep concerns about BCCI from the late 1970s on, and undertook several steps to slow BCCI's expansion in the United Kingdom.

** In 1988 and 1989, the Bank of England learned of BCCI's involvement in the financing of terrorism and in drug money laundering, and undertook additional, but limited supervision of BCCI in response to receiving this information.

** In the spring of 1990, Price Waterhouse advised the Bank of England that there were substantial loan losses at BCCI, numerous poor banking practices, and evidence of fraud, which together had created a massive hole in BCCI's books. The Bank of England's response to the information was not to close BCCI down, but to find ways to prop up BCCI and prevent its collapse. This meant, among other things, keeping secret the very serious nature of BCCI's problems from its creditors and one million depositors.

** In April, 1990, the Bank of England reached an agreement with BCCI, Abu Dhabi, and Price Waterhouse to keep BCCI from collapsing. Under the agreement, Abu Dhabi agreed to guarantee BCCI's losses and Price Waterhouse agreed to certify BCCI's books. As a consequence, innocent depositors and creditors who did business with BCCI following that date were deceived into believing that BCCI's financial problems were not as serious as each of these parties already knew them to be.

REENTERED AS EXHIBIT 3

** From April, 1990, the Bank of England relied on British bank secrecy and confidentiality laws to reduce the risk of BCCI's collapse if word of its improprieties leaked out. As a consequence, innocent depositors and creditors who did business with BCCI following that date were denied vital information, in the possession of the regulators, auditors, officers, and shareholders of BCCI, that could have protected them against their losses.

** In order to prevent risk to its restructuring plan for BCCI and a possible run on BCCI, the Bank of England withheld important information from the Federal Reserve in the spring of 1990 about the size and scope of BCCI's lending on CCAH/First American shares, despite the Federal Reserve's requests for such information. This action by the Bank of England delayed the opening of a full investigation by the Federal Reserve for approximately eight months.

** Despite its knowledge of some of BCCI's past frauds, and its own understanding that consolidation into a single entity is essential for regulating a bank, in late 1990 and early 1991 the Bank of England tentatively agreed with BCCI and its Abu Dhabi owners to permit BCCI to restructure as three "separate" institutions, based in London, Abu Dhabi and Hong Kong. This tentative decision demonstrated extraordinarily poor judgment on the part of the Bank of England. This decision was reversed abruptly when the Bank of England suddenly decided to close BCCI instead in late June, 1991.

** The decision by the Bank of England in April 1990 to permit BCCI to move its headquarters, officers, and records out of British jurisdiction to Abu Dhabi has had profound negative consequences for investigations of BCCI around the world. As a result of this decision, essential records and witnesses regarding what took place were removed from the control of the British government, and placed under the control of the government of Abu Dhabi, which has to date withheld them from criminal investigators in the U.S. and U.K. This decision constituted a costly, and likely irretrievable, error on the part of the Bank of England.

### The U.S. Regulators

### The OCC and John Heimann

The Federal Reserve, rather than the Office of the Comptroller of the Currency was the primary decision maker as to whether to permit the Middle Eastern group which fronted for BCCI to take over Financial General Bankshares. However, due to several accidents of history, the OCC did have more information concerning the threat posed by BCCI to the U.S. banking system, and BCCI's actual intentions. Moreover, the OCC was the primary decision maker in approving whether to permit Ghaith Pharaon, another BCCI front-man, to take over the National Bank of Georgia from Bert Lance in precisely the same period.

Despite having very serious reservations about BCCI, and fears that BCCI might secretly be trying to enter the U.S., the OCC ultimately decided in both cases to accept assurances that its fears were unjustified. The reasons for OCC's decisions in both cases are not entirely clear, but appear to have been related in the case of the National Bank of Georgia, to having no viable alternative to the Pharaon purchase, and in the case of Financial General Bankshares, to extract tough concessions from the shareholders as to the condition that BCCI was not involved, and then leave responsibility for the ultimate decision on the CCAH application to the Federal Reserve.

The main historical accident that placed OCC in this position was the coincidence of John Heimann, the Comptroller of the Currency, having previously been the chief banking regulator for the State of New York at a time when BCCI was trying to enter the New York market through nominees.

As detailed in the chapter on BCCI's early activities in the United States, Heimann had found that a young Pakistani with few personal financial resources had applied to take over a New York bank, with BCCI behind him. On investigating BCCI, Heimann determined that BCCI had no central regulator, divided its operations between two auditors, and had no consolidated financial report, and therefore that its true financial picture could not be determined. Heimann stopped the application from proceeding, BCCI tried to enter New York again through targeting a second bank through a second nominee, and ultimately, Agha Hasan Abedi himself had met with Heimann in an unsuccessful effort to convince him that BCCI was a good bank.

Soon thereafter, Jimmy Carter became President, and Heimann became Comptroller of the Currency, where he wound being the principal person in the Carter Administration who determined that Bert Lance's banking practices were serious enough to warrant criminal investigation, and to require that Lance not remain as director of the Office of Management and Budget.

In early 1978, when Lance sold his shares in the National Bank of Georgia to Ghaith Pharaon, Heimann was in a quandary. A man who in his judgment was among the least trustworthy bankers in the United States was selling his bank to a man who, if history was repeating itself, might be a nominee for the least trustworthy bank in the world.

Heimann began probing the situation to determine whether BCCI was behind Pharaon. As a memorandum he wrote to his files on January 4, 1978 stated::

Tomorrow, January 5th, the sale of Lance's stock to Pharaon will be completed at 2 pm. . . Guyton [President of NBG since Lance's departure for OMB] noted he was somewhat disturbed about the role played by the Pakistanis in this transaction. Not that he knew anything negative about them but their role at present or in the future, seemed to be ill defined and caused him some concern. He believes that Lance is presently on the BCCI payroll working with Addabi [sic] and Sami. As a matter of fact, Lance went to London last week and will be back today. The purpose of that trip, presumably, was to discuss further expansion of BCCI in the U.S.[5]

In the conclusion of the memo, Heimann noted that Pharaon and BCCI apparently had plans for acquiring additional U.S. banks. This fact gave Heimann additional cause for concern given his opposition to BCCI's entry into the U.S. in New York two years previously. Within two weeks, OCC learned that Lance was not merely on BCCI's payroll, but receiving "a tremendous salary," an airplane, office space, and secretarial assistance from BCCI. NBG president Guyton told the OCC that BCCI intended to invest for its own account as well as for other investors in the U.S., and Lance was to be its business agent.[6] Soon thereafter, Heimann learned of Lance's involvement in the FGB takeover, and ordered his staff to determine whether Pharaon was a front for BCCI. As detailed in the chapter on BCCI's activities in the U.S., OCC staff met with Pharaon, who assured them that BCCI was merely

REENTERED AS EXHIBIT 3

an advisor to the purchase. The staff were not sure whether to believe Pharaon, and feared that he might be merely an "alter ego" for BCCI in the U.S.[7]

But Heimann was faced with a difficult choice. Pharaon had agreed that Lance would have no further involvement with National Bank of Georgia if his application to buy it were approved. Shortly, the OCC would be filing suit against Lance, charging him with fraud, which Lance would settle through a consent decree. If the National Bank of Georgia were not severed from Lance, it could be taken down with him.

Given OCC's concerns about Lance, there was an obvious tension between trying to protect the National Bank of Georgia from Lance's practices by letting a sale to Pharaon go forward, and with trying to protect the National Bank of Georgia by stopping the sale because of concerns about BCCI. The likely consequence of the latter course of action, however, would be that no one would buy NBG at all and it would be left in Lance's hands. The OCC knew in private what was not known by the public, although it was whispered in banking circles -- that NBG was in financial trouble, and had inadequate capital. Pharaon's tender offer for the shares of the bank would expire on June 20, 1978. If the OCC took any action to delay or prevent that acquisition, NBG might never recover.[8] The OCC gave Pharaon permission to move forward and he concluded his tender offer to purchase a 60 percent interest in NBG on May 30, 1978. OCC thus took the conservative approach of accepting Pharaon's dubious account about his relationship to BCCI, and permitting Pharaon to "rescue" the bank, rather than challenging Pharaon's purchase and placing the bank at immediate risk.

OCC's decision about NBG was unfortunate. As later bank examination documents demonstrate, NBG remained what OCC termed a "problem" bank for years following its sale to Pharaon, with a substantial number of Lance-related substandard and non-performing loans remaining in its portfolio. A decade later, after its purchase by First American at the behest of BCCI, NBG -- renamed First American Georgia -- remained in "unsatisfactory" condition according to OCC examiners, with serious problems of asset quality, earnings, loan losses, and monitoring system.

Another unfortunate aspect of OCC's decision is that OCC never advised the Federal Reserve of the tentative judgement of its staff that BCCI might be using Pharaon as a nominee at NBG. The OCC had also encountered this practice of BCCI's in a completely different setting at precisely the time it was considering the Pharaon-NBG matter. An OCC auditor based in London, Joseph Vaez, had determined that BCCI, which was still partly owned by Bank of America, had been making use of nominees in purchases of other banks.[9] This information was developed by the OCC's foreign examination division, and did not apparently reach the OCC examiners dealing with NBG.

Thus, while the OCC did ultimately require that BCCI not be involved in owning, lending, controlling, or managing Financial General Bankshares as a condition of signing off on the CCAH application, as an institution, the OCC had been in a position to do much more, and to insist upon further investigations. Instead, it made its concerns known to the Federal Reserve, and left it to the Federal Reserve to reach the ultimate judgments about the wisdom of the CCAH acquisition, and to insure that CCAH and its shareholders lived up to the commitments obtained from them by the OCC.

REENTERED AS EXHIBIT 3

In buying National Bank of Georgia through its nominee, Pharaon, BCCI had succeeded in overcoming the regulators to acquire its first bank in the United States. This lesson would have been especially powerful to Abedi. During this very time, he was in the very midst of high publicized actions in Washington involving many of the same players and where allegations were again being raised about BCCI's possible use of front-men. It was a lesson that with persistence, BCCI would also be able to succeed in deceiving the regulators in its attempt to take over FGB.

**The Federal Reserve**

Like OCC, the Federal Reserve was not blind to the issues involved in the CCAH application to take over FGB. BCCI's role was the key question throughout the highly-contested litigation during the take over and application process for FGB, and the Federal Reserve sought assurances that BCCI was not an owner, lender, controller, or manager of CCAH, on many occasions, and from many sources.

For example, as early as April, 1978, the Federal Reserve was asking detailed questions of Clark Clifford and Robert Altman as attorneys for Lance and the "individuals" in the BCCI group, inquiring whether ICIC, BCCI's Grand Caymans affiliate, was acting as a vehicle for the acquisition of FGB, receiving in reply a statement from BCCI lawyer Robert Altman that BCCI was acting as the commercial banker and financial advisor for the Middle Eastern investors, and that while BCCI had been used to move funds for the investors into the U.S., it had not financed any of the FGB purchases.[10]

Thus, by mid-1978, BCCI had developed a theory of its involvement with the Middle Eastern investors in FGB designed to reconcile its central role in the original takeover with the various securities and banking laws which prohibited it having an actual direct interest in taking over FGB. The theory, a clever cover story for the truth, was that BCCI was a financial advisor to the actual parties at interest, and never a principal itself in their purchases of FGB stock. From May 9, 1978 onward, Clark Clifford and Robert Altman, as attorneys for Lance, BCCI, and the BCCI-related shareholders, would articulate the position that BCCI at no time acted inconsistently with this role. It was a theory that was easy to abuse, as it would be very difficult for anyone, including the Federal Reserve, to distinguish between BCCI's actions as a financial advisor for legitimate shareholders, and the truth, which was that BCCI owned FGB, and the shareholders were nominees.

Nevertheless, the Federal Reserve continued to question whether BCCI actually had a hidden interest in CCAH, receiving further assurances. On March 12, 1981, the OCC finally signed off on the CCAH takeover based on the understanding that BCCI would have no involvement with the management of the bank or the holding companies or with the financing of the acquisition. And on April 23, 1981, the Federal Reserve convened a hearing on the application, focusing again on the issue of BCCI's role in CCAH, receiving still further assurances. A detailed account of the regulators' concerns, and the assurances provided by the CCAH shareholders, Clifford, Altman and others, are specified in detail in the chapter on BCCI's early activities in the U.S.

Based on the assurances, the Federal Reserve, despite its obvious suspicions, approved the CCAH application on August 25, 1981, and the acquisition was completed the following April,

following delays involving state authorities.

In approving the CCAH application, the Federal Reserve explicitly accepted "the entire record" of statements made to it by the Middle Eastern investors, BCCI, and their attorneys. These included certain statements made in the April 23, 1981 hearing and in the applications which constituted practical, if not necessarily legal, loop-holes regarding BCCI's ability to be involved with FGB in the future, and contrary to the understandings which the OCC had said were critical for its approval of BCCI's application.

These statements made by the CCAH shareholders, Clifford and Altman, suggested that if BCCI loaned funds to the shareholders after the original acquisition in connection with CCAH, such loans would not be precluded. Together with the Federal Reserve's acceptance of the concept that BCCI could act as a liaison between FGB and the shareholders in its capacity as "investment advisor," the ability of BCCI to "lend" to its shareholders following the initial acquisition created a mechanism by which BCCI could at any time "call" its interest in CCAH shares, in collusion with its nominees. It would do this by "lending" funds, secured by those shares, on which the nominees defaulted, leaving BCCI in possession of the shares. In the decade to come, this device was used by BCCI repeatedly to deceive the regulators, in some cases with the apparent knowledge of some of BCCI's attorneys and agents in the U.S.

### Assessment of Federal Reserve Decisions On FGB/CCAH

A review of the entire record shows the Federal Reserve to have diligently sought to learn the truth about the nature and extent of BCCI's involvement in the CCAH acquisition of FGB. The Federal Reserve queried relevant federal agencies, such as the CIA and Statement, and learned nothing negative about the proposed shareholders. It asked detailed questions of the shareholders themselves and of its attorneys, and received repeated assurances. Its investigative efforts were persistent and significant, and it is hard even in retrospect to understand much else the Federal Reserve might have done to prove that BCCI in fact was using nominees to buy FGB without looking beyond the transaction to larger issues about BCCI. None of the documents that would show the nominee relationships were available to anyone not part of the conspiracy of deception; any loans made by BCCI in connection with the purchase were hidden abroad, or among its affiliates. Ultimate proof that these wealthy Middle Easterners were lying to the Federal Reserve would have been essentially impossible to obtain.

On the other hand, the Federal Reserve did have before it very substantial circumstantial evidence that the applicants, their attorneys, and BCCI were not telling it the full truth. There were some obvious leads available to the Federal Reserve which it did not follow up. And if the Federal Reserve had decided that BCCI might well be a secret party to the deal, and broadened its investigation to look at BCCI's overall goals and typical procedures, it might well have been able to discover enough about what was actually going on to justify rejecting the application.

To begin with, it was patently obvious that the original four Middle Eastern shareholders working with Lance and BCCI to take over FGB in early 1978 had been acting jointly, and the SEC had specifically made this finding, which was admitted by the shareholders, Lance and BCCI in a consent decree. Yet Kamal Adham, Faisal al Fulaij and the other shareholders had

taken great pains to testify to the Federal Reserve that not only did they not act together in the original takeover, they did not even know one another. The implausible -- and wildly contradictory -- accounts given the Federal Reserve by these shareholders concerning how they came to invest in FGB should have been sufficient, in and of themselves, to have justified disapproval.

In addition, Lance's sale of the National Bank of Georgia at precisely the same time to another person associated with BCCI, Ghaith Pharaon, at an inflated price, was further evidence to any reasonable skeptical mind that BCCI might well be behind both transactions. This should have been especially obvious given the many public accounts of BCCI having bailed Lance out of his financial problems with millions of dollars in loans and payments. Moreover, Heimann at OCC had already seen BCCI use nominees, and an OCC bank examiner had made reference to BCCI's use of nominees in a 1978 memorandum on BCCI and the Bank of America. The possible relationship between the NBG purchase by Pharaon from Lance to the FGB purchase by the Middle Eastern investors with Lance, with BCCI involved as the "investment advisor" in both cases, was never explored by the Federal Reserve. Basic questions concerning that relationship would likely have raised very disturbing questions about what was actually taking place. However, in part because the National Bank of Georgia purchase was regulated by the OCC rather than the Federal Reserve, the Federal Reserve never put the two transactions together, and thus missed a very significant opportunity to find out the truth.

Finally, because BCCI was not an official party to the transaction, the Federal Reserve never considered the possibility of investigating BCCI itself. When it asked the CIA and State Department about the CCAH shareholders, it neglected to ask the agencies what they knew about BCCI. Because it did not view BCCI to be party to the transaction, it did not look at BCCI's other efforts to enter the United States, which would have alerted the Federal Reserve to BCCI's practice of using nominees. Instead, the Federal Reserve looked solely to the parties before it, unable to move past the formal statements in the application to understand what was actually taking place behind it.

Other factors were also at work. BCCI's use of Clark Clifford and Baldwin Tuttle clearly had an impact on the Federal Reserve's willingness to challenge the statements being made to it by the CCAH shareholders. Clifford's prestige was enormous, and his reputation for integrity impeccable. During the April 23, 1981 hearing before the Federal Reserve, he gave the Federal Reserve his word that BCCI was not involved in language that has since often been quoted:

None. There is no function of any kind on the part of BCCI. I think when the question was asked, having to do with what might occur in the future, I think somehow may have given the answer, "well, that would depend upon the judgment of Financial General in the future." I know of no present relationship. I know of no planned future relationship that exists, and other than, I don't know what else there is to say.[11]

Clifford's additional suggestion in the hearing that rejection of the application by the Federal Reserve would be a sign of bigotry and intolerance on the part of the regulators was also an effective means of discouraging regulators from being overly skeptical of the Middle Eastern investors, despite their inherently implausible stories about their investment in FGB.

The fact that Baldwin Tuttle, a former Federal Reserve counsel, was acting as the regulatory lawyer for the group would also have had a significant sobering effect on any Federal Reserve attorney who might otherwise advocate further investigation, or rejection of the application. To deny the application on the ground that one did not believe the assurances given by clients of a former colleague, with the high professional standards of the Federal Reserve itself, would have been a difficult, and painful, judgment.

For all of these reasons, the Federal Reserve in essence gave the CCAH shareholders the benefit of the doubt, and BCCI was given its first significant foothold in the United States.

A second error by the Federal Reserve, which would come back to haunt the regulators later, was its undefined acceptance of the concept that BCCI could be the investment advisor and conduit for the CCAH shareholders. These concepts were to become almost infinitely expandable by BCCI, and to complicate substantially later investigations and prosecutions, although it is now evident the concept was intended by BCCI, its front-men and attorneys as a cover story from the start.

Compounding this error was a third mistake by the Federal Reserve. While initial statements to regulators by the CCAH shareholders had made broad statements about BCCI's non-involvement, by the time of its approval, suggesting that BCCI was free to lend money to FGB shareholders, and to engage in other actions regarding FGB in the future, as implied by the Clifford statement, "what might occur in the future, I think. . . well, that would depend upon the judgment of Financial General."[12] The notion that whatever obligations everyone had been under at the time of the takeover would end the moment that the Federal Reserve approved the CCAH application threatened to undermine the assurances that the regulators had so patiently sought over the previous three years. Yet nowhere on the record is there a clear statement by the Federal Reserve prior to the approval of the CCAH application, that the transactions prohibited in the past would also be prohibited in the future -- as was clearly understood and required by the OCC.

In short, the Federal Reserve was neither sufficiently skeptical, tough, or imaginative to combat the cleverness of those who conspired to deceive it. Justifiably suspicious of the presentation that had been made to them by the Middle Eastern investors, the regulators ultimately lacked the bureaucratic will to refuse them permission to buy the bank they had targeted. The result was that BCCI was able to get away, for a decade, with secretly owning what became with BCCI's money the biggest bank in the nation's capital.

**1982-1989: Sleeping Regulators**

As far as the Federal Reserve was concerned, once it had approved CCAH's application to buy FGB, its role was, for the time being, finished. As Federal Reserve council Virgil Mattingly testified in May, 1991 it was the Federal Reserve's view that:

In the years immediately following the acquisition, there was no evidence to suggest that CCAH and First American were functioning other than in accordance with the statements made to the Board and the other regulators . . . Both federal and state examinations of First American and its subsidiary banks and of the U.S. offices of BCCI detected no irregularities in their dealings with each other, which were reported as limited.[13]

As Mattingly testified, nothing unusual was noticed by the Federal Reserve until BCCI was indicted for drug money laundering in Tampa in October, 1988.[14]

**Non-Regulation of BCCI Branches**

While completing its secret purchase of First American, BCCI itself had opened branch offices, licensed by and primarily regulated by the states in which they were located, in San Francisco, Los Angeles, Miami, Tampa, and Boca Raton, with additional representative offices in Washington DC and Houston. As none of these offices could accept domestic deposits, U.S. regulatory interest in them was slight, and they operated with almost no supervision prior to the Tampa indictment. During that time, these branches worked quietly to take in funds from foreigners who wished to place funds in the U.S., engaging in commercial banking transactions, service the needs of foreign embassies, commercial entities, and central banks, and becoming the home away from home for flight capital from the Third World, for tax evaders, and for those engaged in arms trafficking, commodities fraud, and money laundering.

Regulators were remarkably innocent of all of this activity, which was clearly rampant at BCCI's U.S. offices, and visible in its documents, as later reviewed by Subcommittee staff. Because of BCCI's status as a foreign branch, licensed by states, checks by federal regulators were infrequent and limited. It was not until 1987 that the Federal Reserve first identified money laundering at BCCI, in its Miami office, triggering a criminal referral to the IRS, the FBI, and the U.S. Attorney in Miami.

Even then, the Federal Reserve did not consider BCCI's wrongdoing sufficiently worrisome to require a broader look at what BCCI was doing in the United States, making no attempt to coordinate an examination for money laundering in all of BCCI's offices. Such a coordinated examination took place for the first time only in October and November, 1988 -- after the Tampa sting had shown BCCI to be laundering money from drug countries like Colombia and Panama through the United States to Europe and back on a systematic, institutional basis. When it was finally undertaken, it revealed that BCCI had also been laundering money out of its New York and Boca Raton branches, that the BCCI branches' internal controls and lending practices were poor, and that remedial action was required.[15]

Remarkably, even then, after BCCI had been indicted for having a corporate policy of soliciting the proceeds of cocaine trafficking, and multiple branches of BCCI had been found by regulators to have engaged in money laundering, the Federal Reserve took no action to force BCCI to leave the United States. Its attitude was that this would be a decision for the states which licensed BCCI's local branches. All that the Federal Reserve insisted upon was that the past violations be cleaned up, and that BCCI agree to a anti-money laundering compliance program as a condition of continuing to do business, a deal that BCCI was glad to accept.[16] Under the circumstances, this was a remarkably tolerant attitude on the part of the Federal Reserve. That attitude persisted even after BCCI pled guilty to the drug money laundering charges in January 1990. At that time, the Federal Reserve advised the chairman of the Subcommittee that it lacked the power to simply order the closure of a state-chartered foreign bank for laundering drug money, prompting Senator Kerry to propose legislation -- currently pending before the full Senate -- explicitly mandating the closure of any bank convicted of such a charge.

## Irregularities At First American

Even at First American, although the bank examiners had failed to detect irregularities, they had certainly already occurred, as later investigations were to show.

For example, almost immediately following the acquisition, BCCI directed First American to re-establish banks in New York City, after New York regulators had prevented the New York branches of FGB from being purchased by the CCAH group along with the rest of FGB. The space leased by First American, at BCCI's direction, was far in excess of its needs and imprudent. At the same time, BCCI directed the hiring of employees for First American, and placed on First American's payroll two key officers to staff international operations out of New York. Soon thereafter, BCCI officials began to engage in joint marketing operations with First American officials, and to steer flight capital from Latin American, including Colombia and Panama, to First American.[17]

Moreover, despite the Federal Reserve's contention that nothing unusual took place, in fact, First American's purchase of the National Bank of Georgia in 1986 from "Ghaith Pharaon" should have raised substantial concerns if the regulators had been paying any attention whatsoever. After all, the Federal Reserve knew National Bank of Georgia was officially owned by Ghaith Pharaon, whose "financial advisor" was BCCI, while at the same time, First American was officially owned by other Middle Eastern investors whose "financial advisor," once again, was BCCI. Moreover, Clifford and Altman, chairman and president of First American, and lawyers for BCCI, had previously been the lawyers for Bert Lance in the sale of National Bank of Georgia to Pharaon, at the very time they were also helping Lance, BCCI, and the Middle Eastern investors in their original take over attempt of FGB. These facts surely should have caused the Federal Reserve to undertake a serious investigation in 1986. Not only did this not happen, but in the Federal Reserve's public testimony in May 1991, there was no recognition by Mattingly that such an investigation **should** have happened.

## Federal Reserve Actions After Tampa Indictment

Within weeks after the Tampa indictment, IRS agents working on the case against BCCI advised the Federal Reserve that it had information that BCCI owned First American. As Federal Reserve counsel Mattingly testified:

On December 27, 1988, an IRS agent working with the Justice Department authorities in Florida contacted by telephone one of the Federal Reserve staff personnel and asked for access to the transcripts to the hearing and so forth and so on. . . . . we were told the staff member was told that [the] BCCI employee indicated that BCCI owned First American Banks. That was basically when we were advised. And again, that kind of allegation we had heard before.[18]

Two days later, a reporter for a Florida newspaper contacted Federal Reserve official Lloyd Bostian in Richmond looking for information concerning the ownership of First American. The reporter advised Bostian that an affidavit filed by an undercover FBI agent stated that a BCCI official said BCCI had not bought U.S. banks directly, but BCCI did control the National Bank of Georgia and other banks through individuals.[19]

REENTERED AS EXHIBIT 3

In response to this disturbing information, the Federal Reserve undertook the first significant review of the BCCI-First American relationship that had occurred since its approval of the CCAH application seven and a half years earlier. As Mattingly characterized the review:

We went into the bank [First American] and one of the things that the Reserve bank did was contact each of the First American banks and ask them, what are your dealings, what kind of relations do you have with BCCI. We got back responses from the presidents of each of these banks. Basically, most of them said there were no affiliations whatsoever. . . . We also went into the bank, the First American banks, and contacted and talked to the senior management of the company, including its lawyers, reviewed with them the commitments, and were assured that everything, that any relationships between BCCI and First American were as they had been portrayed in the application. There was no controlling influence. We were subsequently told there are no loans to fund the acquisition by the investors of the CCAH stock.[20]

However, the Federal Reserve did find a number of facts during the review which should have been sufficient to cause the Federal Reserve to open an investigation.

Its examiners found "multiple" First American Accounts at BCCI (there were in fact 40 in all), and a very significant correspondent bank relationship between BCCI and First American, and that the common ownership of CCAH and BCCI had increased.[21]

In addition, its officials had been directly provided with additional information concerning the nature of the BCCI-First American relationship from the IRS itself.

On February 1, 1989, the IRS agent who originally had contacted the Federal Reserve, David Burris, came to Washington with a supervisor and met with William Ryback, a senior Federal Reserve international bank supervisor. The two IRS agents provided Ryback with a briefing of the evidence they had obtained concerning the links between BCCI and First American. According to the IRS agents, they offered to provide Ryback with witnesses who would describe how BCCI owned First American. According to the IRS agents, Ryback declined their offer, and instead suggested that he need documents in order to take further action. However, by Ryback's account, no offer of witnesses was mentioned by the IRS agents in the course of their debriefing.[22]

Regardless of the contradictions between the IRS account and Ryback's concerning what was said in their February 1 meeting, by that date the Federal Reserve had ample information sufficient to justify the opening of an investigation. Yet instead it concluded on February 8, 1989 -- just one week after the Ryback-Burris meeting -- that there were no evidence of irregular contacts between First American and BCCI or of the failure by CCAH to adhere to its commitments.[23] The judgment, needless to say, was flawed. Eight days later, the Federal Reserve approved the acquisition by CCAH/First American of yet another bank -- the Bank of Escambia, of Pensacola, Florida.

Regardless of whether it was the fault of the Federal Reserve or that of federal law enforcement, nothing was done by the regulators with the information that federal law enforcement had developed concerning BCCI's secret ownership of First American. Nowhere is this more evident than in the treatment of a critical tape, made by federal agents on

REENTERED AS EXHIBIT 3

September 9, 1988, during which BCCI officer Amjad Awan had told undercover Customs agent Robert Mazur about BCCI's secret ownership of First American, and his perception of Clark Clifford and Robert Altman's role in a coverup. The tape contained a road map for regulators as to how the FGB transaction was structured, through nominees. But the Federal Reserve never obtained it until December, 1990 -- nearly two years after Burris had first contacted the Federal Reserve -- and some six months after it had already been introduced at trial and become a public document.

The Federal Reserve's lack of diligence in pressing for the information possessed by federal law enforcement was matched by the failure of federal law enforcement, apart from the IRS agents, to provide the Federal Reserve with the information it had. For example, at no time did the Tampa U.S. Attorney's office advise the Federal Reserve that in addition to the original information it had received, the Subcommittee had provided it with further sources concerning the alleged relationship. Similarly, in May, 1989, the information the CIA had previously developed concerning BCCI's secret ownership of First American was provided anew to selected federal agencies, including the State Department, Treasury Department, Commerce Department, National Security Council, Office of the Comptroller of the Currency, and Federal Bureau of Investigation, and yet no one had bothered to notify the Federal Reserve.[24]

On August 21, 1989, in the midst of the Federal Reserve's review of BCCI's compliance with its anti-money laundering consent decree with the Federal Reserve, the Federal Reserve did hear from a local law enforcement agency concerning information that BCCI owned First American. A representative of the New York District Attorney told a Federal Reserve investigator that an informant had reported that BCCI owns or controls First American through nominees. However, the Federal Reserve took no immediate action in response, except to not that it head heard this allegation before.[25]

Thus, from early February on, the Federal Reserve did little if anything further to investigate the BCCI-First American relationship until the end of 1989. At that time, it learned -- informally -- from a Bank of England official that some of First American's shareholders had outstanding loans from BCCI, possibly secured by their stock in CCAH/First American. In response to this new information, the Federal Reserve in December, 1989 wrote Robert Altman, as CCAH's counsel, to again ask whether there were any loans by BCCI or its affiliates to any of CCAH's past or present shareholders, regardless of the purpose of the loan. [26] The questions asked of Altman by Ryback showed that the Federal Reserve was, whatever the failings of its investigations to date, fully focused on the central issue:

In connection with the application of Credit and Commerce American Holdings N.V. [CCAH] . . . a question was raised . . . whether any of the financing of the equity investment would be provided directly or indirectly by Bank of Credit and Commerce International S.A. (BCCI). It was indicated at the time that the individual investors had substantial funds and only a modest portion of the total investments would be financed. Further, any personal borrowing by the investors would come from financial institutions unaffiliated with BCCI.

It has come to our attention that at least some of the investors may have borrowed from BCCI. It may be that these borrowings were unconnected with the Financial General Bankshares transaction, but nevertheless were granted close to the time the acquisition was made. Some, if

REENTERED AS EXHIBIT 3

not all, of the borrowings may be secured by the stock of Financial General Bankshares. In order to clarify the situation it would be helpful if you would provide information on any loans extended to the original or subsequent investors, either directly or indirectly, by BCCI or any other affiliated organizations. This information should include all loans extended to the investors regardless of purpose, whether any of these loans are secured and if so, in what manner, and the date any loans were originally granted. It would also be useful to provide information on the repayment history of any such loans.[27]

True and honest answers to the questions asked by Ryback would have, of course, brought to an immediate end BCCI's secret ownership of First American, and commenced the kind of investigations which in fact began only one year later. Instead, Altman advised Ryback by telephone that he did not know the answers to Ryback's questions and had therefore contacted BCCI and CCAH's shareholders to ask them what they knew. Altman enclosed a letter from Naqvi and BCCI -- which according to later Federal Reserve charges Altman himself had drafted -- contending that the information requested was confidential and could not be released without the permission of the shareholders, which to date had not been granted. The Naqvi letter once again gave assurances that BCCI had not financed the original FGB acquisition, and through artful wording, sought to leave the impression, without so stating, that CCAH shares had been pledged against BCCI lending.[28] The Altman letter concluded by recharacterizing Ryback's broad, and detailed, request, in terms that would if accepted by the Federal Reserve, relieve Altman from the obligation of disclosing his own and Clark Clifford's prior loans from BCCI:

I shall, of course, press ahead with my request for the detailed information you wish to review, with my understanding that you primary interest is the current state of borrowings from BCCI by any of the First American investors, including any stock that may have ben pledge as collateral for loans.[29]

These artful dodges did not relieve the Federal Reserve's mounting anxieties that it might have been duped by BCCI. The Federal Reserve accordingly reached out again to the Justice Department and federal law enforcement.

On February 7, 1990, the Federal Reserve sent investigators to Tampa to meet with federal prosecutors, who were at the time in the midst of the trial of five BCCI officers who had been indicted in the Tampa case. The prosecutors said that while rumors of the BCCI-CCAH relationship abounded, they had investigated them and found no evidence to substantiate them. [30] This position was then confirmed by IRS agents, including Burris. The agents told the Federal Reserve that they wrote a report to the grand jury setting out the facts, which they would be glad to provide to the Federal Reserve, and that they had an informant who could also provide further information on the issue. Following the meeting, the Federal Reserve investigator was told by a Tampa prosecutor that the report contained no relevant information, and therefore would not be provided. The Federal Reserve persisted in requesting the report, and the Tampa prosecutor, for reasons not explained, continued to refuse to cooperate by providing it. In the meantime, the investigator tried repeatedly to talk to the informant, and was told by the informant's wife that the informant was out of the country.[31]

Thus, when the Federal Reserve finally went to federal law enforcement in search of information, the information it was given was either of little help, or actually incorrect. Instead of cooperating with the Federal Reserve, the Tampa prosecutor actually refused to provide requested information.

The Federal Reserve also reached out, with equal lack of success, to the Bank of England. It asked the Bank of England to provide it with more information about the nature of BCCI's lending to CCAH shareholders. In return, the Bank of England advised the Federal Reserve "that it had encountered difficulties in obtaining the necessary information but would continue its investigation."[32]

The previous December, the Bank of England had provided the Federal Reserve with an important warning about BCCI's lending to First American. But since then, the Bank of England itself had been drawn into BCCI's troubles as a result of Price Waterhouse advising it of the massive losses at BCCI and Price Waterhouse's own unwillingness to sign off on further audits of the bank. Thus, the Bank of England was now struggling with the problem of how to prevent BCCI from collapsing entirely, how to work out agreements with Abu Dhabi to guarantee BCCI's losses, and how to keep knowledge of the depth of BCCI's troubles from becoming public. By the spring of 1990, its own perceived vital interests were at stake. Accordingly, the Bank of England chose to be less than completely candid with the Federal Reserve about what it knew. If it had told the Federal Reserve that BCCI had $850 million in lending secured by CCAH's shares, the result would have been the instantaneous action that the Federal Reserve ultimately took the following January, just weeks after it finally saw the Price Waterhouse audits that the Bank of England withheld from it earlier in the year.

Despite its investigatory efforts, from the spring of 1990 through November, 1990, the Federal Reserve made little progress on the BCCI-First American issue. The Justice Department had given it almost nothing. The Bank of England had given it almost nothing. Both were in fact, for differing reasons, withholding important information from the Federal Reserve. At last, in November, the New York District Attorney's office gave the Federal Reserve the information it needed to break the investigation open. As Mattingly testified:

In November 1990, the New York County District Attorney's Office informed Federal Reserve staff that a confidential source had stated that a report prepared in October 1990 by BCCI's outside auditors indicated that BCCI had made substantial loans to CCAH shareholders secured by CCAH shares. Board staff immediately requested access to this report from the United States General Manager of BCCI. After a delay occasioned by the initial refusal of the auditor [Price Waterhouse] to permit the report to be examined by the Federal Reserve, BCCI agreed to make the report available for review by a senior member of the Board's examination staff in BCCI's London office. The review was conducted on December 10, 1990. The auditor's report and a conversation on that date with the new chief executive officer of BCCI [Zafar Iqbal] indicated that BCCI had substantial loans outstanding secured by CCAH stock. This was the first substantive evidence received by the Board confirming a financial relationship between BCCI and CCAH.[33]

Eleven days after this event, the Federal Reserve was contacted by counsel for the Abu Dhabi shareholders of BCCI and First American, Patton, Boggs & Blow, who advised the regulators

that Abu Dhabi had the previous April become BCCI's new majority shareholders, and had invested "a very large sum in BCCI stock to correct certain capital deficiencies." The lawyers for Abu Dhabi confirmed that "a substantial amount of the stock of CCAH had been pledged to BCCI as collateral for hundreds of millions of dollars in loans to certain shareholders of CCAH," and suggested that Patton, Boggs, instead of Clifford and Altman, would now be coordinating the handling of issues pertaining to CCAH with the regulators.[34]

Two weeks later, the Federal Reserve initiated its formal investigation, including the authorization of full discovery power, into the circumstances of BCCI's acquisition of control of CCAH and whether false or misleading statements had been made to the Board during the application process in 1981 and afterwards. Two weeks later, Patton Boggs acknowledged that there was material in BCCI's files concerning nominee arrangements for some of the CCAH shareholders. One week later, on January 22, 1991, the Federal Reserve sent a proposed cease and desist order to BCCI's counsel and made criminal referrals to the Justice Department.[35]

### Federal Reserve Actions, 1991-1992

Having decided at last to place all the resources at its disposal to investigating BCCI's activities in the United States, the Federal Reserve put together a team of attorneys, examiners and investigators to conduct a comprehensive investigation of BCCI.

In Washington, the Board of Governors of the Federal Reserve swiftly reached consent decrees with BCCI and CCAH on March 4, 1991, requiring BCCI to divest itself of any interest it had in CCAH, and prohibiting transactions between BCCI and CCAH except as specifically approved by the Federal Reserve, and requiring BCCI to submit a plan to the Federal Reserve under which it would cease all banking operations in the United States.

At the same time, the Federal Reserve devoted its primary attention to severing First American from BCCI, and trying to stave off its collapse. When the Federal Reserve and other U.S. regulators ultimately did undertake a systematic review of BCCI's relationship with its secretly-held U.S. subsidiaries, they found evidence that BCCI had directed First American's decisions at the holding company level, including in connection with First American's costly decision to open offices in New York City and its even more costly decision to purchase the National Bank of Georgia.[36] But the regulators found only limited evidence that BCCI, its shareholders, or customers had received preferential treatment from First American. Thus, in a sense, BCCI had made only limited use of the asset it had bought. With certain exceptions pertaining to First American's deposits of funds in BCCI's Grand Caymans affiliate, ICIC, First American had been collected as an asset to be held for a rainy day, rather than as an asset to be immediately raided. First American was BCCI's piggy-bank, not BCCI's dust-bin bank, its place to deposit resources created elsewhere.

Nevertheless, First American also had serious financial problems, due in large part to its over-reliance on real estate and agricultural lending, similar to that of other banks in the metropolitan Washington region, that had now turned sour. These problems were now being exacerbated by the bad publicity First American was receiving in connection with its ownership by BCCI. Normal forms of recapitalization were no longer available to First American. It could not call on its nominee shareholders to pump in more funds. Nor could

https://info.publicintelligence.net/The-BCCI-Affair.htm

BCCI itself add new funding to First American. Nor would any "white knight" be able to come in and purchase the bank at any price until many more of the legal problems pertaining to its ownership were resolved. Apart from the Federal Reserve's own discount window, the only possible place to turn was Abu Dhabi. Accordingly, the Federal Reserve began negotiations with Patton, Boggs and Blow to determine the degree to which the Abu Dhabi shareholders of CCAH/First American were willing to help the Federal Reserve preserve the value of their investment -- which would disappear entirely in the event of a First American collapse. Thus, both Abu Dhabi and the Federal Reserve during the first half of 1991 had substantial incentives to cooperate with one another. Abu Dhabi needed to find ways to avoid the closure of BCCI globally, a closure which the Federal Reserve had the potential of forcing. The Federal Reserve needed Abu Dhabi's money.

Squeezed out of this equation was the ability of the Federal Reserve to find out the full story -- including the issue of the precise role Abu Dhabi had played in the original FGB takeover, and subsequently. Obviously, it would not be possible for the Federal Reserve to insist on full and complete disclosure by Abu Dhabi with the same vigor that it was insisting on disclosure by other shareholders, and at the same ask Abu Dhabi to place its cash into First American. The result was that the Federal Reserve and Abu Dhabi entered into a period of cooperation for the purpose of saving First American that in its way, was no different from the same kind of cooperation the Bank of England was getting from Abu Dhabi in Abu Dhabi's attempt to save BCCI. In return for Abu Dhabi giving the regulators money, the regulators would accept Abu Dhabi's assurances of innocence, at least for the time being.

In mid-March, the Federal Reserve sent two experienced investigators, Richard Small in Washington and Thomas Baxter in New York, to Abu Dhabi, where they requested the Abu Dhabi authorities to provide them with all relevant documents pertaining to BCCI's activities in the United States. Abu Dhabi would not grant Small and Baxter direct access to BCCI's files. Instead, they agreed to arrange the transport of particular categories of files, as designated by Small and Baxter, to a suite in the hotel in which they were staying in Abu Dhabi. This arrangement successfully produced vital documents concerning nominee arrangements between BCCI and all of the non-Abu Dhabi shareholders of CCAH. It was never likely to, and did not in practice, result in the provision to the Federal Reserve of useful material concerning Abu Dhabi's relations with BCCI.

Despite its need for funds for First American, the Federal Reserve did take a strong position with British regulators concerning the need for BCCI to be totally reformed if it were to continue in any form. In the weeks prior to BCCI's closing, Federal Reserve investigators, including Small and Baxter, lobbied the Bank of England aggressively on the issue of BCCI being permitted to restructure with any of its former officers remaining in charge of the bank, including the new head, Zafar Iqbal, installed by Abu Dhabi. In part as a result of the Federal Reserve's lobbying, the Bank of England in turn advised Abu Dhabi of the need to remove Iqbal, which in turn lead to a temporary stalemate over the proposed restructuring of BCCI, until the Bank of England ended the issue, and the bank itself, with its order closing BCCI of July 5, 1991.

Following BCCI's closure, the Federal Reserve worked with outside members of the First American board of directors such as former Maryland Senator Charles Mac Mathias, to force Clifford and Altman out of their roles as chairman and president of First American, and

working with other bank regulators, closely monitored First American for signs of a run on the bank, and proceeded to a series of enforcement actions, including an assessment on July 29, 1991 of a $200 million fine against BCCI, a $37 million fine against BCCI nominee Ghaith Pharaon, a $20 million fine against BCCI official Kemal Shoaib, and the commencement of civil enforcement proceedings against Clifford and Altman, and together with the Justice Department and New York District Attorney Morgenthau, a plea agreement on December 17, 1991 by BCCI's liquidators that forfeited some $500 million of BCCI assets in the U.S., together with a complex, asset sharing agreement designed to protect both U.S. interests and assist innocent BCCI depositors and creditors abroad.[37]

The Federal Reserve's summaries of charges accompanying the various enforcement actions have collectively amounted to several hundred pages of detailed, precise information on how, when, and by whom, the Federal Reserve was lied to in connection with BCCI's activities in the United States. These summaries leave little doubt as to what happened on the matters they cover. They demonstrate clearly the very substantial investigatory and legal capabilities placed by the Federal Reserve into the BCCI investigation since January 3, 1991, and collectively provide the most complete account to date of what took place concerning BCCI's activities in the United States.[38]

At the same time, the Federal Reserve has adroitly, if not always swiftly, handled the complexities of severing First American from BCCI. Untangling BCCI's ownership of CCAH was a lawyer's nightmare, and without resorting to the regulatory takeover of First American some believed inevitable, the Federal Reserve now appears to have taken First American from the brink of extinction to long-term survival. While First American did lose several billion dollars in deposits and was severely weakened by the bad publicity surrounding BCCI's closure, buffered by the $190 million obtained from Abu Dhabi, it has, to date, appeared to weather the storm. After extensive and protracted negotiations, the CCAH shareholders placed their shares of CCAH into a trust and an independent trustee was appointed, shortly before the Subcommittee's final hearing, on July 30, 1992. Various First American assets, including its Georgia, Florida and Tennessee operations, have been sold off, and the sale of the metropolitan Washington operations to another bank is anticipated to occur by the end of 1992.

Throughout this period, the Federal Reserve and Abu Dhabi have sought to retain a cordial relationship, deferring problem areas in order to permit the sale of First American to go forward, with Abu Dhabi continuing to provide some, albeit limited, assistance to the Federal Reserve concerning some formerly privileged BCCI documents held in Abu Dhabi, and with the Federal Reserve remaining unaccountably "hopeful" that it will in time gain access to the top BCCI officers still held under house arrest in Abu Dhabi.[39]

### Obstacles to Completing Federal Reserve Investigations

While the Federal Reserve made profound progress in investigating BCCI during 1991 and 1992, substantial obstacles have remained to the Federal Reserve's ability to complete its investigation. As noted above, eighteen key witnesses and many key BCCI documents have remained held in Abu Dhabi and unable to any U.S. investigator to date. Foreign bank secrecy laws have also continued to hinder the Federal Reserve's ability to get information it requires,

REENTERED AS EXHIBIT 3

especially in Luxembourg and France.[40] The Federal Reserve has yet to be able to interview key participants in BCCI's frauds in the United States, including former Saudi intelligence liaison and BCCI front-man Abdul Raouf Khalil, former head of Kuwaiti Airlines and BCCI front-man Faisal al Fulaij. And the Federal Reserve has been prevented from interviewing certain witnesses and reviewing certain documents in the United Kingdom by the British Serious Fraud Office.[41] While all of these issues remain a problem, the most serious of them remains Abu Dhabi's refusal to provide access to the documents and witnesses it controls. As Mattingly testified:

Senator, I think it is absolutely imperative that the Federal Reserve and Mr. Morgenthau and the Justice Department have access to BCCI employees in Abu Dhabi, and that we also have access to all of the documents of BCCI that are in Abu Dhabi.[42]

Until such access is provided, the Federal Reserve's investigations of BCCI cannot be said to be complete.

### Federal Deposit Insurance Corporation (FDIC)

### And Independence Bank

On January 30, 1992, the FDIC was forced to close the Independence bank of Encino California, held by Ghaith Pharaon as a nominee for BCCI, at a cost to the bank insurance fund of an estimated $130 million to $140 million.[43] The action took place just weeks after $5 million was injected into the bank by BCCI's liquidators one week after they had entered a guilty plea with the Justice Department and District Attorney Morgenthau on the bank's criminal indictments. The Independence Banks's closure, so soon after the final cash infusion, suggests just how far the bank had fallen by the time the regulators stepped in.

In fact, U.S. regulators were essentially oblivious to BCCI's ownership of the Independence Bank, and consistently underestimated the financial damage done to the Independence Bank by the management put into place there by BCCI, until the spring of 1991. The reasons for this are not entirely clear. The FDIC was aware of Pharaon's reported 15 percent ownership of BCCI and his borrowing relationship with BCCI, and aware that the person selected by Pharaon to chair Independence Bank, Kemal Shoaib, was a former officer of BCCI. There are two likely explanations for the FDIC's failures. First, the Independence Bank was a state chartered bank, and a non-member of the FDIC, whose principal regulator was the California State Superintendent of Banks, only secondarily backed up by the FDIC. Thus, the FDIC's monitoring of the Independence Bank was less rigorous than it would be if the FDIC were the primary regulator. Second, the FDIC had not been the decision maker in connection with the FGB take over, as was the Federal Reserve, or the decision maker in connection with Pharaon's take over of the National Bank of Georgia, as was the OCC. Accordingly, it had no reason to recognize the pattern that had emerged of BCCI's use of nominees to buy U.S. banks.[44]

Pharaon's purchase of the Independence Bank in 1985 had shown the usual pattern of BCCI. He filed documents showing that he would be financing 40 percent of the purchase himself, with the remaining 60 percent coming from a domestic bank, whose cooperation BCCI had

secured through guarantees from BCCI which were not disclosed to the FDIC.[45] A routine background check of Pharaon was conducted, including requests for comment from the FBI, Customs Service, CIA, INTERPOL, and other regulatory agencies. No adverse information about Pharaon was uncovered by the background checks.[46]

Most interesting about the lack of information was the response by the CIA, which knew at the time of the FDIC's request that BCCI had engaged on a nationwide strategy of acquiring U.S. banks and had by the time of the FDIC request for comment already created a memorandum describing this strategy that it had provided to Treasury Secretary Donald Regan and to Robert Bench at the OCC. What appears to have happened is that the CIA was either unaware of Pharaon's connection to BCCI, or had failed to cross-reference its information about BCCI with Pharaon's name.[47]

After Pharaon purchased the Independence Bank, the condition of the bank was monitored regularly by state and FDIC examiners, and for the next three years, the State banking department conducted gave the bank a composite 2 rating on a scale of five, with 1 being the highest possible rating. This indicated the regulators' view that the Independence Bank was in strong, although not outstanding, financial condition. In mid-1988, this was downgraded to a 3 rating based on the bank's rapid growth and changing asset mix. An on-site examination by the state banking department and the FDIC a few months later downgraded this rating to a 4, indicating that the bank had, in the regulators' view, suddenly developed rather serious problems.[48]

As FDIC enforcement chief Stone testified:

This examination in 1988 marked a turning point for Independence Bank. From 1988, FDIC examiners became increasing concerned and alerted to problems at the bank. The examination report disclosed heavy asset classifications, low capital, weak earnings, thin liquidity, poor underwriting policies and inadequate record keeping and internal controls. Growth had been uncontrolled since mid-1987 and had been concentrated in joint venture real estate investments permitted under California law.

Mr. Shoaib had embarked on a program of investing in joint ventures involving acquisition, development and construction of real estate projects, primarily in southern California. In 1988, FDIC examiners discovered improper account of these projects which resulted in the understatement of total assets and liabilities, and the overstatement of the bank's capital.[49]

While the FDIC took the position that these problems had developed rather suddenly at the Independence Bank, in fact, as Senator Kerry suggested to the FDIC, "a bank does not accumulate" such problems overnight. Stone acknowledged that on detailed examination, the FDIC found that "file documentation was horrible," and that there had been "outright misrepresentation[s] by bank officials during [a] previous examination."[50]

Moreover, the Independence Bank had also begun to earn substantial fees -- $4 million in 1990 alone -- on transaction involving the swapping and restructuring of Third World debt. This was an area that Pharaon had used to his advantage in Argentina, as a result of personal relationships with high Argentine officials, including Argentine central bankers, to engage in

REENTERED AS EXHIBIT 3

transactions with BCCI in that country which were questionable at best.[51] Although the FDIC did not recognize this practice as pertaining to BCCI, it believed it completely inappropriate for a small, state-chartered bank and ordered the practice halted.[52]

Thus, once again, BCCI had successfully taken over a U.S. bank, and in this case actually brought BCCI's own typical practices to bear on the bank, under the nose of regulators who did not recognize what was happening. In the case of the Independence Bank, however, the FDIC did move to try to solve its problems from late 1988 on, through requiring further capital infusions from Ghaith Pharaon, and the resignation of Kemal Shoaib, the former BCCI officer, from his position as head of the bank in January, 1989.

At the same time, the FDIC sought to investigate whether the Independence Bank's ties to BCCI meant that it was engaged in money laundering. It found no systematic money laundering, but a few suspicions customer transaction which it then brought to the FBI. It did not, however, suspect that BCCI might have used Pharaon as a nominee and did not investigate that possibility.[53] It did, however, require Pharaon over the next two and a half years to inject some $46 million in new capital into the bank as the price for avoiding action by the regulators. In April, 1991, Pharaon, then under active investigation by District Attorney Morgenthau and the Federal Reserve, refused to inject any further capital into Independence, placing the bank's survival in doubt. Regulators installed examiners at the bank, looked to the royal family of Abu Dhabi as a source of capital, who refused to assist, considered a sale of the bank, and sought funds from BCCI and then its liquidators in an effort to prevent its collapse. However, it deteriorated rapidly, especially following the bad publicity due to revelations that it had been secretly owned by BCCI, and on January 30, 1991 was closed at the loss of $130 million to $140 million to the bank insurance fund.

In summary, BCCI's purchase of the Independence Bank demonstrated both the weaknesses and the strengths of the U.S. regulatory system. BCCI easily purchased a state bank in California through a nominee, attracting little notice, and using simple devices available to anyone with financial resources and willing to lie to regulators. While its ownership was never caught by examiners, the negative consequences of its ownership were, after about three years, and from there on, the examiners placed very significant pressure on the BCCI nominee, Pharaon, to force the bank to comply with U.S. standards and regulations.

**Lessons Learned And Analysis of**

**Foreign Bank Supervision Enhancement Act of 1991**

The Federal Reserve acted swiftly in the wake of the development of the BCCI scandal in the spring of 1991 to write legislation, then introduced by the chairman and ranking member of the Senate Banking Committee, and the chairman of the Subcommittee, to enhance its supervision of foreign banks. That legislation swiftly passed the Congress in 1991, and is already being implemented by the Federal Reserve. The new law:

** Bars entry of any foreign bank into the U.S. unless it is subject to consolidated home country supervision and agrees to permit supervisory access to any information regarding it that the regulators want.

** Applies to foreign banks the same financial, managerial and operational standards governing U.S. banks.

** Grants specific authority to federal regulators to terminate the U.S. activities of any foreign bank that is engaging in illegal, unsafe, or unsound practices.

** Grants the Federal Reserve authority to examine any office of a foreign bank in the U.S.[54]

The new law filled many of the regulatory gaps specifically applicable to the BCCI case, but at least three broad problems remain:

WEAK FOREIGN REGULATORS. While the new foreign bank supervision law does prohibit banks without a central regulator from entering the U.S., it not does prohibit banks which are regulated in bank regulatory havens, such as Grand Caymans, Luxembourg, or, for that matter, any of the significant number of tiny nations who seek to attract business through offering lax regulatory standards and stringent bank secrecy laws. If BCCI had been based solely in the Grand Caymans, it might not have been able to maintain its deceptions as long once they were uncovered, but penetrating those deceptions in the first place would have just as difficult. The Federal Reserve needs to consider whether it is appropriate to deny access for a foreign bank to engage in activities in the U.S. if it is based in a country that does not certain essential standards for banking regulation.

FOREIGN BANK SECRECY LAWS. Criminals use bank secrecy laws to commit crimes. As the BCCI case demonstrates, even after those crimes have been discovered, foreign bank secrecy laws substantially interfere with legitimate U.S. law enforcement and bank regulatory interests in determining what went and who committed the illicit activity. The Foreign Bank Supervision Enhancement act substantially improved the Federal Reserve's ability to secure information directly from foreign banks doing business in the U.S., as a condition for their participation in the U.S. market. However, vital information pertaining to the activities of those banks may be in the possession of individuals or institutions other than banks not directly subject to the Federal Reserve's jurisdiction. For example, if BCCI had wired funds to a foreign bank, based in a bank secrecy haven, that did not do business in the U.S., the provisions in the Foreign Bank Supervision Enhancement Act would be of no help in obtaining the needed information. The Federal Reserve needs to consider whether it is appropriate to press for broader changes in bank confidentiality laws by foreign countries, beginning with the United Kingdom.

COORDINATION AMONG BANK REGULATORS. Regulation of U.S. banks has become a remarkably complex web, with bank examiners working for the Federal Reserve, the Office of the Comptroller of the Currency, the FDIC, and the Office of Thrift Supervision, at the Federal level, and approximately 52 additional regulators at the state level. It is inevitable under the circumstances that there are failures to communication, cooperation, and coordination among these differing agencies. At numerous, critical times in the BCCI case, information available to one regulator was not passed on to another regulator. The Federal Reserve needs to consider whether it is an appropriate use of regulatory resources to create some form of central federal banking data base regarding every financial institution regulated in any form by the federal government. Such a data base could compile application forms, bank examination reports,

REENTERED AS EXHIBIT 3

audits, correspondence, and other data for the use of all federal regulators which otherwise would remain segregated and scattered at each individual agency.

## THE BANK OF ENGLAND

### Background: BCCI in the United Kingdom

Although BCCI was chartered in Luxembourg and the Grand Caymans, its real home through most of its existence was the United Kingdom, where Abedi established BCCI's headquarters, and the senior BCCI officers made key decisions for BCCI's operations world-wide.

Abedi's choice for a world headquarters in London's financial district, "The City," made sense in the early days of the petrodollar boom. At the time, London was a favored vacation and shopping destination for oil-rich Middle Easterners, and BCCI needed to serve them. London was in any case one of the world's great banking centers. And yet, the location of BCCI's in the United Kingdom also created difficulties for the bank. For one thing, the British banking system viewed BCCI with suspicion and hostility from the beginning, because BCCI was not regulated in the United Kingdom, was managed by Pakistanis, and was therefore, as Abedi's put it, "outside the club."[55]

Despite the hostility shown towards BCCI by the British banking system, the actual jurisdiction over BCCI by the Bank of England was distinctly limited. Because BCCI was chartered in Luxembourg and the Grand Caymans, the Bank of England considered them to be the "lead regulators," and itself to have only a secondary role under British banking laws. This reduced the level of scrutiny imposed on BCCI by the Bank of England, even as British bank secrecy and confidentiality laws combined to impede the ability of any other regulator to penetrate BCCI's activities in the United Kingdom, where it was headquartered, and did all of its essential business.

Thus, in making the UK its actual headquarters, while keeping its charters in Luxembourg and the Grand Caymans, BCCI effectively fractured oversight by each of the regulators to a mere part of its operations, and frustrated consolidated oversight by anyone. At the same time, concern over this arrangement in the UK prompted repeated attempts by the British to curtail BCCI's activities, which proved to have relatively little effect.

Early Warning Signals

BCCI's problems in the United Kingdom were notorious and public by mid-1978, as contemporaneous press accounts, describing the frigid response of British authorities to BCCI's expansion, demonstrate.[56] As the House of Commons Treasury and Civil Service Committee concluded following its investigation of BCCI:

The evidence we have received makes it quite clear that the Bank of England was well aware that there were problems at BCCI even as far back as the 1970s. The Governor told us: "I cannot say I was happy or, indeed, any of us have been particularly happy about having these branches in the UK. It has been the most difficult bank we have had to deal with." [As another bank regulator testified] "We had no shortage, if I may use that term, of allegations and accusations . . . about BCCI."[57]

BCCI's inherent problems in the UK were exacerbated by BCCI's over-rapid expansion, from four offices in the United Kingdom in 1973, to 45 offices four years later. The depth of the problems had already become clear by 1976, when BCCI still had not received the authority from the Bank of England to engage in full banking services in the UK. By 1978, the UK regulators were taking still more aggressive action against BCCI -- blocking the bank from being permitted to engage in any further expansion through branching, in order to "bring greater transparency to the operations of BCCI in the UK," and thus enable regulators to analyze just what BCCI was doing.[58] In 1980, the Bank of England turned down BCCI's request for recognized status under the Banking Act of 1979, limited it only to be a licensed deposit taker in the UK.[59]

Having taken these steps to limit BCCI's activities in the UK, the Bank of England did not seek to investigate BCCI further, or encourage others to do so. Instead, it sought to limit its own involvement in bearing responsibility over BCCI.

For example, in 1985, Luxembourg regulators, increasingly uncomfortable with their inability to oversee BCCI's activities, suggested that BCCI be required by the Bank of England to establish a separately incorporated entity in the UK that would enable the Bank of England to become the lead regulator. The Bank of England's response to the Luxembourg overture was to discourage it.[60] As Brian Quinn, executive director of the Bank of England, testified before the House of Commons, the Bank of England rejected Luxembourg's offer because:

You become lead regulator of an organisation you believe you can regulate.[61]

Prodded by the continuing rumors and allegations about BCCI, on December 4, 1985, the Bank of England decided that it would be appropriate for it to visit BCCI's Central Treasury offices in London, in what was apparently the first time the Bank of England had sought such an examination. Its examiners met with BCCI directors and officers, and after spending a week in the bank reached some startling conclusions. As one Bank of England official wrote in an internal memorandum:

1. After spending one week in BCCI, I am absolutely certain that the real head office is located on six floors of 100 Leadenhall Street. It is here that Abedi, Naqvi, Twitchin, Farqui et al work 12 hours a day managing assets of $15bn. . . . .

2. It is clear that Luxembourg is an historic chapter in the BCCI story and that Grand Cayman is a tax haven used as a booking centre. The Bank of England are effectively the prime supervisors of BCCI, not the IML [the Luxembourg Monetary Institute]. UK incorporation of the UK branch network followed by recognition must be traded with Abedi in exchange for the movement out of Leadenhall Street of the Central Support Organisation.[62]

From this memorandum, it appears that not until the end of 1985 did the Bank of England even understand that BCCI's headquarters was located in London. When it did, its first reaction was not to decide to upgrade its regulation of BCCI, but to consider trading upgraded status for BCCI's deposit taking in the UK in exchange for BCCI's agreement to move its headquarters out of the UK to the Bank of England would not have to regulate it.

REENTERED AS EXHIBIT 3

In this same period, the Bank of England learned of BCCI's huge Treasury losses, which had nearly wiped out BCCI's capital, and did not object when BCCI moved its Treasury operations out of London to Abu Dhabi.

## Formation of the BCCI College of Regulators

But a larger solution to the BCCI problem was still required, and the problem was considered sufficiently severed to require a structural response. After the Luxembourg Monetary Institute found itself unable to convince anyone else to take over the responsibility of monitoring BCCI's activities that were beyond its capabilities -- especially with BCCI's most important records now held in London and Abu Dhabi -- Luxembourg began to press for the formation of a College of Regulators to regulate BCCI. As Luxembourg had explained it, the Basle Concordat signed in May 1983 by many of the European banking regulators established a provision to permit a "college of regulators" to be set up to regulate banks that otherwise would escape regulation. While it was recognized that such a college was a second best approach after supervision on a consolidated basis," it was a lot better than the existing situation, in which Luxembourg did not even have the right to obtain BCCI's records in the UK. As Luxembourg described it, the college was the only solution available to Luxembourg to exercise supervision "over a group 98 per cent of whose activities feel outside its jurisdiction and for which none of the other banking supervisory authorities involved was prepared to take responsibility as parent authority."[63]

The British authorities, as well as Luxembourg, recognized that the college was not an ideal solution, because it perpetuated a problem that had been recurrent in the handling BCCI internationally: each nation focused on its own domestic concerns, and refused to accept full responsibility for BCCI's overall activities.[64]

The College was also, as might be expected of a newly created bureaucratic entity, slow to develop. Its was not formed until 1987. Its first meeting did not take place under April of 1988. At that meeting, which took place in Luxembourg, the regulators met with four BCCI officials and three partners of Price Waterhouse and discussed BCCI's large loan exposures. These consisted of the massive lending to CCAH shareholders for shares of First American; massive lending to BCCI shareholders such as Ghaith Pharaon and Kamal Adham; massive lending to the Gokal brothers; and other large loans which later were shown to be to nominees. As Lord Justice Bingham found:

Reference was made to the large loan exposures, but these were not examined in detail. . . The management were not taxed as to when and how these loans were to be reduced and no plan or timetable was sought. . . There was a brief and inconclusive discussion of CCAH which, according to the IML note of the meeting, had "to be seen as BCCI's steeping stone to set up in the US." . . . The meeting ended with a consideration of the College's enlargement to include Hong Kong, the Caymans and perhaps the United States and some Middle Eastern authorities. Naqvi was opposed to this. A College of that size, he argued, would be unmanageable. He wanted the group to be supervised on a consolidated basis by one supervisor and wanted the group to be restructured with that end in mind.[65]

The last thing that BCCI's top officials wanted was for the U.S. to participate with foreign regulators in overseeing its activities. As Naqvi knew, the moment the Federal Reserve knew of its massive loans for shares of CCAH, BCCI would be on a swift road to being forced out of the United States, and perhaps out of existence entirely.

What is remarkable about the summary of the meeting is the casual manner in which the regulators were approaching BCCI's problems. They saw massive outstanding lending that was not being serviced, and yet failed to recommend, let alone insist upon, any serious effort to correct the situation. Instead, they considered further additions in membership to the college, in what was in retrospect a further attempt to avoid having to take on the responsibility for overseeing BCCI themselves.

In later meetings of the college, discussions continued among BCCI, its auditors, and its regulators, concerning the need for BCCI to put aside additional funds as provisions against country risk, due to BCCI's very large lending to Nigeria -- some $260 million in all -- and its smaller, but still substantial exposure in countries like the Philippines, Zambia, and Sudan.[66]

In the spring of 1989, the college regulators listened to Price Waterhouse express its concerns about BCCI's continued high concentration of lending. Price Waterhouse also told the regulators that some of the largest borrowers were not paying interest on loans, let alone principal when due, and there was evidence that funds had been "drawn down" by BCCI without its central credit committee having provided prior approval. Yet in response, neither the Luxembourg regulators nor the Bank of England suggested that anything in particular be done, and accordingly, Price Waterhouse once again signed off on its audits, again certifying them to be a true and fair representation of BCCI's financial condition.[67]

By the end of 1989, the college regulators were placing increasing pressure on BCCI to reform, in concert with Price Waterhouse. In early 1990, Price Waterhouse informed the Bank of England that it now was confident that top BCCI officials had provided false information to it, and that there was fraud at BCCI, in an amount that was yet to be determined. The problem that the college regulators and the auditors had been slowly trying to come to grips with over the previous three years had accelerated, and action had to be taken.

**The April 1990 Price Waterhouse Report**

On April 18, 1990, Price Waterhouse provided a report to the Bank of England which stated that a number of financial transactions at BCCI booked in its Grand Caymans affiliates and other offshore banks were "false and deceitful," and that it was impossible at the present time to determine just how far the fraud reached. Thus, a critical decision had to be made. Either BCCI had to be closed down now, or the Bank of England itself had to give its assent to keeping it open in some new form as a means of avoiding losses to BCCI's million or more depositors. New management needed to be installed. New financing had to be found, and the holes in BCCI's books had to be plugged.

The obvious solution was to ask Sheikh Zayed and the government of Abu Dhabi to take over the bank. As Zayed and the Al Nayhan family who ruled Abu Dhabi had been major depositors of BCCI, and had long had billions in family finances handled by BCCI, they stood to lose as

REENTERED AS EXHIBIT 3

much as anyone if the bank collapsed. Accordingly, Abu Dhabi would have to be told the truth about BCCI's perilous condition, and asked to commit funds to keeping the bank solvent.

A series of urgent meetings were held in Abu Dhabi and Luxembourg, beginning in March, 1990, in which Naqvi confessed his errors and resigned from his position as CEO at BCCI. Abu Dhabi agreed to provide a $1.2 billion cash infusion to BCCI, and to guarantee its losses. Naqvi was removed to Abu Dhabi, and a new management team was brought in. Best of all, from the point of view of the Bank of England, Abu Dhabi and BCCI had agreed to remove BCCI from its headquarters in London, a goal that the Bank of England had been seeking for years.

Rather than increase its jurisdiction over BCCI at this critical time, the Bank of England was increasingly anxious to make it someone else's problem. Abu Dhabi seemed only too glad to comply, and accordingly, the Bank of England gave its blessing to the removal not only of BCCI's headquarters, but its officers, and most importantly, all of its records, from British jurisdiction to that of Abu Dhabi.

At the same time, the Bank of England met with Price Waterhouse, which wanted to know the Bank of England's position concerning whether or not it should once again sign off on BCCI's books, despite the fraud which now the Bank of England, the Luxembourg regulators, and Abu Dhabi knew about in addition to Price Waterhouse and BCCI. The Bank of England and the Institut Monetaire Luxembourgeois, informed of what the auditors termed "all the uncertainties known to Price Waterhouse and of the financial support commitment by the Government of Abu Dhabi," agreed that BCCI could continue to operate, and Price Waterhouse duly signed off on BCCI's books.[68]

By agreement, the Bank of England had in effect entered into a plan with BCCI, Abu Dhabi and Price Waterhouse in which they would each keep the true state of affairs at BCCI secret in return for cooperation with one another in trying to restructure the bank to avoid a catastrophic multi-billion dollar collapse. From April 1990 forward, the Bank of England had now inadvertently become partner to a cover-up of BCCI's criminality. The goal was not to ignore BCCI's wrongdoing, but to prevent its disclosure, for that in turn could cause a massive run on the bank, BCCI's collapse, and potential billions in losses.

As the Governor of the Bank of England, Robin Leigh-Pemberton, testified before the House of Commons Treasury and Civil Service Committee:

On receipt of both the [Price Waterhouse] report of April 1990 and October 1990 we were alerted to [fraud and deceit], but those phrases described what I call the state of evidence, namely there was an indication that certainly things were not well. Some transactions had been either false or deceitful . . . but our view was that even if this added up to individual acts of fraudulent conduct it did not give evidence of a system of fraud throughout the Bank which was wide enough to justify closure. I hope it does not shock you too much, it is only a matter of realism that we do have occasions of fraud in banks. . . if we close down a bank every time we find an individual act or two of fraud we would have rather fewer banks than we do at the moment.[69]

REENTERED AS EXHIBIT 3

Moreover, according to the Governor of the Bank of England, the moment the decision was made by the Bank that it would try to keep BCCI open rather than close it, it became essential to do everything possible to avoid contributing to its demise:

It is impossible for us to give what one might call an advance warning or a health warning. A hint from the Bank of England that somebody on our list may not be quite pukka would be the kiss of death to the future of a bank. We are in the difficult position that our banks are either on the list or they are struck off. I am sorry to say we have to leave it people to make their best judgment as to whether any one of those institutions is or is not fit to be a depository for the purpose they want.[70]

In short, depositors in the United Kingdom should regard their choice of banking institutions, according to the Governor of the Bank of England, by the ancient Latin maxim, "caveat emptor," let the buyer beware, and should not rely on the regulators to provide them with the facts. BCCI had become a bank too big to fail. In the effort to avoid that failure, the Bank of England was in no position to tell anyone the truth about its difficulties until it was too late for them to protect themselves.

Thus, unfortunately, rather than permitting ordinary depositors to find out for themselves the true state of BCCI's finances, the Bank of England, Price Waterhouse, Abu Dhabi and BCCI found themselves in collusion to deprive the public of the information necessary for them to reach any reasonable judgment on the matter, because the alternative would have been an immediate collapse of the bank.

### Section 41 Report and BCCI's Closure

Throughout the remainder of 1990, and the spring of 1991, BCCI, Abu Dhabi, and the Bank of England continued to work on a restructuring of BCCI as a means of saving the bank, with the intention of collapsing its dozens of entities into three banks, to be based in London, Abu Dhabi, and Hong Kong. At the same time, Price Waterhouse continued to provide each of them with the information that the fraud at BCCI was massive, and that the losses associated with the fraud were mounting into the billions. All the while, BCCI, Abu Dhabi, the Bank of England, and Price Waterhouse worked together to keep what they knew about BCCI secret. The secrecy had become critical now that they all knew about the ongoing criminal investigation into BCCI taking place in New York City by the District Attorney. Each made a strenuous effort to prevent the District Attorney from obtaining the Price Waterhouse audit reports which contained the information that if known would destroy BCCI. But by late 1990, the District Attorney, after months of effort, had obtained some of the audit reports, and appeared to be narrowing in on an indictment of BCCI. At the same time, the Bank of England was also finally having to deal with inquiries from the Federal Reserve, which had been fully alerted to the state of affairs at BCCI for the first time not by the Bank of England, but by the Manhattan District Attorney.

As news continued to filter into the Bank of England from Price Waterhouse and from former BCCI officials, such as Masihur Rahman, who were now working to expose what had happened at the bank, the Bank of England began to conclude that the restructuring proposal advocated by Abu Dhabi might not be possible after all. In March, the Bank of England commissioned it formally to investigate BCCI under Section 41 of the UK's Banking Act.

REENTERED AS EXHIBIT 3

Finally, on June 22, 1991, Price Waterhouse delivered a draft report to the Bank of England, known under British law as a Section 41 report, demonstrating that "fraud on a significant scale had been committed and that it had involved a significant number of people both inside and outside the bank."[71]

One week later, the Bank of England alerted the UK's Serious Fraud Office to begin an investigation of BCCI. Four days later, on July 5, 1991, BCCI was closed internationally in an action initiated by the Bank of England. Apart from the information contained in the Price Waterhouse report, the Bank of England would have had reason to act in any case. The Bank of England had reason to know that the New York District Attorney was only a few weeks away from indicting BCCI for massive fraud in an indictment that would outline in some detail most of the practices described privately to the Bank of England by Price Waterhouse. If the Bank of England had not finally acted, the indictments would have triggered a massive run on BCCI that would have resulted in the bank's immediate global closure in any case.

1. S. Hrg. 102-379 pp. 99-100.
2. See S. Hrg. 102-350 Pt. 4 p. 80, on the popularity of the Cayman Islands for banks because of lax licensing requirements, absence of reserve requirements, income taxes, or lending limitations.
3. Heimann, id, pp. 73-74.
4. House of Commons Treasury and Civil Service Committee Fourth Report, Banking Supervision and BCCI: International and National Regulation, March 4, 1992, hereafter "House of Commons Report," p. xiii.
5. Memorandum, Office of the Comptroller of the Currency, January 4, 1978, Comptroller John Heimann.
6. Memorandum, OCC, to File from John G. Hensel, January 17, 1978.
7. Memorandum, OCC, Serino to Heimann, April 3, 1978, "Notes On Meeting with Pharaon."
8. Various documents, OCC files on NBG, March-July, 1978.
9. Office of Comptroller of the Currency Report of Joseph Vaez, February 15, 1978, memo to Robert R. Bench from J.E. Vaez, National Bank Examiner London regarding BCCI Holdings (Luxembourg).
10. Letter, Robert Altman to Mannion of Federal Reserve, May 9, 1978.
11. Id. p. 144.
12. Clifford, April 23, 1981 hearing, id.
13. Prepared testimony of Virgil Mattingly, S. Hrg. 102-379 p. 118.
14. Id.
15. Prepared testimony of Virgil Mattingly and William Taylor, S. Hrg. 102-350 Pt. 1 pp. 86-87.
16. Id at 87.
17. The details of these interactions between BCCI and First American are set forth in some detail in the chapter on BCCI's later activities in the United States and in the chapter concerning Clifford and Altman.
18. S. Hrg. 102-379 p. 138.
19. House Committee on Banking, Finance and Urban Affairs, September 11, 1991, Pt. 1, "Bank of Credit and Commerce International Investigation, Serial No. 102-69 p. 685.
20. S. Hrg. 102-379 p. 139.
21. Testimony of Virgil Mattingly, S. Hrg. 103-479 p. 139.
22. Chronology, Committee on Banking, Finance and Urban Affairs, House of Representatives, September 11, 1991, Bank of Credit and Commerce International, Pt 1, Serial No. 102-69 p. 686.
23. S. Hrg. 102-379 p. 118.
24. The details of this information, and of how and when it was communicated within the U.S. government, are set forth in the chapter concerning BCCI's relations with the CIA and foreign

REENTERED AS EXHIBIT 3

intelligence.

25. Chronology, House Committee on Banking, Finance, and Urban Affairs, BCCI Pt 1, September 11, 1991, Serial No, 102-89 p. 688.

26. S. Hrg. 102-379 p. 119.

27. Ryback of Federal Reserve to Robert Altman, Clifford & Warnke, S. Hrg. 102-350 Pt. 3 pp. 440-441.

28. Naqvi to Altman, January 31, 1990, S. Hrg. 102-350 Pt. 3 pp. 442-443.

29. Altman to Ryback, February 5, 1990, S. Hrg. 102-350 Pt. 3 pp. 444-445.

30. Chronology, House Banking Committee, BCCI Pt 1, id., p. 689.

31. Chronology, House Banking Committee, BCCI Pt. 1, id. pp. 689-690.

32. S. Hrg. 102-379 p. 119.

33. S. Hrg. 102-379 p. 120.

34. S. Hrg. 102-379 p. 120.

35. Id.

36. The Federal Reserve's findings on these issues are set forth in the Summary of Charges issued by the Board of Governors of the Federal Reserve, In the Matter of BCCI, issued July 29, 1991, and In the Matter of Clark Clifford, issued July 29, 1992. These findings are set forth in some detail in the chapters on BCCI in the United States and the chapter on Clifford and Altman.

37. An account of those enforcement actions as of May 18, 1992, provided by the Federal Reserve to the Subcommittee, is contained at S. Hrg. 102-350 Pt. 4 pp. 144-145.

38. Numerous Federal Reserve investigators and attorneys participated in the investigation and drafting of the summary of charges, including Richard Small, Thomas Baxter, and Kit Wheatley. While their personal roles, and the roles of their colleagues, in exposing the full extent of wrongdoing in connection with BCCI have remained necessarily behind the scenes, the value of their work has been incalculable, both to the Subcommittee specifically and to the public at large.

39. Prepared testimony of Virgil Mattingly, S. Hrg. 102-350 Pt. 4 pp. 147-148.

40. S. Hrg. 102-350 Pt. 5 p. 153.

41. S. Hrg. 102-350 Pt 5 p. 169.

42. S. Hrg. 102-350 p. 171.

43. Prepared testimony of John W. Stone, FDIC, S. Hrg. 102-350 Pt. 5 p. 163.

44. See testimony of John Stone, FDIC, S. Hrg. 102-350 Pt. 5 p. 160.

45. A detailed account of this transaction is set forth in the chapter on BCCI's later activities in the United States.

46. S. Hrg. 102-350 Pt. 5 p. 158.

47. A detailed account of what the CIA knew at the time, and what it told the Treasury and OCC is contained in the chapter concerning BCCI, the CIA and foreign intelligence.

48. S. Hrg. 102-350 Pt. 5 p. 158.

49. S. Hrg. 102-350 Pt 5 p. 159.

50. S. Hrg. 102-350 Pt. 5 pp. 156-157.

51. See section on Argentina in chapter on BCCI's activities in foreign countries.

52. S. Hrg. 102-350 Pt. 5 p. 162.

53. S. Hrg. 102-350 Pt. 5 p. 160.

54. The full hearing on this legislation is set forth in S. Hrg. 102-379, May 23, 1991, which includes its text at p. 9, and a Federal Reserve analysis at p. 122.

55. See Euromoney, S. Hrg. 1-2-350, Pt. 3 p. 308.

56. Euromoney, id., Financial Times, The Many Who Adds a Touch of Mysticism to Banking, May 17, 1978, S. Hrg. 102-350, Pt. 3 pp. 303-304.

57. Bank of England chronology, Annex, Fourth Report, House of Commons Treasury and Civil Service Committee, March 4, 1992, "Banking Supervision and BCCI" p xiii.

58. House of Commons report, id, p. xiii.

REENTERED AS EXHIBIT 3

59. Id.
60. House of Commons Report, id p. xxxi.
61. House of Commons Report, id, p. 54.
62. Extract, Paragraph 144, Report, Inquiry into the Supervision of the Bank of Credit and Commerce International, The Right Honorable Lord Justice Bingham, July 27, 1992, hereafter, "Bingham Report."
63. House of Commons Report, id, Memorandum submitted by the Institut Monetaire Luxembourgeois (IML) p. 95.
64. See Price Waterhouse comment, reprinted in House of Commons report, id, p. ix.
65. Paragraph 268, Bingham Report, id.
66. Price Waterhouse Report BCCI Holdings to the Audit Committee, Unaudited Results to 30 September 1989 and Outlook for the Year; Subcommittee document.
67. Bingham Report, id, Paragraphs 3l3-320.
68. Memorandum submitted by Price Waterhouse in reply to Questions from the House of Commons Committee on Treasury and Civil Service, February 5, 1992.
69. Minutes of Evidence Taken Before The House of Commons Committee on Treasury and Civil Service, July 23, 1991, Fourth Report, Banking Supervision and BCCI, printed March 4, 1992, p. 104.
70. Id, p. 108.
71. Id. Price Waterhouse's findings of the Section 41 report are reviewed in some detail in the chapter concerning BCCI's criminality.

# CLARK CLIFFORD AND ROBERT ALTMAN

### Introduction

For twelve years, from BCCI's initial attempts to acquire FGB/First American in January, 1978, until their forced resignation in August, 1991 from their positions as the top officials of First American, former Secretary of Defense Clark Clifford and his law partner, Robert Altman, were the central figures in BCCI's acquisitions and management of U.S. banks.

During that time, they met with and represented BCCI's top management, major shareholders, major borrowers, and every figure of consequence who participated in BCCI's frauds in the United States. Their roles included:

REENTERED AS EXHIBIT 3

** Representing Bert Lance in his sale of National Bank of Georgia (NBG) to BCCI nominee Ghaith Pharaon in 1977 and 1978.

** Representing Lance, BCCI, and all of the Arab shareholders in the Financial General Bankshares (FGB) takeover and all related litigation from late 1977 through late 1990.

** Representing Commerce and Credit American Holdings (CCAH), the new entity created to buy FGB, and several levels of holding companies below CCAH, from 1978 through late 1990.

** Acting as chairman and president, respectively, and directors of First American, from 1981 through August 1991.

** Negotiating First American's purchase of National Bank of Georgia from Pharaon and BCCI in 1985 and 1986.

** Handling legal matters for First American, and selecting First American's other counsel from 1978 through late 1990.

** Representing BCCI before state and federal regulators from 1978 through late 1990.

** Representing BCCI before Congress from 1988 through 1990.

** Purchasing shares of First American and borrowing funds from BCCI for their shares of First American from 1986 through 1989.

** Coordinating the legal defense of BCCI and of all of its officers charged in the Tampa case, including handling the selection of attorneys for all of the individual BCCI officers, following BCCI's October, 1988 indictment.

Clifford and Altman have testified that they were throughout this period deceived as to BCCI's ownership of and control of First American and other BCCI entities in the United States, and ignorant of the bank's wrongdoing in any material respect. In Clifford's words:

In all these years, we didn't encounter a single suspicious circumstance. . . Were we deceived? Apparently, we were deceived.[1] (emphasis added)

We have not violated any law. We have not been guilty of any impropriety. . . if all that we read about, this poisonous, constant stream of misconduct, if that is a true statement of what this bank did, then we have been grossly deceived.[2]

As Altman testified:

The allegations that relate to misconduct on our part, I want the record to be clear, that we deny them totally and completely.[3]

In contrast, numerous BCCI officers who appeared before the Subcommittee testified that Mr. Clifford and Mr. Altman must have known that BCCI owned First American. Abdur Sakhia, for instance, testified:

[I]n any management discussions . . . on our future in the United States, we would think of three entities -- BCCI, National Bank of Georgia and First American -- in the same breath. Who would be going where, who would work in which entity, what area of entity will be handled by which entity, allocation of businesses, markets, geographic territories, all took place as if this was one entity. . . [I]t is very hard to believe, very, very hard to believe, almost impossible to believe. . . that Clifford and Altman did not know [about BCCI's ownership of First American].[(4)]

Similar statements were made in public testimony and in staff interviews by BCCI officials Amjad Awan, Akbar Bilgrami, and Nazir Chinoy concerning Clifford and Altman's role in BCCI and First American.

While it is clear that no one, with the possible exception of BCCI's top two officials, Abedi and Naqvi, knew of all the criminal conduct at the highest levels of the bank's operations, numerous people at BCCI and associated with it did know of BCCI's ownership of First American, its use of nominees for acquisitions generally, its lending to First American's purported shareholders, and its strategy for expansion in the United States.

**Findings**

The Subcommittee received with care the detailed proffer of information and testimony provided by Clifford and Altman, and struggled to reconcile their statements with the other information provided to the investigation. Reaching judgments regarding the nature and extent of Clifford and Altman's intentions is impeded by the lack of witnesses to a number of key meetings over the course of a decade regarding BCCI and First American in which only Clifford, Altman, and BCCI's top two officials, Abedi and Naqvi, were permitted to participate. Few memoranda exist as to the substance of any of these meetings, and it was the practice of Abedi, Naqvi, Clifford and Altman to exclude all others from these meetings who might otherwise give witness as to what was discussed and decided.

Nevertheless, based on a review of all of the documents and testimony before the Subcommittee, the account provided by Clifford and Altman to the Subcommittee is not consistent with the facts. Regrettably, as the chapter below details, in case after case, explanations provided by Clifford and Altman concerning their conduct are contradicted not merely by sworn testimony of other witnesses, but by contemporaneous documents which set forth facts that are at odds with their testimony. The totality of the information concerning Clifford and Altman leads to the conclusion that regardless of whether they too were deceived by BCCI in some respects, both men participated in some of BCCI's deceptions in the United States. Testimony of mid-level BCCI officials, contemporaneous documents created by others, and the legal documents and correspondence involving Clifford and Altman directly, together lead to the conclusion that Clifford and Altman:

** Assisted BCCI in purchasing a U.S. bank, Financial General Bankshares, with the participation of nominees, and understood BCCI's central involvement in directing and controlling the transaction.

** Made business decisions regarding acquisitions for First American that were motivated by BCCI's goals, rather than by the business needs of First American itself.

REENTERED AS EXHIBIT 3

** Represented as their own to regulators decisions that had been made by Abedi and BCCI on fundamental matters concerning First American, including the purchase by First American of the National Bank of Georgia and First American's decision to purchase branches in New York City. While these decisions were ratified by First American's board of directors, they were decisions made initially by BCCI and communicated to Clifford and Altman, who in turn secured ratification of them, as necessary, by First American's boards.

** Concealed their own financing of shares of First American by BCCI from First American's other directors and from U.S. regulators.

** Withheld from regulators critical information that they possessed to secret BCCI's ownership of First American.

** Deceived regulators and the Congress concerning their own knowledge of and personal involvement in BCCI's illegalities in the United States.[5]

**Early Involvement**

Clifford, Altman and Bert Lance each testified that their mutual involvement with BCCI began in the fall of 1977, in connection with Lance's decision to participate in a hostile takeover of Financial General Bankshares (FGB) in Washington, and the participation of a group of Middle Eastern investors, advised by BCCI.

But their accounts diverge as to how Clifford and Altman came to know BCCI and Abedi, and when Clifford and Altman began to participate with Lance and Abedi in planning BCCI's strategy for acquiring U.S. banks.

By Clifford and Altman's account, they knew nothing of BCCI and were introduced to the bank by Lance in December, 1977 and did not represent BCCI until mid-February, 1978 in connection with litigation with SEC and FGB's management. By Lance's account, Clifford's involvement with the case began two months earlier, soon after Lance met with Abedi in New York and discussed with Abedi BCCI's need to enter the U.S. market.

In Lance's account:

I went to see Mr. Clifford, who had represented me since Labor Day weekend of 1977, and I said: Mr. Clifford, I have made the acquaintance of Mr. Abedi. His bank is BCCI. He has some interest in talking to me about future relationships, whether that is in regard to being merely a consultant or being actively involved in one of his operations somewhere

. . . it is absolutely imperative and incumbent upon me to make sure that we know what kind of people that I am getting involved with . . . I asked Mr. Clifford, because of his knowledge and expertise . . . to do his due diligence on my behalf, as my attorney . . . Every instance o[r] report that I either got or from what Mr. Clifford told me came back that Mr. Abedi was a man of integrity and character.[6]

Based on the assurances he had received from Clifford, Lance went to London, met with Abedi again in late October, and began discussing the possibility of a takeover of FGB with Abedi and BCCI.[7]

REENTERED AS EXHIBIT 3

In contrast, Clifford testified that the first he learned of BCCI was when Lance, as a "former client," brought Abedi to meet them in December, 1977 on "merely a social visit."[8] By Clifford's account:

One of the main subjects we discussed in that brief social meeting was the aid that he had for his bank, of providing the Third World with banking services which they had not ever had before . . . I found him to be pleasant and a man of importance. Thereafter, I'd hear from time to time that the little reports would sift in that Mr. Abedi and BCCI were in the process of acquiring stock in a company called Financial General Bank Shares. That's a bank holding company, centered in Washington. I had not heard of them before.[9]

In fact, in the period that Clifford testified he was merely hearing "little reports" sifting in "from time to time," Clifford and Altman were already representing Lance in connection with his attempt to sell the National Bank of Georgia to Ghaith Pharaon in a transaction fully negotiated by and handled by Abedi, ostensibly on Pharaon's behalf. This representation had begun no later than early December, 1977. As Lance testified, the negotiations concerning National Bank of Georgia with Abedi had taken place between Thanksgiving and Christmas, and were in that period turned over by Lance to his attorneys:

They [Mr. Clifford and Mr. Altman] were very aware of what I was trying to do and were very helpful to me in trying to do that. . . After discussions with Mr. Abedi about the National Bank of Georgia, I turned over these negotiations to Bob Altman to deal with Pharaon's attorney, a gentleman by the name of Frank Van Court, who is a member of the Vincent and Elkins law firm in Houston.[10]

Thus, Lance refers to an ongoing representation of him by Clifford and Altman, stemming out of Congressional testimony a month earlier, while Clifford describes Lance as a "former client." Lance places Clifford's involvement with him with BCCI in October, prior to discussions about the structuring of the FGB takeover, while Clifford places his first contact in late December. Lance places Clifford's representation of him on the BCCI-related acquisitions by December, while Clifford places the representation in mid-February. In each case, the difference between the testimony is that Lance places Clifford as a participant in the critical decisions that BCCI made in late 1977, while Clifford places himself at a distance from these decisions. Clifford's desire not to have been involved is understandable, because the manner in which Lance and the Middle Eastern investors chose to conduct their takeover bid for Financial General Bankshares would prove, within three months, to have been illegal by a federal judge.

A mid-December, 1977 article in The Washington Post provides irrefutable evidence of Clifford and Altman's involvement in negotiations by Lance at that time regarding investments by "Middle Eastern financial interests . . . into banks and other U.S. investments" in a deal in which the "matchmaker" was described as Abedi, head of BCCI. The article states that the Middle Eastern investors represented by Abedi want Lance "to set up a holding company to direct their capital into banks and other U.S. investments," and quotes Altman as confirming that negotiations between Lance and Abedi had taken place concerning the bank transactions:

REENTERED AS EXHIBIT 3

"There are a lot of people who are trying to guess what's going on," said the attorney, Robert A. Altman, but he added that few are privy to the details. "The terms are still being negotiated. We hope to have a statement shortly."[11]

In the same article, Altman is described as announcing Lance's intention to sell his shares in the National Bank of Georgia as of early December, 1978 to an unnamed purchaser for $20 a share -- the exact amount paid in early January, 1978 to Lance by Ghaith Pharaon on behalf of himself and BCCI.[12] Thus, Altman and Clifford were already representing Lance in his negotiations over sales of his bank to Pharaon at the beginning of December, 1977; and in connection with the establishment of a bank holding company, obviously referring to the structure to be used by BCCI to acquire Financial General Bankshares, by mid-December, 1977; the period in which Clifford testified he had been privy only to "a social visit" from Abedi concerning other matters, and during which Clifford by his account did not represent Lance, described by Clifford as "a former client," at all.

**Takeover of Financial General**

As of January, 1978, Clifford and Altman were simultaneously representing Lance in his discussions with BCCI about the possible takeover of Financial General Bankshares; meeting with Abedi and other BCCI officials concerning that takeover; representing Lance in negotiations with Abedi and BCCI officials concerning the purchase of National Bank of Georgia by Ghaith Pharaon; and preparing to handle representation of the Arab shareholders who were ostensibly using BCCI as an "investment advisor" for the Financial General Bankshares transaction.

These roles were not being undertaken casually, or in a routine fashion, but in the context of what was about to become a high-stakes, highly-publicized hostile takeover of a major metropolitan Washington bank. The takeover bid was agreed to by Lance and BCCI in late November, 1977 and begun in December with purchases of Financial General Bankshares shares on the open market. It was structured so that each shareholder participating in the bid with BCCI would purchase an amount of shares just below the 5% that would trigger the requirement of SEC disclosure -- a strategy demonstrating some sophistication about and knowledge of U.S. regulations. The strategy, an obvious violation of SEC law if discovered, was dictated by the group's need to acquire an adequate block of shares in the FGB stock to challenge the controlling management of FGB, the Middendorf group, which already owned about 20 percent of the target bank.

This initial strategy created an underlying problem for Lance, BCCI, the Arab group, and its attorneys which was never corrected. If Lance, BCCI, the Arab investors, or their attorneys admitted the truth -- that they had been acting as a group from the beginning, purchasing blocks of FGB shares just under disclosure requirements to avoid premature disclosure and a more aggressive defense against the takeover by FGB's current management -- they would be admitting to possibly criminal violation of U.S. securities laws. Yet in denying this truth, they committed themselves to what was at the time a significant distortion of the truth, and a distortion which grew ever complicated over time.

Thus, an original, untrue proposition -- that the BCCI group was not a group at all, but a collection of Arab individuals who happened to use BCCI as a joint investment advisor, and

REENTERED AS EXHIBIT 3

who happened individually to independently become interested on the same week in the same U.S. bank -- was one which Clifford and Altman wound up maintaining from February, 1978 onwards, from the time the SEC filed suit against the Arab investors, Lance, and BCCI, charging that they had acted as a group, and had intentionally violated U.S. security disclosure laws by failing to disclose their intent to gain control over FGB. The representations made by Clifford and Altman concerning BCCI's role regarding First American in the years that followed were consistent with this original lie, and therefore inconsistent with the truth.

In their prepared testimony before the Senate, Clifford and Altman described the thrust of the SEC suit and their state of knowledge upon entering the case:

BCCI served as the banker and investment adviser to a number of wealthy Middle Eastern rulers and businessmen. Without our involvement or advice, four of these investors had purchased stock in an American holding company called Financial General Bankshares ("FGB"), the predecessor to First American, without filing certain disclosures with the Securities and Exchange Commission ("SEC").[13]

In their joint written statement to the Subcommittee, Clifford and Altman testified explicitly that they were not involved in the structuring of the original takeover attempt, the selection of the investors, or any other aspect of the transaction:

Without our involvement or advice, four of these [Middle Eastern] investors had purchased stock in an American bank holding company called Financial General Bankshares . . . without filing disclosures with the Securities and Exchange Commission ("SEC"). The SEC investigated these transactions, and the management of FGB, concerned that these purchases foreshadowed a possible corporate takeover effort, filed suit against the Arab investors, BCCI, Mr. Abedi, and others. We were retained to represent Bert Lance, Agha Hasan Abedi, BCCI, Sheikh Mohammed bin Zaied al Nayhan, Sheikh Sultan bin Zaied al Nahyan, Faisal al Fulaij, and Abudullah Darwaish.[14]

This account is contradicted by a January 30, 1978 memorandum found in BCCI files in Abu Dhabi by the Federal Reserve, and previously held in BCCI files in Karachi, Pakistan, from Abdus Sami, a BCCI official, to BCCI chairman Abedi. In this memorandum, Sami advises Abedi that Clifford personally approved the details of the plans for the takeover, and describes BCCI's intention to circumvent SEC disclosure by keeping purchases of the shares to just under 5 percent for each shareholder.

In the memorandum, Sami advised Abedi that in order "to keep ownership to below 5 percent we have to distribute the ownership to 4 persons of substance." Sami noted that "we have already given the names of Sheik Kamal Adham and Mr. Fulaij. We want two other names immediately." In the memorandum Sami also told Abedi that Lance had suggested the retention of Clifford as chief counsel "in view of the possibility of this [takeover] contest and also for presentation of the holding company application to Fed[eral Reserve]." According to Sami, "[I] met Clark Clifford and explained to him our strategy and goal. He was happy to know the details and has blessed the acquisition."[15] [emphasis added]

The memorandum clearly states that Clifford was involved in the FGB takeover from the beginning -- before two of the original four shareholders had even been chosen, before a takeover contest had actually begun, before an application was made to any regulator, before the SEC knew of any activity that might prompt its interest. The memorandum, found by the Federal Reserve in BCCI's files, is a contemporaneous representation of the understanding of the BCCI official most directly involved at the time in meetings with Lance and Clifford concerning the purchase of FGB. Accordingly, its clear import has to be given considerable weight.

The chronology in the memorandum is supported by the legal bills sent by Clifford and Altman to BCCI, and provided to the Subcommittee in the spring of 1992 by BCCI's liquidators. In their written statement to the Subcommittee, Clifford and Altman testified that they did not provide advice to BCCI, or its Arab investors, until the litigation involving the SEC and the Middendorf group, which began in mid-February 1978. But the bills from Clifford's law firm to BCCI, provided to the Subcommittee in May, 1992, demonstrate that they actually represented BCCI and the Arabs in January, 1978, just as Sami had specified, and contrary to Clifford and Altman's testimony.

### Clifford, Altman and the Regulators

Neither Clifford or Altman were experienced in either banking law, or in takeover litigation. Accordingly, Baldwin Tuttle, a former Federal Reserve attorney, was retained to handle banking regulatory issues, and the law firm of Wachtell, Lipton, Rosen & Katz in New York was retained to advise on the takeover itself.

In the months that followed, numerous filings were made with banking regulators by Tuttle, the Wachtell firm, and Clifford and Altman on the behalf of the Arab investors, BCCI, and Lance concerning the nature and extent of BCCI's involvement in the transaction.

For example, the original application to the Federal Reserve of October 19, 1978, made by CCAH and the original Middle Eastern shareholders and signed by Altman, stated:

The proposed individual investors in CCAH have substantial funds and it is contemplated that the funds to be used by each of them to purchase the equity interest in CCAH will be provided from their personal funds and possibly from personal borrowings from one or more financial institutions (which would be unaffiliated with BCCI or any of its affiliates), except that at least an aggregate of $50 million will be provided from personal funds and not more than an aggregate of $20 million will be borrowed. Such investors intend that **if personal borrowings are made, Financial General Shares purchased pursuant to the Offer will not serve as collateral for such borrowings.** (emphasis added)[16]

A November 24, 1978 letter from Altman to the Federal Reserve Bank of Richmond reiterated the commitment that:

neither BCCI nor any other organization related to BCCI contemplates owning any equity interest in CCAH.[17]

REENTERED AS EXHIBIT 3

On January 12, 1979, Altman again told the Federal Reserve by letter that the shareholders would not borrow from BCCI or its affiliates. In October, 1980, when CCAH resubmitted an application to the Federal Reserve signed by Altman, Altman reiterated that BCCI had no role in the transaction:

BCCI owns no shares of FGB, CCAH, or CCAI, either directly or indirectly, nor will it if the application is approved. Neither is it a lender, nor will it be, with respect to the acquisition by any of the Investors of either FGB, CCAI, or CCAH shares . . . All of the Investors in CCAH have substantial funds and the funds to be used by each of them to purchase their equity interest in CCAH will be provided from their personal funds . . . . No principal of Applicant will retain any personal indebtedness in connection with this transaction.[18]

As described in the chapter on BCCI's activities in the United States, ultimately the decision came down to a public hearing at the Federal Reserve on April 23, 1981 in which Clifford and Altman, along with Mr. Adham and Mr. Fulaij, made an appeal to regulators to allow the acquisition to move forward. As Clifford told regulators at the hearing when he was asked about BCCI's involvement in the acquisition, BCCI's role would be:

None. There is no function of any kind on the part of BCCI . . . I know of no present relationship. I know of no planned future relationship that exists.[19]

In their prepared testimony before the Senate, Clifford and Altman testified that they made full disclosure to the regulators at that meeting concerning the contemplated relationship between BCCI and the Middle Eastern investors who bought shares in CCAH. Clifford and Altman testified that the regulators "were advised that certain of First American investors were also shareholders in BCCI; that the investors used BCCI as their commercial and investment bank; that BCCI had provided and would continue to provide "advisory and other services to the shareholders with respect to their CCAH investments; and that BCCI served as a communications link with the investors."[20]

As discussed earlier, Robert Mannion, the Associate General Counsel for the Federal Reserve, who conducted the public hearing on the FGB takeover, broached the issue of the relationship between the Middle Eastern investors and BCCI on numerous occasions, but ultimately accepted the assurances of Clifford, Altman and the Middle East investors themselves that BCCI would neither own nor control Financial General Bankshares.

Part of the problem is that the permissible relationship between BCCI and First American was never explicitly set out by anyone at the Federal Reserve, beyond the original requirement that BCCI could not act as a lender to the shareholders for the original purchase of FGB, and was limited to acting as an "investment advisor," and conduit for information. The principal official regulatory discussion of the degree to which BCCI and FGB could interact was set forth in a letter to the Federal Reserve from the Deputy Comptroller General, Mr. William Muckenfuss, in a letter to the Chairman of the Federal Reserve Board, which became part of the record upon which the Federal Reserve's approval of the CCAH application was granted. The Comptroller's office signed off on the takeover of Financial General Bankshares, stipulating certain conditions:

REENTERED AS EXHIBIT 3

It has now been represented to us that BCCI will have no involvement with the management, and other affairs of Financial General, nor will BCCI be involved in the financing arrangements, if any are required, regarding this proposal. This commitment is critical, both now, and in the future, since a relationship with another financial institution would be a significant factor in appraising this application. This is especially important in light of overlapping ownership, which will exist between Credit and Commerce Holdings, Credit and Commerce Investment, and BCCI. Moreover, any enhanced, direct or indirect affiliation or relationship between BCCI and Financial General, would take on even greater significance in light of the fact that BCCI is not subject to regulation and supervision on a consolidated basis, by a single bank supervisory authority."[21]

Testifying before the Subcommittee, Clifford acknowledged that he interpreted the Muckenfuss letter to have signified a definite agreement in three areas: "one, BCCI would not acquire any stock in First American at the time of the tender offer; two, that they would not, in any way, finance the purchase of the stock in First American; and three, that they would have no control over the operation of First American."[22]

Clifford's interpretation of the obligation differs from the plain text of the Muckenfuss letter and OCC's requirements. OCC stated that its approval was condition on BCCI not being involved with management. For that concept, Clifford unilaterally substituted the word "control," a substantially less stringent standard than that which the OCC actually required.

Concerning the first point, no documents have been found by the Subcommittee which definitively prove Clifford and Altman knew BCCI had acquired stock in First American prior to the conclusion of the FGB acquisition. But the Sami memorandum contains material suggesting that precisely such an arrangement had been approved by Clifford in the early days of the FGB takeover, and other documents provide circumstantial documentation of Clifford's knowledge about the proposed Middle Eastern shareholders in FGB not being at risk.

An October, 1978 telex from former CIA Director Richard Helms to Mohammed Rahim Irvani, one of the original investors, shows Helms advising another BCCI front-man on language designed to hold him harmless for acting as a front-man for BCCI. The language of the telex states that by agreement, Irvani would be not be liable for any liability caused by granting a power of attorney to Clifford and his firm in connection with the FGB takeover, and suggests that this language be sent to the Clifford firm.[23] Irvani was then listed, within days of the telex, in an application filed with the Federal Reserve by Altman on behalf of CCAH, listed as one of its intended principal shareholders, along with representatives of the Abu Dhabi royal family, and Faisal al Fulaij -- another nominee for BCCI.[24]

What was unusual about this agreement provided to Irvani by Helms at the time of Irvani's application to the Federal Reserve as a shareholder of CCAH is not the power of attorney given to Clifford and Altman -- they would hold a power of attorney for all of the Middle Eastern investors -- but rather the indemnification, which essentially states that Clifford and Altman have the power to act in Irvani's name without liability attaching to Irvani -- meaning that someone else, presumably BCCI, would be indemnifying Irvani against any possible liability as a result of the use of his name. As a result, Irvani would not be at risk for any

actions he participated in during the takeover, and therefore would be understood to be a nominee by anyone knowing of the indemnification.

On point two, William Taylor, the head of Banking Supervision for the Federal Reserve, and Gerald Corrigan of the New York Federal Reserve, gave credence to Clifford's interpretation in testimony before the House Banking Committee. Corrigan stated that "there was no prohibition of borrowing from First American even when the stock of First American was placed as collateral." According to Altman, the only prohibition on pledge of stock was for the initial takeover. Nevertheless, Taylor's and Corrigan's testimony is at odds with the specific language of the Muckenfuss letter relating to "financial arrangements .... both now and in the future." Moreover, whenever Clifford and Altman clearly knew of such borrowing by First American shareholders from BCCI against collateral, such as in connection with their own such borrowings, various rights offerings, and First American's purchase of National Bank of Georgia, they took steps to hide this information from the regulators.

On point three, Clifford and Altman have remained adamant that BCCI never exercised any control over First American. On this point, however, there is substantial evidence to the contrary.

**Management of First American**

In testimony to the House Banking Committee, Clifford stated that "Before accepting the offer to serve [as Chairman of First American] however, a fundamental agreement was made with the shareholders on the issue of authority," that he [Clifford] would run the bank. [25] Counsel for Clifford acknowledged, however, that "the specific agreement... was an oral agreement" and that there was nothing in writing to support their client's assertion.[26] Clifford characterized his involvement in the operations of the bank as "no ivory tower experience for us." He explained that "This was a hands-on occupation. I took it as my first obligation."[27]

However, BCCI in fact participated in the selection of First American's top management from the outset of Clifford and Altman's tenure. As detailed in the Federal Reserve's summary of charges, Abedi, BCCI's CEO, interviewed a series of candidates for the new chief executive officer of First American, including former Citibank president William I. Spencer, Daniel J. Callahan, James Drumwright, and Robert Stevens, the last of whom ultimately became First American's CEO and president. While Spencer turned down the job offer after meeting with Abedi following an introductory meeting with Clifford, Callahan was informed by Clifford that he would not be offered the position of CEO of First American because Callahan had requested "exclusive administrative, operational and executive control" of the bank.[28]

Clifford's involvement with Abedi in this process -- which begin within days of the April 23, 1981 hearing before the Federal Reserve -- is evidence of his understanding at the time that BCCI would have a substantial say in the most important decisions affecting First American's future, beginning with the selection of a CEO. Contrary to the assurances provided the Federal Reserve by Clifford and Altman, no CEO would be chosen who would require full autonomy in decisions regarding the bank.

REENTERED AS EXHIBIT 3

In prepared testimony before the Senate Foreign Relations Committee, Clifford and Altman stated that "The evidence is conclusive that the two companies [BCCI and First American] had different -- and incompatible--operating policies and procedures, strategic concepts, bank support functions, staffing and administrative programs, customer bases and controls and systems." Clifford cited as proof that BCCI did not control First American the testimony before the House Banking Committee of Robert P. Black, the Chairman of the Richmond Federal Reserve.

who said, that in a review of First American's activities in 1991, "we have found no evidence of influence or control."[29]

In practice, BCCI's involvement in day-to-day affairs of some of First American's members banks was either very limited, or non-existent, and in others, such as First American Virginia, the institution under the jurisdiction of the Richmond Federal Reserve, limited to a few transactions. But in other parts of First American, including First American Georgia and First American D.C., BCCI clearly influenced both important banking investment decisions and other transactions. In connection with First American New York, BCCI controlled most of the critical decisions by First American, including the hiring of management, the size, location and choice of office space, and the business strategy. More importantly, when it came to fundamental issues of First American's acquisition and sales strategy, BCCI's needs over the course of a decade repeatedly dictated First American's decision making, rather than independent business judgments by the U.S. officials of First American.

**First American New York**

In their written testimony to the Subcommittee, Clifford and Altman made the following presentation concerning the issues related to BCCI's involvement with decisions concerning First American New York:

BCCI has not in any way controlled First American Bank of New York ("FABNY"), much less the First American organization. These events now being questioned cannot be viewed in isolation, and are related to unique circumstances in New York during the 1982-1983 time period. . . In connection with the 1981-1982 regulatory proceedings to acquire two New York banks owned by FGB, an application was submitted to the New York State Banking Board. Due to strong opposition, the investors agreed to divest the New York City bank following the tender offer. The Middle Eastern investors, in effect, were forced to create a new bank in New York City -- an unforeseen development.

As a result, an entire management group to operate the New York bank had to be identified and hired. Mr. Abedi, as investment advisor to the shareholders, was consulted about bankers whom he might know or recommend for employment by the new First American Bank of New York. This assistance was particularly welcome as FABNY was to have an international banking capability, and Mr. Abedi's background was devoted to international banking. At no time, however, did Mr. Abedi make decisions concerning the selection, hiring, or dismissal of officers. Final authority -- as made clear by Board minutes -- rested with Mr. Clifford and the FABNY board.[30]

REENTERED AS EXHIBIT 3

However, in testimony before the Subcommittee, Altman acknowledged that the circumstances pertaining to BCCI's involvement in the establishment of a New York office for First American had lead to BCCI being unusually involved in some of the start-up functions of First American there.

When the acquisition was completed in the spring of 1982 we were then in a very awkward and, to some extent, unhappy posture. We were under an obligation to sell the New York City bank. And we were under a need to set up a new bank and really set it up from scratch. We had nothing in the city. We had no staff. We had no location. We had no resources. It put us, as I say, in a difficult position.

Now throughout the takeover litigation and during the regulatory proceedings, we essentially had two contacts in New York. One was the law firm of Wachtell, Lipton, Rosen & Katz that was co-counsel with us and represented the shareholders during these proceedings. And the other was BCCI, which had a representative office and was acting as the investment advisor. . . And so we went to the people we knew at Wachtell, Lipton and we asked the attorneys did they know of space in the city. And they did. And they recommended space. And we went to BCCI's representative office in New York, which was then headed by this man, Elley. And he also attempted to assist us by telling us of brokers or space that he was aware of. And, indeed, this was something that I worked on personally.

But I was not in New York City and when I would go up there and I was to get back messages or information, I would usually ask people to send it either to BCCI in New York or to the New York lawyers. They acted, in effect, as a local contact for us.

And so BCCI was trying to be helpful to us. Now this did not seem particularly out of the ordinary.[31]

Thus by Altman's account, BCCI, like Wachtell, Lipton, was acting a local contact and assistant to help First American establish its presence. Unfortunately, the account does not square with other information obtained by the Subcommittee concerning the circumstances which lead to the opening of the New York office of First American, nor does it provide any business justification for First American having made the decision to open a New York office in the first place.

To begin with, there was no obvious business justification for First American to purchase two branches in New York City from Banker's Trust, where banks like Citibank, Chase Manhattan, and Chemical Bank collectively had many hundreds of branches. Indeed, a decade later, George Davis, Clifford's successor as CEO of First American, would conclude that the New York operation of First American had lost money for years and remained in 1992 a drain on the resources of First American overall.[32] By contrast, Abedi and BCCI had made acquisition of a bank in New York his priority since 1975, while First American had not done any preparation in insure its ability to do business there. Again, in Altman's words:

We had nothing in the city. We had no staff. We had no location. We had no resources.[33]

REENTERED AS EXHIBIT 3

The obvious question was why First American, under the circumstances, would as among the earliest actions of Clifford and Altman at the head of First American, go ahead with expanding First American's operations through purchasing New York branches under such difficult conditions. The answer, as numerous BCCI memoranda suggest, was that Abedi and BCCI needed the branch to act as an outpost in the U.S. for BCCI's international operations, and that Clifford and Altman were essentially acting as covers for BCCI's acquisition there, that had been previously blocked by New York bank regulators when BCCI sought to go in directly.

For example, a memorandum dated July 25, 1983, from BCCI employee Aijaz Afridi to BCCI Number 2 Swaleh Naqvi, with copies to BCCI officials Kemal Shoaib and K.K. Elley, described BCCI's plan for First American New York in terms that suggest it would operate independently from the other First American banks. According to this BCCI official, while operating independently, First American New York would be subsidized by the other First American banks, using their assets as sources of funds and their clients as sources for "their entire international business," with First American New York becoming "their Central Treasury."[34]

The BCCI memorandum discusses such issues as how to achieve growth and profitability for First American New York, how to project its image domestically and internationally, how to introduce the bank to Third World countries, new products and services, and related issues. Under "basic assumptions," Afridi noted:

Management style and Philosophy will be on the pattern of BCC -- No interference from the Holding Co. and free hand to the Management.[35]

The record also shows that BCCI's involvement in directing the establishment of this office was pervasive. For example, as both BCCI officials and BCCI documents show, it was BCCI, not First American, that determined how much office space First American would lease in New York. As Sakhia testified:

The decision of hiring, decision for acquisition of space . . . the New York office of First American was identified by BCC officers and approved by Mr. Abedi. He made the decision to rent that space.[36]

The space that was rented by First American was 350 Park Avenue, close to the offices already established by BCCI in New York at 320 Park Avenue. According to the Federal Reserve, and contrary to Altman's sworn testimony, it was BCCI, not Wachtell, Lipton, that directed the choice of a location, and when Clifford and Altman objected to the cost of the location, they were overruled by Abedi.[37]

Over the ensuing decade, the space would prove grossly excessive for the actual needs of First American, and its costs would become a significant drain on First American's resources. A letter dated December 13, 1982 from Elley to Swaleh Naqvi, Abedi's number two at BCCI, on BCC New York stationery, documents the nature of the relationship between BCCI and First American in New York. In the letter, Elley brings Naqvi up to date with a meeting he has had with Altman concerning the First American Bank in New York, and covering the subletting of space at 350 Park Avenue, renovation of the space, selection of board directors, recruitment of

key staff, selection of auditors and attorneys, and coordination with the holding company and the shareholders -- all matters being handled for First American by Elley as a BCCI employee and reported to Naqvi, the BCCI senior executive at a time when Clifford and Altman were ostensibly in control of First American.[38]

BCCI also handled the purchase of new branch offices in New York for First American. In March 1983, while Elley was still employed by BCCI as head of its New York representative office, he began discussions with Bankers Trust officials regarding the purchase of branches of their bank for First American. Six weeks later, when First American submitted bids for the branches, BCCI officials -- not First American officials -- handled the negotiations.[39]

For instance, in an October 14, 1982 letter to Swaleh Naqvi, Khusro Karamat Elley, an employee of BCCI in New York, wrote concerning "the subletting of space, ... selection of board of directors, recruitment of key staff, selection of auditors, selection of lawyers, compensation package, including fringe benefits, projections for first year's operations, coordination with holding company and shareholders." [40]

Another letter written by Mr. Elley to Mr. Naqvi concerns the Board of Directors of First American Bank in New York and Mr. Elley's recommendation of Mr. Richard Paget to the board. In response to a question regarding the Paget recommendation, Altman testified only that:

We had a very unusual situation that developed in New York. And you were focusing on a period nearly 10 years ago, very limited in time.[41]

Clifford and Altman's written testimony referred to a single candidate for First American New York recommended to them by Abedi.[42] In fact, as specified below, BCCI had direct involvement in, and apparent control over, numerous key personnel decisions in First American New York beginning in early 1982 and continuing through at least early 1986.

For example, in October, 1982, Abedi had contacted Joseph Feghali, the president of another bank with whom BCCI had a correspondent banking relationship, interviewed him in Los Angeles, and offered Feghali the position of president and CEO of First American New York. In subsequent meetings, Abedi and his number two at BCCI, Naqvi, offered Feghali a seven-year contract with First American, including benefits and salary for Feghali, before Feghali had communicated with either Clifford or Altman. Only after these decisions had been made did Feghali meet with Altman. At that point, Altman and Feghali met to discuss First American New York operations with Elley, and continued further negotiations over the terms of a draft employment contract Altman provided Feghali, who ultimately turned down the offer from BCCI and from Altman for medical reasons.[43] Later, this scenario was repeated in 1983 in connection with BCCI first interviewing and then recommending to Clifford and Altman the hiring of Bruno Richter as CEO and president of First American New York, a position he accepted in July 1983.[44]

Following Richter's hiring by Clifford and Altman, he in turn sought to hire other bank officials for First American New York who were required to interview not only with Altman,

but with Abedi and Naqvi in London. Later, when Clifford and Altman became unhappy with Richter, his firing was discussed at length with Abedi by Clifford and Altman. His replacement, William Duncan, was selected as First American New York's new president and CEO only after interviewing with Abedi in London.[45]

Ultimately, two BCCI officers, Elley and Afridi, were transferred by BCCI's New York agency to First American New York. Naqvi discussed the issue with Altman and then offered Elley a position at First American New York as senior Vice President. After leaving BCCI for First American, both officers continued to receive BCCI benefits including reimbursements from BCCI for gas, electric and telephone bills, as well as concessionary mortgage rates from BCCI.[46]

The minutes of a BCCI U.S. marketing meeting held in 1985 describe the participation of these two former BCCI officials during their tenure at First American in meetings aimed at strengthening BCCI's control of the U.S. bank. As the memorandum stated:

"Mr. Afridi opened the meeting and emphasized that the purpose of the meeting was to coordinate the efforts of different locations of BCCI <u>and other institutions</u> [emphasis added] so that the President's desire to have a totality of approach is achieved. It is a great challenge that the group faces in the present and future U.S. operations."[47]

Afridi was a former employee of BCCI who at the time was working for First American of New York and, according to the memorandum, "requested the members to work together to overwhelm the U.S. market. Historically, we have not made a calculated approach to the U.S. market." When Senator Kerry asked Mr. Altman to comment on the memorandum, Mr. Altman, who did not attend the meeting, said, "I can't explain what this does mean.....I can't comment on the propriety of what the participants were doing, but I think it is troubling."[48]

When asked by Senator Kerry if Mr. Elley and Mr. Afridi, whom Mr. Altman had hired from BCCI, were working behind his back on the joint marketing plan, Altman replied. "That is correct."[49] However, Abdur Sakhia, the head General manager for U.S. operations, testified that Altman talked to him personally "about [joint BCCI-First American] marketing."[50]

**First American Bankshares' Capitalization**

The handling of First American's capitalization by BCCI and by Clifford and Altman raise further substantial questions about their independence of BCCI's control in handling First American's most important financial transactions -- its capitalization. BCCI's direct involvement with Clifford and Altman in connection with financing for First American began almost immediately after the Federal Reserve approved the CCAH application, and continued throughout the 1980's.

As the Federal Reserve found in its summary of charges, on about May 13, 1982, BCCI or ICIC Overseas made a payment to one of First American's holding companies, CCAI, of $2.5 million to permit it to pay interest on a loan from BAII, followed by a second payment of $2.3 million on about July 13, 1982 from BCCI or ICIC Overseas for the same purpose. According

to the Federal Reserve, these payments violated the commitment made by Clifford and Altman and CCAH that no more than $50 million in debt would be incurred by CCAH and its subsidiaries for the acquisition of FGB, because they represented an addition $4.8 million in debt to BCCI or ICIC Overseas by CCAH. The Federal Reserve additionally found that they violated the commitment made that BCCI would not fund the CCAH acquisition of FGB, a commitment violated through the payment of the interest.[51]

Two weeks after the second payment, CCAH's outside auditors, Ernst & Whinney, who at the time were also auditing BCCI's Luxembourg holding company, wrote to BCCI and to Altman concerning the $4.8 million in new funds, and describing the new funds as a capital contribution by a new investor. In effect, the auditors were viewing the payment by BCCI to be a capital contribution by BCCI entitling it to own shares in First American. In response, BCCI told the CCAH manager in the Netherland Antilles and the auditors on September 20, 1982 that the funds should be treated as a short-term subordinated loan from the shareholders of CCAH, making it a loan from BCCI to all of CCAH's shareholders. Six months later, Altman wrote the CCAH manager in the Netherlands Antilles that only one CCAH shareholder had lent the money -- Kamal Adham -- despite knowing that BCCI itself had lent the money and was now using Adham as a pass through or nominee. Later, after BCCI officials in London complained about how much the loan was costing BCCI, Altman directed CCAH to prepay the loan 19 months prior to its maturity, replacing it with a new loan at a higher interest rate, costing CCAH $152,0000 over the remaining term of the loan.[52]

In August, 1982, BCCI provided $30 million to First American through its holding company, CCAH, to purchase the remaining common and Class A shares of Financial General, making FGB a wholly-owned subsidiary of CCAH by eliminating any shareholders from Financial General who were not controlled by BCCI. As the Federal Reserve found:

At the time CCAH received and used the funds, no decision had been made as to the method by which they would be reflected on the books of the company. The board of directors had not authorized the issuance or sale of additional shares of the company, and no decision had been made as to whom, if anyone, new shares would be issued.[53]

In effect, the $30 million capital contribution gave BCCI a direct stake in First American less than one year after the Federal Reserve had approved its application on the understanding that BCCI would not be involved. Alternatively, the $30 million could be characterized as a BCCI loan to First American, also prohibited by the Federal Reserve. It took BCCI over four months to decide how to structure the contribution. Its conclusion was to direct its resident agent in the Netherlands to direct Altman to treat the $30 million as capital contributions from three existing Middle Eastern shareholders and from a fourth new shareholder, Sheikh Khalifa Bin Zayed al Nahyan. The resident agent provided Altman with back-dated resolutions authorizing this handling of the funds, which Altman duly had signed by CCAH's directors.[54]

In 1983, when CCAH raised $75 million in additional capital through a "rights offering," BCCI again paid the funds to First American, advancing the purchase price for the shares, despite the fact that responsibility for payment of the funds had not yet been allocated among the various shareholders in accordance with their acceptances, or waivers, of the shares due them in the rights offering. According to the Federal Reserve's summary of charges:

Altman was aware of BCCI's payment, and was concerned that the funds had not yet been allocated among the various shareholders . . .[55]

Later in 1983, when BCCI failed to provide an additional $25 million requested by CCAH, BCCI provided CCAH with a $20 million credit line, stating that CCAH had requested the loan. These funds were paid by BCCI to First American, with documentation created later attributing the lending to Kamal Adham, a key front-man for BCCI in the CCAH stock purchases. Tellingly, although BCCI treated Adham as the lender of the funds, Altman and another partner at Clifford & Warnke dealt exclusively with BCCI concerning the terms and repayment of the loan, despite Altman's frequent contacts with Adham on other matters pertaining to First American. Later, another Clifford & Warnke attorney drafted loan documents memorializing Adham's involvement in the matter, back dated two and a half months, and signed by Altman, which were provided to BCCI for Adham's signature.[56]

In future years, Clifford & Warnke lawyers communicated with BCCI a number of times concerning the "Adham" loan, and described the loan in two instances as one "arranged by you [BCCI] in our favor."[57] Despite BCCI's handling of every aspect of the loan, including the original disbursement to First American, Altman in filings with the Federal Reserve described it as a "loan from Investor." In 1991, when Altman gave sworn testimony to the Federal Reserve, he represented that the loan was made to CCAH by Adham.[58]

### First American's Purchase of NBG

Perhaps the clearest example of Clifford and Altman undertaking an action, ostensibly on behalf of First American, but directed by BCCI, was First American's decision to purchase the National Bank of Georgia in 1986 from Ghaith Pharaon. Clifford and Altman have testified that they "learned that the owner of NBG, Ghaith Pharaon, was in financial difficulty and might be willing to sell his bank."[59] Clifford and Altman describe the acquisition of the National Bank of Georgia by First American in 1986 as a "reflection of First American's consistent corporate strategy of expansion since 1982," suggesting that it was mere coincidence that First American purchased a bank already owned by another member of the BCCI family, Pharaon, and which they understood to have adopted BCCI's hexagonal logo and banking practices.[60]

As the Office of the Comptroller of the Currency had suspected in early 1978, BCCI in fact owned 50 percent of National Bank of Georgia (NBG) from the moment of its ostensible sale to Ghaith Pharaon in May of that year, with Pharaon acting as BCCI's nominee for those shares to avoid the hostility regulators had already demonstrated towards any direct acquisition by BCCI. If any of Pharaon's creditors attached NBG's assets, the ensuing civil litigation could threaten to reveal this secret interest, with the result that BCCI be destroyed. Accordingly, BCCI decided to consolidate its U.S. holdings through the sale of NBG to First American, as specified in some detail in the chapter on BCCI's later activities in the U.S. Thus, while BCCI's business need to bring about this purchase is clear, First American's was not, especially given the actual underlying problems at NBG, which had begun when the bank had been under the control of Bert Lance and accelerated as a consequence of BCCI's management of NBG while Pharaon held the bank.

## BCCI's Business Need for First American/NBG Purchase

On January 1, 1985, Pharaon executed a secret "Memorandum of Deposit" with BCCI which provided that all of the outstanding shares of NBG Financial would be deposited with BCCI as collateral for loans to Pharaon and his companies, and giving BCCI "or its nominees" the right to vote the shares. As a result, as of that date, BCCI had effective control over the 50% of the shares of NBG which had been BCCI's from the beginning.[61]

By November 1985, with Pharaon's financial difficulties intensifying, BCCI's auditors, Price Waterhouse, began to express concern to BCCI about its exposure to Pharaon and calling on the bank to reduce this exposure. In fact, a portion of this exposure was related to Pharaon's holding of NBG on BCCI's behalf.

Accordingly, BCCI and Pharaon agreed to liquidate Pharaon's 50% interest in NBG, and sell his holdings of NBG stock held by Pharaon Holdings Limited back to NBG Financial, now controlled by BCCI. At this point, BCCI had direct and total secret control of all of the outstanding shares of National Bank of Georgia, and had demonstrated to Price Waterhouse its ability to force "loans" to major borrowers like Pharaon to be "repaid." But these financial manipulations did not solve the other serious problem created by Pharaon's deteriorating financial condition -- the possibility that creditors might seek to attach the shares of NBG Financial -- still officially "owned" by Pharaon. The result would not merely put BCCI's ownership of NBG at risk, but could set in motion the destruction of BCCI's entire empire in the United States and possibly globally.[62]

In London, Abedi looked at the NBG situation and determined that the simplest solution to the Pharaon problem was to merge National Bank of Georgia into First American, and thereby take Pharaon out of the picture. In the terms of the Federal Reserve charges, "in December 1986, BCCI caused CCAH to agree to purchase the shares of NBG [Financial] from Pharaon for $220 million."[63]

Significantly, while the transaction did not close until August 19, 1987, First American provided $80 million at the end of December, 1986 as an option on the purchase, securing those $80 million worth of shares and leaving Pharaon "holding" only a remainder of $140 million worth of the bank -- shares already held by BCCI as security for defaulted loans. Thus, any outsider who tried to attach Pharaon's shares in NBG would find that as creditors, they were now in back of First American and BCCI, making such an attachment of little legal value and thereby protecting the shares. From the point of view of First American, however, this secret arrangement had a significant problem. BCCI's security interest in NBG preceded that of First American. If something went wrong, First American might not be able to recover its $80 million.

## BCCI's Understanding of First American Purchase of NBG

Within BCCI at the time, it was generally understood that the sale of NBG from "Pharaon" to "First American" was principally a consolidation of BCCI entities within the United States. As Abdur Sakhia testified, First American had been planning to expand its operations to Florida in the mid-1980's, and had never discussed a move into Georgia, until 1985. In late 1985, he

REENTERED AS EXHIBIT 3

became aware that Pharaon's financial situation had become shaky, and at Abedi's request arranged for a meeting to take place in Miami in November of 1985 involving Abedi, Naqvi, Clifford, Altman, and two officials from National Bank of Georgia -- Carlson and Jamil. No one else was permitted to attend the meeting. After it ended, Abedi came out and told Sakhia and other BCCI officials that National Bank of Georgia would be merged with First American. [64] Abdur Sakhia remembers organizing the meeting. According to Sakhia, it was at this meeting that the decision was made to merge National bank of Georgia and First American. According to Sakhia, afterwards he met with Abedi, who talked of "merger and not buy and sell."[65]

Later, in preparation for BCCI's possible purchase of a bank in Florida, Sakhia was provided with a model file of the Independence Bank transaction, which showed Pharaon's role as a nominee, which was to be the model for the purchase of the Eagle Bank by BCCI. Sakhia then met with Naqvi in Luxembourg, and discussed BCCI's planned purchase of Eagle, with Faisal al Fulaij to act as the nominee instead of Pharaon. Altman was present during the conversation, and thus participated in a meeting in which the use of nominees by BCCI to purchase banks in the U.S. was discussed.[66] Altman's knowledge of this practice by BCCI and by Pharaon in connection with Independence would obviously have been important in the NBG transaction, causing him as a lawyer to have asked many questions concerning the relationship between BCCI and Pharaon. No document provided the Subcommittee shows Altman having ever expressed concern about the possibility that Pharaon was a nominee. The obvious explanation is that he did not do so because it was a fact Altman already knew, and because Altman himself had become a party to the arrangements involving BCCI and Pharaon.

After the Miami meeting, Sakhia wrote Abedi in London in February 1986 regarding BCCI's "Future Plans in the United States." In the memorandum, Sakhia referenced his discussions with Altman concerning the planned purchases by BCCI of banks in Florida. In a paragraph concerning the National Bank of Georgia, Sakhia suggested that in view of "the forthcoming restructuring of the bank in Georgia, it may be useful to merge their Miami operation with BCC Overseas, Miami, as this will offer additional dollar deposit and correspondent banking relationship to BCCI Overseas."[67]

### Clifford and Altman's Explanation of NBG Transaction

In their written testimony before the Senate, Clifford and Altman denied that the acquisition of NBG by First American was directed by BCCI, stating instead that the acquisition:

was a reflection of First American's consistent corporate strategy of expansion since 1982 . . . in December 1986, based solely on its judgment of First American's best interests, the CCAH Board approved the proposed acquisition of NBG. BCCI did not influence these deliberations, nor did it control the Company's decision to acquire NBG. First American, not BCCI, initiated the NBG acquisition.

The price paid by First American was reasonable and determined free of control by BCCI.[68]

As Altman told journalists in 1986 who wondered at the coincidence of Clifford and Altman buying the bank once held by Lance and whose sale by Lance to Pharaon they had participated

in:

It was clearly an arms-length business deal, that is to suggest we didn't get any special consideration in terms of price. . . It's a logical move for us in terms of our market expansion. (69)

In answers to written questions from the Subcommittee, Altman denied attending any meetings regarding the NBG purchase by First American in Miami, as described by Sakhia. However, Roy P.M. Carlson, the former President of NBG, has told Subcommittee staff that he, Mr. Clifford and Altman all met together at the Grand Bay Hotel in Miami in February 1986 to discuss the price for NBG.

Unfortunately, the statements made by Clifford and Altman to the Committee regarding the National Bank of Georgia transaction cannot be reconciled with the documentary and testimonial accounts of the other parties involved.

**Federal Reserve Findings on NBG Purchase**

On July 29, 1992, the Federal Reserve issued a lengthy summary of charges against Clifford and Altman in connection with their roles in BCCI and First American, including 350 paragraphs setting forth their roles in connection with alleged violations of various federal regulatory provisions. Of those 350 paragraphs, 78 paragraphs were devoted to Clifford and Altman's handling of the purchase of NBG by First American, and they define in detail the factual basis for concluding that the purchase was occasioned not by the independent needs of First American, or an independent business judgment by Clifford and Altman, but by BCCI. The following account summarizes the Federal Reserve evidence and findings.

The Federal Reserve found that in 1977, Pharaon became the nominal owner of National Bank of Georgia in a transaction negotiated and bankrolled by BCCI, and in which BCCI had a secret 50 percent interest from the beginning. While nominally owned by Pharaon, NBG employed several BCCI officials, NBG personnel regularly attended BCCI conferences at BCCI's expense, NBG adopted BCCI's management style and hexagonal logo, and revised its business orientation from a retail bank to an international bank.[70]

In February 1983, Altman joined National Bank of Georgia officials at a BCCI-sponsored conference in New York, whose purpose was to integrate NBG into BCCI's corporate culture. Following a presentation by BCCI officials, an executive vice president of NBG, William Batastini, "gave public remarks at which he expressed his happiness at being part of the BCCI family," in Altman's presence. Batastini then repeated these remarks at a later annual conference of BCCI in Athens in March 1983, again in Altman's presence.[71]

By January 1, 1985, BCCI, in the course of restructuring Pharaon's loan portfolio with BCCI, acquired control of all NBG shares. In November, Pharaon's financial problems -- including a possible default on a $200 million loan that had been syndicated to a number of banks -- became public -- with the result that the prospect of liens on Pharaon's property by creditors became a significant threat. Moreover, the news caused Price Waterhouse, BCCI's auditor, to express concerns about BCCI's exposure to Pharaon, and to urge that BCCI call in loans to reduce its exposure. As the Federal Reserve found:

REENTERED AS EXHIBIT 3

Because BCCI secretly owned and controlled NBG and its shares, an attachment of those assets by Pharaon's creditors threatened BCCI with a substantial financial loss. . . BCCI thus had an incentive to cause NBG to be sold to another BCCI nominee, one that would not be subject to levying creditors.[72]

Accordingly, BCCI began to plan the sale of NBG to CCAH and First American. In September 1985, Altman met with NBG's president, Roy Carlson, who had been placed at NBG by Abedi, who had known Carlson through Carlson's work at the Bank of America when Bank of America owned a stake in BCCI, and two other NBG officials. At the time, Georgia law prohibited the acquisition of a Georgia bank of a bank holding company, such as CCAH, which had substantial assets outside the south. The following month, Altman asked First American's Treasurer, A. Vincent Scoffone, to conduct a preliminary evaluation of NBG to determine a purchase price for NBG. Scoffone estimated that NBG's book value was approximately $80 million, and that based on recent bank sales prices of Georgia banks, a realistic price for NBG would range from $120 million to $180 million. At the time, Scoffone warned that "no review has been performed on the quality of the asset base. Such a review is mandatory before any real meaningful analysis can be made regarding the tangible net worth of NBG."[73]

According to testimony from Sakhia, and the summary of charges of the Federal Reserve, in November, 1985, Clifford and Altman attended a conference of BCCI managers in Miami, including Abedi, Naqvi, Sakhia, and two NBG officers, Carlson and former BCCI official Tariq Jamil. Following a conference with the managers, Clifford and Altman met separately with Abedi, Naqvi, Elley, Jamil and Carlson, during which Abedi decided and announced that NBG would be sold to CCAH, that Jamil would be transferred from NBG back to BCCI's headquarters in London, and that Elley would be transferred from First American New York to NBG to replace Jamil. Some time later, Altman told Sakhia he was not pleased with Abedi's decision to purchase NBG and that he would not have purchased the bank of his own free will. [74]

In February 1986, in connection with an evaluation of Pharaon's holdings, an independent valuation of NBG was conducted by the firm of Keefe, Bruyette & Woods, which determined that NBG was worth between $130 million and $144 million, and a copy of this report was provided to the firm of Clifford & Warnke. In May, 1986, First American's Treasurer, Scoffone, conducted a second analysis of NBG's value, without having been told by Clifford of Altman of the Keefe, Bruyette & Woods valuation. In a memorandum to Altman dated May 7, 1986, Scoffone concluded that based on the median purchase price for banks within the past year, its value was $152 million. Arguing that "NBG may be a unique situation because of its location in Atlanta, Georgia," Scoffone said that "a premium over the median purchase price may be appropriate," and on that basis concluded that a fair price for NBG would be $211 million if one assigned a higher multiple times book price for the shares than banks in the Georgia region had been sold for during the past year. He also acknowledged that at such a price:

this transaction would be highly beneficial to the present owner of NBG. The bank would be sold at a significant premium over both the national and local median sales prices.[75]

Contrary to normal banking practice on a purchase of this magnitude, Clifford and Altman did not retain an independent investment banker to assist in valuing the shares, as they had previously done in the purchase of branches for First American in New York from Banker's Trust in 1983, and would do again in 1990 when they were considering the sale of First American overall. Instead, First American relied on Scoffone's evaluation, and Altman became the sole representative of First American in negotiations over the acquisition and the structuring of the transaction. Significantly, in doing so, Altman did not deal with Pharaon, but with Abedi, Naqvi, and other BCCI officials.[76]

On May 8, 1986, Altman wrote Naqvi, enclosing Scoffone's evaluation, and expressing his hope that the purchase price would be in the range of $160 million to $175 million, as "we are nearing the point at which this purchase is too expensive."[77] A week later, meeting in London with Batastini at BCCI's London headquarters, Altman and Batastini agreed to a purchase price of $205 million, of which $80 million would be paid up front for an option to purchase, and $125 million upon consummation of the transaction. Under the agreement, First American (CCAH) would pay Pharaon the $80 million immediately, and against the $80 million would receive a security interest in NBG's shares -- thus protecting them from other Pharaon creditors. At the same time, BCCI and Altman discussed the fact that BCCI would simultaneously have lending to Pharaon for the remainder of the $205 million, leaving NBG's shares entirely pledged and protected from creditors. Altman then discussed this situation further with other attorneys for First American, who noted the following:

The proposed structure may focus unwelcome attention on the relationship between CCAH [First American's holding company] and BCCI and raise questions as to whether BCCI has acquired control of NBG. . . . A bigger problem [then certain other regulatory issues raised by the structure], however, arising from BCCI's involvement in the transaction is that it might focus closer attention on the relationship between CCAH and BCCI. An argument could be made perhaps that CCAH and BCCI are acting together and/or as principal and agent.[78]

Altman then sent a copy of this memorandum to Naqvi, and Clifford sent a second copy to Abedi in London, with a note from Clifford dated June 17, 1986 warning Abedi that the memorandum would "give you some idea of the difficulties and complexities facing us." Later in June, when CCAH and First American filed drafts of the option agreement with the Federal Reserve under which CCAH would acquire the National Bank of Georgia, the documents did not refer to the pledge of NBG shares to BCCI that was simultaneous with the pledge of NBG shares to First American, or to the fact that BCCI would acting as an "escrow agent" and would hold the funds paid to Pharaon by First American until the completion of the transaction.[79]

By August, Baldwin Tuttle at Milbank, Tweed, the regulatory attorney involved in handling the First American-NBG transaction, became sufficiently concerned about the structuring of it that he wrote to warn him that there five separate legal problems for First American arising out of it. First, the payment of the $80 million option placed CCAH/First American at risk; second, under the structure of the deal, First American did not have the right until the acquisition was completed to exercise any control of management of NBG, leaving it vulnerable should the current management not do their job; third, there was no provision in the

agreement for negotiation of the price if the value of NBG declined prior to the option's exercise; fourth, legal opinions were necessary to determine "the validity of Pharaon's ownership of NBG;" and finally, there was no guarantee CCAH/First American would recover its $80 million if it chose not to exercise its option.[80]

These issues arose in part because Tuttle had previously been advised that BCCI would also have a security interest in NBG shares, raising the question of whether BCCI's interest in the shares, or First American's interest in the shares, would be satisfied first in the event something went wrong.

In response to this letter, Altman demanded that Tuttle appear at Altman's office, and during a "brief and hostile meeting," handed Tuttle both the original and the only other copy of his letter and warned Tuttle that if he ever wrote such a letter again, Tuttle would no longer represent CCAH/First American.[81]

While there are many conclusions one might draw on the basis of this incident, one notable element is Tuttle's recognition that there reasons to doubt "the validity of Pharaon's ownership of NBG." The only possible reason to doubt his ownership under the circumstances was the issue of whether BCCI was the actual owner already. Altman's response to Tuttle offers a convincing example of Altman's determination that no inquiries be made regarding this issue. It is evidence that Altman's failure to advise the Federal Reserve of BCCI's involvement in the transaction was wilful and intentional, rather than accidental, as reflected in the charges brought against Altman by the Federal Reserve in connection with this incident.

On September 4, 1986, Altman provided Naqvi at BCCI with draft documents relating to the option and loan transaction for his review, and identifying BCCI as pledge agent for First American's option payment and BCCI's loan. In a cover letter to Naqvi, Altman wrote that the agreements assumed that there was no debt secured by the NBG shares "except as may be later authorized with respect to the BCCI loan to Dr. Pharaon." As the Federal Reserve found, Altman was already aware of the Pharaon debt to BCCI secured by the NBG shares.[82]

The significance of the September 4, 1986 letter from Altman is that it identifies how Altman chose to respond to the problems posed by revealing the fact that BCCI already had a security interest in National Bank of Georgia shares that might impair the value of First American's security interest in them and raise questions about the $80 million option. Altman's response was, in effect, to join BCCI in a subterfuge -- that BCCI would not lend the money to Pharaon or gain security from Pharaon until First American's debt was secured -- when in fact, both Altman and Naqvi knew this was untrue.

On October 23, 1986, Pharaon and BCCI executed various agreements to effectuate the planned acquisition of National Bank of Georgia, which included a loan agreement between Pharaon and BCCI whereby BCCI would lend Pharaon $140 million at the time that CCAH/First American acquired its option to purchase NBG, secured by another pledge of NBG shares to BCCI. Altman did not sign these documents on behalf of CCAH, however, because, as the Federal Reserve found, he "became concerned that the documents as then drafted in connection with the NBG option would reveal to the Board BCCI's extensive

participation in the transaction."[83] According to the Federal Reserve, Altman then went to London, where he met with a BCCI officer, Imran Iman, and a BCCI lawyer, to discuss the transaction. A memorandum written by the BCCI lawyer memorializing the meeting stated the following:

Mr. Altman stated that because the Federal Remere will see the Pledge Agreement they will see the references to the Loan Agreement and BCCI SA and will therefore want to see the Loan Agreement. By seeing all the documents, they would most likely arrive at an adverse conclusion.

Altman suggested that a better way to have structured the agreements would have been for the Option and Pledge Agreements to have been executed and then perhaps 60 days later, a Loan Agreement signed an addendum [sic] made to the Pledge Agreement to make BCCI a party to the Pledge Agreement. . .

[The BCCI attorney] would contact [C&W Partner] of Mr. Altman's office and appraise [sic] him of the above. [C&W Partner] would prepare the fresh Pledge Agreement on the above facts. . . Mr. Altman would discuss the above with Mr. Naqvi and if he is agreeable, Dr. Pharaon would be approached.[84]

Following the meetings with Altman, the documents were redrawn to separate the integrated transaction into two transactions in order to mislead the Federal Reserve. As a British lawyer for BCCI wrote in a memorandum:

[t]he reason for having two Pledge Agreements is that Mr. R. Altman feels that in the previous Pledge Agreement, the references to "Loan Agreement" would have given the Federal Reserve cause to see the "Loan Agreement" and possibly decide that an "integrated transaction" was being entered into. Whereas now, with the two Pledge agreements, the Federal Reserve will only see the Option Pledge, which contains no reference to the "Loan Agreement."[85]

A later memorandum by the BCCI lawyer to Naqvi, conveying the substance of meetings between him and Altman in Washington D.C. between December 18 and December 20, describes Altman advising that the documents pertaining to BCCI be signed after "a reasonable period will have elapsed" in order to prevent the Federal Reserve from concluding that the transactions involving BCCI were integrated with the First American purchase of NBG.[86]

The result of the signing of these documents is that NBG stock was simultaneously pledged to BCCI and to CCAH/First American, without it being clear which claim was subordinated. On December 18, 1986, Altman wrote BCCI to advise BCCI that CCAH consented to BCCI holding a security interest in Pharaon's stock in NBG up to a level of $140 million, in a letter that did not specify whose claim to Pharaon's pledged shares would come first.[87] In order to protect First American's interest, a subordination agreement was created on behalf of CCAH, which was executed by Altman the same day, December 18, 1986. BCCI did not, however, execute the agreement, leaving it of no effect. When First American lawyer Tuttle brought this to Altman's attention, Altman ordered the $80 million to be disbursed to Pharaon regardless,

placing CCAH/First American at risk. Later, Altman lied about the situation to the Federal Reserve, denying that he was responsible for seeing to it that BCCI executed the subordination agreement.[88]

In the spring of 1987, months after paying the $80 million option to Pharaon, First American began its due diligence review of NBG to determine what First American had acquired. In the course of the due diligence, First American found numerous problems at NBG, including NBG having paid the expenses of its officials to meet with BCCI officials in London; NBG paying for hotel expenses for the crew of Abedi's private plane; NBG paying to fly Abedi to the opening of President Carter's Presidential library; NBG paying the salary of a former NBG employee for 15 months after he went back to work for BCCI; and paying a fee of $475,000 to BCCI in connection with the CCAH purchase. The due diligence also showed extraordinary expenses over NBG's assumption of a lease from Pharaon's business, Interedec, which would cost NBG another $25 million to $30 million over the 15 years life of the lease. Finally, it showed that NBG was at or near the bottom of its peer group on a wide variety of measures of financial performance, including its return on assets, return on equity, margin on earning assets, and percentage of non-performing loans. Any of these items would have justified First American demanding a reduction of the price paid for NBG, or its right to withdraw from the transaction. First American did neither.[89]

On April 22, 1987, CCAH/First American filed an application with the Federal Reserve to acquire NBG, which made no mention of BCCI's involvement in the transaction or of Clifford & Warnke's simultaneous representation of both CCAH and BCCI in the transaction. The application stated that Pharaon had control of 100 percent of NBG's shares, and did not disclose the existence of Pharaon's pledge of the NBG shares, and other documents giving BCCI the power to vote NBG's shares. When the Federal Reserve asked the source of funds for the purchase, at Altman's direction, CCAH's regulatory counsel, Tuttle, advised the Federal Reserve that the funds had been raised through a rights offering paid for in cash, with less than 5 percent of the equity capital involving borrowings by shareholders secured by a pledge of shares. In fact, at that very time, Altman and Clifford had themselves borrowed from BCCI about 10 percent of the equity capital in the rights offering, against shares in First American which they pledged to BCCI, in direct contravention of the representation they were making to the Federal Reserve.[90]

Finally, on July 24, 1987, Clifford and Altman sent all shareholders of First American an offering memorandum relating to a proposed share issuance to raise $115 million in new capital for CCAH to complete the purchase of NBG. This memorandum represented the first time that Clifford and Altman had asked the shareholders for their approval of the transaction they had commenced in September 1985 at BCCI's direction. It was, as the Federal Reserve found, materially incomplete about BCCI's involvement in the transaction. Moreover, its omission of any notice to the shareholder's of Clifford and Altman's own financial interest in the transaction, breached Clifford and Altman's fiduciary duties to the CCAH/First American shareholders.[91]

Final evidence of the fact that the NBG transaction was not in the interest of First American, is contained in the Federal Reserve's last finding concerning the transaction:

REENTERED AS EXHIBIT 3

The acquisition of [NBG] created a serious drain on the financial health of First American . . . In 1992, First American transferred NBG to one of its subsidiaries at a fair market value of only $90 million -- $130 million less than it had paid for the bank only five years earlier. In addition, First American paid approximately $12 million to get out of the obligations of the master lease [on the Interedec property it assumed from Pharaon].[(92)]

The decision by BCCI, Clifford and Altman, to have First American buy National Bank of Georgia had ultimately cost First American over $140 million.

### Other Conflicts of Interest

Part of the difficulty in unravelling the decision-making process relating to BCCI, First American, and the National Bank of Georgia, and Clifford and Altman's role in this process, is that Clifford and Altman simultaneously represented all parties in the transactions over a period of 12 years spanning each permutation of purchase and sale of each of the organizations involved.

The ambiguity about their multiple roles may have been convenient for Clifford and Altman in some circumstances, such as during attendance at BCCI's international conferences. But the ambiguity also created an overwhelming, ongoing conflict of interest between their obligations to First American's board of directors, officers and employees on the one hand, and BCCI on the other. This was especially true because in the United States, within both BCCI and First American, it was often perceived that there was an ongoing struggle for control of First American's destiny, between two competing organizations, one Pakistani, pertaining to BCCI, and the other American, and controlled by Clifford and Altman.

Nazir Chinoy, head of BCCI's Paris branch, learned of the struggle over First American New York at a BCCI annual conference in Luxembourg in 1985, from Afridi himself, who confessed over a glass of wine that he was increasingly unhappy at First American New York.

Afridi felt that Altman was not permitting him to run First American on BCCI lines and yet he was answerable to Mr. Abedi for profits. He said Altman was interfering in the management and that he had reported to Naqvi on many an occasion about Altman interfering with his management, or trying to change the management structure or style.[(93)]

As Chinoy described it, from his point of view as a BCCI official operating outside the U.S., there was not so much a separation between First American and BCCI as two different types of management, one Pakistani and one American.

I saw rivals competing for power -- Afridi wanting to be the top man, and Altman wanting to be the top man.[(94)]

The conflict of interest between First American's needs and BCCI's needs was made explicit to Clifford and Altman in a memorandum from an official of First American New York to them written in early 1987, concerning the termination of a First American employee in New York. Enclosed with the memorandum provided to Clifford and Altman was a letter from a First American employee that stated that the association between BCCI and First American was threatening to destroy First American as a bank:

REENTERED AS EXHIBIT 3

Your basic error has been BCCI. This association is "on the street" and as soon as this becomes known (with BCCI reputation) decent accounts fly. . . . Either FAB must take over and become First American Bank and buy out BCCI shares, or let them have it. But have two factions running FAB, Eastern and Western, and until you decide just whom and what you are, FAB is doomed to extinction.[95]

There is no record that Clifford or Altman undertook any response to this letter, which contradicts Clifford's testimony that there was never a "suspicion" about BCCI's involvement in First American during the period he ran First American.

Another area of difficulty in assessing Clifford and Altman's knowledge of the relationship between First American and BCCI is that Clifford and Altman have maintained that BCCI acted as an investment advisor to the shareholders. In testimony before the Senate, Clifford testified, "we treat Mr. Abedi, we treat Mr. Naqvi, as the representatives of our investors."[96] In other words, not only did Clifford and Altman wear many hats, but they have maintained that Abedi and BCCI also played various roles, ranging from client to investment advisor to "communications link" for the middle eastern investors.

Sakhia, however, challenged Clifford and Altman's characterization of Abedi as a communications link for the Middle Eastern investors. Sakhia testified:

I fail to understand . . . that it was difficult to communicate with the Middle Eastern investors. . . . They were not Bedouins in the desert. . . . These were intelligent people who owned banks and businesses. The Abu Dhabi investment Authority has several billion dollars invested in this country, and if they can manage those businesses they did not need a channel via Mr. Abedi to First American. They could have done it directly.[97]

Clifford and Altman did begin to communicate directly with First American's shareholders in 1989, after the New York grand jury had begun and both BCCI and Clifford and Altman understood that the key issue would be whether the shareholders were nominees for BCCI. Thus, in October 1989, Altman, instead of his past practice in routing communications with shareholders through BCCI, wrote Adham and other shareholders directly to seek their position regarding the possible sale of the bank.

**Clifford and Altman Loans From BCCI**

**And Share Purchases of CCAH/First American**

Perhaps the most controversial aspect of Clifford and Altman's relationship with BCCI was their purchase of CCAH shares with loans provided by BCCI, a transaction that not discovered by First American officials until the summer of 1990 and not disclosed to the Federal Reserve until the spring of 1991.

The transaction was controversial for a number of reasons. First, from the beginning, regulators had stated their understanding that BCCI would not be lending funds to BCCI shareholders which would be secured by CCAH shares. Second, when regulators asked Clifford and Altman whether they had been such lending now in the past, Altman's responses did not acknowledge the existence of the loans. Third, the loans had never been disclosed to

First American's board of director or other offices. Fourth, the terms of the loans were very unusual in that they were non-recourse, and BCCI could not proceed against Clifford and Altman if they failed to repay them. Moreover, as specified below, there were secret side agreements between Clifford and Altman and BCCI which is essence guaranteed that BCCI would handle the sales of the stock for Clifford and Altman at a price agreed to among the three of them.

In their written testimony to the Subcommittee, Clifford and Altman provided a detailed explanation of how they came to purchase the stock, and how BCCI came to finance the purchase:

The amount paid us by the Company was relatively modest. Mr Clifford, as Chairman, requested, and was paid, $50,000 a year -- a modest amount compared to the substantial annual compensation paid to the top officials of major banks. Mr. Altman . . . received no payments other than the usual director's fees. . . Nor were we given the valuable perquisites that are normally provided senior officers of large corporations. We received no financial bonuses, incentive compensation, or profit sharing. . .

If First American prospered under our leadership, we hoped to have the opportunity to invest in stock and thereby participate with the shareholders in the economic benefits we were creating. In effect, we chose to take our financial rewards as managers by making an investment in stock. . . In 1985, in the light of 4 years of sustained economic growth experienced by First American under our control, we discussed with Sheikh Adham the possibility of acquiring stock in the Company. We also discussed it with Mr. Abedi, as the advisor to the shareholders. We learned the shareholders favored our investment in the company . . .

We had learned that certain of the shares [to be offered in a rights offering] might remain unsubscribed, and that we could purchase such shares at the same price -- book value -- as was paid by the other shareholders.

We determined to acquire shares on this basis, and, after considering alternatives, sought to finance this investment through bank loans, if possible. . .

The first institution we approached for financing was Banque Arabe et Internatinale d'Investissement ("BAII") in Paris, the consortium bank that acted as the lead lender in the syndicate that had lent $50 million in connection with the acquisition of FGB in 1982. . . When problems arose in the negotiation of terms by our counsel, efforts commenced to explore with BCCI financing for the contemplated stock purchase. BCCI, too, was familiar with the [First American/CCAH] stock being offered as collateral and the market for the shares. . .[98]

Thus, by this account, both the share purchase and the lending were intended as compensation by CCAH's grateful shareholders to Clifford and Altman for the superior job they had done in strengthening First American over the first five years of their management. As Clifford testified, "we got to a point where we knew we were over the hump. And I thought the time had come for Mr. Altman and me to participate in the results of this very determined effort that

https://info.publicintelligence.net/The-BCCI-Affair.htm

we had made, that was proving to be so successful."[99] Clifford testified that "I wanted to own some stock in my own company."[100]

With the loans that they secured from BCCI, Clifford and Altman purchased stock in CCAH in 1986. In testimony to the Senate, Altman said that he and Clifford participated in a "rights" offering which was confined to the 14 shareholders of CCAH, paying "book price" for the stock, which was $2,216.000.[101]

The account suggests that both the share purchases by Clifford and Altman, and the lending from BCCI were normal arms-length business transaction, such as other banks might contemplate to reward officers and directors. Moreover, it explicitly separates the decision by CCAH shareholders to compensate Clifford and Altman through permitting them to purchase shares in the bank from the decision by BCCI to lend them funds for the purchases. In fact, the two activities were integrated from the beginning, with BCCI committing from the start to arrange no-risk financing for Clifford and Altman as part of the transaction.

Evidence for the integration of the lending by BCCI to Clifford and Altman with the decision by Clifford and Altman to purchase shares, and the intention that the purchase be risk free, is set forth in some detail by the Federal Reserve in its findings against Clifford and Altman.

As the Federal Reserve detailed, prior to coming up with the "rights offering" approach, with lending done against the shares by BCCI, BCCI and Clifford and Altman considered a number of different alternatives by which they would acquire a risk-free interest in First American.

For example, in early drafts of the arrangement, CCAH itself agreed to issue shares to Clifford and Altman, with one draft including a commitment requiring Kamal Adham, with BCCI as a back-up, to repurchase Clifford and Altman's shares at any time at their discretion. Significantly, the requirement that Adham repurchase their shares was never discussed with him, demonstrating the degree to which Clifford and Altman, as well as BCCI, regarding him as no more than a nominee for BCCI.[102]

Ultimately, Clifford, Altman, and BCCI instead decided to provide them shares through a rights offering in which another BCCI nominee, Masriq, would "waive" its rights to shares in order to make them available to Clifford and Altman, at book value or $2216, one day after Masriq had purchased other CCAH shares at the price of $4044.20 a share -- a transaction that would be economically inconceivable if Masriq were a real party at interest rather than a nominee.[103]

In their written and oral testimony, Clifford and Altman never specified exactly what had gone wrong to prevent BAII [the French bank which they had originally contacted for the loans] from agreeing to lend funds to them for their stock, instead suggesting merely that unspecified difficulties with BAII had lead them to open negotiations over loans with BCCI.

In fact, BAII was considering the possibility of issuing such a loan solely on the basis that BCCI would simultaneously provide BAII with a guarante of the loan -- making BAII effectively acting as a pass through to cover BCCI's involvement, just as it had done in

connection in lending money at the outset of the FGB purchase. But Clifford and Altman insisted on the lending being on a non-recourse basis.

Clifford testified that the non-recourse aspect of the loan -- which prevented BCCI from suing him personally if he failed to repay the loan, or interest on the loan -- had been recommended to him by New York counsel who felt his advanced age required such an arrangement.[104] Despite Altman's relative youth -- he was under 40 years old at the time -- Altman's loan was on the same terms. Altman testified that the concern in his case stemmed from "the [lack of] liquidity of the investment."[105] Regardless of Clifford and Altman's actual reason for insisting that they not be at risk for the borrowing necessary to finance their purchases of CCAH shares, BAII refused to provide the lending, even with a backup guarantee from BCCI, on a non-recourse basis, viewing such lending in this circumstance to be inadequately secured. Thus, even with protection from BCCI, and with a BCCI director on its board, BAII viewed the transaction as sufficiently unusual to pull out.[106]

As Clifford testified, ultimately BCCI provided a $15 million loan on a 100% non-recourse basis for 18 months at the London Interbank Rate, which ordinarily runs below the Prime rate. When pressed by Senator Brown as to whether or not First American had ever loaned money to any individual on such favorable terms, Clifford replied, "I do not know."[107] In staff interviews, Virgil Mattingly, General Counsel for the Federal Reserve, has confirmed that First American has never made loans on such favorable terms.

The loans were due on January 1, 1988. The loans, however, were not paid off at that time. Altman explained that

"they [the loans] were not actually in default because we had gone to the lender [BCCI] . . . and asked if they would refinance the loan or roll it over. The lender [BCCI] indicated a willingness to do that, but before the documents were prepared for a second loan, we started the process of disposition of the shares."[108]

Once BCCI lent the money to Clifford and Altman for the loans, it immediately agreed to providing further protection to them to make certain they would never be at risk from their stock purchases, and in fact, committing to help them sell their shares "at such prices as BCCI and [Clifford or Altman] shall mutually determine."[109]

These unusual terms were set forth not in the loan agreements between BCCI and Clifford and Altman, but in a side agreement they executed, which recited the following terms on the loans:

notwithstanding any provision of the Note or Pledge Agreement (or any other document relating to the loan by the undersigned to BCCI) to the contrary, it is understood and agreed that the undersigned shall not be obligated personally to repay to BCCI the loan principal or any interest accrued thereon[, and that] BCCI shall be limited solely to the undersigned's interest in the CCAH shares and any proceeds thereof to repay the loan and interest thereon . . . . BCCI shall arrange for the sale of said CCAH shares to . . . interested buyers in such manner, amount, and at such prices as BCCI and [Clifford or Altman] shall mutually determine.[110]

**Failure to Disclose Terms of BCCI Loans**

Clifford and Altman did not disclose the unique terms of its arrangements with BCCI to anyone, but actively sought to conceal it. In their written testimony to the Subcommittee, they suggest they provided full disclosure in the following terms:

As noted earlier, our investment in CCAH stock was known to and encouraged by the shareholders. In addition, our intended purchase of stock was duly disclosed to and authorized by the Board of CCAH, the parent company of First American. In advance of the 1986 rights offering, Mr. Clifford personally informed Managing Directors Symington and Quesada that we intended to acquire stock in the corporation . . . We also disclosed the acquisition of this stock to the Federal Reserve Board.[111]

In fact, First American itself was never told by Clifford or Altman of their borrowings from BCCI in connection with their purchase of CCAH shares, until the issue arose as First American began to respond to questions arising out of an audit of BCCI-First American wire transactions in the summer of 1990.

As the Federal Reserve found, Clifford and Altman failed to disclose a number of material facts to Symington and Quesada about their stock purchases, including that they were financing their purchases by means of non-recourse, preferential-rate loans from BCCI and that BCCI had agreed to arrange for the subsequent repurchase of their shares at a price to be agreed upon by Clifford, Altman and BCCI later.[112]

First American only learned of the existence of the Clifford and Altman loans, although not all of their unusual terms, when First American officials were conducting a review of BCCI wire transfers to First American accounts in response to matters arising out of the New York criminal investigation into the BCCI-First American relationship. In that review, they discovered millions of dollars in wire transfers from BCCI to Clifford and Altman's accounts, and asked them what these transfers pertained to.

A letter from Clifford and Altman to First American senior vice president James E. Lewis, dated August 1, 1990, details their handling of this inquiry from their own officers at First American. Clifford and Altman replied as follows:

This memorandum is written to provide you with background concerning certain wire transfers in 1988 you have identified between the Bank of Credit and Commerce International (Overseas) lt., and or personal accounts at First American Bank, N.A. . . .

You are informed that in connection with the 1986 Rights Offering to the shareholders of Credit and Commerce American Holdings, N.V., the parent holding company of First American, to raise additional capital for the Company, all of the new rights shares were not subscribed by the shareholders. We determined to acquire a small amount of CCAH shares which were thus available. In this regard, we explored financing of the purchase with possible lenders, including BCCI.

Satisfactory loans with BCCI (Overseas) Ltd. were negotiated by each of us and the purchase of the CCAH shares at the offering price was effected. (Mr. Clifford invested approximately twice as much as Mr. Altman.) . . .

In early 1988 we were interested in selling some of our CCAH stock and upon making inquiries in this regard, learned that a Middle East businessman wished to acquire shares of CCAH. As a result, we each sold him, for cash, a portion of or shares. BCCI serviced that transaction and wired to our respective accounts at First American the sale proceeds. From those proceeds we decided to pay off all outstanding indebtedness to BCCI (including interest) and, accordingly, we arranged to wire monies from or First American accounts to BCCI for that purpose.

We understand this information will be maintained on a confidential and privileged basis.[113]

Notable in this account is what Clifford and Altman did not tell First American on August 1, 1990: that BCCI had held a security interest in their First American shares, in contravention of the understanding of regulators that BCCI would not lend for the purpose of purchases of such shares; that BCCI's lending was made on a non-recourse basis, in which BCCI could recover only Clifford and Altman's interest in First American, rather than against them directly; that BCCI, not Clifford and Altman, had located the "Middle East businessman" who purchased their shares; or that from the beginning, Clifford and Altman had arranged with BCCI for guaranteed buy-backs of their stock to insure them against any possible loss.

Significantly, Clifford and Altman also failed to disclose the existence of these arrangements to their partners at Clifford & Warnke, who under normal partnership rules would have been entitled to a share of Clifford and Altman's profits from the compensation being provided them for their work at First American.

In June 1987, Clifford and Altman met with Abedi and Naqvi in London, and insisted on paying interest on their respective loans from BCCI, despite the fact that the side letters they agreed executed relieved them of any obligation to do so. Two months later, they participated in a second rights offering for CCAH stock. They again paid for the shares with non-recourse loans from BCCI, against which they pledged their shares of CCAH. They again executed side-letters relieving them of any risk on the transaction and insuring that they would be permitted to sell the stock at a price to be determined by BCCI, Clifford and Altman. At this point, Clifford held 5446 shares of CCAH, Altman 2722 shares. All were pledged to BCCI. Nowhere was BCCI's security interest in these shares recorded, including in the Netherland Antilles, where CCAH was incorporated, and where it was legally required.[114]

In early 1988, several events took place which could have given rise to Clifford and Altman's decision to sell enough of their shares in CCAH to eliminate the BCCI lending to them. First, on February 9, 1988, Abedi suffered a heart attack and stroke. The same day, in hearings before the Subcommittee, former Panamanian consul Jose Blandon disclosed that BCCI was handling drug money for General Noriega. In turn, Blandon's testimony prompted the issuance in March of a subpoena by the Foreign Relations Committee to BCCI for Noriega records.

In this very period, Clifford wrote a letter, dated February 8, 1988, to Naqvi, to ask Naqvi to arrange a sale of some or all of Clifford and Altman's stock. Significantly, the Federal Reserve concluded that the letter was not written on February 8, 1988 by Clifford, as dated, but "some time thereafter" and was backdated to make it look as if it were written prior to February 9, the date of the Abedi heart attack and the Blandon testimony.[115]

REENTERED AS EXHIBIT 3

In March, 1988 the shares of CCAH stock owned by Clifford and Altman were sold for $6,800 per share. Although the stock had been purchased at book value, it was sold at market-value, which essentially meant whatever someone was willing to pay for it. Altman testified to the Subcommittee that "the distinction between a purchase at book value and a subsequent sale of the shares... was not a practice that was unique to Mr. Clifford and me and this transaction." [116] Mr. Mohammed Hammoud, a CCAH shareholder and the purchaser of the shares, was apparently willing to pay $6,800.00 per share -- the highest price ever paid for CCAH stock - which afforded Clifford and Altman a combined gross profit of $9.5 million. Clifford explained the high price by noting that "there were no rights offerings in 1988," the year Mr. Hammoud purchased the stock of Altman and Clifford. [117]

In fact, the price of the stock was set not by Hammoud, and not even by BCCI, but by Clifford and Altman, who told Naqvi the amount of net profit they wanted on the sale, after all taxes had been paid. As the Federal Reserve found:

In late February or early March 1988, Altman met in London with Naqvi. Naqvi called Imam and directed him to speak with Altman concerning the sale of Clifford's and Altman's shares. Altman stated that he wanted a net profit on his shares of $1.5 million, and that Clifford wanted a net profit on his shares of $3 million. These profits were to be after payment of all taxes and repayment of all loans from BCCI. Altman also stated that he and Clifford each wanted to retain a portion of their CCAH shares. Naqvi agreed to this and instructed Imam to work out the details with Altman.

In consultation with Altman, Imam calculated the sale price that would be necessary to achieve Clifford's and Altman's goals of paying off their loan balances including all interest paid, covering all capital gains taxes to be imposed in the transaction, and retaining a profit of $3 million and $l.5 million respectively. . . . Imam, in consultation with Altman, calculated that a purchase price of 2.69 times book, or $6,800 per share, would be needed to achieve Altman's objectives. In concluding their conversation, Altman instructed Imam not to disclose their conversation to anyone other than Naqvi.[118]

Following the working out of the details of this arrangement, BCCI "found" Mohammed Hammoud, described by BCCI chief financial officer Masihur Rahman as a "front man" for BCCI, to "purchase" Clifford and Altman's shares in First American, for the highest price ever paid for CCAH stock -- $6800 per share -- and with loans from BCCI, secured by the CCAH stock.[119]

Altman has testified that he had never met Mr. Hammoud.[120] However, a power of attorney maintained in BCCI records shows that Hammoud granted Altman a power of attorney allowing Altman to undertake any transaction on behalf of Hammoud he wished in connection with the purchase or sale of CCAH shares. Thus, the power of attorney granted to Altman by Hammoud would have permitted Altman to have effectuated the sale of his shares to Hammoud whenever he chose, any whatever price he chose.

Altman, however, testified that he did not know that he had a power of attorney from Hammoud, stating "to the best of my recollection, I have never seen that document before." [121]

REENTERED AS EXHIBIT 3

The Federal Reserve concluded that Altman lied to them in his sworn testimony to them concerning the sale of the CCAH stock to Hammoud. According to the Federal Reserve:

On February 12, 1991, in sworn testimony to the Board of Governors, Altman falsely stated that he did not know how the purchase price of $6800 per share was fixed, and that he did not discuss the matter with Imam.[122]

Senator Brown accurately summed up the transaction when he stated, "the substance . . . was that [Clifford and Altman] got title to the stock without putting up a single penny of [their] own money, and suffered no loss if the stock dropped in price . . ."[123]

Remarkably, when Clifford and Altman decided in 1989 to finance purchases of shares in CCAH from their own funds, BCCI automatically advanced loans for those funds regardless, reversing the charges only after BCCI was informed that Clifford and Altman had decided to pay for the additional First American shares themselves.[124]

**Concealment of Loans from Regulators**

The Federal Reserve showed renewed interest in the issue of whether BCCI might secretly control First American after the indictment of BCCI in Tampa for drug money laundering in October, 1988 renewed simmering allegations that BCCI was in fact a rogue bank. At the time, CCAH had an application before the Federal Reserve to retain control of a Florida bank, the Bank of Escambia, N.A., of Pensacola, which it purchased as part of its purchase of the National Bank of Georgia.

On January 23, 1989, Altman met with a Federal Reserve examiner who questioned him concerning the nature and extent of the First American-BCCI relationship. Altman told the examiner he did not know about any understandings or financial arrangements that might exist between any CCAH shareholder and BCCI, failing to mention his own and Clifford's past such understandings and arrangements, as well as pledges of other shareholders' shares to BCCI of which he had learned.[125]

Following the meeting with Altman, the Federal Reserve decided to approve the application to retain Bank of Escambia, advising Altman in its transmittal letter that it was specifically relying on the representations made by CCAH regarding its relationship with BCCI and its commitment that "BCCI is not involved in the operations" of CCAH or First American.[126]

On December 13, 1989, William Rybeck, the Senior Deputy for Banking Supervision at the Federal Reserve wrote to Altman requesting "information on any loans, original or subsequent to the investors." Altman replied that he had no "access to information regarding any financial arrangements that might exist" between any CCAH shareholder and BCCI. "Based on our consultations with the resident management director for [CCAH] in the Netherlands Antilles, we can only confirm that no pledge or security interest has ever been recorded on the Company's share register by any lender."[127]

This response by Altman to the Federal Reserve was exceptionally misleading. First, Altman knew not only of his own and Clifford's loans from BCCI, but had arranged specifically that

https://info.publicintelligence.net/The-BCCI-Affair.htm

the loans not be recorded in the Netherlands Antilles, and had made similar arrangements for other CCAH shares pledged to BCCI. Thus, his confirmation that no pledge or security interest has been recorded was knowingly misleading, and provided to the Federal Reserve for the obvious purpose of convincing the Federal Reserve that no such loans had ever been made, when Altman knew this to be a lie.

On February 5, 1990, Altman followed up this initial misleading answer with a second letter to the Federal Reserve, this one characterized as one he had "just received" from Naqvi at BCCI concerning BCCI's loans to CCAH shareholders. The letter stated that the acquisition of Financial General "was not financed in any respect by BCCI," and was drafted to create the false impression that none of the loans that BCCI may have made to CCAH shareholders were made for the purpose of purchasing shares in CCAH/First American. This misleading letter, which Altman presented to the Federal Reserve as if it originated from BCCI, had actually been drafted by either Altman, or one of his partners at Clifford & Warnke, and transmitted to BCCI and Naqvi for Naqvi's signature.[128]

Altman explained his actions regarding these letters as a consequence of the Federal Reserve's supposed lack of interest in the issue of BCCI lending for CCAH shares that had not been part of the original FGB takeover in 1981:

Mr. Ryback, in December, had submitted to me a letter that is broadly worded . . . When I received the letter I spoke to Mr. Ryback and indeed, I spoke to him more than once. . . Mr. Ryback explained to me what it is that he was seeking by way of information. I might note that the first paragraph of Mr. Ryback's letter I believe is the matter relating to the tender offer. Then he goes on his second paragraph and deals with the subject of any loans made then or subsequently. . .

I pursued it, other attorneys pursued and we pursued it aggressively. We received information back that we thought at the time was credible. In this time period, the issue of lending arrangements arose, and the matter came up about what BCCI's practices were . . . We did not necessarily think that the lending was impermissible . . . It was not impermissible to borrow, even borrowing secured by the stock. But we gave the Federal Reserve the information we had obtained.[129]

Altman said that he understood that what the Federal Reserve wanted to know was first, whether BCCI had lent money for the original FGB takeover, and second, whether BCCI currently had lending which secured BCCI shares. Altman testified that the one kind of information that Ryback did not want was information about past BCCI lending which no longer existed -- such as the lending made to Clifford and Altman, and it was on that basis that Altman failed to provide him with this information:

Mr. Ryback was not interested in certain kinds of information, even though his original letter would seem to call for it. . . I had also indicated to him that to comply literally with this letter, I am told, would be burdensome, to get every loan ever made to any investor by BCCI. And that is why he focused his inquiry as the specific information that he needed for his purposes. (130)

REENTERED AS EXHIBIT 3

Mr. Rybeck, however, told Senator Kerry that he had no memory of ever altering his original request.[131]

Ultimately, the Federal Reserve learned of the BCCI loans to Clifford and Altman only from its own investigation, when it discovered the relevant documents in BCCI files held in Abu Dhabi, and interviewed Imam, who participated in meetings, telephone calls, and written communications with Altman in connection with the loans.

What is evident from this history is that Altman systematically took steps to hide the truth about his and Clifford's loans from BCCI from the Federal Reserve, artfully answering questions in such a manner as to mislead the Federal Reserve and prevent the Federal Reserve from discovering their own secret loans. In the latter stages of this cover-up, Altman actually created letters purporting to be from BCCI that were created at Clifford & Warnke for the purpose of hiding Clifford and Altman's borrowings.

**Altman's Assessment of His Conflict of Interest**

**Pertaining To First American and BCCI**

On July 6, 1990, Robert Altman wrote a memorandum to the file describing a meeting between him, Swaleh Naqvi, and another of BCCI's lawyers from another U.S. firm named Kim Gagne, on that day in London. Both in what it did say, and even more importantly in what it did not say, the memorandum demonstrated Altman's personal recognition of the potential problems for him relating to BCCI having lent him money for the purchase of his First American stock.

The memorandum, written at a time when the Abu Dhabi interests had just begun to assert their control of BCCI's business and legal strategy, focused on conflict of interest issues involving BCCI, Clifford and Altman, and provided a detailed review by Altman of the supposed nature of the First American/BCCI relationship in the following terms:

I said that I had wanted to inform him [Naqvi] personally why Clifford & Warnke could not provide legal advice to BCCI in connection with the investigation being conducted by the District Attorney in New York State. As he knew, our firm did not do criminal work, and the primary representation of BCCI would be by other lawyers in any event. However, we were general counsel to First American and an issue had arisen about BCCI's relationship with First American. While we did not now know of any actual conflict of interest between BCCI and First American, we were concerned about the appearance of a conflict as well as any potential conflict. . . . Mr. Iqbal [the new head of BCCI, replacing Naqvi at the request of Abu Dhabi] said he did not know much about the First American issue in New York as his focus was solely on BCCI's operations. Mr. Iqbal mentioned that BCCI had loans to some of First American shareholders, but that alone constituted his understanding of BCCI's relationship with First American. He accepted, however, my comments regarding any appearance of conflict.

Mr. Naqvi also accepted the views I presented. However, he seemed frustrated and stated that these allegations about the BCCI/First American relationship were "pure rubbish." Mr. Naqvi said that BCCI had "no interest whatsoever" in First American, except for a financial interest in some loans made to some of the First American shareholders (through general lines of

credit). CCAH stock had, at some point, apparently been given as security. Mr. Naqvi said that some years ago BCCI had briefly considered a merger with Fist American, among its various corporate restructuring strategies, but that this had never been pursued, and was merely one of the historical planning models. Mr. Naqvi said he believed the false allegations about BCCI/First American were being spread by disaffected former BCCI employees who felt bitter toward the Bank.[132]

The subject matter of this memorandum is the BCCI relationship to First American, whether BCCI had any interest in First American, and the possible implications of loans BCCI might have made to First American shareholders. At the time Altman wrote this memorandum, both Altman and Naqvi knew well that Clifford and Altman had themselves had previously had such loans, and that loans from BCCI to First American shareholders was a key issue on which the New York District Attorney was seeking information. BCCI's secret loans to Clifford and Altman, secured by First American/CCAH stock, would obviously be material to such an inquiry, and of themselves raise substantial "conflict-of-interest" questions concerning Clifford and Altman. Any competent attorney would recognize this, and be compelled to explore the issue with a client in any genuine conversation about the issue of conflict. Yet nowhere in the memorandum does Altman discuss this issue with Naqvi, as certainly would have happened if such a discussion were authentically exploring the conflict issue.

The omission of any mention of Altman's own loans from BCCI for First American stock during the lengthy discussions of the conflict issues is striking, and extremely unlikely if the conversation and memorandum were intended to reflect an honest analysis and appraisal of the situation.

### Legal Fees

Clifford told the Subcommittee that "most of the services were rendered to the operating holding company, First American Bankshares," which "started out at a lower figure when the bank was not so large, and as the bank expanded then the cost of legal services expanded." Clifford indicated that his law firm received "maybe $1 million a year" in legal fees from First American.[133]

Clifford testified that the fees charged BCCI "were nothing like those charged First American, because there wasn't nearly that much work to do."

In fact, Clifford & Warnke billed First American and its related entities a total of about $11 million over about an eight year period, averaging about $1.35 million per year; and BCCI a total of about $6 million over twelve years, or about $500,000 per year, for a total of $17 million in all.

In addition, the law firm of Clifford & Warnke was the lead firm for the defense of the BCCI officers indicted in Tampa in 1988. According to the House Banking Committee, BCCI paid some $45 million in legal fees which were disbursed by Altman. In testimony before the Senate, however, Mr. Altman disputed that figure and indicated that "the amount of money ... paid in this general effort was half that -- approximately $20 million," which Altman testified was used for a variety of purposes including international audits and the implementation of new procedures to guard against money laundering. [134] Clifford testified that "not one penny

of that effort came to us."[135] A summary of these disbursements, provided to the Subcommittee on March 2, 1992 by Clifford and Altman's attorneys, specifies a total of $18,975,224.47 paid by BCCI in attorney fees for the Tampa criminal defense, and another $2,817,011.66 for miscellaneous expenses, ranging from computer services and court reporters to private investigators and expert witnesses in connection with the case.

## Cooperation with the Subcommittee

In testimony before the Senate, Clifford and Altman explicitly denied having done anything to delay, impede, or frustrate the efforts of the Senate to obtain the full story about BCCI, and BCCI's relationship to First American. As Altman testified:

There have been suggestions made by certain witnesses that we were engaged [in] influence peddling and the like, in order to protect BCCI. Those are totally untrue. There are suggestions that we condoned obstructions of this committee's efforts or investigations of BCCI. Those are totally untrue, and the record should reflect that that is our view, and as I said, we can detail it. [136]

Unfortunately, while repeatedly advising the Subcommittee of their intention to cooperate fully with its inquiries, Clifford and Altman, like BCCI itself, in fact failed to provide documents that had been subpoenaed by the Committee. In addition, according to allegations from a variety of sources, including other attorneys for BCCI and BCCI officials, they undertook a variety of efforts to delay or impede the Subcommittee investigation.

These efforts included:

** Altman allegedly instructing BCCI officer Amjad Awan to mark bank documents "attorney work product" in August 1988 in an attempt to exempt them from subpoena, despite the fact that the documents were bank records maintained in the ordinary course of business that had not been created by attorneys.

** Failing to insure that all BCCI documents specified in the Foreign Relations Committee subpoena in July 1988 were provided to the Subcommittee, and failing to instruct BCCI or First American employees to review BCCI records maintained at First American in response to the subpoena.

** Failing to insure that BCCI officials in Florida did not destroy or alter documents subpoenaed by the Committee in August and September, 1988.

** Altman telling Subcommittee staff on May 14, 1990 that BCCI had no outstanding loans to shareholders of CCAH, when one week earlier, he had told the Federal Reserve that he had heard reports of such lending in amounts ranging from $400 million to over $1 billion.[137]

** Allegedly attempting to use "political chits" to delay hearings of the Subcommittee in the summer of 1990.

Indeed, according to BCCI banker Amjad Awan, at the very time in the summer of 1988 that Clifford and Altman had advised the Subcommittee that they and BCCI would cooperate fully

REENTERED AS EXHIBIT 3

with the Subcommittee, they were simultaneously advising their clients that they intended to play "hardball" with the Subcommittee.[138]

Clifford and Altman have denied intentionally undertaking any of these activities, for example, explaining the failure to provide documents as inadvertent, and based on inadequate document review done by BCCI officials; and denying the "political chit" charge outright. Moreover, the Subcommittee investigation cannot fully answer all the questions raised about Clifford and Altman's response to the inquiries by the Subcommittee. For example, regarding the case in which BCCI officials destroyed and altered documents in response to the Committee subpoena in 1988, it is not clear from the record before the Subcommittee whether Clifford or Altman knew of these activities.

However, there is no question that documents subpoenaed by the Foreign Relations Committee concerning General Noriega, and existing in the United States, were never reviewed by Clifford and Altman as BCCI's attorneys, let alone provided to the Committee in response to a lawful subpoena. And, after Clifford and Altman were no longer representing BCCI, responses by them to document requests were delayed repeatedly, and some of the answers that were ultimately provided proved to be incompatible with the documentary evidence.

### Handling Of Subcommittee Witnesses and Documents

In March, 1988, following testimony before the Subcommittee by Jose Blandon and other witnesses in February concerning the use of BCCI by General Noriega and members of Noriega's business groups, the Foreign Relations Committee authorized subpoenas to BCCI for Noriega's records. At the time the Committee acted, Clifford and Altman had already begun their own internal investigation at BCCI of the relationship between BCCI and Noriega.

Documents provided to the Subcommittee on May 20, 1992 by Clifford and Altman, following BCCI's waiver of the attorney-client privilege, describe a witness interview with Amjad Awan, Noriega's personal banker at BCCI, conducted by an unspecified lawyer at Clifford & Warnke on February 23, 1988 -- two weeks following Blandon's disclosures. At the time, Awan was based in Miami, having been BCCI country manager in Panama from 1981 through 1984, and an officer at BCCI's Washington, D.C. representative office in 1984 and 1985. As the Clifford & Warnke attorney described the situation:

BCCI's New York office believes that BCCI may receive a subpoena, perhaps from Congress, to testify about BCCI's role vis-a-vis General Noriega . . . there was always an undercurrent that alot [sic] of the money in Panama may be drug money, but BCCI felt it was dealing with lawful activity in dealing with the foreign exchange dealers . . . Mr. Awan knows of no specific instances of drug money passing through BCCI. It is possible some was laundered drug money . . . General Noriega's business with BCCI was limited to the $200,000 to $300,000 he deposited for VISA cards, etc. But Mr. Awan became a personal friend of General Noriega. They became very close after Mr. Awan left Panama in 1984. General Noriega asked Mr. Awan to make hotel reservations, and to book limousine and airline tickets. Mr. Awan would often use his own credit cards to perform these services because the BCCI office in

Washington in [sic] only a representative office. . . Mr. Awan meet [sic] General Noriega in New York on one occasion and asked Mr. Awan to give him $100,000 in cash.[139]

Thus, months before the service of a subpoena to BCCI regarding Noriega and Awan, Clifford and Altman had interviewed Awan regarding his relationship with Noriega, been informed of at least one cash payment by BCCI to Noriega in the U.S., and learned of Awan's handling of Noriega finances while at the Washington representative branch office of BCCI.

In the meantime, on June 1, 1988, Clifford wrote a memorandum to Altman concerning information he had received from BCCI's number two official, Swaleh Naqvi, in London, concerning an article in the New York Times that referred to BCCI's alleged involved in money laundering operations in Panama, in a leak arising out of the Customs "C-Chase" sting operation. According to the Clifford memorandum to Altman:

On Wednesday, June 1, at 11:00 am I had a phone call from Mr. Naqvi in London. He had placed the call to you, but in your absence then spoke to me. I explained to Mr. Naqvi that the reason you were away was that you were in California following up on information regarding the possible purchase of a bank.

His call had to do with the BCCI bank in Panama. There had been brought to his attention an article in the New York Times of Wednesday, May 25, that referred to the Panamanian office of BCCI. The report involved missing documents from the bank's records and stated that the authorities have linked BCCI in Panama to money-laundering operations.

Mr. Naqvi says that there are two individuals who operate the bank in Panama and he has told them to come to Washington to see us. . . . He stated that the men would remain here as long as we required their presence. After we have talked to the men we are to report to Mr. Naqvi. The matter is of such importance to him that he may, after our conversation, decide to come to the United States.[140]

Thus, by the time of the issuance of the Committee subpoena on July 27, 1988 and subsequent service August 1, 1988, Clifford and Altman were aware in some detail of both Noriega's involvement with BCCI and serious allegations concerning BCCI's involvement with drug money laundering generally.

After the Committee subpoena was served, in his initial contact with the Subcommittee on behalf of BCCI, Clark Clifford wrote Senator Kerry to advise him of BCCI's intention to cooperate fully with the investigation. Soon thereafter, Clifford contacted Senator Claiborne Pell, chairman of the full Committee, to request a one-month delay in producing documents pursuant to the subpoena. Senator Pell referred that request to Kerry staffer Dick McCall, extending production to September 11, 1988.

In the meantime, Clifford and Altman met with Jack Blum and Kathleen Smith of the Subcommittee staff to discuss the subpoenas. A memorandum to the file from Altman dated August 10, 1988, describes the meeting in the following terms:

During the course of our discussions which lasted about an hour and 20 minutes, Jack Blum described in detail the information collected during the investigation and public hearings by

https://info.publicintelligence.net/The-BCCI-Affair.htm

the Subcommittee . . . From its sources, the Subcommittee has been led to believe that BCCI, through its banking locations in Panama, Colombia and in Miami, Florida, has had a major involvement in the management of assets for General Manuel Antonio Noriega, the current head of the Panamanian government; Michael Harari, reputed to be a close aide of Noriega's, an arms dealer, and formerly an Israeli secret service agent; and various other individuals from Panama and Colombia with major involvements in international drug trafficking. The Subcommittee staff has also been led to believe that BCCI, through its banking locations in Colombia and Panama, has been significantly involved in the laundering of large amounts of cash obtained from the sale of illicit drugs in the United States. . .

(1) The staff has amassed extensive information on BCCI. It is their understanding that General Noriega was instrumental in helping BCCI secure a banking charter in Panama. Information on BCCI has been provided by third parties, including government officials and other banks, as well as current and former employees of BCCI.

(2) We advised the Committee that we would soon be going to Miami to begin to assemble facts and related documents and, if need be thereafter, to Colombia and Panama. We expressed concern over the breadth of the subpoena. . .

(3) Altman told them that it was the intention of BCCI's senior management to be cooperative and helpful. He stated that management was unaware of any impropriety of the bank or its employees.

(4) In response to the staff's inquiry, Altman described BCCI's relationship with First American and explained Clifford's and Altman's long-standing representation of the Bank. Altman also expressed our complete confidence in BCCI's management. He stated that criticism that had been levelled at the Bank over the years had proved, upon careful investigation, to be groundless and without merit. . .

Mr. Clifford, in particular, and the firm generally have enjoyed an excellent relationship with the Committee over the years.[141]

Awan was in London at the time the subpoena was served for a regularly scheduled marketing meeting, and was told about the subpoena by Naqvi, who told him the lawyers would work things out.[142] Following Awan's return to the United States, Awan participated in a series of interviews with Altman and two other lawyers from Clifford & Warnke in Miami in mid-August, 1988. Six other BCCI officials were also interviewed by Altman in the same period. In the memoranda prepared by Clifford & Warnke attorneys concerning these interviews, the BCCI officials made numerous untrue statements to the lawyers conducting the interviews, ranging form claims that they did not knowingly launder drug money, to a contention that "BCCI has no professional relationship with General Noriega," but merely had previously "maintain[ed] depository accounts for General Noriega in London and issued credit cards."
[143]

On August 17, 1988, Altman and other Clifford & Warnke lawyers met again with BCCI officers in Miami and discussed the Senate subpoenas follows:

REENTERED AS EXHIBIT 3

Mr. Altman commented on the existence of the Noriega account in London, but stated that the subpoenas requested documents in the possession of [BCCI] Overseas. . . . They were all transactions of S.A. The wire transfers of Panama to London had no names or account numbers. . . there could be unfortunate implications for the bank if we were to produce documents with respect to General Noriega's London account. Those records may be protected by English or other foreign law, an issue we will check. If those documents are produced, BCCI personnel in Panama could be at risk . . .

Mr. Altman suggested that we seek to produce documents in the first week of September. By then, we would have to formulate a position with respect to Mr. Awan.[144]

During the interviews, Awan stated that General Noriega had in fact banked with BCCI, that Awan had handled various transactions on behalf of Noriega while based in Washington, and that Noriega had a maximum deposit relationship with BCCI of $22 million. This final statement was, of course, entirely inconsistent with Awan's representation to Clifford & Warnke the previous February that Noriega's business with BCCI was limited to $200,000 to $300,000.[145] Moreover, Awan told Altman that he "did not think that General Noriega would be above taking bribes from those involved in the drug industry. [146]

It is clear from the documents provided to the Subcommittee that Mr. Altman was concerned about providing too much information to the Subcommittee. As Sanders notes in his memorandum:

Mr. Altman stated that the bank had a potential political exposure as a result of the receipt of substantial dollar deposits from General Noriega. Additionally, there is the concern with respect to money laundering, although the bank does not believe any laundering occurred knowingly. . . As to money laundering, we could explain it may have occurred. We could explain that we took some few millions dollars from unknown sources and that, in addition, we dealt with money changers. We could state, however, that it was the policy of the bank not to deal with drug money and, in any case, the amount of cash we received was insignificant compared to other banks.[147]

Following his meetings with Altman in Miami, Awan returned to London, to review the Noriega financial records and meet with Naqvi. While in London, he again met with Altman, who questioned Awan concerning the nature and extent of BCCI's relationship with Noriega. According to Awan's sworn testimony before the Committee, and staff interviews in connection with that testimony, while in London in late August, Altman told Awan to retrieve documents pertaining to Noriega in response to the Subpoena. Awan retrieved the documents, which included a number of originals and some copies, and showed them to Altman. All of the documents were BCCI financial records, and none of them contained any material prepared by attorneys. Nevertheless, when Altman returned the documents to Awan, he told Awan to mark them as "attorney work product." Awan, who did not understand what the phrase meant, marked the documents, "attorney word product," with the markings appearing on each folder in which they were contained.[148] Awan later recollected that Altman had also told him that regardless of what he might tell the Senate, he intended to play "hardball" in response to the subpoena.[149]

https://info.publicintelligence.net/The-BCCI-Affair.htm

By contrast, Altman testified that there was "no intention to mislead this committee," and "there has been no effort to derail this process."[150]

Altman then met with Naqvi to discuss the Senate subpoena further. Following that meeting, Awan was told by Naqvi not to return to the United States, and that he would be transferred immediately to Paris as a means of avoiding the subpoena.[151] Awan protested, noting that his family and possessions were in Miami and that prior to the subpoena he had no plans to leave the United States. Naqvi agreed that Awan could return briefly to the U.S. to make arrangements to move, but urged him to leave as rapidly as possible. Awan returned to the United States, and, believing after his meeting with Naqvi that he could not trust Altman to represent his interests, began communicating directly with Blum without the knowledge of Altman, and decided to resign from BCCI and retain a separate attorney.[152]

Significantly, chronologies of meetings, originally created as privileged and confidential attorney work product pertaining to the Congressional subpoena, and ultimately provided to the Subcommittee on May 20, 1992 by Altman's attorneys, do not show any meeting involving Altman and Awan in London in August, 1988, despite Awan's detailed testimony concerning his meeting with Altman in late August.

These chronologies show Altman's meetings with Awan only in February 23, 1988 in Washington and in mid-August with Awan in Miami, and omit any reference to Altman having Awan in London, or even to Altman having met with Naqvi in London in this period. Given Awan's detailed and explicit statement about meeting Altman in London at the time the subpoena was issued, and Altman having told him in London to mark Noriega documents "attorney work product," the omission of any reference to the London meetings in the Clifford & Warnke internal chronologies and documents is suggestive of Altman's intent.

Following his meeting with Altman and his meeting with Naqvi in August, Awan told Blum that BCCI had sought to transfer him out of the country and to prevent the service of the subpoena, and that this took place immediately following a meeting between his superiors and Altman. Blum arranged to serve Awan without providing further notice to BCCI, or Clifford or Altman, and service was made in early September, 1988.

Soon after the service of the subpoena on Awan, on September 9, 1988, Awan told an undercover Customs agent, Robert Musella, in a conversation secretly recorded by the government, that the Foreign Relations Committee "had a vendetta" against BCCI, and that lawyers for BCCI in Washington advised the bank to immediately transfer Awan out of Miami to Paris to avoid being served with the subpoena:

Last Friday, I was told that, ah, our lawyers, Mr. Altman was there, and he suggested to the bank that I should be immediately transferred from the U.S. to Paris. . . So they duly transferred me Friday to Paris.[153]

Later, Awan would explain to investigators that he was not personally present at any meetings with Altman regarding his transfer, but that the circumstances had lead him to believe that the BCCI decision had been made on the advise of Altman.[154]

On the very day Awan was telling Musella about BCCI's decision to move him to Paris in an effort to circumvent the Senate subpoena, September 9, 1988, Altman and his colleague at Clifford & Warnke, Robert Sanders, met with Blum to discuss the subpoenas issued by the Committee to BCCI. Altman told Blum that BCCI "does not do business" with drug dealers, did not have large depository relationships in Colombia and Panama, and that BCCI "had been approached for several occasions and offered lucrative commissions to accept large cash deposits, but the bank always refused." As detailed in the Clifford & Warnke memorandum of the meeting, Blum then asked Altman concerning the relationship between BCCI and Noriega:

Altman stated that BCCI previously maintained a deposit account for the Panamanian government which General Noriega, as head of the government, could control. BCCI may not disclose information about this account for two reasons. First, such disclosure would be unlawful under Panamanian bank secrecy law. Second, if this information were produced, the employees and business operations of BCCI would be vulnerable.

Mr. Blum wanted to know how much money was in this account and in what country the account was maintained. Mr. Altman stated that this information was not available. Mr. Altman advised that the only one way the bank might be able to disclose information was with the permission of the Panamanian government.

Mr. Blum inquired when the money in this account was withdrawn. Mr. Altman said the account was closed sometime this past summer.

Mr. Blum asked about Mr. Awan's present location. Mr. Altman stated that he was traveling in the United States for a few days, but may be transferred soon to BCCI's office in Paris. . . .

Mr. Blum asked whether BCCI ever made any loans to General Noriega. Mr. Altman stated that if there were any loans, they were minor in nature. Again bank secrecy laws foreclosed disclosure. . . .

Mr. Altman then stated in closing that he wanted to convey to Mr. Blum a serious concern. Mr. Altman noted that the banking business is built on trust and confidence. Accordingly, Mr. Clifford and he were concerned that BCCI's reputation would be unfairly damaged as a result of publicity about the investigation, even though all allegations would be disproved. In this regard we were concerned about any rumors or leaks that could flow from the investigation and might, incorrectly and inequitably, tarnish BCCI's investigation.[155]

On September 14, 1988, Clifford and Altman met with Foreign Relations Committee special counsel Blum to discuss document request and production, and reiterated previous commitments to cooperate with the Senate. Shortly thereafter, in Miami, BCCI officials, under instruction from BCCI management, began altering and destroying documents specified in the subpoena.[156] On September 19, 1988, Clifford and Altman made BCCI's first production of the subpoenaed documents, with a second production on September 21, 1988, accompanied by representations from BCCI, through Clifford and Altman, that no other documents pertaining to the subpoena existed.

After retaining separate counsel from BCCI and ceasing being represented by Clifford and Altman, Awan began to take the position that he would be at less risk if he did not object to the

https://info.publicintelligence.net/The-BCCI-Affair.htm

production of documents, and cooperated with the Subcommittee, a position that contradicted Clifford & Warnke's position that if Awan provided information, his life would be risk. Awan's tentative decision to cooperate with the Subcommittee, communicated on September 22, 1988 to lawyers at Clifford & Warnke, caused "distress" to the Clifford & Warnke lawyers handling the matter, as set forth in a September 22, 1988 memorandum from John Kovin, a partner at Clifford & Warnke, to Altman and another partner:

A literal reading of John Grabow's telephone message is somewhat distressing. If it means that no objections of any nature will be interposed to the production of documents in response to Amjad Awan's subpoena -- including any concerns that Mr. Awan may have about his personal safety -- it may cause us to alter the stance that we have adopted with the Committee staff up to this point.[157]

A second memorandum to the file from Kovin describes a meeting five days later in which the Clifford & Warnke attorneys are clearly trying to convince Awan's lawyers to maintain a collective strategy of keeping documents from the Committee. The September 27, 1988 memorandum, marked "privileged and confidential," from Kovin states:

In response to specific questions by Mr. Grabow [Awan's attorney], I responded that we had not provided any copies of Mr. Awan's expense or compensation records for retention by the Committee, nor had we provided any copies of "Noriega documents". With respect to the latter category, we do not intend at the present time supplying any such documents."[158]

In a memorandum three days later, Kovin wrote that "Awan turned over the so-called Noriega documents", and "Awan noted to Grabow but not to Blum that certain of his travel records -- supplied to this firm -- from the period when he was stationed in Miami had not been produced."[159] Thus, Clifford & Warnke knew as of September 30, 1988 that documents responsive to the subpoena existed and had not been provided to the Senate. Kovin's recommendation as to how to proceed regarding those documents was not to conduct a search for them in order that they be provided the Senate, as was legally and ethically required of BCCI's attorneys, given the service of the Senate subpoena, but instead to "check on this [the missing documents] in the event it later became the subject of additional questions."(emphasis added)[160]

During September and October, Blum deposed Awan and a second BCCI witness, as the Subcommittee completed its two year investigation of drug trafficking in Central America and prepared its final report. When Blum's appointment at the Foreign Relations Committee lapsed in March, 1989, BCCI officials were told that Clifford and Altman had taken care the Foreign Relations Committee, and that the investigation was over.[161]

On July 7, 1989, after a June 15, 1989 broadcast by NBC on BCCI's involvement with General Noriega, describing BCCI documents concerning Noriega, Senator Kerry wrote Clifford noting that NBC apparently had obtained documents which had been subpoenaed by the Foreign Relations Committee and never provided.

Four days later, Clifford wrote Senator Kerry to state: "I am in receipt of your letter dated July 7, 1989," and noted that "we shall continue to try to be responsive to the needs of the

Subcommittee."[162]

A meeting was set up for July 17, 1989, between Kerry staff and lawyers for BCCI to discuss the Subcommittee on Narcotics and Terrorism request for documents relating to bank accounts which General Noriega and the government of Panama held at BCCI branches in London, England. At the meeting, Altman and Raymond Banoun, a criminal defense attorney representing BCCI, advised the Subcommittee that no documents responsive to Subpoena were in the United States and that all documents were in London, had been reviewed, and did not refer to documents in the United States. The next day, Subcommittee staff wrote BCCI's attorneys to request the immediate provision of the documents to the Subcommittee to the extent that any such document had ever been in the United States, prompting a reply letter from BCCI's attorneys reaffirming BCCI's offer to assist the Subcommittee in obtaining the documents. The documents from London were ultimately provided to the Subcommittee in late November, 1989, and were found to refer to dozens of transactions involving BCCI records maintained at First American, which passed through First American, or which involved BCCI's representative office in Washington.

After reviewing these documents, Kerry staff noted that they referred to numerous documents at First American and BCCI Washington which should have been produced by BCCI to the Senate in the fall of 1988. On May 14, 1989, staff met with Altman, Banoun and Larry Wechsler, another BCCI lawyer, and the lawyers produced 775 pages of new documents concerning Noriega.

At this meeting, the attorneys stated that they relied on Awan's statements and conducted no independent searches for documents in 1988 in response to the Committee subpoena. Altman, who had previously told staff that he had reviewed all of Noriega's documents in London and that none of them referred to transaction in the United States, now suggested that his initial review had been casual at best, and that he had simply not noticed any such transactions.[163]

In the meeting, BCCI's lawyers agreed to produce all Noriega and Awan records held at First American by BCCI. Thus, a substantial number of documents which should have been provided to the Committee by Clifford and Altman in response to the subpoena to BCCI by the Foreign Relations Committee were in fact not provided. Indeed, no search at BCCI's accounts at First American had ever been conducted by First American in response to the subpoena to BCCI. The documents ultimately provided showed that, regarding Noriega's banking at least, BCCI and First American had a close working relationship, and that Noriega's funds had passed through First American, focusing further staff attention on the relationship between the two institutions.

During the meeting, in response to a request from the Subcommittee to provide information on loans from BCCI to its shareholders and the shareholders of related entities, including ICIC and CCAH, Altman advised Jonathan Winer of Kerry's staff that none of the shareholders of CCAH currently had loans from BCCI.[164] One week earlier, Altman had told the Federal Reserve precisely the opposite -- that Altman had "heard reports of loans by BCCI to certain shareholders [of CCAH] in amounts ranging from $400 million to over $1 billion."[165] Altman thus made a misleading statement to Senate staff regarding BCCI's outstanding

lending to CCAH. Altman of course made no reference to his own past borrowings from BCCI.

By the summer of 1990, as the Subcommittee persisted in its efforts to learn more about BCCI's relationship to First American, the Subcommittee scheduled hearings intended to focus attention on the relationship between the two institutions. In response, according to two confidential memoranda prepared by a BCCI lawyer at the firm of Holland & Knight in Florida, based on conversations with Philip Manuel, a private investigator hired by BCCI in connection with its criminal defense, Altman and Banoun sought to call in "political markers" in an effort to stop the Subcommittee inquiry. As specified in the second of the two memoranda:

The Source [Manuel] stated that Altman and Banoun are opposing the subpoenas and doing everything within their power to call in "political markers." Consequently, it may be that Altman and Banoun will succeed in quashing their subpoenas or having them withdrawn; and not end up testifying before the Kerry Committee.[(166)]

Altman testified that he had "no idea what the author is talking about when he talks about calling in political markers," noting that he had never even asked for a delay of the hearing in writing.[(167)] In fact, staff was informed by Banoun, on behalf of BCCI, that attempts by the Subcommittee to question him or Altman would interfere with BCCI's attorney-client privilege, an assertion reiterated by former Senator John Culver, who as part of BCCI's team of lobbyists, contacted the Kerry office to urge a postponement of the planned hearing. After Altman, Banoun, and BCCI refused to appear at any hearing, and the Justice Department alleged that any hearing by the Subcommittee could interfere with its interests, the hearing was postponed, due to the refusal of each of the requested witnesses to agree to testify.

Thus, in contrast to the full cooperation promised by Clifford and Altman to the Subcommittee in the course of its investigation, BCCI's lawyer team, including Clifford and Altman, collectively failed to meet basic obligations to the Senate to insure that subpoenaed documents be produced; sought to convince BCCI officer Awan to tell the Senate that production of documents would threaten his life, at a time when Awan no longer wished to make this assertion; failed to search for documents known to be required by the subpoena and not produced; failed to search other categories of BCCI documents held at the First American Bank; asserted legal obstacles to cooperation on numerous occasions; and declined to provide witnesses at scheduled hearings. These findings represent the bare minimum of their failure to provide the promised cooperation.

### Federal Reserve Charges

On July 29, 1992, in coordination with criminal cases brought by the Justice Department and the New York District Attorney, the Federal Reserve issued its summary of charges against Clifford and Altman, specifying its findings of violations of law and regulations, and proposing to bar them from banking for life.

In its summary of charges, the Federal Reserve charged Clifford with four counts of violations of law and regulation, and Altman with seven counts of such violations.

REENTERED AS EXHIBIT 3

The first count charges Clifford and Altman with having violated the Bank Holding Company Act by participating in BCCI's acquisition of control of CCAH/First American in violation of that law. Included in that count are numerous factual allegations concerning false statements and concealment of information by Altman.

The second count charges Clifford and Altman with having violated the Federal Reserve's order regarding the FGB takeover through violating the commitments made that BCCI would have no role in the management of or lending to First American, and related issues.

The third count charges Altman with having violated the Bank Holding Company Act by participating in BCCI's acquisition and retention of control of the National Bank of Georgia in violation of that act.

The fourth count charges Clifford and Altman with having breached their fiduciary duties to CCAH, First American, and CCAH shareholders by failing to disclose their personal financial arrangements with BCCI regarding their own shares of CCAH.

The fifth count charges Clifford and Altman with having engaged in unsafe and unsound banking practices and breaches of fiduciary duty in connection with premature paying off BCCI loans to CCAH which cost CCAH money.

The sixth count charges Altman with having violated the law by making a number of false statements to the Federal Reserve.

The seventh count charges Altman with having violated the bank Control Act in connection with the purchase of CCAH shares by Masriq, an entity controlled by Saudi banker Khalid bin Mahfouz, against whom the Federal Reserve has issued separate charges, treated elsewhere in this report.

The findings of the Federal Reserve remain subject at this time to a hearing to give Clifford and Altman the opportunity to rebut the Federal Reserve's case prior to the Federal Reserve reaching a final determination on these findings.

1. House Committee on Banking, Finance, and Urban Affairs, September 11, 1991, Serial No. 102-69, p. 36.
2. S. Hrg. 102-350 Pt 3, p. 63.
3. S. Hrg. 102-350 Pt. 3, p. 286.
4. S. Hrg. 102-350 Pt 2 p. 505, 518.
5. These findings should not be viewed to correspond to any conclusions that might be reached in connection with the matters at issue in criminal and civil litigation concerning Clifford and Altman in the U.S. District Court for the District of Colombia, and in New York County in the case brought by District Attorney Morgenthau. These findings have been reached on the basis of a record which may include material not admissible in any of those proceedings, and reflects judgments made in the course of Congressional fact-finding, whose rules and procedures do not correspond to those rules and procedures applicable to other proceedings.

6. Lance, S. Hrg. 102-350 Pt. 3 p. 6.
7. Id pp. 7-8.
8. Clifford, S. Hrg. 102-350 Pt. 2 pp. 58-59.
9. Id p. 59.

REENTERED AS EXHIBIT 3

10. S. Hrg. 102-350 Pt. 3, pp. 11-12.

11. Art Harris and John F. Berry, Washington Post, December 18, 1977, A1.

12. Id.

13. S. Hrg. 102 Pt. 3 p. 70.

14. Id.

15. Sami memo to Abedi 1/30/78, S. Hrg. 102-350 Pt 3, pp. 26-27.

16. October 19, 1978 Application, CCAH to Federal Reserve; see Summary of Charges, Board of Governors of the Federal Reserve, No, 92-080-E-I1, In the matter of Clark M. Clifford and Robert A. Altman, July 29, 1992, Paragraph 33.

17. Summary of Charges, Federal Reserve, Id.

18. Id, paragraph 33(e).

19. Id, p. 33(i).

20. S. Hrg. 102-350, Pt. 3, p.75.

21. S. Hrg. 102-350 Pt 3 p. 328-330.

22. Clifford, S. Hrg. 102-350 Pt. 3 p. 93.

23. Confidential and Privileged Attendance Note, November 19, 1990, BCCI Attorney memcom of meeting with Roy Carlson, Exhibit D in G and H Montage case.

24. See e.g. Summary of Charges, Board of Governors of the Federal Reserve System, In the matter of Clark M. Clifford, No. 92-080-E-11, July 29, 1992, paragraph 26.

25. Clifford and Altman written testimony before the House Committee on Banking, Finance and Urban Affairs, September 11, 1991, Serial No. 102-69, Pt. 1, p. 21.

26. Letter from Rauh and Bennett to Kerry, October 11, 1991.

27. S. Hrg. 102-350 Pt 3, p. 63.

28. Summary of charges, Federal Reserve, id, paragraphs 51-53.

29. Id p. 64.

30. S. Hrg. 102-350 Pt. 3 p. 77.

31. Altman, S. Hrg. 102-350 Pt. 3 p. 235.

32. Staff interview, Davis, May, 1992.

33. Altman testimony, S. Hrg. 102-350 Pt. 3 pp. 234-235.

34. Board of Governors Federal Reserve System Exhibit AD 134, Afridi to Naqvi, July 25, 1983.

35. Id.

36. Sakhia testimony, S Hrg. 102-350 Pt. 2 p. 513.

37. Summary of charges, Federal Reserve, In Re Clifford, 92-080-E-I1, July 29, 1991 Paragraph 75.

38. S. Hrg. 102-350 Pt. 3 p. 332.

39. Summary of charges, Federal Reserve, In the Matter of BCCI Holdings, 91-043, July 29, 1991, Paragraphs 176-178.

40. p.236. letter from Elley to Naqvi, October 14, 1982

41. S. Hrg. 102-350 Pt. 3 p. 238.

42. S. Hrg. 102-350 Pt. 3 p. 77.

43. Summary of charges, Federal Reserve, In the matter of Clifford, id, Paragraphs 80-86.

44. Id, Paragraph 92.

45. Id, paragraphs 92-103.

46. Summary of charges, Federal Reserve, Clifford, id, Paragraphs 87-91, see also personnel files, BCCI New York, Elley and Afridi, records reviewed by Subcommittee staff.

47. p. 241

48. p.241

49. p. 242

50. S. Hrg. 102-350 Pt. 2, Sakhia testimony, October 22, 1991, p. 518.

51. Summary of charges, Federal Reserve, Clifford, id. Paragraph 59.

52. Summary of charges, Federal Reserve, Clifford, id., Paragraphs 60-65.

53. Id, paragraph 68.
54. Id, paragraphs 69-72.
55. Summary of charges, Federal Reserve, Clifford, id, paragraph 110.
56. Summary of charges, Federal Reserve, Clifford, id, Paragraphs 111-115.
57. Id paragraphs 116-117.
58. Id, paragraph 123.
59. Id.
60. S. Hrg. 102-350 Pt 3, p. 78.
61. Id. Paragraph 184.
62. Id, paragraphs 184-187.
63. Summary of charges, Federal Reserve, In the Matter of BCCI, 91-043, July 29, 1991, Paragraph 188.
64. Sakhia testimony, S. Hrg. 102-350 Pt. 2 p. 604.
65. S. Hrg. 102-350, Pt. 2, testimony of Abdur Sakhia, October 22, 1992, p. 605.
66.
[1019]S. Hrg. 102-350 Pt. 2, pp. 521, 606.
67. Sakhia letter to Abedi, Future Plans in the United States, February 10, 1986, S. Hrg. 102-350, Pt. 2 p. 595.
68. Written statement, Clifford and Altman, S. Hrg. 102-350 Pt 3 p. 78.
69. Id.
70. Summary of Charges, Federal Reserve, Clifford, 92-080-E-I1, July 29, 1992, Paragraphs 128-129.
71. Id, Paragraph 130.
72. Id, paragraph 134.
73. Id, paragraphs 135-136.
74. Id, Paragraphs 137-138.
75.
[1028]Summary of charges, Federal Reserve, Clifford, id, paragraphs 141-152; see also S. Hrg. 102-350 Pt 3. pp 394-400.
76. Id, Paragraphs 153-154.
77. See document reprinted S. Hrg. 102-350 Pt. 3 pp. 402-403.
78. Id, paragraph 162; see also memorandum "Option to Acquire National Bank of Georgia reprinted in House Committee on Banking, Finance, and Urban Affairs, September 11, 1991, Serial No. 102-69, Pt. 1, pp. 309-311.
79. Summary of charges, Federal Reserve, Clifford, id, paragraphs 163-166.
80. Id, paragraph 170.
81. Id.
82. Id, paragraph 171.
83. Id, paragraph 177.
84. Summary of charges, Federal Reserve, Clifford, id, paragraphs 177-178.
85. Id, paragraph 180.
86. Id, paragraph 183.
87. S. Hrg. 102-350 Pt 4 p. 494.
88. Id, paragraphs 187-188.
89. Id, paragraphs 195-202.
90. Id, paragraphs 205-206.
91. Id, paragraphs 207-212.
92. Id, paragraphs 215.
93. Staff interview, Chinoy, March 9, 1992.
94. Id.
95. Summary of charges, Federal Reserve, Clifford, id, Paragraph 104.

REENTERED AS EXHIBIT 3

96. S. Hrg. 102-350 Pt 3, p. 245.

97. Sakhia, S. Hrg. 102-350 Pt. 2 p. 597.

98. S. Hrg. 102-350 Pt. 3 pp. 80-81.

99. S. Hrg. 102-350, Pt. 3, p. 62.

100. S. Hrg. 102-350 Pt. 3, p. 97.

101. S. Hrg. 102-350 Pt. 3, p. 103. Clifford explained that "book...is based ...upon the excess of assets over liabilities of that particular company, as of a particular time."

102. Summary of charges, Federal Reserve, Clifford, id, Paragraph 249.

103. Id, paragraph 251.

104. S. Hrg. 102-350, Pt. 3, p. 98.

105. S. Hrg. 102-350 Pt. 3, p.101.

106. Summary of charges, Federal Reserve, Clifford, id, paragraphs 253-254.

107. p. 100

108. S. Hrg. 102-350 Pt. 3, p. 103.

109. Summary of charges, Federal Reserve, Clifford, id, Paragraph 257.

110. Id, paragraph 257.

111. S. Hrg. 102-350 Pt. 3 pp. 80-81.

112. Summary of charges, Federal Reserve, Clifford, Id, Paragraph 258.

113. Clifford & Warnke Memorandum to James E. Lewis from Clifford and Altman, reprinted House Serial No. 102-69, Pt. 1, pp. 760-761.

114. Summary of charges, Federal Reserve, Clifford, id, Paragraphs 264-267.

115. Summary of charges, Federal Reserve, Clifford, id, Paragraph 268.

116. p.191

117. p.193

118. Summary of charges, Federal Reserve, Clifford, id, Paragraphs 269-270.

119. Id, paragraph 271-272.

120. p.197

121. p.194

122. Summary of charges, Federal Reserve, Clifford, id, Paragraph 275.

123. S. Hrg. 102-350 Pt. 3, p. 202.

124. Federal Reserve summary of charges, In re Clifford, id, Paragraph 290.

125. Summary of charges, Federal Reserve, Clifford, id, Paragraph 299.

126. Id, paragraph 300.

127. Id, paragraph 303.

128. Summary of charges, Federal Reserve, Clifford, id, Paragraph 305.

129. S. Hrg. 102-350 Pt. 3 pp. 206-207.

130. S. Hrg. 102-350 Pt 3 p. 207.

131. Kerry-Rybeck communication, October 22, 1991.

132. Altman Memorandum to the File, Clifford and Warnke, July 6, 1990, reprinted in S. Hrg. 102-350 Pt. 5.

133. S. Hrg. 102-350 Pt. 3, p. 266.

134. S. Hrg. 102-350 Pt. 3, p. 269.

135. S. Hrg. 102-350 Pt. 3, p. 270.

136. S. Hrg. 102-350 Pt. 3 p. 286.

137. Compare S. Hrg. 102-350 Pt. 3 p. 449 Memorandum to the File Re: Meeting with Federal Reserve Staff, May 8, 1992; and Memorandum to BCCI Noriega/Senate File From Raymond Banoun, regarding Altman meeting with Kerry Subcommittee staff, May 18, 1990.

138. Staff interview, Amjad Awan, July 20, 1992.

139. Interview with Amjad Awan at Clifford & Warnke on February 23, 1988, reprinted in S. Hrg. 102-350 Pt. 5.

REENTERED AS EXHIBIT 3

140. Clifford memorandum to Altman, June 1, 1988, reprinted in S. Hrg. 102-350 Pt. 5.
141. Id, Memorandum to the File, Robert A. Altman, August 11, 1988.
142. Awan statements, Staff interview, July 20, 1992.
143. Memorandum to File, Robert C. Sanders, BCCI/Panama, August 29, 1988.
144. Sanders Memorandum to File, August 29, 1988, Re: BCCI/Panama.
145. Id.
146. Id. p. 12
147. Id. p. 22
148. Staff interviews, Awan, July, 1992, and Awan Subcommittee testimony, July 29, 1992, S. Hrg. 102-350 Pt. 6.
149. Id.
150. S. Hrg. 102-350 Pt. 3 pp. 279-280.
151. Id.
152. Id.
153. Awan, Staff Interview, July 20, 1992.
154. Staff interview, Awan, July 27, 1992.
155. Notes of Meeting With Jack A. Blum, Clifford and Warnke, September 9, 1988, reprinted S. Hrg. 102-350 Pt. 5.
156. Staff interview, Akbar Bilgrami, July 13-14, 1992.
157. Privileged and confidential Memorandum to Mssrs. Altman and Sanders Re: BCCI Congressional Matter, September 22, 1988, reprinted in S. Hrg. 102-350 Pt. 5.
158. Kovin, Memorandum to the File, September 27, 1988, p. 1.
159. Kovin, Memorandum to the file, September 30, 1988, p. 2, reprinted in S. Hrg. 102-350 Pt. 5.
160. Id.
161. Staff interview, Sakhia, October, 1991.
162. Clifford-Kerry correspondence.
163. Winer memcom, May, 1989.
164. See e.g. Memo to BCCI Noriega/Senate File, Raymond Banoun, Re: Meeting with Kerry Subcommittee Staff, May 18, 1990.
165. S. Hrg. 102-350 Pt. 3 p. 449.
166. S. Hrg. 102-350 Pt. 3 p. 538.
167. S. Hrg. 102-350 Pt. 3 p. 278.

# ABU DHABI: BCCI'S FOUNDING AND MAJORITY SHAREHOLDERS

## Introduction

There was no relationship more central to BCCI's existence from its inception than that between BCCI and Sheikh Zayed and the ruling family of Abu Dhabi.

REENTERED AS EXHIBIT 3

Abu Dhabi was present at BCCI's creation as one of two providers of BCCI's capital. It was BCCI's largest depositor, and its largest borrower, and for most of BCCI's existence, its largest shareholder. The relationship between the two entities was, as Price Waterhouse told the Bank of England days before BCCI's closure, "very close," with BCCI providing services to the ruling family of Abu Dhabi far beyond the ordinary relationship of a bank to either its shareholders or depositors.[1]

There are numerous examples of the centrality of the Abu Dhabi relationship to BCCI, and its unusual nature.

In 1972, when BCCI was created, Abu Dhabi shareholders purchased 20 percent of its stock with an investment of $500,000, and then generously agreed to have that interest drop to just over one percent of BCCI just three years later.

In January, 1978, when BCCI decided to enter the United States and purchase shares in Financial General Bankshares, and needed two additional names, the ruling family of Abu Dhabi supplied them.

In 1980 and 1981, when BCCI needed a purchaser for Bank of America's shares in BCCI, and had no one other than its bogus Grand Caymans bank-within-a-bank, ICIC, to buy them, Abu Dhabi stepped in once again to increase its interest in BCCI.

Throughout the 1970's and 1980's, the Abu Dhabi ruling family and the Abu Dhabi government placed billions of dollars in deposits at BCCI and its affiliates, such as ICIC, giving BCCI and its head, Agha Hasan Abedi, the right to manage those assets, and a power of attorney to act in the name of Sheikh Zayed.

In 1990, when accountants and regulators in the United Kingdom found fraud at BCCI, the Abu Dhabi ruling family and government stepped in again, agreeing to formally buy the bank, assert control, guarantee its losses, replace BCCI's head with the head of its own BCCI affiliate, the Bank of Credit and Commerce Emirates (BCCE), move BCCI's operations and records from London to Abu Dhabi, and work on a plan to find a way to save the bank despite its having acknowledged "mishandling" at least $2.2 billion of Abu Dhabi's money.

By July 5, 1991, when BCCI was closed globally, the Government of Abu Dhabi, its ruling family, and an investment company holding the assets of the ruling family, were the controlling, and official "majority" shareholders of BCCI -- owning 77 percent of the bank. But since the remaining 23 percent was actually held by nominees and by BCCI's alter-ego ICIC, Abu Dhabi was in fact BCCI's sole owner.

After July 5, 1991, it was in Abu Dhabi that most of BCCI's top officials remained, where they remain under the control of the Abu Dhabi government, under conditions said to be luxurious, which the Abu Dhabi government refuses to discuss. While there, they have remained incommunicado, and out of the reach of foreign investigators, unwilling, or unable, to tell the world what happened.

In short, there is no question that the relationship between Abu Dhabi and BCCI was central to both, and that no adequate understanding of BCCI is possible without an understanding of the Abu Dhabi relationship. Yet according to the testimony presented to the Subcommittee by Abu

REENTERED AS EXHIBIT 3

Dhabi, that relationship was one that boiled down to little more than victim (Abu Dhabi) and criminal (Abedi and BCCI). In essence, according to Abu Dhabi, BCCI abused Abu Dhabi's trust by stealing deposits and mismanaging a bank it owned, making Abu Dhabi by its own account BCCI's largest victim, losing what it describes as some $6 billion in all.

Thus, by Abu Dhabi's account, it never knew that most or all of BCCI's shareholders were front-men or nominees for BCCI, including the heads of state of several of the smaller sheikhdoms of the United Arab Emirates of which Sheikh Zayed is president, sheikhs who are generally understood to treat Sheikh Zayed with great deference. It never knew that such prominent shareholders as Kamal Adham and A.R. Khalil, two successive heads of Saudi intelligence, were also nominees for the bank, along with such well-known Middle Eastern financial figures as Faisal Fulaij of Kuwait and Ghaith Pharaon of Saudi Arabia. Unlike these other figures, who were part of BCCI's deceptions, and who by Abu Dhabi's account participated in BCCI's schemes to deceive Abu Dhabi, Abu Dhabi contends it was innocent of wrongdoing, and utterly duped.[2] To quote the testimony of Abu Dhabi's witness before the Subcommittee, Ahmed Al Sayegh:

We didn't know anything about the bank [BCCI] because of our passive role in the past [prior to taking control in April 1990].[3]

However, unlike any other shareholder, officer, attorney, agent or depositor of BCCI, Abu Dhabi has been in the position, since April, 1990, of having total control over BCCI's records. At least eighteen of its key officers, who have remained held incommunicado and under house arrest in Abu Dhabi since BCCI's collapse. During that period, Abu Dhabi has chosen not to make any of these witnesses available to U.S. law enforcement. While it did, temporarily, make some key documents available to the Federal Reserve concerning the involvement of non-Abu Dhabi figures in BCCI's wrongdoing prior to BCCI's closure, it has at all times prevented federal investigators from having free access to BCCI's records, and all access to those records has been ended since July 5, 1991.

Thus, Abu Dhabi has remained throughout the past fourteen months in the position of being able either to prove its assertions, or risk disproving them, through the simple act of granting access to the critical BCCI information it alone controls, in witnesses and documents. Yet it has chosen not to do so. In the process, Abu Dhabi has made, and broken, repeated commitments to provide both witnesses and documents to the Justice Department, the New York District Attorney, and the Senate, going as far back as November, 1990, and continuing to the present.

Given Abu Dhabi's suppression of critical information about its role in BCCI, its contention that it is innocent of all wrongdoing in connection with BCCI, would, on this basis alone, inevitably be viewed with some skepticism.

But despite Abu Dhabi's withholding of essential witnesses and documents, BCCI financial records obtained to date by investigators, together with testimony and statements from BCCI insiders, outline a picture of the relationship which suggests that Abu Dhabi officials were indeed knowing participants in substantial wrongdoing pertaining to BCCI's activities in the United States and elsewhere, that members of the Abu Dhabi ruling family participated in risk-free investments in BCCI banks, and that Abu Dhabi officials engaged, as of April, 1990 on

REENTERED AS EXHIBIT 3

some issues and on others much earlier, in a cover-up of fraudulent activity involving BCCI, which continues, in substantial part, to this day.

**Findings**

** Members of Abu Dhabi's ruling family appear to have contributed no more than $500,000 to BCCI's capitalization prior to April 1990, despite being the record owner of almost one-quarter of the bank's total shares, with a book value of over $750 million as of December 31, 1989. However, the Abu Dhabi Investment Authority, holder of a 10 percent interest in BCCI beginning in 1980, appears to have made some cash payments for its interest in BCCI, which had a book value of approximately $250 million as of December 31, 1989. An unknown but substantial percentage of the shares acquired by Abu Dhabi overall in BCCI appear to have been acquired on a risk-free basis -- either with guaranteed rates of return, buy-back arrangements, or both.

** The apparent interest held in BCCI by the Abu Dhabi ruling family, like the apparent interests held by the rulers of the three other gulf sheikdoms in the United Arab Emirates who owned shares of BCCI, materially aided and abetted Abedi and BCCI in projecting the illusion that BCCI was backed by, and capitalized by, Abu Dhabi's wealth. However, Abu Dhabi provided BCCI only the use of its name rather than substantial capital, until at least 1980-1981. At that time, "investments" made in BCCI by the Abu Dhabi Investment Authority to purchase shares of BCCI sold by the Bank of America to ICIC, appear to have involved actual payments from Abu Dhabi, according to some documents, on a no-risk, guaranteed return basis.

** Shares in Financial General Bankshares held by members of the Abu Dhabi ruling family in late 1977 and early 1978 appear to have been nominee arrangements, adopted by Abu Dhabi as a convenience to BCCI and Abedi, under arrangements in which Abu Dhabi was to be without risk, and BCCI was to guarantee the purchase through a commitment to buy-back the stock at an agreed upon price. Later, one of the two original members of the Abu Dhabi ruling family in fact sold back his shares to another BCCI front-man, Kamal Adham.

** Abu Dhabi's representative to BCCI's board of directors, Ghanim al Mazrui, received unorthodox financial benefits from BCCI in no-risk stock deals which may have compromised his ability to exercise independent judgment concerning BCCI's actions; confirmed at least one fraudulent transaction involving Abu Dhabi; and engaged in other improprieties pertaining to BCCI; but remains today in place at the apex of Abu Dhabi's committee designated to respond to BCCI's collapse.

** In April, 1990, Abu Dhabi was told in detail about BCCI's fraud by top BCCI officials, and failed to advise BCCI's external auditors of what it had learned. Between April, 1990 and November, 1990, Abu Dhabi and BCCI together kept some information concerning BCCI's frauds hidden from the auditors.

** From April, 1990 through July 5, 1991, Abu Dhabi tried to save BCCI through a massive restructuring. As part of the restructuring process, Abu Dhabi agreed to take responsibility for BCCI's losses, Price Waterhouse agreed to certify BCCI's books for another year, and Abu Dhabi, Price Waterhouse, the Bank of England, and BCCI agreed to keep all information

concerning BCCI's frauds and other problems secret from BCCI's one million depositors, as well as from U.S. regulators and law enforcement, to prevent a run on the bank.

** After the Federal Reserve was advised by the New York District Attorney of possible nominee arrangements involving BCCI and First American, Abu Dhabi, in an apparent effort to gain the Federal Reserve's acquiescence in BCCI's proposed restructuring, provided limited cooperation to the Federal Reserve, including access to selected documents. The cooperation did not extend to permitting the Federal Reserve open access to all BCCI documents, or substantive communication with key BCCI officials held in Abu Dhabi, such as BCCI's former president, Swaleh Naqvi. Access was sufficient, however, to permit the Federal Reserve to identify critical documents regarding frauds involving non-Abu Dhabi shareholders and borrowers of BCCI and BCCI itself pertaining to CCAH/First American, the National Bank of Georgia and the Independence Bank. That access ended with the closure of BCCI July 5, 1991.

** From November, 1990 until September 21, 1992, Abu Dhabi failed to provide documents and witnesses to U.S. law enforcement authorities and to the Congress, despite repeated commitments to do so. Instead, it actively prevented U.S. investigators from having access to vital information necessary to investigate BCCI's global wrongdoing. As of September 21, 1992, Abu Dhabi began making certain documents available for review by U.S. law enforcement, in a move apparently timed to coincide with the publication of this report. No representation has been made by Abu Dhabi, or by U.S. law enforcement, as to the significance or completeness of the documents Abu Dhabi selected for law enforcement review at its Washington, D.C. Embassy. Moreover, none of the BCCI officials held in Abu Dhabi have yet to be made available for interview by U.S. law enforcement. At the time of writing of this report, none of the newly available documents had been made offered by Abu Dhabi for review by the Subcommittee.[(4)]

** The proposed agreement between Abu Dhabi and BCCI's liquidators to settle their claims against one another contains provisions which could have the consequence of permitting Abu Dhabi to cover up wrongdoing it may have had in connection with BCCI.

** Answers by Abu Dhabi's representative to key questions from the Subcommittee about Abu Dhabi's role in BCCI, were non-responsive, evasive, and misleading, although for the most part artfully crafted to avoid being literally untrue.

** There is some evidence that the Sheikh Zayed may have had a political agenda in agreeing to the involvement of members of the Abu Dhabi ruling family and its investment authority in purchasing shares of Financial General Bankshares, then of CCAH/First American. This evidence is offset, in part, by testimony that Abu Dhabi share purchases in the U.S. bank were done at Abedi's request and did not represent an actual investment by Abu Dhabi until much later.

### Origin and Nature of BCCI-Abu Dhabi Relationship

The chapter on BCCI's early history describes in detail the early history of Abu Dhabi and BCCI, which is recapitulated in summary form here.

REENTERED AS EXHIBIT 3

Abu Dhabi is the largest and wealthiest member of the United Arab Emirates, an oil-rich federation of sheikhdoms, formed in 1971, whose rulers own all the land and natural resources of their nations in fee simple absolute, with no distinctions being made among the wealth of the ruler, his family, and the nation itself. Sheikh Zayed of Abu Dhabi, installed in 1966 as head of the newly wealthy oil state through a British-led coup against his brother in 1966, soon after developed a relationship with Agha Hasan Abedi, head of the United Bank of Pakistan. Six years later, when Abedi decided to form BCCI, he did so after receiving the blessing of Sheikh Zayed, and a commitment of support. That support involved a tiny capital contribution to the bank by Abu Dhabi -- $500,000 -- and a huge placement of petrodollars.

As set forth in the chapter on BCCI's early history in some detail, the relationship between BCCI and Sheikh Zayed exceeded normal standards of bank/client relationships in a number of respects. BCCI was not merely a bank owned in part by Sheikh Zayed. Sheikh Zayed was not merely BCCI's largest depositor. BCCI for many years handled almost every financial matter of consequence for the Sheikh and his family, as well planning, managing, and carrying out trips abroad, and a wide range of services limited only by the desires of the Al Nayhan family itself.[5]

In his testimony of May 18, 1992, Abu Dhabi's representative Ahmed Al Sayegh suggested that Abedi's role in Abu Dhabi has been much overstated:

When Mr. Abedi was a respected banker and founder of BCCI, his role, therefore, was limited to his bank. . . . His role in the case, I guess, was limited to inducing potential investors in making commitments to his bank, whether buying shares or placing deposits. . . He was not a financial advisor [to Abu Dhabi or Sheikh Zayed].[6]

Other information obtained by the Subcommittee from many sources demonstrates that Al Sayegh's testimony on this point was untrue. In fact, for over twenty years, Abedi created and managed a network of foundations, corporations, and investment entities for Abu Dhabi's ruling family, of a complexity similar to the network he had created at BCCI itself. BCCI handled the financing arrangements for many of these entities, and managed a variety of Abu Dhabi's portfolio accounts in U.S. dollars.[7] As far back as 1969 and 1970, when Abedi was still head of the United Bank in Pakistan, Abedi established a cargo shipping company, the Hilal Group, operated by Associated Shipping Services, Limited, London, as an operational company for Abu Dhabi's Department of Private Affairs. Though primarily used to own cargo ships, the entity was also used for trading in equities, holding property investments, and other direct investments. One of the entities owned by Hilal Group, Progressive Investment, had Abedi on its board. Later, when BCCI established the Cromwell Hospital in London to provide a medical facility for the Abu Dhabi ruling family and other prominent Middle Easterners, Abedi arranged for the financing of the purchase for Abu Dhabi through a complex series of transactions involving BCCI and a shell corporation holding Sheikh Zayed's interests by which BCCI lent the funds for the hospital in pounds against dollar accounts of the Department of Private Affairs, with the result that the hospital investment did not appear on the books of the Department.[8]

Moreover, BCCI and Abu Dhabi also engaged in a series of joint ventures, managed by BCCI, throughout the 1980's. Typical of such ventures was the China-Arab bank, a joint venture of

BCCI and the Abu Dhabi Investment Authority, established in China in 1985 coincident with BCCI's opening of offices in China, to use funds from Abu Dhabi to invest in China. BCCI accounting records show a number of other ventures involving BCCI and Abu Dhabi in China, as well as numerous financial relationships involving BCCI and Abu Dhabi interests throughout the 1980's.[9]

Contrary to Al Sayegh's testimony, Abedi had broad authority over the investments and finances of the ruling family until his stroke in 1989. As the present chairman of the Department of Private Affairs of Sheikh Zayed, Ghanim Al Mazrui testified in civil litigation in 1982, Abedi could even be viewed as an official of the Abu Dhabi government, because of his position on the Abu Dhabi committee responsible for overseeing Abu Dhabi's wealth.[10]

As Bert Lance observed, the relationship was exceedingly intimate:

Mr. Abedi . . . had, in effect, for lack of a better term, been kind and attentive to Sheikh Zayed when he was still wandering around in the desert and he had all his assets in his tent somewhere . . . I think this is important to you as you search for the truth, to understand that relationship went back a long way -- and it went back before Sheikh Zayed became "the richest man in the world" at that point in time, with an income of some $4 billion or $5 billion, as the press reported; that there had been a relationship that had developed that Mr. Abedi had helped Sheikh Zayed when he had no real power or influence . . . Sheikh Zayed had absolute and total trust and coincidence in Mr. Abedi, that whatever Mr. Abedi said or suggested was something that Sheikh Zayed would look on with favor; that Mr. Abedi had, in effect, built the house where we were [meeting with Sheikh Zayed in his palace] outside of Lahore without any guidance or direction from Sheikh Zayed, and it was that sort of relationship. It was very, very unique.[11]

BCCI also provided members of the Abu Dhabi ruling family with personal services, ranging from Sheikh Zayed's own modest needs to the more elaborate requirements of his sons and members of his retinue. A history of BCCI's protocol department, and its relationship to Abu Dhabi, is set forth in the chapter on BCCI's early history.

Throughout the first critical decade of BCCI's eighteen year existence, as much as 50% of BCCI's overall assets were from Abu Dhabi and the Al Nayhan family, who were earning about $750 million a year in oil revenues in the early 1970's, an amount that rose to nearly $10 billion a year by the end of the decade. Until the formation of a separate affiliate, the Bank of Credit and Commerce Emirates (BCCE), BCCI functioned as the official bank for the Gulf emirates, and handled a substantial portion of Abu Dhabi's oil revenues. And yet from the beginning, there was an oddity about this central relationship: at no time while Abedi was in charge of BCCI did Abu Dhabi hold more than a small share of BCCI's recorded shares. Abu Dhabi appears not to have invested substantial funds in BCCI, but instead to have insisted on guaranteed rates of return for the use of its money. Thus, rather than being a major investor in BCCI, in the early years, Abu Dhabi only agreed to place extremely large sums of money as deposits at the bank, which BCCI used in lieu of capital.

As a result of the Abedi-Zayed agreement, Abedi now had essentially unlimited resources to create BCCI. He could now act simultaneously as manager of billions of Sheikh Zayed's

REENTERED AS EXHIBIT 3

personal wealth, as banker to the United Arab Emirates of which Sheikh Zayed was chief of state, and as chairman of a new bank that had guaranteed assets of hundreds of millions of dollars from its inception.[12]

Abedi thus relied on the Sheikh's resources to finance his rapid expansion, not through capital investment, but as a huge depositor. The result was BCCI's finances quickly became so intermingled with the finances of Abu Dhabi that it was difficult even for BCCI insiders to determine where one left off and the other began. Whether Abu Dhabi insiders, including Abu Dhabi's representative on BCCI's board of directors, Ghanim Al Mazrui, knew of this intermingling, remains an open question.

**Abu Dhabi's Ownership Interest In BCCI**

Although Abu Dhabi had a key interest in BCCI from its creation, in accord with Abu Dhabi's failure to provide the initial funds for capitalization, BCCI's early stock recordations did not show Abu Dhabi as the actual owner of the bank. A snapshot of BCCI shares from Bank of America files as of September 30, 1977 described BCCI's majority owner as ICIC, at 50.1 percent; its most important minority owner as Bank of America, at 30 percent; and its largest Arab owner as Majid Al-Futaim of Dubai in the United Arab Emirates at just 4 percent, with the members of the family of Abu Dhabi owning just 3.4 percent all told.[13]

According to Abu Dhabi itself, it actually had a 20 percent interest in BCCI in 1972, which then dropped to less than five percent some two years later, with Abu Dhabi remaining a "passive investor," without formal representation on BCCI's board until 1981.[14]

In response to the Subcommittee's request for information on the history of Abu Dhabi's ownership interest in BCCI, Abu Dhabi provided on May 13, 1992, a list of Abu Dhabi shareholding in BCCI Holdings (Luxembourg) S.A., one of BCCI's two flag-ship holding companies, which it described as "based on preliminary review of documents."

The shareholding list provided by Abu Dhabi does not begin until 1975, three years following BCCI's founding in 1972, and after, for reasons not fully explained, Abu Dhabi's declared ownership in BCCI shares had dramatically dropped. It shows an unusual pattern of ownership of BCCI shares by the Al Nayhan family and the Abu Dhabi Investment Authority (ADIA).

Overall, after beginning at 20 percent in 1972, the Al-Nayhan family's ownership of BCCI dropped to less than three percent in 1975, and then to just over one percent of BCCI in 1976, where its interest remained, with small increases until 1980. In 1980, the Al Nayhan family's holdings of BCCI sharply increased to over 8 percent, in 1981 increased sharply again to over 18 percent, and by 1984 had reached 27 percent, and by 1986, 33 percent, where it remained until 1990, when Abu Dhabi became -- officially -- a 77 percent owner of BCCI.[15]

What is unusual about this pattern is the drop from Abu Dhabi's holdings of 20 percent to less than 2 percent in three years, followed by an increase from 2 percent to 18 percent five years later. It is difficult to understand why any shareholder of a rapidly growing bank would be willing to sell off or dilute so much of its interest in the years in which the bank's value was rapidly increasing, and then buy back that interest at far greater cost following five years of growth.

REENTERED AS EXHIBIT 3

Sheikh Zayed's own holdings of BCCI displayed a still stranger pattern. After owning 20 percent of BCCI in 1972, his personal ownership had dropped to 2.26 percent in 1975, dropped still further to less than one percent -- just .59 percent -- in 1976, and lower yet in 1977 to .47 percent of BCCI, before suddenly climbing in 1980 to 4.11 percent, when Sheikh Zayed purchased 80,000 shares in the bank. Sheikh Zayed then resold these same 80,000 shares the following year, reducing his ownership interest from the 4.11 percent back to .47 percent. In 1984, he purchased BCCI shares anew and his interest again climbed to over four percent, the vicinity in which his personal interest in BCCI remained to BCCI's closing.

Despite explicit requests to do so, Abu Dhabi failed to provide to the Subcommittee any explanation of the peregrinations of Abu Dhabi's ownership of BCCI stock, the price paid for the shares purchased, or the price received for the shares sold. Prior to the May 14 hearing, staff advised lawyers for Abu Dhabi that the purchase and sales prices of the stock and any funds provided by Abu Dhabi to BCCI as capital were critical issues requiring answers. Apart from the statement that Abu Dhabi paid $500,000 for its original interest in BCCI in 1972, Abu Dhabi provided no answer to these questions. To the extent that Abu Dhabi did not pay for such shares, there would be substantial questions as to whether it, like BCCI's other shareholders, was also a nominee for BCCI.

The patterns shown above, for the period up to April, 1990 are in some respects more consistent with a nominee relationship as with an ownership relationship, except for the 10 percent ownership of BCCI held from 1980 on the Abu Dhabi Investment Authority, which appears to be genuine. However, even that ownership interest in BCCI by Abu Dhabi cannot be viewed as conclusive in the absence of access to any buy-back arrangements from BCCI that might have existed.

For example, evidence for concluding that Sheikh Zayed's interests in BCCI could have been as a nominee for BCCI, or interchangeable with BCCI, is the purchase by him for an unknown price and sale for another unknown price, of 80,000 shares in BCCI, over one year. This is not a normal practice for share trades in a privately held bank by a party with a long-standing ownership interest in the bank. Similar transactions involving BCCI's manipulation of shares in CCAH/First American were definitively found by the Federal Reserve to have been either shams or nominee transactions.

On the other hand, Abu Dhabi did, from 1981 onwards, own ever increasing percentages of BCCI, principally through Sheikh Zayed's son, Sheikh Khalifa, and the Abu Dhabi Investment Authority, becoming the largest shareholders of the bank at some point in the 1980's. This suggests the possibility that Abu Dhabi actually owned the stock, regardless of guaranteed returns or buy-back arrangements to "eliminate" risk to Abu Dhabi.

Following the May 14, 1992 hearing in which Abu Dhabi's representative, Ahmed Al Sayegh, testified, the Subcommittee tried again to elucidate the truth about this issue.

It reiterated in questions to Al Sayegh the request that Abu Dhabi specify the capital actually paid in by the Abu Dhabi shareholders at the time of each stock purchase, including the date of each infusion of capital, and the amount paid in. Al Sayegh did not provide the answer to the question of how much Abu Dhabi paid each time for its shares of BCCI stock. Instead, he stated:

REENTERED AS EXHIBIT 3

Many of the Majority Shareholders' share purchases were from third parties, rather than purchases of newly-issued stock, and other stock acquisitions came in the form of dividends. . . In any event, I am unaware of the details of amounts paid for shares in particular transactions.[16]

The Subcommittee has asked Abu Dhabi to provide a knowledgeable witness regarding such questions for over two years, beginning in July, 1990. In the spring of 1992, it requested that Abu Dhabi's representative on BCCI's board of directors, Ghanim Al Mazrui, appear to testify. Instead, Al Sayegh was selected. His written answers were provided to the Subcommittee five weeks after his testimony, through Abu Dhabi's Washington, D.C. lawyers at Patton, Boggs & Blow. Hence, Al Sayegh's statement that he is "unaware of the details" amounts to nothing less than a refusal by the government of Abu Dhabi to answer the questions asked: what the Abu Dhabi shareholders of BCCI actually paid for the fifteen separate purchases of BCCI stock listed by Abu Dhabi as having been made and what other shareholders paid for the shares of BCCI stock sold in that period by Sheikh Zayed, his son, Sheikh Khalifa bin Zayed, and the Abu Dhabi Investment Authority. Answers to those questions would be vital in demonstrating that Abu Dhabi was a legitimate, non-nominee shareholder for all of its shares. The fact that Abu Dhabi has refused to answer these questions suggests that the facts if revealed would not be helpful to Abu Dhabi's position that it was never a nominee for BCCI, and was always at risk.

Information contained in the Section 41 report of Price Waterhouse of June, 1991, provided to the Bank of England and obtained by the Subcommittee in an uncensored form only in late August, 1992, further suggests that the shares in BCCI held by the ruling family of Abu Dhabi were purchased according to BCCI's typical practices for nominees -- paid for by loans from BCCI itself, with buy-back agreements and guarantees to insure the purchaser against loss.

The Section 41 report states that the initial capitalization of BCCI was just $2.5 million, and that subsequent increases of capitalization, to $845 million as of December 31, 1990, had been carried out through the extensive use of nominee arrangements, financed directly by loans from BCCI and its bank-within-a-bank, ICIC Grand Caymans.

In the report, Price Waterhouse specifically found that members of the Ruling Family of Abu Dhabi acquired their shares on the basis of guaranteed rates of return and buy-back arrangements, with the result that they were not at risk for their ostensible "shareholdings" of BCCI.[17]

While the evidence is not conclusive, there is a significant possibility that BCCI simply loaned the ruling family the funds for its stock, or provided them gratis

A list of major loans to shareholders of BCCI prepared in connection with a BCCI audit for the year ending September 30, 1987, shows lending to the Ruler of Abu Dhabi as standing at $620,800,000 -- some $74 million more than the authorized "limit" for lending to Sheikh Zayed establish by BCCI's credit committee, and more than twice the amount lent to the next highest borrower, Ghaith Pharaon at $283,900,000. A second such list, dated July 31, 1991, shows loans to the Abu Dhabi group from BCCI totalling $371.8 million, with an additional

$17.5 million in loans to Abu Dhabi from BCCI's affiliate, ICIC, for a total lending to Abu Dhabi of just under $390 million. After the Abu Dhabi group, BCCI's next highest level of lending to a shareholder was to its front-man, Kamal Adham, at $323.5 million. In either period, the size of the lending to Abu Dhabi was sufficiently substantial that it could have been applied to any number of purposes by either BCCI or Abu Dhabi, including the financing of a significant proportion of the holdings of members of the Abu Dhabi ruling family in BCCI itself and in CCAH/First American.[18]

**Abu Dhabi's Involvement in the FGB Purchase**

A lengthy account of how Abu Dhabi became involved as shareholders in the purchase of Financial General Bankshares (FGB) is set forth in the chapter on BCCI's entry into the United States.

The key questions that have arisen regarding those facts are whether Sheikh Zayed had a political agenda in participating in BCCI's secret purchase of FGB; whether the Abu Dhabi shareholders were BCCI's nominees in connection with those purchases; whether the Abu Dhabi shareholders knew that BCCI was the real owner of FGB; and whether Abu Dhabi shareholders or representatives knowingly participated in false statements made to the Federal Reserve in connection with the purchase.

**Political Agenda?**

From the first public awareness of the FGB takeover, reported in early 1978, the issue of whether the Middle Eastern investors in FGB had a political agenda was of substantial concern to regulators. As Virginia's chief banking regulator, Sidney Bailey stated in the public hearing at the Federal Reserve concerning the takeover in the spring of 1981:

There can be little doubt that some incentives other than orthodox investment motives must have prompted this effort. . . One obvious plausible answer to this riddle lies in the unique position of Financial General in the market. No other single financial institution is situated in both the financial and government hubs of the United States.[19]

Bailey wondered whether that secret agenda was somehow related to political goals of the Middle Eastern group involved.

According to Bert Lance, BCCI's initial partner in its most important acquisitions in the United States, both Sheikh Zayed and Abedi indeed felt that BCCI could become a critical element in strengthening ties between the United States and their constituencies. As Lance described a meeting between him, Sheikh Zayed and Abedi in Islamabad, Pakistan in late 1977:

Abedi was concerned about the shifting tides towards the Soviets in Afghanistan, Iran, India and the Mideast. Both Abedi and Zayed each expressed their concerns about the Arab worlds lack of ties to the US. They wanted to do something about it.[20]

This point of view was reflected in a contemporaneous press account in the Washington Post on December 18, 1977. As the article stated:

REENTERED AS EXHIBIT 3

An Atlanta source close to the negotiations says the Arabs see Lance as giving them access to the administration. Though a private citizen, Lance is a regular visitor at the White House and is the chairman of a $500-to-$1,000-a-plate fund-raiser for President Carter scheduled for January in Atlanta. "Under normal circumstances," says this source, "NBG would be the last bank anyone would be interested in. But the investors see this as an opportunity to do a favor for someone close to the President."[21]

In response to a written question from the Subcommittee chairman, Al Sayegh denied that any of the Abu Dhabi investments in CCAH/First American were related to a larger political agenda:

The suggestion that Sheikh Zayed purchased shares in Financial General Bankshares to acquire influence in the United States suggests improper motives on his part. Not only . . . did he never purchase FGB shares, but the suggestion of improper motive is vehemently denied. The shares that were purchased for Sheikh Sultan and Sheikh Mohammed were solely intended as a passive commercial investment, not to acquire influence in the United States.[22]

Lance, who was present during the period of the original FGB purchases, had no motive to lie on this particular matter. It is not clear who the Washington Post's source was. Al Sayegh, who was not present during any of the events material to this issue, might well not wish to admit any political agenda that existed on the part of the Sheikh. However, the overall evidence accumulated by the Subcommittee on this point is insufficient to be conclusive either way.

**Were Abu Dhabi Investors Nominees in CCAH/First American?**

The Federal Reserve's judgments about the nominee role of the four Middle East investors in the FGB takeover were reached in large part on the basis of documents provided Federal Reserve investigators in the spring of 1991 by Abu Dhabi in Abu Dhabi.

These BCCI documents were in Abu Dhabi, because Abu Dhabi had insisted on moving them from London to Abu Dhabi in the spring of 1990 after being told of fraud at BCCI by BCCI's external auditors, Price Waterhouse, and agreeing to take over BCCI and to provide new funding for the bank to keep it from collapsing.

During their trip to Abu Dhabi in March, 1991, to review the BCCI documents that been moved there one year earlier by Abu Dhabi, the Federal Reserve investigators were not permitted open access to documents. Instead, they advised the Abu Dhabi government of the documents they wanted, and in return, were provided with access to certain files, which were brought by Abu Dhabi representatives to the Federal Reserve investigators' hotel rooms. As a consequence, the investigators recognized at the time that there was a very significant possibility that they were not being provided access to other important files, and that files pertaining to Abu Dhabi could have been hidden or destroyed.[23] The materials provided by Abu Dhabi to the Federal Reserve documented in detail the mechanisms by which Adham, Fulaij, Khalil, El Gohary, and others were used by BCCI as nominees. The materials provided did not include any documents concerning similar arrangements involving Abu Dhabi. Accordingly, the Federal Reserve's judgments about nominees did not reach the question of whether the Abu Dhabi shareholders had arrangements similar to that of the remaining Arabs involved in the 1978 and 1980 FGB takeover.

REENTERED AS EXHIBIT 3

The Subcommittee has, however, interviewed and received additional statements in some detail, supplemented in more general terms by his sworn testimony, from a key BCCI official who handled the finances of the Sheikh of Abu Dhabi for BCCI in the relevant period, and who had frequent contact in the period 1977 through 1980 with Abdullah Darweish, the Abu Dhabi official handling the shares on behalf of one of Sheikh Zayed's sons during the takeover. This witness, Akbar Bilgrami, convicted of money laundering the Tampa case in 1989, handled personal finances for Sheikh Zayed's Private Department held at BCCI in the late 1970's, working closely with Abedi, Sheikh Zayed, and Darweish, and having numerous direct contacts with each of them in this period.

Bilgrami told the Subcommittee that while he and Darweish were in Marbella, Spain in late 1977 or early 1978, Darweish received a stack of legal papers from BCCI concerning the proposed FGB takeover and the role of the Abu Dhabi investors. Darweish asked Bilgrami to read and review these documents before he would sign them. Bilgrami read them carefully, and told Darweish that while many of the provisions were left in blank, the terms of the documents were for BCCI to provide loans, with buy-back agreements, to several members of the Abu Dhabi ruling family, in nominee arrangements. Bilgrami said the arrangements were complex and involved several interim entities between BCCI and the ruling family shareholders, but that the documents very clearly set forth a nominee relationship involving loans from BCCI for the purchase of shares in the U.S. bank. According to Bilgrami, Darweish told him this was "Abedi's operation," and that it was Darweish's understanding that Abu Dhabi participation in "Abedi's operation" had been cleared and that Darweish would sign the documents. At the time, Darweish advised Bilgrami that he was not happy about signing documents with blanks in them, but that he had little choice since the arrangements had already been made.[24]

Bilgrami concluded at the time that none of Abu Dhabi's funds were being invested in the U.S. and that Abu Dhabi's investors in FGB were all nominees, for several reasons. First, the documents described loans from BCCI to pay the Abu Dhabi investors for the share purchases. Second, the documents referred to "buy back" arrangements, which would give BCCI control over the shares, including the right to buy or sell them, and to set the price of any sale. Third, Bilgrami had had sufficient experience with the Abu Dhabi government to know that Darweish would not sign any document with blanks in it if Abu Dhabi itself was making an investment. Documentation for such investments were closely scrutinized by several levels of Abu Dhabi officials, and blanks would not have been permitted. Finally, Darweish made it clear to Bilgrami that the purchase of the U.S. bank was an "Abedi operation from beginning to end." [25]

According to Bilgrami, he made a copy of these documents for himself, in order to understand them better, and looked at them carefully at the time and at least one additional occasion to make sure he understood them. He said that he carried the documents with him whenever he was transferred to a new country by BCCI, and believed they remained among his papers at the time of his arrest in October 1988 in Tampa. However, it was his understanding from federal investigators that they had not been found among his seized papers.[26]

Bilgrami's account concerning Abu Dhabi having been nominees has been corroborated generally by another Pakistani who was also close to Darweish and involved in the

circumstances pertaining to the FGB takeover in 1977 and 1978.[27] In addition, it is corroborated by the circumstances of Abu Dhabi's shareholders being selected by BCCI to participate in the FGB within days of the preparation of a memorandum by a BCCI employee, Abdus Sami. In the memorandum, dated January 30, 1978, Sami advised Abedi that the details of the FGB takeover had been agreed upon, but that BCCI needed to select two additional shareholders to supplement the two who had already agreed to participate. The memorandum implies that the two are to be nothing more than nominees:

We have already given the names of Sheikh Kamal Adham and Mr. Fulaig [sic]. We want two other names immediately.[28]

Within days, BCCI had the additional two names -- Darweish and Sheikh Zayed's son, Sheikh Sultan bin Zayed Al Nahyan.

According to Abu Dhabi, their participation was solicited by Abedi, and they understood them to be passive investments in a bank with high growth potential.[29] But if they were in fact investments, little if any investigation could have been done by the Abu Dhabi investors into the proposed investment between the time of the Sami memorandum and the time of their share purchases. And the language of the Sami memo -- which refers to names being given, rather than investments being sought -- suggest a nominee relationship instead, especially given the fact that the two names BCCI already had were indeed nominees for BCCI.

As Price Waterhouse told the Bank of England in its June 1991 Section 41 report:

We have . . . seen evidence to suggest . . . that the four investors [Kamal Adham, Faisal al Fulaij, Sheikh Sultan Bin Zayed and Abdullah Darweish on behalf of Sheikh Mohammed Bin Zayed] were used to keep individual ownership below 5% and to ensure that BCCI's name did not appear.[30]

Thus, documents reviewed by Price Waterhouse suggested that the two Abu Dhabi shareholders in the original FGB takeover were as much nominees as Adham and Fulaij.

According to information obtained from a Pakistani national familiar with the transaction, Sheikh Sultan's shares, and the shares held by Darweish on behalf of Sheikh Mohammed, were "allocated" by BCCI for the purpose of avoiding the SEC filing requirement that would have had to have been undertaken if the Abu Dhabi interests were combined together.

It is also significant that Bilgrami's description in staff interviews of the papers allegedly involving Abu Dhabi acting as a nominee for BCCI in 1977 and 1978 closely resembles the actual nominee arrangements BCCI reached with all of the other Arab shareholders -- documents that Bilgrami has never seen.

Abu Dhabi has vigorously denied that it was involved in any nominee arrangements with BCCI. However, given the fact that BCCI had nominee arrangements with the leaders of three other emirates in the United Arab Emirates, as well as with all of the other principal Arab "investors" involved with BCCI, the lack of involvement of Abu Dhabi in nominee arrangements would have been contrary to BCCI's practice. It is difficult to imagine that they would have chosen to be, alone among the Middle Eastern shareholders, including several

others from the UAE, principals, rather than nominees, for Abedi and BCCI in the takeover of Financial General Bankshares. There is an additional plausible alternative: that the Abu Dhabi ruling family viewed BCCI already as an institution they owned and controlled, and therefore they did not distinguish between investments made by them personally and guaranteed by BCCI, or nominee arrangements under which they merely held stock for BCCI.

Accordingly, while the direct documentary evidence that would back up Bilgrami's assertions has not been made available by Abu Dhabi authorities, Bilgrami's account, supported by the other facts available to the Subcommittee, is credible. Either the Abu Dhabi shareholders were nominees for BCCI in the early days of the FGB takeover, or alternatively, they did not distinguish between their holdings of FGB and BCCI's.

**Darweish's Arrest and BCCI's Role in Abu Dhabi in 1980**

From 1977 to December, 1981, Abdullah Darweish was chairman of the private department of Sheikh Zayed and the ruling family of Abu Dhabi, responsible for handling their investments and functioning as a liaison to Abedi and BCCI. According to the Abu Dhabi Attorney General, Darweish's responsibilities were "holding the administration and investment of all monies and assets of this department."[31] Darweish had essentially sole authority for these funds, and worked closely with BCCI on many of the investments. On December 8, 1981, Darweish was arrested in Abu Dhabi and charged with defrauding the ruling family, with his role as chief financial advisor replaced by Ghanim Al Mazrui as head of a committee.

At the time of his arrest, Darweish was still a shareholder in Financial General Bankshares in Washington, having purchased shares in FGB on behalf of Sheikh Mohammed, one of Sheikh Zayed's sons, in the capacity as his guardian. According to various BCCI officials who knew Darweish, there had been a power struggle in Abu Dhabi between Crown Prince Sheikh Khalifa, Sheikh Zayed's son, and Sheikh Zayed, in which Darweish had been caught, with the result that when a compromise was reached between father and son, Darweish was the sacrifice. But his arrest also set into a motion litigation involving others who had been financially injured as a consequence of the power shifts which took place over the incident involving a Panama corporation, registered in the name of Sheikh Zayed, Financiera Avenida. Financiera had been established to invest Sheikh Zayed's wealth, without BCCI's involvement. After Darweish's removal, everyone associated with Financiera lost out, with the investment funds moving to the control of Sheikh Khalifa's long-time aide, Al Mazrui, who replaced Darweish, and to BCCI. The ensuring litigation opened a window into the operations and investments of Sheikh Zayed, and BCCI.

Depositions and documents produced during the litigation in New York, Chicago, London, Switzerland and Abu Dhabi showed that Abedi had come, as of 1980, to supervise essentially all of the handling of Sheikh Zayed and Abu Dhabi's wealth -- through his service on the investment committee of the Department of Private Affairs that supervised the placement of the Sheikhs' wealth outside of BCCI; through his handling, for a period, of essentially all of the oil revenues dedicated by Sheikh Zayed to his private investments; and in his capacity as chairman of BCCI, through his control over Abu Dhabi's funds on deposit at BCCI.

As Abu Dhabi's representative, Ahmed Al Sayegh, testified, "in excess of $2 billion was entrusted to Abedi and Naqvi for investment by Their Highnesses Sheikh Zayed and Sheikh

Khalifa under a power of attorney between 1980 and 1990."[32] Al Sayegh did not identify how much in excess of $2 billion was entrusted to BCCI, but given Abu Dhabi's testimony that it lost $6 billion in all in BCCI's collapse, the amount must have been considerable.

In the context of Darweish's fall in 1980, several things happened to intensify the relationship between BCCI and Abu Dhabi. Sheikh Zayed directed that all of his personal oil revenues be placed in BCCI. He directed his investment authority, ADIA, to acquire a 10 percent state in BCCI from ICIC, after ICIC as BCCI's alter ego agreed to buy-back those shares from its departing U.S. partner, Bank of America. And he placed the chairman of his private department, Al Mazrui, on BCCI's board of directors, where Al Mazrui ultimately became chairman of the board. To a remarkable degree, the fallout from the Darweish arrest was the merger of Abu Dhabi's interest, and that of BCCI. This coincidentally took place at the exact time of the Financial General Bankshares takeover in Washington.

**Ghanim Al Mazrui**

As suggested above, for more than fifteen years, Ghanim Faris Al Mazrui has served Sheikh Zayed as a financial advisor and manager, having been secretary general of the Abu Dhabi Investment Authority (ADIA) from 1976 to the present, which handles the principal government investments of Abu Dhabi; chairman or acting chairman of the Private Department of Sheikh Zayed, which handles the principal personal investments of the ruler of Abu Dhabi, from 1982 to the present; and chairman of a "Shareholders Working Group," which Abu Dhabi describes as "an informal committee appointed to oversee and coordinate the Majority Shareholders' response to the closure of BCCI," since July, 1991, and continuing to the present.[33]

From 1981 on, Al Mazrui also served on the Board of Directors of BCCI itself, in his capacity as secretary general of ADIA, which held 10 percent of BCCI's shares.

Simultaneous with Al Mazrui's appointment to the Board of Directors of BCCI, was his appointment to the Board of Directors of two other banks in Hong Kong, ostensibly unrelated to BCCI, called the Hong Kong Deposit and Guaranty Bank and Tetra Finance, Inc. Both entities, on which he served with several other important Middle Eastern officials, including Yassin Hassan, Kamal Adham's original contact for the FGB takeover, collapsed just two years later, with a total loss of capital and depositor losses amounting to several hundred million dollars.[34] The collapse, however, did not appear have an impact on Al Mazrui's career, and he remained in place handling the ruling family's finances and entrusted with investing billions of Abu Dhabi's oil revenues as well, up to the time of BCCI's collapse a decade later.

Given his long service to both Abu Dhabi and his decade of hands-on experience with BCCI, substantial questions have arisen as to what Al Mazrui knew concerning BCCI's frauds, and when he knew about the frauds. In response to a question to Abu Dhabi from Senator Kerry concerning this issue, Abu Dhabi's designated witness, Ahmed Al Sayegh, stated that Al Mazrui first learned of BCCI's problems, and its involvement in false or deceitful accounting practices, in April, 1990, from Price Waterhouse, along with other members of BCCI's board of directors. According to Al Sayegh, in the same period, BCCI officers, whose names he

failed to specify, met with Abu Dhabi officials, with names again not specified but which apparently included Al Mazrui:

in an effort to persuade the Government to make a substantial capital injection into the bank. BCCI's officers confirmed that the Bank was experiencing severe financial difficulties and disclosed the misuse of $2.2 billion of managed funds on behalf of the Ruling Family.[35]

Thus, Abu Dhabi's chief representative on BCCI's board, and Sheikh Zayed's trusted financial manager, Al Mazrui, had for the previous decade somehow failed to detect BCCI having misused, and apparently defrauded Abu Dhabi of, up to $2.2 billion, in addition to having presided over the failures of the two Hong Kong banks in 1983. Moreover, Al Mazrui himself had participated in improprieties and received no-risk financial pay-offs from BCCI.

As Price Waterhouse told the Bank of England, in June, 1991, neither Al Mazrui nor any other representative of Abu Dhabi had advised them that substantial funds of Abu Dhabi had been "mismanaged" by BCCI. The auditors could not determine what else Al Mazrui knew and when he knew it. But the auditors had determined that Al Mazrui himself had been involved in unusual financial practices with BCCI from 1986 on:

The extent to which the major shareholders and in particular their board representative H.E.G.F. Mazrui was aware of the matters discussed in this report [that is, BCCI's frauds] cannot be established. We are, however, informed that H.E.G.F. Mazrui and the government were briefed fully on all the problems in April, 1990, notwithstanding that they allowed the 1989 accounts to be finalised in discussions with ourselves and the Regulators without disclosing this information. In addition, up until discussion of our Report to the Directors and Regulators of 3 October 1990, H.E.G.F. Mazrui contended that the loans for collection by the shareholders which have now been proven to be totally fictitious, were recoverable.[36]

Price Waterhouse further advised the Bank of England that Al Mazrui had his own accounts at BCCI's bank-within-a-bank, ICIC, which showed that he received funds in 1986 and earlier from no-risk transactions involving BCCI shares in which he was guaranteed against possible loss. Price Waterhouse told the Bank of England that Al Mazrui confirmed that he benefitted from these transactions and informed the Abu Dhabi government of his involvement in them, ostensibly for the first time, in April 1990. Price Waterhouse told the Bank of England that Al Mazrui also confirmed a fictitious loan made to the Crown Prince of Abu Dhabi by BCCI, but claimed that he did not remember signing the false confirmation. Al Mazrui told Price Waterhouse that his signature must have been forged, a contention Price Waterhouse rejected. [37]

In summary, the Section 41 report by Price Waterhouse shows that Al Mazrui received substantial personal financial benefits from BCCI through no-risk stock trading; argued that BCCI loans which were really fictitious were recoverable; and personally confirmed a bogus BCCI loan to the Crown Prince of Abu Dhabi and then lied about it, before confessing all to Abu Dhabi authorities in April, 1990. Yet more than two years later, Al Mazrui remains in place as the head of Abu Dhabi's working group to deal with BCCI-related problems. Al Mazrui has neither been fired, nor resigned, from the positions of trust he has clearly violated.

Given these facts, Al Mazrui's continued role in handling Abu Dhabi's response to the collapse of BCCI, raises additional questions. One possible explanation is that Sheikh Zayed and the ruling family are remarkably tolerant of incompetence, deception, fraud, and the personal enrichment of top advisors. Alternative explanations are that Al Mazrui's improprieties had previously been sanctioned by higher-ups, or were consistent with ordinary practices in the Emirate.

**Abu Dhabi's Commitments in April-May, 1990**

On April 18, 1990, Price Waterhouse provided a devastating report on BCCI to the Bank of England which was simultaneously provided to BCCI's board of directors, including Abu Dhabi representative Al Mazrui. The report stated that a number of financial transactions at BCCI booked in its Grand Caymans affiliates and other offshore banks were "false and deceitful," and that it was impossible at the present time to determine just how far the fraud reached.

Price Waterhouse's report was prompted by its own critical need to solve a problem. It was no longer in a position to certify BCCI's books, unless someone provided financial guarantees to protect against loss. Either BCCI had to be closed down now, or the Bank of England itself had to give its assent to keeping it open in some new form as a means of avoiding losses to BCCI's million or more depositors. New management needed to be installed. New financing had to be found, and the holes in BCCI's books had to be plugged.

The obvious solution was to ask Sheikh Zayed and the government of Abu Dhabi to take over the bank. As Zayed and the Al Nayhan family who ruled Abu Dhabi had been major depositors of BCCI, and had long had billions in family finances handled by BCCI, they stood to lose as much as anyone if the bank collapsed. Accordingly, Abu Dhabi would have to be told the truth about BCCI's perilous condition, and asked to commit funds to keeping the bank solvent.

A series of urgent meetings were held in Abu Dhabi and Luxembourg, beginning in March, 1990, in which Naqvi confessed his errors and resigned from his position as CEO at BCCI. A new management team was brought in. Unfortunately, rather than constituting a strong group of banking professionals, the new team was headed by a long-time Abu Dhabi insider from BCCI itself, Zafar Iqbal, the former head of BCCI's branch in the United Arab Emirates, the Bank of Credit and Commerce Emirates, or BCCE, who had long had a close personal relationship with important members of the ruling family of Abu Dhabi arising out of his provision of intimate personal services for them in Pakistan and elsewhere. Within the bank, Iqbal was not considered to be an expert on much besides pleasing the Abu Dhabi ruling family. BCCI junior officers knew him as the man who had for years provided "singing and dancing girls" to the ruling family, and related personal services.[38] BCCI operations were moved, without objection from the Bank of England, to Abu Dhabi, along with all of BCCI's most important records. And assurances were given to Price Waterhouse that Abu Dhabi would make an open-ended financial commitment to bail out BCCI, enabling Price Waterhouse to sign off on its books. As Price Waterhouse stated to the chairman of the Abu Dhabi Finance Department on April 25, 1990:

REENTERED AS EXHIBIT 3

Your representative, HE G Al Mazrui, has confirmed to use that you are fully aware of the nature and magnitude of the uncertainties and prepared to provide the necessary financial support in the event that losses arise from realisation of these loans.[39]

Price Waterhouse then duly certified BCCI's books, subject to a single caveat -- that the basis of the preparation of the certification was Abu Dhabi's intention to maintain BCCI's capital base while it reorganized and restructured.

By agreement, Price Waterhouse, Abu Dhabi, BCCI, and the Bank of England had in effect agreed upon a plan in which they would each keep the true state of affairs at BCCI secret in return for cooperation with one another in trying to restructure the bank to avoid a catastrophic multi-billion dollar collapse. Thus to some extent, from April 1990 forward, BCCI's British auditors, Abu Dhabi owners, and British regulators, had now become BCCI's partners, not in crime, but in cover-up. The goal was not to ignore BCCI's wrongdoing, but to correct it in order to keep the bank in operation, and therefore, to hide the truth from the public because the truth would force the bank to be closed.

If Abu Dhabi had honored the commitment made to Price Waterhouse and the Bank of England, when BCCI was closed globally, BCCI's innocent creditors and depositors would not have suffered a penny in losses, since Abu Dhabi had agreed to guarantee them as the price for the Price Waterhouse certification.

### Coverup and Obstruction of Investigations

In April, 1990, Naqvi and the other chief officers who resigned with him from their positions in BCCI were placed under house arrest in Abu Dhabi, as Abu Dhabi took formal control of BCCI. Unfortunately, as it did so, it did not disclose to Price Waterhouse certain information that it now had about the extent of the fraud at BCCI, and it took positions that had the clear intention of seeking to sweep the true nature of BCCI's problems under the rug, and to avoid the disclosure to BCCI's regulators of what had really taken place. Essentially, Abu Dhabi was now seeking to make certain that the money it was spending on BCCI would suffice to keep secret many of the facts about the relationship between Abu Dhabi and BCCI, even, as necessary, from Price Waterhouse, the outside auditors for the bank it now owned.

In September, 1990, Price Waterhouse learned that BCCI had concealed further lending of over $500 million to its major customs by "parking" that lending with a Middle Eastern bank, namely, the National Commercial Bank of Saudi Arabia controlled by Khalid bin Mahfouz, the most powerful banker in the Middle East, who was later indicted in the United States in connection with his activities pertaining to BCCI and First American. Price Waterhouse also learned that since Naqvi's removal, the practice had continued, "with the knowledge and approval of the Board representative of the controlling shareholders" -- the government of Abu Dhabi. The auditors had begun to realize that Abu Dhabi officials were now colluding with BCCI in continuing fraudulent practices, and in hiding them from Price Waterhouse.[40]

Since March or April, 1990, Naqvi, who had personally handled in excess of $2 billion of Abu Dhabi's funds and was personally responsible for many of BCCI's frauds, had been living under house arrest in Abu Dhabi. Abu Dhabi had decided to retain Naqvi as a consultant to advise them on BCCI, and were giving him access to BCCI's documents. According to Price

Waterhouse, Naqvi was maintaining some 6,000 files personally in Abu Dhabi, whose very existence had still never been disclosed to the auditors. For months, as Price Waterhouse continued its efforts to review BCCI's books, it had been lied to by BCCI and it was finding, by Abu Dhabi, kept in ignorance of the bank's most vital records, and only stumbled onto the fact of their existence in November, 1990.[41]

As Price Waterhouse described it, when they confronted Abu Dhabi with their concerns about Naqvi, and a request to review the files he controlled, they were told by Abu Dhabi authorities that the auditors could not have access to them, and that they would remain under the control of the discredited Naqvi:

Price Waterhouse's report to the directors of 3 October 1990 revealed that management may have colluded with some of BCCI's major customers to misstate or disguise the underlying purpose of significant transactions. Following this, the controlling shareholders of BCCI [Abu Dhabi], under pressure from Price Waterhouse, agreed to a full investigation of the problem accounts and to enforce the resignations of Abedi and Naqvi as directors.

An Investigative Committee comprising representatives from Price Waterhouse, E&W Middle East Firm (who were auditors of the Abu Dhabi Government interests), two firms of lawyers and the Abu Dhabi Government was established in November 1990 to supervisor the investigation into the problem accounts. Price Waterhouse was advised by senior BCCI management that Naqvi had been retained as an "advisor" to provide explanations to the Abu Dhabi Government and that they could not have access to files being used by him. Price Waterhouse made clear to the controlling shareholders that without access to Naqvi and the files he was using there could be no investigation.

Ultimately access was granted and we were shocked to find that Naqvi was holding around 6,000 files. After initial steps to secure the files, a preliminary review revealed that amongst them were details of transactions and agreements not previously disclosed to us despite management's prior assurances that they had provided all relevant information to Price Waterhouse.[42]

Abu Dhabi had placed Naqvi, a principal architect of BCCI's frauds, in charge of BCCI's most important and secret records without telling them. For the past eight months, Naqvi and Abu Dhabi had maintained exclusive control of those records, with essentially unlimited opportunities to destroy them or falsify them throughout that time. By the time Price Waterhouse finally obtained access to these records in November and December, 1990, it found massive fraud in the materials that still existed. But the auditors had no way of determining the extent to which those documents were already cleansed of any material damaging to the new owners of BCCI, along with any other material which Abu Dhabi or Naqvi wanted hidden forever.

During December, 1990, at the very time that the New York District Attorney had obtained some of the most critical of its earlier audit reports, Price Waterhouse completed its initial review of the formally hidden Naqvi files. In that review, Price Waterhouse found evidence of phony loans and hidden deposits amounting to hundreds of millions of dollars, nominee arrangements, hold harmless agreements relieving borrowers of any obligation to repay loans, and other, similarly criminal practices at the bank. Again, to Price Waterhouse's shock, Abu

REENTERED AS EXHIBIT 3

Dhabi had known of these practices since at least April, 1990, and never disclosed them to the auditors.[43]

The implications of these findings for BCCI's future were devastating. If there were in fact deposits that had been made to BCCI amounting to hundreds of millions that had never been recorded at the bank, how was anyone to ever determine what claims by BCCI depositors might be real, and what claims might be phony? Price Waterhouse decided that it dare not put this information in writing, and would confine itself to reporting it orally to the Bank of England, which it did in January 1991. In response, Abu Dhabi again agreed to make good any losses in connection with these unrecorded deposits.[44]

**Attempt At Restructuring 1990 and 1991**

The key goal of Abu Dhabi from the time it took control of BCCI in April, 1990 was to find a way to save its interest in the bank. By the account of Al Sayegh and Abu Dhabi:

In April, 1990, senior management revealed that BCCI had suffered significant losses and Price Waterhouse for the first time identified certain transactions that had been "either false or deceitful." The Price Waterhouse report was sent to the Bank of England and was discussed at a meeting between the Bank of England, the Luxembourg Monetary Institute, Price Waterhouse, and BCCI management in April, 1990. With the full support of the Bank of England, the Ruling Family purchased some 15 million outstanding BCCI shares, and the Abu Dhabi Department of Finance (which previously had owned no BCCI shares) purchased another 15 million outstanding shares and subscribed for 10 million additional shares issued by BCCI. The share issuance was intended to cover the losses which had been identified and to restore the liquidity of the BCCI subsidiary banks. As a result of these steps, and the outlay of $1.2 billion, the Abu Dhabi investors now owned 77 percent of the stock of BCCI.[45]

Abu Dhabi immediately removed Naqvi from control of BCCI and replaced him with Zafar Iqbal, then head of the Abu Dhabi operation of BCCI, the Bank of Credit and Commerce Emirates, whose qualifications for the position have been discussed above. They decided to shrink the bank, and:

with the encouragement of the College of Regulators, a decision was made to move the headquarters of BCCI to Abu Dhabi form London, so that the Majority Shareholders could begin to monitor some of the activities of BCCI management.[46]

Planning began to find a way to restructure BCCI into a three-headed entity, with separate "independent" banks based in three locations, Abu Dhabi, Hong Kong and London, in a proposal that evidently had some support if not final approval from the Bank of England and the College of Regulators through the spring of 1991. As described in a legal analysis provided to the BCCI Creditors' Committee after BCCI's collapse by the firm of Norton Rose in London, this transaction would have involved the Government of Abu Dhabi committing "some US$4 billion . . . under financial support arrangements." These arrangements were signed between BCCI and Abu Dhabi on May 22, 1991. Under their terms, most of BCCI's problem loans were transferred at book value -- far in excess of their real value -- to new companies owned directly by the Government of Abu Dhabi. In return, Abu Dhabi gave BCCI

SA promissory notes denominated in US dollars and UAE dirhams, equivalent in face value to $3.061 US, with additional guarantees totalling another $750 million for a group of remaining loans with some value.[47]

The three separate and independent banks to arise out of BCCI's ashes were to have control and management of the operations of the former BCCI banks divided into Europe and Canada, for the United Kingdom bank; the Middle East and Asian subcontinent, for the Abu Dhabi bank; and the Far East, for the Hong Kong bank. Under the plan, a substantial portion of the BCCI global network would have been wound up or sold off. The banking operations of BCCI would have been transferred from Luxembourg to Abu Dhabi by the end of 1991 and from Grand Caymans to Abu Dhabi by the end of 1992.[48]

Snags developed, however, as the restructuring proposal proceeded. The first was the New York District Attorney obtaining information in the late autumn of 1990 concerning the previous Price Waterhouse audit reports, including the April, 1990 reports, that triggered Abu Dhabi's takeover of BCCI.

In November, 1990, the New York District Attorney advised the Federal Reserve that a source stated that the reports showed that there had been massive lending -- amounting to $850 million or more -- by BCCI to First American's shareholders, none of which had ever been disclosed to the Federal Reserve.

The Federal Reserve, after some significant obstacles, was permitted by BCCI in December, 1990 to view those reports in London.

On December 21, 1990, Federal Reserve attorneys met with attorneys for Abu Dhabi and BCCI from the Washington law firm of Patton, Boggs and Blow. The Federal Reserve learned from Patton Boggs for the first time about the massive restructuring of BCCI planned by Abu Dhabi to respond to unspecified capital "deficiencies" at BCCI. Patton Boggs confirmed that what the Federal Reserve already knew from the Price Waterhouse audit reports -- that BCCI had lent large sums to CCAH's shareholders which were secured by CCAH's shares. Two weeks later, the Federal Reserve opened a formal investigation. Less than three weeks later, it concluded that criminal activity had been involved in the First American purchase, referred the matter to the Justice Department, sent a proposed cease and desist order to BCCI, and widened its investigation.[49]

Thus, during the spring of 1991, Abu Dhabi faced a new problem. At any time, the Federal Reserve could, if it so desired, make it impossible for the Bank of England to proceed with the restructuring. Accordingly, Abu Dhabi found itself in the position of having to cooperate with the Federal Reserve's investigation of BCCI and First American, and provide information which could simultaneously confirm some of BCCI's frauds, and thus increase the risk that bank which it was trying to save would not survive.

The compromise reached by Abu Dhabi was to permit Federal Reserve investigators to travel to Abu Dhabi and review BCCI documents, but only those documents pertaining to transactions involving U.S. banks, and only as selected by Abu Dhabi. The Federal Reserve investigators went to Abu Dhabi, told them what categories of documents they wanted, and Abu Dhabi officials then "located them" from its BCCI document files. When investigators

REENTERED AS EXHIBIT 3

sought to meet with Swaleh Naqvi, access to Naqvi was granted, but only after Naqvi was provided an attorney who protested that he could not allow the investigators to speak with Naqvi until the lawyer was more familiar with the case.[50] The result was that the Federal Reserve obtained substantial, but incomplete, information concerning BCCI's activities in the United States, and very little information of any kind concerning Abu Dhabi's role, or what took place at BCCI apart from its role in purchasing U.S. banks.

After the Federal Reserve, First American, and BCCI entered into consent decrees on March 4, 1991, Subcommittee staff contacted Abu Dhabi's U.S. attorneys at Patton, Boggs and Blow in an effort to understand the ramifications of the decrees and the proposed restructuring of BCCI. In the meeting, staff expressed their concerns about the fact that BCCI's former head, Swaleh Naqvi was still in place providing advice and assistance to BCCI; that BCCI's current head, Zafar Iqbal, was to remain in control of the banks throughout the restructuring and presumably afterwards; and that a structure was to emerge out of BCCI which failed to respond to what was even the one an obvious lesson of the BCCI affair -- dividing BCCI into more than one part was dangerous to the health of the international banking system. The attorneys at Patton, Boggs and Blow, who were at the time representing both Abu Dhabi and BCCI, acknowledged that they shared the concerns about Iqbal and Naqvi, and would pass the Subcommittee's concerns on to their clients. Staff questioned the attorneys as to whether the three independent banks could do business with one another, and what protection would be in place to prevent further fraud from taking place. In response, Middleton Martin, Abu Dhabi's principal lawyer at Patton, Boggs and Blow in Washington, suggested that Abu Dhabi was a "white hat" among whomever might be the "black hats," and was doing its best to solve BCCI's many problems.[51]

At the direction of the chairman of the Subcommittee, staff met with staff of the Federal Reserve to express Senator Kerry's concerns about the proposed restructuring, and the wisdom of permitting BCCI to be restructured in three parts. The Federal Reserve took the position with staff that the decision was the Bank of England's. The Federal Reserve's principal goals were to sever BCCI's relationship with First American and to find out the nature and decree to which U.S. banking laws had been violated by BCCI, its shareholders, and officers. However, Federal Reserve investigators were also disturbed by the continued participation of BCCI directors and officers in the future of the proposed three banks, and objected especially to the continued involved of Iqbal. By the late spring of 1991, both U.S. and U.K. regulators began to insist on the removal of Iqbal as the head of BCCI. Al Mazrui, who had worked closely with Iqbal for many years, resisted, temporarily paralyzing the restructuring plan that had previously been agreed to among the various regulators, Abu Dhabi and BCCI.[52]

While tentatively assenting to Abu Dhabi's proposal for restructuring BCCI, the Bank of England, in about March, 1991, also authorized a Section 41 report by the auditors, named for the provision in British banking laws by which regulators can commission an audit report of a bank by its outside auditors for the regulators. That report was initiated at least in part in response to new information developed by Price Waterhouse in December, 1990 or January 1991 about the broad extent of BCCI's frauds. The Section 41 report was completed in late June. The fraud outlined in that report resulted in the Bank of England deciding, within days, to abandon its previous support for a restructuring and to close the bank. Just two days before

REENTERED AS EXHIBIT 3

BCCI was closed, Abu Dhabi had provided the British and Luxembourg regulators with the latest -- and what proved to be the final -- draft restructuring plan for BCCI.[53]

**Abu Dhabi and BCCI's Closure**

Abu Dhabi representatives were outraged by the sudden closure of BCCI. They had not been expecting the action, had committed nearly $4 billion to keep BCCI open, and had been working closely with regulators in an effort to make the restructuring succeed. Moreover, in an effort to appease the Federal Reserve and prevent a collapse of First American, while also protecting against the loss of the value of its investment in First American, Abu Dhabi had also made a series of payments totalling about $190 million to keep First American from possible failure. The last of these payments was made only days before the final closure of BCCI, a closure which Abu Dhabi could reasonably conclude might well have been timed not to take place until the moment they had put up the final installment of cash to help prop up First American.[54]

In the wake of BCCI's collapse, any cooperation from Abu Dhabi to the Federal Reserve ceased.

Abu Dhabi's first step in response to the closure of BCCI was to set into motion legal proceedings in Abu Dhabi entitling it to seize the promissory notes it had issued to BCCI as part of the restructuring plan. As Norton Rose described it:

On Tuesday, July 16, 1991 the Government of Abu Dhabi filed Plaint No. 1560 with the Abu Dhabi Civil Court of First Insurance. . . The Court ordered such seizure and consequently that afternoon four court officers attended the head of BCCI Group . . . where they located the outstanding promissory notes and two guarantees, sealed them in yellow enveloped, and deposited them in a safe (which was marked red) at the Bank. The keys to the safe are apparently being kept in the Treasury of the Abu Dhabi Civil Court.[55]

Thus, Abu Dhabi insured that actual documents representing the additional financial obligations it entered into with BCCI -- ranging from $1.2 billion to $2.8 billion depending on how one valued the notes -- would be locked under seal and kept from BCCI's liquidators, who otherwise might be able to recover additional funds from Abu Dhabi on the basis of the notes, but now would be stymied through the notes' impoundment.[56]

Abu Dhabi spent the remainder of July, 1991 trying to avoid the liquidation of BCCI and to restart the restructuring plan. It applied to the courts in the UK and Luxembourg to adjourn the petition for liquidation to permit the consideration of the restructuring. But the effort was fruitless. Even if the courts did not ultimately reject it, within a few hours of its closure on July 5, 1991, BCCI had effectively been obliterated, leaving some 14,000 employees out of work, and some one million depositors out of luck. BCCI had lost billions of their money long ago. But it was BCCI's closure that forced the world to recognize the losses.

**Abu Dhabi and the Liquidators**

Shortly after BCCI's closure, liquidators were appointed by the District Court of Luxembourg, where BCCI was incorporated, to handle the winding up of BCCI and the recovery of the

REENTERED AS EXHIBIT 3

maximum possible amount of assets for distribution to innocent depositors and creditors of BCCI worldwide. The mandate of BCCI's liquidators was to recover funds, not necessarily to aid in investigations of BCCI. As chief liquidator Brian Smouha testified:

[O]ur responsibility is to use the resources in the liquidation estates to maximize recoveries to be made available to creditors and depositors. [A]s far as we are able consistent with that responsibility, we endeavor to cooperate with numerous investigative authorities in a number of countries.[57] [emphasis added]

Thus, to whatever extent investigative efforts might threaten to reduce the recovery of funds for BCCI's depositors, BCCI's liquidators have a responsibility under the terms of their appointment to sacrifice the investigation and uncovering the truth about what happened to the goal of maximizing funds to return to the creditors.

Following their appointment, the liquidators found two key situations they had to deal with in order to recover substantial assets for BCCI. The first was in the United States, which had more than $330 million in BCCI assets frozen unless an agreement could be reached with the Justice Department, New York District Attorney, and Federal Reserve. The second was with Abu Dhabi. Abu Dhabi had previously guaranteed BCCI's debts as of April, 1990. At the time of the liquidation of BCCI, it was BCCI's sole owner. Abu Dhabi has one of the world's deepest pockets as a result of its huge oil reservoirs, and its revenues from oil of $10 billion or more annually. There would be numerous possible theories for recovering funds from Abu Dhabi if its role were litigated by the liquidator. On the other hand, Abu Dhabi also held a number of cards were any such litigation to take place. First, it controlled BCCI's records. Second, it controlled key BCCI witnesses. Third, its wealth could easily be turned to time-consuming litigation, delaying any pay-out to innocents for a decade or more. As a result, the liquidator either had the choice of reaching an agreement with Abu Dhabi which met it interests, or of entering in a difficult, contentious, and drawn-out battle with Abu Dhabi with uncertain results.

The U.S. situation was, needless to say, far easier to resolve. The liquidators were to a remarkable degree able to integrate the goals of assisting investigators and helping depositors in the context of the plea agreements they reached in the United States on January 24, 1992. In those agreements, BCCI's liquidators entered pleas of guilty on behalf of BCCI to federal racketeering and similar New York state charges. The pleas promised full cooperation by the liquidators with U.S. law enforcement authorities and worked out a fair distribution of BCCI's assets in the United States that protected U.S. interests while facilitating the return of excess funds to BCCI's worldwide creditors. BCCI's liquidators also provided substantial assistance to the Subcommittee investigation, providing thousands of BCCI documents in the United States, waivers of the attorney-client and work-product privilege of BCCI's attorneys and investigators, and other important help.

But on the issue of BCCI and Abu Dhabi, the goals of investigating what happened, and the liquidators need to insure the maximum recovery, were not so easily aligned.

Abu Dhabi took a number of positions with the liquidators which together amounted to Abu Dhabi maintaining its ability to cover-up any information it wished the world not to know.

First, Abu Dhabi made it clear to the liquidators that they could not press for the return of BCCI's documents held in Abu Dhabi, despite the fact that under any ordinary standard of bankruptcy law outside the jurisdiction of Abu Dhabi, the liquidators have the right to control those documents, and the obligation to make them available to parties at interest in the liquidation.

Second, Abu Dhabi made it clear that the liquidators themselves would have only limited access to BCCI's documents in Abu Dhabi for the limited purpose of using them to try to litigate claims against non-Abu Dhabi borrowers from BCCI. As Smouha acknowledged:

[W]e have, after initially being denied access to those documents, since late summer [1991] had access to the Central Credit Division and other Central Office documents in Abu Dhabi for loan recovery purposes. Many of the critical documents in Abu Dhabi were put under the control of a court appointed receiver in Abu Dhabi. The receiver has not permitted us to remove documents from Abu Dhabi.

With respect to witnesses, as you know, certain key ex-employees of BCCI are under arrest in Abu Dhabi. We have asked for access to certain of those persons. We have been advised that these persons are under control of [t]he public prosecutor in Abu Dhabi and that access must be obtained through that official.[58]

As of the writing of this report, that access had yet to be obtained by anyone outside the Abu Dhabi government.

Third, Abu Dhabi insisted that it alone would have the right to reach judgments about whom to sue on BCCI's behalf from among BCCI's lawyers, accountants, and top officers, and how to proceed against them, while permitting the liquidators to share in 50 percent of any returns on such claims, with the other 50 percent to be given to Abu Dhabi itself.[59] As Michael Crystal, an attorney for the liquidators, testified:

Under the proposed arrangements . . . these claims will be managed . . . by the Government of Abu Dhabi's lawyers under a cooperation arrangement under which we have a say in the case management.[60]

In fact, the literal language of the Contribution Agreement proposed leaves this decision entirely to Abu Dhabi's discretion, regardless of whom they may consult on "case management":

[T]he claims of Principal BCCI Companies against certain specified third parties are to be assigned to the Government of Abu Dhabi [and] will be pursued by them. [This applies to] the former auditors and certain former solicitors of the Principal BCCI Companies; certain named individuals who were formerly responsible for the management of the principal BCCI Companies.[61]

The right to make decisions about how and against whom to pursue claims is a basic right of any liquidator, and one of the most important responsibilities, as the issue of who is sued, how

REENTERED AS EXHIBIT 3

a case is managed, and whether or not to settle such claims goes to the heart of a liquidators' ability to maximize a recovery.

Here, the interest of Abu Dhabi and the liquidators could dramatically diverge. For example, Abu Dhabi might well be more interested in insuring the silence of BCCI's professional advisors, lawyers and accountants, than in the maximum recovery of assets from them. Accordingly, if the liquidators acquiesced in Abu Dhabi's insistence on having the sole right to make this decision, Abu Dhabi could choose to settle claims against those who know the most about Abu Dhabi's participation in BCCI's improprieties, in return for their silence. Contrary to the import of Crystal's testimony, if Abu Dhabi decided to settle its claims against BCCI officers like Swaleh Naqvi, against its auditors like Price Waterhouse, and against its attorneys, in return for their agreement to say nothing further about what they had learned concerning BCCI to anyone, including government investigators, the liquidators would be bound to accept the decision.

Finally, as would be normal in any such agreement, the liquidators would release Abu Dhabi from any claims that the liquidators, on behalf of BCCI, its depositors and creditors, would have against Abu Dhabi.

In return for these key concessions by the liquidators, Abu Dhabi agreed to provide $1.7 billion to the pool to be used to repay creditors and depositors. Given Abu Dhabi's contention that it was defrauded of $6 billion, and its professions of innocence, its claims would be treated equally with those of innocent creditors and depositors, with the result that half or more of the $1.7 billion contributed by Abu Dhabi would likely be returned to Abu Dhabi itself, going from one Abu Dhabi pocket to another, leaving depositors receiving no more than 30 cents on the dollar for their losses and according to some creditors' contentions, far less.

Given the difficult choice between accepting these unusual demands from Abu Dhabi in return for Abu Dhabi's $1,7 billion contribution or of litigating Abu Dhabi's liability, the liquidators accepted to Abu Dhabi's demands and initialed agreements with Abu Dhabi on February 20, 1992, incorporating the concessions described above, subject to approval by BCCI's creditors and depositors. These agreements, which also included detailed and reasonable provisions for the pooling of BCCI assets and other important technical issues pertaining to the liquidation, were then provided to the courts for ratification, ratified by the British court, and remain pending before the Luxembourg court.

The practical consequences of the agreements reached by the liquidators with Abu Dhabi have meant that the liquidators have essentially chosen not to contest Abu Dhabi's positions concerning its innocence in the affair; have decided not to investigate any wrongdoing by Abu Dhabi in connection with BCCI; have acquiesced in Abu Dhabi's sequestration of documents that legally belong to the liquidators and witnesses to whom the liquidators legally should have access; and have even placed Abu Dhabi in the position of being able to purchase the silence of the auditors and lawyers who handled BCCI's affairs.

The secrecy, if not necessarily the real reason for the secrecy, concerning the actual nature of Abu Dhabi's possibility liabilities to the creditors, has been acknowledged by the liquidators themselves. For example, the presentation made to BCCI's creditors and depositors by the

REENTERED AS EXHIBIT 3

liquidators in their March 16, 1992 report describing the proposed agreement with Abu Dhabi explicitly states under the title "Disadvantages" of the agreement, that:

The Liquidators are advised by their legal advisors that it would be inappropriate to provide a detailed assessment of claims against the Majority Shareholders, because to do so might be highly prejudicial to the interests of creditors were the Majority Shareholder Agreements not to become unconditional.[62]

This remarkable sentence contains the essence of the dilemma in the liquidator-Abu Dhabi deal. If the liquidators were to tell those whom BCCI injured what Abu Dhabi might have done and what its potential liability might be, either the creditors, Abu Dhabi, or both might withdraw from the agreement, with ten years of more of difficult litigation ensuing. Those being asked to sign off on the agreement, were being required to do with full warning by the liquidators that the liquidators were <u>already</u> suppressing information on Abu Dhabi's liability in order to obtain the agreement.

Equally important, the practical consequences of the agreements reached by the liquidators with Abu Dhabi have been that the liquidators are as a practical matter acquiescing in Abu Dhabi's frustration of U.S. law enforcement, regulatory, and Congressional investigations concerning its activities pertaining to BCCI. This is disputed by the liquidators. As Michael Crystal testified:

The commercial situation is not intended by the court appointed fiduciaries, nor does it, touch and concern the ongoing obligations of regulators to inquire into the past, to look into history, and to consider whether there has been criminal misconduct which needs to be prosecuted. There's nothing in the plea agreement which we think cuts across those two separate interests.

The plea agreement requires us to cooperate with regulators to ensure that crime is prosecuted and we have taken assiduously our duties to provide full cooperation to the relevant regulatory authorities under the plea agreement.

So far as the commercial arrangements are concerned . . . they will not prevent regulators in jurisdictions who have access to international treaties . . . from continuing to pursue criminals and bring them to justice in a variety of jurisdictions.

The arrangements with Abu Dhabi don't prevent that. They don't prohibit it.[63]

Crystal's testimony on this point was technically correct, but as a practical matter, misleading. In giving the power of the liquidators to reach independent judgments about how to pursue those most knowledgeable about BCCI's wrongdoing -- and the extent of wrongdoing by Abu Dhabi -- the agreements with Abu Dhabi initialed by the liquidators have already had, and will continue to have, a profound negative impact on ongoing criminal investigations in the United States pertaining to BCCI.

Moreover, there is, to say the least, a very large tension between the legal commitment the liquidators made to the Justice Department and the New York District Attorney to provide BCCI's full cooperation to the United States, and the legal commitment the liquidators have now made to Abu Dhabi. In time, that tension could imperil the ability of the liquidators to

recover any assets from the United States. U.S. law enforcement would be fully entitled to declare that the commitments made to Abu Dhabi have precluded the cooperation with the United States required under the plea agreement entered into by the liquidators on BCCI's behalf. With the liquidators thus declared in breach of their commitments to the Justice Department, New York District Attorney, and Federal Reserve under the plea agreements, the latter institutions and the U.S. courts could be free to take the position that BCCI's U.S. assets had been forfeited by the liquidators in the process.

## Al Sayegh's Testimony And Answers to Questions

Beginning in the spring of 1991, the Subcommittee asked Abu Dhabi's and BCCI's lawyers at Patton Boggs and Blow that Abu Dhabi or BCCI provide knowledgeable witnesses to testify in public concerning the key issues pertaining to BCCI. These requests were ignored, or rejected, until the spring of 1992, when the Subcommittee advised Abu Dhabi's attorneys that they themselves could be subpoenaed to testify before the Subcommittee in their capacity as business agents for Abu Dhabi in the event that a knowledgeable Abu Dhabi witness was not produced. Recognizing that Abu Dhabi was continuing to refuse to produce the key BCCI officials, such as Swaleh Naqvi, the Subcommittee requested that Ghanim Al Mazrui be produced, or an equally knowledgeable associate.

A hearing date was set for May 14, 1992. Until a few days before the hearing, Abu Dhabi did not inform the Subcommittee of the identify of the witness who testify. Shortly before the hearing, he was identified as Ahmed Al Sayegh, a member of the steering committee, headed by Al Mazrui, responsible for handling Abu Dhabi's response to BCCI's closure, and a person with no knowledge of, or involvement in, Abu Dhabi's activities with BCCI over the previous two decades. That lack of knowledge was, unfortunately, reflected in a number of answers by Al Sayegh to important questions from the Subcommittee.

Al Sayegh was, for example, unaware that from at January 1978 through November 1990, Clark Clifford and Robert Altman represented Abu Dhabi, testifying that "I don't think they were ever our lawyers, Senator." In fact, Clifford and Altman made numerous filings with regulators on the behalf of various members of the Abu Dhabi ruling family, had extensive correspondence with representatives of Abu Dhabi, met with Abu Dhabi's representatives during the Financial General Bankshares takeover, and had signed powers of attorney, spanning more than a decade, for Sheikh Zayed personally, for the Abu Dhabi Investment Authority, for at least one of Sheikh Zayed's sons, and for Abdullah Darweish, guardian of another of Sheikh Zayed's sons.[64]

Al Sayegh was similarly unaware of who made the decision to install Zafar Iqbal as head of BCCI in April, 1990; of communications involving Bert Lance and Sheikh Zayed concerning the FGB takeover in 1978; of the structuring of the participation of Abu Dhabi ruling family members in the FGB takeover from 1978 through 1981; of the affairs of Sheikh Zayed's private department at any time; of whether or not Sheikh Zayed in any period placed all of Abu Dhabi's oil revenues in BCCI; of how much Abu Dhabi had invested in CCAH/First American. Al Sayegh further contended that Agha Hasan Abedi was never a financial advisor for Sheikh Zayed or the Abu Dhabi government.[65]

This lack of knowledge, coming in testimony ten months after BCCI's closure, reflected an obvious decision by Abu Dhabi not to send someone to testify before the Subcommittee who knew what had actually taken place between BCCI and Abu Dhabi over the previous twenty years.

Al Sayegh did, however, present Abu Dhabi's formal positions concerning its role in the BCCI affair, and its intentions of fully cooperating with the United States in investigating what happened. As he declared in his opening statement:

First, the majority shareholders had no involvement in the frauds perpetuated by BCCI which went on for some 18 years while they were passive minority shareholders.

The investment decisions they made during that time were based upon unqualified auditor's reports supplied by respected accounting firms and the knowledge that the bank was regulated in many countries. They were investors in a bank, not managers of a bank and relied on auditors and regulators to do their jobs.

Second, the majority shareholders are the single biggest victim of the fraud and probably its only intended victim . . .

[I]t must be understood that the majority shareholders do not control the prosecutions in the UAE, though they are doing everything in their power to assist in the ongoing investigation. . . We too enjoy a separation of powers which include an independent judicial system responsible for criminal proceedings. The separation of powers is respected and upheld at the highest levels of UAE government.

Third, and most importantly for our purposes here today, the Majority Shareholders have every intention of fully cooperating with competent United States authorities in pursuing their own investigations, subject only to any restrictions placed on the under UAE law and the needs of our domestic investigations. . .

[M]y appearance today renews the Majority Shareholders' commitment to cooperate with the investigative efforts of your subcommittee and other competent U.S. authorities to the extent that we are able to do so in a manner consistent with our own vital interests and the law of the United Arab Emirates.[66]

The key points made by Al Sayegh were that Abu Dhabi was innocent, victimized, and would fully cooperate with the United States on investigating and prosecuting BCCI -- to the extent permitted by the law of its country and to the extent permitted by its "vital interests."

By Al Sayegh's account, Abu Dhabi's decisions to invest in BCCI was based not on the personal relationship between Sheikh Zayed and Abedi described by everyone else familiar with what actually happened, but on Abu Dhabi's reliance on BCCI's regulators in Luxembourg, the UK and the Grand Caymans, and on Price Waterhouse and Ernst & Whinney, BCCI's accountants.

By Al Sayegh's account, the chief difficulties in making documents and witnesses available to the investigators of other countries is that the Abu Dhabi legal system does not permit it, as its legal system is based on a separation of powers that prevents the Executive Branch from

exercising any influence over the judicial process. In support of this account, Abu Dhabi's attorneys provided the Subcommittee with extracts of various laws of the United Arab Emirates, most of which have no applicability whatsoever to matters in dispute, but which do contain several relevant passages:

WE ZAYED BIN SULTAN AL NAHYAN, the President of the United Arab Emirates, having examined the Provisional Constitution and in view of the proposal made by [various Abu Dhabi cabinets and councils] HAVE ISSUED THE FOLLOWING LAW: . . .

[J]udges shall be independent having no dominant control over them in the performance of their duties other than the provisions of the Islamic Doctrine, the laws in force and their conscience. No individual or authority may violate the independency of the judicial authorities or interfere in matters of justice. . .

The function of the public prosecution shall be exercised before the Federal Courts by an attorney general . . .

The appointment of the attorney general and the other members of the Public Prosecution to the grade of prosecutor shall be effected by a decree issued by the President of the State [Sheikh Zayed] following approval of the Cabinet upon the nomination of the Minister of Justice. . .

The Minister of Interior may detain an alien against whom a deportation order has been issued, for a period not exceeding two weeks. . .

Following his arrest, an accused may not be detained for more than forty-eight hours [unless there is an order by the prosecutor] to detain him provisionally pending interrogation for a period of seven days subject to renewal for further periods not exceeding fourteen days. [A judge may] extend the detention for a period not to exceed thirty days, subject to renewal . . . (67)

As Al Sayegh's prepared testimony, these final provisions were the basis for the ordering of the summary arrest of the BCCI officials suspected of being involved in the irregularities and fraudulent activities, and their detention since, as under the interpretation given the law, the phrase "subject to renewal" allows the judge to continue to hold the accused from month to month so long as the prosecution wishes, without any limit whatsoever, for years, decades, or life, if matters remain under investigation.[68] Indeed, Subcommittee staff have interviewed one knowledgeable Pakistani insider about BCCI and Abu Dhabi who spent years in prison in Abu Dhabi without trial, after being involved in a dispute with a member of the ruling family.

Similarly, Al Sayegh's prepared testimony described BCCI's bank records as under the "protective custody of the U.A.E. federal civil court," which has provided "access

to the Majority Shareholders," Abu Dhabi, to "gather evidence upon which the prosecution can proceed," while the U.A.E. prosecutor, appointed by Sheikh Zayed, "has ordered that the documents . . . remain confidential" for reasons not explained.[69]

REENTERED AS EXHIBIT 3

Given the fact that Sheikh Zayed, according to his own attorneys in submissions with the Federal Reserve, owns all of Abu Dhabi's resources and land, and that the laws themselves are styled as decrees by Sheikh Zayed, in consultation with other bodies and officials who are appointed by Sheikh Zayed, not by popular vote at elections, the notion that the United Arab Emirates's justice system is somehow completely independent from the interests of the ruling family of Abu Dhabi stretches credulity.

Following the conclusion of Al Sayegh's opening statement, Senator Kerry asked him whether Abu Dhabi was now prepared to cooperate with the United States on investigating BCCI. Al Sayegh gave, in essence, a commitment to complete the process of negotiating cooperation agreements with the U.S. within weeks:

Senator Kerry. Can we understand now that Mr. Naqvi and Mr. Iqbal and others will be made available to both members of the committee staff and Justice Department personnel

Mr. Al Sayegh. Yes, Senator. We are in discussions now, ongoing discussions, with the Department of Justice on terms for an agreement to provide access to both individuals and documents . . . They started a few weeks ago, Senator. I am certain we could wrap them up quickly.[70]

These statements were widely reported in the press the following day. Contrary to Al Sayegh's assurances, as of the date of the writing of this report four months later, no access to documents or witnesses has been provided to either the Subcommittee or to federal law enforcement by Abu Dhabi.[71]

As noted above, Al Sayegh did not have the personal background and knowledge of the facts concerning Abu Dhabi's involvement with BCCI to answer a number of basic questions asked by the Subcommittee in his oral testimony. Moreover, the testimony came following some seven hours of testimony from other witnesses. Accordingly, Senator Kerry requested, and Al Sayegh agreed to provide, answers to a number of remaining questions in writing, which were sent to Abu Dhabi's lawyers on May 20, 1992, with answers received July 8, 1992.

In replying to the 65 additional questions from Senator Kerry, Al Sayegh expressed his unhappiness at the number, nature, and tone of the questions, contending that some "inquired into my own personal affairs and the personal affairs of the Majority Shareholders or their representatives that had no relation whatsoever to matters involving BCCI and CCAH" and that others "contained factual allegations that are baseless and seem designed to embarrass the Majority Shareholders and their representatives." Accordingly, Al Sayegh requested a meeting with Senator Kerry to take place before he answered the questions. Senator Kerry declined.

Senator Kerry's questions sought to clarify points left unclear during the hearing. Unfortunately, in a number of cases, Al Sayegh's answers did not provide the clarification sought.

For example, Question 6 asked whether the Abu Dhabi Investment Authority was claiming sovereign immunity from suit in the United States. In response Al Sayegh gave the

uninformative answer that it "depends upon the context in which the issue arises and the relevant facts and circumstances."[72]

Question 7 asked whether the other majority shareholders of BCCI, including Sheikh Zayed and his sons, would be claiming sovereign immunity. The uninformative answer was "it depends on the context in which the issue arises."[73]

In answer to Question 11, which asked about the circumstances of a loan by the Abu Dhabi Investment Authority to finance the buy-back of BCCI shares by Sheik Khalid bin Mahfouz, who engaged in fraudulent transactions with BCCI, Al Sayegh answered, "I am not aware of the details of the loan. . . I know of no reason why ADIA would be required to disclose its loans to U.S. regulators."[74]

In answer to Question 13, which asked whether any of the Abu Dhabi shareholders placed or deposited assets in ICIC, and if so, for the dates, amounts and purchase of each such placement, Al Sayegh replied that "in excess of $2 billion" was entrusted by Sheikh Zayed and his son, Sheikh Khalifa between 1980 and 1990 which were temporarily deposited in ICIC before being invested. No details were provided, nor any suggestion of how much "in excess of $2 billion" might have been involved.

In answer to Question 14, which asked Al Sayegh to provide detailed information concerning an account maintained by Sheikh Zayed and the ruling family in ICIC, known as Account No. 20071, Al Sayegh replied that "I do not think it is appropriate to provide details of the personal, private affairs of His Highness Sheikh Zayed to the Subcommittee, nor am I privy to them. However, to assist the Subcommittee, I am able to say that funds deposited in Account No. 20071 at ICIC Overseas were Ruling Family funds, to be invested by Abedi and Naqvi pursuant to powers of attorney."[75]

In answer to Question 16, which asked whether any of the majority shareholders had ever taken loans from ICIC, Al Sayegh relied that "I am not aware of any loans by ICIC to the Majority Shareholders."[76] In fact, Price Waterhouse audits of ICIC available to the Majority Shareholders, and obtained by the Subcommittee for the first time in August 1992, demonstrate quite clearly that as of December 31, 1989, ICIC had lent $17.5 million to the Abu Dhabi group.[77]

In answer to Question 18, which asked Al Sayegh to describe the nature and extent of claims by Abu Dhabi against ICIC, Al Sayegh replied that the Ruling Family has "very substantial claims" against ICIC, but "the details of the Majority Shareholders' intentions regarding the claims are subject to legal privilege and cannot be disclosed."[78]

In answer to Question 28, which asked Al Sayegh to provide the Subcommittee with a break-down of the capital paid-in by Abu Dhabi shareholders to BCCI, Al Sayegh replied "I am unaware of the details of amounts paid for shares in particular transactions, except that I am aware that $1.2 billion was injected into BCCI in April 1990 in an effort to save the bank."[79]

REENTERED AS EXHIBIT 3

In answer to Question 29, which asked Al Sayegh to provide a detailed breakdown of its losses as the biggest victim of BCCI's fraud, including the date, type, location and amount, Al Sayegh replied that the losses included misappropriated funds, equity investments in BCCI, amounts on deposit, and interest, ignoring the Subcommittee's request for any dates on the losses, where and how they occurred, and what amounts were involved in each case.[80]

In answer to Question 34, which asked Al Sayegh whether Al Mazrui, who remains chairman of the Shareholders Group in charge of handling Abu Dhabi's interests pertaining to BCCI, received financial benefits in connection with the purchase of BCCI shares, Al Sayegh replied, "I am not privy to the details of Mr. Mazrui's own private affairs."[81] In fact, Al Mazrui had confessed to receiving these benefits, according to Price Waterhouse's Section 41 report, to members of the Abu Dhabi ruling family in April, 1990.

In answer to Question 42, which asked Al Sayegh who had custody of the $1.2 to $2.8 billion in promissory notes to BCCI from Abu Dhabi, seized by Abu Dhabi authorities through court action after BCCI's closure, Al Sayegh replied, "The Majority Shareholders are not in a position to provide details or court papers on this matter because the matter is sub judice and because of the in camera nature of the proceedings."[82]

In answer to question 44, which asked Al Sayegh to specify the terms it requires to conclude a cooperation agreement with the Justice Department and the New York District Attorney, Al Sayegh replied, "I do not believe it to be appropriate to discuss the details of the cooperation program, other than to say that we believe that the U.S. authorities will be fully satisfied."[83]

In answer to question 48, which asked Al Sayegh to specify the conditions of confinement of BCCI's officers in Abu Dhabi (who are reportedly being held in an Officer's Club under comfortable conditions), Al Sayegh replied, "I do not believe the conditions under which these individuals are held in confinement is an appropriate issue for the Subcommittee to be concerned with."[84]

In answer to questions 58-61, concerning the function of the James Lake and his firm, Robinson Lake, retained by Sheikh Zayed and Abu Dhabi to handle public relations for Abu Dhabi pertaining to BCCI, Al Sayegh replied that questions about what they were doing for Abu Dhabi, how much they were being paid, and who they were communicating with, were not legitimate areas for the Subcommittee's inquiry. Al Sayegh said that he believed these basic questions about its purpose in hiring Lake were "intentionally calculated to embarrass Mr. Lake," and refused to tell the Subcommittee what he had been paid.[85]

A number of the answers to other questions were also less than illuminating.

In summary, these answers, taken together, themselves demonstrate how limited the level of scrutiny Abu Dhabi is willing to tolerate as a result of its involvement with BCCI. Basic questions concerning how much money it put into BCCI, how much money it deposited, loans it may have made in connection with BCCI share purchases and sales, improprieties involving its chief financial officer responsible for BCCI, the status of the BCCI officials held in Abu Dhabi, and even what Abu Dhabi wanted out of its negotiations on cooperation with the Justice Department and New York District Attorney, are central to understanding Abu Dhabi's

role in BCCI. Instead, Al Sayegh, representing Abu Dhabi, has taken the position that these matters are, essentially, none of the Subcommittee's business. The answers provided by Al Sayegh highlight how much Abu Dhabi may have to hide.

## Al Sayegh's Credibility

The day after Al Sayegh testified before the Subcommittee, Senator Kerry's office received a sworn, unsolicited letter from a constituent, who described himself as a U.S. citizen with personal knowledge of Al Sayegh.

The constituent, a Massachusetts management consultant who had worked in Abu Dhabi, advised the Subcommittee "against uncritical acceptance of Mr. Al Sayegh's statements [because] he made false statements to me in my business dealings with him and I suffered substantial damage by accepting his word as truth."

The constituent, Dr. George B. Bricker, stated that his management consultant company, had entered into contracts with the Abu Dhabi National Oil Company (ADNOC) from 1982 to 1986, during which time Bricker and his staff performed various services for ADNOC.

In mid-1986, Bricker's company, Redirection, was assigned to diagnose organizational problems relating to the ADNOC Finance Directorate, whose newly appointed manager was Al Sayegh. Bricker stated that he worked closely with Al Sayegh's staff and met twice with Al Sayegh on the project, during which Al Sayegh told him that he was satisfied with the Redirection's and Bricker's performance. However, over a period of several weeks, Redirection stopped being paid by Abu Dhabi, causing Bricker to ask Al Sayegh if there was a problem.

According to Bricker, Al Sayegh said there was merely "an insignificant hiccup in the accounts payable procedure" and that Redirection's invoices would soon be paid in full. Bricker kept his staff on the job for months more, without anyone being paid by Abu Dhabi. Eventually, Bricker told the staff to leave Abu Dhabi, at which time Al Sayegh admitted to Bricker that payments to Redirection had been withheld at Al Sayegh's direction since the beginning of the project more than six months earlier, and would not be paid until Redirection performed additional services for new work which had never before been discussed or included in the contract.

Bricker eventually learned that his situation was related to an attempt by Al Sayegh, which was successful, to replace the previous management of ADNOC entirely, with younger managers of Al Sayegh's generation and background. As Bricker had been in place under the earlier management, Al Sayegh was using the technique of not paying Bricker and his company as a way of forcing Bricker out without firing him. As Bricker summarized, "Redirection performed no further projects for ADNOC. Redirection lost an estimated US$100,0000 because of Mr. Al Sayegh's all-too-plausible false statements. Clearly, Redirection had no legal recourse; the U.S. Embassy was no help."[86]

While it is not possible to resolve the merits of the business dispute involving Al Sayegh and the Massachusetts constituent who wrote Senator Kerry, the unsolicited sworn statements

made by a U.S. citizen, Dr. Bricker, concerning Al Sayegh's alleged dishonesty in doing business with him, do raise questions about the credibility of Al Sayegh.

BCCI audit reports obtained since Al Sayegh's testimony show the company he was managing, ADNOC, as itself having very substantial deposits at BCCI. These deposits were not held, as one would expect of the Abu Dhabi National Oil Company, in Abu Dhabi, or even in the Middle East, but at the BCCI bank responsible for the greatest portion of BCCI's losses and fraud, BCCI-Grand Cayman, where they amounted to some $229,277,000 as of September 30, 1988.[87]

Finally, the Peat Marwick audit investigation of BCCI's commodities affiliate and partner in money-laundering, Capcom, make reference to apparently improper transactions involving Capcom in the United Arab Emirates and individuals referred to as the Al Sayegh brothers. The Subcommittee has not been able to determine whether the reference applies to the witness.[88]

### Abu Dhabi' Lawyers and PR Firms

Like BCCI itself, Abu Dhabi has made a practice of hiring in the United States as its attorneys and public relations assistants firms which are among the most politically well-connected in Washington, D.C.

From 1978 through 1990, Abu Dhabi's interests in Financial General Bankshares and in CCAH/First American were represented by former Defense Secretary Clark Clifford, Robert Altman, and the firm of Clifford & Warnke.

Through much of that period and continuing to the present, Abu Dhabi's other interests in the United States were represented by the Washington firm of Patton, Boggs & Blow. During that period, Patton Boggs has also "served as headquarters for a billion-dollar enterprise called Real Estate Operations, Inc., owned by Sheikh Zayed's Abu Dhabi government," as was described in a lengthy article on Patton Boggs' handling of Abu Dhabi's real estate investments that appeared in the Wall Street Journal May 20, 1992.

According to the Journal, Abu Dhabi's investments in the United States, much of which have been handled by Patton Boggs, total nearly $1 billion. The Journal article then described how these assets were held by Real Estate Operations, Inc., which in turn controlled 22 real estate investment companies, 10 partnerships, three shell corporations, and other entities, which in turn own millions of square feet of commercial and retail property across the United States.[89]

As a result of handling Abu Dhabi's business, Patton Boggs in addition to being attorneys for Abu Dhabi, became, in effect, their business agents, or investment managers in the United States, thus linking the firm to Abu Dhabi in a manner more intimate than a narrower, attorney-client relationship.

Ironically, at BCCI's request, Patton Boggs also handled legal work for a front-man of BCCI, Mohammed Hammoud, pertaining to a real estate investment he made in Virginia that was

REENTERED AS EXHIBIT 3

financed by BCCI, with a back-up letter of credit issued from BCCI's then secretly-held U.S. bank, First American.

Thus, especially for the period from November, 1990, when they became BCCI's principal lawyers in the United States, to July 5, 1991, when BCCI was closed, Patton Boggs inherited, to some extent, the problem of multiple hats previously applicable to Clifford and Altman. While Patton, Boggs partners had no role at the First American bank, apart from the interests of their clients, there was a potential conflict of interest present between the interests of Abu Dhabi as shareholders of BCCI, and the interests of BCCI's creditors and depositors. This conflict always existed, but was only highlighted after BCCI's closure, once the creditor and depositor interest became represented not by Patton Boggs, but by BCCI's liquidators.

At the same time, Abu Dhabi has since BCCI's closure retained a politically-connected public relations consultant, James Lake, and his firm of Robinson-Lake, to carry out public relations efforts on behalf of Abu Dhabi. Lake, who received $200,000 in payments from Abu Dhabi last fall in connection with this work, has simultaneously been performing -- as a volunteer, in an unpaid position -- the job of deputy manager to President Bush's re-election campaign, causing the chairman of the Subcommittee to state on March 18, 1992 that:

I do not believe that Mr. Lake should be sitting in on White House campaign strategy meetings while he is also providing strategy to Sheikh Zayed on how to deal with problems arising out of his ownership of BCCI.[90]

Senator Kerry suggested that Lake resign from representing Abu Dhabi, or from the President's campaign. In response, Lake said that there was no conflict, and he would continue to handle both matters. He also explicitly stated he would have no contact with anyone in the Executive Branch concerning Abu Dhabi matters.

SENATOR KERRY'S VIEW:

Senator Kerry continues to believe that Lake's dual representation represents a disturbing conflict of interest. In the view of the chairman of the Subcommittee, at a time when Abu Dhabi continues to refuse to prevent the Justice Department from obtaining access to documents and witnesses held in Abu Dhabi, Lake's dual role sends the wrong message to Abu Dhabi about how serious U.S. authorities are in investigating and prosecuting anyone who has committed crimes pertaining to BCCI in the United States.

1. Price Waterhouse Report Sec 41 to the Bank of England, June, 1991, Sec. 1.33.
2. See testimony of Al Sayegh, S. Hrg. 102-350 Pt. 5 p. 759.
3. S. Hrg. 102-350 Pt. 5 p. 762.
4. A key issue raised by the September 21, 1992 decision to provide access to some documents is whether the action represents real cooperation, or merely the appearance of cooperation as part of a public relations effort. On September 21, 1992, Robert M. Moregenthau, District Attorney of New York, wrote the Subcommittee stating the following: "I write at the request of Ronald S. Liebman, Esq. of Patton Boggs & Blow, counsel for certain individuals and entities in Abu Dhabi, including members of the Ruling Family. Mr. Liebman has advised me that photocopies of certain documents have been delivered to the Embassy of the United Arab Emirates in Washington, D.C. for inspection by members of the District Attorney's Office. Later today we will begin the process of reviewing these records, and will continue doing so until they have been fully reviewed. Mr. Liebman has further advised me that an

Abu Dhabi court order authorizing this review was obtained yesterday. This review will not be deemed an admission or authorized representation by the Abu Dhabi parties. We will be free to use whatever leads are obtained to further our investigation." Abu Dhabi has provided no explanation of why these documents had been withheld from U.S. law enforcement prior to September 21, 1992. Abu Dhabi has also provided no explanation of why it has refused to permit law enforcement to copy these documents, or to review them outside the confines of the Embassy of the United Arab Emirates. Abu Dhabi has not provided the documents to the Subcommittee. Thus, it is impossible to determine which documents have been provided by Abu Dhabi, and which documents have continued to be withheld. It is also not possible to determine what information the BCCI officials held in Abu Dhabi could provide U.S. law enforcement if Abu Dhabi permitted U.S. officials access to them.

5. See generally detailed testimony regarding this issue of Nazir Chinoy, March 18, 1992; Akbar Bilgrami, July 30, 1992; and testimony of Abdur Sakhia October 22, 1991 and Masihur Rahman, August 8, 1991.

6. S. Hrg. 102-350 Pt. 5 p. 757.

7. Deposition of Abdullah Darweish, September 23, 1982, Financiera Avenida S.A. v. Refco, US District Court Northern District of Illinois No. 82-C-1272.

8. Staff interview, August, 1992, Pakistani national familiar with BCCI-Abu Dhabi relationship.

9. Price Waterhouse audit reports to BCCI board of directors, 1987-1989; miscellaneous BCCI loan and financial documents.

10. Deposition, Lasidi v. Financiera Avenida, New York Supreme Court County of New York, 1982.

11. S. Hrg. 102-350 Pt. 3 p. 22.

12. Id.

13. Exhibit I, OCC Report of Joseph Vaez to Robert Bench, February 15, 1978; an accounting of Abu Dhabi's interest in BCCI at this time provided to the Subcommittee on May 13, 1992 contradicts this figure, describing the Abu Dhabi holdings in 1977 as 1.28 percent of BCCI.

14. Prepared Statement of BCCI Majority Shareholders, S. Hrg. 102-350 Pt. 5 p. 747.

15. Shareholding in BCCI Holdings (Luxembourg) S.A., prepared by Abu Dhabi to Subcommittee, reprinted S. Hrg. 102-350 Pt. 5.

16. Answer of Al Sayegh to Question 28 posed by Subcommittee, reprinted in S. Hrg. 102-350 Pt. 5.

17. Price Waterhouse Section 41 Report to the Bank of England, June, 1991.

18. Price Waterhouse audit report documents, BCCI, Loans to Shareholders, Valuation of Shares BCCI Holdings & CCAH at November 30, 1987, and at December 31, 1989, obtained by Subcommittee.

19. Bailey, Federal Reserve Hearing, April 23, 1981, pp. 15-17.

20. Staff interview, Lance, October, 1991.

21. Washington Post, December 18, 1977, "Arab Investors Want Lance to Manage Funds."

22. Al Sayegh, answer to question 25 from Senator Kerry, July 8, 1992, reprinted in S. Hrg. 102-350 Pt. 5.

23. Interviews, Richard Small and Thomas Baxter, Federal Reserve, April-May, 1991; testimony of Virgil Mattingly, May 14, 1992, S. Hrg. 102-350 Pt. 5.

24. Staff interviews, Akbar Bilgrami, July 13-14, 1992; Bilgrami testimony, July 30, 1992, S. Hrg. 102-350, Pt. 6.

25. Id.

26. Id.

27. Staff interviews, former BCCI employee and Pakistani national, July, 1992.

28. Sami memorandum, January 30, 1978, id.

29. Al Sayegh, answers to question #19 from Senator Kerry, July 8, 1992, reprinted in S. Hrg. 102-350 Pt. 5.

30. Price Waterhouse Report Sec 41 to the Bank of England, June 1991.

31. Indictment, December 8, 1991, Attorney General of Abu Dhabi Sheikh Zayed v. Darweish.

32. Al Sayegh, sworn answer to Question 13 of Senator Kerry, July 8, 1992, reprinted in S. Hrg. 102-350 Pt. 5.

33. Al Sayegh, Answers to Question #33 of Senator Kerry, July 8, 1992, reprinted in S. Hrg. 102-350 Pt. 5.

34. Price Waterhouse Audit Reports, 1983, Hong Kong Deposit and Guaranty and Tetra Finance (HK).

35. Al Sayegh, Answer to Questions #31 and #35 from Senator Kerry, July 8, 1992, reprinted in S. Hrg. 102-350 Pt. 5.

36. Price Waterhouse Report Section 41 to the Bank of England, June 1991.

37. Id.

38. Staff interviews, Nazir Chinoy, Abdur Sakhia, Akbar Bilgrami, Massihur Rahman. In private, BCCI officials referred to Iqbal's chief role and principal skills to be as a procurer.

39. S. Hrg. 102-350 Pt. 1 p. 481.

40. Section 41 Report to the Bank of England, Price Waterhouse, June, 1991.

41. Memorandum submitted by Price Waterhouse in reply to Questions from the House of Commons Committee on Treasury and Civil Service, February 5, 1991.

42. Memorandum submitted by Price Waterhouse in reply to Questions from the House of Commons Committee on Treasury and Civil Service, February 5, 1991.

43. Memorandum submitted by Price Waterhouse in reply to Questions from the House of Commons Committee on Treasury and Civil Service, February 5, 1991.

44. Id. Price Waterhouse's findings of the Section 41 report are reviewed in some detail in the chapter concerning BCCI's criminality.

45. S. Hrg. 102-350 Pt 4 pp. 747-748.

46. Id.

47. Norton Rose Report to the members of the BCCI SA Creditors' Committee, May 1, 1992, pp. 3-5; reprinted in S. Hrg. 102-350 Pt. 5.

48. Norton Rose report, id p. 5.

49. S. Hrg. 102-379, testimony of Virgil Mattingly, May 23, 1991, pp. 114-121.

50. S. Hrg. 102-350 Pt. 5 p. 750, and staff interviews with Federal Reserve investigator Richard Small.

51. Winer memcom, March meeting with Patton, Boggs, and Blow.

52. Staff interview, August 26, 1992, Masihur Rahman, who was in daily contact with BCCI officials and U.S. and British regulators during the relevant period.

53. Norton Rose Report, id p. 6.

54. See testimony of Al-Sayegh, S. Hrg. 102-350 Pt. 5 pp. 760-763.

55. Norton Rose, id p. 54.

56. Norton Rose, id, pp 54-55.

57. S. Hrg. 102-350 Pt. 5 p. 325.

58. Smouha prepared testimony, S. Hrg. 102-350 Pt. 5 p. 330.

59. See Smouha's testimony, S. Hrg. 102-350 Pt 5 pp. 331-333.

60. S. Hrg. 102-350 Pt. 5 p. 335.

61. Appendix 3, Summary of the Proposed Agreements, Joint Liquidators Report, Bank of Credit and Commerce International, SA March 16, 1992, p. 16.

62. Joint Liquidators Report, March 17, 1992, id., reprinted in S. Hrg. 102-350 Pt. 5.

63. S. Hrg. 102-350 Pt. 5 p. 338.

64. S. Hrg. 102-350 Pt. 5 p. 766; documents regarding Clifford and Altman's representation of Abu Dhabi from 1978 through 1990, S. Hrg. 102-350 Pt. 4 pp. 424, 432, 437-439, 456-459.

65. Al-Sayegh testimony, S. Hrg. 102-350 Pt. 5 p. 759-770.

66. S. Hrg. 102-350 Pt. 5 pp. 743-746.

67. Extracts, United Arab Emirates Federal No. 6 of 1973, Federal Law No. 10 of 1973, Federal Law No. 3 of 1983, reprinted in S. Hrg. 102-350 Pt. 5.

68. S. Hrg. 102-350 Pt. 5 p. 754.

69. S. Hrg. 102-350 Pt. 5 p. 754.

70. S. Hrg. 102-350 Pt. 5 pp. 756-757.

71. On September 21, 1992, Abu Dhabi began making selected documents available at its Washington embassy for viewing by the Federal Reserve and U.S. law enforcement, on the condition that no copies be made and that none of the information could be used as admissions in court. None of these documents have been made available to the Subcommittee and the value of this information, if any, cannot be evaluated.

72. Sworn statement, Ahmed Al-Sayegh, in response to question 6 of Senator Kerry, July 8, 1992, reprinted in S. Hrg. 102-350 Pt. 5.

73. Id, question 7.

74. Id., answer to Question 11.

75. Id, answer to Question 14.

76. Id, answer to question 16.

77. Valuation of Shares BCCI Holdings & CCAH at December 31, 1989 and Loans to Shareholders, Subcommittee document.

78. Sworn statement, Ahmed Al-Sayegh, in response to question 18 of Senator Kerry, July 8, 1992, reprinted in S. Hrg. 102-350 Pt. 5.

79. Id, answer to Question 28.

80. Id, response to question 29.

81. Id, answer to question 35.

82. Id, answer to question 42.

83. Id, answer to question 44.

84. Id, answer to question 48.

85. Id., answer to question 58-61.

86. Statement, Dr. George B. Bricker, to Office of Senator John Kerry, May 18, 1992, by Fax.

87. Price Waterhouse Report to the Audit Committee, BCCI Holdings (Luxembourg) SA, 10 November, 1988, Subcommittee document.

88. See S. Hrg. 102-350 Pt. 6, Peat Marwick Report.

89. "Abu Dhabi's Links With A Powerful Law Firm Present Problem For Democrats on BCCI Issue," Wall Street Journal, May 20, 1992, p. A-18.

90. S. Hrg. 102-350 t. 4 . 356.

REENTERED AS EXHIBIT 3

# MOHAMMED HAMMOUD: BCCI'S FLEXIBLE FRONT-MAN

## Introduction

As the BCCI scandal has unfolded, Mohammed Hammoud has emerged as a shadowy figure with close ties to a number of powerful American political and government figures.

During the 1980's, Hammoud acted as a front-man or nominee for BCCI, became an owner of BCCI and of CCAH, the holding company for First American, borrowed over $110 million from BCCI, much of which he failed to make interest payments on, and made numerous investments in the United States with funds provided him by BCCI, and in one case, backed up by guarantees from First American.

During the same period, Hammoud, a little known Lebanese merchant, also purchased the shares in First American held by Clark Clifford and Robert Altman; had his U.S. real estate investments managed by the current U.S. Ambassador to Bahrain, Charles W. Hostler; had contact with officials from the State Department concerning the release of U.S. hostages from Beirut and other issues pertaining to Lebanon, and developed a personal and business relationship with Michael Pillsbury, a former assistant Undersecretary of Defense and Senate staff assistant.

After BCCI's indictment in October, 1988 by the U.S. Attorney in Tampa, Hammoud also worked closely with BCCI's

criminal defense team in Washington to determine whether it would be possible to "reverse Tampa" by meeting with higher-level federal officials in Washington. In the fall of 1989, Hammoud actually met with high-ranking officials at Treasury and Justice concerning the BCCI case, and had ongoing contact with Senate staffer Pillsbury seeking to assist BCCI in defending itself against its criminal case.[1]

Hammoud's multiple roles in connection with BCCI continued until his sudden death on May 3, 1990, at the very time that investigations of BCCI were intensifying. After his death, press accounts raised questions as to whether his death was real or staged, and law enforcement indictments have described Hammoud's current status as "reportedly dead."[2]

## Who is Mohammed Hammoud?

Little is known of Hammoud's background, although Abdur Sakhia, the former general manager for BCCI N.Y., described Hammoud as a merchant who at one time operated a stall in one of Beirut's open-air markets:

My memory goes back about 27 or 28 years when I went first to Beirut. He was a small time money changer.[3]

In interviews with Subcommittee staff, Nazir Chinoy, the BCCI general manager in Paris, remembered Hammoud as:

A short man, not a very impressive personality. . . My impression of Hammoud, to me Hammoud was not rich. Pharoan had physical power from his bearing his confidence. Hammoud was a slimey sort of a chap, not a forceful personality. Would Hammoud understand foreign policy? I do not think so. He was not a worldly man. Pharoan yes. Hammoud no.[4]

In testimony before the Subcommittee in 1991, Massihur Rahman, BCCI's former chief financial officer, described Hammoud as "a medium sized businessman." BCCI's files indicate that Hammoud's wealth grew exponentially, and inexplicably, during the 1980's, at a clip of almost $5 million a year. By 1989 he is listed as owning assets in excess of $35 million.[5] Nevertheless, according to Chinoy, Hammoud did not give "the impression of being an extremely rich man from his clothes and general behavior."[6]

At some point during the 1970's Hammoud became very close to the top management at BCCI. Naqvi had worked in Lebanon and BCCI had branches there, but the Subcommittee has been unable to determine who originally introduced Hammoud to BCCI. Hammoud is described in a 1983 BCCI memorandum as "a very good customer of the BCC Group," who "possesses large means."[7] By the time of his death in 1990, Hammoud was a major shareholder in the bank, owning 2,646,184 shares, according to a February, 1990 report by BCCI's outside auditors, Price Waterhouse.

According to Rahman, "[h]e seemed to be very close to some of our executives. And he has been used obviously for taking loans and doing things."[8] Later in his testimony Rahman characterized Hammoud as the most flexible of BCCI's nominees.

Chinoy echoed the testimony of Rahman, stating that Hammoud had "a very special relationship" with the bank. Chinoy recalled how Hammoud had borrowed about $100,000 from the Paris branch and was not servicing the loan. When Chinoy wrote Hammoud asking that the loan be repaid, Chinoy was rebuked by his superiors in London and told he "should not write abusive letters to good clients who had helped the bank." Chinoy explained that he later wrote the loan off in three separate installments.[9]

The loan to Hammoud by BCCI's Paris branch pales in comparison to the massive loans Hammoud received from BCCI elsewhere. As of April 1990, Hammoud owed over $110 million dollars to BCCI and its affiliate, ICIC, Grand Caymans, As Price Waterhouse concluded in the report, "there remain too many unanswered questions about Mr. Hammoud [including] his connection with delinquent accounts of BCCI." At the time, Price Waterhouse expressed its concern about the lack of evidence at BCCI that Hammoud owned "any of the companies" he claimed to own in connection with BCCI lending. [10]

### Hammoud's Real Estate Investments

Hammoud made real estate investments in the United States through a series of companies: Linden Investments, Copperwood, N.V., Marmaris investments, N.V., Eastward, N.V. and

REENTERED AS EXHIBIT 3

Carlson Farms, Ltd. Ambassador Charles Hostler, who advised Hammoud on his US investments, referred to these companies as "holding companies" for the properties.

Documents obtained by the Subcommittee indicate that all of the companies were probably front companies which Hammoud established on behalf of BCCI. For instance in November, 1978, Hammoud wrote to ICIC, BCCI's "bank within a bank":

I have to request you to arrange on my behalf for the incorporation of a company in Cayman Islands with an authorized capital of US$900,000.00 and Issued and Paid-up capital of $US100,000.00. This company to be incorporated with the name and style of "Linden Investments Company Limited" is to have as its principle objects investments in immovable properties in the U.S.A. and other places, either directly or through any of its subsidiaries to be incorporated in such countries where maximum tax benefits would be available for such property investments, and with such other objects as are usable and necessary for such investment companies, including borrowing powers.

You may appoint your own nominee directors for the said Linden Investment Co. Ltd. and transfer to their names such shares as may be necessary according to the legal requirements. **The remaining shares may be held by you in your name or in the name of any other company as your nominee.**

I hereby authorize you to appoint any agents for the aforesaid purpose and to do, execute and perform or cause to be done, executed and performed all acts, deeds and things that may be required or necessary in a fiduciary capacity for the aforesaid purpose and to give any other authority or writing that you may require or deem necessary for this purpose.[11]

Hammoud's real estate investments include property he purchased from a church in Alexandria, Virginia, an office building in New York, a building in Boston adjacent to Boston Symphony Hall, and a development in the small town of Sherman, Connecticut. All of these investments were financed by BCCI and none of the loans was ever serviced. Carlson Farms, for instance, received a $1 million letter of credit from BCCI secured by only the guarantee of Linden Investments, which apparently held no other properties.[12]

In his Senate testimony, Sakhia described the Hammoud's real estate holdings in the US with which he was familiar. According to Sakhia:

We did a loan to him from BCCI in New York, which we were told from London to give that loan in the first place.

In the second instance, when we had acquired the property and we wanted to develop a property in Washington, he contacted us to make a construction loan-- which we refused to do because we were not equipped to handle constructions loans."[13]

Sakhia testified that he "completely refused to do the second transaction," but that the Central Credit Division in London ordered him to the first transaction, which wound up being "110% of the loan". Sakhia acknowledged that the loan did not make business sense.[14]

REENTERED AS EXHIBIT 3

After Sakhia refused to do the construction loan, the Central Credit Committee in London told its New York regional manager "[W]hy don't you introduce him to First American, because the property is in Washington. First American is located in Washington and First American is big in real estate loans." First American subsequently issued a $4 million letter of credit to Hammoud.[15]

Senator Kerry was struck by the fact that Hammoud needed an introduction to First American after Hammoud had become a shareholder of First American, having purchased his shares in First American/CCAH from First American's chairman and president, Clark Clifford and Robert Altman. Sakhia testified that he too was baffled by the events:

It's [First American] not like a big corporation with hundreds of shareholders. The handful of shareholders -- [Hammmoud] directly bought the shares from the Chairman and the President. And he wants me to introduce the officers of First American. It didn't make any sense to me. (16)

In 1990, the U.S. General Manager of BCCI, in an effort to avoid the scrutiny of bank regulators, recommended "immediate transfer" of Hammoud's assets "to an off shore unit."

**Holdings of CCAH Stock**

Hammoud's investment in First American Bank came about as a result of his acquisition of stock throughout the 1980s through BCCI, and in fact, as a nominee for BCCI. In 1986, Hammoud first began acquiring stock at $2,200 a share as BCCI's nominee. By 1990, Hammoud had acquired 6% of the shares of the bank on BCCI's behalf.

In March 1988, Hammoud bought stock from Clifford and Altman, the Chairman and President of First American, for a whopping $6,800 a share -- the highest price ever paid for First American stock. Hammoud's $25 million purchase of First American shares was bankrolled by BCCI, although in testimony before the Subcommittee, Altman stated that:

[M]r. Hammoud was one of the individuals not listed by the Federal Reserve as a nominee in their notice of charges. He was in their category of bona fide shareholder.[17]

Altman added that after Hammoud's death in the spring of 1990, "we had been contacted by Hammoud's estate." According to Altman:

His estate believes that the stock is stock that belonged to Mr. Hammoud and now belongs to his heirs. They certainly take the position that Mr. Hammoud was no nominee. He was a bona fide shareholder. And they had asked that the stock be transferred into the names of the heirs. And we were seeking certain documentation in that regard before the transfer could be lawfully effected.[18]

Altman's representations before the Subcommittee regarding the bona fides of Mohammed Hammoud were recently challenged in the indictment of Clifford and Altman by the Manhattan District Attorney. The indictment charged that:

As part of the business of the corrupt enterprise, assets were purchased with depositors' funds, but were falsely maintained as ostensibly separate from the BCC group. These assets were purchased in the names of, among others ....Mohammed M. Hammoud, a Lebanese businessman who reportedly died in 1990.

Moreover, Masihur Rahman, BCCI's chief financial officer, provided detail on the mechanism that Hammoud employed to mask the sham transactions involving CCAH stock. Rahman testified that Hammoud used two front companies, Mid-Gulf and Rubstone, to purchase the shares. According to Rahman, after Price Waterhouse raised concerns about BCCI and the bank began an internal investigation, Rahman confronted Hammoud: "He [Hammoud] was first denying, but finally it was accepted that both of them belonged to Hammoud."[19] Rahman did not know what the companies did, "except that they had some loans [from BCCI] for CCAH." According to Rahman, the amount loaned to Rubstone to purchase First American shares was around $14 million and the amount loaned to Mid-Gulf to purchase First American shares was $44 million."[20]

The Subcommittee has obtained an undated letter of instruction from Hammoud to the Manager of BCCI, Overseas, Grand Cayman, which support Rahman's testimony. The letter specifically states:

With reference to the loan advanced by you on my recommendation to Mssrs. Rubstone Trading, of amount up to $US 12 million, I hereby authorize you to hold my shares in Credit and Commerce American Holdings N.V., as security to cover the outstanding balance of the loan.[21]

By April 1990, as the auditors scrutinized BCCI and its CCAH loans, Hammoud informed BCCI that he did "not hold any shares" in either Midgulf or Rubstone.[22] Apparently, both Hammoud and BCCI had decided that it was not in their interest to have Hammoud seen as a nominee for BCCI holding CCAH shares. This, of course, was during the period that Price Waterhouse was uncovering massive fraud and deception at BCCI, and just weeks before Hammoud's sudden death.

**Altman and Hammoud**

Documents obtained by the Subcommittee from BCCI's liquidators show that Robert Altman, who was also BCCI's U.S. attorney, held a power of attorney for Hammoud, giving Altman the right to dispose of Hammoud's stock in CCAH at any time as Hammoud's agent. Altman testified he was unaware that he had such a power of attorney and when shown the document by Senator Kerry, he expressed profound shock:

[T]his gives an authority to sell shares, and that is something that to the best of my recollection, I'd never seen before. I do not know how to explain it. I don't know where it came from, but I don't believe it was ever in our files.[23]

Thus, Altman, who sold his stock to Hammoud for three times what Altman paid for the stock, had the ability through the power of attorney also to buy and sell shares of CCAH to and from Hammoud in any case.

Altman testified that he never met Hammoud. This statement seems odd given that Hammoud was in Washington on a number of occasions, and was ostensibly a major shareholder of First American, on whose behalf Altman was running the bank. On the other hand, there was really no reason for Altman to have met Hammoud if Hammoud was the flexible front man that he has been portrayed to have been. It is entirely possible that Hammoud was not even aware of his holdings in First American: the loans were arranged by BCCI; the purchase and sale may have been arranged by Altman using the power of attorney.

**Hammoud and Ambassador Hostler**

Hammoud also had contacts with US Ambassador to Bahrain Charles Hostler. As a businessman in Beirut in the 1960's, Hammoud met Hostler when Hostler was a young U.S. Air Force officer, attached to Lebanon, Jordan and Cyprus, and based in Beirut, Lebanon. Hammoud's wife taught Arabic to the young Mr. Hostler, and the Hammouds and Hostler became good friends. [24] Later, Hostler returned to Beirut as the manager of the Douglas Aircraft Company in Lebanon from 1965 to 1967, before accepting a position with McDonnell Douglas in the U.S. As the report to the Foreign Relations Committee on Hostler described his career:

Mr. Hostler served at the United States Department of Commerce as Deputy Assistant Secretary of International Commerce from 1974 to 1976, where he was responsible for establishing and managing the nation's export expansion program. From 1963 to 1969 he worked in numerous capacities for McDonnell Douglas Corporation including Director of International Operations for the Middle East and North Africa. . . and Manager of International Marketing for Missiles and Space. [25]

According to the Wall Street Journal, Ambassador Hostler stated that he has from time to time given financial advice to Hammoud. Hostler told the Subcommittee that he advised Hammoud on three properties: "vacant land" in Sherman Connecticut, an "old building" in Boston, Massachusetts and a "tear-down" in New York City. [26]

Curtis Hagen, a real estate broker, also worked with Hammoud on the three properties referenced by the Ambassador in his affidavit.

Concerning the tear-down in New York City, Hagen told the Subcommittee:

In NYC I engineered a joint venture between BCCI and Skanska with an agreed to land evaluation of 5 million (BCCI purchased it at $1.1 million) In the midst of contract negotiation between the two law firms representing each entity. In the meantime I turned down an offer of 4 million in cash by Paul Milstein, because the tax burden was too severe. However, he eventually built the project, although the chain of title after Hammoud came on the scene with Hostler is unclear to me. [27]

Concerning the "old building" in Boston, Hagen told the Subcommittee:

I arranged a zoning change from a two story Taxpayer to a 17 story and lower condominium residential & commercial building with on-parking premises. This process, as you know, was extremely complex and took 2 and 1/2 years to bring to a point, where only a very routine

submission of a detail was needed to finalize. BSO now has ownership. Hostler arranged the sale to BSO for Hammoud, however I do not know what consideration BSO gave to Hammoud/Hostler.[28]

Concerning the "vacant land" in Sherman, Connecticut, Hagen told the Subcommittee:

After 6 tons of papers, maps, demographics, etc. the final subdivision was approved and I negotiated the required road bond.[29]

In short, the vacant land, the old building and the tear down were substantial properties with real value.

In his affidavit to the Subcommittee, Ambassador Hostler stated that "He [Hammoud] considered me expert in real estate matters, since he lived abroad and was then largely unacquainted with US real estate practices."[30] However, Hagen, the New York real estate broker, didn't think Hostler knew much about real estate: "[H]ostler, the real estate typhoon, knew as much about real estate as my Aunt Matilda knew in 1860 about building a space shuttle."[31]

It appears that Hagen did the lion's share of work to make Hammoud's various real estate investments marketable and saleable. The question arises as to what Hostler's role was and what compensation he was received.

According to the Ambassador:

"His inquiries and my advisory activities for him were intermittent and limited. I would estimate that they involved perhaps an average of several hours a month in the period between 1982 and 1988."[32]

Hostler claims that he "received no salary, gifts or other gratuities or compensation from Hammoud, though I was reimbursed for my direct, nominal, actual receipted expenses."[33]

Hagen, however, recalls a meeting at the Pierre Hotel in Hammoud's suite on July 16, 1982 between Hammoud, Hostler, Pisani [an architect] Milne [a Utah real estate developer] and Hagen and his daughter. According to Hagen, "It was either at that meeting or a few days before wherein Hammoud placed both hands on Hostler's shoulders and said: "there will be a Cadillac in your driveway, tomorrow morning."[34]

The Subcommittee has been unable to ascertain whether or not Ambassador Hostler received the Cadillac. However, it is certainly unusual for anyone to provide business services to someone else for several hours a month for six years without receiving any form of compensation for it in return. Hence, Ambassador Hostler's described willingness to work for Hammoud for nothing for this lengthy period raises the question of why Ambassador Hostler did perform these services.

**Hammoud and Pillsbury**

REENTERED AS EXHIBIT 3

Michael Pillsbury is a former Senate staffer. He was formerly an Assistant Secretary of Defense. According to the Washington Post, Pillsbury was "a member of the top-secret "208 Committee," the interagency group that oversees Central Intelligence Agency covert operations for the President and meets in the situation room and room 208 of the Old Executive Office Building."

Pillsbury has told Subcommittee staff that he initially met Hammoud in the context of his work in the Senate when a real estate developer, Earl Milne, introduced him in 1981 or 1982. According to Pillsbury, Hammoud was "unusual" because he was a wealthy, Lebanese shi'ite. Pillsbury subsequently developed a personal relationship with Hammoud and over the course of the decade met him "ten to twenty" times in several cities around the world, including Washington, London, Geneva, Beirut, Damascus and "possibly Paris". According to Pillsbury, Hammoud provided him with intelligence related information concerning U.S. hostages held in Lebanon, which Pillsbury then passed on to US government agencies. As a letter to Subcommittee staff from Pillsbury's attorney, former Watergate prosecutor Seymour Glanzer, states:

Mr. Pillsbury has never said that he is "withholding important information" [from the Subcommittee]. What he did say was that he was reticent about disclosing inflrmation that might be needed about Mr. Hammoud's purported assistance to the United States Government. That was because he was alluding to two State Depeartment communications which may be "classified" and which can be obtained from the State Department. Thus, he does not believe he is at liberty to disclose their contents. One of these communications is a cable from the American Ambassador in Beirut in approximately November 1983, and the other is a cable from the American Ambassador in Damascus in approximately April 1989. Therefore, Mr. Pillsbury believes it is appropriate that disclosure be taken up with the State Department.[35]

Following receipt of the letter from Glanzer, Senator Kerry asked the State Department to retrieve the documents described. Unfortunately, the State Department was not able to locate the 1983 cable. It was able to locate the second cable and that cable remains classified. At the time of the second cable, Edward Derejian was U.S. Ambassador to Syria, and since that time has been appointed Assistant Secretary of State for Middle Eastern Affairs. Contemporaneous notes from BCCI's attorneys show that Pillsbury was contending that Hammoud was directly involved in assisting the U.S. on negotiations concerning the release of the U.S. hostages held in Lebanon as of the fall of 1989.[36]

In the early-1980's Pillsbury moved from the Senate to become the assistant undersecretary for Defense. In that position he championed the provision of advanced weapon systems, notably stinger missiles, to anti-communist insurgencies around the world, including Savimbi's UNITA forces in Angola and the Mujahadin in Afghanistan. Pillsbury is known to have made frequent trips to both countries.

The Task Force on Terrorism and Unconventional Warfare -- House Republican Research Committee claims that Hammoud was an arms merchant:

In order to insert large quantities of explosive and related equipment into target countries, the Hizballah established a web of import-export companies in Western Europe as part of its

https://info.publicintelligence.net/The-BCCI-Affair.htm

dormant network. Lebanon's leading shi'ite businessmen, including Mohammed Hammoud, who would later become a key financier of BCCI, provided crucial expertise, organizational and financial assistance without which projects could not have been undertaken.

Pillsbury has denied that he ever used Hammoud or BCCI either to arrange or to finance the provision of sophisticated weapons to anti-communist insurgencies.

In fact, Pillsbury has stated that his contact with Hammoud, aside from the information he provided on the US hostages held in Lebanon, was in the context of a book that they were writing together about the Shi'ites of Lebanon.

According to Pillsbury, Hammoud paid him an advance to coauthor a scholarly text about the Shi'ites and Pillsbury had completed some 200 pages of this book by the time of Hammoud's death. Pillsbury told the Subcommittee that he disclosed the book deal to the Senate Ethics Committee. However, Pillsbury refused to disclose the amount he had been paid by Hammoud, and when the payment was made. Pillsbury argued that these facts were irrelevant since he ultimately returned the money, although he refused to specify when that occurred. Pillsbury stated that his expenses had never been paid by either Hammoud or BCCI. However, these statements are contradicted by notes taken by BCCI's lawyers in October, l989 state that Pillsbury travelled to Europe on several occasions on tips paid for by Hammoud, raising in their minds concerns about whether Pillsbury's trips were actually being paid for by BCCI. Both BCCI officials and Pillsbury denied BCCI's involvement in the payments. However, given Hammoud's $110 million debt to BCCI at the time, and his frequent front-man status for BCCI, the distinction between Hammoud's activities and BCCI's activities does not seem to be very clear.[37]

Subcommittee staff have seen a law enforcement document which alleges that after Hammoud's death, Pillsbury travelled to Geneva to identify the body. Pillsbury denies the allegation. Pillsbury may or may not have identified the body, but after Hammoud's alleged death Pillsbury maintained a close relationship with Hammoud's family. The Subcommittee has been provided a document which appears to show that after the death of Hammoud, Pillsbury met in New York with Robert Altman, one of BCCI's lawyers, and with Hammoud's son, to discuss settlement of the elder Hammoud's estate. Pillsbury has told the Subcommittee that he only met Altman only twice -- both times in the context of Senate business.

**Hammoud and BCCI's Criminal Defense**

In the fall of 1989, Hammoud began to take an active interest in BCCI's legal problems in the United States as a result of its indictment for drug money laundering in Tampa, Florida. He met with Pillsbury on a number of occasions concerning these problems. Pillsbury in turn identified key Treasury and Justice Department officials in Washington who in Pillsbury's view would be key to assisting BCCI if they determined that the sting operation against BCCI were improper. Hammoud met with some, unidentified, officials from both Treasury and Justice, as well as with BCCI's criminal defense team in Washington. Available documentation concerning Hammoud's activities in this period suggests he may have undertaken other steps in connection with assisting BCCI with its criminal defense, but information on this point is, unfortunately, inadequate to determine precisely what.[38]

## Hammoud's Death

Hammoud, unfortunately, cannot shed any light on his political or government connections because he is, as prosecutors describe his status, "reportedly dead."[39] He allegedly died in Geneva in 1990 while visiting his doctor and he is buried in Beirut. However, insurance companies have reportedly refused to pay out on the life policy because Hammoud's corpse was found to be several inches shorter than the height recorded at his last medical examination. Several former BCCI officials who have testified before the Subcommittee have testified that they do not believe Hammoud is dead.

Hammoud was reportedly buried in Beirut and his family provided his London lawyers with a video of the funeral which allegedly shows high ranking Syrian intelligence officials in attendance. In its August 10, 1992 edition, Newsweek reports:

Intelligence officials now say that Mohammed Hammoud, an alleged BCCI front man, was taped saying over the telephone, "If anybody knew how dirty the Americans are in this BCCI business, they'd be surprised -- they're dirtier than the Pakistanis." He then said he was about to tell someone about the American role. Eight hours later he was found dead.[40]

Much about Mohammed Hammoud's life, business with BCCI, and alleged death remains a mystery to the Subcommittee. He clearly had very close ties not only to BCCI, but also to several US political and government officials as well as to various intelligence agencies.

1. An account of these meetings is contained in the chapter concerning BCCI's lawyers and their contacts with Hammoud and Michael Pillsbury.
2. See e.g. indictment, **People v. Abedi**, New York Supreme Court, County of New York, July 29, 1992.
3. S. Hrg. 102-350. pt. 2, p.612. In an interview with staff prior to his testimony Sakhia stated, "I went to Beirut to a seminar at American University in 1960. Hammoud used to have an office, a storefront the size of this sofa. His store was three feet deep and eight feet wide."
4. Staff interview, Nazir Chinoy, March 9, 1992.
5. BCCI memorandum, Central Credit Division, re:Congressional Place Ltd./M M Hammoud. March 30, 1989.
6. S. Hrg. 102-350, Pt.4 p. 374.
7. BCCI memorandum, reprinted in S. Hrg. 102-350, pt.4, p.762.
8. S. Hrg. 102-350. Pt.1, p.534.
9. Id. p.374.
10. See documents at S. Hrg. 102-350, Pt. 1 pp. 356-358.
11. Letter to ICIC from Mohammed Hammoud, November 1, 1978, reprinted in S. Hrg. 102-350, pt. 4. p.740.
12. BCCI Memorandum, reprinted in S. Hrg. 102-350, pt.4, p.762.
13. pt. 2, p.612.
14. Id.
15. Id. Sakhia explained in his interview with staff, "This transaction was done by First American not directly secured by the assets of Hammoud, but by a counter guarantee of First American. BCCI issued the guarantee which was confirmed by First American."
16. Id. p.614. In his interview with staff prior to his testimony Sakhia asked rhetorically, "If he had bought and sold shares from Clifford & Altman, why would he want my introduction? -- Since he didn't put a cent of his own into First American, he didn't feel like he owned it."

17. Id. p.176.

18. Id. p.176

19. pt. 1, p.534.

20. Id. p. 535.

21. Letter to "the Manager" from Mohammad M. Hammoud, reprinted in S. Hrg. 102-350, pt. 4.p 782.

22. Letter to BCCI, London, from i.H. Ansari, dated 4.4.90.

23. S. Hrg. pt.3, p.195.

24. See Hostler Affidavit, S. Hrg. 102-350 Pt. 4 p. 768, Hostler Resume, submitted to Foreign Relations Committee as part of confirmation process.

25. Report for the Committee on Foreign Relations, U.S. Senate, Ambassadorial Nomination for State of Bahrain, Charles Warren Hostler.

26. S. Hrg. 102-350 Pt. 4 pp. 769-771.

27. Letter to Jonathan Winer from Curtis Hagen, February 10, 1992, reprinted in S. Hrg. 102-350, pt. 4, p.765.

28. Id.

29. Id.

30. Id. pt.4., p.770.

31. Id.

32. Affidavit of Ambassador Hostler, reprinted in S. Hrg. 102-350, Pt.4, p.771.

33. Id. p.771.

34. Id. 766.

35. Seymour Glanzer to David S. McKean, July 31, 1992, concerning Michael Pillsbury.

36. Staff interviews with Pillsbury, March-July, 1992; see also attorney notes of interviews with Pillsbury, October, l989, provided to Subcommittee by BCCI attorney Raymond Banoun on September 3, l992.

37. Documentation on this issues is provided in a series of memoranda created by BCCI's criminal defense team and provided to the Subcommittee on September 3, 1992 by former BCCI lawyer Raymond Banoun and by the law firm of Janis, Schuelke and Wechsler on behalf of Lawrence Wechsler.

38. The fullest account of Hammoud's activities on BCCI's behalf in connection with its criminal defense appears in notes taken by BCCI's lawyers in the U.S. and provided to the Subcommittee on September 3, 1992 by Raymond Banoun and Lawrence Wechsler. These documents form the basis for the information set forth concerning this section.

39. People v. Abedi, New York Supreme Court, New York County, July 29, 1992.

40. Newsweek, August 10, 1992,

# BCCI AND GEORGIA POLITICIANS

### Introduction

When BCCI began its surreptitious takeover of First American, Jimmy Carter was President of the United States. The point man for that takeover, of course, was the President's close personal friend and former Director of the Office of Management and Budget, T. Bertram Lance.

Lance ultimately was forced to abandon his role in the takeover, but he maintained his contacts with BCCI for another decade. During that time, Lance introduced BCCI, and its president, Agha Hasan Abedi, to former President Carter and to the President's friend and former UN Ambassador, Andrew Young. During the 1980's these three former powerful government officials used, and were used, by BCCI, to varying degrees and for various purposes.

Of the three, Lance was far and away the most visibly involved with BCCI. In 1977, when Lance became Director of the Office of Management and Budget, he had serious financial problems. After resigning later that year amid accusations that he had mismanaged corporate and personal financial matters, Lance went to work for BCCI as a consultant. He appears to have traded on his access to the President for BCCI's ability to bail him out of his crushing debt. After getting millions from BCCI, Lance provided services to the bank for the next decade.

BCCI courted the rich and powerful all over the world and so it was natural that President Carter should be approached with an eye towards using him to give credibility to the bank. The President apparently did not establish a relationship with BCCI or Abedi, until after he left

office. However, throughout the 1980's, Abedi used President Carter as a means of gaining stature for himself and for BCCI in a number of third world countries. The President, in return, received millions of dollars for his charities.[1]

Andrew Young is one of the most famous black politicians, not only in this country, but all over the world. A former Congressman, Young is also a past Mayor of Atlanta. Perhaps most significant for BCCI, Young was the first black US Ambassador to the United Nations under President Carter. In that position he often championed Third World causes. BCCI used Young in much the same way as it used Carter -- for introductions and access to government leaders in developing countries. Young, in return received a salary and loans, although his financial relationship never amounted to that of his colleague Lance.

It is no coincidence that at the time the bank closed, BCCI had established its presence in Georgia in many different ways ranging from the ownership of the National Bank of Georgia to the headquarters for BCCI front man Ghaith Pharaon's U.S. corporate headquarters.

**Bert Lance**

**Lance Meets Abedi**

Bert Lance, who provided testimony to the Subcommittee on October 23, 1991 about his role in the BCCI affair, told the Subcommittee that he is "mystified" by the "whole developing scandal."[2]

Lance was the Director of the Office of Management and Budget under President Carter from January 20, 1977 until September 21, 1977. He was forced to resign after it was alleged that he engaged in questionable financial dealings at the National Bank of Georgia where he was chairman for two years, and, earlier, at the Calhoun National Bank where he was also chairman.[3]

Lance has stated on many occasions that he first met Agha Hasan Abedi, the President of BCCI, in October, 1977 when he was introduced by a member of the Georgia state assembly, an oil man named Eugene Holley. According to Lance, Holley:

had some conversations with Mr. Abedi about me and whatever few abilities I might have and things of that nature; and that he thought it would be worthwhile if I had occasion to meet Mr. Abedi and discuss with him what his interest might or may not have been in regard to the United States, in regard to investments, in regarding to banking generally, and so on.[4]

Holley was the Chairman of the Georgia state Senate Banking and Finance Committee. According to press reports Holley "had sought aid from Middle Eastern sources for his petroleum and real estate ventures."[5] According to the Washington Post, "Several Georgia banks that lent money for his [Holley's] ventures have suffered grave losses," noting that "NBG, under Lance's direction, was among the lenders."[6]

In September 1977, Lance met with Holley, Abedi and Naqvi at the Waldorf Astoria hotel in New York. Lance testified that Abedi told him:

REENTERED AS EXHIBIT 3

I am building a bank headquarters in London that has a deep and abiding interest in the problems of health, hunger, economic development, things primarily in the Third World, problems that we are all familiar with and problems that we all want to see resolved in one form or another.[7]

According to Lance, who was in serious financial trouble at the time, "I shared that concern."[8]

Lance told the Subcommittee that he subsequently met with Abedi and told him that "I am not about to get involved in situation whereby the relationships that I establish after having resigned would create any problem of embarrassment, concern, or anything else for the President of the United States."[9] Lance ultimately did introduce Abedi to Carter, which ultimately caused substantial embarrassment and concern for the former President, but this was until 1981 after Carter had left the Presidency.

In October 1977, Lance decided that he should "do due diligence about Mr. Abedi and BCCI" before getting involved with them. To handle this task, he chose Clifford and Altman, who had represented him before the Senate.[10] Lance told the Subcommittee that Clifford "told me . . . Mr. Abedi was a man of integrity and character, that BCCI . . . they were people of integrity and character."[11]

With assurances from Clifford and Altman that BCCI was a reputable institution, Lance began to advise Abedi on gaining a foothold in the United States. He testified to the Subcommittee his advice to Abedi was:

very clear and precise, as I recall, that you need to acquainted, you need to go through the regulatory process in the United States; that, obviously, despite my difficulty sometimes in dealing with them, that I thought it to be the best process in the world; that banks who were regulated in the United States offered their depositors safety; that it was the kind of climate that was appropriate and proper, and that it was they ought to do.[12]

**Lance and the Initial Takeover of FGB**

In line with this sage advice, in late 1977 Lance led a group of Middle-eastern investors, including Abedi, in an attempt to take over Washington D.C. based Financial General Bankshares. The effort was blocked when the SEC discovered that the investors had secretly acquired a 19% holding in the bank and had to divest it.[13] Lance was forced to sign a consent decree by the SEC.[14]

Lance explained to the Subcommittee that he had recommended the purchase of Financial General to Abedi. He told the Subcommittee that he "happened to know about Financial General because when I was at the National Bank of Georgia, they were owned by Financial General." Lance also testified that he "happened to have an awareness of ...other stockholders in Financial General at that point in time... [who] had [not] been very happy about their investment."[15] Indeed, Lance was accused by the SEC of having been involved in the

struggle for control of FGB while he was still director for the office of management and budget.[16]

At the same time that Lance was assisting Abedi in the takeover of Financial General, Ghaith Pharaon, a BCCI front man, offered to buy 60% of the former budget director's stock in the National Bank of Georgia stock for $20 a share, $3 more than Lance had originally paid for it. At the time Lance held 12% of the bank's stock and his sale of some 120,000 shares provided him with a gross gain of approximately $2.4 million. According to press reports, the stock had been trading for about $10.50 to $11.25 before the sale became imminent.[17]

In testimony before the Subcommittee, Lance explained that Abedi told him that he "had an investor who, by the name of Gaith Pharaon, who has acquired banks in the United States previously. . . And he said to that would appear to make a lot of sense." [18] Indeed, it did make sense for Lance, who had previously listed liabilities in excess of $5 million, including a $3.4 million loan form the National bank of Chicago.[19]

At the time the transaction raised concern that Pharaon may have been paying an inflated price in order to help Lance, save President Carter further embarrassment from his association with Lance, and gain influence with the administration. However, Lance stated publicly that "I'm not for sale; I've never been for sale, and that stands on its own."[20] Pharaon also disputed any claims that he was trying to buy influence: "Why should I buy influence? We have many ways of reaching your President through our channels. We have a great deal of influence already." [21]

Lance also testified about Clifford and Altman's role in the Pharaon's purchase of his shares: "Mr. Clifford and Bob Altman represented me at that point in time ...They were very aware of what I was trying to do and were very helpful to me in trying to do that."[22]

In summary, Lance explained:

[T]here were two groups of investors there that Abedi said he was representing. One happened to be the investors that subsequently ended up as the individual shareholders in Financial General, and, Gaith Pharaon, who ended up as the sole investor in the National Bank of Georgia...

And during November and December 1977, it pretty well took place in the broad beginnings of the purchase of Financial General on the one hand and, obviously, the acquisition of the National bank of Georgia on the other.

[T]here were two different entities, is what I'm trying to say to you, that were involved. I guess I was central to both of them. Mr. Clifford and Bob Altman were central to both of them. Mr. Clifford and Bob Altman were central to both of them. And, in fact, Mr. Clifford and Bob Altman represented me in a legal sense.[23]

While Lance took pains to separate the two transactions -- the purchase of his NBG stock and the acquisition of Financial General -- for the Subcommittee, he testified that at a meeting in Atlanta over Thanksgiving weekend in 1977, "there was basic discussion and negotiation

about the purchase of NBG. But there was also negotiation -- not "negotiation" as such, but conversation -- about the purchase of Financial General." Pharaon, the purchaser of NBG, was not present, but Abedi, Naqvi, Abdus Sami and Dildar Rizvi, the elite of BCCI, were all present.[24] In fact, Lance never met Pharaon until the night of the closing on the sale of NBG in January, 1978. Nevertheless, he testified that it was his "impression" that "he [Pharaon] was obviously a person who comes across as being in charge of whatever he's doing, and makes decisions and that sort of thing."[25]

### Lance Advises BCCI; The Second Takeover Attempt

After the sale of NBG stock to Pharaon and the failed takeover of Financial General, Lance continued as an advisor to Abedi and BCCI. Lance described his role as offering advice on "investments in the United States" and "economic development around the world." For these services Lance was paid by BCCI through ICIC, the "bank within a bank", which Lance understood to be a kind of "commercial finance operation."[26] When asked by Senator Pressler what ICIC paid him, Lance responded that he had been asked the same question recently by the SEC and he had refused to answer and he therefore would not answer the Senator. Lance added that "All of that is matter of public record."[27] The Washington Post reported in March, 1978 that:

The president of an Arab-controlled bank paid off a $3.5 million loan for Bert Lance without even asking Lance to sign a note, an attorney claimed yesterday at a court hearing in the Financial General Bankshares case.

Lance's $3.5 million loan from First National Bank of Chicago was repaid in January by Agha Hasan Abedi, president of Bank of Credit and Commerce international, said Edward McAmis, attorney for Financial General in a civil lawsuit against Lance, Abedi, BCCI and others accused of using illegal methods in seeking control of Financial General.

McAmis said Lance told him in a sworn statement made on Monday that Abedi repaid the loan directly, without any discussion of the interest rate or how and when Lance would repay Abedi. The multi-million loan made with only an oral promise to repay showed Lance's close ties and obligation to Abedi and BCCI, McAmis argued.

Lance's attorney, Robert Altman, accused McAmis of deliberately misconstructing the loan as part of a campaign to smear Lance.

"It wasn't like that at all," Altman said. he said formal loan documents were being drawn up, but had not been completed because of the lawsuit and other complications.

The article continues:

The revelation that Abedi repaid the Chicago loan came as a surprise. It had been reported earlier that Lance had sold his NBG stock for $2.4 million and used the money to pay off some of his debts, including the Chicago loan.

Court records in Georgia showed the Chicago loan was repaid on January 4, the same day lance completed the sale of his NBG stock to Gaith R. Pharaon, a Saudi Arabian financier who

REENTERED AS EXHIBIT 3

has business ties to Abedi. That same day Lance paid back a $443,000 loan to a Tennessee bank, raising questions about how he paid nearly $4 million in debts with $2.4 million in cash.

Yesterdays's assertions suggest Lance got money from two Arab sources in January, when he moved to extricate himself from past debts -- the sale of stock to Pharaon plus the loan from Abedi.[28]

Although no longer personally involved in the takeover of Financial General Bankshares, Lance continued to provide advice on the acquisition of the bank. He testified, for instance, that in 1978, at the suggestion of Abedi, he met separately with two of the potential shareholders, Sheik Kamal Adham and Sheik Zayed, the ruler of the United Arab Emirates. Lance told the Subcommittee that he met Zayed in Lahore, Pakistan in "February or March, 1978."[29] According to a February 12, 1978 story in the Washington Post, "In recent weeks, Lance was in Karachi, Pakistan, and sources say the trip was in connection with his dealings with Abedi."[30] Despite the fact that he no longer worked for the government, Lance made the trip on an official, US diplomatic passport.[31]

A meeting during this period would have followed the memorandum written by Abdus Sami to Mr. Abedi on January 30, 1978

in which Mr. Sami discusses the strategy for the takeover of Financial General Bankshares. Sami expresses the need "to keep individual ownership to below 5 percent" and he states that "we want two other names immediately." The two names who ultimately were submitted as investors were those of Sheik Zayed's son's Khalifa and Mohammad. When Senator Kerry asked Lance if he travelled to Pakistan in order to solicit the use of the names of investors from Sheik Zayed, Lance responded, "That's not my understanding of what actually took place."[32] Lance then told the Subcommittee, "Mr. Sami and I never and a conversation along these lines."[33] The Sami memorandum, however, contains a provocative reference to "our friend" involved in the FGB negotiations.

Lance admitted to the Subcommittee that the reference was to him, but testified:

[T]he acquisition of shares were basically handled by Mr. Sami, and he was the man who was responsible. I was not involved in that.[34]

As a new strategy for acquisition of Financial General Bankshares progressed, Lance told the Subcommittee that he reiterated to Abedi the need to "go through the regulatory process." He further advised:

[t]hat you take an outstanding American citizen who has no blemish in regard to anything in a public sense, and you take the stock that these individual investors are going to own, and then you put that together in some sort of trust and give that trustee irrevocable voting rights about that stock, and you will have taken a major step in dealing with some of the perception problems that you may have about individual investors.[35]

Abedi followed Lance's advice almost to the letter. Clifford and Altman created a shell corporation, in a form of a trust, to hold the FGB stock. Clifford, who became Chairman of

First American was essentially a trustee since his associate, Robert Altman, the President of First American, held a power of attorney for virtually every shareholder. And perhaps most importantly, Clifford had the reputation as being "an outstanding American citizen." Clifford helped to alleviate some of the "perception problems" not only in the acquisition stage, but also throughout the 1980's.

**Lance Theorizes About the CIA and BCCI**

Lance's relationship with Abedi and BCCI was interrupted in May, 1979 when he was indicted in the northern district of Georgia. After a sixteen week trial, he was acquitted.[36] Lance testified, "[B]asically, in all of 1979, I was out of the picture as it related to BCCI, as it related to Financial General, and so on."[37] According to Lance, Clifford, Altman and Abedi decided that he was "too controversial" and that he "would bring down the wrath of the regulators."

Despite the fact that he was no longer involved in the takeover of Financial General, Lance testified "my relationship with Mr. Abedi, from the standpoint of personal relationships, moved forward from that point on."[38] Lance said that he did "continue to have conversations and visits with Mr. Abedi."[39]

Lance described one of those conversation with Mr. Abedi to the Subcommittee. In 1983 Lance and Abedi attended a symposium at Emory University. In a car ride to Abedi's hotel from the University, Abedi, according to Lance, explained how he had been he had been placed on a CIA watch list in 1980 because he was a "Third World liberal." Lance testified that "subsequently, beginning in 1984, I would say, I sensed a change in Mr. Abedi, that he no longer had any concerns about visits to the United States." Lance concluded that in 1984 there was an attempt by the CIA to "co-opt" Abedi, although he could offer no proof.[40]

Lance also believed that the CIA Director Casey may have used wealthy businessman Bruce Rappaport to "spy" on Lance to see what he may have known about Abedi and the Agency's involvement with the bank. According to Lance, Rappaport befriended him for no apparent reason, but "He made it very clear to me that he had a very close and definitive relationship with Mr. Casey; the Director of the CIA." Lance said that Rappaport maintained contact with him for a period of years until the death of Director Casey.[41] Again, Lance offered no proof of his theory, and, in fact, he failed to mention in his testimony that despite his suspicions of Rappaport, he arranged with him to have one of his sons work in the financier's New York bank.

**Lance and BCCI During the 1980's**

Besides advising Abedi and BCCI, Lance, during the 1980's pursued financial investments with BCCI-related individuals such as P.S. Prasad, an Indian who was BCCI's largest individual borrower in the United States with over $30 million in outstanding loans. At the time of BCCI's collapse in 1991 Prasad fled the country and returned to India.

Lance served on the board of McDowell Industries, a construction company. In 1984, using various holding companies, Prasad bought out McDowell and merged it with Maxpharma, a publicly traded company owned by Prasad which manufactured generic over-the-counter and

https://info.publicintelligence.net/The-BCCI-Affair.htm

prescription drug products. The buy out was handled by the investment banking firm of Drexel Burnham Lambert Inc. According to Lance, he personally met Dennis Levine, the investment banker who put the deal together. Levine does not recall having ever met Lance or Prasad. Lance continued to serve on the Board of directors of McDowell until approximately 1986. In 1988, Maxpharma was delisted from the American stock exchange after having multimillion dollar losses for the prior seven years, including a nearly eight million dollar loss in 1988.[42] It is unclear exactly what Lance's role was in Prasad's shuffling of companies, but one source close to the negotiations has alleged that "Lance was released of a multimillion loan he had guaranteed (either personally or through National bank of Georgia) for Maxpharma."[43]

Lance's involvement in another Prasad venture is clearly documented. Dr. Prasad borrowed $450,000 from "a bank" to purchase a small business investment company (SBIC) in 1983 called Falcon Capital Corporation.[44] The purpose of SBICs are to provide financing for venture capitalists, provided or guaranteed by the US Government, with the goal of creating new jobs. On September 15, 1986 Prasad's Falcon Capital made an unsecured loan of $75,000 to Bert Lance at an interest rate of 14 percent per annum for a period of five years. The ostensible purpose of the loan was to set up a consulting business in mergers and acquisitions. According to the SBA Assistant Inspector General for Audit, "[I]n 1988, review did not disclose that T. Bert Lance used the proceeds of the loan in a regular and continuous business operation."[45] Moreover, as of September 30, 1987 principal of $9,738.40 and interest of $8,990.27 were delinquent on the loan. Lance has told the Subcommittee that he eventually paid off the entire loan, but the Subcommittee has been unable to independently verify his claim.

## 1988 -- Lance emerges again

In June 1988, Forbes Magazine reported that Lance was being considered by BCCI shareholders and management to run the bank in the absence of Aga Hasan Abedi who had suffered a debilitating heart attack. According to Forbes, "An Arab investor group suggested a compromise candidate to run things, a man who could keep the Saudi and Pakistani factions within the bank at bay. That man: Bert Lance."[46]

Also in 1988, Lance was an unofficial advisor to Presidential candidate Jesse Jackson, who Lance also introduced to Abedi. Nazir Chinoy, former branch manager of BCCI Paris, testified that when Jackson stayed in Paris, all of his expenses were paid by BCCI.

Finally, after the indictment in Florida of BCCI and BCCI personnel, Lance reportedly flew to London with former Chairman of the Democratic Party John White to meet with Naqvi and to advise BCCI on the best strategy for fighting the indictment.

## The Lance Relationship

The full story of Bert Lance's involvement with BCCI remains to be told. Lance was intimately involved with the bank between late 1977 and his indictment in 1979 during which time he provided advice to BCCI in exchange for being relieved his financial burdens. During the 1980's Lance continued his relationship with BCCI, offering advice and providing important introductions, most notably to former President Carter. While Lance's relationship

spanned the decade, there are many gaps in the public record as to exactly what services Lance performed for the bank and what compensation he received. This merits further investigation.

**Jimmy Carter**

**Introduction**

Former President Carter has enormous respect and admiration throughout the world, but particularly in the Third World where he focused much of human rights policy while he was President. The President's focus on "Third World" issues, combined with BCCI's need for rapid worldwide expansion led the bank, and its president, Aga Hasan Abedi, to court President Carter after he left office. BCCI, which styled itself as a "Third World", bank successfully exploited the President's reputation and access by providing large amounts of funding to the his charitable organizations. In turn, the President became an unwitting pawn of BCCI, failing to acknowledge, even when it became obvious, that the bank was a criminal institution.

**The President and Saudi Front Men**

There is nothing to suggest that Jimmy Carter was even aware of BCCI or Aga Hasan Abedi while he was President of the United States. However, the president would have known of at least two important BCCI front men, Kamal Adham and Gaith Pharaon. President Carter undoubtedly met Kamal Adham in the negotiations over the Camp David Accords as Adham, the chief of Saudi intelligence, acted as an important liaison for Anwar Sadat. This is discussed in more detail in the chapter on BCCI's contacts with the CIA and foreign intelligence.

President Carter would have known of Gaith Pharaon because Pharaon bought the National Bank of Georgia where the President's good friend Bert Lance had been chairman and where the President had business loans. According to a 1980 Jack Anderson story, Senator Orrin Hatch, a member of the Senate Judiciary Committee, investigated the Carter loans at NBG. In his story Anderson quotes from a confidential, investigative memorandum to Senator Hatch:

The assumption in financial circles is that Pharaon acted for the Saudi royal family in purchasing the national bank of Georgia. The bank's biggest borrower just happened to be Jimmy Carter. Thus the President of the United States found himself to be deeply in hock to a Saudi Arabian financier with close ties to the Saudi royal family.[(47)]

The memorandum to Senator Hatch continues:

[T]he bank's confidential files contained embarrassing information about the president's financial affairs. The files revealed that the Carter peanut business wrote $3 million in overdrafts and unprocessed checks to repay peanut commodity loans during the 1975-1977 period.

While Carter was scrounging for money in his 1976 presidential campaign, the business borrowed $1.15 from the bank to buy peanuts, without a single peanut in bonded storage to secure the loan, in violation of the loan agreement. By September 1, 1977 , the business was insolvent to the tune of $410,000.

Of course, the Saudis remained discretely silent. The friendly Pharaon not only kept quiet about Carter's irregularities, but renegotiated the loan to Carter's advantage.

According to a memo in the bank files, the bank renegotiated the repayment terms. This resulted in a savings of $60,000 for the Carter family in 1987. The President owned 62% of the business and therefore was the largest beneficiary.[48]

The memorandum concludes:

The press and public have been conditioned by Watergate to expect a smoking gun -- a taped conversation, a full confession by one of the conspirators or some other dramatic evidence... Perhaps the American people need to be reeducated about scandal.[49]

The Subcommittee has not been able to verify the accuracy of the information supplied by Senator Hatch's investigator.

### After the White House: Carter and Abedi

Since leaving the White House and the office of he Presidency in 1980, Jimmy Carter has devoted himself to several charities, including providing assistance to several organizations for fighting disease in the Third World. In this capacity the former President developed a friendship and working relationship with the founder and President of BCCI, Aga Hasan Abedi.

President Carter was introduced to Abedi in 1982 by Bert Lance who brought the banker to Plains, Georgia . Lance remembers, "There was an immediate relationship that developed between the two of them. You could sense it as they talked there in the living room of the Carter residence."[50]

According to Carter, Abedi approached him to undertake charity work on the third world:

The foundation or the bank, I never did know which, had a massive program in the third world called South. They published a monthly magazine that had major conferences in different cities around -- in the developing nations. Mr. Abedi, when he came to see me, said that they were just holding conferences, they were issuing publications, they were doing scholarly work, but they'd never actually planted a seek, or immunized a child or did anything of a specific nature. And he knew that our relationship with the Center for Disease Control let us have access to health care programs, and we were already embarked on those. So his relationship with us was one of "I want to do something practical to help people who are suffering, and we will help you."[51]

During the 1980's Carter and Abedi met over a dozen times and established a very warm, personal relationship. In 1983, for instance, when Carter and former President Ford held a joint symposium on conflict resolution at Emory University, Mr. Abedi was in attendance. [52] When Abedi suffered a heart attack in February 1988, Carter contacted heart specialist Norman Shumway who, at the former President's request, flew to London to examine Abedi, and oversaw a heart transplant operation for the BCCI president. Carter even visited Abedi

REENTERED AS EXHIBIT 3

during his hospitalization and was quoted as calling Mr. Abedi "one of the most unusual men I have met."[53]

**Carter's Travels With Abedi**

The President travelled several thousand miles together with Abedi on the BCCI corporate jet and they visited at least seven countries together. Abedi has stated publicly that he has been "to every country...All the top politicians and heads of state were my friends, Jimmy Carter, James Callahan, I knew them all."[54] Callahan, the former British Prime Minister, has claimed that Carter introduced him to Abedi in 1981 at a charity dinner for the Cambridge Commonwealth Trust in London.[55]

In October 1986 the Carter Center opened in Atlanta. The center was created to study third world issues among the guests was Abedi, who had contributed over $500,000 to the center. [56] Moreover, Abedi and BCCI donated $8 million Carter's Global 2,000 project, helping to fund programs in Asia and Africa. Abedi was appointed the co-chairman of Global 2,000.

Less than one month after the Carter Center opened, the former President travelled with Abedi to Pakistan and to Bangladesh to sign agreements with government officials starting Global 2,000 health care programs in those countries. According to a Global 2,000 statement at the time, the programs sponsored by Carter focused on control of polio, measles, tetanus and diarrheal diseases.[57] BCCI either had, or was to develop corrupt relationships with several of the countries visited by Carter and Abedi, including Bangladesh and Suriname. In 1986 Carter also travelled to the United Arab Emirates, again accompanied by Abedi, for a three day visit during which time he met Sheik Zayed.[58]

In 1987, they met in Bangkok with the King of Thailand before flying on to Hong Kong and back to China.[59] In Beijing they attended a state dinner with Chinese leader Deng Xiaoping where they shared a toast with Premier Zhao Ziyang. President Carter has acknowledged that his travels with Abedi helped the BCCI president in his business:

[I] don't think there's any doubt that when a former President of the United States goes to a country and has anybody in his entourage, that person has some advantage to be derived.[60]

Indeed, the countries to which President Carter travelled with Abedi became important banking centers for BCCI. In China, for instance, BCCI opened the first foreign branch and reportedly conducted weapons transactions involving the Chinese government.

**What the US Government Didn't Tell Carter**

By 1986, of course, several US government agencies, including the Central intelligence Agency, the Justice Department and the Treasury were aware of BCCI's criminal connections. The CIA, for instance, knew that BCCI had secretly -- and illegally -- acquired First American Bankshares, Washington D.C.'s largest financial institution. The State Department knew that the terrorist Abu Nidal was using the bank to finance his operations in Europe. And the Customs Agency was working with the US Attorney's office in Tampa in Operation C-Chase,

an undercover sting operation designed to expose drug money laundering in South Florida, which ultimately targeted BCCI.

During this entire period, President Carter was never briefed by any agency of the US government concerning BCCI.

This seems all the more extraordinary given that during several of his trips with Abedi the State Department asked the former President to raise particular issues with the governments of those countries.[61] However, the former President has said that neither did he ever ask for a briefing, nor did he ever feel the need to request one. Carter has said that he does not feel either "betrayed or deceived". According to the former President he did not become concerned about his association with the bank until the revelations that BCCI had been General Noriega's banker. At that point, the President stated:

[W]e were quite concerned , but the public news media reports -- I believe including statements from the Justice Department -- was that this was a problem that was apparently confined to the one bank operation in Panama dealing with Noriega. We had no information that it was broader.[62]

In point of fact, the indictment in Tampa charged BCCI with having a "corporate policy" of soliciting narcotics proceeds which clearly suggests that knowledge of BCCI's criminal activity was broader than President Carter has suggested was publicly available.

**Carter's Other BCCI-related Benefactors**

In 1987 President Carter invited BCCI's most famous Georgia resident, Gaith Pharaon to have lunch at the Carter center. According to published reports, Pharaon brought David Paul, the President of Centrust with him.[63] Although Pharaon never contributed any funds to President Carter's charities, Centrust made a corporate contribution of $100,000, which arrived with a note instructing Carter fundraisers to "credit it to Gaith Pharaon."[64]

In 1991 after the Federal Reserve issued a cease and desist order concerning BCCI's ownership of First American, the President began to disassociate himself from Abedi and the bank. On April 15, 1991 President Carter said:

We have, at the Carter Center, about 20,000 contributors to our programs, and we appreciate very much what BCCI did at the beginning to get this project started. But now, one of our major contributors is Sheik Zayed, in Abu Dhabi.[65]

Sheik Zayed, of course, was a major shareholder in BCCI from its inception and at the time that President Carter made his remarks, actually controlled the bank. According to the Atlanta Constitution, President Carter was aware of this: [W]hen BCCI changed owners and stopped payments on its Global 2,000 commitments, Mr. Carter asked the new owner, the President of the United Arab Emirates, to pay the $2.5 million balance due."[66]

**Carter Aide Used BCCI To Defraud Former President**

REENTERED AS EXHIBIT 3

On August 26, 1992, George G. Schira, the first executive director of the Carter Presidential Center, was indicted on charges that he impersonated former President Jimmy Carter and defrauded the center and one of its financial contributors out of $650,000.[67]

In committing this fraud on the former President, Schira used BCCI to receive some $650,000 from a shipping magnate through impersonating President Carter and Prince Bandar Bin Sultan, the Saudi Arabian ambassador to the United States, and calling on the magnate for help.

The funds were first transferred to BCCI in London, and then to BCCI's secretly owned U.S. subsidiary, the First American Bank of Georga, and to BCCI's secretly owned Swiss subsidiary, the Banque de Commerce et Placements.

### The Relationship Between Jimmy Carter and BCCI

President Carter was used by BCCI to enhance its credibility around the world and particularly in developing countries. President Carter travelled to a number of these countries with BCCI's president, Abedi, increasing Abedi's status and helping Abedi gain access and entry to political leaders from those countries. At the same time, the former President became beholden to the bank for its generous contributions to his charities. While President Carter did not show sufficient interest in establishing the bona fides of the bank, the CIA, which had substantial negative information on BCCI, failed to provide him with that information. When a President of the United States becomes a private citizen, it is obviously his choice with whom he associates. Nevertheless, former Presidents are afforded physical protection, and should be afforded, to the extent possible, protection of their reputation. As a result of his own lack of diligence in seeking information on BCCI's poor reputation, and the CIA's lack of diligence in telling President Carter what they knew, President Carter became closely associated for a decade with a bank that constituted organized crime. This outcome was not in the interests of the United States.

### Andy Young

### Introduction

Andrew Young is one of the most prominent Black Americans in the country and has a record of high achievement in public service. However, The Subcommittee finds that Young's relationship with BCCI was inappropriate, particularly during the period that Young served as the Mayor of Atlanta. While he may technically have violated no ethical rules of his office, his financial relationship with BCCI has the appearance of influence-peddling.

### Young Meets Abedi

Former UN Ambassador and Mayor of Atlanta Andrew Young represented BCCI as a consultant. Young has said that he learned about BCCI after leaving his position as UN Ambassador in 1979. While he does not recollect who introduced him to Aga Hasan Abedi, BCCI's president, he believes it may have been Gaith Pharaon, the man who purchased Bert Lance's holdings in the National Bank of Georgia.[68]

REENTERED AS EXHIBIT 3

While he was Mayor, Young made at least four international trips on which he made key introductions for BCCI. According to Young, BCCI officials were occasionally involved during trips that he made with the Atlanta Chamber of Commerce. He has explained that he performed services for the bank or met with officials in Tunisia, Nicaragua, Zimbabwe and several Persian Gulf states.[69]

In recent indictments issued by the Manhattan District Attorney, Robert Morgenthau, Tunisia and Zimbabwe were described as countries where government officials were bribed by BCCI officials. There is no information that Mayor Young had any knowledge of any impropriety committed by BCCI officials in either of these countries.

### A Financial Relationship With BCCI

While serving as the Mayor of Atlanta, Young, like Lance, provided services for BCCI in return for financial benefits. Young had a $50,000 annual retainer with the bank, and has claimed that he only became a paid consultant in 1986 after he travelled with former President Carter to Africa on a BCCI jet. Young's fees were paid to his consulting firm, Andrew Young Associates. The relationship between Andrew Young Associates and BCCI lasted for eight years until 1989. During most of that period, the BCCI's loans were booked, and according to BCCI's records, "parked," at its offices in Panama.[70]

According to a loan review document from the National Bank of Georgia, AYA had "initially served as a vehicle for Andrew Young's lecture and occasional consulting fee income," but that following his election as Mayor, the firm "was reorganized to focus primarily on offering consulting services to domestic businesses working to achieve sales to various third world countries."[71] According to the memorandum, AYA relies "largely upon name recognition and third world political contacts."[72]

The document described characterized the company as "small, illiquid, unprofitable, and infinitely leveraged."[73]

According to Stony Cooks, Young's business and political associate, expenses incurred from Mr. Young's travels on behalf of BCCI were used to reduce the balance on the credit line. Cooks has claimed, the "offset" arrangement was worked out between himself and Swaleh Naqvi, the chief operating officer of BCCI without specifying the date of the arrangement.[74]

As of October 10, 1989, the outstanding loan to AYA (Andrew Young Associates) was $197,000 and while interest on the loan had been paid, the principal had not paid down. [75] In a letter from Asif Mujtaba, the Group Vice-President of First American Bank in Georgia to Bande Hasan, BCCI Miami, Mujtaba wrote "This loan matured on October 6, 1986 and I have written to the borrower demanding payment."[76] Cook's assertion following BCCI's global closure that payment of the principal, nearly $200,000, was offset by Young's travel expenses, is difficult to believe. Young would have had to have a large number of trips on BCCI's behalf in order to accumulate $200,000 in expenses, and there is evidence, as discussed below, that when he made trips on behalf of BCCI, he immediately sought cash reimbursement from the bank.

Documents show that Andrew Young Associates received its line of credit from the National Bank of Georgia beginning in 1980 which was transferred to BCCI Panama sometime after June 1985, the year Young was re-elected Mayor of Atlanta. (that same year the National Bank of Georgia donated at least $10,000 to Young's successful candidacy for Mayor of Atlanta in 1985.) [77] There is no explanation for why the loans were transferred. Documents do show that while AYA was paying down interest, Young's brother, Walter Young was not servicing the loan. In 1988, after several years of non-payment BCCI's Tariq Jamil wrote S.M. Shafi: "I understand that this loan is also guaranteed by Mayor Young, and therefore I would submit that the collection should be handled delicately as we would like to preserve the relationship between the BCC group and Mayor Young."[78]

**Young's Travels For BCCI**

According to published reports, Young travelled extensively on behalf of BCCI. The Subcommittee has obtained documents showing one trip which Young made to Nicaragua. In a May, 1987 memorandum written by S.S. Shafi to Ameer Siddiki, BCCI London, Shafi recounts a meeting with government officials in Managua, Nicaragua that had been arranged by Young:

Our first meeting with the Cabinet Ministers and other important personalities of Nicaragua was arranged by Mr. Andrew Young, Mayor of Atlanta who had travelled there for this purpose. Most of the Cabinet Ministers attended the dinner and after some time we were joined by the President of the Republic, Mr. Daniel Ortega. He explained to us at great length the great recession and losses and the widening of the trade gap in his country. The idea behind was to impress on us that BCCI primary concern being the promotion of economic growth in Third World countries we should arrange for credit lines for their pre-export financing of their coffee, sugar, bananas and other items.[79]

In the same memo Shafi reports that "The Minister [of Foreign Trade] added that a delegation headed by him would visit London to meet Mr. Abedi within a few days through good offices of Mr. Andrew Young."[80]

In September, 1987, Tariq Jamil, BCCI London, who had previously worked at the National Bank of Georgia, wrote to Saheb Shafi, BCC LACRO, requesting that Young be reimbursed for his travel expenses to Nicaragua, noting:

Needless to say, we shall continue to receive patronage and help from the Mayor in any of our endeavors in Central America for developing contacts and business for Latin American Region.[81]

The request for $2,345.17 reimbursement was accompanied by a July 15, 1987 letter from Young's assistant Stony Cooks stating that "[p]resently, Mayor Andrew Young's anticipated dates for his visit to Guatemala are August 12-6, 1987."[82] Cooks has told the press, as noted earlier, that Young's travel expenses were used to pay down his loan. The Subcommittee has been unable to verify that assertion, but finds the account -- that Young's travel expenses on behalf of BCCI amounted to nearly $200,000, and were used to offset the loan -- difficult to believe, especially given the reimbursement request in the case of the Nicaragua trip.

An NBG Loan memorandum also shows that Young proposed a joint venture in the country of Nigeria:

[T]o establish a joint venture agreement between A.I.C. and a Nigerian partner, former Head of State, General O. Obasanjo, is being negotiated. The joint venture company would cooperate in the assembly, manufacture and sale of farm equipment in Nigeria and throughout Africa.

Andrew Young Associates will consult with A.I.C. to provide advice and information about the business environment and business development opportunities in the developing nations.[83]

The significance of the Nigerian proposal is simply that it involves a former head of state of the Nigerian government, which was pervasively involved in receiving corrupt payments from BCCI in the form of bribes, kick-backs, money laundering, and other services specified in the chapter on BCCI's activities in foreign countries.

### Other Georgia Contacts

Consistent with its strategy of buying political influence, BCCI used Georgia lawyer and political operative Charlie Jones to court powerful government officials. For example, Jones was hired by Clifford and Warnke to lobby the Georgia state legislature during the takeover of National Bank of Georgia by First American. In order for the takeover to have proceeded, a technicality in the banking law had to be changed. According to Roy Carlson, Jones was paid "the vicinity of $1 million" for successfully lobbying the legislature.[84] NBC reported in February 1991 that members of the legislature had flown to a resort at the expense of BCCI.

Jones also arranged to have Senator Sam Nunn invited to lunch by the Egyptian Ambassador to the United States where Jones introduced the Senator to Gaith Pharaon. Nunn subsequently met with Pharaon on three occasions -- each meeting was arranged by Charlie Jones. There is nothing to suggest, however, that Senator Nunn had any relationship with BCCI or knowledge of Pharaon's ties to the bank.

According to Senator Hatch, Jones also used the offices of Senator Wyche Fowler to set us a meeting between himself, Amir Lohdi, a BCCI employee and aide to Gaith Pharaon, and Danny Wall, the nation's top savings and loan operator. According to a report released by Senator Hatch in 1991, at the time, Centrust was seeking US authority to sell $200 million in bonds to stave off its failure. Senator Fowler has denied that he or anyone in his office played any role in setting up the meeting.[85]

### Conclusion

Beginning in the late 1970's BCCI made a concerted effort to court important members of the Carter administration, including the President himself. Bert Lance, for example, appears to have been relieved of substantial debt by the bank. While Mr. Lance's financial dealings have been thoroughly investigated and he has to date been convicted of no crime, the Subcommittee has concluded that from the beginning Lance traded on his time in public office for personal gain. In short, while his dealings with BCCI may not have been criminal, they can only be characterized as corrupt.

REENTERED AS EXHIBIT 3

Former President Carter demonstrated an astounding lack of curiosity about a man with whom he travelled around the world and who funded his charities. While someone in the US government should have alerted the former President to the criminal nature of BCCI before 1986, President Carter never asked. Moreover, the former President demonstrated some insensitivity to the appearances of impropriety in accepting money from Sheik Zayed, the owner of BCCI, after the 1988 indictment, even though BCCI had been identified as having a corporate policy of soliciting drug money.

Andrew Young did not have as extensive relationship with BCCI as his former colleague Bert Lance, but he seems to have been equally willing to profit by that relationship. While Young may not have broken any criminal laws, he showed poor ethical judgment in performing services for a foreign bank while he was Mayor of Atlanta. Mayor Young's actions could be more easily characterized as business and economic development were it not for the $50,000 he received in consulting fees and the nearly $200,000 his consulting firm borrowed.

What is perhaps most surprising about the actions of former President Carter and former Mayor Young is that they established a relationship with BCCI or Abedi at all given that they knew Bert Lance was intimately involved with the bank and had, in fact, been bailed out by the bank. Lance has a history of showing poor judgment concerning his personal and business finances and his recommendation of BCCI, instead of providing comfort, should have raised red flags.

1. It is important to note that President Carter never personally profited from his relationship with either Abedi or BCCI.
2. S. Hrg. 102-350. Pt.3, p.16.
3. "Saudi to Acquire Lance Stock," by John Berry and Art Harris, The Washington Post, December 21, 1977.
4. S. Hrg. 102-350, pt. 3, p.5.
5. "Arab Investors Want Lance to Manage Funds," by Art Harris and John Berry, The Washington Post, December 18, 1977. p.A1.
6. Id. In 1979 the Justice Department brought a civil suit against Holly and an associate in 1979 claiming that they had sought to bribe an official of Quatar with a $1.5 million cash payment in order to get renewal of oil concessions that were worth millions of dollars. The department also said that Lance was instrumental in arranging the meeting between the businessmen and a State Department official in 1978, after he had left government, that were intended to pave the way for a bribe offer to an official of Qatar. Holly entered a consent order in which he agreed no to bribe officials in the officials. The Associated Press, by James Rubin, April 9, 1979.
7. Id.
8. Id.
9. Id. p.6.
10. Id.
11. Id. p.7
12. Id. p.7
13. "Is Bert Lance Back," By Gretchen Morgenson, Forbes Magazine, june 13, 1988, p.12.
14. Id. p.17.
15. S. Hrg. 102-350. pt.3, p.8.
16. "SEC Charges Lance," by John F. Berry and Jerry Knight, The Washington Post, March 18, 1978, p. A1.
17. Lance Sells Stock, by Michael Doan, Associated Press, December 20, 1977.

REENTERED AS EXHIBIT 3

18. Id. p. 11.
19. Berry and Harris, Id. p.3.
20. Lance Stock Sale, by Robert Furlow, The Associated Press, December 27, 1977.
21. Id.
22. S. Hrg. 102-350, Pt. 3, p.11.
23. Id. p.12.
24. Id. p.13.
25. Id. p.16.
26. Id. p.15.
27. Id. p.37
28. "$3.5 Million Lance Loan An Issue In Takeover Suit," by Jerry Knight and John F. Berry, The Washington Post, March 23, 1978.
29. Id. p.20.
30. "Lance Tied to Bank's Takeover," By John Berry, The Washington Post, February 12, 1978.
31. By Michael Sniffen, The Associated Press, March 27, 1978.
32. Id. p.28.
33. see Sami memo, Id. p.25.
34. Id. p.28.
35. Id. p.19.
36. Id. p. 33.
37. Id. p.34.
38. Id. p.34.
39. Id.
40. Id. p.40
41. Id. p.43.
42. Memorandum, Application to Strike from Listing and Registration, "In the matter of Maxpharma, February 8, 1989, The American Stock Exchange.
43. Letter from Subcommittee source, August 14, 1991.
44. On April 18, 1984, Presad wrote to Marvin Klapp, the southeast regional chief for the SBA, and thanked him for his assistance. He also wrote:
I should also like to take this opportunity to apologize for any inconvenience caused as a result of Congressman Walter Jones, Sr. calling on our behalf. He may have been over zealous in his attempt to help us since he feels that as a minority owned SBIC we required extra help and guidance.
45. memorandum from Assistant Inspector general for Audit to the Associate Administrator for Finance and Investment, US Small Business Administration, March 8, 1988, p5-6.
46. Morgenson, p.12.
47. "The President's Saudi Windmill," by Jack Anderson, The Washington Post, July 29, 1980.
48. Id.
49. Id.
50. S. Hrg. 102-350, Pt.3, p.38.
51. "Jimmy Carter's Relationship With BCCI," ABC News Nightline, show #2664, August 8, 1991.
52. Id. p.38.
53. Fritz, p.1.
54. Id.
55. "BCCI Adept at Courting the Powerful and Rich," by Stuart Auerbach, The Washington Post, August 7, 1991, p.A1.
56. According to U.S. News and World Report, "Most of the Abedi money -- representing less than 3 percent of the 350 million the nonprofit Carter center has raised since its founding in 1982 -- went for eradication of Guinea worm disease, an intestinal disorder affecting millions in Asia and Africa." se "the Atlanta Connection," by Gloria Borger and Matthew Cooper, August 12, 1991, p.30.

57. "Carter Travels to Sudan to visit Grain Experiments," by Carolyn S. Carlson, the Associated Press, October 26, 1986

58. Carter also travelled to Ghana and Nigeria with Abedi where he attended conferences on eradication of Guinea worm disease. see "Nigeria:New Efforts to Eliminate Guinea Worm Disease," Inter Press Service, March 14, 1988.

59. The Los Angeles Times reported, "On June 21, 1987, former President Jimmy Carter was the star attraction at a ceremony dedicating a rehabilitation center for former prostitutes near Bangkok. By his side was Aga Hasan Abedi..." "How the BCCI Gained Friends in High Places," by Sarah Fritz, the Los Angeles Times, July 28, 1991, p.1.

Ironically, Nazir Chinoy testified that BCCI provided prostitutes to its best customers in the Middle East.

60. Nightline, Id.

61. Fritz, p.1. The article indicates that Abedi was excluded during these meetings.

62. Id.

63. Pharaon acquired 20% of Centrust in 1987.

64. Fritz, p.1.

65. Id.

66. "Carter Donors: Questionable Givers?" by Elizabeth Kurylo, The Atlanta Constitution, April 14, 1991, p.1.

67. Atlanta Constitution, August 26, 1992, "Former Carter Center chief indicted in fraud."

68. "Young Disturbed by Charges Against BCCI," by Elizabeth Kurylo, The Atlanta Constitution, July 20, 1991, p.1.

69. Id.

70. Id.

71. NBG Loan Review Memorandum, Andrew Young Associates, 10/17/83.

72. Id.

73. NBG Loan Review Document, p.2.

74. "Seized Bank Helped Atlanta's Ex-Mayor and Carter Charities," by Ronald Smothers, The New York Times, July 15, 1992, p.1.

75. In a memorandum, dated March 25, 1988, from SM Shafi, BCCI LACRO to Akbar Bilgrami, BCCI Panama, Shafi writes, "We have been advised that Mr. Andrew Young will repay the loan of the company by December 31, 1988."

76. letter to Bande Hasan from Asif Mujtaba, October 10, 1989.

77. Smothers, p.1.

78. letter from Tariq Jamil to S.M. Shafi, February 24, 1988.

79. memorandum from S.M. Shafi to Ameer Siddiki, BCCI London, May 1(3?)m 1987. p.1.

80. Id.

81. letter from Tariq Jamil, BCCI London to S.M. Shafi, BCCI, LACRO, September 18, 1987

82. letter from Stony Cooks to Tariq Jamil, BCCI London, July 15, 1987.

83. National bank of Georgia, Loan Memorandum, Andrew Young Associates Inc., 8/9/84.

84. staff telephone interview with R.P. Carlson, July 10, 1991.

85. "Hatch Adds Partisan Spice to BCCI Stew," by Edward T. Pound, The Wall Street Journal, August 6, 1991, p.A8.

# BCCI'S LAWYERS AND LOBBYISTS

In hiring lawyers and lobbyists in the United States to help it deal with its problems, BCCI did not think small. BCCI's cadre of professional help in Washington, D.C. alone included, at various times a former Secretary of Defense (Clark Clifford), former Senators and Congressmen (John Culver and Michael Barnes), former federal prosecutors (Raymond Banoun, Lawrence Barcella and Lawrence Wechsler), and former Federal Reserve attorneys (Baldwin Tuttle and Jerry Hawke).

Still other prominent figures were recruited for BCCI's secretly-held American subsidiary, First American, such as former Senator and Democratic presidential candidate Stuart Symington and former Republican Senator from Maryland Charles Mac Mathias, who each sat on First American's board of director.

Other firms consisting of important former officials -- such as Kissinger Associates, then home to former Secretary of State Henry Kissinger, current Under Secretary of State Lawrence Eagleburger and current National Security Advisor Brent Scowcroft -- were recruited by BCCI, but refused to accept BCCI's business following its indictment on drug money laundering charges.

The revolving door between government and the private sector made it possible for BCCI to retain former government officials with intimate knowledge of how the U.S. government operates to aid BCCI's agenda. Ironically, BCCI used these former officials against the agencies they once served as instruments of its violations of U.S. laws and its attempts to slow or stop investigations of its wrongdoing.

REENTERED AS EXHIBIT 3

Much of the activity of BCCI's lawyers in the United States was normal representation, often extremely aggressive, but within the borders of the kind of work the firms involved did for other clients. At other times, however, lawyers for BCCI participated in decisions to hire private investigators to investigate the private lives of government investigators pursuing BCCI; sought to use "political chits" to shut down Congressional investigations of BCCI; threatened publications considering publishing articles about BCCI with libel suits; and refused to refer BCCI foreign branches to federal law enforcement when BCCI's own employees in the U.S. believed such referrals were legally required because of the degree of the branch's involvement in money laundering.

The most aggressive activity by BCC's lawyers and lobbyists took place at the beginning and at the end of BCCI's

Two periods of activity by BCCI's lawyers in the U.S. illustrate how BCCI accomplished illegal or improper objectives were:

** Assisting BCCI and its nominees in restructuring the takeover attempt of Financial General Bankshares after the initial attempt was stopped by the Securities and Exchanges Commission (SEC), on the ground that BCCI had secretly colluded with other shareholders by purchasing 4.9% of the FGB stock each to evade securities laws requiring the reporting of their purchases at 5% or more. Among the key attorneys involved in the restructuring of the BCCI takeover were Clifford, Altman, and former Federal Reserve lawyer Baldwin Tuttle. (1978-1981)

** Structuring the purchase of National Bank of Georgia by First American from BCCI's nominee, Ghaith Pharoan. (1985-1986)

Response to Senate

Joint Defense Agreement

**BCCI's Lawyers and Lobbyists**

In hiring lawyers and lobbyists in the United States to help it deal with its problems vis a vis the government, BCCI pursued a strategy that it had practiced successfully around the world: the hiring of former government officials.

BCCI's cadre of professional help in Washington D.C. included, at various times, a former Secretary of Defense (Clark Clifford), former Senators and Congressmen (John Culver, Mike Barnes), and former federal prosecutors (Larry Wechsler, Raymond Banoun, and Larry Barcella), and former Federal Reserve Attorneys (Baldwin Tuttle, Jerry Hawke, and Michael Bradfield). Their involvement in representing BCCI, following their government employment, illustrates the perils of the revolving door, and the danger of former government officials using the expertise they gained in government at the service of private clients. Often, such former officials have no idea of the real agenda or problems their clients may be hiding. And yet their actions can, and in the case of BCCI, did, substantially impede the ability of government to do its work.

Apart from Clifford and Tuttle, this team was brou

REENTERED AS EXHIBIT 3

ght in only after BCCI's indictment on drug money laundering charges in October 1988. Since the indictment, at various times, these former officials were used by BCCI to stall investigations, prevent the bank from being closed by regulators, and to stop legislation that would have mandated BCCI's closure.

Some of the questionable tactics employed by BCCI's team of former government officials included:

** Investigating government agents.

** Working outside the normal law enforcement channels to keep the bank open in Florida.

** Lobbying Senators as registered foreign agents in pursuit of their criminal defense work, in order to stop BCCI from being closed.

** Delaying and impeding an authorized U.S. Senate investigation of the bank.

** Refusing to refer BCCI customers and accounts for criminal investigation even after being advised by BCCI's own offiers that the customers and the accounts raised serious questions.

** In the case of Clifford and Altman, using the attorney work product and attorney client privileges as shields to protect their own potential cupability.

Larry Barcella

Larry Barcella is a former Assistant US Attorney who gained national prominence for his successful prosecution of Edwin Wilson, the American convicted of selling secrets to Lybia. Barcella was brought onto the BCCI case shortly after the October 1988 indictment of BCCI in Tampa, Florida. Larry Wechsler, with whom Barcella had practiced law in the US Justice Department recruited him to coordinate the bank's defense.

Although the full extent of Barcella's activities on behalf of BCCI remains unknown, he did engage in the following:

-- In 1988 Barcella tried to persuade his firm's lead partner, former US Senator Paul Laxalt, meet with Swaleh Naqvi, BCCI's CEO, in London, and to engage in lobbying on behalf of the bank on Capitol Hill. The Subcommittee has been unable to determine what, if any, services Senator Laxalt performed on behalf of BCCI.

-- In 1989 and 1990 Barcella joined John Vardaman, a partner at Williams and Conolly and Robert Altman in warning Larry Gurwin, a freelance journalist writing an article about BCCI and First American Bank for Regardie's magazine, that it would be improper to write anything that linked the two institutions. Barcella has called Gurwin's allegations "absurd".[1]

- In early 1990, after BCCI pleaded guilty to money laundering charges in Tampa, Florida, several members of the US Congress criticized the plea bargain as to lenient on the bank. Documents obtained by the Subcommittee show that Barcella met with Senator Dennis Deconcini, one of the critics of the plea bargain, in an effort to persuade him that BCCI was not the corrupt institution that he and others had claimed.

REENTERED AS EXHIBIT 3

Most recently, of course, Barcella has been hired by the House Foreign Affairs Committee to investigate the "October Surprise", the allegations surrounding a political deal for release of the US hostages held in Iran in 1980. On leave from the Justice Department to assist Barcella in his investigation is Greg Kehoe -- the Justice Department official with whom BCCi lawyers, including Barcella, negotiated the bank's plea agreement in Tampa.

Ray Banoun

Raymond Banoun is also a former federal prosecutor who was brought into the BCCI case by Robert Altman to assist in the bank's defense. At the time Banoun was with the law of Arent Fox; he is currently the head of the white collar criminal defense team in the Washington office of Caldawater, Wickersham and Taft.

Aside from Altman, the lawyer who had the most contact with the Subcommittee concerning BCCI was Banoun. In reviewing the record, the Subcommittee has concluded that Banoun may have acted unethically by willfully misleading it in an attempt to impede the investigation.

Banoun was initially charged by Altman to oversee the production of documents respondent to the series of subpoenas issued by the Subcommittee to BCCI in the summer of 1988. Among the documents under subpoena were all records relating to General Noriega's accounts in the United States. While the Subcommittee did receive some information from BCCI, it was clearly incomplete and Senator Kerry has stated publicly on several occasions that he does not believe the Subcommittee received full cooperation. In response, Banoun has made the following extraordinary comments to the press:

-- Banoun told Newsweek that he fully cooperated with the Subcommittee, but that "lawyers don't go around searching for documents for clients."[2]

-- Banoun told the National Journal that the Subcommittee had been "outlawyered." He added that "We don't allow our clients to get pushed around. This is an adversary system, not a roll-over system." [3]

-- Banoun also complained to the Legal Times that "more and more these days the government [is] wanting information obtained under the attorney-client privilege and attorney work product." Banoun stated,"It's an unfortunate and frightening sign because it erodes very seriously the ability of a lawyer to represent a client." BCCI, of course, waived it attorney client privilege.[4]

Taken together these comments suggest that Banoun's approach to the subpoenas was to advise BCCI to turn over all relevant documents, but to take no steps to ascertain whether, indeed, that had been accomplished.

The Subcommittee is also disturbed by a memo written by Roma Theus, a partner in the Florida law firm of Holland Knight, which states that Altman and Banoun "were doing everything within their power to call in political markers."[5] Banoun has called the author of the memo a misinformed "fruitcake."[6] But Theus, a highly respected lawyer, told the Subcommittee that his information came from private investigator Phillip Manuel, who had

REENTERED AS EXHIBIT 3

worked for Banoun's colleague, Larry Barcella. Manuel told the Subcommittee he had no idea why Theus would write such a thing and that his only information about the Subcommittee's investigation came from "journalists with who he played poker."

In the fall of 1988 Banoun was also charged with reviewing all the accounts for BCCI in Florida to determine whether criminal referrals should be made. The Subcommittee has obtained documents that suggest that despite evidence of criminal activity produced by the manager of one of BCCI Florida offices (one of BCCI's few honest officers) Banoun made no criminal referrals.

Larry Wechsler

Larry Wechsler is a former government prosecutor in the Washington D.C. US Attorney's office who now practices with the Washington D.C. firm of Janis, Shuelke and Wechsler. Wechsler previously represented Albert Hakim in the Iran Contra affair and was brought in by his close friend Robert Altman to put together a legal defense team for BCCI in Florida. Wechsler recruited Barcella and bevy of other top lawyers.

Wechsler has refused to meet with Subcommittee staff, but documents show that he and Banoun lobbied the US Senate on behalf of BCCI.

**The Congressmen**

Many who serve in Congress come to public service from other professions, frequently the legal profession. So it is natural that once out of office, those with law degreees return to the practice of law.

While former public servants are entitled to pursue careers once they return to private life, all too often they remain in Washington and pursue legal careers that entail lobbying. Again, while there is nothing improper as long as ethical rules are followed, the BCCI case points out how easily it is for former lawmakers to have their reputations, and therefore the reputation of the government they served, tarnished by representation of unsavory clients.

The Subcommittee has no solution to this sticky problem, except to note that those who develop influence within the Congress, need be cautious in the exercise of that influence at all times, but especially when they leave the Congress.

Senator Culver

John Culver, a former US Senator, was another partner at the law firm of Arent Fox who did work on behalf of BCCI. While Culver's involvement was relatively limited, he did contact the Subcommittee in the winter of 1989 in an attempt to gain an advance copy of the Subcommittee's report on narcotics trafficking, which included references to BCCI. He also lobbied the Subcommittee with Banoun, Weschler and Altman, assuring Subcommittee staff that the bank was fully cooperating, and that, save events in Florida, a sound and honorable institution.

Senator Mathias

Senator Mathias became a director of First American holding company after leaving the Senate in 1986. Mathias also became chairman of the board of directors audit committee.

On August 2, 1991, mathias wrote to lark Clifford and urged him and Robert Altman to resign. According to the Wall Street Journal, Mathias told Clifford, "In recent weeks, there has been a worrisome outflow of deposits which continues to this day." He added, "you and Bob are perceived as the link between BCCI ...and First American."[7]

Michael Barnes

Barnes, a former US Congressman from Maryland, is a partner in the Washington D.C. law firm of Arent Fox. In the spring of 1990, Barnes was called in by his colleague Ray Banoun, who was concerned about the impact of a pending article on First American bank by freelance journalist, Larry Gurwin for Regardies Magazine. Barnes called William A. Regardies to complain about the article. Regardies published Gurwin's work anyway.

**The Fed officials**

The Federal Reserve is a quasi independent government insitution which has enormous power in setting the economic agenda for the country. Because of its unique status, it is somewhat insulated form direct accountbility to the legislative and executive branches of government. While government ethics laws apply to the Fed in a similar fashion as to other government agencies, the BCCI case suggests the Fed has become too much of a club where former employees are able to lobby current employees on critical banking issues.

Baldwin Tuttle

Balwdin Tuttle served as the deputy general counsel at the Federal Reserve during the mid-1970's. After leaving the Federal Reserve Tuttle moved to private practice where he became the outside counsel to Clifford and Altman for their BCCI related work. He is currently a resident partner in the Washington D.C. office of Milbank, Tweed, Hadley and McCloy.

Tuttle represented the middle eastern investors along with Clifford and Altman at the 1981 Federal Reserve hearing on the takeover of Financial General Bankshares. That hearing was chaired by Robert E. Manion, now at the law firm of Arnold and Porter. Manion had been one of Tuttle's former subordinates and replaced Tuttle when he left as the Fed's deputy general counsel.

Besides Manion, Tuttle knew Jack Ryan, the director of the division of banking supervision and regulation. Tuttle fielded most of the tough questions at the hearing and it is clear that his representation impressed his former colleagues at the Federal Reserve.

Tuttle also filed the investors application to the Federal Reserve. In that application, he represented that BCCI "neither is it a lender, nor will it be" to First American's Middle-eastern purchasers. That, of course, has been shown to have been completely untrue.

Tuttle provided legal advice to BCCI and the Middle-Eastern investors throughout the 1980's. The Federal Reserve, in its civil complaint against Clifford and Altman, noted Tuttle's involvement in the NBG takeover in 1986. In a "brief and hostile" meeting, Altman castigated

Tuttle for questioning the proprietary of the takeover and warned him that he if he ever raised the issue again, he would be fired. Apparently Tuttle heeded Altman's advice, and never made his concerns known to bank regulators.

Jerry Hawke

Jerry Hawke, a former general counsel to the Federal Reserve, is currently a partner with the Washington D.C. law firm of Arnold and Porter where he specializes in banking law.

Hawke was hired by First American Bank to lobby the federal reserve against the creation of a trust for the bank to facilitate its sale. Apparently, the management at First American Bank believed that they and not an independent trustee should handle the sale. As the Washington Post reported, "That means Virgil Mattingly, general counsel at the Fed who is personally handling the trust issue, is being lobbied by the man he once worked for."[8]

Michael Bradfield

Michael Bradfield, a former counsel at the Federal Reserve, is with the law firm of Jones, Day, Reavis and Pogue in their Washington D.C. office. During the 1980's Bradfield responsibilities at the Federal Reserve included monitoring First American bank. In 1989 he became a partner in Jones, Day where he does work for First American pertaining to BCCI's interest in the bank holding company. His firm has also done work for the bank's oversight committee.

1. Clark Clifford and a Legal Armada Gave BCCI a Patina of respectability," by Jill Abramson, the Wall Street Journal, August 1, 1991. Also, BCCI's British solicitors wrote Gurwin about an article he did for the Economist. British solicitors threatened to sue and based their charges on information they had received from the Washington lawyers who had spoken to Gurwin. At this point Gurwin had only spoken to Wechsler and Barcella.
2. "The Influence Game," Newsweek, August 26, 1991, p.20.
3. "BCCI's Washington Web," by Paul Starobin, The National Journal, 9/7/91, p.2131.
4. "Top Lawyers are Subpoenaed in BCCI Probe," by Linda Himelstein, The Legal Times, April 27, 1992, p.1.
5. Memo to the files, Roma Theus, August, 1990.
6. Starobin, p.2131.
7. "Revolving Door between Fed and First American," by Peter Truell, The Wall Street Journal, September 6, 1991, p.A10.
8. "First American: Drop Trustee Idea," by Sharon Walsh, the Washington Post, April 14, 1992, p.D1.

# HILL AND KNOWLTON AND BCCI'S PR CAMPAIGN

REENTERED AS EXHIBIT 3

## Introduction

Two days following its indictment in Tampa in October, 1988 as a result of the Operation C-Chase sting, BCCI did what many businesses in trouble do under such circumstances -- it hired a public relations firm to help it reduce the bad publicity surrounding the indictment. The firm selected by BCCI was, consistent with BCCI's usual strategy, unusually well-connected politically: Hill and Knowlton, home to Republican Robert Gray and Democrat Frank Mankiewicz, and generally considered the most politically prominent public relations firm in Washington.[1] During the following two years, Hill and Knowlton provided various services to BCCI and to its secretly-held affiliate, First American.[2]

On August 1, 1991, former Customs Service Commissioner William von Raab, in testimony before the Subcommittee, criticized the public relations firm, implicating its activities as a factor in BCCI's success in staying open following its indictment, and suggesting that the January, 1990 plea agreement between BCCI and the U.S. Attorney in Tampa was "a tribute to the influence team that was marching up and down the Eastern seaboard helping BCCI keep its neck off the block."[3]

In response to the Von Raab testimony, Hill and Knowlton's Vice Chairman, Frank Mankiewicz, immediately issued the following statement on the PR Newswire, which is set forth in full:

Mr. Von Raab's testimony as to Hill and Knowlton is incredibly irresponsible and totally false. Neither I, nor Robert Gray, nor anyone else from Hill and Knowlton ever contacted, on behalf of BCCI, anyone in the Department of Justice or anywhere else in the Executive Branch, or for that matter, on Capitol Hill.[4]

The import of Hill and Knowlton's release was that whatever it did for BCCI, its work had not involved lobbying.

But Mankiewicz's strong statements concerning what Hill and Knowlton did not do for BCCI failed to explain exactly what Hill and Knowlton did do.

In fact, Hill and Knowlton had represented BCCI at a critical time in its history, following the Tampa drug-money laundering indictment.[5] Moreover, according to statements made by former Hill and Knowlton partners to the press, Hill and Knowlton partners did know BCCI was "sleazy," and at least one partner did leave the firm in part as a result of disagreements over the BCCI account.[6]

Moreover, Hill and Knowlton did have contact with Capitol Hill on behalf of First American, Clark Clifford and Robert Altman, on BCCI related matters, in the period when BCCI still secretly-held First American, and after BCCI's ownership of First American was a matter of public record and established fact.[7]

Finally, Hill and Knowlton did have contact with at least one Congressional staffer, Michael Pillsbury, on behalf of BCCI itself, in January, 1990. At that time, Senate staffer Pillsbury wrote Karna Small at Hill and Knowlton, soliciting information from Hill and Knowlton

REENTERED AS EXHIBIT 3

concerning what it was doing for BCCI, and offering to be of assistance to BCCI in its public relations efforts.

Small's involvement provides further evidence of the fact that Hill and Knowlton assigned politically-connected staff to the BCCI account. Small's previous work had included being assistant press secretary to James Brady under President Reagan, press spokesperson for National Security Advisor Robert McFarlane, and an assistant to the National Security Counsel during the period in which McFarlane and Admiral John Poindexter were in charge of the NSC.[8]

The record before the Subcommittee suggests that the contact between Small at Hill and Knowlton and Capitol Hill was initiated by Pillsbury, rather than Small or Hill and Knowlton. Hence, Mankiewicz's statement was technically correct, if incomplete, on this point.[9]

Hill and Knowlton's activities on behalf of BCCI, First American, Clifford and Altman resulted in Hill and Knowlton making statements that in the end proved to be materially misleading, and attacking individuals who were making accurate, but damaging statements about their clients. While there is no evidence that any Hill and Knowlton partner knew that the information it was disseminating was false, BCCI's use of Hill and Knowlton raises questions about the role of public relations firms in our political system.

When a public relations firm disseminates information, does it have any independent responsibility to the public to make sure that the information disseminated is accurate?

Are there other issues of public policy at stake when a public relations firm that is politically well-connected, on behalf of a client who has been indicted for illegal acts, disseminates materials attacking and discrediting people who are making accurate statements? Is corrective industry or legislative action warranted?

**Findings**

** Hill and Knowlton partners knew of BCCI's reputation as a "sleazy" bank at the time it accepted the account in October, 1988. Some of this information came from then Commissioner of Customs William von Raab, in response to questions from a friend who was a partner at Hill and Knowlton.

** Hill and Knowlton made contacts with Capitol Hill on behalf of First American, and BCCI's lawyers, Clark Clifford and Robert Altman, on issues pertaining to BCCI. Materials prepared in part by Hill and Knowlton and provided to Capitol Hill were provided to federal bank regulators in the spring of 1990 in an effort to discourage those regulators from crediting allegations in the media that BCCI secretly owned First American.

** In 1988 and 1989, Hill and Knowlton assisted BCCI with an aggressive public relations campaign designed to demonstrate that BCCI was not a criminal enterprise, and to put the best face possible on the Tampa drug money laundering indictments. In so doing, it disseminated materials discrediting persons and publications whose statements were later proved accurate about BCCI's criminality.

REENTERED AS EXHIBIT 3

** Important information provided by Hill and Knowlton to Capitol Hill and provided by First American to regulators concerning the relationship between BCCI and First American in April, 1990 proved to be incorrect. The misleading material represented the position of BCCI, First American, Clifford and Altman concerning the relationship, and was contrary to facts known by BCCI, Clifford and Altman. There is no evidence that Hill and Knowlton partners knew the information to be inaccurate, or reason to believe that their clients' account was correct.

**Retention and Initial Services to BCCI of Hill and Knowlton**

On October 10, 1988, BCCI was indicted in Tampa on drug money laundering, sparking an immediate need by BCCI to respond by every means possible. As Abdur Sakhia, one of BCCI's senior officers in the United States, recommended Hill and Knowlton.

I started the Hill and Knowlton connection. The day we were indicted we were inundated by everyone. I said we have to tell our side of the story. I am not capable of telling it. You need to have a PR firm to handle this. To me, BCCI's problems here were like Johnson and Johnson's Tylenol crisis, or the indictment of Drexel for insider trading.[10]

Hill and Knowlton had been purchased by a London advertising and public relations conglomerate, the WPP group and now had offices in London. A British BCCI director, John Hilbery, who lived in London, had contacts there, and BCCI's main offices in London hired the firm, at a rate of $50,000 per month.

At the outset of the retention of Hill and Knowlton by BCCI, some Hill and Knowlton partners in Washington expressed concern about the account.

As former Commissioner Von Raab testified:

I was in my office when a friend of mine from Hill & Knowlton came to me and he said, Willie, he said, BCCI wants to hire Hill & Knowlton and they want me to work on it.

And he said, what should I do? And I said, don't work on it, it is a sleazy operation. Well, the result was, Bob Gray and Frank Mankiewicz worked on it. My friend left Hill & Knowlton. (11)

Before the month of October was over, Hill and Knowlton had deployed a team of six of its public relations professionals in New York, Tampa, and Washington, D.C., as well as 16 additional Hill and Knowlton staff in ten other countries. The firm's initial work included such standard public relations tasks as handling BCCI's press strategy, developing various BCCI officials as press spokesmen, creating a public relations history of BCCI and a public relations position paper to be used to rebut the Florida indictments, and developing a recommended advertising campaign for BCCI in major newspapers around the world.[12]

Hill and Knowlton documents found by the Subcommittee at BCCI's document repository in Florida describe this work in some detail.

A document evidently generated by Hill and Knowlton in London in October, 1988, entitled, "BCCI Worldwide Action Program," carried recommendations for generating positive press for BCCI through interviews between BCCI officials trained by Hill and Knowlton on what to say with influential journalists such as Lou Dobbs at CNN, Louis Rukeyser at PBS, and James Stewart of the Wall Street Journal.

A second Hill and Knowlton document dated October 27, 1988, described as "Background on the Tampa Indictments And BCC Position on Compliance," described the approach to be taken by BCCI officers in these interviews:

Management of BCCI was surprised and shocked to learn in news reports that the bank and nine of its employees had been indicted in Tampa, Florida on charges of laundering drug money. The bank had no warning that it or any of its people were under investigation, nor is its management aware that any employee anywhere had violated long-standing bank policies to do business in a manner fully consistent with the laws and regulations of every jurisdiction in which it operates.

The specific facts of the charges are not known to BCCI at this time; the bank has, however, reaffirmed its commitment to legal integrity and pledged to cooperate with all legal authorities in the resolution of these troubling developments. BCC has taken the further step of launching an extensive internal review under the direction of a special committee of outside directors to review the allegations.[13]

Senior BCCI officials to whom the document was being distributed knew at the time that many of these statements were inaccurate. Even mid-level BCCI officials knew that some of these statements were inaccurate. For example, according to BCCI officers such as Amjad Awan and Akbar Bilgrami, both convicted of money laundering, BCCI had never, even on paper, created a package of "long-standing bank policies" against committing any kind of criminal act, let again directed against laundering money.[14]

Creating an anti money-laundering policy after the fact was one of the urgent tasks management was about to engage in as part of BCCI's damage control operation. BCCI official Akbar Bilgrami was in this period told to write a memorandum concerning a meeting which he had not attended in which BCCI had supposedly reiterated its policies against money laundering with BCCI's banking staff in Miami. According to Bilgrami, he declined the request to write the memorandum for two reasons. First, its substance was misleading. Second, he felt ridiculous trying to write an account of an event at which he was not even present.[15] Bilgrami made clear his understanding that the notion that BCCI had an anti-money laundering policy in place prior to his indictment was absurd.[16]

The backgrounder on BCCI prepared by Hill and Knowlton at the time for use with the press stressed BCCI's total institutional commitment to conservative and ethical practices:

BCC draws upon Eastern traditions of trust, confidentiality, hospitality and cordiality in business dealings. The bank has an unusually egalitarian management structure with many functional, as opposed to ceremonial, titles for managers . . .It stresses conservativism,

REENTERED AS EXHIBIT 3

prudence and liquidity in its deposit taking and lending activities. . . Although it has never publicized the fact, BCC is a major participating in recognized charitable and philanthropic programs around the world . . . The BCC Group as a matter of corporate policy adheres strictly to the rules and regulations of all countries in which it does business . . . Financial transactions of the bank are subject to four levels of review by regional auditors, by central auditors, external auditors (Price Waterhouse is the bank's outside audit firm) and by the auditors of various state banking authorities.[17]

The truth, of course, was at the time the words were written, BCCI's top officials had engaged in massive fraud for over a decade and was billions of dollars in the hole, and had survived, to date, through phony bookkeeping designed to hide practices that were neither conservative nor prudent. The material created by Hill and Knowlton was thus unrelated to the facts, and merely an articulated form of what BCCI wanted the world to believe.

On October 21, 1988, Hill and Knowlton released a press statement on BCCI's behalf stating that "BCCI has never knowingly violated the laws of any country," and "would not countenance any such violation or activity." At that time, BCCI had been cited for regulatory violations in numerous countries around the world, despite its practice -- well-known within BCCI -- of bribing public officials around the world in an effort to limit the number of citations for such violations.[18]

In November and December, 1988, Hill and Knowlton coordinated briefings of BCCI employees on how to handle themselves as press representatives, including "media training" classes, and a seminar by BCCI's lawyers to BCCI employees to discuss the implications of the Tampa indictments for the bank and for unindicted bank officials.

On December 8, 1988, Hill and Knowlton registered with the Justice Department as a foreign agent for BCCI in preparation for engaging in lobbying efforts on behalf of BCCI in Washington.

In December, 1988, the Subcommittee deposed a former BCCI official, Aziz Rehman, who testified under oath that BCCI had engaged in wrongdoing beyond the actions for which BCCI was indicted in Tampa. According to Rehman these included maintaining a "Nassau" branch of BCCI in Miami at a time that the bank did not have an office in Nassau, and which it was using to assist clients in tax evasion. According to Rehman, customers were able to make deposits in the Nassau branch in Miami which earned interest "outside" the United States, were not reported by BCCI to the IRS, and thus permitting the customer to evade paying taxes. Rehman's statements were later supported by two other BCCI officers, Akbar Bilgrami and Amjad Awan, in statements to the Subcommittee, as well as by BCCI records stored in Miami.

In a press release from Hill and Knowlton in New York, BCCI defended itself by attacking Rehman and calling his charges, which were accurate, wild lies. The December 22, 1988 press release, issued on Hill and Knowlton New York letterhead, with two Hill and Knowlton account executives listed as press contacts stated:

The allegations made about the Bank of Credit and Commerce International S.A. by Mr. Aziz Rehman before hearings of the U.S. Senate Subcommittee on Terrorism, Narcotics and International Communications [sic] in October, 1988 [sic] have absolutely no basis in fact.

Mr. Rehman was fired from BCCI in 1984. Whether this influenced his sworn Senate testimony in any way we do not know. At no time has BCCI operated any "fictitious" branches in the Bahamas or elsewhere. Nor has the Bank chartered aircraft to transport cash illegally.

Mr. Rehman's statements are fantastic and erroneous interpretations of routine and legitimate banking transactions.[19]

The activities described by Rehman were neither routine nor legitimate; his statements neither fantastic nor erroneous. Rehman's statements were even possibly verifiable at the time they were made. Numerous BCCI employees in Miami knew that Rehman was telling the truth, and that BCCI had maintained its Nassau books in Miami at a desk labelled "Nassau" opposite a desk that handled Miami's transactions. As BCCI officials interviewed by the Subcommittee acknowledged, the Nassau account of BCCI was for years nothing more than a separate set of books kept in BCCI's Miami office and labelled "Nassau."[20]

As these officials later told the Subcommittee in confirming Rehman's account, the Nassau branch of BCCI in Miami was used by BCCI clients for the purpose of shielding assets from U.S. taxation. The Nassau branch was established in Miami at a time when BCCI had no operation in Nassau -- even a post office box. Officers at the "Nassau" branch of BCCI sat across the table at BCCI's office in Miami from the "Miami" branch of BCCI in Miami, so that customers of BCCI could "shift" funds from the on-shore branch of BCCI to the off-shore branch. Moreover, since BCCI, as a foreign bank outside of the Federal Deposit Insurance Corporation (FDIC) system, could not accept deposits from U.S. citizens in the United States, its "Nassau" branch was used to allow U.S. citizens to make deposits "offshore."[21]

There is no indication in BCCI records that any independent fact-checking was done by the firm. Apart from blind acceptance of whatever BCCI told them, Hill and Knowlton also had no reason to believe that Rehman's statements were either true or false. The public relations firm did nothing more, and nothing less, then peddle BCCI's position without regard to the damage to the reputation of the person its client hired it to disparage.

## Attacking The Press

In May, 1990, Regardie's Magazine published a cover story concerning the relationship between BCCI and First American by financial journalist Larry Gurwin. The story was entitled, "Who Really Owns First American Bank?" It provided detailed information concerning that issue, suggesting that one very possible answer was BCCI. The article also contained a comprehensive and detailed history of BCCI's takeover of Financial General Bankshares, BCCI's previous run-ins with regulators and law enforcement, the role played in First American and in BCCI by Clark Clifford and Robert Altman, and questions concerning BCCI's shareholders. The Gurwin article in Regardie's made available in public significant material concerning these issues not previously known. As a consequence, it has been justifiably credited by many as substantially advancing knowledge of BCCI's activities in the United States, and helping prompt the investigative work that led to the unravelling of BCCI's ownership of First American.

When the Regardie's article appeared, on behalf of "First American," Hill and Knowlton created a "Fact Sheet" on the article which consisted of an attack on the story, the magazine

itself, and the reporter who wrote it. The "Fact Sheet" was not released generally to the press, but to specific persons who might have a special interest in whether the article was true -- people like the chairman of the Subcommittee, Senator Kerry, and the Comptroller of the Currency, Robert L. Clarke, each of whom received a seven page fact sheet rebutting the allegations in Regardies in late April, 1990. The "Fact Sheet" was provided to Senator Kerry by Mankiewicz, in his capacity as Vice Chairman of Hill and Knowlton.

The Hill and Knowlton "Fact Sheet" began with the following assessment of the Regardie's article:

The May 1990 issue of Regardie's magazine carries a cover story on First American Bankshares which is full of inaccuracies and outright falsehoods, utilizing a sensationalist approach to yesterday's news. It has been published with the clear intent of denigrating and injuring the company, its officers, and directors, and its shareholders. With glaring bias and distortion, Regardie's fails to report fairly the story of First American. . .[22]

According to the Hill and Knowlton release, the Regardie's article consisted of a:

rehash of stale allegations and charges . . . rejected by the Federal Reserve and other regulators . . . seeks to prove First American may somehow be controlled by the Bank of Credit and Commerce International (BCCI).[23]

Hill and Knowlton then made the following representations of fact concerning the relationship between BCCI and First American, which proved to be untrue:

** BCCI's management is not involved in any respect in the policy or affairs of First American, a point that is easily checked.

** BCCI has never owned any stock in First American.

** First American is not controlled by BCCI in any sense and all dealings between the two institutions (which have actually been quite limited) have been proper and on an arms-length basis.[24]

Again, Hill and Knowlton had no particular knowledge of the true state of affairs. It acted merely as a conduit for the position of its clients. That position, however, was misleading and false.

Hill and Knowlton then made the following representations of fact concerning the use of First American by General Manuel Noriega:

First American has never had any banking relationship of any kind with Manuel Noriega, nor has it ever knowingly handled any funds of Manuel Noriega . . . Nor is there any indication in First American's bank documents [that] any deposit contained funds belonging to Manuel Noriega.[25]

In fact, dozens of documents at First American's offices in Washington showed, quite clearly, the handling of Noriega assets by First American through the bank account maintained by

BCCI at First American in Washington. Thus, Hill and Knowlton's client, First American, or its officers, were again providing untrue information to the PR firm on this point, which the firm in turn was disseminating on First American's behalf.

The "Fact Sheet" distributed by Hill and Knowlton made similarly erroneous statements concerning the relationship between Clifford and Altman and BCCI.[26]

Once again, there is no evidence to demonstrate that Hill and Knowlton had conducted any independent investigation of the facts that they were distributing.

To the contrary, their presentation was identical with the position that was being taken then and to this day, by BCCI, Clifford and Altman concerning these issues. Untrue statements by BCCI, Clifford and Altman concerning these issues are among the central matters on which each has been indicted by law enforcement and cited by regulators.

Once again, Hill and Knowlton acted merely as a conduit for the version of events being promoted by their clients. Once again, the materials it disseminated contained numerous statements that proved to be false. Once again, its attacks -- this time on investigative reporter Larry Gurwin and on Regardie's magazine by Hill and Knowlton in its capacity as public relations firm for First American, Clifford and Altman -- served to discredit people who were telling the truth.

In May, 1991, Hill and Knowlton disseminated another memorandum pertaining to First American and BCCI. This memorandum was written in response to a May 5, 1991 article in the Washington Post concerning Clifford and Altman's purchase of stock in First American through secret lending from BCCI.

A cover page to the Memorandum written by Frank Mankiewicz stated the following:

I would like to stress a few points:

- The fundamental contention of the Washington Post story of May 5, indeed its lead sentence - is untrue, and worse, never supported in the article. The Post says regulators were told "that BCCI would have no financial relationship with First American and its senior management." No such statement was ever made. In fact, First American was free to have financial dealings with BCCI on an arms-length basis - as it did with many banks - and audits have confirmed that no impropriety occurred. As to financial dealings with senior management, I have no idea what representation or discussion the Post is talking about.

- These investments were not secretive ownership; rather, the Directors had full knowledge of both the purchases, and approved them. They were also encouraged by shareholders, and the ownership was timely reported to regulators, as required.

- The loan from BCCI was made with the advice of New York counsel . . . none, then or now, believes the loan contravened any commitment to the Federal Reserve . . .[27]

Mankiewicz then enclosed a memorandum, on Hill and Knowlton stationery, which further stated that "there was no reason at the time of these transactions for any one to consider the

3/4/24, Case 3:24-... Case 3:24-cv-00404-DJN-... Document 45-3... Filed 03/04/24... Page 457 of 540... Page 457 of 540... PageID: 1552

PageID: 5423

role played by BCCI [in lending funds to Clifford and Altman] to be remarkable or inappropriate."[28]

The positions taken, identical to those taken by Clifford and Altman, were at best, gross simplifications and distortions of the truth, as the public record at the time, available to Hill and Knowlton, demonstrated. Specific representations had indeed been made to the Office of the Comptroller of the Currency that BCCI would not be involved in any aspect of financing First American's ownership either at the time of the FGB takeover, or later. These representations were part of the record on which the Federal Reserve agreed to permit the takeover of First American by the group linked with BCCI. While Clifford and Altman's ownership of BCCI stock had been disclosed to and approved by First American directors, their loans from BCCI had not. While Clifford and Altman's ownership of BCCI stock had been disclosed to regulators, their loans from BCCI had not. Clifford and Altman's personal attorneys may not have believed the loans contravened any commitment to the Federal Reserve. But that has not been the position of the regulators themselves. Indeed, the Federal Reserve has formally charged Clifford and Altman with conflict of interest, breach of fiduciary duty, and other violations of their statutory responsibilities in connection with these very transactions. In fact, the Federal Reserve has viewed these transactions to be sufficiently improper to justify banning Clifford and Altman from banking for life.[29]

Again, there is no evidence to demonstrate that Hill and Knowlton had conducted any independent investigation of the facts that they were distributing. The firm acted as a conduit for a position, which contained numerous statements that proved to be misleading at best.

### Should Hill and Knowlton Have Known Better?

According to press accounts, some Hill and Knowlton executives from the beginning raised ethical questions concerning the firm's representation of BCCI and refused to work on the account -- suggesting that sufficient information had always been available to Hill and Knowlton to reject the account on the ground that BCCI had in fact engaged in sleazy practices, and that if Hill and Knowlton accepted BCCI's account, it might end up tarnished. [30]

According to an August 17, 1991 account in the National Journal, in October, 1988, Lawrence J. Brady, an ex-senior vice president in Hill and Knowlton's Washington office and two other Hill and Knowlton executives had told Mankiewicz in a conversation involving all four officials that BCCI was, to use Brady's word, a "sleazy" bank, after Brady discussed the possible representation with Von Raab. The National Journal article quoted another former Hill and Knowlton official as saying "the smell test was used, and [BCCI] did not seem to pass the muster."[31]

Regardless of such concerns, Hill and Knowlton kept the account for 18 months, and represented BCCI's secretly-held U.S. subsidiary, First American, another 15 months beyond that, until Clifford and Altman's resignation in August 1991.

What is the responsibility, if any, of a public relations firm to ensure that it does not assist clients in misleading the public, the Congress, or the Executive Branch, through the dissemination of false information?

REENTERED AS EXHIBIT 3

The baseline standard is one defined by the Code of Professional Standards of the Public Relations Society of America, which states that "a member shall adhere to the highest standards of accuracy and truth" and "shall not knowingly disseminate false or misleading information."

In the case of Hill and Knowlton, BCCI, and First American, there is no evidence that Hill and Knowlton executives actually knew that the specific information they were disseminating was false. But there were obvious warning signs present from the beginning that served as cautions to some Hill and Knowlton partners, who did not want the firm to keep the account because of these warnings. These warnings initially consisted of a lengthy number of press accounts detailing BCCI's past bad behavior; the various filings made with regulators by various parties in connection with the FGB litigation; the Operation C-Chase drug money laundering indictment in Tampa itself. In December, 1988, they also included the Aziz Rehman deposition before the Subcommittee; the information provided Hill and Knowlton executives who refused to work on the account by Customs Commissioner Von Raab and others. By 1990, they included serious allegations being raised by the press in 1990.

## Conclusion

Hill and Knowlton's representation of BCCI was not an unusual event. Institutions charged with wrongdoing hire public relations help all the time to ensure that their side of the story is told.

The result in the case of BCCI was that Hill and Knowlton ended up providing information to the Congress and to the press and public that was not merely misleading or distorted, but actually false. Hill and Knowlton assisted in discrediting people who were providing accurate information about the underlying situation, including a former BCCI officer, an investigative journalist and his publisher. Given Hill and Knowlton's close ties to both political parties, and its influence in Washington, this was especially unfortunate. Hill and Knowlton did not violate any laws. It may not have violated any of the standards of the public relations industry. But its actions raise questions concerning an apparent conflict in this case between the role played by Hill and Knowlton as BCCI's public relations firm, and the public interest.

As former Commissioner Von Raab testified concerning this issue:

So, it should not happen . . . [but] it happens all the time. It should not happen and maybe the BCCI case will be the example that will cause someone to change this influence peddling culture, to try to ask some reasonable questions of the integrity of the people that they are going to be representing.[32]

The public relations industry needs to consider whether additional internal standards may be appropriate to discourage the kind of representation provided BCCI by Hill and Knowlton. Such standards, could, at a minimum, require firms to conduct due diligence before agreeing to represent a client on any matter, backed up by the possibility of some form of sanction for gross violations of the standard.

**SENATOR BROWN'S VIEW:**

REENTERED AS EXHIBIT 3

Clearly, Hill and Knowlton's representation of BCCI during the Chairman's investigaiton increased the pressure to cease the Subcommittee's efforts to make public the bank's nefarious methods. As the report itself concedes, no laws were violated. No ethical standards were breached. Neither my office nor my staff were approached or lobbied by Hill and Knowlton on this subject, nor felt that Hill and Knowlton went beyond their ethical mandate as they presented BCCI's "side of the story" to the public. The experience of Senator Kerry and his staff was quite different. Our comments in this section are especially critical of Hill and Knowlton, and should be evaluated in light of these facts.

1. See lengthy descriptions of Hill and Knowlton's political contacts in The Power House, Robert Keith Gray and the Selling of Access and Influence in Washington, Susan B. Trento, St. Martin's Press, 1992. The book also contains interviews with former Hill and Knowlton executives concerning the discussions within Hill and Knowlton about the BCCI account.

2. Subcommittee documents on Hill and Knowlton stationery obtained from BCCI New York and BCCI Miami; letters and memoranda from Frank Mankiewicz to Senator Kerry on behalf of First American; See Hill and Knowlton's "BCCI Worldwide Action Program" memorandum, October, 1988.

3. S. Hrg. 102-350 PT. 1 p. 51.

4. Hill and Knowlton press release to PR Newswire, August 1, 1991, "To National and Business Editors."

5. Documents on Hill and Knowlton stationery concerning representation of BCCI, October-December, 1988; BCCI internal memoranda concerning Hill and Knowlton, October, 1988-January, 1990; BCCI lawyers notes produced by Raymond Banoun to Subcommittee on September 3, 1992 concerning Hill and Knowlton; correspondence, Michael Pillsbury to Hill and Knowlton, January, 1990.

6. See chapter on BCCI in The Power House, Trento, id.

7. See letter and memorandum from Frank Mankiewicz to Senator John Kerry, May 6, 1991.

8. Numerous press accounts chronicle Small's career. See e.g. UPI, October 15, 1985, Washington Post, November 5, 1985, and some 165 other citations in Nexis database prior to 1991.

9. Letter, Michael Pillsbury, on Senate stationery, to Karna Small, Hill and Knowlton, January 11, 1990, regarding Hill and Knowlton's media strategy for BCCI.

10. Staff interview, Abdur Sakhia, October 7, 1991.

11. Id. p. 52.

12. Neither Frank Mankiewicz nor Robert Gray were among the team of Hill and Knowlton professionals hired by BCCI in this period, nor do any documents in the possession of the Subcommittee show them to have worked on BCCI matters at all. Mankiewicz, however, along with others at Hill and Knowlton, did provide assistance to First American on the charges that it was secretly owned by BCCI, after the handling of the Hill and Knowlton retention by BCCI in the U.S. was switched from BCCI-London to Clifford and Altman in the spring of 1989.

13. Draft Appendix A to White Paper, October 27, 1988, Hill and Knowlton.

14. Staff interviews, July, 1992, Amjad Awan and Akbar Bilgrami. BCCI Miami documents provide ample evidence for the proposition that money laundering at BCCI was systematic, as do the various indictments of BCCI by federal and local U.S. law enforcement. See indictment, U.S. v. Awan, BCCI et al, Middle District of Florida, 1988, 88-330-Cr.-T-13(B), "BCCI . . . would and did formulate and implement a corporate strategy for increasing BCCI's deposits by encouraging placements of funds from whatever sources, specifically including "flight capital," "black market capital," and the proceeds of drug sales, in conscious disregard of the currency regulations, tax laws and anti-drug laws of the United States and of other nations. Paragraph 7.

15. Staff interview, Bilgrami, July 20-29, 1992.

16. Bilgrami, staff interviews, July 20-28, 1992.

17. October 26, 1988, Hill and Knowlton, "Background: The Bank of Credit and Commerce."

REENTERED AS EXHIBIT 3

18. Among the foreign countries which had cited BCCI for various infractions prior to Hill and Knowlton's representation of BCCI were France, Kenya, Nigeria, and Sudan, as reported in press accounts available to Hill and Knowlton on the Lexis database. See Reuters, November 11, 1987. As BCCI officer Abdur Sakhia testified before the Subcommittee, "BCCI officers were indicted and jailed in other countries, like Sudan, Kenya, India, and in each case there was a terror in the bank that, you know, this has happened, that has happened. And somehow then some deal would be struck. People would be freed, BCCI would start doing business all over again." S. Hrg. 102-350 Pt. 2.

19. News Release, Hill and Knowlton, For: Bank of Credit and Commerce International, December 22, 1988.

20. Staff interviews, Amjad Awan and Akbar Bilgrami, July, 1992.

21. Staff interviews, Akbar Bilgrami, July 20-28, 1992; see also staff interviews with Nazir Chinoy, March 9, 1992.

22. "FACT SHEET," Re: Regardie's Article, provided to Senator John Kerry on April 30, 1990 by Hill and Knowlton.

23. Id.

24. Id.

25. Id.

26. Id.

27. Memorandum, From Frank Mankiewicz, Hill and Knowlton, May 6, 1991.

28. Id.

29. Board of Governors of the Federal Reserve, Summary of Charges, In the matter of Clifford, July 29, 1992.

30. A lengthy treatment of this question is contained in The Power House by Susan Trento, id. The book describes meetings about BCCI by Hill and Knowlton executives who wanted the firm to reject the account as a consequence of its poor reputation, but were rebuffed by firm management.

31. National Journal, August 17, 1991, "BCCI Passed PR Firm's Smell Test."

32. S. Hrg. 102-350 Pt. 1 p. 52.

# ED ROGERS AND KAMAL ADHAM

## Introduction

In the view of the Subcommittee, the real story of Ed Rogers' involvement in the BCCI scandal has yet to be fully revealed. Rogers, a former White House Political Director, left his position at the White House in early August 1991 to start the political consulting firm of Rogers and Barbour in Washington D.C. By the end of August Rogers, who had only briefly practiced law, was offered a $600,000 contract with Kamal Adham.

Rogers was deposed by the Subcommittee in March 1992. His account of how he received the contract with Adham, who he consulted before accepting Adham as a client, and his relationship to Adham after withdrawing from the contract, are all called into question by his telephone logs, documents provided to the Subcommittee and interviews conducted by the Subcommittee.

## Initial Contacts

Rogers described to the Subcommittee the events leading up to his representation of Kamal Adham. According to Rogers, in mid-August after he left the White House, a friend of his, the General Manager at the Grand Hotel, Samir Darwisch, called him to tell him that "his friend Moussa Raphael was in town looking for lawyers and asked me if I would please come by the hotel and meet him."[1] Rogers stated that he knew Darwish from "being around the hotel and events at the hotel."[2] Rogers said while at the White House he went to the hotel "once every couple of weeks." He also explained that the Hotel's owner, Joe Yazbek, had been to the White House, to discuss "events in Lebanon" with then White House Chief of Staff, John Sununu. At some point Rogers learned that Moussa Raphael was the lawyer for the Mr. Yazbek's business interests.

Rogers says that when Darwish first called him he did not mention the name Kamal Adham, but Rogers was nonetheless sufficiently interested by Darwish's invitation that he met with Raphael that same night at the Grand Hotel. According to Rogers, Raphael "provided a general overview of what was doing here on behalf of the sheik, in order to organize the sheik's legal affairs." The general overview included "the problems that were relevant to the sheik, or First American, BCCI," and, testified Rogers, at some point Raphael "must have" identified Plato Cacheris as the criminal defense lawyer for Adham.[3] In his testimony Rogers did not indicate whether Raphael discussed the Sheik's financial affairs in the United States.

After meeting with Raphael, Rogers discussed the possibility of representing Adham with his partner, former political director of the Reagan White House, Haley Barbour. They decided, however, that before accepting the account, Rogers should get more information on Adham.

Rogers has provided at least three different accounts of whom he consulted before accepting the Adham account. In his letter to White House Counsel Boyden Gray on October 28, Rogers stated, "Prior to agreeing to represent Mr. Adham, I made inquiries about him among former government officials and people in the private sector who have had dealings in Saudi Arabia. Invariably those who knew or knew of Mr. Adham said he was a man of stature and prestige in the region and that he had the respect of Americans who had dealt with him in the past."[4]

On December 18, 1991, Rogers was contacted by Subcommittee staff concerning prospective testimony to the Subcommittee. During the conversation, Rogers indicated that he "checked out Adham with a guy who does business in the Middle East, checked him out with a widely respected former government official, and finally talked to two other former government officials." Rogers claimed that each of these contacts urged him to take the account, noting that with his experience he would not be getting offers from non-controversial entities like "Quaker Oats."[5]

In his deposition with the Subcommittee, Rogers indicated that he only contacted Sam Bamieh, a businessman and Sandra Charles, a mid-level former NSC and Defense Department staffer. Rogers explained the discrepancies in the following way: "Perhaps as I prepared that [his letter to Boyden Gray] I used those two people as plural, but I don't have any recollection of talking to other people."[6]

**Sam Bamieh**

Although there is some difference of opinion between Rogers and White House Counsel Boyden Gray as to exactly when in early August Rogers left the White House, Rogers' office phone logs at Rogers and Barbour indicate that on August 5th, he placed a phone call to Mr. Sam Bamieh at Intertrade Group in San Mateo, California. According to Mr. Gray, Rogers officially left the White House on August 6, the day after phone records show Rogers called Bamieh.

Sam Bamieh is someone whom Rogers has indicated that he spoke with concerning the advisability of taking on the Adham account. Bamieh is a well know Palestinian-American businessman with strong ties to the Republican party and to various individuals in the Middle East, including the Saudi Royal family. According to press reports, in the late 1970's Bamieh financed the trip of Ruth Carter Stapleton, President Carter's sister, to the Middle East. During the 1980's Bamieh testified on several occasions before the US Congress on issues related to the Middle East.[7]

According to Rogers he met Bamieh during the 1988 campaign because "he was a friend of Lee Atwater's who I worked for."[8] Rogers told subcommittee staff that while he was at the White House he spoke on the telephone to Bamieh on a regular basis, indicating "There was no pattern to it, but monthly."[9]

However, shortly after he left the White House, Rogers was in frequent contact in with Bamieh placing calls to him on August 5,13,14,15,16,26,28 and attending a party at his house in San Mateo, California on August 27 which Bamieh hosted for Adnan Khashoggi.

Rogers could not explain his frequent contact with Bamieh, other than to say that he and Bamieh were friends and "It would not be unusual for him to call."[10] Rogers did not say why he was calling Bamieh on such a regular basis. According to Bamieh, who was interviewed on the telephone by staff on two separate occasions, he wanted Rogers to come to work for him. But in his deposition, Rogers stated that he could not recall discussing possible representation of Bamieh and said that neither was he "soliciting business."

Rogers meeting with Khashoggi at a party hosted by Bamieh is of particular interest to the Subcommittee because of Khashoggi's ties in the Middle East, including reported business dealings with Adham, and his role in BCCI. Khashoggi had accounts with BCCI in France and used those accounts to move millions of dollars for financing US arms sales to Iran.

The Subcommittee learned of the Bamieh party for Khashoggi from Bamieh: Mr Rogers did not offer this information at his pre-deposition interview by Subcommittee staff. When asked under oath, Rogers told the Subcommittee that at Bamieh's party he only engaged in "social chit-chat" with Khashoggi and did not discuss Adham.[11] He described his conversation as "just a few polite moments -- a couple of minutes at the most."[12] Rogers testified that "there were several other people" at the party.[13] In fact, besides Rogers and his wife, Bamieh invited only a dozen people to meet Khashoggi.[14] Bamieh also contradicted Rogers when he told Subcommittee staff that Rogers did discuss Adham with Khashoggi. Moreover, Bamieh claims that when Rogers first called him to discuss Adham, Bamieh told him that representing Adham "would be a political mistake", but he promised to find out more about the Sheik. When asked with whom he checked, Bamieh said "Khashoggi."[15]

**Sandra Charles**

The other person with whom Rogers claims to have discussed Kamal Adham was Sandra Charles, a former staffer on the National Security Council who left the White House at approximately the same time Rogers did in order to work for the International Planing and Analysis Center, a consulting firm headed by Frank Carlucci, the former Deputy Director of the CIA and Secretary of Defense. Like Bamieh, Charles had a background in the Middle East. [16]

Charles checked her calendars and told the Subcommittee that she first talked to Rogers on August 26 when he indicated that he was being considered as one of a team of advisors to Sheik Kamal Adham. She told Subcommittee staff that Rogers identified Adham to her as a "former chief of Saudi intelligence."[17] (Rogers can not remember from whom or when he learned that Adham was a former chief of Saudi intelligence) Charles told Rogers that she didn't know much about Adham, but that she would try to gather information and report back to him. According to Charles, she then called "a Saudi diplomatic source at the embassy" who confirmed that Adham was a former head of Saudi intelligence, that he was related by marriage to the former king, and that he was a wealthy businessman. [18] Her source also told her that Adham had a very close relationship to Sadat and that he was man of great status in the Middle East.[19]

According to Rogers, he later asked Charles to set up a meeting for him with Frank Carlucci to discuss whether or not Mr. Carlucci's firm could act as "financial advisors" to Sheik Adham. The meeting took place on October 7, 1991 and, according to Rogers, Carlucci told him "[w]e don't manage finances. We don't manage people's money. We do things on a deal-by-deal basis."[20] That, testified Rogers, was the extent of the meeting.

**Rogers' Trips To the Middle East**

Rogers did not ultimately decide to accept the Adham account until he and Haley Barbour actually met with Adham. On August 31, the two political operatives flew to Jeddah where, according to Rogers, they had three days of meetings with the Sheik's legal and financial advisors. Although he had dinner with Adham one evening, Rogers implied to the Subcommittee that the trip was all work: he never discussed his friend Sam Bamieh or his acquaintance Adnan Khashoggi with the Sheik. According to Rogers, near the end of their three day stay, Adham made him an offer. In his deposition, Rogers explained why he believes he was hired:

Mr. Pilcher. [Office of Senator Brown] When you go to talk to somebody ....How do you sell yourself. What is it that you say about your firm that is interesting?

Mr. Rogers. That we are two lawyers. I am of counsel to a 120 person firm that provides a broad array of experience.

Mr. Pilcher. What do you consider your personal specialty? When you say broad array of experience, what expertise in particular o you have?

Mr. Rogers. Managing other people's affairs. Managing other people's problems, managing other people's business.

Mr. Pilcher. My mother-in-law is like that, but what do you mean exactly by it?

Mr. Rogers. When people present me with a problem, I like to think that they can turn their back on it. They can tell me what the problem is and they'll know that I'll know how to go about my business to organize their affairs and do things on their behalf.

Mr. Pilcher. When this particular case was brought to you, what specific problem did you see that you thought you might be able to solve?

Mr. Rogers. An organizational problem. A large business concern that needed a lot of different kinds of representation.

Mr. Pilcher. Meaning BCCI?

Mr. Rogers. Meaning Sheik Adham, not BCCI.

Rogers' counsel in the deposition explained to Subcommittee staff that "[i]t's hard for him to say what he was doing since it had a very short life."[21] Nevertheless, the Subcommittee finds it odd that Mr. Rogers who represented Sheik Adham for over two months and met with him

REENTERED AS EXHIBIT 3

and his advisors for several days at a time in the Middle East, could be so vague about his duties.

After Rogers returned to the United States, he wrote Sheik Adham thanking him for the opportunity to join his legal team. One week later he received a $136,000 down payment on his $600,000 contract. And ten days later he registered with the Justice Department as a foreign agent, indicating that his work on behalf of Adham might "border on political." In his deposition, Rogers acknowledged that his representation of Sheik Adham related to "the Sheik's problems with the Feds."[22] Moreover, Rogers provided the Subcommittee with copies of letters written by Cacheris concerning the investigations being conducted by the US Federal Reserve and the Manhattan District Attorney's Office.[23] Rogers received these letters only days before flying to Cairo to meet with the Sheik. These events appear to contradict other Rogers testimony that his agreement with Sheik Adham specified that "matters regarding criminal investigations didn't come to me for any type of management participation."[24]

Rogers had two more meetings with the Adham legal and financial team. At the end of September he flew to Cairo, stopping over in London at the Four Seasons --Inn on the Park, where BCCI regularly hosted important clients. Rogers would not discuss with the Subcommittee the substance of any of his meetings in Cairo with Adham or his "legal or financial advisors" citing attorney-client privilege.

Rogers flew to Cairo with Plato Cacheris, the prominent Washington criminal defense attorney for Sheik Adham. By this time, of course, both the Justice Department and the Manhattan District Attorney had communicated with Adham their concern over his involvement with BCCI, particularly as it related to the Sheik's "holdings" in First American Bank. With no background in business, in criminal law, or in any facet of the law for that matter, the 33 year old Rogers must have accompanied Cacheris for one reason only: his political skills and access.

Rogers returned to the Middle East one more time to meet with the Sheik in mid-October in Jeddah. On this trip, Rogers met briefly on two occasions with David Eisenberg of the Justice Department. According to Rogers, "[h]e [Eisenberg] came into the room to meet with the Sheik. I walked out and we shook hands."[25] Rogers testified that he met Eisenberg the next morning in a "virtual identical encounter."[26] Robert Mueller, the Assistant Attorney General, provided a similar account of events several months earlier in testimony before the Subcommittee.[27]

### Rogers Resigns Account -- The White House Investigates

On October 23, the story of Rogers's representation of Adham was reported in the press. Two days later, President Bush, in a press conference, said that he didn't know what Ed Rogers "is selling," and that "he didn't know anything about the man."[28] From the President's comments it was unclear whether or not he was referring to Rogers or Adham, but, in fact, he appears to know both men reasonably well. In his deposition, Rogers testified that he sat in on meetings with the President "on numerous occasions."[29] In an interview with the Middle East News

REENTERED AS EXHIBIT 3

Network, Kamal Adham, who was head of Saudi intelligence during the same years that President Bush headed the CIA, stated:

[t]here was a period of overlap, but whatever the case it is not possible for a President to say that. The next day, nobody mentioned the White House spokesman came out and said that the President knows Mr. Adham and he did not like what was written in the papers..."[30]

Shortly thereafter Rogers reportedly resigned the Adham account, writing to Boyden Gray:

I registered [with the Justice Department] out of an abundance of caution. The ethics atmosphere at the Bush White House was to go the extra mile to assure that no one could ever say any ethics requirement was violated or avoided. I followed this philosophy and registered, as I did not want anyone to say that I should have registered but did not do so. Unfortunately, going beyond the requirements of the law has resulted in an embarrassing spate of stories for my client, the Administration and me.[31]

Responding to Congressman's Charles Schumer's call for an investigation of the matter, Counsel Gray purported to mount an inquiry. However, Gray never met with Rogers. Instead, two of Grays's assistants, with whom Rogers was "friendly" called him on the telephone two times each to discuss the matter.[32] According to Rogers, the conversations lasted ten to fifteen minutes each. On November 1, 1991, Gray wrote Congressman Schumer that "Mr. Rogers was not responsible for and did not participate in any matters concerning to BCCI at the White House."[33]

The question, however, is not only whether Rogers had access to information on BCCI at the White House, but whether or not he began the process of negotiating his contract with Adham while he was at the White House. On this point, Rogers provided conflicting and confusing testimony:

Mr. McKean. [staff of Senator John Kerry] He [Moussa Raphael] was here in March. Did you meet with him then?

Mr. Rogers. Mr. Raphael?

Mr. McKean. Yes.

Mr. Rogers. Yes.

Mr. McKean. You met with in March of 1991?

Mr. Rogers. Oh,no, I'm sorry. I thought you meant --

this is March now.

Mr. McKean. Right.

Mr. Rogers. No, I thought you meant -- I have met with him since this whole thing blew up. (34)

Later in the deposition Rogers also denied having met with Raphael in March, 1992 and after the deposition his counsel wrote the Subcommittee indicating that "Mr. Rogers did not meet with Mr. Raphael in March 1991 or in March 1992."[35] Hotel records indicate that Raphael stayed at the Grand Hotel in March 1991, but not in March 1992. It seems plausible that Rogers could have met Raphael in March 1991: Rogers told the Subcommittee that he gave his notice to the White House in January and Adham needed help as the Federal Reserve Board had just issued a cease and desist order to First American concerning its status vis a vis BCCI. The most logical time for Adham to have sought political influence and access was March 1991.[36]

### Continued Contacts

Rogers ostensibly resigned the Adham account in October, although he will not reveal whether or not he returned his retainer to Sheik Adham. Rogers' counsel has told the Subcommittee that Rogers' fees are a confidential matter.[37]

During the month of November 1991 Rogers continued to work on the Adham account in so far as he provided assistance to other lawyers for Adham who assumed his responsibilities. He also continued to meet with Moussa Raphael. According to Rogers:

"I met with him to finalize and hand over matters we were working on, specifically on the trust, then I met with him one more time subsequently to that, just -- I dropped by the Grand Hotel to say hello. He asked me to. He was worried about me."[38]

Subsequent to Rogers' deposition, his lawyer wrote the Subcommittee that the last time his client met with Mr. Raphael was in December 1991, or January of this year. However, as recently as April, the Subcommittee has learned that Raphael was calling Rogers' office.[39]

### Conclusion

Ed Rogers is not a major player in the BCCI scandal, but his involvement with Sheik Adham is illustrative of how the bank tried to buy influence in order to ameliorate its problems. Rogers is neither an experienced businessman nor a prominent lawyer: rather, he is political operative who achieved significant political influence and access by the age of 33, and who sought to "cash in" on those political skills. The story he provided to the Subcommittee of how he came to represent one the most important figures in the BCCI scandal is shallow and unconvincing, but the greater failing and more worrisome aspect in the Rogers affair may be that of the White House inquiry. The columnist William Saffire predicted in November 1991 that the Boyden Gray, charged by the President to investigate the Rogers affair, would "pass along the denials and the White House whitewash will continue."[40] There is nothing in the record that suggests Mr. Saffire's assessment was inaccurate.

1. S. Hrg. 102-350 Pt.4, p.935. Subcommittee staff met with Darwish and talked to him on the telephone. His account of how Moussa Raphael met Rogers is essentiaally the same as Rogers' account. According to Darwish, Raphael asked the hotel executive if he knew any good lawyers," and Darwish recommended Rogers. Despite the similarlity of accounts, the Subcommittee is skeptical of his story: Rogers had virtually no legal experience and Moussa Raphael was well acquainted with

REENTERED AS EXHIBIT 3

Adham's criminal lawyer, Plato Cacheris, who presumably had better contacts in Washington's legal establishment than the general manager of the Grand Hotel.

2. Rogers told the Subcommittee that there Republican political events at the Grand Hotel.

Darwish told the Subcommittee that he knew Senate Majority leader George Mitchell well (Senator Mitchell is of Lebanese extraction), but that he did not know and, in fact, had never even met Governor Sununu (also of Lebanese extraction).

3. Id. p.935.

4. Letter to C. Boyden Gray, Counsel to the President, from Ed Rogers, October 28, 1991.

5. Memo to Files, From Jonathan M Winer, Conversation with Ed Rogers, December 18, 1991.

6. S. Hrg. 102-350, pt. 5,p.944.

7. According to press reports, in 1987, Bamieh told the House Foreign Affairs Subcommittee on Africa the following:

-- In November 1981, prince Fahd, who later became the king, told Bamieh that he was pleased Congress had agreed to sell AWACS surveillance planes to the kingdom. In exchange for AWACS, Fahd said, "We will help you guys fight anti-communist movements," according to Bamieh.

--In 1983 [Prince] Bandar asked Bamieh if he would go into business with Richard V. Secord and Albert Hakim to bid on a security project at a Saudi airport. Secord and Hakim were key figures in the plan to channel money from the sale of US weapons to Iran to the Contra rebels fighting Nicaragua's leftist government. The business relationship was never cemented because the three never got the contract.

-- In 1983, Saudi officials asked Bamieh to funnel money to Morocco for the training of UNITA guerrillas. The Saudis said former CIA Director William Casey was aware of the plan, Bamieh said.

-- In February 1984, Bandar approached Bamieh in Cannes, France, asking him to set up an offshore company that would supply goods and services to anti-communist movements and oil to South Africa. Bandar aid he declined, even though Bandar said, "Don't worry about the legalities" because Casey was discussing the matter with King Fahd.

Another newspaper article reported on Bamieh's statements about the Iran Contra affair:

An American businessman with extensive ties to Saudi Arabia's royal family contends King Fahd was the chief financier of Iran's secret US weapons purchases in 1985 and 1986.

Sam Bamieh, a naturalized American citizen, said in an interview with United Press International Tuesday that Fahd was hoping to gain favor with Ayatollah Ruhollah Khomeini to ward off possible threats to Saudi security.

Investigators of the Iran-Contra scandal have concluded Iran paid about $30 million for the arms, at prices double or triple the Pentagon's cost, and about $3.5 million of the profits were diverted to the Nicaraguan Contra rebels.

The reason they paid those high prices was because the money wasn't theirs," he said of the Iranians. Bamieh, of San Mateo, California, said he based his assertion that Fahd paid for the arms on statements made to him by confidants of Fahd and international arms dealer Adnan Khashoggi and on dealings and on dealings made in his presence by Khashoggi.

Khashoggi, a Saudi Arabian who investigators have found played a significant role in financing the early US arms shipments to Iran, was serving as Fahd's emissary in the deals, Bamieh said.

Finally, Bamieh is quoted in the press on the CIA's involvement in an assassination attempt of a high ranking Lebanese official:

Top secret CIA reports in 1985, conflicting with author Bob Woodward's recent assertions, said Syria masterminded an assassination attempt against a radical Moslem leader without agency cooperation, U.S. intelligence officials say.

But California businessman Sam Bamieh, who describes himself as a former close friend of Saudi King Fahd, said he has evidence of reports of Syria's involvement were part of a Saudi cover story and that Woodward's report in his new book is largely correct.

REENTERED AS EXHIBIT 3

Woodward, an assistant managing editor at the Washington Post, described the unsuccessful attempt to kill Hezbolah leader Sheik Fadahllah, whose organization bombed several American facilities in Lebanon in his book, "Veil: The Secret Wars of the CIA in 1981-1987."

8. S. Hrg. 102-350, pt. 5. p.937.

9. Id. p.938.

10. Id. p.941.

11. Id. p.939.

12. Id. p.945.

13. Id. p.939.

14. Invitation list. 8/27/91. Provided by Sam Bamieh.

15. telephone interview with Mr. Bamieh, 2/10/92. Bamieh also told staff that he had met Adham on two occassions: once in 1975 for about ten minutes and then again in December, 1991. According to Bamieh he was staying at the Hilton in Cairo when Adham called and asked for a meeting. According to Bamieh, Adham "wanted to get things off his chest."

16. According to a recent article in the New York Times:

The Bush Administration today confirmed reports that Saudi Arabia engaged in unauthorized transfers of American made military equipment to Iraq, Syria and Bangladesh.

Administration officials said, however, that they had brought these unauthorized transfers to the attention of both Saudi Arabia and the Congress, as required by law, and had been told by the Saudis that the shipments were "inadvertent."

Sandra Charles, the former director of Middle East and South Asia affairs at the Defense Department in 1986, and she recalled that the Saudis had gone out of their way to alert Washington about the inadvertent. Other officials, though, say it was American military officials in Saudi Arabia who first detected the transfer.

"It was a small number," Miss Charles said. "It was not considered significant. The bombs were in a warehouse with equipment for other countries."

She said she not recall whether Washington pressed Riyadh to get the bombs back, adding, "It just didn't seem very consequential at the time.

17. telephone conversation with Sandra Charles, 2/10/92.

18. Id.

19. telephone conversation with Sandy Charles, 1/29/9.

20. S. Hrg. 102-250, pt. 5. p.943.

21. Id. p.950.

22. Id. p.942. When asked if he was discussing his representation of Sheik Adham with Mr. Bamieh, Rogers replied, "Never, I wouldn't have discussed any matters relating to the Sheik's problems with the Feds."

23. see letter to John Moscow, Deputy Chief Investigations, New York Country District Attorney's Office, from Plato Cacheris, September 25, 1991 and letter to J. Virgil Mattingly, General Counsel, Federal Reserve from Plato Cacheris, September 26, 1991.

24. S. Hrg. 102-250. pt. 5. p. 950.

25. Id. p.943.

26. Id.

27. S. Hrg. 102-350. pt.3. p.800.

28. Transcript, White House Press Conference, President Bush, 10/25/91.

29. S. Hrg. 102-350. pt. 5. p.933.

30. "A Victim of Operation Overkill by West, Says Adham." Middle East News Network, 1/18/92.

31. letter to C. Boyden Gray, Counsel to the President, from Ed Rogers, October 28, 1991.

32. Id. p.946.

33. letter to Congressman Charles Schumer from C. Boyden Gray, Counsel to the President, November 1, 1991.

REENTERED AS EXHIBIT 3

34. Id. p. 941.

35. Id. p.931.

36. William Safire, columnist for the New York Times, speculated that the relationship arose in another context:

This same Sununu toady helped organize the meeting on May 23 that founded the Arab American Council, an oil backed elite lobbying group scorns broader-based Arab-American organizations. Mr. Sununu and the Syrian Ambassador were stars of the gathering; out of Lebanese contacts made there or later, I presume, came Mr. Roger's huge contact.

see "BCCI and Sununu", by William Safire, The New York Times, November 28, 1991, p.25.

It is worth noting that Sam Bamieh is a member of the Arab-American Council and that Mr. Bamieh acknowledges contacts with Mr. Sununu when Sununu was Chief of Staff at the White House and afterwards.

37. staff conversation with Jonathan Schiller, 8/20/92.

38. Id. p. 941.

39. phone records of Moussa Raphael at The Grand Hotel, subpoenaed by the Subcommittee.

40. Safire, p.25.

# BCCI AND KISSINGER ASSOCIATES

### Introduction

Beginning in the fall of 1986, and continuing through early 1989, BCCI initiated a series of contacts with perhaps the most politically prominent international and business consulting firm in the United States -- Kissinger Associates.

At the time, Kissinger Associates had five partners: former Secretary of State Henry Kissinger, former Assistant and current National Security Advisor Brent Scowcroft, former Under

REENTERED AS EXHIBIT 3

Secretary and current Acting Secretary of State Lawrence Eagleburger, international economist Alan Stoga, and investment bank T. Jefferson Cunningham III.

Ultimately both Stoga and a retired Brazilian Ambassador working as a consultant to Kissinger Associates, Sergio Correa da Costa, seriously explored finding ways to link BCCI's global network of banks with the services being offered by Kissinger Associates. Discussions between representatives of BCCI and representatives of Kissinger Associates took place over an 18 month period concerning the possibility of merging the capabilities of BCCI and Kissinger Associates on various, mostly unspecified, projects. Following BCCI's indictment, discussions continued as to whether Kissinger Associates could help BCCI respond to the ramifications of that indictment. These discussions ended in early 1989 at Henry Kissinger's personal insistence.

During the discussions, Stoga provided advice to BCCI on a possible public relations campaign. At their conclusion, Kissinger Associates referred BCCI to one its own directors, former Assistant Secretary of State William Rogers, and his firm, Arnold & Porter, who already represented Kissinger Associates on its own legal work. Rogers and Arnold & Porter in turn agreed to provide BCCI with legal services arising out of its indictment, although few services were provided as a consequence of the opposition of Clark Clifford and Robert Altman to the firm's involvement.

Although discussions concerning a broader relationship were cut short by the indictment, the BCCI-Kissinger Associates correspondence reveals much about BCCI's approach to seeking political influence in the United States. The correspondence also highlights BCCI's focus on doing business with, and ability, given its $23 billion in reported assets and 73 countries of operation, to attract interest from, some of the most politically well-connected people in the United States.

**Genesis of Interest in BCCI-Kissinger Relationship**

**And Position Of Kissinger Associates Concerning BCCI**

In late July, 1991, the Subcommittee received documents from BCCI's liquidators describing BCCI's use of a retired Brazilian Ambassador, Sergio da Costa, as a front-man for its purchase of a bank in Brazil while da Costa was also working -- according to the BCCI documents -- as a partner in Kissinger Associates.

In September, 1991, staff was advised by press that there were a number of documents at BCCI's document depositories concerning its relationship with Kissinger Associates. Staff were provided some of these documents by reporters, and found others in subsequent reviews of BCCI documents at its former offices in New York. These documents, on both Kissinger Associates and BCCI stationery, discussed in general terms the services Kissinger Associates might perform for BCCI, and were dated both before and after BCCI's indictment on drug money laundering charges in Tampa. Accordingly, they raised the question of whether Kissinger Associates had ever been retained by BCCI.

In November, 1991, the Committee on Foreign Relations authorized a subpoena for all documents to Kissinger Associates and related entities, for all documents pertaining to BCCI, and for its client lists.

REENTERED AS EXHIBIT 3

In response, Kissinger Associates promised to cooperate with the Subcommittee investigation and to provide all documents pertaining to BCCI, under an agreement that the subpoena not be served. Kissinger Associates refused, however, to provide the client list, arguing that the list was beyond the parameters of the investigation into BCCI by the Subcommittee, and advising the Subcommittee that if it pursued the list, Kissinger Associates would litigate the matter, if necessary, through an extensive appellate process to the Supreme Court.

In providing several dozen documents material to the Subcommittee investigation on January 30, 1992, Kissinger Associates, represented by its attorney, former Presidential counsel Lloyd Cutler, made the following representations:

At the outset, it should be made clear that Kissinger Associates, Kent Associates, and China Joint Ventures (collectively referred to hereinafter as "Kissinger Associates") have never represented or provided any services for BCCI, ICIC, or any BCCI shareholder. Neither BCCI or ICIC nor any person known to be a BCCI shareholder has ever been a client of Kissinger Associates.

The only substantive contact between Kissinger Associates and BCCI occurred in late 1988-early 1989, when [BCCI officer] Abol Helmy met several times with Alan Stoga of Kissinger Associates to discuss a possible consulting arrangement for BCCI . . . In December, 1988, Mr. Stoga advised Mr. Helmy that Kissinger Associates was not interested in a consulting relationship with BCCI. At Mr. Helmy's request, Mr. Stoga met with Mr. Helmy again in January, 1989, at which time in response to a further inquiry from Mr. Helmy he again advised Mr. Helmy that Kissinger Associates did not want to proceed with a relationship. In February 1989, in response to Mr. Helmy's request for a recommendation for Washington-based legal counsel, Mr. Stoga recommended Arnold & Porter. Mr. Stoga has had a number of other meetings with Mr. Helmy since February, 1989, but these meetings have been of a purely social nature.[1]

While this account of the relationship is not untrue, it does fail to characterize the full extent of the contacts between BCCI and Kissinger Associates and the series of meetings and contacts between representatives of the two organizations. In fact, both Stoga, as a partner of Kissinger Associates, as well as its consultant, da Costa, worked over an extended period to bring the two organizations together, and such a relationship could well have developed but for BCCI's drug money laundering indictment. The following account, while not necessarily complete, is intended to provide a fuller picture of the contacts between BCCI and Kissinger Associates, of BCCI's goals and intentions in soliciting the relationship with Kissinger Associates, and of the assistance, albeit limited, provided to BCCI by Kissinger Associates in BCCI's time of trouble.

**Background: BCCI and Ambassador Sergio da Costa**

In the fall of 1986, Sergio da Costa, the most senior member of the Brazilian diplomatic corps and a close associate of then Brazilian president Jose Sarney, decided to retire at the age of 67 after four decades of serving Brazil as its Ambassador to such significant postings as England, Canada, the United Nations, and the United States. Da Costa was anxious to enter the private sector, and ultimately accepted offers from three organizations. Da Costa would move to Paris and set up an office there as a consultant to an international law firm, Coudert Brothers. He

would simultaneously also work for BCCI, on a monthly retainer. And he would become a consultant to Kissinger Associates, for a third monthly retainer.

At the time, BCCI already knew Ambassador da Costa well. Months earlier, he had provided BCCI with advice on selecting possible front-men for BCCI's intended acquisition of a bank in Brazil. Under Brazilian law, foreign banks were not permitted to own a majority interest in any Brazilian bank. Accordingly, BCCI had decided to buy a Brazilian bank, purchase a minority interest in the bank openly, and hold additional shares to guarantee BCCI's control of the bank through cooperating Brazilian nominees, in what was essentially a conspiracy to circumvent Brazilian banking laws.

Da Costa was extremely politically well-connected in Brazil. He had been brought to BCCI by BCCI shareholder and front-man Ghaith Pharaon, who in late April, 1986 had met with Da Costa in Miami to seek Da Costa's help in responding to the problems posed for BCCI in circumventing the Brazilian bank laws. A telex from Miami branch manager Abdur Sakhia to BCCI-London on May 6, 1986 described the meeting having ended positively for BCCI:

Ambassador Da Costa has promised Dr. Pharaon to assist the Bank in any way he can and he also had asked Mr. Ferreira [a prominent Brazilian businessman close to President Sarney] to use his association with the President of the Republic to assist BCC.[2]

By September of 1986, da Costa had agreed to himself become a front-man for BCCI in Brazil. In return, BCCI agreed to pay him $150,000 a year, with no further responsibilities beyond being a front-man and using his influence to help BCCI with Brazilian authorities in Brasilia, the capital city.

Under the terms of the arrangement, da Costa agreed to be a director and shareholder, secretly acting as BCCI's nominee, of the bank BCCI was purchasing in Brazil, in a transaction structured by BCCI officer Abol Helmy, who later himself had a series of contacts with Kissinger Associates.

Helmy drafted a memorandum, "Strictly Private and Confidential," regarding "Brazil," on September 2, 1986, under which da Costa and a second prominent Brazilian would each own 50 percent of a Brazilian company that would buy 12,622,500 voting ordinary shares in BCCI Brazil, pledge those shares to BCCI, give BCCI the right to vote its shares, and give BCCI the right to buy those shares. Da Costa would agree to serve on the three man board of directors as BCCI's front-man, to guarantee BCCI control of the bank. He would 'pay' $1,233,580 for his 'share' of BCCI Brazil's stock, and BCCI would reimburse him that amount in New York. The internal BCCI memorandum drafted by Helmy makes explicit the fact that these arrangements were designed to deceive Brazilian authorities:

It <u>must</u> be emphasized that the Brazilian economy and bureaucracy are highly sophisticated. As such <u>any</u> payments made by Brazilians must have the appropriate <u>ORIGINATION OF FUNDS</u>. That is, the Brazilian 'investors' <u>must</u> have the necessary net worth for Brazilian taxation authorities' purposes to support any investments made. . .

Messrs. Da Costa and Leoni to ensure that the transaction is fully acceptable to the Central Bank and to ensure that there are no adverse public consequences will be purchasing their

shares in cash. . .

Both Ambassador Da Costa and Mr. Leoni are reluctant to take loans from any bank to finance the transaction for Central Bank and public image purposes . . . I have negotiated, subject to BCC management approval, an interest free loan to the individuals concerned . . . to enable them to complete the transaction.[3] (emphasis in original)

The memorandum demonstrated that BCCI would provide da Costa with $2,467,160 for the purchase of his stock in BCCI Brazil, every penny the stock would cost. In a staff interview, Helmy acknowledged that da Costa was not at risk and that the transaction was a standard nominee arrangement by which BCCI circumvented local laws and that this approached had been used a numerous of times previously by BCCI. Helmy also said it was BCCI's understanding that da Costa would take care of arrangements with Brazil's central bank and other Brazilian officials to make sure that they acquiesced in the transaction as structured.[4] Thus, in essence, Helmy at BCCI and da Costa, while still Brazil's Ambassador to the United States, had with other BCCI officials and other prominent Brazilians, created a plan by which they would together make possible BCCI's purchase of a bank in Brazil to circumvent Brazilian law.

BCCI officials were ecstatic at da Costa's participation in their plan for Brazil, and his agreement to be a Senior Advisor to BCCI. On October 28, 1986, while da Costa was still Brazil's Ambassador to the United States, the head of BCCI's Miami office, S. M. Shafi, sent him a congratulatory telex at the Embassy:

congratulations from myself and my colleagues on your joing [sic] our Brazilian project. We welcome you to the fold BCC family. I am very certain your experience, qualifications and contacts not only in Brazil but also internationally will go a long way in turning our subsidiary in Brazil into one of the most successful units of BCCI.[5]

Da Costa signed a three-year consultancy agreement with BCCI on November 3, 1986, under which he committed to acting as "Director of [BCCI's] investment bank in Brazil," and a front-man for BCCI there.[6] Da Costa then followed through in participating in the plan developed by Helmy under which BCCI would secretly purchase a majority interest in BCCI Brazil through nominees. He received his 'loans,' from BCCI, and purchased his 'stock' in the Brazilian bank. BCCI duly reported its loans to him on its books in Panama, characterized as "International Loans," as if they were normal loans that BCCI anticipated would be repaid. By April 30, 1988, da Costa's 'loans,' from BCCI amounted to $1,563,723.85. In fact, da Costa did not pay interest or principal on the loans, which were shams to mask BCCI's ownership of the 'da Costa' shares of the bank.

Among themselves, BCCI officials were also pleased about another aspect of being connected to da Costa. As he entered his agreement with BCCI to circumvent Brazilian banking laws, he had told them that he was also joining Kissinger Associates. A BCCI telex that circulated in New York and London in early December, 1986 described da Costa's principal work to now be as a partner in Kissinger Associates, with BCCI understanding the Coudert Brothers work, by comparison, as merely a consultancy.

REENTERED AS EXHIBIT 3

**Da Costa and Kissinger Associates**

In September, 1986, while da Costa was negotiating the terms of his consultancy with BCCI, he also reached out to determine if he could reach a similar relationship with Henry Kissinger. In early September, he sent Kissinger a copy of a biography he had written, "Every Inch a King," concerning Brazilian emperor Dom Pedro I.

In November, 1986, da Costa and Kissinger concluded their discussions concerning the services da Costa would provide Kissinger Associates. Letters between da Costa and Kissinger, dated November 3, 1986, set forth the terms of their agreement, under which da Costa would be paid $40,000 a year as a consultant to Kissinger Associates, plus a 10 percent to 20 percent fee for putting together transactions for Kissinger Associates. The letters show that Kissinger sought an agreement from da Costa that he would work only for Kissinger Associates and for Coudert Brothers, and that da Costa told Kissinger in return that he would also be working for BCCI, as he and Kissinger had previously discussed. As da Costa wrote Kissinger:

From our brief conversation, I gathered that you had in mind, basically, the Brazilian "market", i.e. you would expect me to channel through Kissinger Associates whatever Brazil-related project is secured by me. . . What concerns me is the case of companies that have already indicated their firm intention of retaining my services as consultant under a permanent retainer agreement soon after November 1st . . . There is particularly the case of B.C.C.I., mentioned to you when we first discussed our association. They not only wish to retain me as a permanent consultant, but insist that I become member of the Board and shareholder of their Brazilian operation, obviously seeking to benefit from my standing in the country. . . In short, since we are both acting in good faith and are reasonable men, I cannot even visualize a possibility of discomfort in our business relationship. I am convinced that a simple reflection in a side letter like this would be far better than any attempt at spelling out a paragraph on the exact meaning of "exclusivity."[7]

Kissinger accepted da Costa's simultaneous involvement in acting as a consultant to Kissinger Associates and BCCI, and da Costa signed up for a two-year commitment.

On December 8, 1986, da Costa received the first of a series of payments of $12,500 a month from BCCI Grand Caymans to his account at BCCI's agency in New York for his consultancy to BCCI. In the same period, he received the first of a series of payments from Kissinger Associates of $10,000 a quarter.

Beginning in early 1987, da Costa began to act as a business agent for Kissinger Associates in Brazil on projects involving purchases of companies, plants, or assets in Brazil by foreign companies. During 1987, he made several trips to Brazil on behalf of Kissinger Associates, and attended in the summer of 1987 what he described in a letter to Kissinger Associates as "that amusing luncheon with the BNL crowd," referring to a meeting with people involved in the Banco Nationale del Lavaro, an Italian bank from whom Kissinger was a consultant, and which has recently been under investigation by the House Committee on Banking, Finance and Urban Affairs for its role in the illegal arming of Iraq using U.S. commodity credits.[8]

**Da Costa, Kissinger and Ghaith Pharaon**

REENTERED AS EXHIBIT 3

On September 20, 1987, da Costa wrote Kissinger to invite him to a party hosted by BCCI front-man Ghaith Pharaon, suggesting that Kissinger might want to obtain Pharaon as a client for Kissinger Associates:

I was asked to convey an invitation of Dr. Gaith Pharaon to a dinner at his plantation at Richmond Hill, Georgia, Saturday October 31st.

Although with residences in Paris and in Saudi Arabia, his real "home" seems to be the River Oaks Plantation, which once belonged to Henry Ford. His main local asset was the National Bank of Georgia, which he recently agreed to sell to First American Bankshare Inc of Washington DC for some $230 million. I believe that the latter bank is owned by the main shareholders of BCCI, of which Pharaon was or still is a shareholder . . .

As [Pharaon] admires you intensely and has a wide range of business interests in the US, I have thought of him for some time as a potential client. Hence my acquiescence to forward the invitation.[9]

In October, 1987, while da Costa was seeking to put together an acquisition of a plant in Brazil involving the New York firm of Kohlberg Kravis Roberts & Co., ("KKR") on behalf of Kissinger Associates, he wrote Lawrence Eagleburger and Alan Stoga, again referencing his invitation to Kissinger to attend the Pharaon dinner with da Costa.[10] However, Kissinger declined the invitation.

**Da Costa Introduces BCCI to Kissinger Associates**

On May 28, 1987, da Costa decided to introduce BCCI acquisitions officer Abol Helmy, who had crafted BCCI's purchase of the bank in Brazil, and da Costa's participation as a BCCI front man, to Kissinger Associates partner Alan Stoga. A chronology provided the Subcommittee by Kissinger Associates' attorneys, and apparently prepared by Stoga in November, 1991, describes the meeting as follows:

Da Costa introduces Abol Helmy to Stoga without any specific purpose. Helmy is described as responsible for BCCI's acquisitions in Latin America.[11]

According to the Stoga chronology, on June 10, 1987, Stoga met Helmy again to discuss the possibility of a relationship between Kissinger Associates and BCCI. According to the Stoga chronology, no specifics of the relationship were discussed.[12]

On August 26, 1987, Pakistan's former Ambassador to the United States, Sultan M. Khan, who now worked at BCCI's representative office in Washington, D.C., wrote Kissinger, on BCCI stationery, to invite Kissinger to attend a dinner he and BCCI were hosting, honoring the leader of the Chinese delegation to the annual International Monetary Fund dinner. Although Khan had worked closely with Kissinger when he was U.S. Secretary of State and Khan was Pakistan's foreign minister, Kissinger declined the invitation.[13]

The Stoga chronology shows no further meetings between Stoga and Helmy until September, 1988. However, Helmy told Subcommittee staff that he had a series of meetings in this period with Stoga regarding possible links between BCCI and Kissinger Associates. Moreover, a

November 2, 1988 letter on Kissinger Associates letterhead from Stoga to da Costa states, "I have been in regular contact with Abol Helmy for more than two years and, during that time, we have discussed the possibility of a consulting relationship [by Kissinger Associates for BCCI] several times."[14]

**Helmy and Stoga's Attempts to Develop**

**Business Between Kissinger Associates and BCCI**

Helmy viewed his meetings with Stoga as a means to engage in business development for BCCI, and believed that Stoga also believed that it could be to both of their benefits within their respective organizations to provide one another with business.[15]

This process moved forward slowly, and it was not until October 7, 1988 that Stoga sent Helmy and BCCI written material from Kissinger Associates describing the nature of their business and the possible benefits to both organizations of a relationship. As Stoga wrote Helmy:

I enjoyed lunch yesterday and, even more, your suggestion that BCCI might be interested in developing a relationship with Kissinger Associates.

As you suggested, I am enclosing a brief explanation of our firm and biographical sketches of our principals. I am not sure the former really does us justice, but I am reluctant to be more specific, at least on paper, about the kinds of consulting projects we undertake for clients. . .

I agree that a next step should be for me to meet your [BCCI's] management in London or in New York.[16]

The materials enclosed by Helmy, and retrieved later by Subcommittee staff at BCCI's offices in New York, consisted of a six paragraph summary of Kissinger Associates approach to its business, and a two page biographical summary of its partners' credentials. According to the summary:

Kissinger Associates' purpose is to utilize the diverse backgrounds, experiences, contacts, and relationships of its senior personnel to assist client companies in sorting through and coming to terms with the increasingly complicated international environment. . . The firm does not provide detailed written materials to clients, in large part to assure the confidentiality and the frankness of communications.[17] (emphasis in original)

Less than one week later, BCCI was indicted in Tampa, prompting an immediate memorandum from Helmy to Swaleh Naqvi, then BCCI's chief:

Further to our recent conversation in London, I met with Mr. Alan Stoga who is one of the 3 partners of Kissinger Associates, Inc. Subsequently, the developments in the United States took place. Judging by the high level of adverse publicity that is being generated by the media, it is imperative that a firm response be made.

I received a call today from Mr. Stoga who informed me that Dr. Kissinger recommends that a public relations offensive be made by us and in that context has suggested using Burson-

Marstellar, a highly reputable public relations firm that successfully dealt with 1st Chicago crises last year. Kissinger Associates, Inc. have indicated that they shall be happy to use their personal contacts with the firm and make the necessary recommendations. I shall, of course, not proceed in any way without explicit instructions from you.[18]

The next day, Helmy sent another memorandum to Naqvi, enclosing the materials he had received from Stoga concerning Kissinger Associates and advising Naqvi that he would meet with Stoga on October 14. Helmy and Naqvi then discussed the overture to Kissinger Associates by telephone, evidently to discuss the qualms that Kissinger Associates might have to working with BCCI now that it had been indicted. Following Helmy and Stoga's next meeting, Helmy reported back to BCCI London as follows:

I just met with Mr. Alan Stoga, Dr. Kissinger's partner, and discussed the relevant matters as per our phone conversation of yesterday.

I emphasized to Mr. Stoga that our conversations in getting our two respective organizations together have been going on for over a year and hence, have not been generated as result of the present circumstances.

I feel that a relationship could be established in the near future depending on how fast the present publicity ends.

I shall keep you duly informed of my next meeting with Dr. Kissinger himself which should be sometime next week.[19]

The correspondence makes clear Helmy's desire to secure this important relationship for BCCI as a means of helping BCCI reduce its current problems in the United States, and as a means for Helmy himself to increase his power within the BCCI organization.

While Helmy pursued the relationship from his office at BCCI New York, da Costa in the meantime also tried to push a relationship forward. Kissinger Associates had decided to end his consultancy in September as a consequence of his not having developed enough business in Brazil to justify his $40,000 a year stipend, and sent da Costa a letter to that effect which he evidently did not receive. In the meantime, Helmy had contacted da Costa to seek da Costa's assistance in reassuring Kissinger Associates that BCCI was truly an ethical institution.

On October 25, 1988, da Costa wrote Eagleburger and Stoga to remind them that the discussions to link the two organizations went back many months and were not prompted by the indictments:

On two or three different occasions last year and early this year, I suggested to BCCI to seek the assistance of K.A. [Kissinger Associates] to obtain their assessments worldwide and particularly regarding the Untied States. The suggestion was well received and matter virtually cleared six months ago. However, the situation created by the serious heart condition which stroke [sic] BCCI's president and founding father delayed the implementation until September 29th when I was asked to a meeting in London.

During the meeting, a few questions were put to me as to the type of work that KA did normally for their clients and the Deputy Chairman [Naqvi] indicated that instructions would

be promptly sent to Mr. Abol Helmy in new York to approach KA and negotiate a contract.

That was Thursday September 29th. Thirteen days later, October 12th., the blow of the accusation for money-laundering, of which the bank expects to be entirely cleared, having offered the fullest cooperation with the investigators.

Mr. Abol Helmy has already contacted Alan Stoga last week and asked me to refer to the early conversations held at the bank about my recommendation, not to appear that he is seeking support in a moment of distress. . .

Perhaps you could start talking to Mr. Helmy in the clear understanding that a contract would be signed only after you had the opportunity to ascertain - to your satisfaction - that the procedures adopted by the bank to defend itself from the allegations are adequate enough.[20]

In response, Stoga wrote da Costa November 2, 1988. The letter from Stoga to da Costa was **not** to advise him that Kissinger Associates was sufficiently concerned about BCCI's drug money laundering indictments to preclude a relationship. The letter instead politely advised da Costa that as far as Stoga was concerned, the prospective relationship was Stoga's, not da Costa's, and that da Costa was not welcome to participate in further discussions between BCCI and Kissinger Associates. As Stoga wrote da Costa:

Thank you for your fax regarding BCC. After your kind introduction, I have been in regular contact with Abol Helmy for more than two years and, during that time, we have discussed the possibility of a consulting relationship several times. Abol raised this issue again in September saying that he was urging Mr. Naqvi to consider hiring us. Helmy did not mention your involvement during any of these discussions and said he, too, was surprised by your fax.

I am not sure how we will proceed with respect to BCC, but I will remain directly in contact with Abol.[21]

Da Costa acknowledged Stoga's position and had no further involvement with Kissinger Associates until December, when he wrote to remind the firm that he had not received his quarterly stipend, and was told that his consultancy was at an end, other than on a case-by-case basis should da Costa generate transactions for Kissinger Associates. Da Costa replied with a fax transmission to Kissinger, thanking him for being welcomed to Kissinger Associates "at that precise moment when I was leaving a life-long protected life to explore on my own the other side of the fence," and promising to do his best to generate more business in Brazil on a case-by-case basis in the future.[22]

### Kissinger Associates Says No to BCCI, Provides Legal Referral

Kissinger Associates determined to take its time in considering the risks and benefits of any relationship with BCCI, with Kissinger himself apparently taking the view throughout that the relationship was not worth having, while Stoga sought to continue to explore it.

The chronology provided the Subcommittee by Kissinger Associates states that Stoga telephoned Helmy in December to advise him that Kissinger Associates would not be

interested in any relationship with BCCI, but that Helmy requested another meeting with Stoga "after holidays to discuss."[23]

BCCI files tell a different story. According to a December 19, 1988 memorandum from Helmy to Naqvi, he continued to be in communication with Stoga about the proposed relationship, and continued to anticipate that they would work something out despite the drug money laundering indictment:

I am in communication with Mr. Alan Stoga, Partner of Kissinger Associates, Inc. Their response was they are interested in principal but would like to wait a bit longer. I will be meeting Mr. Stoga in the first week of January, 1989 and will be discussing the issue further. It would be of interest for you to know that Mr. Scowcroft is now the National Security Advisor Designate in the Bush Administration and another Partner of Kissinger Associates is being tapped for Assistant Secretary of State in the Bush Administration. I shall keep you informed of my next meeting. You may agree that this association with Kissinger Associates, Inc. needs time to be cultivated. I am working in that direction.[24]

Evidence of what Helmy was referring to is a proposal which Kissinger Associates found in its files from Helmy to Stoga, dated January 9, 1989.

The proposal refers to a California bank known by Stoga to be available for a price of $76 million, a price which he estimated was less than 10 times the bank's expected earnings. The bank was for sale, and if Kissinger Associates could find a buyer, there was an opportunity for everyone to make money. Helmy provided Stoga with a 17 page outline for the proposal transaction, and asked him to consider it.

The proposal revealed that the bank involved was the Independence Bank of Encino, held by BCCI shareholder and front-man Ghaith Pharaon.

There is no record that Helmy advised Stoga or Kissinger Associates of what he also knew about Independence Bank -- that the bank was secretly owned by BCCI, in arrangements similar to the nominee arrangements Helmy had personally crafted for da Costa in Brazil. Helmy himself may not have known Independence Bank's other secret -- that at the time, it was already in the deep financial trouble that three years later lead to a $150 million bailout of Independence Bank, with funds lent by the U.S. Treasury, of the Bank Insurance Fund.

At about this time, in January, 1989, according to the Stoga chronology, Stoga again met with Helmy to repeat that Kissinger Associates would not proceed with a relationship with BCCI. The Stoga chronology states that Helmy said he understood that the time was not right and he hoped if circumstances changed, the firm would reconsider.

The Stoga chronology is again contradicted by BCCI files. A memorandum written January 11, 1989 from Helmy to Naqvi, found in BCCI's Kissinger Associate files in New York, presents an entirely different picture of the relationship at this stage:

I had a lunch meeting with the gentleman in January 5, 1989 and a follow up telephone conversation on January 10, 1989. It was established that it is in our interest for both parties to continue with the conversations. As such, the door for an eventual relationship remains open.

They were far more knowledgeable of the details of our situation during this meeting and made certain "unofficial" general recommendations which I shall convey to you at our next meeting. I am meeting my contacts senior partner by the end of January with a view of discussing our overall worldwide activities.[25]

In staff interviews, Helmy later confirmed that the memorandum referred to Stoga and to the "senior partner" to an intended meeting with Kissinger.

There are four possible explanations of the difference between Helmy's understanding and the Kissinger Associates chronology.

First, Helmy could have been wilfully misleading his superiors at BCCI about the relationship, although it is hard to understand why he would do this, persistently, for months, unless he had in fact received some encouragement from Stoga. Moreover, Stoga had in fact continued to meet month after month with Helmy.

Second, Helmy could have misunderstood what Stoga was telling him. Again, this would fail to explain why Stoga continued meeting with him to discuss these matters.

Third, Stoga could himself have been trying to keep the door open, despite instructions from Kissinger to the contrary. There is some evidence for this from the various memoranda, including Stoga's later representations as to what happened. It would be plausible that Stoga as the most junior member of the partnership would at the time have had a greater need than Kissinger himself to take advantage of BCCI's 73 nation financial network and reported $23 billion in assets to generate new business,

Finally, Kissinger Associates as an organization might at the time have been seeking to keep its options open concerning a possible relationship with BCCI, and rewritten history once BCCI had become notorious. The documents provided do not either preclude such a possibility, or prove it.

It is impossible to make a definitive judgment on this issue because of the remarkable absence of any contemporaneous documents concerning Kissinger Associates' rejection of the relationship, at least among the documents provided the Subcommittee by Kissinger Associates. While Kissinger Associates did provide the Subcommittee with Stoga's November, 1991 reconstruction of what took place, for better or worse, the only contemporaneous documents available to the Subcommittee concerning this issue were those created by Helmy while he was at BCCI.

However, there is no evidence from any source that Helmy ever met with Kissinger, as Helmy had implied he would do in two of his memoranda to Naqvi. Moreover, there is no evidence that Stoga took any action to follow up on Helmy's business suggestions.

It is not contested, however, that Kissinger Associates did make "certain 'unofficial' general recommendations" to BCCI, just as Helmy's January 11, 1989 memorandum stated.

The Stoga chronology shows that Stoga did stay in contact with Helmy through January, 1989. The chronology states that Helmy asked to meet with Stoga, and did so on January 25, 1989,

when Helmy told Stoga that he was now in charge of the Tampa legal case, and would appreciate Stoga recommending new lawyers for BCCI in Washington.

As Helmy later explained, he, among others at BCCI, felt that Clark Clifford and Robert Altman had their own agenda and own problems, and were not ideally situated to manage the overall handling of the Tampa case. He had received authority to try to go around Clifford and Altman, and was using the best contacts he had to develop an alternative.[26]

According to the Stoga chronology, Stoga reported the request for assistance to Kissinger, and after consulting with Kissinger, told Helmy he could recommend William Rogers and a team of lawyers at Arnold and Porter, which Kissinger Associates had long used to handle legal matters pertaining to the firm and its principals. According to the Stoga chronology, this was "without reference to HAK," that is, Henry Kissinger. At the time, Rogers was also on the Board of Directors of Kissinger Associates.[27]

**Referral to William Rogers and Arnold and Porter**

BCCI's records in New York first alerted the Subcommittee to the possibility that BCCI had been represented by Arnold & Porter and former Assistant Secretary of State William D. Rogers. An undated document maintained in the Kissinger Associates file at BCCI listed as BCCI's team of representatives:

FIRM: ARNOLD & PORTER

1. Mr. William D. Rogers

(Formerly Assistant Secretary of State)

2. Mr. Jerry Hawke

(Formerly General Counsel Federal Reserve Board)

3. Mr. Irv Nathan

(Formerly Deputy Attorney General of the US)

FIRM: Kissinger Associates

1. Dr. Henry Kissinger

2. General Scowcroft

(Presently: National Security Counsel Chief)

3. Mr Eagleburger

(Presently: Assistant Secretary of State (Designate)

4. Mr. Alan Stoga[28]

The listing of the present and former government titles of the "team" BCCI was seeking to assemble gives a clue as to BCCI's intentions. Consistent with BCCI's historic approach to responding to its problems, it was seeking to retain people as close to the heart of the U.S. government as it could find to fix its problems, and in its view, this appropriately included people who worked for the Justice Department, State Department, and Federal Reserve.

In fact, while Kissinger Associates did not perform any services for BCCI apart from its referral of Arnold & Porter, Arnold & Porter did agree to represent BCCI, although that representation never developed into any substantial activity on the part of the firm. According to BCCI officers Abol Helmy and Abdur Sakhia, the principal reason the representation did not ultimately take hold was that Clifford and Altman did not want BCCI to develop any independent representation in Washington, and squelched the Arnold & Porter representation. As Sakhia recollected, in the period after BCCI's indictment:

We had a longish meeting about Kissinger representing us. I came in late in the meeting, and the upshot of it was they referred him to William Rogers. Then Rogers met with Naqvi and Abedi, but Clifford did not want Rogers involved.[29]

As Rogers described the representation:

Our relationship with BCCI consisted of about 10 meetings and telephone calls with BCCI people, one meeting with Messrs. Clifford and Altman and related office work. The purpose of the discussions was to explore legal services that Arnold & Porter might render BCCI. We geared up to provide services with background reading and the like. But we did not communicate on behalf of BCCI with any public official in connection with any BCCI matter, either orally or in writing. We made no appearances on behalf of BCCI in any judicial proceedings or in any administrative matter. We did not lobby on behalf of BCCI. And we did not communicate with any Senator, Representative or Hill staff.[30]

In all, four Arnold & Porter partners worked on BCCI matters between June 12, 1989, the date Arnold & Porter agreed to "provide legal advice from time to time to BCCI and its affiliates as and when requested to do so by BCCI," and January, 1990, including the three referred to in the BCCI memorandum concerning Arnold & Porter and Kissinger Associates. The firm did about $16,000 in legal work for BCCI in all, a fraction compared with the $20 million BCCI paid the various attorneys whose services were managed on BCCI's behalf by Clifford and Altman.[31]

### Further Contacts Between Stoga and Helmy

During the spring of 1989, Abol Helmy, frustrated in his attempts to wrest control of BCCI's legal strategy in the U.S. from Clifford and Altman, and BCCI's unwillingness to take advantage of the Arnold & Porter representation he had arranged, decided to leave BCCI and form his own company, Equicap.

During this period, Helmy had several meetings with Stoga which the Kissinger Associates chronology characterized as "social." Helmy also provided Stoga with copies of detailed proposals he was working on for a Brazilian investment fund, which appears to be a suggestion to Stoga that Stoga help him solicit possible investors for the fund.

**Response to Press and Congressional Inquiries**

In November 1991, after BCCI's global closure, Kissinger Associates began to receive queries from the press concerning its contacts with BCCI. In response to those queries, Kissinger asked Stoga to reconstruct his contacts with BCCI. Stoga reviewed the documents concerning BCCI contained at Kissinger Associates files that were later provided the Subcommittee, and prepared a memorandum to Kissinger on November 11, 1991 that described the contacts as follows:

The most titillating passage in Helmy's memos claim I passed along a recommendation from you about a public relations offensive involving Burson Marstellar which we would help facilitate. Another memo implies that he met you. And another says that we had been discussing a client relationship for over a year.

To the best of my collection, I did not talk to Helmy about Burson (which had not been a client for almost two years at that point), in particular, or about public relations in general. The only "advice" I do recall giving is telling him in an aside that, based on what I read in the papers, BCCI would be lucky to survive as a bank in the U.S. unless there was a thorough house cleaning. And, of course, when Helmy in February, 1989, asked for the name of a good lawyer, we referred him to Bill [Rogers].

With regard to meeting you, as you know, there is no reference on your calendars, you have no recollection, and da Costa says it did not happen. Additionally, I asked Helmy (with whom I developed a social relationship after he left BCCI) and he says he did not meet with you.

Finally, I remember that Helmy said when he approached us in September, 1988 that after meeting me a year earlier he had begun thinking about proposing a relationship. He was concerned that we would think his 1988 overture was a product of the indictment, but insisted that it was not. At the same time da Costa -- whose contract had not been renewed -- sent us a memo which said he had been having conversations with BCCI about a relationship with us for some time. If so, he did not tell us about them until the moment it looked like a contract might be in the offing. Then da Costa tried to prove he would deserve a fee.[32]

Stoga offers no explanation in the memorandum to Kissinger as to how Helmy could have set forth the supposed recommendation to BCCI of Burson Marstellar from Stoga and Kissinger himself if Stoga had said nothing concerning the firm. But it seems less than likely that Helmy would as a matter of sheer coincidence fabricate the supposed recommendation by Stoga and Kissinger of a firm who had indeed been a client. An alternative theory might be simply that Stoga did make the recommendation, represented it as Kissinger's, and failed to recollect it three years later. A third possibility is that Stoga chose not to remember the recommendation, or whether it actually came from Kissinger himself, given its "titillating" quality.

Helmy was by his own account distraught to find out that his overtures to Stoga and Kissinger Associates were about to become public. As he later told Subcommittee staff, he had sought to nurture his relationship with Stoga before while he was at BCCI and since he had left, considered him a personal friend, and feared the exposure would damage a relationship of some personal importance to Helmy. Helmy understood that exposure of the BCCI-Kissinger Associates letters could potentially injure Stoga's standing with Kissinger himself, and wished

to help Stoga out of a situation which Helmy felt Helmy had created. Accordingly, after talking with Stoga, Helmy drafted a letter, dated November 13, 1991, to describe his current view of what had taken place.

In the letter, Helmy wrote Stoga as follows:

Obviously both you and I are distressed by the recent articles in The Boston Globe and the New York Times which discuss my 1988 recommendation to BCC that I retain the services of Kissinger Associates after BCCI was indicted in Tampa, Florida.

I am, of course, surprised that a recommendation that BCCI retain the services of an organization enjoying the fine reputation held by Kissinger Associates warrants publicity, but I suppose that in the current milieu this kind of thing makes the news too. . .

On the merits, while we were discussing the possibility of BCCI's retention of Kissinger Associates, the fact is that you never told me or led me to believe that Dr. Kissinger himself actually made any recommendation. Only my enthusiasm to encourage Mr. Naqvi and BCC inadvertently resulted in my memorandum suggesting otherwise. Also, as you told The New York Times, and to the best of my knowledge, Kissinger Associates was never actually retained by BCCI in any kind of professional, advisory, or any other relationship. . .

Since no good deed goes unpunished, my efforts to assist BCCI in gaining the valuable services of Kissinger Associates, seem, now, to have caused both Kissinger Associates and myself a degree of harm for which I apologize to you and your organization.[(33)]

Thus, Helmy sought to make clear that Henry Kissinger himself had never to Helmy's knowledge been involved in his attempts to link the two organizations. His letter did not refer to the one thing that definitely happened during the course of his discussions with Stoga -- the initially successful referral of BCCI to William D. Rogers and Arnold & Porter.

### Conclusion

The solicitation by BCCI of a relationship with Kissinger Associates was largely based on personal contacts. It began with overtures by Ambassador da Costa, a man Kissinger knew was simultaneously a consultant to Kissinger Associates and to BCCI. The solicitation then developed through the burgeoning personal relationship between BCCI officer Helmy and Kissinger Associates partner Stoga.

Although Henry Kissinger was never himself especially interested in this potential client, BCCI become aggressively interested in Kissinger Associates because of its political connections, at a time when BCCI was struggling for survival.

Following the Tampa indictments, Kissinger himself recognized the potential risk to the reputation of his firm should it perform services for BCCI, and by December or January instructed Stoga to advise BCCI that no relationship was possible. Unable to respond to Helmy's overtures directly, Stoga, with Kissinger's participation, eventually agreed to pass BCCI on to William Rogers at Arnold & Porter as a means of helping Helmy and BCCI, while protecting Kissinger Associates.

REENTERED AS EXHIBIT 3

The result was that through the Kissinger Associates connection, BCCI retained lawyers who had previously represented the Justice Department, State Department, and Federal Reserve, agencies of some relevance to BCCI's predicament. That relationship failed to develop not because of any lack of willingness by Arnold & Porter or Helmy at BCCI, but as the direct result of Clifford and Altman's need to maintain control over BCCI's affairs in the United States.

This story highlights once again BCCI's consistent strategy of responding to problems through reaching out to prominent political figures and retired government officials in hopes that it could use political influence to solve its problems. The failure of this strategy was a reflection of BCCI's own naivete about how to do business in the United States, the care which Kissinger himself took to protect his own reputation in dealing with clients, and Clifford and Altman's role of primacy in BCCI's U.S. affairs. BCCI's ability to get its foot in the door at such politically well-connected institutions, does, however, raise questions about the general vulnerability of such politically well-connected firms to providing services that advance the secret agendas of other clients who may be less notorious than, but equally noxious as, BCCI.

1. Letter, Lloyd N. Cutler to Senator Kerry, January 30, 1992.
2. Memorandum/telex, Sakhia to Siddiki, May 6, 1986, Senate document.
3. BCCI internal memorandum, Helmy to Ameer Saddiki, September 2, 1986, Senate document 000653.
4. Staff interview, Abol Helmy, January 12, 1992.
5. Telex, Shafi to da Costa, October 28, 1986, BCCI Senate Document 000645.
6. BCCI Luxembourg Letter of Appointment, Ameer H. Siddiki to Ambassador Correa da Costa, October 28, 1986, Senate document.
7. Letter, November 3, 1987, da Costa to Kissinger.
8. Letter, Sergio Correa da Costa to Chris Vicks, Kissinger Associates, August 13, 1987.
9. Letter, Da Costa to Kissinger, September 20, 1987.
10. Da Costa Memorandum to L. Eagleburger and A. Stoga Re: Kohlberg Kravis Robert & Co -- KKR; October 6, 1987.
11. BCCI Chronology, January 30, 1992, provided to Subcommittee by attorneys for Kissinger Associates.
12. Id.
13. Letter, Khan to Kissinger, August 26, 1987.
14. Letter, Stoga to da Costa, November 2, 1988.
15. Helmy staff interview, January 12, 1992.
16. Letter, Stoga to Helmy, October 7, 1988.
17. Attachment, KISSINGER ASSOCIATES, INC., to Stoga letter to Helmy, October 7, 1988.
18. Letter, BCCI New York, from Abol Fazl Helmy to Swaleh Naqvi, October 12, 1988.
19. Memorandum, BCCI New York, Helmy to Naqvi, October 14, 1988.
20. Memorandum, Sergio Correa da Costa, to Kissinger Associates, October 25, 1988, Ref. BCCI as client of KA, Attention: Mr. L. Eagleburger, Mr. Alan Stoga.
21. Letter, Stoga to da Costa, November 2, 1988.
22. Letters, Cunningham to da Costa, December 12, 1988; da Costa to Kissinger, December 13, 1988.
23. BCCI Chronology, provided to Subcommittee by Kissinger Associates.
24. Letter, BCCI New York, Helmy to Naqvi, December 19, 1991.
25. Memorandum, BCCI New York, Helmy to Naqvi, January 11, 1989.
26. Helmy staff interview, January 12, 1992.
27. BCCI Chronology provided by Kissinger Associates to Subcommittee.
28. BCCI Document in Kissinger Associates file, BCCI New York.

29. Staff interview, Abdur Sakhia, October, 1991.

30. Letter, Rogers to Winer, March 3, 1992.

31. Id and attachments.

32. Stoga to Kissinger, November 11, 1991, RE: BCCI.

33. Letter, Abol F. Helmy to Alan Stoga, November 13, 1991.

REENTERED AS EXHIBIT 3

**CAPCOM**

## Introduction

In the entire BCCI affair, perhaps no entity is more mysterious and yet more central to BCCI's collapse and criminality than Capcom, a London and Chicago based commodities futures firm which operated between 1984 and 1988. Capcom is vital to understanding BCCI because BCCI's top management and most important Saudi shareholders were involved with the firm. Moreover, Capcom moved huge amounts of money -- billions of dollars -- which passed through the future's markets in a largely anonymous fashion.

Capcom was created by the former head of BCCI's Treasury Department, Ziauddin Ali Akbar, who capitalized it with funds from BCCI and BCCI customers. The company was staffed, primarily, by former BCCI bankers, many of whom had worked with Akbar in Oman and few of whom had any experience in the commodities markets. The major investors in the company were almost exclusively Saudi and were largely controlled by Sheik AR Khalil, the chief of Saudi intelligence. Additionally, the company employed many of the same practices as BCCI, especially the use of nominees and front companies to disguise ownership and the movement of money. Four Americans, Larry Romrell, Robert Magness, Kerry Fox and Robert Powell -- none of whom had any experience or expertise in the commodities markets -- played important and varied roles as frontmen.

While the Subcommittee has been able to piece together the history of Capcom and can point to many unusual and even criminal acts committed by the firm, it still has not been able to determine satisfactorily the reason Capcom was created and the purposes it served for the various parties connected to the BCCI scandal. It appears from the available evidence that Akbar, BCCI, and the Saudis all may have pursued different goals through Capcom, including:

-- misappropriation of BCCI assets for personal enrichment.

-- laundering billions of dollars from the Middle East to the US and other parts of the world.

-- siphoning off assets from BCCI to create a safe haven for them outside of the official BCCI empire.

## Conditions At BCCI Which Spawned Capcom

By early 1985, BCCI was on the verge of financial collapse as the result of losses in the commodities markets executed by the head of the bank's Treasury Department, Mr. Z.A. Akbar.[1] Akbar, a young Pakistani and protege of Swaleh Naqvi, the bank's Chief Executive

Officer, had been plucked from his job at National Bank of Oman in 1981 to manage BCCI's investments from its headquarters in London. Despite the fact that Akbar had no apparent experience in the commodities, foreign exchange or securities markets, by 1984 he was managing over $5.5 billion at BCCI Treasury.[2]

As Akbar invested heavily in the futures' markets, losses at BCCI treasury began to mount. According to Masihur Rahman, BCCI's former chief financial officer, Akbar made highly unusual investments based on unsound assumptions:

He [Akbar] was taking positions on silver and 20 year bonds, suggesting that 20 year bonds would be 7% or 6.8%, and things like that,, which anybody who understands treasury knows how deeply discounted it would be if you project that sort of thing for 20 years. And he was taking those sorts of positions for a premium.[3]

As the losses increased to staggering levels, Akbar created a maze of artificial accounting. According to a 1991 Price Waterhouse report, Akbar split the department's functions into normal Treasury activities and 'Number Two' account activities" . . . outside the scope of external audit . . . in the name of private clients but for [BCCI]. . ."[4] The report explained that the "Number Two" accounts derived from :

"misappropriation of external funds deposited under trust with [BCCI] to be managed on behalf of a few prominent people who are also shareholders of Holdings, and maintaining a pool of funds in the private named accounts of A. R. Khalil which were used freely by Z. Akbar to fund adjustments. . ."[5]

In other words, Akbar inflated BCCI Treasury profits through the use of unrecorded deposits in the accounts of important BCCI "customers", such as Khalil.

By 1985, Akbar's treasury department had accumulated losses approaching $1 billion, leading to a near collapse of the bank.[6] Akbar and, presumably Naqvi, recognized that the off-balance sheet accounting in the "Number Two" accounts could no longer adequately hide the massive losses. Accordingly, "out-of-book" or unrecorded deposits were moved "out-of-bank" to a new financial entity -- Capcom Financial Services, Ltd.

At Capcom, Akbar and Naqvi reasoned, the phony BCCI accounts could be further disguised and placed beyond the reach of bank auditors. In short, Capcom afforded BCCI a wider scope of options for the manipulation of accounts, the continuation of frauds and, perhaps, a last ditch attempt at fiscal recovery.

### Creation of Capcom 1984-1985

On April 26, 1984 Akbar registered an obscure company named Hourcharm, Ltd, at his home address in London. On May 22, 1984, Hourcharm was renamed Capital Commodity Dealers, Ltd., and then in July, Capcom Financial Services. Capcom was funded with a capital of 1 million which during the first year was augmented to 10,00,000 pounds and then increased to 25,000,000 pounds (approximately $37,000,000).

Capcom commenced trading in London on September 17, 1984. According to the June 22, 1991 Price Waterhouse Report to the Bank of England, "Capcom ... rapidly became one of the most significant of the brokers used by Treasury [BCCI]."[7] Indeed, within the first year customer accounts bulged to over 100,000,000 (approximately $160,000,000), inordinately large sums for a fledgling commodities brokerage company.[8] According to Masihur Rahman, "Capcom was given an official credit line" by BCCI.[9]

A 1991 documentary on BCCI, produced in London, featured Jehangir Masud, a former employee of the Abu Dhabi Investment Authority, and Shahid Suleri, a former BCCI employee, commenting on the connections between Capcom and BCCI. Masud claimed, "the [BCCI] Treasury put huge volumes of business through generating large brokerage fees for Capcom." Suleri recounted that Capcom allocated profits to their own account, losses to BCCI, using BCCI funds as margin deposits.[10] In testimony to the Subcommittee, Rahman concurred, noting that "many of the transactions that the bank was doing [were] being routed through Capcom, who obviously was scaling out the differentials ....and passing on the heavy losses and things to the bank."[11]

## Capcom Operations

Capcom operated as a broker in the London and Chicago commodities markets. Commodities markets should be distinguished from the stock markets, which are more or less "cash markets" designed for "direct investment." As author Martin Mayer has explained, "you own what you buy and your success is a function of the success of the company in which you have purchased shares."[12] According to Mayer, futures markets, in contrast to cash markets, do not offer the investor the "commodity that underlies the activity." Mayer has written that futures investors:

"trade contracts to purchase or sell that commodity on a future date. The contract is inescapable. Those who purchase must stand ready to receive the commodity at a specified delivery point at this price on a specified date (or to buy an offsetting obligation from someone who has a contract to deliver to that point on that date, thus permitting the "clearing corporation" that serves the exchange to extinguish both contracts.) Those who sell futures contracts must stand ready to deliver the commodity to the delivery point for this price on the specified date (or buy in someone else's contract to accept delivery.) As a result future's markets are not situations where everyone can win.[13]

The commodities markets in the U.K. and the U.S. are not restricted, regulated or supervised as stringently as the banking industry or the securities markets.[14]

Moreover, the commodities markets can sustain almost limitless volume, a necessary prerequisite for crime on the scale of that contemplated by BCCI since fraudulent transactions may be hidden in a multitude of legitimate ones. In a letter to the directors, the Chairman of Capcom, Larry Romrell, reported that 165 million in trading during the first four months of operation, and profits of 883,393. That trend continued until 1988 leading Akbar to boast to agent Mazur: "We have contracted 165,000 contracts totalling $53 billion with Drexel Burnham," and later, "we have done over $90 billion total in 1988."[15]

While the number of contracts and dollar volume seems unbelievable, a commodities company can artificially create massive volume by many small or no-risk trading methods. Indeed, the volume generated by Capcom helped it to generate respectability and acceptance with reputable banks and brokers.[16] For example, listed under "Auditors and Advisers" in Capcom's 1987 Annual Report were the following major international banks: Manufacturers Hanover Trust Company, London, National Westminster Bank Plc, Manufacturers Hanover Trust Company, New York, Deutsche Westminster Bank, A.G., and National Westminster Bank, plc. Elsewhere, Capcom noted its ties to Dean Witter Reynolds, American Express Bank, Refco, Prudential Bache Trading Corp., and Sumitomo Trust and Banking, Ltd.[17] Like BCCI, Capcom attempted to buy legitimacy to assist its rapid expansion.

Capcom's expansion took it to the United States where it opened Capcom Futures in late 1984.[18] Mohammed Saghir, born in the same town in India as Abedi, and a former cohort of Akbar's at the National Bank of Oman, was brought in to run the Chicago operations. The American Board of Directors mirrored that of London with Larry Romrell serving as the Chairman.

In testimony before the Subcommittee, Wendy Gramm, the Chairperson of the Commodities Futures Trading Association (CFTC) described the relationship between Capcom US and Capcom UK:

Capcom UK and Capcom US were intertwined. Both companies had common directors and shareholders. Capcom UK owned 82% of Capcom US from May 1985 until June 30, 1987.

**BCCI Pulls Out**

In July, 1985 the BCCI accounts were ostensibly withdrawn from Capcom, apparently on the advice of the firm's auditors who counseled that the bank should not be engaged in the kind of speculation intrinsic to the commodities markets.[19] With all visible BCCI accounts closed, Chairman Larry Romrell observed in Capcom's annual report: "The cessation of BCCI business obviously had an impact upon our volume."[20]

However, according to the 1991 Price Waterhouse report, at the same time that BCCI withdrew from Capcom an amount of $68 million was paid by BCCI Treasury to Brenchase, Ltd, a subsidiary of Capcom, controlled by Akbar, raising the question of whether or not BCCI had really withdrawn from the firm.[21] Moreover, the Price Waterhouse report notes that, "...despite an apparent cessation of trading links with Capcom ...two payments of $50 million were made to Capcom in March, 1986 out of external funds for which no liability for repayment was recorded."[22] These and other comparable payments clearly suggest that Naqvi and Akbar continued to use Capcom to shield BCCI funds and perhaps to move money.

Moreover, as late as 1989 the client list for Capcom Futures, the US subsidiary of London-based Capcom Financial Services, consists of several apparent BCCI accounts in the names of BCCI employees controlled by Z.A. Akbar.

It is not clear why Naqvi and Akbar chose to maintain the public facade of a split between Capcom and BCCI. One possible explanation is that Naqvi and Akbar profited from BCCI

losses both at BCCI treasury and later at Capcom. When Senator Kerry asked Mr. Rahman if Mr. Naqvi had profited from the BCCI losses, the former BCCI manager responded, "since only two, three people are involved ...somebody has profited a lot."[23]

**Akbar and Capcom**

In 1986, after the discovery of BCCI losses on cotton trading, Akbar left the BCCI Treasury to join Capcom. According to Masihur Rahman, Akbar "was released" from BCCI, taking "his company car and other benefits."[24]

Upon moving to Capcom, Akbar formed Financial Advisory Services (FAS), an introducing broker, or marketing arm for Capcom. FAS was owned by Akbar's Panamanian-registered, Liechtenstein operated nominee company, ZASK Trading and Investments, Ltd.

Akbar did not immediately become a Director of Capcom, sitting instead in the FAS offices which adjoined Capcom. Akbar explained to Mazur his reasons for not joining Capcom's Board of Directors:

when I left the bank, BCCI people, they said 'Mr. Akbar, for, for at least a couple of years you don't go and sit in the office...it doesn't look nice that you leave the bank...and establish your own company'... they said 'please keep away'...[25]

But it was Akbar, nevertheless, who directed operations at Capcom. With the freedom of singular control over a vast pool of BCCI's "out-of-book", "Number Two" Treasury funds deposited at Capcom, Akbar manipulated to enrich himself. The Subcommittee has concluded that with Akbar at the helm, Capcom engaged in blackmail, bogus loans, "bucket shop" trading, use of nominee frontmen, artificial mirror-image trades, co-mingling of funds, money-laundering, theft, skimming of accounts, and kickbacks to insiders.

For example, Akbar arranged for kickbacks to Peniel Investments, a Liechtenstein-based, Panamanian-registered company that he owned. This arrangement, and others, specified commissions that he paid to himself of between $5.00 and $12.00 per contract on business he had introduced to Capcom, specifying "BCCI Overseas" as a qualifying account. In the months during which BCCI lost $430 million at Capcom, Akbar paid himself a total kickback of 4,671,579.86 (approximately $7,000,000).[26] It is not clear whether Naqvi and anyone else at BCCI knew about or participated in these kickback schemes.

**Capcom and Money Laundering**

There is evidence that Capcom engaged in money laundering for a variety of clients both in the United States and in London. For example, some 50 transactions were identified in the Futures, Inc. accounts with insufficient or no supporting documentation regarding the source or disposition of funds. These transactions totalled more than $125,000,000.[27]

In testimony to the Subcommittee, Customs agent Robert Mazur testified how Akbar used "mirror-image" trading to launder huge sums of money. Mirror image trading involves buying contracts for one account while selling an equal number from another account. Since both accounts are controlled by the same individual any profit or loss is effectively netted.

REENTERED AS EXHIBIT 3

According to Mazur, Akbar explained that because these "mirror image" transactions can be lost among many millions of dollars worth of legitimate transactions "it would take forever for anyone to ever find it."[28]

Using mirror-image trading, Akbar bilked the BCCI Treasury accounts and laundered money for one of Capcom's most notorious clients, General Manuel Antonio Noriega.[29] Although complex, the series of transactions involving Noriega, BCCI and Capcom provide an illustration of textbook money laundering.

**Capcom, BCCI and Noriega**

From 1982 through 1986 Noriega opened accounts with BCCI for the "placement of secret funds of the [Panama] National Guard -- money which Noriega was using for his personal use and that of his family."[30] Despite the fact that the accounts were "no correspondence" accounts in countries with strict bank secrecy laws, Noriega was not completely free from risk in his use of the public funds because the accounts were opened in his name and with his signature.[31]

As of 1986, Noriega had placed approximately $23 million in BCCI accounts in Luxembourg and London. In July of that year, BCCI and Noriega began to shuffle these funds. On 26 July 1986, two Noriega accounts containing $8.1 million and $3 million were transferred from BCCI, Luxembourg, to the account of the Banco Nacionale de Panama at the Union Bank of Switzerland in Zurich[32] in the name of a company called [sic] "Finlay International."[33]

On this same day, other Noriega accounts at BCCI totalling $11.8 million were transferred into the accounts of Banco Nacionale de Panama at Deutsche Sudamerikanische Bank in Hamburg, Germany, also in the name of [sic] "Finlay International."[34] Thus, in a complicated set of transactions, the entire sum of Noriega's BCCI accounts was transferred to banks other than BCCI, held in accounts not opened by Noriega, and held in the name of an entity other than Noriega.

The transfers became even more convoluted over the next two years. On 8 September 1988, the entire $23 million was transferred to the Banco Nacionale de Panama account at the Middle Eastern Bank in London in the name of [sic] "Findlays."[35] This transfer served to consolidate the funds in a single account. Despite the fact that the funds were nominally held in the account of the Banco Nacionale de Panama, the accounts themselves had been opened by Noriega (who personally signed the account opening documents) and remained in his control.[36]

On 13 September 1988, the Chief of the Private and Investment Banking Division of the Nacionale Banco de Panama instructed Middle East Bank to transfer the money from its account to the account of [sic] "Finleys International Ltd."[37] This transfer thus served to remove Banco Nacionale de Panama from the transaction altogether.

From 15 September 1988 through 19 September 1988, Finley instructed Middle East Bank to disburse almost the entire balance which had been amassed in Finley's account. The letters

from Finley were signed by Capcom's President, Z.A. Akbar.[38] Three of these payments totalling $20.5 million were made to Capcom and credited to the GESS and GOOD Capcom customer accounts.[39]

Another $2.6 million was paid to a coded account at the Trade Development Bank in Geneva, Switzerland.

The transfers between Finley and Capcom effectively laundered the funds originally deposited in BCCI by Noriega. The transactions constituted "mirror image" trading; in effect, the same person -- Akbar -- stood on both sides of the transaction. Akbar was the managing director of Capcom and almost certainly possessed the controlling interest in the majority of the company's shares.[40] He also was the chairman and director of Finley. Moreover, he possessed a Power of Attorney for the GESS account and his brother was a director of the company behind the GESS account.[41]

In the entire set of transfers between Capcom, Finley, and the Capcom Accounts, the funds were under Akbar's control and subject to his direction. In order to disguise the transactions, Akbar continually sought to inject other parties into the scenario and to portray the transfers as legitimate business transactions between non-identical parties.[42] However, the documents indicate that Akbar moved funds from a bank account under his control to a company of which he was the managing director and then into Capcom customer accounts under his control.[43] What appeared to be transactions between different entities were merely transfers of funds between nominally different accounts under the control of the same individual. Akbar used Capcom and its accounts to conceal the source of the funds and "transform" them into facially legitimate business capital, brokerage fees, and bank account deposits.

**Capcom and Shakarchi**

Capcom may also have laundered money in the so-called "Lebanese connection" case. According to the Peat, Marwick report, on February 10th, 1988, Capcom received a telex from Ahmed Tawfik giving instructions to make a payment of $150,000 to Shakarchi Trading. Shakarchi trading was a Zurich-based currency trading firm, principally involved in gold bullion trading. Reportedly, a number of wealthy Egyptians had accounts with the firm which was owned by Mohammed Shakarchi.

In February, 1989 Shakarchi was linked by U.S. and Swiss investigators to two Lebanese brothers, Jean and Barkev Magharian, who admitted that some of the two billion swiss francs they channeled into Swiss banks and trading houses between 1985 and 1988 derived from drug transactions. The Magharian brothers told investigators that $36 million the couriers brought to them in Switzerland from Los Angeles came from cocaine profits.

The case gained notoriety when Swiss Minister of Justice was forced to resign in January 1989 after admitting that she told her husband, who worked for Shakarchi, that the firm was about to be implicated in Switzerland's biggest financial scandal.

**Capcom and AMBROS**

Yet another suspicious relationship maintained by Capcom was with a German trading company, Ambros Holdings. Approximately 44% of the Capcom U.S. client base consisted of West German individual and corporate accounts controlled by a handful of Western German companies such as "A and G management", SFS GmbH management" and "Ralf Ltd." For example, Metzler SFS controlled 37 of the accounts, or 39% of the total. The most important of the German clients was Ambros holdings which accounted for 50% to 70% of Capcom Future's gross commissions and revenues in the period September/October 1988. According to Capcom's records, the ledger balance was $40 million.

Ambros was a Panama registered company with offices in both Germany and Liechtenstein. The company's President and Secretary was Richard Sax, who traded for Ambros through Capcom Futures, and elsewhere in Chicago, under the alias of Richard Wagner.

Ambros declared bankruptcy in Germany in 1991. German prosecutors have been investigating the collapse of the firm which may have lost as much DM 500m in the commodity futures markets. According to press reports, German investigators believe that Ambros operated as a giant Ponzi scheme.[44]

**Majority Shareholder of**

**Kamal Adham and A.R. Khalil**

The June, 1991 Price Waterhouse Report noted the overlap of shareholders between BCCI and Capcom: "[Capcom's]...initial shareholders were dominated by major shareholders of [BCCI]."[45] A.R. Khalil, Minister of Communications for Saudi Arabia and Deputy Chief of Intelligence -- and a major BCCI shareholder -- was the dominant shareholder and director of Capcom from its foundation until its termination. Besides Khalil, the "Saudi Group", included, Kamal Adham, Khalil's former boss and the lead investor in the FGB takeover; J.J. Uddin, who acted as a substitute for Khalil; El Sayed E. El Jawhary, an associate of Adham and Khalil; and Robert E. Powell, an American with long-standing ties to Adham and Khalil.

Although little is known about Mr. Khalil, the Subcommittee has learned that in 1976 he became Director General of Ministry of Communications of Saudi Arabia . The Subcommittee has also obtained a brief description of Khalil's background which he provided to officials of the Federal Reserve on April 23, 1981 in connection with the proposed acquisition of Financial General Bankshares:

My career has been devoted to business and I presently hold interests in real estate, mechanical and electrical maintenance projects, and commodities. In addition, I have been involved in some business ventures with American and British manufacturers for the installation of electronic and computer equipment in Saudi Arabia.[46]

In a document entitled "A Brief Resume of the Company and Its Directors, Capital Commodities Dealers, Ltd.", Khalil is identified as a prominent Saudi Businessman, involved in real estate and construction, mainly in Saudi Arabia, U.A.E. and Oman. He is also listed as the owner or director of the following companies: Arabian Electronic Project Establishment, Global Chemical and Maintenance Systems (where Robert E. Powell was CEO), and

Rockwell International, USA (where Kerry Fox worked). The resume estimated Khalil's net worth to be "US $300,000,000."

It is noteworthy that during the same years that the Chief of Saudi Intelligence, Kamal Adham, is entering the American banking industry through the purchase of First American, his successor in Saudi intelligence, Mr. Khalil, is quietly purchasing three houses in the United States with the assistance of Americans Kerry Fox and Larry Romrell -- key players in Capcom.

### U.S. Connection: Romrell, Magness and Fox

The investor relationships in Capcom represent the culmination of a long relationship between members of Saudi intelligence and important figures in the US communications industry. The record establishes the relationship between Khalil and the Americans, Romrell, Magness, and Fox had its genesis in the communications industry prior to the creation of Capcom.[47] First, Kerry Fox had a long relationship with Khalil through his work in the electronics business for Martin Marietta and Rockwell International with the Saudi government dating five to ten years prior to the creation of Capcom.

Second, Romrell and Magness proposed numerous ventures in communications to BCCI and Khalil in the three years prior to the formation of Capcom, 1982-1985. The proposals included the installation of state-of-the-art electronics and communications in the Saudi military command center. In October, 1982 Romrell expressed interest to Akbar in "working with the bank [BCCI] and managing any interests they may have in our area."

### US Investments Proposed By Romrell/Magness

Larry Romrell has told the Subcommittee that he met Khalil in 1981. The timing of the meeting appears to have been just subsequent to Khalil's appearance at the Federal Reserve in Washington D.C. in connection with the takeover of Financial General Bankshares.[48]

After entering into a real estate venture with Khalil, Romrell moved quickly to solidify his relationship with Akbar, BCCI and Khalil. The Subcommittee has compiled a log of business proposals by Romrell for BCCI. (see Appendix I) Mr. Romrell explained the various propositions in a response to written questions from the Subcommittee:

Mr. Akbar had indicated to me that his clients or BCCI -- I always had difficulty distinguishing between Mr. Akbar's actions on behalf of his Mid-East investment client and his actions on behalf of BCCi -- might be interested in investing in the United States, principally in "bricks and mortar" office buildings. I suggested some possible investments to Mr. Akbar. I never sought or received any compensation from BCCI or Mr. Akbar for managing properties or anything else.[49]

While there is insufficient evidence to determine whether or not any of these proposals were consummated between the parties, the heavy traffic of proposals in 1983 to 1985 raises many serious questions about Romrell's and Magness' involvement with BCCI. Moreover, documents suggest that during this period BCCI credit was an important vehicle for Mr. Romrell and Mr. Magness in their personal affairs.

REENTERED AS EXHIBIT 3

**BCCI and TCI**

Documents provided to the Subcommittee also indicate that BCCI may have been a shareholder in TCI, the largest cable company in the United States.[50] All TCI shareholders were issued WTCI stock when the latter was spun-off from TCI as a separate company. The WTCI stock was then listed independently and was publicly traded on its own. In a letter to Akbar, Romrell wrote:

"I am enclosing an Information Statement which has just become available this morning covering the distribution to the TCI shareholders of all the outstanding shares of WTCI...the stock will be distributed by today by mail along with the enclosed Information Statement to all TCI shareholders...there is a possibility that the WTCI stock price will sell for a price upwards from $8.00. I still intend to buy for our accounts at the best possible price somewhere between $2 to $4.50. If you have any comments or require any additional information, please give me a call."[51]

Six months later, Romrell wrote Akbar about an apparent agreement:

"I understand the WTCI stock will officially start trading at opening of business tomorrow, March 20. I want to confirm my understanding that I have established pursuant to my conversation with you a $100,000 credit line with which to purchase stock and, in addition, that you have authorized me to purchase stock in your behalf up to a $100,000 limit. The combined credit line would then be $200,000, except that I would reduce my credit line within 30 days from $100,000 to $85,000. If this is not your understanding or does not meet with your approval, please contact me immediately.[52]

Romrell has told the Subcommittee that, in fact, there was no agreement and no combined credit line. He acknowledged that the wording of the letter "did not sound good".[53]

Perhaps the most provocative document suggests that Romrell was seeking a $200 million credit line from BCCI for TCI:

"...the TCI finance group that they are interested in obtaining a loan facility...I asked Bob Magness...he asked me to determine whether there would be any interest ion the part of BCCI...I believe the credit facility that TCI is looking for is around $200,000,000...as a separate matter, WTCI will soon be looking for approximately $50,000,000 to construct a new microwave route...there may be an opportunity to put this deal together with BCCI if you are interested."[54]

According to TCI's lawyers, the company has never had any relationship of any kind with BCCI:

[There is] no evidence that the TCI or the Related companies had any business dealings with Capcom, BCCI, or any currently identified related entity or person... [55]

**Romrell, Magness and Capcom**

REENTERED AS EXHIBIT 3

During the period that Romrell is passing on WTCI information to Akbar, he is also contemplating an investment in Capcom: "Magness and I have discussed your proposal to invest in a U.S. brokerage firm in Chicago or New York and to participate in the ownership and operation to the mutual benefit of BCCI and ourselves."[56] To entice the participation of Romrell and Magness in Capcom, Akbar represented to the Americans that the firm would earn a minimum of $4 million per year, and potentially as much as $10 to $15 million.[57]

Despite the fact that neither of them had any experience or expertise in the futures markets, Magness and Romrell agreed to become directors on May 27, 1984.[58] They also decided to make a financial investment in the firm. Magness, in a notarized statement dated May 12, 1992, explained to the Subcommittee:

"...I agreed to buy a 1 percent interest for approximately $15,000."[59]

"I was not offered anything for my investment beyond the [above stated 1 percent] interest in Capcom. Nor was I offered anything as an inducement to become a member of Capcom's board of directors."[60]

However, Magness and Romrell also purchased a stake in Capcom with funds provided by BCCI. In a "Note for file" written November 9, 1984, Romrell scribbled:

"Bob and I" funded our share capital and loan stock as follows: "We agreed to fund $14,744[61]

and borrow $75,000 each from BCCI London...Balance of current amount due was funded from our Credit Lines at BCCI, London."[62]

The Subcommittee has obtained documents which appear to show that, in fact there were other loans beyond those provided by BCCI. Magness and Romrell executed no-risk loans to purchase Capcom stock in a September 17, 1984 agreement with a Panamanian company secretly owned by Akbar, managed in Liechtenstein by a Dr. Franz Pucher. The company was named "Peniel Investments, Inc."[63] Akbar provided Romrell and Magness with subordinated Loan Stock in the amounts of 330,000 (approximately $450,000) for Romrell and 69,300 (approximately $90,000) for Magness.[64] A very unusual aspect of the loans is that they were self-liquidating: funds paid into Romrell's and Magness' loan accounts from profits in their "managed investment" accounts would be used to pay down the loan principal. [65] In other words, these loans resembled the standard issue BCCI no-risk loans provided to those who acted as nominees for the bank.

Another set of documents dating some months later shows additional loans to Magness and Romrell from Paten Holdings, Inc., a different Panamanian company, operated out of Geneva by Mme. Cecile Ringenberg, and again, secretly owned by Akbar. [66]

Romrell has told the Subcommittee that "at the time I understood Paten Holdings to be a Swiss bank."[67]

On May 23, 1985, the Capcom directors used Paten Holdings to increase the capital base in Capcom from L10,000,000 to L25,000,000. By increasing the capital base of the firm, Romrell's and Magness' overall holdings were also increased. Romrell, who had placed only $15,000 of his own money into the firm, found himself with holdings valued in excess of $2 million.[68]

The Loan Agreement, dated June 17, 1985, between Paten Holdings, Inc. and Romrell and Magness provides both men with 169,500 (approx. $250,000). The terms require payment no later than June 17, 1987. The collateral for the loans was the shares secured by an attached memorandum of deposit and dividends and interest were to be retained in order to reduce the outstanding balance of the loans. As Romrell explained: "...with regard to Paten Holdings, Inc...we had originally planned to reduce that loan with dividends from Capcom."[69]

Indeed two years later, in July 1987, Romrell proposed a 30 percent dividend in a letter to Khalil, Adham, and Jawhary.[70] However, upset from the events surrounding the CBOT investigation, the Saudi Group refused to allow the dividends. In order to accommodate the Americans, Akbar arranged for Romrell and Magness to enter into replacement loan agreements with Paten Holdings, Inc. The new loans were for an increased amount, 221,157.93 (approx. $330,000) and were secured by the Capcom shares. [71]

The year-end 1987 audit of Capcom in London by Arthur Anderson raised the issue of disclosure of the Paten and Peniel loans:

"All transactions with related or associated parties have, where material and appropriate for the presentation of a true and fair view...There are no agreements whereby the directors could receive benefit from dealing transactions either directly or indirectly through agency agreements...In respect of the agency agreements between Capcom Financial Services, Ltd and the following companies: a) Peniel Investments, Ltd, and b) Paten Holdings, Inc. ...In addition, we confirm that the agreements were entered into at arms length and that no director or shareholder has an interest in either agent company. The company and its subsidiaries have at no time during the period entered into any arrangement, transaction or agreement to provide credit facilities (including loans, quasi-loans, credit transactions, mutually beneficial arrangements or guarantees or security for liabilities for any directors, shadow directors, officers or their connected persons (except as permitted by the Companies Act 1985 and as disclosed in the accounts.)[72]

The Paten and Peniel loan documents show this statement by the auditors to be completely false. Either the auditors colluded with Capcom management, or more likely, they were misled as to Paten and Peniel by the management of Capcom.

Ultimately, Romrell tried to sever his connection to Paten. According to Cecile Ringenberg, an emergency meeting was called in London by Sheik Khalil. At that meeting, control of Paten passed from Romrell to Akbar. Romrell has indicated to the Subcommittee that he has never

met Cecile Ringenberg, although a xerox of her calling card was provided by him to the Subcommittee.[73]

**Capcom Nominees**

The Subcommittee has uncovered documents which show that Romrell and Magness clearly understood that they were acting as nominees on behalf of Capcom. In a 1987 letter to Khalil, Romrell wrote:

"it was my understanding that the majority shareholders were not willing to sign these guarantees ...As far as I personally am concerned, except for my paid-up stock and notes, I have acted as nominee for one or more of the original shareholders."[74]

Five days later, Romrell reiterated this point in another letter:

"...It was my understanding at that time the majority shareholders representing yourself, Sheikh Kamal, and Mr. Jawhary...but it was the only one [plan] we could see that would retain the original shareholders through voting trusts and nominees and meet the needs of the Chicago Board of Trade. It was understood by the reorganized shareholders that they were nominees for the original shareholders. Thus, the actual beneficial ownership did not change."[75]

The reason for using American nominees by Capcom was clearly stated by Akbar in his taped conversation with undercover U.S. Customs agent Robert Mazur: "...it's better if we use some other people as our nominees, instead of showing [Capcom] as BCC subsidiary"[76] This is the identical strategy to that pursued by BCCI in its acquisition of First American Bank in Washington D.C.

**Robert Powell**

Robert Powell, a California businessman with interests in the Middle East, was also a director of Capcom, and, he claims, unbeknownst to him, a nominee for the company. Powell, like so many others involved in the BCCI affair, claims to feel "deceived, duped, humiliated ...etc...etc."[77]

Powell has a background in infrastructure and aircraft maintenance for the U.S. military, having provided "contract services to the United States Air Force, Military Airlift command, for the operation and maintenance of United States Air Force facilities located at Wake-Island, Mid Pacific."[78] Despite his close relationship to the U.S. military during the Vietnam War, Powell claims to have no background in, or affiliation with, military intelligence. Rather, he told Subcommittee staff that he simply follows the military "where they go."

According to Powell, in 1968 he was contacted by an assistant to Sheik Kamal Adham named Mamoud Arabe who met with him in Washington D.C. and subsequently set up meetings for him with Adham, then chief of Saudi Intelligence, and A.R. Khalil, the Deputy Chief of Saudi Intelligence, in New York. According to Powell, he believed that Adham and Khalil were simply "advisor(s)" to the King of Saudi Arabia and that during their meeting they only

REENTERED AS EXHIBIT 3

discussed "differences between Democratic and Residential candidates [with] a little bit of talk about the company and the services we offer."[79] Nevertheless, at some point thereafter, Powell settled in Saudi Arabia where he became the managing director for Global Chemical and Maintenance Systems, a company owned by A.R. Khalil. When Global Chemical opened an office in Oman in 1976 Powell met Z.A. Akbar who was then working at the National Bank of Oman, which was partially owned by BCCI. The next year Powell established a banking relationship for Global Chemical with BCCI, and while he lists BCCI as Global's bank in its annual report, he claims under oath that "no Global entity or myself borrowed any money from BCCI."[80]

Powell became involved with Capcom in 1984 at the suggestion of Akbar.[81] According to Powell he invested 80,000 Pounds Sterling in Capcom, money which was financed, although as of June 21, 1992, Powell was uncertain the nature or source of the financing.[82] Powell told the Subcommittee that he believed his initial investment represented the extent of his holdings. In July, 1992, however, prompted by questions from the Subcommittee, Powell contacted Capcom in London which advised him that by July 1985 he had accumulated 3,500,000 shares of stock -- 15% of the firm's holdings. Most of that stock was transferred from his account in 1987 but as of July 1992 he still owned 250,000 shares of stock. According to Powell, "When or how I became the owner of a 250,000 shares is not explained by the record nor do I have any knowledge about the activities that created this apparent paper increase." Powell wrote the Subcommittee "[I]t is obvious that the company can do anything it pleases with its shares without informing the affected parties. Is not hindsight beautiful?"[83]

Powell's account of Akbar's deception and of his relationship with BCCI, however, require further investigation. By his own admission, Powell met with Akbar "once or twice a year" in London to review Capcom and his stock holdings.[84] Moreover, he acknowledges having met Abedi on at least one occasion and Naqvi on at least a half dozen occasions.[85] These meetings with BCCI's top management strike the Subcommittee as strange given Powell's claim that he had such a limited relationship with BCCI as an institution.

**Kerry Fox**

As mentioned earlier, the genesis of Capcom's links to the U.S. lies in the relationship between Kerry Fox and A.R. Khalil. Fox had been Vice-President and General Manager of communications and electronics at Martin Marietta and President of two of Rockwell International's major divisions when he met A.R. Khalil while doing business with the Saudi government.[86]

Correspondence between Fox and Khalil suggests that they maintained a close relationship: "A.R. Khalil was and is a good friend of mine."[87] According to Fox, "I had known Sheikh Khalil for several years prior to that through business relationships with the Saudi government...(prior to 1982.)"[88] Moreover, Fox and Khalil owned neighboring homes in Texas and in Florida.[89]

REENTERED AS EXHIBIT 3

During the early 1980's Fox went to work for U.S. Telephone Communications, which by 1982, had experienced "phenomenal growth and revenues of $90 million annually." In 1985 Fox founded his own company in the telecommunications industry -- American Telecommunications Inc. He also invested in a number of real estate projects with his partner, Larry E. Romrell.[90]

In an affidavit, Fox described his relationship with Akbar who "at that time... was personally handling many of Sheikh Khalil's world-wide financial transactions."[91] According to Fox, "I worked <u>closely</u> with Mr. Akbar both as managing director of the Capital Fund, but more importantly for me when he served as a Director of American Telecommunications Corporation."[92] Fox described Akbar's role with ATC: "I worked closely with him by telephone to assist our company through some very difficult start-up and financial problems. Mr. Akbar provided badly needed financial resources to the company, first as equity and later as debt, which was instrumental to the company's survival."[93] Indeed, Capcom and related entities purchased in excess of 350,000 shares of ATC stock, over 100,000 ATC warrants and loaned the company hundreds of thousands of dollars. In the affidavit, Fox defended Akbar as: "absolutely honest, trustworthy, and very honorable. He is a man of the highest integrity, having a strict code of high morals and business ethics."[94]

After Akbar was indicted for money laundering by the US Attorney's office in Tampa Florida, he resigned from the board of ATC. Akbar was replaced by Larry Romrell on the board, even though Romrell told the Subcommittee that "by the late 1980's he and Fox had a personal falling-out."[95]

This background raises questions about Fox, who along with Romrell acted on behalf of Khalil in 1981 and 1982 to purchase three residences in the U.S. and manage them. The Subcommittee has learned that the three properties located in New Smyrna Beach, Florida; Dallas, Texas; and Vail, Colorado were each financed by BCCI and managed by Akbar.[96] Second, while Fox and Romrell "used the houses from time to time", the property deals may have been used to financially benefit the two Americans who at the time were salaried employees. [97]

The Subcommittee invited Fox to testify on these matters at its July 30, 1992 hearing, but Fox, though his attorneys, invoked his fifth amendment privilege not to incriminate himself.[98]

### The Capital Fund

Kerry Fox, although not a director of Capcom, was a director of The Capital Fund, an open-ended public investment fund launched by Capcom. The stated purpose of the FUND was investment in stocks, bonds, metals, options, and commodities. Control of the FUND resided in the "Manager", Capital Management Services, which had its operating base in Muttra, Oman. The original Directors were Paten Holdings and Zask Trading and Investment, Ltd, Akbar's secretly held Panamanian companies operated out of Liechtenstein. These entities were replaced as directors by Kerry Fox in October, 1985, indicating that Akbar had complete confidence in his ability to control Fox.[99]

REENTERED AS EXHIBIT 3

By January 1, 1986 the initial L10,000,000 share capital had been fully subscribed, making it appear that the general public had invested in the Capital Fund.[100] In fact, however, Akbar controlled almost everything behind the FUND, including Zask Investment, Paten Holdings, his brother and Dr. Franz Pucher, the Liechtenstein lawyer. Akbar secretly contributed $8,145,000 (81 percent) of the $10,000,000 deposited in the FUND with the remaining 19 percent coming from BCCI/Capcom insiders, including Kamal Adham and Mr. E. El Jawhary.

The first year of investments by the Capital Fund resulted in an impressive profit, $2,278,708, and, in fact, the FUND produced profits in every other year until its termination in 1988. However, Ian Watt of Peat Marwick McLintock, characterized the profits as "artificial" and explained that through "matched" and "back to back" transactions, money from at least 17 accounts was transferred into Fund, totalling an estimated $3,334,480.[101] Watt concluded that the FUND played a significant role in Capcom's operations: "In all, save a number of insignificant cases, the client account in which profit was created was FUND."[102]

The Capital Fund continued to increase and prosper until Akbar's indictment for drug money-laundering on October 10, 1988. After the indictments, Kerry Fox met A.J. Puri in December, 1988 at the Dallas-Ft. Worth airport and was advised that the Capital Fund would be wound up.[103] However, it was not until September 18, 1990 that Capital Management Services ceased trading and was liquidated.[104]

### The 1987 Chicago Investigation

In early 1987 the Chicago Board of Trade (CBOT) clearing corporation imposed a requirement that the owner of 5% or more of a clearing member guarantee the house obligations of such member. Accordingly, in June, 1987 the ownership of Capcom UK in Capcom US was reduced from 82% to 4%. The individuals who purchased Capcom UK shares in Capcom-U.S. did so with a loan from Capcom UK. One month later, in July 1987, Capcom US loaned Capcom UK nearly $3 million. That loan was never serviced and the Subcommittee has concluded that Capcom was involved in nothing more than a shell game to restructure its US operations.

At the same time that the restructuring was taking place, an investigation of Capcom had been undertaken by the CBOT to determine the identities of the individuals and entities which had an ownership interest in Capcom. In response to the investigation, A.R. Khalil wrote to Capcom's chairman, Larry Romrell, demanding that all the directors be fully advised of the true owners of Zask Investment and Trading, Akbar's company, which had surreptitiously increased its ownership in various Capcom entities. Ironically, Khalil ask that Romrell keep "my advisor, Mr. Z. Akbar, fully informed."

The issue was resolved when the secretly held Akbar-controlled interests in Capcom declined and the Saudi Group re-established its majority position using relatives and associates of Adham and Khalil on the Boards to escape the disclosure requirements of the US regulators. For instance, Mr. Wadia Sayed Khalil acquired a 39 percent ownership, and Mr. Robert E. Powell a 1 percent ownership, which combined with others in the "Saudi Group" totals 52 percent.[105]

REENTERED AS EXHIBIT 3

In its investigation of Capcom the CBOT also disclosed that Capcom had engaged in numerous serious violations. Stephen Early, General Counsel to the CBOT testified before the Subcommittee:

[O]ne of the violations was that Capcom London was acting as a principal rather than an agent in transactions entered into on behalf of its customers. Now in essence, what that means, if I can put it in simplest terms, is that Capcom London was selling to its customers out of its inventory of positions of contracts traded at the board of trade....It is illegal in the United States...What we require is that the customer gets is the trade that was transacted in the public auction on the floor of the exchange and nothing else.[106]

Early concluded that "a trading practice such as this ...may be a means to further cloud what you have already encountered as the disarray of records, which is typical of Capcom and BCCI." Capcom settled with the CBOT and agreed to "cease and desist" from further violations and to pay a $124,000 fine.[107]

Early also testified that at the time "[W]e had no direct evidence of money laundering on behalf of Capcom."[108] However, during the same period, undercover Customs agent Robert Mazur was learning from BCCI insiders that Capcom was, in fact, being used to launder money. Mazur's undercover tapes formed the basis for the October, 1988 indictment of the trading firm.

### Akbar Blackmails BCCI

In the summer of 1988, just months before the indictment in Tampa, Akbar contacted the Special Counsel to the Foreign Relations Committee, Jack Blum, and during a luncheon meeting in New York, claimed that he could lay out in detail the criminality of BCCI. Akbar boasts were real: according to the 1991 Price Waterhouse Report, "...Akbar took certain documents with him when he left [BCCI]. In 1988 he used this information to blackmail [BCCI], which paid $32 million to prevent him disclosing the true nature of the activities of Treasury..."[109] Akbar may have been using his meeting Blum to threaten BCCI. In testimony to the Subcommittee, Blum characterized his meeting with Akbar as "a $30 million lunch." [110]

The alleged bribes from BCCI to Akbar were paid into the TWOY account at Capcom. According to the Ian Watt audit, "TWOY and TWOY2 are both controlled by Akbar's brother, Mr. R. Akbar. The beneficial owners are not known..."[111] But Watt notes, "Akbar possessed a power of attorney over both TWOY accounts."[112]

In a secretly taped conversation Akbar explained to agent Bob Mazur the use of coded accounts to disguise ownership. Akbar used the example of TWOY, which he described as his account, and explained that "TWOY" was a translation, presumably from his native language, of the word "who":

"But if somebody asks, who's that person. Number two, it means who? For my account and Tawoy. It is called Tawoye. Tawoy. My account is Tawoye. Tawoye means who. No one asks who's Tawoye. We are not supposed to. [113]

The auditors noted the booking of a $31 million loss in the TWOY account in March 1987 from Standard and Poors Index futures trades.[114] In short, Akbar may have used the Twoy account to launder money that he had extorted from BCCI.

**The 1988 Indictment**

Capcom Financial Services, Ltd., the British parent company of the Chicago-based Capcom Futures, Inc., was indicted by a grand jury in Tampa, Florida on October 10, 1988.[115] S.Z.A. Akbar and BCCI were also named in the indictment.

The indictment charged that Capcom had participated in a conspiracy to launder money and to violate federal narcotics laws.[116] The indictment specifically charged that Capcom had used its bank and customer accounts to launder drug money for the Medellin cartel and other Latin American sources.[117]

Just as BCCI mounted a full scale public relations assault following the October 1988 indictment, so it appears did those with ties to Capcom contemplate a similar campaign. In his January office diary, Romrell noted "talked to Magness about CNN report and Capcom... waiting to know the source of the misinformation."[118] TCI, which Magness is chairman of, owns 20% of CNN. During the same period, Romrell also scribbled in his diary "Ramsey Clark/Lyndon Johnson/ Atty Gen is talking to people in Wash D.C. ... Drug charges may be lifted against Capcom."[119]

But the charges were not dropped and, in fact, a second, superseding indictment against BCCI was issued in 1989.[120] This second indictment added 14 additional defendants but it neither deleted Akbar or Capcom as defendants nor did it alter the legal claims made against them. [121]

Akbar was arrested in the UK where he had also been indicted. He was found guilty and sentenced to 18 months in prison. After his release, he fled to Paris where he was again arrested. Akbar is currently awaiting extradition to the United States. While Capcom Financial Services, Ltd., the UK parent, has been indicted, Capcom Futures, the U.S. subsidiary, has never been indicted.

The day after Akbar and Capcom were indicted in the U.S. for drug money-laundering, a memorandum was written by Romrell and John Parry, which revealed that Romrell had working knowledge of some of the "sensitive" accounts at Capcom, and that a joint agreement existed between Romrell and Capcom to make investments:

"On Tuesday 11th October 1986 it was decided by mutual agreement between John Parry and Larry Romrell that it would be in the best interests of the company to liquidate the open positions in the account GESS (General Securities). This decision was taken in light of the sensitive nature of the account pertaining at the time...

"It was decided to close the account slowly over a matter of days, if necessary, so as to preclude any market comment concerning unnatural activity at Capcom.

For all of the above reasons it was also decided to <u>liquidate any open positions in the accounts of Little and Large."</u>[122]

**1989 Chicago Investigation**

Following the announcements in October 1988 of the Florida indictments of Capcom UK for money laundering and drug trafficking, the futures markets activities of Capcom US, according to CFTC Chairperson Gramm, "became of great concern" to the CFTC.[123]

Indeed, the CFTC and the Chicago Mercantile Exchange commenced an inquiry into Capcom. According to Chairperson Gramm:

We were also interested in examining the Capcom US records to identify potential evidence that might suggest money laundering. Although money laundering is not a violation of the Commodity Exchange Act, the commission staff wanted to be sure all relevant information was available to the authorities who could best use it.[124]

On August 15, 1989, the CME Clearing House Finance Subcommittee reviewed the staff report of the activities of Capcom Futures from January, 1986 through May, 1989 and concluded that there was a reasonable basis to charge Capcom U.S. with the following violations: "Act of bad faith" (commingling customer funds with house funds); Permitting the Misuse of facilities; Detrimental Act; Uncommercial conduct; Accepting new trades when account undermargined; Transfers of positions with no change in ownership; notification of reduction in capital in excess of 20%; and non-compliance with financial requirements.

The CME found that trading at Capcom was often done on the basis of oral instructions received from customers which were then confirmed in writing. In some instances, according to the CME, "the files showed no confirmations." Moreover, the CME's internal investigation found that:

There were several transfers of funds from unaffiliated Capcom-U.S. customer accounts into the Ixora account, an account owned and controlled by Z.A. Akbar. According to the CME, no written authorizations were obtained prior to the transfer of the funds.

According to the CME, Akbar, the owner of the Ixora account, told the firm "he intended to use the account for trading and the firm anticipated significant trading volume."[125] The Ixora account actively traded from December, 1986 until May, 1987. From November, 1987 through October, 1988, there were twelve receipts into the account totaling $9.84 million and twenty-five disbursements totaling $9.82 million. CFTC Chairperson Gramm testified that IXORA was also "involved in a complicated $2 million transaction involving Finley International, Ltd. and Capcom UK."[126] Finley, as noted earlier, was the account used to launder General Noriega's money.

Certain of the trades in the Ixora account were clearly BCCI-related. For instance, a confirmation letter, dated April 27, 1987 is addressed to Mustafa Kamal c/o Bande Hasan. Mr. Hasan was an employee of BCCI in Miami. Moreover, CFTC Chairperson Gramm told the Subcommittee that:

REENTERED AS EXHIBIT 3

Information developed in our inquiry with respect to the Ixora account at Capcom US, however, indicated that certain disbursements were made to persons apparently unrelated to the purported account owners, including Akbar Bilgrami, who may be the same Akbar Bilgrami identified as the Director of Latin American Overseas by the October 1988 indictment.[127]

The Subcommittee has obtained documents which show that Romrell is the individual named on the IXORA account at First National Bank of Chicago. Moreover, Ixora account statements and bank statements were sent to him at his Western Telecommunications offices. CFTC Chairperson Gramm testified to the Subcommittee that "In February of 1988 S.Z.A. Akbar instructed that a cash disbursement of $100,000 be made the IXORA account ... to Mr. Romrell's account." [128] Concerning the IXORA account, Romrell told the Subcommittee:

[I] learned from the Subcommittee that Ixora also had an account at Capcom, but I have no knowledge of that account.

Ixora was a Cayman Islands corporation that was owned by Mr. Akbar. Mr. Akbar asked me to find the name of a Cayman Islands lawyer to handle this matter....To my knowledge, Ixora never conducted any business whatsoever.[129]

According to Chairperson Gramm, investigators were unable to learn anything more about the IXORA account because "Mr. Saghir exercised his fifth amendment rights with respect to all questions concerning this account when his investigative testimony was taken by the CFTC. [130]

The CME also found that there were multiple transfers of funds between Mohammed Zaheer, the brother of Capcom Futures' President, M. Saghir and two unaffiliated customer accounts.

On October 29 1987 there were six receipts in the Zaheer account totaling $4.84 million and the next day there were two disbursements totaling $4.80 million. The CME noted that "from the period December 31, 1986 through May 31, 1989, the ledger balance of the account was usually less than $150,000." These transfers are particularly suspect because an investigative firm retained by the CME discovered that Mr. Zaheer worked in a service station in Karachi, Pakistan and his position at this service station is described as "not very high."[131]

After reviewing the Saghir/Zaheer transactions, Gerald Beyer, Vice President for the CME, told the Subcommittee that "On a person level, when I was involved in this investigation, I was certain that it involved drug money and laundering of money.

But there was no way we could prove that. We discussed that in our committee; we discussed that among ourselves."[132]

Despite suspicions about highly unusual transactions, CFTC Chairperson Wendy Gramm told the Subcommittee:

In terms of finding trading violations or Commodity Exchange Act violations that perhaps could support money laundering, we did not find any discernible pattern...[N]o one has ben

able to --at least other law enforcement officials have not been able to find money laundering in Capcom US, to our knowledge, as of now.[133]

Money laundering, as Chairperson Gramm testified, is not even a violation of the Commodities Futures Trading Act. Incredibly, it appears that the CFTC and the self-regulatory organizations have never even made a criminal referral for possible money laundering:

Senator Kerry. [H]ave you ever specifically referred, or have any of the exchanges ever made a criminal referral for money laundering?

Dr. Gramm. We have raised concerns.

Senator Kerry. Have you made a criminal referral for money laundering?

Dr. Gramm. No. Not-- not specifically in that regard...

**Capcom Today**

Chairperson Gramm told the Subcommittee that the results of the inquiry by the CFTC "contributed to the removal of Capcom US from US financial markets."[134] According to Gramm:

The Chicago Mercantile Exchange, CME, immediately restricted the trading activities of Akbar and subsequently made specific findings in October of 1989 that Capcom US had violated CME rules, including accepting new trades in an undermargined account and improperly transferring positions between accounts. Capcom US paid a fine of $500,000 and agreed to withdraw as a CME clearing member.

Early in 1989 the Chicago Board of Trade, the only US exchange for which Capcom UK was a member, suspended Capcom UK indefinitely and Capcom UK was subsequently expelled on August 24, 1989. Also, on June 30, 1989 they allowed Capcom US to withdraw from CBOT membership. In accepting the Capcom UK settlement, the Board of Trade had reason to believe that Capcom UK had entered into reckless and unbusinesslike dealings, was unable to demonstrate capital compliance, and engaged in fraud and dishonorable conduct in its dealings with the exchanges, among other things.

In October of 1990 the NFA, the National Futures Association, found Capcom US to have violated NFA rules by making misrepresentations to a customer and making unauthorized trades, failing to collect proper margin from a customer, and failing to supervise employees and agents. As a consequence NFA ordered Capcom US to relinquish its FCM registration and NFA membership and never to reapply, and to dissolve its corporate status at the earliest possible date.

Ms. Gramm also stated that "all of the information developed by the commission [including that developed by the exchanges]....was made available to the prosecutors in charge of the criminal case pending in Tampa."

While Capcom UK was indicted in the US, it has never been tried and has successfully avoided service of process. More amazingly, Capcom UK continues to operate in London to

REENTERED AS EXHIBIT 3

this day. In fact, it has developed new European clients. While ZA Akbar is in jail in France, his legal defense bills, in excess of $100,000 a year are being picked up by Capcom. Moreover, Akbar's brother and Mrs. Puri, until recently, served on the board of Capcom.

**Conclusion**

Turmoil in the Persian Gulf after the fall of the Shah of Iran in 1979 left a vacuum in the CIA's capability to gather information. The huge CIA operation in Iran was lost, including its most important listening stations to monitor the Soviet Union and China. With Iran and Iraq locked in a land war, options remaining were limited to several friendly nations: Saudi Arabia, U.A.E., Oman, and Kuwait. With the revolutionary changes in technology that spawned the modern communications industry in the 1980's came the need for the proper U.S. agencies to employ it, and, conversely, for our allies to gain access to it.

It was in this climate that majority shareholders in BCCI approached U.S. executives in the communications industry to serve on the board of Capcom. The Americans, Larry Romrell, Robert Magness, both of Telecommunications Inc., and Kerry Fox of American Telecommunications Company, had no knowledge or background in commodities trading, and evidently were never involved in the management of the firm.

The evidence of the role of Saudi Intelligence officials, Adham and Khalil, who are the principle liaisons with the CIA over two decades, owning and controlling Capcom, is disturbing to the Subcommittee for two reasons. First, the Subcommittee is concerned by the possibility of a foreign intelligence service promoting a policy agenda in the U.S. Secondly, the close relationship of Saudi Intelligence to the CIA leads to the question of whether or not the CIA was aware of Saudi activities in the U.S.. The CIA has unequivocally told the Subcommittee that it did not use and has no knowledge of Capcom, and that it was unaware of the investments in Capcom by Sheik Adham and Sheik Khalil.

Unfortunately, it will be increasingly difficult to ascertain the purposes for which Capcom was used. In a December, 1990 letter, it was noted that Mrs. Puri, wife of A.J. Puri, was handling the "final details" of the Capital Fund wind-up. Although the meaning of final details is ambiguous, the London Independent reported in August, 1991 that "more than 100 boxes of files and other papers belonging to BCCI-linked Capcom Financial Services...were destroyed on the orders of a senior Capcom official...The request to destroy the documents was made by Sushma Puri...Ms. Puri is also co-director along with Capcom's founder, S.Z.A. Akbar, of Futures Advisory Services."[135]

Documents do still exist in the United States. Andrea Cocoran of the CFTC told the Subcommittee that the CFTC has all the records. Chairperson Gramm added that "We do have an investigation that continues regarding Capcom US."[136]

While it is encouraging to learn that the CFTC is continuing to investigate Capcom, four years have lapsed since Capcom was originally indicted. Counsel for Larry Romrell, the Chairman of Capcom, told the Subcommittee in the spring of 1992 that his client had not been interviewed nor had his records been subpoenaed by any law enforcement agency: the Subcommittee was the first government entity to show interest in Mr. Romrell's role in the entire Capcom affair. Clearly, in the United States, a much greater investigative effort needs to

REENTERED AS EXHIBIT 3

be devoted to Capcom. It is hard to understand why British regulators -- in light of the Peat Marwick report -- have allowed Capcom UK to continue operations. Subcommittee staff have been advised that Lord Justice Bingham has looked into the irregularities surrounding Capcom in the United Kingdom. His findings regarding Capcom's activities in the UK will, it is hoped, expose more of the facts concerning its extensive activities in the UK than the US investigations have been able to uncover.

In terms of the broader lessons of Capcom, regulation of the futures markets need to be greatly strengthened. Even a cursory background check on Akbar would have revealed that he had managed the Treasury accounts at BCCI which lost $400 million in the futures markets in the early eighties. Moreover, regulators who appeared before the Subcommittee testified on the one hand that annual audits of Capcom US turned up nothing irregular, but that Capcom's books and records were a mess. That such a contradiction was allowed to continue for four years indicates that the CFTC needs to critically review the effectiveness of the various exchange audits. Finally, money laundering should be made a crime under the Commodities Futures Trading Act.

# APPENDIX 1

## Romrell Proposals To Akbar

1. Installation of a subscription T.V. service in Saudi Arabia: "...I would rather work with you and Mr. Khalil on this venture."[137] (Khalil was the Minister of Communications in Saudi Arabia.)

REENTERED AS EXHIBIT 3

2. "...Mr. Khalil, the Saudi Sheikh...I will go over the material with him and I feel confident he will be interested..."[138]

3. Advice on how to proceed on TCI's bid to the Saudi Arabian government for cable television distribution system located at the Royal Saudi Air Defense Command School, Jeddah.[139]

4. Advice on proposal to TCI to install a cable system for the Ministry of Defense and Aviation Army Air Defense Command.[140]

5. $90,000,000 investment in a hospital in Houston, Northwest Medical Center. Proposal that Magness and Romrell take 25 percent, BCCI 50 percent, doctors 25 percent.[141]

6. $22,000,000 joint purchase of Stouffers Inn, Denver.[142]

7. BCCI loan proposed for $2,600,000 for a related investor group to purchase 30 percent in cattle feedlots owned partly by Magness and Romrell.[143]

8. Purchase proposal of Winterwood Townhomes, Steamboat Springs, using BCCI loan of $2,500,000 arranged by Romrell.[144]

9. Proposal of an investment of $3,100,000 in Marina Del Rey, California.[145]

10. $300,000 credit line from BCCI for operation of Amigo Farms. (April 18, 1984)[146]

11. $50,000 credit line for Romrell and Magness from BCCI. (June 5, 1984)

12. Beehive International building in Salt Lake City, Utah; Corporate Secretary and General Counsel is Romrell's brother; "with his inside information we could make a good deal."[147]

13. Oil and gas investment in Windsor Reservoir.[148]

14. "$6 million of credit on real estate to a friend of Romrell.[149]

15. "Duds 'n Suds" share offering purchase proposal before public issue proposed by Romrell to Akbar.[150]

16. Proposal for BCCI to be a partner in a land deal in Phoenix with Mr. Noel Cullison, who Romrell had arranged to borrow $525,000 from Capcom.[151]

17. $2,635,899 balance in loan credit from BCCI to Winterwood.[152]

18. "I scheduled a meeting with Mr. Shoaib and Mr. Nazarian with myself and Mr. Magness." [153]

REENTERED AS EXHIBIT 3

19. "Also, I am enclosing <u>another</u> letter from Tony Coelho. Tony Coelho would be the third most important man in the U.S. Government, with the President and the Speaker of the House being first and second most important."[154]

## APPENDIX II

### Money Flow From BCCI to Capcom and Related Individuals

The following transactions are an indication of the dimension of the relationship between the BCCI group and Capcom and related individuals, transactions which occurred in Capcom, and other financial details which have been found on documents produced to the Subcommittee. In

REENTERED AS EXHIBIT 3

some instances, this information resolves and explains questions regarding Capcom, but in others it raises questions.

The itemization of these transactions is presented here only as a log to put on public record in some consolidated order the evidence of financial events which relate to Capcom.

A. <u>ATC / FOX / Akbar et al</u>.

Akbar and entities which be controlled issued credit and purchased equity in American Telecommunications, Inc (ATC). The Chairman and CEO of ATC is Mr. Kerry Fox. Mr. Larry E. Romrell is a Director of ATC. Mr. Fox was a Director of Capital Fund, a Capcom public investment fund which was the recipient of large amounts of moneys skimmed or laundered by Capcom, as described later in this report.

The following transactions occurred between Mr. Kerry Fox, ATC, Akbar, Capcom, Financial Advisory Services, and BCCI:

1. 150,000 shares of ATC purchased by Zask Investments and Trading, owned by Akbar, operated out of Liechtenstein.

2. 30,000 shares purchased as in 1 above.

3. 177,102 shares purchased by Financial Advisory Services (FAS), owned and controlled by Akbar, linked to Capcom as an "introducing agent".

April 20, 1988.

4. $100,000 borrowed by ATC from Zask, June 1, 1989.

5. 50,000 warrants of ATC stock purchased by FAS.

6. 50,000 warrants of ATC stock purchased by Zask.

7. 25,000 warrants of ATC stock (not purchased) owned by Akbar.

8. June 11, 1991 letter from Fox to Akbar offers ATC warrants to Capital Fund, referring to the February 12, 1987 and August 5, 1988 grants of warrants.

9. September 30, 1988 letter from Fox to Akbar solicited Akbar's support in arranging receivables financing in the amount of $1.5 million.

10. $100,000 loaned to ATC June 15, 1988 by Akbar. Fox refers to ATC making losses and asks Akbar to consider making another $100,000 credit.

11. Request from Fox to Akbar May 3, 1988, stating that Fox had <u>"nowhere else to turn"</u> and was in a <u>"near term but critical cash flow problem"</u> (emphasis added), for "another" immediate loan of $250,000 and longer term $2-3,000,000 financing package.

<u>NOTE:</u> Akbar was a Director of ATC to November 4, 1988, when he resigned subsequent to his and Capcom's October 10, 1988 indictments for drug money-laundering. Some of the above transactions occurred after the indictment and conviction of Akbar.

## B. BCCI / Fox, Romrell / Khalil / Adham

Fox and Romrell acted as a front for A.R. Khalil for the purchase of three real estate assets in the U.S., as described later in this report. Akbar was the BCCI officer who arranged the financing.

1. $530,000 loan from BCCI to Fox/Romrell for construction of "Potato Patch" house, Vail, Colorado.

2. $908,625 loan from BCCI as of February 7, 1983, apparently for Vail Associates apartments.[155]

3. $2,000,000 loan BCCI to Dr. Charles Howard, Houston for sale of "Potato Patch" house by Romrell/Fox, who arranged loan and received part of proceeds.

4. November 8, 1982 letter from BCCI, Cayman to Fox/Romrell confirming loans outstanding:

$754,619 (Potato Patch, Vail)

$108,742

$532,003 (collateral: 1st mortgage on Khalil's Vail house)

5. Payments of $15,000, $34,995, and $20,000 were paid by Khalil to Fox/Romrell in March, April 1981, apparently to find costs of a real estate construction project.

6. Fox/Romrell had an account at BCCI, Cayman, #03002241, which had a balance of $388,486.33 on December 1, 1981.

7. $2,635,899 balance in loan accounts at BCCI for Magness, Romrell properties (Amigo Farms).[156]

8. $2,000,000 loan request by Romrell from BCCI, Cayman for IXORA Investments, Ltd, a company owned by Akbar cited by the CME in 1987 for 53 irregular transactions which imply money-laundering, although the Audit Report stated "We cannot speculate on the reasons, known only to them." The CME required total financial disclosures against the threat of expulsion, which caused ownership and directorship changes in 1987/88.

The transfers into the account came from A. Bilgrami, the BCCI officer convicted of drug money-laundering and presently serving prison sentence in Florida.

$1,950,000 was dispersed from the IXORA account at Capcom U.S. to Capcom U.K. on September 23, 1988.

A letter of January 1990 from First Chicago indicates that IXORA is an account owned by Akbar c/o Romrell, who had apparently acted for the company IXORA for many years.

9. A British accountant investigating for the Serious Fraud Office, London, noted:

https://info.publicintelligence.net/The-BCCI-Affair.htm

"...a series of transfers made out of and back to the Winterwood Associates [Romrell/Magness] funding around year end 1985. Two amounts of $1,000,000 were credited to this account from Bank America Int'l, N.Y. prior to Dec. 31, 1985. Subsequently, on 2 Jan. 1986, one amount of $1,000,000 was transferred to 1st Interstate Bank favoring Larry Romrell and another of $1,018,750 transferred to Account No. 01024628 of Mr. A.R. Khalil with BCCI. Ziauddin Akbar and K. Muneer were involved in authorizing both transfers." "The 01024628 account has been identified from our investigation into treasury operations as a London treasury pool account."

This suggests that the Winterwood Associates account of Romrell/Magness and/or Romrell may have been connected to the "routing of funds" by BCCI.

10. Kamal Adham, majority shareholder of Capcom, was responsible for estimated losses at BCCI of $199 million as of December 29, 1990.[157]

11. A "Note for File 11.9.84" indicates that BCCI loaned Magness and Romrell $75,000 each to buy shares in Capcom.

C. Capital Fund (Capcom) / Kerry Fox

This was a public investment fund organized by Akbar/Capcom with Kerry Fox as Director. It was the recipient of funds from skimming and money-laundering.

1. October 14, 1985 share capital of $900,000 was authorized and by January 1, 1986, $10,000,000 was fully subscribed by investors.[158]

2. Akbar controlled entities, Notan Trading and Investment, Zask Investments and Trading, Pate Holdings, Riziaudden Akbar contributed $8,145,000 of the $10,000,000 to capital fund, thereby benefiting of 80 percent of the funds skimmed or laundered into Capital Fund.

3. October 31, 1988 Special Audit identified $2,900,000 of funds artificially "processed" between certain accounts of which Capital Fund was the recipient.

4. $734,158 was skimmed into Capital Fund from 16 customer accounts by "internal matching."[159]

D. Capcom Financial Information

1. Audit as at October 31, 1988 for Capcom: 1988 showed Brokerage Commission Income 7,156,692 and loss on ordinary activities 8,514,936. Stock ownership at this date by Directors was as follows:

a. Romrell: 250,000 shares, down from 2,750,000 shares in 1987

b. A.R. Khalil: 8,250,000 shares (1/3 of outstanding)

c. A.K. Puri: 3,620,000 shares

d. B. Magness: 250,000 shares

REENTERED AS EXHIBIT 3

e. S.Z.A. Akbar: 6,000,000 shares

2. February 3, 1988 Khalil "sold" 8,250,000 shares to Akbar for 8,250,000. However, 4,000,000 cash was debited to a Capcom account which did not have sufficient funds and the balance of 4,250,000 was offset of "other obligations." The transaction appears to be only a camouflage of Khalil's interest to circumvent disclosure requirements imposed by regulatory authorities in late 1987.[160]

3. October 31, 1988 Special Audit revealed a total of $3,600,000 of artificially processed transactions between accounts at Capcom.

4. October 31, 1988 Special Audit detailed 11,518,360 provision against "doubtful customer balances."

5. Auditors noted an unexplained deposit in Capcom of 8.6 million by an Egyptian Dr. Attia with no trading having taken place.

6. $53,000,000 schedule of "profits" for the ARKY account at Capcom found in Akbar's desk. Presumably this is the account of A.R. Khalil. These "profits were made from October, 1984 to September, 1985, the period in which BCCI lost $430 million at Capcom. This is the clearest evidence that the shareholders of Capcom and/or Akbar stole funds from BCCI through artificial market transactions.[161]

7. $525,000 loan to Mr. Noel Cullison for a real estate development in Phoenix, arranged and managed by Romrell.[162]

8. Romrell borrowed $400,000 from Mideast Finances, Ltd., P.O. Box 211, Port Vila, Vanuatu for the purchase of his shares in Capcom Futures, Chicago. the credit was strictly limited to the value of his Capcom Futures shares, with no other liability. The document is dated September 30, 1988, but is not signed, leaving open the issue of whether this was the actual form of financing for his share purchase.

9. Magness entered into the same financing arrangement with Mideast Finances, Ltd, Vanuatu as in (8) above, dated September 30, 1988. The document in file is not a signed copy either.

10. A Resolution of the Board October 3, 1988 Authorized Share Capital Increase of Capcom Financial Services, Ltd, London to 100,000,000 (approximately $150,000,000). The intent evidenced by this document evidences the large scope of business contemplated by Capcom. Such a capitalization would have placed it among the largest brokerage houses in the world within three years from start-up.

11. May 11, 1989 letter from Parry to Romrell requiring confirmation of the debt of Romrell ($400,000) and Magness ($100,000) to Capcom Financial Services, Ltd, requesting repayment and confirmation that Capcom Futures, Inc shares are the security for this indebtedness.

This document suggests that the financing of Romrell's and Magness' shares was not done through Mideast Finances Ltd, Vanuatu, or that Capcom Financial Services, Ltd owns Mideast Finances, Ltd and assigned the debt.

REENTERED AS EXHIBIT 3

It should be noted that in the Capcom group was a company called Capcom Bankers, Ltd, Suite 11, Melitco House, Rue Pastenn, port Vila, Vanuatu.

12. August 14, 1986 letter from Akbar, Capcom Financial Services to Romrell, Western Telecommunications states that Romrell's balances on July 18, 1986 at Capcom were as follows:

Investment Account $48,670 CR

Loan Account 53,250 DR

The loan account had been paid down with profits from the Investment Account leading to a new balance as follows:

Investment Account $14,260 CR

Loan Account 30,000 DR

This implies that the Capcom share financing was "self-liquidating" from internal Capcom transactions, so that Romrell would finally own the shares without paying for them.

13. It is reported that BCCI lost $430,000,000 in the Capcom affair.[163] This allegedly occurred from September, 1984 to July, 1985.

14. An internal Capcom account GESS (General Securities Corp) loaned FAS (Financial Advisory Services, Ltd, owned by Akbar) 1,627,812.03 to purchase its office building at 107 Grays Inn Road, London on September 1, 1986.

The repayment of the loan does not connect to its funding, having come from the following. Sources: Sheikh Nooruddin, Middle East Bank, with funds which should have gone to GESS, instead going to GOOD (195,000), TWOY (350,000), GESS (1,209), totalling 1,754,000.

15. A snapshot of internal account management at Capcom is provided by an audit review revealing the following:

Finley International (presumably the company through which Noriega's money passed) sent $1,000,000 on September 16, 1988 and $10,000,000 on September 19, 1988. Akbar's explanation to the auditors was that "funds were to cover losses made by GESS when covering GOOD's position in silver in 1987."

16. The audit report stated that Predelict Investments, Ltd, owned by the Nigerian National Petroleum Corporation, loaned Capcom $10,000,000 from its Capcom Sub-account 134-170-054/52/200, with a two percent fee paid to Predelict, as noted on a letter October 4, 1988. The funds were returned to Predelict 12/10/88.

17. "The owner of the GOOD account is El Rayan, an Islamic Investment company based in Cairo...one of the largest in Egypt in import/export and real estate and funds management...Egyptian authorities closed El Rayan in November 1988." It was described as "Capcom's biggest account" and may have "lost" up to $90,000,000.[164]

REENTERED AS EXHIBIT 3

3/4/24, ... Case 3:24-... Case 3:24-cv-00... Document 45-... File 03/... File 04/... Page 45... Page 45... Page 54... 1613

PageID: 5484

It should be noted that the code used on all telexes from Romrell to A.R. Khalil at the Kamal Adham office in Jeddah is "GOOD".

18. A total of $47,500,000 in nine separate transfers was paid to Capcom from Credit and Finance Corp, Cayman; BCCI Overseas, Cayman; Bank of New York. These transactions relate to Blackmail, Akbar, $32 million as discussed later.[165]

19. $150,000 payment February 10, 1988 through Capcom from Ahmed Tawfick to Shakarchi Trading, A.G., the Zürich-based company recently identified in a $1 billion money-laundering scandal in Switzerland.[166]

20. $68,000,000 was paid from Treasury at BCCI to Brenchase, Ltd, a wholly owned Capcom subsidiary, on June 25, 1985, "for an unknown purpose."[167]

21. "Two payments of $50,000,000 were made to Capcom in March, 1986 out of external funds [BCCI Treasury] for which no liability for repayment was recorded."[168]

22. Capcom Financial Services, Ltd loaned $10,000,000 originally to Capcom Futures, Inc, Chicago, then replaced that loan with a $12,500,000 loan.[169]

23. Romrell had a series of payments to and from Capcom in London around July 1, 1987 for his personal account at Capcom: $25,000, $148,000, $22,000, $50,000.

1. According to Akbar Bilgrami, the losses at BCCI were accumulating long before Akbar assumed his responsibilities at BCCI's Treasury. According to Bilgrami, the "hole" in BCCI dated from the mid-seventies and increased until the early 1980's when the accountants began to suspect that BCCI was in financial difficulty. BCCI's Treasury losses were nothing more than a convenient means for explaining the actual financial condition of the bank.
2. Tape 150N, 9/2/88, 11:20 a.m., London, from U.S. v. BCCI, et al in Tampa.
3. S. Hrg. 102-305, Pt.1, p.513.
4. Price Waterhouse, 1991 Report, Section 4, Treasury, p.16.
5. Id at 17.
6. Price Waterhouse, 1991 Report, p.2.
7. Id. p.21.
8. By October 3, 1988, a Resolution of the Board of Directors authorized an increase in share capital to 100,000,000, a staggering amount, raising the question as to how the firm planned to grow so quickly.
9. S. Hrg. 102-350, Pt. 1, p.513.
10. Bandung Productions, transcript, "The Fraud of the Century", September 11, 1991, pp. 53-59.
11. S. Hrg. 102-350, Pt. 1, p.513.
12. Markets, by Martin Mayer, Norton Publishing, 1988, p.xxi.
13. Id. p. xxiv.
14. According to the Chairperson of the Commodities Futures Trading Commission, Wendy Gramm, the futures markets operate on the same principle of "know your customer" as banks. According to Gramm:
The futures broker, the futures commission merchant, does have responsibilities with regard to its customer accounts, including knowing its customers. The self-regulatory organizations have an obligation to ensure that they are meeting those responsibilities, and also do audits concerning brokers' activities with regard to their customers. see Gramm testimony, S. Hrg. 102-350, Pt. 6, p.647.
15. Price Waterhouse Report, June 22, 1991, p.21, Reprinted in S. Hrg. 102-350, Pt.5.

REENTERED AS EXHIBIT 3

16. According to the Chairperson of the Commodities Futures Trading Commission, Wendy Gramm, Capcom US "was a relatively small, smaller than average company, with not many customer accounts and unremarkable in its trading." see Gramm testimony, S. Hrg. 102 -350, Pt.6, p. 647.

17. Capcom 1987 Annual Report. In testimony before the Subcommittee, Andrea Cocoran, Director of Planning and Supervision at the CFTC, confirmed that Capcom UK realized a net loss on futures trading of $76,206,064 to Refco. see testimony, Andrea Cocoran, S. Hrg. Pt.6, p.651.

18. In her testimony to the Subcommittee on July 30, 1992, Wendy Gramm, the Chairperson of the Commodities Futures Exchange Commission (CFTC), noted that "we found that certain principals of Capcom US, specifically S.Z.A. Akbar, Sushma Puri, and Mohammed Saghir, had previously worked at BCCI. S. Hrg. Pt. 6, p.7.

19. Price Waterhouse Report, June 22, 1991, p.21, emphasis added

20. Id.

21. Price Waterhouse Report, July 22, 1991, p.20. Reprinted in S. Hrg. Pt. 5.

22. Id. p.21

23. S. Hrg. 102-350, Pt. 1, p.513.

24. Id. p. 513.

25. Mazur tapes 150N, 9/20/88, 11:20 p.m., p.73, line 22-23, p.74, line 15

26. Handwritten Consolidated Profit and Loss Statement, Capcom, October 31, 1985.

27. February 17, 1989 Audit, Coopers and Lybrand Investigation of Capcom, p. 2.

28. Wall Street Journal, Peter Truell, 11/22/91, p.A1.

29. According to the 1991 Price Waterhouse report, "the adjustments in 1985 occurred in the period 25-28 June when amounts totalling $191 million were drawn down in the names of Khalil [and others]" and were paid to "Z.A.Akbar ($142 million) to adjust various Treasury pool accounts." Price Waterhouse Report, June 22, 1991, p.30.

30. For example, the account was to be in his name; accounts were opened in the name of his wife; BCCI Visa cards were issued to him, his wife and their children, and the bills were paid from the BCCI accounts.

31. Account Opening Forms, dated 24 August 1982. Correspondence was to be sent to Amjad Awan, BCCI Branch Manager in Panama.

32. [1586]26 July 1988 Letter from Subhan Siddiqui to BCCI Luxembourg.

33. Throughout the course of these events, "Finley International Ltd." is alternatively spelled "Findlays," "Finlay," "Finley International Co.," or "Finleys International Ltd." The account numbers and transfer letters of the various banks leave no doubt that all the names refer to Finley International Ltd., a Capcom customer. Finley International Ltd. is a company registered in Liberia whose only two officers are S. Z. Akbar and G. R. Khan. Akbar served as its chairman and treasurer.

34. 26 July 1988 Letter from Noriega to the manager of BCCI Luxembourg.

35. 8 September 1988 Letter from Eva de Teran of Banco Nacionale de Panama to Middle East Bank (to the attention of Amanullah Khan).

36. Complaint, Republic of Panama v. BCCI Holdings, et al., Case No. 90-2913-CIV-RYSKAMP (D.C. Fla.), dated 18 January 1991, at 6.

37. 13 September 1988 Letter from Eva de Teran of Banco Nacionale de Panama to Middle East Bank (to the attention of Amanullah Khan).

38. Akbar claimed that the $23 million received by Finley were remitted by a real estate investor named Al Fathi Tawfik who died in 1988. Akbar denied that any connection existed between the Finley deposits and Noriega. Ian Glendinning Watt, a Chartered Accountant of Peat, Marwick appointed to investigate Capcom's trading, found Akbar's explanations on this and every other matter to be "unsatisfactory," Affidavit of Ian Glendinning Watt dated 20 January 1989, at 44, "deficien[t]," id. at 45, "most curious," "illogical," and "not capable of corroboration." Id. at 46.

39. Among various papers in Mr. Akbar's desk at the time of his arrest was a schedule indicating that an account with the code name ARKY [presumed to be A.R. Khalil] earned profits of $53 million between

https://info.publicintelligence.net/The-BCCI-Affair.htm

October 1984 and September 1985." "The owner of account GOOD is El Rayan, an Islamic Investment Company based in Cairo...Egyptian authorities closed El Rayan in November,s 1988." "...it may have lost $90,000,000." The closing of El Rayan was the month following Akbar's indictment for drug money-laundering, October 19, 1988. Numerous fax transmissions from Romrell to Khalil at the "Kamal Adham Office" in Jeddah are inscribed "Code: GOOD".

40. Watt Affidavit, p 18. Reprinted in S. Hrg. 102-350, Pt. 6.

41. The company behind the GESS account is General Securities, registered in Panama. Watt Affidavit at 20.

42. See, e.g., Watt Affidavit, at 38, 40, and 42.

43. The Finley account at Middle East Bank. See 13 September 1988 Letter from Akbar and Khan (on Finley letterhead) to Middle East Bank. Akbar admitted that he controlled the GESS account, see Watt Affidavit at 20, denied having any control over the GOOD account, id. at 38, and offered no explanation for the $2.5 million transfer to the Red Roses Account at the Trade Development Bank in Zurich. Id. at 42.

44. Staff Review of Capcom client list, provided by the Commodities Futures Exchange Commission. The Subcommittee would like to thank the staff of the Commodities Futures Exchange Commission which has provided important assistance to the Subcommittee.

45. The Price Waterhouse Report stated that Adham's exposure of losses at BCCI as of December 29, 1990, was $249,000,000; estimated losses were $199,000,000. Price Waterhouse Report, June 22, 1991, p.6

46. Transcript, Federal Reserve Board Hearing, April 23, 1981, p.65.

47. Khalil also had known Powell for several years prior to the creation of Capcom, although Powell was not connected, as far as the Subcommittee knows, to any communications business.

48. Letter, Romrell to Akbar, November 17, 1981.

49. Answers of Larry Romrell to questions from Subcommittee, July 3, 1992, questions 28.

50. "89225 1 BCCLNA G.
TCI ENGL
6/9/83
Attn. Mr. Akbar

At the TCI Stockholders meeting this morning it was announced there would be a one for one stock split of TCI stock, effective date 6/24/83.

Best regards,
Larry Romrell. (Telex, 6/9/83)

51. Letter, Romrell to Akbar, April 2, 1984, WTCI letterhead
Further in the same letter:Magness and I are most anxious to visit with you with regard to the business opportunity we discussed in Chicago or New York." The opportunity referred to in the letter appears to be the founding of Capcom.

52. Letter, March 19, 1984, draft of Telex to Akbar.

53. staff interview with Romrell, 6/16/92. In his written response, provided under oath, Romrell stated: "In 1984 following the spin-off of WTCI, the stock might become available on the market. I contacted Mr. Akbar to inquire whether BCCI would lend money with which I could purchase shares. In that conversation, I understood that Mr. Akbar agreed to establish a line of credit for me, and that he was also interested in purchasing stock. There was no discussion of any joint line of credit, or even of how Mr, Akbar might finance his purchase. The March 19, 1984 reflects that understanding. However, I never received a response from Mr. Akbar. I never received the line of credit mentioned, I never put Akbar in touch with my broker, and, to my knowledge, Mr. Akbar never invested in TCI or WTCI." Affidavit, Larry Romrell, July 3, 1992, answer 40.

54. Letter, November 14, 1984, Romrell to Akbar at BCCI, London.

55. Letter, Betram Perkel, Law Offices of Jerome Kern, February 11, 1992. p.2, Reprinted in S. Hrg. 102-350. Pt.6.

56. Letter, February 27, 1984

57. Undated note on Western TCI note paper, styled Romrell.

Akbar's representation, as recorded by Romrell, is further evidence that from the beginning Akbar contemplated a BCCI link since there could not possibly be any other means for earning such commissions in a start-up company.

58. Telex, May 27, 1984.

59. Magness Affidavit, 5/19/92, p.3.

60. Id, p.3.

61. While Magness was already a wealthy man, this must be considered a significant investment on the part of Romrell who was at that time a salaried employee making $38,000.00.

62. Note for file, 11.9.84, hand-written.

63. Letter, February 6, 1985, Romrell to Mr. Ajay Puri, Capcom, London.

64. Letter, November 7, 1984, Larry Romrell to Mr. Ajay Puri, Capital Commodities Dealers, Ltd, London, attached.

65. Letter, November 7, 1984, Larry Romrell to Mr. Ajay Puri, Capital Commodities Dealers, Ltd, London.

66. Letter and loan documents attached, June 11, 1985, Letter from Romrell to Mr. Ajay Puri, Capcom.

67. Written responses from Larry Romrell, July 3, 1992, answer 53.

68. Staff interview with Larry Romrell, June 5, 1992.

69. Letter, August 22, 1986, Romrell to Akbar.

70. Letter, Romrell to Khalil, Adham, July 27, 1987.

71. The loan documents specified: "(a) that the total liability of the borrower in the repayment of the loan and all its accrued interests is strictly limited to the value of his shares in Capcom Financial Services, Ltd..." Paten loan agreement ("old and new loans"), signed, Romrell, June 30 1987.

72. Signed Larry Romrell et al, letter March 28, 1988, Capcom to Arthur Anderson, London, emphasis added.

73. Written responses from Larry Romrell, July 3, 1992, answer 58.

74. Letter, July 20, 1987, L.E. Romrell to Sheik Abdul Raouf H. Khalil, Sheik Kamal Adham, Mr. El Ghary, emphasis added.

75. Letter, July 25, 1987, L.E. Romrell to Sheikh Abdul Raouf H. Khalil, H.E. Sheikh Kamal Adham, El Sayed E. El Jawhary.

76. Mazur tape 150N, 9/20/88, p.9, line 1.

77. Affidavit, Robert E. Powell, July 8, 1992, p.5. Reprinted in S. Hrg. 102-350, Pt. 6.

78. Letter, Harry H. Schneider, Department of the Air Force, "To Whom it may Concern," January 3, 1977.

79. Affidavit, Robert E. Powell, July 8, 1992, p. 1. Reprinted in S. Hrg. 102-350, Pt. 6.

80. Affidavit, Robert E. Powell, August 2, 1992, p.1. Reprinted in S. Hrg. 102-350, Pt.6.

81. Affidavit, Robert E. Powell, June 21, 1992, answer to question 17. Reprinted in S. Hrg. 102 -350, Pt. 6.

82. Id., answer to question 19.

83. Affidavit, Robert E. Powell, August 2, 1992, p.2. Reprinted in S. Hrg. 102- 350, Pt. 6.

84. Affidavit, Robert E. Powell, June 21, 1992 answer to question 23. Reprinted in S. Hrg. 102- 350., Pt.6.

85. Id. answer to question 24.

86. Fox has acknowledged to the Subcommittee that he maintained a top secret clearance during this period because he worked with sophisticated electronics components in Saudi Arabia for Martin Marietta and Rockwell International.

Romrell told the Subcommittee that Fox once worked for ARAMCO -- the middle east oil concern. Staff interview with Romrell, June 5, 1992.

87. Letter, Fox to Jamil Khan, BCCI Overseas, Cayman Islands, April 22, 1987.

88. Statement of Witness, Kerry Fox, September 19, 1990

89. Interview with Larry Romrell, June 5, 1992.

90. Letter, June 28, 1982, Fox to Richard Bowman and Statement of Witness, September 19, 1990.

91. Id.

92. Id.

93. Id, p.2.

94. Statement of Witness, Kerry Fox, September 19, 1990.

95. Staff interview with Larry Romrell, June 5, 1992.

96. Documents show that "the Lake House", Rockwall, Texas, was purchased "with or through BCCI...Khalil bought the house in 1981, but immediately conveyed the property to BCCI in full satisfaction of debt to Khalil Investment and Trading Co., Panama. Letter, Fox to Khan, August 23, 1989.

97. Letter, Fox to Akbar, February 2, 1982. In 1984, Romrell's annual salary was approximately $38,000.00. Staff interview with Larry Romrell, June 5, 1992.

98. Letter, Lynn H. Cole, lawyer for Kerry Fox, to David McKean, July 27, 1992.

99. Letter from S. Walker and Co., October 4, 1985.

The "Advisor" to the Fund was Futures Advisory Services, an Akbar controlled company. The Administrator for the Fund was Cayhaven Corporate Services, Cayman Islands. The broker for the Fund was Capcom, London. Letter attached to Capital Fund prospectus, October 11, 1985. he main U.S. bank for the FUND was Bank of America International, New York. Authorized share capital in October, 1985 was $900,000. Account 2-04-19489 / BOA, Cayman Islands.

100. Letter, Puri to Fox, December 4, 1985.

101. Watt Affidavit, p.25. Reprinted in S. Hrg. 102- 350, Pt.6.

102. Id.

103. Note to File, Fox, December, 1988.

104. Fox affidavit, September 18, 1990.

105. Resolution of Board of Directors of Capcom Financial Services, Ltd, July 30, 1987; letter, December 22, 1987, Saghir to Romrell.

106. S. Hrg. 102-350, Pt.6, p.15.

107. Id.

108. Id.

109. Price Waterhouse Report, June 22, 1991, p.18.

110. S. Hrg. 102- 305, Pt. 1, p.30.

111. Peat Marwick McLintock Audit of Capcom for CBOT, May 4, 1989, p.21(b).

112. Id p. 21(b).

113. Mazur tape, 150N, 9/20/88, 11:20 a.m., p.57, lines 6-18.

114. Peat Marwick McLintock audit for CBOT, May 4, 1989.

115. Capcom Futures Inc. was not named in the original indictment. See 11/23/88 letter from Robert E. Powis of Interpass, Ltd., to Gerald E. Beyer of the Chicago Mercantile Exchange. Nor was it named in the second superseding indictment. See Second Superseding Indictment, United States District Court, Middle District of Florida, case no. 88-330-Cr-T-13(B).

116. Specifically, the indictment charged that the defendants had violated the following provisions of the United States Code: 21 U.S.C. s.846, the Attempt and Conspiracy section of the Drug Abuse Prevention Act; 18 U.S.C. s.371, the general provision regarding criminal conspiracy, and 18 U.S.C. s.1956, regarding the laundering of monetary instruments.

117. See, e.g., the Affidavit of Ian Glendinning Watt, dated 01/20/89, at 1.

118. Romrell office diary. To January 18, 1889. p. 6.

REENTERED AS EXHIBIT 3

119. Id.

120. See Second Superseding Indictment, dated _____, United States District Court, Middle District of Florida, case no. 88-330-Cr-T-13(B).

121. See "Superseding Indictment Still Names Capcom Financial Services," Securities Week, 05/15/89, at 6.

122. Memorandum, 11 October 1988, signed by L. Romrell and J.C.F. Parry.

123. S. Hrg. 102-350, Pt.6, p.7.

124. S. Hrg. 102-350, Pt.6,p.8.

125. CFTC Chairperson Wendy Gramm did not indicate who the owner of the account was, but rather testified that "S.Z.A. Akbar had a power of attorney to direct trading in this account." S. Hrg. 102-350, Pt. 6, p.11.

126. S. Hrg. 102-350, Pt.6, p.12.

127. Id.

128. S. Hrg. 1-2-350. Pt.6,p.11.

129. Affidavit, Larry Romrell, July 3, 1992. Answer to question 61.

130. S. Hrg. 102-350, Pt. 6, p12.

131. In response to questions from the CME staff, Capcom characterized Mr. Zaheer as "a self-employed auto dealer with a dealership in Karachi, Pakistan."

132. S. Hrg. 102-350, Pt.6, p.658.

133. S. Hrg. 102-350, Pt.6, p.647.

134. S. Hrg. 102-350. Pt.6, p.7.

135. Independent, 18.8.91, p.6.

136. S. Hrg. 102-350, Pt.6, p.660.

137. Letter, Romrell to Akbar, October 27, 1982.

138. Letter, Mr. J. Barnathan, ABC, N.Y., April 29, 1982.

139. Letter, Romrell to Akbar, January 6, 1983.

140. Telex, Romrell to Akbar, December 17, 1982

141. Telex, Romrell to Akbar.

142. Letter, Romrell to Akbar, March 30, 1983.

143. Memo, Bob Saffel, August 17, 1983.

144. Letter, Romrell to Akbar, December 16, 1983.

145. Romrell to Puri, January 5, 1984.

146. Letter, Romrell to Akbar, [Personal guarantees given by Magness, Romrell to BCCI], April 18, 1984.

147. Letter, June 8, 1984, Romrell to Akbar.

148. Letter, Romrell to Akbar, December 18, 1984.

149. Letter, June 4, 1985, Romrell to Akbar.

150. Letter, January 17, 1986, Romrell to Akbar.

151. Letter, January 17, 1986, Romrell to Akbar.

152. Letter, July 7, 1987.

153. Letter, April 13, 1988, Romrell to Akbar, while at FAS, Ltd, after he left BCCI indicating continued interaction.

154. Letter, July 27, 1987, Romrell to Puri, emphasis added.

155. Letter, February 10, 1983 from Romrell to Fox.

156. Letter, July 7, 1987, Romrell to Ehrlich

157. Price Waterhouse Report, June 22, 1991

158. ' [1712]Letter, December 4, 1985, Puri to Fox.

159. Watt Affidavit, p.25.

160. Arthur Anderson Special Audit Prepared for Counsel of Association of Futures Brokers and Dealers, Ltd, London, 5/10/89, p.22.

161. Watt Affidavit, p.22.
162. Letter, January 17, 1986, Romrell to Akbar.
163. September 11, 1991, "The Fraud of the Century", Bandung Productions, 53-79 highgate Road, London.
164. Peat Marwick McLintock audit of Capcom for CBOT, May 4, 1989, p.22(c).
165. Peat Marwick McLintock audit of Capcom for CBOT, May 4, 1989.
166. WATT Affidavit, supporting documents, Exhibit 20 (iii).
167. Price Waterhouse Report, June 22, 1991, p.20.
168. Price Waterhouse Report, June 22, 1991, p.21.
169. April 16, 1987, Joint Unanimous Resolution of Capcom Futures, Inc, Board of Directors.

# LEGISLATIVE RECOMMENDATIONS

**1. THE SUBCOMMITTEE RECOMMENDS THAT THE UNITED STATES DEVELOP A MORE AGGRESSIVE AND COORDINATED APPROACH TO COMBAT INTERNATIONAL FINANCIAL CRIME. THE U.S. NEEDS TO TAKE FIRM ACTION AGAINST NATIONS WHO PERMIT THEIR PRIVACY AND CONFIDENTIALITY LAWS TO PROTECT CRIMINALS FROM U.S. REGULATORS AND LAW ENFORCEMENT.**

Both BCCI and its customers used foreign bank secrecy and confidentiality laws to commit crimes, to prevent the detection of those crimes, and to obstruct law enforcement efforts to investigate and prosecute crimes once they were discovered.

The traditional approach of smaller nations such as the Cayman Islands and Luxembourg of offering strict bank secrecy as an inducement to attract foreign deposits has is poor international public policy, and threatens vital interests of the United States.

Current practices of major financial centers such as the United Kingdom and Switzerland, while providing for the exchange of information among regulators, and some mechanisms for the exchange of information among federal law enforcement, after criminal activity is uncovered, still impede an adequate flow of financial information concerning such activity in the earlier, investigative phase.

The United States needs to take a more aggressive and coordinated approach to developing an international regime for the sharing of financial information among governmental entities, and a substantial loosening in financial confidentiality and privacy laws to insure that government investigators in the U.S. can gain adequate access to and information about, financial transactions that cross international boundaries, but impact the U.S.

While the U.S. has become more focused in fighting drug money laundering through international cooperation in recent years, it has continued to take the position that the process of sharing on applications between law enforcement agencies is sufficient to protect U.S. interests, and no broad-scale changes in foreign bank secrecy laws are necessary. As Federal Reserve counsel Virgil Mattingly testified, sixteen months after the Federal Reserve began its formal investigation of BCCI, Swiss and French authorities were still denying it critical information as a consequence of their secrecy laws.[1] A much more aggressive approach by the United States to changing attitudes among the G-10 nations on this issue is essential.

Current toleration by the United States of bank secrecy and regulatory havens such as the Grand Caymans, Liechtenstein, the Bahamas, the Channel Islands, Vanuatu, Hong Kong, Aruba, and the Netherlands Antilles needs to be replaced by a policy that threatens to withhold access to the U.S. market for banks doing business in any nation that does not meet minimum standards for regulation and the sharing of information with the United States.

The Treasury, as the lead agency for handling U.S. policies concerning international financial crime, needs to be much more aggressive on these issues, to place substantial limits on the ability of criminals to use confidentiality and privacy laws as a shield against law enforcement.

**2. THE SUBCOMMITTEE RECOMMENDS THAT THE INSPECTOR GENERAL OF THE JUSTICE DEPARTMENT INVESTIGATE THE POLICIES AND PRACTICES THAT LED TO THE JUSTICE DEPARTMENT'S INEFFECTIVENESS IN INVESTIGATING AND PROSECUTING BCCI, AND IMPAIRED ITS ABILITY TO COOPERATE WITH OTHER INVESTIGATIONS OF BCCI. THE JUSTICE DEPARTMENT NEEDS FUNDAMENTALLY TO RECONSIDER ITS POLICIES IN DEALING WITH COMPLEX FINANCIAL CASES. FUNDAMENTAL CHANGE IN HOW THE JUSTICE DEPARTMENT HANDLES INQUIRIES FROM OTHER GOVERNMENT AGENCIES AND THE CONGRESS IS ALSO ESSENTIAL.**

The problems encountered by the Justice Department in investigating and prosecuting BCCI are familiar ones. As a consequence of a lack of understanding of the significance of the case, requests for additional resources from the Customs Agents and prosecutors involved were ignored, broader investigated leads were abandoned, and ultimately, BCCI was permitted to plead guilty and thereby avoid a trial that could have helped bring down the bank entirely.

Other problems compounded these original problems. Most significant was the Justice Department's unwillingness to share information with other ongoing governmental investigations, including those of the Federal Reserve, the New York District Attorney and the Senate. Instead, the Justice Department appeared on numerous occasions to be more concerned with protecting its ability to control information about BCCI, than with assisting the investigative efforts of others. Related to this problem was the lack of candor demonstrated by individual Justice Department employees in responding to inquiries of the Federal Reserve,

REENTERED AS EXHIBIT 3

New York District Attorney, and Senate. In addition, there were substantial problems of coordination between the Justice Department in Washington and its U.S. Attorneys office, as was especially demonstrated by the breakdown in communication between the U.S. Attorney in Miami and the Criminal Division of the Justice Department in Washington in 1991.

In response to the resource and coordination issues arising in BCCI, consideration needs to be given within the Justice Department to the recreation of the strike force concept, abandoned during the early years of the Reagan Administration, and used to devote substantial resources to major cases.

In response to the cooperation issues pertaining the Federal Reserve, New York District Attorney and Senate, consideration needs to be given by the Attorney General to adopting a new set of procedures and regulations governing such contacts, to direct Justice Department personnel to give a far higher priority to providing assistance in response to the legitimate requests of other governmental entities, limited only by such legal requirements as the withholding of documents placed before a grand jury.

**3. THE SUBCOMMITTEE RECOMMENDS THAT THE CENTRAL INTELLIGENCE AGENCY AND STATE DEPARTMENT TARGET FOREIGN FINANCIAL INSTITUTIONS AS SUBJECTS FOR INTELLIGENCE GATHERING AND ANALYSIS.**

Prior to BCCI's collapse, the CIA had disseminated only three analytic reports on BCCI itself, one of which was lost and of which no original remains. While the reports demonstrate the Agency's early recognition of BCCI's systematic engagement in money laundering and other criminality, they are also oddly limited in detail and scope, given the serious nature of the allegations discussed, and there was little follow up by the CIA to any of them. Moreover, these reports were not provided to the users, the Federal Reserve and the Justice Department, who most required them. Finally, these reports contained no information concerning several individuals who were affiliated with or owned BCCI, and with whom the CIA had had or was still having substantial contact. These gaps would suggest a remarkable lack of information at the CIA about the basic business dealings of important CIA contacts in the Middle East.

The State Department, by contrast to the CIA, knew almost nothing about BCCI prior to its collapse, and seemed to view the collection of information on foreign financial institutions as largely beyond its scope of responsibilities.

Given the risk to the United States from international financial crime, both agencies need to upgrade their capabilities to understand the strategies being employed by foreign financial institutions that may impact on vital U.S. interests, and to begin to include such entities as targets for collection and analysis.

**4. THE SUBCOMMITTEE RECOMMENDS THAT THE CONGRESS CONSIDER ADOPTING ADDITIONAL OVERSIGHT MECHANISMS TO ENSURE THE CIA'S ACCOUNTABILITY ON THE PROVISION OF INFORMATION.**

At various times, the Central Intelligence Agency provided information to the Subcommittee during the course of its investigation that was both misleading and untrue. Documents that existed were characterized as not existing. Information that was provided was incomplete. It required repeated efforts by the Subcommittee, extending over a year, to obtain more complete

REENTERED AS EXHIBIT 3

information, which was provided only following a meeting in February, 1992 between the Subcommittee chairman and Director Gates. Even then, as the CIA purported to provide a full account of its knowledge of BCCI, it cautioned the Subcommittee that its system of record-keeping could not guarantee that all information had in fact been provided. Moreover, information regarding certain persons who were shareholders, nominees, officers, or affiliates of BCCI, was provided solely in a summary form, containing relatively limited information and far less than is clearly in the CIA's possession.

Staff of the officer of the Inspector General of the Central Intelligence Agency has recently requested meetings with Subcommittee staff to discuss these issues.

It is recommended that the House and Senate Select Committees on Intelligence consider whether the current procedures and mechanisms are adequate to ensure accountability by the CIA in its responses to Congressional requests. Of particular concern is the lack of any practical mechanism for members who do not serve on the Committees to insure the CIA's responsiveness to their legitimate requests, as well as the difficulties of establishing whether or not the CIA's responses to inquiries are forthright and accurate.

**5. THE SUBCOMMITTEE RECOMMENDS THAT FEDERAL AGENCIES IMPOSE NEW REQUIREMENTS ON FOREIGN AUDITORS TO PROTECT U.S. INTERESTS IN ANY CASE IN WHICH ANY SUCH AGENCY IS RELYING ON AN AUDIT CERTIFIED BY A FOREIGN AUDITOR. AT MINIMUM, THIS SHOULD REQUIRE FOREIGN AUDITORS WHOSE CERTIFICATIONS ARE USED BY INSTITUTIONS DOING BUSINESS IN THE U.S. AGREE TO SUBMIT THEMSELVES TO U.S. LAWS.**

As the Subcommittee discovered during the course of investigating BCCI, the major accounting firms, such as Price Waterhouse, while operating globally, are structured to be independent partnerships in which no national partnership has financial obligations or ties to any other. As a consequence, when a foreign auditor certifies the audit of an entity doing business in the United States, the domestic auditor views itself to be not legally responsible for any of the actions taken by the foreign auditor, nor for providing any information to U.S. regulators and law enforcement personnel that may be in the possession of the foreign auditor. In the case of BCCI, this meant that Price Waterhouse in the United States was able to take the position that it could not answer any questions or provide the information requested by investigators, while Price Waterhouse in the United Kingdom -- which certified BCCI's books -- was able to take the position that it did not do business the United States, was not subject to service of process in the United States, and was not responsible to provide information to the United States, although BCCI was licensed as a foreign bank in several states.

The inability of U.S. regulators and law enforcement to gain access to foreign auditors who may have certified the accounts of entities doing business in the United States substantially impeded investigations and prosecutions of BCCI. It is recommended that the Congress develop a statutory mechanism to require all U.S. agencies to develop regulations imposing the requirement that any entity certifying the audit of an entity which is provided to any U.S. agency in so doing submit itself to U.S. jurisdiction and agree to the provision of documents and records as required by U.S. law. Additional mechanisms to insure accountability by auditors to government regulators and investigators should also be explored.

**6. THE SUBCOMMITTEE RECOMMENDS THAT THE PRESIDENT AND THE SECRETARY OF STATE ADVISE THE GOVERNMENT OF ABU DHABI THAT ITS WITHHOLDING OF DOCUMENTS AND WITNESSES PERTAINING TO BCCI FROM U.S. FEDERAL LAW ENFORCEMENT INVESTIGATORS, THE FEDERAL RESERVE, THE NEW YORK DISTRICT ATTORNEY AND THE CONGRESS THREATENS VITAL U.S. INTERESTS AND WILL NOT BE TOLERATED.**

As of the writing of this report, the most important remaining impediment to investigating and prosecuting the BCCI case is the withholding of critical documents and witnesses from U.S. law enforcement and regulators by the Abu Dhabi authorities. Given the ownership of BCCI by Abu Dhabi, and Abu Dhabi's controlling interest, through BCCI and its own shares, in CCAH, holding company for the First American Banks, the Abu Dhabi government has engaged in substantial non-sovereign activities in the United States. Its continued suppression of evidence in the case is so serious that it should raise some questions about the previously friendly relationship between the two nations. To date, neither the White House nor the State Department has made any statement criticizing the Abu Dhabi government for its refusal to cooperate adequately with the United States on this matter. The United States needs to express its deep concern over this matter, and its intention to take further steps if the failure to provide access to the witnesses and documents is not rectified immediately.

**7. FURTHER ATTENTION NEEDS TO BE GIVEN TO THE PROBLEM OF THE REVOLVING DOOR IN WASHINGTON, AND THE IMPACT ON THE REGULATORY PROCESS AND ON LAW ENFORCEMENT OF POLITICAL INFLUENCE IN WASHINGTON. THE SUBCOMMITTEE RECOMMENDS THE CONSIDERATION OF LEGISLATING A FEDERAL STATUTORY CODE OF CONDUCT FOR ATTORNEYS WHO PRACTICE BEFORE FEDERAL AGENCIES.**

BCCI's political connections in Washington had a material impact on its ability to accomplish its goals in the United States. In hiring lawyers, lobbyists and public relations firms in the United States to help it deal with its problems vis a vis the government, BCCI pursued a strategy that it had practiced successfully around the world: the hiring of former government officials. These former government officials played a major role both in making it possible for BCCI secretly to purchase Financial General Bankshares, and then to evade detection and impede investigative efforts to expose what it had done.

There is something fundamentally wrong with a political system in which former government officials, as in the case of BCCI, too frequently appear to be willing to provide assistance

in circumventing U.S. laws and regulations to anyone who is willing to pay their fee.

In theory, ethical considerations would discourage former high public officials, government prosecutors, and regulators from using the skills and knowledge they obtained in government to assist clients who wish to circumvent, or at least, bend, the obvious import of the laws. However, in the highly competitive day-to-day practice of law and lobbying in Washington, D.C., it appears that such considerations are too often thrown aside to the need of the former officials to generate fees.

The problem of the revolving door and influence-peddling is serious enough when applied to domestic clients looking to influence the legislative, regulatory, or law enforcement process. However, as with BCCI, when former government officials provide put their expertise to use

for foreign clients, even deeper problems emerge. First, the foreign clients have little stake in our society beyond their own self-interest, and thus, there is less incentive for them to adhere to U.S. laws apart from the threat of sanctions if they are caught breaking them. Second, some foreign clients may be accustomed to political influence and corruption within their own countries, and therefore pay for and expect such services to circumvent laws in the United States. Third, as in BCCI, foreign clients are less susceptible to being investigated, and prosecuted or held liable in the United States, if something goes wrong. Fourth, it is more difficult to determine the ultimate agenda of an entity which is based outside the United States.

Foreign investment in the United States may in some respects be an essential component of long-term prosperity, and in any case inevitable. Yet the continued willingness of so many attorneys and lobbyists in Washington to represent foreign clients without regard to the special problems they pose, suggests that consideration needs to be given to legislation that would force lawyers and lobbyists who represent foreign interests to adhere to a higher standard of practice, adequate to protect U.S. interests.

At present, essentially no mechanism exists whereby sanctions can be imposed on attorneys who fail to meet basic ethical obligations to regulatory bodies. Serious attention needs to be given to the development of a federal code of professional conduct, that would supplement the industry code adopted by the American Bar Association. Such a code would set forth minimum ethical standards for the practice of law before federal regulatory bodies, including requiring certain disclosures to the government by the attorney in cases in which the attorney has reason to believe the client may have made false statements to the government. The code would allow for any party, including the regulators themselves, to seek revocation of a lawyer's right to practice before that regulatory body for an infraction of the code, or before any federal regulatory body for a serious such infraction.

**8. THE SELF-REGULATION OF THE U.S COMMODITIES MARKETS BY THE COMMODITIES FUTURES TRADING COMMISSION, THE CHICAGO BOARD OF TRADE, AND THE CHICAGO MERCANTILE EXCHANGE IS INADEQUATE TO PROTECT THOSE MARKETS AGAINST MONEY LAUNDERING INVOLVING TRADES**

**FROM ABROAD. THE SUBCOMMITTEE RECOMMENDS THAT THE EXCHANGES MAKE MONEY LAUNDERING ILLEGAL, AND DEMAND THAT THIS REQUIREMENT BE ACCEPTED BY FOREIGN COMMODITIES EXCHANGES WITH WHOM THEY DO BUSINESS, AS A CONDITION OF ACCESS TO US EXCHANGES.**

As the Subcommittee investigation found, commodities regulators with the responsibility for investigating Capcom showed little interest in conducting a thorough investigation of its activities, and in 1989 allowed Capcom to avoid such an investigation through agreeing to cease doing business in the United States. While the exchanges have developed sophisticated mechanisms for detecting money laundering that takes place within the U.S. markets, those markets interact with foreign commodities markets in a manner that makes detection of money-laundering that crosses international boundaries very difficult.

At present, the laundering of money, in and of itself, does not violate commodities regulations, and is not grounds for expulsion from the exchanges.

Commodities regulators in the U.S. need to push for the definition and criminalization of money laundering in all commodities exchanges with whom they deal, including those in foreign countries, and develop procedures for "spot" checks of various investment houses to detect money laundering. They also need to develop mechanisms with foreign commodities regulators to insure that mirror imaging and similar techniques for money laundering are not tolerated simply because the mirror images are separated by national borders.

**9. THE SUBCOMMITTEE RECOMMENDS THAT FURTHER STEPS BE TAKEN TO INSURE ADEQUATE ACCOUNTABILITY OF FOREIGN FINANCIAL INSTITUTIONS DOING BUSINESS IN THE UNITED STATES, INCLUDING REQUIRING THAT FOREIGN BANKS FORM SEPARATELY CAPITALIZED HOLDING COMPANIES IN THE UNITED STATES AS A CONDITION OF LICENSE AND THE ESTABLISHMENT BY THE FEDERAL RESERVE OF A MINIMUM STANDARD FOR CONSOLIDATED REGULATION THAT EXCLUDES BANK REGULATORY HAVENS.**

While foreign bank regulation in the United States has already been substantially strengthened as a result of the BCCI affair, foreign banks doing business in the United States are still treated differently from domestic banks, and to the competitive detriment of domestic banks. Under the changes in law implemented last year through the passage of the Foreign Bank Supervisory Enhancement Act as part of the banking reform bill, foreign banks are now effectively regulated, supervised, and examined at a level equivalent to U.S. banks. However, they are not separately capitalized within the United States, and are merely required to maintain certain levels of reserves here as a means of protecting U.S. creditors.

The result is that U.S. regulators have no means for determining the nature, source, and backing of these reserves, or the real ability to keep such reserves in the U.S. in the event of a crisis involving the foreign bank. The Treasury has already recommended that foreign banks engaging in the sale of securities and other expanded-banking activities be required to establish separately capitalized holding companies in the U.S. This approach should be adopted for all foreign banks as a matter of enhancing overall accountability.

In addition, the Federal Reserve needs to move forward with a certification process which reaches a determination as to whether the home country supervision of a foreign bank meets a base-line standard sufficient to justify granting banks regulated by that country the right to operate in the United States.

Under current law, any foreign bank operating on a consolidated basis regulated by any home country bank regulator is on an equal footing with all other foreign banks similarly regulated in seeking permission to operate in the United States. With the passage of the Foreign Bank Supervisory Enhancement Act last year, the Congress has implemented a number of suggestions made by the Federal Reserve to strengthen U.S. regulatory oversight of such institutions, which includes the ability of the Federal Reserve to differentiate among such institutions based on the quality or extent of regulation by the home state regulator. The Federal Reserve needs to make use of the authority granted in the Foreign Bank Supervisory Enhancement Act to specify what the baseline requirements for consolidated regulation are, and which jurisdictions do and which do not meet these requirements.

As BCCI demonstrated, lax regulation in such jurisdictions as Luxembourg and the Grand Caymans can enable an institution bent on fraud to engage in manipulation of accounts and

REENTERED AS EXHIBIT 3

assets at a significant level as a means of securing legitimate deposits. The U.S. remains a key market for foreign banks, and few nations would be willing to give up the right for their banks to operate in the United States. A certification process under which the Federal Reserve sets criteria under which home country regulation is deemed adequate, and excludes banks regulated by "havens" which fail to meet those standards, would have no impact on banks regulated by countries that met basic standards for such regulation. The adoption of such a process, including the creation of an approve and non-approved list of country regulators, is essential to protect U.S. banking from being infiltrated by criminals.

**10. THE SUBCOMMITTEE RECOMMENDS THAT FOREIGN INVESTORS WHO PURCHASE SUBSTANTIAL SHARES OF U.S. BUSINESSES BE REQUIRED TO APPEAR PERSONALLY IN THE UNITED STATES AS INSURANCE THAT THE FOREIGN INVESTOR IS NOT ACTING AS A NOMINEE FOR SOMEONE ELSE.**

Currently, U.S. lawyers are allowed to establish a nominee company on behalf of foreign investors. While there are certain disclosure requirements for investors who purchase over 5% of a company, there exists no requirement that the individual appear in the United States. Nominees whose names are used to purchase businesses on behalf of others is a common practice in much of the world, especially Latin America and the Middle East.

A requirement that any foreign investor who purchase more than 5% of a U.S. company, business, bank or financial entity, appear personally before the appropriate regulatory authority, with a waiver for investors who met certain defined criteria, such as showing adequate assets in the United States to meet judgments against them personally, would help to curtail the practice, as illustrated in the BCCI case, of nominee shareholders.

If the investor refuses to be present at a hearing, the legislation could required that the investment be made provided the U.S. attorney is willing to waive the attorney/client privilege and incur liability should the investment subsequently prove to be fraudulent in any way.

**11. TURF WARS CONTINUE TO SEVERELY DAMAGE THE ABILITY OF LAW-ENFORCEMENT AGENCIES IN THE UNITED STATES TO DO THEIR JOB. THE SUBCOMMITTEE RECOMMENDS THE ESTABLISHMENT OF A COMMITTEE OF LAW ENFORCEMENT OFFICIALS WHOSE JOB IT IS TO CONDUCT OVERSIGHT OF, PREVENT, AND RESPOND TO FAILURES OF COOPERATION IN LAW ENFORCEMENT.**

Turf wars in the BCCI case were evident everywhere, including within the U.S. Customs Service itself, among competing federal law enforcement agencies, within the Justice Department and U.S. Attorneys' Offices, and between federal law enforcement, the Federal Reserve, the New York District Attorney, and the Congress. These bureaucratic battles had a substantial and negative impact on investigating and prosecuting BCCI. They are not unique to the BCCI case, but endemic, and some structural response is essential.

This Subcommittee previously encountered this problem during the course of its investigations in 1987 and 1988. Since that time, the problem has not improved, and the Subcommittee has seen no signs that it is effectively being responded to by federal law enforcement.

It is recommended that the Congress establish, by statute, a law enforcement committee, reporting annually to the Justice Department and the Congress, which focuses on developing

REENTERED AS EXHIBIT 3

solutions to the continuing "turf wars" in the sharing of information and coordination of prosecutions among law enforcement entities in the U.S. The committee would consist of a representative from the Justice Department, a U.S. Attorney, a state Attorney General and a District Attorney, all appointed by the President and each subject to confirmation by the Senate.

## 12. THE SUBCOMMITTEE RECOMMENDS THAT A STATUTORY MECHANISM FOR THE RECEIPT BY CONGRESS OF FOREIGN FINANCIAL INFORMATION BE ESTABLISHED.

The Justice Department has for a number of years taken the position that U.S. treaties with foreign jurisdictions for the sharing of information in criminal, regulatory and investigative matters does not encompass the Congress, even when Mutual Legal Assistance Treaties (MLATs) have been entered into with those countries which do not by their language exclude the Congress. Accordingly, the Justice Department refused to assist the Subcommittee, and will not in general assist Congressional requests for information, including the enforcement of Congressional subpoenas, to the extent that they seek information that is held abroad. This position has recently been modified so that the Justice Department will cooperate in such assistance in cases in which the Foreign Country has already explicitly agreed to provide it to the Congress.

As the Iran-Contra Committees found in 1987, and as this Subcommittee has found during its work from 1988 through 1992, the inability of the Congress to obtain information from abroad either directly or through the Executive Branch due to the lack of procedures has substantially impeded the Congress' constitutional responsibilities in fact-finding and oversight of U.S. foreign policy and other extra-territorial activities.

Two possible legislative solutions would be a statute explicitly adding the enforcement of legislative branch subpoenas as a matter of U.S. domestic law to the mutual enforcement responsibilities of the Executive Branch under mutual legal assistance treaties with foreign countries; and a statute providing for direct application by the Congress to the foreign government for enforcement of the subpoena, backed by some form of limitation on Executive Branch cooperation with that foreign government in the event of non-compliance.

1. S. Hrg. 102-350 Pt. 5 p. 153.

REENTERED AS EXHIBIT 3

# APPENDICES

**Matters For Further Investigation**

There have been a number of matters which the Subcommittee has received some information on, but has not been able to investigate adequately, due such factors as lack of resources, lack of time, documents being withheld by foreign governments, and limited evidentiary sources or witnesses. Some of the main areas which deserve further investigation include:

1. The extent of BCCI's involvement in Pakistan's nuclear program. As set forth in the chapter on BCCI in foreign countries, there is good reason to conclude that BCCI did finance Pakistan's nuclear program through the BCCI Foundation in Pakistan, as well as through BCCI-Canada in the Parvez case. However, details on BCCI's involvement remain unavailable. Further investigation is needed to understand the extent to which BCCI and Pakistan were able to evade U.S. and international nuclear non-proliferation regimes to acquire nuclear technologies.

2. BCCI's manipulation of commodities and securities markets in Europe and Canada. The Subcommittee has received information that remains not fully substantiated that BCCI defrauded investors, as well as some major U.S. and European financial firms, through manipulating commodities and securities markets, especially in Canada, the Netherlands, and Luxembourg. This alleged fraud requires further investigation in those countries.

3. BCCI's activities in India, including its relationship with the business empire of the Hinduja family. The Subcommittee has not had access to BCCI records regarding India. The substantial lending by BCCI to the Indian industrialist family, the Hindujas, reported in press accounts, deserves further scrutiny, as do the press reports concerning alleged kick-backs and bribes to Indian officials.

4. BCCI's relationships with convicted Iraqi arms dealer Sarkis Soghanalian, Syrian drug trafficker, terrorist, and arms trafficker Monzer Al-Kassar, and other major arms dealers. Sarkenalian was a principal seller of arms to Iraq. Monzer Al-Kassar has been implicated in terrorist bombings in connection with terrorist organizations such as the Popular Front for the Liberation of Palestine. Other arms dealers, including some who provided machine guns and

REENTERED AS EXHIBIT 3

trained Medellin cartel death squads, also used BCCI. Tracing their assets through the bank would likely lead to important information concerning international terrorist and arms trafficker networks.

5. The use of BCCI by central figures in arms sales to Iran during the 1980's. The late Cyrus Hashemi, a key figure in allegations concerning an alleged deal involving the return of U.S. hostages from Iran in 1980, banked at BCCI London. His records have been withheld from disclosure to the Subcommittee by a British judge. Their release might aid in reaching judgments concerning Hashemi's activities in 1980, with the CIA under President Carter and allegedly with William Casey.

6. BCCI's activities with the Central Bank of Syria and with the Foreign Trade Mission of the Soviet Union in London. BCCI was used by both the Syrian and Soviet governments in the period in which each was involved in supporting activities hostile to the United States. Obtaining the records of those financial transactions would be critical to understanding what the Soviet Union under Brezhnev, Chernenko, and Andropov was doing in the West; and might document the nature and extent of Syria's support for international terrorism.

7. BCCI's involvement with foreign intelligence agencies. A British source has told the Bank of England and British investigators that BCCI was used by numerous foreign intelligence agencies in the United Kingdom. The British intelligence service, the MI-5, has sealed documents from BCCI's records in the UK which could shed light on this allegation.

8. The financial dealings of BCCI directors with Charles Keating and several Keating affiliates and front-companies, including the possibility that BCCI related entities may have laundered funds for Keating to move them outside the United States. The Subcommittee found numerous connections among Keating and BCCI-related persons and entities, such as BCCI director Alfred Hartman; CenTrust chief David Paul and CenTrust itself; Capcom front-man Lawrence Romrell; BCCI shipping affiliate, the Gokal group and the Gokal family; and possibly Ghaith Pharaon. The ties between BCCI and Keating's financial empire require further investigation.

9. BCCI's financing of commodities and other business dealings of international criminal financier Marc Rich. Marc Rich remains the most important figure in the international commodities markets, and remains a fugitive from the United States following his indictment on securities fraud. BCCI lending to Rich in the 1980's amounted to tens of millions of dollars. Moreover, Rich's commodities firms were used by BCCI in connection with BCCI's involving in U.S. guarantee programs through the Department of Agriculture. The nature and extent of Rich's relationship with BCCI requires further investigation.

10. The nature, extent and meaning of the ownership of shares of other U.S. financial institutions by Middle Eastern political figures. Political figures and members of the ruling family of various Middle Eastern countries have very substantial investments in the United States, in some cases, owning substantial shares of major U.S. banks. Given BCCI's routine use of nominees from the Middle East, and the pervasive practice of using nominees within the Middle East, further investigation may be warranted of Middle Eastern ownership of domestic U.S. financial institutions.

11. The nature, extent, and meaning of real estate and financial investments in the United States by major shareholders of BCCI. BCCI's shareholders and front-men have made substantial investments in real estate throughout the United States, owning major office buildings in such key cities as New York and Washington, D.C. Given BCCI's pervasiveness criminality, and the role of these shareholders and front-men in the BCCI affair, a complete review of their holdings in the United States is warranted.

12. BCCI's collusion in Savings & Loan fraud in the U.S. The Subcommittee found ties between BCCI and two failed Savings and Loan institutions, CenTrust, which BCCI came to have a controlling interest in, and Caprock Savings and Loan in Texas, and as noted above, the involvement of BCCI figures with Charles Keating and his business empire. In each case, BCCI's involvement cost the U. S. taxpayers money. A comprehensive review of BCCI's account holders in the U.S. and globally might well reveal additional such cases. In addition, the issue of whether David Paul and CenTrust's political relationships were used by Paul on behalf of BCCI merits further investigation.

13. The sale of BCCI affiliate Banque de Commerce et de Placements (BCP) in Geneva, to the Cukorova Group of Turkey, which owned an entity involved in the BNL Iraqi arms sales, among others. Given BNL's links to BCCI, and Cukorova Groups' involvement through its subsidiary, Entrade, with BNL in the sales to Iraq, the swift sale of BCP to Cukorova just weeks after BCCI's closure -- prior to due diligence being conducted -- raises questions as to whether a prior relationship existed between BCCI and Cukorova, and Cukorova's intentions in making the purchase. Within the past year, Cukorova also applied to purchase a New York bank. Cukorova's actions pertaining to BCP require further investigation in Switzerland by Swiss authorities, and by the Federal Reserve New York.

14. BCCI's role in China. As noted in the chapter on BCCI's activities in foreign countries, BCCI had extensive activity in China, and the Chinese government allegedly lost $500 million when BCCI closed, mostly from government accounts. While there have been allegations that bribes and pay-offs were involved, these allegations require further investigation and detail to determine what actually happened, and who was involved.

15. The relationship between Capcom and BCCI, between Capcom and the intelligence community, and between Capcom's shareholders and U.S. telecommunications industry figures. The Subcommittee was able to interview people and review documents concerning Capcom that no other investigators had to date interviewed or reviewed. Much more needs to be done to understand what Capcom was doing in the United States, the United Kingdom, Egypt, Oman, and the Middle East, including whether the firm was, as has been alleged but not proven, used by the intelligence community to move funds for intelligence operations; and whether any person involved with Capcom was seeking secretly to acquire interests in the U.S. telecommunications industry.

16. The relationship of important BCCI figures and important intelligence figures to the collapse of the Hong Kong Deposit and Guaranty Bank and Tetra Finance (HK) in 1983. The circumstances surrounding the collapse of these two Hong Kong banks; the Hong Kong banks' practices of using nominees, front-companies, and back-to-back financial transactions; the Hong Banks' directors having included several important BCCI figures, including Ghanim Al Mazrui, and a close associate of then CIA director William Casey; all raise the question of

https://info.publicintelligence.net/The-BCCI-Affair.htm

whether there was a relationship between these two institutions and BCCI-Hong Kong, and whether the two Hong Kong institutions were used for domestic or foreign intelligence operations.

17. BCCI's activities in Atlanta and its acquisition of the National Bank of Georgia through First American. Although the Justice Department indictments of Clark Clifford and Robert Altman cover portions of how BCCI acquired National Bank of Georgia, other important allegations regarding the possible involvement of political figures in Georgia in BCCI's activities there remain outside the indictment. These allegations, as well as the underlying facts regarding BCCI's activities in Georgia, require further investigation.

18. The relationship between BCCI and the Banca Nazionale del Lavoro. BCCI and the Atlanta Branch of BNL had an extensive relationship in the United States, with the Atlanta Branch of BNL having a substantial number of accounts in BCCI's Miami offices. BNL was, according to federal indictments, a significant financial conduit for weapons to Iraq. BCCI also made loans to Iraq, although of a substantially smaller nature. Given the criminality of both institutions, and their interlocking activities, further investigation of the relationship could produce further understanding of Saddam Hussein's international network for acquiring weapons, and how Iraq evaded governmental restrictions on such weapons acquisitions.

19. The alleged relationship between the late CIA director William Casey and BCCI. As set forth in the chapter on intelligence, numerous trails lead from BCCI to Casey, and from Casey to BCCI, and the investigation has been unable to follow any of them to the end to determine whether there was indeed a relationship, and if there was, its nature and extent. If any such relationship existed, it could have a significant impact on the findings and conclusions concerning the CIA and BCCI's role in U.S. foreign policy and intelligence operations during the Casey era. The investigation's work detailing the ties of BCCI to the intelligence community generally also remains far from complete, and much about these ties remains obscure and in need of further investigation.

20. Money laundering by other major international banks. Numerous BCCI officials told the Subcommittee that BCCI's money laundering was no different from activities they observed at other international banks, and provided the names of a number of prominent U.S. and European banks which they alleged engaged in money laundering. There is no question that BCCI's laundering of drug money, while pervading the institution, constituted a small component of the total money laundering taking place in international banking. Further investigation to determine which international banks are soliciting and handling drug money should be undertaken.

## WITNESSES

(All witnesses testified in public session or in published depositions printed by the Subcommittee, except witnesses with *, who testified at hearing conducted within Subcommittee on Consumer and Regulatory Affairs of Senate Committee on Banking, Housing and Urban Affairs in coordination with this investigation, May 23, 1991.)

Robert A. Altman, former president, First American Bankshares and attorney for BCCI.

Fausto Alvarado, Member, Peruvian House of Deputies.

REENTERED AS EXHIBIT 3

Fernando Ramon Marin Amaya. Investigator retained by Attorney General of Guatemala to investigate BCCI's activities in Guatemala.

Amjad Awan, federal prisoner, former BCCI official who handled accounts of Panamanian General Manuel Noriega.

Sidney Bailey, Virginia Commissioner of Financial Institutions, Richmond, Virginia.*

Robert R. Bench, Partner, Price Waterhouse, Former Deputy Comptroller for International Relations and Financial Evaluation.

Gerald Beyer, Executive Vice President, Chicago Merchantile Exchange.

Akbar Bilgrami, federal prisoner, former head of Latin American and Caribbean Regional Office, BCCI, Miami.

Jack Blum. A private attorney at the firm of Novins, Lamont & Flug. Formerly special counsel to the Foreign Relations Committee for the investigation of the Subcommittee on Narcotics, Terrorism, and International Operations into Drugs, Law Enforcement, and Foreign Policy, 1987-1988.

Parker W. Borg. Deputy Assistant Secretary of the Bureau of International Narcotics Matters at the Department of State.

James Bruton, Acting Assistant Attorney General, Tax Divisin, Department of Justice.

A. Peter Burleigh, Coordinator for Counter-Terrorism at the Department of State.

Jorge Del Castillo, Member, Peruvian House of Delegates.

Pedro Cateriano, Member, Peruvian House of Deputies.

Nazir Chinoy, federal prisoner, former General Manager, BCCI Paris.

Clark M. Clifford, formerly, chairman of First American Bankshares and attorney for BCCI.

Andrea Cocoran, Director of Planning and Compliance, Commodities Futures Trading Commission.

Michael Crystal, Queen's Counsel, representing English court-appointed liquidators of BCCI.

George Davis, President and CEO, First American Bankshares, Washington, D.C.

James F. Dougherty, Attorney, Miami Florida. Representing Lloyds of London in litigation concerning alleged fraud involving BCCI.

Scott M. Early, General Counsel, Chicago Board of Trade.

Lourdes Flores, Member, Peruvian House of Deputies.

Robert Genzman, U.S. Attorney for the Middle District of Florida.

REENTERED AS EXHIBIT 3

Wendy Gramm, Commissioner, Commodities Futures Trading Commission.

John Heimann, former New York State Bank Supervisor and Comptroller of the Currency.*

Mark Jackowski, Assistant U.S. Attorney for the Middle District of Florida.

Nicholas de B. Katzenbach, Chairman, First American Bankshares, Washington, D.C.

Gregory Kehoe, First Assistant U.S. Attorney, Criminal Division, for the Middle District of Florida.

Richard Kerr, Acting Director, Central Intelligence Agency.

Alan J. Kreczko. Deputy Legal Advisor at the U.S. Department of State.

T. Bertram Lance, Former Director of the Office of Management and Budget.

Dexter Lehtinen, Former U.S. Attorney, Southern District of Miami, Florida.

Richard A. Lehrman, Esq., attorney, Miami, Florida. Represented Lloyds of London in case involving BCCI commmodities fraud.

Ricardo Llaque, Deputy Director of Exchange Operations, Federal Reserve Bank of Peru.

Paul Maloney, Deputy Assistant Attorney General for Criminal Division, U.S. Department of Justice, Washington, D.C.*

Virgil Mattingly, General Counsel, Board of Governors, Federal Reserve System.

Robert Mazur, Undercover Agent for Operation C-Chase, Drug Enforcement Administration.

Douglas P. Mulholland, Assistant Secretary for Intelligence and Research, Department of State.

Robert Morgenthau, District Attorney, County of New York, New York.*

Robert S. Mueller, III, Assistant Attorney General, Department of Justice, Washington, D.C.

Fernando Olivera, Member, Peruvian House of Deputies.

Laurence Pope, Associate Coordinator for Counter-Terrorism, Department of State.

William Von Raab. An attorney at the firm of William H. Bode Associates. Formerly Commissioner of the United States Customs Service, 1985-1989, oversaw Customs' handling of the sting operation that targeted BCCI, Operation C-Chase.

Masihur Rahman, Former Chief Financial Officer, BCCI London.

Mark Richard, Deputy Assistant Attorney General, Criminal Division, Department of Justice.

Edward M. Rogers, Jr., former White House aide.

Jesus Rodriguez, Member, Chamber of Deputies, Argentina.

Abdur Sakhia, former head, BCCI Miami.

Ahmed Al Sayegh, Director, Abu Dhabi National Oil Company.

Raul Alconada Sempe, former Secretary of Defense and former Secretary for Special Projects, Foreign Ministry, Argentina.

Grant Smith, Deputy Assistant Secretary, International Narcotics Matters, Department of State.

Brian Smouha, Court Appointed Fiduciary for BCCI Holdings (Luxembourg) SA and Bank of Credit and Commerce International, S.A., London, England.

John W. Stone, Chief of Enforcement, Federal Deposit Insurance Corporation.

William Taylor, Staff Director, Division of Banking Supervision and Regulation, Federal Reserve, Washington, D.C.

WRITS AND SUBPOENAS AUTHORIZED DURING INVESTIGATION

**WRITS AUTHORIZED (4)**

Amjad Awan

Akbar Bilgrami

Nazir Chinoy

Ian Howard

**SUBPOENAS AUTHORIZED (17)**

Sani Ahmed

BCCI

Roy Carlson

Kerry Fox

Grand Hotel, Washington DC

Abol Helmy

Kissinger Associates

Office of the Comptroller of the Currency

Price Waterhouse (US)

Price Waterhouse (UK)

First American

REENTERED AS EXHIBIT 3

First American Georgia

Robert Magness

David Paul

Robert Powell

Ed Rogers

Larry Romrell